IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| INVACARE CORPORATION, *et al.*,[1] | ) ) ) | Case No. 23 - 90068 (CML) |
| Debtors. | ) ) ) | (Jointly Administered) |

**DECLARATION OF JOHN C. DIDONATO IN SUPPORT
OF THE DEBTORS' EMERGENCY MOTION FOR ENTRY OF
INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS
TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE
DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS
AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE
EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION TO THE
EXISTING SECURED PARTIES, (V) MODIFYING THE AUTOMATIC STAY,
(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

I, John C. DiDonato, hereby declare under penalty of perjury:

1. I am a Managing Director of Huron Consulting Services LLC ("Huron"), a consulting firm that specializes in, among other things, bankruptcy and restructuring consulting, interim management, and financial and operational consulting to financially troubled companies. Huron has been engaged and assisting the above-captioned debtors and debtors in possession (collectively, the "Debtors")[2] since around September 2, 2022. Since that time, I, along with my colleagues, have worked at-length to familiarize ourselves with the Debtors' day-to-day

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Invacare Corporation (0965); Freedom Designs, Inc. (4857); and Adaptive Switch Laboratories, Inc. (6470). The corporate headquarters and the mailing address for the Debtors is 1 Invacare Way, Elyria, Ohio 44035.

[2] A detailed description of the Debtors and their business and the facts and circumstances supporting this Declaration and the Debtors' chapter 11 cases is set forth in greater detail in the *Declaration of Kathleen P. Leneghan, Senior Vice President and Chief Financial Officer of Invacare Corporation, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") filed contemporaneously herewith.

operations, business affairs, financial performance, books and records, and restructuring efforts. We also have been directly engaged in negotiating the DIP Budget.

2. Accordingly, I am generally familiar with the Debtors' day-to-day operations, business affairs, financial performance, books and records, and restructuring efforts. I submit this declaration (this "Declaration") in support of the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Status, (IV) Granting Adequate Protection to the Existing Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "DIP Motion").[3]

3. The statements in this Declaration are, except where specifically noted, based on (a) my personal knowledge, belief, or personal judgment based on more than 30 years' experience in the restructuring space; (b) information I have received from the Debtors' management team, my colleagues at Huron working directly with me or under my supervision, direction, or control, or other advisors of the Debtors; or (c) the Debtors' books and records maintained in the ordinary course of business. I am authorized by the Debtors to submit this Declaration and, if I were called upon to testify, I could and would testify competently to the facts set forth herein.

---

[3] Capitalized terms used but not defined herein have the meanings given to such terms in the DIP Motion or the Interim DIP Order, as applicable. Additional facts and details supporting the DIP Motion are set forth in the *Declaration of Vladimir Moshinsky in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Existing Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief*, (the "Moshinsky Declaration") filed contemporaneously herewith.

**Professional Background and Qualifications**

4. Huron provides high-quality financial advisory support services to clients in connection with both out-of-court and in-court chapter 11 restructurings, including advice related to (a) general corporate finance, (b) mergers, acquisitions, and divestitures, (c) corporate restructurings, (d) special committee assignments, and (e) capital raising. Huron's business restructuring professionals have served as advisors on restructuring, financial, capital markets, and investment banking matters in numerous cases. Investment banking and capital advisory services are provided through Huron's investment banking affiliate, Huron Transaction Advisory.

5. Huron has extensive experience in providing restructuring services in and out of chapter 11 proceedings and has an excellent reputation for the services it has rendered on behalf of debtors and creditors throughout the United States. Among many other examples, Huron has provided restructuring and turnaround advisory services to clients including: Vital Pharmaceutical Corporation, Rockdale Marcellus, LLC Town Sports International, LLC, Maines Paper & Food Service, Inc., NORDAM Corporation, Allen Systems Group, Revstone Industries, Blue Water Automotive Systems, Dura Automotive Systems, INTERMET Corporation, Anchor Manufacturing Company, Kazi Foods, and K&B Foods.

6. I have more than 30 years of experience in chapter 11 cases and in providing restructuring management services. In particular, I have been involved in numerous cases involving reorganizations, restructurings, capital raising, buy and sell side advisories, and merger integrations. I have provided guidance to numerous financially-challenged entities maneuvering through both out-of-court and court-supervised restructurings. During my career, I have served in excess of 100 debtors, functioning for many as a chief restructuring strategist. My expertise encompasses a wide range of industries, including retail, automotive original equipment and aftermarket suppliers, aerospace suppliers, engineering and construction, exploration and

production of oil and metals, equipment leasing, logistics, distribution, and transportation. I also possess extensive experience servicing debtors with complex capital structures. Moreover, throughout my crisis management career, I have raised replacement and exit financing in excess of $1.0 billion.

**Preliminary Statement**

7. Huron, acting as financial advisor to the Debtors, has rendered financial advisory services to the Debtors in connection with liability management initiatives since around September 2, 2022. By working with the Debtors to evaluate their financing and strategic alternatives, I have become knowledgeable about the Debtors' business, finances, operations, and systems, and evaluating the Debtors' liquidity and cash needs.

8. The Term DIP Facility contemplates an initial draw of up to $17.5 million of new money upon entry of the Interim DIP Order (the "Initial New Term Money Loan") and a second draw in an aggregate principal amount up to $17.5 million of new money within two (2) business days of entry of the Final DIP Order (the "Final New Term Money Loan"). The Term DIP Facility also contemplates a "roll-up" of up to $35 million outstanding prepetition term loans on a dollar-for-dollar basis with the Initial New Term Money Loan and Final New Term Money Loan.

9. The ABL DIP Facility contemplates a $17.4 million debtor-in-possession revolving credit facility provided by the ABL DIP Lenders, comprised of (a) $11.6 million in undrawn commitments, of which $3.4 million will be used to cash collateralize certain letters of credit, and (b) a full roll-up of $5.8 million in drawn revolving commitments under the Prepetition Revolving Credit Facility upon entry of the Interim DIP Order.

10. The Debtors' business will benefit materially from approval of the DIP Facilities. Access to fresh funding is critical to provide the liquidity needed to fund these chapter 11 cases, facilitate a transformational restructuring, and maximize the likelihood that the Debtors will be

able to execute their business plan. In the period leading up to these chapter 11 cases, the Debtors stretched their vendors as a result of a dearth of liquidity and had to pick and choose exactly where to spend their diminishing cash balances. Although the Debtors attempted to manage relationships with suppliers and vendors, near-term payment demands and the potential for supply chain disruptions suggested that this stopgap measure was not sustainable. The Debtors simply cannot afford to take on any additional uncertainty without putting their entire business enterprise at risk and need to secure additional financing to ensure the continued success of their enterprise. Accordingly, the DIP Facilities will signal to the Debtors' customers, vendors, and employees that operations can and will continue in the ordinary course during the reorganization process and help mitigate the uncertainty these chapter 11 cases may otherwise cause.

## The Debtors' Immediate Liquidity Needs

11. I am familiar with the DIP Facilities, the material terms thereof, and the Debtors' immediate liquidity needs. Based on my experience in the restructuring industry generally and my experience with the Debtors in particular, I believe that approval of the proposed DIP Facilities, and the use of cash collateral during the interim period, is essential for the continued operation of the Debtors' business and a prerequisite to a successful reorganization.

12. The Debtors face significant costs related to maintaining their operations and corporate enterprise and in respect of these chapter 11 cases including: (a) satisfying obligations to employees, customers, and suppliers, (b) satisfying expenses and billings related to the Debtors' manufacturing facilities, (c) paying expenses relating to the upkeep and maintenance of their manufacturing facilities, (d) making other payments that are essential for the continued management, operation, and preservation of the their business and assets, (e) paying adequate protection payments, and (f) funding the administrative cost of these chapter 11 cases. The ability to satisfy these expenses when due is essential to the continued operation of the Debtors' business

and the preservation of their assets during the pendency of these cases. Failure to obtain access to the DIP Facilities and the prepetition secured lenders' cash collateral (the "Cash Collateral") will result in immediate and irreparable harm to the Debtors and their stakeholders, and will diminish the value of the Debtors' estates.

13. Access to this liquidity is necessary to enable the Debtors to ultimately consummate their restructuring, all while funding the working capital needs of their business and maintaining favorable credit terms and relations with vendors, suppliers, customers, sureties, and other contract counterparties. Without the approval of the DIP Facilities and use of Cash Collateral, the Debtors will be unable to continue to operate in the ordinary course or preserve and maximize the value of their assets for the benefit of all parties in interest. Without debtor-in-possession financing, the Debtors' operations will come grinding to a halt. Accordingly, the Debtors' access to the proposed DIP Facilities, which has the support of lenders throughout their capital structure, will enable the Debtors to stabilize their cash flows, continue operating in the ordinary course, and fulfill their commitment to key stakeholders throughout the chapter 11 process.

14. As the Debtors expect to exhaust their liquidity in the immediate term, they require the DIP Facilities and other ongoing credit support to continue to fund their operations. Absent an expedient and fully funded chapter 11 case, a combination of insufficient funding and heightened business disruption would make it nearly impossible for the Debtors to execute their business plan, cause significant and permanent value destruction, and materially impair creditors' recoveries.

15. With a restructuring plan that contemplates a fully funded, pre-arranged agreement, the Debtors can progress these chapter 11 cases along a clear path through bankruptcy to maintain customer confidence. In the event the Debtors are not able to obtain the DIP Facilities, their ability

to restructure as a going concern will rapidly deteriorate, leading to a likely wind-down of their businesses and likely lead to significant value destruction for all creditors.

16. Furthermore, aside from the funding needs, the Debtors' failure to obtain access to the proposed DIP Facilities would likely subject the Debtors to a protracted and uncertain bankruptcy process and result in significantly reduced distributable value to their creditors and stakeholders. Such impacts include, among others: (a) extensive disruptions and delays on existing projects, (b) likely permanent damage to customer relationships, resulting in lost backlog, and (c) likely permanent damage to vendor relationships, increasing operating costs and requiring additional liquidity to convince vendors to perform. In addition, vendors who are not paid may be able to assert additional mechanics liens or other priming claims. In light of the foregoing, there would likely be other follow-on effects therefrom, which would increase the likelihood of a full wind-down of the Debtors' business that would generate a far lower recovery against a materially larger claims pool.

17. Importantly, obtaining access to the DIP Facilities will allow the Debtors to send a clear message to customers and their vendor base that the case is limited to a financial restructuring, with clarity of the outcome and a consensual path forward. Further, the Debtors intend to use a portion of the proceeds from the DIP Facilities to provide for significant first-day order relief to pay prepetition trade accounts payable claims held by their vendor base, including foreign vendors, vendors with potential lien rights, sole source vendors, regulatory approval vendors, and certain other vendors. Accordingly, the proposed DIP Facilities will provide much needed stabilization to the Debtor's vendor base.

**DIP Sizing**

18. In connection with the search for viable postpetition financing, Huron assisted the Debtors, their management, and their other advisors, including Miller Buckfire & Co., LLC ("MB&C"), in reviewing and refining projected cash forecasts for the Debtors' business during these chapter 11 cases. These forecasts take into account anticipated cash receipts and disbursements during the projected period and consider a number of factors, including, but not limited to, the effect of the chapter 11 filing on the operations of the business, fees and interest expenses associated with postpetition financing, professional fees, and customer and vendor obligations, as well as the operational performance of the business.

19. As of the Petition Date, substantially all of the Debtors' cash is encumbered, which means that the Debtors require immediate access to Cash Collateral to operate their enterprise and continue paying their debts as they come due. Prior to the Petition Date, the Debtors, in consultation with Huron, reviewed and analyzed their projected cash needs and prepared projections (as updated from time to time in accordance with the terms of the DIP Facilities, the "Budget") of postpetition cash needs for the Debtors' business in the initial 13 weeks of these chapter 11 cases, including detailed line items for categories of cash flows anticipated to be received or disbursed during this period, and, along with the longer term monthly forecasts, was utilized to determine the amount of postpetition financing required to administer these chapter 11 cases.

20. I believe that the Budget and projections provide an accurate reflection of the Debtors' likely funding requirements over the identified period, respectively, and are reasonable and appropriate under the circumstances. Based on my knowledge, extensive discussions with the Debtors' management team and advisors, and the Budget, I believe that the proposed DIP Facilities

give the Debtors sufficient liquidity to stabilize their operations and fund the administration of these chapter 11 cases as the Debtors seek to proceed expeditiously toward a value-maximizing resolution to these chapter 11 cases.  Further, the Debtors have an immediate need for debtor-in-possession financing to fund immediate liquidity needs and provide comfort to their employees, customer, and vendor constituencies.  Finally, based on extensive discussions with the Debtors' other advisors, I understand that the proposed DIP Facilities are on the most favorable terms available in light of the circumstances of these chapter 11 cases, the time available, and the current market for such financing.  Accordingly, in my professional opinion, the relief requested in the DIP Motion is necessary and appropriate to avoid immediate and irreparable harm to the Debtors' estates and should be approved by this Court.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated:  February 1, 2023

By: _/s/ John C. DiDonato_
Name: John C. DiDonato
Managing Director
Huron Consulting Services LLC

**Exhibit A**

**DIP Budget**

**Invacare Corporation et. al**
**Weekly Cash Flow - Debtor-entities**
*$ in thousands*

| $ in thousands | 1 FCST | 2 FCST | 3 FCST | 4 FCST | 5 FCST | 6 FCST | 7 FCST | 8 FCST | 9 FCST | 10 FCST | 11 FCST | 12 FCST | 13 FCST | 13-Wk Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 2/3/23 | 2/10/23 | 2/17/23 | 2/24/23 | 3/3/23 | 3/10/23 | 3/17/23 | 3/24/23 | 3/31/23 | 4/7/23 | 4/14/23 | 4/21/23 | 4/28/23 | |
| **Operating Receipts** | $ 4,245 | $ 4,065 | $ 4,065 | $ 2,956 | $ 3,535 | $ 3,182 | $ 3,182 | $ 3,182 | $ 3,182 | $ 4,558 | $ 4,558 | $ 4,558 | $ 4,558 | $ 49,828 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Post-petition Vendor Payments | (2,627) | (1,770) | (1,122) | (1,244) | (1,159) | (3,224) | (535) | (1,434) | (1,434) | (1,331) | (2,087) | (1,867) | (1,629) | (21,464) |
| Payroll Related | (1,043) | (373) | (2,344) | (373) | (1,005) | (322) | (2,317) | (322) | (2,237) | (480) | (2,300) | (313) | (2,020) | (15,449) |
| IT Services | (297) | (43) | (43) | (961) | (417) | (44) | (164) | (44) | (1,081) | (686) | (43) | (43) | (920) | (4,786) |
| Occupancy | (276) | (35) | (35) | (35) | (276) | (36) | (36) | (36) | (277) | (35) | (35) | (35) | (306) | (1,452) |
| Taxes | (123) | (180) | (25) | (55) | (52) | - | (25) | (55) | (234) | (30) | (30) | (30) | (30) | (869) |
| Insurance | (894) | - | - | - | (894) | - | - | - | - | (894) | - | - | - | (2,681) |
| Deposits | (500) | - | - | - | - | - | - | - | - | - | - | - | - | (500) |
| Non-Insider KERP | - | - | - | - | - | - | - | - | (656) | - | - | - | - | (656) |
| **Total Operating Disbursements** | $ (5,758) | $ (2,401) | $ (3,569) | $ (2,667) | $ (3,803) | $ (3,626) | $ (3,077) | $ (1,891) | $ (5,919) | $ (3,456) | $ (4,496) | $ (2,289) | $ (4,905) | $ (47,858) |
| **Operating Cash Flow** | $ (1,514) | $ 1,664 | $ 495 | $ 289 | $ (268) | $ (444) | $ 105 | $ 1,291 | $ (2,737) | $ 1,103 | $ 63 | $ 2,270 | $ (347) | $ 1,970 |
| **Non-Operating Receipts and Disbursements** | | | | | | | | | | | | | | |
| Critical Vendor Payments | (4,167) | (4,167) | (4,167) | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | - | - | - | - | - | (25,000) |
| Restructuring / Ordinary Course Professional Fees | (1,130) | (755) | (755) | (906) | (1,030) | (655) | (655) | (655) | (1,032) | (1,085) | (705) | (705) | (1,496) | (11,563) |
| Board Fees | - | - | - | - | - | - | - | - | - | - | (214) | - | - | (214) |
| Transformation Costs | (15) | (25) | (25) | (25) | (23) | (22) | (22) | (22) | (22) | (75) | (75) | (75) | (75) | (500) |
| Adequate Protection | (3,392) | (18) | (46) | (22) | - | - | - | - | - | (735) | - | - | - | (4,213) |
| Interest / Fees- DIP | (700) | - | - | - | (588) | - | - | - | - | (1,080) | - | - | (941) | (3,309) |
| **Total Non-Operating Receipts and Disbursements** | $ (9,404) | $ (4,964) | $ (4,993) | $ (3,453) | $ (4,141) | $ (3,177) | $ (3,177) | $ (3,177) | $ (1,054) | $ (2,975) | $ (994) | $ (780) | $ (2,511) | $ (44,798) |
| **Intercompany Transactions** | | | | | | | | | | | | | | |
| Intercompany Netting | - | - | 623 | - | - | - | 281 | - | - | - | 102 | - | 1,282 | 2,289 |
| Intercompany Loans | 158 | - | - | - | 158 | - | - | - | 158 | - | - | - | - | 474 |
| Corporate Reimbursement (EMEA) | - | - | - | - | 1,092 | - | - | - | 581 | - | - | - | 798 | 2,471 |
| Funding between NA Debtor/Non-debtor Entities (US & IX & Medbloc) | (816) | (773) | (150) | (829) | (637) | (780) | 1,336 | (764) | (640) | (758) | 1,377 | (723) | (448) | (4,607) |
| **Net Intercompany Transactions** | $ (658) | $ (773) | $ 473 | $ (829) | $ 613 | $ (780) | $ 1,617 | $ (764) | $ 99 | $ (758) | $ 1,479 | $ (723) | $ 1,631 | $ 627 |
| **Net Cash Flow** | $ (11,576) | $ (4,074) | $ (4,024) | $ (3,992) | $ (3,796) | $ (4,401) | $ (1,455) | $ (2,650) | $ (3,692) | $ (2,631) | $ 548 | $ 766 | $ (1,227) | $ (42,202) |
| Beginning ABL/DIP ABL Balance | $ 5,838 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 5,838 |
| Draws (Paydown) | 8,171 | - | - | - | - | - | - | - | - | - | - | - | - | 8,171 |
| **Ending ABL Balance** | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 |
| Beginning Highbridge DDTL Balance | $ 90,500 | $ 73,000 | $ 73,000 | $ 73,000 | $ 73,000 | $ 55,500 | $ 55,500 | $ 55,500 | $ 55,500 | $ 55,500 | $ 55,500 | $ 55,500 | $ 55,500 | $ 90,500 |
| Draws (Paydown) | (17,500) | - | - | - | (17,500) | - | - | - | - | - | - | - | - | (35,000) |
| **Ending Highbridge DDTL Balance** | $ 73,000 | $ 73,000 | $ 73,000 | $ 73,000 | $ 55,500 | $ 55,500 | $ 55,500 | $ 55,500 | $ 55,500 | $ 55,500 | $ 55,500 | $ 55,500 | $ 55,500 | $ 55,500 |
| Beginning DIP Balance | $ - | $ 35,000 | $ 35,000 | $ 35,000 | $ 35,000 | $ 70,000 | $ 70,000 | $ 70,000 | $ 70,000 | $ 70,000 | $ 70,000 | $ 70,000 | $ 70,000 | $ - |
| Draws (Paydown) | 17,500 | | | | 17,500 | | | | | | | | | 35,000 |
| Rollup Draw | 17,500 | | | | 17,500 | | | | | | | | | 35,000 |
| **Ending DIP Balance** | $ 35,000 | $ 35,000 | $ 35,000 | $ 35,000 | $ 70,000 | $ 70,000 | $ 70,000 | $ 70,000 | $ 70,000 | $ 70,000 | $ 70,000 | $ 70,000 | $ 70,000 | $ 70,000 |
| Beginning Book Cash Balance | 368 | 14,293 | 10,219 | 6,196 | 2,203 | 15,907 | 11,506 | 10,052 | 7,402 | 3,710 | 1,079 | 1,627 | 2,394 | 368 |
| Net Cash Flow | (11,576) | (4,074) | (4,024) | (3,992) | (3,796) | (4,401) | (1,455) | (2,650) | (3,692) | (2,631) | 548 | 766 | (1,227) | (42,202) |
| ABL Draws (Paydowns) | 8,000 | - | - | - | - | - | - | - | - | - | - | - | - | 8,000 |
| DIP Draws (Paydown) | 17,500 | - | - | - | 17,500 | - | - | - | - | - | - | - | - | 35,000 |
| **Ending Book Cash Balance** | $ 14,293 | $ 10,219 | $ 6,196 | $ 2,203 | $ 15,907 | $ 11,506 | $ 10,052 | $ 7,402 | $ 3,710 | $ 1,079 | $ 1,627 | $ 2,394 | $ 1,166 | $ 1,166 |