## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | ) | Chapter 11 |
| INVACARE CORPORATION, *et al.*,[1] | ) | Case No. 23-90068 (CML) |
| Debtors. | ) | (Jointly Administered) |
| | ) | (Emergency Hearing Requested) |

### DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

> **Emergency relief has been requested. Relief is requested not later than 1:00 p.m. on February 1, 2023.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on February 1, 2023 at 1:00 p.m. in Courtroom 401, 4th floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's home page. The meeting code is "JudgeLopez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Lopez's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Invacare Corporation (0965); Freedom Designs, Inc. (4857); and Adaptive Switch Laboratories, Inc. (6470). The corporate headquarters and the mailing address for the Debtors is 1 Invacare Way, Elyria, Ohio 44035.

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2] respectfully state the following in support of this motion:

**Relief Requested**

1. The Debtors seek entry of an interim order, substantially in the form attached hereto (the "Interim Order") and a final order (the "Final Order," and together with the Interim Order, the "DIP Orders"):

| DIP Facility Term | Relief Requested |
|---|---|
| **DIP Facilities** | Authorizing the Debtor DIP Loan Parties to obtain postpetition financing (the "DIP Financing") pursuant to the terms and conditions set forth in that certain term loan credit agreement, attached as **Exhibit A** to the Interim Order (the "Term DIP Credit Agreement") and that certain revolving credit agreement attached as **Exhibit B** to the Interim Order (the "ABL DIP Credit Agreement"), consisting of: |
| | (a) superpriority senior secured postpetition financing in the form of a term loan financing facility (the "Term DIP Facility") consisting of (i) up to $35 million of new money term loans (the "DIP New Money Term Loans"), of which $17.5 million will be available upon entry of the Interim Order and $17.5 million no later than two (2) business days following entry of the Final Order (the "Final Funding Date"); and (ii) the roll-up of up to $35 million of term loans outstanding under the Prepetition Term Loan Credit Facility (such roll-up loans, the "DIP Roll-Up Term Loans," and together with the DIP New Money Term Loans, the "DIP Term Loans"), of which $17.5 million will roll into the Term DIP Facility upon entry of the Interim Order and the remaining $17.5 million will roll into the Term DIP Facility within two (2) business days of entry of the Final Order; and |
| | (b) superpriority senior secured postpetition financing in the form of a $17.4 million revolving credit facility (the "ABL DIP Facility" and together with the Term DIP Facility, the "DIP Facilities"), comprised of (i) $11.6 million in undrawn commitments which will be available immediately upon entry of the Interim Order, of which $3.4 million will be used to cash collateralize certain letters of credit; and (ii) a $5.8 million roll-up of drawn commitments under the Prepetition Revolving Credit Facility upon entry of the Interim Order (the "ABL Roll-Up") (the loans in respect of the commitments of the lenders under the DIP Facilities, the "DIP Loans"). |
| **DIP Documents** | Authorizing the Debtors to enter into and deliver the Term DIP Credit Agreement and ABL DIP Credit Agreement, substantially in the forms annexed as **Exhibit A** and **Exhibit B**, respectively, to the Interim Order attached hereto and certain |

---

[2]   A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this declaration and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Kathleen P. Leneghan, Senior Vice President and Chief Financial Officer of Invacare Corporation, in Support of the Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on January 31, 2023 (the "Petition Date").

|  | ancillary documentation (together with the Term DIP Credit Agreement and ABL DIP Credit Agreement, the "<u>DIP Documents</u>") as may be necessary, appropriate or desirable in connection with entry into the DIP Facilities. All of the Debtors' secured obligations arising under the Term DIP Credit Agreement, together with the DIP Documents related thereto (the "<u>Term DIP Obligations</u>") and under the ABL DIP Credit Agreement, together with DIP Documents related thereto (the "<u>ABL DIP Obligations</u>," together with the Term DIP Obligations, the "<u>DIP Obligations</u>"). |
|---|---|
| **Cash Collateral** | Authorizing the Debtors to continue to use cash collateral (the "<u>Cash Collateral</u>"), as defined by section 363(a) of the Bankruptcy Code, subject to the restrictions set forth in the DIP Documents and the DIP Orders, and the granting of Adequate Protection to the Prepetition Secured Parties (as defined below). |
| **Security and Priority** | Authorizing the Debtors to grant, subject to the Carve Out, fully perfect priority security interests and liens to each of the Term DIP Agents (as defined below), for its own benefit and for the benefit of the Term DIP Secured Parties (as defined below) (the foregoing, collectively, the "<u>Term DIP Liens</u>" and the collateral securing such Term DIP Liens, the "<u>Term DIP Collateral</u>"), including but not limited to: |

> (a) perfected, first priority (subject to the terms of the ABL Intercreditor Agreement (as defined herein) and the priorities reflected herein and in the Final Order) senior security interests in and liens on all of the Unencumbered Property (as defined in the Interim Order) of the Debtor Term DIP Loan Parties (as defined herein) other than the Avoidance Actions (but, for the avoidance of doubt, subject to the Carve-Out and effective only upon entry of the Final Order, such Unencumbered Property shall include Avoidance Proceeds (as defined in the Interim Order)); *provided*, that, and for the avoidance of doubt, the Term DIP Liens that attach to Unencumbered Property that is not of the type of property constituting CF Debt Priority Collateral (as such term is defined in the ABL Intercreditor Agreement) shall be junior and subordinate to the ABL DIP Liens on such Unencumbered Property not of the type of property constituting CF Debt Priority Collateral (as such term is defined in the ABL Intercreditor Agreement);

> (b) perfected, first-priority priming security interests in and liens on all of the CF Debt Priority Collateral and Non-Intercreditor Collateral (each as defined in the ABL Intercreditor Agreement) of the Debtor Term DIP Loan Parties (the "<u>Term DIP Non-ABL Collateral Priming Liens</u>"), which shall prime the interests of the Prepetition Secured Parties on the CF Debt Priority Collateral and Non-Intercreditor Collateral (each as defined in the ABL Intercreditor Agreement), including any liens granted as adequate protection to the Prepetition Secured Parties, but subject and junior to the Carve-Out;

> (c) perfected, junior priority security interests in and liens on all of the Revolving Credit Priority Collateral (as defined in the ABL Intercreditor Agreement) of the Debtor Term DIP Loan Parties (the "<u>Term DIP ABL Collateral Liens</u>") which shall be subject to and junior to the Carve-Out in all respects and shall, with respect to the Revolving Priority Collateral (as defined in the ABL Intercreditor Agreement), be (1) junior to the ABL DIP Liens (as defined below), (2) junior to the Revolving Adequate Protection Liens, if applicable, (3) junior to the Prepetition Liens of the Prepetition Revolving Secured

Parties, (4) senior in all respects to the Term Adequate Protection Liens (as defined below), and (5) senior in all respects to the Prepetition Liens (as defined in the Interim Order) of the Prepetition Term Loan Secured Parties and the Prepetition Secured Notes Parties; and

(d)   perfected, junior priority security interest and liens on all tangible and intangible property of each Debtor Term DIP Loan Party that is subject to a Prepetition Permitted Prior Lien (as defined in the Interim Order), which (x) shall be junior and subordinate to such Prepetition Permitted Prior Liens and the Carve Out and (y) with respect to (1) CF Debt Priority Collateral (as defined in the ABL Intercreditor Agreement), shall be senior to the ABL DIP Liens, the Adequate Protection Liens, and the Prepetition Liens of the Prepetition Revolving Secured Parties, if applicable, and (2) with respect to Revolving Credit Priority Collateral (as defined in the ABL Intercreditor Agreement), shall be junior to the ABL DIP Liens and the Revolving Adequate Protection Liens and Prepetition Liens of the Prepetition Revolving Secured Parties under the Prepetition Revolving Credit Facility, if applicable, and senior to the Term Adequate Protection Liens.

Authorizing the Debtors to grant, subject to the Carve-Out, fully perfect priority security interests and liens to the ABL DIP Agent (as defined below), for its own benefit and for the benefit of the ABL DIP Secured Parties (as defined below) (the foregoing, collectively, the "ABL DIP Liens" and, the collateral securing such ABL DIP Liens, the "ABL DIP Collateral"; and, the ABL DIP Liens together with the Term DIP Liens, the "DIP Liens" and the property subject to the DIP Liens, collectively, the "DIP Collateral"), including but not limited to:

(e)   perfected, first-priority (subject to the terms of the ABL Intercreditor Agreement and the priorities reflected herein and in the Final Order) senior security interest and lien upon all Unencumbered Property in each case other than the Avoidance Actions (but, for the avoidance of doubt, subject to entry of the Final Order, "Unencumbered Property" shall include Avoidance Proceeds); *provided* that, and for avoidance of doubt, the ABL DIP Liens that attach to Unencumbered Property that is of the type of property constituting CF Debt Priority Collateral (as such term is defined in the ABL Intercreditor Agreement) shall be junior and subordinate to the Term DIP Liens on such Unencumbered Property of the type of property constituting CF Debt Priority Collateral (as such term is defined in the ABL Intercreditor Agreement);

(f)   perfected, first priority priming security interests in and liens on all of the Revolving Credit Priority Collateral (as defined in the ABL Intercreditor Agreement) of the Debtor ABL DIP Loan Parties (the "ABL DIP ABL Collateral Priming Liens"), which ABL DIP ABL Collateral Priming Liens shall prime in all respects the interests of the Prepetition Secured Parties on the Revolving Credit Priority Collateral (as defined in the ABL Intercreditor Agreement) arising from the current and future liens of the Prepetition Secured Parties (including, without limitation, the Adequate Protection Liens granted to the Prepetition Secured Parties);

(g)   perfected, junior priority security interests in and liens on all of the CF Debt Priority Collateral (as defined in the ABL Intercreditor Agreement) of the Debtor ABL DIP Loan Parties which shall, with respect to the CF Debt Priority Collateral (as defined in the ABL

4

Intercreditor Agreement) of the Debtor ABL DIP Loan Parties (the "ABL DIP Non-ABL Collateral Liens"), which ABL DIP Non-ABL Collateral Liens shall, with respect to the CF Debt Priority Collateral (as defined in the ABL Intercreditor Agreement), be (1) junior only to the Term DIP Liens, (2) junior the Term Adequate Protection Liens, (3) junior to the Prepetition Liens of the Prepetition Term Secured Parties and the Prepetition Secured Notes Parties, (4) senior to the Revolving Adequate Protection Liens and (5) senior in all respects to the Prepetition Liens of the Prepetition Revolving Secured Parties; and

(h) perfected, junior priority security interest in and lien upon all tangible and intangible prepetition and postpetition property of each Debtor ABL DIP Loan Party that is subject to a Prepetition Permitted Prior Lien (other than the Prepetition Liens) (i) in existence and properly perfected immediately prior to the Petition Date or (ii) in existence immediately prior to the Petition Date that is perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code, which (x) shall be junior and subordinate to such Prepetition Permitted Prior Liens and (y) with respect to (1) Revolving Credit Priority Collateral (as such term is defined in the ABL Intercreditor Agreement), shall be senior to the Term DIP Liens, the Adequate Protection Liens, and the Prepetition Liens of the Prepetition Secured Parties, and (2) with respect to CF Debt Priority Collateral (as such term is defined in the ABL Intercreditor Agreement), shall be junior to the Term DIP Liens, the Term Adequate Protection Liens and the Prepetition Liens of the Prepetition Term Secured Parties and the Prepetition Secured Notes Parties and senior with respect to the Revolving Adequate Protection Liens and the Prepetition Liens of the Prepetition Revolving Secured Parties.

Authorizing the Debtors to grant, subject to the Carve Out in respect of the Term DIP Obligations, joint and several superpriority administrative expense claim status in these chapter 11 cases to all DIP Obligations having priority over any and all other administrative expenses, Adequate Protection Claims, and all other priority claims (collectively, the "DIP Super-Priority Claims").

| **Adequate Protection** | Authorizing the Debtors to grant adequate protection to the holders and lenders, and their respective agents[3], as applicable, under the Prepetition Term Loan Credit Agreement (such parties, the "Prepetition Term Loan Secured Parties"), the Prepetition Revolving Credit Agreement (such parties, the "Prepetition Revolving Secured Parties"), and the Prepetition Secured Notes Indentures (such parties, the "Prepetition Secured Notes Parties," and collectively with the Prepetition Term Loan Secured Parties and the Prepetition Revolving Secured Parties, the "Prepetition Secured Parties") and all related security agreements and other ancillary documentation (respectively, the "Prepetition Term Loan Documents," the "Prepetition Revolving Credit Documents," and the "Prepetition Notes Documents" and, collectively, the "Prepetition Credit Documents"), all of the Debtors' secured obligations arising thereunder (respectively, the "Prepetition Term Loan Obligations," the "Prepetition Revolving Obligations,"  and the "Prepetition Secured Notes Obligations" and collectively, the "Prepetition Obligations"): |
|---|---|

---

[3] "Prepetition Agents" shall mean, collectively, the Prepetition Term Loan Collateral Agent, the Prepetition Revolving Agent, and the Prepetition Secured Notes Agents (each as defined herein).

(a) Each of (x) the Prepetition Term Loan Collateral Agent, for itself and for the benefit of the other Prepetition Term Loan Secured Parties, (y) the Prepetition Secured Notes Agents, for itself and for the benefits of the other Prepetition Secured Notes Parties, and (z) the Prepetition Revolving Agent, for itself and for the benefit of the other Prepetition Revolving Secured Parties, are

(i) granted valid, enforceable, unavoidable and fully perfected replacement liens on and security interests in the DIP Collateral (the "Adequate Protection Liens"), in the case of the Prepetition Term Loan Secured Parties and Prepetition Secured Notes Parties, subject and subordinate only to (A) the Carve Out, (B) the DIP Liens, and (C) the priorities set forth in Exhibit 3 of the Interim Order and in the case of the Prepetition Revolving Secured Parties, subject and subordinate only to (A) the DIP Liens and (B) the priorities set forth in Exhibit 3 of the Interim Order;

(ii) to the extent of any postpetition diminution in the value of the respective Prepetition Secured Parties' collateral, allowed superpriority administrative expense claims in the amount equal to such diminution in value in the chapter 11 cases having priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "507(b) Claims"), in each case subject only to (A) the Carve Out and (B) the DIP Super-Priority Claims;

(iii) granted, for the benefit of the Prepetition Secured Parties, as applicable, current cash payments of all reasonable and documented prepetition and postpetition fees and expenses, including, but not limited to, the reasonable and documented fees and out-of-pocket expenses of primary, special and local counsel (in each applicable jurisdiction) and financial advisors to the applicable Prepetition Agents and Prepetition Secured Parties, including without limitation (i) Davis Polk & Wardwell LLP, Ducera Partners, Porter Hedges LLP, Baker & McKenzie LLP and any other advisors retained by or on behalf of the Prepetition Term Loan Lenders or the holders of Prepetition Secured Notes (ii) Blank Rome LLP, B. Riley Advisory Services, and any other advisors retained by or on behalf of the Prepetition Revolving Secured Parties; and (iii) McDermott, Will & Emery LLP and Shipman & Goodwin LLP as counsel to the Prepetition Term Loan Agents and Prepetition Secured Notes Agents (the "Adequate Protection Fees and Expenses");

(iv) granted, (A) payment of all amounts in connection with the interest payment that was due under the Prepetition Term Loan Credit Agreement on January 26, 2023 to the Prepetition Term Loan Secured Parties on the closing date of the DIP Financing, and (B) current cash payments, subject to the Carve Out (other than with respect to the Prepetition Revolving Obligations and Prepetition Revolving Secured Parties), in the amount of interest on the outstanding principal at the non-default rate under the Prepetition Revolving  Loan Documents, Prepetition Term Loan Documents, and the Prepetition Notes Documents, as applicable;

(v) entitled to, as appliable, performance of those certain Term/Notes Adequate Protection Milestones and Revolving Adequate Protection Milestones (each as defined in the Interim Order);

| | |
|---|---|
| | (vi) entitled to performance of certain financial covenants and other reporting obligations as described in the DIP Order, the Term DIP Credit Agreement and the ABL DIP Credit Agreement, as applicable; and |
| | (vii) customary ongoing reporting (subsections (i)-(vii), (collectively, the "<u>Adequate Protection Obligations</u>")). |
| **DIP Fees** | Authorizing the Debtors to pay on a final and irrevocable basis, the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become earned, due and payable, including, without limitation, the Administrative Agent Fee, the Collateral Agent Fee, the Upfront Fee, the Unused Commitment Fee, the Closing Fee, and the Float Fee (each as defined below). |
| **Automatic Stay** | Modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and conditions of the DIP Orders. |
| **Final Hearing** | Scheduling a final hearing to consider entry of the Final Order. |

2.     In support of this motion, the Debtors respectfully submit the *Declaration of Vladimir Moshinsky in Support of the Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Existing Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief,* attached hereto as **Exhibit A** (the "<u>Moshinsky Declaration</u>"), the *Declaration of John DiDonato in Support of the Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Existing Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief,* attached hereto as **Exhibit B** (the "<u>DiDonato Declaration</u>" and, together with the Moshinsky Declaration, the "<u>DIP Declarations</u>"), and the First Day Declaration.

**Jurisdiction and Venue**

3.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The bases for the relief requested herein are sections 105, 361, 362, 363(b), 363(c)(2), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506(c), and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, rules 2002-1, 4001(1)(b), 4002-1(i) and 9013-1 of the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Local Rules"), and the *Procedures for Complex Cases in the Southern District of Texas* (the "Complex Case Procedures").

**Preliminary Statement**

6.      The Debtors, together with their non-Debtor affiliates, are a leading manufacturer and distributor of medical equipment utilized in non-acute care settings aimed at providing clinically complex medical devices and solutions for congenital (*e.g.*, cerebral palsy, muscular dystrophy, spina bifida), acquired (*e.g.*, stroke, spinal cord injury, traumatic brain injury, post-acute recovery, pressure ulcers), and degenerative (*e.g.*, ALS, multiple sclerosis, elderly, bariatric) diseases.  The Debtors manufacture and sell various medical products through e-commerce

channels, residential care facilities, medical health distributors, and government health services predominately in North America, Europe, and Asia Pacific.

7.      The Debtors, like many businesses, faced significant issues as a result of the global COVID-19 pandemic—such as interruptions in the production and supply of the Debtors' products due to supply chain disruptions and the ongoing shipping and logistics crisis that has crippled the global economy.  As a result, costs to manufacture the Debtors' products significantly increased and access to certain product components decreased, which in turn negatively impacted the Debtors' ability to fulfill customer orders and placed a significant strain on its business.  In the months leading up to the Petition Date, the Debtors' North American liquidity position continued to worsen.  Accordingly, on December 23, 2022, the Debtors entered into an amendment of the Prepetition Term Loan Credit Agreement (as defined herein) whereby Highbridge Capital Management LLC ("Highbridge") agreed to provide the Debtors with an additional $5.5 million of term loans pursuant to the Prepetition Term Loan Credit Agreement (the "Bridge Financing").

8.      Although the Debtors have worked tirelessly to improve profitability and free cash flow by narrowing their product portfolio, optimizing manufacturing efficiency, accessing the Bridge Financing, and taking other organization transformations to reduce overall costs, the Debtors, with the assistance of their advisors, determined that the best path forward to maximize value is a comprehensive deleveraging transaction pursuant to these chapter 11 cases.  In order to do so, the Debtors required a substantial liquidity injection at the outset of these chapter 11 cases to stabilize operations and fund their restructuring efforts.  Accordingly, the Debtors, with the assistance of their advisors, conducted a fulsome and competitive marketing process in the weeks leading up to the Petition Date to explore financing options.

9.      In parallel, after securing necessary liquidity under the Bridge Financing, the Debtors engaged in robust negotiations regarding a comprehensive restructuring with their major creditor constituencies, including Highbridge, the Prepetition Revolving Lenders (as defined herein), and an ad hoc group of holders of the Prepetition Unsecured Notes (as defined herein). These negotiations were ultimately successful with the agreed upon terms memorialized in a restructuring support agreement (the "Restructuring Support Agreement") executed on January 31, 2023 by Highbridge (as  Prepetition Term Loan Lender and holder of the Prepetition Secured Notes), the Prepetition Revolving Lenders, and the Ad Hoc Group of Noteholders (which consists of holders of over 68% in aggregate outstanding principal amount of the Prepetition Unsecured Notes).

10.      To that end, as part of the Restructuring Support Agreement, the Debtors negotiated the terms of the consensual use of Cash Collateral and the DIP Facilities that provide for (x) a $70 million debtor-in-possession term loan financing facility provided by the Term DIP Lenders, comprised of new money term loans in an aggregate principal amount of up to $35 million (the "DIP New Money Term Loans") and the conversion of up to $35 million of term loans outstanding under the Prepetition Term Loan Credit Facility and (y) a $17.4 million debtor-in-possession revolving credit facility provided by the ABL DIP Lenders, comprised of $11.6 million in undrawn commitments and a $5.8 million roll-up and conversion of drawn revolving commitments under the Prepetition Revolving Credit Facility upon entry of the Interim Order.  The Term DIP Facility contemplates an initial draw of $17.5 million in DIP New Money Term Loans upon entry of the Interim Order (the "Initial New Money Term Loan") and a second draw in an aggregate principal amount not to exceed $17.5 million in DIP Term Money Term Loans upon entry of the Final Order (the "Final New Money Term Loan").  The DIP Roll-Up Term Loans are contemplated to be rolled

up on a dollar-for-dollar basis with the Initial New Money Term Loan and Final New Money Term Loan.   The ABL Roll-Up, which comprises the remaining drawn commitments under the Prepetition Revolving Credit Facility following a partial paydown of the Prepetition Revolving Credit Facility, is contemplated to be rolled up upon entry of the Interim Order in exchange for $11.6 million of undrawn commitments available to be drawn under the ABL DIP Facility immediately upon entry of the Interim Order.   Of the $11.6 million in undrawn commitments provided under the ABL DIP Facility, the ABL DIP Facility also contemplates the cash collateralization of certain letters of credit, with the remaining $8.2 million in undrawn commitments to be available to the Debtors to use in accordance with the Approved Budget (as defined herein).

11.     The relief requested by this motion is necessary as the Debtors require immediate access to the DIP Facilities and Cash Collateral to continue operating in the ordinary course of business during the early stages of these chapter 11 cases.  Absent access to the DIP Facilities and Cash Collateral, the Debtors would be unable to operate their business, pay employees, vendors, and other suppliers, or administer these chapter 11 cases, and their ability to successfully reorganize would be jeopardized.  Importantly, the DIP Facilities are the best—and only—viable postpetition financing options available to the Debtors and do not seek to prime any creditors without their consent.   The DIP Facilities send a strong signal to the Debtors' employees, customers, and trade partners regarding the confidence the DIP Lenders have in the value of the Debtors' business and ensure there is adequate funding to execute on the Debtors' restructuring transactions embodied in the Restructuring Support Agreement.

12.     As described below and in the supporting DIP Declarations, the Debtors' proposed DIP Facilities are the product of arm's-length negotiations with their existing lenders and of a

robust prepetition marketing process, as described in the Moshinsky Declaration.  The Debtors are not aware of any third party who is willing to provide postpetition financing to the Debtors on more favorable terms under the circumstances.  In short, the DIP Facilities are a key component of the Restructuring Support Agreement and the transactions contemplated thereby, and will provide the Debtors with the liquidity necessary to continue to operate their business and fund the administrative costs of these chapter 11 cases.

13.     For these reasons, and for the reasons set forth below, in the DIP Declarations and the First Day Declaration, the Debtors believe that entering into the DIP Credit Agreements to provide access to the DIP Facilities and the use of Cash Collateral will maximize the value of the Debtors' estates and is a sound exercise of the Debtors' business judgment.  Accordingly, the Debtors respectfully request that the Court enter the DIP Orders.

**Concise Statement Pursuant to Bankruptcy Rule 4001(b)
and the United States Bankruptcy Court for the Southern District of Texas Procedures for
Complex Chapter 11 Cases**

14.     The following chart contains a summary of the material terms of the proposed DIP Facilities, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and the Complex Case Procedures.[4]

| Bankruptcy Rule | Summary of Material Terms |
| --- | --- |
| **Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | **Term DIP Facility**: Invacare Corporation ("<u>Invacare</u>" or the "<u>Term DIP Borrower</u>").<br><br>*See* Term DIP Credit Agreement, Preamble.<br><br>**ABL DIP Facility**: Invacare Corporation, Freedom Designs, Inc., and Adaptive Switch Laboratories, Inc. (the "<u>ABL DIP Borrowers</u>" or the "<u>Debtor ABL DIP Loan Parties</u>" and together with the Term DIP Borrower, the "<u>Borrowers</u>"). |

---

4   The summaries contained in this motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Credit Documents or the Interim Order, as applicable.

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | *See* ABL DIP Credit Agreement, Preamble. |
| **Guarantors**<br><br>Bankruptcy Rule 4001(c)(1)(B) | **Term DIP Facility**: Certain of the Debtors (the "Debtor Term DIP Guarantors" and, together with the Term DIP Borrower, the "Debtor Term DIP Loan Parties") and non-Debtors (the "Non-Debtor Term DIP Loan Parties") and together with the Debtor Term DIP Guarantors, the "Term DIP Guarantors" and together with the Term DIP Borrower, the "Term DIP Loan Parties") identified in the Term DIP Credit Agreement.<br><br>**ABL DIP Facility**: Certain non-Debtors (the "ABL DIP Guarantors" and together with the ABL DIP Borrowers, the "ABL DIP Loan Parties") identified in the ABL DIP Credit Agreement. |
| **DIP Lenders**<br><br>Bankruptcy Rule 4001(c)(1)(B) | **Term DIP Facility**: The several banks and other financial institutions or entities from time-to-time party to the Term DIP Facility (in such capacities, the "Term DIP Lenders").<br><br>**ABL DIP Facility**: The several banks and other financial institutions or entities from time-to-time party to the ABL DIP Facility (in such capacities, the "ABL DIP Lenders" and together with the Term DIP Lenders, the "DIP Lenders"). |
| **DIP Agents**<br><br>Bankruptcy Rule 4001(c)(1)(B) | **Agent for the Term DIP Facility**: Cantor Fitzgerald Securities as administrative agent (the "Term DIP Administrative Agent") and GLAS Trust Corporation Limited as collateral agent (the "Term DIP Collateral Agent," and, together with the Term DIP Administrative Agent and their respective successors and permitted assigns, the "Term DIP Agents" and, together with the Term DIP Lenders, the "Term DIP Secured Parties").<br><br>**Agent for the ABL DIP Facility**: PNC Bank, National Association (in such capacity, together with its successors and permitted assigns, the "ABL DIP Agent" and, together with the Term DIP Agents, the "DIP Agents"; the ABL DIP Agent together with the ABL DIP Lenders, the "ABL DIP Secured Parties" and, the ABL DIP Secured Parties together with the Term DIP Secured Parties, the "DIP Secured Parties"). |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | **Term DIP Facility**: The maturity date with respect to the Term DIP Facility (the "Term DIP Maturity Date") shall be the earliest of:<br><br>(a) May 31, 2023;<br><br>(b) the date of termination pursuant to an Event of Default (as defined in the Term DIP Credit Agreement);<br><br>(c) the date of which all or substantially all assets of the Term DIP Borrower are sold or otherwise disposed of pursuant to Section 363 of the Bankruptcy Code;<br><br>(d) the effective date of any chapter 11 plan for the Term DIP Borrower and any other Debtor (the "Effective Date"); and<br><br>(e) the date that is thirty (30) calendar days after the Petition Date (or such later date as acceptable to the Term DIP Lenders holding DIP Term Loans or commitments under the Term DIP Facility representing more than 50% of the aggregate outstanding DIP Term Loans and commitments under the Term DIP Facility) if the Final Order has not been entered prior to the expiration of such period.<br><br>*See* Term DIP Credit Agreement, Art. 1, § 1, "Termination Date".<br><br>**ABL DIP Facility**: The maturity date with respect to the ABL DIP Facility (the "DIP ABL Maturity Date") shall be the earliest of<br><br>(f) May 1, 2023, which, if the ABL DIP Obligations have not been paid in full prior to May 1, 2023, may be extended to May 31, 2023 so long as (i) no Event of |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | Default  (as defined in the ABL DIP Credit Agreement) has occurred under certain circumstances set forth in the ABL DIP Credit Agreement, (ii) the ABL DIP Lenders are not required to provide revolving commitments in excess of the Revolver Sublimit (as defined in the ABL DIP Credit Agreement), (iii) the Debtors are in compliance with Section 2.1(a)(A) of the ABL DIP Credit Agreement both before and after giving effect to such extension; and |
| | (g)  to the extent the ABL DIP Obligations have not been paid in full on or prior to May 31, 2023, the ABL Maturity Date shall be automatically extended by an additional (60) days so long as (i) no Event of Default  (as defined in the ABL DIP Credit Agreement) has occurred under certain circumstances set forth in the ABL DIP Credit Agreement, (ii) the ABL DIP Lenders are not required to provide revolving commitments in excess of the Revolver Sublimit (as defined in the ABL DIP Credit Agreement), (iii) a budget covering such 60-day extension period, reflecting compliance with the ABL DIP Credit Agreement for the duration of such extension period, is on file with the Court, and (iv) the Debtors are in compliance with Section 2.1(a)(A) of the ABL DIP Credit Agreement both before and after giving effect to such extension. |
| | *See* ABL DIP Credit Agreement, Art. 1, § 1, "Maturity Date". |
| **Commitments** Bankruptcy Rule 4001(c)(1)(B) | **Term DIP Facility**: The Term DIP Facility shall consist of the following: |
| | (a)  *DIP New Money Term Loans*.  New Monday term loans in an aggregate maximum principal amount of up to $35 million; and |
| | (b)  *DIP Roll-Up Term Loans*.  Up to $35 million of loans outstanding under the Prepetition Term Loan Credit Facility will roll-up into the Term DIP Facility on a dollar-for-dollar basis in an amount equal to the amount of DIP New Money Term Loans. |
| | *See* Term DIP Credit Agreement, § 2.01. |
| | **ABL DIP Facility**: The ABL DIP Facility shall consist of the following: |
| | (a)  *ABL DIP Facility.* A revolving loan facility in an aggregate principal amount of $11.6 in undrawn commitments, of which $3.4 million shall be used to cash collateralize certain letters of credit, and a roll up of $5.8 million in drawn commitments under the Prepetition Revolving Credit Facility. |
| | *See* ABL DIP Credit Agreement, Art. 2. |
| **Conditions of Borrowing** Bankruptcy Rule 4001(c)(1)(B) | The DIP Orders and DIP Documents include standard and customary conditions to borrowing, the satisfaction of which is a condition precedent to the obligations of each of the DIP Lenders to provide the DIP Facilities. |
| | *See* Term DIP Credit Agreement, § 4.02, 4.03, ABL DIP Credit Agreement, § 8. |
| **Interest Rates** Bankruptcy Rule 4001(c)(1)(B) | **Term DIP Facility**: The DIP Term Loans shall bear interest at 15.00 percent. The default rate shall be the interest rate plus an additional 2.00 percent per annum. |
| | *See* Term DIP Credit Agreement, § 2.13. |
| | **ABL DIP Facility**: The ABL DIP Facility shall bear interest at the rate equal to the sum of the Alternate Base Rate (as defined in the ABL DIP Credit Agreement) *plus* 4.25 percent payable monthly in arrears. The default rate shall be the interest rate plus an additional 2.00 percent per annum. |
| | *See* ABL DIP Credit Agreement, § 3.1. |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| **Use of DIP Facilities and Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(ii) | The proceeds of the DIP Facilities shall be used for the payment of: <br><br> (a) postpetition working capital, capital improvements, and general corporate purposes of the Debtors and business expenses of the DIP Borrowers; <br><br> (b) amounts due to the DIP Lenders and DIP Agents under the DIP Facilities and professional fees and expenses; <br><br> (c) adequate protection payments to the Prepetition Secured Parties; <br><br> (d) to refinance the Prepetition Revolving Obligations under the Prepetition Revolving Credit Documents in full on the closing date; <br><br> (e) the allowed administrative costs and expenses of these chapter 11 cases, including the Carve Out, solely in accordance with the DIP Orders; and <br><br> (f) payment of other obligations during the case. <br><br> *See* Term DIP Credit Agreement, § 5.10, *See* ABL DIP Credit Agreement, § 2.20 |
| **Entities with Interests in Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(i) | The following secured parties have an interest in Cash Collateral: <br><br> (a) the DIP Secured Parties and <br><br> (b) the Prepetition Secured Parties. <br><br> *See* Interim Order, ¶ F. |
| **Fees** Bankruptcy Rule 4001(c)(1)(B) | The DIP Facilities also includes the following fees. <br><br> **Term DIP Facility**: <br><br> (a) *Upfront Fee*. The Term DIP Borrower shall pay to the Term DIP Lenders (i) an upfront fee equal to 2.00% of the aggregate principal amount of the Initial New Money Term Loan, which fee shall be due and payable on the Effective Date (as defined in the Term DIP Credit Agreement) and shall be netted out of the proceeds of the Initial New Money Term Loan, and (ii) an upfront fee equal to 2.00% of the aggregate principal amount of the Final New Money Term Loan, which fee shall be due and payable on the Final Funding Date, and shall be netted out of the proceeds of the Final New Money Term Loan. <br><br> (b) *Administrative Agent Fee*. The Term DIP Borrower agrees to pay to the Term DIP Administrative Agent fees payable in the amounts and at the times separately agreed upon between the Term DIP Borrower and the Term DIP Administrative Agent pursuant to that certain fee letter filed under seal and annexed hereto as **Exhibit C** (the "Term DIP Administrative Agent Fee Letter"). <br><br> (c) *Collateral Agent Fee*. The Term DIP Borrower agrees to pay to the Term DIP Collateral Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between the Term DIP Borrower and the Term DIP Collateral Agent pursuant to that certain fee letter filed under seal and annexed hereto as **Exhibit D** (the "Term DIP Collateral Agent Fee Letter"). <br><br> **ABL DIP Facility**: <br><br> (a) *Facility Fee*. The ABL DIP Borrowers shall pay a percentage of the average daily usage under the ABL DIP Facility, payable quarterly in arrears. <br><br> (b) *Closing Fee*. The ABL DIP Borrowers shall pay a closing fee, fully earned on the Closing Date (as defined in the ABL DIP Agreement), and due and payable |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | (x) on the Closing Date in an aggregate amount equal to $174,250 and (y) on the ABL Maturity Date in an aggregate amount equal to $174,250.<br><br>*See* Term DIP Credit Agreement, § 2.12; ABL DIP Credit Agreement, § 3; Fee Letters |
| **Budget**<br>Bankruptcy Rule 4001 (c)(1)(B) | The DIP Borrowers shall operate in accordance with the latest rolling 13-week consolidated weekly operating budget (the "Approved Budget") in form and substance satisfactory to the Required DIP Lenders. The Debtors shall deliver an initial budget on or prior to the Petition Date (the "Initial DIP Budget") and shall update such budget every Friday thereafter.<br><br>*See* Term DIP Credit Agreement, § 5.17, *See* ABL DIP Credit Agreement, § 9.12. |
| **Chapter 11 Milestones**<br>Bankruptcy Rule 4001(c)(1)(B) | **Term DIP Facility**: The Debtors shall implement the Restructuring Transactions in accordance with the Case Milestones which shall include the following:<br><br>(a) no later than three (3) calendar days following the Petition Date, the Court shall have entered the Interim Order;<br><br>(b) no later than thirty-five (35) calendar days following the Petition Date, the Court shall have entered the Final Order;<br><br>(c) Unless a Sale Toggle Event (as defined in the Term DIP Credit Agreement) has occurred, then:<br><br>(i) no later than the Petition Date, the Debtors shall have filed the Acceptable Plan (as defined in the Term DIP Credit Agreement)<br><br>(ii) no later than ten (10) Business Days after the Petition date, the Debtors shall have filed (i) the Acceptable Disclosure Statement (as defined in the Term DIP Credit Agreement), (ii) a motion seeking entry of an order approving the Acceptable Disclosure Statement, and (iii) the Backstop Commitment Letter (as defined in the Restructuring Support Agreement).<br><br>(ii) no later than sixty (60) calendar days following the Petition Date, the Court shall have entered (a) the Acceptable Disclosure Statement Order (as defined in the Term DIP Credit Agreement), (b) an order approving the Backstop Commitment Letter, and (c) an order approving the Rights Offering Procedures (as defined in the Restructuring Support Agreement);<br><br>(iii) No later than twenty (20) Business Days after the Subscription Commencement Date (as defined in the Backstop Commitment Letter), the Debtors shall have ended the subscription period for the Rights Offering (as defined in the Restructuring Support Agreement);<br><br>(iv) no later than one-hundred and five (105) calendar days following the Petition Date, the Court shall have entered the Acceptable Confirmation Order (as defined in the Term DIP Credit Agreement) and an order approving the Backstop Commitment Agreement; and<br><br>(v) no later than one-hundred and twenty (120) calendar days after the Petition Date, the Plan Effective Date shall have occurred; *provided*, however, that such date shall be extended for an additional three (3) month period, solely to the extent all other events and actions necessary for the occurrence of the Plan Effective Date have occurred other than the receipt of regulatory or other approval of a governmental entity or unit necessary for the occurrence of the Plan Effective Date.<br><br>(d) Following the occurrence of a Sale Toggle Event, then: |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | (i)   by no later than the date that is fourteen (14) days following the date on which the Sale Toggle Event occurs, the filing with the Court of a motion to approve bid procedures in respect of an Acceptable Sale Transaction (as defined in the Term DIP Credit Agreement) in form and substance satisfactory to the Term DIP Lenders in their sole discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Term DIP Lenders, the "<u>Acceptable Bid Procedures Motion</u>"); <br><br> (ii)  by no later than the date that is twenty-four (24) days following the filing of the Acceptable Bid Procedures Motion, the entry by the Court of an order approving such Acceptable Bid Procedures Motion (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Term DIP Lenders, the "<u>Acceptable Bid Procedures Order</u>"); <br><br> (iii) by no later than the date that is fifty (50) days following the entry by the Bankruptcy Court of the Acceptable Bid Procedures Order, the commencement of an auction in connection with such Acceptable Sale (the "<u>Auction</u>"), unless, in accordance with the Acceptable Bid Procedures Order, no Auction is required; and <br><br> (iv) by no later than sixty 60 days after the occurrence of a Sale Toggle Event, the entry by the Court of an order approving such Acceptable Sale Transaction, if applicable (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders, the "<u>Acceptable Sale Order</u>"). <br><br> *See* Term DIP Credit Agreement, § 5.15. <br><br> **<u>ABL DIP Facility</u>**: The Debtors shall implement the Restructuring Transactions in accordance with the Case Milestones which shall include the following: <br><br> (a)  obtain court approval of the Final Order within forty (40) days of the Petition Date; <br><br> (b)  on or before the date that is one hundred ten (110) days after the Petition Date, the Bankruptcy Court shall have entered an order confirming the Reorganization Plan (as defined in the ABL DIP Credit Agreement) (the "<u>Confirmation Order</u>"); and <br><br> (c)  within fifteen (15) after entry of the Confirmation Order, the confirmed Reorganization Plan shall have been consummated. <br><br> *See* ABL DIP Credit Agreement § 6.18. |
| **Liens and Priorities** <br> Bankruptcy Rule 4001(c)(l)(B)(i) | **<u>Term DIP Facility</u>**: The liens contemplated by the Term DIP Credit Agreement will follow the following priority until the Term DIP Maturity Date, in each case subject to the Carve Out in all respects: (a) the Term DIP Liens and (b) the priorities set forth in Exhibit 3 of the Interim Order. <br><br> **<u>ABL DIP Facility</u>**: The liens contemplated by the ABL DIP Credit Agreement will follow the following priority until the ABL DIP Facility Maturity Date: (a) the ABL DIP Liens and (b) the priorities set forth in Exhibit 3 of the Interim Order. <br><br> *See* Interim Order, ¶ 16. |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| **Carve Out**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Orders provide a "Carve Out" of certain statutory fees and allowed professional fees of the Debtors pursuant to section 1103 of the Bankruptcy Code.<br><br>*See* Interim Order, ¶ 5. |
| **Challenge Period**<br>Bankruptcy Rule 4001(c)(l)(B) | The Interim Order provides for a standard and customary challenge period:<br><br>(i) at the earliest of:<br><br>    (a) an order confirming a chapter 11 plan;<br><br>    (b) sixty (60) calendar days after the appointment of the Committee;<br><br>    (c) if the Chapter 11 Cases are converted to chapter 7 and a chapter 7 or chapter 11 trustee is appointed or elected prior to the expiration of the Challenge Period, then the Challenge Period for any such estate representative or trustee shall be extended (solely as to such estate representative or trustee) to the date that is the later of (1) 75 calendar days after entry of the  Interim Order or (2) the date that is 30 calendar days after its appointment; and<br><br>    (d) seventy-five (75) calendar days after entry of the Interim Order;<br><br>(ii) any such later date agreed to in writing by the DIP Agents and Prepetition Agents; and<br><br>(iii) any such later date as has been ordered by the Court for cause upon a motion filed and served within any applicable period.<br><br>*See* Interim Order, ¶ 21. |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | The adequate protection provided to the Prepetition Secured Parties shall be in accordance with the Interim Order.<br><br>*See* Interim Order, ¶ 16. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B) | The Term DIP Credit Agreement, ABL DIP Credit Agreement, and Interim Order contain events of default that are usual and customary for debtor-in-possession financings, including without limitation, failure to comply with the budget and variance reporting and failure to satisfy any of the case milestones (unless otherwise waived or extended).<br><br>*See* Term DIP Credit Agreement, Art. 7; ABL DIP Credit Agreement, Art. 10. |
| **Waiver/Modification of the Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv) | Pursuant to the Interim Order, the automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to implement and effectuate the terms of the Interim Order.<br><br>*See* Interim Order, ¶ 10. |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | Usual and customary for financings of this type, including that the Debtors shall agree to indemnify and hold harmless the DIP Secured Parties and the Prepetition Secured Parties as provided in the Prepetition Loan Documents and the DIP Documents, as applicable. The Debtors agree that no exception or defense in contract, law, or equity exists as of the date of this Interim Order to any obligation set forth, as the case may be, in the Interim Order or in the DIP Documents, or in the Prepetition Loan Documents, to indemnify and/or hold harmless the DIP Agents, any other DIP Secured Party, or any Prepetition Secured Party, as the case may be, and any such defenses are hereby waived. |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | *See* Interim Order, ¶ 23. |

## Statement Regarding Significant Provisions

15.     The DIP Orders contain certain of the provisions (the "Significant Provisions")[5] identified in paragraph 8 of the Complex Case Procedures as set forth below.  The Debtors believe that each of the Significant Provisions and the Carve Out is justified and necessary in the context and circumstances of these chapter 11 cases.

16.     The Interim Order and the Final Order, as applicable:

(a) grant superpriority administrative expense claims to the DIP Secured Parties, subject, with respect to the Term DIP Facility, only to the Carve Out;

(b) bind the Debtors and all parties in interest with respect to the validity, perfection, or amount of the Adequate Protection Liens, subject only to the Carve Out, the DIP Liens and any liens to which the DIP Liens are junior, (each subject to certain challenge rights);

(c) authorize the Debtors to waive (a) the "equities of the case" exception under section 552(b) of the Bankruptcy Code and (b) except to the extent of the Carve Out (other than with respect to the ABL DIP Collateral), any right to surcharge any collateral pursuant to section 506(c) of the Bankruptcy Code; *provided* that the foregoing waivers shall be without prejudice to any provisions of the Final Order with respect to costs or expenses incurred following the entry of such Final Order;

(d) except to the extent of the Carve Out, authorize the Debtors to waive the equitable doctrine of "marshaling" and other similar doctrines (x) with respect to the DIP Collateral for the benefit of any party other than the DIP Secured Parties and (y) with respect to any of the Prepetition Collateral (as defined below) (including the Cash Collateral) for the benefit of any party other than the Prepetition Secured Parties; *provided* that, with respect to the Prepetition Agents and the other Prepetition Secured Parties, the

---

[5]     Significant Provisions refer to those provisions that contain:  (a) sale or plan confirmation milestones; (b) cross-collateralization; (c) roll ups; (d) liens on avoidance actions or proceeds of avoidance actions; (e) default provisions and remedies; (f) releases of claims against lenders or others; (g) limitations on fees for advisors to official committees; (h) non-consensual priming liens; or (i) any other provision that limits the ability of estate fiduciaries to fulfill their duties under the Bankruptcy Code and applicable law.

foregoing waivers shall be without prejudice to any provisions of the Final Order;

(e) subject to entry of the Interim Order, grant the release of claims held by the Debtors against the Prepetition Secured Parties, the DIP Secured Parties, and each of their respective Representatives (as defined in the Interim Order);

(f) subject to the entry of the Final Order, grant the DIP Lenders liens on the proceeds of the Debtors' claims and causes of action under chapter 5 of the Bankruptcy Code;

(g) subject to the entry of the Interim Order, authorize the Debtors to convert the DIP Roll-Up Term Loans into the Term DIP Facility in an amount equal not to exceed $17.5 million and $5.8 of drawn commitments under the Prepetition Revolving Credit Facility into the ABL DIP Facility;

(h) subject to the entry of the Final Order, authorize the Debtors to convert the balance of the DIP Roll-Up Term Loans into the Term DIP Facility;

(i) impose deadlines for the filing of a plan or disclosure statement and entering into a sale transaction;

(j) grant a limitation on the use of DIP Loans, Cash Collateral, DIP Collateral, Prepetition Collateral, or any portion of the Carve Out to pay the fees and expenses of an official committee of unsecured creditors (if appointed) in investigating claims against the Prepetition Secured Parties, or challenging the amount, validity, perfection, or priority of their claims and liens; and

(k) grant the DIP Lenders certain events of default and remedies.

17. The DIP Facilities are critical to the Debtors' continuing operations and essential to facilitating a consensual restructuring transaction. In light of the foregoing, the Significant Provisions are necessary under the facts and circumstances of these chapter 11 cases. Accordingly, the Significant Provisions in the Interim Order and the Final Order should be approved.

### The Debtors' Prepetition Capital Structure

18.    As of the Petition Date, the Debtors have approximately $358.2 million in total funded debt obligations, all of which is held by Debtor entities.   The following table below summarizes the Debtors' prepetition capital structure:[6]

| Facility | Maturity | Outstanding Principal Amount |
|---|---|---|
| **Secured Debt** | | |
| ABL Credit Facility | January 16, 2026 | $5,813,367.50 |
| Term Loan Facility | July 26, 2026 | $90,500,000 |
| 5.68% Convertible Senior Secured Notes | July 1, 2026 | $41,475,000 |
| **Unsecured Debt** | | |
| 5.00% Series I 4.25% Convertible Notes | November 15, 2024 | $72,909,000 |
| 5.00% Series II 4.25% Convertible Notes | November 15, 2024 | $77,758,161.45 |
| 4.25% Convertible Notes | March 15, 2026 | $69,700,000 |
| | **Total Debt:** | **$358,155,528.95** |

## I.    Secured Lien Obligations.

### A.    ABL Credit Facility.

19.    The Debtors maintain a senior secured asset-based   revolving credit facility (the "Prepetition Revolving Credit Facility") under that certain Second Amended and Restated Revolving Credit and Security Agreement, dated as of July 26, 2022 (as amended, restated or otherwise modified from time to time, the "Prepetition Revolving Credit Agreement"), by and among Invacare Corporation, Invacare Canada L.P., Motion Concepts L.P., Perpetual Motion Enterprises Limited, Freedom Designs, Inc., and Medbloc, Inc., as borrowers, the Debtor and non-

---

[6]    The Debtors capitalize certain additional financial and operational liabilities in accordance with GAAP.

Debtor guarantors party thereto as guarantors,[7] PNC Bank, National Association, as lender and agent (in such capacity, together with its permitted successors and assigns, the "Prepetition Revolving Agent"), JP Morgan Chase Bank, N.A., as a lender, and the other issuer and agent parties thereto (the "Prepetition Revolving Lenders").

20.     The Prepetition Revolving Credit Facility provides total commitments of $35 million, subject to availability based on a borrowing base formula.  As of the Petition Date, the Prepetition Revolving Credit Facility borrowing base was approximately $5.8 million with a $6.5 million reserve.  The Prepetition Revolving Credit Facility matures on the earlier of (i) January 16, 2026 and (ii) the earlier of (a) one hundred ninety-one (191) days prior to the maturity of the Prepetition Convertible Notes (as defined herein), or the maturity date of a refinancing of any of the Prepetition Convertible Notes, and (b) one hundred (100) days prior to the maturity of the Prepetition Term Loan Credit Facility (as defined herein), and accrues interest at a rate of SOFR + 3.25%.

21.     The Prepetition Revolving Obligations are secured on a senior basis by substantially all of the Debtors' U.S. and Canadian assets (collectively, the "Prepetition Revolving Collateral"), however, under that certain Intercreditor Agreement (as defined below), with the exception of the liens held on accounts receivable, inventory, cash collections of accounts receivable, and certain other priority "Prepetition Revolving Collateral" enumerated in the Intercreditor Agreement (collectively the "Prepetition Revolving Credit Priority Collateral" and the collateral other than the Prepetition Revolving Credit Priority Collateral, the "CF Debt Priority Collateral" together with the Prepetition Revolving Credit Collateral, the "Prepetition Collateral"),

---

[7]     The Prepetition Revolving Credit Facility is guaranteed by Adaptive Switch Laboratories, Inc., Invacare Credit Corporation, Invacare Holdings, LLC, Invamex Holdings LLC, Carroll Healthcare General Partner, Inc., Carroll Healthcare Inc., and Invacare Canada General Partners Inc.

such liens rank junior to the liens securing the Prepetition Term Loan Credit Facility and the Prepetition Secured Notes Indentures (each as defined below).

**B.      Term Loans.**

22.      The Debtors are party to a senior secured term loan credit facility (the "Prepetition Term Loan Credit Facility") under that certain credit agreement, dated as of July 26, 2022 (as amended by that certain Amendment Agreement and Joinder to Foreign Guarantee Agreement, dated as of October 3, 2022, and as further amended by that certain Amendment Agreement dated as of December 23, 2022, the "Prepetition Term Loan Credit Agreement"), by and among Invacare Corporation, as borrower, the guarantors party thereto,[8] Cantor Fitzgerald Securities, as administrative agent for the lenders (the "Prepetition Term Loan Administrative Agent"), GLAS Trust Corporation Limited, as collateral agent for the secured parties (the "Prepetition Term Loan Collateral Agent," each in such capacity, together with their permitted successors and assigns, collectively, the "Prepetition Term Loan Agents"), Highbridge, and the other lenders party thereto (the "Prepetition Term Loan Lenders").

23.      The Prepetition Term Loan Credit Facility provides for aggregate commitments of $104.5 million, with (i) $66.5 million in term loans that were drawn on July 26, 2022, (ii) $8.5 million in term loans that were drawn on the first additional funding date of October 3, 2022, (iii) $10 million in term loans that were drawn on the second additional funding date of October 3, 2022, and (iv) $19.5 million in term loan commitments in respect to third

---

[8]    The Prepetition Term Loan Credit Facility is guaranteed by Freedom Designs, Inc., Medbloc, Inc., Adaptive Switch Laboratories, Inc., Invacare Credit Corporation, Invacare Holdings, LLC, Invamex Holdings LLC, Carroll Healthcare General Partner, Inc., Invacare Canada General Partner Inc., Carroll Healthcare Inc., Invacare Canada L.P., Motion Concepts L.P., Perpetual Motion Enterprises Limited, Invacare France Operations SAS, Invacare Poirier SAS, Invacare Holdings S.À R.L., Invacare Holdings Two S.À R.L., Invacare Holdings C.V., Invacare Holdings Two B.V., Invacare B.V, Invacare UK Operations Limited, Invacare Limited, Invacare A/S, Invacare Holding AS, Invacare AS, Invacare Verwaltungs GmbH, Invacare Australia Pty Ltd, Invacare New Zealand, Invacare AG, Alber GmbH, and Invacare International GmbH.

additional term loans, of which, $5.5 million in term loans were drawn on December 23, 2022 pursuant to an agreement to provide Bridge Financing as more fully discussed above.  The Prepetition Term Loan Credit Facility matures on July 26, 2026 and accrues interest at a rate equal to (a) prior to the second anniversary of the Effective Date (as defined in the Prepetition Term Loan Credit Agreement), (i) Alternate Base Rate + 6.00%  and (ii) SOFR + 7.00% and (b) thereafter, (i) Alternate Base Rate + 7.75% and (ii) SOFR + 8.75%.

24.     The Prepetition Term Loan Obligations are secured on a senior basis by substantially all of the Debtors' assets.  However, under the Intercreditor Agreement, the liens on the Prepetition ABL Priority Collateral securing the Prepetition Term Loan Credit Facility rank junior in priority to the liens of the Prepetition Revolving Credit Facility on the Prepetition ABL Priority Collateral.  Additionally, the liens securing the Prepetition Term Loan Credit Facility rank *pari passu* to the liens securing the Prepetition Secured Notes pursuant to the First Lien Intercreditor Agreement dated as of July 26, 2022 (as supplemented by that certain Supplement No. 1, dated as of October 3, 2022 and as further supplemented by that certain Supplement No. 2 dated as of October 3, 2022) among GLAS Trust Corporation Limited, as authorized representative for the secured parties under the Prepetition Term Loan Credit Facility and the Prepetition Secured Notes, and certain of the Debtors and non-Debtors party thereto.[9]

---

[9]     Such entities: Invacare Corporation, Freedom Designs, Inc., Medbloc, Inc., Adaptive Switch Laboratories, Inc., Invacare Credit Corporation, Invacare Holdings, LLC, Invamex Holdings LLC, Carroll Healthcare General Partner, Inc., Invacare Canada General Partner Inc., Carroll Healthcare Inc., Invacare Canada L.P., Motion Concepts L.P., Perpetual Motion Enterprises Limited, Invacare France Operations SAS, Invacare Poirier SAS, Invacare Holdings S.À R.L., Invacare Holdings Two S.À R.L., Invacare Holdings C.V., Invacare Holdings Two B.V., Invacare B.V, Invacare UK Operations Limited, Invacare Limited, Invacare A/S, Invacare Holding AS, Invacare AS, Invacare Verwaltungs GmbH, Invacare Australia Pty Ltd, Invacare New Zealand, Invacare AG, Alber GmbH, and Invacare International GmbH.

C.      **Secured Notes.**

25.      *Secured Tranche I Convertible Notes*. On July 26, 2022, Invacare Corporation issued $15,553,000 in aggregate principal amount of 5.68% convertible senior secured notes due July 1, 2026, Tranche I (the "Prepetition Secured Tranche I Notes"), pursuant to an indenture entered into with the guarantors party thereto,[10] Computershare Trust Company, N.A., as trustee (the "Prepetition Secured Notes Trustee"), and GLAS Trust Corporation Limited, as notes collateral agent  (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition Secured Tranche I Notes Indenture").  On October 3, 2022, Debtor Invacare Corporation issued $5,186,000 in aggregate principal amount of additional Prepetition Secured Tranche I Notes, for a total aggregate principal amount outstanding of $20,739,000.

26.      *Secured Tranche II Convertible Notes*.  On July 26, 2022, Invacare Corporation issued $15,553,000 in aggregate principal amount of 5.68% convertible senior secured notes due July 1, 2026, Tranche II (the "Prepetition Secured Tranche II Notes," and, together with the Prepetition Secured Tranche I Notes, the "Prepetition Secured Notes"), pursuant to an indenture entered into with the guarantors party thereto,[11] GLAS Trust Corporation Limited as notes

---

[10]   The obligations under the Prepetition Secured Tranche I Notes are guaranteed by Freedom Designs, Inc., Medbloc, Inc., Adaptive Switch Laboratories, Inc., Invacare Credit Corporation, Invacare Holdings, LLC, Invamex Holdings LLC, Carroll Healthcare General Partner, Inc., Invacare Canada General Partner Inc., Carroll Healthcare Inc., Invacare Canada L.P., Motion Concepts L.P., Perpetual Motion Enterprises Limited, Invacare France Operations SAS, Invacare Poirier SAS, Invacare Holdings S.À R.L., Invacare Holdings Two S.À R.L., Invacare Holdings C.V., Invacare Holdings Two B.V., Invacare B.V, Invacare UK Operations Limited, Invacare Limited, Invacare A/S, Invacare Holding AS, Invacare AS, Invacare Verwaltungs GmbH, Invacare Australia Pty Ltd, Invacare New Zealand, Invacare AG, Alber GmbH, and Invacare International GmbH.

[11]   The obligations under the Prepetition Secured Tranche II Notes are guaranteed by Freedom Designs, Inc., Medbloc, Inc., Adaptive Switch Laboratories, Inc., Invacare Credit Corporation, Invacare Holdings, LLC, Invamex Holdings LLC, Carroll Healthcare General Partner, Inc., Invacare Canada General Partner Inc., Carroll Healthcare Inc., Invacare Canada L.P., Motion Concepts L.P., Perpetual Motion Enterprises Limited, Invacare France Operations SAS, Invacare Poirier SAS, Invacare Holdings S.À R.L., Invacare Holdings Two S.À R.L., Invacare Holdings C.V., Invacare Holdings Two B.V., Invacare B.V, Invacare UK Operations Limited, Invacare

collateral agent (the "Prepetition Secured Notes Collateral Agent" and the other trustees and notes collateral agents under the Prepetition Secured Notes Indentures, the "Prepetition Secured Notes Agents"), and the Prepetition Secured Notes Trustee (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition Secured Tranche II Notes Indenture" and together with the Prepetition Secured Tranche I Notes Indenture, the "Prepetition Secured Notes Indentures").  On October 3, 2022, Debtor Invacare Corporation issued $5,183,000 in aggregate principal amount of additional Prepetition Secured Tranche II Notes, for a total aggregate principal amount of $20,736,000.

27.     The obligations under the Prepetition Secured Notes are secured on a *pari passu* basis by the same collateral that secures the Prepetition Term Loan Credit Agreement.

**D.     Intercreditor Agreement.**

28.     To establish the relative priority of the liens created by the Prepetition Revolving Credit Agreement, on the one hand, and the Prepetition Term Loan Credit Agreement, and the Prepetition Secured Notes Indentures, on the other hand, and to set forth certain other rights, priorities, and limitations on the exercise of remedies under such documents, the Prepetition Revolving Agent, the Prepetition Term Loan Collateral Agent, and the Prepetition Secured Notes Collateral Agent entered into that certain Intercreditor Agreement dated as of July 26, 2022 (the "Intercreditor Agreement" as amended in connection with the DIP Financing, the "ABL Intercreditor Agreement").  As the Prepetition Term Loan Credit Facility, Prepetition Secured Tranche I Notes, and Prepetition Secured Tranche II Notes provide for security over substantially all of the Debtors' assets and the Prepetition Revolving Credit Facility provides for security over

---

Limited, Invacare A/S, Invacare Holding AS, Invacare AS, Invacare Verwaltungs GmbH, Invacare Australia Pty Ltd, Invacare New Zealand, Invacare AG, Alber GmbH, and Invacare International GmbH.

all of the Debtors' assets located in the United States and Canada, the Intercreditor Agreement establishes that the liens in favor of the Prepetition Revolving Agent in respect of the Revolving Credit Priority Collateral have priority over the liens in favor of the Prepetition Term Loan Collateral Agent and Prepetition Secured Notes Collateral Agent on the Revolving Credit Priority Collateral.  And conversely, it establishes that the liens in favor of the Prepetition Term Loan Collateral Agent and Prepetition Secured Notes Collateral Agent in respect of the CF Priority Collateral have priority over the liens in favor of the Prepetition Revolving Agent on the CF Priority Collateral.

## II.     Existing Unsecured Debt Obligations

### A.     5.00% Series I Convertible Notes due 2024.

29.     On November 19, 2019, Debtor Invacare Corporation issued $72,909,000 in aggregate principal amount of 5.00% convertible senior exchange senior notes due November 15, 2024 (the "5.00% Series I Convertible Notes"), pursuant to an indenture entered into with Computershare Trust Company, N.A. (as successor to Wells Fargo Bank, National Association), as trustee (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "5.00% Series I Convertible Notes Indenture").

### B.     5.00% Series II Convertible Notes due 2024.

30.     On June 4, 2020, Debtor Invacare Corporation issued $68,875,000 in aggregate principal amount of 5.00% senior notes due November 15, 2024 (the "5.00% Series II Convertible Notes"), pursuant to an indenture entered into with Computershare Trust Company, N.A. (as successor to Wells Fargo Bank, National Association), as trustee (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "5.00% Series II Convertible Notes Indenture"). The principal amount of the 5.00% Series II Convertible Notes also accrete at a rate of approximately 4.7% —payable in cash upon maturity but do not bear

interest.   On June 4, 2022, $8,883,161.45 in aggregate principal amount of 5.00% Series II Convertible Notes were exchanged in connection with the issuance of the Prepetition Secured Notes.  As a result, $77,758,161.45 in aggregate principal amount of 5.00% Series II Convertible Notes are currently outstanding.

> **C.    4.25% Convertible Notes due 2026.**

31.    On March 16, 2021, Debtor Invacare Corporation issued $125,000,000 in aggregate amount principal of 4.25% convertible senior exchange notes due March 15, 2026 (the "4.25% Convertible Notes," and together with the 5.00% Series I Convertible Notes and the 5.00% Series II Convertible Notes, the "Prepetition Unsecured Notes"), pursuant to an indenture entered into with Computershare Trust Company, N.A. (as successor to Wells Fargo Bank, National Association), as trustee (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "4.25% Convertible Notes Indenture").   On July 26, 2022 and October 3, 2022, $55,300,000 in aggregate principal amount of 4.25% Convertible Notes were exchanged in connection with the issuance of the Prepetition Secured Notes.  As a result, $69,700,000 in aggregate principal amount of 4.25% Convertible Notes are currently outstanding.

32.    The obligations under the Prepetition Unsecured Notes are unsecured and without guarantee, and the Prepetition Unsecured Notes are convertible only upon satisfaction of certain conditions and during certain periods, and thereafter, at any time until the close of business on the second scheduled trading day immediately preceding the maturity date.

## III.    Equity Obligations

> **A.    Common Stock.**

33.    Debtor Invacare Corporation's certificate of incorporation authorizes the board of directors to issue 150 million common shares ("Common Shares"), 12 million class B common shares ("Class B Common Shares"), and 300,000 preferred shares ("Preferred Shares").

Approximately 37 million Common Shares are outstanding. Before being de-listed, the Common Shares traded on the New York Stock Exchange ("NYSE") under the ticker symbol "IVC." Invacare Corporation also issued 4,000 Class B Common Shares, approximately 3,600 of which are outstanding as of the Petition Date. To date, Invacare Corporation has not issued any preferred shares.

### The Debtors Have a Need for
### Debtor-in-Possession Financing and Use of Cash Collateral.

34.     The Debtors require an immediate capital infusion in the form the DIP Facilities and access to Cash Collateral to operate their business postpetition, fund these chapter 11 cases, and to preserve the Debtors' assets during the pendency of these cases. *See* DiDonato Decl. ¶¶ 11, 12. If the Debtors cannot quickly access the liquidity provided by the DIP Facilities and Cash Collateral, the Debtors will not be able to operate their business in the ordinary course. *See* DiDonato Decl. ¶ 13. In turn, this would result in immediate and irreparable harm to the Debtors and their stakeholders, and will diminish the value of the Debtors' estates. *See* DiDonato Decl. ¶ 12.

35.     Recent events have underscored the Debtors' need to access the proceeds of the DIP Facilities and Cash Collateral. Specifically, interruptions in the production and supply of the Debtors' products due to supply chain disruptions and the ongoing shipping and logistics crisis that has crippled the global economy and caused shortages in the availably and cost of materials, labor, and container shipping have placed significant strain on the Debtors' business in the wake of the COVID-19 pandemic. *See* First Day Decl. ¶ 7. As discussed in greater detail in the First Day Declaration, to combat the economic pressures COVID-19 had on the business, the Debtors initiated a financial and operational turnaround comprised of product line rationalization, footprint optimization, supply chain simplification, organization rightsizing, and liquidity enhancements.

*See* First Day Decl. ¶ 8.   While the Debtors have continued executing on these initiatives, the strain of the Debtors' existing capital structure has made it increasingly difficult to effectuate a turnaround without addressing the Debtors' balance sheet and liquidity constraints.  *See* First Day Decl. ¶¶ 11, 12.

36.     Absent the funds available from the DIP Facilities and access to Cash Collateral, the Debtors could face a value-destructive interruption to their business by losing the ability to satisfy critical expenses that are essential to the continued operation of the Debtor' business during the pendency of these chases.  *See* DiDonato Decl. ¶ 12.  In the event the Debtors are not able to obtain the DIP Facilities, the Debtors' operations will come grinding to a halt.  *See* DiDonato Decl. ¶ 12.  Accordingly, the Debtors' access to the proposed DIP Facilities, which has the support of lenders throughout their capital structure, will enable the Debtors to stabilize their cash flows, continue operating in the ordinary course, and fulfill their commitment to key stakeholders throughout the chapter 11 process. *See* DiDonato Decl. ¶ 13.

37.     The Debtors also rely on the Cash Collateral generated from their operations to fund working capital and maintain favorable credit terms and relations with vendors, suppliers, customers, sureties, and other contract counterparties.  *See* DiDonato Decl. ¶ 13.  Access to postpetition Cash Collateral and the proposed DIP Facilities is essential to enable the Debtors to ultimately restructure as a going concern, all while continuing to operate their business by satisfying obligations to employees, customers, and suppliers and satisfying any other payments that are essential for the continued management, operation, and preservation of the Debtors' assets. *See* DiDonato Decl. ¶ 12, 15.  Absent an expedient and fully funded chapter 11 case, a combination of insufficient funding and heightened business disruption would make it nearly impossible for the

Debtors to execute their business plan, cause significant and permanent value destruction, and materially impair creditors' recoveries. *See* DiDonato Decl. ¶ 14.

38.     Accordingly, the Debtors' access to the proposed DIP Facilities will provide necessary liquidity to allow the Debtors to facilitate a chapter 11 process, fund their operations, and proceed expeditiously toward a value-maximizing resolution to these chapter 11 cases thereby maximizing the value of the Debtors' estates for all stakeholders.  *See* DiDonato Decl. ¶ 20.

### Alternative Sources of Financing Are Not Available on Better Terms.

39.     The Debtors do not believe it would be prudent, or even possible, to administer these chapter 11 estates on a "cash collateral" basis, rendering postpetition financing a necessity. The Debtors, with the assistance of their advisors, ran a comprehensive marketing process for postpetition financing but did not receive any third-party proposals.  Moshinsky Decl. ¶ 14. Accordingly, the Debtors believe that the proposed DIP Facilities represent the only viable financing option available under the circumstances.  *See* Moshinsky Decl. ¶ 16.

40.     The Debtors' investment banker, Miller Buckfire & Co. ("Miller Buckfire"), reached out to various financial institutions to gauge their interest in providing debtor-in-possession financing to the Debtors.  *See* Moshinsky Decl. ¶ 14.  Miller Buckfire contacted 16 potential third-party lenders, including large commercial banks and sophisticated alternative investment institutions.   *See* Moshinsky Decl. ¶ 14. Ultimately, of the 16 potential third-party lenders that were contacted in connection with the DIP financing process, only one party executed a  non-disclosure  agreement  and  received  access  to  additional  diligence  information.[12] *See*  Moshinsky  Decl. ¶ 14. None  of  the  financing  parties  contacted  were  willing  to  provide

---

[12]     For the avoidance of doubt, several of the third-party lenders who were contacted as part of DIP financing process had previously executed non-disclosure agreements as part of earlier financing processes conducted during 2022, which are currently still active.

unsecured financing or financing secured by liens junior to the Debtors' prepetition debt.  *See* Moshinsky Decl. ¶ 14.

41.     Concurrent with the DIP marketing process, the Debtors and their advisors conducted hard-fought, arm's-length negotiations with their major creditor constituencies, including Highbridge, the Prepetition Revolving Lenders, and an ad hoc group of holders of the Prepetition Unsecured Notes with respect to DIP financing in connection with a comprehensive restructuring transaction.  *See* Moshinsky Decl. ¶ 15.  Ultimately, these negotiations culminated in the DIP terms set forth in the Restructuring Support Agreement. *See* Moshinsky Decl. ¶ 15.

42.     The Restructuring Support Agreement and the proposed DIP Facilities demonstrate the support and commitments from the Debtors' key stakeholders to the proposed restructuring transaction.  The proposed DIP Facilities, which provide the Debtors with immediate access to liquidity, including access to the use of Cash Collateral on a consensual basis, was the result of a comprehensive marketing and negotiation process and represents the best available terms for the Debtors' debtor-in-possession financing.   *See* Moshinsky Decl. ¶ 16.   Further, based on the marketing process for postpetition financing, no alternative sources of postpetition financing were readily available to the Debtors (whether unsecured or secured) on terms better than the DIP Facilities. *See* Moshinsky Decl. ¶ 20.

43.     The DIP Facilities and the Restructuring Support Agreement demonstrate the Prepetition Term Loan Lenders' and Prepetition Revolving Lenders' support and commitment to the Debtors and belief in the strength of the Debtors' asset base and future earnings potential.  *See* First Day Decl. ¶ 16.  The DIP Facilities will provide the Debtors with immediate access to liquidity and provide the Debtors with access to the use of the Cash Collateral on a consensual basis.  *See* Moshinsky Decl. ¶ 16.  The Debtors believe that the proposed DIP Facilities represent

reasonable, fair, and appropriate terms for the Debtors' debtor-in-possession financing under the circumstances.  *See* Moshinsky Decl. ¶ 21.

### The Terms of the DIP Facilities Should Be Approved

44.     The DIP Facilities consist of an aggregate principal amount of $87.4 million to fund the chapter 11 cases, consisting of a (i) $ 70 million senior secured term loan financing facility, which includes a roll-up of up to $35 million in Prepetition Term Loans outstanding under the Prepetition Term Loan Credit Facility, $17.5 million of which be rolled-up upon entry of the Interim Order and the remaining $17.5 million will be rolled up within two (2) business days of entry of the Final Order and (ii) a $17.4 million senior secured revolving credit facility, which includes $11.6 million in undrawn commitments, of which $3.4 million will be used to cash collateralize certain letters of credit, and a roll-up of $5.8 million in drawn revolving commitments under the Prepetition Revolving Credit Facility upon entry of the Interim Order.  *See* Moshinsky Decl. ¶ 17.  The DIP Facilities provide adequate protection for the Prepetition Agents in the form of: (a) adequate protection liens, (b) superpriority administrative expense claims, (c) allowed payments for fees and expenses, (d) interest, (e) financial reporting and covenants, and (f) information rights.  *See* Moshinsky Decl. ¶ 31.  Given the potential for diminution of value of the Prepetition Agents' respective interests in the Prepetition Collateral, the adequate protection provided is appropriate.  *See* Moshinsky Decl. ¶ 31.  In addition to providing fresh liquidity and access to Cash Collateral, the DIP Facilities contemplate a forbearance with respect to all borrowers and/or guarantors of the Debtors' prepetition secured debt other than the Debtors —a significant reduction in the administrative burden of these chapter 11 cases on the Debtors and their non-Debtor affiliates.  *See* Moshinsky Decl. ¶ 16. Additionally, the Bridge Financing gave the Debtors and their stakeholders time to negotiate a consensual restructuring path and avoid a free-fall into chapter 11—which would have prolonged these Chapter 11 Cases, likely required

significantly more postpetition financing commitments, and put the Debtors' ability to emerge from the Chapter 11 Cases in jeopardy.  *See* Moshinsky Decl. ¶ 23.

45.    The DIP Roll-Up Term Loans were a requirement for the consideration provided by the Term DIP Lenders as part of their commitment to provide postpetition financing. *See* Moshinsky Decl. ¶ 22.  Similarly, the ABL Roll-Up was a material component of the structure of the ABL DIP Facility and was required by the ABL DIP Lenders as a condition to their commitment to provide the Debtors with postpetition undrawn revolving commitments, the consensual use of Cash Collateral, a lower availability block during the first few months of the case to mitigate any risk of a paydown due to a borrowing base adjustment, reduced case controls and consent rights, continued treasury management services, and a standstill in respect to actions against non-Debtor guarantors.  *See* Moshinsky Decl. ¶ 24.  In addition, the ABL DIP Lenders made clear that they would not sign the Restructuring Support Agreement without the ABL Roll-Up.  *See* Moshinsky Decl. ¶ 24.  Given the Prepetition Secured Parties are likely oversecured, the refinancings only affect the timing and not the recovery on account of such prepetition secured claims.  Under the circumstances described herein and as set forth in the Moshinsky Declaration, the Debtors submit that these refinancings are appropriate and reasonable.  *See* Moshinsky Declaration ¶ ¶ 23, 26.

46.    In addition to the DIP Roll-Up Term Loans and ABL Roll-Up, the DIP Facilities contain various fees expressly required by the respective DIP Lenders as a condition to providing financing that are integral to the DIP Financing package.  *See* Moshinsky Decl. ¶¶ 27, 28. Each of the fees was the subject of arm's-length and good-faith negotiations between the Debtors and the respective DIP Lenders, is an integral component of the overall terms of the DIP Facilities, and is required by the respective DIP Agents and the respective DIP Lenders as consideration for the

extension of postpetition financing.  *See* Moshinsky Decl. ¶ 27.  Given the circumstances described herein and the lack of available alternatives, the fees are appropriate under the circumstances. *See* Moshinsky Declaration ¶ 28.

47.     For these reasons, the Debtors, in consultation with their advisors, determined that the DIP Lenders' financing proposal represents the only viable postpetition financing option available to the Debtors.  *See* Moshinsky Decl. ¶¶ 33, 34.  The DIP Facilities are the product of robust good-faith, arm's-length negotiations and are necessary for the Debtors to complete a successful restructuring.  The DIP Facilities provide the Debtors and their creditor constituencies with market-tested postpetition financing on the best available terms.  *See* Moshinsky Decl. ¶ 20. Accordingly, approval of the DIP Facilities is in the best interest of the Debtors' estates, and the Debtors respectfully request entry of the DIP Orders approving the DIP Facilities.

## **Basis for Relief**

### I.     **The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Documents.**

#### A.     **Entry into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.**

48.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facilities, and continue using the Cash Collateral.  Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34,

40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest.").

49.     Specifically, to determine whether a debtor has met this business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

50.     Further, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

51.     The Debtors' determination to move forward with the DIP Facilities is a sound exercise of their business judgment following an arm's-length process and careful evaluation of available alternatives.  Specifically, and in the face of insufficient cash on hand, the Debtors and their advisors determined that the Debtors would require postpetition financing to support their operational and chapter 11 activities.  The DIP Facilities will allow the Debtors to:  (a) obtain the liquidity necessary to continue operations in the ordinary course of business and reassure other

stakeholders; (b) fund payroll obligations; (c) fund the administrative cost of these chapter 11 cases; and (d) secure a path to emergence by enabling the Debtors to implement the restructuring contemplated by the Restructuring Support Agreement.  The Debtors negotiated the Term DIP Credit Agreement, ABL DIP Agreement, and the other DIP Documents with the DIP Lenders in good faith, at arm's-length, and with the assistance of their respective advisors, and the Debtors believe that they have obtained the best financing available.  Accordingly, the Court should authorize the Debtors' entry into the DIP Documents, as it is a reasonable exercise of the Debtors' business judgment.

**B.      The Roll-Up Is Appropriate.**

52.      The proposed DIP Orders provide that upon entry of the Interim Order (i) $17.5 million of outstanding term loans under the Prepetition Term Loan Credit Facility will be rolled into the Term DIP Facility and (ii) $5.8 million in drawn revolving commitments under the Prepetition Revolving Credit Facility will be rolled into the ABL DIP Facility (together, the "Roll-Up").  The proposed Roll-Up is an exercise of the Debtors' sound business judgment.

53.      Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  Courts in the Fifth Circuit have recognized that it is appropriate to authorize the payment of existing obligations where necessary to protect and preserve the estate, including an operating business's going-concern value.  *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation).  The business judgment rule shields a debtor's management from judicial second-guessing.  *In re Johns-Manville Corp.*, 60 B.R. 612,

615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.")

54.     Repayment of prepetition debt (often referred to as a "roll-up") is a common feature in debtor-in-possession financing arrangements.  The importance of "roll-up" features in DIP facilities has been repeatedly recognized by courts in this district and others, and such courts have granted relief similar to the relief requested herein.  *See e.g.*, *In re Pipeline Health System, LLC*, No. 22-90291 (MI) (Bankr. S.D. Tex. November 16, 2022) (authorizing $110 million in DIP financing that included repayment of approximately $70.7 million of prepetition debt); *In re Chesapeake Energy Corp.*, No. 20-33233 (DRJ) (Bankr. S.D. Tex. June 29, 2020) (authorizing $925 million in DIP financing that included repayment of over $750 million of prepetition debt); *In re Gulfport Energy Corp.*, No. 20-35562 (DRJ) (Bankr. S.D. Tex. Nov. 16, 2020) (authorizing $262.5 million in DIP financing that included repayment of approximately $157.5 million); *In re McDermott International, Inc.*, No. 20-30336 (DRJ) (Bankr. S.D. Tex. Jan. 23, 2020) (authorizing approximately $2.81 billion in DIP financing that included repayment of approximately $1 billion of prepetition debt).[13]

55.     Where, as here, the Prepetition Revolving Lenders and Prepetition Term Loan Lenders are likely oversecured, repaying creditors that stand to receive payment in full with postpetition loans will not harm the Debtors' estates and other creditors.  Rather, the proposed Roll-Up feature merely affects the timing, not the amount, of the Prepetition Revolving Lenders' recovery.  Further, the Roll-Up is a material component of the consideration required by the DIP

---

[13]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

Lenders as part of their commitment to provide postpetition financing.  Highbridge provided the Bridge Financing, which gave the Debtors and their stakeholders time to negotiate a consensual restructuring path and avoid a free-fall into chapter 11—which would have prolonged these Chapter 11 Cases, likely required significantly more postpetition financing commitments, and put the Debtors' ability to emerge from the Chapter 11 Cases in jeopardy.  A key negotiating point in Highbridge's willingness to provide the Bridge Financing at a time when the Debtors were in severe financial distress and heading towards an eventual chapter 11 filing, was the Debtors' willingness to seek a "roll-up" of prepetition term loan amounts into a subsequent DIP financing. *See* Moshinsky Decl. ¶ 23.  Furthermore, the Term DIP Facility, in addition to providing critical access to funding throughout the chapter 11 cases, also provides the Debtors with other important benefits.  Significantly, the Term DIP Lenders have agreed to roll a portion of the Term DIP Facility into an exit facility to fund the Debtors' emergence from chapter 11. *See* Moshinsky Decl. ¶ 18.

56.     Additionally, the ABL Roll-Up is essential to the proposed ABL DIP Facility.  The ABL Roll-Up was required by the ABL DIP Lenders as a condition to their commitment to provide the Debtors postpetition undrawn revolving commitments, the consensual use of Cash Collateral, a lower availability block during the first few months of the case to mitigate any risk of a paydown due to a borrowing based adjustment, reduced case controls and consent rights, continued treasury management services, and a standstill in respect to actions against non-Debtor guarantors.  In addition, the ABL DIP Lenders made clear that they would not sign the Restructuring Support Agreement without the ABL Roll-Up. *See* Moshinsky Decl. ¶ 24.  Additionally, the prepetition negotiations with the ABL DIP Lenders were critical in the Debtors' sale of their respiratory business just prior to the Petition Date.  Without agreement on the ABL Roll-Up, the Debtors

would not have been able to use of $3 million of proceeds to fund critical expenses prior to the filing. *See* Moshinsky Decl. ¶25. Without it, the Prepetition Revolving Lenders would not consent to the Debtors immediate use of Cash Collateral and the Debtors would not have access to an asset-based lending facility. *See* Moshinsky Decl. ¶ 26. Without continued access to the DIP Facilities, the Debtors' ability to restructure as a going concern will rapidly deteriorate, leading to a likely wind-down of their businesses and significant value destruction for all creditors. *See* DiDonato Decl. ¶ 15.

57. Finally, the DIP Facilities would not be available absent the Roll-Up. Without the agreement to roll-up outstanding obligations under the Prepetition Term Loan Credit Facility and the remaining drawn commitments under the Prepetition Revolving Credit facility, the Debtors would been unable to achieve the comprehensive restructuring contemplated by the Restructuring Support Agreement. Given these circumstances, the Roll-Up is reasonable, appropriate, and a sound exercise of the Debtors' business judgment.

**C.    The Debtors Should Be Authorized to Grant Liens and Superpriority Claims to the DIP Lenders.**

58. The Debtors propose to obtain financing under the DIP Facilities, in part, by providing superpriority claims and liens pursuant to section 364(c) of the Bankruptcy Code. Significantly, the Debtors propose to provide first priority liens on substantially all of the Debtors' assets, including previously unencumbered property and "priming" liens on all of the Prepetition Collateral, with relative priorities as between the DIP Lenders set forth in the Interim Order.

59. In the event that a debtor demonstrates that it is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court:

> [M]ay authorize the obtaining of credit or the incurring of debt
> (1) with priority over any or all administrative expenses of the kind

> specified in section 503(b) or 507(b) of [the Bankruptcy Code];
> (2) secured by a lien on property of the estate that is not otherwise
> subject to a lien; or (3) secured by a junior lien on property of the
> estate that is subject to a lien.

11 U.S.C. § 364(c); *see also In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987)

(secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing,

upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test

to determine whether a debtor is entitled to financing pursuant to section 364(c) of the Bankruptcy

Code. Specifically, courts look to whether:

> a. the debtor is unable to obtain unsecured credit under section
> 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender
> only an administrative claim;
>
> b. the credit transaction is necessary to preserve the assets of
> the estate; and
>
> c. the terms of the transaction are fair, reasonable, and
> adequate, given the circumstances of the debtor-borrower
> and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R at 37–40; *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–

02 (Bankr. E.D. Pa. 1988); *Crouse Group*, 71 B.R. at 549.

60.     No party that Miller Buckfire contacted as part of the above-described process was

interested in providing, or willing to provide, postpetition financing to the Debtors on an unsecured

basis. Indeed, no constituency was willing to provide postpetition financing on anything other

than a superpriority or priming basis with respect to all of the Debtors' assets. Put simply, the

DIP Lenders were not willing to provide the DIP Facilities on any other terms, and no other

existing stakeholder or third-party has presented a proposal without such priming liens. Further,

the Debtors have not discovered sufficient unencumbered assets to secure sufficient debtor-in-

possession financing to fund a non-consensual chapter 11 case. Accordingly, the structure of the

DIP Facilities is appropriate in light of the Debtors' financing needs and the lack of viable non-priming debtor-in-possession financing alternatives.

61.     Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  Accordingly, the Debtors may incur "priming" liens under the DIP Facilities if they are unable to obtain unsecured or junior secured credit and either (a) the existing secured parties have consented or (b) the existing secured parties' interests in collateral are adequately protected.

62.     Here, substantially all of the Prepetition Term Loan Lenders and Prepetition Revolving Lenders have consented to, and are participating in, the DIP Facilities.  In short, the Debtors and their advisors realized that proceeding with any DIP financing over the objection of the majority of the Prepetition Secured Parties would entail complicated, costly, and time-consuming litigation and that litigation of this kind would be inherently risky and not in the best interests of the Debtors' estates.  Further, the Prepetition Secured Parties will receive adequate protection of the Prepetition Collateral under the DIP Orders in the form of the Adequate Protection Liens and the Adequate Protection Super Priority Claims.

63.     Accordingly, the Debtors submit that relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is both warranted and appropriate under the circumstances.

**D.     No Comparable Alternative to the DIP Facilities Is Reasonably Available.**

64.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only

a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)). Furthermore, courts will defer to debtor's business judgment in selecting financing. *In re L.A. Dodgers LLC*, 457 B.R. at 313; *In re General Growth Properties, Inc.*, 412, B.R. 122, 126 (Bankr. S.D.N.Y. 2009) (approving DIP financing where it reflected the prudent business judgment of the debtors).

65.     Here, the Debtors conducted a competitive marketing process in the weeks leading up to the Petition Date to explore financing options.  *See* Moshinsky Decl. ¶ 14.  As described in greater detail in the Moshinsky Declaration, the Debtors contacted multiple institutions and strategic parties.  *See* Moshinsky Decl. ¶ 14.  In the midst of this robust process, the Debtors' North American liquidity position continued to worsen.  Ultimately, the Debtors did not receive any proposals from third-party lenders.  *See* Moshinsky Decl. ¶ 14.  Further, the Debtors do not believe any alternative sources of postpetition financing are readily available (whether unsecured or secured) on terms better than the DIP Facilities.  Following arm's-length negotiations, the Debtors determined that the DIP Facilities are the best available alternative under the circumstances to fund these chapter 11 cases.

**II.     The Debtors Should Be Authorized to Continue to Use the Cash Collateral.**

66.     The Debtors' use of property of their estates, including the Cash Collateral, is governed by section 363 of the Bankruptcy Code,[14] which provides in relevant part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).  Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).

67.     Generally, what constitutes adequate protection is decided on a case-by-case basis. *See In re Columbia Gas Sys., Inc.*, No. 91-803, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *see also In re Realty Southwest Assocs.*, 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its

---

[14]    Section 363(a) of the Bankruptcy Code defines "cash collateral" as follows:

> Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

collateral during the reorganization process") (citation omitted); *see also In re Cont'l Airlines Inc.*, 154 B.R. 176, 180–81 (Bankr. D. Del. 1993).

68.     The Prepetition Secured Parties will inherently benefit from the Debtors' proposed use of property of their estates, including the Cash Collateral, which will prevent avoidable diminution in value of the Cash Collateral and enhance the likelihood of preserving the Debtors' overall going concern value as the Debtors continue to negotiate with all of their key stakeholders. Preservation of the Debtors' business as a going concern in and of itself serves to provide such parties "adequate protection" for Bankruptcy Code purposes.  *See 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (noting that, in determining whether protection is "adequate," courts consider "whether the value of the debtor's property will increase as a result of the" use of collateral or provision of financing); *In re Sky Valley, Inc.*, 100 B.R. at 114 ("an increase in the value of the collateral . . . resulting from superpriority financing could result in adequate protection." (citation omitted).

69.     The Debtors believe that the proposed adequate protection in the proposed Interim Order is necessary and sufficient for the Debtors to continue to use Cash Collateral.  Accordingly, the Debtors submit that the adequate protection is (a) fair and reasonable, (b) necessary to satisfy the requirements of sections 363(c)(2) and 363(e) of the Bankruptcy Code, and (c) in the best interests of the Debtors and their estates.

**III.    The Debtors Should Be Authorized to Pay the Interest and Fees Required by the DIP Agents and the DIP Lenders under the DIP Documents.**

70.     Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain interest and fees to the DIP Agents and the DIP Lenders.  In particular, the Debtors have agreed to pay:

      a.     ***Interest Rates***.  The Term DIP Facility shall bear interest at 15.00% and the default rate shall be the interest rates plus an additional 2.00%.   The ABL

DIP Facility shall bear interest at the Alternate Base Rate plus 4.25% percent and the default rate shall be the interest rates plus an additional 2.00%.

b.     ***Upfront Fee***. The Term DIP Borrower shall pay a fee of 2.00% of the aggregate principal amount of the Initial New Money Term Loan and 2.00% of the aggregate principal amount of the Final New Money Term Loan.

c.     ***Administrative Agency Fee (Term DIP Facility)***. The Term DIP Borrower shall pay a fee to the Term DIP Administrative Agent as set forth in the Term DIP Administrative Agent Fee Letter filed under seal and annexed hereto as **Exhibit C**.

d.     ***Collateral Agency Fee (Term DIP Facility)***.  The Term DIP Borrower shall pay a one-time acceptance fee and a one-time agency fee to the Term DIP Collateral Agent pursuant to the Term DIP Collateral Agent Fee Letter filed under seal and annexed hereto as **Exhibit D**.

e.     ***Facility Fee***. The ABL DIP Borrowers shall pay a quarterly fee equal to (i) 0.375% if the average daily usage under the ABL DIP Facility is equal to or greater than 50%, or (ii) 0.50% if average daily usage under the ABL DIP Facility is less than 50%.

f.     ***Closing Fee***. The ABL DIP Borrowers shall pay $174,250 payable upon the closing of the ABL DIP Facility and $174,250 payable upon the maturity of the ABL DIP Facility.

71.     As set forth in the Moshinsky Declaration, the Debtors believe that the interest and fees to be paid under the DIP Facilities are necessary reasonable under the circumstances of these chapter 11 cases.  *See* Moshinsky Decl. ¶ 28.  The Debtors considered the fees described above when determining in their business judgment that the DIP Facilities constituted the best terms on which the Debtors could obtain postpetition financing necessary to continue their operations, prosecute their cases, and benefit the Debtors' estates.  Accordingly, the Court should authorize the Debtors to pay the interest and fees provided under the DIP Documents in connection with the DIP Facilities.

**IV.     The Scope of the Carveout is Appropriate.**

72.     The proposed adequate protection is subject to the Carve Out contained in the DIP Orders.  Without the Carve Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these chapter 11 cases would be restricted.  *See In re Ames Dep't Stores*, 115 B.R. at 40 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced.").  The Carve Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers.  Additionally, the Carve Out protects against administrative insolvency during the course of the chapter 11 cases by ensuring that assets remain for the payment of the Clerk of the Court, U.S. Trustee fees, and professional fees of the Debtors and any statutory committee appointed under section 1102 of the Bankruptcy Code in these chapter 11 cases.

**V.      The DIP Agents and the DIP Lenders Should Be Afforded Good-Faith Protection under Section 364(e).**

73.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

74.     As detailed in the Moshinsky Declaration, the DIP Facilities are the result of (a) the Debtors' reasonable and informed determination that no alternative sources of postpetition

financing are readily available to the Debtors (whether unsecured or secured) on terms better than the DIP Facilities, and (b) extensive arm's-length, good-faith negotiations between the Debtors and the DIP Secured Parties. *See* Moshinsky Decl. ¶¶ 15, 20. The Debtors submit the terms and conditions of the DIP Facilities are appropriate under the circumstances, and the proceeds of the DIP Facilities will be used only for purposes that are permissible under the Bankruptcy Code. Further, the Debtors market-tested the terms of the DIP Facilities before determining that the DIP Facilities provided the best terms available and was the only viable financing proposal supported by a majority of the Prepetition Secured Parties. *See* Moshinsky Decl. ¶¶ 14, 16. Accordingly, the Court should find that the obligations arising under the DIP Facilities and other financial accommodations made to the Debtors have been extended by the DIP Agents and the DIP Lenders in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and therefore the DIP Secured Parties are entitled to all of the protections afforded thereby.

**VI.    The Automatic Stay Should Be Modified on a Limited Basis.**

75.    The Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the DIP Orders. *See* Interim Order ¶ 10. The proposed Interim Order further provides that the automatic stay is modified to the extent necessary to implement and effectuate the terms of the Interim Order. *See id.* Finally, the proposed Interim Order provides that the automatic stay shall be vacated and modified, subject to certain limitations, to the extent necessary to permit the DIP Agents and DIP Lenders to exercise certain remedies upon the occurrence of an event of default by the Debtors under the DIP Documents. *See id.*

48

**VII.     Failure to Obtain Immediate Interim Access to the DIP Facilities and Cash Collateral Would Cause Immediate and Irreparable Harm.**

76.     Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the court is empowered to conduct an interim expedited hearing on the motion at which it may authorize a debtor to use cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. *See* Bankruptcy Rule 4001(b)(2).  Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3).  Furthermore, the Complex Case Procedures provide that "[o]n motion by the debtors, a hearing will routinely be conducted as a first-day hearing to consider either cash collateral use and/or interim debtor in possession financing."   Complex Case Procedures, ¶ 5.

77.     The Debtors require an immediate capital infusion to operate their business postpetition and to preserve their assets during the pendency of the chapter 11 cases.  *See* DiDonato Decl. ¶ 12.  If the Debtors cannot quickly access the DIP Facilities and Cash Collateral, the Debtors will not be able to operate their business in the ordinary course, which will result in immediate and irreparable harm to the Debtors and their stakeholders, and will diminish the value of the Debtors' estates.  *See* DiDonato Decl. ¶ 12.  Access to this liquidity is necessary to enable the Debtors to ultimately consummate their restructuring, all while funding the working capital needs of their business and maintaining favorable credit terms and relations with vendors, suppliers, customers, and other contract counterparties. *See* DiDonato Decl. ¶ 13.

78.     In connection with the search for viable postpetition financing, the Debtors, in consultation with their advisors, evaluated the Debtors' liquidity position and developed projected cash forecasts for the Debtors' business during these chapter 11 cases.  These forecasts take into account anticipated cash receipts and disbursements during the projected period and consider a number of factors, including, but not limited to, the effect of the chapter 11 filing on the operations of the business, fees and interest expenses associated with postpetition financing, professional fees, and customer and vendor obligations, as well as the operational performance of the business. *See* DiDonato Decl. ¶ 18.

79.     In addition, the Debtors, in consultation with their advisors, reviewed and analyzed their projected cash needs and prepared the Approved Budget of postpetition sources and uses of cash for the Debtors' business in the initial 13 weeks of these chapter 11 cases, including detailed line items for categories of cash flows anticipated to be received or disbursed during this period, and, along with longer term monthly forecasts, was utilized to determine the amount of postpetition financing required to administer these chapter 11 cases. *See* DiDonato Decl. ¶ 19.  The projections and Approved Budget provide an accurate reflection of the Debtors' likely funding requirements over the identified period, respectively, and are appropriate under the circumstances.  *See* DiDonato Decl. ¶ 20.

80.     The Debtors are seeking limited relief to, among other things, satisfy employee obligations, pay suppliers, expenses and billings related to the Debtors' manufacturing facilities, and make any other payments that are essential for the continued management, operation, and preservation of the Debtors' business.  *See* DiDonato Decl. ¶ 12. The ability to satisfy these expenses when due is essential to the continued operation of the Debtors' business during the pendency of these cases.  *See* DiDonato Decl. ¶ 12.

81.     Accordingly, pursuant to section 363(c)(3) of the Bankruptcy Code and Bankruptcy Rule 4001(b), the Debtors request that the Court conduct an expedited hearing on this motion, and enter the proposed Interim Order authorizing the Debtors to enter into the DIP Facilities and use the Cash Collateral.

**<u>Request for Final Hearing</u>**

82.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

**<u>Emergency Consideration</u>**

83.     The Debtors request emergency consideration of this motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  As set forth in this motion, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this motion on an emergency basis.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

84.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Reservation of Rights

85.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as:  (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested by this motion or any order granting the relief requested by this motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should

not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

**<u>Notice</u>**

86.     The Debtors have provided notice of this motion to the following parties or their respective counsel: (a) the Office of the United States Trustee for the Southern District of Texas; (b) the Debtors' prepetition secured lenders, collateral agents, and administrative agents; (c) the ad hoc group of holders of the Debtors' unsecured convertible notes; (d) Highbridge Capital Management, LLC; (e) Azurite Management LLC; (f) the Debtors' proposed debtor in possession financing lender; (g) the Internal Revenue Service; (h) the Securities and Exchange Commission; (i) the parties included on the Debtors' consolidated list of their 30 largest unsecured creditors; (j) the United States Attorney for the Southern District of Texas; (k) the state attorneys general for states in which the Debtors conduct business; (l) the Food and Drug Administration; (m) PNC; (n) the DIP Lenders and DIP Agents; and (o) any party that has requested notice pursuant to Bankruptcy Rule 2002.  Due to the urgency of the circumstances surrounding this motion and the nature of the relief sought, no further notice of this motion is required.

WHEREFORE, the Debtors respectfully request that the Court enter the DIP Orders, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
February 1, 2023

/s/ *Matthew D. Cavenaugh*

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4200
Facsimile:     (713) 752-4221
Email:          mcavenaugh@jw.com
                jwertz@jw.com
                vpolnick@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Ryan Blaine Bennett, P.C. (*pro hac vice* pending)
Yusuf Salloum (*pro hac vice* pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          ryan.bennett@kirkland.com
                yusuf.salloum@kirkland.com

- and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Nicole L. Greenblatt, P.C. (*pro hac vice* pending)
Erica D. Clark (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 610022
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          nicole.greenblatt@kirkland.com
                erica.clark@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

## Certificate of Accuracy

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Local Rule 9013-1(i).

*/s/ Matthew Cavenaugh*
Matthew D. Cavenaugh

## Certificate of Service

I certify that on February 1, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew Cavenaugh*
Matthew D. Cavenaugh

### Exhibit A

**Moshinsky Declaration**

**[On File]**

**<u>Exhibit B</u>**

**DiDonato Declaration**

**[On File]**

## Exhibit C

**Term DIP Administrative Agent Fee Letter**

**[Filed Under Seal]**

**<u>Exhibit D</u>**

**Term DIP Collateral Agent Fee Letter**

**[Filed Under Seal]**