United States Bankruptcy Court
Southern District of Texas

**ENTERED**

February 02, 2023

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| INVACARE CORPORATION, *et al.*,[1] | ) Case No. 23-90068 (CML) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION
FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND
PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE
STATUS, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION
SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING
A FINAL HEARING AND (VI) GRANTING RELATED RELIEF**

Upon the motion (the "**DIP Motion**")[2] of Invacare Corporation and each of its affiliates

that are debtors and debtors-in-possession (each, a "**Debtor**" and collectively, the "**Debtors**") in

the above-captioned cases (the "**Chapter 11 Cases**") and pursuant to sections 105, 361, 362,

363(b), 363(c)(2), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506(c) and 507

of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), Rules

2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy

Rules**"), Rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1 of the Bankruptcy Local Rules of the

United States Bankruptcy Court for the Southern District of Texas (together, the "**Local Rules**"),

and the Procedures for Complex Cases in the Southern District of Texas (the "**Complex Case**

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Invacare Corporation (0965); Freedom Designs, Inc. (4857); and Adaptive Switch Laboratories, Inc. (6470). The corporate headquarters and the mailing address for the Debtors is 1 Invacare Way, Elyria, Ohio 44035.

[2]   Capitalized terms used but not defined herein are given the meanings ascribed to such terms in the applicable DIP Credit Agreement (as defined herein).

Rules" and, together with the Local Rules, the "**Bankruptcy Local Rules**"), seeking entry of this interim order (this "**Interim Order**") among other things:

(i)   authorizing Invacare Corporation (the "**Borrower**") to obtain postpetition financing ("**DIP Financing**") pursuant to:

    a. a superpriority, senior secured and priming debtor-in-possession term loan credit facility (the "**Term DIP Facility**"), subject to the terms and conditions set forth in that certain Superpriority Secured Debtor-in-Possession Credit Agreement attached hereto as <u>**Exhibit 1**</u> (as amended, supplemented, or otherwise modified from time to time, the "**Term DIP Credit Agreement**"), by and among the Borrower, as borrower, the banks and other financial institutions or entities from time to time party thereto as "Lenders" (as defined in the Term DIP Credit Agreement) (the "**Term DIP Lenders**"), Cantor Fitzgerald Securities, as administrative agent (in such capacity, together with its successors and permitted assigns, the "**Term DIP Administrative Agent**") and GLAS Trust Corporation Limited, as collateral agent (in such capacity, together with its successors and permitted assigns, the "**Term DIP Collateral Agent**" and, together with the Term DIP Administrative Agent, the "**Term DIP Agents**") (the Term DIP Agents, collectively with the Term DIP Lenders, the "**Term DIP Secured Parties**"), in an aggregate principal amount not to exceed $70 million (the commitments in respect thereof, the "**Term DIP Commitments**"), consisting of:

      i. new money term loans in the aggregate principal amount of $35 million (the "**DIP New Money Term Loans**") from the Term DIP Lenders (as defined herein), of which $17.5 million will be available immediately upon entry of this Interim Order (the "**Initial Draw**"), and the remainder to be available no later than (2) two business days following the date of entry of the Final Order (the "**Final Draw**"); and

      ii. term loans in an aggregate principal amount of $35 million (the "**DIP Roll-Up Term Loans**" and, together with the DIP New Money Term Loans, the "**Term DIP Loans**"), which shall consist of the Interim Rolled-Up Term Loans and the Final Rolled-Up Term Loans (each as defined below).

        (A) On the date of this Interim Order, concurrently with the making of the Initial Draw of the DIP New Money Term Loans as described in <u>clause i.</u> above, $17.5 million in aggregate principal amount of Prepetition Term Loans shall be deemed substituted and exchanged for DIP Roll-Up Term Loans (such substitution and exchange, the "**Interim Term Loan Roll-Up**" and the Prepetition Term

Loans rolled-up pursuant to this <u>clause (A)</u>, the "**Interim Rolled-Up Term Loans**"), and $17.5 million of DIP Roll-Up Term Loans shall be deemed funded on the date of this Interim Order, without constituting a novation, and shall satisfy and discharge $17.5 million in aggregate principal amount of Interim Rolled-Up Term Loans.

(B) Subject to the entry of and the terms of the Final Order, on the Final Funding Date (as defined in the Term DIP Credit Agreement), concurrently with and automatically upon the Final Draw of the DIP New Money Term Loans (as defined in the Term DIP Credit Agreement), $17.5 million in aggregate principal amount of Prepetition Term Loans shall be deemed substituted and exchanged for DIP Roll-Up Term Loans (such substitution and exchange, the "**Final Term Loan Roll-Up**" and, together with the Interim Term Loan Roll-Up, the "**Term Loan Roll-Up**"; and the Prepetition Term Loans rolled-up pursuant to this <u>clause (B)</u>, the "**Final Rolled-Up Term Loans**"), and $17.5 million of DIP Roll-Up Term Loans shall be deemed funded on the Final Funding Date, without constituting a novation, and shall satisfy and discharge $17.5 million in aggregate principal amount of Final Rolled-Up Term Loans.

b. a superpriority, senior secured and priming debtor-in-possession asset-based revolving credit facility (the "**ABL DIP Facility**" and, together with the Term DIP Facility, the "**DIP Facilities**"), subject to the terms and conditions set forth in that certain ABL DIP Credit Agreement attached hereto as **<u>Exhibit 2</u>** (as amended, supplemented, or otherwise modified from time to time, the "**ABL DIP Credit Agreement**" and, together with the Term DIP Credit Agreement, the "**DIP Credit Agreements**"), by and among the Borrower, Freedom Designs, Inc., Medbloc, Inc., Invacare Canada L.P., Motion Concepts L.P. and Perpetual Motion Enterprises Limited, as borrowers (collectively, the "ABL DIP Borrower" and, together with the Borrower, the "**Borrowers**"), the banks and other financial institutions or entities from time to time party thereto as "Lenders" (as defined in the ABL DIP Credit Agreement) (the "**ABL DIP Lenders**" and, together with the Term DIP Lenders, the "**DIP Lenders**"), PNC Bank, National Association, as agent for the ABL DIP Lenders (in such capacity, together with its successors and permitted assigns, the "**ABL DIP Agent**" and, together with the Term DIP Agents, the **"DIP Agents"**) (the ABL DIP Agent, collectively with the ABL DIP Lenders, the "**ABL DIP Secured Parties**"; the ABL DIP Secured Parties, collectively with the Term DIP Secured Parties, the "**DIP Secured Parties**"), consisting of:

3

      i.   new money asset-based revolving credit facility loans in the aggregate principal amount of the unused Revolving Commitments (as defined in the Prepetition Revolving Credit Agreement) in an aggregate principal amount equal to $17.4 million (the "**DIP New Money ABL Loans**") from the ABL DIP Secured Parties, which amount will be available immediately upon entry of this Interim Order (the commitments in respect thereof, the "**ABL DIP Commitments**" and, together with the Term DIP Commitments, the "**DIP Commitments**"; the loans in respect thereof, the "**ABL DIP Loans**" and, together with the Term DIP Loans, the "**DIP Loans**")

      ii.   the roll up and conversion of all Prepetition Revolving Obligations (as defined herein) (the "**ABL Roll-Up**"; which ABL Roll-Up shall be separate and apart from the Term Loan Roll-Up, but may be collectively referred to herein with the Term Loan Roll-Up as, the "**Roll-Up**") and any unused Revolving Commitments (as defined in the Prepetition Revolving Credit Agreement) into the ABL DIP Facility pursuant to commitments of the ABL DIP Lenders in an aggregate principal amount equal to $10.3 million, consisting of revolving advances ("**ABL Revolving Advances**") and letters of credit issued or deemed issued under the ABL DIP Facility, with the entire amount of the ABL DIP Loans to be fully drawn in accordance with the terms of the ABL DIP Credit Agreement and applied automatically in full satisfaction of the outstanding Prepetition Revolving Obligations.

(ii)   authorizing and directing (a) the Debtors other than the Borrower (such Debtors, the "**Debtor Term DIP Guarantors**" and, together with the Borrower, the "**Debtor Term DIP Loan Parties**") to jointly and severally guarantee the Term DIP Loans and the other Term DIP Obligations (as defined herein) as set forth in that certain Domestic Superpriority Guarantee Agreement among the Borrower, certain domestic subsidiaries thereof, and the Term DIP Administrative Agent (as amended , supplemented or otherwise modified, the "**Domestic Guarantee**"); and (b) the Debtors identified as Borrowers (such Debtors, the "**Debtor ABL DIP Guarantors**" and, under and as defined in the ABL DIP Documents (as defined below), the "**Debtor ABL DIP Loan Parties**"; the Debtor ABL DIP Loan Parties and the Debtor Term DIP Loan Parties, collectively, the "**Debtor DIP Loan Parties**") to be jointly and severally obligated to repay the ABL DIP Loans and the other ABL DIP Obligations (as defined herein).

(iii)   authorizing and directing (a) the Debtor Term DIP Loan Parties to cause the "Guarantors" (as defined in the Term DIP Credit Agreement) that are not Debtors (the "**Non-Debtor Term DIP Loan Parties**" and together with the Debtor Term DIP Guarantors, the "**Term DIP Guarantors**" and together with the Borrower, the "**Term DIP Loan Parties**") to jointly and severally guarantee the Term DIP Loans and the other Term DIP Obligations as set forth in (x) the Domestic Guarantee and (y) that certain Foreign Superpriority Guarantee Agreement among the Borrower,

certain foreign subsidiaries thereof, and the Term DIP Agents; and (b) the Debtor ABL DIP Loan Parties to cause the "Guarantors" (as defined in the ABL DIP Credit Agreement) that are not Debtors (the "**Non-Debtor ABL DIP Loan Parties**" and, together with the Debtor ABL DIP Loan Parties, the "**ABL DIP Loan Parties**" and together with the Term DIP Loan Parties, the "**DIP Loan Parties**"; the Non-Debtor ABL DIP Loan Parties and the Non-Debtor Term DIP Loan Parties, collectively, the "**Non-Debtor DIP Loan Parties**") to jointly and severally guarantee the ABL DIP Loans and other ABL DIP Obligations.

(iv)    authorizing the Debtors, (i) subject to entry of this Interim Order, to effectuate the Interim Term Loan Roll-Up, (ii) upon entry of the Final Order, to effectuate the Final Term Loan Roll-Up and (iii) upon entry of this Interim Order, to effectuate the ABL Roll-Up;

(v)    authorizing (a) the Debtor Term DIP Loan Parties to, and authorizing and directing the Debtor Term DIP Loan Parties to cause the Non-Debtor Term DIP Loan Parties to, execute, deliver and perform under the Term DIP Credit Agreement and all other loan documentation, including security agreements, pledge agreements, control agreements, mortgages, deeds, charges, guarantees, promissory notes, intercompany notes, certificates, instruments, intellectual property security agreements, notes, the Prepetition ABL Intercreditor Agreement (as amended in connection with the DIP Financing, the "**ABL Intercreditor Agreement**"), the Junior Intercreditor Agreement, the Intercompany Subordination Agreement, the Fee Letters, and such other documents that may be reasonably requested by the Term DIP Secured Parties, in each case, as amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with the Term DIP Credit Agreement, all loan documents thereunder, this Interim Order, and the Final Order, the "**Term DIP Documents**") and (b) the Debtor ABL DIP Loan Parties to, and authorizing and directing the Debtor ABL DIP Loan Parties to cause the Non-Debtor ABL DIP Loan Parties to, execute, deliver and perform under the ABL DIP Credit Agreement and all other loan documentation, including security agreements, pledge agreements, control agreements, mortgages, deeds, charges, guarantees, promissory notes, intercompany notes, certificates, instruments, intellectual property security agreements, notes, the ABL Intercreditor Agreement, and such other documents that may be reasonably requested by the ABL DIP Secured Parties, in each case, as amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with the ABL DIP Credit Agreement, all loan documents thereunder, this Interim Order, and the Final Order, the "**ABL DIP Documents**" and together with the Term DIP Documents and the ABL Intercreditor Agreement, the "**DIP Documents**");

(vi)    authorizing (a) the Debtor Term DIP Loan Parties to incur, and to cause the Non-Debtor Term DIP Loan Parties to incur, loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees (including, without limitation, commitment fees, administrative agency fees, exit fees, other fees and

fees payable pursuant to the Fee Letters and the Term DIP Credit Agreement), costs, expenses and other liabilities, all other obligations (including indemnities and similar obligations, whether contingent or absolute) and all other obligations due or payable under the Term DIP Documents (collectively, the "**Term DIP Obligations**"), and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith and (b) the Debtor ABL DIP Loan Parties to incur, and to cause the Non-Debtor ABL DIP Loan Parties to incur, loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees (including, without limitation, commitment fees, administrative agency fees, exit fees, and other fees), costs, expenses and other liabilities, all other obligations (including indemnities and similar obligations, whether contingent or absolute) and all other obligations due or payable under the ABL DIP Documents (collectively, the "**ABL DIP Obligations**" and together with the Term DIP Obligations, the "**DIP Obligations**"), and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

(vii)   (a) subject to the Carve Out (as defined herein), granting to the Term DIP Secured Parties and each of the Term DIP Agents, for itself and for the benefit of the Term DIP Secured Parties, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all Term DIP Obligations of the Debtor Term DIP Loan Parties and (b) granting to the ABL DIP Secured Parties and the ABL DIP Agent, for itself and for the benefit of the ABL DIP Secured Parties, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all ABL DIP Obligations of the Debtor ABL DIP Loan Parties;

(viii)  (a) subject to the Carve Out, granting to the Term DIP Secured Parties and each of the Term DIP Agents, for itself and for the benefit of the Term DIP Secured Parties, valid, enforceable, non-avoidable and automatically perfected liens pursuant to section 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on all prepetition and postpetition property of the Debtor Term DIP Loan Parties' estates (other than certain excluded property as provided in the Term DIP Documents) and all proceeds thereof, including, subject only to and effective upon entry of the Final Order (as defined herein), any Avoidance Proceeds (as defined herein), in each case with the relative priorities set forth on **Exhibit 3** hereto, and (b) granting to the ABL DIP Secured Parties and the ABL DIP Agent, for itself and for the benefit of the ABL DIP Secured Parties, valid, enforceable, non-avoidable and automatically perfected liens pursuant to section 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code on all prepetition and postpetition property of the Debtor ABL DIP Loan Parties' estates and all proceeds thereof, including, subject only to and effective upon entry of the Final Order (as defined herein), in each case with the relative priorities set forth on **Exhibit 3** hereto;

(ix)   authorizing each of the DIP Agents, acting at the direction of the applicable required parties under the DIP Documents, and the Prepetition Agents, acting at the direction of the applicable required parties under the Prepetition Loan Documents,

6

as applicable, to take all commercially reasonable actions to implement and effectuate the terms of this Interim Order;

(x)     authorizing the Debtors to waive (a) their right to surcharge the Prepetition Collateral (as defined herein) and the DIP Collateral (as defined herein) (together, the "**Collateral**") pursuant to section 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code; *provided* that the foregoing waivers shall be immediately applicable and without prejudice to any provisions of the Final Order with respect to costs or expenses incurred following the entry of such Final Order;

(xi)    waiving the equitable doctrine of "marshaling" and other similar doctrines (a) with respect to the DIP Collateral for the benefit of any party other than the DIP Secured Parties and (b) with respect to any of the Prepetition Collateral (including the Cash Collateral) for the benefit of any party other than the Prepetition Secured Parties (as defined herein); *provided* that the foregoing waiver in clause (b) shall be immediately applicable without prejudice to any provisions of the Final Order;

(xii)   authorizing the Debtors to, and cause the Non-Debtor DIP Loan Parties to, use proceeds of the DIP Facilities solely in accordance with this Interim Order and the DIP Documents;

(xiii)  authorizing the Debtors to, and to cause the Non-Debtor DIP Loan Parties to, pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become earned, due and payable to the extent provided in, and in accordance with, the DIP Documents;

(xiv)   subject to the restrictions set forth in the DIP Documents and this Interim Order, authorizing the Debtors to use the Prepetition Collateral (as defined herein), including Cash Collateral of the Prepetition Secured Parties under the Prepetition Loan Documents (as defined herein), and provide adequate protection to the Prepetition Secured Parties for any diminution in value of their respective interests in the Prepetition Collateral (including Cash Collateral) (as defined herein), resulting from the imposition of the automatic stay under section 362 of the Bankruptcy Code (the "**Automatic Stay**"), the Debtors' use, sale, or lease of the Prepetition Collateral (including Cash Collateral), and the priming of their respective interests in the Prepetition Collateral (including Cash Collateral);

(xv)    vacating and modifying the Automatic Stay to the extent set forth herein to the extent necessary to permit the Debtors and their affiliates, the DIP Secured Parties and the Prepetition Secured Parties to implement and effectuate the terms and provisions of this Interim Order, the DIP Documents and the Final Order and to deliver any notices of termination described below and as further set forth herein;

(xvi)   waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order and, upon entry, the Final Order; and

(xvii)   scheduling a final hearing (the "**Final Hearing**") to consider final approval of the DIP Facilities and use of Cash Collateral pursuant to a proposed final order (the "**Final Order**"), as set forth in the DIP Motion and the DIP Documents filed with this Court.

The Court having considered the interim relief requested in the DIP Motion, the exhibits attached thereto, the *Declaration of Vladimir Moshinsky in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Existing Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "**Moshinsky Declaration**"), the *Declaration of John DiDonato In Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Existing Secured Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related* (the "**DiDonato Declaration**," and together with the Moshinsky Declaration, the "**DIP Declarations**"), and the *Declaration of Kathleen P. Leneghan, Senior Vice President and Chief Financial Officer of Invacare Corporation, in Support of the Chapter 11 Petitions and First Day Motions* (the "**First Day Declaration**"), the available DIP Documents, and the evidence submitted and arguments made at the interim hearing held on February 1, 2023 (the "**Interim Hearing**"); and due and sufficient notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Bankruptcy Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it

appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtor DIP Loan Parties and their estates pending the Final Hearing, otherwise is fair and reasonable and in the best interests of the Debtor DIP Loan Parties and their estates, and is essential for the continued operation of the Debtor DIP Loan Parties' businesses and the preservation of the value of the Debtor DIP Loan Parties' assets; and it appearing that the Debtor DIP Loan Parties' entry into the DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor.

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING**, **THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

A.    *Petition Date*.  On January 31, 2023 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Court**").   On February 1, 2023, this Court entered an order approving the joint administration of the Chapter 11 Cases.

B.    *Debtors in Possession*.   The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.     *Jurisdiction and Venue*.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  Consideration of the DIP Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter a final order consistent with Article III of the United States Constitution.  Venue for the Chapter 11 Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief sought herein are sections 105, 361, 362, 363(c), 363(e), 363(m), 364(c), 364(d)(1), 364(e), and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014, and Bankruptcy Local Rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1.

D.     *Creditors' Committee Formation*.  As of the date hereof, the United States Trustee for the Southern District of Texas (the "**U.S**. **Trustee**") has not appointed an official committee of unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "**Creditors' Committee**").

E.     *Notice*.  The Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Proper, timely, adequate and sufficient notice of the Interim Hearing and DIP Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Local Rules, and no other or further notice of the DIP Motion or the entry of this Interim Order shall be required. The DIP Motion complies with the requirements of Bankruptcy Local Rule 4001-1(b).

F.     *Cash Collateral*.  As used herein, the term "**Cash Collateral**" shall mean all of the Debtors' cash except for cash that is an Excluded Asset (as defined in the Term DIP Credit Agreement), wherever located and held, including cash in deposit accounts, that constitutes or will constitute "cash collateral" of any of the Prepetition Secured Parties and DIP Secured Parties within the meaning of section 363(a) of the Bankruptcy Code.

10

G.     *Debtors' Stipulations*.  Subject to the limitations contained in paragraph 21 hereof, and after consultation with their attorneys and financial advisors, the Debtors admit, stipulate and agree that:

(i)     *Prepetition Term Loan Credit Facility*.  Pursuant to that certain Credit Agreement, dated as of July 26, 2022 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Prepetition Term Loan Credit Agreement**", and collectively with the other Loan Documents (as defined in the Prepetition Term Loan Credit Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Prepetition Term Loan Documents**"), among (a) Invacare Corporation, as borrower (in such capacity, the "**Prepetition Term Loan Borrower**"), (b) Cantor Fitzgerald Securities, as administrative agent (in such capacity, the "**Prepetition Term Loan Administrative Agent**"), (c) GLAS Trust Corporation Limited, as collateral agent (in such capacity, the "**Prepetition Term Loan Collateral Agent**" and, together with the Prepetition Term Loan Administrative Agent, the "**Prepetition Term Loan Agents**"), (d) the Lenders (as defined in the Prepetition Term Loan Credit Agreement) party thereto (collectively, the "**Prepetition Term Loan Lenders**" and together with the Prepetition Term Loan Agents, the "**Prepetition Term Loan Secured Parties**"), the Prepetition Term Loan Lenders provided Term Loans (as defined in the Prepetition Term Loan Credit Agreement) (the "**Prepetition Term Loans**") to the Prepetition Term Loan Borrower pursuant to the Prepetition Term Loan Documents (the "**Prepetition Term Loan Credit Facility**").

(ii)     *Prepetition Secured Notes Indentures*.  (a) Pursuant to that certain Indenture, dated as of July 26, 2022 (as amended, restated, amended and restated, supplemented, waived, or

otherwise modified from time to time, the "**Prepetition Secured Tranche I Notes Indenture**"), by and among Invacare Corporation, as issuer (the "**Prepetition Secured Tranche I Issuer**"), the Note Guarantors (as defined in the Prepetition Secured Tranche I Notes Indenture), Computershare Trust Company, N.A., as trustee, and GLAS Trust Corporation Limited, as notes collateral agent (the "**Prepetition Notes Tranche I Collateral Agent**"), Invacare Corporation issued the 5.68% Convertible Senior Secured Notes due 2026, Tranche I (the "**Prepetition Secured Tranche I Notes**") and (b) pursuant to that certain Indenture, dated as of July 26, 2022 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Prepetition Secured Tranche II Notes Indenture**" and together with the Prepetition Secured Tranche I Notes Indenture, the "**Prepetition Secured Notes Indentures**"), by and among Invacare Corporation, as issuer (the "**Prepetition Secured Tranche II Issuer**" and together with the Prepetition Secured Tranche I Issuer, the "**Prepetition Secured Notes Issuers**"), the Note Guarantors (as defined in the Prepetition Secured Tranche II Notes Indenture), Computershare Trust Company, N.A, as trustee, and GLAS Trust Corporation Limited, as notes collateral agent (the "**Prepetition Notes Tranche II Collateral Agent**"), Invacare Corporation issued the 5.68% Convertible Senior Secured Notes due 2026, Tranche II (the "**Prepetition Secured Tranche II Notes**" and together with the Prepetition Secured Tranche I Notes, the "**Prepetition Secured Notes**"; the trustees and notes collateral agents under the Prepetition Secured Notes Indentures, the "**Prepetition Secured Notes Agents**"; the Prepetition Secured Notes Agents and the holders of the Prepetition Secured Notes, the "**Prepetition Secured Notes Parties**"; the Collateral Documents (as defined in the Prepetition Secured Notes Indentures) and any other agreements and documents executed or delivered in connection with the Prepetition Secured Notes Indentures,

each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Prepetition Secured Notes Documents**").

(iii)    *Prepetition Revolving Credit Facility*.   Pursuant to that certain Second Amended and Restated Revolving Credit and Security Agreement, dated as of July 26, 2022 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Prepetition Revolving Credit Agreement**", and collectively with the Other Documents (as defined in the Prepetition Revolving Credit Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, the "**Prepetition Revolving Credit Documents**" and, together with the Prepetition Term Loan Documents and the Prepetition Secured Notes Documents, the "**Prepetition Loan Documents**"), among (a) Invacare Corporation, Freedom Designs, Inc., Medbloc, Inc., Invacare Canada L.P., Motion Concepts L.P. and Perpetual Motion Enterprises Limited, as borrowers (in such capacity, the "**Prepetition Revolving Borrowers**"; the Prepetition Term Loan Borrower, the Prepetition Secured Notes Issuers and the Prepetition Revolving Borrowers, collectively, the "**Prepetition Primary Obligors**"), (b) the Guarantors (as defined in the Prepetition Revolving Credit Agreement) party thereto (collectively, the "**Prepetition Revolving Guarantors**"), (c) PNC Bank, National Association, as agent for the Lenders (in such capacity, the "**Prepetition Revolving Agent**" and, together with the Prepetition Term Loan Agents and the Prepetition Secured Notes Agents, the "**Prepetition Agents**"), (d) the Lenders (as defined in the Prepetition Revolving Credit Agreement) party thereto (collectively, the "**Prepetition Revolving Lenders**" and together with the Prepetition Revolving Agent, the "**Prepetition Revolving Secured Parties**"; the Prepetition Term Loan Secured Parties, the Prepetition Secured Notes Parties and the Prepetition Revolving

Secured Parties, collectively, the "**Prepetition Secured Parties**"), the Prepetition Revolving Lenders have provided Advances (as defined in the Prepetition Revolving Credit Agreement) (the "**Prepetition Revolving Loans**") to the Prepetition Revolving Borrowers pursuant to the Prepetition Revolving Credit Documents (the "**Prepetition Revolving Credit Facility**").

(iv)     Pursuant to and to the extent set forth in that certain Intercreditor Agreement (the "**Prepetition ABL Intercreditor Agreement**"), dated as of July 26, 2022, by and among PNC Bank, National Association, as agent for itself and the Prepetition Revolving Lenders under the Prepetition Revolving Credit Agreement, GLAS Trust Corporation Limited, as collateral agent for itself and the Prepetition Term Loan Lenders under the Prepetition Term Loan Credit Agreement, GLAS Trust Corporation Limited, as collateral agent for itself and the other Prepetition Secured Notes Parties under the Prepetition Secured Notes Indentures, the applicable Prepetition Agents agreed, among other things (a) that the Prepetition Liens of the Prepetition Term Loan Secured Parties and the Prepetition Secured Notes Parties on the CF Debt Priority Collateral (as defined in the Prepetition ABL Intercreditor Agreement) (the "**Prepetition Non-ABL Priority Collateral**") are senior to the Prepetition Liens of the Prepetition Revolving Secured Parties on the Prepetition Non-ABL Priority Collateral and (b) that the Prepetition Liens of the Prepetition Revolving Secured Parties on the Revolving Credit Priority Collateral (as defined in the Prepetition ABL Intercreditor Agreement) (the "**Prepetition ABL Priority Collateral**") are senior to the Prepetition Liens of the Prepetition Term Loan Secured Parties and the Prepetition Secured Notes Parties on the Prepetition ABL Priority Collateral, (c) to be bound by the waterfall and turnover provisions contained therein and (d) to (x) consent to, or not oppose, certain actions taken, or rights asserted, by the Prepetition Term Loan Secured Parties and the Prepetition Secured Notes Parties and/or the Prepetition Revolving Secured Parties, as applicable,

and (y) refrain from taking certain actions with respect to the Prepetition Collateral, including in connection with a bankruptcy proceeding.  Except as provided herein, the rights of the Prepetition Revolving Secured Parties and Prepetition Term Loan Secured Parties shall continue to be governed by the terms of the ABL Intercreditor Agreement, including as amended in connection with the DIP Financing.

(v)  *Prepetition Term Loan Guarantee*.  Pursuant to (x) that certain Domestic Term Loan Guarantee Agreement, dated as of July 26, 2022 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time) and (y) that certain Foreign Term Loan Guarantee Agreement, dated as of July 26, 2022 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time), the Debtors and certain of their direct and indirect non-Debtor subsidiaries and affiliates party thereto (the "**Prepetition Term Guarantors**") guaranteed on a joint and several basis the obligations under the Prepetition Term Loan Documents.

(vi)  *Prepetition Secured Notes Guarantee*.  Pursuant to (x) that certain Guarantee dated as of July 26, 2022 with respect to the Prepetition Secured Tranche I Notes (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time) and (y) that certain Guarantee dated as of July 26, 2022 with respect to the Prepetition Secured Tranche II Notes (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time), the Debtors and certain of their direct and indirect non-Debtor subsidiaries and affiliates party thereto (the "**Prepetition Secured Notes Guarantors**") guaranteed on a joint and several basis the obligations under the Prepetition Secured Notes Documents.

(vii)    *Prepetition Revolving Guarantee*. Pursuant to that certain Continuing Agreement of Guaranty and Suretyship dated as of January 16, 2015 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time), the certain of the Debtors' direct and indirect non-Debtor subsidiaries and affiliates party thereto (the "**Prepetition Revolving Guarantors**" and, together with the Prepetition Term Guarantors and the Prepetition Secured Notes Guarantors, the "**Prepetition Guarantors**") guaranteed on a joint and several basis the obligations under the Prepetition Revolving Credit Documents.

(viii)    *Prepetition Term Loan Debt*.  As of the Petition Date, the Prepetition Term Loan Borrower was justly and lawfully indebted and liable to the Prepetition Term Loan Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $90,500,000.00 in outstanding principal amount of Prepetition Term Loans (collectively, together with accrued and unpaid interest, any reimbursement obligations (contingent or otherwise) in respect of letters of credit, any fees, expenses and disbursements (including attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), treasury, cash management, bank product and derivative obligations, indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Term Loan Borrower's or the Prepetition Term Guarantors' obligations pursuant to, or secured by, the Prepetition Term Loan Documents, including all Loan Document Obligations (as defined in the Prepetition Term Loan Credit Agreement) (collectively, the "**Prepetition Term Loan Obligations**"), and, together with all other interest, fees, prepayment premiums, early termination fees, costs and other charges, the

"**Prepetition Term Loan Debt**") which Prepetition Term Loan Debt has been guaranteed on a joint and several basis by each of the Prepetition Term Guarantors.

(ix)    *Prepetition Secured Notes*.  As of the Petition Date, the Prepetition Secured Notes Issuers were justly and lawfully indebted and liable to the holders of Prepetition Secured Notes, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $41,475,000.00, including (a) $20,739,000.00 in outstanding principal amount of Prepetition Secured Tranche I Notes and (b) $20,736,000.00 in outstanding principal amount of Prepetition Secured Tranche II Notes (collectively, together with accrued and unpaid interest, any fees, expenses and disbursements (including attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Secured Notes Issuers' or the Prepetition Secured Notes Guarantors' obligations pursuant to, or secured by, the Prepetition Secured Notes Documents, including all Notes Obligations (as defined in each of the Prepetition Secured Notes Indentures) (collectively, the "**Prepetition Secured Notes Obligations**"), and, together with all other interest, fees, prepayment premiums, early termination fees, costs and other charges, the "**Prepetition Secured Notes Debt**") which Prepetition Secured Notes Debt has been guaranteed on a joint and several basis by each of the Prepetition Secured Notes Guarantors.

(x)    *Prepetition Revolving Loans*.  As of the Petition Date, the Prepetition Revolving Borrowers were justly and lawfully indebted and liable to the Prepetition Revolving Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $10,257,631.50  million, including, without limitation, (a) $5,828,867.50

17

million in outstanding principal amount of Prepetition Revolving Loans, (b) outstanding letters of credit in the aggregate amount of $4,428,764.00, and (c) all accrued and accruing charges and obligations in respect of Cash Management Products and Services (as defined in the Prepetition Revolving Credit Agreement), including without limitation, that certain Global Multilateral Netting Agreement dated as of August 16, 2022 among, *inter alia*, Borrower and PNC Bank, National Association (collectively, together with accrued and unpaid interest, any fees, expenses and disbursements (including attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, guarantee obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Revolving Borrowers' or the Prepetition Revolving Guarantors' obligations pursuant to, or secured by, the Prepetition Revolving Documents, including all Obligations (as defined in the Prepetition Revolving Credit Agreement) (collectively, the "**Prepetition Revolving Obligations**"), and all interest, fees, prepayment premiums, early termination fees, costs and other charges, the "**Prepetition Revolving Debt**"; the Prepetition Term Loan Debt, the Prepetition Secured Notes Debt and the Prepetition Revolving Debt, collectively, the "**Prepetition Secured Debt**") which Prepetition Revolving Debt has been guaranteed on a joint and several basis by each of the Prepetition Revolving Guarantors.

(xi)    *Prepetition Liens*.    As more fully set forth in the Prepetition Loan Documents, prior to the Petition Date, the Prepetition Primary Obligors and the Prepetition Guarantors each granted to each of the respective Prepetition Agents, for the benefit of itself and the other Prepetition Secured Parties, a security interest in and continuing lien on (the "**Prepetition Liens**") substantially all of their assets and property, including Cash Collateral, subject to certain

limited customary exclusions as set forth in the Prepetition Loan Documents (the "**Prepetition Collateral**").

(xii)   *Validity, Perfection and Priority of Prepetition Liens and Prepetition Secured Debt*.  The Debtors, on behalf of themselves and the non-Debtor Prepetition Guarantors, acknowledge and agree that as of the Petition Date (a) the Prepetition Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable and properly perfected and were granted to, or for the benefit of, the Prepetition Secured Parties for fair consideration and reasonably equivalent value; (b) the Prepetition Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to certain liens senior by operation of law (solely to the extent any such liens were permitted by the Prepetition Loan Documents and were valid, properly perfected, non-avoidable and senior in priority to the Prepetition Liens as of the Petition Date, the "**Prepetition Permitted Prior Liens**"); (c) the Prepetition Secured Debt constitutes legal, valid, binding, and non-avoidable obligations of the Prepetition Primary Obligors and the Prepetition Guarantors enforceable in accordance with the terms of the applicable Prepetition Loan Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Secured Debt exist, and no portion of the Prepetition Liens or Prepetition Secured Debt is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors

and employees arising out of, based upon or related to the Prepetition Secured Debt; and (f) the Debtors waive, discharge, and release any right to challenge any of the Prepetition Secured Debt, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the Prepetition Liens securing the Prepetition Secured Debt.

(xiii)   *Intercreditor Agreements.* Pursuant to Section 510 of the Bankruptcy Code, the Prepetition ABL Intercreditor Agreement, the Junior Intercreditor Agreement, the Intercompany Subordination Agreement, and any other applicable intercreditor or subordination provisions contained in any of the other Prepetition Loan Documents (the "Intercreditor Agreements") (i) shall remain in full force and effect, (ii) shall continue to govern the relative priorities, rights, and remedies of the Prepetition Secured Parties (including the relative priorities, rights and remedies of such parties with respect to replacement liens, administrative expense claims and superpriority administrative expense claims granted or amounts payable in respect thereof by the Debtors under this Interim Order or otherwise) and (iii) shall not be deemed to be amended, altered or modified by the terms of this Interim Order or the DIP Documents, unless expressly set forth herein or therein, including as amended by the ABL Intercreditor Agreement.

(xiv)   *No Control*.  None of the Prepetition Secured Parties control (or have in the past controlled) the Debtors or their properties or operations, have authority to determine the manner in which any Debtors' operations are conducted or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from the Prepetition Loan Documents.

(xv)   *No Claims or Causes of Action*.  No claims or causes of action held by the Debtors or their estates exist against, or with respect to, the Prepetition Secured Parties and each of their respective Representatives (as defined herein) (in each case, in their capacity as such)

under or relating to any agreements by and among the Debtors and any Prepetition Secured Party that is in existence as of the Petition Date.

(xvi)    *Release*.  Effective as of the date of entry of this Interim Order, each of the Debtors and the Debtors' estates, on its own behalf, on behalf of (to the greatest extent permitted by law) the Non-Debtor DIP Loan Parties, and on behalf of its and their respective past, present and future predecessors, successors, heirs, subsidiaries, and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits the Prepetition Secured Parties, the DIP Secured Parties, and each of their respective Representatives (as defined herein) (collectively, the "**DIP Released Parties**"), from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the Petition Date of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract or tort or under any state or federal law or otherwise (collectively, the "**Released Claims**"), in each case arising out of or related to (as applicable) the Prepetition Loan Documents, the DIP Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions and agreements reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter can or may have against any of the DIP Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order.  For the avoidance of doubt, nothing in this release shall relieve the DIP Secured

Parties, the Debtor DIP Loan Parties or the Non-Debtor DIP Loan Parties of their DIP Obligations under the DIP Documents.

H.    *Corporate Authority.*  Each Debtor has all requisite corporate power and authority to execute and deliver the DIP Documents to which it is a party and to perform its obligations thereunder.

I.    *Findings Regarding the DIP Financing and Use of Cash Collateral.*

(i)    Good and sufficient cause has been shown for the entry of this Interim Order and for authorization of the Debtor DIP Loan Parties to obtain financing pursuant to the DIP Documents.

(ii)    The Debtor DIP Loan Parties have an immediate and critical need to obtain the DIP Financing and to use the Prepetition Collateral (including Cash Collateral) in order to, among other things (a) permit the orderly continuation of the operation of their business, (b) maintain business relationships with vendors, suppliers and customers, (c) make payroll, (d) make capital expenditures, (e) satisfy other working capital and operational needs and (f) fund expenses of these Chapter 11 Cases.  In the absence of the DIP Facilities and the use of Cash Collateral, the Debtors' business and estates would suffer immediate and irreparable harm.  The access by the Debtor DIP Loan Parties to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral, the incurrence of new indebtedness under the DIP Documents and the other financial accommodations provided under the DIP Documents are necessary and vital to the preservation and maintenance of the going concern values of the Debtor DIP Loan Parties and to a successful reorganization of the Debtor DIP Loan Parties.

(iii)    The Debtor DIP Loan Parties are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable

to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtor DIP Loan Parties are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting to the DIP Secured Parties, the DIP Liens and the DIP Superpriority Claims (each as defined herein) and incurring the Adequate Protection Obligations (as defined herein), in each case subject to the Carve Out, to the extent set forth in and as expressly limited by the provisions of paragraph 5 herein, under the terms and conditions set forth in this Interim Order and in the DIP Documents.

(iv)     The Debtor DIP Loan Parties continue to collect cash, rents, income, offspring, products, proceeds, and profits generated from the Prepetition Collateral and acquire equipment, inventory and other personal property, all of which constitute Prepetition Collateral under the Prepetition Loan Documents that are subject to the Prepetition Secured Parties' security interests as set forth in the Prepetition Loan Documents, as applicable.

(v)     The Debtor DIP Loan Parties desire to use a portion of the cash, rents, income, offspring, products, proceeds and profits described in the preceding paragraph in their business operations that constitute Cash Collateral of the Prepetition Secured Parties under section 363(a) of the Bankruptcy Code.  Certain prepetition rents, income, offspring, products, proceeds, and profits, in existence as of the Petition Date, including balances of funds in the Debtor DIP Loan Parties' prepetition and postpetition operating bank accounts, also constitute Cash Collateral.

(vi)     Based on the DIP Motion, the DIP Declarations and the record presented to the Court at the Interim Hearing, the terms of the DIP Financing, the terms of the adequate protection granted to the Prepetition Secured Parties as provided in paragraph 16 of this Interim Order (the "**Adequate Protection**"), and the terms on which the Debtor DIP Loan Parties may

continue to use the Prepetition Collateral (including Cash Collateral) pursuant to this Interim Order and the DIP Documents are fair and reasonable, reflect the Debtor DIP Loan Parties' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(vii)    The DIP Financing (including the Roll-Up), the Adequate Protection and the use of the Prepetition Collateral (including Cash Collateral) have been negotiated in good faith and at arm's length among the Debtor DIP Loan Parties, the Non-Debtor DIP Loan Parties, the DIP Secured Parties and the Prepetition Secured Parties, and all of the Debtor DIP Loan Parties' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Financing and the DIP Documents, including, without limitation: all loans made to and guarantees issued by the Debtor DIP Loan Parties pursuant to the DIP Documents and any DIP Obligations shall be deemed to have been extended by the DIP Agents and the DIP Secured Parties and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Agents and the DIP Secured Parties (and the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise. The Debtor DIP Loan Parties have provided adequate consideration and reasonably equivalent value in exchange for the guarantees provided by the Non-Debtor DIP Loan Parties.

(viii)    The Prepetition Agents and the Prepetition Secured Parties have acted in good faith regarding the DIP Financing and the Debtor DIP Loan Parties' continued use of the Prepetition Collateral (including Cash Collateral) to fund the administration of the Debtor DIP Loan Parties' estates and continued operation of their businesses (including the incurrence and

payment of and performance under the Adequate Protection Obligations and the granting of the

Adequate Protection Liens (each as defined herein)), in accordance with the terms hereof, and the

Prepetition Agents and Prepetition Secured Parties (and the successors and assigns thereof) shall

be entitled to the full protection of sections 363(m) and 364(e) of the Bankruptcy Code in the event

that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or

otherwise.

(ix)    The Prepetition Secured Parties are entitled to the Adequate Protection

provided in this Interim Order as and to the extent set forth herein pursuant to sections 361, 362,

363 and 364 of the Bankruptcy Code.  Based on the DIP Motion and on the record presented to

the Court, the terms of the proposed Adequate Protection arrangements and of the use of the

Prepetition Collateral (including Cash Collateral) are fair and reasonable, reflect the Debtor DIP

Loan Parties' prudent exercise of business judgment and constitute reasonably equivalent value

and fair consideration for the use of the Prepetition Collateral, including the Cash Collateral, and

the Required Lenders (as such term is defined in the Prepetition Term Loan Credit Agreement),

the Required Holders (as such term is defined in the Prepetition Secured Tranche I Notes

Indenture), the Required Holders (as such term is defined in the Prepetition Secured Tranche II

Notes Indenture) and the US-Canada Required Lenders (as such term is defined in the Prepetition

Revolving Credit Agreement), have consented or are deemed hereby to have consented to the use

of the Prepetition Collateral, including the Cash Collateral, the priming of the Prepetition Liens by

the DIP Liens pursuant to the terms set forth in this Interim Order and the DIP Documents, and

the Roll-Up; *provided* that nothing in this Interim Order or the DIP Documents shall (x) be

construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash

Collateral other than on the terms set forth in this Interim Order and in the context of the DIP

Case 23-90068   Document 96   Filed in TXSB on 02/02/23   Page 26 of 485

Financing authorized by this Interim Order to the extent such consent has been or will be given, (y) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior) other than as contemplated by the DIP Financing authorized by this Interim Order or (z) prejudice, limit or otherwise impair the rights of any of the Prepetition Secured Parties to seek new, different or additional adequate protection or assert any rights of any of the Prepetition Secured Parties, and the rights of any other party in interest, including the Debtor DIP Loan Parties, to object to such relief are hereby preserved.

(x)     Upon (i) entry of this Interim Order and (ii) entry of the Final Order, as applicable, the Interim Term Loan Roll-Up and the Final Term Loan Roll-Up reflect the Debtor Term DIP Loan Parties' exercise of prudent business judgment consistent with their fiduciary duties.  The Prepetition Term Loan Secured Parties and the Prepetition Secured Notes Parties would not otherwise consent to the use of their Cash Collateral or the subordination of their liens to the DIP Liens (as defined herein), and the Term DIP Secured Parties would not be willing to provide the Term DIP Facility or extend credit to the Debtor Term DIP Loan Parties thereunder without the Interim Term Loan Roll-Up and the Final Term Loan Roll-Up.  The Interim Term Loan Roll-Up and the Final Term Loan Roll-Up will benefit the Debtors and their estates because it will enable the Debtors to obtain urgently needed financing critical to administering these Chapter 11 Cases and funding their operations, which financing would not otherwise be available.

(xi)     Upon (i) entry of this Interim Order and (ii) entry of the Final Order, as applicable, the ABL Roll-Up reflects the ABL DIP Loan Parties' exercise of prudent business judgment consistent with their fiduciary duties.  The Prepetition Revolving Lenders and their affiliates that have provided Prepetition Secured Debt to the Debtors would not otherwise consent

to the use of their Cash Collateral or the subordination of their liens to the DIP Liens, and the ABL DIP Agent and the ABL DIP Lenders would not be willing to provide the ABL DIP Facility or extend credit to the ABL DIP Loan Parties thereunder without the ABL Roll-Up. The ABL Roll-Up will benefit the Debtors and their estates because it will enable the Debtors to obtain necessary financing critical to administering these Chapter 11 Cases and funding their operations.

(xii)    The Debtors have prepared and delivered to the advisors to the Term DIP Secured Parties an initial budget (the "**Initial DIP Budget**"), attached hereto as <u>Schedule 1</u>. The Initial DIP Budget reflects, among other things, the Borrower's and its Restricted Subsidiaries' (as defined in the Term DIP Credit Agreement) anticipated sources and uses of cash for each calendar week, in form and substance satisfactory to the Required Term DIP Lenders.[4]  The Initial DIP Budget may be modified, amended and updated from time to time in accordance with the Term DIP Credit Agreement, and once approved by the Required Term DIP Lenders pursuant to the Term DIP Credit Agreement, shall supplement and replace the Initial DIP Budget (the Initial DIP Budget and each subsequent approved budget, shall constitute without duplication, an "**Approved Budget**").  The Debtors believe that the Initial DIP Budget is reasonable under the facts and circumstances.  The Term DIP Secured Parties are relying, in part, upon the DIP Loan Parties' agreement to comply with the Approved Budget, the other DIP Documents and this Interim Order in determining to enter into the postpetition financing arrangements provided for in this Interim Order.

(xiii)    Each of the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception

---

[4]    "**Required Term DIP Lenders**" means, at any time, Term DIP Lenders constituting "Required Lenders" as defined in the Term DIP Credit Agreement.

under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, product, offspring, or profits with respect to any of the Prepetition Collateral.

J.      *Immediate Entry*.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Bankruptcy Local Rule 4001-1(b). Absent granting the relief set forth in this Interim Order, the Debtor DIP Loan Parties' estates will be immediately and irreparably harmed.  Consummation of the DIP Financing and the use of Prepetition Collateral (including Cash Collateral), in accordance with this Interim Order and the DIP Documents are therefore in the best interests of the Debtor DIP Loan Parties' estates and consistent with the Debtor DIP Loan Parties' exercise of their fiduciary duties.

K.      *Prepetition Permitted Prior Liens; Continuation of Prepetition Liens*.  Nothing herein shall constitute a finding or ruling by this Court that any alleged Prepetition Permitted Prior Lien is valid, senior, enforceable, prior, perfected, or non-avoidable.  Moreover, nothing herein shall prejudice the rights of any party-in-interest, including, but not limited to, the Debtor DIP Loan Parties, the DIP Agents, the DIP Secured Parties, the Prepetition Agents, or the Prepetition Secured Parties to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Prepetition Permitted Prior Lien and/or security interests.  The right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Prepetition Permitted Prior Lien and is expressly subject to the DIP Liens (as defined herein). The Prepetition Liens, and the DIP Liens that prime the Prepetition Liens, are continuing liens and the DIP Collateral is and will continue to be encumbered by such liens in light of the integrated nature of the DIP Facility, the DIP Documents and the Prepetition Loan Documents.

Based upon the foregoing findings and conclusions, the DIP Motion and the record before the Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      *Motion Granted*.  The interim relief sought in the DIP Motion is granted, the interim financing described herein is authorized and approved, and the use of Cash Collateral on an interim basis is authorized, in each case subject to the terms and conditions set forth in the DIP Documents and this Interim Order.  All objections to this Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled on the merits.  This Interim Order shall become effective immediately upon its entry.

2.      *Authorization of the DIP Financing and the DIP Documents*.

(a)      The Debtor DIP Loan Parties are hereby authorized, and the Debtors are authorized and directed to cause the Non-Debtor DIP Loan Parties, as applicable, to execute, deliver, enter into and, as applicable, perform all of their obligations under the DIP Documents (including, without limitation, the Intercreditor Agreements (as defined in the Term DIP Credit Agreement)) and such other and further acts as may be necessary, appropriate or desirable in connection therewith.  The Borrowers are hereby authorized to borrow money pursuant to the DIP Credit Agreements, each Debtor Term DIP Guarantor is hereby authorized to, and the Debtors are hereby authorized and directed to cause the Non-Debtor DIP Loan Parties to, provide a guaranty of payment in respect of the Borrower's obligations with respect to such borrowings, subject to any limitations on borrowing under the DIP Documents, which shall be used for all purposes permitted under the DIP Documents (and subject to and in accordance with the Approved Budget). Except as provided herein, the rights of the ABL DIP Secured Parties and Term DIP Secured

Parties shall continue to be governed by the terms of the ABL Intercreditor Agreement, except as amended in connection with the DIP Financings.

(b)     In furtherance of the foregoing and without further approval of this Court, each Debtor DIP Loan Party is authorized and directed to, and authorized and directed to cause the Non-Debtor DIP Loan Parties to, perform all acts, to make, execute and deliver all instruments, certificates, agreements, charges, deeds and documents (including, without limitation, the execution or recordation of pledge and security agreements, mortgages, financing statements and other similar documents), and to pay all fees, expenses and indemnities in connection with or that may be reasonably required, necessary, or desirable for the DIP Loan Parties' performance of their obligations under or related to the DIP Financing, including, without limitation:

(i)     the execution and delivery of, and performance under, each of the DIP Documents;

(ii)     the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in such form as the DIP Loan Parties and the applicable DIP Agent (acting in accordance with the terms of the applicable DIP Credit Agreement and at the direction of the applicable required parties under the DIP Documents) may agree, it being understood that no further approval of this Court shall be required for any authorizations, amendments, waivers, consents or other modifications to and under the DIP Documents (and the payment of any fees and other expenses (including attorneys', accountants', appraisers' and financial advisors' fees), amounts, charges, costs, indemnities and other obligations paid in connection therewith) that do not shorten the maturity of the extensions of credit thereunder or increase the aggregate commitments or the rate of interest payable thereunder; *provided* that, for the avoidance of doubt,

updates and supplements to the Approved Budget required to be delivered by the DIP Loan Parties under the DIP Documents shall not, for purposes of this Interim Order or any Final Order, be considered amendments or modifications to the Approved Budget or the DIP Documents that require approval of this Court;

(iii)        the non-refundable payment to the DIP Agents and the DIP Secured Parties, as the case may be, of all fees, including unused facility fees, amendment fees, prepayment premiums, early termination fees, servicing fees, audit fees, liquidator fees, structuring fees, administrative agent's, collateral agent's or security trustee's fees, upfront fees, closing fees, commitment fees, exit fees, closing date fees, backstop fees, original issue discount fees, prepayment fees or agency fees, indemnities and professional fees (the payment of which fees shall be irrevocable, and shall be, and shall be deemed to have been, approved upon entry of this Interim Order, whether any such fees arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, and upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance, disallowance, impairment, or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, applicable non-bankruptcy law or otherwise by any person or entity) and any amounts due (or that may become due) in respect of any indemnification and expense reimbursement obligations, in each case referred to in the DIP Credit Agreements or DIP Documents (or in any separate letter agreements, including, without limitation, any fee letters between any or all DIP Loan Parties, on the one hand, and any of the DIP Agents and/or DIP Secured Parties, on the other, in connection with the DIP Financing) and the costs and expenses as may be due from time to time, including, without limitation, the fees and expenses of the professionals retained by, or on behalf of, any of the (a) Term DIP Agents or Term

DIP Secured Parties (including without limitation those of Davis Polk & Wardwell LLP, Ducera Partners, Porter Hedges LLP, Baker & McKenzie LLP, McDermott Will & Emery LLP, Shipman & Goodwin LLP and any local legal counsel or other advisors in any foreign jurisdictions and any other advisors as are permitted under the applicable DIP Documents) or (b) ABL DIP Agent or ABL DIP Secured Parties (including without limitation those of Blank Rome LLP, B. Riley Advisory Services, and any local legal counsel or other advisors in any foreign jurisdictions and any other advisors as are permitted under the applicable DIP Documents), in each case, as provided for in the DIP Documents (collectively, the "**DIP Fees and Expenses**"), without the need to file retention motions or fee applications; and

(iv)     the performance of all other acts required under or in connection with the DIP Documents, including the granting of the DIP Liens and the DIP Superpriority Claims and perfection of the DIP Liens and DIP Superpriority Claims as permitted herein and therein, and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith, in each case in accordance with the terms of the DIP Documents.

3.     *DIP Obligations*.  Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute legal, valid, binding and non-avoidable obligations of the DIP Loan Parties, enforceable against each Debtor DIP Loan Party and their estates and each Non-Debtor DIP Loan Party in accordance with the terms of the DIP Documents and this Interim Order, and any successors thereto, including any trustee appointed in the Chapter 11 Cases, or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "**Successor Cases**").  Upon execution and delivery of the DIP Documents, the DIP Obligations

will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the DIP Loan Parties to any of the DIP Agents or DIP Secured Parties, in each case, under, or secured by, the DIP Documents or this Interim Order, including all principal, interest, costs, fees, expenses, premiums, indemnities and other amounts under the DIP Documents (including this Interim Order).  The DIP Loan Parties shall be jointly and severally liable for the DIP Obligations in accordance with the DIP Documents.  Except as permitted hereby, no obligation, payment, transfer, or grant of security hereunder or under the DIP Documents to the DIP Agents and/or the DIP Secured Parties (including their Representatives) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

4.      *Prepetition Secured Debt Roll-Up.*

(a)      (i) Subject to entry of this Interim Order, and effective upon the Effective Date[5] in accordance with the Term DIP Credit Agreement and the other Term DIP Documents, the Debtors shall be deemed to substitute and exchange Interim Rolled-Up Term Loans of the Term DIP Lenders on a cashless, dollar-for-dollar basis with DIP Roll-Up Term Loans in accordance

---

[5]      "**Effective Date**" means the date on which the conditions specified in Section 4.01 of the Term DIP Credit Agreement have been satisfied or waived in accordance with the terms thereof.

with the Interim Term Loan Roll-Up and subject to the terms and conditions set forth in the Term DIP Documents and (ii) subject to entry of the Final Order, and effective upon the Final Funding Date[6] in accordance with the Term DIP Credit Agreement and the other Term DIP Documents, the Debtors shall be deemed to substitute and exchange Final Rolled-Up Term Loans of the Term DIP Lenders on a cashless, dollar-for-dollar basis with DIP Roll-Up Term Loans in accordance with the Final Term Loan Roll-Up and subject to the terms and conditions set forth in the Term DIP Documents.  The DIP Roll-Up Term Loans deemed substituted and exchanged under this paragraph 4(a) shall be deemed indefeasible and the Interim Rolled-Up Term Loans and Final Rolled-Up Term Loans substituted thereby shall be deemed exchanged therefor by each Term DIP Lender (or an investment advisor, manager, or beneficial owner for the account of such Term DIP Lender, or an affiliated fund or trade counterparty designated by such Term DIP Lender) on a pro rata basis, in accordance with its share of New Money Loans (as defined in the Term DIP Credit Agreement) made by such Term DIP Lender.  The cashless substitution and exchange dollar-for-dollar of Interim Rolled-Up Term Loans and Final Rolled-Up Term Loans under the Prepetition Term Loan Credit Facility by "rolling-up" such amounts into Term DIP Obligations as described in this paragraph 4(a) shall be authorized as compensation for, in consideration for, as a necessary inducement for, and on account of the agreement of the Term DIP Lenders to fund the DIP New Money Term Loans and not as adequate protection for, or otherwise on account of, the Prepetition Term Loan Credit Facility. Notwithstanding anything to the contrary herein or in the DIP Documents, the claims and liens in respect of the DIP Roll-Up Term Loans shall be subject and subordinate to the claims and liens in respect of the Carve Out in all respects.

---

[6]     "**Final Funding Date**" means the date of funding of the Final New Money Loan (as defined in the Term DIP Credit Agreement), which shall be within two Business Days of the entry of the Final Order.

(b)    Subject to entry of this Interim Order, and in accordance with the ABL DIP Credit Agreement and the other ABL DIP Documents, the Debtors shall be deemed to exchange and substitute the Prepetition Revolving Credit Facility on a cashless, dollar-for-dollar basis with the ABL DIP Facility in accordance with the ABL Roll-Up and subject to the terms and conditions set forth in the ABL DIP Documents.  The ABL DIP Facility deemed substituted and exchanged (and used to replace the Prepetition Revolving Credit Facility) under this paragraph 4(b) shall be deemed indefeasible and the Prepetition Revolving Credit Facility shall be deemed exchanged (and fully satisfied) therefor.   The ABL Roll-Up shall be authorized as compensation for, in consideration for, as a necessary inducement for, and on account of the agreement of the ABL DIP Lenders to provide the ABL DIP Facility and not as adequate protection for, or otherwise on account of, the Prepetition Revolving Credit Facility. The claims and liens in respect of the Prepetition Revolving Credit Facility and ABL DIP Facility (other than with respect to Prepetition Non-ABL Priority Collateral and the CF Debt Priority Collateral (as defined in the ABL Intercreditor Agreement)) shall not be subject or subordinate to the claims and liens in respect of the Carve Out in any respect.

(c)    The Roll-Up authorized upon entry of this Interim Order shall be final, subject only to the right of parties in interest (other than the Debtor DIP Loan Parties, the DIP Lenders, and the Consenting Stakeholders (as defined in the Restructuring Support Agreement)) to seek a determination in accordance with paragraph 21 below that such Roll-Up resulted in the payment of an unsecured prepetition claim of the Prepetition Term Loan Secured Parties or the Prepetition Revolving Secured Parties, as applicable.

(d)    The DIP Agents and the Prepetition Agents, acting at the direction of, as applicable, the applicable required parties under the DIP Documents or the applicable required

parties under the Prepetition Loan Documents, are hereby authorized to take any actions as may be necessary or advisable to effectuate the terms of the Roll-Up, including entry into and performance under the Intercreditor Agreements (as defined in the Term DIP Credit Agreement) and in accordance with the terms thereof and of the other DIP Documents.

5. *Carve Out*.

(a)      *Carve Out.* As used in this Interim Order, the term "**Carve Out**" means the sum of: (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) all unpaid fees and expenses to the extent allowed at any time, whether by interim order, procedural order, or final order of the Court or otherwise, (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code ("the **Debtor Professionals**") and the Creditors' Committee (if appointed) pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") (in each case, other than any restructuring, sale, success or other transaction fee of any investment bankers or financial advisors) at any time before or on the first business day following delivery by the Term DIP Administrative Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice and without regard to whether such fees and expenses are provided for in the Approved Budget; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $2,500,000 incurred after the first business day following delivery by the

Term DIP Administrative Agent of the Carve Out Trigger Notice(the "**Post-Carve Out Trigger Notice Cap**").

(b)     For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the Term DIP Administrative Agent acting at the direction of the applicable required parties under the DIP Documents (or, after the Term DIP Obligations have been indefeasibly paid in full and the Term DIP Commitments terminated, the Prepetition Term Loan Administrative Agent or the Prepetition Secured Notes Agents) to the Debtors, their lead restructuring counsel, the U.S. Trustee and lead counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined herein) and acceleration of the DIP Obligations under the Term DIP Facility (or, after the Term DIP Obligations have been indefeasibly paid in full and the Term DIP Commitments terminated, any occurrence that would constitute an Event of Default hereunder), following the occurrence and during the continuation of an Event of Default (as defined herein) and the termination of the use of Cash Collateral, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(c)     *Delivery of Weekly Fee Statements*.  Not later than 7:00 p.m. New York time on the third business day of each week starting with the first full calendar week following entry of this Interim Order, each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of fees and expenses (collectively, "**Estimated Fees and Expenses**") incurred during the preceding week by such Professional Person (through Saturday of such week, the "**Calculation Date**"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors

(each such statement, a "**Weekly Statement**"); *provided that*, within one business day of the Termination Declaration Date (as defined below), each Professional Person shall deliver one additional statement (the "**Final Statement**") setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration Date.  If any Professional Person fails to deliver a Weekly Statement within three calendar days after such Weekly Statement is due, such Professional Person's entitlement (if any) to any funds in the Carve Out Reserves (as defined below) with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period shall be limited to the aggregate unpaid amount of Allowed Professional Fees included in the Approved Budget for such period for such Professional Person; *provided*, that such Professional Person shall be entitled to be paid any unpaid amount of Allowed Professional Fees in excess of Allowed Professional Fees included in the Approved Budget for such period for such Professional Person from a reserve to be funded by the Debtors from all cash on hand as of such date and any available cash thereafter held by any Debtor pursuant to paragraph 5(d) below. *Carve Out Reserves*. On the day on which a Carve Out Trigger Notice is given by the Term DIP Administrative Agent to the Debtors with a copy to counsel to the Creditors' Committee (the "**Termination Declaration Date**"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor (solely to the extent such cash is proceeds of the Term DIP Facility or proceeds of the CF Debt Priority Collateral (as defined in the ABL Intercreditor Agreement)) to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees. The Debtors shall

deposit and hold such amounts in a segregated account in trust to pay such then unpaid Allowed Professional Fees (the "**Pre-Carve Out Trigger Notice Reserve**") prior to any and all other claims. On the Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a demand to the Debtors to utilize all remaining cash on hand as of such date and any available cash thereafter (solely to the extent such cash is proceeds of the Term DIP Facility or proceeds of the CF Debt Priority Collateral (as defined in the ABL Intercreditor Agreement)) held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap. The Debtors shall deposit and hold such amounts in a segregated account in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "**Post-Carve Out Trigger Notice Reserve**" and, together with the Pre-Carve Out Trigger Notice Reserve, the "**Carve Out Reserves"**) prior to any and all other claims. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (a)(i) through (a)(iii) of the definition of Carve Out set forth above (the "**Pre-Carve Out Amounts**"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Term DIP Administrative Agent for the benefit of the Term DIP Lenders, unless the Term DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments (as defined in the Term DIP Credit Agreement) have been terminated, in which case any such excess shall be paid to the Prepetition Term Loan Secured Parties in accordance with their rights and priorities as of the Petition Date. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "**Post-Carve Out Amounts**"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Term DIP

Agent for the benefit of the Term DIP Lenders, unless the Term DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Term Loan Secured Parties in accordance with their rights and priorities as of the Petition Date.  Notwithstanding anything to the contrary in the DIP Documents, or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 5, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively (subject to the limits contained in the Post-Carve Out Trigger Notice Cap), shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 5, prior to making any payments to the Term DIP Administrative Agent or the Prepetition Term Loan Secured Parties, as applicable.  Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the Term DIP Administrative Agent and the Prepetition Agents shall not sweep or foreclose on cash proceeds of the Term DIP Facility or proceeds of the CF Debt Priority Collateral (as defined in the ABL Intercreditor Agreement) (including cash received as a result of the sale or other disposition of CF Debt Priority Collateral (as defined in the ABL Intercreditor Agreement)) until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual  interest in the Carve Out Reserves, with any excess paid to the Term DIP Agent for application in accordance with the Term DIP Documents.  Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Loans (as defined in the Term DIP Credit Agreement) or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial DIP Budget, Approved Budget,

Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Documents, or any other documentation of the DIP Facilities, or in any Prepetition Term Loan Credit Facility, Prepetition Secured Notes, or Prepetition Revolving Credit Facility, the Carve Out shall be senior to all liens and claims securing the Term DIP Facility, the Term Adequate Protection Liens, and the 507(b) Claims (as defined herein) of the Prepetition Term Loan Secured Parties and the Prepetition Secured Notes Parties, and any and all other forms of adequate protection, liens, or claims securing the Term DIP Obligations, the Prepetition Term Loan Obligations or the Prepetition Secured Notes Obligations; *provided*, that the ABL DIP Liens (other than with respect to the CF Debt Priority Collateral (as defined in the ABL Intercreditor Agreement), ABL DIP Superpriority Claims, Revolving Adequate Protection Liens, Adequate Protection Claims granted to the Prepetition ABL Secured Parties, and Prepetition Liens granted to the Prepetition ABL Secured Parties shall not be subject to the Carve Out.

(d)     *Payment of Allowed Professional Fees Prior to the Termination Declaration Date.*  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(e)     *No Direct Obligation To Pay Allowed Professional Fees.* None of the DIP Agents, DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agents,

the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f)     *Payment of Carve Out On or After the Termination Declaration Date*.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

(g)     *No ABL Priority Collateral Used for the Carve Out*. If any proceeds of any Prepetition ABL Priority Collateral or Revolving Credit Priority Collateral (as defined in the ABL Intercreditor Agreement) are used in any way to fund the Carve Out, such proceeds shall be immediately transferred back to the Debtors or the Non-Debtor ABL DIP Loan Parties and remain subject to the liens of the ABL DIP Secured Parties.

6.     *Term DIP Superpriority Claims*.  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the Term DIP Obligations shall constitute allowed superpriority administrative expense claims against the Debtor Term DIP Loan Parties on a joint and several basis (without the need to file any proof of claim) with priority over any and all claims against the Debtor Term DIP Loan Parties (other than the Carve Out), now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113 or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "**Term DIP**

**Superiority Claims**") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which Term DIP Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtor Term DIP Loan Parties and all proceeds thereof (excluding claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "**Avoidance Actions**") but, subject to the entry of the Final Order, including any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement or otherwise ("**Avoidance Proceeds**")) in accordance with the Term DIP Documents and this Interim Order.  The Term DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

7. *ABL DIP Superpriority Claims*.  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the ABL DIP Obligations shall constitute allowed superpriority administrative expense claims against the Debtor ABL DIP Loan Parties on a joint and several basis (without the need to file any proof of claim) with priority over any and all claims against the Debtor ABL DIP Loan Parties, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113 or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "**ABL DIP Superpriority Claims**" and together with the

Term DIP Superpriority Claims, the "**DIP Superpriority Claims**") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which ABL DIP Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtor ABL DIP Loan Parties and all proceeds thereof (excluding Avoidance Actions but, subject to the entry of the Final Order, including the Avoidance Proceeds) in accordance with the ABL DIP Documents and this Interim Order.  The ABL DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

8.      *Priority of DIP Superpriority Claims*.  The Term DIP Superpriority Claims and the ABL DIP Superpriority Claims shall be *pari passu* in right of payment with one another, senior to the 507(b) Claims (as defined herein).  The Term DIP Superpriority Claims shall be subordinate only to the Carve Out.  The ABL DIP Superpriority Claims shall not be subordinate to the Carve Out.

9.      *DIP Liens*.

(a)      *Term DIP Liens*.  As security for the Term DIP Obligations, effective and automatically and properly perfected upon the date of this Interim Order and without the necessity of the execution, recordation or filing by the Term DIP Loan Parties or any of the Term DIP Secured Parties of mortgages, security agreements, control agreements, pledge agreements, financing statements, intellectual property filing or other similar documents, notation of certificates of title for titled goods or other similar documents, instruments, deeds, charges or certificates, or the possession or control by the Term DIP Agents of, or over, any Collateral, without any further action by the Term DIP Agents or the Term DIP Secured Parties, the following

valid, binding, continuing, enforceable and non-avoidable security interests and liens (all security interests and liens granted to each of the Term DIP Agents, for its benefit and for the benefit of the Term DIP Secured Parties, pursuant to this Interim Order and the Term DIP Documents, the "**Term DIP Liens**") are hereby granted to each of the Term DIP Agents for its own benefit and the benefit of the Term DIP Secured Parties a security interest in and lien on all property identified in clauses (i) through (vi) below and all other "Collateral" as defined in the Term DIP Credit Agreement (collectively, the "**Term DIP Collateral**"); *provided* that notwithstanding anything herein to the contrary, the Term DIP Liens shall be (x) subject and junior to the Carve Out in all respects and (y) in each case subject to the priorities set forth in **Exhibit 3**:

> (i)    *Liens on Unencumbered Property.* Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected first priority (subject to the terms of the ABL Intercreditor Agreement and the priorities reflected herein and in the Final Order) senior security interest in and lien upon all tangible and intangible prepetition and postpetition property of the Debtor Term DIP Loan Parties, whether existing on the Petition Date or thereafter acquired, and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date, is not subject to (i) a valid, perfected and non-avoidable lien or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, including, without limitation, any and all unencumbered cash of the Debtor Term DIP Loan Parties (whether maintained with any of the Term DIP Secured Parties or otherwise) and any investment of cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, goodwill, causes of action, insurance policies and rights, claims and proceeds from insurance, commercial tort claims and claims that may constitute commercial tort claims (known and unknown), chattel paper (including electronic chattel paper and tangible chattel paper), interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, equity interests of subsidiaries, joint ventures and other entities,

wherever located, and the proceeds, products, rents and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise, of all the foregoing (the "**Unencumbered Property**"), in each case other than the Avoidance Actions (but, for the avoidance of doubt, subject to the Carve Out and effective only upon entry of the Final Order, "Unencumbered Property" shall include Avoidance Proceeds); *provided* that, and for the avoidance of doubt, the Term DIP Liens that attach to Unencumbered Property that is not of the type of property constituting CF Debt Priority Collateral (as such term is defined in the ABL Intercreditor Agreement) shall be junior and subordinate to the ABL DIP Liens on such Unencumbered Property not of the type of property constituting CF Debt Priority Collateral (as such term is defined in the ABL Intercreditor Agreement)

(ii)     *Liens Priming Certain Prepetition Secured Parties' Liens*. Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all CF Debt Priority Collateral and Non-Intercreditor Collateral (each as defined in the ABL Intercreditor Agreement) of the Debtor Term DIP Loan Parties, regardless of where located, regardless whether or not any liens on such assets are voided, avoided, invalidated, lapsed or unperfected (the "**Term DIP Non-ABL Collateral Priming Liens**"), which Term DIP Non-ABL Collateral Priming Liens shall prime in all respects the interests of the Prepetition Secured Parties on the CF Debt Priority Collateral and Non-Intercreditor Collateral (each as defined in the ABL Intercreditor Agreement) arising from the current and future liens of the Prepetition Secured Parties (including, without limitation, the Adequate Protection Liens granted to the Prepetition Secured Parties), which shall be subject to and junior to the Carve Out in all respects;

(iii)    *Junior Liens Priming Certain Prepetition Secured Parties' Liens*. Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected priority security interest in and lien upon all Revolving Credit Priority Collateral (as defined in the ABL Intercreditor Agreement) of the Debtor Term DIP Loan Parties, regardless of where located, regardless whether or not any liens on such assets are voided, avoided, invalidated, lapsed or unperfected (the "**Term DIP ABL Collateral Liens**"), which Term DIP ABL Collateral Liens shall be subject to and junior to the Carve Out in all respects, shall be subject to the ABL Intercreditor Agreement

and shall, with respect to the Revolving Credit Priority Collateral (as defined in the ABL Intercreditor Agreement), be (1) junior to the ABL DIP Liens, (2) junior to the Revolving Adequate Protection Liens, if applicable, (3) junior to the Prepetition Liens of the Prepetition Revolving Secured Parties, (4) senior in all respects to the Term Adequate Protection Liens and (5) senior in all respects to the Prepetition Liens of the Prepetition Term Loan Secured Parties and the Prepetition Secured Notes Parties;

(iv)    *Liens Junior to Certain Other Liens.* Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of each Debtor Term DIP Loan Party that is subject to a Prepetition Permitted Prior Lien (other than the Prepetition Liens) (i) in existence and properly perfected immediately prior to the Petition Date or (ii) in existence immediately prior to the Petition Date that is perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code, which (x) shall be junior and subordinate to such Prepetition Permitted Prior Liens and the Carve Out and (y) with respect to (1) CF Debt Priority Collateral (as defined in the ABL Intercreditor Agreement), shall be senior to the ABL DIP Liens and the Adequate Protection Liens and the Prepetition Liens of the Prepetition Revolving Secured Parties, if applicable, and (2) with respect to Revolving Credit Priority Collateral (as defined in the ABL Intercreditor Agreement), shall be junior to the ABL DIP Liens and the Revolving Adequate Protection Liens and Prepetition Liens of the Prepetition Revolving Secured Parties under the Prepetition Revolving Credit Facility, if applicable, and senior to the Term Adequate Protection Liens; provided that nothing in the foregoing clauses (i) and (ii) shall limit the rights of the DIP Secured Parties under the DIP Documents to the extent such liens are not permitted thereunder or otherwise not entitled to priority under applicable law (including applicable contract law); and

(v)    *Liens Senior to Certain Other Liens.* The Term DIP Liens shall be subject to the terms of the ABL Intercreditor Agreement and shall not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors or their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in the Term DIP Documents or in this Interim Order, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor

of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtor Term DIP Loan Parties, or (C) any intercompany or affiliate liens of the Debtor Term DIP Loan Parties or security interests of the Debtor Term DIP Loan Parties; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code granted after the date hereof.

(vi)     *Term DIP Loan Proceeds Account*.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected first priority senior security interest in and lien upon the Term DIP Loan Proceeds Account.

(b)     *ABL DIP Liens*.  As security for the ABL DIP Obligations, effective and automatically and properly perfected upon the date of this Interim Order and without the necessity of the execution, recordation or filing by the ABL DIP Loan Parties or any of the ABL DIP Secured Parties of mortgages, security agreements, control agreements, pledge agreements, financing statements, intellectual property filing or other similar documents, notation of certificates of title for titled goods or other similar documents, instruments, deeds, charges or certificates, or the possession or control by the ABL DIP Agent of, or over, any Collateral, without any further action by the ABL DIP Agent or the ABL DIP Secured Parties, the following valid, binding, continuing, enforceable and non-avoidable security interests and liens (all security interests and liens granted to the ABL DIP Agent, for its benefit and for the benefit of the ABL DIP Secured Parties, pursuant to this Interim Order and the ABL DIP Documents, the "**ABL DIP Liens**" and together with the Term DIP Liens, the "**DIP Liens**") are hereby granted to the ABL DIP Agent for its own benefit and the benefit of the ABL DIP Secured Parties a security interest in and lien on all property identified in clauses (i) through (v) and all other "Collateral" as defined in the ABL DIP Credit Agreement (collectively, the "**ABL DIP Collateral**" and together with the Term DIP Collateral, the "**DIP Collateral**"); *provided* that, for the avoidance of doubt, in no circumstance shall the

direct proceeds of the Term DIP Facility deposited in the Term DIP Loan Proceeds Account and all assets therein (so long as no other assets are comingled with such proceeds), be deemed ABL DIP Collateral (and none of the Prepetition Revolving Secured Parties or the ABL Secured Parties shall have the right to exercise cash dominion or control over the Term DIP Loan Proceeds Account); *provided*, *further* that notwithstanding anything herein to the contrary, the ABL DIP Liens shall be, in each case, in accordance with the priorities set forth in **Exhibit 3**:

(i)    *Liens on Unencumbered Property*. Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected first priority (subject to the terms of the ABL Intercreditor Agreement and the priorities reflected herein and in the Final Order) senior security interest in and lien upon all Unencumbered Property in each case other than the Avoidance Actions (but, for the avoidance of doubt, subject to entry of the Final Order, "Unencumbered Property" shall include Avoidance Proceeds); *provided* that, and for avoidance of doubt, the ABL DIP Liens that attach to Unencumbered Property that is of the type of property constituting CF Debt Priority Collateral (as such term is defined in the ABL Intercreditor Agreement) shall be junior and subordinate to the Term DIP Liens on such Unencumbered Property of the type of property constituting CF Debt Priority Collateral (as such term is defined in the ABL Intercreditor Agreement);

(ii)   *Liens Priming Certain Prepetition Secured Parties' Liens*. Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all Revolving Credit Priority Collateral (as defined in the ABL Intercreditor Agreement) of the Debtor ABL DIP Loan Parties, regardless of where located, regardless whether or not any liens on such assets are voided, avoided, invalidated, lapsed or unperfected (the "**ABL DIP ABL Collateral Priming Liens**"), which ABL DIP ABL Collateral Priming Liens shall prime in all respects the interests of the Prepetition Secured Parties on the Revolving Credit Priority Collateral (as defined in the ABL Intercreditor Agreement) arising from the current and future liens of the Prepetition Secured Parties (including, without limitation, the Adequate Protection Liens granted to the Prepetition Secured Parties);

(iii)     *Junior Liens Priming Certain Prepetition Secured Parties'*
         *Liens*.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a
         valid, binding, continuing, enforceable, fully perfected priority
         security interest in and lien upon all CF Debt Priority Collateral
         (as defined in the ABL Intercreditor Agreement) of the Debtor
         ABL DIP Loan Parties, regardless of where located, regardless
         whether or not any liens on such assets are voided, avoided,
         invalidated, lapsed or unperfected (the "**ABL DIP Non-ABL
         Collateral Liens**"), which ABL DIP Non-ABL Collateral Liens
         shall be subject to the ABL Intercreditor Agreement, and, shall,
         with respect to the CF Debt Priority Collateral (as defined in the
         ABL Intercreditor Agreement), be (1) junior to the Term DIP
         Liens, (2) junior to the Term Adequate Protection Liens, (3)
         junior to the Prepetition Liens of the Prepetition Term Secured
         Parties and the Prepetition Secured Notes Parties, (4) senior to
         the Revolving Adequate Protection Liens and (5) senior in all
         respects to the Prepetition Liens of the Prepetition Revolving
         Secured Parties;

(iv)     *Liens Junior to Certain Other Liens*. Pursuant to section
         364(c)(3) of the Bankruptcy Code, a valid, binding, continuing,
         enforceable, fully perfected security interest in and lien upon all
         tangible and intangible prepetition and postpetition property of
         each Debtor ABL DIP Loan Party that is subject to a Prepetition
         Permitted Prior Lien (other than the Prepetition Liens) (i) in
         existence and properly perfected immediately prior to the
         Petition Date or (ii) in existence immediately prior to the Petition
         Date that is perfected subsequent to such commencement as
         permitted by section 546(b) of the Bankruptcy Code, which (x)
         shall be junior and subordinate to such Prepetition Permitted
         Prior Liens and (y) with respect to (1) Revolving Credit Priority
         Collateral (as defined in the ABL Intercreditor Agreement),
         shall be senior to the Term DIP Liens, the Adequate Protection
         Liens and Prepetition Liens of the Prepetition Secured Parties
         and (2) with respect to CF Debt Priority Collateral (as defined in
         the ABL Intercreditor Agreement), shall be junior to the Term
         DIP Liens, the Term Adequate Protection Liens and the
         Prepetition Liens of the Prepetition Term Secured Parties and
         the Prepetition Secured Notes Parties and senior with respect to
         the Revolving Adequate Protection Liens and the Prepetition
         Liens of the Prepetition Revolving Secured Parties; provided
         that nothing in the foregoing clauses (i) and (ii) shall limit the
         rights of the DIP Secured Parties under the DIP Documents to
         the extent such liens are not permitted thereunder or otherwise
         not entitled to priority under applicable law (including
         applicable contract law); and

(v)     *Liens Senior to Certain Other Liens.*  The ABL DIP Liens shall be subject to the terms of the ABL Intercreditor Agreement and shall not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors or their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in the ABL DIP Documents or in this Interim Order, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtor ABL DIP Loan Parties, or (C) any intercompany or affiliate liens of the Debtor ABL DIP Loan Parties or security interests of the Debtor ABL DIP Loan Parties; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code granted after the date hereof.

10.     *Protection of DIP Lenders' Rights.*

(a)     So long as (x) there are any Term DIP Obligations outstanding or the Term DIP Lenders have any outstanding Term DIP Commitments under the Term DIP Documents, the Prepetition Term Loan Secured Parties and the Prepetition Notes Secured Parties shall and (y) there are any ABL DIP Obligations outstanding or the ABL DIP Lenders have any outstanding ABL DIP Commitments under the ABL DIP Documents, the Prepetition Revolving Secured Parties shall, in each case: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Loan Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against the DIP Collateral, including in connection with the Adequate Protection Liens; (ii) be deemed to have consented to any transfer, disposition or sale of, or release of liens on, the DIP Collateral (but not any proceeds of such transfer, disposition or sale to the extent remaining after payment in cash in full of the DIP Obligations and termination of the DIP Commitments), to the extent the transfer, disposition, sale or release is authorized under the DIP Documents; (iii) not file any further

51

financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral other than as necessary to give effect to this Interim Order other than, (x) solely as to this clause (iii), the DIP Agents filing financing statements or other documents to perfect the liens granted pursuant to this Interim Order, or (y) as may be required by applicable state law or foreign law to complete a previously commenced process of perfection or to continue the perfection of valid and non-avoidable liens or security interests existing as of the Petition Date; and (iv) deliver or cause to be delivered, at the DIP Loan Parties' cost and expense, any termination statements, releases and/or assignments in favor of the DIP Agents or the DIP Secured Parties or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of liens on any portion of the DIP Collateral subject to any sale or Court-approved disposition.

(b)     (i) To the extent any Prepetition Secured Party has possession of any Prepetition Collateral or DIP Collateral or has control with respect to any Prepetition Collateral or DIP Collateral, or has been noted as secured party on any certificate of title for a titled good constituting Prepetition Collateral or DIP Collateral, then such Prepetition Secured Party shall be deemed to maintain such possession or notation or exercise such control as a gratuitous bailee and/or gratuitous agent for perfection for the benefit of the DIP Agents and the DIP Secured Parties, and such Prepetition Secured Party shall comply with the instructions of the DIP Agents, acting at the direction of the applicable required parties under the DIP Documents, with respect to the exercise of such control, (ii) to the extent any ABL DIP Secured Party has possession of any CF Debt Priority Collateral (as such term is defined in the ABL Intercreditor Agreement) that constitutes DIP Collateral or has control with respect to any such collateral, or has been noted as secured party on any certificate of title for a titled good constituting such collateral, then such ABL

DIP Secured Party shall be deemed to maintain such possession or notation or exercise such control as a gratuitous bailee and/or gratuitous agent for perfection for the benefit of the Term DIP Secured Parties and the Prepetition Secured Parties, and such ABL DIP Secured Party shall comply with the instructions of the Term DIP Agents (or, if applicable, the Prepetition Term Loan Collateral Agent, the Prepetition Notes Tranche I Collateral Agent, or the Prepetition Notes Tranche II Collateral Agent), acting at the direction of the applicable required parties under the Term DIP Documents or the Prepetition Loan Documents, with respect to the exercise of such control and (iii) to the extent any Term DIP Secured Party or any Prepetition Secured Party has possession of any Revolving Credit Priority Collateral (as such term is defined in the ABL Intercreditor Agreement)] that constitutes DIP Collateral or has control with respect to any such collateral, or has been noted as secured party on any certificate of title for a titled good constituting such collateral, then such Term DIP Secured Party or Prepetition Secured Party shall be deemed to maintain such possession or notation or exercise such control as a gratuitous bailee and/or gratuitous agent for perfection for the benefit of the ABL DIP Secured Parties, and such Term DIP Secured Party or Prepetition Secured Party shall comply with the instructions of the ABL DIP Agent, acting at the direction of the applicable required parties under the ABL DIP Documents, with respect to the exercise of such control.

(c)     Any proceeds of Prepetition Collateral subject to liens that are primed by the DIP Financing received by any Prepetition Secured Party, whether in connection with the exercise of any right or remedy (including setoff) relating to the Prepetition Collateral or otherwise received by the Prepetition Agents shall be subject to the ABL Intercreditor Agreement.

(d)     Upon the occurrence of and during the continuance of an Event of Default, and without the necessity of seeking relief from the Automatic Stay, which shall be modified to

permit the following without any further Order of the Court, (i) the DIP Agents and DIP Secured Parties shall be entitled to deliver a notice providing at least five (5) days advance written notice (the "**Notice Period**") of an Event of Default to the Debtors or the other DIP Loan Parties (or, if being delivered by a Prepetition Agent, a notice of any breach of this Interim Order) (an "**Enforcement Notice**"); (ii) the DIP Agents and DIP Secured Parties shall no longer have any obligation to make any loans, advances, or other extensions of credit under the DIP Facilities; (ii) all amounts outstanding under the DIP Loan Documents shall, at the option of the applicable DIP Agent, be accelerated and become immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the Debtors and the Non-Debtor DIP Loan Parties; (iii) each DIP Agent (and (x) after the Term DIP Obligations have been indefeasibly paid in full and the Term DIP Commitments terminated, the Prepetition Term Loan Agent or the Prepetition Secured Notes Agents, acting at the direction of the applicable required parties under the Prepetition Loan Documents and (y) after the ABL DIP Obligations have been indefeasibly paid in full and the ABL DIP Commitments terminated, the Prepetition Revolving Agent, acting at the direction of the applicable required parties under the Prepetition Revolving Loan Documents), the applicable Prepetition Agent) shall be entitled to immediately terminate the Debtors' right to use Cash Collateral, without further application or Order of this Court and fully restrict Non-Debtor DIP Loan Parties' access to Cash Collateral, *provided*, *however*, that during the Notice Period the Debtors and the Non-Debtor DIP Loan Parties shall have the right (1) to use Cash Collateral that is proceeds of the Term DIP Facility (including Cash Collateral in the Term DIP Loan Proceeds Account) to pay expenses set forth in the Approved Budget in accordance with the Term DIP Documents, and (2) after the Cash Collateral in the prior clause (1) is exhausted, to use Cash Collateral that is proceeds of the ABL DIP Facility to pay expenses set forth in the

Approved Budget in accordance with the ABL DIP Documents only to the extent such expenses are necessary to avoid immediate and irreparable harm to the Debtors' estates and only to the extent the ABL DIP Loan Parties continue to operate in the ordinary course of business during the Notice Period; and (iv) each DIP Agent shall be entitled to charge the default rate of interest under the DIP Credit Agreements. Immediately upon the expiration of the Notice Period, without the necessity of seeking relief from the Automatic Stay, which shall be modified to permit the following without any further Order of the Court, any ABL DIP Secured Parties shall be entitled to immediately (a) freeze monies or balances in the Debtors' accounts; (b) immediately set-off any and all amounts in accounts maintained by the Debtors with the ABL DIP Agent or the ABL DIP Secured Parties against the ABL DIP Obligations (or, if paid in full, the Prepetition Revolving Obligations), and (c) apply proceeds received into a lockbox, collection, other account maintained by such ABL DIP Secured Party to reduce the ABL DIP Obligations (or, if paid in full, the Prepetition Revolving Obligations) in any order at the sole discretion of the ABL DIP Agent.

(e)     Following an Event of Default and the delivery of an Enforcement Notice, but prior to exercising the remedies set forth in this sentence below or any other remedies (except for the remedies set forth in paragraph 10(d)) against the Debtor DIP Loan Parties, the DIP Secured Parties, or, if applicable, any Prepetition Secured Party shall be required to file a motion with the Court seeking emergency relief (the "**Stay Relief Motion**") on not less than five (5) business days' notice to the Debtors, Debtors' Counsel, counsel for each of the DIP Secured Parties and the Prepetition Secured Parties (which may run concurrently with the Notice Period) for a further order of the Court modifying the automatic stay in the Chapter 11 Cases to permit (i) the Term DIP Secured Parties to, subject to the ABL Intercreditor Agreement and the Carve-Out and related provisions: (a) freeze monies or balances in the Term DIP Loan Proceeds Account;

(b) immediately set-off any and all amounts in the Term DIP Loan Proceeds Account against the Term DIP Obligations, and (c) enforce any and all rights against the Term DIP Collateral, including, without limitation, foreclosure on all or any portion of the Term DIP Collateral, occupying the Debtors' premises, sale or disposition of the Term DIP Collateral; and (ii) the DIP Secured Parties, subject to the ABL Intercreditor Agreement and related provisions to take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Loan Documents or applicable law.  If the DIP Secured Parties are permitted by the Court to take any enforcement action with respect to the DIP Collateral following the hearing on the Stay Relief Motion, the Debtors shall cooperate with the DIP Secured Parties in their efforts to enforce their security interest in the DIP Collateral, and shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect such DIP Secured Parties from enforcing their security interests in the DIP Collateral.  The Court may fashion any appropriate remedy at a hearing pursuant to a Stay Relief Motion.

(f)      Upon expiration of the Notice Period, each DIP Agent and each Prepetition Agent shall be entitled to take any other action or exercise any other right or remedy as provided in this Interim Order, the DIP Loan Documents, the Prepetition Loan Documents, or applicable law solely against the Non-Debtor DIP Loan Parties, including, without limitation, setting off any DIP Obligations (other than with respect to any amount required to fund the Carve-Out Reserves solely from proceeds of the Term DIP Facility and CF Debt Priority Collateral (as defined in the ABL Intercreditor Agreement)) or Prepetition Obligations with DIP Collateral, Prepetition Collateral or proceeds in the possession of any Prepetition Secured Party or DIP Secured Party, and enforcing any and all rights and remedies with respect to the DIP Collateral or Prepetition Collateral, as applicable, all in accordance with the terms of the ABL Intercreditor Agreement.

(g)     No rights, protections or remedies of the DIP Agents or the DIP Secured Parties granted by the provisions of this Interim Order or the DIP Documents shall be limited, modified or impaired in any way by: (i) any actual or purported withdrawal of the consent of any party to the Debtors' authority to continue to use Cash Collateral; (ii) any actual or purported termination of the Debtors' authority to continue to use Cash Collateral; or (iii) the terms of any other order or stipulation related to the Debtors' continued use of Cash Collateral or the provision of adequate protection to any party.

11.     *Limitation on Charging Expenses Against Collateral*.  No costs or expenses of administration of the Chapter 11 Cases or any Successor Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral (including Cash Collateral) or Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the applicable DIP Agent or Prepetition Agent, as applicable, and no consent shall be implied from any other action, inaction or acquiescence by the DIP Agents, the DIP Secured Parties, the Prepetition Agents or the Prepetition Secured Parties, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Agents, the DIP Secured Parties, the Prepetition Agents or the Prepetition Secured Parties to any charge, lien, assessment or claims against the DIP Collateral (including Cash Collateral) under section 506(c) of the Bankruptcy Code or otherwise; *provided* that the foregoing waiver shall be immediately applicable and without prejudice to any provisions of the Final Order with respect to costs or expenses incurred following the entry of such Final Order.

12.     *No Marshaling*.  In no event shall the DIP Agents, the DIP Secured Parties, the Prepetition Agents or the Prepetition Secured Parties be subject to the equitable doctrine of

"marshaling" or any similar doctrine with respect to the DIP Collateral (including, without limitation, the assets of the Non-Debtor DIP Loan Parties), the DIP Obligations, the Prepetition Secured Debt, or the Prepetition Collateral (including, without limitation, the assets of the Non-Debtor DIP Loan Parties). Further, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Agents or the Prepetition Secured Parties with respect to proceeds, products, offspring or profits of any Prepetition Collateral (including, without limitation, the assets of the Non-Debtor DIP Loan Parties); *provided* that, with respect to the Prepetition Agents and the other Prepetition Secured Parties, the foregoing waivers shall be without prejudice to any provisions of the Final Order.

13.   *Payments Free and Clear*.  Any and all payments or proceeds remitted to the DIP Agents by, through or on behalf of the DIP Secured Parties pursuant to the provisions of this Interim Order, the DIP Documents or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including without limitation, any claim or charge arising out of or based on, directly or indirectly, sections 506(c) or 552(b) of the Bankruptcy Code, whether asserted or assessed by through or on behalf of the Debtors.

14.   *Use of Cash Collateral*.  The Debtors are hereby authorized, subject to the terms and conditions of this Interim Order, to use all Cash Collateral in accordance with the DIP Documents and the Approved Budget; *provided* that (a) the Prepetition Secured Parties are granted the Adequate Protection as hereinafter set forth and (b) except on the terms and conditions of this Interim Order, the Debtors shall be enjoined and prohibited from at any times using the Cash Collateral absent further order of the Court.

15.     *Disposition of DIP Collateral.*  The Debtor DIP Loan Parties shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, except as otherwise permitted by the DIP Documents or otherwise permitted by an order of the Court.

16.     *Adequate Protection of Prepetition Secured Parties.*  The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their respective interests in all Prepetition Collateral (including Cash Collateral) in an amount equal to the aggregate diminution in the value of their respective interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date (with, upon the assertion of any Adequate Protection Claims (as defined herein), the presumption being that diminution in value has occurred and the burden being on any party opposing the assertion of any Adequate Protection Claims to show that such diminution has not occurred), for any reason provided for under the Bankruptcy Code, including, without limitation, any diminution resulting from the sale, lease or use by the Debtors of the Prepetition Collateral, the priming of the Prepetition Liens by the DIP Liens pursuant to the DIP Documents and this Interim Order, the payment of any amounts under the Carve Out or pursuant to this Interim Order, the Final Order or any other order of the Court or provision of the Bankruptcy Code or otherwise, and the imposition of the Automatic Stay (the "**Adequate  Protection Claims**").  In consideration of the foregoing, the applicable Prepetition Agents, for the benefit of themselves and the other Prepetition Secured Parties, are hereby granted the following as Adequate Protection for, and to secure repayment of an amount equal to such Adequate Protection Claims, and as an inducement to the Prepetition Secured Parties to consent to the priming of the Prepetition Liens and use of the Prepetition Collateral (including Cash Collateral) (collectively, the "**Adequate Protection Obligations**"):

(a)     *Prepetition Adequate Protection Liens*.   To the extent any Prepetition Revolving Obligations are outstanding at any time on or after the Petition Date, the Prepetition Revolving Agent, for itself and for the benefit of the other Prepetition Revolving Secured Parties, are hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements) in the amount of their respective Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all of the DIP Collateral (the "**Revolving Adequate Protection Liens**"), subject to the priorities set forth in **Exhibit 3**.   The Prepetition Term Loan Collateral Agent, for itself and for the benefit of the other Prepetition Term Loan Secured Parties, and each of the Prepetition Secured Notes Agents, for itself and for the benefit of the other Prepetition Secured Notes Parties, are hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements) in the amount of their respective Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all of the DIP Collateral (the "**Term Adequate Protection Liens**", collectively with the Revolving Adequate Protection Liens, the "**Adequate Protection Liens**"), in each case subject to the priorities set forth in **Exhibit 3**.

(b)     *Section 507(b) Claims*.   The Prepetition Term Loan Administrative Agent, for itself and for the benefit of the other Prepetition Term Loan Secured Parties, and each of the Prepetition Secured Notes Agents, for itself and for the benefit of the other Prepetition Secured Notes Parties, and, to the extent any Prepetition Revolving Obligations are outstanding at any time on or after the Petition Date, the Prepetition Revolving Agent, for itself and for the benefit of the other Prepetition Revolving Secured Parties, are hereby granted, subject to the Carve Out, to the

extent set forth in and as expressly limited by the provisions of paragraph 6 herein, an allowed superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code in the amount of their respective Adequate Protection Claims, with priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "**507(b) Claims**") which 507(b) Claims shall have recourse to and be payable from all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding Avoidance Actions, but including, subject to entry of Final Order, Avoidance Proceeds). The 507(b) Claims shall be subject and subordinate only to the Carve Out and the DIP Superpriority Claims.

(c)     *Prepetition Secured Parties Fees and Expenses*.  The Debtor DIP Loan Parties shall provide each of the Prepetition Term Loan Agents, for itself and for the benefit of the other Prepetition Term Loan Secured Parties, each of the Prepetition Secured Notes Agents, for itself and for the benefit of the other Prepetition Secured Notes Parties, and to the extent any Prepetition Revolving Obligations are outstanding at any time on or after the Petition Date, the Prepetition Revolving Agent, for itself and for the benefit of the other Prepetition Revolving Secured Parties, without duplication of fees paid for the benefit of the DIP Secured Parties, current cash payments of all reasonable and documented prepetition and postpetition fees and expenses, including, but not limited to, the reasonable and documented fees and out-of-pocket expenses of primary, special and local counsel (in each applicable jurisdiction) and financial advisors to the applicable Prepetition Agents and Prepetition Secured Parties, including without limitation (i) Davis Polk & Wardwell LLP, Ducera Partners, Porter Hedges LLP, Baker & McKenzie LLP and any other advisors retained by or on behalf of the Prepetition Term Loan Lenders or the holders of Prepetition Secured Notes, (ii) Blank Rome LLP, B. Riley Advisory Services, and any other

advisors retained by or on behalf of the Prepetition Revolving Secured Parties, and (iii) Foley & Lardner LLP, McDermott, Will & Emery LLP and Shipman & Goodwin LLP as counsel to the Prepetition Term Loan Agents and Prepetition Secured Notes Agents (the "**Adequate Protection Fees and Expenses**") (and such counsel and advisors, the "**Prepetition Secured Parties Advisors**"), subject to the review procedures set forth in paragraph 20 of this Interim Order.

(d)     *Prepetition Secured Parties' Cash Payments.* The Debtors are authorized and directed, and authorized and directed to cause the non-Debtor Loan Parties (as defined in the Prepetition Term Loan Credit) to pay all amounts in connection with the interest payment that was due under the Prepetition Term Loan Credit Agreement on January 26, 2023 to the Prepetition Term Loan Secured Parties on the closing date of the DIP Financing. In addition, until the payment in full of all Prepetition Revolving Obligations, Prepetition Term Loan Obligations or Prepetition Secured Notes Obligations, respectively, the Prepetition Revolving Secured Parties, Prepetition Term Loan Secured Parties, and the Prepetition Secured Notes Parties shall receive, subject to the Carve Out (other than with respect to the Prepetition Revolving Obligations and Prepetition Revolving Secured Parties) current cash payments in the amount of interest on the outstanding principal at the non-default rate under the Prepetition Revolving Loan Documents, Prepetition Term Loan Documents and the Prepetition Notes Documents, as applicable.

(e)     *Milestones.* Upon indefeasible payment in full of all Term DIP Obligations and termination of all Term DIP Commitments, (i) the Prepetition Term Loan Secured Parties and Prepetition Notes Secured Parties are hereby entitled to performance of those certain case milestones set forth in Section 5.15 of the Term DIP Credit Agreement (for such purposes, the "**Term/Notes Adequate Protection Milestones**") and (ii) the Term/Notes Required Prepetition

Lenders[7] shall constitute the Required Term DIP Lenders for purposes of any amendment, extension, waiver or other modification of such Tem/Notes Adequate Protection Milestones. Upon indefeasible payment in full of all ABL DIP Obligations and termination of all ABL DIP Commitments, (x) the Prepetition Revolving Secured Parties are hereby entitled to performance of those certain case milestones set forth in Section 6.18 of the ABL DIP Credit Agreement (for such purposes, the "**Revolving Adequate Protection Milestones**") and (y) the Prepetition Required Revolving Lenders[8] shall constitute the Required ABL DIP Lenders for purposes of any amendment, extension, waiver or other modification of such Revolving Adequate Protection Milestones.

(f)     *Budget and Financial Covenants.*  Upon indefeasible payment in full of all Term DIP Obligations and termination of all Term DIP Commitments, (i) the Approved Budget shall continue to be updated in accordance with the terms and conditions of the Term DIP Credit Agreement (for such purposes, the "**Term/Notes Adequate Protection Budget Requirement**"), (ii) the Prepetition Term Secured Parties and the Prepetition Notes Secured Parties are hereby entitled to performance of those certain financial and other covenants set forth in Sections 5.17 and 6.22 of the Term DIP Credit Agreement (for such purposes, the "**Term/Notes Adequate Protection Covenants**") and (iii) the Term/Notes Required Prepetition Lenders shall constitute the Required DIP Lenders for purposes of any amendment, extension, waiver or other modification relating to the Adequate Protection Budget Requirement or Adequate Protection Covenants.

---

[7]     The "**Term/Notes Required Prepetition Lenders**" shall mean the parties required to direct the Controlling CF Debt Agent under the ABL Intercreditor Agreement.

[8]     The "**Required Prepetition Revolving Lenders**" shall mean the US-Canada Required Lenders (as defined in the Prepetition Revolving Credit Agreement).

(g)    *Prepetition Secured Parties' Adequate Protection Information Rights*.  The Debtor DIP Loan Parties shall promptly provide the Prepetition Term Loan Agents and the Prepetition Secured Notes Agents, for distribution to the applicable Prepetition Secured Parties and, to the extent applicable, counsel to such parties (and subject to applicable confidentiality restrictions in any of the Prepetition Loan Documents, including with respect to any "private" side lender database), with all required written financial reporting and other periodic reporting that is required to be provided to the Term DIP Agent or the Term DIP Secured Parties under the Term DIP Documents (the "**Term/Notes Adequate Protection Reporting Requirement**").  Upon indefeasible payment in full of all Term DIP Obligations and termination of all Term DIP Commitments, the Prepetition Term Loan Secured Parties and the Prepetition Secured Notes Parties shall continue to be entitled hereby to satisfaction of the Term/Notes Adequate Protection Reporting Requirement. In addition, the Debtor DIP Loan Parties shall promptly provide the Prepetition Revolving Agent, for distribution to the Prepetition Revolving Secured Parties and, to the extent applicable, counsel to such parties (and subject to applicable confidentiality restrictions in any of the Prepetition Revolving Credit Documents, including with respect to any "private" side lender database), with all required written financial reporting and other periodic reporting that is required to be provided to the ABL DIP Agent or the ABL DIP Secured Parties under the ABL DIP Documents (the "**Revolving Adequate Protection Reporting Requirement**").  Upon indefeasible payment in full of all ABL DIP Obligations and termination of all ABL DIP Commitments, the Prepetition Revolving Secured Parties shall continue to be entitled hereby to satisfaction of the Revolving Adequate Protection Reporting Requirement.

(h)     *Maintenance of Collateral*.  The DIP Loan Parties shall continue to maintain and insure the Prepetition Collateral and DIP Collateral in amounts and for the risks, and by the entities, as required under the Prepetition Loan Documents and the DIP Documents.

17.     *Reservation of Rights of Prepetition Secured Parties*.  Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties and any other parties' holding interests that are secured by liens primed by the DIP Financing; *provided* that each of the Prepetition Agents, acting on their own respective behalf or at the direction of their applicable requisite Prepetition Secured Parties, may request further or different adequate protection and the Debtor DIP Loan Parties or any other party in interest may contest any such request.

18.     *Perfection of DIP Liens and Adequate Protection Liens.*

(a)     Without in any way limiting the automatically valid and effective perfection of the DIP Liens granted pursuant to paragraph 9 hereof and the Adequate Protection Liens granted pursuant to paragraph 16 hereof, the DIP Agents, the DIP Secured Parties, the Prepetition Agents and the Prepetition Secured Parties are hereby authorized, but not required, to file or record (and to execute in the name of the DIP Loan Parties and the Prepetition Secured Parties (as applicable), as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, including as may be reasonably required or deemed appropriate by the applicable DIP Agent, acting at the direction of the applicable required parties under the DIP Documents, and the Prepetition Agents, acting at the direction of the applicable

required parties under the Prepetition Loan Documents, under applicable local laws, or take possession of or control over cash or securities, or to amend or modify security documents, or enter into, amend or modify intercreditor agreements, or to subordinate existing liens and any other similar action or action in connection therewith in a manner not inconsistent herewith or take any other action in order to document, validate and perfect the liens and security interests granted to them hereunder the ("**Perfection Actions**").  Whether or not the applicable DIP Agent, on behalf of the DIP Secured Parties and acting at the direction of the applicable required parties under the DIP Documents, or the Prepetition Agents, on behalf of the applicable Prepetition Secured Parties and acting at the direction of the applicable required parties under the Prepetition Loan Documents, shall take such Perfection Actions, the liens and security interests granted pursuant to this Interim Order shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Interim Order. Upon the request of a DIP Agent, acting at the direction of the applicable required parties under the DIP Documents, or a Prepetition Agent, acting at the direction of the applicable required parties under the Prepetition Loan Documents, each of the Prepetition Secured Parties and the Debtor DIP Loan Parties, without any further consent of any party, and at the sole cost of the Debtors as set forth herein, is authorized (in the case of the Debtor DIP Loan Parties), authorized and directed to cause (in the case of the Debtors with respect to the Non-Debtor DIP Loan Parties) and directed (in the case of the Prepetition Secured Parties), and such direction is hereby deemed to constitute required direction under the applicable DIP Documents or Prepetition Loan Documents, to take, execute, deliver and file such actions, instruments and agreements (in each case, without representation or warranty of any kind) to enable the DIP Agents to further validate, perfect, preserve and enforce the DIP Liens in all jurisdictions required under the DIP Credit Agreements,

including all local law documentation therefor determined to be reasonably necessary by such DIP Agent, acting at the direction of the applicable required parties under the DIP Documents; *provided*, *however*, that no action need be taken in a foreign jurisdiction that would jeopardize the validity and enforceability of the Prepetition Liens.  All such documents will be deemed to have been recorded and filed as of the Petition Date.  To the extent necessary to effectuate the terms of this Interim Order and the DIP Documents, each of the DIP Agents and the Prepetition Agents hereby is deemed to appoint the other (and deemed to have accepted such appointment) to act as its agent with respect to the Collateral (as defined in the DIP Documents) and under the Security Documents (as defined in the DIP Documents) to which they are a party in such capacity, with such powers as are expressly delegated thereto under the DIP Documents and Prepetition Loan Documents (and even if it involves self-contracting and multiple representation to the extent legally possible), together with such other powers as are reasonably incidental thereto.

(b)     A certified copy of this Interim Order may, in the discretion of each DIP Agent, acting at the direction of the applicable required parties under the DIP Documents, and the Prepetition Agents, acting at the direction of the applicable required parties under the Prepetition Loan Documents, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept a certified copy of this Interim Order for filing and/or recording, as applicable.  The Automatic Stay shall be modified to the extent necessary to permit the DIP Agents and the Prepetition Agents to take all actions, as applicable, referenced in this subparagraph (b) and the immediately preceding subparagraph (a).

19.    *Preservation of Rights Granted Under this Interim Order.*

(a)    Other than the Carve Out (as to Non ABL Priority Collateral) and other claims and liens expressly granted or permitted by this Interim Order, no claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order to the DIP Agents and the DIP Secured Parties or the Prepetition Agents and the Prepetition Secured Parties shall be permitted while any of the DIP Obligations or the Adequate  Protection Obligations remain outstanding, and, except as otherwise expressly provided in or permitted under this Interim Order, the DIP Liens and the Adequate Protection Liens shall not be: (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise; (iii) subordinated to or made *pari passu* with any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties; or (iv) subject or junior to any intercompany or affiliate liens or security interests of the DIP Loan Parties.

(b)    The occurrence of (i) any Event of Default (as defined in the DIP Credit Agreements) or (ii) any violation of any of the terms of this Interim Order, shall, after notice by the applicable DIP Agent (acting in accordance with the terms of this Interim Order) in writing to the Borrower (and, in the case of violation of any terms of this Interim Order, and after indefeasible payment in full of the DIP Obligations and termination of the DIP Commitments, notice by the applicable Prepetition Agent acting at the direction of the applicable required parties under the Prepetition Loan Documents), constitute an event of default under this Interim Order

(each an "**Event of Default**") and, upon any such Event of Default, interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Credit Agreements. Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code:  (A) the DIP Superpriority Claims, the 507(b) Claims, the DIP Liens, and the Adequate Protection Liens, and any claims related to the foregoing, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Obligations shall have been paid in full (and that such DIP Superpriority Claims, 507(b) Claims, DIP Liens and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (B) the other rights granted by this Interim Order, including with respect to the Carve Out, shall not be affected; and (C) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Interim Order.

(c)     If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacatur or stay shall not affect: (i) the validity, priority or enforceability of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agents or the Prepetition Agents, as applicable, of the effective date of such reversal, modification, vacatur or stay; or (ii) the validity, priority or enforceability of the DIP Liens or the Adequate Protection Liens or the Carve Out.  Notwithstanding any reversal, modification, vacatur or stay of any use of Cash Collateral, any DIP Obligations, DIP Liens, Adequate Protection Obligations or Adequate Protection Liens incurred by the Debtor DIP Loan Parties and granted to the DIP Agents, the DIP Secured Parties, the Prepetition Agents, or the Prepetition Secured Parties, as the case may be,

prior to the actual receipt of written notice by the DIP Agents or the Prepetition Agents, as applicable, of the effective date of such reversal, modification, vacatur or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Agents, the DIP Secured Parties, the Prepetition Agents, and the Prepetition Secured Parties shall be entitled to, and are hereby granted, all the rights, remedies, privileges and benefits arising under sections 364(e) and 363(m) of the Bankruptcy Code, this Interim Order and the DIP Documents with respect to all uses of Cash Collateral, DIP Obligations and Adequate Protection Obligations.

(d) Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Obligations, the 507(b) Claims and all other rights and remedies of the DIP Agents, the DIP Secured Parties, the Prepetition Agents, and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents and the Carve Out shall survive, and shall not be modified, impaired or discharged by: (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Chapter 11 Cases or terminating the joint administration of these Chapter 11 Cases or by any other act or omission; (ii) the entry of an order approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents); or (iii) the entry of an order confirming a chapter 11 plan in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the DIP Loan Parties have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations. The terms and provisions of this Interim Order and the DIP Documents shall continue in these Chapter 11 Cases, in any Successor Cases if these Chapter 11 Cases cease to be jointly administered and in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the DIP Superpriority Claims, the

Adequate Protection Liens and the Adequate Protection Obligations and all other rights and remedies of the DIP Agents, the DIP Secured Parties, the Prepetition Agents, and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full in cash, as set forth herein and in the DIP Documents, and the DIP Commitments have been terminated (and in the case of rights and remedies of the Prepetition Agents and Prepetition Secured Parties, shall remain in full force and effect thereafter, subject to the terms of this Interim Order), and the Carve Out shall continue in full force and effect.

20.      *Payment of Fees and Expenses*.   The Fee Letters are hereby approved, and the Debtor DIP Loan Parties are authorized to and shall pay the DIP Fees and Expenses and the Adequate Protection Fees and Expenses whether or not included in the Approved Budget.   Subject to the review procedures set forth in this paragraph 20, payment of all DIP Fees and Expenses and Adequate Protection Fees and Expenses shall not be subject to allowance or review by the Court. Professionals for the DIP Secured Parties and the applicable Prepetition Secured Parties shall not be required to comply with the U.S. Trustee fee guidelines, however any time that such professionals seek payment of fees and expenses from the Debtor DIP Loan Parties after the Initial Draw and prior to confirmation of a chapter 11 plan, each professional shall provide summary copies of its invoices (which shall not be required to contain time entries and which may be redacted, summarized or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of their invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine) to the Debtor DIP Loan Parties, the U.S. Trustee, and counsel to any statutory committee appointed in these

Chapter 11 Cases (together, the "**Review Parties**").  In no event shall any invoice or other statement submitted by any DIP Secured Party or Prepetition Secured Party operate to waive the attorney/client privilege, the work-product doctrine or any other evidentiary privilege or protection recognized under applicable law.  The U.S. Trustee and any statutory committee appointed in these Chapter 11 Cases reserve their rights to request additional detail regarding the services rendered and expenses incurred by such professionals (an "**Information Request**").  Any objections raised by any Review Party with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within ten (10) calendar days after the receipt of such invoices by the Review Parties (the "**Review Period**"), which shall not be extended by the delivery of an Information Request or the timing of any reply thereto; *provided*, that upon expiration of the Review Period with no written objection having been received, ABL DIP Agent shall be permitted to include as the ABL DIP Obligations any DIP Fees and Expenses owed to professionals retained by ABL DIP Agent or ABL DIP Secured Parties and make a Revolving Advance for the purposes of effectuating such payment by the Debtors.  If no written objection is received by 12:00 p.m., prevailing Eastern Time, on the end date of the Review Period, the Debtor DIP Loan Parties shall pay such invoices within three (3) calendar days.  If an objection to a professional's invoice is received within the Review Period, the Debtor DIP Loan Parties shall promptly pay the undisputed amount of the invoice, without the necessity of filing formal fee applications, regardless of whether such amounts arose or were incurred before or after the Petition Date, and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually.  Notwithstanding the foregoing, the Debtor DIP Loan Parties are authorized and directed to pay, on or after the closing date of the DIP Financing, the DIP Fees and Expenses and Adequate Protection Fees and Expenses incurred

on or prior to such date without the need for any professional engaged by, or on behalf of, the DIP Secured Parties or the applicable Prepetition Secured Parties to first deliver a copy of its invoice or other supporting documentation to the Review Parties (other than the Debtor DIP Loan Parties). No attorney or advisor to the DIP Secured Parties or any Prepetition Secured Party shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court.  Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtors to the (i) DIP Secured Parties in connection with or with respect to the DIP Facility and (ii) applicable Prepetition Secured Parties in connection or with respect to these matters, are hereby approved in full and shall not be subject to recharacterization, avoidance, subordination, disgorgement or any similar form of recovery by the Debtor DIP Loan Parties or any other person.

21.     *Effect of Stipulations on Third Parties*.  The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding upon the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors) in all circumstances and for all purposes.  The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes unless: (a) such committee or any other party in interest with requisite standing (in each case, to the extent requisite standing is obtained pursuant to an order of this Court entered prior to the expiration of the Challenge Period and subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so) has timely filed an adversary

proceeding or contested matter (subject to the limitations contained herein, including, *inter alia*, in this paragraph) by no later than (i) the earlier of (w) an order confirming a chapter 11 plan, (x) 60 calendar days after the appointment of the Creditors' Committee, (y) if the Chapter 11 Cases are converted to chapter 7 and a chapter 7 or chapter 11 trustee is appointed or elected prior to the expiration of the Challenge Period, then the Challenge Period for any such estate representative or trustee shall be extended (solely as to such estate representative or trustee) to the date that is the later of (1) 75 calendar days after entry of this Interim Order or (2) the date that is 30 calendar days after its appointment, and (z) 75 calendar days after entry of this Interim Order; (ii) any such later date agreed to in writing by the applicable DIP Agent (acting at the direction of the applicable required parties under the applicable DIP Documents) and applicable Prepetition Agent (acting with the direction of the applicable required parties under the applicable Prepetition Loan Documents); and (iii) any such later date as has been ordered by the Court for cause upon a motion filed and served within any applicable period (the time period established by the foregoing clauses (i)-(iii), the "**Challenge Period**"), (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Secured Debt or the Prepetition Liens, or (B) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "**Challenges**") against the Prepetition Secured Parties or their respective subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (each, a "**Representative**" and, collectively, the "**Representatives**") in connection with matters related to the Prepetition Loan Documents, the Prepetition Secured

Debt, the Prepetition Liens and the Prepetition Collateral; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter; *provided*, *however*, that any pleadings filed in connection with any Challenge shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred, including any amended or additional claims that may or could have been asserted thereafter through an amended complaint under Fed. R. Civ. P. 15 or otherwise.  If no such Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such proceeding then: (1) the Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding on all parties in interest; (2) the obligations of the Debtor DIP Loan Parties under the Prepetition Loan Documents, including the Prepetition Secured Debt, shall constitute allowed claims not subject to defense, claim, counterclaim, recharacterization, subordination, recoupment, offset or avoidance, for all purposes in the Chapter 11 Cases, and any subsequent chapter 7 case(s); (3) the Prepetition Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination, avoidance or other defense; and (4) the Prepetition Secured Debt and the Prepetition Liens on the Prepetition Collateral shall not be subject to any other or further claim or challenge by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any other party in interest acting or seeking to act on behalf of the Debtor DIP Loan Parties' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and any defenses, claims, causes of action, counterclaims and offsets by any statutory or non-statutory committees

appointed or formed in the Chapter 11 Cases or any other party acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors), whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties and their Representatives arising out of or relating to any of the Prepetition Loan Documents, the Prepetition Secured Debt, the Prepetition Liens and the Prepetition Collateral shall be deemed forever waived, released and barred. If any such Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in this Interim Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on any statutory or non-statutory committee appointed or formed in the Chapter 11 Cases and on any other person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction. Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to the Prepetition Loan Documents, the Prepetition Secured Debt or the Prepetition Liens, and any ruling on standing, if appealed, shall not stay or otherwise delay the Chapter 11 Cases or confirmation of any plan of reorganization.

22.  *Limitation on Use of DIP Financing Proceeds and Collateral.*  Notwithstanding any other provision of this Interim Order or any other order entered by the Court, no DIP Loans, DIP Collateral, Prepetition Collateral (including Cash Collateral) or any portion of the Carve Out, may be used directly or indirectly, including without limitation through reimbursement of

professional fees of any non-Debtor party (a) in connection with the investigation, threatened initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against any of the DIP Secured Parties, or the Prepetition Secured Parties, or their respective predecessors-in-interest, agents, affiliates, Representatives, attorneys, or advisors, in each case in their respective capacities as such, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens, DIP Superpriority Claims, Prepetition Secured Debt, and/or the Adequate Protection Obligations and Adequate Protection Liens granted to the Prepetition Secured Parties, as applicable, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to the DIP Obligations, the Prepetition Secured Debt and/or the liens, claims, rights, or security interests securing or supporting the DIP Obligations granted under this Interim Order, the Final Order, the DIP Documents or the Prepetition Loan Documents in respect of the Prepetition Secured Debt, including, in the case of each (i) and (ii), without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; provided that, notwithstanding anything to the contrary herein, the proceeds of the DIP Loans and/or DIP Collateral (including Cash Collateral) may be used by any Creditors' Committee to investigate (but not to prosecute or initiate the prosecution of, including the preparation of any complaint or motion on account of) (A) the claims and liens of the Prepetition Secured Parties and (B) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties (together, the "**Investigation**"), up to an aggregate cap of no more than $100,000 (the "**Investigation Budget**"), (b) to prevent, hinder, or otherwise delay or interfere with the Prepetition Agents', the Prepetition Secured Parties', the DIP Agents', or the DIP Secured Parties', as applicable, enforcement or realization on the Prepetition Secured Debt,

Prepetition Collateral, DIP Obligations, DIP Collateral, and the liens, claims and rights granted to such parties under the Interim Order or Final Order, as applicable, each in accordance with the DIP Documents, the Prepetition Loan Documents or this Interim Order; (c) to seek to modify any of the rights and remedies granted to the Prepetition Agents, the Prepetition Secured Parties, the DIP Agents, or the DIP Secured Parties under this Interim Order, the Prepetition Loan Documents or the DIP Documents, as applicable; (d) to apply to the Court for authority to approve superpriority claims or grant liens (other than the liens permitted pursuant to the DIP Documents) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens and 507(b) Claims granted to the Prepetition Term Loan Secured Parties and the Prepetition Secured Notes Parties; or (e) to pay or to seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are approved or authorized by the Court, agreed to in writing by the Required Term/ABL DIP Lenders,[9] expressly permitted under this Interim Order or permitted under the DIP Documents (including the Approved Budget), in each case unless all DIP Obligations, Prepetition Secured Debt, Adequate Protection Obligations, and claims granted to the DIP Agents, DIP Secured Parties, Prepetition Agents and Prepetition Secured Parties under this Interim Order, have been refinanced or paid in full in cash (including the cash collateralization of any letters of credit) or otherwise agreed to in writing by the Required Term/ABL DIP Lenders.  For the avoidance of doubt, this paragraph 22 shall not limit the Debtors' right to use DIP Collateral to contest whether an Event of Default has occurred hereunder pursuant to and consistent with paragraph 10 of this Interim Order.

---

[9]  "**Required Term/ABL DIP Lenders**" means, at any time, (i) Term DIP Lenders constituting "Required Lenders" as defined in the Term DIP Credit Agreement and (ii) ABL DIP Lenders constituting "US-Canada Required Lenders" as defined in the ABL DIP Credit Agreement.

23. *Indemnification*.  The Prepetition Secured Parties and the DIP Secured Parties have acted in good faith and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the DIP Facilities and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens, any challenges or objections to the DIP Facilities or the use of Cash Collateral, the DIP Documents, and all other documents related to, and all transactions contemplated by, the foregoing. Accordingly, without limitation to any other right to indemnification, the Prepetition Secured Parties and the DIP Secured Parties shall be, and hereby are, indemnified (as applicable) as provided in the Prepetition Loan Documents and the DIP Documents, as applicable. The Debtors agree that no exception or defense in contract, law, or equity exists as of the date of this Interim Order to any obligation set forth, as the case may be, in this paragraph or in the DIP Documents, or in the Prepetition Loan Documents, to indemnify and/or hold harmless the DIP Agent, any other DIP Secured Party, or any Prepetition Secured Party, as the case may be, and any such defenses are hereby waived.

24. *Interim Order Governs*.  In the event of any inconsistency between the provisions of this Interim Order and the DIP Documents (including, but not limited to, with respect to the Adequate Protection Obligations) or the Prepetition Loan Documents, the provisions of this Interim Order shall govern.  Notwithstanding anything to the contrary in any other order entered by this Court, any payment made pursuant to any authorization contained in any other order entered by this Court shall be consistent with and subject to the requirements set forth in this Interim Order and the DIP Documents, including, without limitation, the Approved Budget.

25.     *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Agents, the DIP Secured Parties, the Prepetition Agents, the Prepetition Secured Parties, any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agents, the DIP Secured Parties, the Prepetition Agents, the Prepetition Secured Parties and the Debtors and their respective successors and assigns; *provided* that the DIP Agents, the DIP Secured Parties, the Prepetition Agents and the Prepetition Secured Parties shall have no obligation to permit the use of the Prepetition Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

26.     *Exculpation*.  Nothing in this Interim Order, the DIP Documents, the Prepetition Loan Documents or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon any DIP Secured Party or Prepetition Secured Party any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts.  The DIP Secured Parties and Prepetition Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral or Prepetition Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any

80

cause, (iii) any diminution in the value thereof or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person and (b) all risk of loss, damage or destruction of the DIP Collateral or Prepetition Collateral shall be borne by the Debtors.

27.     *Limitation of Liability*.  In determining to make any loan or other extension of credit under the DIP Documents, to permit the use of the DIP Collateral or Prepetition Collateral (including Cash Collateral) or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents or Prepetition Loan Documents, none of the DIP Secured Parties or Prepetition Secured Parties shall (a) have any liability to any third party or be deemed to be in "control" of the operations of the Debtors; (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" or "managing agent" with respect to the operation or management of any of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, as amended, or any other federal or state statute, including the Internal Revenue Code). Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Agents, DIP Secured Parties, Prepetition Agents or Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

28.     *Master Proofs of Claim*.  The Prepetition Agents and/or any other Prepetition Secured Parties shall not be required to file proofs of claim in the Chapter 11 Cases or any Successor Case in order to assert claims on behalf of themselves or the Prepetition Secured Parties for payment of the Prepetition Secured Debt arising under the Prepetition Loan Documents, as

applicable, including, without limitation, any principal, unpaid interest, fees, expenses and other amounts under the Prepetition Loan Documents.  The statements of claim in respect of such indebtedness set forth in this Interim Order, together with any evidence accompanying the DIP Motion and presented at the Interim Hearing, are deemed sufficient to and do constitute proofs of claim in respect of such debt and such secured status.  However, in order to facilitate the processing of claims, to ease the burden upon the Court and to reduce an unnecessary expense to the Debtors' estates, each of the Prepetition Agents are authorized, but not directed or required, to file in the Debtors' lead Chapter 11 Case *In re Invacare Corporation*, Case No. 23-90068 (CML), a master proof of claim on behalf of its respective Prepetition Secured Parties on account of any and all of their respective claims arising under the applicable Prepetition Loan Documents and hereunder (each, a "**Master Proof of Claim**") against each of the Debtors.  Upon the filing of a Master Proof of Claim by a Prepetition Agent, such Prepetition Agent shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against each of the Debtors of any type or nature whatsoever with respect to the applicable Prepetition Loan Documents, and the claim of each applicable Prepetition Secured Party (and each of its respective successors and assigns), named in a Master Proof of Claim shall be treated as if it had filed a separate proof of claim in each of these Chapter 11 Cases.  The Master Proofs of Claim shall not be required to identify whether any Prepetition Secured Party acquired its claim from another party and the identity of any such party or to be amended to reflect a change in the holders of the claims set forth therein or a reallocation among the holders of the claims asserted therein resulting from the transfer of all or any portion of such claims.  The provisions of this paragraph 28 and each Master Proof of Claim are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition Secured Party (or its successors in

interest) to vote separately on any plan proposed in these Chapter 11 Cases. The Master Proofs of Claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition Secured Parties, which instruments, agreements or other documents will be provided upon written request to counsel to the applicable Prepetition Agent. The DIP Agents and the DIP Secured Parties shall similarly not be required to file proofs of claim with respect to their DIP Obligations under the DIP Documents, and the evidence presented with the DIP Motion and the record established at the Interim Hearing are deemed sufficient to, and do, constitute proofs of claim with respect to their obligations, secured status, and priority.

29.     *Forbearance of the Prepetition Secured Parties*.  Prior to the occurrence of an Event of Default, except as expressly permitted pursuant to the terms of this Interim Order or the DIP Documents, the Prepetition Secured Parties shall not (i) exercise any rights or remedies with respect to any Prepetition Liens or Prepetition Collateral, (ii) enforce or pursue a default or other breach under any Prepetition Loan Document, or (iii) assert any demand for payment of any kind whatsoever, in each case with respect to any Debtor or Non-Debtor DIP Loan Party on account of any Prepetition Secured Debt; *provided* that, following the occurrence of any Event of Default or other violation of the terms of this Interim Order, the forbearance set forth in this paragraph 29 shall be of no further force or effect and (x) the Prepetition Term Loan Agent and the Prepetition Notes Agent shall have the rights and obligations of the Term DIP Agent as set forth in paragraph 10 hereof and (y) the Prepetition Revolving Agent shall have the rights and obligations of the ABL DIP Agent as set forth in paragraph 10 hereof.

30.     *Insurance*.  To the extent that a Prepetition Agent is listed as loss payee under the Borrower's or any DIP Guarantors' insurance policies, the applicable DIP Agent (on behalf of the

applicable DIP Lenders) is also deemed to be the loss payee under the insurance policies (in any such case with the same priority of liens and claims thereunder relative to the priority of (x) the Prepetition Liens and Adequate Protection Liens and (y) the DIP Liens, as set forth herein) and shall act in that capacity and distribute any proceeds recovered or received in respect of the insurance policies, to the indefeasible payment in full of the applicable Term DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and termination of the Term DIP Commitments, and to the payment of the applicable Prepetition Secured Debt.

31.     *Credit Bidding*.  Subject to the lien priorities set forth herein, (a) the respective DIP Agents shall have the right to credit bid, in accordance with the DIP Documents, up to the full amount of the applicable DIP Obligations in any sale of the DIP Collateral and (b) the respective Prepetition Agents shall have the right, consistent with the provisions of the applicable Prepetition Loan Documents (and providing for the DIP Obligations to be indefeasibly repaid in full in cash and the termination of the DIP Commitments), to credit bid up to the full amount of the applicable Prepetition Secured Debt, in each case as and to the extent provided for in section 363(k) of the Bankruptcy Code, without the need for further Court order authorizing the same and whether any such sale is effectuated through section 363(k), 1123 or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise, in each case unless the Court for cause orders otherwise; *provided* that (x) no Term DIP Obligations, Prepetition Term Loan Debt or Prepetition Secured Notes Debt may be credit bid in any disposition of any Prepetition ABL Priority Collateral unless such sale provides for indefeasible payment in full in cash to the ABL DIP Agent and the ABL DIP Lenders of all ABL DIP Obligations and (y) no ABL DIP Obligations may be credit bid in any disposition of any Prepetition Non-ABL Priority

Collateral unless such sale provides for indefeasible payment in full in cash to the Term DIP Agents and the Term DIP Lenders of all Term DIP Obligations, to the Prepetition Term Loan Secured Parties of all Prepetition Term Loan Debt and to the Prepetition Secured Notes Parties of all Prepetition Secured Notes.

32.     *Term DIP Loan Proceeds Account*.  The Borrower is authorized and directed to deposit all proceeds of the Term DIP Loans into account ending in 6387 at PNC Bank, National Association (the "**Term DIP Loan Proceeds Account**"). The Debtors shall not, and shall cause the Non-Debtor Term DIP Loan Parties not to, deposit any assets  (including any ABL Collateral) into the Term DIP Loan Proceeds Account other than proceeds of the Term DIP Loans.  If any ABL Collateral is deposited into the Term DIP Loan Proceeds Account, the Debtors shall, as promptly as practicable, transfer all ABL Collateral out of the Term DIP Loan Proceeds Account.

33.     *Effectiveness*.  This Interim Order shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 and shall take effect and be fully enforceable as of the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

34.     *Modification of DIP Documents and Approved Budget*.  The Debtors are hereby authorized, without further order of this Court, to enter into agreements with the DIP Secured Parties (or the Prepetition Secured Parties after the indefeasible payment in full of the Term DIP Obligations and termination of the Term DIP Commitments) providing for any consensual non-material modifications to the Approved Budget or the DIP Documents, or of any other

modifications to the DIP Documents necessary to conform the terms of the DIP Documents to this Interim Order, in each case consistent with the amendment provisions of the DIP Documents; *provided*, *however*, that notice of any material modification or amendment to the DIP Documents shall be provided to the U.S. Trustee, any statutory committee and any other DIP Agent which shall have five (5) days from the date of such notice within which to object, in writing, to the modification or amendment. If the U.S. Trustee, any statutory committee or any other DIP Agent timely objects to any material modification or amendment to the DIP Documents, the modification or amendment shall only be permitted pursuant to an order of the Court. The foregoing shall be without prejudice to the Debtors' right to seek approval from the Court of a material modification on an expedited basis.

35.     *Headings*.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

36.     *Payments Held in Trust*.  Except as expressly permitted in this Interim Order or the DIP Documents and except with respect to the DIP Loan Parties, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral or receives any other payment with respect thereto from any other source prior to indefeasible payment in full in cash of all DIP Obligations and termination of all DIP Commitments, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Agents and the DIP Secured Parties and shall immediately turn over the proceeds to the DIP Agents, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Interim Order, including paragraph 10(b) hereof.

37.     *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the DIP Motion.

38.     *No Third-Party Rights*.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect or incidental beneficiary.

39.     *Necessary Action*.  The Debtors, the DIP Secured Parties and the Prepetition Secured Parties are authorized to take all actions as are necessary or appropriate to implement the terms of this Interim Order.  In addition, the Automatic Stay is modified to permit affiliates of the Debtors who are not debtors in these Chapter 11 Cases to take all actions as are necessary or appropriate to implement the terms of this Interim Order.

40.     *Retention of Jurisdiction*.  The Court shall retain jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

41.     *Final Hearing*.  A final hearing to consider the relief requested in the Motion shall be held on February 28, 2023 at 2:30 p.m. (prevailing Central Time) and any objections or responses to the Motion shall be filed on or prior to February 21, 2023 at 4:00 p.m. (prevailing Central Time) (the "**Objection Deadline**").

42.     *Objections*.  Any party in interest objecting to the relief sought at the Final Hearing shall file and serve (via mail and e-mail) written objections, which objections shall be served upon (a) the U.S. Trustee; (b) entities listed as holding the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the Debtors, 1 Invacare Way, Elyria, Ohio 44035 (Attn: Anthony LaPlaca (ALaPlaca@invacare.com); (d) counsel to the Debtors, Kirkland & Ellis LLP,

300 N La Salle Street, Chicago, Illinois 60654 (Attn: Ryan Blaine Bennett (ryan.bennett@kirkland.com) and Yusuf Salloum (yusuf.salloum@kirkland.com); (e) counsel to the ABL DIP Agent and Prepetition Revolving Agent, Blank Rome LLP, One Logan Square, 130 N. 18th Street, Philadelphia, Pennsylvania 19103 (Attn.: Regina Stango Kelbon, Esq. (regina.kelbon@blankrome.com) and Ira Herman, Esq. (ira.herman@blankrome.com); (f) counsel to the Prepetition Term Loan Lenders and holders of the Prepetition Secured Notes, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017 (Attn.: Damian Schaible, Esq. (damian.schaible@davispolk.com), Jonah A. Peppiatt, Esq. (jonah.peppiatt@davispolk.com), Jarret Erickson, Esq. (jarret.erickson@davispolk.com) and Eric Hwang (eric.hwang@davispolk.com)); (g) the Office of the United States Attorney for the Southern District of Texas; (h) the state attorneys general for states in which the Debtor DIP Loan Parties conduct business; (i) the Internal Revenue Service; (j) the Securities and Exchange Commission; and (k) any other party that has filed a request for notices with this Court pursuant to Bankruptcy Rule 2002, with a copy to the Court's chamber, in each case to allow actual receipt by the foregoing no later than the Objection Deadline, prevailing Central Time and otherwise in conformity with the Court's order establishing notice and case management procedures.

43.     The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing and to any party that has filed a request for notices with this Court.

Signed:  February 02, 2023

_____
Christopher Lopez
United States Bankruptcy Judge

## Schedule 1
## Budget

**Invacare Corporation et. al**
**Weekly Cash Flow - Debtor-entities**
*$ in thousands*

|  | 1/31 Filing Date | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *$ in thousands* | 1 FCST | 2 FCST | 3 FCST | 4 FCST | 5 FCST | 6 FCST | 7 FCST | 8 FCST | 9 FCST | 10 FCST | 11 FCST | 12 FCST | 13 FCST | 13-Wk Total |
| Week Ending | 2/3/23 | 2/10/23 | 2/17/23 | 2/24/23 | 3/3/23 | 3/10/23 | 3/17/23 | 3/24/23 | 3/31/23 | 4/7/23 | 4/14/23 | 4/21/23 | 4/28/23 | |
| **Operating Receipts** | $ 4,245 | $ 4,065 | $ 4,065 | $ 2,956 | $ 3,535 | $ 3,182 | $ 3,182 | $ 3,182 | $ 3,182 | $ 4,558 | $ 4,558 | $ 4,558 | $ 4,558 | $ 49,828 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Post-petition Vendor Payments | (2,627) | (1,770) | (1,122) | (1,244) | (1,159) | (3,224) | (535) | (1,434) | (1,434) | (1,331) | (2,087) | (1,867) | (1,629) | (21,464) |
| Payroll Related | (1,043) | (373) | (2,344) | (373) | (1,005) | (322) | (2,317) | (322) | (2,237) | (480) | (2,300) | (313) | (2,020) | (15,449) |
| IT Services | (297) | (43) | (43) | (961) | (417) | (44) | (164) | (44) | (1,081) | (686) | (43) | (43) | (920) | (4,786) |
| Occupancy | (276) | (35) | (35) | (35) | (276) | (36) | (36) | (36) | (277) | (35) | (35) | (35) | (306) | (1,452) |
| Taxes | (123) | (180) | (25) | (55) | (52) | - | (25) | (55) | (234) | (30) | (30) | (30) | (30) | (869) |
| Insurance | (894) | - | - | - | (894) | - | - | - | - | (894) | - | - | - | (2,681) |
| Deposits | (500) | - | - | - | - | - | - | - | - | - | - | - | - | (500) |
| Non-Insider KERP | - | - | - | - | - | - | - | - | (656) | - | - | - | - | (656) |
| **Total Operating Disbursements** | $ (5,758) | $ (2,401) | $ (3,569) | $ (2,667) | $ (3,803) | $ (3,626) | $ (3,077) | $ (1,891) | $ (5,919) | $ (3,456) | $ (4,496) | $ (2,289) | $ (4,905) | $ (47,858) |
| **Operating Cash Flow** | $ (1,514) | $ 1,664 | $ 495 | $ 289 | $ (268) | $ (444) | $ 105 | $ 1,291 | $ (2,737) | $ 1,103 | $ 63 | $ 2,270 | $ (347) | $ 1,970 |
| **Non-Operating Receipts and Disbursements** | | | | | | | | | | | | | | |
| Critical Vendor Payments | (4,167) | (4,167) | (4,167) | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | - | - | - | - | - | (25,000) |
| Restructuring / Ordinary Course Professional Fees | (1,130) | (755) | (755) | (906) | (1,030) | (655) | (655) | (655) | (1,032) | (1,085) | (705) | (705) | (1,496) | (11,563) |
| Board Fees | - | - | - | - | - | - | - | - | - | - | (214) | - | - | (214) |
| Transformation Costs | (15) | (25) | (25) | (25) | (23) | (22) | (22) | (22) | (22) | (75) | (75) | (75) | (75) | (500) |
| Adequate Protection | (3,392) | (18) | (46) | (22) | - | - | - | - | - | (735) | - | - | - | (4,213) |
| Interest / Fees- DIP | (700) | - | - | - | (588) | - | - | - | - | (1,080) | - | - | (941) | (3,309) |
| **Total Non-Operating Receipts and Disbursements** | $ (9,404) | $ (4,964) | $ (4,993) | $ (3,453) | $ (4,141) | $ (3,177) | $ (3,177) | $ (3,177) | $ (1,054) | $ (2,975) | $ (994) | $ (780) | $ (2,511) | $ (44,798) |
| **Intercompany Transactions** | | | | | | | | | | | | | | |
| Intercompany Netting | - | - | 623 | - | - | - | 281 | - | - | - | 102 | - | 1,282 | 2,289 |
| Intercompany Loans | 158 | - | - | - | 158 | - | - | - | 158 | - | - | - | - | 474 |
| Corporate Reimbursement (EMEA) | - | - | - | - | 1,092 | - | - | - | 581 | - | - | - | 798 | 2,471 |
| Funding between NA Debtor/Non-debtor Entities (US & IX & Medbloc) | (816) | (773) | (150) | (829) | (637) | (780) | 1,336 | (764) | (640) | (758) | 1,377 | (723) | (448) | (4,607) |
| **Net Intercompany Transactions** | $ (658) | $ (773) | $ 473 | $ (829) | $ 613 | $ (780) | $ 1,617 | $ (764) | $ 99 | $ (758) | $ 1,479 | $ (723) | $ 1,631 | $ 627 |
| **Net Cash Flow** | $ (11,576) | $ (4,074) | $ (4,024) | $ (3,992) | $ (3,796) | $ (4,401) | $ (1,455) | $ (2,650) | $ (3,692) | $ (2,631) | $ 548 | $ 766 | $ (1,227) | $ (42,202) |
| Beginning ABL/DIP ABL Balance | $ 5,838 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 5,838 |
| Draws (Paydown) | 8,171 | - | - | - | - | - | - | - | - | - | - | - | - | 8,171 |
| **Ending ABL Balance** | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | $ 14,009 | 14,009 |
| Beginning Highbridge DDTL Balance | $ 90,500 | $ 73,000 | $ 73,000 | $ 73,000 | $ 73,000 | $ 55,500 | $ 55,500 | $ 55,500 | $ 55,500 | $ 55,500 | $ 55,500 | $ 55,500 | $ 55,500 | 90,500 |
| Draws (Paydown) | (17,500) | - | - | - | (17,500) | - | - | - | - | - | - | - | - | (35,000) |
| **Ending Highbridge DDTL Balance** | $ 73,000 | $ 73,000 | $ 73,000 | $ 73,000 | $ 55,500 | $ 55,500 | $ 55,500 | $ 55,500 | $ 55,500 | $ 55,500 | $ 55,500 | $ 55,500 | $ 55,500 | 55,500 |
| Beginning DIP Balance | $ - | $ 35,000 | $ 35,000 | $ 35,000 | $ 35,000 | $ 70,000 | $ 70,000 | $ 70,000 | $ 70,000 | $ 70,000 | $ 70,000 | $ 70,000 | $ 70,000 | $ - |
| Draws (Paydown) | 17,500 | - | - | - | 17,500 | - | - | - | - | - | - | - | - | 35,000 |
| Rollup Draw | 17,500 | - | - | - | 17,500 | - | - | - | - | - | - | - | - | 35,000 |
| **Ending DIP Balance** | $ 35,000 | $ 35,000 | $ 35,000 | $ 35,000 | $ 70,000 | $ 70,000 | $ 70,000 | $ 70,000 | $ 70,000 | $ 70,000 | $ 70,000 | $ 70,000 | $ 70,000 | $ 70,000 |
| Beginning Book Cash Balance | 368 | 14,293 | 10,219 | 6,196 | 2,203 | 15,907 | 11,506 | 10,052 | 7,402 | 3,710 | 1,079 | 1,627 | 2,394 | 368 |
| Net Cash Flow | (11,576) | (4,074) | (4,024) | (3,992) | (3,796) | (4,401) | (1,455) | (2,650) | (3,692) | (2,631) | 548 | 766 | (1,227) | (42,202) |
| ABL Draws (Paydowns) | 8,000 | - | - | - | - | - | - | - | - | - | - | - | - | 8,000 |
| DIP Draws (Paydown) | 17,500 | - | - | - | 17,500 | - | - | - | - | - | - | - | - | 35,000 |
| **Ending Book Cash Balance** | $ 14,293 | $ 10,219 | $ 6,196 | $ 2,203 | $ 15,907 | $ 11,506 | $ 10,052 | $ 7,402 | $ 3,710 | $ 1,079 | $ 1,627 | $ 2,394 | $ 1,166 | $ 1,166 |

**<u>Exhibit 1</u>**

**Term DIP Credit Agreement**

**Filing Version**

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT

dated as of

February [2], 2023

among

INVACARE CORPORATION,

a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code, as the Borrower,

The LENDERS Party Hereto,

CANTOR FITZGERALD SECURITIES,

as Administrative Agent,

and

GLAS TRUST CORPORATION LIMITED,

as Collateral Agent

## TABLE OF CONTENTS

**Page**

**ARTICLE 1 DEFINITIONS**................................................................................1

    Section 1.01.    Defined Terms ...............................................................1
    Section 1.02.    Classification of Loans and Borrowings .........................57
    Section 1.03.    Terms Generally ...........................................................57
    Section 1.04.    Accounting Terms; GAAP ............................................57
    Section 1.05.    Currency Translation ....................................................58
    Section 1.06.    Timing of Payment of Performance ...............................58
    Section 1.07.    Cashless Rollovers .......................................................59
    Section 1.08.    [Reserved] ...................................................................59
    Section 1.09.    Rounding .....................................................................59
    Section 1.10.    Divisions .....................................................................59
    Section 1.11.    [Reserved] ...................................................................59
    Section 1.12.    [Reserved] ...................................................................59
    Section 1.13.    Quebec Matters ...........................................................59
    Section 1.14.    French terms ................................................................60
    Section 1.15.    Luxembourg terms .......................................................60
    Section 1.16.    Swiss terms .................................................................61
    Section 1.17.    Australian matters ........................................................61
    Section 1.18.    Danish terms ................................................................62

**ARTICLE 2 THE CREDITS**..........................................................................62

    Section 2.01.    Commitments and Loans ...............................................62
    Section 2.02.    Loans and Borrowings ..................................................63
    Section 2.03.    Requests for Borrowings ...............................................64
    Section 2.04.    [Reserved] ...................................................................65
    Section 2.05.    [Reserved] ...................................................................65
    Section 2.06.    Funding of Borrowings .................................................65
    Section 2.07.    [Reserved] ...................................................................66
    Section 2.08.    Termination and Reduction of Commitments .................66
    Section 2.09.    Repayment of Loans; Evidence of Debt.........................66
    Section 2.10.    [Reserved] ...................................................................66
    Section 2.11.    Prepayment of Loans ....................................................67
    Section 2.12.    Fees............................................................................67
    Section 2.13.    Interest .......................................................................68
    Section 2.14.    [Reserved] ...................................................................69
    Section 2.15.    Increased Costs ............................................................69
    Section 2.16.    [Reserved] ...................................................................70
    Section 2.17.    Taxes .........................................................................70
    Section 2.18.    Payments Generally; Pro Rata Treatment; Sharing of Setoffs .........74
    Section 2.19.    Mitigation Obligations; Replacement of Lenders .............76
    Section 2.20.    Priority and Liens; No Discharge ..................................77

Section 2.21.    [Reserved] ..................................................................................78
Section 2.22.    [Reserved] ..................................................................................78
Section 2.23.    [Reserved] ..................................................................................78

**ARTICLE 3 REPRESENTATIONS AND WARRANTIES**..................................................**79**

Section 3.01.    Organization; Powers ...............................................................79
Section 3.02.    Authorization; Enforceability....................................................79
Section 3.03.    Governmental Approvals; No Conflicts .....................................79
Section 3.04.    Financial Condition; No Material Adverse Effect.......................80
Section 3.05.    Properties..................................................................................80
Section 3.06.    Litigation and Environmental Matters .......................................80
Section 3.07.    Compliance with Laws and Agreements......................................81
Section 3.08.    Investment Company Status .......................................................81
Section 3.09.    Taxes .........................................................................................81
Section 3.10.    ERISA ........................................................................................81
Section 3.11.    Disclosure .................................................................................82
Section 3.12.    Subsidiaries ..............................................................................82
Section 3.13.    Intellectual Property; Licenses, Etc ...........................................82
Section 3.14.    [Reserved] ................................................................................82
Section 3.15.    Senior Indebtedness...................................................................82
Section 3.16.    Federal Reserve Regulations .....................................................82
Section 3.17.    Security Interest in Collateral ...................................................83
Section 3.18.    PATRIOT Act, OFAC and FCPA .................................................83
Section 3.19.    Luxembourg Law ......................................................................84
Section 3.20.    [Reserved] ................................................................................84
Section 3.21.    [Reserved] ................................................................................84
Section 3.22.    Intermediate Holdcos ................................................................84
Section 3.23.    Bankruptcy Matters ..................................................................84

**ARTICLE 4 CONDITIONS** .........................................................................................**85**

Section 4.01.    Effective Date...........................................................................85
Section 4.02.    Conditions to the Initial Borrowing...........................................88
Section 4.03.    Conditions to the Subsequent Borrowing....................................89

**ARTICLE 5 AFFIRMATIVE COVENANTS** ................................................................**90**

Section 5.01.    Financial Statements and Other Information...............................90
Section 5.02.    Notices of Material Events .........................................................93
Section 5.03.    Information Regarding Collateral ...............................................93
Section 5.04.    Existence; Conduct of Business ..................................................94
Section 5.05.    Payment of Taxes, Etc ...............................................................94
Section 5.06.    Maintenance of Properties.........................................................94
Section 5.07.    Insurance ..................................................................................94
Section 5.08.    Books and Records; Inspection and Audit Rights........................95
Section 5.09.    Compliance with Laws...............................................................95

Section 5.10.    Use of Proceeds ...................................................................96
Section 5.11.    Additional Subsidiaries .......................................................96
Section 5.12.    Further Assurances ...............................................................97
Section 5.13.    Cash Management and Collections .....................................97
Section 5.14.    Certain Post-Closing Obligations .......................................97
Section 5.15.    Case Milestones ...................................................................98
Section 5.16.    Bankruptcy Covenants .......................................................100
Section 5.17.    Budget and Variance Reports ............................................101
Section 5.18.    DIP Term Loan Proceeds Account .....................................102

**ARTICLE 6 NEGATIVE COVENANTS**.................................................................**103**

Section 6.01.    Indebtedness; Certain Equity Securities ..........................103
Section 6.02.    Liens ..................................................................................106
Section 6.03.    Fundamental Changes ........................................................109
Section 6.04.    Investments, Loans, Advances, Guarantees and Acquisitions .......110
Section 6.05.    Asset Sales .........................................................................113
Section 6.06.    Intermediate Holdco Covenant ..........................................115
Section 6.07.    Negative Pledge .................................................................116
Section 6.08.    Restricted Payments; Certain Payments of Indebtedness...............118
Section 6.09.    Transactions with Affiliates ..............................................119
Section 6.10.    Liquidity ............................................................................121
Section 6.11.    Change in Nature of Business ...........................................121
Section 6.12.    Accounting Changes ..........................................................121
Section 6.13.    Amendments or Waivers of Organizational Documents...............121
Section 6.14.    Intellectual Property ..........................................................121
Section 6.15.    Use of Proceeds in Switzerland .........................................121
Section 6.16.    Additional Limitations on Certain Investments ...............122
Section 6.17.    Limitations on Amendments to the DIP ABL Documents.............122
Section 6.18.    Limitations on the German Group......................................122
Section 6.19.    Danish Collateral ...............................................................122
Section 6.20.    Additional Bankruptcy Matters .........................................123
Section 6.21.    Use of Proceeds .................................................................124
Section 6.22.    Budget Variance Covenant ................................................124

**ARTICLE 7 EVENTS OF DEFAULT** ......................................................................**125**

Section 7.01.    Events of Default................................................................125
Section 7.02.    [Reserved] ..........................................................................132
Section 7.03.    Application of Proceeds .....................................................132

**ARTICLE 8 THE ADMINISTRATIVE AGENT AND COLLATERAL AGENT**............**132**

**ARTICLE 9 MISCELLANEOUS** .............................................................................**141**

Section 9.01.    Notices................................................................................141
Section 9.02.    Waivers; Amendments .......................................................143

iii

Section 9.03.  Expenses; Indemnity; Damage Waiver ..........................................145
Section 9.04.  Successors and Assigns ...............................................................147
Section 9.05.  Survival ....................................................................................152
Section 9.06.  Counterparts; Integration; Effectiveness ......................................153
Section 9.07.  Severability................................................................................153
Section 9.08.  Right of Setoff ..........................................................................153
Section 9.09.  Governing Law; Jurisdiction; Consent to Service of Process ........153
Section 9.10.  WAIVER OF JURY TRIAL .......................................................154
Section 9.11.  Headings ...................................................................................154
Section 9.12.  Confidentiality...........................................................................154
Section 9.13.  USA Patriot Act.........................................................................156
Section 9.14.  Judgment Currency.....................................................................156
Section 9.15.  Release of Liens and Guarantees..................................................157
Section 9.16.  No Fiduciary Relationship...........................................................158
Section 9.17.  [Reserved] .................................................................................158
Section 9.18.  Acknowledgement and Consent to Bail-In of EEA Financial Institutions ................................................................................158
Section 9.19.  [Reserved] .................................................................................158
Section 9.20.  Amendments for Guarantee Limitations .......................................159
Section 9.21.  Parallel Debt; Parallel Debt owed to the Collateral Agent.............159
Section 9.22.  Erroneous Payments ...................................................................164
Section 9.23.  Original Issue Discount ...............................................................165
Section 9.24.  Orders Control............................................................................165

SCHEDULES:

Schedule 1.01(a)  —  Excluded Subsidiaries
Schedule 1.01(c)  —  Guarantors
Schedule 2.01  —  Commitments
Schedule 3.05  —  Real Estate
Schedule 3.12  —  Subsidiaries
Schedule 5.14  —  [Reserved]
Schedule 6.01  —  Existing Indebtedness
Schedule 6.02  —  Existing Liens
Schedule 6.04(f)  —  Existing Investments
Schedule 6.07  —  Existing Restrictions
Schedule 6.09  —  Existing Affiliate Transactions

EXHIBITS:

Exhibit A  —  Form of Compliance Certificate
Exhibit B  —  Form of Assignment and Assumption
Exhibit C  —  Form of Borrowing Request
Exhibit D  —  Form of U.S. Collateral Agreement
Exhibit E  —  Form of Withdrawal Notice
Exhibit F  —  [Reserved]

iv

Exhibit G-1      —     [Reserved]

Exhibit G-2      —     Form of Junior Intercreditor Agreement

Exhibit G-3      —     [Reserved]

Exhibit H-1      —     Form of Domestic Superpriority Guarantee Agreement

Exhibit H-2      —     Form of Foreign Superpriority Guarantee Agreement

Exhibit I      —     [Reserved]

Exhibit J      —     Form of Perfection Certificate

Exhibit K      —     Form of Interim Order

Exhibit L      —     Form Initial Budget

Exhibit M      —     Form of Acceptable Plan

Exhibit N      —     Form of Initial EMEA Report

Exhibit O      —     [Reserved]

Exhibit P      —     Form of Notice of Prepayment

Exhibit Q-1      —     Form of U.S. Tax Compliance Certificate (For Non-U.S. Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Exhibit Q-2      —     Form of U.S. Tax Compliance Certificate (For Non-U.S. Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Exhibit Q-3      —     Form of U.S. Tax Compliance Certificate (For Non-U.S. Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Exhibit Q-4      —     Form of U.S. Tax Compliance Certificate (For Non-U.S. Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Exhibit R      —     Form of Closing Certificate

Exhibit S      —     Form of Intercompany Subordination Agreement


Annex I      —     [Reserved]

Annex II      —     [Reserved]

Annex III      —     Agreed Security Principles

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT dated as of February [2], 2023 (this "Agreement"), among INVACARE CORPORATION, an Ohio corporation, as a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (the "Borrower"), the LENDERS party hereto, CANTOR FITZGERALD SECURITIES, as Administrative Agent, and GLAS TRUST CORPORATION LIMITED, as Collateral Agent.

## RECITALS

WHEREAS, on January 31, 2023 (the "Petition Date"), the Borrower and certain Subsidiaries of the Borrower (collectively, and together with any other Affiliates that become debtors-in-possession in the Cases, the "Debtors") filed voluntary petitions with the Bankruptcy Court initiating their respective cases that are pending under Chapter 11 of the Bankruptcy Code (each case of the Borrower and such Subsidiaries, a "Case" and, collectively, the "Cases") and have continued in the possession of their assets and in the management of their businesses pursuant to Section 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Borrower has requested that the Lenders extend credit in the form of new money term loans in an aggregate principal amount of $35,000,000 and loans in an aggregate principal amount of $35,000,000 resulting from the roll-up of term loans under the Prepetition Term Loan Agreement;

WHEREAS, the Lenders are willing to extend (or be deemed to extend) such credit to the Borrower on the terms and subject to the conditions set forth herein;

WHEREAS, the Loan Parties will derive substantial direct and indirect benefit from the making of extensions of credit under this Agreement;

WHEREAS, priority of the Indebtedness with respect to the Collateral granted to secure the Loan Document Obligations shall be as set forth in the Interim Order and the Final Order, in each case upon entry thereof by the Bankruptcy Court, and in the Security Documents; and

WHEREAS, all of the claims and the Liens granted under the Orders and the Loan Documents to the Agents and the Lenders in respect of the Loan Document Obligations shall be subject to the Carve Out;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and of the loans, extensions of credit and commitments hereinafter referred to, the parties hereto agree as follows:

ARTICLE 1
DEFINITIONS

Section 1.01.  Defined Terms. As used in this Agreement, the following terms have the meanings specified below:

"ABL Intercreditor Agreement" means that certain Intercreditor Agreement dated as of July 26, 2022 (as amended by that certain Amendment No. 1, dated as of the Effective Date), by and among the Collateral Agent, the DIP ABL Agent and each additional representative party

thereto from time to time, as acknowledged by the Loan Parties, as amended, restated or otherwise modified from time to time in accordance with the terms thereof.

"Acceptable Bid Procedures Motion" has the meaning assigned to such term in Section 5.15(d)(i).

"Acceptable Bidding Procedures" means bidding procedures in an Acceptable Bid Procedures Order.

"Acceptable Bid Procedures Order" has the meaning assigned to such term in Section 5.15(d)(ii).

"Acceptable Confirmation Order" means an order of the Bankruptcy Court confirming an Acceptable Plan, in form and substance satisfactory to the Required Lenders (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders).

"Acceptable Disclosure Statement" means the disclosure statement relating to an Acceptable Plan in form and substance acceptable to the Required Lenders in their sole discretion.

"Acceptable Disclosure Statement Order" means an order of the Bankruptcy Court approving the Acceptable Disclosure Statement as containing, among other things, "adequate information" as required by sections 1125 and 1126(b) of the Bankruptcy Code, in form and substance satisfactory to the Required Lenders in their sole discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders).

"Acceptable Plan" means a Chapter 11 Plan for each of the Cases, which Chapter 11 Plan is in all material respects consistent with the Restructuring Support Agreement and otherwise in a form and substance satisfactory to the Required Lenders in their sole discretion (as the same may be amended, supplemented, or modified from time to time after filing thereof with the consent of the Required Lenders). The Chapter 11 Plan attached hereto as Exhibit M shall be deemed an Acceptable Plan (as the same may be amended, supplemented, or modified from time to time after filing thereof with the consent of the Required Lenders).

"Acceptable Sale Order" has the meaning assigned to such term in Section 5.15(d)(iv).

"Acceptable Sale Transaction" shall mean a sale of assets pursuant to section 363 of the Bankruptcy Code that is utilized to implement an Approved Restructuring and includes bid procedures that, without limitation, permit credit bidding of the Obligations at the full face amount thereof in accordance with Article 8.

"Accounting Changes" has the meaning assigned to such term in Section 1.04(d).

"Adequate Protection Payments" means the Adequate Protection Fees and Expenses (as defined in the Orders) together with all other obligations of the Debtors owed to the Prepetition Secured Parties under the Orders.

"<u>Administrative Agent</u>" means Cantor Fitzgerald Securities, in its capacity as administrative agent hereunder and under the other Loan Documents, and its successors in such capacity as provided in <u>Article VIII</u>.

"<u>Administrative Agent Fee Letter</u>" means that certain letter, dated as of the Effective Date, between the Borrower and the Administrative Agent.

"<u>Administrative Questionnaire</u>" means an administrative questionnaire in a form approved by the Administrative Agent.

"<u>Affected Financial Institution</u>" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"<u>Affiliate</u>" means, with respect to a specified Person, another Person that directly or indirectly Controls or is Controlled by or is under common Control with the Person specified.

"<u>Agent</u>" means the Administrative Agent, the Collateral Agent, any subagents thereof and any successors and assigns in such capacity, and "<u>Agents</u>" means two or more of them.

"<u>Agent Related Person</u>" has the meaning provided in <u>Section 5.01</u>.

"<u>Agreed Security Principles</u>" has the meaning set forth on <u>Annex III</u>.

"<u>Agreement</u>" has the meaning provided in the introductory paragraph hereto.

"<u>Agreement Currency</u>" has the meaning assigned to such term in <u>Section 9.14(b)</u>.

"<u>Alber</u>" means Alber GmbH, a limited liability company (*Gesellschaft mit beschränkter Haftung*), incorporated and existing under the laws of the Federal Republic of Germany, registered in the commercial register (*Handelsregister*) of the local court (*Amtsgericht*) of Stuttgart under HRB 401393, with registered seat in Albstadt, Germany.

"<u>Applicable Account</u>" means, with respect to any payment to be made to the Administrative Agent hereunder, the account specified by the Administrative Agent from time to time for the purpose of receiving payments of such type.

"<u>Applicable Creditor</u>" has the meaning assigned to such term in <u>Section 9.14(b)</u>.

"<u>Applicable Rate</u>" means 15% per annum.

"<u>Approved Bank</u>" has the meaning assigned to such term in the definition of "Permitted Investments."

"<u>Approved Bankruptcy Court Order</u>" means (a) each of the Orders, as such order is amended and in effect from time to time in accordance with this Agreement; (b) any other order entered by the Bankruptcy Court regarding, relating to or impacting (i) any rights or remedies of any Secured Party, (ii) the Loan Documents (including the Loan Parties' obligations thereunder), (iii) the Collateral, any Liens thereon or any Superpriority Claims (including, without limitation,

3

any sale or other disposition of Collateral or the priority of any such Liens or Superpriority Claims), (iv) use of cash collateral, (v) debtor-in-possession financing, (vi) adequate protection or otherwise relating to any Prepetition Secured Indebtedness or (vii) any Chapter 11 Plan, in any such case, that (x) is in form and substance satisfactory to the Required Lenders in their sole discretion, (y) has not been vacated, reversed or stayed and (z) has not been amended or modified except as agreed in writing by the Required Lenders; and (c) any other order entered by the Bankruptcy Court that (i) is, in form and substance, reasonably satisfactory to the Required Lenders in their sole discretion, (ii) has not been vacated, reversed or stayed and (iii) has not been amended or modified except in a manner reasonably satisfactory to the Required Lenders in their sole discretion.

"Approved Foreign Bank" has the meaning assigned to such term in the definition of "Permitted Investments."

"Approved Fund" means, with respect to any Lender, (i) any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities and is administered, advised or managed by (a) such Lender, (b) any Affiliate of such Lender or (c) any entity or any Affiliate of any entity that administers, advises or manages such Lender and (ii) (a) any fund or similar investment vehicle the investment decisions with respect to which are made by (x) such Lender or (y) an investment manager or other Person that manages such Lender or (b) the Affiliates of each of the foregoing to the extent that the investment decisions with respect to which are made as specified in (x) and (y) above.

"Approved Restructuring" shall mean a restructuring transaction (or series of transactions) to be implemented through (a) prior to the occurrence of a Sale Toggle Event, an Acceptable Plan or (b) following the occurrence of a Sale Toggle Event, an Acceptable Sale Transaction, in each case in form and substance satisfactory to the Required Lenders in their sole discretion (including, except as otherwise agreed by the Required Lenders, all ancillary documents related to such transactions and as such terms, conditions and/or documents are amended, restated, amended and restated, supplemented, superseded and/or otherwise modified).

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any Person whose consent is required by Section 9.04), or as otherwise required to be entered into under the terms of this Agreement, substantially in the form of Exhibit B or any other form reasonably approved by the Administrative Agent.

"Auction" has the meaning assigned to such term in Section 5.15(d)(iii).

"Audited Financial Statements" means the audited consolidated balance sheets of the Borrower and its consolidated subsidiaries for the fiscal year ended December 31, 2021, and the related consolidated statements of operations, comprehensive income/(loss), stockholders' equity/deficiency and cash flows of the Borrower and its consolidated subsidiaries, including the notes thereto.

"<u>Australia</u>" shall mean the Commonwealth of Australia (and includes, where the context requires, any State or Territory of Australia).

"<u>Australian Collateral Agreements</u>" means (i) the Australian General Security Deed and (ii) the Australian Specific Security Deed over shares in the issued share capital in an Australian private limited liability company, each dated as of the Effective Date between each Foreign Loan Party from time to time party thereto and the Collateral Agent.

"<u>Australian Collateral Documents</u>" means each of the Australian Collateral Agreements, and each other security agreement, pledge, debenture, hypothec, mortgage, consent or other instrument or document, as applicable, executed and delivered by any Australian Loan Party in connection with this Agreement and the Agreed Security Principles to secure the applicable Secured Obligations.

"<u>Australian Corporations Act</u>" means the *Corporations Act 2001* (Cth) (Australia).

"<u>Australian Controller</u>" has the meaning given to the term "controller", "administrator" or "deed administrator" in the Australian Corporations Act.

"<u>Australian General Security Deed</u>" means the general security deed, dated as of the Effective Date, by and among the Australian Loan Party thereto and the Collateral Agent.

"<u>Australian Loan Party</u>" means a Loan Party incorporated or otherwise organized under the laws of Australia who becomes a party to the Foreign Guarantee Agreement and its respective successors and assigns.

"<u>Australian PPSA</u>" means the *Personal Property Securities Act 2009* (Cth) of Australia and includes any regulations made thereunder.

"<u>Australian Specific Security Deed</u>" means the specific security deed (marketable securities), dated as of the Effective Date, by and among the offshore shareholder of the Australian Loan Party and the Collateral Agent, granting a Lien over the entire issued share capital of the Australian Loan Party.

"<u>Avoidance Action</u>" means any and all claims and causes of action of the Debtors' estate arising under Sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code.

"<u>Bail-In Action</u>" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"<u>Bail-In Legislation</u>" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom,  Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution

of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Southern District of Texas or any other court having jurisdiction over the Cases from time to time.

"<u>Bankruptcy Law</u>" means each of (i) the Bankruptcy Code, (ii) any domestic or foreign law relating to liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, administration, insolvency, reorganization, debt adjustment, receivership or similar debtor relief from time to time in effect and affecting the rights of creditors generally (including without limitation any plan of arrangement provisions of applicable corporation statutes), and (iii) any order made by a court of competent jurisdiction in respect of any of the foregoing.

"<u>Basel III</u>" means, collectively, those certain agreements on capital requirements, a leverage ratio and liquidity standards contained in "Basel III: A Global Regulatory Framework for More Resilient Banks and Banking Systems," "Basel III: International Framework for Liquidity Risk Measurement, Standards and Monitoring," and "Guidance for National Authorities Operating the Countercyclical Capital Buffer," each as published by the Basel Committee on Banking Supervision in December 2010 (as revised from time to time), and as implemented by a Lender's primary banking regulatory authority.

"<u>Beneficial Ownership Certification</u>" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"<u>Beneficial Ownership Regulation</u>" means 31 C.F.R. § 1010.230.

"<u>BIA</u>" means the *Bankruptcy and Insolvency Act* (Canada).

"<u>Board of Directors</u>" means, with respect to any Person, (a) in the case of any corporation, the board of directors of such Person or any committee thereof duly authorized to act on behalf of such board, (b) in the case of any limited liability company, the board of managers, board of directors, manager or managing member of such Person or the functional equivalent of the foregoing, (c) in the case of any partnership, the board of directors, board of managers, manager or managing member of a general partner of such Person or the functional equivalent of the foregoing and (d) in any other case, the functional equivalent of the foregoing.

"<u>Board of Governors</u>" means the Board of Governors of the Federal Reserve System of the United States of America.

"<u>Borrower</u>" has the meaning assigned to such term in the introductory paragraph hereto.

"<u>Borrowing</u>" means Loans of the same Type made on the same date in the same currency.

"<u>Borrowing Minimum</u>" means $1,000,000.

"Borrowing Multiple" means $1,000,000.

"Borrowing Request" means a request by the Borrower for a Borrowing in accordance with Section 2.03 and substantially in the form attached hereto as Exhibit C.

"Budget" means the Initial Budget, as amended, modified, supplemented or replaced from time to time in accordance with Section 5.17.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed. Notwithstanding the foregoing, when the term "Business Day" is used in any Foreign Loan Document or in relation to the performance of any obligation under the Loan Documents by any Foreign Loan Party that is a party, the "Business Day" means any day other than a day on which commercial banks in the applicable jurisdiction are authorized or required by law to remain closed.

"Canadian Collateral Agreement" means the Canadian term loan general security agreement dated as of the Effective Date between each Loan Party from time to time party thereto and the Collateral Agent.

"Canadian Collateral and Guarantee Requirement" means, at any time and solely with respect to each Canadian Loan Party or Canadian Subsidiary of the Borrower not constituting an Excluded Subsidiary, the requirement that:

(a)        the Administrative Agent shall have received from (i) each Canadian Loan Party or Canadian Subsidiary of the Borrower not constituting an Excluded Subsidiary either (x) a counterpart of the Foreign Superpriority Guarantee Agreement duly executed and delivered on behalf of such Person or (y) in the case of any Person that becomes or is required to become a Canadian Loan Party after the Effective Date (including by ceasing to be an Excluded Subsidiary), a supplement to the Foreign Superpriority Guarantee Agreement, in the form specified therein, duly executed and delivered on behalf of such Person, (ii) each Canadian Loan Party or Canadian Subsidiary of the Borrower not constituting an Excluded Subsidiary either (x) a counterpart of the Canadian Collateral Agreement duly executed and delivered on behalf of such Person or (y) in the case of any Person that becomes or is required to become a Canadian Loan Party after the Effective Date (including by ceasing to be an Excluded Subsidiary), a supplement to the Canadian Collateral Agreement, in the form specified therein, duly executed and delivered on behalf of such Person and (iii) each Canadian Loan Party or Canadian Subsidiary of the Borrower not constituting an Excluded Subsidiary either (x) a counterpart of each Intercreditor Agreement then in effect duly executed and delivered on behalf of such Person or (y) in the case of any Person that becomes or is required to become a Canadian Loan Party after the Effective Date (including by ceasing to be an Excluded Subsidiary), a supplement to each Intercreditor Agreement then in effect, in the form specified therein, duly executed and delivered on behalf of such Person, in each case under this clause (a) together with, in the case of any such Loan Documents executed and delivered after the Effective Date, documents and, to the extent reasonably requested by the Administrative Agent, (acting at the direction of Required Lenders), opinions, documents and certificates of the type referred to in Section 4.01(b), Section 4.01(c) and Section 4.01(d);

(b)        all outstanding Equity Interests of the Canadian Loan Parties (other than any Equity

Interests constituting Excluded Assets) owned by or on behalf of any Canadian Loan Party shall have been pledged pursuant to the Canadian Collateral Agreement and (except in the case of Equity Interests of Immaterial Interest solely because such stock is redeemable or subject to repurchase pursuant to any customary stock option, employee stock award or similar agreement that may be in effect from time to time Subsidiaries), the Collateral Agent shall have received certificates or other instruments representing all such Equity Interests (if any), together with undated stock powers or other instruments of transfer with respect thereto endorsed in blank;

   (c) if any Indebtedness for borrowed money of the Borrower or any Subsidiary in a principal amount of $500,000 or more is owing by such obligor to any Canadian Loan Party and if such Indebtedness shall be evidenced by a promissory note, such promissory note shall have been pledged pursuant to the Canadian Collateral Agreement and the Collateral Agent shall have received all such promissory notes,  together with undated instruments of transfer with respect thereto endorsed in blank;

   (d) all certificates, agreements, documents and instruments, including Personal Property Security Act financing statements, intellectual property security agreements, collateral control agreements, required by the Canadian Collateral Agreement, Requirements of Law and reasonably requested by the Administrative Agent, acting at the direction of the Required Lenders, to be filed, delivered, registered or recorded to create, perfect, or preserve the Liens intended to be created by the Canadian Collateral Agreement and perfect such Liens to the extent required by, and with the priority required by, the Canadian Collateral Agreement and the other provisions of the term  "Canadian Collateral and Guarantee Requirement," shall have been filed, registered or recorded or delivered to the Required Lenders in proper form for filing, registration or recording;

   (e) the Administrative Agent shall have received, with respect to any Material Real Property (i) counterparts of a Mortgage, duly executed and delivered by the record owner of such Material Real Property, (ii) a policy or policies of title insurance (or marked unconditional commitment to issue such policy or policies) in the amount equal to not less than 100% (or such lesser amount as reasonably agreed to by the Administrative Agent, acting at the direction of the Required Lenders) of the Fair Market Value of such Material Real Property and fixtures, as reasonably determined by the Borrower and agreed to by the Administrative Agent, acting at the direction of the Required Lenders, issued by a nationally recognized title insurance company reasonably acceptable to the Administrative Agent, acting at the direction of the Required Lenders, insuring the Lien of each such Mortgage as a first priority Lien on the Material Real Property described therein, free of any other Liens except as expressly permitted by Section 6.02, together with such endorsements (other than a creditor's rights endorsement), coinsurance and reinsurance as the Administrative Agent, acting at the direction of the Required Lenders, may reasonably request to the extent available in the applicable jurisdiction at commercially reasonable rates, (iii) such affidavits, instruments of indemnification (including a so-called "gap" indemnification) as are customarily requested by the title company to induce the title company to issue the title policies and endorsements contemplated above, (iv) evidence reasonably acceptable to the Administrative Agent, acting at the direction of the Required Lenders, of payment by the Borrower or any other Subsidiary of all title policy premiums, search and examination charges, escrow charges and related charges, mortgage recording taxes, fees, charges,  costs and expenses required for the recording of the Mortgages and issuance of the title policies referred to above, (v) a survey of each Material Real Property in such form as shall be required by the title company to issue the so-called

comprehensive and other survey-related endorsements and to remove the standard survey exceptions from the title policies and endorsements contemplated above (provided, however, that a survey shall not be required to the extent that the issuer of the applicable title insurance policy provides reasonable and customary survey-related coverages (including, without limitation, survey-related endorsements) in the applicable title insurance policy based on an existing survey and/or such other documentation as may be reasonably satisfactory to the title insurer), and (vi) such legal opinions as the Administrative Agent, acting at the direction of the Required Lenders may reasonably request with respect to any such Mortgage or Material Real Property; and

(f)     (i) with respect to any deposit account or securities account of any of the Canadian Loan Parties that has been identified by the Administrative Agent (at the direction of the Required Lenders) as requiring a control agreement to be put in place to provide the Administrative Agent with control over such accounts each Canadian Loan Party shall have obtained a Control Agreement with respect to such Required Account, as soon as possible and in any event within 60 days after the Effective Date (or such later date as the Administrative Agent, acting at the direction of the Required Lenders, shall reasonably agree), (ii) with respect to any Required Account established by a Canadian Loan Party after the Effective Date, each Canadian Loan Party shall have obtained a Control Agreement with respect to such Required Account contemporaneously with the opening of such Required Account, and (iii) with respect to any Required Account acquired by a Canadian Loan Party after the Effective Date, each Canadian Loan Party shall have obtained a Control Agreement with respect to such Required Account, as soon as possible and in any event within 60 days after the date of such acquisition (or such later date as the Administrative Agent, acting at the direction of the Required Lenders, shall reasonably agree) (unless such account is closed prior to such date), in each case, unless waived by the Administrative Agent at the direction of the Required Lenders. Notwithstanding the foregoing, no Control Agreement shall be required with respect to any Canadian Required Account so long as such Required Account constitutes DIP ABL Priority Collateral and the Lien thereon securing the obligations under the DIP ABL Credit Agreement is subject to the ABL Intercreditor Agreement.

Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary, (a) the foregoing provisions of this definition shall not require the creation or perfection of pledges of or security interests in, or the obtaining of title insurance, legal opinions or other deliverables with respect to, particular assets of the Canadian Loan Parties, or the provision of Guarantees by any Subsidiary (i) if, and for so long as and to the extent that the Administrative Agent, acting at the direction of the Required Lenders, and the Borrower reasonably agree that the cost, burden, difficulty or consequence of creating or perfecting such pledges or security interests in such assets, or obtaining such title insurance, legal opinions or other deliverables in respect of such assets, or providing such Guarantees (taking into account any material adverse Tax consequences to the Borrower and its Subsidiaries (including the imposition of material withholding or other Taxes)), outweighs the benefits to be obtained by the Lenders therefrom and/or (ii) the grant or perfection of a security interest in such asset would (A) be prohibited by enforceable anti-assignment provisions of any applicable law, (B) violate the terms of any contract (to the extent binding on such property at the time of the acquisition thereof and not incurred in contemplation of such acquisition) (in each case, after giving effect to the applicable anti-assignment provisions of the PPSA or other applicable law) or (C) trigger termination of any contract pursuant to any "change of control" or similar provision (to the extent binding on such property at the time of the acquisition thereof and not incurred in contemplation

of such acquisition); it being understood that the Canadian Collateral shall include any proceeds and/or receivables arising out of any contract described in this clause (ii) to the extent the assignment of such proceeds or receivables is expressly deemed effective under the PPSA or other applicable law notwithstanding the relevant prohibition, violation or termination right, (b) Liens required to be granted from time to time pursuant to the term "Canadian Collateral and Guarantee Requirement" shall be subject to exceptions and limitations set forth in the Canadian Collateral Agreement, (c) except with respect to any Required Accounts, in no event shall control agreements or other control or similar arrangements be required with respect to deposit accounts, securities accounts, commodities accounts or other assets specifically requiring perfection by control agreements, (d) no perfection actions shall be required with respect to Vehicles and other assets subject to certificates of title (other than the filing of PPSA financing statements), (e) no perfection actions shall be required with respect to commercial tort claims with a value less than $500,000 and, other than the filing of PPSA financing statements, no perfection shall be required with respect to promissory notes evidencing debt for borrowed money in a principal amount of less than $500,000, (f) except as set forth in the Foreign Loan Documents, no actions in any non-U.S. jurisdiction or required by the laws of any non-U.S. jurisdiction shall be required to be taken to create any security interests in assets located or titled outside of the United States (including any Equity Interests of Foreign Subsidiaries and any Foreign Intellectual Property) or to perfect or make enforceable any security interests in any such assets, (g) no actions shall be required to perfect a security interest in letter of credit rights (other than the filing of PPSA financing statements), (h) no Loan Party shall be required to seek any landlord lien waiver, estoppel, warehouseman waiver or other collateral access or similar letter or agreement, (i) no action shall be required to perfect any Lien with respect to (i) the Equity Interests of any Immaterial Subsidiary and/or (ii) the Equity Interests of a Person that is not a subsidiary, which Person, if a subsidiary, would constitute an Immaterial Subsidiary, in each case except to the extent that a security interest therein can be perfected by filing a Financing Statement pursuant to the PPSA, and (j) in no event shall the Collateral include any Excluded Assets. The Administrative Agent, acting at the direction of the Required Lenders, may grant extensions of time for the creation and perfection of security interests in or the obtaining of title insurance, legal opinions or other deliverables with respect to particular assets or the provision of any Guarantee by any Subsidiary (including extensions beyond the Effective Date or in connection with assets acquired, or Subsidiaries formed or acquired, after the Effective Date) where it determines that such action cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required to be accomplished by this Agreement or the Security Documents.

Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary, to the extent any perfection actions are required to be taken with respect to any asset under the DIP ABL Credit Agreement, such perfection actions shall be required to be taken hereunder with respect to such asset.

"Canadian Collateral Documents" means the Canadian Collateral Agreement, and each other security agreement, pledge, debenture, hypothec, mortgage, consent or other instrument or document, as applicable, governed by Canadian law in connection with this Agreement to secure the applicable Secured Obligations.

"Canadian Loan Party" means any Loan Party incorporated or otherwise organized under the laws of Canada or any province or territory thereof.

"Canadian Insolvency Laws" means the BIA, the CCAA, WURA and any applicable corporations legislation to the extent the relief sought under such corporations legislation relates to or involves the compromise, settlement, adjustment or arrangement of debt.

"Capital Lease Obligation" means an obligation that is a Capitalized Lease; and the amount of Indebtedness represented thereby at any time shall be the amount of the liability in respect thereof that would at that time be required to be capitalized on a balance sheet in accordance with GAAP.

"Capitalized Leases" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases.

"Carve Out" has the meaning set forth in the Interim Order or the Final Order, as applicable.

"Case" or "Cases" has the meaning assigned to such term in the Recitals herein.

"Case Milestones" has the meaning assigned to such term in Section 5.15.

"Cash Management Obligations" means (a) obligations in respect of any treasury management services, overdraft and related liabilities arising from treasury, depository, cash pooling arrangements and cash management services or any automated clearing house transfers of funds and (b) other obligations in respect of netting services, employee credit, commercial credit card, debit card, stored value card or purchase card programs and similar arrangements.

"Casualty Event" means any event that gives rise to the receipt by the Borrower or any Restricted Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"CCAA" means the *Companies' Creditors Arrangement Act* (Canada).

"CFC" means a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"Change in Control" means the occurrence of:

(a)      any Person or "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act as in effect on the date of this Agreement, but excluding the Borrower, its Subsidiaries, any employee benefit plan and/or Person acting as the trustee, agent or other fiduciary or administrator therefor) shall at any time have acquired direct or indirect beneficial ownership of voting power of the outstanding Voting Stock or economic interests in the Borrower having more than 50% of the outstanding Voting Stock or economic interests of the Borrower; or

(b)      the consummation of any sale, lease or other transfer in one transaction or a series of transactions of all or substantially all of the consolidated assets of the Borrower and its Subsidiaries, taken as a whole, to any Person other than one of the Borrower's Subsidiaries; *provided, however*, that a transaction in which the holders of all classes of the Borrower's Common Equity immediately prior to such transaction own, directly or indirectly,

11

more than 50% of all classes of Common Equity of the continuing or surviving person or transferee or the parent thereof immediately after such transaction in substantially the same proportions as such ownership immediately prior to such transaction shall not be a Change in Control pursuant to this <u>clause (b)</u>.

For purposes of this definition, (i) "beneficial ownership" shall be as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act as in effect on the date of this Agreement and (ii) the phrase Person or "group" is within the meaning of Section 13(d) or 14(d) of the Exchange Act as in effect on the date of this Agreement, but excluding any employee benefit plan of such Person or "group" and its subsidiaries and any Person acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan.

"<u>Change in Law</u>" means (a) the adoption of any rule, regulation, treaty or other law after the date of this Agreement, (b) any change in any rule, regulation, treaty or other law or in the administration, interpretation, implementation or application thereof by any Governmental Authority after the date of this Agreement or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority made or issued after the date of this Agreement; <u>provided</u> that, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 and any requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) any requests, rules, guidelines or directives promulgated by the Bank of International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case shall be deemed to be a "Change in Law," regardless of the date enacted, adopted, promulgated or issued after the date of this Agreement, but only to the extent the relevant increased costs or loss of yield would have been included if they had been imposed under applicable increased cost provisions.

"<u>Chapter 11 Plan</u>" means a plan of reorganization filed in any or all of the Cases.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended from time to time.

"<u>Collateral</u>" means any and all assets, whether real or personal, tangible or intangible, on which Liens are purported to be granted pursuant to the Orders, this Agreement or the Security Documents as security for the Secured Obligations but shall in all events with respect to Loan Parties organized or incorporated outside the United States (or any state or territory thereof), other than the Canadian Loan Parties, be limited by and subject in all respects to the Agreed Security Principles (including, without limitation, the Overriding Principle (as defined in the Agreed Security Principles)) and exclude all Excluded Assets. Without limitation of the foregoing, subject to the terms of the Orders, the Collateral shall not include any Avoidance Actions but shall include all proceeds of any and all Avoidance Actions (including, without limitation, assets to which Liens are avoided).

"<u>Collateral Agent</u>" means GLAS Trust Corporation Limited, in its capacity as collateral agent hereunder and under the other Loan Documents, and its successors in such capacity as provided in <u>Article VIII</u>.

"Collateral Agent Fee Letter" means that certain letter, dated as of the Effective Date, between the Borrower and the Collateral Agent.

"Collateral Agreements" means the U.S. Superpriority Collateral Agreement among the Borrower, each other Loan Party and the Collateral Agent (the "U.S. Collateral Agreement"), the Canadian Collateral Agreement, the Dutch Collateral Agreements, the English Collateral Agreement, the Luxembourg Collateral Agreements, the German Collateral Agreements, the French Collateral Agreements, the Swiss Collateral Agreements, the Australian Collateral Agreements, the Norwegian Collateral Agreements, the NZ Collateral Agreements, the Danish Collateral Agreements and each other security agreement, pledge, debenture, hypothec, mortgage, consent or other instrument or document, as applicable, executed and delivered by the Borrower and/or the other Guarantors in connection with this Agreement and the Agreed Security Principles to secure the applicable Secured Obligations.

"Collateral and Guarantee Requirement" means, at any time, as the context may require, individually or collectively, the Domestic Collateral and Guarantee Requirement, the Canadian Collateral and Guarantee Requirement and/or the Agreed Security Principles.

"Commitment" means, with respect to any New Money Lender, its obligation to make New Money Loans, to the Borrower pursuant to Section 2.01(a) in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 2.01(a) under the caption "Commitment" or opposite such caption in the Assignment and Assumption pursuant to which such New Money Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement. The aggregate Commitment of all the New Money Lenders shall be $35 million on the Effective Date, as such amount may be adjusted from time to time in accordance with the terms of this Agreement.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Common Equity" of any Person means Equity Interests of such Person that is generally entitled (a) to vote in the election of directors of such Person or (b) if such Person is not a corporation, to vote or otherwise participate in the selection of the governing body, partners, managers or others that will control the management or policies of such Person.

"Common Stock" means the common stock of the Borrower, without par value, at the Effective Date.

"Company Materials" has the meaning assigned to such term in Section 5.01.

"Company Parties" has the meaning assigned to such term in the Restructuring Support Agreement.

"Compliance Certificate" means a Compliance Certificate required to be delivered pursuant to Section 5.01 in the form of Exhibit A.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, or the dismissal or appointment of the management, of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Control Agreement" means an agreement, in form and substance reasonably satisfactory to the Required Lenders (and, in the case of protections for the benefit of the Collateral Agent or obligations of the Collateral Agent, the Collateral Agent), which provides for the Collateral Agent to have "control" (as defined in Section 9-104 of the UCC or Section 8-106 of the UCC, as applicable) of Deposit Accounts (as defined in the UCC or the Canadian Collateral Agreement, as applicable) or Securities Accounts (as defined in the UCC or PPSA), as applicable.

"Danish Collateral Agreements" means the Danish DIP Share Pledge and the Danish Prepetition Share Pledge.

"Danish Collateral Documents" means each of the Danish Collateral Agreements, and each other security agreement, pledge, assignment, mortgage, consent or other instrument or document, as applicable, governed by Danish law in connection with this Agreement and the Agreed Security Principles to secure the applicable Secured Obligations.

"Danish Loan Party" means any Loan Party incorporated or otherwise organized under the laws of the Denmark.

"Danish DIP Share Pledge" means the Danish law governed share pledge agreement between Invacare Holdings Two Netherlands as pledgor and the Collateral Agent as security agent relating to the shares in Invacare A/S, a public limited liability company incorporated under the laws of Denmark, having its registered address at Søndre Ringvej 37, 2605 Brøndby, Denmark, with CVR no. 18058936, in respect of the Secured Obligations.

"Danish Prepetition Share Pledge" means the Danish law governed share pledge agreement between Invacare Holdings Two Netherlands as pledgor and the Collateral Agent as security agent relating to the shares in Invacare A/S, a public limited liability company incorporated under the laws of Denmark, having its registered address at Søndre Ringvej 37, 2605 Brøndby, Denmark, with CVR no. 18058936, in respect of the Prepetition Secured Documents.

"Debtor" or "Debtors" has the meaning assigned to such term in the recitals hereto.

"Debtor Financial Advisor" means Huron Consulting Group.

"Debtor Legal Advisors" means Kirkland & Ellis LLP, McDonald Hopkins LLP, Jackson Walker LLP, and any other legal advisor to the Loan Parties.

"Default" means any event or condition that constitutes an Event of Default or that upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"DIP ABL Credit Agreement" means that certain Superpriority Secured Debtor-In-Possession Revolving Credit and Security Agreement, dated as of the Effective Date, by and among the Borrower, as a borrower, PNC Bank, National Association, as lender and agent thereunder, the other Borrowers (as defined therein) from time to time thereunder, the other Guarantors (as defined therein) from time to time thereunder, and the other agents and lenders from time to time party thereto, as the same may be amended, restated, modified, supplemented, extended, renewed, refunded, replaced or refinanced from time to time.

"DIP ABL Documents" means the DIP ABL Credit Agreement and the "Other Documents" as defined in the DIP ABL Credit Agreement.

"DIP ABL Priority Collateral" means the "ABL DIP Collateral" as defined in the ABL Intercreditor Agreement.

"DIP ABL Obligations" means "ABL DIP Obligations" as defined in the DIP ABL Credit Agreement.

"DIP Facility" means the Loans made or deemed made under this Agreement.

"DIP Funding Withdrawal Notice" has the meaning provided in Section 2.04.

"DIP Term Loan Proceeds Account" shall mean a segregated account to be established by the Borrower into which the proceeds of the New Money Loans are to be deposited.

"Disposition" has the meaning assigned to such term in Section 6.05.

"Disqualified Equity Interest" means, with respect to any Person, any Equity Interest in such Person that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable, either mandatorily or at the option of the holder thereof), or upon the happening of any event or condition:

> (a)    matures or is mandatorily redeemable (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests), whether pursuant to a sinking fund obligation or otherwise;

> (b)    is convertible or exchangeable, either mandatorily or at the option of the holder thereof, for Indebtedness or Equity Interests (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests); or

> (c)    is redeemable (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests) or is required to be repurchased by such Person or any of its Affiliates, in whole or in part, at the option of the holder thereof;

in each case, on or prior to the date 91 days after the Stated Maturity Date (determined as of the date of issuance thereof or, in the case of any such Equity Interests outstanding on the date hereof,

the date hereof); provided, however, that (i) an Equity Interest in any Person that would not constitute a Disqualified Equity Interest but for terms thereof giving holders thereof the right to require such Person to redeem or purchase such Equity Interest upon the occurrence of an "asset sale," a "change of control" or similar event shall not constitute a Disqualified Equity Interest if any such requirement becomes operative only after repayment in full of all the Loans and all other Loan Document Obligations that are accrued and payable, (ii) if an Equity Interest in any Person is issued pursuant to any plan for the benefit of directors, officers, employees, members of management, managers or consultants, of the Borrower or any Subsidiary or by any such plan to such employees, such Equity Interest shall not constitute a Disqualified Equity Interest solely because it may be required to be repurchased by the Borrower or any Subsidiary in order to satisfy applicable statutory or regulatory obligations of such Person and (iii) no Equity Interest held by any future, present or former employee, director, officer, manager, member of management, consultant or independent contractor (or their respective affiliates or immediate family members) of the Borrower (or any subsidiary) shall be considered a Disqualified Equity Interest solely because such stock is redeemable or subject to repurchase pursuant to any customary stock option, employee stock award or similar agreement that may be in effect from time to time.

"Dollars" or "$" refers to lawful money of the United States of America.

"Dollar Equivalent" means, at any time, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount denominated in Sterling or Euros, the equivalent amount thereof in Dollars as determined by the Administrative Agent at such time in accordance with Section 1.05 hereof.

"Domestic Collateral and Guarantee Requirement" means, at any time and solely with respect to each Domestic Loan Party or Domestic Subsidiary of the Borrower not constituting an Excluded Subsidiary, and, subject in the case of the Debtors, to the Orders, the requirement that:

(a) the Administrative Agent shall have received from (i) each Domestic Loan Party or Domestic Subsidiary of the Borrower not constituting an Excluded Subsidiary either (x) a counterpart of the Domestic Superpriority Guarantee Agreement duly executed and delivered on behalf of such Person or (y) in the case of any Person that becomes or is required to become a Domestic Loan Party after the Effective Date (including by ceasing to be an Excluded Subsidiary), a supplement to the Domestic Superpriority Guarantee Agreement, in the form specified therein, duly executed and delivered on behalf of such Person, (ii) each Domestic Loan Party or Domestic Subsidiary of the Borrower not constituting an Excluded Subsidiary either (x) a counterpart of the U.S. Collateral Agreement duly executed and delivered on behalf of such Person or (y) in the case of any Person that becomes or is required to become a Domestic Loan Party after the Effective Date (including by ceasing to be an Excluded Subsidiary), a supplement to the U.S. Collateral Agreement, in the form specified therein, duly executed and delivered on behalf of such Person and (iii) each Domestic Loan Party or Domestic Subsidiary of the Borrower not constituting an Excluded Subsidiary either (x) a counterpart of each Intercreditor Agreement then in effect duly executed and delivered on behalf of such Person or (y) in the case of any Person that becomes or is required to become a Domestic Loan Party after the Effective Date (including by ceasing to be an Excluded Subsidiary), a supplement to each Intercreditor Agreement then in effect, in the form specified therein, duly executed

16

and delivered on behalf of such Person in each case under this clause (a) together with, in the case of any such Loan Documents executed and delivered after the Effective Date, documents and, to the extent reasonably requested by the Administrative Agent (acting at the direction of Required Lenders), opinions, documents and certificates of the type referred to in <u>Section 4.01(b)</u>, <u>Section 4.01(c)</u> and <u>Section 4.01(d)</u>;

(b)     subject to the Orders, (i) all outstanding Equity Interests of the Borrower and the Restricted Subsidiaries (other than any Equity Interests constituting Excluded Assets) owned by or on behalf of any Domestic Loan Party shall have been pledged pursuant to the U.S. Collateral Agreement and (ii) (except in the case of Equity Interests of Immaterial Subsidiaries) the Collateral Agent shall have received certificates or other instruments representing all such Equity Interests (if any), together with undated stock powers or other instruments of transfer with respect thereto endorsed in blank;

(c)     if any Indebtedness for borrowed money of the Borrower or any Subsidiary in a principal amount of $500,000 or more is owing by such obligor to any Domestic Loan Party and if such Indebtedness shall be evidenced by a promissory note, such promissory note shall have been pledged pursuant to the U.S. Collateral Agreement and the Collateral Agent shall have received all such promissory notes, together with undated instruments of transfer with respect thereto endorsed in blank;

(d)     all certificates, agreements, documents and instruments, including Uniform Commercial Code financing statements and intellectual property security agreements, required by the Security Documents, Requirements of Law and reasonably requested by the Administrative Agent, acting at the direction of the Required Lenders, to be filed, delivered, registered or recorded to create the Liens intended to be created by the Security Documents and perfect such Liens to the extent required by, and with the priority required by, the Security Documents and the other provisions of the term "Domestic Collateral and Guarantee Requirement," shall have been filed, registered or recorded or delivered to the Required Lenders in proper form for filing, registration or recording;

(e)     the Administrative Agent shall have received, (i) with respect to any Real Estate constituting Collateral that is located in the United States, is improved with a building or mobile home and is either owned in fee or demised pursuant to a ground lease, (A) a completed "Life-of-Loan" Federal Emergency Management Agency ("FEMA") Standard Flood Hazard Determination with respect to such Mortgaged Property subject to the applicable FEMA rules and regulations (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and each Loan Party relating thereto), and (B) if any such Real Estate is located in an area determined by FEMA to have special flood hazards, evidence of such flood insurance as may be required under applicable law, including Regulation H of the Board of Governors and the other Flood Insurance Laws and as required under <u>Section 5.07</u>, and (ii) with respect to any Material Real Property owned by a Loan Party that is not a Debtor or, if owned by a Debtor, as to which the Administrative Agent (at the request of any Lender) has made a request pursuant to <u>Section 2.20(c)</u>, <u>Section 5.11</u> or <u>Section 5.12</u>, (A) counterparts of a Mortgage duly executed and delivered by the record owner of such Material Real Property, (B) a policy or policies of title insurance (or marked unconditional

commitment to issue such policy or policies) in the amount equal to not less than 100% (or such lesser amount as reasonably agreed to by the Administrative Agent, acting at the direction of the Required Lenders) of the Fair Market Value of such Material Real Property and fixtures, as reasonably determined by the Borrower and agreed to by the Administrative Agent, acting at the direction of the Required Lenders, issued by a nationally recognized title insurance company reasonably acceptable to the Administrative Agent, acting at the direction of the Required Lenders, insuring the Lien of each such Mortgage as a first priority Lien on such Materal Real Property described therein, free of any other Liens except as expressly permitted by <u>Section 6.02</u>, together with such endorsements (other than a creditor's rights endorsement), coinsurance and reinsurance as the Administrative Agent, acting at the direction of the Required Lenders, may reasonably request to the extent available in the applicable jurisdiction at commercially reasonable rates, (C) such affidavits, instruments of indemnification (including a so-called "gap" indemnification) as are customarily requested by the title company to induce the title company to issue the title policies and endorsements contemplated above, (D) evidence reasonably acceptable to the Administrative Agent, acting at the direction of the Required Lenders, of payment by the Borrower or any other Subsidiary of all title policy premiums, search and examination charges, escrow charges and related charges, mortgage recording taxes, fees, charges, costs and expenses required for the recording of the Mortgages and issuance of the title policies referred to above, (E) a survey of each Material Real Property in such form as shall be required by the title company to issue the so-called comprehensive and other survey-related endorsements and to remove the standard survey exceptions from the title policies and endorsements contemplated above (<u>provided</u>, <u>however</u>, that a survey shall not be required to the extent that the issuer of the applicable title insurance policy provides reasonable and customary survey-related coverages (including, without limitation, survey-related endorsements) in the applicable title insurance policy based on an existing survey and/or such other documentation as may be reasonably satisfactory to the title insurer), and (F) such legal opinions as the Administrative Agent, acting at the direction of the Required Lenders  may reasonably request with respect to any such Mortgage; and

(f)      (i) with respect to any Required Account maintained by a Domestic Loan Party on the Effective Date, each Domestic Loan Party shall have obtained a Control Agreement with respect to such Required Account, as soon as possible and in any event within 60 days after the Effective Date (or such later date as the Administrative Agent, acting at the direction of the Required Lenders, shall reasonably agree), (ii) with respect to any Required Account established by a Domestic Loan Party after the Effective Date, each Domestic Loan Party shall have obtained a Control Agreement with respect to such Required Account contemporaneously with the opening of such Required Account, and (iii) with respect to any Required Account acquired by a Domestic Loan Party after the Effective Date, each Domestic Loan Party shall have obtained a Control Agreement with respect to such Required Account, as soon as possible and in any event within 90 days after the date of such acquisition (or such later date as the Administrative Agent, acting at the direction of the Required Lenders, shall reasonably agree) (unless such account is closed prior to such date), in each case, unless waived by the Administrative Agent at the direction of the Required Lenders. Notwithstanding the foregoing, no Control Agreement shall be required with respect to any Required Account so long as such Required Account

constitutes DIP ABL Priority Collateral and the Lien thereon securing the obligations under the DIP ABL Credit Agreement is subject to the ABL Intercreditor Agreement.

Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary, (a) the foregoing provisions of this definition shall not require the creation or perfection of pledges of or security interests in, or the obtaining of title insurance, legal opinions or other deliverables with respect to, particular assets of the Loan Parties, or the provision of Guarantees by any Subsidiary the grant or perfection of a security interest in such asset would (A) be prohibited by enforceable anti-assignment provisions of any applicable law, (B) violate the terms of any contract (to the extent binding on such property at the time of the acquisition thereof and not incurred in contemplation of such acquisition) (in each case, after giving effect to the applicable anti-assignment provisions of the UCC or other applicable law) or (C) trigger termination of any contract pursuant to any "change of control" or similar provision (to the extent binding on such property at the time of the acquisition thereof and not incurred in contemplation of such acquisition); it being understood that the Collateral shall include any proceeds and/or receivables arising out of any contract described in this clause (ii) to the extent the assignment of such proceeds or receivables is expressly deemed effective under the UCC or other applicable law notwithstanding the relevant prohibition, violation or termination right, (b) Liens required to be granted from time to time pursuant to the term "Domestic Collateral and Guarantee Requirement" shall be subject to exceptions and limitations set forth in the Security Documents, (c) except with respect to any Required Accounts, in no event shall control agreements or other control or similar arrangements be required with respect to deposit accounts, securities accounts, commodities accounts or other assets specifically requiring perfection by control agreements, (d) no perfection actions shall be required with respect to Vehicles and other assets subject to certificates of title (other than the filing of UCC financing statements), (e) no perfection actions shall be required with respect to commercial tort claims with a value less than $500,000 and, other than the filing of UCC financing statements, no perfection shall be required with respect to promissory notes evidencing debt for borrowed money in a principal amount of less than $500,000, (f) except as set forth in the Foreign Loan Documents or as expressly required by the Agreed Security Principles, no actions in any non-U.S. jurisdiction or required by the laws of any non-U.S. jurisdiction shall be required to be taken to create any security interests in assets located or titled outside of the United States (including any Equity Interests of Foreign Subsidiaries and any Foreign Intellectual Property) or to perfect or make enforceable any security interests in any such assets (it being understood that except as set forth in the Foreign Loan Documents or as expressly required by the Agreed Security Principles, there shall be no security agreements or pledge agreements governed under the laws of any non-U.S. jurisdiction), (g) no actions shall be required to perfect a security interest in letter of credit rights (other than the filing of UCC financing statements), (h) no Loan Party shall be required to seek any landlord lien waiver, estoppel, warehouseman waiver or other collateral access or similar letter or agreement, (i) no action shall be required to perfect any Lien with respect to (i) the Equity Interests of any Immaterial Subsidiary and/or (ii) the Equity Interests of a Person that is not a subsidiary, which Person, if a subsidiary, would constitute an Immaterial Subsidiary, in each case except to the extent that a security interest therein can be perfected by filing a Form UCC-1 (or similar) financing statement under the UCC, and (j) in no event shall the Collateral include any Excluded Assets. The Administrative Agent, acting at the direction of the Required Lenders, may grant extensions of time for the creation and perfection of security interests in or the obtaining of title insurance, legal opinions or other deliverables with respect to particular assets or the provision of any Guarantee

by any Subsidiary (including extensions beyond the Effective Date or in connection with assets acquired, or Subsidiaries formed or acquired, after the Effective Date) where it determines that such action cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required to be accomplished by this Agreement or the Security Documents.

Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary, subject to the terms of the ABL Intercreditor Agreement (including any bailee provisions therein), to the extent any perfection actions are required to be taken with respect to any asset under the DIP ABL Credit Agreement, such perfection actions shall be required to be taken hereunder with respect to such asset.

Notwithstanding anything to the contrary herein, each Federally Regulated Lender waives and releases any and all liens, security interests or the rights it may have in and to any Federally Regulated Lender Excluded Property and reserves all rights as a Secured Party with respect to all Collateral, other than Federally Regulated Lender Excluded Property.

"Domestic Superpriority Guarantee Agreement" means the Domestic Superpriority Guarantee Agreement, dated as of the Effective Date and as further supplemented or modified from time to time, among the Domestic Loan Parties (other than the Borrower) and the Administrative Agent.

"Domestic Loan Party" means any Loan Party that is not a Foreign Loan Party.

"Domestic Perfection Requirements" means the filing of appropriate financing statements with the office of the Secretary of State or other appropriate office of the state of organization of each Loan Party, the filing of appropriate assignments or notices with the U.S. Patent and Trademark Office and the U.S. Copyright Office, the proper recording or filing, as applicable, of Mortgages and fixture filings with respect to any Material Real Property, in each case in favor of the Collateral Agent for the benefit of the applicable Secured Parties and the delivery to the Collateral Agent of any stock certificate or promissory note required to be delivered pursuant to the applicable Loan Documents, together with instruments of transfer executed in blank.

"Domestic Subsidiary" means any Subsidiary that is not a Foreign Subsidiary.

"Domestic Subsidiary Guarantor" means any Subsidiary Loan Party that is a Domestic Subsidiary.

"Dutch Collateral Agreements" means (i) the Dutch general security agreement (*omnibus pandakte*), (ii) the Dutch security agreement over partnership interests and (iii) the Dutch deed of pledge of shares over shares in the issued share capital in a Dutch private limited liability company, each dated as of the Effective Date between each Foreign Loan Party from time to time party thereto and the Collateral Agent.

"Dutch Collateral Documents" means each of the Dutch Collateral Agreements, and each other security agreement, pledge, debenture, hypothec, mortgage, consent or other instrument or document, as applicable, governed by Dutch law in connection with this Agreement and the Agreed Security Principles to secure the applicable Secured Obligations.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 9.02).

"Eligible Assignee" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund and (d) any other Person (other than the Borrower or any of its Subsidiaries or Affiliates), other than, in each case, a natural person.

"EMEA Report" means means the Initial EMEA Report, as amended, modified, supplemented or replaced from time to time in accordance with Section 5.17.

"EMEA Cash" means, as of any date of determination, the sum of (i) the aggregate amount of unrestricted cash (other than to the extent restricted in favor of the DIP Facility or any Prepetition Secured Document) owned by the EMEA Entities, as reflected on a balance sheet prepared as of such date on a consolidated basis in accordance with GAAP, to the extent such cash are free and clear of any Liens (other than (x) non-consensual Liens permitted by Section 6.02 and (y) consensual Liens permitted by Section 6.02(i), 6.02(xvi) or 6.02(xix)) and the use thereof for the application to the payment of Indebtedness is not prohibited by law or any contract to which the Borrower or any Restricted Subsidiary is a party, (ii) cash of EMEA Entities restricted or subject to a Lien in favor of the DIP Facility and (iii) restricted cash of EMEA Facilities related to JPM European Treasury Management Obligations (as defined in the DIP ABL Credit Agreement).

"EMEA Entities" means all Subsidiaries of the Borrower or any Restricted Subsidiary located in Europe, the Middle East or Africa.

"EMEA Variance Report" means a variance report prepared by a Responsible Officer of the Borrower, comparing the actual results against anticipated results under the applicable EMEA Report, on a line item basis and in the same level of detail as set forth in the Initial EMEA Report, or in a form otherwise reasonably acceptable to the Required Lenders for the underlying Variance Testing Period.

"EMU Legislation" means the legislative measures of the European Council for the introduction of, changeover to or operation of a single or unified European currency.

21

"English Collateral Agreement" means the English law governed debenture to be entered into on or around the Effective Date and made between each English Loan Party, Invacare Holdings Two Netherlands, Invacare AG, Alber GmbH and Invacare International GmbH as chargors and the Collateral Agent as chargee.

"English Collateral Documents" means (a) the English Collateral Agreement and (b) each other security agreement, pledge, debenture, hypothec, mortgage, consent or other instrument or document, as applicable, governed by English law in connection with this Agreement and the Agreed Security Principles to secure the applicable Secured Obligations.

"English Loan Party" means any Loan Party incorporated or otherwise organized under the laws of England and Wales.

"Environmental Laws" means applicable common law and all applicable treaties, rules, regulations, codes, ordinances, judgments, orders, decrees and other applicable Requirements of Law, and all applicable injunctions or binding agreements issued, promulgated or entered into by or with any Governmental Authority, in each instance relating to the protection of the environment, including with respect to the preservation or reclamation of natural resources or the Release or threatened Release of any Hazardous Material, or to the extent relating to exposure to Hazardous Materials, the protection of human health or safety.

"Environmental Liability" means any liability, obligation, loss, claim, action, order or cost, contingent or otherwise (including any liability for damages, costs of medical monitoring, costs of environmental remediation or restoration, administrative oversight costs, consultants' fees, fines, penalties and indemnities), of the Borrower or any Subsidiary directly or indirectly resulting from or based upon (a) any actual or alleged violation of any Environmental Law or permit, license or approval issued thereunder, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in, or interests in a Person.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or Section 414(c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Sections 414(b), (c), (m) and (o) of the Code.

"ERISA Event" means (a) any "reportable event," as defined in Section 4043(c) of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30 day notice period is waived); (b) any failure by a Loan Party or any ERISA Affiliate to satisfy the minimum funding standards (within the meaning of Section 412 or Section 430 of the Code or Section 302 or Section 303 of ERISA) applicable to any Plan, whether or not waived; (c) the filing

pursuant to Section 412 of the Code or Section 302 of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) a determination that any Plan is, or is expected to be, in "at-risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code); (e) the incurrence by a Loan Party or any ERISA Affiliate of any liability under Title IV of ERISA (other than premiums due and not delinquent under Section 4007 of ERISA) with respect to the termination of any Plan; (f) the receipt by a Loan Party or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans under Section 4041 of ERISA or to appoint a trustee to administer any Plan under Section 4042 of ERISA; (g) the incurrence by a Loan Party or any ERISA Affiliate of any liability with respect to the withdrawal from any Plan subject to Section 4063 of ERISA during a plan year in which it was a "substantial employer" (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA), or a complete or partial withdrawal (within the meanings of Section 4203 and Section 4205 of ERISA, respectively) from a Multiemployer Plan; (h) the receipt by a Loan Party or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from a Loan Party or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, "insolvent," within the meaning of Section 4245 of ERISA, or in "endangered or critical status," within the meaning of Section 305 of ERISA or Section 432 of the Code; or (i) a Foreign Pension Event.

"Erroneous Payment" has the meaning assigned to such term in Section 9.22.

"Erroneous Payment Notice" has the meaning assigned to such term in Section 9.22(b).

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"European Loan Party" means any Foreign Loan Party that is not a Canadian Loan Party.

"Euros" and "€" mean the single currency of the European Union as constituted by the Treaty on European Union and as referred to in the EMU Legislation.

"Event of Default" has the meaning assigned to such term in Section 7.01.

"Exchange Act" means the United States Securities Exchange Act of 1934, as amended from time to time.

"Exchange Rate" means on any day, for purposes of determining the Dollar Equivalent of any currency other than Dollars, the rate at which such other currency may be exchanged into Dollars at the time of determination on such day as set forth on the Reuters WRLD Page for such currency. In the event that such rate does not appear on any Reuters WRLD Page, the Exchange Rate shall be determined by reference to such other publicly available service for displaying exchange rates as may be agreed upon by the Administrative Agent and the Borrower or, in the absence of such an agreement, such Exchange Rate shall instead be the arithmetic average of the Exchange Rates of exchange of the Administrative Agent in the market where its foreign currency exchange operations in respect of such currency are then being conducted, at or about such time as the Administrative Agent shall elect after determining that such rates shall be the basis for determining the Exchange Rate, on such date for the purchase of Dollars for delivery two Business

Days later; provided that if at the time of any such determination, for any reason, no such Exchange Rate is being quoted, the Administrative Agent may use any reasonable method it deems appropriate to determine such rate, and such determination shall be conclusive absent manifest error.

"Excluded Assets" means (a) except in the case of any Debtor, any fee-owned real property with a Fair Market Value of less than $1,000,000 as determined on the Effective Date for existing real property and on the date of acquisition for after-acquired real property, (b) except in the case of any Debtor, all leasehold interests in real property, (c) any governmental licenses or state or local franchises, charters or authorizations, to the extent a security interest in any such license, franchise, charter or authorization would be prohibited or restricted thereby (including any legally effective prohibition or restriction, but excluding any prohibition or restriction that is ineffective under the PPSA or Uniform Commercial Code of any applicable jurisdiction), (d) any asset if, to the extent that and for so long as the grant of a Lien thereon to secure the Secured Obligations is prohibited by any Requirements of Law (other than to the extent that any such prohibition would be rendered ineffective pursuant to any other applicable Requirements of Law, including Bankruptcy Law, the PPSA or the Uniform Commercial Code of any applicable jurisdiction), or would require consent or approval of any Governmental Authority, (e) [reserved], (f) margin stock and, to the extent (i) prohibited by the terms of, creating an enforceable right of termination in favor of any other party thereto (other than any Loan Party) or requiring the consent of one or more third parties (other than the Borrower) under and/or (ii) any pledge could give rise to a "right of first refusal", a "right of first offer" or a similar right that may be exercised by any third party (other than the Borrower) pursuant to, any applicable Organizational Documents, joint venture agreement or shareholders' agreement, Equity Interests in any Person other than the Borrower and Restricted Subsidiaries that are wholly-owned subsidiaries, (g) assets of any (i) direct or indirect Foreign Subsidiary of the Borrower organized outside of a Specified Jurisdiction ("Excluded Foreign Subsidiary") and (ii) direct or indirect Domestic Subsidiary of an Excluded Foreign Subsidiary to the extent a security interest or grant of perfection in such assets would result in material adverse Tax consequences to the Borrower or one of the Restricted Subsidiaries as reasonably determined by the Borrower in consultation with the Administrative Agent, (h) except to the extent owned by a Debtor, Foreign Intellectual Property (except with respect to any Intellectual Property governed by or arising or existing under, pursuant to or by virtue of the laws of any Specified Jurisdiction) and any intent-to-use trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, (i) any lease, license or other agreement or any property subject thereto (including pursuant to a purchase money security interest, capital lease or similar arrangement) to the extent that a grant of a security interest therein would violate or invalidate such lease, license or agreement or purchase money arrangement or capital lease or create a breach, default or right of termination in favor of any other party thereto (other than any Loan Party) after giving effect to the applicable anti-assignment provisions of the PPSA or Uniform Commercial Code of any applicable jurisdiction or other similar applicable law, other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the PPSA or Uniform Commercial Code of any applicable jurisdiction or Bankruptcy Law or other similar applicable law notwithstanding such prohibition, (j) assets of any (i) any Excluded Foreign Subsidiary and (ii) any direct or indirect Domestic Subsidiary of an Excluded Foreign Subsidiary and, (k) cash or cash equivalents maintained in any deposit account that are comprised of (i) funds used or to be used for payroll and payroll taxes and other employee benefit payments to or for the benefit of the employees of the Borrower and/or any Restricted Subsidiary, in each

24

case, during the applicable period, (ii) funds used or to be used to pay any taxes required to be collected, remitted or withheld during the current period and (iii) other funds which any Loan Party holds as an escrow or fiduciary for the benefit of any third person, but in each case subject to the terms of the Agreed Security Principles (including, without limitation, the Overriding Principle (as defined in the Agreed Security Principles)) (other than to the extent no additional action needs to be taken with respect to any such assets to create or perfect a security interest in any such assets). Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary, any asset that does not constitute "Excluded Property" under and as defined in the Prepetition Term Loan Agreement shall not constitute an "Excluded Asset" for purposes of this Agreement and the other Loan Documents.

"Excluded Subsidiary" means any of the following (except as otherwise provided in clause (b) of the definition of "Subsidiary Loan Party"): (a) any Subsidiary that is not a wholly-owned subsidiary of the Borrower; provided, that no Subsidiary Loan Party shall become an Excluded Subsidiary and cease being a Subsidiary Loan Party solely as a result of no longer constituting a wholly-owned subsidiary of the Borrower unless such Subsidiary Loan Party no longer constitutes a Subsidiary, (b) each Subsidiary listed on Schedule 1.01(a), (c) [reserved], (d) each Immaterial Subsidiary, (e) any Subsidiary that is prohibited by (i) applicable Requirements of Law or (ii) any contractual obligation existing on the Effective Date or on the date any such Subsidiary is acquired (so long as, in respect of any such contractual prohibition, such prohibition is not incurred in contemplation of such acquisition), in each case from guaranteeing the Secured Obligations or which would require governmental (including regulatory) consent, approval, license or authorization to provide a Guarantee, (f) any Excluded Foreign Subsidiary, (g) any direct or indirect Domestic Subsidiary of an Excluded Foreign Subsidiary, (h) [reserved], (i) any other Subsidiary excused from becoming a Loan Party pursuant to clause (a) of the last paragraph of the definition of the term "Domestic Collateral and Guarantee Requirement," or the terms of the Agreed Security Principles" (j) [reserved], (k) [reserved] and (l) any not-for-profit Subsidiaries or captive insurance companies. Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary, any subsidiary that does not constitute an "Excluded Subsidiary" under and as defined in the Prepetition Term Loan Agreement shall not constitute an "Excluded Subsidiary" for purposes of this Agreement and the other Loan Documents.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender or any other recipient (each referred to for purposes of this definition a "recipient") of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document, (a) Taxes imposed on (or measured by) its net income (however denominated), branch profits Taxes and franchise Taxes, in each case (i) imposed by a jurisdiction as a result of such recipient being organized or having its principal office located in or, in the case of any Lender, having its applicable lending office located in, such jurisdiction or (ii) that are Other Connection Taxes, (b) any withholding Tax that is attributable to a Lender's failure to comply with Section 2.17(e), (c) except in the case of an assignee pursuant to a request by the Borrower under Section 2.19, any U.S. federal withholding Taxes imposed on amounts payable to or for the account of a Lender due to a Requirement of Law in effect at the time the Lender becomes a party hereto (or designates a new lending office), except to the extent that such Lender (or its assignor, if any) was entitled, immediately prior to the time of designation of a new lending office (or assignment), to receive additional amounts with respect to such withholding Tax under Section 2.17(a), (d) any

federal withholding Tax imposed pursuant to FATCA, (e) any Taxes imposed on payments to a Lender by the German tax authorities under § 49 para. 1 Nr. 5 lit. c (aa) or § 50a para. 7 German income tax act by virtue of the Lender having security over German-situs real estate (*inländischen Grundbesitz*) or over rights subject to the civil law provisions applicable to real estate (*inländische Rechte, die den Vorschriften des bürgerlichen Rechts über Grundstücke unterliegen*), (f) any Taxes imposed by Germany because the relevant recipient is a Non-Cooperative Jurisdiction Resident Party, (g) (I) any Luxembourg withholding Taxes imposed under the amended Luxembourg law of 23 December 2005 introducing a final withholding tax on certain interest payments and (II) any Luxembourg registration duties (*droits d'enregistrement*) payable in the case of voluntary registration of any Loan Document by the Loan Parties with the *Administration de l'Enregistrement des Domaines et de la TVA* in Luxembourg, or registration of the Notes in Luxembourg when such registration is not reasonably required to enforce the rights of that Loan Party under the Loan Documents and (h) any Canadian withholding Taxes arising as a result of (i) the recipient not dealing at arm's length (within the meaning of the ITA) with any Loan Party, (ii) the recipient being a "specified non-resident shareholder" (as defined in subsection 18(5) of the ITA) of any Loan Party or not dealing at arm's length (for the purposes of the ITA) with a "specified shareholder" (as defined in subsection 18(5) of the ITA) of the Loan Party or of any partner of the Loan Party (and if a partnership, any partner thereof), or (iii) the recipient being a "specified entity" (as defined in subsection 18.4(1) of the ITA, as it is proposed to be amended by certain Tax proposals released by the Department of Finance (Canada) on April 29, 2022) of the Loan Party, except in the case of (i) through (iii) where (x) the non-arm's length relationship or (y) the recipient being a "specified non-resident shareholder" of the Loan Party or not dealing at arm's length with a "specified shareholder" of the Loan Party.

"Fair Market Value" means with respect to any asset or group of assets on any date of determination, the value of the consideration obtainable in a sale of such asset at such date of determination assuming a sale by a willing seller to a willing purchaser dealing at arm's length and arranged in an orderly manner over a reasonable period of time having regard to the nature and characteristics of such asset. Except as otherwise expressly set forth herein, such value shall be determined in good faith by the Borrower.

"FATCA" means Sections 1471 through 1474 of the Code as in effect on the date hereof (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future Treasury regulations or official administrative interpretations thereof, any agreements entered into pursuant to current Section 1471(b)(1) of the Code and any intergovernmental agreements entered into in connection with the implementation of such current Sections of the Code (or any such amended or successor version described above).

"FCPA" has the meaning assigned to such term in Section 3.18(b).

"Federal Funds Effective Rate" means, for any day, the rate of interest per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day

shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) quoted to Administrative Agent on such day on such transactions as determined by Administrative Agent.

"Federally Regulated Lender" means any bank, savings and loan association, credit union, farm credit bank, federal land bank association, production credit association, or similar institution subject to the supervision of a federal entity or lending regulation.

"Federally Regulated Lender Excluded Property" means, solely with respect to any Federally Regulated Lender, any right, title and interest of any Loan Party in and to any real property improved by a Building (as defined in the Flood Insurance Laws) or Manufactured (Mobile) Home (as defined in the Flood Insurance Laws) that is located in a Special Flood Hazard Area.

"Fee Letters" means the Administrative Agent Fee Letter and the Collateral Agent Fee Letter.

"FEMA" has the meaning assigned to such term in the definition of "Domestic Collateral and Guarantee Requirement."

"Final Borrowing Amount" means $17,500,000.

"Final Funding Date" shall be the date of funding of the Final New Money Loan, which shall be within two Business Days of the entry of the Final Order.

"Final New Money Loan" shall have the meaning assigned to such term in Section 2.01(b).

"Final Order" means an order of the Bankruptcy Court (as such order may be amended, supplemented or modified from time to time after entry thereof in accordance with the terms hereof, but only with the written consent of the Required Lenders and (solely with respect to any provision that affects its rights or duties) the Administrative Agent or the Collateral Agent) in substantially the form of the Interim Order and in form and substance acceptable to the Required Lenders in their sole discretion, which order shall authorize and approve, among other things on a final basis, (a) the Loan Document Obligations and extensions of credit hereunder including the incurrence by the Loan Parties of secured indebtedness in accordance with this Agreement, (b) the form of this Agreement and the other Loan Documents, (c) the granting of Liens and Superpriority Claims in favor of the Agents and Lenders and (d) the other obligations of the Loan Parties under this Agreement and the other Loan Documents, and which order shall not have been vacated or reversed, shall not be subject to any stay or appeal (and for which the time to appeal, petition for certiorari, or seek re-argument or rehearing has expired, or as to which any right to appeal, petition for certiorari or seek re-argument or rehearing has been waived in writing in a manner satisfactory to the parties in interest, or if a notice of appeal, petition for certiorari, or motion for re-argument or rehearing was timely filed, the order or judgment has been affirmed by the highest court to which the order or judgment was appealed or from which the re-argument or rehearing was sought, or a certiorari has been denied, and the time to file any further appeal or to petition for certiorari or to seek further re-argument has expired) and shall not have been modified or amended without the prior written consent of the Required Lenders and, if applicable, the Administrative Agent or the Collateral Agent.

27

"Final Rolled-Up Loans" shall have the meaning assigned to such term in Section 2.01(b)(i)(B).

"Financial Advisor" means Ducera Partners.

"First Day Orders" means the orders entered by the Bankruptcy Court in respect of first day motions and applications in respect of the Cases.

"Financial Officer" means the chief financial officer, principal accounting officer, treasurer or controller (or other officer with reasonably equivalent responsibilities) of a Loan Party.

"Flood Insurance Laws" means, collectively, (a) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (b) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (c) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto, (e) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (e) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"Foreign Superpriority Guarantee Agreement" means the Foreign Superpriority Guarantee Agreement, dated as of the Effective Date and as further supplemented or modified from time to time, among the Foreign Loan Parties and the Administrative Agent.

"Foreign Intellectual Property" means any right, title or interest in or to any Intellectual Property governed by or arising or existing under, pursuant to or by virtue of the laws of any jurisdiction other than the United States of America or any state thereof.

"Foreign Loan Documents" means (i) the Canadian Collateral Documents, (ii) the English Collateral Documents, (iii) the Dutch Collateral Documents, (iv) the Luxembourg Collateral Documents, (v) the German Collateral Documents, (vi) the Swiss Collateral Documents, (vii) the French Collateral Documents and (viii) the Australian Collateral Documents, (ix) the Norwegian Collateral Documents, (x) the NZ Collateral Documents, (xi) the Danish Collateral Documents and (xii) any other Loan Document which is not governed by the laws of the United States of America or any state, province or territory thereof.

"Foreign Loan Party" means a Loan Party that is a Foreign Subsidiary organized in a Specified Jurisdiction.

"Foreign Pension Event" means, with respect to any Foreign Pension Plan, (a) the existence of unfunded liabilities in excess of the amount permitted under any applicable law or in excess of the amount that would be permitted absent a waiver from applicable Governmental Authority or (b) the failure to make the required contributions or payments, under any applicable law, on or before the due date for such contributions or payments.

"Foreign Pension Plan" means any benefit plan that under applicable law (other than the laws of the United States or any political subdivision thereof) is required to be funded through a trust or other funding vehicle other than a trust or funding vehicle maintained exclusively by a

Governmental Authority and with respect to which the Borrower or any Restricted Subsidiary has any liability.

"Foreign Perfection Requirements" means any registration, acknowledgement, filing, endorsement, notarisation, stamping, notification or other action or step to be made or procured in a Specified Jurisdiction in order to create, perfect or enforce the Lien created by a Foreign Loan Document and/or achieve the relevant priority for the Lien created thereunder.

"Foreign Subsidiary" means any Subsidiary that is organized under the laws of a jurisdiction other than the United States of America, any State thereof or the District of Columbia.

"Foreign Subsidiary Guarantor" means a Subsidiary Guarantor that is a Foreign Subsidiary organized in a Specified Jurisdiction.

"Freedom Winddown" means the winddown and dissolution of Freedom Designs, Inc.; provided, that any remaining material assets of Freedom Designs, Inc. after satisfaction of applicable claims shall be distributed to another Loan Party in connection with such winddown.

"French Collateral Agreements" means the following agreements: (i) a French law financial securities account pledge agreement (*convention de nantissement de compte de titres financiers*) granted by Invacare Holdings Two B.V. as pledgor in favor of the Collateral Agent over all shares held by Invacare Holdings Two B.V. in Invacare France Operations SAS and the related statement of pledge of financial securities account (*déclaration de nantissement de compte de titres financiers*) and (ii) a French law pledge of assets without dispossession agreement (*convention de gage sans dépossession*) granted by Invacare International GmbH as pledgor in favor of the Collateral Agent in respect of the inventory held by Invacare International GmbH in France.

"French Collateral Documents" means the French Collateral Agreements and each security agreement, pledge, hypothec, mortgage or other instrument or document, as applicable, governed by French law in connection with this Agreement and the Agreed Security Principles to secure the applicable Secured Obligations.

"French Loan Party" means any Loan Party incorporated or otherwise organized under the laws of France.

"FSHCO" means any direct or indirect Domestic Subsidiary of the Borrower that has no material assets other than Equity Interests in one or more direct or indirect Foreign Subsidiaries that are CFCs.

"GAAP" means generally accepted accounting principles in the United States of America, as in effect from time to time; provided, however, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Effective Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately

before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith; provided, further, that if such an amendment is requested by the Borrower or the Required Lenders, then the Borrower and the Administrative Agent, acting at the direction of the Required Lenders, shall negotiate in good faith to enter into an amendment of the relevant affected provisions (without the payment of any amendment or similar fee to the Lenders) to preserve the original intent thereof in light of such change in GAAP or the application thereof. Notwithstanding any other provision contained herein, (a) all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under FASB Accounting Standards Codification 825-Financial Instruments, or any successor thereto (including pursuant to the FASB Accounting Standards Codification), to value any Indebtedness of the Borrower or any subsidiary at "fair value," as defined therein and (b) the amount of any Indebtedness under GAAP with respect to Capital Lease Obligations shall be determined in accordance with Section 1.04(e).

"German Collateral Agreement" means the German law share pledge agreement granted by Invacare Holdings Two B.V. as pledgor over all shares held by it in Invacare Germany Holding GmbH in favor of the Collateral Agent and the Secured Parties.

"German Collateral Documents" means the German Collateral Agreement, and each other security agreement, pledge, debenture, hypothec, mortgage, consent or other instrument or document, as applicable, governed by German law in connection with this Agreement and the Agreed Security Principles to secure the applicable Secured Obligations.

"German Group" means Invacare Germany Holding and each subsidiary of Invacare Germany Holding.

"German Loan Party" means any Loan Party incorporated or otherwise organized under the laws of Germany.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, provincial or territorial, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including the National Association of Insurance Commissioners ("NAIC") and any supra-national bodies such as the European Union or the European Central Bank).

"Granting Lender" has the meaning assigned to such term in Section 9.04(f).

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such

Indebtedness of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness; <u>provided</u> that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Effective Date or entered into after the Effective Date in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined in good faith by a Financial Officer.  The term "Guarantee" as a verb has a corresponding meaning.

"<u>Guarantors</u>" means, subject to the Agreed Security Principles, collectively, (i) the Subsidiary Loan Parties that have Guaranteed the Secured Obligations on the Effective Date and (ii) any Subsidiary that will Guarantee the Secured Obligations after the Effective Date in accordance with the Agreed Security Principles and terms of this Agreement which such Subsidiaries, in the case of clause (i), are listed on Schedule 1.01(c) hereto; <u>provided</u> that no Guarantor under <u>clause (ii)</u> above shall be deemed to have Guaranteed any Secured Obligations until it becomes a Loan Party in accordance with the terms of this Agreement (including the satisfaction of all applicable conditions contemplated on <u>Section 5.14</u>) and the Agreed Security Principles.

"<u>Hazardous Materials</u>" means all explosive, radioactive, hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum by-products or distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated as hazardous or toxic, or any other term of similar import, pursuant to any Environmental Law.

"<u>IFRS</u>" means international accounting standards as promulgated by the International Accounting Standards Board.

"<u>Immaterial Subsidiary</u>" means any Subsidiary that is not a Material Subsidiary.

"<u>Indebtedness</u>" of any Person means, without duplication,

(a)     all obligations of such Person for borrowed money,

(b)     all obligations of such Person evidenced by bonds, debentures, notes or similar instruments to the extent the same would appear as a liability on a balance sheet of such Person prepared in accordance with GAAP,

(c)     all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person,

(d)     all obligations of such Person in respect of the deferred purchase price of property or services (excluding (i) trade accounts payable in the ordinary course of business, (ii) any earn-out obligation, purchase price adjustment or similar obligation until

such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP and if not paid after being due and payable and (iii) liabilities associated with customer prepayments and deposits),

(e)      all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed,

(f)      all Guarantees by such Person of Indebtedness of others,

(g)      all Capital Lease Obligations of such Person,

(h)      all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty and

(i)      all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances;

provided that the term "Indebtedness" shall not include (i) deferred or prepaid revenue and (ii) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the seller.

The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner), to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. The amount of Indebtedness of any Person for purposes of clause (e) above shall (unless such Indebtedness has been assumed by such Person) be deemed to be equal to the lesser of (A) the aggregate unpaid amount of such Indebtedness and (B) the Fair Market Value of the property encumbered thereby as determined by such Person in good faith. For all purposes hereof, the Indebtedness of the Borrower and the Restricted Subsidiaries shall exclude intercompany liabilities arising from their cash management, tax, and accounting operations and intercompany loans, advances or Indebtedness having a term not exceeding 364 days (inclusive of any rollover or extensions of terms) and made in the ordinary course of business.

"Indemnified Taxes" means all Taxes, other than Excluded Taxes and Other Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document.

"Indemnitee" has the meaning assigned to such term in Section 9.03(b).

"Information" has the meaning assigned to such term in Section 9.12(a).

"Initial Borrowing" has the meaning assigned to such term in Section 2.01(a).

"Initial Borrowing Amount" means $17,500,000.

"Initial Budget" means the initial 13-week consolidated weekly operating budget of Borrower and its consolidated Restricted Subsidiaries setting forth sources and uses of cash for the periods described therein prepared by the Borrower's management, in consultation with the Debtor Financial Advisor, a copy of which is attached as Exhibit L, such budget in form and substance satisfactory to the Required Lenders in their sole discretion.

"Initial EMEA Report" means the initial 13-week consolidated forecast setting forth receipts of the EMEA Entities for the periods described therein prepared by the Borrower's management, in consultation with the Debtor Financial Advisor, a copy of which is attached as Exhibit N, such budget in form and substance satisfactory to the Required Lenders in their sole discretion.]

"Initial New Money Loan" has the meaning assigned to such term in Section 2.01(a).

"Initial Rolled-Up Loans" has the meaning assigned to such term in Section 2.01(b)(i)(A).

"Insurance Subsidiary" means Invatection Insurance Company, a Vermont corporation.

"Intellectual Property" has the meaning assigned to such term in the U.S. Collateral Agreement, the Canadian Collateral Agreement, the English Collateral Agreement or the Dutch Collateral Agreements, as applicable.

"Intercompany Subordination Agreement" has the meaning assigned to such term in Section 6.01(a)(iv).

"Intercreditor Agreements" means the ABL Intercreditor Agreement and the Junior Intercreditor Agreement.

"Interim Order" means an interim order of the Bankruptcy Court (as such order may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms hereof, but only with the written consent of the Required Lenders and (solely with respect to any provision that affects its rights or duties) the Administrative Agent or the Collateral Agent) in the form set forth as Exhibit K (with changes to such form only as are satisfactory to the Required Lenders, and solely with respect to any provision that affects the rights or duties of the Agents, such Agents, in their sole discretion), which order shall authorize and approve, on an interim basis, among other things, (a) the Loan Document Obligations and extensions of credit hereunder including the incurrence by the Loan Parties of secured indebtedness in accordance with this Agreement, (b) the form of this Agreement and the other Loan Documents, (c) the granting of Liens and Superpriority Claims in favor of the Agents and Lenders, (d) the payment by the Loan Parties of the reasonable and documented fees contemplated by this Agreement, (e) the provision of adequate protection to the Secured Parties under and as defined in each of the Prepetition Secured Documents in a manner satisfactory to the Required Lenders in their sole discretion, and (f) such other matters as are usual and customary for orders of this kind, and which order shall not have been vacated or reversed, shall not be subject to any stay or appeal and shall not have been modified or amended without the prior written consent of the Required Lenders and, if applicable, the Administrative Agent or the Collateral Agent.

"Intermediate Holdcos" means, collectively, Invacare Holdings Netherlands, Invacare Holdings Lux, Invacare Holdings Two Lux, Invacare Holdings Two Netherlands and Invacare Germany Holding.

"Intermediate Holdco Subsidiaries" means, as to each Intermediate Holdco, such Intermediate Holdco's subsidiaries.

"Invacare Germany Holding" means Invacare Germany Holding GmbH, a limited liability company (*Gesellschaft mit beschränkter Haftung*), incorporated and existing under the laws of the Federal Republic of Germany, registered in the commercial register (*Handelsregister*) of the local court (*Amtsgericht*) of Ulm under HRB 621121, with registered seat in Isny, Germany.

"Invacare Holdings Lux" means Invacare Holdings S.à. r.l., a Luxembourg private limited liability company (*société à responsabilité limitée*) having its registered office located at 6, rue Eugène Ruppert, L-2453 Luxembourg, and registered with the Luxembourg Trade and Companies Register (*Registre de Commerce et des Sociétés, Luxembourg*) under number B169438.

"Invacare Holdings Netherlands" means Invacare Holdings C.V., a limited partnership (*commanditaire vennootschap*) formed under the laws of the Netherlands, having its registered office at Benkenstrasse 260, 4108 Witterswil, Switzerland, and registered with the commercial register of the Chamber of Commerce (*Kamer van Koophandel*) for indefinite period under number 09123986.

"Invacare Holdings Two Lux" means Invacare Holdings Two S.à. r.l., a Luxembourg private limited liability company (*société à responsabilité limitée*) having its registered office located at 6, rue Eugène Ruppert, L-2453 Luxembourg, and registered with the Luxembourg Trade and Companies Register (*Registre de Commerce et des Sociétés, Luxembourg*) under number B169458.

"Invacare Holdings Two Netherlands" means Invacare Holdings Two B.V., a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*) incorporated under the laws of the Netherlands, having its corporate seat (*statutaire zetel*) at Amsterdam, the Netherlands, its registered office at Galvanistraat 14 3, 6716 AE Ede, the Netherlands, and registered with the trade register of the Chamber of Commerce (*Kamer van Koophandel*) under number 34058960.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or Indebtedness or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other Indebtedness or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person (excluding, in the case of the Borrower and the Restricted Subsidiaries, (i) intercompany advances arising from their cash management, cash pooling, tax, and accounting operations, (ii) intercompany loans, advances or Indebtedness having a term not exceeding 364 days (inclusive of any rollover or extensions of terms) and made in the ordinary course of business) and (iii) intercompany advances, transfer pricing and cost-sharing arrangements that are in the ordinary course of business or (c) the purchase or other acquisition (in

34

one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person. The amount, as of any date of determination, of (i) any Investment in the form of a loan or an advance shall be the principal amount thereof outstanding on such date, minus, to the extent any such loan or advance is made to any third party unaffiliated with the Borrower and its Subsidiaries, any cash payments actually received by such investor representing interest in respect of such Investment (to the extent any such payment to be deducted does not exceed the remaining principal amount of such Investment), but without any adjustment for writedowns or write-offs (including as a result of forgiveness of any portion thereof) with respect to such loan or advance after the date thereof, (ii) any Investment in the form of a Guarantee shall be equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof, as determined in good faith by a Financial Officer, (iii) any Investment in the form of a transfer of Equity Interests or other non-cash property by the investor to the investee, including any such transfer in the form of a capital contribution, shall be the Fair Market Value of such Equity Interests or other property as of the time of the transfer, without any other adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment after the date of such Investment, and (iv) any Investment (other than any Investment referred to in clause (i), (ii) or (iii) above) by the specified Person in the form of a purchase or other acquisition for value of any Equity Interests (including through any capital contribution), evidences of Indebtedness or other securities of any other Person shall be the original cost of such Investment (including any Indebtedness assumed in connection therewith), plus (A) the cost of all additions thereto, and minus (B) to the extent such original Investment was made in cash, the amount of any portion of such Investments that has been repaid to the investor in cash as a repayment of principal or a return of capital, and of any cash payments actually received by such investor representing interest, dividends or other distributions in respect of such Investment (in all of the foregoing cases in this clause (B), to the extent such payments do not exceed, in the aggregate, the original cash amount of such Investment), but without any other adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment after the date of such Investment. For purposes of Section 6.04, if an Investment involves the acquisition of more than one Person, the amount of such Investment shall be allocated among the acquired Persons in accordance with GAAP; provided that pending the final determination of the amounts to be so allocated in accordance with GAAP, such allocation shall be as reasonably determined by a Financial Officer.

"IRS" means the United States Internal Revenue Service.

"ITA" means the Income Tax Act (Canada), as amended from time to time.

"Judgment Currency" has the meaning assigned to such term in Section 9.14(b).

"Junior Financing" means any Indebtedness (other than any permitted intercompany Indebtedness owing to the Borrower or any Restricted Subsidiary and, for the avoidance of doubt, other than Indebtedness incurred under Section 6.01(a)(xxii)) that is (a) subordinated in right of payment to the Loan Document Obligations, (b) Indebtedness that is secured on a junior basis to the Liens securing the Secured Obligations in respect of the Loans or (c) Indebtedness that is unsecured; provided that (i) no such Junior Financing incurred or assumed on or after the Effective

Date shall provide for any payments of principal, interest, fees or other amounts (other than customary third party agent or trustee fees) in cash on or prior to the date that is 91 days after the Stated Maturity Date (determined as of the date of incurrence or assumption of such Junior Financing) and (ii) for purposes of <u>Section 6.08(b)</u>, Indebtedness of the type described in <u>clauses (a)</u> through <u>(c)</u> shall constitute Junior Financing only to the extent the aggregate principal amount of such Indebtedness, when taken together with the aggregate principal amount of all other Indebtedness of the type described in <u>clause (a)</u> through <u>(c)</u>, respectively, outstanding at such time, is greater than $1,000,000.

"<u>Junior Intercreditor Agreement</u>" means that certain Junior Intercreditor Agreement, dated as of the Effective Date, substantially in the form attached as <u>Exhibit G-2</u> hereto, by and among the Collateral Agent and the Prepetition Term Loan Agreement Collateral Agent, the Prepetition Senior Secured Convertible Notes Agent and each additional representative party thereto from time to time, as acknowledged by the Loan Parties, as amended, restated or otherwise modified from time to time in accordance with the terms thereof.

"<u>Lease</u>" means any agreement, whether written or oral, no matter how styled or structured, pursuant to which a Loan Party is entitled to the use or occupancy of any space in a structure, land, improvements or premises for any period of time.

"<u>Legal Reservations</u>" means, in the case of any Foreign Loan Party or any Foreign Loan Document: (i) the principle that certain remedies may be granted or refused at the discretion of the court, the limitation of enforcement by laws relating to bankruptcy, insolvency, liquidation, reorganization, court schemes, moratoria, administration and other laws generally affecting the rights of creditors and secured creditors; (ii) the time barring of claims under applicable limitation laws and defenses of acquiescence, set-off or counterclaim and the possibility that an undertaking to assume liability for or to indemnify a person against non-payment of stamp duty may be void; (iii) the principle that in certain circumstances Liens granted by way of fixed charge may be recharacterized as a floating charge or that Liens purported to be constituted as an assignment may be recharacterized as a charge; (iv) the principle that additional interest imposed pursuant to any relevant agreement may be held to be unenforceable on the grounds that it is a penalty and thus void; (v) the principle that a court may not give effect to an indemnity for legal costs incurred by an unsuccessful litigant; (vi) the principle that the creation or purported creation of Liens over any contract or agreement which is subject to a prohibition on transfer, assignment or charging may be void, ineffective or invalid and may give rise to a breach of the contract or agreement over which Liens has purportedly been created; (vii) similar principles, rights and defenses under the laws of any relevant jurisdiction; (viii) the principle that a court may not give effect to any parallel debt provisions, covenants to pay the Collateral Agent or other similar provisions; (ix) the principle that in certain circumstances pre-existing Liens purporting to secure further advances may be void, ineffective, invalid or unenforceable; (x) the Swiss general principle of reasonableness and fairness (*Treu und Glauben*) and similar principles under the laws of any applicable jurisdiction; (xi) mandatory provisions (*lois de police*) under Luxembourg law; and (xii) any other matters which are (or would in respect of any legal opinion provided by counsel to any Lender customarily be) set out as qualifications or reservations (however described) as to matters of law in any legal opinion delivered to the Administrative Agent pursuant to any Loan Document.

"Lenders" means each New Money Lender and each Roll-Up Lender and, in each case, any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset, (c) in the case of any Collateral under an Australian Collateral Document, any "security interest" as defined in sections 12(1) and 12(2) of the Australian PPSA and (d) in the case of any Collateral under a NZ Collateral Document, any "security interest" as defined in section 17(1)(a) of the NZ PPSA.

"Liquidity" means, as of any date of determination, the sum of (x) the aggregate amount of unrestricted cash (other than to the extent restricted in favor of the DIP Facility or any Prepetition Secured Document) and Permitted Investments owned by the Loan Parties, as reflected on a balance sheet prepared as of such date on a consolidated basis in accordance with GAAP, to the extent such cash and Permitted Investments are free and clear of any Liens (other than (x) non-consensual Liens permitted by Section 6.02 and (y) consensual Liens permitted by Section 6.02(i), 6.02(xvi) or 6.02(xix)) and the use thereof for the application to the payment of Indebtedness is not prohibited by law or any contract to which the Borrower or any Restricted Subsidiary is a party, (y) cash and Permitted Investments of the Loan Parties restricted or subject to a Lien in favor of the DIP Facility (which may also include cash and Permitted Investments securing other Indebtedness permitted hereunder that is secured by a Lien on the Collateral along with the DIP Facility) [and (z) the aggregate amount that is then available to be borrowed under the DIP ABL Credit Agreement (for the avoidance of doubt, after giving effect to the "borrowing base" provided for thereunder).]

"Loan Document Obligations" means (a) the due and punctual payment by the Borrower of (i) the principal of and interest at the applicable rate or rates provided in this Agreement (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, and (ii) all other monetary obligations of the Borrower under or pursuant to this Agreement and each of the other Loan Documents, including obligations to pay  fees, expense reimbursement obligations and indemnification obligations, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), (b) the due and punctual payment and performance of all other obligations of the Borrower under or pursuant to this Agreement and each of the other Loan Documents and (c) the due and punctual payment and performance of all the obligations of each other Loan Party under or pursuant to this Agreement and each of the other Loan Documents (including interest and monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding).

"Loan Documents" means, collectively, this Agreement, the Orders, the Domestic Superpriority Guarantee Agreement, the Foreign Superpriority Guarantee Agreement, the Foreign Loan Documents, the Collateral Agreements, the Fee Letters, the ABL Intercreditor Agreement, the Junior Intercreditor Agreement, the other Security Documents and, except for purposes of Section 9.02, any promissory notes delivered pursuant to Section 2.09(e).

"Loan Parties" means the Borrower and the Subsidiary Loan Parties.

"Loans" means the New Money Loans and the Roll-Up Loans.

"Luxembourg" means the Grand Duchy of Luxembourg.

"Luxembourg Civil Code" means the Luxembourg Civil Code (*Code civil*).

"Luxembourg Collateral Agreements" means the Luxembourg law governed (i) second ranking share pledge agreement between Invacare Holdings C.V. as pledgor, Invacare Holdings S.à r.l. as company and the Collateral Agent as first ranking pledgee and second ranking pledgee, (ii) second ranking share pledge agreement between Invacare Holdings S.à r.l. as pledgor, Invacare Holdings Two S.à r.l. as company and the Collateral Agent as first ranking pledgee and second ranking pledgee, (iii) second ranking receivables pledge agreement between Invacare Holdings C.V. as pledgor, Invacare Holdings S.à r.l. as debtor and the Collateral Agent as first ranking pledgee and second ranking pledgee and (iv) second ranking receivables pledge agreement between Invacare Holdings S.à r.l. as pledgor, Invacare Holdings Two S.à r.l. as debtor and the Collateral Agent as first ranking pledgee and second ranking pledgee.

"Luxembourg Collateral Documents" means each of the Luxembourg Collateral Agreements, and each other security agreement, pledge, mortgage, or other instrument or document, as applicable, governed by Luxembourg law in connection with this Agreement and the Agreed Security Principles to secure the applicable Secured Obligations.

"Luxembourg Loan Party" means any Loan Party incorporated or otherwise organized under the laws of the Luxembourg.

"Master Agreement" has the meaning assigned to such term in the definition of "Swap Agreement."

"Material Adverse Effect" means after the Effective Date, a material adverse effect on (a) the business, assets, financial condition or results of operations, in each case, of the Borrower and its Restricted Subsidiaries, taken as a whole (other than by virtue of the commencement of the Cases and the events and circumstances giving rise thereto), (b) the rights and remedies (taken as a whole) of the Administrative Agent and the Lenders under the applicable Loan Documents or (c) the ability of the Loan Parties (taken as a whole) to perform their payment obligations under the applicable Loan Documents.

"Material Indebtedness" means (without duplication) Indebtedness for borrowed money (other than the Loan Document Obligations), Capital Lease Obligations, unreimbursed obligations for letter of credit drawings and financial guarantees (other than ordinary course of business contingent reimbursement obligations) or obligations in respect of one or more Swap Agreements,

of any one or more of the Borrower and the Restricted Subsidiaries in an aggregate principal amount exceeding $1,000,000. For purposes of determining Material Indebtedness, the "principal amount" of the obligations in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Borrower or any Restricted Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

"Material Real Property" means any owned Real Estate with a Fair Market Value in excess of $1,000,000.

"Material Subsidiary" means (a) each Restricted Subsidiary that, as of the last day of the fiscal quarter of the Borrower most recently ended for which financial statements are available, had revenues or total assets (determined on a consolidated basis for such Restricted Subsidiary and its Restricted Subsidiaries) for such quarter in excess of 2.5% of the consolidated revenues or total assets, as applicable, of the Borrower and the Restricted Subsidiaries for such quarter or that is designated by the Borrower as a Material Subsidiary and (b) any Restricted Subsidiary that is part of a group comprising Restricted Subsidiaries that each would not have been a Material Subsidiary under clause (a) but that, taken together, as of the last day of the fiscal quarter of the Borrower most recently ended for which financial statements are available, had revenues or total assets (determined on a consolidated basis for all such Restricted Subsidiaries and their respective Restricted Subsidiaries) for such quarter in excess of 5.0% of the consolidated revenues or total assets, as applicable, of the Borrower and the Restricted Subsidiaries for such quarter. Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary, any subsidiary that constitutes a "Material Subsidiary" under and as defined in the Prepetition Term Loan Agreement shall constitute a "Material Subsidiary" for purposes of this Agreement and the other Loan Documents.

"Moody's" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"Mortgage" means a mortgage, deed of trust, assignment of leases and rents or other security document granting a Lien on any Material Real Property to secure the Secured Obligations, provided, however, in the event any Material Real Property is located in a jurisdiction which imposes mortgage recording taxes or similar fees, the applicable Mortgage shall not secure an amount in excess of 100% of the Fair Market Value of such Material Real Property. Each Mortgage shall be in a form reasonably acceptable to the Required Lenders.

"Mortgaged Property" means any Real Estate with respect to which a lien and security interest is granted pursuant to the Orders, Section 2.20, Section 5.11 or Section 5.12.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which a Loan Party or any ERISA Affiliate makes or is obligated to make contributions or with respect to which any Loan Party or ERISA Affiliate could have liability.

"Net Proceeds" means, with respect to any event, (a) the proceeds received in respect of such event in cash or Permitted Investments, including (i) any cash or Permitted Investments received in respect of any non-cash proceeds, including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price

adjustment or earn-out (but excluding any interest payments), but only as and when received, (ii) in the case of a casualty, insurance proceeds that are actually received, (iii) [reserved], and (iv) in the case of a condemnation or similar event, condemnation awards and similar payments that are actually received, <u>minus</u> (b) the sum of (i) all fees and out-of-pocket expenses paid by the Borrower and the Restricted Subsidiaries in connection with such event (including attorney's fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, underwriting discounts and commissions, other customary expenses and brokerage, consultant, accountant and other customary fees), (ii) in the case of a Disposition of an asset (including pursuant to a Casualty Event or similar proceeding), (x) the amount of all payments that are permitted hereunder and are made by the Borrower and the Restricted Subsidiaries as a result of such event to repay Indebtedness permitted to be incurred hereunder (other than (x) the Loans or (y) other pari passu or junior Financing secured by a Lien on the Collateral and incurred pursuant to <u>Section 6.01(a)</u>) and secured by such asset or otherwise subject to mandatory prepayment as a result of such event, (y) the pro rata portion of net cash proceeds thereof (calculated without regard to this <u>clause (y)</u>) attributable to minority interests and not available for distribution to or for the account of the Borrower and the Restricted Subsidiaries as a result thereof and (z) the amount of any liabilities directly associated with such asset and retained by the Borrower or the Restricted Subsidiaries and (iii) the amount of all Taxes paid (or reasonably estimated to be payable (including indirectly via a payment that is permitted by <u>Section 6.09(vi)</u>), and the amount of any reserves established by the Borrower and the Restricted Subsidiaries to fund contingent liabilities reasonably estimated to be payable, that are directly attributable to such event, <u>provided</u> that any reduction at any time in the amount of any such reserves (other than as a result of payments made in respect thereof) shall be deemed to constitute the receipt by the Borrower at such time of Net Proceeds in the amount of such reduction.

"<u>New Money Lenders</u>" means, at any time, Lenders holding New Money Loans or unused Commitments and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption in respect of any New Money Loans, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption..

"<u>New Money Loan</u>" means the term loans made to the Borrower pursuant to Section 2.01(a).

"<u>Non-Cash Compensation Expense</u>" means any non-cash expenses and costs that result from the issuance of stock-based awards, partnership interest-based awards and similar incentive based compensation awards or arrangements.

"<u>Non-Consenting Lender</u>" has the meaning assigned to such term in <u>Section 9.02(c)</u>.

"<u>Non-Cooperative Jurisdiction</u>" means a non-cooperative tax jurisdiction (*nicht kooperierendes Steuerhoheitsgebiet*) within the meaning of the German Defense against Tax Havens Act (*Gesetz zur Abwehr von Steuervermeidung und unfairem Steuerwettbewerb und zur Änderung weiterer Gesetze*, the "<u>SteueroasenAbwG</u>") and the and the respective legislative decree (*Rechtsverordnung*), each as amended, supplemented or restated.

"Non-Cooperative Jurisdiction Resident Party" means a Party that is resident in a Non-Cooperative Jurisdiction.

"Norwegian Collateral Agreements" means the following agreements: (i) a Norwegian law governed general security agreement granted by Invacare Holding AS as pledgor/assignor in favor of the Collateral Agent in respect of relevant intercompany receivables, trade receivables (Norw. *Factoring*), inventory (Norw. *varelager*), operating assets (Norw. *driftstilbehør*), such bank accounts which are capable of being subject to third party security (which i.a. excludes tax withholding accounts and escrow/collateral accounts), (ii) a Norwegian law governed general security agreement granted by Invacare AS as pledgor/assignor in favor of the Collateral Agent in respect of relevant intercompany receivables, trade receivables (Norw. *Factoring*), inventory (Norw. *varelager*), operating assets (Norw. *driftstilbehør*), such bank accounts which are capable of being subject to third party security (which i.a. excludes tax withholding accounts and escrow/collateral accounts), (iii) Norwegian law governed shares pledge agreement granted by Invacare Holding AS and Invacare Holdings Two B.V. as pledgors over all shares held by each of them in Invacare AS in favor of the Collateral Agent, including evidence that the relevant debtor(s) thereunder have been duly notified of the pledge and updated shareholders register and (iv) Norwegian law governed shares pledge agreement granted by Invacare Holdings Two B.V. as pledgor over all shares held by it in Invacare Holding AS in favor of the Collateral Agent, including evidence that the relevant debtor(s) thereunder have been duly notified of the pledge and updated shareholders register.

"Norwegian Collateral Documents" means each of the Norwegian Collateral Agreements, and each other security agreement, notice, standard charge form, pledge, debenture, hypothec, mortgage, consent or other instrument or document, as applicable, executed and delivered by any Norwegian Loan Party in connection with this Agreement and the Agreed Security Principles to secure the applicable Secured Obligations.

"Norwegian Loan Party" means any Loan Party incorporated or otherwise organized under the laws of Norway.

"Notice of Prepayment" shall have the meaning assigned to such term in Section 2.11(e).

"NZ Collateral Agreements" means (i) the NZ General Security Deed and (ii) each NZ Specific Security Deed over shares in the issued share capital in a New Zealand unlimited liability company between each Foreign Loan Party from time to time party thereto and the Collateral Agent.

"NZ Collateral Documents" means each of the NZ Collateral Agreements, and each other security agreement, pledge, debenture, hypothec, mortgage, consent or other instrument or document, as applicable, executed and delivered by any NZ Loan Party in connection with this Agreement and the Agreed Security Principles to secure the applicable Secured Obligations.

"NZ General Security Deed" means the general security deed, dated on or about the Effective Date, granted by and among the NZ Loan Party thereto and the Collateral Agent.

"<u>NZ Loan Party</u>" means any Loan Party incorporated or otherwise organized under the laws of New Zealand who becomes a party to the Foreign Guarantee Agreement and its respective successors and assigns.

"<u>NZ PPSA</u>" means the *Personal Property Securities Act 1999* of New Zealand and includes any regulations made thereunder.

"<u>NZ Specific Security Deed</u>" means each specific security deed (shares), dated on or about the Effective Date, by and among the offshore shareholders of the NZ Loan Party and the Collateral Agent, granting a Lien over the entire issued share capital of the NZ Loan Party.

"<u>OFAC</u>" has the meaning assigned to such term in <u>Section 3.18(c)</u>.

"<u>Order</u>" means the Interim Order or the Final Order, whichever is in effect at the time of any determination made hereunder, and "<u>Orders</u>" means the Interim Order and the Final Order, collectively.

"<u>Organizational Documents</u>" means (a) with respect to any corporation, the certificate or articles of incorporation, amendment or amalgamation, the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction) and/or any shareholder(s) agreements; (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction) and, with respect to any German Loan Party, the shareholder list (*Gesellschafterliste*); and (c) with respect to any partnership, limited partnership, joint venture, trust or other form of business entity, the partnership, limited partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"<u>Other Connection Taxes</u>" means, with respect to any recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"<u>Other Taxes</u>" means any and all present or future intangible, filing, recording, stamp, documentary, transfer, sales, property or similar Taxes arising from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except for (i) any such Taxes that are Other Connection Taxes imposed with respect to an assignment, other than an assignment pursuant to <u>Section 2.19</u> and (ii) any Luxembourg registration duties (*droits d'enregistrement*) payable in the case of voluntary registration of any Loan Document by the Loan Parties with the *Administration de l'Enregistrement des Domaines et*

42

*de la TVA* in Luxembourg, or registration of any Loan Document in Luxembourg when such registration is not reasonably required to enforce the rights of that Loan Party under the Loan Document.

"Participant" has the meaning assigned to such term in Section 9.04(c)(i).

"Participant Register" has the meaning assigned to such term in Section 9.04(c)(iii).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"PCMLTF Act" means the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada).

"Perfection Certificate" means a certificate in the form of Exhibit J or any other form approved by the Administrative Agent at the direction of the Required Lenders.

"Permitted Encumbrances" means:

(a)     Liens for Taxes (i) that are not overdue for a period of more than 30 days, (ii) that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, or (iii) for a tax claim for any pre-filing or straddle tax period, the nonpayment of which is permitted or required by the Bankruptcy Code, in each case, the nonpayment of which could not reasonably be expected to result in a Material Adverse Effect;

(b)     Liens imposed by law, such as carriers', warehousemen's, mechanics', materialmen's, repairmen's or construction contractors' Liens and other similar Liens, arising in the ordinary course of business that secure amounts not overdue for a period of more than 30 days or, if more than 30 days overdue, are unfiled and no other action has been taken to enforce such Liens or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, in each case so long as such Liens could not reasonably be expected to individually or in the aggregate have a Material Adverse Effect;

(c)     Liens incurred or deposits made in the ordinary course of business (i) in connection with workers' compensation, unemployment insurance and other social security legislation or (ii) securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees or similar instruments for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any Restricted Subsidiary or otherwise supporting the payment of items of the type set forth in the foregoing clause (i);

(d)     Liens incurred or deposits made to secure the performance of tenders, bids, trade contracts (other than for the payment of Indebtedness), governmental contracts and leases (other than Capital Lease Obligations), statutory obligations, surety, stay, customs

43

and appeal bonds, performance bonds, bankers acceptance facilities and other obligations of a like nature (including those to secure health, safety and environmental obligations) and obligations in respect of letters of credit, bank guarantees or similar instruments that have been posted to support the same, in each case incurred in the ordinary course of business or consistent with past practices;

(e)     easements, rights-of-way, restrictions, encroachments, protrusions, zoning restrictions and other similar encumbrances and minor title defects affecting real property that, in the aggregate, do not in any case materially interfere with the ordinary conduct of the business of the Borrower and the Restricted Subsidiaries, taken as a whole;

(f)     (i) Liens securing, or otherwise arising from, judgments, awards attachments and/or decrees and notices of *lis pendens* and associated rights relating to litigation being contested in good faith not constituting an Event of Default under Section 7.01(j) and (ii) any pledge and/or deposit securing any settlement of litigation;

(g)     Liens on goods the purchase price of which is financed by a documentary letter of credit issued for the account of the Borrower or any of the Restricted Subsidiaries or Liens on bills of lading, drafts or other documents of title arising by operation of law or pursuant to the standard terms of agreements relating to letters of credit, bank guarantees and other similar instruments; provided that such Lien secures only the obligations of the Borrower or such Restricted Subsidiaries in respect of such letter of credit, bank guarantee or other similar instrument to the extent such obligations are permitted by Section 6.01;

(h)     rights of setoff, banker's lien, netting agreements and other Liens arising by operation of law or by of the terms of documents of banks or other financial institutions in relation to the maintenance of administration of deposit accounts, securities accounts or cash management arrangements or in connection with the issuance of letters of credit, bank guarantees or other similar instruments;

(i)     Liens arising from precautionary Uniform Commercial Code financing statements or any similar filings made in respect of operating leases or consignment or bailee arrangements entered into by the Borrower or any of the Restricted Subsidiaries;

(j)     Liens or right of set-off arising under the general banking conditions (*algemene bankvoorwaarden*) or any non-Dutch equivalent thereof;

(k)     any Lien deemed to be granted under section 12(3) of the Australian PPSA which does not secure payment or performance of an obligation; and

(l)     any Lien deemed to be granted under section 17(1)(b) of the NZ PPSA which does not secure payment or performance of an obligation.

"Permitted Investments" means any of the following, to the extent owned by the Borrower or any Restricted Subsidiary:

(a)     Dollars, Euros, Sterling, Australian Dollars, Canadian dollars and such other currencies held by it from time to time in the ordinary course of business;

(b)      readily marketable obligations issued or directly and fully guaranteed or insured by the government or any agency or instrumentality of (i) the United States or (ii) any member nation of the European Union rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, having average maturities of not more than 24 months from the date of acquisition thereof; provided that the full faith and credit of the United States or such member nation of the European Union is pledged in support thereof;

(c)      time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) is a Lender or (ii) has combined capital and surplus of at least (x) $250,000,000 in the case of U.S. banks and (y) $100,000,000 (or the Dollar Equivalent as of the date of determination) in the case of non-U.S. banks (any such bank meeting the requirements of clause (i) or (ii) above being an "Approved Bank"), in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(d)      commercial paper and variable or fixed rate notes issued by an Approved Bank (or by the parent company thereof) or any variable or fixed rate note issued by, or guaranteed by, a corporation rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, in each case with average maturities of not more than 24 months from the date of acquisition thereof;

(e)      repurchase agreements entered into by any Person with an Approved Bank, a bank or trust company (including any of the Lenders) or recognized securities dealer, in each case, having capital and surplus in excess of (x) $250,000,000 in the case of U.S. banks and (y) $100,000,000 (or the Dollar Equivalent as of the date of determination) in the case of non-U.S. banks, in each case, for direct obligations issued by or fully guaranteed or insured by the government or any agency or instrumentality of (i) the United States or (ii) any member nation of the European Union rated A (or the equivalent thereof) or better by S&P and A2 (or the equivalent thereof) or better by Moody's, in which such Person shall have a perfected first priority security interest (subject to no other Liens) and having, on the date of purchase thereof, a Fair Market Value of at least 100% of the amount of the repurchase obligations;

(f)      marketable short-term money market and similar highly liquid funds either (i) having assets in excess of (x) $250,000,000 in the case of U.S. banks or other U.S. financial institutions and (y) $100,000,000 (or the Dollar Equivalent as of the date of determination) in the case of non-U.S. banks or other non-U.S. financial institutions or (ii) having a rating of at least A-2 or P-2 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized rating service);

(g)      securities with average maturities of 24 months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, or by any political subdivision or taxing authority of any such state, commonwealth or territory or by a foreign government having an investment grade rating from either S&P or Moody's (or the equivalent thereof);

(h)     investments with average maturities of 12 months or less from the date of acquisition in mutual funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's;

(i)     instruments equivalent to those referred to in clauses (a) through (h) above denominated in Euros or any other foreign currency comparable in credit quality and tenor to those referred to above and customarily used by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by any Subsidiary organized in such jurisdiction;

(j)     investments, classified in accordance with GAAP as current assets, in money market investment programs that are registered under the Investment Company Act of 1940 or that are administered by financial institutions having capital of at least $250,000,000, and, in either case, the portfolios of which are limited such that substantially all of such investments are of the character, quality and maturity described in clauses (a) through (i) of this definition;

(k)     with respect to any Foreign Subsidiary: (i) obligations of the national government of the country or jurisdiction in which such Foreign Subsidiary maintains its chief executive office and principal place of business; provided such country or jurisdiction is a member of the Organization for Economic Cooperation and Development, in each case maturing within one year after the date of investment therein, (ii) certificates of deposit of, bankers acceptances of, or time deposits with, any commercial bank which is organized and existing under the laws of the country in which such Foreign Subsidiary maintains its chief executive office and principal place of business; provided such country or jurisdiction is a member of the Organization for Economic Cooperation and Development, and whose short-term commercial paper rating from S&P is at least "A-2" or the equivalent thereof or from Moody's is at least "P-2" or the equivalent thereof (any such bank being an "Approved Foreign Bank"), and in each case with maturities of not more than 24 months from the date of acquisition and (iii) the equivalent of demand deposit accounts which are maintained with an Approved Foreign Bank;

(l)     interest bearing instruments with a maximum maturity of 180 days in respect of which the obligor is a G8 government or other G8 governmental agency or a G8 financial institution with credit ratings from S&P of at least "A-2" or the equivalent thereof or from Moody's of at least "P-2" or the equivalent thereof; and

(m)     investment funds investing at least 90% of their assets in securities of the types described in clauses (a) through (l) above.

"Permitted Priority Liens" means "Prepetition Permitted Prior Liens" as defined in the Orders.

"Permitted Refinancing" means, with respect to any Person, any modification, refinancing, refunding, renewal or extension of any Indebtedness of such Person; provided that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed or extended

except (i) by an amount equal to unpaid accrued interest and premium (including tender premiums) thereon plus underwriting discounts, other amounts paid, and fees, commissions and expenses (including upfront fees, original issue discount or initial yield payments) incurred, in connection with such modification, refinancing, refunding, renewal or extension and (ii) by an amount equal to any existing revolving commitments unutilized thereunder to the extent that the portion of any existing and unutilized revolving commitment being refinanced was permitted to be drawn under Section 6.01 immediately prior to such refinancing (other than by reference to a Permitted Refinancing) and such drawing shall be deemed to have been made, (b) Indebtedness resulting from such modification, refinancing, refunding, renewal or extension, has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed or extended, (c) if the Indebtedness being modified, refinanced, refunded, renewed or extended is subordinated in right of payment to the Loan Document Obligations, Indebtedness resulting from such modification, refinancing, refunding, renewal or extension is subordinated in right of payment to the Loan Document Obligations on terms at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed or extended, (d) [reserved] and (e) immediately after giving effect thereto, no Event of Default shall have occurred and be continuing. For the avoidance of doubt, it is understood and agreed that a Permitted Refinancing includes successive Permitted Refinancings of the same Indebtedness.

"Permitted Transferees" means, with respect to any Person that is a natural person (and any Permitted Transferee of such Person), (a) such Person's immediate family, including his or her spouse, ex-spouse, children, step-children and their respective lineal descendants, (b) any trust or other legal entity the beneficiary of which is such Person's immediate family, including his or her spouse, ex-spouse, children, stepchildren or their respective lineal descendants and (c) without duplication with any of the foregoing, such Person's heirs, executors and/or administrators upon the death of such Person and any other Person who was an Affiliate of such Person upon the death of such Person and who, upon such death, directly or indirectly owned Equity Interests in the Borrower.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, Governmental Authority or other entity.

"Petition Date" has the meaning assigned to such term in the Recitals herein.

"Plan" means any "employee pension benefit plan" as defined in Section 3(2) of ERISA (other than a Multiemployer Plan) which is subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which a Loan Party or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Plan Effective Date" means the effective date of the Acceptable Plan, pursuant to which substantial consummation (as defined in section 1101 of the Bankruptcy Code) of the Acceptable Plan shall have occurred.

"Platform" has the meaning assigned to such term in Section 5.01.

"PPSA" means the *Personal Property Security Act* (Ontario) including the regulations thereto, provided that if perfection or the effect of perfection or non-perfection or the priority of any Lien created hereunder or under any other Loan Document on the Collateral is governed by the personal property security legislation or other applicable legislation with respect to personal property security in effect in a jurisdiction in Canada other than the Province of Ontario, "PPSA" means the Personal Property Security Act or such other applicable legislation (including the Civil Code of Quebec) in effect from time to time in such other jurisdiction in Canada for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"Prepetition 2024 Notes" means collectively, (i) the Borrower's 5.00% Convertible Senior Exchange Notes due 2024 and (ii) the Borrower's 5.00% Series II Convertible Senior Exchange Notes due 2024, in each case, as amended, restated, supplemented or otherwise modified from time to time, and, in each case, in the amount outstanding on the Petition Date.

"Prepetition 2026 Notes" means the Borrower's 4.25% Convertible Senior Notes due 2026 (as amended, restated, supplemented or otherwise modified from time to time) in the amount outstanding on the Petition Date.

"Prepetition Existing Unsecured Notes" means the Prepetition 2024 Notes and the Prepetition 2026 Notes.

"Prepetition Indebtedness" means the Prepetition Secured Indebtedness and the Prepetition Existing Unsecured Notes.

"Prepetition Payment" means a payment on account of any Indebtedness of any Debtor (including pursuant to any Guarantee thereof by the Borrower or any Restricted Subsidiary) incurred prior to the Petition Date.

"Prepetition Secured Documents" means, collectively, the Prepetition Term Loan Agreement and the Prepetition Senior Secured Convertible Notes.

"Prepetition Secured Indebtedness" means collectively the Indebtedness under the Prepetition Secured Documents.

"Prepetition Secured Parties" means the "Secured Parties" under and as defined in the Prepetition Secured Documents.

"Prepetition Senior Secured Convertible Notes" means, collectively, the Borrower's 5.68% Convertible Senior Secured Notes due 2026, Tranche I, and 5.68% Convertible Senior Secured Notes due 2026, Tranche II, issued pursuant to the applicable Prepetition Senior Secured Convertible Notes Indenture and outstanding on the Petition Date.

"Prepetition Senior Secured Convertible Notes Agent" means GLAS Trust Corporation Limited, as collateral agent in respect of the Prepetition Senior Secured Convertible Notes.

"Prepetition Senior Secured Convertible Notes Indentures" means, collectively, the indentures, each dated as of July 26, 2022, among the Borrower, as issuer, the guarantors listed therein, the Prepetition Senior Secured Convertible Notes Agent and the trustee referred to therein pursuant to which the Prepetition Senior Secured Convertible Notes are issued, as such indentures may be amended or supplemented from time to time.

"Prepetition Term Lender" means a lender under the Prepetition Term Loan Agreement.

"Prepetition Term Loan Agreement" means that certain Credit Agreement dated as of July 26, 2022 (as amended by that certain Amendment No. 1 dated as of October 3, 2022, that certain Amendment Agreement dated as of December 23, 2022 and that certain Amendment No. 3 dated as of the Effective Date, and as further amended, restated amended and restated, supplemented or otherwise modified prior to the date hereof) by and among the Borrower, the lenders party thereto, the Prepetition Term Loan Agreement Administrative Agent and the Prepetition Term Loan Agreement Collateral Agent.

"Prepetition Term Loan Agreement Administrative Agent" means the "Administrative Agent" as defined in the Prepetition Term Loan Agreement.

"Prepetition Term Loan Agreement Collateral Agent" means the "Collateral Agent" as defined in the Prepetition Term Loan Agreement.

"Prepetition Term Loans" means term loans under the Prepetition Term Loan Agreement.

"Proposed Change" has the meaning assigned to such term in Section 9.02(c).

"Public Lender" has the meaning assigned to such term in Section 5.01.

"Qualified Equity Interests" means Equity Interests other than Disqualified Equity Interests.

"Real Estate" means all Leases and all land, together with the buildings, structures, parking areas, and other improvements thereon, now or hereafter owned by any Loan Party, including all easements, rights-of-way, and similar rights relating thereto and all leases, tenancies, and occupancies thereof.

"Register" has the meaning assigned to such term in Section 9.04(b)(iv).

"Regulation" has the meaning assigned to such term in Section 3.22(b).

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the partners, directors, officers, employees, trustees, agents, controlling persons, advisors, servicers, financing sources and other representatives of such Person and of each of such Person's Affiliates and permitted successors and assigns.

"Release" means any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into the environment (including ambient air,

surface water, groundwater, land surface or subsurface strata) and including the environment within any building or other structure.

"Representative" has the meaning assigned to such term in Section 9.12.

"Required Accounts" means, (A) all deposit accounts or securities accounts of the Domestic Loan Parties and the Canadian Loan Parties, other than (i) accounts having a de minimis balance and (ii) accounts that are zero balance accounts; provided that the aggregate balance in all accounts excluded by de minimis threshold set forth in clause (i) shall not exceed $50,000 at any time and (B) all deposit accounts and securities accounts that are subject to control agreements in favor of the DIP ABL Agent.  Notwithstanding the foregoing, accounts used solely for payroll or benefits related disbursements or in which trust or the Insurance Subsidiary funds are maintained shall not constitute "Required Accounts".  Notwithstanding the foregoing, and for the avoidance of doubt, the DIP Term Loan Proceeds Account shall constitute a "Required Account".

"Required Additional Debt Terms" means, with respect to any Indebtedness, (a) such Indebtedness does not mature earlier than 180 days after the Stated Maturity Date or have a Weighted Average Life to Maturity less than the greatest Weighted Average Life to Maturity of the then-existing Loans outstanding at the time of incurrence of such Indebtedness, (b) such Indebtedness does not have mandatory prepayment or redemption provisions (other than customary asset sale proceeds events, insurance and condemnation proceeds events, change of control offers or events of default) that could result in the prepayment or redemption of such Indebtedness prior to the Stated Maturity Date, (c) such Indebtedness is not guaranteed by any entity that is not a Loan Party, (d) such Indebtedness that is secured (i) is not secured by any assets not securing the Secured Obligations, (ii) is secured on a junior basis to the Liens securing the Secured Obligations and is subject to the relevant Intercreditor Agreement(s) and (iii) is subject to security agreements relating to such Indebtedness that are substantially the same as the Security Documents (with such differences as are reasonably satisfactory to the Required Lenders), (e) with respect to any Indebtedness incurred pursuant to Section 6.01(a)(xii), such Indebtedness does not have provisions requiring the payment of amortization prior to the Stated Maturity Date and (f) the terms and conditions of such Indebtedness (excluding pricing, interest rate margins, rate floors, discounts, fees, premiums and, subject to clauses (a) and (b) above, prepayment or redemption provisions, are not materially more favorable (when taken as a whole) to the lenders or investors providing such Indebtedness than the terms and conditions of this Agreement (when taken as a whole) are to the Lenders (except for covenants or other provisions applicable only to periods after the Stated Maturity Date at such time) (it being understood that, to the extent that any financial maintenance covenant is added for the benefit of any such Indebtedness, no consent shall be required by the Administrative Agent or any of the Lenders if such financial maintenance covenant is either (i) also added for the benefit of any Loans remaining outstanding after the issuance or incurrence of any such Indebtedness in connection therewith or (ii) only applicable after the Stated Maturity Date at such time); provided that a certificate of a Responsible Officer of the Borrower delivered to the Administrative Agent at least five Business Days prior to the incurrence of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the foregoing requirement, shall be conclusive evidence that such terms and conditions satisfy the foregoing requirement unless the Administrative Agent, acting at the direction of the Required Lenders, notifies the Borrower within

such five Business Day period that it disagrees with such determination (including a reasonable description of the basis upon which it disagrees).

"Required Lenders" means, at any time, Lenders holding Loans and Commitments representing more than 50.0% of the sum of (i) the aggregate outstanding Loans at such time and (ii) the Commitments then in effect.

"Requirements of Law" means, with respect to any Person, any statutes, laws, treaties, rules, regulations, orders, decrees, writs, injunctions or determinations of any arbitrator or court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Resignation Effective Date" has the meaning assigned to such term in Article VIII.

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer" means the chief executive officer, president, vice president, chief financial officer, secretary, treasurer or assistant treasurer, in relation to a German Loan Party, managing director (*Geschäftsführer*) or other similar officer, manager or a director of a Loan Party and with respect to certain limited liability companies or partnerships that do not have officers, any manager, sole member, managing member or general partner thereof. Any document delivered hereunder that is signed by one or more Responsible Officers of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Debt Payment" has the meaning assigned to such term in Section 6.08(b).

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Borrower or any Restricted Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interests in the Borrower or any Restricted Subsidiary or any option, warrant or other right to acquire any such Equity Interests, including, for the avoidance of doubt, any payments made to settle or otherwise redeem any convertible indebtedness that are in excess of the principal amount thereof.

"Restricted Subsidiary" means any Subsidiary.

"Restructuring Support Agreement" means that certain Restructuring Support Agreement, dated as of January 31, 2023, by and among the Borrower, the other Company Parties party thereto and the "Consenting Stakeholders" party thereto, including the exhibits, schedules and other attachments thereto (as amended, supplemented or otherwise modified from time to time in accordance with its terms).

"Roll-Up Lenders" has the meaning set forth in Section 2.01(b).

"Roll-Up Loans" means the roll-up loans deemed made on the Effective Date and on the date of the Subsequent Borrowing pursuant to Section 2.01(b)(i)(B).

"S&P" means Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business, and any successor to its rating agency business.

"Sale Toggle Event" has the meaning assigned to such term in the Restructuring Support Agreement.

"Sanctions" means economic sanctions administered or enforced by the United States Government (including without limitation, sanctions enforced by OFAC and the Department of State), the United Nations Security Council, the European Union, Foreign Affairs, Trade and Development Canada, Public Safety Canada, or His Majesty's Treasury of the United Kingdom.

"SEC" means the Securities and Exchange Commission or any Governmental Authority succeeding to any of its principal functions.

"Secured Obligations" means the Loan Document Obligations.

"Secured Parties" means (a) each Lender, (b) the Administrative Agent, (c) the Collateral Agent, (d) each other Agent, (e) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document owed to a Lender or any of its Affiliates or an Agent Related Person of an Agent or any of its Affiliates and (f) the successors and permitted assigns of each of the foregoing.

"Securities Act" means the Securities Act of 1933, as amended.

"Security Documents" means each of the Collateral Agreements, the Mortgages (if any), the Control Agreements, the Foreign Loan Documents and each other security agreement or pledge agreement, including any intellectual property security agreement executed and delivered pursuant to the Collateral and Guarantee Requirement to secure any of the Secured Obligations.

"Significant Subsidiary" means any Restricted Subsidiary that, or any group of Restricted Subsidiaries that, taken together, as of the last day of the fiscal quarter of the Borrower most recently ended for which financial statements are available, had revenues or total assets (determined on a consolidated basis for such Restricted Subsidiary and its Restricted Subsidiaries or such group of Restricted Subsidiaries and their respective Restricted Subsidiaries, as applicable) for such quarter in excess of 5.0% of the consolidated revenues or total assets, as applicable, of the Borrower and the Restricted Subsidiaries for such quarter, provided, that each Restricted Subsidiary that is a Debtor shall constitute a "Significant Subsidiary".

"Specified Jurisdictions" means England and Wales, Canada (including any province and territory thereof), Luxembourg, the Netherlands, Germany, Switzerland, France, Norway, Denmark, Australia and New Zealand.

"SPV" has the meaning assigned to such term in Section 9.04(f).

"Stated Maturity Date" means [June 2], 2023; provided, however, that if such date is not a Business Day, the Stated Maturity Date shall be the immediately preceding Business Day.

"Sterling" means the lawful currency of the United Kingdom from time to time.

"Subordinated Indebtedness" means any Junior Financing under clause (a) of the definition thereof.

"Subsequent Borrowing" shall have the meaning assigned to such term in Section 2.01(a).

"subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which Equity Interests representing more than 50.0% of the equity or more than 50.0% of the ordinary voting power or, in the case of a partnership, more than 50.0% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" means any subsidiary of the Borrower.

"Subsidiary Loan Party" means (a) each Subsidiary that is a party to the Domestic Guarantee Agreement, (b) each Subsidiary that is party to the Foreign Guarantee Agreement and (c) any other Subsidiary of the Borrower that may be designated by the Borrower (subject to the requirements of the Agreed Security Principles in the case of a Foreign Subsidiary) by way of delivering to the Collateral Agent a supplement to the U.S. Collateral Agreement and a supplement to the Domestic Guarantee Agreement or the Foreign Guarantee Agreement, as applicable, in each case, duly executed by such Subsidiary) in its sole discretion from time to time to be a guarantor in respect of the Secured Obligations, whereupon such Subsidiary shall be obligated to comply with the other requirements of Section 5.11 as if it were newly acquired; provided, in the case of this clause (c), that, in the case of a Foreign Subsidiary, the jurisdiction of incorporation, organization or formation of such Foreign Subsidiary shall be reasonably acceptable to the Required Lenders (it being acknowledged and agreed that the Specified Jurisdictions are reasonably acceptable).

"Superpriority Claim" or "Superpriority Claims" shall mean superpriority administrative expense claims against the Loan Parties on a joint and several basis with priority over any and all claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, or specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113 or 1114 of the Bankruptcy Code.

"Swap" means any agreement, contract, or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Swap Agreement" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swiss Collateral Agreements" means the following agreements: (i) Swiss law second ranking bank account pledge granted by INVACARE AG in favor of the Collateral Agent, (ii) Swiss law second ranking bank account pledge granted by Alber GmbH in favor of the Collateral Agent, (iii) Swiss law second ranking bank account pledge granted by Invacare International GmbH in favor of the Collateral Agent, (iv) Swiss law second ranking share pledge by Invacare Holdings Two B.V. over all shares held by it in INVACARE AG in favor of the Collateral Agent, (v) Swiss law second ranking quota pledge granted by INVACARE AG over all quotas held by it in Alber GmbH in favor of the Collateral Agent and (vi) Swiss law second ranking quota pledge granted by Invacare Holdings Two B.V. over all quotas held by it in Invacare International GmbH in favor of the Collateral Agent.

"Swiss Collateral Documents" means each of the Swiss Collateral Agreements, and each other security agreement, pledge, mortgage, lien or other instrument or document, as applicable, governed by Swiss law in connection with this Agreement and the Agreed Security Principles to secure the applicable Secured Obligations.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges, fees, assessments or withholdings (including backup withholdings) imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Date" means the earliest to occur of (i) the Stated Maturity Date, (ii) the date on which the Loan Document Obligations become due and payable pursuant to Section 7.01, (iii) the effective date of any chapter 11 plan for the Borrower or any other Debtor, (iv) the date on which all or substantially all assets of the Borrower are sold or otherwise disposed of pursuant to Section 363 of the Bankruptcy Code, and (v) the date that is thirty calendar days after the Petition Date (or such later date acceptable to the Required Lenders in their sole discretion) if the Final Order has not been entered prior to the expiration of such period.

"Transactions" means, with respect to (a) the Borrower, the execution, delivery and performance by the Borrower of this Agreement, and each other Loan Document to which it is a party, the borrowing of New Money Loans, the deemed borrowing of the Roll-Up Loans, the use of the proceeds thereof, and the granting of Liens by the Borrower on Collateral pursuant to the

Security Document and the Orders, as applicable, (b) each Guarantor, the execution, delivery and performance by such Guarantor of each Loan Document to which it is a party, the guaranteeing of the Indebtedness and the other obligations under the Domestic Superpriority Guarantee Agreement or the Foreign Superpriority Guarantee Agreement, by such Guarantor, and the granting of Liens by such Guarantor on Collateral pursuant to the Security Documents and the Orders, as applicable (for the avoidance of doubt, excluding Excluded Assets) and (c) the other transactions contemplated by the Restructuring Support Agreement.

"Type," when used in reference to any Loan or Borrowing, refers to whether such Loan, or on the Loans comprising such Borrowing, is a New Money Loan or a Roll-Up Loan.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that, at any time, if by reason of mandatory provisions of law, any or all of the perfection or priority of the Collateral Agent's security interest in any item or portion of the Collateral is governed by the Uniform Commercial Code as in effect in a U.S. jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"U.S. Tax Compliance Certificate" has the meaning assigned to such term in Section 2.17(e).

"USA Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended from time to time.

"Variance Report" means a variance report prepared by a Responsible Officer of the Borrower, comparing the actual results for each applicable Variance Reporting Period against anticipated results under (i) the applicable Budget, on a line item basis and in the same level of detail as set forth in the Initial Budget, and (ii) the applicable EMEA Report, on a line item basis and in the same level of detail as set forth in the Initial EMEA Report, in each case in form otherwise acceptable to the Required Lenders in their sole discretion.

"Variance Reporting Period" means (i) for the first Variance Report, the two (2) week calendar period ending on the Sunday immediately preceding the delivery of the first Variance Report, (ii) for the second Variance Report, the three (3) week calendar period ending on the Sunday immediately preceding the delivery of the second Variance Report and (iii) for the third

Variance Report and each Variance Report thereafter, the four (4) week calendar period ending on the Sunday immediately preceding the delivery of the applicable Variance Report.

"<u>Variance Testing Period</u>" means (i) for the first Variance Report, the two (2) week calendar period ending on the Sunday immediately preceding the delivery of the first Variance Report, (ii) for the second Variance Report, the three (3) week calendar period ending on the Sunday immediately preceding the delivery of the second Variance Report and (iii) for the third Variance Report and each Variance Report thereafter, the four (4) week calendar period ending on the Sunday immediately preceding the delivery of the applicable Variance Report.

"<u>Vehicles</u>" means all railcars, cars, trucks, trailers, construction and earth moving equipment and other vehicles covered by a certificate of title law of any state and all tires and other appurtenances to any of the foregoing.

"<u>Vendor Financing Program</u>" means the sale of customer accounts receivables in the ordinary course of business by (i) Subsidiaries of the Borrower incorporated in Denmark, Sweden and/or Norway to Nordea Finans Danmark A/S pursuant to the agreements on purchase of receivables each dated May 12, 2021 and any amendments, extensions, renewals or replacements thereof and (ii) the Borrower or any of its Subsidiaries to De Lage Landen Financial Services, Inc under the program in existence on the Effective Date and any amendments, extensions, renewals or replacements thereof (the, "<u>De Lage Program</u>").

"<u>Voting Stock</u>" means, with respect to any Person, such Person's Equity Interests having the right to vote for the election of directors of such Person under ordinary circumstances.

"<u>Weighted Average Life to Maturity</u>" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

"<u>wholly-owned subsidiary</u>" means, with respect to any Person at any date, a subsidiary of such Person of which securities or other ownership interests representing 100% of the Equity Interests (other than (a) directors' qualifying shares and (b) nominal shares issued to foreign nationals to the extent required by applicable Requirements of Law) are, as of such date, owned, controlled or held by such Person or one or more wholly-owned subsidiaries of such Person or by such Person and one or more wholly-owned subsidiaries of such Person.

"<u>Withdrawal Date</u>" has the meaning set forth in <u>Section 2.04(a)(ii)</u>.

"<u>Withdrawal Liability</u>" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"<u>Withholding Agent</u>" means any Loan Party, the Administrative Agent and, in the case of any U.S. federal withholding tax, any other withholding agent, if applicable.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom,  any powers of the applicable Resolution Authority  under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution  or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

"WURA" means the *Winding-Up and Restructuring Act* (Canada).

Section 1.02.   Classification of Loans and Borrowings. For purposes of this Agreement, Loans and Borrowing may be classified by and referred to by Type (e.g., a "New Money Loan" or a "Roll-Up Loan").

Section 1.03.   Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (a) any definition of or reference to any agreement (including this Agreement and the other Loan Documents), instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. Any references to "as of the date hereof" or similar terms or references shall be deemed to refer to the Effective Date.

Section 1.04.   Accounting Terms; GAAP.

(a)         All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein.

(b)         [Reserved].

(c)         [Reserved].

(d)         In the event that the Borrower elects to prepare its financial statements in accordance with IFRS and such election results in a change in the method of calculation of financial covenants, standards or terms (collectively, the "Accounting Changes") in this Agreement, the Borrower and the Administrative Agent, acting at the direction of the Required Lenders, agree to enter into good faith negotiations in order to amend such provisions of this Agreement so as to reflect equitably the Accounting Changes with the desired result that the criteria for evaluating the Borrower's financial condition shall be substantially the same after such change as if such change had not been made. Until such time as such an amendment shall have been executed and delivered by the Borrower, the Administrative Agent and the Required Lenders, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed in accordance with GAAP (as determined in good faith by a Responsible Officer of the Borrower) (it being agreed that the reconciliation between GAAP and IFRS used in such determination shall be made available to Lenders) as if such change had not occurred.

(e)         Notwithstanding any other provision contained herein, for purposes of determining compliance with any provision of this Agreement and any related definitions, the determination of whether a lease is to be treated as an operating lease or capital lease shall be made without giving effect to any change in GAAP that becomes effective on or after November 30, 2016 that would require operating leases to be treated similarly to capital leases.

Section 1.05.   Currency Translation.

(a)         For purposes of any determination under Article V, Article VI or Article VII or any determination under any other provision of this Agreement expressly requiring the use of a current exchange rate, all amounts incurred, outstanding or proposed to be incurred or outstanding in currencies other than Dollars shall be translated into Dollars at the Exchange Rate (rounded to the nearest currency unit, with 0.5 or more of a currency unit being rounded upward); provided, however, that for purposes of determining compliance with Article VI with respect to the amount of any Indebtedness, Investment, Disposition or Restricted Payment in a currency other than Dollars, no Default or Event of Default shall be deemed to have occurred solely as a result of changes in rates of exchange occurring after the time such Indebtedness or Investment is incurred or Disposition or Restricted Payment made; provided further that, for the avoidance of doubt, the foregoing provisions of this Section 1.05 shall otherwise apply to such Sections, including with respect to determining whether any Indebtedness or Investment may be incurred or Disposition or Restricted Payment made at any time under such Sections. Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent, acting at the direction of the Required Lenders, may from time to time specify with the Borrower's consent (such consent not to be unreasonably withheld) to appropriately reflect a change in currency of any country and any relevant market conventions or practices relating to such change in currency.

Section 1.06.   Timing of Payment of Performance. When payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or required on a day which is not a Business Day, the date of such payment or performance shall extend to the immediately

succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.

Section 1.07.   <u>Cashless Rollovers</u>. Notwithstanding anything to the contrary contained in this Agreement or in any other Loan Document, to the extent that any Lender extends the maturity date of, or replaces, renews or refinances, any of its then-existing Loans with loans that refinance in full or fully replace the Loans or loans incurred under a new credit facility, in each case, to the extent such extension, replacement, renewal or refinancing is effected by means of a "cashless roll" by such Lender, such extension, replacement, renewal or refinancing shall be deemed to comply with any requirement hereunder or any other Loan Document that such payment be made "in Dollars", "in immediately available funds", "in Cash" or any other similar requirement.

Section 1.08.   [Reserved].

Section 1.09.   <u>Rounding</u>. Any financial ratios required to be maintained by the Borrower pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding up for five).

Section 1.10.   <u>Divisions</u>.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

Section 1.11.   [Reserved].

Section 1.12.   [Reserved].

Section 1.13.   <u>Quebec Matters</u>. For purposes of any assets, liabilities or entities located in the Province of Québec and for all other purposes pursuant to which the interpretation or construction of this Agreement may be subject to the laws of the Province of Québec or a court or tribunal exercising juris diction in the Province of Québec, (a) "personal property" shall include "movable property", (b) "real property" or "real estate" shall include "immovable property", (c) "tangible property" shall include "corporeal property", (d) "intangible property" shall include "incorporeal property", (e) "security interest", "mortgage" and "lien" shall include a "hypothec", "right of retention", "prior claim" , "reservation of ownership" and a resolutory clause, (f) all references to filing, perfection, priority, remedies, registering or recording under the UCC or a PPSA shall include publication under the *Civil Code of Québec,* (g) all references to "perfection" of or "perfected" liens or security interest shall include a reference to an "opposable" or "set up" hypothec as against third parties, (h) any "right of offset", "right of setoff" or similar expression shall include a "right of compensation", (i) "goods" shall include "corporeal movable property" other than chattel paper, documents of title, instruments, money and securities, (j) an "agent" shall

include a "mandatary", (k) "construction liens" or "mechanics, materialmen, repairmen, construction contractors or other like Liens" shall include "legal hypothecs" and "legal hypothecs in favour of persons having taken part in the construction or renovation of an immovable", (l) "joint and several" shall include "solidary", (m) "gross negligence or wilful misconduct" shall be deemed to be "intentional or gross fault", (n) "beneficial ownership" shall include "ownership on behalf of another as mandatary", (o) "easement" shall include "servitude", (p) "priority" shall include "rank" or "prior claim", as applicable (q) "survey" shall include "certificate of location and plan", (r) "state" shall include "province", (s) "fee simple title" shall include "absolute ownership" and "ownership" (including ownership under a right of superficies), (t) "accounts" shall include "claims", (u) "legal title" shall be including "holding title on behalf of an owner as mandatory or prete-nom", (v) "ground lease" shall include "emphyteusis" or a "lease with a right of superficies, as applicable, (w) "leasehold interest" shall include a "valid lease", (x) "lease" shall include a "leasing contract" and (y) "guarantee" and "guarantor" shall include "suretyship" and "surety", respectively.

Section 1.14.   <u>French terms</u>. In this Agreement, where it relates to a French entity and unless the contrary intention appears, a reference to: (a) an "administrator" or a "similar officer" includes an *administrateur judiciaire*, a *mandataire ad hoc*, a *conciliateur*, a *mandataire liquidateur* or any other person appointed as a result of any proceedings under articles L. 611-3 to L. 611-16 of the French Commercial Code; (b) a "winding-up", "dissolution", "administration", or "amalgamation" includes (without limitation) a *redressement judiciaire*, *cession totale ou partielle de l'entreprise*, *liquidation judiciaire* or a *procédure de sauvegarde* under Livre Sixième of the French Commercial Code; (c) "any analogous procedure or step" or "legal proceedings or other procedures" shall include, without limitation: (i) proceedings for the appointment of a *mandataire ad hoc* for a *conciliation* in accordance with Articles L.611-3 to L.611-16 of the French Commercial Code, and (ii) the entry of a judgment for *sauvegarde, redressement judiciaire, cession totale de l'entrepris, liquidation judiciaire* or *cession totale de l'entreprise* under Articles L.620-1 to L.670-8 of the French Commercial Code; (d) a person being unable to pay its debts is that person being in a state of *cessation des paiements* within the meaning of the French Commercial Code; (e) "control" has the meaning given in article L.233-3 I and II of the French Commercial Code; (f) "gross negligence" means "*faute lourde*"; (g) "merger" includes any fusion implemented in accordance with articles L.236-1 to L.236-24 of the French Commercial Code; (h) a "guarantee" includes, as regards French law, any "*cautionnement*", "*aval*", any "*garantie*" which is independent from the debt to which it relates and any type of "*sûreté personnelle*"; (i) a "security interest" includes any type of security (*sûreté réelle*) and transfer by way of security and fiducie sûreté; (j) "wilful misconduct" means "*dol*"; (k) the "French Civil Code" means the *Code Civil*; (l) the "French Commercial Code" means the *Code de commerce*.

Section 1.15.   <u>Luxembourg terms</u>.

Luxembourg legal concepts expressed in English terms in this Agreement may not correspond to the original French or German terms relating thereto.

In this Agreement, where it relates to a Luxembourg Loan Party, a reference to:

(a) a winding up, dissolution, administration or moratorium includes:

60

(i)  bankruptcy (*faillite déclarée*);

(ii) voluntary or compulsory liquidation (*liquidation volontaire* or *liquidation judiciaire*)

(iii) controlled management (*gestion contrôlée*);

(iv) reprieve from payment (*sursis de paiement*) or a composition with creditors (*concordat préventif de faillite*)

(b) a trustee,  an administrator, a receiver or a similar office  includes *a commissaire*, *juge-commissaire*, *mandataire ad hoc*, *administrateur provisoire*, *liquidateur*, *curateur* or a *juge délégué*;

(c) guarantee includes any *garantie* which is independent from the debt to which it relates and excludes any suretyship (*cautionnement*) within the meaning of Articles 2011 et seq. of the Luxembourg Civil Code;

(d) a person being unable to pay its debts includes that person being in a state of cessation of payments (*cessation de paiements*) and has lost its creditworthiness (*ebranlement du credit*) ; and

(e) an attachment includes a *saisie*;

(f) by-laws or constitutional documents includes its up-to-date (restated) articles of association (*statuts coordonnés*); and

(g) a director includes a *gérant* or an *administrateur*.

Section 1.16.   <u>Swiss terms</u>. In respect of any Loan Party incorporated in Switzerland, any obligations of, and the use of any enforcement proceeds of security provided by, such Loan Party set out in this Agreement or any other Loan Document shall be limited as set out in Section 6.03 (Swiss Guaranty Limitations) of the Foreign Guarantee Agreement, which shall apply mutatis mutandis.

Section 1.17.   <u>Australian matters</u>.

(a)   Without prejudice to the generality of any provision of this Agreement, in this Agreement where it relates to an Australian Collateral Document, an Australian Loan Party or any of their Subsidiaries incorporated under the laws of Australia or any state or territory thereof, a reference in this Agreement to:

(i)   with respect to any reference to an Affiliate, "Control" has the meaning given to it in section 50AA of the Australian Corporations Act;

(ii)   "Controller", "receiver" or "receiver and manager" has the meaning given to it in section 9 of the Australian Corporations Act;

       (iii)   "Inventory" has the meaning provided in section 10 of the Australian PPSA; and

       (iv)   "Subsidiary" means a subsidiary within the meaning given in Part 1.2 Division 6 of the Australian Corporations Act.

    (b)    The parties agree that the Australian Banking Association Banking Code of Practice published by the Australian Bankers' Association (as amended, revised or amended and restated from time to time) does not apply to the Loan Documents or the transactions under them.

Section 1.18.  <u>Danish terms</u>.

    (a)    The guarantee and indemnity obligations or any third party Collateral of any Danish Loan Party under any Loan Document shall be deemed not to be assumed (and any Collateral created in relation thereto shall be limited) to the extent that the same would otherwise constitute unlawful financial assistance, including (without limitation) within the meaning of §§ 206-212 of the Danish Companies Act (in Danish: *selskabsloven*).

    (b)    Any Guarantor's guarantee and indemnity obligations in relation to obligations not incurred as a result of direct or indirect borrowings under any Loan Document by such Guarantor or by a direct or indirect Subsidiary of such Guarantor shall further be limited to an amount equal to the equity (in Danish: *egenkapital*) of such Guarantor at the date when a claim is made against such Guarantor calculated in accordance with IFRS, however, adjusted to the extent market values deviate from book values.

    (c)    The limitations in <u>Section 1.18(a)</u> and <u>Section 1.18(b)</u> shall apply to any security by guarantee, indemnity, joint and several liability, collateral or otherwise and to subordination of rights and claims, subordination or turn over of rights of recourse, application of proceeds and any other means of direct and indirect financial assistance.

<div align="center">

ARTICLE 2
THE CREDITS

</div>

Section 2.01.  <u>Commitments and Loans</u>.

    (a)    <u>New Money Loans</u>. Subject to the terms and conditions set forth herein and in the Orders, each New Money Lender severally agrees to make the following New Money Loans to the Borrower; provided, however, that the aggregate principal amount of all New Money Loans funded by such New Money Lender shall not exceed such Lender's Commitment:

       (i)   a New Money Loan (an "<u>Initial New Money Loan</u>") to the Borrower in a single Borrowing on the Effective Date (which shall be a Business Day) in Dollars in an aggregate principal amount not to exceed the Initial Borrowing Amount (such Borrowing, the "<u>Initial Borrowing</u>"); and

       (ii)   a New Money Loan (a "<u>Final New Money Loan</u>") to the Borrower in a single Borrowing on the Final Funding Date (which shall be a Business Day) in Dollars

<div align="center">62</div>

in an aggregate principal amount not to exceed the Final Borrowing Amount (such Borrowing, the "Subsequent Borrowing").

Amounts borrowed under Section 2.01(a) and subsequently repaid or prepaid may not be reborrowed.  Each New Money Lender's Commitment shall (x) automatically and permanently be reduced by the amount of each New Money Loan made hereunder and (y) terminate immediately and without further action on the Termination Date.

(b)          Roll-Up Loans.

(i)          Subject to the terms and conditions set forth herein and in the Orders:

(A)          on the Effective Date and concurrently with the Initial Borrowing, without any further action of any Person, for each Lender that is a Prepetition Term Lender (each, a "Roll-Up Lender" and collectively, the "Roll-Up Lenders"), an aggregate principal amount of Prepetition Term Loans held by such Roll-Up Lender equal to the amount of the Initial New Money Loan made by such Lender (such Prepetition Term Loans, the "Initial Rolled-Up Loans") shall be automatically substituted and exchanged for (which exchange shall not, for the avoidance of doubt, constitute a novation) on a cashless basis, the Roll-Up Loans; and

(B)          on the Final Funding Date and concurrently with the Subsequent Borrowing, without any further action of any Person, for each Roll-Up Lender, an aggregate principal amount of Prepetition Term Loans held by such Roll-Up Lender equal to the amount of Final New Money Loan made by such Lender (such Prepetition Term Loans, the "Final Rolled-Up Loans" and together with the Initial Rolled-Up Loans, the "Rolled-Up Loans"), shall be automatically substituted and exchanged for (which exchange shall not, for the avoidance of doubt, constitute a novation) on a cashless basis, the Roll-Up Loans.

(ii)          Subject to the terms and conditions set forth herein and in the Orders, and without any further action by any party to this Agreement, each Roll-Up Lender's Roll-Up Loans shall be deemed to be Loans, administered hereunder and secured by perfected Liens on, and security interests in, all of the Collateral of the Loan Parties to the same extent as all other obligations of the Loan Parties hereunder, in accordance with Section 2.20

(iii)          For the avoidance of doubt, until such Rolled-Up Loans are deemed to be Roll-Up Loans hereunder and approved by the Orders, such Rolled-Up Loans shall continue to be "Obligations" under the Prepetition Term Loan Agreement and be guaranteed by the guarantors of and secured by and entitled to the benefits of all liens created and arising under the Prepetition Term Loan Agreement, which liens shall remain in full force and effect on a continuous basis, unimpaired, uninterrupted and undischarged, and having the same perfected status and priority.  The Prepetition Term Loans to be exchanged into Roll-Up Loans hereunder shall be selected in the order of the most recent

funding, beginning with the most recently funded Prepetition Term Loans.  The Roll-Up Loans and the New Money Loans shall jointly constitute a single facility hereunder.

Section 2.02.   <u>Loans and Borrowings</u>.

(a)        Each New Money Loan shall be made as part of a Borrowing consisting of New Money Loans made by the New Money Lenders ratably in accordance with their respective Commitments. The failure of any New Money Lender to make any New Money Loan required to be made by it shall not relieve any other New Money Lender of its obligations hereunder; <u>provided</u> that the Commitments of the New Money Lenders are several and no New Money Lender shall be responsible for any other New Money Lender's failure to make New Money Loans as required hereby.

(b)        Each New Money Lender at its option may make any New Money Loan by causing any domestic or foreign branch or Affiliate of such New Money Lender to make such New Money Loan; <u>provided</u> that (i) any exercise of such option shall not affect the obligation of the Borrower to repay such New Money Loan in accordance with the terms of this Agreement, (ii) such New Money Loan shall be deemed to have been made and held by such New Money Lender, and the obligation of the Borrower to repay such New Money Loan shall nevertheless be to such New Money Lender for the account of such domestic or foreign branch or Affiliate of such New Money Lender and (iii) in exercising such option, such New Money Lender shall use reasonable efforts to minimize increased costs to the Borrower resulting therefrom (which obligation of such New Money Lender shall not require it to take, or refrain from taking, actions that it determines would result in increased costs for which it will not be compensated hereunder or that it otherwise determines would be disadvantageous to it and in the event of such request for costs for which compensation is provided under this Agreement); <u>provided</u>, <u>further</u>, that no such domestic or foreign branch or Affiliate of such New Money Lender shall be entitled to any greater indemnification under <u>Section 2.17</u> with respect to such New Money Loan than that to which the applicable New Money Lender was entitled on the date on which such New Money Loan was made (except in connection with any indemnification entitlement arising as a result of any Change in Law after the date on which such New Money Loan was made).

(c)        At the time that each Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum.

(d)        The New Money Loans shall be made available to the Borrower by depositing the proceeds thereof into the DIP Term Loan Proceeds Account.

Section 2.03.   <u>Requests for Borrowings</u>. To request a Borrowing, the Borrower shall notify the Administrative Agent of such request by delivery (by hand delivery, facsimile or other electronic transmission) of a written Borrowing Request signed by the Borrower to the Administrative Agent not later than 11:00 a.m., one Business Day before the date of the proposed Borrowing. Each such Borrowing Request shall be irrevocable upon delivery and shall specify the following information:

(i)        the aggregate amount of such Borrowing;

(ii)             the date of such Borrowing, which shall be the Effective Date or the Final Funding Date;

(iii)            the location and number of the Borrower's account to which funds are to be disbursed, which shall comply with the requirement of Section 2.06, which shall be the DIP Term Loan Proceeds Account; and

(iv)            that, as of the date of such Borrowing, the conditions set forth in Section 4.02(b), (c), (e), (g), (h) and (i) are satisfied.

Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each  New Money Lender of the details thereof and of the amount of such New Money Lender's New Money Loan to be made as part of the requested Borrowing.

Section 2.04.   Withdrawals of Funds from the DIP Term Loan Proceeds Account.

(a)             The Borrower shall have the right to withdraw the funds on deposit in the DIP Term Loan Proceeds Account from time to time at any time on or after the Effective Date (but not more frequently than one time in any week period) by delivering a written notice to the Financial Advisor and the Lenders in substantially the form attached as Exhibit E hereto (each such notice, a "DIP Funding Withdrawal Notice"); provided, that the amount of each such proposed withdrawal shall not exceed the greater of [(x)] [110%] of negative cash flow set forth in the Budget for the calendar week following immediately thereafter [and (y) the amount necessary such that the aggregate amount of unrestricted cash and Cash Equivalents of the Loan Parties and their Subsidiaries (excluding amounts credit to the DIP Term Loan Proceeds Account) will be no less than $[●] million for the calendar week following immediately thereafter. Each DIP Funding Withdrawal Notice shall specify the following information:

(i)             the amount of such withdrawal;

(ii)            the date of such proposed withdrawal (the "Withdrawal Date"); and

(iii)           the account of the Borrower to which the proceeds of such withdrawal are to be disbursed.

(b)             For the avoidance of doubt, (i) all amounts held in the DIP Term Loan Proceeds Account shall constitute proceeds of funded New Money Loans for all purposes hereunder and shall be available to the Borrower as provided by Section 2.04(a), and, notwithstanding that the proceeds of such Loans are held in the DIP Term Loan Proceeds Account, shall bear interest in accordance with this Agreement and shall be subject to all other terms and provisions of this Agreement and the other Loan Documents to the same extent as all other Loans, and (ii) there shall be no conditions precedent to making any withdrawal from the DIP Term Loan Proceeds Account other than as set forth in this Section 2.04.

Section 2.05.   [Reserved].

Section 2.06.   Funding of Borrowings.

(a)          Each New Money Lender shall make each New Money Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds in the applicable currency by 10:00 a.m., New York City time, to the Applicable Account of the Administrative Agent most-recently designated by it for such purpose by notice to the New Money Lenders. The Administrative Agent will make such New Money Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to an account of the Borrower designated by the Borrower in the applicable Borrowing Request.

(b)          Unless the Administrative Agent shall have received notice from a New Money Lender prior to the proposed date of any Borrowing that such New Money Lender will not make available to the Administrative Agent such New Money Lender's share of such Borrowing, the Administrative Agent may assume that such New Money Lender has made such share available on such date in accordance with paragraph (a) of this Section and may, in reliance on such assumption and in its sole discretion (but without obligation), make available to the Borrower a corresponding amount. In such event, if a New Money Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable New Money Lender agrees to pay to the Administrative Agent an amount equal to such share on demand of the Administrative Agent. If such New Money Lender does not pay such corresponding amount forthwith upon demand of the Administrative Agent therefor, the Administrative Agent shall promptly notify the Borrower, and the Borrower agrees to pay such corresponding amount to the Administrative Agent forthwith on demand. The Administrative Agent shall also be entitled to recover from such New Money Lender or the Borrower interest on such corresponding amount, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such New Money Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrower, the interest rate applicable to such Borrowing in accordance with Section 2.13. If such New Money Lender pays such amount to the Administrative Agent, then such amount shall constitute such New Money Lender's Loan included in such Borrowing.

(c)          Obligations of the New Money Lenders hereunder to make New Money Loans and to make payments pursuant to Section 9.03(c) are several and not joint. The failure of any New Money Lender to make any New Money Loan, to fund any such participation or to make any payment under Section 9.03(c) on any date required hereunder shall not relieve any other New Money Lender of its corresponding obligation to do so on such date, and no New Money Lender shall be responsible for the failure of any other New Money Lender to so make its New Money Loan, to purchase its participation or to make its payment under Section 9.03(c).

Section 2.07.  [Reserved].

Section 2.08.  Termination and Reduction of Commitments.  Unless previously terminated, the Commitments shall be reduced by the amount of each New Money Loan made to the Borrower. The Commitments shall terminate on the earlier of (x) the Final Funding Date immediately after giving effect to the Subsequent Borrowing and (y) the Termination Date.

Section 2.09.  Repayment of Loans; Evidence of Debt.

(a)         The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan of such Lender on the Termination Date; provided that any such repayment shall be subject to Section 2.12(d).

(b)         Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)         The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)         The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein, provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to pay any amounts due hereunder in accordance with the terms of this Agreement. In the event of any inconsistency between the entries made pursuant to paragraphs (b) and (c) of this Section, the accounts maintained by the Administrative Agent pursuant to paragraph (c) of this Section shall control.

(e)         Any Lender may request through the Administrative Agent that Loans made by it be evidenced by a promissory note. In such event, the Borrower shall execute and deliver to such Lender a promissory note payable to such Lender or its registered assigns and in a form provided by the Administrative Agent and approved by the Borrower.

Section 2.10.   [Reserved].

Section 2.11.   Prepayment of Loans.

(a)         The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, without premium or penalty.

(b)         [Reserved].

(c)         [Reserved].

(d)         [Reserved].

(e)         Prior to any optional or mandatory prepayment of Borrowings hereunder, the Borrower shall select the Borrowing or Borrowings to be prepaid and shall specify such selection in the notice of such prepayment pursuant to paragraph (f) of this Section substantially in the form of Exhibit P hereto (the "Notice of Prepayment").

(f)         The Borrower shall notify the Administrative Agent of any optional prepayment pursuant to <u>Section 2.11(a)</u> by delivering a Notice of Prepayment to the Administrative Agent not later than 11:00 a.m., New York City time, one Business Day before the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment; <u>provided</u> that a notice of optional prepayment may state that such notice is conditional upon the effectiveness of other credit facilities or the receipt of the proceeds from the issuance of other Indebtedness or the occurrence of some other identifiable refinancing event or condition, in which case such notice of prepayment may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified date of prepayment) if such condition is not satisfied. Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in <u>Section 2.02</u>. Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing. Prepayments shall be accompanied by accrued interest to the extent required by <u>Section 2.13</u>.

(g)         [reserved].

Section 2.12.   <u>Fees</u>.

(a)         The Borrower agrees to pay (i) to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent pursuant to the Administrative Agent Fee Letter and (ii) to the Collateral Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between the Borrower and the Collateral Agent pursuant to the Collateral Agent Fee Letter.

(b)         The Borrower shall pay to the Lenders (i) an upfront fee equal to 2.00% of the aggregate principal amount of the Initial Borrowing of New Money Loans, which fee shall be due and payable on the Effective Date and shall be netted out of the proceeds of the Initial Borrowing, and (ii) an upfront fee equal to 2.00% of the aggregate principal amount of the Subsequent Borrowing of New Money Loans, which fee shall be due and payable on the Final Funding Date, and shall be netted out of the proceeds of the Subsequent Borrowing.

(c)         [reserved].

(d)         All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Administrative Agent. Fees paid hereunder shall not be refundable under any circumstances.

Section 2.13.   <u>Interest</u>.

(a)         The Loans shall bear interest at the Applicable Rate.

(b)         [reserved].

(c)                [reserved].

(d)                Notwithstanding the foregoing, if any Event of Default shall have occurred and be continuing and the Required Lenders have directed the Administrative Agent to apply the Default Rate, all outstanding Loan Document Obligations shall bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of any principal or interest of any Loan, 2.00% per annum plus the rate otherwise applicable to Loans as provided in the preceding paragraphs of this Section or (ii) in the case of any other amount, 2.00% per annum plus the rate applicable to Loans as provided in paragraph (a) of this Section (the "Default Rate").

(e)                Accrued interest on each Loan shall be payable in arrears on the last Business Day of each calendar month, provided that (i) interest accrued pursuant to paragraph (d) of this Section shall be payable on demand and (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(f)                All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed. Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.18, bear interest for one day. Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(g)                For the purposes of the Interest Act (Canada) and disclosure thereunder, whenever any interest or any fee to be paid under any Loan Document is to be calculated on the basis of a 360-day or 365-day year, the yearly rate of interest to which the rate used in such calculation is equivalent is the rate so used multiplied by the actual number of days in the calendar year in which the same is to be ascertained and divided by 360 or 365, as applicable. The rates of interest under this Agreement are nominal rates, and not effective rates or yields. The principle of deemed reinvestment of interest does not apply to any interest calculation under this Agreement.

(h)                If any provision of this Agreement would oblige a Canadian Loan Party to make any payment of interest or other amount payable to any Lender in an amount or calculated at a rate which would be prohibited by applicable laws or would result in a receipt by that Lender of "interest" at a "criminal rate" (as such terms are construed under the Criminal Code (Canada)), then, notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by law or so result in a receipt by that Lender of "interest" at a "criminal rate", such adjustment to be effected, to the extent necessary (but only to the extent necessary), as follows: (a) first, by reducing the amount or rate of interest to be paid to such Lender; and (b) thereafter, by reducing any fees, commissions, costs, expenses, premiums and other amounts required to be paid to such Lender which would constitute "interest" for purposes of section 347 of the Criminal Code (Canada).

Section 2.14.   [Reserved].

69

Section 2.15.   <u>Increased Costs</u>.

(a)          If any Change in Law shall:

(i)          impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)          subject any recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)          impose on any Lender any other condition, cost or expense (other than with respect to Taxes) affecting this Agreement or Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to the Administrative Agent or such Lender of making or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to the Administrative Agent or such Lender or to reduce the amount of any sum received or receivable by the Administrative Agent or such Lender hereunder (whether of principal, interest or otherwise), then, from time to time upon request of the Administrative Agent or such Lender, the Borrower will pay to the Administrative Agent or such Lender, as the case may be, such additional amount or amounts as will compensate the Administrative Agent or such Lender, as the case may be, for such increased costs actually incurred or reduction actually suffered, <u>provided</u> that the Borrower shall not be liable for such compensation if, in the case of requests for reimbursement under <u>clause (ii)</u> above resulting from a market disruption, (A) the relevant circumstances are not generally affecting the banking market or (B) the applicable request has not been made by Lenders constituting Required Lenders; <u>provided</u>, further, that to the extent any such costs or reductions are incurred by any Lender as a result of any requests, rules, guidelines or directives enacted or promulgated under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 and Basel III, then such Lender shall be compensated pursuant to this <u>(a)</u> only to the extent such Lender is imposing such charges on similarly situated borrowers where the terms of other syndicated credit facilities permit it to impose such charges.

(b)          If any Lender determines that any Change in Law regarding capital or liquidity requirements has the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy and liquidity), then, from time to time upon request of such Lender contemplated by <u>clause (c)</u> below, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction actually suffered.

(c)        Any Lender requesting compensation under this <u>Section 2.15</u> shall be required to deliver a certificate to the Borrower, (i) setting forth the amount or amounts necessary to compensate such Lender or its holding company in reasonable detail, as the case may be, as specified in paragraph (a) or (b) of this Section, (ii) setting forth, in reasonable detail, the manner in which such amount or amounts were determined and (iii) certifies that such Lender is generally charging such amounts to similarly situated borrowers, which certificate shall be conclusive absent manifest error. The Borrower shall pay such Lender, as the case may be, the amount shown as due on any such certificate within 15 days after receipt thereof.

(d)        Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation, <u>provided</u> that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs incurred or reductions suffered more than 180 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; <u>provided</u> <u>further</u> that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 2.16.   [Reserved].

Section 2.17.   <u>Taxes</u>.

(a)        Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made free and clear of and without deduction or withholding for any Taxes, <u>provided</u> that if the applicable Withholding Agent shall be required by applicable Requirements of Law (as determined in the good faith discretion of the applicable Withholding Agent) to deduct or withhold any Taxes from such payments, then (i) the applicable Withholding Agent shall make such deductions or withholdings, (ii) the applicable Withholding Agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Requirements of Law and (iii) if the Tax in question is an Indemnified Tax or Other Tax, the amount payable by the applicable Loan Party shall be increased as necessary so that after all required deductions or withholdings have been made (including deductions and withholdings applicable to additional amounts payable under this <u>Section 2.17</u>) the Lender (or, in the case of a payment received by the Administrative Agent for its own account, the Administrative Agent) receives an amount equal to the sum it would have received had no such deductions or withholdings been made.

(b)        Without duplication of any obligation under paragraph (a) above, the Loan Parties shall timely pay to the relevant Governmental Authority in accordance with Requirements of Law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)        The Loan Parties shall jointly and severally indemnify the Administrative Agent and each Lender, within 30 days after written demand therefor, for the full amount of any Indemnified Taxes and/or Other Taxes payable or paid by, or required to be withheld or deducted from a payment to, the Administrative Agent or such Lender, as the case may be (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under

71

this <u>Section 2.17</u>) and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate setting forth in reasonable detail the basis and calculation of the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent) or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)        As soon as practicable after any payment of Indemnified Taxes or Other Taxes by a Loan Party to a Governmental Authority pursuant to this <u>Section 2.17</u>, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)        Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Requirements of Law and such other documentation reasonably requested by the Borrower or the Administrative Agent (i) as will permit such payments to be made without, or at a reduced rate of, withholding or (ii) as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding sentence, the completion, execution and submission of such documentation (other than such documentation set forth in <u>Section 2.17(e)(1)-(3)</u> below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender. Each Lender shall, if a lapse or time or change in circumstances renders such documentation obsolete, expired or inaccurate in any material respect, deliver promptly to the Borrower and the Administrative Agent upon their reasonable request updated or other appropriate documentation (including any new documentation) or promptly notify the Borrower and the Administrative Agent in writing of its legal ineligibility to do so. Each Lender hereby authorizes the Administrative Agent to deliver to the Loan Parties and to any successor Administrative Agent any documentation provided by such Lender to the Administrative Agent pursuant to this <u>Section 2.17</u>.

Without limiting the foregoing:

(1)   Each Lender and Administrative Agent that is a "United States person" within the meaning of Section 7701(a)(30) of the Code shall deliver to the Borrower and the Administrative Agent on or about the date on which it becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent) two properly completed and duly signed copies of IRS Form W-9 or successor form certifying that such Lender or Administrative Agent is exempt from U.S. federal backup withholding.

(2)   Each Lender that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code shall deliver to the Borrower and the Administrative Agent on or about the date on which it becomes a party to this Agreement (and from time to time

thereafter upon the request of the Borrower or the Administrative Agent) whichever of the following is applicable:

(A)      two properly completed and duly signed copies of IRS Form W-8BEN or IRS Form W-8BEN-E (or any successor forms), as applicable, claiming eligibility for the benefits of an income tax treaty to which the United States is a party, establishing an exemption from, or reduction of, U.S. federal withholding Tax (i) pursuant to the "interest" article of such tax treaty with respect to payments of interest under any Loan Document and (ii) pursuant to the "business profits" or "other income" article of such tax treaty with respect to any other applicable payments under any Loan Document,

(B)      two properly completed and duly signed copies of IRS Form W-8ECI (or any successor forms),

(C)      in the case of a Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or Section 881(c) of the Code, (x) two properly completed and duly signed certificates substantially in the form of Exhibit Q-1, Q-2, Q-3 and Q-4, as applicable, (any such certificate, a "U.S. Tax Compliance Certificate") and (y) two properly completed and duly signed copies of IRS Form W-8BEN or IRS Form W-8BEN-E (or any successor forms), as applicable,

(D)      to the extent a Lender is not the beneficial owner (for example, where the Lender is a partnership or a participating Lender), two properly completed and duly signed copies of IRS Form W-8IMY (or any successor forms) of the Lender, accompanied by an IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, U.S. Tax Compliance Certificate, IRS Form W-9, IRS Form W-8IMY or any other information (or any successor forms) from each beneficial owner that would be required under this Section 2.17(e) if such beneficial owner were a Lender, as applicable (provided that, if the Lender is a partnership for U.S. federal income tax purposes (and not a participating Lender) and one or more direct or indirect partners are claiming the portfolio interest exemption, the U.S. Tax Compliance Certificate may be provided by such Lender on behalf of such direct or indirect partner(s)), or

(E)      two properly completed and duly signed copies of any other form prescribed by applicable U.S. federal income tax laws as a basis for claiming a complete exemption from, or a reduction in, U.S. federal withholding tax on any payments to such Lender under the Loan Documents, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made.

(3)      If a payment made to a Lender or Administrative Agent under any Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if such

Lender or Administrative Agent were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender or Administrative Agent shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender or Administrative Agent has or has not complied with such Lender's or Administrative Agent's obligations under FATCA and, if necessary, to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (3), "FATCA" shall include any amendments made to FATCA after the date hereof.

(4)     If the Administrative Agent is not a "United States person" within the meaning of Section 7701(a)(30) of the Code, it shall provide to the Borrower on or prior to the date on which it becomes an Administrative Agent under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower): (A) two executed copies of Form W-8ECI with respect to any amounts payable to the Administrative Agent for its own account, and (B) two executed copies of Form W-8IMY with respect to any amounts payable to the Administrative Agent for the account of others, certifying that it is a "U.S. branch" and that the payments it receives for the account of others are not effectively connected with the conduct of its trade or business within the United States and that it is using such form as evidence of its agreement with the Borrower to be treated as a U.S. Person with respect to such payments (and the Borrower and the Administrative Agent agree to so treat the Administrative Agent as a "United States person" with respect to such payments as contemplated by Section 1.1441-1(b)(2)(iv) of the United States Treasury Regulations).

Each Lender or Administrative Agent agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so. Notwithstanding any other provisions of this paragraph (e), a Lender shall not be required to deliver any form or other documentation that such Lender is not legally eligible to deliver.

(f)          If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.17, it shall pay over such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Borrower, upon the request of the Administrative Agent or such Lender, agrees promptly to repay the amount paid over to the Borrower pursuant to this Section 2.17(f) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay

such refund to such Governmental Authority. The Administrative Agent or such Lender, as the case may be, shall, at the Borrower's request, provide the Borrower with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant taxing authority (provided that the Administrative Agent or such Lender may delete any information therein that the Administrative Agent or such Lender deems confidential). Notwithstanding anything to the contrary in this Section 2.17(f), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this Section 2.17(f) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This Section 2.17(f) shall not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other information relating to Taxes which it deems confidential to any Loan Party or any other Person).

(g)        Each party's obligations under this Section 2.17 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, or the consummation of the transactions contemplated hereby, the repayment, satisfaction or discharge of all obligations under any Loan Document or the termination of this Agreement or any provision hereof.

Section 2.18.   Payments Generally; Pro Rata Treatment; Sharing of Setoffs.

(a)        The Borrower shall make each payment required to be made by it under any Loan Document (whether of principal, interest, fees, or of amounts payable under Section 2.17 or otherwise) prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without setoff or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to such account as may be specified by the Administrative Agent, shall be made as expressly provided herein and except that payments pursuant to Section 2.17 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment under any Loan Document shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day. In the case of any payment of principal pursuant to the preceding sentence, interest thereon shall be payable at the then applicable rate for the period of such extension. All payments or prepayments of any Loan (or of interest thereon) and all other payments under each Loan Document shall be made in Dollars.

(b)        If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, any fees that are due hereunder to the Administrative Agent or the Collateral Agent, (ii) second, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then

due to such parties, and (iii) third, towards payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)         If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender with outstanding Loans, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders at such time outstanding to the extent necessary so that the benefit of all such payments shall be shared by the Lenders of such class ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest and (ii) the provisions of this paragraph shall not be construed to apply to (A) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement, (B) any payment obtained by a Lender as consideration for any permitted assignment of or sale of a participation in any of its Loans to any assignee or participant, including any payment made or deemed made in connection with Section 9.02 or (C) any disproportionate payment obtained by a Lender as a result of the extension by Lenders of the Stated Maturity Date or expiration date of some but not all Loans or Commitments or any increase in the Applicable Rate in respect of Loans of Lenders that have consented to any such extension. The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)         Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may (but shall not be obligated to), in reliance upon such assumption and in its sole discretion, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)         If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.06(a), Section 2.06(b), Section 2.18(d) or Section 9.03(c), then the Administrative Agent may, in its discretion and in the order determined by the Administrative Agent (notwithstanding any contrary provision hereof), (i) apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Section until all such unsatisfied obligations are fully paid and/or (ii) hold any such

amounts in a segregated account as cash collateral for, and to be applied to, any future funding obligations of such Lender under any such Section.

Section 2.19.   Mitigation Obligations; Replacement of Lenders.

(a)         If any Loan Party is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17, then such Lender shall (at the request of the Borrower) use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder affected by such event, or to assign and delegate its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such Lender, such designation or assignment and delegation (i) would eliminate or reduce amounts payable pursuant to Section 2.17, as the case may be and (ii) would not subject such Lender to any unreimbursed cost or expense and would not be inconsistent with the internal policies of, or otherwise be disadvantageous in any economic, legal or regulatory respect to, such Lender.

(b)         If (i) any Lender gives notice under Section 2.23 or (ii) the Borrower is required to pay any additional amount to any Lender or to any Governmental Authority for the account of any Lender pursuant to Section 2.17, and, in each case, such Lender has declined or is unable to designate a different lending office in accordance with paragraph (a) of this Section, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate (and such Lender shall be obligated to assign and delegate), without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights (other than its existing rights to payments pursuant to Section 2.15 or Section 2.17) and obligations under this Agreement and the other Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment and delegation), provided that (A) the Borrower shall have received the prior written consent of the Administrative Agent to the extent such consent would be required under Section 9.04(b) for an assignment of Loans or Commitments, as applicable, which consents, in each case, shall not unreasonably be withheld or delayed, (B) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued but unpaid interest thereon, accrued but unpaid fees and all other amounts payable to it hereunder from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts), (C) the Borrower or such assignee shall have paid (unless waived) to the Administrative Agent the processing and recordation fee specified in Section 9.04(b)(ii) and (D) in the case of any such assignment resulting from payments required to be made pursuant to Section 2.17 or a notice given under Section 2.23, such assignment will result in a material reduction in such compensation or payments. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise (including as a result of any action taken by such Lender under paragraph (a) above), the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 2.20.   Priority and Liens; No Discharge.

(a)         Each of the Loan Parties that is a Debtor hereby covenants and agrees that upon the entry of an Interim Order (and when entered, the Final Order) its obligations hereunder and under the Loan Documents shall, subject, solely to the extent set forth in the Interim Order

(and when entered, the Final Order) to the Carve Out and Permitted Priority Liens, at all times, pursuant to Section 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, be secured by a perfected Lien on and security interest in all of the Collateral of the Debtors, whether consisting of Real Estate, or personal, tangible or intangible property, whether now owned or hereafter acquired, excepting Excluded Assets, unless such Collateral has been released in accordance with Section 9.15 in connection with transactions permitted under the Loan Documents.

(b)        The relative priorities of the Liens with respect to the Collateral of the Debtors shall be as set forth in the Interim Order (and, when entered, the Final Order).

(c)        Each Loan Party that is a Debtor hereby confirms and acknowledges that, pursuant to the Interim Order (and, when entered, the Final Order), the Liens in favor of the Collateral Agent on behalf of and for the benefit of the Secured Parties in all of the Collateral of such Loan Party (including, without limitation, (x) all of the outstanding shares of capital stock of subsidiaries and (y) any property and rights of such Loan Parties described in the Orders and/or the U.S. Collateral Agreement) shall be created and perfected, to the maximum extent permitted by law, without the execution or the recordation or filing in any land records or filing offices, of any Mortgage, assignment, security agreements, mortgages, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Collateral Agent of, or over, any such Collateral, as set forth in the Interim Order (and, when entered, the Final Order).

(d)        Further to Section 2.20(a)-(c), the Interim Order (and, when entered, the Final Order), to secure the full and timely payment and performance of (A) the Secured Obligations, each Loan Party that is a Debtor hereby MORTGAGES, GRANTS, BARGAINS, ASSIGNS, SELLS, CONVEYS and CONFIRMS, to the Collateral Agent, for the ratable benefit of the Secured Parties, in each case to the extent constituting Collateral, the Real Estate (which, for the avoidance of doubt, shall include all of such Debtor's right, title and interest now or hereafter acquired in and to all Real Estate and (a) all goods, accounts, inventory, general intangibles, instruments, documents, contract rights and chattel paper, (b) all reserves, escrows or impounds and all deposit accounts maintained by such Debtor with respect to the Real Estate, (c) all leases, licenses, concessions, occupancy agreements or other agreements (written or oral, now or at any time in effect) which grant to any Person a possessory interest in, or the right to use, all or any part of the Real Estate, together with all related security and other deposits, (d) all of the rents, revenues, royalties, income, proceeds, profits, accounts receivable, security and other types of deposits, and other benefits paid or payable by parties to the leases for using, leasing, licensing possessing, operating from, residing in, selling or otherwise enjoying the Real Estate, (e) all other agreements, such as construction contracts, architects' agreements, engineers' contracts, utility contracts, maintenance agreements, management agreements, service contracts, listing agreements, guaranties, warranties, permits, licenses, certificates and entitlements in any way relating to the construction, use, occupancy, operation, maintenance, enjoyment or ownership of the Real Estate, (f) all rights, privileges, tenements, hereditaments, rights-of-way, easements, appendages and appurtenances appertaining to the foregoing, (g) all property tax refunds payable with respect to the Real Estate, (h) all accessions, replacements and substitutions for any of the foregoing and all proceeds thereof, (i) all insurance policies, unearned premiums therefor and proceeds from such policies covering any of the above property now or hereafter acquired by such Debtor as an insured party, and (j) all awards, damages, remunerations, reimbursements,

settlements or compensation heretofore made or hereafter to be made to any Debtor by any governmental authority pertaining to any condemnation or other taking (or any purchase in lieu thereof) of all or any Real Estate), TO HAVE AND TO HOLD to the Collateral Agent, and such Debtor does hereby bind itself, its successors and assigns to WARRANT AND FOREVER DEFEND the title to such property, assets and interests unto the Collateral Agent.

(e)        Each Loan Party that is a Debtor further agrees that, upon the request of the Administrative Agent or the Collateral Agent (in each case, at the direction of the Required Lenders) such Debtor shall, as soon as reasonably practicable following such request but in any event within 60 days following such request (as extended by the Collateral Agent, at the written direction of the Required Lenders), with respect to any Material Real Property identified by the Collateral Agent, execute and deliver to the Collateral Agent a Mortgage and otherwise satisfy clause (e)(ii) of the Domestic Collateral and Guarantee Requirement definition with respect to such Material Real Property.

(f)        Each of the Loan Parties agrees that to the extent that the Loan Document Obligations shall not have been satisfied in full in cash, unless a Lender has otherwise agreed in writing in respect of the applicable obligations owed to it, (i) such Loan Document Obligations shall not be discharged by any order confirming a Chapter 11 Plan (and each of the Loan Parties, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Superpriority Claims granted to the Administrative Agent and the Lenders pursuant to the Orders and the Liens granted to the Collateral Agent and the Lenders pursuant to the Orders shall not be affected in any manner by any order confirming a Chapter 11 Plan.

Section 2.21.   [Reserved].

Section 2.22.   [Reserved].

Section 2.23.   [Reserved].

ARTICLE 3
REPRESENTATIONS AND WARRANTIES

The Borrower (as to itself and its Restricted Subsidiaries) represents and warrants to the Lenders and the Agents that:

Section 3.01.   Organization; Powers. The Borrower and each Restricted Subsidiary is (a) duly organized or incorporated and validly existing and (to the extent such concept exists in the relevant jurisdictions) in good standing under the laws of the jurisdiction of its organization or incorporation or amalgamation, (b) subject in the case of each Loan Party that is a Debtor, to the entry of the Orders and the terms thereof, has the corporate, constitutional power, or other organizational power and authority to carry on its business as now conducted and to execute, deliver and perform its obligations under each Loan Document to which it is a party and (c) is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except in the case of clause (a) (other than with respect to the Borrower), clause (b) (other than with respect to the Borrower) and clause (c), where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 3.02.   Authorization; Enforceability. Subject in the case of each Loan Party that is a Debtor, to the entry of the Orders and the terms thereof, this Agreement has been duly authorized, executed and delivered by the Borrower and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of the Borrower or such Loan Party, as the case may be, enforceable against it in accordance with its terms, subject to (i) Bankruptcy Law affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law and (ii) in the case of each Foreign Loan Party and each Foreign Loan Document, (x) the need for filings and registrations necessary to create or perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties, and (y) the Legal Reservations and the Foreign Perfection Requirements.

Section 3.03.   Governmental Approvals; No Conflicts. Subject in the case of each Loan Party that is a Debtor, to the entry of the Order and the terms thereof, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect and except filings necessary to perfect Liens created under the Loan Documents, (b) will not violate (i) the Organizational Documents of the Borrower or any other Loan Party, or (ii) any Requirements of Law applicable to the Borrower or any Restricted Subsidiary, (c) will not violate or result in a default under any indenture or other agreement or instrument binding upon the Borrower or any Restricted Subsidiary or their respective assets, or give rise to a right thereunder to require any payment, repurchase or redemption to be made by the Borrower or any Restricted Subsidiary, or give rise to a right of, or result in, termination, cancellation or acceleration of any obligation thereunder, and (d) will not result in the creation or imposition of any Lien on any asset of the Borrower or any Restricted Subsidiary, except Liens created under the Loan Documents or the Orders, except (in the case of each of clauses (a), (b)(ii) and (c)) to the extent that the failure to obtain or make such consent, approval, registration, filing or action, or such violation, default or right as the case may be, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, and, in case of each Foreign Loan Party and each Foreign Loan Document, subject to the Legal Reservations and the Foreign Perfection Requirements.

Section 3.04.   Financial Condition; No Material Adverse Effect.

(a)        The Audited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly indicated therein, including the notes thereto, and (ii) fairly present in all material respects the consolidated financial position of the Borrower and its consolidated subsidiaries as of the respective dates thereof and the consolidated results of their operations for the respective periods then ended in accordance with GAAP consistently applied during the periods referred to therein, except as otherwise expressly indicated therein, including the notes thereto.

(b)        [Reserved].

(c)        Since the Petition Date, there has been no event, circumstance or condition that has had, or could reasonably be expected to have, a Material Adverse Effect (other than any events, circumstance or condition disclosed by the Borrower in the Form 10-K or Form 10-Q filed on or prior to the Effective Date; provided that, for the avoidance of doubt, the disclosure in such

documents shall not be deemed to include any disclosure of "Risk Factors" or risks included in any "forward-looking statements" disclaimer or any other statements that are similarly predictive or forward-looking in nature, but in each case, other than any specific factual information contained therein).

Section 3.05.   Properties.

(a)            The Borrower and each Restricted Subsidiary has good title to, or valid leasehold interests in, all its real and personal property material to its business (including the Mortgaged Properties, if any), (i) free and clear of all Liens except for Liens permitted by Section 6.02 and (ii) except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or as proposed to be conducted or to utilize such properties for their intended purposes, in each case, except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)            As of the Effective Date, Schedule 3.05 contains a true and complete list of Real Estate constituting Collateral that is (i) located in the United States, (ii) improved with a building or mobile home, and (iii) owned in fee or demised to a Loan Party pursuant to a ground Lease or long-term Lease.

Section 3.06.   Litigation and Environmental Matters.

(a)            There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened in writing against or affecting the Borrower or any Restricted Subsidiary that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)            Except with respect to any matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, none of the Borrower or any Restricted Subsidiary (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has, to the knowledge of the Borrower, become subject to any Environmental Liability, (iii) has received written notice of any claim with respect to any Environmental Liability or (iv) has, to the knowledge of the Borrower, any basis to reasonably expect that the Borrower or any Restricted Subsidiary will become subject to any Environmental Liability.

Section 3.07.   Compliance with Laws and Agreements. The Borrower and each Restricted Subsidiary is in compliance with (a) all Requirements of Law applicable to it or its property  and (b) all indentures and other agreements and instruments binding upon it or its property (other than, in the case of a Debtor, any Prepetition Indebtedness), except, where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 3.08.   Investment Company Status. None of the Borrower or any other Loan Party is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended from time to time, subject, in case of each Foreign Loan Party and each Foreign Loan Documents, to the Legal Reservations and the Foreign Perfection Requirements.

Section 3.09.   Taxes. Subject to Bankruptcy Law, the terms of the applicable Orders and any required approval by the Bankruptcy Court, except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, the Borrower and each Restricted Subsidiary (a) have timely filed or caused to be filed all Tax returns required to have been filed and (b) have paid or caused to be paid all Taxes required to have been paid (whether or not shown on a Tax return) including in their capacity as tax withholding agents, except any Taxes (i) that are not overdue by more than 30 days or (ii) that are being contested in good faith by appropriate proceedings; provided that the Borrower or such Restricted Subsidiary, as the case may be, has set aside on its books adequate reserves therefor in accordance with GAAP.

Section 3.10.   ERISA.

(a)         Except as could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with the applicable provisions of ERISA, the Code and other federal or state laws.

(b)         Except as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (i) no ERISA Event has occurred during the five year period prior to the date on which this representation is made or deemed made or is reasonably expected to occur, (ii) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Plan (other than premiums due and not delinquent under Section 4007 of ERISA), (iii) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 or 4243 of ERISA with respect to a Multiemployer Plan and (iv) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

Section 3.11.   Disclosure. (a) As of the Effective Date, no written information (other than projections, other forward-looking and/or projected information and information of a general economic or industry specific nature) furnished by the Borrower or any of their respective representatives on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or delivered thereunder (as modified or supplemented by other information so furnished on or prior to the Effective Date) on or before the Effective Date, when taken as a whole, did not, when furnished, contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading (after giving effect to all supplements and updates thereto from time to time), provided that, with respect to projections and other forward-looking information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed by it to be reasonable at the time delivered, it being understood that any such projections and other forward-looking information are not to be viewed as facts and are subject to significant uncertainties and contingencies, many of which are beyond the control of the Borrower and that actual results may vary from projected results and such variations may be material.

(b)         As of the Effective Date, the information included in the Beneficial Ownership Certification is true and correct in all material respects.

Section 3.12.   Subsidiaries. As of the Effective Date, Schedule 3.12 sets forth the name of, and the ownership interest of the Borrower and each Subsidiary in, each Subsidiary.

Section 3.13.   Intellectual Property; Licenses, Etc. Except as could not reasonably be expected to have a Material Adverse Effect, each of the Borrower and each Restricted Subsidiary owns, licenses or possesses the right to use, all of the rights to Intellectual Property that are reasonably necessary for the operation of its business as currently conducted, and, without conflict with the rights of any Person. The Borrower or each Restricted Subsidiary do not, in the operation of their businesses as currently conducted, infringe upon any Intellectual Property rights held by any Person except for such infringements, individually or in the aggregate, which could not reasonably be expected to have a Material Adverse Effect. No claim or litigation regarding any of the Intellectual Property owned by the Borrower or any Restricted Subsidiary is pending or, to the knowledge of the Borrower, threatened in writing against the Borrower or any Restricted Subsidiary, which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 3.14.   [Reserved].

Section 3.15.   Senior Indebtedness. The Loan Document Obligations constitute "Senior Indebtedness" and "Designated Senior Indebtedness" (or any comparable terms) under and as defined in the documentation governing any Subordinated Indebtedness.

Section 3.16.   Federal Reserve Regulations. None of the Borrower or any Restricted Subsidiary is engaged or will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors), or extending credit for the purpose of purchasing or carrying margin stock. No part of the proceeds of the Loans will be used, directly or indirectly, to purchase or carry any margin stock or to refinance any Indebtedness originally incurred for such purpose, or for any other purpose that entails a violation (including on the part of any Lender) of the provisions of Regulations U or X of the Board of Governors.

Section 3.17.   Security Interest in Collateral. Subject to the provisions of this Agreement (including, without limitation, the terms of the proviso to clause (f) of Section 4.01) and the other relevant Loan Documents, the Orders and the Security Documents create legal, valid and enforceable Liens on all of the Collateral in favor of the Collateral Agent, for the benefit of itself and the other applicable Secured Parties, subject to Bankruptcy Law or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law. With respect to Liens on assets of any Debtor, upon the entry of the Orders or the satisfaction of the applicable Domestic Perfection Requirements, such Liens constitute perfected Liens (with the priority that such Liens are expressed to have under the relevant Security Documents) on the applicable Collateral (to the extent such Liens are required to be perfected under the terms of the Loan Documents) securing the applicable Secured Obligations, in each case as and to the extent set forth therein, provided that in the case of each Foreign Loan Party and each Foreign Loan Document, each representation and warranty made in this Section 3.17 shall be subject to the Legal Reservations and the Foreign Perfection Requirements.

Section 3.18.   PATRIOT Act, OFAC and FCPA.

(a)          The Borrower and the Restricted Subsidiaries will not, directly or indirectly, use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other Person, for the purpose of funding (i) any activities of or business with any Person who is the subject of Sanctions, or in any country or territory to the extent that such country or territory is the subject of Sanctions, or (ii) any other transaction that will result in a violation by any Person (including any Person participating in the transaction, whether as underwriter, advisor, investor, lender or otherwise) of Sanctions.

(b)          The Borrower and the Restricted Subsidiaries will not use the proceeds of the Loans directly, or, to the knowledge of the Borrower, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended (the "FCPA") or other applicable anti-corruption laws and regulations.

(c)          Each of the Borrower and the Restricted Subsidiaries is in compliance in all material respects with applicable Sanctions, including without limitation regulations of the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"), Title III of the USA Patriot Act and other applicable anti-terrorism laws and regulations, and the FCPA and other applicable anti-corruption laws and regulations, and have instituted and maintain policies and procedures reasonably designed to ensure compliance with such laws and regulations.

(d)          To the knowledge of the Borrower, none of the Borrower or the Restricted Subsidiaries has, in the three years prior to the Effective Date, committed a material violation of Sanctions, Title III of the USA Patriot Act or other applicable anti-terrorism laws and regulations, or the FCPA or other applicable anti-corruption laws and regulations.

(e)          None of the Loan Parties, none of the Restricted Subsidiaries that are not Loan Parties or other Restricted Subsidiaries, nor to the knowledge of the Borrower, any director, officer, employee or agent of any Loan Party or Restricted Subsidiary, in each case, (i) is an individual or entity currently on OFAC's list of Specially Designated Nationals and Blocked Persons, the "Consolidated Canadian Autonomous Sanctions List", or any other list of targets identified or designated pursuant to any Sanctions, (ii) is located, organized or resident in a country or territory that is the subject of Sanctions, or (iii) is otherwise the Subject or target of Sanctions, or 50% or more in the aggregate owned or controlled by any such Person or Persons.

(f)          This Section 3.18 shall not be interpreted or applied in respect of any German Loan Party to the extent that any such undertaking would violate or expose such entity or any directors, officer or employee thereof to any liability, under section 7 of the German Foreign Trade Ordinance (*Außenwirtschaftsverordnung*), any provision of Council Regulation (EC) 2271/1996, as amended, or any similar applicable antiboycott or blocking law or regulation binding on the relevant German Loan Party.

Section 3.19.   <u>Luxembourg Law</u>. Any Foreign Subsidiary that is incorporated in Luxembourg complies with all the provisions of the Luxembourg law of 31 May 1999 governing the domiciliation of companies, as amended.

Section 3.20.   [Reserved].

Section 3.21.   [Reserved].

Section 3.22.   <u>Intermediate Holdcos.</u>

(a)         From and after the Effective Date, each Intermediate Holdco has not traded, carried on any business, owned any assets or incurred any material liabilities except to the extent permitted under <u>Section 6.06</u>.

(b)         For the purposes of Regulation (EU) No. 2015/848 of the European Parliament and of the Council of 20 May 2015 on Insolvency Proceedings (recast) (the "<u>Regulation</u>"), each Intermediate Holdco's Centre of Main Interest (as that term is used in Article 3(1) of the Regulation) is situated in its jurisdiction of incorporation and it has no "establishment" (as that term is used in Article 2(h) of the Regulation) in any other jurisdiction.

Section 3.23.   <u>Bankruptcy Matters</u>

(a)         The Cases were commenced on the Petition Date in accordance with applicable laws, and proper notice thereof has been or will be given of (i) the motion seeking approval of the Loan Documents, the Interim Order and the Final Order, (ii) the hearing for the entry of the Interim Order and (iii) the hearing for the entry of the Final Order.

(b)         The Debtors are in material compliance with the terms and conditions of the Orders. The Interim Order (with respect to the period prior to the entry of the Final Order) or the Final Order (from after the date the Final Order is entered), is in full force and effect and has not been vacated or reversed, is not subject to a stay and has not been modified or amended other than as acceptable to the Required Lenders, in their sole discretion.

(c)         After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, (i) the Loan Document Obligations (including for the avoidance of doubt the Roll-Up Loans) will constitute allowed Superpriority Claims, subject only to the Carve Out and the priorities set forth in the Orders, as applicable, and (ii) in respect of any property owned by a Debtor other than Excluded Assets, to the maximum extent permitted by law, the Loan Document Obligations will be secured by a valid, binding, continuing, enforceable, fully-perfected Lien on all of the "Collateral" pursuant to sections 364(c)(2), (c)(3) and (d), subject only to the Permitted Priority Liens and the Carve Out.

(d)         The entry of the Orders is effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, in respect of each Loan Party that is a Debtor, the Superpriority Claims and, to the maximum extent permitted by law, Liens on the Collateral of each Debtor described in this Section 3.23, without the necessity of the execution (or recordation or filing) of mortgages, security agreements, pledge agreements, financing statements or other agreements or documents.

(e)         Notwithstanding the provisions of section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Order or the Final Order, as the case may be, upon the Termination Date (whether by acceleration or otherwise) of any of the Loan Document Obligations, the Agents and the Lenders shall be entitled to terminate the Commitments and, subject to any prior notice requirements under the Orders in respect of the Collateral, to enforce the remedies provided for hereunder or under applicable laws, without further notice, motion or application to, hearing before, or order from the Bankruptcy Court.

ARTICLE 4
CONDITIONS

Section 4.01.   Effective Date. The obligations of the Lenders to make the Loans hereunder shall not become effective until the date on which each of the following conditions shall be satisfied (or waived in accordance with Section 9.02):

(a)         The Administrative Agent (or its counsel) shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence satisfactory to the Administrative Agent (which may include a copy transmitted by facsimile or other electronic transmission of a signed counterpart of this Agreement) that such party has signed a counterpart of this Agreement.

(b)         The Administrative Agent shall have received a written opinion (addressed to the Administrative Agent, the Collateral Agent and the Lenders and dated the Effective Date) of each of (i) Kirkland & Ellis LLP, as special New York counsel for the Loan Parties (ii) Kirkland & Ellis International LLP, as German counsel for the Loan Parties, (iii) Baker McKenzie Rechtsanwaltsgesellschaft mbH von Rechtsanwälten und Steuerberatern, as German counsel to the Lenders, (iv) Blake, Cassels & Graydon LLP, as Canadian counsel for the Loan Parties, (v) Baker & McKenzie Amsterdam N.V., as Dutch counsel for the Lenders, (vi) Loyens & Loeff Luxembourg S.à r.l., as Luxembourg counsel for the Loan Parties, (vii) Baker & McKenzie LLP as English counsel for the Lenders, (viii) Baker & McKenzie LLP, as French counsel for the Lenders, (ix) Gorrissen Federspiel Advokatpartnerselskab as Danish counsel to the Lenders, (x) MinterEllisonRuddWatts, as New Zealand counsel to the Lenders, (xi) Baker & McKenzie Australia, as Australian counsel to the Lenders, (xii) [reserved] and (xiii) Arntzen De Besche Advokatfirma AS, as Norwegian counsel to the Lenders.

(c)         The Administrative Agent shall have received a certificate of each Loan Party (other than any Loan Party organized under the laws of Switzerland), dated the Effective Date, substantially in the form of Exhibit R with appropriate insertions or as otherwise customary in the relevant jurisdiction of incorporation of a Foreign Loan Party, executed by any Responsible Officer of such Loan Party, and including or attaching the documents referred to in clauses (d)(i) through (d)(iii) of this Section and, in the case of the certificate delivered by the Borrower, confirming compliance with the conditions set forth in paragraph (j) and (k) of this Section 4.01.

(d)         Other than with respect to any Loan party organized under the laws of Switzerland, the Administrative Agent shall have received a copy of (i) each Organizational Document of each Loan Party certified, to the extent applicable, as of a recent date by the applicable Governmental Authority, (ii) to the extent applicable in the relevant jurisdiction of

86

incorporation of a Foreign Loan Party, signature and incumbency certificates of the Responsible Officers of each Loan Party executing the Loan Documents to which it is a party, (iii) resolutions of the Board of Directors, holders of all issued shares in and/or other corporate body of each Loan Party (as applicable), if applicable, the supervisory board of directors, and if applicable, an unconditional positive or neutral advice (*advies*) from each relevant works council, including the request for advice of such Loan Party approving and authorizing the execution, delivery and performance of Loan Documents to which it is a party, to the extent applicable in the relevant jurisdiction of incorporation of a Foreign Loan Party, certified as of the Effective Date by a Responsible Officer as being in full force and effect without modification or amendment, (iv) a good standing certificate, certificate of compliance, certificate of status or another analogous certificate (to the extent such concept exists) from the applicable Governmental Authority of each Loan Party's jurisdiction of incorporation, organization or formation, (v) [reserved], (vi) in the case of a Loan Party incorporated in England and Wales the shares of which are to become the subject of a Lien in accordance with the English Collateral Agreement (a "<u>Charged Company</u>"), either: (A) a certificate of an authorized signatory of the shareholder(s) of that Loan Party certifying that: (1) the shareholder(s) of that Loan Party and their respective subsidiaries (however described) from time to time have complied within the relevant timeframe with any notice it has received pursuant to Part 21A of the Companies Act 2006 from the Charged Company, and (2) no "<u>warning notice</u>" or "<u>restrictions notice</u>" (in each case as defined in Schedule 1B of the Companies Act 2006) has been issued in respect of those shares, together with a copy of the "<u>PSC register</u>" (within the meaning of section 790C(10) of the Companies Act 2006) of that Charged Company which, in the case of that Charged Company, are certified by an authorized signatory of the shareholder(s) of that Loan Party to be correct, complete and has not been amended or superseded as at a date no earlier than the date of this Agreement, or (B) a certificate of an authorized signatory of the shareholder(s) of that Charged Company certifying that the Charged Company is not required to comply with Part 21A of the Companies Act 2006 and (vii) in the case of any Australian Loan Party, confirmation that its constitution contains a term pursuant to section 187 of the Australian Corporations Act authorizing it to act in the best interests of its holding company.

(e)         Prior to or substantially concurrently with the funding of the Initial Borrowing hereunder on the Effective Date, the Administrative Agent and the Lenders shall have received (i) all fees required to be paid by the Borrower on the Effective Date hereunder and under the Fee Letters and (ii) all expenses required to be paid by the Borrower for which invoices have been presented at least three Business Days prior to the Effective Date (except as otherwise agreed by the Borrower), which amounts, in the case of the Lenders, may be offset against the proceeds of the Loans.

(f)         The Collateral and Guarantee Requirement shall have been satisfied. The Collateral Agent shall have received a completed Perfection Certificate dated the Effective Date and signed by a Responsible Officer of each of the Borrower and each Domestic Loan Party, together with all attachments contemplated thereby.

(g)         Each document (including any UCC, PPSA (or similar) financing statement and intellectual property security agreements) required by any Security Document or under applicable Requirements of Law to be filed, registered or recorded in order to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a perfected Lien on the Collateral required to be delivered pursuant to such Security Document (unless such Security Document

provides for any such requirement to be provided at a later point in time), shall be in proper form for filing, registration or recordation and the Required Lenders have made arrangements for such filing, registration or recordation.

(h)    The Administrative Agent shall have received (1) an executed copy of the DIP ABL Credit Agreement, (2) an executed copy of the ABL Intercreditor Agreement and (3) an executed copy of the Junior Intercreditor Agreement, in each case, that is reasonably satisfactory to the Required Lenders.

(i)    Each applicable Lender shall have received at least three Business Days prior to the Effective Date all documentation and other information about the Loan Parties required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation Title III of the USA Patriot Act, that shall have been reasonably requested by an initial Lender in writing at least 10 Business Days prior to the Effective Date.

(j)    The representations and warranties of each Loan Party set forth in the Loan Documents shall be true and correct in all material respects on and as of the Effective Date; provided that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided further that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct in all respects on the date of such credit extension or on such earlier date, as the case may be.

(k)    No Default shall have occurred and be continuing.

(l)    The Administrative Agent shall have received a Borrowing Request in accordance with Section 2.03.

(m)    The Administrative Agent shall have received, in the case of each Loan Party incorporated in Luxembourg, an excerpt of the Luxembourg Trade and Companies Register (*Registre de Commerce et des Sociétés*) dated no earlier than 2 Business Days earlier than the date of the Effective Date and a certificate of non-inscription of a judicial decision (*certificat de non inscription de decision judiciaire*) in respect of each Loan Party incorporated in Luxembourg issued by the Luxembourg Register of Commerce and Companies, dated no earlier than 2 Business Days earlier than the Effective Date.

(n)    The Petition Date shall have occurred, and each of the Debtors shall be a debtor and a debtor-in-possession under the Cases.

(o)    The Interim Order (i) shall have been entered and shall be in full force and effect, (ii) shall not have been amended, supplemented, appealed, altered, stayed, vacated, rescinded or otherwise modified, without the prior written consent of the Required Lenders and (iii) the Loan Parties and their Subsidiaries shall be in compliance with the Interim Order.

(p)    The First Day Orders (including a cash management order), which shall be in form and substance satisfactory to the Required Lenders, shall have been entered upon an application or motion of the Debtors in form and substance reasonably satisfactory to the Required

Lenders, shall be in full force and effect, shall not have been vacated or reversed, shall not be subject to a stay and shall not have been modified or amended other than as acceptable to the Required Lenders; provided, that it shall be reasonable that any change to such orders that impacts the interaction between such orders and the Orders is not satisfactory to the Lenders.

(q)     The Administrative Agent and the Required Lenders shall have received and the Required Lenders shall have approved the Budget.

Solely with respect to the Loan Parties that are Debtors, to the extent that any of the items described in Section 4.01(g) shall not have been received by the Administrative Agent notwithstanding the Borrower's use of its commercially reasonable efforts to provide same, delivery of such items shall not constitute a condition effectiveness of this Agreement and the obligations of each Lender to make Loans hereunder and the Borrower shall, instead, cause such items to be delivered to the Administrative Agent not later than 30 days following the Effective Date (or such later date as the Required Lenders shall agree in their sole discretion).

For purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement (and each prospective Lender participating in the primary syndication of the Loans) shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required hereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender or prospective Lender prior to the proposed Effective Date specifying its objection thereto.

Section 4.02.  Conditions to the Initial Borrowing. The obligations of each New Money Lender to make any New Money Loan requested to be made by it on any date (including the Effective Date) hereunder is subject to the satisfaction of the following conditions precedent (or waiver thereof in accordance with Section 9.02):

(a)     The Effective Date shall have occurred.

(b)     At the time of and immediately after giving effect to such Borrowing, no Default or Event of Default shall have occurred and be continuing or would result therefrom.

(c)     The representations and warranties of the Borrower and the Guarantors set forth in this Agreement and in the other Loan Documents shall be true and correct in all material respects on and as of the date of such Borrowing, except to the extent any such representations and warranties are expressly limited to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date); provided that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct in all respects on the applicable Borrowing date or on such earlier date, as the case may be.

(d)     The Administrative Agent shall have received a Borrowing Request in accordance with Section 2.03.

(e)         No injunction, writ, restraining order, or other order of any nature restricting or prohibiting, directly or indirectly, the extending of such credit shall have been issued and remain in force by any Governmental Authority against the Borrower, Agents or any Lender.

(f)         The outstanding amount of the Initial Borrowing shall not exceed the amount authorized for such Borrowing under the Interim Order.

(g)         The Restructuring Support Agreement shall be in full force and effect as between the Debtors and the Lenders.

(h)         The Cases of any of the Debtors shall have not been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code.

(i)         No trustee, receiver or examiner having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code section 1104 (other than a fee examiner) shall have been appointed or designated with respect to the Debtors' business, properties or assets.

Each Borrowing Request shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in <u>Section 4.02(b)</u>, <u>(c)</u> and <u>(e)</u>.

Section 4.03.   <u>Conditions to the Subsequent Borrowing</u>. The obligations of each New Money Lender to make the Subsequent Borrowing hereunder shall not become effective until the date on which each of the following conditions shall be satisfied (or waived in accordance with Section 9.02):

(a)         The conditions precedent set forth in <u>Section 4.02</u> shall have been satisfied.

(b)         The Financial Advisor shall have received the Budget, the EMEA Report and the Variance Report, as applicable, required to be delivered pursuant to <u>Section 5.17</u>, and the Required Lenders shall have approved such Budget, EMEA Report and Variance Report, as applicable.

(c)         All material final orders of the "first day motions" that were entered on an interim basis and all related pleadings intended to be entered on or prior to the date of entry of the Final Order and any order establishing material procedures for the administration of the Cases, shall have been entered by the Bankruptcy Court.

(d)         The Final Order (i) shall have been entered within [thirty (30) calendar days] of the Petition Date (or such longer period as the Required Lenders may agree in their sole discretion)  and shall be in full force and effect, (ii) shall not have been amended, supplemented, appealed, altered, stayed, vacated, rescinded or otherwise modified, without the prior written consent of the Required Lenders and (iii) the Loan Parties and their Subsidiaries shall be in compliance with the Final Order.

(e)         The outstanding amount of the Subsequent Borrowing shall not exceed the amount authorized for such Borrowing under the Final Order.

90

ARTICLE 5
AFFIRMATIVE COVENANTS

Until the Stated Maturity Date shall have occurred, the Borrower covenants and agrees with the Lenders that:

Section 5.01.   <u>Financial Statements and Other Information</u>. The Borrower will furnish to the Administrative Agent, on behalf of each Lender:

(a)          commencing with the financial statements for the fiscal year ending December 31, 2022, on or before the date on which such financial statements are required or permitted to be filed with the SEC (or, if such financial statements are not required to be filed with the SEC, on or before the date that is 120 days after the end of each such fiscal year of the Borrower), (i) internal drafts of consolidated balance sheets and related consolidated statements of operations, comprehensive income/(loss), stockholders equity/deficiency and cash flows of the Borrower as of the end of and for such year, and related notes and related explanations thereto, setting forth  in each case in comparative form the figures for the previous fiscal year or (ii) if required to be filed with the SEC, audited consolidated balance sheets and related audited consolidated statements of operations, comprehensive income/(loss), stockholders' equity/deficiency and cash flows of the Borrower as of the end of and for such year, and related notes and related explanations thereto, setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by Ernst & Young LLP, Deloitte, KPMG, PWC, RSM, Grant Thornton, BDO USA or other independent public accountants of recognized national standing (without a "going concern" or like qualification or exception that is expressly and solely as a result of (A) fraud or (B) a material adverse change on the performance of the business of the Loan Parties) to the effect that such consolidated financial statements present fairly in all material respects the consolidated financial position and consolidated results of operations and cash flows of the Borrower and its consolidated Subsidiaries as of the end of and for such year on a consolidated basis in accordance with GAAP consistently applied;

(b)          commencing with the financial statements for the fiscal quarter ended March 31, 2023, on or before the date on which such financial statements are required or permitted to be filed with the SEC with respect to each fiscal quarter (including the fourth fiscal quarter) of each fiscal year of the Borrower (or, if such financial statements are not required to be filed with the SEC, on or before the date that is 60 days after the end of each such fiscal quarter), unaudited consolidated balance sheets and related unaudited consolidated statements of operations, comprehensive income/(loss) and cash flows of the Borrower and related explanations as of the end of and for such fiscal quarter (except in the case of cash flows) and the then elapsed portion of the fiscal year, and setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheets, as of the end of) the previous fiscal year, all certified by a Financial Officer as presenting fairly in all material respects the consolidated financial position and consolidated results of operations and cash flows of the Borrower and its consolidated Subsidiaries as of the end of and for such fiscal quarter (except in the case of cash flows) and such portion of the fiscal year on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c)             commencing with the financial statements for the fiscal month ended March 31, 2023, as soon as available, but in any event within 30 days after the end of each fiscal month of the Borrower, a consolidated balance sheet of the Borrower and its Restricted Subsidiaries as at the end of such fiscal month, and the related consolidated statements of income or operations and cash flows for such fiscal month and for the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal month of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and certified by a Financial Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnote;

(d)             not later than five days after any delivery of financial statements under clause (b) above, a Compliance Certificate of a Financial Officer (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto and (ii) setting forth reasonably detailed calculations demonstrating compliance with Section 6.10  as of the last day of the applicable fiscal quarter;

(e)             [reserved];

(f)             promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and registration statements (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered to the Administrative Agent), exhibits to any registration statement and, if applicable, any registration statement on Form S-8) filed by the Borrower or any Subsidiary with the SEC or with any national securities exchange; and

(g)             promptly following any request therefor, (i) such other information (which may be in the form of an officer's certificate) regarding the operations, business affairs and financial condition of the Borrower or any Restricted Subsidiary, or compliance with the terms of any Loan Document, as the Administrative Agent on its own behalf or on behalf of any Lender may reasonably request in writing or (ii) information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with applicable "know your customer" requirements under the PATRIOT Act, the PCMLTF Act or other applicable anti-money laundering laws.

Notwithstanding the foregoing, the obligations in clauses (a) or (b) of this Section 5.01 may be satisfied with respect to financial information of the Borrower and its Subsidiaries by furnishing the Form 10-K or 10-Q (or the equivalent), as applicable, of the Borrower filed with the SEC to the extent such filing includes the information required by such clauses.

Documents required to be delivered pursuant to Section 5.01 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the earlier of the date (A) on which the Borrower posts such documents, or provides a link thereto, on the Borrower's or one of its Affiliates' website on the Internet or (B) on which such documents are posted on the Borrower's behalf on IntraLinks/IntraAgency or another website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether

sponsored by the Administrative Agent); provided that: (i) the Borrower shall deliver such documents to the Administrative Agent upon its reasonable request until a written notice to cease delivering such documents is given by the Administrative Agent and (ii) the Borrower shall notify the Administrative Agent (by telecopier or electronic mail) of the posting of any such documents and upon its reasonable request, provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. The Administrative Agent shall have no obligation to request the delivery of or maintain paper copies of the documents referred to above, and each Lender shall be solely responsible for timely accessing posted documents and maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "Company Materials") by posting the Company Materials on IntraLinks or another similar electronic system (the "Platform") and (b) certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive material nonpublic information with respect to the Borrower or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities. The Borrower hereby agrees that it will, upon the Administrative Agent's reasonable request, identify that portion of the Company Materials that may be distributed to the Public Lenders and that (i) all such Company Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (ii) by marking Company Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Company Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Borrower or its respective Affiliates or their respective securities for purposes of United States federal and state securities laws (provided, however, that to the extent such Company Materials constitute Information, they shall be treated as set forth in Section 9.12); (iii) all Company Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (iv) the Administrative Agent shall be entitled to treat any Company Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."

The Platform is provided "as is" and "as available." The Agent Related Persons (as defined below) do not warrant the adequacy of the Platform and expressly disclaim liability for errors or omissions in the Company Materials or Communications. No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by any Agent Related Person in connection with the Company Materials, the Communications or the Platform. In no event shall the Agent or any agent or affiliate thereof (collectively, the "Agent Related Person") have any liability to the Borrower or the other Loan Parties, any Lender or any other Person or entity for damages of any kind, including, without limitation, direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of the Borrower's, any Loan Party's or the Administrative Agent's transmission of communications through the Platform. "Communications" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of any Loan Party pursuant to any Loan Document or the transactions contemplated therein which is distributed to the Administrative

Agent or any Lender by means of electronic communications pursuant to this Section and Section 9.01, including through the Platform.

Section 5.02.   Notices of Material Events. Promptly after any Responsible Officer of the Borrower obtains actual knowledge thereof, the Borrower will furnish to the Administrative Agent (for distribution to each Lender through the Administrative Agent) written notice of the following:

(a)        the occurrence of any Default; and

(b)        the filing or commencement of any action, suit or proceeding (other than as a result of the Cases) by or before any arbitrator or Governmental Authority against or, to the knowledge of a Financial Officer or another senior executive officer of the Borrower, affecting the Borrower or any of its Subsidiaries or the receipt of a written notice of an Environmental Liability or the occurrence of an ERISA Event, in each case, that could reasonably be expected to result in a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a written statement of a Responsible Officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 5.03.   Information Regarding Collateral.

(a)        The Borrower will furnish to the Administrative Agent promptly (and in any event within 30 days or such longer period as reasonably agreed to by the Administrative Agent acting at the direction of the Required Lenders) written notice of any change (i) in any Loan Party's legal name (as set forth in its certificate of organization or like document), (ii) in the jurisdiction of incorporation or organization or the location of the chief executive office of any Loan Party or in the form of its organization or (iii) in any Loan Party's organizational identification number to the extent that such Loan Party is organized or owns Mortgaged Property in a jurisdiction where an organizational identification number is required to be included in a UCC financing statement for such jurisdiction, together with any necessary or advisable financing statements or amendments to maintain the perfection of the Collateral Agent's Liens on the Collateral.

(b)        Not later than five days after any delivery of financial statements pursuant to Section 5.01(a), the Borrower shall deliver to the Administrative Agent a certificate executed by a Responsible Officer of the Borrower identifying any Domestic Subsidiary that is a Restricted Subsidiary and that has become, or ceased to be, a Material Subsidiary during the most recently ended fiscal quarter.

Section 5.04.   Existence; Conduct of Business. The Borrower will, and will cause each Restricted Subsidiary to, do or cause to be done all things necessary to obtain, preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges, franchises, the patents, copyrights, trademarks and trade names material to the conduct of its business, in each case (other than the preservation of the existence of the Borrower) to the extent that the failure to do so could reasonably be expected to have a Material Adverse Effect, provided that the foregoing shall not prohibit any merger, amalgamation, consolidation, liquidation or dissolution permitted under Section 6.03 or 6.06 or any Disposition permitted by Section 6.05.

94

Section 5.05.   Payment of Taxes, Etc. The Borrower will, and will cause each Restricted Subsidiary to, pay its obligations in respect of Taxes before the same shall become delinquent or in default, except (a) where the failure to make payment could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (b) that are being contested in good faith by appropriate proceedings for which adequate reserves have been made in accordance with GAAP or (c) with respect to any Person that is a Debtor under the Cases, the nonpayment of such Tax is permitted or required by the Bankruptcy Code.

Section 5.06.   Maintenance of Properties. The Borrower will, and will cause each Restricted Subsidiary to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, except where the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.07.   Insurance.

(a)          The Borrower will, and will cause each Restricted Subsidiary to, maintain, with insurance companies that the Borrower believes (in the good faith judgment of the management of the Borrower) are financially sound and responsible at the time the relevant coverage is placed or renewed, insurance in at least such amounts (after giving effect to any self-insurance which the Borrower believes (in the good faith judgment of management the Borrower) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as the Borrower believes (in the good faith judgment of the management the Borrower) are reasonable and prudent in light of the size and nature of its business; and will furnish to the Lenders, upon written request from the Administrative Agent (acting at the direction of Required Lenders), information presented in reasonable detail as to the insurance so carried. Each such policy of insurance maintained by a Loan Party shall (i) name the Administrative Agent and the Collateral Agent, on behalf of the applicable Secured Parties, as an additional insured thereunder as its interests may appear and (ii) in the case of each casualty insurance policy (excluding any business interruption insurance, workers' compensation policy or employee liability policy), contain a loss payable/mortgagee clause or endorsement that names Collateral Agent, on behalf of the applicable Secured Parties, as the loss payee/mortgagee thereunder.

(b)          If any portion of any Mortgaged Property subject to FEMA rules and regulations is at any time located in an area identified by FEMA (or any successor agency) as a Special Flood Hazard Area with respect to which flood insurance has been made available under the Flood Insurance Laws, then the Borrower shall, or shall cause the relevant Loan Party to, (i) maintain or cause to be maintained, flood insurance sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) deliver to the Administrative Agent evidence of such compliance, which evidence complies with applicable Flood Insurance Laws and rules and regulations promulgated pursuant thereto.

Section 5.08.   Books and Records; Inspection and Audit Rights. The Borrower will, and will cause each Restricted Subsidiary to, maintain proper books of record and account in which entries that are full, true and correct in all material respects and are in conformity with GAAP (or applicable local standards) consistently applied shall be made of all material financial transactions

and matters involving the assets and business of the Borrower or the Restricted Subsidiaries, as the case may be. The Borrower will, and will cause the Restricted Subsidiaries to, permit any representatives designated by the Administrative Agent or any Lender, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested; provided that, excluding any such visits and inspections during the continuation of an Event of Default, only the Administrative Agent on behalf of the Lenders (provided that a representative of the Lenders may accompany the Administrative Agent) may exercise visitation and inspection rights of the Administrative Agent and the Lenders under this Section 5.08 and the Administrative Agent shall not exercise such rights more often than one time during any calendar year absent the existence of an Event of Default, which visitation and inspection shall be at the reasonable expense of the Borrower; provided, further that (a) when an Event of Default exists, the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice and (b) the Administrative Agent and the Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants.

Section 5.09.   Compliance with Laws. Subject to Bankruptcy Law, the terms of the Orders and any required approval by the Bankruptcy Court, the Borrower will, and will cause each Restricted Subsidiary to, comply with its Organizational Documents and all Requirements of Law (including Environmental Laws, ERISA, FCPA, Sanctions, the USA Patriot Act, the PCMLTF Act and other anti-terrorism and anti-corruption laws) applicable to it or its property, except where the failure to do so (other than compliance with FCPA, Sanctions, the USA Patriot Act and other anti-terrorism and anti-corruption laws), individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. This Section 5.09 shall not be interpreted or applied in respect of any German Loan Party to the extent that any such undertaking would violate or expose such entity or any directors, officer or employee thereof to any liability, under section 7 of the German Foreign Trade Ordinance (*Außenwirtschaftsverordnung*), any provision of Council Regulation (EC) 2271/1996, as amended, or any similar applicable antiboycott or blocking law or regulation binding on the relevant German Loan Party.

Section 5.10.   Use of Proceeds. The proceeds of the Loans and any Cash Collateral (as defined in the Orders) shall be used by the Loan Parties only for the following, in each case in accordance with the terms of the Orders, the Loan Documents and the Budget (including the Budget Variance): (i) to pay amounts due to Lenders and the Agents hereunder and professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by Lenders and the Agents, including those incurred in connection with the preparation, negotiation, documentation and court approval of the Transactions, (ii) to pay Adequate Protection Payments as authorized by the Bankruptcy Court in the applicable Order, (iii) solely to the extent provided for in the Budget, to fund the working capital needs, capital improvements and general corporate purposes of the Borrower and the other Loan Parties following the commencement of the Cases to the extent authorized by the Bankruptcy Court and not prohibited by the terms hereof, (iv) to the extent provided in the Budget, to fund the costs and expenses related to the Cases and (v) to pay obligations arising from or related to the Carve Out. This Section 5.10 shall not be interpreted or applied in respect of any German Loan Party to the extent that any such undertaking would violate or expose such entity or any directors, officer or

employee thereof to any liability, under section 7 of the German Foreign Trade Ordinance (*Außenwirtschaftsverordnung*), any provision of Council Regulation (EC) 2271/1996, as amended, or any similar applicable antiboycott or blocking law or regulation binding on the relevant German Loan Party.  The Borrower shall ensure that no proceeds borrowed under this Agreement will be used in a manner which constitutes a "use of proceeds in Switzerland" as interpreted by Swiss tax authorities when assessing whether or not interest payable with respect to such borrowing is subject to Swiss withholding tax, except and to the extent that a written confirmation or tax ruling countersigned by the Swiss Federal Tax Administration (*Eidgenössische Steuerverwaltung*) has been obtained (in a form satisfactory to the Administrative Agent (at the direction of the Required Lenders)) confirming that the intended "use of proceeds in Switzerland" does not result in any Loans qualifying as a Swiss financing for Swiss withholding tax purposes and that, accordingly, no Swiss withholding tax is or becomes payable on the interest payments made under this Agreement.

Section 5.11.  Additional Subsidiaries. If any additional Restricted Subsidiary is formed or acquired after the Effective Date, the Borrower will, within 60 days (or such longer period contemplated by the Agreed Security Principles, the Orders, or as the Administrative Agent acting at the direction of the Required Lenders shall reasonably agree) after such newly formed or acquired Restricted Subsidiary is formed or acquired (unless such Subsidiary is an Excluded Subsidiary), notify the Administrative Agent thereof, and shall take all actions (if any) required to be taken with respect to such newly formed or acquired Subsidiary in order to satisfy the applicable Collateral and Guarantee Requirement with respect to such Subsidiary, the assets of such Subsidiary and with respect to any Equity Interest in or Indebtedness of such Subsidiary owned by or on behalf of any Loan Party within 60 days after such formation or acquisition (or such longer period contemplated by the Agreed Security Principles or as the Administrative Agent, acting at the direction of the Required Lenders, shall reasonably agree).

Section 5.12.  Further Assurances.

(a)        The Borrower will, and will, subject in the case of the Foreign Loan Parties to the Agreed Security Principles, cause each Loan Party to, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents), that may be required under any applicable law and that the Administrative Agent or the Required Lenders may reasonably request, to cause the applicable Collateral and Guarantee Requirement to be and remain satisfied at all times, all at the expense of the Loan Parties and subject to the Orders, the Legal Reservations and Foreign Perfection Requirements (if applicable).

(b)        If, after the Effective Date, any Material Real Property is acquired by the Borrower or any other Loan Party or are owned by any Subsidiary on or after the time it becomes a Loan Party pursuant to Section 5.11 the Borrower will promptly notify the Administrative Agent thereof, and, if requested by the Administrative Agent or the Collateral Agent (on the direction of the Required Lenders), the Borrower will cause the requirements set forth in the definitions of "Domestic Collateral and Guarantee Requirement," "Canadian Collateral and Guarantee Requirement," and the Agreed Security Principles to be satisfied (it being understood that, with respect to the assets of a Debtor constituting Collateral, such assets shall automatically be subject

to a Lien and security interest pursuant to the Orders as provided in <u>Section 2.20</u>, unless constituting Excluded Assets).

Section 5.13.   <u>Cash Management and Collections</u>. Unless otherwise consented to by the Required Lenders in their sole discretion, the Borrower shall ensure that the primary European cash collections and cash pooling arrangements of the European Loan Parties and their subsidiaries as in effect on the Effective Date shall not be modified in any material manner if the result of such modification would be (x) to cause material amounts of cash to be concentrated or pooled into bank accounts located in any jurisdiction other than the Netherlands, the United Kingdom, Sweden, Norway or Denmark or (y) materially adverse to the scope of collateral and lien perfection (with respect to cash and deposit accounts) contemplated by the parties hereto on the Effective Date (including pursuant to <u>Section 5.14</u>).

Section 5.14.   <u>Certain Post-Closing Obligations</u>.

(a)         The Administrative Agent shall have received within 20 Business Days after the Effective Date (or such longer period as the Required Lenders may approve in their sole discretion), evidence that the insurance required by <u>Section 5.07</u> is in effect and the Administrative Agent and the Collateral Agent, within 20 Business Days after the Effective Date, (A) shall have been named as loss payee or additional insured, as appropriate, under each such insurance policy to the extent required by <u>Section 5.07</u> and (B) shall have received customary insurance certificates containing notification endorsements reasonably satisfactory to the Required Lenders in respect of each such insurance policy under which the Administrative Agent and the Collateral Agent are named as loss payee or additional insured.

(b)         The Collateral Agent shall have received within 20 Business Days after the Effective Date (or such longer period as the Required Lenders may approve in their sole discretion, provided that such time period shall be automatically extended to the extent that a written confirmation or tax ruling countersigned by the Swiss Federal Tax Administration (*Eidgenössische Steuerverwaltung*) has not been obtained, such time period shall be automatically extended until 3 Business Days after such ruling has been obtained), executed copies of the Swiss Collateral Documents in a form satisfactory to the Required Lenders (in their sole discretion).

(c)         The Collateral Agent shall have received within 20 Business Days after the Effective Date (provided that such time period shall be automatically extended to the extent that a written confirmation or tax ruling countersigned by the Swiss Federal Tax Administration (*Eidgenössische Steuerverwaltung*) has not been obtained, such time period shall be automatically extended until 3 Business Days after such ruling has been obtained) the French law pledge of assets without dispossession agreement (*convention de gage sans dépossession*) granted by Invacare International GmbH as pledgor in favor of the Collateral Agent in respect of the inventory held by Invacare International GmbH in France.

(d)         The Collateral Agent shall have received within 20 Business Days after the Effective Date (or such longer period as the Required Lenders may approve in their sole discretion), written opinions (addressed to the Administrative Agent, the Collateral Agent and the Lenders, date as of the date thereof, provided that such time period shall be automatically extended to the extent that a written confirmation or tax ruling countersigned by the Swiss Federal Tax

Administration (*Eidgenössische Steuerverwaltung*) has not been obtained, such time period shall be automatically extended until 3 Business Days after such ruling has been obtained) of (i) Baker & McKenzie Zurich, as Swiss counsel to the Lenders, (ii) Baker & McKenzie LLP as English counsel for the Lenders and (iii) Baker & McKenzie LLP as French counsel for the Lenders.

(e)        The Collateral Agent shall have received within 20 Business Days after the Effective Date (or such longer period as the Required Lenders may approve in their sole discretion), an executed copy of the English law governed accession deed to the English Collateral Agreement made between Invacare AG, Alber GmbH and Invacare International GmbH as additional chargors and the Collateral Agent as chargee in a form satisfactory to the Required Lenders (in their sole discretion).

(f)        The Collateral Agent shall have received within 10 Business Days after the Effective Date (or such longer period as the Required Lenders may approve in their sole discretion), evidence that (i) each of the Norwegian law floating charges has been registered with the Norwegian Register of Mortgaged Movable Property and (ii) that each debtor of intercompany claims, which have become subject to security hereunder, has been notified of that security and has provided an acknowledgement thereof.

Section 5.15.  Case Milestones.  The Loan Parties shall ensure satisfaction of the milestones set forth below (the "Case Milestones"), unless waived or extended with the consent of the Required Lenders in their sole discretion or the Administrative Agent (with the consent of the Required Lenders) (which may be by email from the Required Lenders or their counsel):

(a)        no later than three (3) calendar days following the Petition Date, the Bankruptcy Court shall have entered the Interim Order;

(b)        no later than thirty-five (35) calendar days following the Petition Date, the Bankruptcy Court shall have entered the Final Order

(c)        Unless a Sale Toggle Event has occurred, then:

(i)        no later than the Petition Date, the Debtors shall have filed the Acceptable Plan;

(ii)        no later than ten (10) Business Days after the Petition Date, the Debtors shall have filed (ii) the Acceptable Disclosure Statement and (i) a motion seeking entry of an order approving the Acceptable Disclosure Statement and (iii) the Backstop Commitment Letter (as defined in the Restructuring Support Agreement);

(iii)        no later than sixty (60) calendar days following the Petition Date, the Bankruptcy Court shall have entered (i) the Acceptable Disclosure Statement Order (ii) an order approving the Backstop Commitment Letter (as defined in the Restructuring Support Agreement) and (iii) an order approving the Rights Offering Procedures (as defined in the Restructuring Support Agreement);

(iv)        No later than twenty (20) Business Days after the Subscription Commencement Date (as defined in the Backstop Commitment Letter), the Debtors shall

have ended the subscription period for the Rights Offering (as defined in the Restructuring Support Agreement);

(v)       No later than one hundred and five (105) calendar days following the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order and an order approving the Backstop Commitment Agreement;

(vi)      No later than one hundred and twenty (120) calendar days after the Petition Date, the Plan Effective Date shall have occurred.

(d)       Following the occurrence of a Sale Toggle Event, then:

(i)       by no later than the date that is fourteen (14) days following the date on which the Sale Toggle Event occurs, the filing with the Bankruptcy Court of a motion to approve bid procedures in respect of an Acceptable Sale Transaction in form and substance satisfactory to the Required Lenders in their sole discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders, the "Acceptable Bid Procedures Motion");

(ii)      by no later than the date that is twenty-four (24) days following the filing of the Acceptable Bid Procedures Motion, the entry by the Bankruptcy Court of an order approving such Acceptable Bid Procedures Motion (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders, the "Acceptable Bid Procedures Order");

(iii)     by no later than the date that is fifty (50) days following the entry by the Bankruptcy Court of the Acceptable Bid Procedures Order, the commencement of an auction in connection with such Acceptable Sale (the "Auction"), unless, in accordance with the Acceptable Bid Procedures Order, no Auction is required; and

(iv)      by no later than sixty (60) days after the occurrence of a Sale Toggle Event, the entry by the Bankruptcy Court of an order approving such Acceptable Sale Transaction, if applicable (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders, the "Acceptable Sale Order");

*provided* that, for the avoidance of doubt (x) the Approved Restructuring and all terms, conditions and documentation in respect thereof, including all documents referenced above and/or other documentation in connection with an Acceptable Plan or Acceptable Sale Transaction shall be subject to the consent requirements set forth in the definition of "Approved Restructuring", (y) the Bid Procedures Motion and Procedures Order shall be consistent with the definition of "Acceptable Sale Transaction."

Section 5.16.   Bankruptcy Covenants.

(a)       The Debtors shall cause all proposed First Day Orders, "second day" orders and all other orders establishing procedures for administration of the Cases or approving significant or outside the ordinary course of business transactions submitted to the Bankruptcy

Court to be in accordance with and permitted by the terms of this Agreement and, in any event, reasonably acceptable to the Required Lenders in all respects.

(b)        The Loan Parties shall comply in all material respects with each order entered by the Bankruptcy Court.

(c)        The Debtors shall comply in a timely manner with their obligations and responsibilities as debtors-in-possession under the Bankruptcy Code, the Orders, and any other order of the Bankruptcy Court.

(d)        The Debtors shall provide at least five (5) Business Days' (or such shorter notice reasonably acceptable to the Required Lenders) prior written notice to the Lenders or their counsel prior to any filing of a motion for assumption or rejection of any Debtor's or any other Subsidiary's material contracts pursuant to Section 365 of the Bankruptcy Code and no such contract or lease shall be assumed or rejected, if such assumption or rejection would be materially adverse to the interests of the Secured Parties.

(e)        The Debtors shall deliver or cause to be delivered to the Required Lenders or their counsel for review and comment, as soon as reasonably practicable in advance of (but no later than two (2) Business Days prior to) any filing with the Bankruptcy Court, copies of all proposed pleadings, motions, applications, orders, financial information and other documents to be filed by or on behalf of the Loan Parties with the Bankruptcy Court except those that are ministerial or administrative pleadings, motions, applications, orders, financial information and other documents to be filed by or on behalf of the Loan Parties, or distributed by or on behalf of the Loan Parties to any official or unofficial committee appointed or appearing in the Cases or any other party in interest, and shall consult in good faith with the Required Lenders' advisors regarding the form and substance of any such document.

(f)        The Debtors shall provide (i) if not otherwise provided by the Bankruptcy Court's electronic docketing system or the website maintained by the Debtors' noticing and service agent, copies to the Administrative Agent of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Debtors with the Bankruptcy Court or filed with respect to any Loan Document, (ii) reporting and financial information distributed by or on behalf of the Debtors to the Consenting Stakeholders (as defined in the Restructuring Support Agreement) or any statutory committee appointed in the Cases and (iii) such other reports and information as the Required Lenders may, from time to time, reasonably request.

(g)        In connection with the Cases, the Borrower and the other Debtors shall use best efforts to seek to give the proper notice for (i) the motions seeking approval of the Loan Documents and the Orders and (ii) the hearings for the approval of the Orders. The Borrower and the other Debtors shall give, on a timely basis as specified in the Orders, all notices required to be given to all parties specified in the Orders.

(h)        The Borrower and the other Debtors shall use reasonable best efforts to obtain the Final Order.

(i)         Each Debtor shall provide the Administrative Agent and the Lenders with reasonable access to non-privileged information (including historical information) and relevant personnel regarding strategic planning, cash and liquidity management, operational and restructuring activities, in each case subject to customary confidentiality restrictions.

(j)         Each Debtor shall promptly deliver or cause to be delivered to the Financial Advisor (and the Financial Advisor shall be entitled to deliver such information to any Lender or Agent subject to the confidentiality requirements herein) copies of (i) any term sheets, proposals, or presentations from any party, related to (A) the restructuring of the Debtors, or (B) a material sale of assets of one or all of the Debtors and/or any other Restricted Subsidiary, subject to any existing confidentiality and other obligations owed by such Debtor and/or Loan Party to such party furnishing such term sheets, proposals or presentations, including with respect to the sharing of any such information with third parties and (ii) any informational packages provided to potential bidders, draft agency agreements, purchase agreements, status reports and updated information related to the sale or any other transaction and copies of any such bids and any updates, modifications or supplements to such information and materials; provided that, for the avoidance of doubt, the foregoing shall not apply to any Lender or Agent participating in a material sale of assets of one or all of the Debtors and/or any other Restricted Subsidiary in accordance with Acceptable Bidding Procedures.

(k)         All pleadings related to procedures for approval of significant transactions, including, without limitation, asset sale procedures, regardless of when filed or entered, shall be reasonably satisfactory in form and substance to the Required Lenders in their sole discretion.

Section 5.17.   Budget and Variance Reports.

(a)         On or before February 10, 2023 and each fourth Friday thereafter, the Borrower shall deliver to the Financial Advisor (and the Financial Advisor shall be entitled to deliver such information to any Lender or Agent) a Budget, which shall be in substantially the same form and detail of the Initial Budget, and an EMEA Report, which shall be in substantially the same form and detail of the Initial EMEA Report, in each case, accompanied by (1) a certificate signed by a Financial Officer of the Borrower to the effect that such budget has been prepared in good faith based upon assumptions which the Borrower believes to be reasonable in light of the conditions existing at the time of delivery and (2) such supporting documentation as reasonably requested by the Financial Advisor or the Required Lenders.

(b)         Each Budget delivered pursuant to Section 5.17(a) or any proposed amendment or supplement to the Budget delivered by the Borrower to the Financial Advisor (and the Financial Advisor shall be entitled to deliver such information to any Lender or Agent) shall replace, amend or supplement, as the case may be, the prior Budget hereunder only to the extent that the Required Lenders consent (which consent may be documented pursuant to email) to such replacement, amendment or supplement, it being acknowledged and agreed that if the Required Lenders do not object to any such Budget within five (5) Business Days of delivery thereof, it shall be deemed to be approved by the Required Lenders as the Budget; provided, that if the proposed Budget is objected to by the Required Lenders, the Budget that was last approved by the Required Lenders shall continue to be in effect until such objection is resolved in the Required Lenders' sole discretion.

(c)      Beginning on February 10, 2023 and each Friday thereafter, the Borrower shall deliver to the Financial Advisor (and the Financial Advisor shall be entitled to deliver such information to any Lender or Agent) a Variance Report. Concurrently with delivery of each Variance Report, a Financial Officer of the Borrower shall deliver an Officer's Certificate certifying that the Variance Report (i) demonstrates compliance with Section 6.22 and (ii) was prepared in good faith and fairly presents in all material respects the information set forth therein.

Section 5.18.   DIP Term Loan Proceeds Account. The Borrower shall hold all proceeds of the New Money Loans in the DIP Term Loan Proceeds Account. The Borrower may withdraw funds from the DIP Term Loan Proceeds Account so long as such funds are applied in accordance with the Budget (subject to Budget Variances).

<div align="center">

ARTICLE 6
NEGATIVE COVENANTS

</div>

Until the Termination Date shall have occurred, the Borrower covenants and agrees with the Lenders that:

Section 6.01.   Indebtedness; Certain Equity Securities.

(a)              the Borrower will not, and will not permit any Restricted Subsidiary to, create, incur, assume or permit to exist any Indebtedness, except:

(i)              (A) Indebtedness of the Loan Parties under the Loan Documents and (B) Prepetition Indebtedness of any Debtor;

(ii)              Indebtedness outstanding on the Effective Date and listed on Schedule 6.01;

(iii)              Guarantees by the Borrower and the Restricted Subsidiaries in respect of Indebtedness (other than Indebtedness permitted under Section 6.01(a)(xxiv)) of the Borrower or any Restricted Subsidiary otherwise permitted hereunder (other than Guarantees by Restricted Subsidiaries that are not Domestic Loan Parties or Canadian Loan Parties of Indebtedness incurred pursuant to Section 6.01(a)(xxii)); provided that (A) such Guarantee is otherwise permitted by Section 6.04, (B) no Guarantee by any Restricted Subsidiary of any Junior Financing shall be permitted unless such Restricted Subsidiary shall have also provided a Guarantee of the Loan Document Obligations pursuant to the Domestic Guarantee Agreement or the Foreign Guarantee Agreement, as applicable and (C) if the Indebtedness being Guaranteed is subordinated to the Loan Document Obligations, such Guarantee shall be subordinated to the Guarantee of the Loan Document Obligations on terms at least as favorable (as reasonably determined by the Required Lenders) taken as a whole, to the Lenders as those contained in the subordination of such Indebtedness;

(iv)              Indebtedness of the Borrower or any Restricted Subsidiary owing to the Borrower or any Restricted Subsidiary to the extent permitted by Section 6.04; provided that all such Indebtedness of any Loan Party owing to any Restricted Subsidiary that is not a Loan Party shall be subordinated to the Loan Document Obligations (but only to the

<div align="center">103</div>

extent permitted by applicable law and not giving rise to material adverse Tax consequences) on terms (A) at least as favorable to the Lenders as those set forth in the form of intercompany subordination agreement attached as Exhibit S (the "Intercompany Subordination Agreement") or (B) otherwise reasonably satisfactory to the Required Lenders;

(v)       (A) Indebtedness (including Capital Lease Obligations) of the Borrower or any Restricted Subsidiary financing the acquisition, construction, repair, replacement, installation or improvement of any property (real or personal, and whether through the direct purchase of property or the Equity Interest of any person owning such property); provided that such Indebtedness is incurred concurrently with or within 270 days after the applicable acquisition, construction, repair, replacement, installation or improvement and (B) any Permitted Refinancing of any Indebtedness set forth in the immediately preceding subclause (A); provided further that, at the time of any such incurrence of Indebtedness and after giving pro forma effect thereto and to the use of the proceeds thereof, the aggregate principal amount of Indebtedness that is outstanding in reliance on this subclause (v) shall not exceed $2,500,000 as of such time;

(vi)      Indebtedness in respect of Swap Agreements entered into to hedge or mitigate risks to which the Borrower or any Restricted Subsidiary has actual exposure (other than those in respect of shares of capital stock or other Equity Interests of the Borrower or any Restricted Subsidiary), including Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of the Borrower or any Restricted Subsidiary;

(vii)     Indebtedness incurred pursuant to Section 8a of the German Old Age Employees Retirement Act (*Altersteilzeitgesetz*) or Section 7e of the Fourth Book of the German Social Security Code IV (*Sozialgesetzbuch IV*);

(viii)    Indebtedness consisting of unsecured promissory notes issued by any Loan Party to current or former officers, managers, consultants, independent contractors, directors and employees or their respective estates, successors, spouses, former spouses, domestic partners, heirs, legatees or distributees to finance the purchase or redemption of Equity Interests of the Borrower permitted by Section 6.08(a);

(ix)      Indebtedness arising from an agreement providing for indemnification obligations or obligation in respect of purchase price or other similar adjustments incurred pursuant to transactions permitted by Section 6.04(i) and Section 6.05(l);

(x)       Indebtedness consisting of obligations under deferred compensation or other similar arrangements incurred (A) in the ordinary course of business to current or former directors, officers, employees, members of management, managers and consultants of the Borrower and/or any Restricted Subsidiary and (B) in connection with any Investment permitted hereunder;

(xi)         Cash Management Obligations and other Indebtedness in respect of netting services, cash pooling, overdraft protections and similar arrangements and Indebtedness arising from the honoring of a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds, in each case in the ordinary course of business;

(xii)        Indebtedness of the Domestic Loan Parties and the Canadian Loan Parties; provided that at the time of the incurrence thereof and after giving pro forma effect thereto, the aggregate principal amount of Indebtedness outstanding in reliance on this clause (xii) shall not exceed $2,500,000; and shall be subject to the Required Additional Debt Terms;

(xiii)       Indebtedness consisting of (A) the financing of insurance premiums or (B) take-or-pay obligations contained in supply arrangements, in each case in the ordinary course of business;

(xiv)        Indebtedness incurred by the Borrower or any Restricted Subsidiary in respect of letters of credit, bank guarantees, bankers' acceptances, or similar instruments issued or created, or related to, obligations or liabilities (other than Indebtedness) incurred in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other reimbursement-type obligations regarding workers compensation claims;

(xv)         obligations in respect of performance, bid, appeal and surety bonds and performance, bankers acceptance facilities and completion guarantees, leases, government or trade contracts and similar obligations provided by the Borrower or any Restricted Subsidiary or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(xvi)        [reserved];

(xvii)       Indebtedness under the De Lage Program in the ordinary course of business and consistent with past practice in an aggregate amount at any time outstanding not to exceed $10,000,000;

(xviii)      [reserved];

(xix)        any liability in respect of any Loan Party arising under a declaration of joint and several liability (*hoofdelijke aansprakelijkheid*) as referred to in Section 2:403 of the Dutch Civil Code (and any residual liability under such declaration arising pursuant to Section 2:404(2) of the Dutch Civil Code;

(xx)         any liability arising as a result of a fiscal unity (*fiscale eenheid*) between Loan Parties;

(xxi)        [reserved];

(xxii)          Indebtedness of the Domestic Loan Parties and the Canadian Loan Parties under the DIP ABL Credit Agreement; provided that the aggregate principal amount of Indebtedness outstanding in reliance on this clause (xxii) shall not exceed $17,425,000; provided, that any such Indebtedness, if secured, shall be secured only by Liens granted under the Orders or permitted under Section 6.02(xix);

(xxiii)         [reserved];

(xxiv)         [reserved];

(xxv)         [reserved]; and

(xxvi)         all premiums (if any), interest (including interest paid in kind and post-petition interest), accretion or amortization of original issue discount, fees, expenses, charges and additional or contingent interest on obligations described in clauses (i) through (xxv) above.

(b)         The Borrower will not, nor will it permit any Restricted Subsidiary to, issue any preferred Equity Interests or any Disqualified Equity Interests.

Section 6.02.   Liens. The Borrower will not, nor will it permit any Restricted Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, except:

(i)         Liens created under (A) the Orders, (B) this Agreement and any other Loan Document and (C) any Prepetition Secured Documents, as in effect on the Petition Date or as modified to the extent not prohibited by the applicable Intercreditor Agreement;

(ii)         Permitted Encumbrances;

(iii)         Liens existing on the Petition Date; provided that any Lien securing Indebtedness or other obligations in excess of $1,000,000 individually shall only be permitted if set forth on Schedule 6.02, and any modifications, replacements, renewals or extensions thereof; provided that (1) such modified, replacement, renewal or extension Lien does not extend to any additional property other than (a) after-acquired property that is affixed or incorporated into the property covered by such Lien and (b) proceeds and products thereof, and (2) the obligations secured or benefited by such modified, replacement, renewal or extension Lien are permitted by Section 6.01;

(iv)         Liens securing Indebtedness permitted under Section 6.01(a)(v); provided that (A) such Liens attach concurrently with or within 270 days after the acquisition, repair, replacement, construction or improvement (as applicable) of the property subject to such Liens, (B) such Liens do not at any time encumber any property other than the property financed by such Indebtedness, except for accessions to such property and the proceeds and the products thereof, and any lease of such property (including accessions thereto) and the proceeds and products thereof and (C) with respect to Capital Lease Obligations, such Liens do not at any time extend to or cover any assets

106

(except for accessions to or proceeds of such assets) other than the assets subject to such Capital Lease Obligations; provided further that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

(v)           leases, licenses, subleases or sublicenses granted to others (whether on an exclusive or non-exclusive basis) that are entered into in the ordinary course of business or that do not interfere in any material respect with the business of the Borrower and the Restricted Subsidiaries, taken as a whole;

(vi)          Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(vii)         Liens (A) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection and (B) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of setoff) and that are within the general parameters customary in the banking industry;

(viii)        Liens (A) on cash advances or escrow deposits in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 6.04 to be applied against the purchase price for such Investment or otherwise in connection with any escrow arrangements with respect to any such Investment or any Disposition permitted under Section 6.05 (including any letter of intent or purchase agreement with respect to such Investment or Disposition) or (B) consisting of an agreement to dispose of any property in a Disposition permitted under Section 6.05 in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(ix)          Liens on property and Equity Interests, in each case, that are not Collateral, which Liens secure Indebtedness of a Restricted Subsidiary that is not a Loan Party that is permitted under Section 6.01(a);

(x)           Liens granted by a Restricted Subsidiary that is not a Loan Party in favor of any Loan Party (other than any Intermediate Holdco), Liens granted by a Restricted Subsidiary that is not a Loan Party in favor of Restricted Subsidiary that is not a Loan Party and Liens granted by a Loan Party (other than any Intermediate Holdco) in favor of any other Loan Party;

(xi)          [reserved];

(xii)         any interest or title (and all encumbrances and other matters affecting such interest or title) of a lessor, sublessor, licensor or sublicensor or secured by a lessor's sublessor's, licensor's or sublicensor's interest under leases (other than leases constituting Capital Lease Obligations), subleases, licenses, cross-licenses or sublicense entered into by the Borrower or any Restricted Subsidiary in the ordinary course of business;

(xiii)  Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale or purchase of goods by the Borrower or any Restricted Subsidiary in the ordinary course of business;

(xiv)  Liens deemed to exist in connection with Investments in repurchase agreements permitted under clause (e) of the definition of the term "Permitted Investments";

(xv)  [reserved];

(xvi)  Liens that are contractual rights of setoff (A) relating to the establishment of depository relations with banks not given in connection with the incurrence of Indebtedness, including liens or rights of set-off arising under the general terms and conditions of banks with whom any group member maintains a banking relationship in the ordinary course of business; including liens of group members under the German general terms and condition of banks and saving banks (*Allgemeine Geschäftsbedingungen der Banken und Sparkassen*) (B) relating to pooled deposit or sweep accounts to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and the Restricted Subsidiaries or (C) relating to purchase orders and other agreements entered into with customers of the Borrower or any Restricted Subsidiary in the ordinary course of business;

(xvii)  ground leases in respect of real property on which facilities owned or leased by the Borrower or any Restricted Subsidiary are located and, in respect of real property located in Germany, any landlord' lien (*Vermieter- oder Verpächterpfandrecht*);

(xviii)  Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(xix)  Liens on the Collateral of the Domestic Loan Parties and/or the Canadian Loan Parties in each case securing the DIP ABL Obligations, provided that such Liens shall be subject to the ABL Intercreditor Agreement;

(xx)  other Liens; provided that at the time of incurrence of such Liens and the obligations secured thereby (after giving pro forma effect to any such obligations) the aggregate outstanding face amount of obligations secured by Liens existing in reliance on this clause (xx) shall not exceed $1,000,000;

(xxi)  any security or quasi-security granted under mandatory law (sections 22, 204 of the German Transformation Act (*Umwandlungsgesetz*)) in favor of creditors as a consequence of a merger or conversion permitted under this Agreement;

(xxii)  [reserved];

(xxiii)  receipt of progress payments and advances from customers in the ordinary course of business to the extent the same creates a Lien on the related inventory and proceeds thereof;

(xxiv)          [reserved];

(xxv)          Liens on amounts under Pension Benefits Standards Act of Canada or any province thereto applicable to any Foreign Pension Plan that relate to contributions withheld from pay but not yet due to be remitted; and

(xxvi)          [reserved].

Notwithstanding the foregoing, the Borrower will not, nor will it permit any Restricted Subsidiary to, create, incur, assume or permit to exist any consensual Lien on any Equity Interests of any Intermediate Holdco, except (i) Liens created under the Loan Documents or the Orders and (ii) Liens existing on the Petition Date.

Section 6.03.  <u>Fundamental Changes</u>. The Borrower will not, nor will it permit any Restricted Subsidiary to, merge into, amalgamate or consolidate or amalgamate with any other Person, or permit any Person to merge into or consolidate with it, or liquidate or dissolve, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of the assets (whether now owned or hereafter acquired) of the Borrower and the Restricted Subsidiaries, taken as a whole, to or in favor of any Person (other than as part of the Transactions), except that:

(a)          any Restricted Subsidiary of the Borrower (other than any Intermediate Holdco) may merge, amalgamate, consolidate or amalgamate with (A) the Borrower; <u>provided</u> that the Borrower shall be the continuing or surviving Person or (B) one or more other Restricted Subsidiaries of the Borrower; <u>provided</u> that, when any Domestic Subsidiary Guarantor or any Canadian Loan Party is merging, consolidating or amalgamating with any other Restricted Subsidiary the continuing or surviving Person shall be a Domestic Subsidiary Guarantor or a Canadian Loan Party; <u>provided</u>, <u>further</u> that, except with the consent of the Required Lenders (in their sole discretion) when any European Loan Party is merging, consolidating or amalgamating with any other Restricted Subsidiary the continuing or surviving Person shall be a Domestic Subsidiary Guarantor, a Canadian Loan Party or Subsidiary Loan Party organized in the same Specified Jurisdiction as such European Loan Party;

(b)          any Restricted Subsidiary (other than any Intermediate Holdco) may liquidate or dissolve if the Borrower determines in good faith that such action is in the best interests of the Borrower and the Restricted Subsidiaries, taken as a whole, and is not materially disadvantageous to the Lenders;

(c)          any Restricted Subsidiary (other than any Intermediate Holdco) may make a Disposition of all or substantially all of its assets (upon voluntary liquidation or otherwise) to any other Restricted Subsidiary; <u>provided</u> that if the transferor in such a transaction is a Loan Party, then either (A) the transferee must be a Loan Party (other than an Intermediate Holdco), (B) to the extent constituting an Investment, such Investment must be an Investment in a Restricted Subsidiary that is not a Loan Party permitted by <u>Section 6.04 and Section 6.16</u> or (C) to the extent constituting a Disposition to a Restricted Subsidiary that is not a Loan Party, such Disposition is for Fair Market Value and any promissory note or other non-cash consideration received in respect thereof is an Investment in a Restricted Subsidiary that is not a Loan Party permitted by <u>Section 6.04 and Section 6.16</u>; <u>provided</u> that the aggregate amount of Dispositions made in reliance on

subclauses (B) and (C) of this clause (c), together with (x) all other Investments made in and Dispositions made to Restricted Subsidiaries that are not Loan Parties by any Loan Party after the Effective Date and (y) all Investments and Dispositions made in reliance on Section 6.16(ii), shall not exceed, at the time of the making thereof, and after giving pro forma effect thereto, $2,500,000;

(d)             [reserved];

(e)             [reserved];

(f)             any Restricted Subsidiary may merge, consolidate or amalgamate with any other Person (other than any Intermediate Holdco) in order to effect an Investment permitted pursuant to Section 6.04; provided that the continuing or surviving Person shall be a Restricted Subsidiary, which shall have complied with the requirements of Sections 5.11 and 5.12; provided further, that no such merger, consolidation or amalgamation involving any European Loan Party shall be permitted pursuant to this clause (f) unless the same has been consented to by the Required Lenders (in their sole discretion);

(g)             [reserved];

(h)             [reserved]; and

(i)             any Restricted Subsidiary (other than any Intermediate Holdco) may effect a merger, dissolution, liquidation consolidation or amalgamation to effect a Disposition permitted pursuant to Section 6.05; provided further, that no such merger, consolidation or amalgamation involving any European Loan Party shall be permitted pursuant to this clause (i) unless the same has been consented to by the Required Lenders (in their sole discretion).

Section 6.04.   Investments, Loans, Advances, Guarantees and Acquisitions. The Borrower will not, nor will it permit any Restricted Subsidiary to, make or hold any Investment, except:

(a)             Permitted Investments at the time such Permitted Investment is made;

(b)             loans or advances to present or former officers, directors, managers, members of management, consultants, independent contractors and employees of the Borrower and the Restricted Subsidiaries (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes and (ii) for purposes not described in the foregoing clause (i); provided that at the time of incurrence thereof and after giving pro forma effect thereto, the aggregate principal amount outstanding in reliance on these clauses (i) and (ii) shall not exceed $1,000,000;

(c)             Investments (i) by the Borrower or any Restricted Subsidiary in any Loan Party; provided that to the extent the aggregate amount of Investments by a Restricted Subsidiary that is not a Loan Party in a Loan Party exceeds $1,000,000, such non-Loan Party Restricted Subsidiary shall have acceded to the Junior Intercreditor Agreement pursuant to the terms thereof; (ii) by any Restricted Subsidiary that is not a Loan Party in any other Restricted Subsidiary that is also not a Loan Party, (iii) subject to the proviso in clause (c)(i) of this Section 6.04, by the Borrower or any Restricted Subsidiary (A) in any Restricted Subsidiary; provided that (x) the aggregate amount of such Investments made by Loan Parties after the Effective Date in Restricted

110

Subsidiaries that are not Loan Parties in reliance on this clause (iii)(A), together with the aggregate amount of (x) all other Investments made in and Dispositions made to Restricted Subsidiaries that are not Loan Parties by any Loan Parties after the Effective Date and (y) all Investments and Dispositions made in reliance on Section 6.16(ii), shall not exceed, at the time of the making thereof and after giving pro forma effect thereto, $2,500,000, (y) no Event of Default has occurred and is continuing and (z) all Investments made by Loan Parties in Restricted Subsidiaries that are not Loan Parties in reliance on this clause (iii)(A) shall be made only for the purpose of financing working capital needs of such non Loan Parties or another purpose agreed to by the Required Lenders (in their sole discretion) and shall be evidenced by an intercompany note that has been pledged as Collateral, (B) [reserved] or (C) constituting Guarantees of Indebtedness or other monetary obligations of Restricted Subsidiaries that are not Loan Parties owing to any Loan Party, (iv) by the Borrower or any Restricted Subsidiary in Restricted Subsidiaries that are not Loan Parties so long as such transaction is part of a series of simultaneous transactions that results in the proceeds of the initial Investment being invested in one or more Loan Parties, (v) subject to the consent of the Required Lenders (in their sole discretion), by the Borrower or any Restricted Subsidiary in any Restricted Subsidiary that is not a Loan Party, consisting of the contribution of Equity Interests of any other Restricted Subsidiary that is not a Loan Party so long as the Equity Interests of the transferee Restricted Subsidiary is pledged to secure the Secured Obligations;

(d)        Investments consisting of deposits, prepayments and/or other credits to suppliers in the ordinary course of business;

(e)        Investments consisting of extensions of trade credit in the ordinary course of business;

(f)        Investments existing or contemplated on the Petition Date and set forth on Schedule 6.04(f) and any modification, replacement, renewal, reinvestment or extension thereof; provided that the amount of the original Investment is not increased except by the terms of such Investment to the extent set forth on Schedule 6.04(f) or as otherwise permitted by this Section 6.04;

(g)        Investments in Swap Agreements permitted under Section 6.01;

(h)        promissory notes and other non-cash consideration received in connection with Dispositions permitted by Section 6.05;

(i)        the acquisition of BAN Precision Manufacturing;

(j)        subject to the consent of the Required Lenders (in their sole discretion), Investments made by any Loan Party in any non-Loan Party consisting of contributions or other Dispositions of Equity Interests of Persons that are non-Loan Parties; provided that, prior to such contribution or Disposition, such Equity Interests were not owned directly by a Loan Party or such Equity Interests are contributed or disposed to a Non-Loan Party that is a wholly owned Restricted Subsidiary of a Loan Party;

(k)        Investments in the ordinary course of business consisting of endorsements for collection or deposit and customary trade arrangements with customers consistent with past practices;

(l)           Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers, from financially troubled account debtors or in settlement of delinquent obligations of, or other disputes with, customers and suppliers or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(m)           subject to the consent of the Required Lenders (in their sole discretion), cash or property distributed from any Restricted Subsidiary that is not a Loan Party (i) may be contributed to other Restricted Subsidiaries that are not Loan Parties, and (ii) may pass through the Borrower and/or any intermediate Restricted Subsidiaries, so long as part of a series of related transactions and such transaction steps are not unreasonably delayed and are otherwise permitted hereunder;

(n)           additional Investments and other acquisitions made and held by the Loan Parties; provided that at the time any such Investment or other acquisition is made, the aggregate outstanding amount of such Investment or acquisition made in reliance on this clause (n), (including the aggregate amount of all consideration paid in connection with all other Investments and acquisitions made in reliance on this clause (n)), whether in the form of Indebtedness assumed or otherwise), shall not exceed at the time of incurrence thereof and after giving pro forma effect thereto, $500,000; provided that (x) the aggregate amount of such Investments made by Loan Parties after the Effective Date in Restricted Subsidiaries that are not Loan Parties in reliance on this clause (n), together with the aggregate amount of (x) all other Investments made in and Dispositions made to Restricted Subsidiaries that are not Loan Parties by Loan Parties after the Effective Date and (y) all Investments and Dispositions made in reliance on Section 6.16(ii), shall not exceed, at the time of the making thereof and after giving pro forma effect thereto, $2,500,000 at any time outstanding and (y) all Investments made by Loan Parties in Restricted Subsidiaries that are not Loan Parties in reliance on this clause (n) shall be made only for the purpose of financing working capital needs  of such non Loan Parties or another purpose agreed to by the Required Lenders (in their sole discretion) and shall be evidenced by an intercompany note that has been pledged as Collateral;

(o)           [reserved];

(p)           advances of payroll payments to employees in the ordinary course of business;

(q)           Investments and other acquisitions to the extent that payment for such Investments is made with Qualified Equity Interests of the Borrower; provided that any other amounts used for such an Investment or other acquisition that are not Qualified Equity Interests of the Borrower shall otherwise be permitted pursuant to this Section 6.04;

(r)           [reserved];

(s)           [reserved];

(t)           Investments consisting of Indebtedness, Liens, fundamental changes, Dispositions and Restricted Payments permitted (other than by reference to this Section 6.04(t)) under Sections 6.01, 6.02, 6.03, 6.05 and 6.08, respectively;

112

(u)              [reserved];

(v)              [reserved];

(w)              to the extent that they constitute Investments, purchases and acquisitions of inventory, supplies, materials or equipment or purchases, acquisitions, licenses or leases of other assets, Intellectual Property, or other rights, in each case in the ordinary course of business;

(x)              [reserved];

(y)              [reserved];

(z)              [reserved];

(aa)              [reserved]; and

(bb)              unfunded pension fund and other employee benefit plan obligations and liabilities to the extent that the same are permitted to remain unfunded under applicable Requirements of Law.

Section 6.05.   Asset Sales. (i) The Borrower will not, nor will it permit any Restricted Subsidiary to, sell, transfer, lease, license or otherwise dispose of any asset, including any Equity Interest and any Intellectual Property owned by it, and (ii) the Borrower will not permit any Restricted Subsidiary to issue any additional Equity Interest (other than (A) issuing directors' qualifying shares, nominal shares issued to foreign nationals to the extent required by applicable Requirements of Law, (B) issuing Equity Interests to the Borrower or any Restricted Subsidiary in compliance with Section 6.04(c), (C) any non-wholly-owned Restricted Subsidiary issuing Equity Interests of such Subsidiary to each owner of Equity Interests of such Subsidiary ratably based on their relative ownership interests) and (D) issuing securities pursuant to a management equity plan, stock option plan, phantom equity plan or any other management, employee benefit or other compensatory plan or agreement (and any successor plans or arrangements thereto)), in each case, having a fair market value (x) in excess of $250,000 in a single transaction or a series of related transactions or (y) in excess of $1,000,000 in the aggregate during the term of this Agreement (each, a "Disposition"), except:

(a)              Dispositions of obsolete or worn out property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used or useful, or economically practicable to maintain, in the conduct of the business of the Borrower and the Restricted Subsidiaries (including (i) allowing any registration or application for registration of any Intellectual Property that is no longer used or useful, or economically practicable to maintain, to lapse, go abandoned, or be invalidated or (ii) disposing of, discontinuing the use or maintenance of, abandoning, failing to pursue or otherwise allowing to lapse, expire, terminate or put into the public domain any of its Intellectual Property if the Borrower determines in its reasonable business judgment that such discontinuance is desirable in the conduct of its business);

(b)              Dispositions of inventory in the ordinary course of business (including on an intercompany basis);

113

(c)        Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property, or other assets of comparable or greater value or usefulness to the business or (ii) an amount equal to the Net Proceeds of such Disposition are promptly applied to the purchase price of such replacement property;

(d)        Dispositions of property to the Borrower or any Restricted Subsidiary; provided that if the transferor in such a transaction is a Loan Party, then either (i) the transferee must be a Loan Party, (ii) to the extent constituting an Investment, such Investment must be an Investment in a Restricted Subsidiary that is not a Loan Party permitted by Section 6.04 and Section 6.16 or (iii) to the extent constituting a Disposition to a Restricted Subsidiary that is not a Loan Party, such Disposition is for Fair Market Value and any promissory note or other non-cash consideration received in respect thereof is an Investment in a Restricted Subsidiary that is not a Loan Party permitted by Section 6.04 and Section 6.16; provided that the aggregate amount of such Dispositions made by Loan Parties after the Effective Date in Restricted Subsidiaries that are not Loan Parties in reliance on this clause (d), together with the aggregate amount of (x) all other Investments made in and Dispositions made to Restricted Subsidiaries that are not Loan Parties by Loan Parties after the Effective Date and (y) all Investments and Dispositions made in reliance on Section 6.16(ii), shall not exceed $2,500,000;

(e)        Dispositions permitted by Section 6.03, Investments permitted by Section 6.04, Restricted Payments permitted by Section 6.08 and Liens permitted by Section 6.02, in each case, other than by reference to this Section 6.05(e);

(f)        Dispositions of cash and/or Permitted Investments;

(g)        the sale or discount, in each case without recourse, of past due accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof and not for financing purposes;

(h)        leases, subleases, licenses or sublicenses, in each case in the ordinary course of business and that do not materially interfere with the business of the Borrower and the Restricted Subsidiaries, taken as a whole;

(i)        transfers of property subject to Casualty Events upon receipt of the Net Proceeds of such Casualty Event;

(j)        Dispositions of property to Persons other than the Borrower or any Restricted Subsidiary (including the sale or issuance of Equity Interests in a Restricted Subsidiary) not otherwise permitted under this Section 6.05 in an aggregate amount during the term of this Agreement not to exceed $2,500,000; provided, that (i) such Disposition is made for Fair Market Value and (ii) the Borrower or any Restricted Subsidiary shall receive not less than 75.0% of such consideration in the form of cash or Permitted Investments (provided, that for purposes of this clause (ii), the following shall be deemed to be cash or Permitted Investments: (1) any liabilities other than Prepetition Indebtedness (as shown on the Borrower's or such Restricted Subsidiary's most recent balance sheet or in the notes thereto for which internal financial statements are available immediately preceding such date or, if incurred or accrued subsequent to the date of such balance sheet, such liabilities that would have been reflected on the Borrower's or such Restricted

Subsidiary's balance sheet or in the footnotes thereto if such incurrence or accrual had taken place on or prior to the date of such balance sheet in the good faith determination of the Borrower) of the Borrower or any of its Restricted Subsidiaries (other than liabilities that are by their terms subordinated to the Secured Obligations) that are extinguished in connection with the transactions relating to such Disposition, or that are assumed by the transferee, in each case, pursuant to an agreement that releases or indemnifies the Borrower and/or its applicable Restricted Subsidiaries, as the case may be, from further liability and (2) any notes or other obligations or other securities or assets received by the Borrower or any of its Restricted Subsidiaries from such transferee that are converted by the Borrower or such Restricted Subsidiary into cash or Cash Equivalents, or by their terms are required to be satisfied for cash or Permitted Investments (to the extent of the cash or Permitted Investments received), in each case, within 60 days of the receipt thereof;  provided, further,  that the Net Proceeds thereof shall be applied in accordance with Section 2.11(d);

(k)       Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between the joint venture parties set forth in, joint venture agreements and similar binding arrangements;

(l)       the Freedom Winddown;

(m)       transfers of condemned property as a result of the exercise of "eminent domain" or other similar powers to the respective Governmental Authority or agency that has condemned the same (whether by deed in lieu of condemnation or otherwise), and transfers of property arising from foreclosure or similar action or that have been subject to a casualty to the respective insurer of such real property as part of an insurance settlement;

(n)       [reserved];

(o)       [reserved];

(p)       [reserved];

(q)       any merger, amalgamation, consolidation, Disposition or conveyance the sole purpose of which is to reincorporate or reorganize (i) any Domestic Subsidiary in another jurisdiction in the U.S., (ii) or any Foreign Subsidiary in the U.S. and/or (iii) subject to the consent of the Required Lenders (in their sole discretion), any Foreign Subsidiary in any other jurisdiction; and

(r)       Dispositions of customer accounts receivable in connection with a Vendor Financing Program.

Subject to Section 6.19, to the extent that any Collateral is Disposed of as expressly permitted by this Section 6.05 to any Person other than a Loan Party, subject to the proviso set forth in clause (a) of the definition of Excluded Subsidiary with respect to any Disposition of less than 100% of the Equity Interests of a wholly-owned subsidiary, such Collateral shall be sold free and clear of the Liens created by the Loan Documents, which Liens shall be automatically released upon the consummation of such Disposition; it being understood and agreed that the Administrative Agent, acting at the direction of the Required Lenders, shall be authorized to take, and shall take, any actions deemed appropriate in order to effect the foregoing, and shall be entitled to rely, without

independent investigation on a certificate of Responsible Officer of the Borrower in connection with the foregoing (which shall be delivered to the Administrative Agent upon request therefor).

Section 6.06.   <u>Intermediate Holdco Covenant</u>.

(a)        No Intermediate Holdco will incur any Indebtedness or Liens or engage in any activities or consummate any transactions (including, without limitation, any Investments or Dispositions) and will not conduct, transact or otherwise engage in any business or operations, in each case, other than:

(i)        the ownership and/or acquisition of the Equity Interests of direct subsidiaries of such Intermediate Holdco that are in existence on the Effective Date;

(ii)        the performance of obligations under and compliance with its Organizational Documents, or other Requirement of Law (including the maintenance of its legal existence, including the ability to incur fees, costs and expenses relating to such maintenance), ordinance, regulation, rule, order, judgment, decree or permit, including without limitation as a result of or in connection with the activities of the Restricted Subsidiaries;

(iii)        participating in tax, accounting, cash management, cash pooling, transfer pricing, cost-sharing arrangements and other administrative matters related to the Borrower or any of its Subsidiaries;

(iv)        the entry into, and exercise rights and performance of its obligations under, the Prepetition Term Loan Agreement and the Prepetition Senior Secured Convertible Notes;

(v)        holding of any cash, Permitted Investments and other assets received from the Borrower or any Restricted Subsidiary, in each case, pending prompt application thereof in a manner permitted by the terms of this Agreement (including by way of Restricted Payments pursuant to <u>Section 6.08(a)(i))</u>;

(vi)        incurring fees, costs and expenses relating to overhead and general operating including professional fees for legal, tax and accounting issues and paying taxes, providing indemnification for its current and former officers, directors, members of management, managers, employees and advisors or consultants; and

(vii)        activities incidental to the businesses or activities described in the foregoing clauses.

(b)        No Intermediate Holdco shall, without the prior written consent of the Required Lenders, cause or allow its Centre of Main Interest (as that term is used in Article 3(1) of the Regulation) to change.

(c)        No direct or indirect wholly-owned subsidiary of an Intermediate Holdco shall cease to be a direct or indirect wholly-owned subsidiary of an Intermediate Holdco except (x) in connection with any transaction solely among one or more subsidiaries of Intermediate

Holdco that are permitted by <u>Section 6.03</u> or (y) any transaction consented to by the Required Lenders in their sole discretion.

(d)        No Intermediate Holdco shall merge, amalgamate or consolidate with any other Person without the consent of the Required Lenders.

Section 6.07.   <u>Negative Pledge</u>. The Borrower will not, and will not permit any Restricted Subsidiary to, enter into any agreement, instrument, deed or lease that prohibits or limits the ability of any Loan Party to create, incur, assume or suffer to exist any Lien upon any of their respective properties or revenues, whether now owned or hereafter acquired, for the benefit of the applicable Secured Parties with respect to the applicable Secured Obligations or under the Loan Documents; provided that the foregoing shall not apply to:

(a)        restrictions and conditions imposed by (i) Requirements of Law, (ii) any Loan Document, (iii) the Prepetition Secured Documents, (iv) the DIP ABL Documents, (v) [reserved], (vi) [reserved], and (vii) [reserved];

(b)        customary restrictions and conditions existing on the Effective Date and any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

(c)        restrictions and conditions contained in agreements relating to the Disposition of a Subsidiary or any assets pending such Disposition; <u>provided</u> that such restrictions and conditions apply only to the Subsidiary or assets that is or are subject of such Disposition and such Disposition is permitted hereunder;

(d)        customary provisions in leases, subleases, licenses, cross-licenses or sublicenses and other contracts restricting the assignment thereof;

(e)        restrictions imposed by any agreement relating to secured Indebtedness permitted by this Agreement to the extent such restriction applies only to the property securing by such Indebtedness;

(f)        any restrictions or conditions set forth in any agreement in effect at any time any Person becomes a Restricted Subsidiary (but not any modification or amendment expanding the scope of any such restriction or condition); <u>provided</u> that such agreement was not entered into in contemplation of such Person becoming a Restricted Subsidiary and the restriction or condition set forth in such agreement does not apply to the Borrower or any Restricted Subsidiary;

(g)        restrictions or conditions in any Indebtedness permitted pursuant to <u>Section 6.01</u> that is incurred or assumed by Restricted Subsidiaries that are not Loan Parties to the extent such restrictions or conditions are no more restrictive in any material respect than the restrictions and conditions in the Loan Documents or, in the case of Junior Financing, are market terms at the time of issuance and are imposed solely on such Restricted Subsidiary and its Subsidiaries;

(h)        restrictions on cash (or Permitted Investments) or other deposits imposed by agreements entered into in the ordinary course of business (or other restrictions on cash or deposits constituting Permitted Encumbrances);

(i)            restrictions set forth on Schedule 6.07 and any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

(j)            customary provisions in partnership agreements, limited liability company organizational governance documents, sale leaseback agreements, joint venture agreements and other similar agreements, in each case, entered into in the ordinary course of business;

(k)            customary net worth provisions contained in real property leases entered into by Subsidiaries, so long as the Borrower has determined in good faith that such net worth provisions could not reasonably be expected to impair the ability of the Borrower and its Subsidiaries to meet their ongoing obligations; and

(l)            restrictions arising in any Swap Agreement and/or any agreement relating to any Cash Management Obligation.

Section 6.08.   Restricted Payments; Certain Payments of Indebtedness.

(a)            The Borrower will not, nor will it permit any Restricted Subsidiary to, pay or make, directly or indirectly, any Restricted Payment, except:

(i)            each Restricted Subsidiary of the Borrower may make Restricted Payments to the Borrower or any Restricted Subsidiary of the Borrower (and, in the case of any such Subsidiary that is not a wholly-owned Subsidiary, to each other owner of Equity Interests of such Subsidiary ratably based on their relative ownership interests of the relevant class of Equity Interests);

(ii)            to the extent constituting a Restricted Payment, the Borrower may consummate any transaction permitted by Section 6.03 and Section 6.04 (other than Section 6.04(j), (m), (n), (q) and (t));

(iii)            [reserved];

(iv)            [reserved];

(v)            [reserved];

(vi)            [reserved];

(vii)            [reserved];

(viii)            [reserved];

(ix)            redemptions in whole or in part of any of its Equity Interests for another class of its Equity Interests or with proceeds from substantially concurrent equity contributions or issuances of new Equity Interests; provided that such new Equity Interests contain terms and provisions at least as advantageous to the Lenders in all respects material to their interests as those contained in the Equity Interests redeemed thereby;

118

(x)        payments made or expected to made in respect of withholding or similar Taxes payable by any future, present or former employee, director, manager or consultant and any repurchases of Equity Interests in consideration of such payments including deemed repurchases in connection with the exercise of stock options and the vesting of restricted stock and restricted stock units;

(xi)        [reserved];

(xii)        [reserved];

(xiii)        [reserved]; and

(xiv)        [reserved].

(b)        The Borrower will not, nor will it permit any Restricted Subsidiary to, make or pay, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Junior Financing, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, repayment, prepayment, redemption, retirement, acquisition, cancellation or termination of any such Indebtedness prior to the scheduled maturity date thereof (collectively, "Restricted Debt Payments"), except:

(i)        payment of regularly scheduled interest and principal payments, payments of fees, expenses and indemnification obligations when due in respect of any Indebtedness, other than payments in respect of any Junior Financing prohibited by the subordination provisions thereof;

(ii)        [reserved]; and

(iii)        the conversion of any Junior Financing to or payments with Equity Interests (other than Disqualified Equity Interests) of the Borrower;

(c)        The Borrower will not, nor will it permit any Restricted Subsidiary to, amend or modify any documentation governing any Junior Financing, in each case if the effect of such amendment or modification (when taken as a whole) is in violation of any Intercreditor Agreement or other applicable intercreditor agreement or subordination agreement.

Section 6.09.   Transactions with Affiliates. The Borrower will not, nor will it permit any Restricted Subsidiary to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except:

(i)        (A) transactions among Loan Parties and, to the extent not otherwise prohibited hereunder, their Restricted Subsidiaries and (B) transactions involving aggregate payments or consideration of less than $1,000,000 (in one transaction or a series of transactions);

(ii)           on terms substantially as favorable to the Borrower or such Restricted Subsidiary as would be obtainable by such Person at the time in a comparable arm's-length transaction with a Person other than an Affiliate;

(iii)           guaranty fees among the Loan Parties;

(iv)           issuances of Equity Interests of the Borrower to the extent otherwise permitted by this Agreement;

(v)           employment, consulting, severance and other service or benefit related arrangements between the Borrower and the Restricted Subsidiaries and their respective officers and employees in the ordinary course of business (including loans and advances pursuant to Sections 6.04(b) and 6.04(o), salary or guaranteed payments and bonuses) and transactions pursuant to stock option and other equity award plans and employee benefit plans and arrangements in the ordinary course of business;

(vi)           payments among the Borrower and the Restricted Subsidiaries pursuant to tax sharing agreements among the Borrower and the Restricted Subsidiaries on customary terms to the extent attributable to the ownership or operation of the Borrower and the Restricted Subsidiaries, to the extent payments are permitted by Section 6.08;

(vii)           the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, directors, officers, consultants and employees of the Borrower and the Restricted Subsidiaries in the ordinary course of business to the extent attributable to the ownership or operation of the Borrower and the Restricted Subsidiaries;

(viii)           transactions pursuant to permitted agreements in existence or contemplated on the Effective Date and set forth on Schedule 6.09 or any amendment thereto to the extent such an amendment is not adverse to the Lenders in any material respect;

(ix)           Restricted Payments permitted under Section 6.08;

(x)           the Transactions and the payment of all fees, costs and expenses (including all legal, accounting and other professional fees, costs and expenses) related to the Transactions, in a manner consistent with the Budget;

(xi)           the issuance or transfer of Equity Interests (other than Disqualified Equity Interests) of the Borrower to any former, current or future director, manager, officer, employee or consultant (or spouses, former spouses, successors, heirs, legatees, distributes or Affiliates of any of the foregoing) of the Borrower or any of the Subsidiaries;

(xii)           [reserved];

(xiii)           [reserved];

(xiv)           [reserved];

(xv)        (A) Guarantees permitted by <u>Section 6.01</u> or <u>Section 6.04</u> and (B) Investments permitted by <u>Section 6.04(aa)</u>; and

(xvi)        transactions with customers, clients, joint venture partners, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Agreement that are fair to the Borrower and the Restricted Subsidiaries, in the reasonable determination of the Board of Directors or the senior management of the Borrower, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party.

Section 6.10.   <u>Liquidity</u>.

(a)   The Borrower shall not permit Liquidity, as of the last day of any month, commencing with the month ending February 28, 2023, to be less than $19,500,000.

(b)   The Borrower shall not permit EMEA Cash, as of the last day of any month, commencing with the month ending February 28, 2023, to be less than $19,500,000.

Section 6.11.   <u>Change in Nature of Business</u>. The Borrower and the Restricted Subsidiaries, taken as a whole, will not enter into any new line of business that is fundamentally and substantively different from their existing lines of business conducted by them on the Effective Date, taken as a whole, other than activities reasonably related, complementary or ancillary to such existing lines of business or reasonable extensions thereof.

Section 6.12.   <u>Accounting Changes</u>. The Borrower shall not make any change in its fiscal year; provided, however, that the Borrower may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the Required Lenders, in which case, the Borrower and the Administrative Agent, acting at the direction of the Required Lenders, will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

Section 6.13.   <u>Amendments or Waivers of Organizational Documents</u>. The Borrower shall not, nor shall they permit any Subsidiary Loan Party to, amend or modify their respective Organizational Documents in a manner that is materially adverse to the Lenders (in their capacities as such); provided that, for purposes of clarity, it is understood and agreed that the Borrower and/or any Subsidiary Loan Party may effect a change to its respective organizational form and/or consummate any other transaction that is permitted under <u>Section 6.03</u>.

Section 6.14.   <u>Intellectual Property</u>. Notwithstanding anything in this Agreement to the contrary, no Disposition or transfer (via an Investment, Disposition or otherwise) of Intellectual Property material to the business or operations of the Borrower and its Restricted Subsidiaries owned by a Loan Party may be made to a Restricted Subsidiary that is not a Loan Party.

Section 6.15.   <u>Use of Proceeds in Switzerland</u>. No proceeds borrowed under this Agreement will be used in a manner which constitutes a "use of proceeds in Switzerland" as interpreted by Swiss tax authorities when assessing whether or not interest payable with respect to such borrowing is subject to Swiss withholding tax, except and to the extent that a written confirmation or tax ruling countersigned by the Swiss Federal Tax Administration (*Eidgenössische*

*Steuerverwaltung*) has been obtained (in a form satisfactory to the Administrative Agent (at the direction of the Required Lenders)) confirming that the intended "use of proceeds in Switzerland" does not result in any Loans qualifying as a Swiss financing for Swiss withholding tax purposes and that, accordingly, no Swiss withholding tax is or becomes payable on the interest payments made under this Agreement.

Section 6.16.   Additional Limitations on Certain Investments. Notwithstanding anything to the contrary herein (including in Section 6.04), and without limiting any other provision of this Agreement, the Borrower will not, and will not permit any other Domestic Loan Party or Canadian Loan Party to, directly or indirectly make any Investment in any European Loan Party, other than (i) Investments in the form of cash and Permitted Investments made for bona fide business purposes; provided that any such Investments shall be made in the form of intercompany loans evidenced by an intercompany note that has been pledged as Collateral and (ii) other Investments in an amount not to exceed, at the time of the making thereof and after giving pro forma effect thereto, together with (x) all other Investments and Dispositions made by the Domestic Loan Parties and Canadian Loan Parties to European Loan Parties after the Effective Date and (y) all Investments and Dispositions made pursuant to Section 6.03(c)(B) and (C), Section 6.04(c)(iii)(A), Section 6.04(n) and Section 6.05(d), $7,500,000.

Section 6.17.   Limitations on Amendments to the DIP ABL Documents.

The Borrower will not, nor will it permit any Restricted Subsidiary to, amend or modify any provision of any DIP ABL Document if the effect of such amendment or modification is material and adverse with respect to the interests of any of the Loan Parties or the Lenders (it being understood and agreed that, without limitation, (x) any changes to the interest rate, redemption requirements, amortization schedule, negative covenants or events of default set forth in the DIP ABL Documents and any changes to Section 7.23 of the DIP ABL Credit Agreement shall, in each case, be deemed to be material for purposes hereof, (y) any changes to Section 7.23 of the DIP ABL Credit Agreement that impose new or increased limitations on the making of the payments described in such Section 7.23 of the DIP ABL Credit Agreement shall be deemed to be material and adverse for purposes hereof and (z) any changes to the US-Canada Formula Amount or the component definitions thereof shall not be deemed to be material and adverse for purposes hereof) unless (x) the Borrower shall have provided at least fifteen (15) calendar days' prior written notice to the Administrative Agent and Lenders of any such amendment or modification and (y) the Required Lenders shall have consented in writing prior to the date of any such amendment or modification.

Section 6.18.   Limitations on the German Group. Without consent of the Required Lenders in their sole discretion, no member of the German Group (other than Alber) will (A) conduct its business (including, without limitation, financing activities and the entry into leasing arrangements) in any manner that is outside the ordinary course of its business or inconsistent with past practice in any material respect or (B) incur any funded debt for borrowed money or any Capitalized Lease Obligations (excluding, for the avoidance of doubt and to the extent the same are otherwise permitted hereunder (including under this Section 6.18), intercompany loans, Capitalized Lease Obligations in existence on the date hereof and any renewals or replacements thereof that do not result in a material liability increase and purchase money and similar obligations).

Section 6.19.   <u>Danish Collateral</u>. Notwithstanding any other provision of this Agreement, Invacare Holdings Two Netherlands shall not dispose of the Equity Interests of Invacare A/S pledged pursuant to the Danish DIP Share Pledge and the Danish Prepetition Share Pledge.

Section 6.20.   <u>Additional Bankruptcy Matters</u>. No Debtor shall, and no Debtor shall permit any of its Subsidiaries to, without the Required Lenders' prior written consent, do any of the following:

(a)         object to or contest the validity or enforceability of any Order, any Liens granted to the Collateral Agent and the Lenders therein, or any terms of the Loan Documents or cooperate with any party with respect to such objection or contest;

(b)         seek to modify any of the rights granted under the Orders to any of the Administrative Agent, the Collateral Agent or the Lenders in any manner adverse to the Administrative Agent, the Collateral Agent or the Lenders (including incurring, creating, assuming or suffering to exist or permit any other superpriority claim which is pari passu or senior to the superpriority claims of the Administrative Agent, the Collateral Agent and the Lenders hereunder, except for the Carve Out or pursuant to an applicable Intercreditor Agreement;

(c)         assert any claim against any Lender under Section 506(c) of the Bankruptcy Code;

(d)         incur, create, assume, suffer or permit any claim or Lien or encumbrance against its or any of its property or assets in the Cases to be pari passu with or senior to the claims of the Lenders against the Debtors in respect of the Secured Obligations hereunder, or apply to the Bankruptcy Court for authority to do so, other than pursuant to the Orders; provided that any Lien permitted pursuant to the foregoing shall have been in existence, validly perfected and non-avoidable on the Petition Date, shall have been senior to the Lien securing the obligations arising under any Prepetition Indebtedness and shall have been permitted under the terms of the Prepetition Secured Documents or the ABL Intercreditor Agreement solely to the extent such liens were, as of the Petition Date: (i) validly existing, properly perfected and non-avoidable, (ii) senior to the Liens securing the obligations under any Prepetition Indebtedness and (iii) permitted to exist under the Prepetition Secured Documents;

(e)         assert, join, investigate, support or prosecute any claim or cause of action against any of the Secured Parties (in their capacities as such), unless such claim or cause of action is in connection with the enforcement of the Loan Documents against any of the Agents or Lenders;

(f)         subject to the terms of the Orders and subject to Article 7, object to, contest, delay, prevent or interfere with in any material manner the exercise of rights and remedies by the Agents or the Lenders with respect to the Collateral following the occurrence of an Event of Default, including without limitation a motion or petition by any Agent or Lender to lift an applicable stay of proceedings to do the foregoing (*provided,* that any Debtor may contest or dispute any such motion or petition solely to the extent permitted under the terms of the Orders); or

(g)         except as expressly provided or permitted hereunder (including, without limitation, to the extent authorized pursuant to any order of the Bankruptcy Court complying with

the terms of this Agreement) or, with the prior consent of the Required Lenders, as provided pursuant to any other Approved Bankruptcy Court Order, make any payment or distribution to any non-Debtor affiliate or insider unless such payment or distribution is on arm's-length terms, consistent with past practice and in the ordinary course of business.

Section 6.21.   Use of Proceeds. No Collateral, proceeds of the Loans, any portion of the Carve Out or any other amounts may be used directly or indirectly by any of the Loan Parties, any statutory committee appointed in the Cases or any trustee or other estate representative appointed in the Cases (or any successor case) or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith): (a) to seek authorization to obtain liens or security interests that are senior to, or on a parity with, the Liens securing the Loan Document Obligations or the Liens securing the Prepetition Secured Indebtedness; or (b) to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support, threaten or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against the Agents, the Lenders, the Prepetition Secured Parties and each of their respective officers, directors, controlling persons, employees, agents, attorneys, representatives, advisors, affiliates, assigns, predecessors-in-interest or successors of each of the foregoing, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (i) any claims or causes of action arising under chapter 5 of the Bankruptcy Code; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the Indebtedness, the Liens granted under the Loan Documents, or the Prepetition Secured Documents; (iv) any action seeking to invalidate, modify, set aside, avoid or subordinate, in whole or in part, the Loan Document Obligations or the Prepetition Secured Documents; (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to either (A) the Administrative Agent, the Collateral Agent or the Lenders hereunder or under any of the Loan Documents, or (B) the Prepetition Secured Parties under any of the Prepetition Secured Documents (in each case, including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of the Agents' or the Lenders' assertions, enforcements, realizations or remedies on or against the Collateral in accordance with the applicable Loan Documents and the Orders); (vi) except as set forth in the applicable Order with respect to any Stay Relief Motion (as defined in such Order), objecting to, contesting, or interfering with, in any way, the Agents' and the Lenders' enforcement or realization upon any of the Collateral once an Event of Default has occurred; or (vii) to pay any amount on account of any claims arising prior to the Petition Date unless such payments are (X) approved by an order of the Bankruptcy Court (including, without limitation, under the Orders) and (Y) permitted under the Loan Documents; *provided, however,* that no more than $50,000 in the aggregate of the Collateral, proceeds from the Borrowings or any other amounts, may be used by the Creditors' Committee (as defined in such Order) to investigate claims and/or liens of the Prepetition Secured Parties under the Prepetition Secured Documents.

Section 6.22.   Budget Variance Covenant. With respect to any Variance Testing Period, the Debtors shall not permit (in each case tested on the date on which the Borrower delivers a Variance Report pursuant to Section 5.17(c)):

(a)             the negative variance (as compared to the Budget) of the aggregate cash receipts of the Borrower and its consolidated Restricted Subsidiaries for such Variance Testing Period to exceed (x) solely with respect to the first Variance Testing Period, 20.0% and (y) with respect to each Variance Testing Period thereafter, 15.0%;

(b)             the positive variance (as compared to the Budget) of aggregate operating disbursements (excluding professional fees and expenses of the Debtor Financial Advisor and the Debtor Legal Advisors) made by the Borrower and its consolidated Restricted Subsidiaries for such Variance Testing Period to exceed (x) solely with respect to the first Variance Testing Period, 20.0% and (y) with respect to each Variance Testing Period thereafter, 15.0%;

(c)             the positive variance (as compared to the Budget) of professional fees and expenses of the Debtor Financial Advisor paid by the Debtors for such Variance Testing Period and all prior Variance Testing Periods, on a cumulative basis, to exceed 12.5%;

(d)             the positive variance (as compared to the Budget) of professional fees and expenses of the Debtor Legal Advisors paid by the Debtors for such Variance Testing Period and all prior Variance Testing Periods, on a cumulative basis, to exceed 12.5%; and

(e)             the negative variance (as compared to the EMEA Report) of the aggregate receipts of the EMEA Entities on a consolidated basis for such Variance Testing Period and all prior Variance Testing Periods, on a cumulative basis, to exceed (x) solely with respect to the first Variance Testing Period, 17.5% and (y) with respect to each Variance Testing Period thereafter, 15.0%.

The permitted variances set forth above shall be referred to herein as the "Budget Variances".

## ARTICLE 7
## EVENTS OF DEFAULT

Section 7.01.  Events of Default.     If any of the following events (any such event, an "Event of Default") shall occur:

(a)             the Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable and in the currency required hereunder, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)             any Loan Party shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Section) payable under any Loan Document, when and as the same shall become due and payable and in the currency required hereunder, and such failure shall continue unremedied for a period of five Business Days after the date such amount shall have become due and payable;

(c)             any representation or warranty made or deemed made by or on behalf of the Borrower or any Restricted Subsidiary in or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or

any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(d)        the Borrower or any Restricted Subsidiary shall fail to observe or perform any covenant, condition or agreement contained in Section 5.02(a) or 5.04 (with respect to the existence of the Borrower), Sections 5.15, 5.16, 5.17, 9.03 or in Article VI;

(e)        any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document (other than those specified in clause (a), (b) or (d) of this Section), and such failure shall continue unremedied for a period of 30 days after written notice thereof from the Administrative Agent (acting at the direction of Required Lenders) to the Borrower;

(f)        the Borrower or any Restricted Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable (after giving effect to any applicable grace period); provided, that, this clause (f) shall not apply, in the case of any Debtor, to any Prepetition Indebtedness (including any guarantee thereof) or any other secured or unsecured debt of a Debtor that arose prior to the Petition Date as to which remedial action by the holder of such debt is subject to the automatic stay of the Bankruptcy Code imposed in the Cases or otherwise barred or enjoined by a court of competent jurisdiction.

(g)        any event or condition occurs that results in any Material Indebtedness (other than any Prepetition Indebtedness of a Debtor) becoming due prior to its scheduled maturity or that enables or permits (with all applicable grace periods having expired) the holder or holders of any Material Indebtedness (other than any Prepetition Indebtedness of a Debtor (other than the DIP ABL Credit Agreement)) or any trustee or agent on its or their behalf to cause any Material Indebtedness (other than any Prepetition Indebtedness of a Debtor) to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity (including, for the avoidance of doubt, the occurrence of any "Fundamental Change" (as defined in any of the Borrower's convertible Indebtedness)); provided that this clause (g) shall not apply (i) to secured Indebtedness that becomes due as a result of the sale, transfer or other disposition (including as a result of a casualty or condemnation event) of the property or assets securing such Indebtedness (to the extent such sale, transfer or other disposition is not prohibited under this Agreement) or (ii) termination events or similar events occurring under any Swap Agreement that constitutes Material Indebtedness (it being understood that clause (f) of this Section will apply to any failure to make any payment required as a result of any such termination or similar event) or (iii) in the case of any Debtor, to any Prepetition Indebtedness (including any guarantee thereof) or any other secured or unsecured debt of a Debtor that arose prior to the Petition Date as to which remedial action by the holder of such debt is subject to the automatic stay of the Bankruptcy Code imposed in the Cases or otherwise barred or enjoined by a court of competent jurisdiction; provided, further, that immediately upon a cure or waiver of the default described in this clause (g) with respect to such Material Indebtedness, such default hereunder shall be immediately and automatically cured without any further action by any Person;

(h)        an involuntary proceeding shall be commenced or an involuntary petition or application shall be filed seeking (i) liquidation, court protection, reorganization or other relief

in respect of the Borrower, any Guarantor or any Significant Subsidiary that is not a Debtor or its debts, or of a material part of its assets, under any Federal, state, provincial, territorial or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, Australian Controller, interim receiver, receiver and manager, monitor, trustee, custodian, examiner, sequestrator, conservator or similar official for the Borrower, any Guarantor or any Significant Subsidiary that is not a Debtor or for a material part of its assets, and, in any such case, such proceeding or petition shall continue undismissed or unstayed for 60 consecutive days or an order or decree approving or ordering any of the foregoing shall be entered;

(i)        the Borrower, any Guarantor or any Significant Subsidiary shall (i) voluntarily commence any proceeding or file any petition or application seeking liquidation, court protection, reorganization or other relief under any Federal, state, provincial, territorial or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect (other than the Cases) without the consent of the Required Lenders, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Section, (iii) except for the Cases, apply for or consent to the appointment of a receiver, interim receiver, Australian Controller, receiver and manager, manager, monitor, trustee, examiner, custodian, sequestrator, conservator or similar official for the Borrower, any Guarantor or any Significant Subsidiary or for a material part of its assets (excluding a fee examiner and any committee appointed in the Cases), (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding or (v) make a general assignment for the benefit of creditors;

(j)        one or more enforceable judgments for the payment of money (in each case other than against any Debtor as a result of the commencement of the Cases) in an aggregate amount in excess of $5,000,000 (to the extent not covered by insurance as to which the insurer has been notified of such judgment or order and has not denied its obligation) shall be rendered against the Borrower, any other Debtor (which, in case of the Debtors only, arose following the Petition Date), any Restricted Subsidiary or any combination thereof and the same shall remain unpaid, undischarged, unvacated, unbonded or unstayed pending appeal for a period of 30 consecutive days during which a stay of enforcement of such judgment, by reason of the automatic stay of Section 362 of the Bankruptcy Code;

(k)        (i) an ERISA Event occurs that, individually or in the aggregate with all other ERISA Events that have occurred, has resulted or would reasonably be expected to result in a Material Adverse Effect or (ii) any of the Borrower or any Restricted Subsidiary or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its Withdrawal Liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount that could reasonably be expected to result in a Material Adverse Effect;

(l)        any Lien purported to be created under any Security Document or under the Orders shall cease to be, or shall be asserted by any Loan Party in writing not to be, a valid and perfected Lien on any material portion of the Collateral, except (i) as a result of the sale or other disposition of the applicable Collateral to a Person that is not a Loan Party in a transaction permitted under the Loan Documents, (ii) as a result of the Collateral Agent's failure to maintain possession of any stock certificates, promissory notes or other instruments delivered to it under

the Security Documents, (iii) as a result of the Collateral Agent's failure to file Uniform Commercial Code continuation statements or (iv) as to Collateral consisting of real property, to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage; or

(m)        (i) this Agreement, any material Security Document or any material Guarantee of the Secured Obligations shall for any reason not be (or asserted by any Loan Party in writing not to be) a legal, valid and binding obligation of any Loan Party party thereto other than as expressly permitted hereunder or thereunder; or (ii) any subordination provision in respect of any Material Indebtedness shall for any reason not be (or asserted by any Loan Party in writing not to be) a legal, valid and binding obligation of any Loan Party party thereto other than as expressly permitted hereunder or thereunder; provided, that immediately upon a cure of the Default described in this clause(m)(ii) with respect to such Material Indebtedness, such Default hereunder shall be immediately and automatically cured without any further action by any Person so long as such Default did not have an adverse impact on the Lenders; or

(n)        a Change in Control shall occur; or

(o)        there occurs any of the following:

(i)        the entry of an order dismissing any of the Cases or converting any of the Cases to a case under chapter 7 of the Bankruptcy Code, or any filing by any Loan Party (or any affiliate thereof) of a motion or other pleading seeking entry of such an order, in each case other than with respect to Freedom Designs, Inc.;

(ii)        without the written consent of the Required Lenders, the entry of an order or the filing by any Loan Party (or any affiliate thereof) of an application, motion or other pleading seeking entry of an order providing for a change in venue with respect to the Cases and such order shall not be reversed or vacated within ten (10) calendar days;

(iii)        a trustee, a responsible officer or an examiner having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code section 1104 (other than a fee examiner), or any similar person is appointed or elected in the any of the Cases, any Loan Party (or any affiliate thereof) applies for, consents to, or fails to contest in, any such appointment, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of the Required Lenders;

(iv)        the entry of an order on behalf of any Loan Party or the filing by any Loan Party (or any affiliate thereof) of an application, motion or other pleading seeking entry of an order staying, reversing, amending, supplementing, vacating or otherwise modifying the Interim Order, the Final Order, any Loan Document, any document relating to the Prepetition Secured Indebtedness or any of the transactions contemplated in any of the foregoing, or any of the Borrowers or any of its Affiliates shall apply for authority to do so, without the prior written consent of the Required Lenders, or the Interim Order or Final Order shall cease to be in full force and effect;

(v)      (A) the entry of an order in any of the Cases denying or terminating use of cash collateral of the Prepetition Secured Parties by the Loan Parties that are Debtors; (B) the termination of the right of any Loan Party that is a Debtor to use any cash collateral of the Prepetition Secured Parties under the Interim Order or the Final Order, and in either case the Debtors have not otherwise obtained authorization to use cash collateral with the prior written consent of the Administrative Agent (at the direction of the Required Lenders) and the Required Lenders; or (C) any other event that terminates the Loan Parties' right to use cash collateral;

(vi)      the entry of an order in any of the Cases granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed against any assets of the Debtors having an aggregate value of $1,000,000 or to permit other actions that would have a material adverse effect on the Debtors or their estates;

(vii)      any of the Loan Parties or any of their Subsidiaries, or any person claiming by or through any of the Loan Parties or their Subsidiaries, shall obtain court authorization to commence, or shall commence, join in, assist, support or otherwise participate as an adverse party in any motion practice, suit or other proceeding against (x) the Administrative Agent or the Lenders or (y) the lenders or agents under any of the Prepetition Secured Documents other than to enforce the terms of the Loan Documents and/or the Prepetition Secured Documents;

(viii)      the entry of a final non-appealable order in the Cases charging any of the Collateral under Section 506(c), Section 552 or any other section of the Bankruptcy Code against the Lenders or the Prepetition Secured Lenders or the commencement of any other action or the filing of any motion or other pleading by the Loan Parties (or any affiliate thereof) that challenges the rights and remedies of the Agents, the Lenders or the Prepetition Secured Parties under the Loan Documents, the Prepetition Secured Credit Agreements and related documents or the Orders or that is inconsistent with the Loan Documents;

(ix)      the entry of an order in any of the Cases granting, or the filing of a motion by the Loan Parties (or any affiliate thereof) seeking, authority to use cash collateral (other than with the prior written consent of the Required Lenders) or to obtain financing under Section 364 of the Bankruptcy Code (other than the Orders);

(x)      without the written consent of the Required Lenders, the entry of an order in any of the Cases, other than the Orders, granting adequate protection to any other person (which, for the avoidance of doubt, shall not apply to any payments made pursuant to any Order or any First Day Order reasonably acceptable to the Required Lenders);

(xi)      termination or expiration of any exclusivity period for any Loan Party to file or solicit acceptances for a Chapter 11 Plan other than Freedom Designs, Inc.;

(xii)      the making of any Prepetition Payments other than (A) as permitted by the Interim Order, the Final Order or the Restructuring Support Agreement and (B) as

129

permitted by any Acceptable Bankruptcy Court Order and consistent with the Budget (subject to the Budget Variance), but in the case of clauses (A) and (B) in amounts not in excess of the amounts set forth for such payments in the Budget (subject to the Budget Variance);

(xiii)   an order of the Bankruptcy Court granting, other than in respect of the Orders, this Agreement and the Carve Out, any claim entitled to superpriority administrative expense claim status in the Cases pursuant to Section 364(c)(1) of the Bankruptcy Code pari passu with or senior to the claims of the Administrative Agent and the Lenders or the Prepetition Secured Parties, or the filing by any Loan Party (or any of its affiliates) of a motion or application seeking entry of such an order;

(xiv)   the failure to satisfy any of the Case Milestones in accordance with the terms relating to such Case Milestones (unless waived or extended with the consent of the Required Lenders in accordance with the terms hereof);

(xv)   other than with respect to the Carve Out and the Liens permitted to have such priority under the Loan Documents and the Orders, any Loan Party shall create or incur, or the Bankruptcy Court enters an order granting, any Lien which is pari passu with or senior to any Liens under the Loan Documents or the Liens securing the Prepetition Secured Indebtedness;

(xvi)   noncompliance in any material respect (including any noncompliance with any material term) by any Loan Party or any of its Subsidiaries with the terms of the Interim Order or the Final Order (*provided* that, to the extent such term is also reflected in this Agreement or another Loan Document, and noncompliance therewith is subject to a grace period otherwise provided for herein, such failure shall be subject to such grace period);

(xvii)   any motion, supplement, amendment or other document relating to the Orders, this Agreement, the Prepetition Secured Documents or the transactions contemplated in any of the foregoing that is not in form and substance satisfactory to the Required Lenders in their sole discretion, is filed by any Loan Party (or any affiliate thereof) or entered by the Bankruptcy Court;

(xviii)   the termination of the Restructuring Support Agreement;

(xix)   the filing of a motion, pleading or proceeding by any Loan Party (or any affiliate thereof) which could reasonably be expected to result in a material impairment of the rights or interests of the Lenders or the Prepetition Secured Parties or a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in a material impairment of the rights or interests of the Lenders or the Prepetition Secured Parties, including with respect to the Liens under the Loan Documents or the Liens securing the Prepetition Secured Indebtedness;

(xx)   any Loan Party (or any affiliate thereof) shall challenge, support or encourage a challenge to any payments made to any Agent or any Lender in respect of the

Secured Obligations or made to any Prepetition Secured Party in respect of the Prepetition Secured Indebtedness;

(xxi)   the filing of a Chapter 11 Plan that is not an Acceptable Plan, or any Loan Party (or any affiliate thereof) proposes or otherwise supports any Chapter 11 Plan that is not an Acceptable Plan;

(xxii)   without the written consent of the Required Lenders, any sale of, or the filing by or on behalf of any Loan Party seeking authority to sell, any Collateral pursuant to Section 363 of the Bankruptcy Code (except for sales or other dispositions expressly permitted hereunder) except pursuant to an Acceptable Sale Transaction;

(xxiii)  any Loan Party (or any of its affiliates) shall file a motion, without the Required Lenders' written consent, seeking authority to sell all or substantially all of its assets in a transaction that is not approved by the Required Lenders;

(xxiv)  any Loan Document shall cease to be effective or shall be contested by any Loan Party (or any affiliate thereof);

(xxv)   an order shall have been entered by the Bankruptcy Court avoiding or requiring disgorgement by any of the Agents or any of the Lenders of any amounts received in respect of the Secured Obligations;

(xxvi)  other than Freedom Designs, Inc., any order shall have been entered by the Bankruptcy Court which dismisses the Cases and which order does not provide for payment in full in cash of the Loan Document Obligations, or any of the Loan Parties shall seek, support or fail to contest in good faith the entry of any such order; or

(xxvii) the filing or support of any pleading by any Loan Party (or any of its affiliates) seeking, or otherwise consenting to, any of the matters set forth in clauses (i) through (xxvi) above or which could otherwise be reasonably expected to result in the occurrence of an Event of Default and such application is not contested in good faith by the Debtors or any other material subsidiaries and the relief requested is granted in an order that is not stayed pending appeal.

(xxviii) an order shall be entered by the Bankruptcy Court confirming a plan of reorganization which shall not be an Acceptable Confirmation Order.

then, and in every such event, and at any time thereafter during the continuance of such event, the Administrative Agent and/or the Collateral Agent, as applicable, at the request of the Required Lenders (subject to Article 8) and subject to the terms of the Orders, shall, by notice to the Borrower, take any or all of the following actions, at the same or different times: terminate the Commitments, and thereupon the Commitments shall terminate immediately and declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder), shall become due and payable immediately, in each case without presentment, demand, protest or other notice of any

kind, all of which are hereby waived by the Borrower and each other Loan Party; provided, that so long as the Orders are in effect, with respect to the enforcement of Liens or other remedies with respect to the Collateral, the Administrative Agent shall provide the Borrower at least five (5) Business Days' notice prior to the taking of such action; provided, further, that during such period, any party in interest shall be entitled to seek an emergency hearing with the Bankruptcy Court solely to the extent permitted under the Orders. Notwithstanding anything to the contrary herein, the enforcement of Liens or remedies with respect to the Collateral and the exercise of all other remedies provided for in this Agreement and the other Loan Documents, shall be subject to the provisions of the Interim Order (and, when entered, the Final Order).

Section 7.02.   [Reserved].

Section 7.03.   Application of Proceeds. After the exercise of remedies provided for in Section 7.01, subject to the terms of the Orders and any applicable Intercreditor Agreement, any amounts received on account of the Secured Obligations shall be applied by the Administrative Agent as follows:

FIRST, to the payment of that portion of the Secured Obligations constituting fees, indemnities, expenses and other amounts (including the Carve Out and fees, disbursements and other charges of counsel payable under Section 9.03 and amounts payable under Section 2.17) payable to (i) the Collateral Agent and (ii) the Administrative Agent, each in its capacity as such;

SECOND, to payment of that portion of the Secured Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including fees, disbursements and other charges of counsel payable under Section 9.03) arising under the Loan Documents and amounts payable under Section 2.17), ratably among them in proportion to their respective amounts described in this clause SECOND payable to them;

THIRD, to payment of that portion of the Secured Obligations constituting unpaid principal of the New Money Loans and Roll-Up Loans, ratably among each of the New Money Lenders and Roll-Up Lenders in proportion to their respective amounts described in this clause THIRD held by them;

FOURTH, to the payment of all other Secured Obligations of the Loan Parties owing under or in respect of the Loan Documents that are due and payable to the Administrative Agent, the Collateral Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Secured Obligations owing to the Administrative Agent, the Collateral Agent and the other Secured Parties on such date; and

FIFTH, the balance, if any, after all of the Secured Obligations have been indefeasibly paid in full, to the Borrower and held subject to further order of the Bankruptcy Court or as otherwise required by Law.

ARTICLE 8
THE ADMINISTRATIVE AGENT AND COLLATERAL AGENT

Each of the Lenders hereby irrevocably appoints Cantor Fitzgerald Securities to serve as Administrative Agent and GLAS Trust Corporation Limited to serve as Collateral Agent under the

Loan Documents, and authorizes each of the Administrative Agent and Collateral Agent to execute, deliver and administer the Loan Documents to which it is a party and to take such actions and to exercise such powers as are delegated to the Administrative Agent and Collateral Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Administrative Agent, the Collateral Agent and the Lenders, and none of the Borrower or any other Loan Party shall have any rights as a third party beneficiary of any such provisions. It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law, regardless of whether a Default or Event of Default shall have occurred or is continuing.  Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

Without limiting the foregoing, the Collateral Agent shall act as the "collateral agent" under the Loan Documents, and each of the Lenders and each other Secured Party hereby irrevocably appoints and authorizes the Collateral Agent to act as the agent (i) for itself and for and on behalf of the other Secured Parties as direct representative (*direkter Stellvertreter*) as far as Swiss law governed security interests are concerned which are accessory in nature (*akzessorisch*) and (ii) for the benefit of the other Secured Parties (*Halten unter einem Treuhandverhältnis*) as far as Swiss law governed security interests are concerned that are non-accessory in nature (*nicht akzessorisch*) and (ii) for itself and for and on behalf of the other Secured Parties as far as Luxembourg law governed security interests are concerned, with all rights under Article 2(4) of the Luxembourg law of 5 August 2005 on financial collateral arrangements as amended from time to time) for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Secured Obligations, together with such powers and discretion as are reasonably incidental thereto.

The Person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender, if applicable, as any other Lender and may exercise the same as though it were not an Agent, and such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any other Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders.

No Agent shall have any duties or obligations except those expressly set forth in the Loan Documents. Without limiting the generality of the foregoing, (a) no Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) no Agent shall have any duty to take any discretionary action or to exercise any discretionary power, except discretionary rights and powers expressly contemplated by the Loan Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in the Loan Documents); provided that such Agent shall not be required to take any action that, in its opinion, may expose any Agent to liability or that is contrary to any Loan Document or applicable law, or for which the Agents are not indemnified to their satisfaction, and (c) except as expressly set forth in the Loan Documents, no Agent shall have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower, any other Subsidiary

or any other Affiliate of any of the foregoing that is communicated to or obtained by the Person serving as Agent or any of its Affiliates in any capacity. No Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith to be necessary, under the circumstances as provided in <u>Section 9.02</u>) or in the absence of its own gross negligence or willful misconduct (such absence to be presumed unless otherwise determined by a court of competent jurisdiction by a final and nonappealable judgment). No Agent shall be deemed to have knowledge of any Default unless and until written notice thereof is given to such Agent by the Borrower or a Lender, such notice referring to this Agreement and describing such Default and stating that such notice is a "notice of default." No Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, (v) the existence, value, sufficiency or collectability of any Collateral or creation, perfection or priority of any Lien purported to be created by the Security Documents, (vi) the satisfaction of any condition set forth in <u>Article IV</u> or elsewhere in any Loan Document or (vii) whether any Loan Party has complied with its obligations under the Loan Documents, including in respect of documents, notices and certificates that are required to be delivered to the Agents or as to the matters described therein being acceptable or satisfactory to the Agents. No Agent shall be responsible or liable to the Lenders or any other Secured Parties for any failure to monitor or maintain any portion of the Collateral or for the perfection of any Lien on the Collateral. Each party to this Agreement acknowledges and agrees that no Agent shall have any obligation to file financing statements, amendments to financing statements, or continuation statements, or to perfect or maintain the perfection of any Agent's Lien on the Collateral. Notwithstanding anything herein to the contrary, no Agent shall have any liability arising from any confirmation or determination of the terms and conditions of any Intercreditor Agreement.

Each Agent shall be entitled to rely, and shall not incur any liability for relying, upon any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person (including, if applicable, a Responsible Officer or Financial Officer of such Person). Each Agent also may rely, and shall not incur any liability for relying, upon any statement made to it orally or by telephone and believed by it to be made by the proper Person (including, if applicable, a Financial Officer or a Responsible Officer of such Person), and may act upon any such statement prior to receipt of written confirmation thereof. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

In no event shall any Agent be responsible or liable for any failure or delay in the performance of their obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, future changes in applicable law or regulation, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that such Agent shall use commercially reasonable efforts consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

The Agents may perform any of and all its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by such Agent. The Agents and any such sub-agent may perform any of and all their duties and exercise their rights and powers through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Agents and any such sub-agent. No Agent shall be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Each Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice, concurrence, instruction or direction of the Required Lenders or all Lenders, as it deems appropriate, or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense (except those incurred solely as a result of such Agent's gross negligence or willful misconduct as determined by the final non-appealable judgment of a court of competent jurisdiction) which may be incurred by it by reason of taking or continuing to take any such action.  Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders or all Lenders, as may be required, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans. Such advice, concurrence, instruction or direction, may, in such Agent's sole discretion, be delivered by e-mail from the Required Lenders or their counsel, who, as of the date hereof is Davis Polk & Wardwell LLP.

Subject to the appointment and acceptance of a successor Administrative Agent or Collateral Agent as provided in this paragraph, the Administrative Agent or Collateral Agent may resign upon 10 days' notice to the Lenders and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, with the Borrower's consent (unless an Event of Default has occurred and is continuing), to appoint a successor, which shall be a commercial bank or trust company or such other Person that regularly acts as agent for similar types of credit arrangements with an office in the United States, or an Affiliate of any such bank with an office in the United States. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent or Collateral Agent gives notice of its resignation, then the retiring Administrative Agent or Collateral Agent may (but shall not be obligated to) on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications above (the date upon which the retiring Administrative Agent or Collateral Agent is replaced, the "Resignation Effective Date").

With effect from the Resignation Effective Date (1) the retiring Administrative Agent or Collateral Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except (i) that in the case of any collateral security held by the Collateral Agent on behalf of the Lenders under any of the Loan Documents, the retiring Collateral Agent shall continue to hold such collateral security until such time as a successor Administrative Agent or Collateral Agent is appointed and (ii) with respect to any outstanding payment obligations) and (2) except for any indemnity payments or other amounts then owed to the retiring Administrative Agent or Collateral Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders or the retiring Administrative Agent or Collateral Agent appoint a successor Administrative Agent or Collateral Agent as provided for above. Upon the acceptance of a successor's appointment as Administrative Agent or Collateral Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Administrative Agent or Collateral Agent (other than any rights to indemnity payments or other amounts owed to the retiring Administrative Agent or Collateral Agent as of the Resignation Effective Date), and the retiring Administrative Agent or Collateral Agent shall be discharged from all of its duties and obligations hereunder and under the other Loan Documents as set forth in this Section. The fees payable by the Borrower to a successor Administrative Agent or Collateral Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Administrative Agent's or Collateral Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 9.03 shall continue in effect for the benefit of such retiring Administrative Agent or Collateral Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent or Collateral Agent was acting as Administrative Agent or Collateral Agent and in respect of the matters referred to under clause (1) above.

Each Lender acknowledges that it has, independently and without reliance upon any Agent or any other Lender or any of the Related Parties of any of the foregoing, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, the Collateral Agent or any other Lender or any of the Related Parties of any of the foregoing, and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Each Lender, by delivering its signature page to this Agreement and funding its Loans on the Effective Date, or delivering its signature page to an Assignment and Assumption pursuant to which it shall become a Lender hereunder, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be delivered to, or be approved by or satisfactory to, the Administrative Agent or the Lenders on the Effective Date.

Except with respect to the exercise of setoff rights of any Lender in accordance with Section 9.08 or with respect to a Lender's right to file a proof of claim in an insolvency proceeding, no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce

any Guarantee of the Secured Obligations, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Administrative Agent or the Collateral Agent, as applicable, on behalf of the applicable Secured Parties in accordance with the terms thereof. In the event of a foreclosure by the Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition, the Collateral Agent, the Administrative Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition, and the Administrative Agent, as agent for and representative of the applicable Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled (but not obligated), for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Loan Document Obligations as a credit on account of the purchase price for any collateral payable by the Administrative Agent on behalf of the applicable Secured Parties at such sale or other disposition. Each Secured Party, whether or not a party hereto, will be deemed, by its acceptance of the benefits of the Collateral and of the Guarantees of the Secured Obligations, to have agreed to the provisions of this Article, Section 9.15 and Section 9.17.

The Lenders and each other holder of a Loan Document Obligation under a Loan Document shall act collectively through the Administrative Agent with respect to the exercise of rights and remedies under the Loan Documents. The Administrative Agent, acting at the direction of Required Lenders, shall direct the course of action with respect to the exercise of rights and remedies hereunder and under other Loan Documents (including with respect to alleging the existence or occurrence of, and exercising rights and remedies as a result of, any Default or Event of Default), and the exercise of rights and remedies hereunder or under any other Loan Document with respect to (i) the Loans, (ii) any Collateral, and (iii) any other property of any Loan Party or any past, present, or future Related Party of any Loan Party.  Any such rights and remedies shall not be exercised other than through the Administrative Agent. Each Lender agrees that it shall not, and hereby waives any right to, take or institute any actions or proceedings, judicial or otherwise, in each case with respect to the exercise of rights and remedies under the Loan Documents against any Loan Party or any past, present, or future Subsidiary or Affiliate of any Loan Party concerning this Agreement, the other Loan Documents, the Loans, any Collateral, or any other property of any Loan Party or any past, present, or future Related Party of any Loan Party other than through the Administrative Agent.

Each of the Lenders and other Secured Parties irrevocably authorizes and directs the Administrative Agent and the Collateral Agent to, and the Administrative Agent and Collateral Agent, as applicable, shall, subject to receipt of a certificate of a Responsible Officer of the Borrower (it being understood that the Administrative Agent and the Collateral Agent may rely, without independent investigation, on any such certificate), (a) release and terminate, or to confirm or evidence any automatic release and termination of, any Guarantees and Liens created under the Loan Documents as provided in Section 9.15 or in any other Security Document and (b) subordinate, at the request of the Borrower, any Lien on any property granted to or held by the Collateral Agent under any Security Document to the holder of any Lien on such property that is permitted by Section 6.02(iv).

In case of the pendency of any proceeding with respect to any Loan Party under any federal, state, provincial, territorial or foreign bankruptcy, insolvency, receivership or similar law now or

hereafter in effect, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)         to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Secured Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim under Section 2.12, Section 2.13, Section 2.17 and Section 9.03) allowed in such judicial proceeding; and

(b)         to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, interim receiver, receiver and manager, manager, monitor, assignee, trustee, liquidator, sequestrator or other similar official in any such proceeding is hereby authorized by each Lender and each other Secured Party to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders or the other Secured Parties, to pay to the Administrative Agent any amount due to it, in its capacity as the Administrative Agent under the Loan Documents (including under Section 9.03).

To the extent required by any applicable Requirements of Law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. Without limiting or expanding the provisions of Section 2.17, each Lender shall indemnify the Administrative Agent against, and shall make payable in respect thereof within 30 days after demand therefor, any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the IRS or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold tax from amounts paid to or for the account of any Lender for any reason (including, without limitation, because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding tax ineffective, or because such Lender's failure to comply with the provisions of Section 9.04 relating to the maintenance of a Participant Register), but in each case only to the extent that any Loan Party has not already indemnified the Administrative Agent for such amounts and without limiting the obligation of the Loan Parties to do so. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this paragraph. The agreements in this paragraph shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender and the repayment, satisfaction or discharge of all other obligations under any Loan Document.

Each Lender and other Secured Party hereby appoints the Administrative Agent and Collateral Agent to act as its agent  (i) for itself and for and on behalf of the other Secured Parties

as direct representative (*direkter Stellvertreter*) as far as Swiss law governed security interests are concerned which are accessory in nature (*akzessorisch*) and (ii) for the benefit of the other Secured Parties (*Halten unter einem Treuhandverhältnis*) as far as Swiss law governed security interests are concerned that are non-accessory in nature (*nicht akzessorisch*) under and in connection with the relevant Security Documents and any Intercreditor Agreement and instructs the Administrative Agent and Collateral Agent, as applicable, to enter into any Intercreditor Agreement, and agrees that (i) the Secured Obligations are subject to, and bound by, the provisions of any Intercreditor Agreement and (ii) each Secured Party will be subject to, and bound by, the provisions of any Intercreditor Agreement in its capacity as holder of Secured Obligations.

All provisions of this Article VIII applicable to the Administrative Agent shall apply to the Collateral Agent and the Collateral Agent shall be entitled to all the benefits and indemnities applicable to the Administrative Agent under this Agreement.  The provisions of this Article VIII and Section 9.03 hereof and Section 5.03 of the U.S. Collateral Agreement, applicable to the Administrative Agent or the Collateral Agent, shall apply to the Administrative Agent and the Collateral Agent when acting in any capacity under any other Loan Document, whether or not such provision is set forth in such other Loan Document.  Without limiting the scope of the immediately preceding sentence, all rights, privileges, immunities and indemnities of the Administrative Agent and the Collateral Agent set forth in this Article VIII and Section 9.03 and Section 5.03 of the U.S. Collateral Agreement shall apply to GLAS Trust Corporation Limited, as security trustee, security agent, collateral agent, administrator, agent, representative, pledgee, chargee and/or similar concept under the Foreign Loan Documents, and for the avoidance of doubt, Cantor Fitzgerald Securities and GLAS Trust Corporation Limited shall not be subject to any fiduciary or other implied duties, and shall be entitled to all benefits and indemnities applicable to the Administrative Agent and the Collateral Agent under this Agreement and the other Loan Documents as if such benefits and indemnities were set forth in such Foreign Loan Document.

Each Secured Party hereby authorizes the Collateral Agent to enter into the Foreign Loan Documents, and acknowledges and agrees that in connection therewith the Borrower, the Administrative Agent and the Collateral Agent may amend this Agreement (and the Borrower hereby agrees to amend this Agreement) without the consent of any other Lender or any other Person to, to include provisions appointing the Collateral Agent as security trustee or other concept under applicable foreign law, to hold the security under the Foreign Loan Documents and to provide the Collateral Agent with the maximum protections under applicable foreign law (including, without limitation, to provide for releases of liability for the Collateral Agent and to disclaim any fiduciary or other obligations or duties of, or restrictions on, the Collateral Agent under applicable law and to provide for indemnification and exculpation of the Collateral Agent) and otherwise to implement the Foreign Loan Documents.  Each Secured Party acknowledges and agrees that it shall be bound by such provisions, as if fully set forth in Article VIII of this Agreement.  To the extent required under the laws of any jurisdiction other than the United States of America, each of the Lenders hereby grants to the Administrative Agent and the Collateral Agent any required powers of attorney to execute and perform under any Foreign Loan Documents on its behalf.

The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Secured Obligations (including by accepting some or all of the Collateral in satisfaction of some or all of the Secured Obligations

pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code or Canadian Insolvency Laws, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, Section 36 of the CCAA, Section 65.13 of the BIA, or any similar laws in any other jurisdictions to which a Loan Party is subject, or (b) at any other sale, foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable law.  In connection with any such credit bid and purchase, the Secured Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid by the Administrative Agent at the direction of the Required Lenders on a ratable basis (with Secured Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase).  In connection with any such bid, (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles and to assign any successful credit bid to such acquisition vehicle or vehicles, (ii) each of the Secured Parties' ratable interests in the Secured Obligations which were credit bid shall be deemed without any further action under this Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (iii) the Administrative Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall provide for, control by the vote of the Required Lenders or their permitted assignees under the terms of this Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 9.02 of this Agreement), (iv) the Administrative Agent on behalf of such acquisition vehicle or vehicles shall be authorized to issue to each of the Secured Parties, ratably on account of the relevant Secured Obligations which were credit bid, interests, whether as equity, partnership interests, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any Secured Party or acquisition vehicle to take any further action, and (v) to the extent that Secured Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Secured Obligations assigned to the acquisition vehicle exceeds the amount of Secured Obligations credit bid by the acquisition vehicle or otherwise), such Secured Obligations shall automatically be reassigned to the Secured Parties pro rata with their original interest in such Secured Obligations and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Secured Obligations shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action. Notwithstanding that the ratable portion of the Secured Obligations of each Secured Party are deemed assigned to the acquisition vehicle or vehicles as set forth in clause (ii) above, each Secured Party shall execute such documents and provide such information regarding the Secured Party (and/or any designee of the Secured Party which will receive interests in or debt instruments issued by such acquisition vehicle) as the Administrative Agent may reasonably request in

connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid. Notwithstanding the grant of authority to the Administrative Agent in this paragraph, nothing herein shall impose an obligation on the Administrative Agent or the Collateral Agent to credit bid any of the Loan Document Obligations, it being expressly understood and agreed by the Lenders and the other Secured Parties that the Administrative Agent may appoint a third-party to perform such functions, and such third-party shall be entitled to all of the protections granted to an Agent under this Agreement and the other Loan Documents.

For the purposes of the grant of security under the laws of the Province of Québec which may now or in the future be required to be provided by any Loan Party, the Collateral Agent is hereby irrevocably authorized and appointed by each of the Lenders hereto to act as hypothecary representative (within the meaning of Article 2692 of the Civil Code of Québec) for all present and future Lenders (in such capacity, the "Hypothecary Representative") in order to hold any hypothec granted under the laws of the Province of Quebec and to exercise such rights and duties as are conferred upon the Hypothecary Representative under the relevant deed of hypothec and applicable Laws (with the power to delegate any such rights or duties). The execution prior to the date hereof by the Collateral Agent in its capacity as the Hypothecary Representative of any deed of hypothec or other security documents made pursuant to the laws of the Province of Québec, is hereby ratified and confirmed. Any Person who becomes a Lender or successor Collateral Agent shall be deemed to have consented to and ratified the foregoing appointment of the Collateral Agent as the Hypothecary Representative on behalf of all Lenders, including such Person and any Affiliate of such Person designated above as a Lender. For greater certainty, the Collateral Agent, acting as the Hypothecary Representative, shall have the same rights, powers, immunities, indemnities and exclusions from liability as are prescribed in favor of the Collateral Agent in this Agreement, which shall apply mutatis mutandis. In the event of the resignation of the Collateral Agent (which shall include its resignation as the Hypothecary Representative) and appointment of a successor Collateral Agent, such successor Collateral Agent shall also act as the Hypothecary Representative, as contemplated above.

Despite any other provision of this Agreement, if an administrator is appointed to an Australian Loan Party under Part 5.3A of the Australian Corporations Act and the Collateral Agent has not received instructions under this Article 8 in time to enable it to appoint an Australian Controller under the relevant Australian Collateral Documents within the decision period (as defined in the Australian Corporations Act) then despite any other provision of this Agreement, the Collateral Agent  must, if it is entitled to do, appoint an Australian Controller within that decision period.

<div align="center">

ARTICLE 9
MISCELLANEOUS

</div>

Section 9.01.  Notices.        Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax, e-mail or other electronic transmission, as follows:

<div align="center">

141

</div>

(a)　　　　　If to the Borrower, to Invacare Corporation, One Invacare Way, Elyria, OH 44035, Attention: Kathleen P. Leneghan, Telephone: (440) 329-6717, Email: kleneghan@invacare.com with a copy (which shall not constitute notice) to Brian Ford, c/o Kirkland & Ellis LLP, 2049 Century Park East, Suite 3700, Los Angeles, CA 90067, Tel: (310) 552-4307, Fax: (310) 552-5900;

(b)　　　　　If to the Administrative Agent, to: Cantor Fitzgerald Securities, 900 West Trade, Suite 725, Charlotte, North Carolina 28202, Attention: Bobbie Young (Invacare Corporation), Telephone: 704-374-0574, Facsimile: 646-390-1764, E-mail: BankLoansAgency@cantor.com; with a copy to Cantor Fitzgerald Securities, 110 East 59th Street, NY, NY 10022. Attention: Michael Bennett (Invacare Corporation), E-mail: Michael.Bennett@cantor.com; with a copy (which shall not constitute notice) to Shipman & Goodwin LLP, One Constitution Plaza, Hartford, Connecticut 06103, Attention: Nathan Plotkin; E-mail: nplotkin@goodwin.com;

(c)　　　　　If to the Collateral Agent, to: GLAS Trust Corporation Limited, 55 Ludgate Hill, Level 1 West, EC4M 7JW, London, United Kingdom, Attention: DCM Team Project Impact Invacare, Telephone: +44 (0) 20 4542 5457 ext. 414, E-mail: DCM@glas.agency;

(d)　　　　　[reserved]; and

(e)　　　　　If to any Lender, to it at its address (or fax number or email address) set forth in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by fax or other electronic transmission shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).

The Agents or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications. Unless the Agents otherwise prescribe, (i) notices and other communications sent to an e-mail address of such Agent shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

The Borrower may change its address, email or facsimile number for notices and other communications hereunder by notice to the Administrative Agent and Collateral Agent, the Administrative Agent and Collateral Agent may change their address, email or facsimile number

for notices and other communications hereunder by notice to the Borrower and the Lenders may change their address, email or facsimile number for notices and other communications hereunder by notice to the Administrative Agent. Notices and other communications to the Lenders hereunder may also be delivered or furnished by electronic transmission (including email and Internet or intranet websites) pursuant to procedures reasonably approved by the Administrative Agent; provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic transmission.

The Borrower agrees that the Agent may, but shall not be obligated to, make the Communications (as defined below) available to the Lenders by posting the Communications (as defined below) on the Platform.

Section 9.02.   Waivers; Amendments.

(a)            No failure or delay by the Administrative Agent or any Lender in exercising any right or power under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent, any Lender may have had notice or knowledge of such Default at the time. No notice or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

(b)            Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower, the Administrative Agent (to the extent that such waiver, amendment or modification does not affect the rights, duties, privileges or obligations of the Administrative Agent under this Agreement, the Administrative Agent shall execute such waiver, amendment or other modification to the extent approved by the Required Lenders) and the Required Lenders or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent, the Collateral Agent, if applicable, and the Loan Party or Loan Parties that are parties thereto, in each case with the consent of the Required Lenders, provided that no such agreement shall (i) increase the Commitment of any Lender without the written consent of such Lender (but not the consent of the Required Lenders) (it being understood that the waiver of any Default, Event of Default or mandatory prepayment shall not constitute an extension or increase of any Commitment of any Lender), (ii) reduce the principal amount of any Loan (it being understood that a waiver of any Default, Event of Default or mandatory prepayment shall not constitute a reduction in principal) or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender directly and adversely affected thereby (but not the

consent of the Required Lenders) (it being understood that any change to the definition of any ratio used in the calculation of the interest rate or fees therein or in the component definitions thereof shall not constitute a reduction of interest or fees), underlined provided that the consent of the Required Lenders shall be necessary to waive any obligation of the Borrower to pay default interest pursuant to Section 2.13(d), (iii) postpone the maturity of any Loan (it being understood that a waiver of any Default, Event of Default or mandatory prepayment shall not constitute a postponement of any maturity date), or any date for the payment of any interest or fees payable hereunder, without the written consent of each Lender directly and adversely affected thereby (but not the consent of the Required Lenders), (iv) change any of the provisions of this Section or the percentage set forth in the definition of "Required Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any right thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender, (v) release all or substantially all the value of the Guarantees under the Domestic Guarantee Agreement or the Foreign Guarantee Agreement (except as expressly provided in the Loan Documents), without the written consent of each Lender, (vi) release all or substantially all the Collateral from the Liens of the Security Documents, without the written consent of each Lender (except as expressly provided in the Loan Documents) or (vii) (1) waive, amend or modify Section 2.18, Section 7.03 or any other provision hereof in a manner that would have the effect of altering the ratable reduction of Commitments or the pro rata sharing of payments otherwise required hereunder, (2) subordinate, or have the effect of subordinating, the Secured Obligations hereunder to any other Indebtedness or other obligation, (3) subordinate, or have the effect of subordinating, the Liens securing the Secured Obligations with respect to all or substantially all of the Collateral to Liens securing any other Indebtedness or other obligation, (4) release, or have the effect of releasing, all or substantially all of the Collateral securing the Secured Obligations, or (5) release, or have the effect of releasing, all or substantially all of the value of the Guarantees of the Secured Obligations, in each case, without the written consent of each Lender directly and adversely affected thereby (except as provided in this Section 9.02); provided further that (A) no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or the Collateral Agent without the prior written consent of the Administrative Agent and the Collateral Agent, as applicable, and (B) any provision of this Agreement or any other Loan Document may be amended by an agreement in writing entered into by the Borrower and the Administrative Agent to cure any ambiguity, omission, defect or inconsistency. Notwithstanding the foregoing, upon notice thereof by the Borrower to the Administrative Agent with respect to the inclusion of any previously absent financial maintenance covenant, this Agreement shall be amended by an agreement in writing entered into by the Borrower and the Administrative Agent without the need to obtain the consent of any Lender to include such covenant on the date of the incurrence of the applicable Indebtedness to the extent required by the terms of such definition or section. Notwithstanding the foregoing, (a) this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (i) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents (and to the extent such credit facilities are pari passu in right of payment and security with any then existing Loans, to share ratably in prepayments with such Loans) and (ii) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders on substantially the same basis as the Lenders prior to such inclusion and (b) this

Agreement and other Loan Documents may be amended or supplemented by an agreement or agreements in writing entered into by the Administrative Agent and the Borrower or any Loan Party as to which such agreement or agreements is to apply, without the need to obtain the consent of any Lender, to include "parallel debt" or similar provisions, and any authorizations or granting of powers by the Lenders and the other Secured Parties in favor of the Administrative Agent, in each case required to create in favor of the Administrative Agent any security interest contemplated to be created under this Agreement, or to perfect any such security interest, where the Required Lenders have determined that such provisions are necessary or advisable under local law for such purpose (with the Borrower hereby agreeing to, and to cause its subsidiaries to, enter into any such agreement or agreements upon reasonable request of the Administrative Agent (acting at the direction of Required Lenders) promptly upon such request).

(c)        In connection with any proposed amendment, modification, waiver or termination (a "Proposed Change") requiring the consent of all Lenders or all directly and adversely affected Lenders, if the consent of the Required Lenders to such Proposed Change is obtained, but the consent to such Proposed Change of other Lenders whose consent is required is not obtained (any such Lender whose consent is not obtained as described in paragraph (b) of this Section being referred to as a "Non-Consenting Lender"), then, the Borrower may, at its sole expense and effort, upon notice to such Non-Consenting Lender and the Administrative Agent, (x) terminate the applicable Commitments of such Lender, and repay all obligations of the Borrower owing to such Lender relating to the applicable Loans and participations held by such Lender as of such termination date or (y) require such Non-Consenting Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement to an Eligible Assignee that shall assume such obligations (which Eligible Assignee may be another Lender, if a Lender accepts such assignment), provided that (a) in the case of clause (y) above, the Borrower shall have received the prior written consent of the Administrative Agent to the extent such consent would be required under Section 9.04(b) for an assignment of Loans or Commitments, as applicable, which consent shall not unreasonably be withheld, (b) such Non-Consenting Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees, any redemption premium, any prepayment premium and all other amounts (including any amounts under Section 2.11(a)(i)), payable to it hereunder from the Borrower or Eligible Assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (c) in the case of clause (y) above, unless waived, the Borrower or such Eligible Assignee shall have paid to the Administrative Agent the processing and recordation fee specified in Section 9.04(b).

Section 9.03.  Expenses; Indemnity; Damage Waiver.

(a)        The Borrower shall pay (i) all reasonable and documented or invoiced fees and out of pocket expenses incurred by the Lender, the Administrative Agent, the Collateral Agent and their Affiliates (without duplication), including the reasonable fees, charges and disbursements of (a) the Financial Advisor and (b) Davis Polk & Wardwell LLP, Shipman & Goodwin LLP, McDermott, Will & Emery LLP, Baker & McKenzie LLP, MinterEllisonRuddWatts, Gorrissen Federspiel Advokatpartnerselskab and Arntzen De Besche Advokatfirma AS, and, to the extent reasonably determined by the Lenders and the Administrative Agent and the Collateral Agent to be necessary, one local counsel in each applicable jurisdiction or otherwise retained with the

Borrower's consent, in each case, for the Administrative Agent, the Collateral Agent and the Lenders in connection with the preparation, execution, delivery or administration of the Loan Documents or any amendments, modifications or waivers of the provisions thereof and (ii) all reasonable and documented or invoiced fees and out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent or any Lender, including the fees, charges and disbursements of counsel for the Administrative Agent, the Collateral Agent and the Lenders, in connection with the enforcement or protection of its rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Loans made hereunder (including, but not limited to, all out-of-pocket costs and expenses associated with creating and maintaining the Platform and providing accounting for the Lenders), including all such fees and out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans; provided that such counsel shall be limited to one counsel for the Administrative Agent, one counsel for the Collateral Agent, and one counsel for the Lenders taken as a whole, and, if necessary, one local counsel in each applicable jurisdiction and one foreign counsel for the Administrative Agent, one separate counsel for the Collateral Agent and one local counsel in each applicable jurisdiction and one foreign counsel for the Lenders taken as a whole.

(b)        The Borrower shall, and shall cause the other Loan Parties to, jointly and severally indemnify each Agent, each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and reasonable and documented or invoiced fees and out-of-pocket expenses of one counsel to the Administrative Agent and its Related Parties taken as a whole, one counsel to the Collateral Agent and its Related Parties taken as a whole and one counsel to the Lenders and their Related Parties taken as a whole, if reasonably necessary, and one local counsel in each relevant material jurisdiction (and, in the case of an actual or potential conflict of interest, one additional counsel to all affected Indemnitees, taken as a whole) for all affected Indemnitees, incurred by or asserted against any Indemnitee by any third party or by the Borrower or any Subsidiary arising out of, in connection with, or as a result of (i) the preparation, execution, delivery or administration of the Loan Documents or any other agreement or instrument contemplated thereby or any amendments, modifications or waivers of the provisions thereof, the performance by the parties to the Loan Documents of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated thereby, (ii) any Loan or the use of the proceeds therefrom, (iii) to the extent in any way arising from or relating to any of the foregoing, any actual or alleged presence or Release of Hazardous Materials on, at or from any Mortgaged Property or any other property currently or formerly owned or operated by the Borrower or any Restricted Subsidiary, or any other Environmental Liability, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any Subsidiary and regardless of whether any Indemnitee is a party thereto, provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (i) are determined by a court of competent jurisdiction by final, non-appealable judgment to have resulted from the gross negligence or willful misconduct of, or, other than the Agents and their Related Parties, bad faith or (ii) have resulted from any dispute solely between and among Indemnitees that does not involve an act or omission by the Borrower or any of their Subsidiaries (other than with respect to a claim against an Indemnitee acting in its capacity as an Agent or similar role under the Loan Documents, except to the extent that any of the exceptions set forth in clause (i)

applies to such Indemnitee with respect to such claim at such time); provided that this Section 9.03(b) shall not apply with respect to Taxes other than any Taxes that represent losses or damages arising from any non-Tax claim.

(c)        To the extent that the Borrower or any other Loan Party fails to pay any amount required to be paid by it to any Agent (or any sub-agent thereof) or any Related Party of any of the foregoing under paragraph (a) or (b) of this Section, and without limiting the Borrower's obligation to do so, each Lender severally agrees to pay to such Agent (or such sub-agent) or such Related Party, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against such Agent (or such sub-agent), in its capacity as such, or against any Related Party of any of the foregoing acting for such Agent (or any such sub-agent) in connection with such capacity. For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the aggregate outstanding Loans at the time.

(d)        To the fullest extent permitted by applicable law, the Borrower shall not assert, or permit any of its Affiliates or Related Parties to assert, and each hereby waives, any claim against any Indemnitee (i) for any damages arising from the use by others of information or other materials obtained through telecommunications, electronic or other information transmission systems (including the Internet), provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such damages are determined by a court of competent jurisdiction by final, non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or its Related Parties, or (ii) on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, any Loan Document or any agreement or instrument contemplated thereby, the Transactions, any Loan or the use of the proceeds thereof.

(e)        All amounts due under this Section shall be payable not later than 30 days (x) after written demand therefor, in the case of any indemnification obligations and (y) in the case of reimbursement of costs and expenses, after receipt by the Borrower of an invoice setting forth such costs and expenses in reasonable detail, together with backup documentation supporting the relevant reimbursement request; provided, however, that any Indemnitee shall promptly refund or return an indemnification payment received hereunder to the extent that such Indemnitee was not entitled to indemnification with respect to such payment pursuant to this Section 9.03.

(f)        All amounts reimbursable by the Borrower and the other Loan Parties under this Section 9.03 shall constitute Loan Document Obligations secured by the Collateral.  Each party's obligations under this Section 9.03 shall survive the termination of the Loan Documents and payment of the obligations hereunder or the earlier resignation or removal of any Agent.

Section 9.04.   Successors and Assigns.

(a)        The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) except as provided in clause (d), the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any

attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section) and, to the extent expressly contemplated hereby, the sub-agents of the Administrative Agent, the other Agents, the Related Parties of each of the Agents and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)             (i) Subject to the conditions set forth in clause (ii) and paragraph (g) below, any Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments outstanding at such time and/or Loans at the time owing to it) with the prior written consent of (A) the Borrower (such consent not to be unreasonably withheld), provided that no consent of the Borrower shall be required for an assignment (1) by a Lender to any Lender or an Affiliate of any Lender, (2) by a Lender to an Approved Fund or (3) if an Event of Default under Section 7.01(a), (b), (h) or (i) has occurred and is continuing, by a Lender to any other assignee; and provided further that the Borrower shall have the right to withhold its consent to any assignment if, in order for such assignment to comply with applicable law, the Borrower would be required to obtain the consent of, or make any filing or registration with, any Governmental Authority, and (B) the Administrative Agent (at the direction of the Required Lenders); provided that no consent of the Administrative Agent shall be required for an assignment to a Lender, an Affiliate of any Lender or an Approved Fund. Notwithstanding anything in this Section 9.04 to the contrary, if any Person the consent of which is required by this paragraph with respect to any assignment of Loans has not given the Administrative Agent written notice of its objection to such assignment within 10 Business Days after written notice to such Person, such Person shall be deemed to have consented to such assignment.

(ii)        Assignments shall be subject to the following additional conditions: (A) except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the trade date specified in the Assignment and Assumption with respect to such assignment or, if no trade date is so specified, as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 (and integral multiples of $1,000,000 in excess thereof), unless the Borrower and the Administrative Agent otherwise consent (such consent not to be unreasonably withheld or delayed), (B) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together (unless waived by the Administrative Agent) with a processing and recordation fee of $3,500, provided that assignments made pursuant to Section 2.19 or Section 9.02(c) shall not require the signature of the assigning Lender to become effective, and (C) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent any tax documentation required by Section 2.17(e) and an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-

public information about the Borrower, the Loan Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws.

(i)        Subject to acceptance and recording thereof pursuant to clause (v) of this paragraph (b), from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of (subject to the obligations and limitations of) Section 2.17 and 9.03 and to any fees payable hereunder that have accrued for such Lender's account but have not yet been paid). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 9.04(c)(i).

(ii)       The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal and stated interest amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the other Loan Parties, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and, solely with respect to its Loans or Commitments, any Lender, at any reasonable time and from time to time upon reasonable prior notice. The parties intend that Loans are at all times maintained in "registered form" within the meaning of Section 163(f), 871(h)(2) and 881(c)(2) of the Code and any related Treasury regulations (or any other relevant or successor provisions of the Code or of such Treasury regulations).

(iii)      Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire and the documentation required by Section 2.17(e) (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in this paragraph (b) and any written consent to such assignment required by this paragraph (b), the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph (b).

(iv)　　　　The words "execution," "signed," "signature" and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act.

(v)　　　　As far as a Luxembourg law governed security interests is concerned, each Guarantor hereby expressly accepts and confirms, for the purpose of article 1278 et seq. of the Luxembourg Civil Code, that notwithstanding any assignment, transfer and/or novation permitted under, and made in accordance with the provisions of this Agreement, any Security Documents and all guarantees created under the Loan Documents shall be preserved for the benefit of any Eligible Assignee.

(c)　　　　(i) Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other Persons (other than to a Person that is not an Eligible Assignee) (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and Loans); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents, provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that directly and adversely affects such Participant. Subject to clause (ii) below, the Borrower agrees that each Participant shall be entitled to the benefits of Section 2.17 (subject to the obligations and limitations therein including the requirements under Section 2.17(e), it being understood that the documentation required by Section 2.17(e) shall be provided to the Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender, provided that such Participant shall be subject to Section 2.18(c) as though it were a Lender.

(ii)　　　　No Participant shall be entitled to receive any greater payment under Section 2.17 than the participating Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent (not to be unreasonably withheld or delayed) expressly acknowledging that such Participant's entitlement to benefits under Section 2.17 is not limited to what the participating Lender would have been entitled to receive absent the participation.

(i)              Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal and stated interest amounts of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive (absent manifest error), and each Person whose name is recorded in the Participant Register pursuant to the terms hereof shall be treated as a Participant for all purposes of this Agreement, notwithstanding notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)              Any Lender may, without the consent of the Borrower or the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank, and this Section shall not apply to any such pledge or assignment of a security interest, provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)              [reserved].

(f)              Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle (an "SPV"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to the Borrower pursuant to this Agreement, provided that (i) nothing herein shall constitute a commitment by any SPV to make any Loan and (ii) if an SPV elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. The making of a Loan by an SPV hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that no SPV shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender). In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPV, such party will not institute against, or join any other person in instituting against, such SPV any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof. In addition, notwithstanding anything to the contrary contained in this Section 9.04, any SPV may (i) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the

Borrower and Administrative Agent) providing liquidity or credit support to or for the account of such SPV to support the funding or maintenance of Loans and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPV.

(g)                    [reserved].

(h)                    (i) In the event of any assignment or participation by a Lender without the Borrower's consent or deemed consent (if applicable) (A) [reserved] or (B) to the extent the Borrower's consent is required under this <u>Section 9.04</u>, to any other Person, the Borrower shall be entitled to seek specific performance to unwind any such assignment or participation in addition to injunctive relief (without posting a bond or presenting evidence of irreparable harm) or any other remedies available to the Borrower at law or in equity in respect of such assignor or assignee; it being understood and agreed that the Borrower and its subsidiaries will suffer irreparable harm if any Lender breaches any obligation under this <u>Section 9.04</u> as it relates to any assignment, participation or pledge of any Loan or Commitment to any Person to whom the Borrower's consent is required but not obtained (or has not been deemed consented to).

(ii)        [reserved].

(i)                    Upon the cancellation or retirement of any Loans pursuant to this <u>**Section 9.04**</u>, (A) the aggregate principal amount (calculated on the face amount thereof) shall be deemed reduced by the full par value of the aggregate principal amount of the Loans so retired or cancelled and (B) the Administrative Agent shall record such cancellation or retirement in the Register.

(j)                    Any Lender may, if it considers it necessary to make the present transfer effective as against an obligor incorporated or resident for tax purposes under the laws of France (a "<u>French Obligor</u>"), arrange for such transfer to be notified to that French Obligor or acknowledged by that French Obligor in accordance with article 1216 of the French Civil Code. Each Party agrees that in case of an assignment or transfer pursuant to this Clause, the French Collateral granted under the French Collateral Documents and the guarantees granted by any French Obligor under the relevant Foreign Guarantee Agreement shall be preserved for the benefit of the Collateral Agent, the new lender and the other Secured Parties (as applicable). In addition, for the purpose of the provisions of paragraph 2 of article 1334 of the French Civil Code and any similar provisions under any other applicable law, each Party agrees that following a transfer by way of novation under this Agreement, any French Collateral granted under the French Collateral Documents and the obligations of any French Obligor under the Foreign Guarantee Agreement will be reserved and will continue in full force for the benefit of the Collateral Agent, the new lender and the other Secured Parties. A transfer by way of novation under this Clause shall be deemed to be also a novation (*novation*) within the meaning of articles 1329 et seq. of the French Civil Code.

Section 9.05.   <u>Survival</u>. All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to any Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on

its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated. The provisions of Section 2.17 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitment, the termination of this Agreement or any provision hereof, and in the case of Article VIII and Section 9.03, the resignation or removal of any Agent.

Section 9.06.   Counterparts; Integration; Effectiveness. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents, the Fee Letters and any separate letter agreements with respect to fees payable to the Lenders or any Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic means shall be effective as delivery of an original counterpart of this Agreement.

Section 9.07.   Severability. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 9.08.   Right of Setoff. Subject to the Orders, if an Event of Default shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) (other than escrow, payroll, employee health and benefits, pension, fiduciary, 401(K), petty cash, trust and tax accounts) or other amounts at any time held and other obligations (in whatever currency) at any time owing by such Lender, to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower then due and owing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness. The applicable Lender shall notify the Borrower and the Administrative Agent of such setoff and application, provided that any failure to give or any delay in giving such notice shall not affect the validity of any such setoff and application under this Section. The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender may have.

Section 9.09.    <u>Governing Law; Jurisdiction; Consent to Service of Process</u>.

(a)         This Agreement shall be construed in accordance with and governed by the law of the State of New York and, to the extent applicable, the Bankruptcy Code.

(b)         Each of the parties hereto hereby irrevocably and unconditionally consents and agrees that the Bankruptcy Court shall have exclusive jurisdiction to hear and determine any claims or disputes among the parties hereto pertaining to this Agreement or the other Loan Documents or to any matter arising out of or relating to this Agreement or any of the other Loan Documents; provided, that the Agents, Lenders and the Loan Parties acknowledge that any appeals from the Bankruptcy Court may have to be heard by a court other than the Bankruptcy Court; provided, further, that nothing in this Agreement shall be deemed or operate to preclude (i) either Agent from bringing suit or taking other legal action in any other jurisdiction to realize on the Collateral or any other security for the Secured Obligations, or to enforce a judgment or other court order in favor of such Agent or (ii) any party from bringing any legal action or proceeding in any jurisdiction for the recognition and enforcement of any judgment.  Each of the parties hereby agrees that a final judgment in any such legal action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(c)         Each Loan Party expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such court, and each Loan Party hereby waives any objection that such Loan Party may have based upon lack of personal jurisdiction, improper venue or forum-non-conveniens and hereby consents to the granting of such legal or equitable relief as is deemed appropriate by such court.

(d)         Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in <u>Section 9.01</u>. Nothing in any Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 9.10.    <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 9.11.    <u>Headings</u>. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 9.12.    <u>Confidentiality</u>.

(a)          Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees, servicers, financing sources, trustees and agents, including accountants, legal counsel and other agents and advisors (collectively, the "Representatives") on a "need to know" basis solely in connection with the transactions contemplated hereby (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential and any failure of such Persons to comply with this Section 9.12 shall constitute a breach of this Section 9.12 by the Administrative Agent or the relevant Lender, as applicable); provided that, unless the Borrower otherwise consents, no such disclosure shall be made by the Administrative Agent, any Lender or any Affiliate or Representative thereof to any Affiliate or Representative of the Administrative Agent, (b) (x) to the extent requested by any regulatory authority (including the NAIC), required by applicable law or by any subpoena or similar legal process or (y) necessary in connection with the exercise of remedies; provided that, (i) in each case, unless specifically prohibited by applicable law or court order, each Lender and the Administrative Agent shall promptly notify the Borrower of any request by any governmental agency or representative thereof (other than any such request in connection with an examination of the financial condition of such Lender by such governmental agency or other routine examinations of such Lender by such governmental agency) for disclosure of any such non-public information prior to disclosure of such information and (ii) in the case of clause (y) only, each Lender and the Administrative Agent shall use reasonable best efforts to ensure that such Information is kept confidential in connection with the exercise of such remedies, and provided, further, that in no event shall any Lender or the Administrative Agent be obligated or required to return any materials furnished by the Borrower or any of its Subsidiaries, (c) to any other party to this Agreement, (d) subject to an acknowledgment and acceptance by the relevant recipient that such Information is being disseminated on a confidential basis (on substantially similar terms to those of this Section or as otherwise reasonably acceptable to the Borrower and the Administrative Agent), to any Eligible Assignee of or Participant in, or any prospective Eligible Assignee of or prospective Participant in, any of its rights or obligations under this Agreement, (e) with the consent of the Borrower, in the case of Information provided by the Borrower or any other Subsidiary, (f) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent or any Lender on a non-confidential basis from a source other than the Borrower or (g) subject to the Borrower's prior approval of the information to be disclosed (not to be unreasonably withheld), to Moody's or S&P on a confidential basis in connection with obtaining or maintaining ratings. In addition, the Agents and the Lenders may disclose the existence of this Agreement and publicly available information about this Agreement to market data collectors, similar service providers to the lending industry, and service providers to the Agents and the Lenders in connection with the administration and management of this Agreement, the other Loan Documents, the Commitments and the Borrowings hereunder. For the purposes of this Section, "Information" means all information received from the Borrower relating to the Borrower, any Subsidiary or their business, other than any such information that is available to the Administrative Agent or any Lender on a non-confidential basis prior to disclosure by the Borrower. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the

confidentiality of such Information as such Person would accord to its own confidential information.

(b)         EACH LENDER ACKNOWLEDGES THAT INFORMATION AS DEFINED IN <u>SECTION 9.12(a)</u> FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWER, THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

(c)         ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS FURNISHED BY THE BORROWER OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT, WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE BORROWER, THE OTHER LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES. ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWER AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

Section 9.13.   <u>USA Patriot Act</u>. Each Lender and the Agents (for itself and not on behalf of any Lender) hereby notifies each Loan Party that pursuant to the requirements of Title III of the USA Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender or such Agent, as applicable, to identify each Loan Party in accordance with the Title III of the USA Patriot Act.

Section 9.14.   <u>Judgment Currency</u>.

(a)         If, for the purpose of obtaining judgment in any court, it is necessary to convert a sum owing hereunder in one currency into another currency, each party hereto agrees, to the fullest extent that it may effectively do so, that the rate of exchange used shall be that at which in accordance with normal banking procedures in the relevant jurisdiction the first currency could be purchased with such other currency on the Business Day immediately preceding the day on which final judgment is given.

(b)         The obligations of the Borrower in respect of any sum due to any party hereto or any holder of any obligation owing hereunder (the "<u>Applicable Creditor</u>") shall, notwithstanding any judgment in a currency (the "<u>Judgment Currency</u>") other than the currency in which such sum is stated to be due hereunder (the "<u>Agreement Currency</u>"), be discharged only to the extent that, on the Business Day following receipt by the Applicable Creditor of any sum

156

adjudged to be so due in the Judgment Currency, the Applicable Creditor may in accordance with normal banking procedures in the relevant jurisdiction purchase the Agreement Currency with the Judgment Currency; if the amount of the Agreement Currency so purchased is less than the sum originally due to the Applicable Creditor in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Applicable Creditor against such loss. The obligations of the Borrower under this Section shall survive the termination of this Agreement, the resignation or removal of any Agent and the payment of all other amounts owing hereunder.

Section 9.15.  Release of Liens and Guarantees. Subject to the Orders, to the extent applicable, a Subsidiary Loan Party shall automatically be released from its obligations under the Loan Documents, and all security interests created by the Security Documents in Collateral owned by such Subsidiary Loan Party shall be automatically released, (1) upon the consummation of any single transaction or related series of transactions permitted by this Agreement as a result of which such Subsidiary Loan Party ceases to be a Restricted Subsidiary or becomes an Excluded Subsidiary  (subject to the proviso set forth in clause (a) of the Excluded Subsidiary definition) or (2) upon the request of the Borrower, in connection with a transaction permitted under this Agreement, as a result of which such Subsidiary Loan Party ceases to be a wholly-owned Subsidiary (subject to the proviso set forth in clause (a) of the Excluded Subsidiary definition). Subject to Section 6.19, (i) upon any sale or other transfer as part of or in connection with a Disposition by any Loan Party (other than to the Borrower or any other Loan Party) of any Collateral in a transaction permitted under this Agreement, (ii) if any property granted to or held by the Collateral Agent under any Loan Documents does not constitute (or ceases to constitute) and is not required to be Collateral or (iii) upon the effectiveness of any written consent to the release of the Lien or security interest created under any Security Document in any Collateral or the release of any Loan Party from its Guarantee under the Domestic Guarantee Agreement or the Foreign Guarantee Agreement, as applicable, pursuant to Section 9.02, the security interests in such Collateral created by the Security Documents or such Guarantee shall be automatically released. The security interest in any Collateral of a Foreign Loan Party will also be released pursuant to Foreign Loan Documents as specified by the Agreed Security Principles or the Canadian Collateral and Guarantee Requirement, as applicable. Upon the occurrence of the Termination Date, all obligations under the Loan Documents and all security interests created by the Security Documents shall be automatically released. In connection with any termination or release pursuant to this Section or in connection with any subordination of its interest as required by Article VIII, the Administrative Agent or Collateral Agent, as applicable, acting at the direction of the Required Lenders, shall execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such termination or release. Any execution and delivery of documents pursuant to this Section shall be without recourse to or warranty by the Administrative Agent or Collateral Agent. The Lenders irrevocably authorize the Administrative Agent and Collateral Agent, as applicable, to release or subordinate any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 6.02(iv) to the extent required by the terms of the obligations secured by such Liens at the Loan Parties' reasonable request.   The parties hereto acknowledge and agree that the Administrative Agent and the Collateral Agent may rely conclusively as to any of the matters described in this Section 9.15 (including as to its authority hereunder) on a certificate or similar instrument provided

157

to it by any Loan Party without further inquiry or investigation, which certificate shall be delivered to the Administrative Agent and the Collateral Agent by the Loan Parties upon request.

In the event of any conflict or inconsistency between any term of the Agreed Security Principles, if applicable, and any term of a Foreign Loan Document, the Secured Parties authorize, instruct and direct the Collateral Agent to, and the Collateral Agent shall promptly upon written request of the Borrower (i) enter into such amendments to such Foreign Loan Document or (ii) release and terminate such Foreign Loan Document and enter into a replacement Security Document on such amended terms, in each case as shall be necessary or desirable to cure such conflict or inconsistency as the Borrower and the Administrative Agent (acting at the direction of the Required Lenders) shall determine in their reasonable discretion.

Upon request by the Administrative Agent or Collateral Agent at any time, the Required Lenders will confirm in writing such Agent's authority to release particular types or items of Collateral pursuant to this Section and the other Loan Documents.

Section 9.16.   No Fiduciary Relationship. The Borrower, on behalf of itself and its Subsidiaries, agrees that in connection with all aspects of the transactions contemplated hereby and any communications in connection therewith, the Borrower, the other Subsidiaries and their Affiliates, on the one hand, and the Administrative Agent, the Collateral Agent, the Lenders and their Affiliates, on the other hand, will have a business relationship that does not create, by implication or otherwise, any fiduciary duty on the part of the Administrative Agent, the Collateral Agent, the Lenders or their Affiliates, and no such duty will be deemed to have arisen in connection with any such transactions or communications.

Section 9.17.   [Reserved].

Section 9.18.   Acknowledgement and Consent to Bail-In of EEA Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)      the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)      the effects of any Bail-in Action on any such liability, including, if applicable:

(i)      a reduction in full or in part or cancellation of any such liability;

(ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)        the variation of the terms of such liability  in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

Section 9.19.   [Reserved].

Section 9.20.   Amendments for Guarantee Limitations. Notwithstanding anything to the contrary herein, this Agreement and other Loan Documents may be amended or supplemented by an agreement or agreements in writing entered into by the Administrative Agent, acting at the direction of the Required Lenders, and the Borrower or any Loan Party as to which such agreement or agreements is to apply, without the need to obtain the consent of any Lender, to include guarantee limitations required by applicable local law and other provisions, in each case where the Required Lenders have determined that such provisions are necessary or advisable under local law for such purpose (with the Borrower hereby agreeing to, and to cause its subsidiaries to, enter into any such agreement or agreements upon reasonable request of the Administrative Agent (acting at the direction of Required Lenders) promptly upon such request).

Section 9.21.        Parallel Debt; Parallel Debt owed to the Collateral Agent. Each of the Loan Parties hereby irrevocably and unconditionally undertakes to pay to the Collateral Agent as creditor in its own right and not as a representative of the other Secured Parties amounts equal to any amounts owing from time to time by that Loan Party to any Secured Party under any Loan Document as and when those amounts are due for payment under the relevant Loan Document.

(b)        Each of the Loan Parties and the Collateral Agent acknowledge that the obligations of each Loan Party under paragraph (a) are several and are separate and independent from, and shall not in any way limit or affect, the corresponding obligations of that Loan Party to any Secured Party under any Loan Document (its "Corresponding Debt") nor shall the amounts for which each Loan Party is liable under paragraph (a) (its "Parallel Debt") be limited or affected in any way by its Corresponding Debt provided that:

(i)        the Collateral Agent shall not demand payment with regard to the Parallel Debt of each Loan Party to the extent that such Lender's Corresponding Debt has been irrevocably paid or (in the case of guarantee obligations) discharged; and

(ii)        a Finance Party shall not demand payment with regard to the Corresponding Debt of each Lender to the extent that such Lender's Parallel Debt has been irrevocably paid or (in the case of guarantee obligations) discharged.

(c)        The Collateral Agent acts in its own name and not as a trustee, and its claims in respect of the Parallel Debt shall not be held on trust. The collateral under the Collateral Documents granted under the Loan Documents to the Collateral Agent to secure the Parallel Debt is granted to the Collateral Agent in its capacity as creditor of the Parallel Debt and shall not be held on trust.

(d)        All monies received or recovered by the Collateral Agent pursuant to this Section 9.21, and all amounts received or recovered by the Collateral Agent from or by the enforcement of any collateral under the Collateral Documents granted to secure the Parallel Debt, shall be applied in accordance with this Agreement.

159

(e)         Without limiting or affecting the Collateral Agent's rights against the Loan Parties (whether under this <u>Section 9.21</u> or under any other provision of the Loan Documents), each Lender acknowledges that:

(f)         nothing in this <u>Section 9.21</u> shall impose any obligation on the Collateral Agent to advance any sum to any Lender or otherwise under any Loan Document, except in its capacity as lender; and

(g)         for the purpose of any vote taken under any Loan Document, the Collateral Agent shall not be regarded as having any participation or commitment other than those which it has in its capacity as a lender.

(h)         Special Appointment of Collateral Agent (German Collateral)

(i)         For the purposes of any security provided under the German Security Documents (where "<u>German Collateral</u>" means any security interest created under the Security Documents governed by German law) in addition to the provision set out above, the specific provisions set out in paragraphs (b) to (f) of this <u>Section 9.21</u> shall be applicable. In the case of any inconsistency, the provisions set out in paragraphs (b) to (f) of this <u>Section 9.21</u> shall prevail. The provisions set out in paragraph (b) to (f) of this <u>Section 9.21</u> shall not constitute a trust but a fiduciary relationship (*Treuhand*) within the meaning of German law.

(ii)         With respect to any German Collateral constituted by non–accessory (*nicht akzessorische*) security interests, the Collateral Agent shall hold, administer and, as the case may be, enforce or release that German Collateral in its own name, but as trustee (*Treuhänder*) for the account of the Secured Parties.

(iii)         With respect to any German Collateral constituted by accessory (*akzessorische*) security interests, the Collateral Agent shall administer and, as the case may be, enforce or release that German Collateral in the name of and for and on behalf of the Secured Parties and shall hold, administer and, as the case may be, enforce or release that German Collateral in its own name on the basis of its own rights under <u>Section 9.21</u>.

(iv)         Each Secured Party (other than the Collateral Agent) hereby instructs and authorizes the Collateral Agent (with the right of sub-delegation) to act as its agent (*Stellvertreter*) and in particular (without limitation) to enter into and amend any documents evidencing German Collateral and to make and accept all declarations and take all actions it considers necessary or useful in connection with any German Collateral on behalf of that Secured Party. The Collateral Agent shall further be entitled to enforce or release any German Collateral, to perform any rights and obligations under any documents evidencing German Collateral and to execute new and different documents evidencing or relating to the German Collateral.

(v)         At the request of the Collateral Agent, each Secured Party shall provide the Collateral Agent with a separate written power of attorney (*Spezialvollmacht*) for the purposes of executing any agreements and documents or otherwise acting on their

behalf. Each Secured Party hereby ratifies and approves all acts previously done by the Collateral Agent on such secured party's behalf.

(vi)        Each Secured Party which becomes a party to this Agreement ratifies and approves all acts and declarations previously done by the Collateral Agent on such Secured Party's behalf (including, for the avoidance of doubt the declarations made by the Collateral Agent as representative without power of attorney (*Vertreter ohne Vertretungsmacht*) in relation to the creation of any pledge (*Pfandrecht*) on behalf and for the benefit of each Secured Party as future pledgee or otherwise).

(vii)        Each Secured Party hereby releases the Collateral Agent from the restrictions imposed by Section 181 German Civil Code (*Bürgerliches Gesetzbuch*) and similar restrictions applicable to it pursuant to any other law, in each case to the extent legally possible to that Secured Party. A Secured Party which is barred by its constitutional documents or by-laws from granting such exemption shall notify the Collateral Agent accordingly.

(viii)        The Collateral Agent accepts its appointment as agent and administrator of the German Collateral on the terms and subject to the conditions set out in this Agreement and the Secured Parties, the Collateral Agent and all other parties to this Agreement agree that, in relation to any German Collateral, no Secured Party (other than the Collateral Agent in that capacity) shall exercise any independent power to enforce any German Collateral or take any other action in relation to the enforcement of the German Collateral, or make or receive any declarations in relation thereto.

(i)        Special Appointment of Collateral Agent (Norwegian Collateral)

(i)        For the purposes of any security provided under the Norwegian Collateral Documents (where "Norwegian Collateral" means any security interest created under the Norwegian Collateral Documents), each Secured Party hereby appoints the Collateral Agent to act as its agent under and in connection with the Norwegian Collateral on behalf of that Secured Party and the Collateral Agent declares that it holds the Norwegian Collateral on behalf of that Secured Party on the terms contained in the Norwegian Collateral Documents and this Agreement.

(ii)        Each Secured Party authorizes the Collateral Agent to perform the duties, obligations and responsibilities and to exercise the rights, powers, authorities and discretions specifically given to the Collateral Agent under or in connection with the Norwegian Collateral Documents together with any other incidental rights, powers, authorities and discretions.

(j)        Special Appointment of Collateral Agent (French Collateral Documents)

(i)        Each Secured Party:

(A)        irrevocably and unconditionally appoints GLAS Trust Corporation Limited (who accepts such appointment) to act as security agent

(*agent des sûretés*) pursuant to articles 2488-6 to 2488-12 of the French Civil Code in respect of any French Collateral Document; and

(B)        irrevocably authorizes, empowers and directs the Collateral Agent acting in such capacity, without limitation and notwithstanding any other rights conferred upon the Collateral Agent under this Agreement to take, register, manage and enforce any Lien governed by the laws of France in its own name and for the benefit of (*au profit de*) each such Secured Party (the Collateral Agent in such capacity, the "French Collateral Agent").

(ii)        As a result of the appointment referred to in paragraph (i) above, the French Collateral Agent shall:

(A)        be the *titulaire* of the Lien created or purported to be created by the French Collateral Documents and the rights and assets held by the French Collateral Agent in the exercise of its functions as *agent des sûretés* shall form part of a dedicated estate being distinct from the French Collateral Agent's own assets; and

(B)        in respect of any Lien created or purported to be created by a French Collateral Document, it shall act in its own name for the benefit of the Secured Parties.

(iii)        Any change of French Collateral Agent appointed pursuant to this Section 9.21 shall be made in accordance with article 2488-11 of the French Civil Code.

(iv)        Each Secured Party:

(A)        approves the French Collateral Documents creating or expressed to create Liens in its favour and irrevocably authorises, empowers and directs the French Collateral Agent to negotiate, execute and deliver for and on its behalf each such French Collateral Document (and any ancillary document in connection therewith), to perform the duties and to exercise the rights, powers, prerogatives and discretions that are specifically delegated to the French Collateral Agent or any Secured Party under or in connection with such French Collateral Documents, together with any other rights, powers and discretions which are incidental thereto and to give a good discharge for any moneys payable under such French Collateral Documents;

(B)        acknowledges that the French Collateral Agent has been appointed by it to constitute, register, manage and enforce all Liens created in its favour by any French Collateral Document, and agrees that the French Collateral Agent may exercise the rights and perform the obligations arising from its nomination in accordance with applicable law from time to time;

(C)        authorises the French Collateral Agent to take any steps necessary and collect all information necessary or, at the French Collateral Agent's discretion, desirable for the preparation of any such French Collateral Document,

the perfection, the preservation and/or the enforcement of any Lien created in its favour by any such French Collateral Document;

(D) to the extent it may have any interest therein, every other party, to the extent permitted by law, authorises the French Collateral Agent to execute on its own behalf and on behalf of each Secured Party and other party (where relevant) any release of Liens granted under the French Collateral Documents following the applicable Discharge of Senior Obligations (as such term is defined in the Junior Intercreditor Agreement) in accordance with the applicable Security Documents;

(E) acknowledges and confirms that the French Collateral Agent is entitled to take any step to protect the rights and interests of each of the Secured Parties,

*provided that* notwithstanding the provisions of article 2488-9 of the French Civil Code, the French Collateral Agent shall not be bound to make the filing of any proof of claim for the benefit of any Secured Party, unless otherwise agreed between the French Collateral Agent and that Secured Party;

and more generally to take any action to protect the rights of each of the Secured Parties under or in connection with any Collateral created under any French Collateral Documents, in each case together with any other right, power, prerogative and discretion which are incidental thereto; and

(F) acknowledges that (i) the French Collateral Agent (acting in such capacity) shall not be liable on its own estate (*patrimoine propre*) for the payment of any *Soulte* that would be payable to an obligor as a result of the enforcement of Collateral created pursuant to a French Collateral Document and (ii) the payment of any sums in respect of a *Soulte* (if any) shall be borne by each other Secured Party in accordance with this Agreement, the Junior Intercreditor Agreement or any French Collateral Document.

(v) Notwithstanding any contrary provision in this Agreement or any other Loan Document:

(A) the French Collateral Agent shall not hold the benefit of the Liens created pursuant to the French Collateral Documents on trust but as security agent (*agent des sûretés*);

(B) no Grantor (as such term is defined in the Junior Intercreditor Agreement) incorporated under the laws of France shall undertake to pay any claim pursuant to this Section 9.21 and the French Collateral Documents shall not secure any claim pursuant to this Section 9.21;

(C)         any change of the French Collateral Agent appointed pursuant to this Article shall be made in accordance with the provisions of this Agreement (*remplacement conventionnel*) or article 2488-11 of the French Civil Code (*remplacement judiciaire*); and

(D)         no appointment of any additional security agent or delegation of powers by the French Collateral Agent shall be made in respect of the French Collateral Documents for those rights and duties which benefit to or are imposed on the French Collateral Agent by operation of articles 2488-6 to 2488-12 of the French Civil Code.

(vi)         Nothing in this paragraph (j) (*Special Appointment of Collateral Agent (French Collateral Documents)*) shall limit any other rights or obligations that the French Collateral Agent may have under this Agreement.

(vii)         With respect to any French Collateral Document, any reference in this Agreement to the French Collateral Agent acting as agent shall be deemed to include a reference to the French Collateral Agent acting as *agent des sûretés* as referred to in this paragraph (j) (*Special Appointment of Collateral Agent (French Collateral Documents)*).

(viii)         In this paragraph (j) (*Special Appointment of Collateral Agent (French Collateral Documents)*), "Soulte" means, in relation to any enforcement of Lien governed by French law occurring by way of contractual or judicial foreclosure or appropriation (including pursuant to a *pacte commissoire* or any similar enforcement mechanism), the amount by which the value of the Collateral appropriated or foreclosed pursuant to that enforcement (as determined in accordance with the relevant Security Documents or any applicable law) exceeds the amount of the Senior Obligations secured by that Security Document (immediately prior to such enforcement) discharged as a result of such enforcement.

Section 9.22.   Erroneous Payments.

(a)         Each Lender hereby agrees that (i) if any Agent notifies such Lender that such Agent has determined in its sole discretion that any funds received by such Lender from such Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Lender (whether or not known to such Lender) (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, a "Erroneous Payment") and demands the return of such Erroneous Payment (or a portion thereof), such Lender shall promptly, but in no event later than one Business Day thereafter, return to such Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender to the date such amount is repaid to such Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by such Agent in accordance with banking industry rules on interbank compensation from time to time in effect and (ii) to the extent permitted by applicable law, such Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives, any claim, counterclaim, defense or right of setoff or

recoupment with respect to any demand, claim or counterclaim by such Agent for the return of any Erroneous Payments received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine. A notice of any Agent to any Lender under this clause (a) shall be conclusive, absent manifest error.

(b)         Without limiting immediately preceding clause (a), each Lender hereby further agrees that if it receives an Erroneous Payment from any Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by such Agent (or any of its Affiliates) with respect to such Erroneous Payment (an "Erroneous Payment Notice"), (y) that was not preceded or accompanied by an Erroneous Payment Notice, or (z) that such Lender otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), in each case, an error has been made (and that it is deemed to have knowledge of such error at the time of receipt of such Erroneous Payment) with respect to such Erroneous Payment, and to the extent permitted by applicable law, such Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by such Agent for the return of any Erroneous Payments received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine. Each Lender agrees that, in each such case, it shall promptly (and, in all events, within one Business Day of its knowledge (or deemed knowledge) of such error) notify such Agent of such occurrence and, upon demand from such Agent, it shall promptly, but in all events no later than one Business Day thereafter, return to such Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender to the date such amount is repaid to such Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by such Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(c)         The Borrower and each other Loan Party hereby agrees that (x) in the event an Erroneous Payment (or portion thereof) is not recovered from any Lender that has received such Erroneous Payment (or portion thereof) for any reason, the Agents shall be subrogated to all the rights of such Lender with respect to such amount and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party; except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by such Agent from the Borrower or any other Loan Party for the purpose of making such Erroneous Payment.

(d)         Each party's obligations under this Section 9.22 shall survive the resignation or replacement of the Agents, the termination of the Commitments or the repayment, satisfaction or discharge of all Loan Document Obligations (or any portion thereof).

Section 9.23.  Original Issue Discount. THE NEW MONEY LOANS HAVE BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR U.S. FEDERAL INCOME TAX PURPOSES. THE ISSUE PRICE, AMOUNT OF ORIGINAL ISSUE DISCOUNT, ISSUE DATE AND YIELD TO MATURITY OF THE NEW MONEY LOANS MAY BE OBTAINED BY WRITING TO THE BORROWER AT ITS ADDRESS SPECIFIED HEREIN.

Section 9.24.   <u>Orders Control</u>. It is acknowledged and agreed that in the event of any conflict or inconsistency between this Agreement and the Orders, the Orders shall control in all respects.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**INVACARE CORPORATION,**
as Borrower, debtor and debtor-in-possession

By: _____

Name:

Title:

**CANTOR FITZGERALD SECURITIES,**
as Administrative Agent

By: _____
Name: _____
Title:   Authorized Signatory

**GLAS TRUST CORPORATION
LIMITED,** as Collateral Agent

By: _____
Name: _____
Title:   Authorized Signatory

**[_]**, as a Lender

By: _____
Name: _____
Title:   Authorized Signatory

**<u>Exhibit 2</u>**

**ABL DIP Credit Agreement**

**DEBTOR-IN-POSSESSION REVOLVING CREDIT AND SECURITY AGREEMENT**

**PNC BANK, NATIONAL ASSOCIATION**,
as a Lender and Agent, and

**THE OTHER LENDERS PARTY HERETO**

**WITH**

**INVACARE CORPORATION**,
as a Borrower,

**THE OTHER BORROWERS PARTY HERETO**

**THE GUARANTORS PARTY HERETO**

**February [__], 2023**

**TABLE OF CONTENTS[1]**

Page

1. DEFINITIONS...................................................................................................................2

    1.1    Accounting Terms.  As used in this Agreement, the Other Documents or any certificate, report or other document made or delivered pursuant to this Agreement, accounting terms not defined in Section 1.2 or elsewhere in this Agreement and accounting terms partly defined in Section 1.2 to the extent not defined shall have the respective meanings given to them under GAAP; provided, however that, whenever such accounting terms are used for the purposes of determining compliance with financial covenants in this Agreement, such accounting terms shall be defined in accordance with GAAP as applied in preparation of the audited financial statements of Borrowers on a Consolidated Basis for the fiscal year ended December 31, 2021. If there occurs after the Closing Date any change in GAAP that affects in any respect the calculation of any covenant contained in this Agreement or the definition of any term defined under GAAP used in such calculations, Agent, Lenders and Borrowers shall negotiate in good faith to amend the provisions of this Agreement that relate to the calculation of such covenants with the intent of having the respective positions of Agent, Lenders and Borrowers after such change in GAAP conform as nearly as possible to their respective positions as of the Closing Date, provided, that, until any such amendments have been agreed upon, the covenants in this Agreement shall be calculated as if no such change in GAAP had occurred and Borrowers shall provide additional financial statements or supplements thereto, attachments to Officer's Certificates and/or calculations as Agent may reasonably require in order to provide the appropriate financial information required hereunder with respect to Borrowers both reflecting any applicable changes in GAAP and as necessary to demonstrate compliance with the financial covenants before giving effect to the applicable changes in GAAP. Without limiting the foregoing, for purposes of determining compliance with any provision of this Agreement and any related definitions, the determination of whether a lease is to be treated as an operating lease or capital lease shall be made without giving effect to any change in GAAP that becomes effective on or after November 30, 2016 that would require operating leases to be treated similarly to capital leases. .2

    1.2    General Terms.  For purposes of this Agreement the following terms shall have the following meanings:.........................................................................................2

    1.3    Uniform Commercial Code Terms.  All terms used herein and defined in the Uniform Commercial Code as adopted in the State of New York from time to time (which together with the PPSA shall be referred to herein as the "Uniform Commercial Code") shall have the meaning given therein unless otherwise defined herein. Without limiting the foregoing, the terms "accounts", "chattel paper" (and "electronic chattel paper" and "tangible chattel paper"), "commercial tort claims", "deposit accounts", "documents", "equipment", "financial asset", "fixtures", "general intangibles", "goods", "instruments", "inventory", "investment property", "letter-of-credit rights", "payment intangibles",

---

[1] NTD: To be updated.

"proceeds", "promissory note" "securities", "software" and "supporting obligations" as and when used in the description of Collateral shall have the meanings given to such terms in Articles 8 or 9 of the Uniform Commercial Code. In addition, without limiting the foregoing, the terms "accounts", "chattel paper", "goods", "instruments", "intangibles", "proceeds", "securities", "investment property", "document of title", "inventory" and "equipment", as and when used in the description of Collateral located in Canada shall have the meanings given to such terms in the PPSA. To the extent the definition of any category or type of collateral is expanded by any amendment, modification or revision to the Uniform Commercial Code, such expanded definition will apply automatically as of the date of such amendment, modification or revision. .............................................56

1.4     Certain Matters of Construction.  The terms "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision. All references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement. Any pronoun used shall be deemed to cover all genders. Wherever appropriate in the context, terms used herein in the singular also include the plural and vice versa. All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations. Unless otherwise provided, all references to any instruments or agreements to which Agent is a party, including references to any of the Other Documents, shall include any and all modifications, supplements or amendments thereto, any and all restatements or replacements thereof and any and all extensions or renewals thereof. Unless otherwise provided, all financial calculations shall be performed with Inventory valued on a first- in, first-out basis. Whenever the words "including" or "include" shall be used, such words shall be understood to mean "including, without limitation" or "include, without limitation". A Default or an Event of Default shall be deemed to exist at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing pursuant to this Agreement or, in the case of a Default, is cured within any period of cure expressly provided for in this Agreement; and an Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing by the US-Canada Required Lenders. Any Lien referred to in this Agreement or any of the Other Documents as having been created in favor of Agent, any agreement entered into by Agent pursuant to this Agreement or any of the Other Documents, any payment made by or to or funds received by Agent pursuant to or as contemplated by this Agreement or any of the Other Documents, or any act taken or omitted to be taken by Agent shall, unless otherwise expressly provided, be created, entered into, made or received, or taken or omitted, for the benefit or account of Agent and Lenders. Wherever the phrase "to the best of Borrowers' knowledge" or words of similar import relating to the knowledge or the awareness of any Borrower are used in this Agreement or Other Documents, such phrase shall mean and refer to (i) the actual knowledge of a senior officer of any Borrower or (ii) the knowledge that a senior officer would have obtained if he/she had engaged in a good faith and diligent performance of his/her duties,

including the making of such reasonably specific inquiries as may be necessary of the employees or agents of such Borrower and a good faith attempt to ascertain the existence or accuracy of the matter to which such phrase relates. All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or otherwise within the limitations of, another covenant shall not avoid the occurrence of a default if such action is taken or condition exists. In addition, all representations and warranties hereunder shall be given independent effect so that if a particular representation or warranty proves to be incorrect or is breached, the fact that another representation or warranty concerning the same or similar subject matter is correct or is not breached will not affect the incorrectness of a breach of a representation or warranty hereunder. The inclusion of Permitted Encumbrances in this Agreement is not intended to subordinate and shall not subordinate any Lien created by any of the security contemplated by this Agreement and the Other Documents to any Permitted Encumbrances. All of the property and assets of each of the Canadian Loan Parties, including, without limitation, its Receivables, shall be valued in, and converted into, the Equivalent Amount in Dollars in accordance with the Agent's customary banking and conversion practices and procedures. 

............................57
1.5   Acknowledgment.  Each Debtor ratifies and affirms the stipulations set forth in Paragraph G(iv), (x), (xi) and (xii) of the Interim Order and the Final Order. .......58
1.6   Release. .........................................................................................................58
1.7   Adoption and Ratification.  Each Loan Party hereby (a) ratifies, assumes, adopts and agrees to be bound by all of the Pre-Petition Other Documents to which it is a party and (b) agrees to pay all Pre-Petition Obligations in accordance with the terms of the Pre-Petition Other Documents and in accordance with the Interim Order and Final Order.  Each Pre-Petition Other Document to which any Loan Party is a party is hereby incorporated herein by reference and hereby is and shall be deemed adopted and assumed in full by such Loan Party, and in respect of each Debtor, as a debtor and debtor-in-possession, and considered an agreement among the Loan Parties, on the one hand, and the applicable Secured Parties, on the other hand. ............................................................................................................59
2.     ADVANCES, PAYMENTS. ........................................................................59
2.1   Revolving Advances. .....................................................................................59
2.2   Procedures for Requesting Revolving Advances; Procedures for Selection of Applicable Interest Rates for All Advances. .................................................59
2.3   Swing Loans. ..................................................................................................60
2.4   Disbursement of Advance Proceeds. .............................................................61
2.5   Making and Settlement of Advances. ............................................................62
2.6   Maximum Advances. The aggregate principal amount of: .............................64
2.7   Manner and Repayment of Advances. ...........................................................64
2.8   Repayment of Excess Advances. If at any time, including, without limitation on any Computation Date, the aggregate balance of outstanding Revolving Advances, US-Canada Swing Loans and/or US-Canada Advances taken as a whole, exceeds the maximum amount of such type of Advances and/or Advances individually or taken as a whole (as applicable) permitted hereunder, such excess

Advances shall be immediately due and payable without the necessity of any demand, at the Payment Office, whether or not a Default or an Event of Default has occurred. ........................................................................................................65

2.9    Statement of Account. ..........................................................................................65

2.10    Letters of Credit. .................................................................................................65

2.11    Issuance of Letters of Credit. ..............................................................................66

2.12    Requirements For Issuance of Letters of Credit. .................................................66

2.13    Disbursements, Reimbursement. .........................................................................67

2.14    Repayment of Participation Advances. ................................................................68

2.15    Documentation.  Each Borrower agrees to be bound by the terms of any applicable Issuer's form of letter of credit application (the "Letter of Credit Application") and by the applicable Issuer's interpretations of any Letter of Credit issued on behalf of such Borrower and by such Issuer's written regulations and customary practices relating to letters of credit, though such Issuer's interpretations may be different from such Borrower's own. In the event of a conflict between any Letter of Credit Application and this Agreement, this Agreement shall govern. It is understood and agreed that, except in the case of gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment), no Issuer shall be liable for any error, negligence and/or mistakes, whether of omission or commission, in following Borrowing Agent's or any Borrower's instructions or those contained in any Letters of Credit or any modifications, amendments or supplements thereto.69

2.16    Determination to Honor Drawing Request. In determining whether to honor any request for drawing under any Letter of Credit by the beneficiary thereof, the applicable Issuer shall be responsible only to determine that the documents and certificates required to be delivered under such Letter of Credit have been delivered and that they comply on their face with the requirements of such Letter of Credit and that any other drawing condition appearing on the face of such Letter of Credit has been satisfied in the manner so set forth. ...............................69

2.17    Nature of Participation and Reimbursement Obligations. The obligation of each Lender holding a Revolving Commitment in accordance with this Agreement to make the Revolving Advances or Participation Advances as a result of a drawing under a Letter of Credit, and the obligations of the Borrowers to reimburse any Issuer upon a draw under a Letter of Credit, shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Section 2.17 under all circumstances, including the following circumstances: ....69

2.18    Liability for Acts and Omissions. .......................................................................71

2.19    Mandatory Prepayments. ....................................................................................72

2.20    Use of Proceeds. .................................................................................................73

2.21    Defaulting Lender. ..............................................................................................73

2.22    Payment of Obligations. Agent may charge to the Borrowers' Account as a Revolving Advance or, at the discretion of the Swing Loan Lender, as a Swing Loan (i) all payments with respect to any of the Obligations required hereunder (including without limitation principal payments, payments of interest, payments of Letter of Credit Fees and all other fees provided for hereunder and payments under Sections 16.5 and 16.9) as and when each such payment shall become due

and payable (whether as regularly scheduled, upon or after acceleration, upon maturity or otherwise), (ii) without limiting the generality of the foregoing clause (i), (a) all amounts expended by Agent or any Lender pursuant to Sections 4.2 or 4.3 hereof or any corresponding provision in any Other Document and (b) all expenses which Agent incurs in connection with the forwarding of Advance proceeds and the establishment and maintenance of any Blocked Accounts or Depository Accounts as provided for in Section 4.8(h), and (iii) any sums expended by Agent or any Lender due to any Borrower's failure to perform or comply with its obligations under this Agreement or any Other Document including any Borrower's obligations under Sections 3.3, 3.4, 4.4, 4.7, 6.4, 6.7, 6.8 and 6.9 hereof, any corresponding provision in any Other Document, and all amounts so charged shall be added to the Obligations and shall be secured by the Collateral.  To the extent Revolving Advances are not actually funded by the other Lenders in respect of any such amounts so charged, all such amounts so charged shall be deemed to be Revolving Advances made by and owing to Agent and Agent shall be entitled to all rights (including accrual of interest) and remedies of a Lender under this Agreement and the Other Documents with respect to such Revolving Advances.

3.	INTEREST AND FEES.................................................................................................76
	3.1	Interest. ..........76
	3.2	Letter of Credit Fees. ...............77

3.1	Interest. Interest on Advances shall be payable in arrears on the first day of each month, provided further that all accrued and unpaid interest shall be due and payable at the end of the Term (each of the foregoing payment dates, an "Interest Payment Date"). Interest charges shall be computed on the actual principal amount of Advances outstanding during the month at a rate per annum equal to the Revolving Interest Rate (as applicable, the "Contract Rate"). Except as expressly provided otherwise in this Agreement, any Obligations other than the Advances that are not paid when due shall accrue interest at the applicable Revolving Interest Rate for Domestic Rate Loans, subject to the provision of the final sentence of this Section 3.1 regarding the Default Rate. Whenever, subsequent to the date of this Agreement, the Alternate Base Rate is increased or decreased, the applicable Contract Rate for Domestic Rate Loans shall be similarly changed without notice or demand of any kind by an amount equal to the amount of such change in the Alternate Base Rate during the time such change or changes remain in effect. Upon and after the occurrence of an Event of Default, and during the continuation thereof, at the option of Agent or at the direction of US-Canada Required Lenders (or, in the case of any Event of Default under Section 10.7, immediately and automatically upon the occurrence of any such Event of Default without the requirement of any affirmative action by any party), the Obligations shall bear interest at the Revolving Interest Rate for Domestic Rate Loans set forth in the definition of US-Canada Applicable Margin plus two percent (2.00%) per annum (as applicable, the "Default Rate").

3.3	Facility Fee. If, for any calendar quarter during the Term, the average daily balance of the sum of US-Canada Revolving Advances (for purposes of this computation, US-Canada Swing Loans shall be deemed to be US-Canada Revolving Advances made by PNC as a US-Canada Lender) plus the Maximum

Undrawn Amount of all outstanding US-Canada Letters of Credit for each day of such calendar quarter (a) equals or is greater than 50% of the Maximum US-Canada Revolving Advance Amount, then US-Canada Borrowers shall pay to Agent, for the ratable benefit of US-Canada Lenders holding the US-Canada Revolving Commitments based on their US-Canada Revolving Commitment Percentages, a fee at a rate equal to .375% per annum on the amount by which the Maximum US-Canada Revolving Advance Amount exceeds such average daily unpaid balance, or (b) equals 50% or less of the Maximum US-Canada Revolving Advance Amount, US-Canada Borrowers shall pay a Facility Fee at a rate equal to .50% of the amount by which the Maximum US-Canada Revolving Advance Amount exceeds such average daily unpaid balance (the "Facility Fee").  Such applicable Facility Fee shall be payable to Agent in arrears on the first day of each calendar quarter with respect to the previous calendar quarter..............................78

3.4    Closing Fee and Collateral Evaluation Fee.............................................................79

3.5    Computation of Interest and Fees; Criminal Code (Canada). Interest and fees hereunder shall be computed on the basis of a year of 360 days and for the actual number of days elapsed. If any payment to be made hereunder becomes due and payable on a day other than a Business Day, the due date thereof shall be extended to the next succeeding Business Day and interest thereon shall be payable at the applicable Contract Rate during such extension. For purposes of the Interest Act (Canada): (i) whenever any interest or fee under this Agreement is calculated on the basis of a period of time other than a calendar year, such rate used in such calculation, when expressed as an annual rate, is equivalent to (x) such rate, multiplied by (y) the actual number of days in the calendar year in which the period for which such interest or fee is calculated ends, and divided by (z) the number of days in such period of time; (ii) the principle of deemed reinvestment of interest shall not apply to any interest calculation under this Agreement; and (iii) the rates of interest stipulated in this Agreement are intended to be nominal rates and not effective rates or yields. If any provision of this Agreement or Other Documents would oblige any Borrower to make any payment of interest or other amount payable to any Lender in an amount or calculated at a rate which would be prohibited by law or would result in a receipt by that Lender of "interest" at a "criminal rate" (as such terms are construed under the Criminal Code (Canada)), then, notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by Applicable Law or so result in a receipt by that Lender of "interest" at a "criminal rate", such adjustment to be effected, to the extent necessary (but only to the extent necessary), as follows: first, by reducing the amount or rate of interest, and, thereafter, by reducing any fees, commissions, costs, expenses, premiums and other amounts required to be paid to the affected Lender which would constitute interest for purposes of section 347 of the Criminal Code (Canada)....................79

3.6    Maximum Charges. In no event whatsoever shall interest and other charges charged hereunder exceed the highest rate permissible under Applicable Law. In the event interest and other charges as computed hereunder would otherwise exceed the highest rate permitted under Applicable Law: (i) the interest rates

hereunder will be reduced to the maximum rate permitted under Applicable Law; (ii) such excess amount shall be first applied to any unpaid principal balance owed by Borrowers; and (iii) if the then remaining excess amount is greater than the previously unpaid principal balance, Lenders shall promptly refund such excess amount to Borrowers and the provisions hereof shall be deemed amended to provide for such permissible rate.......................................................................79

3.7     Increased Costs. In the event that any Applicable Law or any Change in Law or compliance by any Lender (for purposes of this Section 3.7, the term "Lender" shall include the Agent, Swing Loan Lender, any Issuer or any Lender and any corporation or bank controlling the Agent, Swing Loan Lender, any Lender or any Issuer with any request or directive (whether or not having the force of law) from any central bank or other financial, monetary or other authority), shall:...............80

3.8     Alternate Rate of Interest. ....................................................................................80

3.9     Capital Adequacy...................................................................................................84

3.10    Taxes.......................................................................................................................85

3.11    Replacement of Lenders. If any Lender (an "Affected Lender") (a) makes demand upon Borrowers for (or if Borrowers are otherwise required to pay) amounts pursuant to Section 3.7 or 3.9 hereof or (b) is a Defaulting Lender, Borrowers may, within ninety (90) days of receipt of such demand, notice (or the occurrence of such other event causing Borrowers to be required to pay such compensation or causing Section 2.2(h) hereof to be applicable), or such Lender becoming a Defaulting Lender or denial of a request by Agent pursuant to Section 16.2(b) hereof, as the case may be, by notice in writing to Agent and such Affected Lender (i) request the Affected Lender to cooperate with Borrowers in obtaining a replacement Lender satisfactory to Agent and Borrowers (the "Replacement Lender"); (ii) request the non-Affected Lenders to acquire and assume all of the Affected Lender's Advances and its Revolving Commitment Percentage, as provided herein, but none of such Lenders shall be under any obligation to do so; or (iii) propose a Replacement Lender subject to approval by Agent in its good faith business judgment. If any satisfactory Replacement Lender shall be obtained, and/or if any one or more of the non-Affected Lenders shall agree to acquire and assume all of the Affected Lender's Advances and its Revolving Commitment Percentage, then such Affected Lender shall assign, in accordance with Section 16.3 hereof, all of its Advances and its Revolving Commitment Percentage and other rights and obligations under this Agreement and the Other Documents to such Replacement Lender or non-Affected Lenders, as the case may be, in exchange for payment of the principal amount so assigned and all interest and fees accrued on the amount so assigned, plus all other Obligations then due and payable to the Affected Lender. ........................................................88

4.      COLLATERAL: GENERAL TERMS .................................................................88

        4.1     Security Interest in the Collateral. To secure the prompt payment and performance to the Post-Petition Secured Parties of the Post-Petition Obligations (and, upon entry of the Final Order, any and all Obligations, including without limitation, all Pre-Petition Obligations and Post-Petition Obligations) of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, the Agent, for the benefit of itself and the other Secured Parties, shall have and is

hereby granted by (x) each Debtor, effective as of the Petition Date, valid and perfected first priority (subject to (x) the priority of Liens set forth Section 10(b) of the Interim Order and (y) the ABL Intercreditor Agreement) security interests and liens in and upon all pre- and post- petition property of such Debtor constituting US Collateral, whether existing on the Petition Date or thereafter acquired (which shall, for the avoidance of doubt, include the property listed in the following clause (y)) and (y) the US Loan Parties a continuing security interest in and to and Lien on all of its US Collateral, whether now owned or existing or hereafter created, acquired or arising and wheresoever located. Each US Loan Party shall mark its books and records as may be necessary or appropriate to evidence, protect and perfect Agent's security interest and shall cause its financial statements to reflect such security interest. Each US Loan Party shall promptly provide Agent with written notice of all commercial tort claims in excess of $500,000 in Officer's Certificate required under Section 9.7 or 9.8, as the case may be, next following the commencement of legal proceedings with respect thereto, such notice to contain the case title together with the applicable court and a brief description of the claim(s), the events out of which such claim(s) arose and the parties against which such claims may be asserted and the case title together with the applicable court and docket number and the express grant by such US Loan Party to Agent of a security interest and lien in and to such commercial tort claim and the proceeds thereof. In the event that such notice does not include such grant of a security interest, the sending thereof by a US Loan Party to Agent shall be deemed to thereby grant to Agent a security interest and lien in and to such commercial tort claims described therein and all proceeds thereof. Each US Loan Party shall provide Agent with written notice promptly upon becoming the beneficiary under any letter of credit or otherwise obtaining any right, title or interest in any letter of credit rights, in each case having a value in excess of $1,000,000, and at Agent's request shall take such actions as Agent may reasonably request for the perfection of Agent's security interest therein. The Pre-Petition Secured Parties are entitled to adequate protection as set forth in the Interim Order and, once entered, the Final Order. ...........................................88

4.2    Perfection of Security Interest. Subject to the Orders and the ABL Intercreditor Agreement, each US Loan Party shall take all action that may be necessary or desirable, or that Agent may request, so as at all times to maintain the validity, perfection, enforceability and priority (subject to the terms of the ABL Intercreditor Agreement) of Agent's security interest in and Lien on the US Collateral or to enable Agent to protect, exercise or enforce its rights hereunder and in the US Collateral, including, but not limited to, (i) immediately discharging all Liens other than Permitted Encumbrances, (ii) using commercially reasonable efforts to obtain Lien Waiver Agreements, (iii) delivering to Agent, endorsed or accompanied by such instruments of assignment as Agent may specify, and stamping or marking, in such manner as Agent may specify, any and all chattel paper, instruments, letters of credits and advices thereof and documents evidencing or forming a part of the US Collateral, provided that Loan Parties shall not be required to endorse or deliver such chattel paper, instruments, letters of credit and advices thereof individually or in the aggregate with all others not so

endorsed and delivered to the Agent and so marked and stamped, having a value less than $500,000, (iv) entering into warehousing, lockbox, customs and freight agreements and other custodial arrangements satisfactory to Agent, and (v) executing and delivering financing statements, control agreements, instruments of pledge, notices and assignments, in each case in form and substance satisfactory to Agent, relating to the creation, validity, perfection, maintenance or continuation of Agent's security interest and Lien under the Uniform Commercial Code or other Applicable Law; provided, however, that control agreements shall not be required with respect to individual deposit accounts having a de minimis balance; provided, further, that the aggregate balance of all such deposit accounts described in the foregoing proviso shall not exceed $50,000 at any time. By its signature hereto, each US Loan Party hereby authorizes Agent to file against such US Loan Party, one or more financing, continuation or amendment statements pursuant to the Uniform Commercial Code or similar notices or filings under other Applicable Law, in each case in form and substance satisfactory to Agent (which statements may have a description of collateral which is broader than that set forth herein, including without limitation a description of US Collateral as "all assets" and/or "all personal property" of any US Loan Party). All charges, expenses and fees Agent may incur in doing any of the foregoing, and any local taxes relating thereto, shall be charged to the Borrowers' Account as a Revolving Advance of a Domestic Rate Loan and added to the Obligations, or, at Agent's option, shall be paid by Loan Parties to Agent for its benefit and for the ratable benefit of the Secured Parties immediately upon demand. ....................................89

4.3     Preservation of Collateral. Subject to the Orders and the ABL Intercreditor Agreement, during the continuance of an Event of Default, in addition to the rights and remedies set forth in Section 11.1 hereof, Agent: (a) may at any time take such steps as Agent deems necessary to protect Agent's interest in and to preserve the US Collateral, including the hiring of security guards or the placing of other security protection measures as Agent may deem appropriate; (b) may employ and maintain at any of any US Loan Party's premises a custodian who shall have full authority to do all acts necessary to protect Agent's interests in the US Collateral; (c) may lease warehouse facilities to which Agent may move all or part of the US Collateral; (d) may use any US Loan Party's owned or leased lifts, hoists, trucks and other facilities or equipment for handling or removing the US Collateral; and (e) shall have, and is hereby granted, a right of ingress and egress to the places where the US Collateral is located, and may proceed over and through any of US Loan Parties' owned or leased property. Each US Loan Party shall cooperate fully with all of Agent's efforts to preserve the US Collateral and will take such actions to preserve the US Collateral as Agent may direct. All of Agent's expenses of preserving the US Collateral, including any expenses relating to the bonding of a custodian, shall be charged to the Borrowers' Account as a Revolving Advance maintained as a Domestic Rate Loan and added to the Obligations. ...........................................................................................90

4.4     Ownership and Location of Collateral. ...............................................................90

4.5     Defense of Agent's and Lenders' Interests. Until (a) payment and performance in full of all of the Obligations and (b) termination of this Agreement, Agent's

security interests in the US Collateral shall continue in full force and effect. During such period no US Loan Party shall, without Agent's prior written consent, pledge, sell (except for sales or other dispositions otherwise permitted in Section 7.1(b) hereof), assign, transfer, create or suffer to exist a Lien upon or encumber or allow or suffer to be encumbered in any way except for Permitted Encumbrances, any part of the US Collateral. Each US Loan Party shall defend Agent's interests in the US Collateral against any and all Persons whatsoever. At any time following demand by Agent for payment of all Obligations, Agent shall have the right to take possession of the indicia of the US Collateral and the US Collateral in whatever physical form contained, including: labels, stationery, documents, instruments and advertising materials. If Agent exercises this right to take possession of the US Collateral, US Loan Parties shall, upon demand, assemble it in the best manner possible and make it available to Agent at a place reasonably convenient to Agent. In addition, with respect to all US Collateral, Agent and Lenders shall be entitled to all of the rights and remedies set forth herein and further provided by the Uniform Commercial Code or other Applicable Law. During the continuance of an Event of Default, each US Loan Party shall, and Agent may, at its option, instruct all suppliers, carriers, forwarders, warehousers or others receiving or holding cash, checks, Inventory, documents or instruments in which Agent holds a security interest to deliver same to Agent and/or subject to Agent's order and if they shall come into any US Loan Party's possession, they, and each of them, shall be held by such US Loan Party in trust as Agent's trustee, and such US Loan Party will immediately deliver them to Agent in their original form together with any necessary endorsement. ...............91

4.6      Inspection of Premises. At all reasonable times and, so long as no Event of Default is continuing, upon prior notice to the Borrowing Agent, and from time to time as often as Agent shall elect in its sole discretion, Agent and each Lender shall have full access to and the right to audit, check, inspect and make abstracts and copies from each US Loan Party's books, records, audits, correspondence and all other papers relating to the US Collateral and the operation of each US Loan Party's business. Agent, any Lender and their agents may enter upon any premises of any US Loan Party at any time during business hours and at any other reasonable time, and from time to time as often as Agent shall elect in its sole discretion, for the purpose of inspecting the US Collateral and any and all records pertaining thereto and the operation of such US Loan Party's business................91

4.7      Appraisals. Agent may, in its sole discretion, exercised in a commercially reasonable manner, at any time after the Closing Date and from time to time, engage the services of an independent appraisal firm or firms of reputable standing, satisfactory to Agent, for the purpose of appraising the then current values of the Loan Parties' assets.  Absent the occurrence and continuance of an Event of Default at such time, Agent shall consult with US Loan Parties as to the identity of any such firm.  Not more than one field examination, at US-Canada Borrowers' expense, shall be conducted per annum unless an Event of Default or Default has occurred and is continuing................................................................91

4.8      Receivables; Deposit Accounts and Securities Accounts. ....................................92

4.9      Inventory. To the extent Inventory held for sale or lease has been produced by any

US Loan Party, it has been and will be produced by such Borrower in material accordance with the Federal Fair Labor Standards Act of 1938, as amended, and all rules, regulations and orders thereunder. ........................................................95

4.10    Maintenance of Equipment. The equipment shall be maintained in good operating condition and repair (reasonable wear and tear and casualty excepted) consistent with past practice and as needed in current operations, and all necessary replacements of and repairs thereto shall be made so that the value and operating efficiency of the equipment shall be maintained and preserved. No US Loan Party shall use or operate the equipment in violation of any law, statute, ordinance, code, rule or regulation. ........................................................................................95

4.11    Exculpation of Liability. Nothing herein contained shall be construed to constitute Agent or any Lender as any US Loan Party's agent for any purpose whatsoever, nor shall Agent or any Lender be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the US Collateral wherever the same may be located and regardless of the cause thereof. Neither Agent nor any Lender, whether by anything herein or in any assignment or otherwise, assume any of any US Loan Party's obligations under any contract or agreement assigned to Agent or such Lender, and neither Agent nor any Lender shall be responsible in any way for the performance by any US Loan Party of any of the terms and conditions thereof.......................................................................95

4.12    Financing Statements. Except as respects the financing statements filed by Agent, financing statements described on Schedule 1.2, and financing statements filed in connection with Permitted Encumbrances, no financing statement covering any of the US Collateral or any proceeds thereof is or will be on file in any public office..95

4.13    Superpriority Claims and Collateral Security.  Each Debtor hereby represents, warrants and covenants that, upon the entry by the Bankruptcy Court of the Interim Order and/or the Final Order, as applicable, the Obligations are entitled to superpriority Liens and claims to the extent provided by Section 7 of the Interim Order and, once entered, the Final Order................................................................95

4.14    No Filings Required.  The Liens securing the Obligations of the Debtors shall be deemed valid and perfected and duly recorded by entry of the Interim Order. Agent shall not be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office or to cause any account control agreements to be entered into by any otherwise applicable parties with respect to any deposit account or securities account or to take any other action in order to validate or perfect the Lien granted by or pursuant to the Interim Order, the Final Order, this Agreement or any Other Document. ........................95

4.15    Grants, Rights and Remedies.  The Lien and administrative priority granted by or pursuant to the Interim Order, the Final Order, this Agreement or any Other Document are independently granted.  The Interim Order, the Final Order, this Agreement and the Other Documents supplement each other, and the grants, priorities, rights and remedies of Agent and Lenders hereunder and thereunder are cumulative..........................................................................................................96

5.      REPRESENTATIONS AND WARRANTIES.................................................................96

5.1     Authority. ....................................................................................................96

5.2     Formation and Qualification. ...................................................................96

5.3      Survival of Representations and Warranties. All representations and warranties of such Loan Party contained in this Agreement and the Other Documents to which it is a party shall be true in all material respects at the time of such Loan Party's execution of this Agreement and the Other Documents to which it is a party, and shall survive the execution, delivery and acceptance thereof by the parties thereto and the closing of the transactions described therein or related thereto. ..............97

5.4      Tax Returns. Each Loan Party's federal tax identification number (where applicable) is set forth on Schedule 5.4. Each Loan Party has filed all federal, national, state, provincial and material local tax returns and other reports each is required by law to file and has paid all federal, national, state, provincial and all other material taxes, assessments, fees and other governmental charges that are due and payable, except (i) those which are being Properly Contested or (ii) the nonpayment of which is permitted or required by the Bankruptcy Code. The provision for taxes on the books of each Loan Party is adequate for all years not closed by applicable statutes, and for its current fiscal year, and no Loan Party has any knowledge of any deficiency or additional assessment in connection therewith not provided for on its books. ................................................................................97

5.5      [Reserved]. ...........................................................................................97

5.6      [Reserved]. ...........................................................................................97

5.7      [Reserved]. ...........................................................................................97

5.8      [Reserved]. ...........................................................................................97

5.9      Budget.  The Budget was prepared in good faith and based upon assumptions which were reasonable in light of the conditions existing at the time of delivery thereof and reflect each Debtor's reasonable estimate of its future financial performance for such period (it being understood that projections by their nature are inherently uncertain and the results reflected therein may not actually be achieved and actual results may differ and differences may be material). ............97

5.10    Entity Names. Except as set forth on Schedule 5.10, no Loan Party has been known by any other company or corporate name, as applicable, in the past five (5) years and does not sell Inventory under any other name except as set forth on Schedule 5.10, nor has any Loan Party been the surviving corporation or company, as applicable, of a merger or consolidation or acquired all or substantially all of the assets of any Person during the preceding five (5) years. .97

5.11    O.S.H.A. Environmental Compliance; Flood Insurance.......................................97

5.12    No Litigation, Violation, Indebtedness or Default; ERISA Compliance...............98

5.13    Patents, Trademarks, Copyrights and Licenses. All material Intellectual Property owned or utilized by any Loan Party: (i) is set forth on Schedule 5.13; and (ii) is valid and has been duly registered or filed with all appropriate Governmental Bodies. The Intellectual Property set forth on Schedule 5.13 constitutes all of the intellectual property rights which are necessary for the operation of each Loan Party's business. Except as set forth in Schedule 5.13 hereto, there is no objection to, pending challenge to the validity of, or proceeding by any Governmental Body to suspend, revoke, terminate or adversely modify, any such Intellectual Property and no Loan Party is aware of any grounds for any challenge or proceedings, and no such matters set forth on Schedule 5.13, if determined adversely to a Loan Party, would reasonably be expected to have a Material Adverse Effect. All

material Intellectual Property owned or held by any Loan Party consists of original material or property developed by such Loan Party or was lawfully acquired by such Loan Party from the proper and lawful owner thereof. Each of such items has been maintained so as to preserve the value thereof from the date of creation or acquisition thereof. ....................................................................100

5.14    Licenses, Permits and Accreditation. Except as could not, individually or in the aggregate, result in a Material Adverse Effect or result in criminal liability for any Loan Party, (a) each of Loan Parties and their Subsidiaries has, to the extent applicable: (i) obtained and maintains in good standing all required licenses or permits required by any applicable federal, state, provincial or local law, rule or regulation for the operation of its business in each jurisdiction wherein it is now conducting or proposes to conduct business; and (ii) to the extent prudent and customary in the industry in which it is engaged, obtained and maintains accreditation from all generally recognized accrediting agencies; and (b) all such required licenses, permits and accreditations are in full force and effect on the date hereof and have not been revoked or suspended or otherwise limited.........100

5.15    [Reserved]. ......................................................................................................100

5.16    [Reserved]. ......................................................................................................100

5.17    No Burdensome Restrictions. No Loan Party is party to any contract or agreement the performance of which would reasonably be expected to have a Material Adverse Effect. As of the Closing Date, each Loan Party has heretofore delivered to Agent true and complete copies of all Material Contracts to which it is a party or to which it or any of its properties is subject. No Loan Party has agreed or consented to cause or permit in the future (upon the happening of a contingency or otherwise) any of its property, whether now owned or hereafter acquired, to be subject to a Lien which is not a Permitted Encumbrance. ....................................101

5.18    No Labor Disputes. No Loan Party is involved in any labor dispute which would reasonably be expected to have a Material Adverse Effect; there are no material labor disputes, strikes or walkouts or union organization of any Loan Party's employees threatened or in existence and no labor contract is scheduled to expire during the Term other than as set forth on Schedule 5.18 hereto. .......................101

5.19    Margin Regulations. No Loan Party is engaged, nor will it engage, principally or as one of its important activities, in the business of extending credit for the purpose of "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U of the Board of Governors of the Federal Reserve System as now and from time to time hereafter in effect. No part of the proceeds of any Advance will be used for "purchasing" or "carrying" "margin stock" as defined in Regulation U of such Board of Governors......................................................................................................................101

5.20    Investment Company Act. No Loan Party is an "investment company" registered or required to be registered under the Investment Company Act of 1940, as amended, nor is it controlled by such a company. ................................................101

5.21    Disclosure. No representation or warranty made by any Loan Party in this Agreement, the Term DIP Loan Documents or in any financial statement, report, certificate or any other document furnished in connection herewith or therewith contains any untrue statement of a material fact or omits to state any material fact

necessary to make the statements herein or therein not misleading. There is no fact known to any Loan Party or which reasonably should be known to such Loan Party which such Loan Party has not disclosed to Agent in writing with respect to the transactions contemplated by this Agreement or the Term DIP Loan Documents which would reasonably be expected to have a Material Adverse Effect..................................................................................................................101

5.22    Swaps. No Loan Party is a party to, nor will it be a party to, any swap agreement whereby such Loan Party has agreed or will agree to swap interest rates or currencies unless same provides that damages upon termination following an event of default thereunder are payable on an unlimited "two-way basis" without regard to fault on the part of either party. ..........................................................101

5.23    Business and Property of Loan Parties. Upon and after the Closing Date, Loan Parties do not propose to engage in any business that is fundamentally and substantively different from their existing lines of business conducted by them on the Closing Date, taken as a whole, other than activities reasonably related, complementary or ancillary to such existing lines of business or reasonable extensions thereof. On the Closing Date, each Loan Party will own all the property and possess all of the rights and Consents necessary for the conduct of the business of such Loan Party........................................................................101

5.24    Ineligible Securities. Loan Parties do not intend to use and shall not use any portion of the proceeds of the Advances, directly or indirectly, to purchase during the underwriting period, or for 30 days thereafter, Ineligible Securities being underwritten by a securities Affiliate of Agent or any Lender. ...........................102

5.25    Federal Securities Laws. None of Loan Parties or any of their Subsidiaries (other than the Company with respect to clauses (i) and (ii)), (i) is required to file periodic reports under the Exchange Act or securities legislation of Canada, France, England or the Netherlands, (ii) has any securities registered under the Exchange Act or securities legislation of Canada, France, England or the Netherlands or (iii) has filed a registration statement that has not yet become effective under the Securities Act or securities legislation of Canada, France, England or the Netherlands...............................................................................102

5.26    Equity Interests. The authorized and outstanding Equity Interests of each Loan Party, and each legal and beneficial holder thereof, are as set forth on Schedule 5.26 hereto. All of the Equity Interests of each Loan Parties have been duly and validly authorized and issued and are fully paid and non-assessable and have been sold and delivered to the holders hereof in compliance with, or under valid exemption from, all federal, provincial and state laws and the rules and regulations of each Governmental Body governing the sale and delivery of securities. Except for the rights and obligations set forth on Schedule 5.26, there are no subscriptions, warrants, options, calls, commitments, rights or agreement by which any Loan Party or any of the shareholders of any Loan Party is bound relating to the issuance, transfer, voting or redemption of shares of its Equity Interests or any pre-emptive rights held by any Person with respect to the Equity Interests of Loan Parties.  Except as set forth on Schedule 5.26, Loan Parties have not issued any securities convertible into or exchangeable for shares of its Equity Interests or any options, warrants or other rights to acquire such shares or

securities convertible into or exchangeable for such shares. ...............................102

5.27 Commercial Tort Claims. No Loan Party has any commercial tort claims in excess of $1,000,000 whether or not a proceeding has been filed, except as set forth on Schedule 5.27 hereto. ...........................................................................102

5.28 Letter of Credit Rights. No Loan Party has any letter of credit rights in excess of $1,000,000 except as set forth on Schedule 5.28 hereto.....................................102

5.29 Material Contracts. Schedule 5.29 sets forth all Material Contracts of Loan Parties and any material defaults thereunder. Except where any failure or default would reasonably be expected to have a Material Adverse Effect, all Material Contracts are in full force and effect and no material defaults currently exist thereunder. .102

5.30 Fraud and Abuse. Except as would not, individually or in the aggregate, constitute a Material Adverse Effect or result in criminal liability for any Loan Party, neither any Loan Party and its Subsidiaries nor, to the knowledge of any Chief Executive Officer, Chief Financial Officer, Treasurer or Compliance Officer of the Company, any of their officers or directors, have engaged in any activities which are prohibited under federal Medicare and Medicaid statutes, 42 U.S.C. Section 1320a-7b or 42 U.S.C., or any other Applicable Laws in any applicable jurisdiction. Section 1395nn or the regulations promulgated pursuant to such statutes or related state, local or provincial statutes or regulations, or which are prohibited by binding rules of professional conduct, including but not limited to the following: (a) knowingly and willfully making or causing to be made a false statement or misrepresentation of a material fact in any applications for any benefit or payment; (b) knowingly and willfully making or causing to be made any false statement or misrepresentation of a material fact for use in determining rights to any benefit or payment; (c) failing to disclose knowledge by a claimant of the occurrence of any event affecting the initial or continued right to any benefit or payment on its own behalf or on behalf of another with the intent to secure such benefit or payment fraudulently; (d) knowingly and willfully soliciting or receiving any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind, or offering to pay such remuneration (i) in return for referring an individual to a Person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by Medicare, Medicaid or other applicable third party payors, including any Governmental Body, or (ii) in return for purchasing, leasing or ordering or arranging for or recommending the purchasing, leasing or ordering of any good, facility, service, or item for which payment may be made in whole or in part by Medicare, Medicaid or other applicable third party payors, including any Governmental Body. .....................102

5.31 Other Regulatory Protection. Except for oxygen products, none of Loan Parties and their Subsidiaries manufactures pharmaceutical products. Except as set forth on Schedule 5.31, none of Loan Parties and none of the Subsidiaries of Loan Parties (a) participates in Medicare or Medicaid or other similar government programs in applicable jurisdictions as a provider or supplier, rather, Loan Parties and their Subsidiaries are manufacturers and sell to providers for purposes of Medicare, Medicaid and any other Medical Reimbursement Program or other similar government programs in applicable jurisdictions, (b) is a party to any

Medicare Provider Agreement or Medicaid Provider Agreement, or (c) bills for items or services to any Medical Reimbursement Program or other similar government programs in applicable jurisdictions. Each of Loan Parties and its Subsidiaries is in compliance with all applicable rules, regulations and other requirements of the Food and Drug Administration and Health Canada (for purposes hereof collectively, "FDA"), the Federal Trade Commission (for purposes hereof, "FTC"), the Consumer Product Safety Commission, the United States Customs Service and the United States Postal Service and other state, national, provincial or federal regulatory authorities or jurisdictions in which such Loan Party or any of its Subsidiaries do business or distribute and market products, except to the extent that any such noncompliance, individually or in the aggregate, does not constitute a Material Adverse Effect. Neither the FDA, the FTC, the Consumer Product Safety Commission, nor any other such regulatory authority has requested (or, to the knowledge of any authorized officer, are considering requesting) any product recalls or other enforcement actions that (a) if complied with, individually or in the aggregate, would reasonably be expected to constitute a Material Adverse Effect or (b) with which Loan Parties and their Subsidiaries have not complied within the time period allowed, except where any such failure would not reasonably be expected to have a Material Adverse Effect. .103

5.32    [Reserved]. ......................................................................................103
5.33    Delivery of Term DIP Loan Documents. Agent has received complete copies of the Term DIP Loan Documents. None of such documents and agreements has been amended or supplemented, nor have any of the provisions thereof been waived, except pursuant to a written agreement or instrument which has heretofore been delivered to Agent.....................................................................104
5.34    [Reserved]. ......................................................................................104
5.35    EEA Financial Institution. No Loan Party is an EEA Financial Institution.........104
5.36    Certificate of Beneficial Ownership. The Certificate of Beneficial Ownership executed and delivered to Agent and Lenders for each Borrower (other than the Company) on or prior to the date of this Agreement, as updated from time to time in accordance with this Agreement, is accurate, complete and correct as of the date hereof and as of the date any such update is delivered. The Borrowers acknowledge and agree that the Certificate of Beneficial Ownership is one of the Other Documents. ...............................................................................104
5.37    Sanctions and other Anti-Terrorism Laws. No (a) Covered Entity, nor any employees, officers, directors, affiliates, consultants, brokers or agents acting on a Covered Entity's behalf in connection with this Agreement: (i) is a Sanctioned Person; (ii) directly, or indirectly through any third party, is engaged in any transactions or other dealings with or for the benefit of any Sanctioned Person or Sanctioned Jurisdiction, or any transactions or other dealings that otherwise are prohibited by any Anti-Terrorism Laws; (b) Collateral is Embargoed Property.104
5.38    Anti-Corruption Laws. Each Covered Entity has (a) conducted its business in compliance with all Anti-Corruption Laws and (b) has instituted and maintains policies and procedures designed to ensure compliance with such Laws............104
6.    AFFIRMATIVE COVENANTS....................................................................104
6.1    Compliance with Laws. Comply in all material respects with all Applicable Laws

with respect to the Collateral or any part thereof or to the operation of such Loan Party's business the non-compliance with which would reasonably be expected to be material and adverse to any Loan Party (except to the extent (a) any separate provision of this Agreement shall expressly require compliance with any particular Applicable Law(s) pursuant to another standard or (b) any Applicable Law is being Properly Contested)................................................................104

6.2     Conduct of Business and Maintenance of Existence and Assets. (a) Conduct continuously and operate actively its business according to good business practices and maintain all of its properties useful or necessary in its business in good working order and condition (reasonable wear and tear and casualty excepted and except as may be disposed of in accordance with the terms of this Agreement), including all material Intellectual Property and take all actions necessary to enforce and protect the validity of any material intellectual property right or other right included in the Collateral; (b) keep in full force and effect its existence and comply with all laws and regulations governing the conduct of its business where the failure to do so would reasonably be expected to have a Material Adverse Effect; and (c) make all such reports and pay all such franchise and other taxes and license fees and do all such other acts and things as may be lawfully required to maintain its rights, licenses, leases, powers and franchises under the laws of the United States, Canada, France, England or the Netherlands or any political subdivision thereof where the failure to do so would reasonably be expected to have a Material Adverse Effect. ......................................................104

6.3     Books and Records; Inspection Rights. .............................................105

6.4     Payment of Taxes. Unless Properly Contested, pay, when due, all Priority Payables and all taxes, assessments and other Charges lawfully levied or assessed upon such Loan Party or any of the Collateral, including real and personal property taxes, assessments and charges and all franchise, income, employment, social security benefits, withholding, and sales taxes, except, in each case, with respect to any Person that is a Debtor under the Cases, the nonpayment of such tax, assessment, or other charge is permitted or required by the Bankruptcy Code. If any tax by any Governmental Body is or may be imposed on or as a result of any transaction between any Loan Party and the Agent or any Lender which the Agent or any Lender may be required to withhold or pay or if any taxes, assessments, or other Charges remain unpaid after the date fixed for their payment, or if any claim shall be made which, in the Agent's opinion, may reasonably be expected to create a valid Lien on the Collateral, the Agent may, upon notice to Loan Parties (or during an Event of Default without notice to Loan Parties) pay the taxes, assessments or other Charges and each Loan Party hereby indemnifies and holds the Agent and each Lender harmless in respect thereof. The amount of any payment by an Agent under this Section 6.4 shall be charged to Borrowers' Account as a Revolving Advance maintained as a Domestic Rate Loan and added to the Obligations and, until Loan Parties shall furnish the Agent with an indemnity therefor (or supply the Agent with evidence satisfactory to the Agent that due provision for the payment thereof has been made), the Agent may hold without interest any balance standing to Loan Parties' credit and the Agent shall retain its security interest in and Lien on any and all Collateral held by the

Agent....................................................................................................................105

6.5     [Reserved]......................................................................................................105

6.6     [Reserved]......................................................................................................106

6.7     Insurance........................................................................................................106

6.8     [Reserved]......................................................................................................107

6.9     Environmental Matters....................................................................................107

6.10   Standards of Financial Statements. Cause all financial statements referred to in Sections 9.7, 9.8, 9.9, 9.10, 9.11, 9.12 and 9.13 as to which GAAP is applicable to be complete and correct in all material respects (subject, in the case of interim financial statements, to the absence of footnotes and normal year-end audit adjustments) and to be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein (except as disclosed therein and agreed to by such reporting accountants or officer, as applicable)..............................................................................................................108

6.11   Federal Securities Laws. Promptly notify Agent in writing if any Loan Party (other than, with respect to clause (i) or (ii), the Company) or any of their Subsidiaries (i) is required to file periodic reports under the Exchange Act or securities legislation of Canada, France, England or the Netherlands, (ii) registers any securities under the Exchange Act or securities legislation of Canada, France, England or the Netherlands or (iii) files a registration statement under the Securities Act or securities legislation of Canada, France, England or the Netherlands. ........................................................................................108

6.12   Execution of Supplemental Instruments. Execute and deliver to Agent from time to time, upon demand, such supplemental agreements, statements, assignments and transfers, or instructions or documents relating to the Collateral, and such other instruments as Agent may request, in order that the full intent of this Agreement may be carried into effect. ....................................................................109

6.13   Government Receivables. To the extent any Borrower desires such Receivables to constitute Eligible Receivables, take all steps necessary to protect Agent's interest in the Collateral under the Federal Assignment of Claims Act, the Financial Administration Act (Canada) and any similar applicable provincial statute, the Uniform Commercial Code and all other applicable state, national, provincial or local statutes or ordinances and deliver to Agent appropriately endorsed, any instrument or chattel paper connected with any Receivable arising out of any contract between any Loan Party and the relevant Governmental Body or any department, agency or instrumentality of any of them. ........................................109

6.14   Keepwell. If it is a Qualified ECP Loan Party, then jointly and severally, together with each other Qualified ECP Loan Party, hereby absolutely unconditionally and irrevocably (a) guarantees the prompt payment and performance of all Swap Obligations owing by each Non-Qualifying Party (it being understood and agreed that this guarantee is a guaranty of payment and not of collection), and (b) undertakes to provide such funds or other support as may be needed from time to time by any Non-Qualifying Party to honor all of such Non-Qualifying Party's obligations under this Agreement or any Other Document in respect of Swap Obligations (provided, however, that each Qualified ECP Loan Party shall only be liable under this Section 6.14 for the maximum amount of such liability that can

be hereby incurred without rendering its obligations under this Section 6.14, or otherwise under this Agreement or any Other Document, voidable under applicable law, including applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Loan Party under this Section 6.14 shall remain in full force and effect until payment in full of the Obligations and termination of this Agreement and the Other Documents. Each Qualified ECP Loan Party intends that this Section 6.14 constitute, and this Section 6.14 shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support, or other agreement" for the benefit of each other Borrower and Guarantor for all purposes of Section 1a(18)(A)(v)(II) of the CEA. ............................................................................109

6.15    [Reserved.] ............................................................................................109

6.16    Canadian Pension Plans and Canadian Benefit Plans. Except as would not reasonably be expected to have a Material Adverse Effect: ...............................109

6.17    Certificate of Beneficial Ownership and Other Additional Information. Provide to Agent and the Lenders: (i) confirmation of the accuracy of the information set forth in the most recent Certificate of Beneficial Ownership provided to the Agent and Lenders; (ii) a new Certificate of Beneficial Ownership, in form and substance acceptable to Agent and each Lender, when the individual(s) to be identified as a Beneficial Owner have changed; and (iii) such other information and documentation as may reasonably be requested by Agent or any Lender from time to time for purposes of compliance by Agent or such Lender with applicable laws (including without limitation the USA Patriot Act and other "know your customer" and anti- money laundering rules and regulations), and any policy or procedure implemented by Agent or such Lender to comply therewith..............110

6.18    Milestones.  Within the time periods set forth below, each Debtor shall perform each action with respect to the Case as set forth below:.....................................110

6.19    [Reserved]. .............................................................................................110

6.20    Bankruptcy Schedules and Covenants. ...............................................................110

7.    NEGATIVE COVENANTS. .......................................................................................111

7.2    Creation of Liens. Create or suffer to exist any Lien or transfer upon or against any of its property or assets now owned or hereafter created or acquired, except Permitted Encumbrances. ..................................................................................111

7.3    Guarantees. Become liable upon the obligations or liabilities of any Person by assumption, endorsement or guaranty thereof or otherwise (other than to Lenders) except (a) as disclosed on Schedule 7.3, (b) guarantees by one or more Loan Parties or Subsidiaries thereof of the Indebtedness or obligations of any other Loan Parties or Subsidiaries thereof to the extent such Indebtedness or obligations are permitted to be incurred and/or outstanding pursuant to the provisions of this Agreement and (c) the endorsement of checks in the Ordinary Course of Business.111

7.4    Investments. Purchase or acquire obligations or Equity Interests of, or any other interest in, any Person, other than Permitted Investments. ...................................112

7.5    Loans. Make advances, loans or extensions of credit to any Person, including any Loan Party, or Subsidiary or Affiliate of a Loan Party other than as described in the definition of Permitted Investments.............................................................112

7.6    Capital Expenditures. Contract for, purchase or make any expenditure or

commitments for Capital Expenditures in any fiscal year in an aggregate amount for all Loan Parties in excess of $20,000,000. ..................................................112

7.7    Dividends. Declare, pay or make any dividend or distribution on any Equity Interests of any Loan Party (other than dividends or distributions payable in its stock, or split-ups or reclassifications of its stock) or apply any of its funds, property or assets to the purchase, redemption or other retirement of any Equity Interest, or of any options to purchase or acquire any Equity Interest of any Loan Party, except in respect of dividends and distributions made by any Subsidiary, for dividends and distributions made to Loan Parties or in respect of dividends and distributions made by any Loan Party, for dividends and distributions made to other Loan Parties. ...........................................................................................112

7.8    Indebtedness. Create, incur, assume or suffer to exist any Indebtedness other than Permitted Indebtedness. .....................................................................................112

7.9    Nature of Business. Substantially change the nature of the business in which it is presently engaged, nor except as specifically permitted hereby purchase or invest, directly or indirectly, in any assets or property other than in the Ordinary Course of Business for assets or property which are useful in, necessary for and are to be used in its business as presently conducted, in each case, except as contemplated by the Orders.....................................................................................................112

7.10    Transactions with Affiliates. Directly or indirectly, purchase, acquire or lease any property from, or sell, transfer or lease any property to, or otherwise enter into any transaction or deal with, any Affiliate, except for (i) transactions among Loan Parties and their Subsidiaries which are not expressly prohibited by the terms of this Agreement and which are in the Ordinary Course of Business, (ii) payment by Loan Parties and their Subsidiaries of dividends and distributions permitted under Section 7.7 hereof, (iii) transactions disclosed to Agent in writing, which are in the Ordinary Course of Business, on an arm's-length basis on terms and conditions no less favorable than terms and conditions which would have been obtainable from a Person other than an Affiliate, (iv) transactions with customers, clients, joint venture partners, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Agreement that are fair to the Company and the Subsidiaries, in the reasonable determination of the Board of Directors or the senior management of the Company, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party, (v) the issuance or transfer of Equity Interests (other than Disqualified Equity Interests) of the Company to any former, current or future director, manager, officer, employee or consultant (or spouses, former spouses, successors, heirs, legatees, distributes or Affiliates of any of the foregoing) of the Company or any of the Subsidiaries, (vi) the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, directors, officers, consultants and employees of the Company and the Subsidiaries in the Ordinary Course of Business to the extent attributable to the ownership or operation of the Company and the Subsidiaries, (vii) employment, consulting, severance and other service or benefit related arrangements between the Company and the Subsidiaries and their respective officers and employees in the ordinary course of business (including

loans and advances pursuant to Sections 7.4, salary or guaranteed payments and bonuses) and transactions pursuant to stock option and other equity award plans and employee benefit plans and arrangements in the Ordinary Course of Business, and (viii) issuances of Equity Interests of the Company to the extent otherwise permitted by this Agreement. ...........................................................................112

7.11    Leases. Enter as lessee into any lease arrangement for real or personal property (unless capitalized and permitted under Section 7.6 hereof or entered into in connection with a Sale and Leaseback Transaction permitted pursuant to clause (D) of the definition of Permitted Dispositions) if after giving effect thereto, aggregate annual rental payments for all leased property would exceed $25,000,000 in any one fiscal year in the aggregate for all Loan Parties and their Subsidiaries. ...................................................................................................113

7.12    Subsidiaries. ........................................................................................................113

7.13    Fiscal Year and Accounting Changes. No US-Canada Loan Party shall change its fiscal year from December 31 or make any change (i) in accounting treatment and reporting practices except as required by GAAP or (ii) in tax reporting treatment except as required by law.....................................................................................113

7.14    Pledge of Credit. Now or hereafter pledge Agent's or any Lender's credit on any purchases, commitments or contracts or for any purpose whatsoever or use any portion of any Advance in or for any business other than such Loan Party's business operations as conducted on the Closing Date........................................113

7.15    Amendment of Organizational Documents. (i) Change its legal name, (ii) change its form of legal entity (e.g., converting from a corporation to a limited liability company or vice versa), (iii) change its jurisdiction of organization or become (or attempt or purport to become) organized in more than one jurisdiction, or (iv) otherwise amend, modify or waive any term or material provision of its Organizational Documents unless required by law, in any such case without (x) giving at least thirty (30) days prior written notice of such intended change to Agent, (y) having received from Agent confirmation that Agent has taken all steps necessary for Agent to continue the perfection of and protect the enforceability and priority of its Liens in the Collateral belonging to such Loan Party and in the Equity Interests of such Loan Party and (z) in any case under clause (iv), if the change would be adverse to the Lenders as determined by the Agent, having received the prior written consent of US-Canada Required Lenders to such amendment, modification or waiver. ................................................................114

7.16    Compliance with ERISA; Canadian Pension Plans. (i) (x) Maintain, or permit any member of the Controlled Group to maintain, or (y) become obligated to contribute, or permit any member of the Controlled Group to become obligated to contribute, to any Plan, other than those Plans disclosed on Schedule 5.12(d), (ii) engage, or permit any member of the Controlled Group to engage, in any non-exempt "prohibited transaction", as that term is defined in Section 406 of ERISA or Section 4975 of the Code, (iii) terminate, or permit any member of the Controlled Group to terminate, any Plan where such event could result in any liability of any Loan Party or any member of the Controlled Group or the imposition of a lien on the property of any Loan Party or any member of the Controlled Group pursuant to Section 4068 of ERISA, (iv) incur, or permit any

member of the Controlled Group to incur, any withdrawal liability to any Multiemployer Plan; (v) fail promptly to notify Agent of the occurrence of any Termination Event, (vi) fail to comply, or permit a member of the Controlled Group to fail to comply, with the requirements of ERISA or the Code or other Applicable Laws in respect of any Plan, (vii) fail to meet, permit any member of the Controlled Group to fail to meet, or permit any Plan to fail to meet all minimum funding requirements under ERISA and the Code, without regard to any waivers or variances, or postpone or delay or allow any member of the Controlled Group to postpone or delay any funding requirement with respect of any Plan, (viii) cause, or permit any member of the Controlled Group to cause, a representation or warranty in Section 5.12(d) to cease to be true and correct, (ix) permit its unfunded pension fund obligations and liabilities under any Canadian Pension Plan to remain unfunded other than in accordance with Applicable Law, or (x) maintain, sponsor, administer, contribute to, participate in or assume or incur any liability in respect of any Specified Canadian Pension Plan, or acquire an interest in any Person if such Person sponsors, administers, contributes to, participates in or has any liability in respect of, any Specified Canadian Pension Plan. ....................................................................................................114

7.17    Prepayment of Indebtedness.  At any time, directly or indirectly, prepay any Indebtedness or repurchase, redeem, retire or otherwise acquire any Indebtedness other than (i) on or about the Closing Date directly or indirectly in connection with the Transactions, (ii) Indebtedness of a Loan Party to another Loan Party, (iii) of an Excluded Subsidiary to a Loan Party, (iv) of an Excluded Subsidiary to another Excluded Subsidiary (iv) payments not prohibited under the ABL Intercreditor Agreement and in accordance with the Orders. ..............................114

7.18    Membership / Partnership Interests. Designate or permit any of their Subsidiaries to (a) treat their limited liability company membership interests or partnership interests, as the case may be, as securities as contemplated by the definition of "security" in Section 8-102(15) and by Section 8-103 of Article 8 of the Uniform Commercial Code or (b) certificate their limited liability membership interests or partnership interests, as applicable....................................................................114

7.19    Covenants as to Certain Indebtedness. Amend or modify any provisions of the documents governing the 2024 Convertible Notes or the 2026 Convertible Notes, in each case, in any adverse way to any of the Loan Parties or the Lenders without providing at least fifteen (15) calendar days' prior written notice to Agent and Lenders, and obtaining the prior written consent of the US-Canada Required Lenders, it being understood for the avoidance of doubt, that adjustments, amendments, and modifications expressly required to be made pursuant to the terms of the 2024 Convertible Notes or the 2026 Convertible Notes shall be permitted.  Amend or modify any provisions of the Term Loan Documents or the Senior Secured Convertible Notes Documents in any adverse way to any of the Loan Parties or the Lenders without providing at least fifteen (15) calendar days' prior written notice to Agent and Lenders, and obtaining the prior written consent of the US-Canada Required Lenders. ...............................................................115

7.20    Agreements Restricting Dividends. Other than the Term Loan Documents, the Term DIP Loan Documents and the Senior Secured Convertible Notes

Documents, enter into any Agreement with any Person which restricts any of the Subsidiaries of the Company's right to pay dividends or other distributions to the Company or any other Loan Party or repay intercompany loans from the Subsidiaries of the Company to the Company or any other Loan Party..............115

7.21    [Reserved]. ........................................................................................115

7.22    Restrictions on Insurance Subsidiary. Permit the Insurance Subsidiary to have any substantial assets, liabilities or business operations, other than such assets, liabilities and operations necessary (a) to provide insurance coverage to the Company and certain of its Subsidiaries, or (b) to comply with applicable Laws. .115

8.      CONDITIONS PRECEDENT. ........................................................................115

8.1     Conditions to Initial Advances. The agreement of Lenders to make the initial Advances requested to be made on the Closing Date is subject to the satisfaction, or waiver by Agent, immediately prior to or concurrently with the making of such Advances, of the following conditions precedent:..............................................115

8.2     [Reserved]. ........................................................................................116

8.3     Conditions to Each Advance. The agreement of Lenders to make any Advance requested to be made on any date (including the initial Advance), is subject to the satisfaction of the following conditions precedent as of the date such Advance is made:..................................................................................................116

9.      INFORMATION AS TO LOAN PARTIES. ..................................................117

9.1     Disclosure of Material Matters. Promptly upon learning thereof, report to Agent all matters materially affecting the value, enforceability or collectability of any portion of the Collateral, including any Loan Party's reclamation or repossession of, or the return to any Loan Party of, a material amount of goods or claims or disputes asserted by any Customer or other obligor. ...........................................117

9.2     Schedules; US-Canada Borrowing Base Certificates, etc. Deliver to Agent (i) on (x) on each of February 20, 2023 and March 20, 2023, for the prior month and (y) commencing on April 4, 2023 and on [Tuesday] of every second week thereafter, for the prior [two (2) calendar week] period, (a) accounts receivable ageings inclusive of reconciliations to the general ledger, (b) accounts payable schedules inclusive of reconciliations to the general ledger, (c) a US-Canada Borrowing Base Certificate, in form and substance satisfactory to Agent (which shall be calculated as of the last day of the prior month and which shall not be binding upon the Agent or restrictive of the Agent's rights under this Agreement) and (d) a sales report / roll forward. In addition, the Borrowing Agent will deliver to Agent at such intervals as Agent may require: (i) confirmatory assignment schedules; (ii) copies of Customer's invoices; (iii) evidence of shipment or delivery; and (iv) such further schedules, documents and/or information regarding the Collateral as Agent may require including trial balances and test verifications. Agent shall have the right to confirm and verify all Receivables in such Borrower's name by any manner and through any medium it considers advisable and do whatever it may deem reasonably necessary to protect its interests hereunder. The items to be provided under this Section 9.2 are to be in form satisfactory to Agent and executed by Borrowing Agent and delivered to Agent from time to time solely for Agent's convenience in maintaining records of the Collateral, and any Loan Party's failure to deliver any of such items to Agent

shall not affect, terminate, modify or otherwise limit the Agent's Lien with respect to the Collateral. Unless otherwise agreed to by the Agent, the items to be provided under this Section 9.2 shall be delivered to Agent by the specific method of Approved Electronic Communication designated by Agent. .........................117

9.3     Environmental Reports. ......................................................................................117

9.4     Litigation. Promptly notify Agent in writing of any claim, litigation, suit or administrative proceeding affecting any Loan Party, whether or not the claim is covered by insurance, and of any litigation, suit or administrative proceeding, which in any such case affects the Collateral or which could reasonably be expected to have a Material Adverse Effect. .......................................................118

9.5     Material Occurrences. Immediately notify Agent and Lenders in writing upon the occurrence of: (a) any Event of Default or Default; (b) any event which with the giving of notice or lapse of time, or both, would constitute an event of default under the Term DIP Loan Documents, the 2024 Convertible Notes and/or the 2026 Convertible Notes; (c) any event, development or circumstance whereby any financial statements or other reports furnished to the Agent fail in any material respect to present fairly, in accordance with GAAP consistently applied, the financial condition or operating results of any Loan Party as of the date of such statements; (d) any accumulated retirement plan funding deficiency which, if such deficiency continued for two plan years and was not corrected as provided in Section 4971 of the Code, could subject any Loan Party to a tax imposed by Section 4971 of the Code; (e) each and every default by any Loan Party which might result in the acceleration of the maturity of any Indebtedness, including the names and addresses of the holders of such Indebtedness with respect to which there is a default existing or with respect to which the maturity has been or could be accelerated, and the amount of such Indebtedness; and (f) any other development in the business or affairs of any Loan Party, which could reasonably be expected to have a Material Adverse Effect; in each case describing the nature thereof and the action Loan Parties propose to take with respect thereto. ...........118

9.6     Government Receivables. Notify Agent promptly if any of its Receivables having a value, individually or in the aggregate, in excess of $1,000,000 arise out of contracts between any Borrower and the United States, Canada, any state, province or any department, agency or instrumentality of any of them. .............119

9.7     Annual Financial Statements. Furnish Agent and Lenders within one hundred and twenty (120) days after the end of each fiscal year of Loan Parties, financial statements of the Company and other Loan Parties and their Subsidiaries on a consolidating and consolidated basis including, but not limited to, statements of income and stockholders' equity and cash flow from the beginning of the current fiscal year to the end of such fiscal year and the balance sheet as at the end of such fiscal year, all prepared in accordance with GAAP applied on a basis consistent with prior practices, and in reasonable detail and reported upon without qualification by its current independent certified public accounting firm or another such firm of national standing selected by Loan Parties or any other firm satisfactory to Agent (the "Accountants"). The report of the Accountants shall be accompanied by an Officer's Certificate. Loan Parties will be deemed to have complied with this financial statement delivery requirement by delivering, within

the required ninety (90) day time period, a copy of its Quarterly Report on Form 10-K as filed with the SEC and the financial statements contained therein. .......119

9.8     Quarterly Financial Statements. Furnish Agent and Lenders within sixty (60) days after the end of each of the first three (3) fiscal quarters in each fiscal year, an unaudited balance sheet of the Company and other Loan Parties and their Subsidiaries on a consolidated and consolidating basis and unaudited statements of income and stockholders' equity and cash flow of Company and other Loan Parties and their Subsidiaries on a consolidated and consolidating basis reflecting results of operations from the beginning of the fiscal year to the end of such quarter and for such quarter, prepared on a basis consistent with prior practices and complete and correct in all material respects, subject to footnotes and normal year-end adjustments that individually and in the aggregate are not material to Loan Parties' business operations and setting forth in comparative form the respective financial statements for the corresponding date and period in the previous fiscal year. The reports shall be accompanied by an Officer's Certificate. Loan Parties will be deemed to have complied with this financial statement delivery requirement by delivering, within the required forty-five (45) day time period, a copy of its Quarterly Report on Form 10-Q as filed with the SEC and the financial statements contained therein. ...............................................................119

9.9     Monthly Financial Statements. Commencing with the month ended March 31, 2023, furnish Agent and Lenders within thirty (30) days after the end of each month (other than for the months of March, June, September and December which shall be delivered in accordance with Sections 9.7 and 9.8 as applicable), an unaudited balance sheet of Company and other Loan Parties and their Subsidiaries on a consolidated and consolidating basis and unaudited statements of income and stockholders' equity and cash flow of Company and other Loan Parties and their Subsidiaries on a consolidated and consolidating basis reflecting results of operations from the beginning of the fiscal year to the end of such month and for such month, prepared on a basis consistent with prior practices and complete and correct in all material respects, subject to footnotes and normal year-end adjustments that individually and in the aggregate are not material to Loan Parties' business operations and setting forth in comparative form the respective financial statements for the corresponding date and period in the previous fiscal year.  The reports shall be accompanied by an Officer's Certificate......................................................................................................119

9.10   Other Reports. Furnish Agent within ten (10) days after the issuance thereof, with copies of such financial statements, reports and returns as each Loan Party shall send to its stockholders generally, members or material creditors (as applicable), it being understood that any document, report or other information that is not expressly required to be delivered in physical form and that is filed by the Company with the SEC shall be deemed to be delivered to on the date on which such report is posted on the SEC's website at www.sec.gov.....................................120

9.11   Additional Information. Furnish Agent with such additional information as Agent shall reasonably request in order to enable Agent to determine whether the terms, covenants, provisions and conditions of this Agreement and the Notes have been complied with by Loan Parties including, without the necessity of any request by

the Agent, (a) copies of all environmental audits and reviews, (b) at least thirty (30) days prior thereto, notice of any Loan Parties' opening of any new office or place of business where a material portion of business of any such Loan Party is conducted or Collateral having a value in excess of $500,000 is located or any Loan Party's closing of any existing office or place of business where a material portion of business of any such Loan Party is conducted or Collateral having a value in excess of $500,000 is located, and (c) promptly upon any Loan Party's learning thereof, notice of any labor dispute to which any Loan Party may become a party, any strikes or walkouts relating to any of its plants or other facilities, and the expiration of any labor contract to which any Loan Party is a party or by which any Loan Party is bound...........................................................................120

9.12    Budget and Variance Reports. ...........................................................120

9.13    [Reserved]. ......................................................................................120

9.14    Notice of Suits, Adverse Events. Furnish Agent with prompt written notice of (i) any lapse or other termination of any Consent issued to any Loan Party by any Governmental Body or any other Person that is material to the operation of any Loan Party's business, (ii) any refusal by any Governmental Body or any other Person to renew or extend any such Consent; and (iii) copies of any periodic or special reports filed by any Borrower or any Guarantor with any Governmental Body or Person, if such reports indicate any material change in the business, operations, affairs or condition of any Borrower or any Guarantor, or if copies thereof are requested by Lender, and (iv) copies of any material notices and other communications from any Governmental Body or Person which specifically relate to any Borrower or any Guarantor, it being understood that any such notice that is filed by the Company with the SEC shall be deemed to be delivered to on the date on which such notice is posted on the SEC's website at www.sec.gov...............120

9.15    ERISA Notices and Requests; Canadian Pension Plans. Furnish Agent with immediate written notice in the event that (i) any Loan Party knows that a Termination Event has occurred, together with a written statement describing such Termination Event and the action, if any, which such Loan Party or any member of the Controlled Group has taken, is taking, or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, Department of Labor or PBGC with respect thereto, (ii) any Loan Party knows that a prohibited transaction (as defined in Sections 406 of ERISA and 4975 of the Code) has occurred together with a written statement describing such transaction and the action which such Loan Party or any member of the Controlled Group has taken, is taking or proposes to take with respect thereto, (iii) a funding waiver request has been filed with respect to any Plan together with all communications received by any Loan Party with respect to such request, (iv) [reserved], (v) any Loan Party shall receive from the PBGC a notice of intention to terminate a Plan or to have a trustee appointed to administer a Pension Benefit Plan or Multiemployer Plan, together with copies of each such notice, (vi) any Loan Party shall receive any favorable or unfavorable determination letter from the Internal Revenue Service regarding the qualification of a Plan under Section 401(a) of the Code, together with copies of each such letter; (vii) any Loan Party shall receive a notice regarding the imposition of

withdrawal liability, together with copies of each such notice; (viii) any Loan Party shall fail to make a material required installment or any other material required payment under the Code or ERISA on or before the due date for such installment or payment; or (ix) any Loan Party knows that (a) a Multiemployer Plan has been terminated, (b) the administrator or plan sponsor of a Multiemployer Plan intends to terminate a Multiemployer Plan, (c) the PBGC has instituted or will institute proceedings under Section 4042 of ERISA to terminate a Multiemployer Plan or (d) a Multiemployer Plan is subject to Section 432 of the Code or Section 305 of ERISA.

........................................................................121

9.16    Notices Under Certain Indebtedness Documents. At the same time sent or provided to the Term DIP Loan Agent or to the holders of the 2024 Convertible Notes and/or the 2026 Convertible Notes, as the case may be, (in each case, without duplication), deliver to Agent copies of all notices and reports provided in connection with the Term DIP Loan Documents, the 2024 Convertible Notes and/or the 2026 Convertible Notes, it being understood that any such notices or reports that are filed by the Company with the SEC shall be deemed to be delivered to Agent on the date on which such notices or reports are posted on the SEC's website at www.sec.gov. ........................................................................121

9.17    Consent Decree. Provide to Agent written status updates with respect to the Consent Decree and Consent Decree Event and any other pending governmental and/or regulatory investigations and proceedings involving the Company or any of its Subsidiaries promptly following request therefor by Agent. ......................122

9.18    Additional Documents. Execute and deliver to the Agent, upon request, such documents and agreements as the Agent may, from time to time, reasonably request to carry out the purposes, terms or conditions of this Agreement...........122

9.19    Updates to Certain Schedules. Deliver to Agent promptly as shall be required to maintain the related representations and warranties as true and correct, updates to Schedule 4.4 (Locations of Chief Executive Offices, Equipment and Inventory), Schedule 5.13 (Intellectual Property, Source Code Escrow Agreements), Schedule 5.26 (Equity Interests), Schedule 5.27 (Commercial Tort Claims), Schedule 5.28 (Letter-of-Credit Rights), and Schedule 5.29 (Material Contracts); provided, that in the absence of the occurrence and continuance of any Event of Default, Loan Party shall only be required to provide such updates on a quarterly basis in connection with delivery of an Officer's Certificate with respect to the applicable quarter. Any such updated Schedules delivered by Loan Parties to Agent in accordance with this Section 9.19 shall automatically and immediately be deemed to amend and restate the prior version of such Schedule previously delivered to Agent and attached to and made part of this Agreement. ....................................122

9.20    Financial Disclosure.  Each Borrower hereby irrevocably authorizes and directs all accountants and auditors employed by such Borrower at any time during the Term to exhibit and deliver to Agent and each Lender copies of any of such Borrower's financial statements, trial balances or other accounting records of any sort in the accountant's or auditor's possession, and to disclose to Agent and each Lender any information such accountants may have concerning such Borrower's financial status and business operations. Each Borrower hereby authorizes all Governmental Bodies to furnish to Agent and each Lender copies of reports or

examinations relating to such Borrower, whether made by such Borrower or otherwise; however, Agent and each Lender will attempt to obtain such information or materials directly from such Borrower prior to obtaining such information or materials from such accountants or Governmental Bodies. .........122

9.21    Other Bankruptcy Documents.  Deliver to Agent: (a) copies of all pleadings, motions, applications, financial information and other papers and documents filed by any Debtor in the Case, with copies of such papers and documents also provided to or served on Agent's counsel; (b) substantially contemporaneous with the receipt and/or execution thereof, copies of all letters of intent, expressions of interest, and offers to purchase with respect to any of the Collateral; (c) substantially contemporaneously with delivery thereof to the Committee or any other official or unofficial committee in the Case, copies of all material written reports and all term sheets for a Reorganization Plan or any sale under Section 363 of the Bankruptcy Code given by any Debtor to the Committee or any other official or unofficial committee in the Case, with copies of such reports and term sheets also provided to or served on Agent's counsel; and (d) projections, operating plans and other financial information and information, reports or statements regarding any Debtor, its business and the Collateral as Agent may from time to time reasonably request. ................................................................122

10.    EVENTS OF DEFAULT. ..............................................................................122

10.1    Nonpayment. Failure by any Loan Party to pay when due (a) any principal or interest on the Obligations (including without limitation pursuant to Section 2.8), or (b) any other fee, charge, amount or liability provided for herein or in any Other Document, in each case whether at maturity, by reason of acceleration pursuant to the terms of this Agreement, by notice of intention to prepay or by required prepayment. .........................................................................................123

10.2    Breach of Representation. Any representation or warranty made or deemed made by any Loan Party in this Agreement, any Other Document or any related agreement or in any certificate, document or financial or other statement furnished at any time in connection herewith or therewith shall prove to have been incorrect or misleading in any material respect on the date when made or deemed to have been made; ..............................................................................................123

10.3    Financial Information. Failure by any Loan Party to (i) furnish financial information when due or promptly upon request; provided, that, in respect of any failure to furnish financial information pursuant to Section 9.12(a), such failure shall not result in an Event of Default to the extent the Term Loan Agent shall have waived the requirement to deliver such documentation or waived any default in respect of the failure to deliver any such documentation under the Term DIP Loan Agreement, or (ii) permit the inspection of its books or records or access to its premises for audits and appraisals in accordance with the terms hereof; ........123

10.4    Judicial Actions. Issuance of a notice of Lien, levy, assessment, injunction or attachment (a) against any Loan Party's Inventory or Receivables having a value in excess of $1,000,000 or (b) against a material portion of any Loan Party's other property which is not stayed or lifted within thirty (30) days; ...........................123

10.5    Noncompliance. Except as otherwise provided for in Sections 10.1, 10.3 and 10.5(ii), (i) failure or neglect of any Loan Party or any Person to perform, keep or

observe any term, provision, condition or covenant contained in Section 6.17, or (ii) failure or neglect of any Loan Party or any Person to perform, keep or observe any term, provision, condition, covenant herein contained, or contained in any Other Document or any other agreement or arrangement, now or hereafter entered into between any Loan Party or such Person, and the Agent or any Lender which is not cured within ten (10) days from the occurrence of such failure or neglect; 123

10.6   Judgments. Any (a) judgment or judgments, writ(s), order(s) or decree(s) for the payment of money are rendered against any Borrower or any Guarantor for an aggregate amount (to the extent not covered by independent third-party insurance as to which the insurer does not dispute coverage and is not subject to an insolvency proceeding) in excess of $3,000,000 or against all Borrowers or Guarantors for an aggregate amount in excess of $3,000,000 and (b) (i) action shall be legally taken by any judgment creditor to levy upon assets or properties of any Borrower or any Guarantor to enforce any such judgment, (ii) such judgment shall remain undischarged for a period of sixty (60) consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, shall not be in effect, or (iii) any Liens arising by virtue of the rendition, entry or issuance of such judgment upon assets or properties of any Borrower or any Guarantor shall be senior to any Liens in favor of the Agent on such assets or properties; ..................................................................................123

10.7   Bankruptcy Defaults. .........................................................................................124

10.8   [Reserved]...........................................................................................................125

10.9   Lien Priority. Any Lien created hereunder or provided for hereby or under any related agreement for any reason ceases to be or is not a valid and perfected Lien having a first priority interest (subject only to Permitted Encumbrances) that have priority as a matter of Applicable Law to the extent such Liens only attach to Collateral other than Receivables; ...................................................................125

10.10  Cross Default. (a) A default or event of default has occurred under any Indebtedness in excess of $3,000,000 (other than the Obligations and any prepetition Indebtedness) of any Loan Party, which default shall have resulted in (x) acceleration of such Indebtedness and the termination of commitments under such the documents governing such Indebtedness, and continues without subsequent waiver or rescinding of such acceleration and termination, (y) the exercise of remedies against a material portion of the Collateral or (z) delivery of a notice of intent to exercise rights and remedies thereunder or (b) a default or event of default has occurred under the Term DIP Loan Documents, which default shall have resulted in (x) acceleration of any obligations owing under any of the Term DIP Loan Documents and the termination of commitments under the Term DIP Loan Documents, and continues without subsequent waiver or rescinding of such acceleration and termination, (y) the exercise of remedies against a material portion of the Collateral or (z) delivery of a notice of intent to exercise rights and remedies thereunder;............................................................................................125

10.11  Breach of Guaranty or Pledge Agreement. Termination or breach of any Guaranty, Guarantor Security Agreement, Pledge Agreement, the Canadian Security Agreement or similar agreement executed and delivered to the Agent in connection with the Obligations of any Loan Party, or if any Guarantor or pledgor

attempts to terminate, challenges the validity of, or its liability under, any such Guaranty, Guarantor Security Agreement, Pledge Agreement, Canadian Security Agreement or similar agreement;..........................................................................125

10.12  Change of Control. Any Change of Control shall occur;....................................125

10.13  Invalidity. Any material provision of this Agreement or any Other Document shall, for any reason, cease to be valid and binding on any Borrower or any Guarantor, or any Borrower or any Guarantor shall so claim in writing to the Agent or any Lender or any Loan Party challenges the validity of or its liability under this Agreement or any Other Document; ..................................................125

10.14  Seizures. Any (a) portion of the Collateral having a value in excess of $1,000,000 shall be seized, subject to garnishment or taken by a Governmental Body, or any Borrower or any Guarantor, or (b) the title and rights of any Borrower or any Guarantor which is the owner of any material portion of the Collateral shall have become the subject matter of claim, litigation, suit, garnishment or other proceeding which might, in the opinion of the Agent, upon final determination, result in impairment or loss of the security provided by this Agreement or the Other Documents; ............................................................................................125

10.15  Operations. The operations of any Borrower's or any Guarantor's material manufacturing facilities are interrupted (other than in connection with any regularly scheduled shutdown for employee vacations and/or maintenance in the Ordinary Course of Business) at any time for more than ten (10) consecutive days, unless such Borrower or Guarantor shall (i) be entitled to receive for such period of interruption, proceeds of business interruption insurance sufficient to assure that its per diem cash needs during such period is at least equal to its average per diem cash needs for the consecutive three month period immediately preceding the initial date of interruption and (ii) receive such proceeds in the amount described in clause (i) preceding not later than thirty (30) days following the initial date of any such interruption; provided, however, that notwithstanding the provisions of clauses (i) and (ii) of this section, an Event of Default shall be deemed to have occurred if such Borrower or Guarantor shall be receiving the proceeds of business interruption insurance for a period of ten (10) consecutive days; ..............................................................................................126

10.16  Pension Plans. An event or condition specified in Sections 7.16 or 9.15 hereof shall occur or exist with respect to any Plan and, as a result of such event or condition, together with all other such events or conditions, any Loan Party or any member of the Controlled Group shall incur, or in the opinion of Agent be reasonably likely to incur, a liability to a Plan or the PBGC (or both) which, in the reasonable judgment of Agent, would have a Material Adverse Effect; or the occurrence of any Termination Event, or any Canadian Pension Termination Event, or any Loan Party's failure to immediately report a Termination Event, or a Canadian Pension Termination Event, in accordance with Section 9.15 hereof; in each case that could reasonably be expected to result in a Material Adverse Effect;............................................................................................................126

10.17  Anti-Money Laundering/International Trade Law Compliance. Any representation, warranty or covenant contained in Section 16.18 is or becomes false or misleading at any time; or ....................................................................126

10.18   Any Exclusion from Medical Reimbursement Programs. Any Loan Party shall be temporarily or permanently excluded from any Medical Reimbursement Program or similar government or insurance program in any applicable jurisdiction, where such exclusion arises from fraud or other claims or allegations which, individually or in the aggregate, could cause a Material Adverse Effect.................................126

11.   LENDERS' RIGHTS AND REMEDIES AFTER DEFAULT. ......................................126

11.1   Rights and Remedies.............................................................................126

11.2   Agent's Discretion. Agent shall have the right in its sole discretion to determine which rights, Liens, security interests or remedies Agent may at any time pursue, relinquish, subordinate, or modify, which procedures, timing and methodologies to employ, and what any other action to take with respect to any or all of the Collateral and in what order, thereto and such determination will not in any way modify or affect any of Agent's or Lenders' rights hereunder as against Loan Parties or each other.................................................................................130

11.3   Setoff. Subject to Section 14.13, in addition to any other rights which the Agent or any Lender may have under Applicable Law, during the continuance of any Event of Default hereunder, the Agent and such Lender shall have a right, immediately and without notice of any kind, to apply any Loan Party's property held by the Agent and such Lender or any of their Affiliates to reduce the Obligations and to exercise any and all rights of setoff which may be available to the Agent and such Lender with respect to any deposits held by the Agent or such Lender. ............................................................................................130

11.4   Rights and Remedies not Exclusive. The enumeration of the foregoing rights and remedies is not intended to be exhaustive and the exercise of any rights or remedy shall not preclude the exercise of any other right or remedies provided for herein or otherwise provided by law, all of which shall be cumulative and not alternative. [The fourteen-day stay provisions of Bankruptcy Rules 6004(h) and 4001(a)(3) are hereby waived.]........................................................................................130

11.5   Allocation of Payments After Event of Default. Notwithstanding any other provisions of this Agreement to the contrary, after the occurrence and during the continuance of an Event of Default, all amounts collected or received by the Agent on account of the Obligations (including without limitation any amounts on account of any Cash Management Liabilities (including JPM European Treasury Management Obligations) or Hedge Liabilities) or in respect of the Collateral shall be paid, subject to the Interim Order, the Final Order (once entered) and the terms of the ABL Intercreditor Agreement, over or delivered as follows: ..................................................................................................131

12.   WAIVERS AND JUDICIAL PROCEEDINGS. ...........................................................132

12.1   Waiver of Notice. Each Loan Party hereby waives notice of non-payment of any of the Receivables, demand, presentment, protest and notice thereof with respect to any and all instruments, notice of acceptance hereof, notice of loans or advances made, credit extended, Collateral received or delivered, or any other action taken in reliance hereon, and all other demands and notices of any description, except such as are expressly provided for herein. ............................132

12.2   Delay. No delay or omission on the Agent's or any Lender's part in exercising any right, remedy or option shall operate as a waiver of such or any other right,

remedy or option or of any Default or Event of Default......................................132

12.3   Jury Waiver. EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, COUNTERCLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THIS AGREEMENT, ANY OTHER DOCUMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT, ANY OTHER DOCUMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE AND EACH PARTY HEREBY CONSENTS THAT ANY SUCH CLAIM, COUNTERCLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.........132

13.   EFFECTIVE DATE AND TERMINATION. ................................................................133

13.1   Term. This Agreement, which shall inure to the benefit of and shall be binding upon the respective successors and permitted assigns of each Loan Party signatory hereto and the Secured Parties, shall become effective on the date hereof and shall, unless sooner terminated as herein provided (including by acceleration by Agent), continue in full force and effect for a period ending on the Maturity Date (such date, the "Termination Date", and such period from of the date hereof through and ending on the Termination Date, the "Term").  Debtors may terminate this Agreement at any time, subject to providing three (3) Business Days' prior written notice to Agent, upon Payment in Full as provided in Section 13.2 hereof. .................................................................................................133

13.2   Termination.....................................................................................................133

14.   REGARDING AGENT. ................................................................................................134

14.1   14.1 Appointment. Each Lender hereby designates PNC to act as Agent for such Lender under this Agreement and the Other Documents. Each Lender hereby irrevocably authorizes the Agent to take such action on its behalf under the provisions of this Agreement and the Other Documents and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of the Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto and the Agent shall hold all Collateral, payments of principal and interest, fees (except the fees set forth in Sections 2.7(b), 3.3 and 3.4), charges and collections received pursuant to this Agreement, for the ratable benefit of Lenders. Agent may perform any of its duties hereunder by or through its agents or employees. As to any matters not expressly provided for by this Agreement (including collection of the Note) Agent

shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of US-Canada Required Lenders, and such instructions shall be binding; provided, however, that Agent shall not be required to take any action which, in the Agent's discretion, exposes the Agent to liability or which is contrary to this Agreement or the Other Documents or Applicable Law unless the Agent is furnished with an indemnification reasonably satisfactory to the Agent with respect thereto. ....................................................134

14.2     Nature of Duties. Agent shall have no duties or responsibilities except those expressly set forth in this Agreement and the Other Documents. Neither Agent nor any of its officers, directors, employees or agents shall be (i) liable for any action taken or omitted by them as such hereunder or in connection herewith, unless caused by their gross (not mere) negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non- appealable judgment), or (ii) responsible in any manner for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement, or in any of the Other Documents or in any certificate, report, statement or other document referred to or provided for in, or received by the Agent under or in connection with, this Agreement or any of the Other Documents or for the value, validity, effectiveness, genuineness, due execution, enforceability or sufficiency of this Agreement, or any of the Other Documents or for any failure of any Loan Party to perform its obligations hereunder.  Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any of the Other Documents, or to inspect the properties, books or records of any Loan Party. The duties of Agent as respects the Advances to Loan Parties shall be mechanical and administrative in nature; Agent shall not have by reason of this Agreement a fiduciary relationship in respect of any Lender; and nothing in this Agreement, expressed or implied, is intended to or shall be so construed as to impose upon the Agent any obligations in respect of this Agreement or the transactions described herein except as expressly set forth herein. ....................................................................134

14.3     Lack of Reliance on Agent.  Independently and without reliance upon the Agent or any other Lender, each Lender has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of each Borrower and each Guarantor in connection with the making and the continuance of the Advances hereunder and the taking or not taking of any action in connection herewith, and (ii) its own appraisal of the creditworthiness of each Borrower and each Guarantor. Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before making of the Advances or at any time or times thereafter except as shall be provided by any Loan Party pursuant to the terms hereof. Agent shall not be responsible to any Lender for any recitals, statements, information, representations or warranties herein or in any agreement, document, certificate or a statement delivered in connection with or for the execution, effectiveness, genuineness, validity,

enforceability, collectability or sufficiency of this Agreement or any Other Document, or of the financial condition of any Borrower or any Guarantor, or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement, the Note, the Other Documents or the financial condition or prospects of any Loan Party, or the existence of any Event of Default or any Default. .................................................135

14.4    Resignation of the Agent; Successor Agent. Agent may resign on sixty (60) days written notice to each Lender and Borrowing Agent and upon such resignation, US-Canada Required Lenders will promptly designate a successor Agent reasonably satisfactory to Borrowers (provided that no such approval by Borrowers shall be required (i) in any case where the successor Agent is one of Lenders or (ii) after the occurrence and during the continuance of any Event of Default). Any such successor Agent shall succeed to the rights, powers and duties of Agent, and shall in particular, if applicable, succeed to all of the Agent's right, title and interest in and to all of the Liens in the Collateral securing the Obligations created hereunder or any Other Document (including the Pledge Agreement and all account control agreements), and the term "Agent" shall mean such successor agent effective upon its appointment, and the former Agent's rights, powers and duties as the Agent shall be terminated, without any other or further act or deed on the part of such former Agent. However, notwithstanding the foregoing, if at the time of the effectiveness of the new Agent's appointment, any further actions need to be taken in order to provide for the legally binding and valid transfer of any Liens in the Collateral from former Agent to new Agent and/or for the perfection of any Liens in the Collateral as held by new Agent or it is otherwise not then possible for new Agent to become the holder of a fully valid, enforceable and perfected Lien as to any of the Collateral, former Agent shall continue to hold such Liens solely as agent for perfection of such Liens on behalf of new Agent until such time as new Agent can obtain a fully valid, enforceable and perfected Lien on all Collateral, provided that the Agent shall not be required to or have any liability or responsibility to take any further actions after such date as such agent for perfection to continue the perfection of any such Liens (other than to forego from taking any affirmative action to release any such Liens). After the Agent's resignation as an Agent, the provisions of this Article 14, and any indemnification rights under this Agreement, including without limitation, rights arising under Section 16.5 hereof, shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Agent under this Agreement (and in the event such resigning Agent continues to hold any Liens pursuant to the provisions of the immediately preceding sentence, the provisions of this Article 14 and any indemnification rights under this Agreement, including without limitation, rights arising under Section 16.5 hereof, shall inure to its benefit as to any actions taken or omitted to be taken by it in connection with such Liens). ..135

14.5    Certain Rights of Agent.  If the Agent shall request instructions from Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any Other Document, the Agent shall be entitled to refrain from such act or taking such action unless and until the Agent shall have received instructions from US-Canada Required Lenders; and the Agent shall not incur

liability to any Person by reason of so refraining. Without limiting the foregoing, Lenders shall not have any right of action whatsoever against the Agent as a result of its acting or refraining from acting hereunder in accordance with the instructions of US- Canada Required Lenders.....................................................136

14.6    Reliance. Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, email, facsimile, telex, teletype or telecopier message, cablegram, order or other document or telephone message believed by it to be genuine and correct and to have been signed, sent or made by the proper person or entity, and, with respect to all legal matters pertaining to this Agreement and the Other Documents and its duties hereunder, upon advice of counsel selected by it. Agent may employ agents and attorneys-in-fact and shall not be liable for the default or misconduct of any such agents or attorneys-in-fact selected by the Agent with reasonable care. .............136

14.7    Notice of Default. Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder or under the Other Documents, unless the Agent has received notice from a Lender or Borrowing Agent referring to this Agreement or the Other Documents, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Agent receives such a notice, the Agent shall give notice thereof to Lenders. Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by US-Canada Required Lenders; provided, that, unless and until the Agent shall have received such directions, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of Lenders.............................................................136

14.8    Indemnification. To the extent the Agent is not reimbursed and indemnified by Loan Parties, each Lender will reimburse and indemnify the Agent in proportion to its respective portion of the outstanding Advances and its respective Participation Commitments in the outstanding Letters of Credit and outstanding Swing Loans (or, if no Advances are outstanding, pro rata according to the percentage that its Revolving Commitment Amount constitutes of the total aggregate Revolving Commitment Amounts), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Agent in performing its duties hereunder, or in any way relating to or arising out of this Agreement or any Other Document; provided that Lenders shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Agent's gross (not mere) negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment). ........................................................................136

14.9    Agent in its Individual Capacity. With respect to the obligation of the Agent to lend under this Agreement, the Advances made by it shall have the same rights and powers hereunder as any other Lender and as if it were not performing the duties as the Agent specified herein; and the term "Lender" or any similar term shall, unless the context clearly otherwise indicates, include the Agent in its

individual capacity as a Lender. Any Agent may engage in business with any Loan Party as if it were not performing the duties specified herein, and may accept fees and other consideration from any Loan Party for services in connection with this Agreement or otherwise without having to account for the same to Lenders.................................................................................................137

14.10   Delivery of Documents. To the extent the Agent receives financial statements required under Sections 9.7, 9.8, 9.9, 9.12 and 9.13, US-Canada Borrowing Base Certificates from any Loan Party pursuant to the terms of this Agreement which any Loan Party is not obligated to deliver to each Lender, the Agent will promptly furnish such documents and information to Lenders...........................................137

14.11   Loan Parties' Undertaking to Agent. Without prejudice to their respective obligations to Lenders under the other provisions of this Agreement, each Loan Party hereby undertakes with the Agent to pay to the Agent from time to time on demand all amounts from time to time due and payable by it for the account of the Agent or Lenders or any of them pursuant to this Agreement to the extent not already paid. Any payment made pursuant to any such demand shall pro tanto satisfy the relevant Loan Party's obligations to make payments for the account of Lenders or the relevant one or more of them pursuant to this Agreement...........137

14.12   No Reliance on Agent's Customer Identification Program. To the extent the Advances or this Agreement is, or becomes, syndicated in cooperation with other Lenders, each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on the Agent to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the USA PATRIOT Act or the regulations thereunder, including the regulations contained in 31 CFR 103.121 (as hereafter amended or replaced, the "CIP Regulations"), or any other Anti-Terrorism Law, including any programs involving any of the following items relating to or in connection with any of Loan Parties, their Affiliates or their agents, the Other Documents or the transactions hereunder or contemplated hereby: (i) any identity verification procedures, (ii) any recordkeeping, (iii) comparisons with government lists, (iv) customer notices or (v) other procedures required under the CIP Regulations or such Anti-Terrorism Laws. ...................137

14.13   Other Agreements. Each of Lenders agrees that it shall not, without the express consent of Agent, and that it shall, to the extent it is lawfully entitled to do so, upon the request of Agent, set off against the Obligations, any amounts owing by such Lender to any Loan Party or any deposit accounts of any Loan Party now or hereafter maintained with such Lender. Anything in this Agreement to the contrary notwithstanding, each of Lenders further agrees that it shall not, unless specifically requested to do so by the Agent, take any action to protect or enforce its rights arising out of this Agreement or the Other Documents, it being the intent of Lenders that any such action to protect or enforce rights under this Agreement and the Other Documents shall be taken in concert and at the direction or with the consent of Agent or US- Canada Required Lenders. ...........................................137

14.14   [Reserved]. ........................................................................................138

14.15   [Reserved]. ........................................................................................138

14.16   [Reserved]. ........................................................................................138

14.17     [Reserved]. ...................................................................................................138

14.18     Erroneous Payments.....................................................................................138

15.     BORROWING AGENCY. .......................................................................................140

15.1     Borrowing Agency Provisions. ..............................................................140

15.2     Waiver of Subrogation. Each Loan Party expressly waives any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution of any other claim which such Loan Party may now or hereafter have against the other Loan Parties or any other Person directly or contingently liable for the Obligations hereunder, or against or with respect to any other Loan Parties' property (including, without limitation, any property which is Collateral for the Obligations), arising from the existence or performance of this Agreement, until termination of this Agreement and repayment in full of the Obligations. ...........141

15.3     Common Enterprise. The successful operation and condition of each of the Borrowers is dependent on the continued successful performance of the functions of the group of Borrowers as a whole and the successful operation of each Borrower is dependent on the successful performance and operation of each other Borrower. Each of the Borrowers expects to derive benefit (and its board of directors or other governing body has determined that it may reasonably be expected to derive benefit), directly or indirectly, from successful operations of the Loan Parties and each of the other Borrowers. Each Borrower expects to derive benefit (and the board of directors or other governing body of each such Borrower have determined that it may reasonably be expected to derive benefit), directly and indirectly, from the credit extended by the Lenders to the Borrowers hereunder, both in their separate capacities and as members of the group of companies. Each Borrower has determined that execution, delivery, and performance of this Agreement and any Other Documents to be executed by such Borrower is within its corporate purpose, will be of direct and indirect benefit to such Borrower, and is in its best interest. ...........................................................141

16.     MISCELLANEOUS. ..............................................................................................142

16.1     Governing Law. This Agreement and each Other Document (unless and except to the extent expressly provided otherwise in any such Other Document), and all matters relating hereto or thereto or arising herefrom or therefrom (whether arising under contract law, tort law or otherwise) shall, in accordance with Section 5-1401 of the General Obligations Law of the State of New York, be governed by and construed in accordance with the laws of the State of New York. Each Loan Party hereby consents to and acknowledges the jurisdiction of the Bankruptcy Court over any actions or proceedings arising in connection with the Case, this Agreement and the Other Loan Documents (or in any way connected with or related or incidental to the dealings of the parties hereto in respect of the Case, this Agreement or any of the Other Documents. If (i) the Case is dismissed, (ii) the Bankruptcy Court abstains from hearing any actions or proceedings arising in connection with this Agreement or any of the Other Documents (or in any way connected with or related or incidental to the dealings of the parties hereto in respect of this Agreement or any of the Other Documents or the transactions related hereto or thereto) or (iii) the Bankruptcy Court refuses to exercise jurisdiction over any actions or proceedings arising in connection with this

Agreement or any of the Other Documents (or in any way connected with or related or incidental to the dealings of the parties hereto in respect of this Agreement or any of the Other Documents or the transactions related hereto or thereto), then any judicial proceeding brought by or against any Loan Party with respect to any of the Obligations, this Agreement, the Other Documents or any related agreement may be brought in any court of competent jurisdiction in the State of New York, United States of America (unless and except to the extent expressly provided otherwise in any such Other Document or related agreement) and, by execution and delivery of this Agreement, each Loan Party accepts for itself and in connection with its properties, generally and unconditionally, the non-exclusive jurisdiction of the aforesaid courts, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement, but with respect to any Canadian Loan Party only, the Agent and Lenders shall not be precluded from initiating any proceeding against such Canadian Loan Party in the Courts of the Province of Ontario, Canada sitting in Toronto in their absolute and sole discretion. Each Loan Party hereby waives personal service of any and all process upon it and consents that all such service of process may be made by certified or registered mail (return receipt requested) directed to Borrowing Agent at its address set forth in Section 16.6 and service so made shall be deemed completed five (5) days after the same shall have been so deposited in the mails of the United States of America, or, at Agent's option, by service upon Borrowing Agent which each Loan Party irrevocably appoints as such Loan Party's agent for the purpose of accepting service within the State of New York. Nothing herein shall affect the right to serve process in any manner permitted by law or shall limit the right of the Agent or any Lender to bring proceedings against any Loan Party in the courts of any other jurisdiction. Each Loan Party waives any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon forum non conveniens. Each Loan Party waives the right to remove any judicial proceeding brought against such Loan Party in any state court to any federal court. Any judicial proceeding by any Loan Party against the Agent or any Lender involving, directly or indirectly, any matter or claim in any way arising out of, related to or connected with this Agreement or any related agreement, shall be brought only in a federal, state or provincial court located in the County of New York, State of New York. ................................................................................................142

16.2   Entire Understanding. ........................................................................142
16.3   Successors and Assigns; Participations; New Lenders. ......................................146

16.4   Application of Payments. The Agent shall have the continuing and exclusive right to apply or reverse and re-apply any payment and any and all proceeds of Collateral to any portion of the Obligations, subject to Section 11.5 hereof. To the extent that any Loan Party makes a payment or the Agent or any Lender receives any payment or proceeds of the Collateral for any Loan Party's benefit, which are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other party under any bankruptcy law, common law or equitable cause, then, to such extent, the Obligations or part thereof intended to be satisfied shall be

revived and continue as if such payment or proceeds had not been received by the Agent or such Lender. ..........................................................................................148

16.5     Indemnity. Each Loan Party shall defend, protect, indemnify, pay and save harmless Agent, Issuer, each Lender and each of their respective officers, directors, Affiliates, attorneys, employees and agents (each an "Indemnified Party") for and from and against any and all claims, demands, liabilities, obligations, losses, damages, penalties, fines, actions, judgments, suits, costs, charges, expenses and disbursements of any kind or nature whatsoever (including reasonable and documented fees and disbursements of counsel) (collectively, "Claims") which may be imposed on, incurred by, or asserted against Indemnified Party in arising out of or in any way relating to or as a consequence, direct or indirect, of: (i) this Agreement, the Other Documents, the Advances and other Obligations and/or the transactions contemplated hereby, (ii) any action or failure to act or action taken only after delay or the satisfaction of any conditions by any Indemnified Party in connection with and/or relating to the negotiation, execution, delivery or administration of the Agreement and the Other Documents, the credit facilities established hereunder and thereunder and/or the transactions contemplated hereby, (iii) any Loan Party's or any Guarantor's failure to observe, perform or discharge any of its covenants, obligations, agreements or duties under or breach of any of the representations or warranties made in this Agreement and the Other Documents, (iv) the enforcement of any of the rights and remedies of the Agent, the Issuer or any Lender under the Agreement and the Other Documents, (v) any threatened or actual imposition of fines or penalties, or disgorgement of benefits, for violation of any Anti-Terrorism Law by any Loan Party, any Affiliate or Subsidiary of any Borrowers, or any Guarantor, and (vi) any claim, litigation, proceeding or investigation instituted or conducted by any Governmental Body or instrumentality or any other Person with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, this Agreement or the Other Documents, whether or not the Agent or any Lender is a party thereto. Without limiting the generality of any of the foregoing, each Loan Party shall defend, protect, indemnify, pay and save harmless each Indemnified Party from (x) any Claims which may be imposed on, incurred by, or asserted against any Indemnified Party arising out of or in any way relating to or as a consequence, direct or indirect, of the issuance of any Letter of Credit hereunder and (y) any Claims which may be imposed on, incurred by, or asserted against any Indemnified Party under any Environmental Laws with respect to or in connection with the Real Property, any Hazardous Discharge, the presence of any Hazardous Materials affecting the Real Property (whether or not the same originates or emerges from the Real Property or any contiguous real estate), including any Claims consisting of or relating to the imposition or assertion of any Lien on any of the Real Property under any Environmental Laws and any loss of value of the Real Property as a result of the foregoing except to the extent such loss, liability, damage and expense is attributable to any Hazardous Discharge resulting from actions on the part of the Agent or any Lender. Loan Parties' obligations under this Section 16.5 shall arise upon the discovery of the presence of any Hazardous Materials at the Real Property,

whether or not any federal, state, provincial or local environmental agency has taken or threatened any action in connection with the presence of any Hazardous Materials, in each such case except to the extent that any of the foregoing arises out of the gross negligence or willful misconduct of the Indemnified Party (as determined by a court of competent jurisdiction in a final and non- appealable judgment). Without limiting the generality of the foregoing, this indemnity shall extend to any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including fees and disbursements of counsel) asserted against or incurred by any of the Indemnified Parties by any Person under any Environmental Laws or similar laws by reason of any Loan Party's or any other Person's failure to comply with laws applicable to solid or hazardous waste materials, including Hazardous Materials and Hazardous Waste, or other Toxic Substances. Additionally, if any taxes (excluding taxes imposed upon or measured solely by the net income of Agent and Lenders, but including any intangibles taxes, stamp tax, recording tax or franchise tax) shall be payable by Agent, Lenders or Loan Parties on account of the execution or delivery of this Agreement, or the execution, delivery, issuance or recording of any of the Other Documents, or the creation or repayment of any of the Obligations hereunder, by reason of any Applicable Law now or hereafter in effect, Loan Parties will pay (or will promptly reimburse Agent and Lenders for payment of) all such taxes, including interest and penalties thereon, and will indemnify and hold the Indemnified Parties harmless from and against all liability in connection therewith. Notwithstanding the foregoing, the Loan Parties shall have no obligation to any Indemnified Party under this Section 16.5 with respect to any liability that a court of competent jurisdiction finally determines to have resulted from the gross negligence or willful misconduct of such Indemnified Party or its officers, directors, employees, attorneys, or agents. This Section 16.5 shall not apply to the extent that the losses, claims or damages relate to any Taxes described in Section 3.10. ..................................................................................149

16.6    Notice. Any notice or request hereunder may be given to Borrowing Agent or any Loan Party or to the Agent or any Lender at their respective addresses set forth below or at such other address as may hereafter be specified in a notice designated as a notice of change of address under this Section 16.6. Any notice, request, demand, direction or other communication (for purposes of this Section 16.6 only, a "Notice") to be given to or made upon any party hereto under any provision of this Agreement shall be given or made by telephone or in writing (which includes by means of electronic transmission (i.e., "e-mail")) or by setting forth such Notice on a website to which Loan Parties are directed (an "Internet Posting") if Notice of such Internet Posting (including the information necessary to access such site) has previously been delivered to the applicable parties hereto by another means set forth in this Section 16.6) in accordance with this Section 16.6. Any such Notice must be delivered to the applicable parties hereto at the addresses and numbers set forth under their respective names on Section 16.6 hereof or in accordance with any subsequent unrevoked Notice from any such party that is given in accordance with this Section 16.6. Any Notice shall be effective:........150

16.7    Survival. The obligations of Loan Parties under Sections 2.2(b), 3.7, 3.8, 3.9, 3.10, 16.5 and 16.9 and the obligations of Lenders under Sections 2.2, 2.14(b), 2.15, 2.17, 2.18, 14.8 and 16.5, shall survive termination of this Agreement and the Other Documents and payment in full of the Obligations. ...........................152

16.8    Severability. If any part of this Agreement is contrary to, prohibited by, or deemed invalid under Applicable Laws, such provision shall be inapplicable and deemed omitted to the extent so contrary, prohibited or invalid, but the remainder hereof shall not be invalidated thereby and shall be given effect so far as possible..152

16.9    Expenses. ........................................................................................................152

16.10   Injunctive Relief. Each Loan Party recognizes that, in the event any Loan Party fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, or threatens to fail to perform, observe or discharge such obligations or liabilities, any remedy at law may prove to be inadequate relief to Lenders; therefore, Agent, if the Agent so requests, shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving that actual damages are not an adequate remedy. .......................................................153

16.11   Consequential Damages. Neither the Agent nor any Lender, nor any agent or attorney for any of them, shall be liable to any Borrower, or any Guarantor (or any Affiliate of any such Person) for indirect, punitive, exemplary or consequential damages arising from any breach of contract, tort or other wrong relating to the establishment, administration or collection of the Obligations or as a result of any transaction contemplated under this Agreement or any Other Document.......................................................................................................153

16.12   Captions. The captions at various places in this Agreement are intended for convenience only and do not constitute and shall not be interpreted as part of this Agreement..........................................................................................................154

16.13   Counterparts; Facsimile Signatures. This Agreement may be executed in any number of and by different parties hereto on separate counterparts, all of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement. Any signature delivered by a party by facsimile or electronic transmission (including email transmission of a PDF image) shall be deemed to be an original signature hereto. ................................154

16.14   Construction. The parties acknowledge that each party and its counsel have reviewed this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments, schedules or exhibits thereto..............................................................................................154

16.15   Confidentiality; Sharing Information. The Agent, each Lender and each Transferee shall hold all non-public information obtained by the Agent, such Lender or such Transferee pursuant to the requirements of this Agreement in accordance with the Agent's, such Lender's and such Transferee's customary procedures for handling confidential information of this nature and such non-public information shall not be disclosed by the Agent, such Lender or such Transferee to Persons who are not parties to this Agreement; provided, however, the Agent, each Lender and each Transferee may disclose such confidential information (a) to its employees, officers, directors, examiners, Affiliates, outside

auditors, counsel and other professional advisors, (b) to the Agent, any Lender or to any prospective Transferees (so long as the Persons to whom such disclosure is made are informed of the confidential nature of such information and have agreed to keep such information confidential), and (c) as required or requested by any Governmental Body or representative thereof or pursuant to legal process; provided, further that (i) unless specifically prohibited by Applicable Law, the Agent, each Lender and each Transferee shall use its reasonable best efforts prior to disclosure thereof, to notify the applicable Loan Party of the applicable request for disclosure of such non-public information (A) by a Governmental Body or representative thereof (other than any such request in connection with an examination of the financial condition of a Lender or a Transferee by such Governmental Body) or (B) pursuant to legal process and (ii) in no event shall the Agent, any Lender or any Transferee be obligated to return any materials furnished by any Loan Party other than those documents and instruments in possession of the Agent or any Lender in order to perfect its Lien on the Collateral once the Obligations have been paid in full and this Agreement has been terminated; provided that any disclosure under sub-clauses (A) or (B) of this sentence shall be limited to the information required by such Governmental Body or such legal process. Each Loan Party acknowledges that from time to time financial advisory, investment banking and other services may be offered or provided to such Loan Party or one or more of its Affiliates (in connection with this Agreement or otherwise) by any Lender or by one or more Subsidiaries or Affiliates of such Lender and each Loan Party hereby authorizes each Lender to share any information delivered to such Lender by such Loan Party and its Subsidiaries pursuant to this Agreement, or in connection with the decision of such Lender to enter into this Agreement, to any such Subsidiary or Affiliate of such Lender, it being understood that any such Subsidiary or Affiliate of any Lender receiving such information shall be bound by the provisions of this Section 16.15 as if it were a Lender hereunder. Such authorization shall survive the repayment of the other Obligations and the termination of this Agreement. Notwithstanding any non- disclosure agreement or similar document executed by the Agent in favor of any Loan Party or any of any Loan Party's affiliates, the provisions of this Agreement shall supersede such agreements. ..........................154

16.16    Publicity. Each Loan Party and each Lender hereby authorizes Agent to make appropriate announcements of the financial arrangement entered into among Loan Parties, Agent and Lenders, including announcements which are commonly known as tombstones, in such publications and to such selected parties as Agent shall deem appropriate in consultation with, and subject to the approval of, the Borrowing Agent, such approval not to be unreasonably withheld, conditioned or delayed. ............................................................................................................155

16.17    Certifications From Banks and Participants; USA PATRIOT Act......................155

16.18    Anti-Terrorism Laws. ..........................................................................................155

16.19    Liability of Canadian Loan Parties.  Notwithstanding anything in this Agreement or any of the Other Documents to the contrary, the parties intend that this Agreement and the Other Documents do hereby provide, and shall in all circumstances be interpreted to provide, that the Canadian Loan Parties are jointly

and severally liable for, and the Canadian Collateral shall secure, all Advances, interest on such Advances, and all other Obligations, including, without limitation, general fees, reimbursements, indemnities and charges hereunder and under any Other Document. Nothing in this Section 16.19 is intended to limit, nor shall it be deemed to limit, any liability of the Company or any other US Loan Party for any of the Obligations, whether in its primary capacity as a Borrower, as a Guarantor, at law or otherwise. All Obligations of the Borrowers and Guarantors, both the US Guarantors and the Canadian Loan Parties, are joint and several. ........................................................................................................156

16.20 [Reserved]. ......................................................................................................156

16.21 Joinder of Guarantors and Borrowers. Any Subsidiary of the Company which is required to join this Agreement as a Guarantor, or any Subsidiary of the Company which elects to join this Agreement as a Borrower, pursuant in each case to Section 7.12 shall execute and deliver to Agent (i) a Guarantor Joinder or Borrower Joinder, as applicable, pursuant to which it shall, after acceptance of such Guarantor Joinder or Borrower Joinder by Agent, join this Agreement as a US Loan Party or Canadian Loan Party, as applicable, and join each of the Other Documents to which the US Loan Parties or Canadian Loan Parties, as applicable, are parties, (ii) documents in the forms described in Section 8.1 (or foreign jurisdictional equivalents, if any), modified as appropriate to relate to such Subsidiary, and (iii) documents necessary to grant and perfect Liens in favor of Agent for the benefit of Lenders in the Equity Interest of, and Collateral held by, such Subsidiary. Joinder of each new Loan Party pursuant to this Section shall be subject to compliance with all the other terms and conditions set forth in this Agreement and the Other Documents, including without limitation Section 6.1 and Section 3.10. .............................................................................................156

16.22 [Reserved]. ......................................................................................................157

16.23 continue as such to be secured by the Collateral. Such Obligations shall in all respects be continuing and this Agreement shall not be deemed to evidence or result in a novation or repayment and reborrowing of such Obligations. The Liens securing payment of the Obligations under the Existing Credit Agreement, as amended and restated in the form of this Agreement, shall in all respects be continuing, securing the payment of all Obligations. .........................................157

16.24 [Reserved]. ......................................................................................................157

16.25 Acknowledgment Regarding Any Supported QFCs. To the extent that this Agreement or any of the Other Documents provide support, through a guarantee or otherwise, for any hedges, commodity hedges and/or foreign currency hedges, or any other agreement or instrument that is a QFC (such support, "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Other Documents and any Supported QFC may in fact be stated to be governed by the Laws of the State of New York

and/or of the United States or any other state of the United States): ..................157

16.26   Acknowledgment and Consent to Bail-In of EEA Financial Institutions. Notwithstanding anything to the contrary in this Agreement, any Other Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under this Agreement or any Other Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by (a) the application of any Write-Down and Conversion Powers by an applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and (b) the effects of any Bail-in Action on any such liability, including, if applicable, (i) a reduction in full or in part or cancellation of any such liability; (ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any Other Document; or (iii) the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any applicable Resolution Authority. ...............................158

16.27   Exclusive Remedy For Any Alleged Post-Petition Claim.  Notwithstanding anything to the contrary provided for herein, if any Loan Party asserts that it has any adverse claims against any Post-Petition Secured Party with respect to this Agreement and the transactions contemplated hereby, each Loan Party agrees that its sole and exclusive remedy for any and all such adverse claims will be an action for monetary damages (a "Damage Lawsuit").  Any such Damage Lawsuit, regardless of the procedural form in which it is alleged (e.g., by complaint, counterclaim, cross-claim, third-party claim, or otherwise) will be severed from any enforcement by Post-Petition Secured Parties of their legal, equitable, and contractual rights (including collection of the Obligations and foreclosure or other enforcement against the Collateral) pursuant to the Other Documents, and the Damage Lawsuit (including any and all adverse claims alleged against the Post-Petition Secured Parties) cannot be asserted by any Loan Party as a defense, setoff, recoupment, or grounds for delay, stay, or injunction against any enforcement by any Post-Petition Secured Party of their legal, equitable, and contractual rights under the Final Order, the Other Documents, and otherwise..158

16.28   Prohibition on Surcharge.  No Person will be permitted to surcharge the Collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the Collateral.  The prohibition on surcharging or priming of the Liens of Agent on the Collateral will survive the termination of this Agreement and the dismissal of the Case, such that no Person will be permitted to obtain a Lien or rights (through any means, at law or in equity) which in any case is equal or senior to the Liens of Agent on the Collateral.  Upon the termination of this Agreement and the dismissal of the Case, the Bankruptcy Court will retain jurisdiction over the Collateral for the limited purpose of enforcing this section. 159

16.29   Marshalling Obligations.  The Agent shall not be subject to any equitable remedy of marshalling. ...................................................................................................159

16.30   No Discharge; Survival of Claims.  Each Loan Party agrees that (i) the Obligations shall not be discharged by the entry of an order confirming a Reorganization Plan (and the Debtor, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge), (ii) the Superpriority Claim granted to the Post-Petition Secured Parties pursuant to the Interim Order and the Final Order and the Liens granted to Agent, for the benefit of the Post-Petition Secured Parties pursuant to the Interim Order, the Final Order, this Agreement and the Other Documents, shall not be affected in any manner by the entry of an order confirming a Reorganization Plan, (iii) no Debtor shall propose or support any Reorganization Plan that is not conditioned upon Payment in Full and the release of Agent and Lenders in full from all claims of each Loan Party and, in respect of a Debtor, the estate of such Debtor, in each case, on or before the effective date of such Reorganization Plan, and (iv) no Reorganization Plan shall be confirmed if it does not satisfy the foregoing requirements. ..........................159

16.31   Disavowal and Waiver of Any Subsequent Relief Based on Changed Circumstances.  Each Debtor and the Post-Petition Secured Parties know and understand that there are rights and remedies provided under the Bankruptcy Code, the Federal Rules of Civil Procedure, and the Bankruptcy Rules, pursuant to which parties otherwise bound by a previously entered order can attempt to obtain relief from such an order by alleging circumstances that may warrant a change or modification in the order, or circumstances such as fraud, mistake, inadvertence, excusable neglect, newly discovered evidence, or similar matters that may justify vacating the order entirely, or otherwise changing or modifying it (collectively, "Changed Circumstances").  Rights and remedies based on Changed Circumstances include, but are not limited to, modification of a plan of reorganization after confirmation of the plan and before its substantial consummation, pursuant to Section 1127(b) of the Bankruptcy Code, relief from a final order or judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure and Bankruptcy Rule 9024, and the commencement and prosecution of a serial Chapter 11 case by a debtor which is in default of obligations under a stipulation or plan of reorganization confirmed in an earlier case.  With full knowledge and understanding of what are, or may be, its present or future rights and remedies based on allegations of Changed Circumstances, each Debtor: (i) expressly disavows that there are any matters which constitute any kind of Changed Circumstances as of the date of entry of the Interim Order and (ii) expressly disavows that it is aware of any matters whatsoever that it is assuming, contemplating, or expecting in proceeding with the Final Order and the transactions contemplated by this Agreement and having the Final Order entered that would serve as a basis to allege such Changed Circumstances.  Each Debtor understands and agrees that the Post-Petition Secured Parties are not willing to bear any of the risks involved in such Debtor's business enterprises and the Post-Petition Secured Parties are not willing to modify any of the rights if such risks cause actual or alleged Changed Circumstances; and each Debtor expressly assumes all risks of any and all such matters, and the consequences that the Post-

Petition Secured Parties will enforce their legal, equitable, and contractual rights if the Post-Petition Secured Parties are not paid and dealt with strictly in accordance with the terms and conditions of the Interim Order, the Final Order, this Agreement and the Other Documents. Without limiting the foregoing in any way, each Debtor's use of any cash collateral that is included in the Collateral will be governed exclusively by the terms and conditions of this Agreement, the Interim Order and the Final Order, and, until Payment in Full either before or after a termination of this Agreement, no Debtor will seek authority from the Bankruptcy Court to otherwise use any cash collateral that is included in the Collateral for any purpose whatsoever. ...............................................................159

16.32   Interim Order and Final Order Control.  In the event of any conflict between the terms of the Interim Order and/or the Final Order and this Agreement or any Other Document, the terms of the Interim Order and/or the Final Order, as applicable, shall control to the extent the Interim Order and/or Final Order, as applicable, were approved and acceptable to Agent. ..........................................160

## LIST OF ANNEXES, EXHIBITS AND SCHEDULES

### Annexes

| Annex A | US Borrowers |
| Annex B | US Guarantors |
| Annex C | Canadian Loan Parties |

### Exhibits

| Exhibit A | Budget |
| Exhibit B | Interim Order |
| Exhibit C | Existing Letters of Credit |
| Exhibit 1.2(a) | US-Canada Borrowing Base Certificate |
| Exhibit 1.2(b) | Officer's Certificate |
| Exhibit 2.1(a) | US-Canada Revolving Credit Note |
| Exhibit 2.3(a) | US-Canada Swing Loan Note |
| Exhibit 2.22 | Lender Joinder |
| Exhibit 7.12(a) | Borrower Joinder |
| Exhibit 7.12(b) | Guarantor Joinder |
| Exhibit 16.3 | Commitment Transfer Supplement |

### Schedules

| Schedule 1.2 | Permitted Encumbrances |
| Schedule 4.4(b) | Equipment and Inventory Locations; Place of Business, Chief Executive Office, Real Property |
| Schedule 4.8(k) | Deposit and Investment Accounts |
| Schedule 5.1 | Consents |
| Schedule 5.2(a) | States of Qualification and Good Standing |

| | |
|---|---|
| Schedule 5.2(b) | Subsidiaries |
| Schedule 5.4 | Federal Tax Identification Numbers |
| Schedule 5.10 | Prior Names |
| Schedule 5.11 | Environmental |
| Schedule 5.12(b)(i) | Litigation |
| Schedule 5.12(b)(ii) | Indebtedness |
| Schedule 5.12(d) | Plans |
| Schedule 5.13 | Intellectual Property, Source Code Escrow Agreements |
| Schedule 5.18 | Labor Disputes |
| Schedule 5.26 | Equity Interests |
| Schedule 5.27 | Commercial Tort Claims |
| Schedule 5.28 | Letter of Credit Rights |
| Schedule 5.29 | Material Contracts |
| Schedule 5.31 | Medicare/Medicaid Provider Information |
| Schedule 7.3 | Guarantees |
| Schedule 7.4 | Existing Investments |
| Schedule 7.8 | Existing Indebtedness |

**DEBTOR-IN-POSSESSION REVOLVING CREDIT AND SECURITY AGREEMENT**

Pursuant to Sections 364(c) and (d) of the Bankruptcy Code, this Debtor-In-Possession Revolving Credit and Security Agreement (as hereafter amended, this "**Agreement**") dated as of February [__], 2023, among the BORROWERS (as hereinafter defined), the GUARANTORS (as hereinafter defined), the financial institutions which are now or which hereafter become a party hereto as LENDERS (collectively, "**Lenders**" and each individually a "**Lender**"), and PNC BANK, NATIONAL ASSOCIATION ("**PNC**"), as agent for Lenders (PNC, in such capacity, "**Agent**").

A.       On January [31], 2023 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, which petitions are identified as Bankruptcy Case Nos. [__] (collectively and individually as the context may require, the "**Case**") before the United States Bankruptcy Court for the Southern District of Texas (together any other court having jurisdiction over the Case, the "**Bankruptcy Court**").  Each Debtor remains in possession of its assets and is operating its business as a debtor-in-possession under Chapter 11 of the Bankruptcy Code.

B.       Pursuant to that certain Second Amended and Restated Revolving Credit and Security Agreement dated as of July 26, 2022 (as has been amended, supplemented and modified through the date hereof, the "Pre-Petition Credit Agreement"), by and among the Borrowers, the Guarantors, the financial institutions party thereto as lenders as of the Petition Date (collectively, in such capacity, the "Pre-Petition Lenders"), PNC, as agent for Pre-Petition Lenders (in such capacity, "Pre-Petition Agent"), Pre-Petition Agent and Pre-Petition Lenders made certain credit facilities and advances of credit available to certain of the Loan Parties prior to the Petition Date on the terms and conditions set forth therein, which credit facilities and advances of credit and all other Pre-Petition Obligations (as defined below) thereunder are unconditionally guaranteed by the Guarantors and secured by Liens on substantially all the assets of the Borrowers and the Guarantors.

C.       The Borrowers have requested that during the Case, Agent and the Lenders make advances and other financial accommodations available to the Borrowers of up to the Maximum Revolving Advance Amount specified herein on a senior secured, superpriority basis, pursuant to, inter alia, Sections 364(c) and (d) of the Bankruptcy Code.

D.       Agent and the Lenders are willing to provide advances and other financial accommodations to the Borrowers on a senior secured, superpriority basis on the terms and subject to the conditions of this Agreement, so long as, among other things, such post-petition credit obligations are (i) secured by Liens on all of the assets, property and interests, real and personal, tangible and intangible, of the Debtors, whether now owned or hereafter acquired, which Liens are superior to all other Liens pursuant to Sections 364(c) and (d) of the Bankruptcy Code (subject to (x) the priority of Liens set forth Section 10(b) of the Interim Order and (y) the ABL Intercreditor Agreement); (ii) given priority over any administrative expenses of the kind specified in the Bankruptcy Code, including without limitation, under Sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503, 506(c) (upon entry of the Final Order), 507, 546(c), 726, 1113 or 1114 of the Bankruptcy Code, as provided in the Interim Order and the Final Order; (iii) secured by Liens on all of the assets, property and interests, real and personal, tangible and intangible, of the Debtors, whether

now owned or hereafter acquired, which Liens are subject to the ABL Intercreditor Agreement; and (iv) guaranteed by the Guarantors pursuant to the terms set forth in the Guaranties.

IN CONSIDERATION of the foregoing recitals, which are incorporated herein by this reference, the mutual covenants and undertakings herein contained, the Debtors, the other Borrowers, the Guarantors, Lenders, Issuer (as hereinafter defined) and Agent hereby agree as follows:

# 1. DEFINITIONS.

1.1    Accounting Terms.  As used in this Agreement, the Other Documents or any certificate, report or other document made or delivered pursuant to this Agreement, accounting terms not defined in Section 1.2 or elsewhere in this Agreement and accounting terms partly defined in Section 1.2 to the extent not defined shall have the respective meanings given to them under GAAP; provided, however that, whenever such accounting terms are used for the purposes of determining compliance with financial covenants in this Agreement, such accounting terms shall be defined in accordance with GAAP as applied in preparation of the audited financial statements of Borrowers on a Consolidated Basis for the fiscal year ended December 31, 2021. If there occurs after the Closing Date any change in GAAP that affects in any respect the calculation of any covenant contained in this Agreement or the definition of any term defined under GAAP used in such calculations, Agent, Lenders and Borrowers shall negotiate in good faith to amend the provisions of this Agreement that relate to the calculation of such covenants with the intent of having the respective positions of Agent, Lenders and Borrowers after such change in GAAP conform as nearly as possible to their respective positions as of the Closing Date, provided, that, until any such amendments have been agreed upon, the covenants in this Agreement shall be calculated as if no such change in GAAP had occurred and Borrowers shall provide additional financial statements or supplements thereto, attachments to Officer's Certificates and/or calculations as Agent may reasonably require in order to provide the appropriate financial information required hereunder with respect to Borrowers both reflecting any applicable changes in GAAP and as necessary to demonstrate compliance with the financial covenants before giving effect to the applicable changes in GAAP. Without limiting the foregoing, for purposes of determining compliance with any provision of this Agreement and any related definitions, the determination of whether a lease is to be treated as an operating lease or capital lease shall be made without giving effect to any change in GAAP that becomes effective on or after November 30, 2016 that would require operating leases to be treated similarly to capital leases.

1.2    General Terms.  For purposes of this Agreement the following terms shall have the following meanings:

2024 Convertible Notes shall mean the Company's 5.00% unsecured senior convertible notes, issued in 2019 and 2020 and due November 15, 2024, in the aggregate original principal amount not to exceed $146,784,000.

2026 Convertible Notes shall mean the Company's unsecured senior convertible notes, issued in 2021 and due in 2026, in the aggregate original principal amount not to exceed $125,000,000.

2

2026 Convertible Notes Hedge Transaction shall mean any call or capped call option (or substantially equivalent derivative transaction) on the Company's common shares (including, for the avoidance of doubt, any call or capped call option that may be settled in whole or in part in cash) purchased by the Company substantially concurrently with, and in connection with, any issuance or issuances of the 2026 Convertible Notes and existing on the Closing Date.

ABL Intercreditor Agreement shall mean that certain Intercreditor Agreement, dated as of July 26, 2022, by and among the Agent, the Term DIP Loan Agent and the Loan Parties, as the same may be amended from time to time.

Accountants shall have the meaning set forth in Section 9.7 hereof.

Adjusted Daily Simple SOFR means an interest rate per annum equal to (a) Daily Simple SOFR *plus* (b) the SOFR Adjustment.

Advance Rates shall mean the US-Canada Advance Rates.

Advances shall mean and include the US-Canada Advances.

Affected Financial Institution means (a) any EEA Financial Institution or (b) any UK Financial Institution.

Affected Lender shall have the meaning set forth in Section 3.11 hereof.

Affiliate of any Person shall mean (a) any Person which, directly or indirectly, is in control of, is controlled by, or is under common control with such Person, or (b) any Person who is a director, manager, member, managing member, general partner or officer (i) of such Person, of any Subsidiary of such Person or (iii) of any Person described in clause (a) above. For purposes of this definition, control of a Person shall mean the power, direct or indirect, (x) to vote 5% or more of the Equity Interests having ordinary voting power for the election of directors of such Person or other Persons performing similar functions for any such Person, or (y) to direct or cause the direction of the management and policies of such Person whether by ownership of Equity Interests, contract or otherwise.

Agent shall have the meaning set forth in the preamble to this Agreement and shall include its successors and assigns.

Agreement shall mean this Debtor-In-Possession Revolving Credit and Security Agreement, as the same may be amended, restated, supplemented or otherwise modified from time to time.

Alternate Base Rate shall mean, for any day, a rate per annum equal to the highest of (a) the Base Rate in effect on such day, (b) the sum of the Overnight Bank Funding Rate in effect on such day *plus* one half of one percent (0.5%), and (c) the sum of Adjusted Daily Simple SOFR in effect on such day *plus* one percent (1.0%), so long as Daily Simple SOFR is offered, ascertainable and not unlawful; provided, however, if the Alternate Base Rate as determined above would be less than zero, then such rate shall be deemed to be zero. Any change in the Alternate Base Rate (or any component thereof) shall take effect at the opening of business on the day such change occurs.

3

Alternate Source shall have the meaning set forth in the definition of Overnight Bank Funding Rate.

Anti-Corruption Laws shall mean the United States Foreign Corrupt Practices Act of 1977, as amended, the UK Bribery Act 2010, and any other similar anti-corruption laws or regulations administered or enforced in any jurisdiction in which the Borrower or any of its Subsidiaries conduct business.

Anti-Terrorism Laws shall mean any Laws relating to terrorism, trade sanctions programs and embargoes (including economic or financial sanction or trade embargoes imposed, administered or enforced by (a) the United States Government, including, without limitation, the Office of Foreign Assets Control, or (b) the United Nations Security Council, Canada, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom), import/export licensing, money laundering, corruption or bribery (including Laws comprising or implementing the Canadian Anti-Money Laundering & Anti-Terrorism Legislation), and any regulation, order, or directive promulgated, issued or enforced pursuant to such Laws, all as amended, supplemented or replaced from time to time.

Applicable Law shall mean all laws, rules and regulations applicable to the Person, conduct, transaction, covenant, Other Document or contract in question, including all applicable common or civil law and equitable principles, all provisions of all applicable state, federal, provincial, local and foreign constitutions, statutes, rules, regulations, treaties, directives and orders of any Governmental Body, and all orders, judgments and decrees of all courts and arbitrators.

Applicable Margin shall mean the US-Canada Applicable Margin.

Application Date shall have the meaning set forth in Section 2.7(b) hereof.

Approvals shall have the meaning set forth in Section 5.11(b) hereof.

Approved 363 Sale shall mean any sale of the Debtors' assets or business pursuant to Section 363 of the Bankruptcy Code approved by the Agent pursuant to appropriate orders of the Bankruptcy Court that are approved by and acceptable to Agent.

Approved Bankruptcy Sale shall mean, collectively, any Approved 363 Sale.

Approved Bank shall have the meaning assigned to such term in the definition of "Permitted Investments."

Approved Foreign Bank shall have the meaning assigned to such term in the definition of "Permitted Investments."

Approved Electronic Communication shall mean each notice, demand, communication, information, document and other material transmitted, posted or otherwise made or communicated by e-mail, E-Fax, the Credit Management Module of PNC's PINACLE® system, or any other equivalent electronic service agreed to by Agent, whether owned, operated or hosted by Agent, any Lender, any of their Affiliates or any other Person, that any party is obligated to, or otherwise

4

chooses to, provide to Agent pursuant to this Agreement or any Other Document, including any financial statement, financial and other report, notice, request, certificate and other information material; provided that Approved Electronic Communications shall not include any notice, demand, communication, information, document or other material that Agent specifically instructs a Person to deliver in physical form.

Availability Block shall mean (a) from the period commencing on the Closing Date and ending on March 20, 2023, $4,000,000, and (b) thereafter, $5,000,000.

Avoidance Actions means all claims and causes of action of each Debtor or its estate under Chapter 5 of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code, and all proceeds thereof.

Bail-In Action means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

Bail-In Legislation means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

Bankruptcy Code means the United States Bankruptcy Code (11 U.S.C. §§ 101, *et seq.*).

Bankruptcy Court shall have the meaning set forth in the recitals hereto.

Base Rate shall mean the base commercial lending rate of PNC as publicly announced to be in effect from time to time, such rate to be adjusted automatically, without notice, on the effective date of any change in such rate. This rate of interest is determined from time to time by PNC as a means of pricing some loans to its customers and is neither tied to any external rate of interest or index nor does it necessarily reflect the lowest rate of interest actually charged by PNC to any particular class or category of customers of PNC.

Beneficial Owner shall mean, for each Borrower (other than the Company), each of the following: (a) each individual, if any, who, directly or indirectly, owns 25% or more of such Borrower's Equity Interests; and (b) a single individual with significant responsibility to control, manage, or direct such Borrower.

Benefited Lender shall have the meaning set forth in Section 2.5(e) hereof. Blocked Account Bank shall have the meaning set forth in Section 4.8(h) hereof.

Blocked Accounts shall have the meaning set forth in Section 4.8(h) hereof.

Borrower or Borrowers shall mean the US-Canada Borrowers.

Borrower Joinder shall mean a joinder by a Person as a US-Canada Borrower under this Agreement and the Other Documents in substantially the form of Exhibit 7.12(a).

Borrowers' Account shall mean the US-Canada Borrowers' Account.

Borrowers on a Consolidated Basis shall mean the consolidation in accordance with GAAP of the accounts or other items of Borrowers and their respective Subsidiaries.

Borrowing Agent shall mean the Company.

Budget shall mean the initial 13-week consolidated weekly operating budget of Debtors setting forth sources and uses of cash for the periods described therein prepared by the Debtors' management, in consultation with [Huron Consulting Group], a copy of the initial budget is attached as Exhibit A, as such budget shall be updated from time to time in accordance with Section 9.12 hereof.

Business Day shall mean any day other than Saturday or Sunday or a legal holiday on which commercial banks are authorized or required by law to be closed for business in East Brunswick, New Jersey. Notwithstanding the foregoing, when the term "Business Day" is used in connection with an amount that bears interest at a rate based on SOFR or any direct or indirect calculation or determination of SOFR, the "Business Day" means any such day that is also a U.S. Government Securities Business Day.

Canadian Anti-Money Laundering & Anti-Terrorism Legislation shall mean the *Criminal Code,* R.S.C. 1985, c. C 46, *The Proceeds of Crime (Money Laundering) and Terrorist Financing Act,* S.C. 2000, c. 17 and the *United Nations Act,* R.S.C. 1985, c. U 2 or any similar Canadian legislation, together with all rules, regulations and interpretations thereunder or related thereto including, without limitation, the *Regulations Implementing the United Nations Resolutions on the Suppression of Terrorism and the United Nations Al Qaida and Taliban Regulations* promulgated under the *United Nations Act.*

Canadian Benefit Plan shall mean any plan, fund, program, or policy, whether oral or written, formal or informal, funded or unfunded, insured or uninsured, providing material employee benefits, including medical, hospital care, dental, sickness, accident, disability, life insurance, pension, retirement or savings benefits, under which any Borrower has any liability with respect to any employee or former employee, but excluding any Canadian Pension Plans.

Canadian Collateral shall mean the assets of the Canadian Loan Parties on which Liens are granted pursuant to the Canadian Security Agreement securing the Obligations.

Canadian Confirmation of Security shall mean an acknowledgment and confirmation of guarantees and security executed by the Canadian Loan Parties dated as of the date of this Agreement.

Canadian Loan Parties shall mean the Persons from time to time listed on Annex C hereto, and any other Person who may hereafter guarantee payment or performance of the whole or any part of the Obligations.

6

Canadian Pension Plan shall mean each pension plan required to be registered under Canadian federal or provincial law that is maintained or contributed to by a Canadian Loan Party for its employees or former employees, but does not include the Canada Pension Plan as maintained by the Government of Canada.

Canadian Pension Termination Event shall mean (a) the voluntary full or partial wind up of a Canadian Pension Plan that is a registered pension plan by a Canadian Loan Party; (b) the institution of proceedings by any Governmental Body to terminate in whole or in part or have a trustee appointed to administer such a plan; or (c) any other event or condition which might constitute grounds for the termination of, winding up or partial termination of, winding up or the appointment of trustee to administer, any such plan.

Canadian Receivables Advance Rate shall have the meaning specified in the definition of US-Canada Formula Amount.

Canadian Security Agreement shall mean any security agreement (including, for certainty, any deed of hypothec or bond pledge agreement governed by the laws of Quebec) executed by any Canadian Loan Party in favour of Agent securing the Obligations or the Guaranty of such Canadian Loan Party, in form and substance satisfactory to Agent.

Capital Expenditures shall mean expenditures made or liabilities incurred for the acquisition of any fixed assets or improvements (or of any replacements or substitutions thereof or additions thereto) which have a useful life of more than one year and which, in accordance with GAAP, would be classified as capital expenditures.

Capitalized Lease Obligation shall mean any Indebtedness of any Loan Party represented by obligations under a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

Case shall have the meaning set forth in the recitals hereto.

Cash Collateral shall have the meaning set forth in the Interim Order, or, after the entry of the Final Order, in the Final Order.

Cash Management Liabilities shall have the meaning provided in the definition of "Cash Management Products and Services."

Cash Management Order shall have the meaning set forth in Section 8.1(h) hereof.

Cash Management Products and Services shall mean agreements or other arrangements (including, without limitation, the Master Netting Agreement) under which the Agent or any Lender or any Affiliate of the Agent or a Lender provides or arranges for the provision of any of the following products or services to any Loan Party or any Subsidiary of any Loan Party: (a) credit cards; (b) credit card processing services; (c) debit cards and stored value cards; (d) commercial cards; (e) ACH transactions; and (f) cash management and treasury management services and products, including without limitation controlled disbursement accounts or services, lockboxes, automated clearinghouse transactions, overdrafts, interstate depository network services. The indebtedness, obligations and liabilities of any Loan Party or any Subsidiary of any

7

Loan Party to the provider of any Cash Management Products and Services (including all obligations and liabilities owing to such provider in respect of any returned items deposited with such provider) (the "**Cash Management Liabilities**") shall be "Obligations" hereunder, guaranteed obligations under the Guaranty and secured obligations under any Guarantor Security Agreement, and otherwise treated as Obligations for purposes of each of the Other Documents. The Liens securing the Cash Management Products and Services shall be pari passu with the Liens securing all other Obligations under this Agreement and the Other Documents, subject to the express provisions of Section 11.5.

CEA shall mean the Commodity Exchange Act (7 U.S.C.§1 et seq.), as amended from time to time, and any successor statute.

CERCLA shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §§9601 et seq.

Certificate of Beneficial Ownership shall mean, for each Borrower (other than the Company), a certificate in form and substance acceptable to Agent (as amended or modified by Agent from time to time in its sole discretion), certifying, among other things, the Beneficial Owner of such Borrower.

CFTC shall mean the Commodity Futures Trading Commission.

Challenge Period shall have the meaning set forth in the Interim Order, or, after the entry of the Final Order, in the Final Order.

Change in Law shall mean the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any Applicable Law; (b) any change in any Applicable Law or in the administration, implementation, interpretation or application thereof by any Governmental Body; or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Body; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, regulations, guidelines, interpretations or directives thereunder or issued in connection therewith (whether or not having the force of Applicable Law) and (y) all requests, rules, regulations, guidelines, interpretations or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities (whether or not having the force of law), in each case pursuant to Basel III, shall in each case be deemed to be a Change in Law regardless of the date enacted, adopted, issued, promulgated or implemented.

Change of Control shall mean any of the following occurrences:

(a)     any Person or "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act as in effect on the date of this Agreement, but excluding the Borrower, its Subsidiaries, any employee benefit plan and/or Person acting as the trustee, agent or other fiduciary or administrator therefor) shall at any time have acquired direct or indirect beneficial ownership of voting power of the outstanding Voting Stock or economic interests in the Borrower having more than 35% of the outstanding Voting Stock or economic interests of the Borrower;

8

(b)      the consummation of any sale, lease or other transfer in one transaction or a series of transactions of all or substantially all of the consolidated assets of the Company and its Subsidiaries, taken as a whole, to any Person other than one of the Company's Subsidiaries; provided, however, that a transaction in which the holders of all classes of the Company's Common Equity immediately prior to such transaction own, directly or indirectly, more than 65% of all classes of Common Equity of the continuing or surviving person or transferee or the parent thereof immediately after such transaction in substantially the same proportions as such ownership immediately prior to such transaction shall not be a Change in Control pursuant to this clause (b);

(c)      a "change of control" or any comparable term under, and as defined in the documents governing the 2024 Convertible Notes, the 2026 Convertible Notes, the Term Loan, the Term DIP Loan or any other material Indebtedness of the Company shall occur prior to the date such Indebtedness is repaid or redeemed in accordance with, or to the extent not prohibited by, the provisions of this Agreement; or

(d)      the Company shall fail to own and control, directly or indirectly, 100% of the outstanding Equity Interests of each of the other Borrowers, except as otherwise expressly permitted under this Agreement.

For purposes of this definition, (i) "beneficial ownership" shall be as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act as in effect on the date of this Agreement and (ii) the phrase Person or "group" is within the meaning of Section 13(d) or 14(d) of the Exchange Act as in effect on the date of this Agreement, but excluding any employee benefit plan of such Person or "group" and its subsidiaries and any Person acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan.

Charges shall mean all taxes, charges, fees, imposts, levies or other assessments, including all net income, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation and property taxes, custom duties, fees, assessments, liens, claims and charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts, imposed by any taxing or other authority, domestic or foreign (including the Pension Benefit Guaranty Corporation or any environmental agency or superfund or any other applicable Governmental Body), upon the Collateral, any Loan Party or any of its Affiliates.

CIP Regulations shall have the meaning set forth in Section 14.12 hereof.

Claims shall have the meaning set forth in Section 16.5.

Closing Date shall mean [    ], 2023.

Closing Projections shall have the meaning set forth in Section 5.9(a) hereof.

CMS shall mean the Centers for Medicare and Medicaid Services of HHS, any successor thereof and any predecessor thereof, including the Health Care Financing Administration.

Code shall mean the Internal Revenue Code of 1986 as it may be amended or supplemented

from time to time, and any successor statute of similar import, and the rules and regulations thereunder, as from time to time in effect.

Collateral shall mean the US-Canada Collateral.

Commitment Transfer Supplement shall mean a document in the form of Exhibit 16.3 hereto, properly completed and otherwise in form and substance satisfactory to Agent by which the Purchasing Lender purchases and assumes a portion of the obligation of Lenders to make Advances under this Agreement.

Committee shall have the meaning assigned to the term "Creditors' Committee" in the Interim Order, or, after the entry of the Final Order, in the Final Order.

Common Equity of any Person shall mean Equity Interests of such Person that is generally entitled (a) to vote in the election of directors of such Person or (b) if such Person is not a corporation, to vote or otherwise participate in the selection of the governing body, partners, managers or others that will control the management or policies of such Person.

Company shall mean Invacare Corporation, an Ohio corporation.

Computation Date shall have the meaning specified in Section 2.26 herein.

Conforming Changes means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Business Day," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Agent decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Agent in a manner substantially consistent with market practice (or, if the Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Agent determines that no market practice for the administration of the Benchmark Replacement exists, in such other manner of administration as the Agent decides is reasonably necessary in connection with the administration of this Agreement and the Other Documents).

Consent Decree shall mean that certain Consent Decree and Permanent Injunction dated as of December 21, 2012 with the United States of America.

Consent Decree Event shall mean the Company's agreement, pursuant to the Consent Decree, to not design, manufacture, process, pack, repack, label or hold for distribution certain products from or at its locations at One Invacare Way, Elyria, OH 44035 and 1200 Taylor Street, Elyria, OH 44035, subject to satisfaction by the Company of certain requirements more particularly set forth therein and the receipt of related governmental approvals.

Consents shall mean all filings and all licenses, permits, consents, approvals, authorizations, qualifications and orders of Governmental Bodies and other third parties, domestic or foreign, necessary to carry on any Loan Party's business or necessary (including to avoid a

10

conflict or breach under any agreement, instrument, other document, license, permit or other authorization) for the execution, delivery or performance of this Agreement or the Other Documents, the Term Loan Documents or the Term DIP Loan Documents, including any Consents required under all applicable federal, provincial, state or other Applicable Law.

Contract Rate shall have the meaning set forth in Section 3.1 hereof.

Controlled Group shall mean, at any time, each Loan Party and all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control and all other entities which, together with any Loan Party, are treated as a single employer under Section 414 of the Code.

Covered Entity shall mean (a) each Loan Party, each of Loan Party's Subsidiaries, all Guarantors and all pledgors of Collateral and (b) each Person that, directly or indirectly, is in control of a Person described in clause (a) above. For purposes of this definition, control of a Person shall mean the direct or indirect (x) ownership of, or power to vote, 25% or more of the issued and outstanding equity interests having ordinary voting power for the election of directors of such Person or other Persons performing similar functions for such Person, or (y) power to direct or cause the direction of the management and policies of such Person whether by ownership of equity interests, contract or otherwise.

Customer shall mean and include the account debtor with respect to any Receivable and/or the prospective purchaser of goods, services or both with respect to any contract or contract right, and/or any party who enters into or proposes to enter into any contract or other arrangement with any applicable Loan Party, pursuant to which such Loan Party is to deliver any personal property or perform any services.

Daily Simple SOFR means, for any day (a "**SOFR Rate Day**"), the interest rate per annum determined by the Agent by dividing (the resulting quotient rounded upwards, at the Agent's discretion, to the nearest 1/100th of 1%) (A) SOFR for the day (the "**SOFR Determination Date**") that is two (2) Business Days prior to (i) such SOFR Rate Day if such SOFR Rate Day is a Business Day or (ii) the Business Day immediately preceding such SOFR Rate Day if such SOFR Rate Day is not a Business Day, by (B) a number equal to 1.00 minus the SOFR Reserve Percentage. If Daily Simple SOFR as determined above would be less than the SOFR Floor, then Daily Simple SOFR shall be deemed to be the SOFR Floor. If SOFR for any SOFR Determination Date has not been published or replaced with a Benchmark Replacement by 5:00 p.m. (Eastern Standard Time) on the second Business Day immediately following such SOFR Determination Date, then SOFR for such SOFR Determination Date will be SOFR for the first Business Day preceding such SOFR Determination Date for which SOFR was published in accordance with the definition of "SOFR"; provided that SOFR determined pursuant to this sentence shall be used for purposes of calculating Daily Simple SOFR for no more than three (3) consecutive SOFR Rate Days. If and when Daily Simple SOFR as determined above changes, any applicable rate of interest based on Daily Simple SOFR will change automatically without notice to the Borrowers, effective on the date of any such change.

Debtors shall mean the US-Canada Borrowers, together with the permitted successors and assigns of each such Person.

Debtor Obligations shall mean any and all Obligations owing by a Debtor.

Default shall mean an event, circumstance or condition which, with the giving of notice or passage of time or both, would constitute an Event of Default.

Default Rate shall have the meaning set forth in Section 3.1 hereof.

Defaulting Lender shall mean any Lender that: (a) has failed, within two (2) Business Days of the date required to be funded or paid, to (i) fund any portion of its Revolving Commitment Percentage of Advances, (ii) if applicable, fund any portion of its Participation Commitment in Letters of Credit or Swing Loans or (iii) pay over to the Agent, Issuer, Swing Loan Lender or any Lender any other amount required to be paid by it hereunder, unless, in the case of clause (i) above, such Lender notifies Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified and including a particular Default or Event of Default, if any) has not been satisfied;

(b)      has notified Loan Parties or Agent in writing, or has made a public statement to the effect, that it does not intend or expect to comply with any of its funding obligations under this Agreement (unless such writing or public statement indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including a particular Default or Event of Default, if any) to funding a loan under this Agreement cannot be satisfied) or generally under other agreements in which it commits to extend credit;

(c)      has failed, within two (2) Business Days after request by Agent, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations (and is financially able to meet such obligations) to fund prospective Advances and, if applicable, participations in then outstanding Letters of Credit and Swing Loans under this Agreement, provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon Agent's receipt of such certification in form and substance satisfactory to Agent; (d) has become the subject of an Insolvency Event; (e) has failed at any time to comply with the provisions of Section 2.5(e) with respect to purchasing participations from the other Lenders, whereby such Lender's share of any payment received, whether by setoff or otherwise, is in excess of its pro rata share of such payments due and payable to all of Lenders; or (f) becomes the subject of a Bail-in Action.

Depository Accounts shall have the meaning set forth in Section 4.8(h) hereof.

Designated Lender shall have the meaning set forth in Section 16.2(d) hereof.

Disqualified Equity Interest shall mean, with respect to any Person, any Equity Interest in such Person that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable, either mandatorily or at the option of the holder thereof), or upon the happening of any event or condition:

(a)      matures or is mandatorily redeemable (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests), whether pursuant to a sinking fund obligation or otherwise;

(b)      is convertible or exchangeable, either mandatorily or at the option of the holder thereof, for Indebtedness or Equity Interests (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests); or

(c)      is redeemable (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests) or is required to be repurchased by such Person or any of its Affiliates, in whole or in part, at the option of the holder thereof;

in each case, on or prior to the date 91 days after the [Maturity Date] (determined as of the date of issuance thereof or, in the case of any such Equity Interests outstanding on the date hereof, the date hereof); provided, however, that (i) an Equity Interest in any Person that would not constitute a Disqualified Equity Interest but for terms thereof giving holders thereof the right to require such Person to redeem or purchase such Equity Interest upon the occurrence of an "asset sale," a "change of control" or similar event shall not constitute a Disqualified Equity Interest if any such requirement becomes operative only after repayment in full of all the Loans and all other Obligations that are accrued and payable, (ii) if an Equity Interest in any Person is issued pursuant to any plan for the benefit of directors, officers, employees, members of management, managers or consultants, of the Company or any Subsidiary or by any such plan to such employees, such Equity Interest shall not constitute a Disqualified Equity Interest solely because it may be required to be repurchased by the Company or any Subsidiary in order to satisfy applicable statutory or regulatory obligations of such Person and (iii) no Equity Interest held by any future, present or former employee, director, officer, manager, member of management, consultant or independent contractor (or their respective affiliates or immediate family members) of the Borrower (or any subsidiary) shall be considered a Disqualified Equity Interest solely because such stock is redeemable or subject to repurchase pursuant to any customary stock option, employee stock award or similar agreement that may be in effect from time to time.

Document shall have the meaning given to the term "document" in the Uniform Commercial Code.

Dollar and the sign $ shall mean lawful money of the United States of America.

Dollar Equivalent shall mean, with respect to any amount of any currency, as of any date determined by the Agent in its sole discretion, the Equivalent Amount of such currency expressed in Dollars.

Domestic Rate Loan shall mean any US-Canada Advance that bears interest based upon the Alternate Base Rate.

Drawing Date shall have the meaning set forth in Section 2.13(b) hereof.

EEA Financial Institution means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and

13

is subject to consolidated supervision with its parent.

EEA Member Country means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

EEA Resolution Authority means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

Effective Date shall mean the date indicated in a document or agreement to be the date on which such document or agreement becomes effective, or, if there is no such indication, the date of execution of such document or agreement.

Effective Federal Funds Rate means for any day the rate per annum (based on a year of 360 days and actual days elapsed and rounded upward to the nearest 1/100 of 1% announced by the Federal Reserve Bank of New York (or any successor)) on such day as being the weighted average of the rates on overnight federal funds transactions arranged by federal funds brokers on the previous trading day, as computed and announced by such Federal Reserve Bank (or any successor) in substantially the same manner as such Federal Reserve Bank computes and announces the weighted average it refers to as the "Effective Federal Funds Rate" as of the date of this Agreement; provided that if such Federal Reserve Bank (or its successor) does not announce such rate on any day, the "Effective Federal Funds Rate" for such day shall be the Effective Federal Funds Rate for the last day on which such rate was announced.

Notwithstanding the foregoing, if the Effective Federal Funds Rate as determined under any method above would be less than zero percent (0.00%), such rate shall be deemed to be zero percent (0.00%) for purposes of this Agreement.

Eligibility Date shall mean, with respect to each Borrower and Guarantor and each Swap, the date on which this Agreement or any Other Document becomes effective with respect to such Swap (for the avoidance of doubt, the Eligibility Date shall be the Effective Date of such Swap if this Agreement or any Other Document is then in effect with respect to such Borrower or Guarantor, and otherwise it shall be the Effective Date of this Agreement and/or such Other Document(s) to which such Borrower or Guarantor is a party).

Eligible Canadian Receivables shall mean Eligible Receivables of a Canadian Loan Party that (i) arise in a province of Canada that has adopted the PPSA and the Agent has registered under the PPSA in such jurisdiction and (ii) has not been included as Eligible Domestic Receivables under the US-Canada Formula Amount.

Eligible Contract Participant shall mean an "eligible contract participant" as defined in the CEA and regulations thereunder.

Eligible Domestic Receivables shall mean Eligible Receivables of a US Loan Party that has not been included as Eligible Canadian Receivables.

Eligible Receivables shall mean and include, each Receivable of a US-Canada Loan Party arising in the Ordinary Course of Business and which Agent, in its Permitted Discretion, shall

14

deem to be an Eligible Receivable, based on such considerations as Agent may from time to time deem appropriate. A Receivable shall not be deemed eligible unless such Receivable is subject to Agent's first priority perfected security interest and no other Lien (other than Permitted Encumbrances), and is evidenced by an invoice or other documentary evidence satisfactory to Agent. In addition, no Receivable shall be an Eligible Receivable if:

(a)     it arises out of a sale made by any Loan Party to an Affiliate of any Loan Party or to a Person controlled by an Affiliate of any Loan Party;

(b)     (i) it is due or unpaid more than 60 days after the original due date or, for terms ranging from net 0 to 60 days, more than 120 days after the original invoice date or, for terms ranging from net 61 to 120 days, more than 150 days after the original invoice date; (ii) to the extent that, for terms ranging from net 61 to 90 days aged 60 days or less past due, not to exceed 150 days from original invoice date, such Eligible Receivables included in the US- Canada Formula Amount exceed $30,000,000 in the aggregate at any time; and (iii) to the extent that, for terms ranging from net 91 days to 120 days aged 30 days or less past due, not to exceed 150 days from original invoice date, such Eligible Receivables included in the US-Canada Formula Amount exceed $20,000,000 in the aggregate at any time;

(c)     fifty percent (50%) or more of the Receivables from such Customer are not deemed Eligible Receivables hereunder (as Agent, in its Permitted Discretion, may decrease such percentage from time to time);

(d)     any covenant, representation or warranty contained in this Agreement with respect to such Receivable has been breached;

(e)     an Insolvency Event shall have occurred with respect to such Customer;

(f)     the sale is to a Customer outside the United States of America or a province of Canada that has not adopted the PPSA, unless the sale is on letter of credit, guaranty or acceptance terms, in each case acceptable to Agent in its Permitted Discretion;

(g)     the sale to the Customer is on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment or any other repurchase or return basis or is evidenced by chattel paper;

(h)     Agent believes, in its Permitted Discretion, that collection of such Receivable is insecure or that such Receivable may not be paid by reason of the Customer's financial inability to pay;

(i)     the Customer is the United States of America, any state or any department, agency or instrumentality of any of them, unless the applicable Loan Party assigns its right to payment of such Receivable to Agent pursuant to the Assignment of Claims Act of 1940, as amended (31 U.S.C. Sub-Section 3727 et seq. and 41 U.S.C. Sub-Section 15 et seq.) or has otherwise complied with other applicable statutes or ordinances, or if the Customer is any province in or the federal government of (or any department, agency or instrumentality thereof) Canada, unless the applicable Loan Party assigns its rights to payment of such Receivable to Agent pursuant to the Financial Administration Act, the general laws of Canada and of the applicable province,

15

and such assignment has been acknowledged by such Governmental Body and is enforceable against it;

(j)     the goods giving rise to such Receivable have not been delivered to and accepted by the Customer or the services giving rise to such Receivable have not been performed by the applicable Loan Party and accepted by the Customer or the Receivable otherwise does not represent a final sale;

(k)     the Receivables of the Customer exceed a credit limit determined by Agent, in its Permitted Discretion, to the extent such Receivable exceeds such limit;

(l)     the Receivable is subject to any offset, deduction, defense, dispute, credits or counterclaim (but such Receivable shall only be ineligible to the extent of such offset, deduction, defense or counterclaim), the Receivable includes any finance charge (but such Receivable shall only be ineligible to the extent of such finance charge), the Customer is also a creditor or supplier of a Loan Party or the Receivable is contingent in any respect or for any reason;

(m)     the applicable Loan Party has made any agreement with any Customer for any deduction therefrom, except for discounts or allowances made in the Ordinary Course of Business for prompt payment, all of which discounts or allowances are reflected in the calculation of the face value of each respective invoice related thereto;

(n)     any return, rejection or repossession of the merchandise has occurred or the rendition of services has been disputed; or

(o)     such Receivable is not payable to a Loan Party or Subsidiary of a Loan Party.

Embargoed Property means any property (a) beneficially owned, directly or indirectly, by a Sanctioned Person; (b) that is due to or from a Sanctioned Person; (c) in which a Sanctioned Person otherwise holds any interest; (d) that is located in a Sanctioned Country; or (e) that otherwise would cause any actual or possible violation by the Lenders or Agent of any applicable Anti-Terrorism Law if the Lenders were to obtain an encumbrance on, lien on, pledge of, or security interest in such property or provide services in consideration of such property.

Environmental Complaint shall have the meaning set forth in Section 9.3(b) hereof.

Environmental Laws shall mean all federal, state and local environmental, land use, zoning, health, chemical use, safety and sanitation laws, statutes, ordinances and codes as well as common laws, relating to the protection of the environment, human health and/or governing the use, storage, treatment, generation, transportation, processing, handling, production or disposal of Hazardous Materials and the rules, regulations, policies, guidelines, interpretations, decisions, orders and directives of federal, state, provincial, international and local governmental agencies and authorities with respect thereto.

Equity Interests shall mean, with respect to any Person, any and all shares, rights to purchase, options, warrants, general, limited or limited liability partnership interests, member interests, participation or other equivalents of or interest in (regardless of how designated) equity

16

of such Person, whether voting or nonvoting, including common stock, preferred stock, convertible securities or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act), including in each case all of the following rights relating to such Equity Interests, whether arising under the Organizational Documents of the Person issuing such Equity Interests (the "**issuer**") or under the applicable laws of such issuer's jurisdiction of organization relating to the formation, existence and governance of corporations, limited liability companies or partnerships or business trusts or other legal entities, as the case may be: (i) all economic rights (including all rights to receive dividends and distributions) relating to such Equity Interests; (ii) all voting rights and rights to consent to any particular action(s) by the applicable issuer; (iii) all management rights with respect to such issuer; (iv) in the case of any Equity Interests consisting of a general partner interest in a partnership, all powers and rights as a general partner with respect to the management, operations and control of the business and affairs of the applicable issuer; (v) in the case of any Equity Interests consisting of the membership/limited liability company interests of a managing member in a limited liability company, all powers and rights as a managing member with respect to the management, operations and control of the business and affairs of the applicable issuer; (vi) all rights to designate or appoint or vote for or remove any officers, directors, manager(s), general partner(s) or managing member(s) of such issuer and/or any members of any board of members/managers/partners/directors that may at any time have any rights to manage and direct the business and affairs of the applicable issuer under its Organizational Documents as in effect from time to time or under Applicable Law; (vii) all rights to amend the Organizational Documents of such issuer, (viii) in the case of any Equity Interests in a partnership or limited liability company, the status of the holder of such Equity Interests as a "partner", general or limited, or "member" (as applicable) under the applicable Organizational Documents and/or Applicable Law; and (ix) all certificates evidencing such Equity Interests.

Equivalent Amount shall mean, at any time, as determined by Agent (which determination shall be conclusive absent manifest error), with respect to an amount of any currency (the "**Reference Currency**") which is to be computed as an equivalent amount of another currency (the "**Equivalent Currency**"), the amount of such Equivalent Currency converted from such Reference Currency at Agent's rate (based on the market rates then prevailing and available to Agent) for such Equivalent Currency for such Reference Currency at a time determined by Agent on the second Business Day immediately preceding the event for which such calculation is made.

Equivalent Currency shall have the meaning specified in the definition of Equivalent Amount.

ERISA shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended or supplemented from time to time and the rules and regulations promulgated thereunder.

Erroneous Payment has the meaning assigned to it in Section 14.18(a).

Erroneous Payment Deficiency Assignment has the meaning assigned to it in Section 14.18(d).

Erroneous Payment Impacted Class has the meaning assigned to it in Section 14.18(d).

17

Erroneous Payment Return Deficiency has the meaning assigned to it in Section 14.18(d).

Erroneous Payment Subrogation Rights has the meaning assigned to it in Section 14.18(d).

EU Bail-In Legislation Schedule means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

Event of Default shall have the meaning set forth in Article 10 hereof.

Exchange Act shall mean the Securities Exchange Act of 1934, and any other applicable statute in any other applicable jurisdiction, as amended.

Excluded Hedge Liability or Liabilities shall mean, with respect to each Borrower and Guarantor, each of its Swap Obligations if, and only to the extent that, all or any portion of this Agreement or any Other Document that relates to such Swap Obligation is or becomes illegal under the CEA, or any rule, regulation or order of the CFTC, solely by virtue of such Borrower's and/or Guarantor's failure to qualify as an Eligible Contract Participant on the Eligibility Date for such Swap. Notwithstanding anything to the contrary contained in the foregoing or in any other provision of this Agreement or any Other Document, the foregoing is subject to the following provisos: (a) if a Swap Obligation arises under a master agreement governing more than one Swap, this definition shall apply only to the portion of such Swap Obligation that is attributable to Swaps for which such guaranty or security interest is or becomes illegal under the CEA, or any rule, regulations or order of the CFTC, solely as a result of the failure by such Borrower or Guarantor for any reason to qualify as an Eligible Contract Participant on the Eligibility Date for such Swap; (b) if a guarantee of a Swap Obligation would cause such obligation to be an Excluded Hedge Liability but the grant of a security interest would not cause such obligation to be an Excluded Hedge Liability, such Swap Obligation shall constitute an Excluded Hedge Liability for purposes of the guaranty but not for purposes of the grant of the security interest; and (c) if there is more than one Borrower or Guarantor executing this Agreement or the Other Documents and a Swap Obligation would be an Excluded Hedge Liability with respect to one or more of such Persons, but not all of them, the definition of Excluded Hedge Liability or Liabilities with respect to each such Person shall only be deemed applicable to (i) the particular Swap Obligations that constitute Excluded Hedge Liabilities with respect to such Person, and (ii) the particular Person with respect to which such Swap Obligations constitute Excluded Hedge Liabilities.

Excluded Property shall mean any non-material lease, license, contract or agreement to which any Loan Party is a party, and any of its rights or interests thereunder, if and to the extent that a security interest therein is prohibited by or in violation of (x) any Applicable Law, or (y) a term, provision or condition of any such lease, license, contract or agreement (unless in each case, such Applicable Law, term, provision or condition would be rendered ineffective with respect to the creation of such security interest pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code (or any successor provision or provisions) of any relevant jurisdiction or any other Applicable Law or principles of equity), provided, however, that the foregoing shall cease to be treated as "Excluded Property" (and shall constitute Collateral) immediately at such time as the contractual or legal prohibition shall no longer be applicable and to the extent severable, such security interest shall attach immediately to any portion of such lease, license, contract or agreement not subject to the prohibitions specified in (x) or (y) above,

provided, further that Excluded Property shall not include any proceeds of any such lease, license, contract or agreement or any goodwill of Loan Parties' business associated therewith or attributable thereto.

Excluded Subsidiaries shall mean the US Excluded Subsidiaries and the Foreign Excluded Subsidiaries. The Excluded Subsidiaries are not required to join this Agreement as Guarantors. No US Excluded Subsidiary is a Material Subsidiary except the Insurance Subsidiary.

Excluded Taxes shall mean, with respect to Agent, any Lender, Participant, Swing Loan Lender, Issuer or any other recipient (each referred to for the purposes of this definition as a "**recipient**") of any payment to be made by or on account of any Obligations, (a) (I) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office or applicable lending office is located or, in the case of any Lender, Participant, Swing Loan Lender or Issuer, in which its applicable lending office is located, or (II) Other Connection Taxes, (b) capital taxes imposed on or measured by such recipient's taxable capital, (c) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which any Loan Party is located (in each case imposed or measured by overall gross receipts), (d) in the case of a Foreign Lender, any United States withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or designates a new lending office) or is attributable to such Foreign Lender's failure or inability (other than as a result of a Change in Law) to comply with Section 3.10(e), except to the extent that such Foreign Lender or Participant (or its assignor or seller of a participation, if any) was entitled, at the time of designation of a new lending office (or assignment or sale of a participation), to receive additional amounts from Loan Parties with respect to such withholding tax pursuant to Section 3.10(a), (e) any Canadian withholding Taxes arising as a result of (i) the recipient not dealing at arm's length (within the meaning of the ITA) with any Loan Party, (ii) the recipient being a "specified non-resident shareholder" (as defined in subsection 18(5) of the ITA) of any Loan Party or not dealing at arm's length (for the purposes of the ITA with a "specified shareholder" (as defined in subsection 18(5) of the ITA) of the Loan Party or or any partner of the Loan Party (and if a partnership, any partner thereof)), or (iii) the recipient being a "specified entity" (as defined in subsection 18.4(1) of the ITA, as it is proposed to be amended by certain Tax proposals released by the Department of Finance (Canada) on April 29, 2022) of the Loan Party, except in the case of (i) through (iii) where (x) the non-arm's length relationship, (y) the recipient being a "specified non-resident shareholder" of the Loan Party or not dealing at arm's length with a "specified shareholder" of the Loan Party, or (z) the recipient being a "specified entity" of the Loan Party, as applicable, arises in connection with or as a result of the recipient having become a party to, received or perfected a security interest under or received or enforced any rights under this Agreement or any Other Document, or (f) any Taxes imposed on any "withholding payment" payable to such recipient as a result of the failure of such recipient to satisfy the requirements set forth in the FATCA after December 31, 2012.

Existing Chase L/C shall mean that certain Existing Letter of Credit issued by JPMorgan for the benefit of TZW Technology Center (Switzerland) in the face amount of 787,136.40 CHF.

Existing Letters of Credit shall mean those certain Letters of Credit (as defined in the Pre-

19

Petition Credit Agreement) issued under the Pre-Petition Credit Agreement and listed on <u>Exhibit C</u>.

<u>Facility Fee</u> shall have the meaning set forth in Section 3.3 hereof.

<u>FATCA</u> shall mean:

(a)     Sections 1471 through 1474 of the Code as in effect on the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations thereunder or official interpretations thereof;

(b)     any treaty, law or regulation of any other jurisdiction, or relating to an intergovernmental agreement between the United States and any other jurisdiction, which (in either case) facilitates the implementation of any law or regulation referred to in paragraph (a) above; or

(c)     any agreement pursuant to the implementation of any treaty, law or regulation referred to in paragraphs (a) or (b) above with the United States Internal Revenue Service, the US government or any governmental or taxation authority in any other jurisdiction.

<u>FDA</u> shall have the meaning set forth in Section 5.31 hereof.

<u>Final Order</u> shall mean a final order of the Bankruptcy Court in the Case authorizing and approving this Agreement and the Other Documents under, *inter alia*, Sections 364(c) and (d) of the Bankruptcy Code on a final basis and entered at or after a final hearing, which order is consistent with the Interim Order in all material respects or otherwise in form and substance satisfactory to Agent in its reasonable discretion and shall in any event contain a waiver of surcharge under Section 5.06(c) of the Bankruptcy Code.

<u>Fixed Assets</u> shall mean and include as to each Borrower, all of such Borrower's machinery and equipment, wherever located.

<u>Flood Laws</u> shall mean all Applicable Laws relating to policies and procedures that address requirements placed on federally regulated lenders under the National Flood Insurance Reform Act of 1994 and other Applicable Laws related thereto.

<u>Foreign Currency Hedge</u> shall mean any foreign exchange transaction, including spot and forward foreign currency purchases and sales, listed or over-the-counter options on foreign currencies, non-deliverable forwards and options, foreign currency swap agreements, currency exchange rate price hedging arrangements, and any other similar transaction providing for the purchase of one currency in exchange for the sale of another currency entered into by any Borrower, Guarantor and/or any of their respective Subsidiaries.

<u>Foreign Currency Hedge Liabilities</u> shall have the meaning assigned in the definition of Lender-Provided Foreign Currency Hedge.

<u>Foreign Excluded Subsidiaries</u> shall mean all Subsidiaries organized under the laws of a jurisdiction outside the United States of America, any State thereof, the District of Columbia, or

<div align="center">20</div>

Canada (or any province thereof).

Foreign Lender shall mean (a) with respect to a Loan Party that is a "United States Person" as defined in section 7701(a)(30) of the Code (a "**U.S. Person**"), a Lender that is not a U.S. Person, and (b) with respect to a Loan Party that is not a U.S. Person, a Lender that is resident or organized under the laws of a jurisdiction other than that in which such Loan Party is resident for tax purposes or in which such Loan Party is otherwise organized or formed.

Foreign Pension Plan shall mean any benefit plan that under applicable law (other than the laws of the United States or any political subdivision thereof) is required to be funded through a trust or other funding vehicle other than a trust or funding vehicle maintained exclusively by a Governmental Authority and with respect to which the Company or any Subsidiary has any liability.

Foreign Subsidiary shall mean any Subsidiary which is organized under the laws of a jurisdiction other than the United States of America, any State thereof or the District of Columbia.

Formula Amount shall mean the US-Canada Formula Amount.

Freedom shall mean Freedom Designs, Inc., a California corporation.

Freedom Winddown shall mean the winddown and dissolution of Freedom.

FSCO shall mean The Financial Services Commission of Ontario or like body in Canada or in any other province or territory or jurisdiction of Canada with whom a Canadian Pension Plan is required to be registered in accordance with Applicable Law and any other Governmental Body succeeding to the functions thereof.

FTC shall have the meaning set forth in Section 5.31 hereof.

GAAP shall mean generally accepted accounting principles in the United States of America and, with respect to the Canadian Loan Parties, in Canada, in effect from time to time.

Governmental Acts shall mean any act or omission, whether rightful or wrongful, of any present or future de jure or de facto Governmental Body.

Governmental Body shall mean any nation or government, any state, province or other political subdivision thereof or any entity, authority, agency, division or department exercising the executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to a government (including any supra-national bodies such as the European Union or the European Central Bank) and any group or body charged with setting financial accounting or regulatory capital rules or standards (including, without limitation, the Financial Accounting Standards Board, the Bank for International Settlements or the Basel Committee on Banking Supervision or any successor or similar authority to any of the foregoing).

Guarantor shall collectively mean the US Guarantors and the Canadian Loan Parties.

Guarantor Joinder shall mean a joinder by a Person as a Guarantor under this Agreement

21

.and the Other Documents in substantially the form of Exhibit 7.12(b).

Guarantor Security Agreement shall mean any security agreement executed by any Guarantor in favor of Agent securing the Obligations or the Guaranty of such Guarantor, in form and substance satisfactory to Agent.

Guaranty shall mean any guaranty of the Obligations executed by a Guarantor in favor of Agent for its benefit and for the ratable benefit of Lenders, in form and substance satisfactory to Agent.

Hazardous Discharge shall have the meaning set forth in Section 9.3(b) hereof.

Hazardous Materials shall mean, without limitation, any flammable explosives, radon, radioactive materials, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum and petroleum products, methane, hazardous materials, Hazardous Wastes, hazardous or Toxic Substances or related materials as defined in or subject to regulation under Environmental Laws.

Hazardous Wastes shall mean all waste materials subject to regulation under CERCLA, RCRA or applicable state law, and any other applicable Federal and state laws now in force or hereafter enacted relating to hazardous waste disposal.

Hedge Liabilities shall mean collectively, the Foreign Currency Hedge Liabilities and the Interest Rate Hedge Liabilities.

HHS shall mean the United States Department of Health and Human Services, or any other applicable Governmental Body in any other applicable jurisdiction, or any successor thereof and any predecessor thereof.

Increasing Lender shall have the meaning set forth in Section 2.23(a) hereof.

Indebtedness shall mean, as to any Person at any time, any and all indebtedness, obligations or liabilities (whether matured or unmatured, liquidated or unliquidated, direct or indirect, absolute or contingent, or joint or several) of such Person for or in respect of: (a) borrowed money; (b) amounts received under or liabilities in respect of any note purchase or acceptance credit facility, and all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments; (c) all Capitalized Lease Obligations; (d) reimbursement obligations (contingent or otherwise) under any letter of credit agreement, banker's acceptance agreement or similar arrangement; (e) net obligations under any Interest Rate Hedge, Foreign Currency Hedge, or other interest rate management device, foreign currency exchange agreement, currency swap agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement; provided for purposes of calculating Indebtedness hereunder, the foregoing net obligations shall not be included unless any such agreement or device has been closed out or any amount is due and payable thereunder; (f) any other advances of credit made to or on behalf of such Person or other transaction (including forward sale or purchase agreements, capitalized leases and conditional sales agreements) having the commercial effect of a borrowing of money entered into by such Person to finance its operations or capital requirements including to finance the purchase price of property or services and all obligations of such Person to pay the

22

deferred purchase price of property or services (but not including trade payables and accrued expenses incurred in the Ordinary Course of Business which are not represented by a promissory note or other evidence of indebtedness and which are not more than sixty (60) days past due); (g) all Equity Interests of such Person subject to repurchase or redemption/retraction rights or obligations (excluding repurchases or redemptions at the sole option of such Person); (h) all indebtedness, obligations or liabilities secured by a Lien on any asset of such Person, whether or not such indebtedness, obligations or liabilities are otherwise an obligation of such Person; (i) all obligations of such Person for "earnouts", purchase price adjustments, profit sharing arrangements, deferred purchase money amounts and similar payment obligations or continuing obligations of any nature of such Person arising out of purchase and sale contracts; (j) off-balance sheet liabilities and/or pension plan liabilities of such Person; (k) obligations arising under bonus, deferred compensation, incentive compensation or similar arrangements, other than those arising in the Ordinary Course of Business; and (l) any guaranty of any indebtedness, obligations or liabilities of a type described in the foregoing clauses (a) through (k). For avoidance of doubt, obligations under operating leases are not considered Indebtedness.

Indemnified Party shall have the meaning set forth in Section 16.5.

Indemnified Taxes shall mean Taxes (including Other Taxes) other than Excluded Taxes.

Ineligible Purchaser shall mean any Loan Party or any of the Loan Parties' Affiliates or Subsidiaries or any natural person.

Ineligible Security shall mean any security which may not be underwritten or dealt in by member banks of the Federal Reserve System under Section 16 of the Banking Act of 1933 (12 U.S.C. Section 24, Seventh), as amended.

Insolvency Event shall mean, with respect to any Person, including without limitation any Lender, such Person or such Person's direct or indirect parent company (a) becomes the subject of a bankruptcy or insolvency proceeding (including any proceeding under Title 11 of the United States Code, the Bankruptcy and Insolvency Act (Canada), the Companies Creditors Arrangement Act, the Winding-Up Act and Restructuring Act, or any applicable corporate statute providing for such arrangements or similar proceedings, in each case as amended from time to time), (b) has had a receiver, receiver and manager, conservator, trustee, administrator, monitor, liquidator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization, arrangement or liquidation of its business appointed for it or has called a meeting of its creditors generally or any substantial portion thereof, (c) admits in writing its inability, or be generally unable, to pay its debts as they become due or cease operations of its present business or undertake any sale of assets in bulk, (d) with respect to a Lender, such Lender is unable to perform hereunder due to the application of Applicable Law, or (e) in the good faith determination of Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment of a type described in clauses (a) or (b), provided that an Insolvency Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person or such Person's direct or indirect parent company by a Governmental Body or instrumentality thereof if, and only if, such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such

23

Governmental Body or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

Insurance Subsidiary shall mean Invatection Insurance Company, a Vermont corporation.

Intellectual Property shall mean property constituting a patent, copyright, trademark (or any application in respect of the foregoing), service mark, copyright, copyright application, trade name, mask work, trade secrets, design right, assumed name or license or other right to use any of the foregoing under Applicable Law.

Intellectual Property Claim shall mean the assertion, by any means, by any Person of a claim that any Borrower's ownership, use, marketing, sale or distribution of any Inventory, equipment, Intellectual Property or other property or asset is violative of any ownership of or right to use any Intellectual Property of such Person.

Interest Payment Date shall have the meaning set forth in Section 3.1.

Interest Rate Hedge shall mean an interest rate exchange, collar, cap, swap, floor, adjustable strike cap, adjustable strike corridor, cross-currency swap or similar agreements entered into by any Borrower, Guarantor and/or their respective Subsidiaries in order to provide protection to, or minimize the impact upon, such Borrower, any Guarantor and/or their respective Subsidiaries of increasing floating rates of interest applicable to Indebtedness.

Interest Rate Hedge Liabilities shall have the meaning assigned in the definition of Lender-Provided Interest Rate Hedge.

Interim Order means an order of the Bankruptcy Court in the Case authorizing and approving this Agreement and the Other Documents, for an interim period, under, *inter alia*, Sections 364(c) and (d) of the Bankruptcy Code and entered at or after a hearing, in form and substance satisfactory to Agent in its reasonable discretion (it being understood and agreed that the proposed Interim Order attached to the Restructuring Support Agreement shall be deemed acceptable to Agent) and attached hereto as Exhibit B.

Internet Posting shall have the meaning set forth in Section 16.6.

Invacare Holdings shall mean Invacare Holdings, LLC, an Ohio limited liability company.

Invacare International shall mean Invacare International Corporation, an Ohio corporation.

Inventory shall mean and include as to each Loan Party all of such Loan Party's inventory (as defined in Article 9 of the Uniform Commercial Code) and all of such Loan Party's goods, merchandise and other personal property, wherever located, to be furnished under any consignment arrangement, contract of service or held for sale or lease, all raw materials, work in process, finished goods and materials and supplies of any kind, nature or description which are or might be used or consumed in such Loan Party's business or used in selling or furnishing such goods, merchandise and other personal property, and all Documents.

Issuer shall mean with respect to any US-Canada Letter of Credit, PNC or each other US-

24

Canada Lender (or Affiliate of a US-Canada Lender) that is requested by the Agent to act as an Issuer, and which US-Canada Lender (or such Affiliate) accepts such appointment, and each of their successors and assigns (and which may be replaced, with the concurrence of such replacement, at the sole discretion of the Agent).

ITA shall mean the *Income Tax Act* (Canada) as it same may be amended or supplemented from time to time, and any successor statute of similar import, and the rules and regulations thereunder, as from time to time in effect.

Joint Venture shall mean a corporation, partnership, limited liability company or other entity in which any Person other than Loan Parties and their Subsidiaries holds, directly or indirectly, an Equity Interest.

JPM European Treasury Management Obligations shall mean any indebtedness, obligations and liabilities now or hereafter owing by any Foreign Subsidiary organized in any jurisdiction located in Europe or the United Kingdom to JPMorgan (or any branch or Affiliate of JPMorgan) pursuant to one or more agreements or arrangements for Cash Management Products and Services. For the avoidance of doubt, the JPM European Treasury Management Obligations shall constitute "Cash Management Liabilities" and "Obligations" hereunder.

JPM European Treasury Management Reserve shall mean such reserves as JPMorgan determines in its sole discretion from time to time as being appropriate to reflect the reasonably anticipated JPM European Treasury Management Obligations. Notwithstanding anything to the contrary herein, Agent agrees to implement the JPM European Treasury Management Reserve promptly upon receiving written notice (email being sufficient) thereof from JPMorgan.

JPMorgan shall mean JPMorgan Chase Bank, National Association.

Law(s) shall mean any law(s) (including common law), constitution, statute, treaty, regulation, rule, ordinance, opinion, issued guidance, release, ruling, order, executive order, injunction, writ, decree, bond judgment authorization or approval, lien or award of or any settlement arrangement, by agreement, consent or otherwise, with any Governmental Body, foreign or domestic.

Leasehold Interests shall mean all of each Borrower's right, title and interest in and to, and as lessee of, any premises, including without limitation as identified as leased Real Property on Schedule 4.4 hereto.

Lender and Lenders shall have the meaning given to such term in the preamble to this Agreement and shall include each Person which becomes a transferee, successor or assign of any Lender. For the purpose of provision of this Agreement or any Other Document which provides for the granting of a security interest or other Lien to Agent for the benefit of Lenders as security for the Obligations, "Lenders" shall include any Affiliate of a Lender to which such Obligation (specifically including any Hedge Liabilities and any Cash Management Liabilities) is owed.

Lender-Provided Foreign Currency Hedge shall mean a Foreign Currency Hedge which is provided by any Lender or any Affiliate of a Lender and for which such Lender confirms to Agent in writing that it: (a) is documented in a standard International Swap Dealers Association, Inc.

25

Master Agreement or another reasonable and customary manner; (b) provides for the method of calculating the reimbursable amount of the provider's credit exposure in a reasonable and customary manner; and (c) is entered into for hedging (rather than speculative) purposes. The liabilities owing to the provider of any Lender-Provided Foreign Currency Hedge (the "**Foreign Currency Hedge Liabilities**") by any Borrower or Guarantor or any Subsidiary of any Borrower or Guarantor that is party to or guaranties such Lender-Provided Foreign Currency Hedge shall, for purposes of this Agreement and all Other Documents be "Obligations" of such Person and of each other Borrower and Guarantor, be guaranteed obligations under any Guaranty and secured obligations under any Guarantor Security Agreement, and otherwise treated as Obligations for purposes of the Other Documents, except to the extent constituting Excluded Hedge Liabilities of such Person. The Liens securing the Foreign Currency Hedge Liabilities shall be pari passu with the Liens securing all other Obligations under this Agreement and the Other Documents, subject to the express provisions of Section 11.5 hereof.

Lender-Provided Interest Rate Hedge shall mean an Interest Rate Hedge which is provided by any Lender and with respect to which such Lender confirms to Agent in writing that it: (a) is documented in a standard International Swap Dealers Association, Inc. Master Agreement or another reasonable and customary manner; (b) provides for the method of calculating the reimbursable amount of the provider's credit exposure in a reasonable and customary manner; and (c) is entered into for hedging (rather than speculative) purposes. The liabilities owing to the provider of any Lender-Provided Interest Rate Hedge (the "**Interest Rate Hedge Liabilities**") by any Borrower or Guarantor that is party to or guaranties such Lender- Provided Interest Rate Hedge shall, for purposes of this Agreement and all Other Documents be "Obligations" of such Person and of each other Borrower and Guarantor, be guaranteed obligations under any Guaranty and secured obligations under any Guarantor Security Agreement, and otherwise treated as Obligations for purposes of the Other Documents, except to the extent constituting Excluded Hedge Liabilities of such Person. The Liens securing the Hedge Liabilities shall be pari passu with the Liens securing all other Obligations under this Agreement and the Other Documents, subject to the express provisions of Section 11.5 hereof.

Letter of Credit Application shall have the meaning set forth in Section 2.11(a) hereof.

Letter of Credit Borrowing shall have the meaning set forth in Section 2.13(d) hereof.

Letters of Credit shall mean any of the US-Canada Letters of Credit.

Lien shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, assignment by way of security, security interest, mortgage or lien (whether statutory or otherwise), or encumbrance, or other security agreement or preferential arrangement held or asserted in respect of any asset of any kind or nature whatsoever including any conditional sale or other title retention agreement, any lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction. The term "Lien" shall not include reference to any public record filings for notice purposes only which do not have, and would not have, the effect of a true lien or encumbrance.

Lien Waiver Agreement shall mean an agreement which is executed in favor of Agent by

26

a Person who owns or occupies premises at which any Collateral may be located from time to time in form and substance satisfactory to Agent.

LLC Division shall mean, in the event a Borrower or Guarantor is a limited liability company, (a) the division of any such Borrower or Guarantor into two or more newly formed limited liability companies (whether or not such Borrower or Guarantor is a surviving entity following any such division) pursuant to Section 18-217 of the Delaware Limited Liability Company Act or any similar provision under any similar act governing limited liability companies organized under the laws of any other State or Commonwealth or of the District of Columbia, or (b) the adoption of a plan contemplating, or the filing of any certificate with any applicable Governmental Body that results or may result in, any such division.

Loan means the Domestic Rate Loans.

Loan Parties shall collectively mean the US-Canada Loan Parties.

Master Netting Agreement shall mean that certain Global Multilateral Netting Agreement dated as of August 16, 2022 among, inter alia, the Company and PNC.

Material Adverse Effect shall mean a material adverse effect on (a) the condition (financial or otherwise), results of operations, assets or business, or properties of Loan Parties taken as a whole (other than by virtue of the commencement of the Cases and the events and circumstances giving rise thereto), (b) the ability of the Loan Parties, taken as a whole, to duly and punctually pay or perform the Obligations in accordance with the terms thereof, (c) Agent's Liens on the Collateral or the priority of any such Lien or (d) the practical realization of the benefits of Agent's and each Lender's rights and remedies under this Agreement and the Other Documents.

Material Contract shall mean any contract, agreement, instrument, permit, lease or license, written or oral, of any Loan Party, which is material to any Loan Party's business or which the failure to comply with would reasonably be expected to result in a Material Adverse Effect.

Material Subsidiary shall mean each Subsidiary of the Company which is identified on Schedule 5.2(b) as a "Material Subsidiary," and each other Subsidiary of the Company (other than any Foreign Excluded Subsidiaries) that has assets at such time, or revenues during the most recently ended fiscal year, comprising 5% or more of the consolidated assets of the Company and its Subsidiaries at such time, or of the consolidated revenues of the Company and its Subsidiaries during such fiscal year, as the case may be.

Maturity Date shall mean May 1, 2023; provided, that:

(a) to the extent the Obligations shall not have been Paid in Full on or prior to May 1, 2023, the Maturity Date shall automatically be extended to May 31, 2023 (the "Initial Maturity Extension") so long as (i) no Event of Default under Section 10.1, 10.2 (solely due to representations and warranties with respect to the Borrowing Base Certificate), Section 10.5 (solely due to a failure to comply with (x) Section 6.18(a) (Milestones) and (y) Section 9.2 (Schedules; US-Canada Borrowing Base Certificates, etc.)), Section 10.7 or Section 10.10 shall have occurred and be continuing, (ii) the Lenders shall not be required to provide any Revolving Commitment in excess of the Revolver Sublimit, and (iii) the Debtors are in compliance with

27

Section 2.1(a)(A) both before and after giving effect to such extension; and

(b) to the extent the Obligations shall not have been Paid in Full on or prior to May 31, 2023, the Maturity Date shall automatically be extended by an additional 60 days (the "Second Maturity Extension") so long as (i) no Event of Default under Section 10.1, 10.2 (solely due to representations and warranties with respect to the Borrowing Base Certificate), Section 10.5 (solely due to a failure to comply with (x) Section 6.18(a) (Milestones) and (y) Section 9.2 (Schedules; US-Canada Borrowing Base Certificates, etc.)), Section 10.7 or Section 10.10 shall have occurred and be continuing, (ii) the Lenders shall not be required to provide any Revolving Commitment in excess of the Revolver Sublimit, (iii) a Budget covering such 60-day extension period, reflecting (A) compliance with Section 2.1(a)(A) for the duration of such extension period and (B) sufficient funding to achieve to a confirmable plan of reorganization or a 363 sale that in either case provides for Payment in Full of the Obligations, is on file with the Bankruptcy Court and (iv) the Debtors are in compliance with Section 2.1(a)(A) both before and after giving effect to such extension.

Maximum Undrawn Amount shall mean, with respect to any outstanding Letter of Credit as of any date, the amount of such Letter of Credit (and, if the Letter of Credit was denominated in another currency, in the Dollar Equivalent amount of such Letter of Credit) that is or may become available to be drawn, including all automatic increases provided for in such Letter of Credit, whether or not any such automatic increase has become effective.

Maximum US-Canada Revolving Advance Amount shall mean $[17,425,000].

Maximum US-Canada Swing Loan Advance Amount shall mean $[2,137,500].

MCLP shall mean Motion Concepts L.P., an Ontario limited partnership.

Medicaid shall mean that entitlement program under Title XIX of the Social Security Act that provides federal grants to states for medical assistance programs based on specific eligibility criteria.

Medicaid Provider Agreement shall mean an agreement entered into between a state agency or other such entity administering the Medicaid program and a health care provider or supplier under which the health care provider or supplier agrees to provide services for Medicaid patients in accordance with the terms of the agreement and Medicaid Regulations.

Medicaid Regulations shall mean, collectively, (a) all federal statutes (whether set forth in Title XIX of the Social Security Act or elsewhere) with respect to Medicaid and any statutes succeeding thereto, (b) all applicable provisions of all federal rules, regulations, manuals and orders and administrative, reimbursement and other guidelines having the force of Law of any Governmental Body promulgated pursuant to or in connection with the statutes described in clause (a), (c) all state statutes and plans for medical assistance enacted in connection with such statutes and provisions described in clauses (a) and (b), and (d) all applicable provisions of all other guidelines having the force of Law of all Governmental Bodies promulgated pursuant to or in connection with the statutes described in clause (c) and all state administrative, reimbursement and other guidelines of all Governmental Bodies having the force of Law promulgated pursuant to or in connection with the statutes described in clause (b), in each case as may be amended,

28

supplemented or otherwise modified from time to time.

Medical Reimbursement Programs shall mean the Medicare, Medicaid and TRICARE programs and any other healthcare program operated by or financed in whole or in party by any foreign, domestic, federal, state, local or provincial government and any other non-government funded third party payor programs.

Medicare shall mean that government-sponsored entitlement program under Title XVIII of the Social Security Act that provides for a health insurance system for eligible elderly and disabled individuals.

Medicare Provider Agreement shall mean an agreement entered into between CMS or other such entity administering the Medicare program on behalf of CMS, and a health care provider or supplier under which the health care provider or supplier agreed to provide services for Medicare patients in accordance with the terms of the agreement and Medicare Regulations.

Medicare Regulations shall mean, collectively, all federal statutes (whether set forth in Title XVIII of the Social Security Act or elsewhere) with respect to the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act and any statutes succeeding thereto, together with all applicable provisions of all rules, regulations, manuals and orders and administrative, reimbursement and other guidelines having the force of Law of all Governmental Bodies (including, without limitation, HHS, CMS, the OIG or any person succeeding to the functions of any of the foregoing) promulgated pursuant to or in connection with any of the foregoing having the force of Law, as each may be amended, supplemented or otherwise modified from time to time.

MI shall mean Medbloc, Inc., a Delaware corporation.

Modified Commitment Transfer Supplement shall have the meaning set forth in Section 16.3(d) hereof.

Mortgage-Eligible Properties shall mean those parcels of real property identified on Schedule 1.2(m).

Multiemployer Plan shall mean a "multiemployer plan" as defined in Sections 3(37) or 4001(a)(3) of ERISA to which contributions are required or, within the preceding five plan years, were required by any Borrower or any member of the Controlled Group.

Multiple Employer Plan shall mean a Plan which has two or more contributing sponsors (including any Borrower or any member of the Controlled Group) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

Non-Defaulting Lender shall mean, at any time, any Lender holding a Revolving Commitment that is not a Defaulting Lender at such time.

Non-Qualifying Party shall mean any Borrower or any Guarantor that on the Eligibility Date fails for any reason to qualify as an Eligible Contract Participant.

Note shall mean collectively, the Revolving Credit Note and the Swing Loan Note.

Notice shall have the meaning set forth in Section 16.6.

Obligations shall mean and include any and all loans (including without limitation, all Advances and Swing Loans), advances, debts, liabilities, obligations (including without limitation all reimbursement obligations and cash collateralization obligations with respect to Letters of Credit issued hereunder), covenants and duties owing by any Borrower or Guarantor or, with respect to Cash Management Products and Services (including any JPM European Treasury Management Obligation) only, any Subsidiary of any Borrower or any Guarantor, in all cases, to Issuer, Swing Loan Lender, Lenders or Agent (or to any other direct or indirect subsidiary or affiliate of Issuer, Swing Loan Lender, any Lender or the Agent) of any kind or nature, present or future (including any interest or other amounts accruing thereon, any fees accruing under or in connection therewith, any costs and expenses of any Person payable by any Borrower or Guarantor and any indemnification obligations payable by any Borrower arising or payable after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or Insolvency Event or like proceeding relating to any Borrower or Guarantor, whether or not a claim for post-filing or post-petition interest, fees or other amounts is allowable or allowed in such proceeding), whether or not for the payment of money, whether arising by reason of an extension of credit, opening or issuance of a letter of credit, loan, equipment lease, establishment of any commercial card or similar facility or guarantee, under any interest or currency swap, future, option or other similar agreement, or in any other manner, whether arising out of overdrafts or deposit or other accounts or electronic funds transfers (whether through automated clearing houses or otherwise) or out of the Agent's or any Lender's non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository transfer check or other similar arrangements, whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, regardless of how such indebtedness or liabilities arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, including but not limited to, (i) this Agreement, the Other Documents and any amendments, extensions, renewals or increases thereto, including all costs and expenses of the Agent, Issuer, Swing Loan Lender and any Lender incurred in the documentation, negotiation, modification, enforcement, collection or otherwise in connection with any of the foregoing, including but not limited to reasonable attorneys' fees and expenses and all obligations of any Borrower or Guarantor to the Agent, Issuer, Swing Loan Lender or Lenders to perform acts or refrain from taking any action, all Hedge Liabilities, (iii) all Cash Management Liabilities (including all liabilities in connection with JPM European Treasury Management Obligations) and (iv) after entry of the Interim Order, all Pre-Petition Obligations. Notwithstanding anything to the contrary contained in the foregoing, the Obligations shall not include any Excluded Hedge Liabilities.

Officer's Certificate shall mean an officer's certificate substantially in the form of Exhibit 1.2(b) hereto to be signed by the Chief Executive Officer, Chief Financial Officer, Treasurer or Corporate Controller of Borrowing Agent.

OIG shall mean the Office of Inspector General of HHS and any successor thereof.

30

OIG Investigation shall mean the investigation initiated pursuant to a subpoena received by the Company in 2006 from the U.S. Department of Justice seeking documents relating to three (3) long-standing and well-known promotional and rebate programs maintained by the Company and its Subsidiaries.

Order shall have the meaning specified in Section 2.18 hereof.

Ordinary Course of Business shall mean, with respect to any Borrower or any Subsidiary of any Borrower, the ordinary course of such Borrower or Subsidiary's business as conducted on the Closing Date.

Organizational Documents shall mean, with respect to any Person, any charter, articles or certificate of incorporation, certificate of organization, registration or formation, certificate of partnership or limited partnership, bylaws, articles or memorandum of association, operating agreement, limited liability company agreement, or partnership agreement of such Person and any and all other applicable documents relating to such Person's formation, organization or entity governance matters (including any shareholders' or equity holders' agreement or voting trust agreement) and specifically includes, without limitation, any certificates of designation for preferred stock or other forms of preferred equity.

Other Documents shall mean the Note, each Guaranty, each Guarantor Security Agreement, each Pledge Agreement, the Canadian Security Agreement, the Canadian Confirmation of Security, the ABL Intercreditor Agreement and any and all other agreements, instruments and documents, including intercreditor agreements, guaranties, pledges, powers of attorney, consents, waivers, interest or currency swap agreements, estoppels, control agreements, acknowledgements, undertakings, certificates or other similar agreements and all other writings heretofore, now or hereafter executed by any Borrower or any Guarantor and/or delivered to Agent or any Lender in respect of the transactions contemplated by this Agreement, in each case together with all extensions, renewals, amendments, supplements, modifications, substitutions and replacements thereto and thereof.

Other Taxes shall mean all present or future stamp, documentary, registration, filing or other similar taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any Other Document or from the execution, delivery, enforcement or registration of, or otherwise with respect to, this Agreement or any Other Document.

Out-of-Formula Loans shall have the meaning set forth in Section 16.2(e) hereof.

Overnight Bank Funding Rate shall mean, for any, day the rate per annum (based on a year of 360 days and actual days elapsed) comprised of both overnight federal funds and overnight Eurocurrency borrowings by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the Federal Reserve Bank of New York, as set forth on its public website from time to time, and as published on the next succeeding Business Day as the overnight bank funding rate by such Federal Reserve Bank (or by such other recognized electronic source (such as Bloomberg) selected by the Agent for the purpose of displaying such rate) (an "**Alternate Source**"); provided, that if such day is not a Business Day, the Overnight Bank

Funding Rate for such day shall be such rate on the immediately preceding Business Day; provided, further, that if such rate shall at any time, for any reason, no longer exist, a comparable replacement rate determined by the Agent at such time (which determination shall be conclusive absent manifest error). If the Overnight Bank Funding Rate determined as above would be less than zero, then such rate shall be deemed to be zero. The rate of interest charged shall be adjusted as of each Business Day based on changes in the Overnight Bank Funding Rate without notice to the Borrower.

Participant shall mean each Person who shall be granted the right by any Lender to participate in any of the Advances and who shall have entered into a participation agreement in form and substance satisfactory to such Lender.

Participation Advance shall have the meaning set forth in Section 2.13(d) hereof.

Participation Commitment shall mean the US-Canada Participation Commitment.

Payment in Full shall mean, (a) the termination of Lenders' obligations to make Advances hereunder, (b) payment in full in cash and performance of all outstanding and unpaid Obligations, other than (i) contingent indemnification obligations for which claims have not been asserted, (ii) Hedge Liabilities that have been novated or collateralized, and (iii) Cash Management Liabilities to the extent that the provider of such Cash Management Liabilities allows such Obligations to remain outstanding without being repaid or cash collateralized, other than Cash Management Liabilities outstanding in respect of purchase cards that have been cash collateralized in an amount equal to one hundred and five percent (105%) of such Cash Management Liabilities, and (c) expiration of all Letters of Credit, other than Letters of Credit that have been cash collateralized in an amount equal to one hundred and five percent (105%) of the Maximum Undrawn Amount of such Letters of Credit in accordance with the terms of this Agreement or that have otherwise been backstopped in a manner reasonably satisfactory to Issuer of such Letter of Credit.

Payment Office shall mean the US-Canada Payment Office.

PBGC shall mean the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA or any successor.

Pension Benefit Plan shall mean at any time any "employee pension benefit plan" as defined in Section 3(2) of ERISA (including a Multiple Employer Plan, but not a Multiemployer Plan) which is covered by Title IV of ERISA or is subject to the minimum funding standards under Sections 412, 430 or 436 of the Code and either (i) is maintained or to which contributions are required by Loan Party or any member of the Controlled Group or (ii) has at any time within the preceding five years been maintained or to which contributions have been required by a Loan Party or any entity which was at such time a member of the Controlled Group.

Permitted Assignee shall mean (a) Agent, any Lender or any of their direct or indirect Affiliates; (b) a federal or state chartered bank, a United States branch of a foreign bank, an insurance company, or any finance company generally engaged in the business of making commercial loans; (c) any fund that is administered or managed by Agent or any Lender, an Affiliate of Agent or any Lender or a related entity; and (d) any Person to whom Agent or any Lender assigns its rights and obligations under this Agreement as part of an assignment and transfer

32

of the Agent's or Lender's rights in and to a material portion of the Agent's or Lender's portfolio of asset-based credit facilities.

Permitted Discretion shall mean a determination made in good faith and in the exercise (from the perspective of a secured asset-based lender) of commercially reasonable business judgment.

Permitted Dispositions shall mean any of the following:

(A)     transactions involving the sale, transfer or other disposition of (i) inventory or intellectual property, or (ii) other assets of the Company, in each case in the Ordinary Course of Business;

(B)     any sale, transfer or lease of assets in the Ordinary Course of Business which are no longer necessary or required in the conduct of such Loan Party's or such Subsidiary's business, in an aggregate amount not to exceed $5,000,000 in any fiscal year; provided that the assets that are the subject of such disposition are not included in the US-Canada Formula Amount;

(C)     any sale, transfer or lease of assets in the Ordinary Course of Business which are replaced by substitute assets to the extent that the proceeds of any such disposition are used to acquire replacement assets which is subject to Agent's first priority security interest (unless otherwise provided in the Intercreditor Agreement);

(D)     Sale and Leaseback Transactions in existence on the Closing Date;

(E)     dispositions of customer accounts receivable in connection with Vendor Financing Program;

(F)     asset transfers (i) between Loan Parties and their Subsidiaries contemplated by Section 7.1(a)(v)   and (ii) in which an Excluded Subsidiary (other than the Insurance Subsidiary) is the transferor and a Loan Party or Foreign Excluded Subsidiary is the transferee;

(G)     dispositions constituting conversion of cash equivalents into other cash equivalents;

(H)     dispositions constituting casualty events;

(I)     grants of Permitted Encumbrances;

(J)     waivers of contract rights in the Ordinary Course of Business;

(K)     transfers of condemned property as a result of the exercise of "eminent domain" or other similar powers to the respective Governmental Authority or agency that has condemned the same (whether by deed in lieu of condemnation or otherwise), and transfers of property arising from foreclosure or similar action or that have been subject to a casualty to the respective insurer of such real property as part of an insurance settlement;

(L)     asset transfers between US-Canada Loan Parties;

33

(M)   the sale or discount, in each case without recourse, of past due accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof and not for financing purposes;

(N)   leases, subleases, licenses or sublicenses, in each case in the ordinary course of business and that do not materially interfere with the business of the Company and the Subsidiaries, taken as a whole; and

(O)   disposition of assets of Freedom in connection with the Freedom Winddown; provided, that any material assets of Freedom Designs, Inc. shall be distributed to another Loan Party in connection with such winddown and dissolution.

Permitted Encumbrances shall mean any of the following:

(A)   Liens in favor of Agent for the benefit of Agent and Lenders, including without limitation, Liens securing Hedge Liabilities and Cash Management Products and Services (including the JPM European Treasury Management Obligations);

(B)   Liens for taxes, assessments or other governmental charges (i) that are not delinquent, (ii) that are being Properly Contested, or (iii) for a tax claim for any pre-filing or straddle tax period, the nonpayment of which is permitted or required by the Bankruptcy Code;

(C)   deposits or pledges to secure obligations under worker's compensation, social security or similar laws, or under unemployment insurance;

(D)   deposits or pledges to secure bids, tenders, contracts (other than contracts for the payment of money), governmental contracts, leases, statutory obligations, surety, stay, customs and appeal bonds, performance bonds, bankers acceptance facilities and other obligations of like nature (including those to secure health, safety and environmental obligations) and obligations in respect of letters of credit, bank guarantees or similar instruments that have been posted to support the same, in each case incurred in the Ordinary Course of Business;

(E)   Liens arising by virtue of the rendition, entry or issuance against any Borrower or any Subsidiary, or any property of any Borrower or any Subsidiary, of any judgment, writ, order, or decree to the extent the rendition, entry, issuance or continued existence of such judgment, writ, order or decree (or any event or circumstance relating thereto) has not resulted in the occurrence of an Event of Default under Section 10.6 hereof;

(F)   carriers', repairmens', mechanics', workers', materialmen's or other like Liens arising in the Ordinary Course of Business with respect to obligations which are not due or which are being Properly Contested;

(G)   Liens placed upon fixed assets securing Indebtedness permitted under clause (C) of the definition of Permitted Indebtedness, provided that any such lien shall not encumber any property of any Loan Party other than the assets so acquired or leased;

(H)   easements, rights-of-way, restrictions, encroachments, protrusions, zoning restrictions, and other similar encumbrances and minor defects or irregularities in title and other

34

charges or encumbrances, in each case, which do not interfere in any material respect with the Ordinary Course of Business of Borrowers and their Subsidiaries, taken as a whole;

(I)  Liens disclosed on Schedule 1.2; provided that such Liens shall secure only those obligations which they secure on the Closing Date and shall not subsequently apply to any other property or assets of any Borrower other than the property and assets to which they apply as of the Closing Date;

(J)  Liens on (i) assets of Foreign Excluded Subsidiaries; and (ii) to the extent consented to by the US-Canada Required Lenders, Equity Interests owned by Loan Parties in first tier Foreign Excluded Subsidiaries, in either case securing Indebtedness of Foreign Excluded Subsidiaries permitted under clause (M) of the definition of Permitted Indebtedness;

(K)  Liens in favor of the Term Loan Agent pursuant to the Term Loan Documents; provided that such Liens are at all times subject to the ABL Intercreditor Agreement;

(L)  Liens in favor of the Term DIP Loan Agent pursuant to the Term DIP Loan Documents; provided that such Liens are at all times subject to the ABL Intercreditor Agreement;

(M)  Liens securing the Senior Secured Convertible Notes; provided that such Liens are at all times subject to the ABL Intercreditor Agreement;

(N)  Liens on goods the purchase price of which is financed by a documentary letter of credit issued for the account of the Company or any Subsidiary or Liens on bills of lading, drafts or other documents of title arising by operation of law or pursuant to the standard terms of agreements relating to letters of credit, bank guarantees and other similar instruments; provided that such Lien secures only the obligations of the Company or such Subsidiaries in respect of such letter of credit, bank guarantee or other similar instrument to the extent such obligations are permitted by Section 7.8;

(O)  rights of setoff, banker's lien, netting agreements and other Liens arising by operation of law or by of the terms of documents of banks or other financial institutions in relation to the maintenance of administration of deposit accounts, securities accounts or cash management arrangements or in connection with the issuance of letters of credit, bank guarantees or other similar instruments;

(P)  Liens arising from precautionary Uniform Commercial Code financing statements or any similar filings made in respect of operating leases or consignment or bailee arrangements entered into by the Company or any Subsidiary;

(Q)  Liens or right of set-off arising under the general banking conditions (algemene bankvoorwaarden) or any non-Dutch equivalent thereof;

(R)  leases, licenses, subleases or sublicenses granted to others (whether on an exclusive or non-exclusive basis) that are entered into in the ordinary course of business or that do not interfere in any material respect with the business of the Company and the Subsidiaries, taken as a whole;

(S)      Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(T)      Liens (A) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection and (B) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of setoff) and that are within the general parameters customary in the banking industry;

(U)      Liens (A) on cash advances or escrow deposits in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 7.4 to be applied against the purchase price for such Investment or otherwise in connection with any escrow arrangements with respect to any such Investment or any Disposition permitted under Section 7.1 (including any letter of intent or purchase agreement with respect to such Investment or Disposition) or (B) consisting of an agreement to dispose of any property in a Disposition permitted under Section 7.1 in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(V)      Liens on property and Equity Interests, in each case, of any Foreign Excluded Subsidiary, which Liens secure Indebtedness of such Foreign Excluded Subsidiary, in each case permitted under Section 7.8;

(W)      Liens granted by a non-Loan Party Subsidiary in favor of any Loan Party, Liens granted by non-Loan Party Subsidiary in favor of a non-Loan Party Subsidiary and Liens granted by a Loan Party in favor of any other Loan Party;

(X)      any interest or title (and all encumbrances and other matters affecting such interest or title) of a lessor, sublessor, licensor or sublicensor or secured by a lessor's sublessor's, licensor's or sublicensor's interest under leases (other than leases constituting Capital Lease Obligations), subleases, licenses, cross-licenses or sublicense entered into by the Company or any Subsidiary in the Ordinary Course of Business;

(Y)      Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale or purchase of goods by the Company or any Subsidiary in the Ordinary Course of Business;

(Z)      Liens deemed to exist in connection with Investments in repurchase agreements permitted under clause (E) of the definition of the term "Permitted Investments";

(AA)      Liens that are contractual rights of setoff (A) relating to the establishment of depository relations with banks not given in connection with the incurrence of Indebtedness, including liens or rights of set-off arising under the general terms and conditions of banks with whom any group member maintains a banking relationship in the ordinary course of business; including liens of group members under the German general terms and condition of banks and saving banks (*Allgemeine Geschäftsbedingungen der Banken und Sparkassen*) (B) relating to pooled deposit or sweep accounts to permit satisfaction of overdraft or similar obligations incurred in the Ordinary Course of Business of the Company and its Subsidiaries or (C) relating to purchase orders and other agreements entered into with customers of the Company or any Subsidiary in the Ordinary Course of Business;

(BB)    ground leases in respect of real property on which facilities owned or leased by the Company or any Subsidiary are located and, in respect of real property located in Germany, any landlord's lien (*Vermieter- oder Verpächterpfandrecht*);

(CC)    Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(DD)    any security or quasi-security granted under mandatory law (sections 22, 204 of the German Transformation Act (*Umwandlungsgesetz*)) in favor of creditors as a consequence of a merger or conversion permitted under this Agreement;

(EE)    receipt of progress payments and advances from customers in the Ordinary Course of Business to the extent the same creates a Lien on the related inventory and proceeds thereof;

(FF)    (i) Liens on Equity Interests of joint ventures securing capital contributions to, or obligations of, such Persons and (ii) customary rights of first refusal and tag, drag and similar rights in joint venture agreements;

(GG)    Liens on amounts under pension standard legislation of Canada or any province thereto applicable to any Foreign Pension Plan that relate to contributions withheld from pay but not yet due to be remitted; and

(HH)    Liens on cash and Permitted Investments arising in connection with the defeasance, discharge or redemption of Indebtedness for no longer than 60 days prior to such defeasance, discharge or redemption.

    Permitted Indebtedness shall mean:

(A)    Indebtedness under the Other Documents;

(B)    Existing Indebtedness as set forth on Schedule 7.8;

(C)    Indebtedness (x) existing on the Closing Date secured by Purchase Money Security Interests and Synthetic Lease Obligations and (y) secured by Purchase Money Security Interests, Synthetic Lease Obligations, which when added with all Capitalized Lease Obligations, does not exceed $2,500,000 in the aggregate;

(D)    Intercompany Indebtedness between or among the Company and its Subsidiaries and between or among the Subsidiaries in the Ordinary Course of Business and consistent with past practice, provided that such intercompany Indebtedness shall be unsecured; provided further, that the amount of intercompany Indebtedness extended by Loan Parties to non-Loan Party Subsidiaries after the Closing Date shall not exceed $5,000,000 in the aggregate at any time outstanding;

(E)    Any (a) Lender-Provided Interest Rate Hedge or Lender-Provided Foreign Currency Hedge, (b) other Interest Rate Hedge or Foreign Currency Hedge or (c) Indebtedness under any Cash Management Products and Services (including the JPM European Treasury

37

Management Obligations); provided, however, that Loan Parties and their Subsidiaries shall enter into a Lender-Provided Interest Rate Hedge or Lender-Provided Foreign Currency Hedge or another Interest Rate Hedge or Foreign Currency Hedge only for hedging (rather than speculative) purposes.

(F)     Indebtedness under the 2024 Convertible Notes and the 2026 Convertible Notes (in each case, including any guaranties thereof and subject to compliance with Section 7.19);

(G)     Indebtedness under performance, bid, surety, statutory or appeal bonds, bankers acceptance facilities and completion guarantees, leases, government or trade contracts and similar obligations provided by the Company or any Subsidiary or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto or with respect to workers' compensation claims or other bonds permitted hereunder, in each case in the Ordinary Course of Business;

(H)     Indebtedness constituting customary indemnification obligations under purchase agreements;

(I)     Performance guarantees by the Company or any Subsidiary with respect to the performance of any obligation of any other Subsidiary entered into in the Ordinary Course of Business consistent with past practice;

(J)     Indebtedness owed to third party financing companies in the form of limited recourse obligations that finance receivables of customers of Loan Parties and their Subsidiaries in the Ordinary Course of Business; provided such Indebtedness shall not exceed at any time outstanding the lesser of (i) 75% of the total owed by the customers of the Loan Parties or their Subsidiaries to such financing company and (ii) $10,000,000;

(K)     Other Indebtedness of Loan Parties, US Excluded Subsidiaries and Foreign Excluded Subsidiaries in an aggregate amount at any time outstanding not to exceed $10,000,000; provided that Indebtedness of Loan Parties under this clause (K) shall not exceed $2,500,000;

(L)     Cash Management Liabilities and other Indebtedness in respect of netting services, cash pooling, overdraft protections and similar arrangements and Indebtedness arising from the honoring of a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds, in each case in the Ordinary Course of Business;

(M)     Indebtedness owed to third party financing companies in the form of factoring of public and government receivables by Foreign Excluded Subsidiaries incorporated in Denmark, Sweden and/or Norway in the Ordinary Course of Business; provided that such Indebtedness shall not exceed at any time outstanding $9,000,000;

(N)     Indebtedness consisting of (A) the financing of insurance premiums or (B) take-or-pay obligations contained in supply arrangements, in each case in the Ordinary Course of Business;

38

(O)     Indebtedness consisting of obligations under deferred compensation or other similar arrangements incurred (A) in the Ordinary Course of Business to current or former directors, officers, employees, members of management, managers and consultants of the Company and/or any Subsidiary and (B) in connection with any Investment permitted hereunder;

(P)     Indebtedness consisting of unsecured promissory notes issued by the Company or any Subsidiary to current or former officers, managers, consultants, independent contractors, directors and employees or their respective estates, successors, spouses, former spouses, domestic partners, heirs, legatees or distributees to finance the purchase or redemption of Equity Interests of the Company permitted by Section 7.7;

(Q)     Indebtedness incurred pursuant to Section 8a of the German Old Age Employees Retirement Act (Altersteilzeitgesetz) or Section 7e of the Fourth Book of the German Social Security Code IV (Sozialgesetzbuch IV);

(R)     Guarantees by the Company and any Subsidiaries in respect of Indebtedness of the Company or any Subsidiary otherwise permitted hereunder; provided that such Guarantee is otherwise permitted by Section 7.4;

(S)     Indebtedness under the Term Loan Documents (subject to compliance with Section 7.19) in an aggregate principal amount not to exceed $[___];

(T)     Indebtedness under the Term DIP Loan Documents (subject to compliance with Section 7.19) in an aggregate principal amount not to exceed $70,000,000;

(U)     Indebtedness in respect of the Senior Secured Convertible Notes; provided that the aggregate principal amount of Indebtedness outstanding in reliance on this clause (U) shall not exceed $41,475,000;

(V)     the Company and any Subsidiary may advance, loan, invest or contribute the proceeds of the Indebtedness under the Term DIP Loan Documents directly and indirectly to or in any Subsidiary in connection with the Transactions; and

(W)     all premiums (if any), interest (including interest paid in kind and post-petition interest), accretion or amortization of original issue discount, fees, expenses, charges and additional or contingent interest on obligations described in clauses (A) through (U) above.

For all purposes hereof, the Indebtedness of the Company and the Subsidiaries shall exclude intercompany liabilities arising from their cash management, tax, and accounting operations and intercompany loans, advances or Indebtedness having a term not exceeding 364 days (inclusive of any rollover or extensions of terms) and made in the Ordinary Course of Business.

Permitted Investments shall mean investments in:

(A)     obligations issued or guaranteed by the (i) United States of America or any agency thereof, or (ii) any member nation of the European Union rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, having average

39

maturities of not more than 24 months from the date of acquisition thereof; provided that the full faith and credit of the United States or such member nation of the European Union is pledged in support thereof;

(B)      commercial paper and variable or fixed rate notes issued by an Approved Bank (or by the parent company thereof) or any variable or fixed rate note issued by, or guaranteed by, a corporation rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, in each case with average maturities of not more than 24 months from the date of acquisition thereof;

(C)      time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that has combined capital and surplus of at least (x) $250,000,000 in the case of U.S. banks and (y) $100,000,000 (or the Dollar Equivalent as of the date of determination) in the case of non-U.S. banks (any such bank meeting the requirements of clause (x) or (y) above being an "**Approved Bank**"), in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(D)      obligations issued or guaranteed by Canada or any agency thereof;

(E)      repurchase agreements entered into by any Person with an Approved Bank, a bank or trust company or recognized securities dealer, in each case, having capital and surplus in excess of (x) $250,000,000 in the case of U.S. banks and (y) $100,000,000 (or the Dollar Equivalent as of the date of determination) in the case of non-U.S. banks, in each case, for direct obligations issued by or fully guaranteed or insured by the government or any agency or instrumentality of (i) the United States or (ii) any member nation of the European Union rated A (or the equivalent thereof) or better by S&P and A2 (or the equivalent thereof) or better by Moody's, in which such Person shall have a perfected first priority security interest (subject to no other Liens) and having, on the date of purchase thereof, a fair market value of at least 100% of the amount of the repurchase obligations;

(F)      investments existing on the Closing Date under the 2026 Convertible Notes Hedge Transaction;

(F)      (G)      marketable short-term money market and similar highly liquid funds either (i) having assets in excess of (x) $250,000,000 in the case of U.S. banks or other U.S. financial institutions and (y) $100,000,000 (or the Dollar Equivalent as of the date of determination) in the case of non-U.S. banks or other non-U.S. financial institutions or (ii) having a rating of at least A-2 or P-2 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized rating service);

(G)      securities with average maturities of 24 months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, or by any political subdivision or taxing authority of any such state, commonwealth or territory or by a foreign government having an investment grade rating from either S&P or Moody's (or the equivalent thereof);

(H)      investments with average maturities of 12 months or less from the date of

40

acquisition in mutual funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's;

(I)     instruments equivalent to those referred to in clauses (A) through (I) above denominated in Euros or any other foreign currency comparable in credit quality and tenor to those referred to above and customarily used by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by any Subsidiary organized in such jurisdiction;

(J)     investments, classified in accordance with GAAP as current assets, in money market investment programs that are registered under the Investment Company Act of 1940 or that are administered by financial institutions having capital of at least $250,000,000, and, in either case, the portfolios of which are limited such that substantially all of such investments are of the character, quality and maturity described in clauses (A) through (J) of this definition;

(K)     with respect to any Foreign Subsidiary: (i) obligations of the national government of the country or jurisdiction in which such Foreign Subsidiary maintains its chief executive office and principal place of business; provided such country or jurisdiction is a member of the Organization for Economic Cooperation and Development, in each case maturing within one year after the date of investment therein, (ii) certificates of deposit of, bankers acceptances of, or time deposits with, any commercial bank which is organized and existing under the laws of the country in which such Foreign Subsidiary maintains its chief executive office and principal place of business; provided such country or jurisdiction is a member of the Organization for Economic Cooperation and Development, and whose short-term commercial paper rating from S&P is at least "A-2" or the equivalent thereof or from Moody's is at least "P- 2" or the equivalent thereof (any such bank being an "**Approved Foreign Bank**"), and in each case with maturities of not more than 24 months from the date of acquisition and (iii) the equivalent of demand deposit accounts which are maintained with an Approved Foreign Bank;

(L)     interest bearing instruments with a maximum maturity of 180 days in respect of which the obligor is a G8 government or other G8 governmental agency or a G8 financial institution with credit ratings from S&P of at least "A-2" or the equivalent thereof or from Moody's of at least "P-2" or the equivalent thereof;

(M)     investment funds investing at least 90% of their assets in securities of the types described in clauses (A) through (M) above;

(N)     investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the Ordinary Course of Business, and investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(P)     loans or advances to present or former officers, directors, managers, members of management, consultants, independent contractors and employees in the Ordinary Course of Business consistent with past practice, (i) for travel, entertainment, relocation and analogous ordinary business purposes and (ii) for purposes not described in the foregoing clauses (i); provided that at the time of incurrence thereof and after giving pro forma effect thereto, the

41

aggregate principal amount outstanding in reliance on this clause (ii) shall not exceed $1,000,000;

(O)   (Q)   investments listed on Schedule 7.4;

(P)   investments by the Company and its Subsidiaries in the Company and its Subsidiaries and investments by non-Loan Party Subsidiaries in Loan Parties, in each case in the Ordinary Course of Business and consistent with past practice; provided further, that the amount of investments by Loan Parties in non-Loan Party Subsidiaries made after the Closing Date (including in the form of intercompany Indebtedness (y) owed to one or more of the Loan Parties by a non-Loan Party Subsidiary and (z) owed to one or more non-Loan Party Subsidiaries by a Loan Party pursuant to clause [(D)] of the definition of Permitted Indebtedness) shall not exceed $5,000,000 in the aggregate at any time outstanding;

(Q)   Guaranties permitted by Section 7.3;

(R)   investments consisting of key man life insurance;

(S)   investments made under Cash Management Products and Services;

(T)   investments with respect to Indebtedness permitted under clause [(K)] of the definition of Permitted Indebtedness;

(U)   promissory notes and other non-cash consideration received in connection with Dispositions permitted by Section 7.1;

(V)   Investments in the ordinary course of business consisting of endorsements for collection or deposit and customary trade arrangements with customers consistent with past practices and advances of payroll payments to employees in the Ordinary Course of Business;

(W)   Investments consisting of Indebtedness, Liens, mergers, sales of assets and Dividends permitted (other than by reference to this subpart (Y)) under Sections 7.8, 7.2, 7.1, and 7.7, respectively;

(X)   contributions to a "rabbi" trust for the benefit of employees, directors, consultants, independent contractors or other service providers of the Company or any Subsidiary or other grantor trust subject to claims of creditors in the case of a bankruptcy of the Company;

(Y)   to the extent that they constitute Investments, purchases and acquisitions of inventory, supplies, materials or equipment or purchases, acquisitions, licenses or leases of other assets, Intellectual Property, or other rights, in each case in the Ordinary Course of Business;

(Z)   unfunded pension fund and other employee benefit plan obligations and liabilities to the extent that the same are permitted to remain unfunded under applicable law;

(AA)   the Company and any Subsidiary may advance, loan, invest or contribute the proceeds of the Indebtedness under the Term DIP Loan Documents directly and indirectly to or in any Subsidiary in connection with the Transactions;

42

(BB)   the acquisition of BAN Precision Manufacturing; and

(CC)   Dollars, Euros, Sterling, Australian Dollars, Canadian dollars and such other currencies held by it from time to time in the Ordinary Course of Business.

Person shall mean any individual, sole proprietorship, partnership, corporation, business trust, joint stock company, trust, unincorporated organization, association, limited liability company, limited liability partnership, institution, public benefit corporation, joint venture, entity or Governmental Body (whether federal, state, provincial, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof).

Petition Date shall have the meaning set forth in the recitals hereto.

Plan shall mean any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Benefit Plan and a Multiemployer Plan, as defined herein) maintained by any Borrower or any member of the Controlled Group or to which any Borrower or any member of the Controlled Group is required to contribute.

Pledge Agreement shall mean that certain Pledge Agreement executed by each of the US-Canada Loan Parties in favor of Agent dated as of the Closing Date and any other pledge agreements executed subsequent to the Closing Date by any other Person to secure the Obligations.

PNC shall have the meaning set forth in the preamble to this Agreement and shall extend to all of its successors and assigns.

Post-Petition Obligations shall mean all Obligations (including, without limitation the Letters of Credit) other than the Pre-Petition Obligations.

Post-Petition Secured Parties shall mean, collectively, the Agent, the Lenders, the Issuer and each Lender or Agent, or Affiliate thereof, that is counterparty to any Hedge Agreement or Cash Management Products and Services entered into after the Petition Date.

PPSA shall mean the Personal Property Security Act (Ontario), or any other applicable Canadian federal or provincial statute pertaining to the granting, perfecting, priority or ranking of security interests, liens or hypothecs on movable property, and any successor statutes, together with any regulations thereunder, in each case as in effect from time to time. References to sections of the PPSA shall be construed to also refer to any successor sections.

Pre-Petition Agent shall have the meaning set forth in the recitals hereto.

Pre-Petition Collateral shall mean all "Collateral" as defined in Pre-Petition Credit Agreement in existence as of the Petition Date.

Pre-Petition Credit Agreement shall have the meaning set forth in the recitals hereto.

Pre-Petition Lender shall have the meaning set forth in the recitals hereto.

Pre-Petition Obligations shall have the meaning set forth in Section 1.7(a).

Pre-Petition Other Documents shall mean the Pre-Petition Credit Agreement, the "Other Documents" as defined in the Pre-Petition Credit Agreement and each document, agreement and instrument (and all schedules and exhibits thereto) executed in connection therewith, in each case, as in effect immediately prior to the Petition Date.

"Pre-Petition Payment" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Indebtedness or trade payables or other pre-petition claims against any Debtor.

Pre-Petition Released Claim or Pre-Petition Released Claims shall have the meaning set forth in Section 1.8(a) hereof.

Pre-Petition Secured Parties shall mean, collectively, the Pre-Petition Agent, the Pre-Petition Lenders, PNC, as Issuer under the Pre-Petition Credit Agreement, and each Lender or Agent, or Affiliate thereof, counterparty to any Hedge Agreement or Cash Management Products and Services entered into prior to the Petition Date.

Priority Payables shall mean the full amount of the liabilities of any applicable Person which (i) have a trust imposed to provide for payment including any trust, Lien or claim in favour of any subcontractors, or a security interest, pledge, Lien, hypothec or charge, in each case ranking or capable of ranking senior to or pari passu with security interests, Liens, hypothecs or charges securing the Obligations on any Collateral, in each case under any federal, provincial, state, county, district, municipal, local or foreign Applicable Law, or (ii) have a right imposed to provide for payment secured by a Lien ranking or capable of ranking senior to or pari passu with the Obligations under local or national law, regulation or directive, including, but not limited to, claims for unremitted and/or accelerated rents, taxes, wages (including, without limitation, under the Bankruptcy and Insolvency Act (Canada)), withholding taxes, value added taxes and other amounts payable to an insolvency administrator, employee withholdings or deductions and vacation pay (including, without limitation, under the Bankruptcy and Insolvency Act (Canada)), severance and termination pay, workers' compensation obligations, government royalties or pension obligations in each case to the extent such trust, or security interest, Lien, hypothec or charge, ranking or capable of ranking senior or pari passu with security interests, Liens, hypothecs or charges securing Obligations on any Collateral has been or may be imposed, or (iii) rank or are capable of ranking in priority to the Liens granted to the Agent to secure the Obligations, by statute or otherwise.

Properly Contested shall mean, in the case of any Indebtedness, Lien or Taxes, as applicable, of any Person that are not paid as and when due or payable by reason of such Person's bona fide dispute concerning its liability to pay the same or concerning the amount thereof: (a) such Indebtedness, Lien or Taxes, as applicable, are being properly contested in good faith by appropriate proceedings promptly instituted and diligently conducted; (b) such Person has established appropriate reserves as shall be required in conformity with GAAP; (c) Agent has established reserves in respect of Priority Payables regarding the Canadian Loan Parties, as applicable; (d) the non-payment of such Indebtedness or Taxes will not have a Material Adverse Effect or will not result in the forfeiture of any assets of such Person; (e) no Lien is imposed upon any of such Person's assets with respect to such Indebtedness or taxes unless such Lien (i) does not attach to any Receivables or Inventory or Fixed Assets, (ii) is at all times junior and subordinate

44

in priority to the Liens in favor of Agent (except only with respect to property Taxes that have priority as a matter of applicable state law) and (iii) enforcement of such Lien is stayed during the period prior to the final resolution or disposition of such dispute; and (f) if such Indebtedness or Lien, as applicable, results from, or is determined by the entry, rendition or issuance against a Person or any of its assets of a judgment, writ, order or decree, enforcement of such judgment, writ, order or decree is stayed pending a timely appeal or other judicial review.

Protective Advances shall have the meaning set forth in Section 16.2(f) hereof.

Purchase Money Security Interest shall mean Liens upon tangible personal property securing loans to any Loan Party or Subsidiary of a Loan Party or deferred payments by such Loan Party or Subsidiary for the purchase of such tangible personal property.

Purchasing CLO shall have the meaning set forth in Section 16.3(d) hereof. Purchasing Lender shall have the meaning set forth in Section 16.3(c) hereof.

Qualified ECP Loan Party shall mean each Borrower or Guarantor that on the Eligibility Date is (a) a corporation, partnership, proprietorship, organization, trust, or other entity other than a "commodity pool" as defined in Section 1a(10) of the CEA and CFTC regulations thereunder that has total assets exceeding $10,000,000 or (b) an Eligible Contract Participant that can cause another person to qualify as an Eligible Contract Participant on the Eligibility Date under Section 1a(18)(A)(v)(II) of the CEA by entering into or otherwise providing a "letter of credit or keepwell, support, or other agreement" for purposes of Section 1a(18)(A)(v)(II) of the CEA.

Qualified Equity Interests shall mean Equity Interests other than Disqualified Equity Interests.

RCRA shall mean the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq., as same may be amended from time to time.

Real Property shall mean all of the now or hereafter owned and leased real property of any Borrower, including without limitation as identified on Schedule 4.4 hereto.

Receivables shall mean and include, as to each Loan Party, all of such Loan Party's accounts (as defined in Article 9 of the Uniform Commercial Code) and all of such Loan Party's contract rights, instruments (including those evidencing indebtedness owed to such Loan Party by its Affiliates), documents, chattel paper (including electronic chattel paper), general intangibles relating to accounts, contract rights, instruments, documents and chattel paper, and drafts and acceptances, credit card receivables and all other forms of obligations owing to such Loan Party arising out of or in connection with the sale or lease of Inventory or the rendition of services, all supporting obligations, guarantees and other security therefor, whether secured or unsecured, now existing or hereafter created, and whether or not specifically sold or assigned to Agent hereunder.

Reference Currency shall have the meaning specified in the definition of Equivalent Amount.

Register shall have the meaning set forth in Section 16.3(e) hereof.

45

Reimbursement Obligation shall have the meaning set forth in Section 2.13(b) hereof.

Release or Releases shall have the meaning set forth in Section 5.11(c) hereof.

Reorganization Plan means a plan or plans of reorganization in the Case.

Replacement Lender shall have the meaning set forth in Section 3.11 hereof.

Reportable Compliance Event shall mean that (1) any Covered Entity becomes a Sanctioned Person, or is charged by indictment, criminal complaint or similar charging instrument, arraigned, custodially detained, penalized or the subject of an assessment for a penalty or enters into a settlement with an Governmental Body in connection with any economic sanctions or other Anti-Terrorism Law or Anti-Corruption Law, or any predicate crime to any Anti-Terrorism Law or Anti-Corruption Law, or has knowledge of facts or circumstances to the effect that it is reasonably likely that any aspect of its operations represents a violation of any Anti-Terrorism Law or Anti-Corruption Law; (2) any Covered Entity engages in a transaction that has caused or may cause the Lenders or Agent to be in violation of any Anti-Terrorism Law, including a Covered Entity's use of any proceeds of the credit facility to fund any operations in, finance any investments or activities in, or, make any payments to, directly or indirectly, a Sanctioned Jurisdiction or Sanctioned Person; (3) any Collateral becomes Embargoed Property; or (4) any Covered Entity otherwise violates, or reasonably believes that it will violate, any of the representations in Section 5.37 or Section 5.38 or covenants and representations in Section 16.18.

Reportable ERISA Event shall mean a reportable event described in Section 4043(c) of ERISA or the regulations promulgated thereunder.

Required Lenders for Eligibility shall mean US-Canada Lenders (not including US-Canada Swing Loan Lender (in its capacity as such US-Canada Swing Loan Lender) or any Defaulting Lender) holding at least sixty-six and two-thirds percent (66 2/3%) of the US-Canada Advances and, if no US-Canada Advances are outstanding, shall mean US-Canada Lenders holding sixty-six and two thirds-percent (66 2/3%) of the US-Canada Revolving Commitment Percentages; provided, however, if there are fewer than three (3) US-Canada Lenders, Required Lenders for Eligibility shall mean all US-Canada Lenders (excluding any Defaulting Lender).

Resolution Authority shall mean an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

Restructuring Support Agreement shall mean that certain Restructuring Support Agreement, dated as of [__], 2023, by and among the Parties (as defined therein), as amended, modified or supplemented in accordance with Section 12 thereof.

Revolver Sublimit shall mean $14,025,000 plus the Revolver Sublimit Increase Amount (Professional Fees) minus Cash Management Liabilities outstanding in respect of purchase cards minus on and after the date that is fourteen (14) days following the Closing Date, the Maximum Undrawn Amount of the Existing Chase L/C.

Revolver Sublimit Increase Amount (Professional Fees) shall mean professional fees incurred by the Agent on or prior to the Petition Date and paid on the Closing Date (including,

without limitation, fees of Blank Rome LLP and B Riley Financial, Inc.).

Revolving Advances shall mean the US-Canada Revolving Advances other than Letters of Credit and the Swing Loans.

Revolving Commitment shall mean, as to any Lender, its US-Canada Revolving Commitment.

Revolving Commitment Amount shall mean, as to any Lender, such Lender's US-Canada Revolving Commitment Amount.

Revolving Commitment Percentage shall mean any Lender's US-Canada Revolving Commitment Percentage.

Revolving Credit Note shall mean, collectively, the US-Canada Revolving Credit Notes. Revolving Interest Rate shall mean the US-Canada Revolving Interest Rate.

Revolving Credit Priority Collateral shall have the meaning assigned to the term ["Revolving Credit Priority Collateral"] in the ABL Intercreditor Agreement.

Sale and Leaseback Transaction shall mean, with respect to the Company and its Subsidiaries, any arrangement, directly or indirectly, with any Person whereby the Company or such Subsidiary shall sell or transfer any property used in its business and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

Sanctioned Jurisdiction shall mean a country subject to a sanctions program maintained under any Anti-Terrorism Law.

Sanctioned Person shall mean (a) a Person that is the subject of sanctions administered by OFAC or the U.S. Department of State ("State"), including by virtue of being (i) named on OFAC's list of "Specially Designated Nationals and Blocked Persons"; (ii) organized under the laws of, ordinarily resident in, or physically located in a Sanctioned Jurisdiction; (iii) owned or controlled 50% or more in the aggregate, by one or more Persons that are the subject of sanctions administered by OFAC; (b) a Person that is the subject of sanctions maintained by the European Union ("E.U."), including by virtue of being named on the E.U.'s "Consolidated list of persons, groups and entities subject to E.U. financial sanctions" or other, similar lists; (c) a Person that is the subject of sanctions maintained by the United Kingdom ("U.K."), including by virtue of being named on the "Consolidated List Of Financial Sanctions Targets in the U.K." or other, similar lists; or (d) a Person that is the subject of sanctions imposed by any Governmental Body of a jurisdiction whose laws apply to this Agreement.

SEC shall mean the Securities and Exchange Commission and any other similar applicable authority or Governmental Body in any applicable jurisdiction or any successor thereto.

Secured Parties shall mean, collectively, the Agent, Issuer, Swing Loan Lender and Lenders, together with any Affiliates of the Agent or any Lender to whom any Hedge Liabilities or Cash Management Liabilities (including JPM European Treasury Management Obligations) are

47

owed and with each other holder of any of the Obligations, and the respective successors and assigns of each of them and Secured Party shall mean any of them.

Securities Act shall mean the Securities Act of 1933, or any similar applicable statute or Laws in any applicable jurisdiction, as amended.

Senior Secured Convertible Notes Agent shall mean GLAS Trust Corporation Limited, as collateral agent in respect of the Senior Secured Convertible Notes.

Senior Secured Convertible Notes shall mean the Company's 5.68% senior secured notes issued pursuant to the Senior Secured Convertible Notes Indenture.

Senior Secured Convertible Notes Documents shall mean the Senior Secured Convertible Notes Indenture and the other transaction documents referred to therein (including the related guarantee, the notes and notes purchase agreement).

Senior Secured Convertible Notes Indenture shall mean, collectively, the indentures, each dated as of July 26, 2022, among the Company, as issuer, the guarantors listed therein, the Senior Secured Convertible Notes Agent and the trustee referred to therein pursuant to which the Senior Secured Convertible Notes are issued, as such indentures may be amended or supplemented from time to time.

Settlement shall have the meaning set forth in Section 2.5(d) hereof.

Settlement Date shall have the meaning set forth in Section 2.5(d) hereof.

SOFR shall mean, for any day, a rate equal to the secured overnight financing rate as administered by the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

SOFR Determination Date shall have the meaning set forth in the definition of Daily Simple SOFR.

SOFR Adjustment shall mean ten basis points (0.10%).

SOFR Floor means a rate of interest per annum equal to zero basis points (0.00%).

SOFR Rate Day shall have the meaning set forth in the definition of Daily Simple SOFR.

SOFR Reserve Percentage shall mean, for any day, the maximum effective percentage in effect on such day, if any, as prescribed by the Board of Governors of the Federal Reserve System (or any successor) for determining the reserve requirements (including, without limitation, supplemental, marginal and emergency reserve requirements) with respect to SOFR funding.

Specified Canadian Pension Plan means any Canadian Pension Plan which contains a "defined benefit provision", as defined in subsection 147.1(1) of the Income Tax Act (Canada).

Statutory Fees shall have the meaning given to the term "Statutory Fees" in the Final Order, or, prior to the entry of the Final Order, the Interim Order.

Subsidiary shall mean of any Person a corporation or other entity of whose Equity Interests having ordinary voting power (other than Equity Interests having such power only by reason of the happening of a contingency) to elect a majority of the directors of such corporation, or other Persons performing similar functions for such entity, are owned, directly or indirectly, by such Person.

Subsidiary Stock shall mean with respect to the Equity Interests issued to a Borrower or Guarantor by any Subsidiary (other than a Foreign Excluded Subsidiary), 100% of such issued and outstanding Equity Interests.

Superpriority Claim means an allowed claim against any Debtor or any Debtor's estate in the Case which is an administrative expense claim having priority over (a) any and all allowed administrative expenses and (b) all unsecured claims now existing or hereafter arising, including any administrative expenses of the kind specified in the Bankruptcy Code, including without limitation Sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503, 506(c) (upon entry of the Final Order), 507, 546, 726, 1113 or 1114 of the Bankruptcy Code.

Swap shall mean any "swap" as defined in Section 1a(47) of the CEA and regulations thereunder, other than (a) a swap entered into, or subject to the rules of, a board of trade designated as a contract market under Section 5 of the CEA, or (b) a commodity option entered into pursuant to CFTC Regulation 32.3(a).

Swap Obligation shall mean any obligation to pay or perform under any agreement, contract or transaction that constitutes a Swap which is also a Lender-Provided Interest Rate Hedge, or a Lender-Provided Foreign Currency Hedge.

Swing Loan Lender shall mean the US-Canada Swing Loan Lender.

Swing Loan Notes shall mean the US-Canada Swing Loan Note.

Swing Loans shall mean the US-Canada Swing Loans.

Synthetic Lease Obligation shall mean the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property (including Sale and Leaseback Transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any insolvency proceeding to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

Taxes shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Body, including any interest, fines, additions to tax or penalties applicable thereto, and references to "Tax" shall be construed accordingly.

Term shall have the meaning set forth in Section 13.1 hereof.

Term DIP Loan shall mean the loan and Indebtedness evidenced by the Term DIP Loan Documents.

Term DIP Loan Agent shall mean together Cantor Fitzgerald Securities, as administrative agent for the lenders under the Term DIP Loan Documents and GLAS Trust Corporation Limited, as collateral agent.

Term DIP Loan Agreement shall mean the Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of February [__], 2023, in the original principal amount of $[70,000,000] among the Company, the lenders party thereto, Cantor Fitzgerald Securities, as administrative agent, and GLAS Trust Corporation Limited, as collateral agent, as may be amended, restated or otherwise modified from time to time.

Term DIP Loan Documents shall mean the Term DIP Loan Agreement and all other instruments, agreements and documents executed in connection therewith.

Term Loan shall mean the loan and Indebtedness evidenced by the Term Loan Documents.

Term Loan Agent shall mean together Cantor Fitzgerald Securities, as administrative agent for the lenders under the Term Loan Documents and GLAS Trust Corporation Limited, as collateral agent.

Term Loan Agreement shall mean the Credit Agreement, dated as of July 26, 2022 in the original principal amount of $104,500,000 among the Company, the lenders party thereto, Cantor Fitzgerald Securities, as administrative agent, and GLAS Trust Corporation Limited, as collateral agent, as may be amended, restated or otherwise modified from time to time.

Term Loan Documents shall mean the Term Loan Agreement and all other instruments, agreements and documents executed in connection therewith.

Term Loan Priority Collateral shall have the meaning assigned to the term "CF Debt Priority Collateral" in the ABL Intercreditor Agreement.

Termination Date shall have the meaning set forth in Section 13.1 hereof.

Termination Event shall mean: (a) a Reportable ERISA Event with respect to any Plan; (b) the withdrawal of any Borrower or any member of the Controlled Group from a Plan during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) the providing of notice of intent to terminate a Plan in a distress termination described in Section 4041(c) of ERISA; (d) the commencement of proceedings by the PBGC to terminate a Plan; (e) any event or condition (i) which might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan, or (ii) that may result in termination of a Multiemployer Plan pursuant to Section 4041A of ERISA; (f) the partial or complete withdrawal within the meaning of Section 4203 or 4205 of ERISA, of any Borrower or any member of the Controlled Group from a Multiemployer Plan; (g) notice that a Multiemployer Plan is subject to Section 4245 of ERISA; or (h) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not diligent, upon any Borrower or any member

50

of the Controlled Group.

Toxic Substance shall mean and include any material present on the Real Property (including the Leasehold Interests) which has been shown to have significant adverse effect on human health or which is subject to regulation under the Toxic Substances Control Act (TSCA), 15 U.S.C. §§ 2601 et seq., applicable state law, or any other applicable Federal or state laws now in force or hereafter enacted relating to toxic substances. "Toxic Substance" includes but is not limited to asbestos, polychlorinated biphenyls (PCBs) and lead-based paints.

Transaction Costs shall mean any fees, expenses and other transaction costs incurred or paid by the Company or any of its Subsidiaries in connection with the Transactions, this Agreement, the Term DIP Loan Documents, and the transactions contemplated hereby and thereby.

Transactions shall mean (a) the funding of the Term DIP Loans on each of the Closing Date and on the Final Funding Date (as defined in the Term DIP Loan Agreement) and the consummation of the other transactions contemplated by the Term DIP Loan Agreement, (b) the consummation on the Closing Date of the transactions contemplated by this Agreement, and (c) the payment of the fees and expenses incurred in connection with any of the foregoing (including the Transaction Costs).

Transferee shall have the meaning set forth in Section 16.3(d) hereof.

UK Financial Institutions means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

UK Resolution Authority means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

Uniform Commercial Code shall have the meaning set forth in Section 1.3 hereof.

US Borrowers shall mean the Persons from time to time listed on Annex A hereto, and shall include any Person who may hereafter join this Agreement as a US Borrower.

US Collateral shall mean and include all right, title and interest of each US Loan Party in all of the following property and assets of such US Loan Party, in each case whether now existing or hereafter arising or created and whether now owned or hereafter acquired and wherever located:

        (A)     all Receivables and all supporting obligations relating thereto;

        (B)     all equipment and fixtures;

        (C)     all general intangibles (including all payment intangibles and all software) and all supporting obligations related thereto;

51

(D)     all Inventory;

(E)     all Subsidiary Stock, securities, investment property, and financial assets;

(F)     all contract rights, rights of payment which have been earned under a contract rights, chattel paper (including electronic chattel paper and tangible chattel paper), commercial tort claims (whether now existing or hereafter arising and whether or not specifically identified); documents (including all warehouse receipts and bills of lading), deposit accounts, goods, instruments (including promissory notes), letters of credit (whether or not the respective letter of credit is evidenced by a writing) and letter-of-credit rights, cash, certificates of deposit, insurance proceeds (including hazard, flood and credit insurance), security agreements, eminent domain proceeds, condemnation proceeds, tort claim proceeds and all supporting obligations, including, without limitation, all liquidation and other proceeds, refunds and supporting obligations under any Hedge Liabilities;

(G)     upon (and subject to) entry of the Final Order, all Avoidance Actions;

(H)     all other property and assets of each Debtor described in the Final Order, or, prior to the entry of the Final Order, the Interim Order;

(I)     all ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computers, computer software (owned by any such Loan Party or in which it has an interest), computer programs, tapes, disks and documents, including all of such property relating to the property described in clauses (A) through (H) of this definition;

(J)     all proceeds and products of the property described in clauses (A) through (G) of this definition, in whatever form. It is the intention of the parties that if Agent shall fail to have a perfected Lien in any particular property or assets of any such Loan Party for any reason whatsoever, but the provisions of this Agreement and/or of the Other Documents, together with all financing statements and other public filings relating to Liens filed or recorded by Agent against the applicable US Loan Parties, would be sufficient to create a perfected Lien in any property or assets that such US Loan Party may receive upon the sale, lease, license, exchange, transfer or disposition of such particular property or assets, then all such "proceeds" of such particular property or assets shall be included in the US Collateral as original collateral that is the subject of a direct and original grant of a security interest as provided for herein and in the Other Documents (and not merely as proceeds (as defined in Article 9 of the Uniform Commercial Code) in which a security interest is created or arises solely pursuant to Section 9-315 of the Uniform Commercial Code); and

(K)     Without limitation of any of the foregoing, all of the Pre-Petition Collateral that is owned by a Debtor or in which a Debtor holds an interest;

Notwithstanding the forgoing, US Collateral shall not include any Excluded Property.

US Excluded Subsidiaries shall mean the Subsidiaries listed on Schedule 5.2(b) and which are organized under the laws of the United States of America, any State thereof or the District of Columbia.

US Guarantors shall mean the Persons from time to time listed on Annex B hereto, and any other Person who may hereafter guarantee payment or performance of the whole or any part of the Obligations.

US Loan Parties shall mean the US Borrowers and US Guarantors.

US Priority Collateral shall mean and include all right, title and interest of each US Loan Party in Revolving Priority Collateral (as defined in the ABL Intercreditor Agreement).

US Receivables Advance Rate shall have the meaning specified in the definition of US-Canada Formula Amount.

US Trustee shall have the meaning set forth in the Interim Order, or, after the entry of the Final Order, in the Final Order.

US-Canada Advances shall mean and include the US-Canada Revolving Advances, the US-Canada Letters of Credit and the US-Canada Swing Loans.

US-Canada Applicable Margin shall mean four and one quarter of one percent (4.25%) for Revolving Advances.

US-Canada Borrowers shall mean the US Borrowers.

US-Canada Borrowers' Account shall have the meaning set forth in Section 2.9 hereof.

US-Canada Borrowing Agent shall mean the Company.

US-Canada Borrowing Base Certificate shall mean a certificate in substantially the form of Exhibit 1.2(a) hereto duly executed by the Chief Executive Officer, Chief Financial Officer, Assistant Treasurer or Corporate Controller of the Borrowing Agent and delivered to Agent, appropriately completed, by which such officer shall certify to Agent the US-Canada Formula Amount and calculation thereof as of the date of such certificate.

US-Canada Collateral shall mean US Collateral and Canadian Collateral.

US-Canada Facility means, collectively, the US-Canada Revolving Commitment and the extensions of credit made thereunder.

US-Canada Formula Amount shall mean an amount equal to the sum of an amount equal to the sum of:

       (A)    up to 85% (the "**US Receivables Advance Rate**") of Eligible Domestic Receivables (subject to specific caps on terms ranging from 0 to 120 days as set forth in the definition of Eligible Receivables), *plus*

       (B)    up to 85% (the "**Canadian Receivables Advance Rate**") of the Dollar Equivalent amount of Eligible Canadian Receivables (subject to specific caps on terms ranging from 0 to 120 days as set forth in the definition of Eligible Receivables), *minus*

<div align="center">53</div>

(C)      the aggregate amount of any outstanding US-Canada Swing Loans, *minus*

(D)      the aggregate Maximum Undrawn Amount of all outstanding US-Canada Letters of Credit, *minus*

(E)      the Availability Block, *minus*

(F)      (i) reserves in respect of Priority Payables, established by Agent from time to time in its Permitted Discretion, *provided* that such reserves shall not be duplicative of any exclusionary criteria set forth in the definition of Eligible Receivables, and (ii) unless the JPM European Treasury Management Obligations are cash collateralized in an amount and manner reasonably satisfactory to JPMorgan, the JPM European Treasury Management Reserve.

US-Canada Guarantors shall mean the US Guarantors and the Canadian Loan Parties.

US-Canada Increasing Lender shall have the meaning as set forth in Section 2.23(a) hereof.

US-Canada Lender shall mean each Lender with an US-Canada Revolving Commitment.

US-Canada Letter of Credit Fees shall have the meaning set forth in Section 3.2 hereof.

[US-Canada Letter of Credit Sublimit shall mean $[__].]

US-Canada Letters of Credit shall have the meaning set forth in Section 2.10 hereof.

US-Canada Loan Parties shall mean collectively the US-Canada Borrowers and the US-Canada Guarantors.

US-Canada New Lender shall have the meaning set forth in Section 2.23(a) hereof.

US-Canada Obligations shall mean that portion of the Obligations arising from, related to or connected with the US-Canada Advances.

US-Canada Participation Commitment shall mean the obligation hereunder of each US-Canada Lender holding a US-Canada Revolving Commitment to buy a participation equal to its US-Canada Revolving Commitment Percentage (subject to any reallocation pursuant to Section 2.21(b)(iv) hereof) in the US-Canada Swing Loans made by US-Canada Swing Loan Lender hereunder as provided for in Section 2.3(c) hereof and in the US-Canada Letters of Credit issued hereunder as provided for in Section 2.13(a) hereof.

US-Canada Payment Office shall mean initially Two Tower Center Boulevard, East Brunswick, New Jersey 08816; thereafter, such other office of Agent, if any, which it may designate by notice to Borrowing Agent and to each Lender to be the Payment Office.

US-Canada Quarterly Average Undrawn Availability shall mean, for any fiscal quarter, the daily average of the aggregate amount of US-Canada Undrawn Availability for such fiscal quarter.

US-Canada Required Lenders shall mean, at any time, US-Canada Lenders (not including any US-Canada Swing Loan Lender (in its capacity as such US-Canada Swing Loan Lender) or

54

any Defaulting Lender) holding greater than fifty percent (50%) of either (a) the aggregate of the US-Canada Revolving Commitment Amounts of all US-Canada Lenders (excluding any Defaulting Lender), or (b) after the termination of all commitments of the US-Canada Lenders hereunder, the sum of (x) the outstanding US-Canada Revolving Advances and US-Canada Swing Loans, *plus* (y) (i) the aggregate of the Maximum Undrawn Amount of all outstanding US-Canada Letters of Credit multiplied by (ii) the US-Canada Revolving Commitment Percentage of all US-Canada Lenders as most recently in effect excluding any Defaulting Lender; provided, however, if there are fewer than three (3) US-Canada Lenders, US-Canada Required Lenders shall mean all US-Canada Lenders (excluding any Defaulting Lender).

US-Canada Revolving Advances shall mean the advances made under Section 2.1(a) by the US-Canada Lenders to the US-Canada Borrowers.

US-Canada Revolving Commitment shall mean, as to any US-Canada Lender, the obligation of such US-Canada Lender (if applicable), to make US-Canada Revolving Advances and participate in US-Canada Swing Loans and US-Canada Letters of Credit, in an aggregate principal and/or face amount not to exceed the US-Canada Revolving Commitment Amount (if any) of such Lender.

US-Canada Revolving Commitment Amount shall mean, (i) as to any US-Canada Lender other than a US-Canada New Lender, the US-Canada Revolving Commitment amount (if any) set forth below such Lender's name on the signature page hereto (or, in the case of any Lender that became party to this Agreement after the Closing Date pursuant to Section 16.3(c) or 16.3(d) hereof, the US-Canada Revolving Commitment amount (if any) of such Lender as set forth in the applicable Commitment Transfer Supplement), and (ii) as to any Lender that is a US-Canada New Lender, the US-Canada Revolving Commitment amount provided for in the joinder signed by such US-Canada New Lender under Section 2.23(a)(x), in each case as the same may be adjusted upon any increase by such Lender pursuant to Section 2.23 hereof, or any assignment by or to such Lender pursuant to Section 16.3(c) or 16.3(d) hereof.

US-Canada Revolving Commitment Percentage shall mean, (i) as to any Lender other than a US-Canada New Lender, the US-Canada Revolving Commitment Percentage (if any) set forth below such Lender's name on the signature page hereof (or, in the case of any Lender that became party to this Agreement after the Closing Date pursuant to Section 16.3(c) or 16.3(d) hereof, the US-Canada Revolving Commitment Percentage (if any) of such Lender as set forth in the applicable Commitment Transfer Supplement), and (ii) as to any Lender that is a US-Canada New Lender, the US-Canada Revolving Commitment Percentage provided for in the joinder signed by such US-Canada New Lender under Section 2.23(a)(x), in each case as the same may be adjusted upon any increase in the Maximum US-Canada Revolving Advance Amount pursuant to Section 2.23 hereof, or any assignment by or to such Lender pursuant to Section 16.3(c) or 16.3(d) hereof.

US-Canada Revolving Credit Notes shall have the meaning set forth in Section 2.1(a) hereof.

US-Canada Revolving Facility Usage shall mean at any time, the sum of (i) the outstanding US-Canada Revolving Advances (for purposes of this computation, US-Canada Swing Loans shall be deemed to be US-Canada Revolving Advances) *plus* (ii) the Maximum Undrawn Amount of all

55

outstanding US-Canada Letters of Credit.

US-Canada Revolving Interest Rate shall mean an interest rate per annum equal to the sum of the US-Canada Applicable Margin *plus* the Alternate Base Rate.

US-Canada Swing Loan Lender shall mean PNC Bank, National Association.

US-Canada Swing Loan Note shall have the meaning set forth in Section 2.3(a) hereof.

US-Canada Swing Loans shall have the meaning set forth in Section 2.3(a) hereof.

US-Canada Undrawn Availability at a particular date shall mean an amount equal to the lesser of (i) the US-Canada Formula Amount or (ii) the Maximum US-Canada Revolving Advance Amount *minus* the sum of (x) the Maximum Undrawn Amount of all outstanding US-Canada Letters of Credit, *plus* (y) the aggregate amount of any outstanding US-Canada Swing Loans, *plus* (z) reserves; and in the case of both (a)(i) and (a)(ii) *minus* (b) the sum of (i) the outstanding amount of US-Canada Advances (other than US-Canada Letters of Credit and US-Canada Swing Loans), *plus* (ii) fees and expenses that are accrued and unpaid under this Agreement and/or the Other Documents, *plus* (iii) all amounts due and owing to any Borrower's trade creditors which are outstanding sixty (60) days or more past their due date that are not otherwise on formal extended terms.

USA PATRIOT Act shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107 56, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

U.S. Government Securities Business Day means any day except for (a) a Saturday or Sunday or (b) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

Vendor Financing shall mean the sale in the Ordinary Course of Business by the Company or any of its Subsidiaries to De Lage Landen Financial Services, Inc. or any other Person that is not an Affiliate of the Company or any of its Subsidiaries of Customer Leases.

Vendor Financing Program shall mean the sale of customer accounts receivables in the Ordinary Course of Business by (i) the Company or any of its Subsidiaries to De Lage Landen Financial Services Inc. under the program in existence on January 15, 2021 and (ii) any Foreign Excluded Subsidiary to De Lage Landen Financial Services Inc. or any other Person that is not an Affiliate of the Company or any of its subsidiaries.

Voting Stock shall mean, with respect to any Person, such Person's Equity Interests having the right to vote for the election of directors of such Person under ordinary circumstances.

Write-Down and Conversion Powers means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect

56

to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

1.3     <u>Uniform Commercial Code Terms</u>.  All terms used herein and defined in the Uniform Commercial Code as adopted in the State of New York from time to time (which together with the PPSA shall be referred to herein as the "Uniform Commercial Code") shall have the meaning given therein unless otherwise defined herein. Without limiting the foregoing, the terms "accounts", "chattel paper" (and "electronic chattel paper" and "tangible chattel paper"), "commercial tort claims", "deposit accounts", "documents", "equipment", "financial asset", "fixtures", "general intangibles", "goods", "instruments", "inventory", "investment property", "letter-of-credit rights", "payment intangibles", "proceeds", "promissory note" "securities", "software" and "supporting obligations" as and when used in the description of Collateral shall have the meanings given to such terms in Articles 8 or 9 of the Uniform Commercial Code. In addition, without limiting the foregoing, the terms "accounts", "chattel paper", "goods", "instruments", "intangibles", "proceeds", "securities", "investment property", "document of title", "inventory" and "equipment", as and when used in the description of Collateral located in Canada shall have the meanings given to such terms in the PPSA. To the extent the definition of any category or type of collateral is expanded by any amendment, modification or revision to the Uniform Commercial Code, such expanded definition will apply automatically as of the date of such amendment, modification or revision.

1.4     <u>Certain Matters of Construction</u>.  The terms "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision. All references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement. Any pronoun used shall be deemed to cover all genders. Wherever appropriate in the context, terms used herein in the singular also include the plural and vice versa. All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations. Unless otherwise provided, all references to any instruments or agreements to which Agent is a party, including references to any of the Other Documents, shall include any and all modifications, supplements or amendments thereto, any and all restatements or replacements thereof and any and all extensions or renewals thereof. Unless otherwise provided, all financial calculations shall be performed with Inventory valued on a first- in, first-out basis. Whenever the words "including" or "include" shall be used, such words shall be understood to mean "including, without limitation" or "include, without limitation". A Default or an Event of Default shall be deemed to exist at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing pursuant to this Agreement or, in the case of a Default, is cured within any period of cure expressly provided for in this Agreement; and an Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing by the US-Canada Required Lenders. Any Lien referred to in this Agreement or any of the Other Documents as having been created in favor of Agent, any agreement entered

57

into by Agent pursuant to this Agreement or any of the Other Documents, any payment made by or to or funds received by Agent pursuant to or as contemplated by this Agreement or any of the Other Documents, or any act taken or omitted to be taken by Agent shall, unless otherwise expressly provided, be created, entered into, made or received, or taken or omitted, for the benefit or account of Agent and Lenders. Wherever the phrase "to the best of Borrowers' knowledge" or words of similar import relating to the knowledge or the awareness of any Borrower are used in this Agreement or Other Documents, such phrase shall mean and refer to (i) the actual knowledge of a senior officer of any Borrower or (ii) the knowledge that a senior officer would have obtained if he/she had engaged in a good faith and diligent performance of his/her duties, including the making of such reasonably specific inquiries as may be necessary of the employees or agents of such Borrower and a good faith attempt to ascertain the existence or accuracy of the matter to which such phrase relates. All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or otherwise within the limitations of, another covenant shall not avoid the occurrence of a default if such action is taken or condition exists. In addition, all representations and warranties hereunder shall be given independent effect so that if a particular representation or warranty proves to be incorrect or is breached, the fact that another representation or warranty concerning the same or similar subject matter is correct or is not breached will not affect the incorrectness of a breach of a representation or warranty hereunder. The inclusion of Permitted Encumbrances in this Agreement is not intended to subordinate and shall not subordinate any Lien created by any of the security contemplated by this Agreement and the Other Documents to any Permitted Encumbrances. All of the property and assets of each of the Canadian Loan Parties, including, without limitation, its Receivables, shall be valued in, and converted into, the Equivalent Amount in Dollars in accordance with the Agent's customary banking and conversion practices and procedures.

1.5    Acknowledgment.  Each Debtor ratifies and affirms the stipulations set forth in Paragraph G(iv), (x), (xi) and (xii) of the Interim Order and the Final Order.

1.6    Release.

(a)    Upon entry of the Final Order and the indefeasible payment in full of all Obligations owed to the Agent and the Lenders by the Debtor and termination of the rights and obligations arising under this Agreement, the Interim Order and the Other Documents (which payment and termination shall be on terms and conditions acceptable to the Agent), the Agent and the Lenders shall be automatically deemed absolutely and forever released and discharged from any and all obligations, liabilities, actions, duties, responsibilities, commitments, claims and causes of action arising or occurring in connection with or related to this Agreement, the Other Documents, the Interim Order or the Final Order (whether known or unknown, direct or indirect, matured or contingent, foreseen or unforeseen, due or not due, primary or secondary, liquidated or unliquidated).

(b)    Upon the entry of the Interim Order, each Loan Party, on behalf of itself, and successors and assigns, as applicable, and each Debtor's estate (collectively, "Releasors"), hereby, absolutely, unconditionally and irrevocably, covenants and agrees  to absolutely, unconditionally and irrevocably, covenant and agree, with each Pre-Petition Secured Party, and

58

each of their respective successors, participants, and assigns, as applicable, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, and other representatives (the Pre-Petition Agent, each Pre-Petition Lender, and all such other parties being hereinafter referred to collectively as "<u>Releasees</u>") that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any claims, demands, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages, and any and all other claims, counterclaims, cross claims, defenses, rights of set-off, demands, and liabilities whatsoever (individually, a "<u>Pre-Petition Released Claim</u>" and collectively, "<u>Pre-Petition Released Claims</u>") released, remised and discharged by each Releasor pursuant to this Section 1.6. If any Releasor violates the foregoing covenant, the Debtor agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

1.7    <u>Adoption and Ratification</u>. Each Loan Party hereby (a) ratifies, assumes, adopts and agrees to be bound by all of the Pre-Petition Other Documents to which it is a party and (b) agrees to pay all Pre-Petition Obligations in accordance with the terms of the Pre-Petition Other Documents and in accordance with the Interim Order and Final Order. Each Pre-Petition Other Document to which any Loan Party is a party is hereby incorporated herein by reference and hereby is and shall be deemed adopted and assumed in full by such Loan Party, and in respect of each Debtor, as a debtor and debtor-in-possession, and considered an agreement among the Loan Parties, on the one hand, and the applicable Secured Parties, on the other hand.

## 2.  ADVANCES, PAYMENTS.

2.1    <u>Revolving Advances</u>.

(a)    <u>Amount of US-Canada Revolving Advances</u>. Subject to the terms and conditions set forth in this Agreement specifically including Section 2.1(d) and Article 8, and in reliance upon the representations and warranties of the Debtor contained herein, each US-Canada Lender, severally and not jointly, will make US-Canada Revolving Advances to the US-Canada Borrowers in Dollars (<u>provided</u>, that after giving effect to such US-Canada Revolving Advances the US-Canada Revolving Facility Usage shall not exceed the lesser of the Maximum US- Canada Revolving Advance Amount and the US-Canada Formula Amount (without deduction of US-Canada Swing Loans and the Maximum Undrawn Amount of all outstanding US-Canada Letters of Credit)), from the Closing Date through the Termination Date, in aggregate amounts outstanding at any time equal to such Lender's US-Canada Revolving Commitment Percentage of the lesser of (x) the Maximum US-Canada Revolving Advance Amount, *less* the outstanding amount of US-Canada Swing Loans, *less* the aggregate Maximum Undrawn Amount of all issued and outstanding US-Canada Letters of Credit and (y) the US-Canada Formula Amount. The US- Canada Revolving Advances shall be evidenced by one or more secured promissory notes (collectively, the "**US-Canada Revolving Credit Note**") substantially in the form attached hereto as <u>Exhibit 2.1(a)</u>. Notwithstanding anything to the contrary contained in the foregoing or otherwise in this Agreement, (A) the outstanding aggregate principal amount of US-Canada Swing Loans and US-Canada Revolving Advances at any one time outstanding shall not exceed an amount equal to the least of (i) the Maximum US-Canada Revolving Advance Amount less the Maximum Undrawn Amount of all issued and outstanding US-Canada Letters of Credit, (ii) the US-Canada Formula

<div align="center">59</div>

Amount (without deduction of US-Canada Swing Loans) and (iii) the Revolver Sublimit.

        (b)     <u>Roll-Up</u>. On the Closing Date, subject to the conditions set forth in Article 8, Lenders shall make a US-Canada Revolving Advance for the benefit of the Debtors in an amount not less than $10,257,632, which amount shall be advanced to the Pre-Petition Agent and applied to repay the Pre-Petition Obligations in full.

        2.2     <u>Procedures for Requesting Revolving Advances; Procedures for Selection of Applicable Interest Rates for All Advances</u>.

        (a)     <u>Requests for Domestic Rate US-Canada Revolving Advances</u>. Borrowing Agent on behalf of any US-Canada Borrower may notify Agent prior to 1:00 p.m. on a Business Day of a US-Canada Borrower's request to incur, on that day, a US-Canada Revolving Advance hereunder.

        (b)     <u>Deemed Requests</u>. Should any amount required to be paid as interest hereunder, or as fees or other charges under this Agreement or any other agreement with the Agent or any Lenders, or with respect to any other Obligation under this Agreement, become due, same shall be deemed a request for a Revolving Advance maintained as a Domestic Rate Loan, in each case as of the date such payment is due, in the amount required to pay in full such interest, fee, charge or Obligation, and such request shall be irrevocable.

        2.3     <u>Swing Loans</u>.

        (a)     <u>US-Canada Swing Loans</u>. Subject to the terms and conditions set forth in this Agreement, and in order to minimize the transfer of funds between US-Canada Lenders and Agent for administrative convenience, Agent, US-Canada Lenders holding US-Canada Revolving Commitments and US-Canada Swing Loan Lender agree that in order to facilitate the administration of this Agreement, US-Canada Swing Loan Lender may, at its election and option made in its sole discretion cancelable at any time for any reason whatsoever, make swing loan advances in Dollars ("**US-Canada Swing Loans**") available to US-Canada Borrowers as provided for in this Section 2.3(a) at any time or from time to time after the date hereof to, but not including, the expiration of the Term, in an aggregate principal amount up to but not in excess of the Maximum US-Canada Swing Loan Advance Amount, <u>provided</u> that the outstanding aggregate principal amount of US-Canada Swing Loans and the US-Canada Revolving Advances at any one time outstanding shall not exceed an amount equal to the lesser of (i) the Maximum US-Canada Revolving Advance Amount <u>less</u> the Maximum Undrawn Amount of all outstanding US-Canada Letters of Credit or (ii) the US- Canada Formula Amount (without deduction of US-Canada Swing Loans). All US-Canada Swing Loans shall be Domestic Rate Loans only. US-Canada Borrowers may borrow (at the option and election of US-Canada Swing Loan Lender), repay and reborrow (at the option and election of US-Canada Swing Loan Lender) US-Canada Swing Loans and US-Canada Swing Loan Lender may make US-Canada Swing Loans as provided in this Section 2.3(a) during the period between Settlement Dates. All US-Canada Swing Loans shall be evidenced by a secured promissory note (the "**US-Canada Swing Loan Note**") substantially in the form attached hereto as <u>Exhibit 2.3(a)</u>. US-Canada Swing Loan Lender's agreement to make US-Canada Swing Loans under this Agreement is cancelable at any time for any reason whatsoever and the making of US-Canada Swing Loans by US-Canada Swing Loan Lender from time to time shall not create

<div align="center">60</div>

any duty or obligation, or establish any course of conduct, pursuant to which US-Canada Swing Loan Lender shall thereafter be obligated to make US-Canada Swing Loans in the future.

(b)     Election of US-Canada Swing Loan Lender.  Upon either (i) any request by Borrowing Agent for a US-Canada Revolving Advance made pursuant to Section 2.2(a) hereof or (ii) the occurrence of any deemed request by US-Canada Borrowers for a US-Canada Revolving Advance pursuant to the provisions of Section 2.2(b) hereof, US-Canada Swing Loan Lender may elect, in its sole discretion, to have such request or deemed request treated as a request for a US-Canada Swing Loan, and may advance same day funds to US-Canada Borrowers as a US-Canada Swing Loan; provided that notwithstanding anything to the contrary provided for herein, US-Canada Swing Loan Lender may not make US-Canada Swing Loans if US-Canada Swing Loan Lender has been notified by Agent or by US-Canada Required Lenders that one or more of the applicable conditions set forth in Section 8.3 of this Agreement have not been satisfied or the US-Canada Revolving Commitments have been terminated for any reason.

(c)     Participation by US-Canada Lenders in US-Canada Swing Loans.  Upon the making of a US-Canada Swing Loan (whether before or after the occurrence of a Default or Event of Default and regardless of whether a Settlement has been requested with respect to such US-Canada Swing Loan), each US-Canada Lender holding a US-Canada Revolving Commitment shall be deemed, without further action by any party hereto, to have unconditionally and irrevocably purchased from US-Canada Swing Loan Lender, without recourse or warranty, an undivided interest and participation in such US-Canada Swing Loan in proportion to its US-Canada Revolving Commitment Percentage. US-Canada Swing Loan Lender or Agent may, at any time, require US-Canada Lenders holding US-Canada Revolving Commitments to fund such participations by means of a Settlement as provided for in Section 2.5(d) below. From and after the date, if any, on which any US-Canada Lender holding a US-Canada Revolving Commitment is required to fund, and funds, its participation in any US- Canada Swing Loans purchased hereunder, Agent shall promptly distribute to such US-Canada Lender its US-Canada Revolving Commitment Percentage of all payments of principal and interest and all proceeds of US-Canada Collateral received by Agent in respect of such US- Canada Swing Loan; provided that no Lender holding a US-Canada Revolving Commitment shall be obligated in any event to make US-Canada Revolving Advances in an amount in excess of its US-Canada Revolving Commitment Amount minus its US-Canada Participation Commitment (taking into account any reallocations under Section 2.21) of the Maximum Undrawn Amount of all outstanding US-Canada Letters of Credit.

(d)     [Reserved].

2.4     Disbursement of Advance Proceeds.

(a)     US-Canada Advances. All US-Canada Advances shall be disbursed from whichever office or other place Agent may designate from time to time and, together with any and all other Obligations of US-Canada Borrowers to the Agent or US-Canada Lenders, shall be charged to US-Canada Borrowers' Account on Agent's books. The proceeds of each US-Canada Revolving Advance or US-Canada Swing Loan requested by US-Canada Borrowing Agent on behalf of any US-Canada Borrower or deemed to have been requested by any US-Canada Borrower under Sections 2.2(b), 2.5(b) or 2.13 hereof shall, (i) with respect to requested US-Canada Revolving Advances, to the extent US-Canada Lenders make such US-Canada Revolving

61

Advances in accordance with Sections 2.2(b), 2.5(b) or 2.13 hereof, and with respect to US-Canada Swing Loans made upon any request by US-Canada Borrowing Agent for a US- Canada Revolving Advance to the extent US-Canada Swing Loan Lender makes such US- Canada Swing Loan in accordance with Section 2.3(b) hereof, be made available to the applicable US-Canada Borrower on the day so requested by way of credit to such US-Canada Borrower's operating account at PNC, or such other bank as US-Canada Borrowing Agent may designate following notification to Agent, in immediately available federal funds or other immediately available funds or, (ii) with respect to US-Canada Revolving Advances deemed to have been requested by any US-Canada Borrower or US-Canada Swing Loans made upon any deemed request for a US-Canada Revolving Advance by any US-Canada Borrower, be disbursed to Agent to be applied to the outstanding US-Canada Obligations giving rise to such deemed request. During the Term, US-Canada Borrowers may use the US-Canada Revolving Advances and US-Canada Swing Loans by borrowing, prepaying and reborrowing, all in accordance with the terms and conditions hereof.

(b)     [Reserved].

2.5     <u>Making and Settlement of Advances</u>.

(a)     Each borrowing of Revolving Advances shall be advanced according to the Revolving Commitment Percentages of the Lenders holding the Revolving Commitments (subject to any contrary terms of Section 2.21). Each borrowing of Swing Loans shall be advanced by the Swing Loan Lender alone.

(b)     Promptly after receipt by Agent of a request or a deemed request for a Revolving Advance pursuant to Section 2.2(a) or 2.2(b) and, with respect to Revolving Advances, to the extent Agent elects not to provide a Swing Loan or the making of a Swing Loan would result in the aggregate amount of all outstanding Swing Loans exceeding the maximum amount permitted in Section 2.3, Agent shall notify the Lenders holding the Revolving Commitments of its receipt of such request specifying the information provided by the Borrowing Agent and the apportionment among such Lenders of the requested Revolving Advance as determined by Agent in accordance with the terms hereof. Each Lender shall remit the principal amount of each such Revolving Advance to the Agent such that the Agent is able to, and the Agent shall, to the extent the applicable Lenders have made funds available to it for such purpose and subject to Section 8.3, fund such Revolving Advance to the Borrowing Agent in immediately available funds at the applicable Payment Office prior to the close of business, on the applicable borrowing date; <u>provided</u> that if any applicable Lender fails to remit such funds to the Agent in a timely manner, the Agent may elect in its sole discretion to fund with its own funds the Revolving Advance of such Lender on such borrowing date, and such Lender shall be subject to the repayment obligation in Section 2.5(c) hereof.

(c)     Unless Agent shall have been notified by telephone, confirmed in writing, by any Lender holding a Revolving Commitment that such Lender will not make the amount which would constitute its Revolving Commitment Percentage of the requested Revolving Advance available to Agent, Agent may (but shall not be obligated to) assume that such Lender has made such amount available to Agent on such date in accordance with Section 2.5(b) and may, in reliance upon such assumption, make available to the Borrowing Agent a corresponding amount. Agent will promptly notify the Borrowing Agent of its receipt of any such notice from a Lender. In such

62

event, if a Lender has not in fact made its Revolving Commitment Percentage of the requested Revolving Advance available to Agent, then the applicable Lender and Borrowers severally agree to pay to Agent on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to Borrowers through but excluding the date of payment to Agent, at (i) the greater of (A) (x) the daily average Effective Federal Funds Rate (computed on the basis of a year of 360 days) during such period as quoted by Agent, times (y) such amount or (B) a rate determined by Agent in accordance with banking industry rules on interbank compensation and (ii) in the case of a payment to be made by the Borrowers, the Revolving Interest Rate for Revolving Advances that are Domestic Rate Loans. If such Lender pays its share of the Revolving Advance to Agent, then the amount so paid shall constitute such Lender's Revolving Advance. Any payment by any Borrower shall be without prejudice to any claim any Borrower may have against a Lender that shall have failed to make such payment to Agent.  A certificate of Agent submitted to any Lender or Borrowing Agent with respect to any amounts owing under this paragraph (c) shall be conclusive, in the absence of manifest error.

(d)     Agent, on behalf of the Swing Loan Lender, shall demand settlement (a "**Settlement**") of all or any Swing Loans with the Lenders holding the Revolving Commitments on at least a weekly basis, or on any more frequent date that Agent elects or that the Swing Loan Lender at its option exercisable for any reason whatsoever may request, by notifying the Lenders holding the Revolving Commitments of such requested Settlement by facsimile, telephonic or electronic transmission no later than 3:00 p.m., Eastern Standard Time, on the date of such requested Settlement (the "**Settlement Date**"). Subject to any contrary provisions of Section 2.21, each Lender holding a Revolving Commitment shall transfer the amount of such Lender's Revolving Commitment Percentage of the outstanding principal amount (*plus* interest accrued thereon to the extent requested by Agent) of the Swing Loan with respect to which Settlement is requested by the Agent, to such account of Agent as Agent may designate not later than 5:00 p.m., Eastern Standard Time, on such Settlement Date if requested by Agent by 3:00 p.m., Eastern Standard Time, otherwise not later than 5:00 p.m., Eastern Standard Time, on the next Business Day. Settlements may occur at any time notwithstanding that the conditions precedent to making Revolving Advances set forth in Section 8.3 have not been satisfied or the Revolving Commitments shall have otherwise been terminated at such time. All amounts so transferred to Agent shall be applied against the amount of outstanding Swing Loans and, when so applied, shall constitute Revolving Advances of such Lenders accruing interest as Domestic Rate Loans. If any such amount is not transferred to Agent by any Lender holding a Revolving Commitment on such Settlement Date, Agent shall be entitled to recover such amount on demand from such Lender together with interest thereon as specified in Section 2.5(c).

(e)     If any Lender or Participant (a "**Benefited Lender**") shall at any time receive any payment of all or part of its Advances, or interest thereon, or receive any Collateral in respect thereof (whether voluntarily or involuntarily or by set-off) in a greater proportion than any such payment to, and Collateral received by, any other Lender, if any, in respect of such other Lender's Advances, or interest thereon, and such greater proportionate payment or receipt of Collateral is not expressly permitted hereunder, such Benefited Lender shall purchase for cash from the other Lenders a participation in such portion of each such other Lender's Advances, or shall provide such other Lenders with the benefits of any such Collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such Collateral or proceeds ratably with each of such other Lenders; <u>provided</u>, <u>however</u>, that if all

63

or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest. Each Borrower consents to the foregoing and agrees, to the extent it may effectively do so under Applicable Law, that each Lender so purchasing a portion of another Lender's Advances may exercise all rights of payment (including rights of set-off) with respect to such portion as fully as if such Lender were the direct holder of such portion, and the obligations owing to each such purchasing Lender in respect of such participation and such purchased portion of any other Lender's Advances shall be part of the Obligations secured by the Collateral, and the obligations owing to each such purchasing Lender in respect of such participation and such purchased portion of any other Lender's Advances shall be part of the Obligations secured by the Collateral.

2.6    Maximum Advances. The aggregate principal amount of:

US-Canada Revolving Advances *plus* US-Canada Swing Loans outstanding at any time shall not exceed the least of (a) the Maximum US-Canada Revolving Advance Amount *less* the aggregate Maximum Undrawn Amount of all issued and outstanding US-Canada Letters of Credit, (b) the US-Canada Formula Amount (without deduction of US-Canada Swing Loans) and (c) the Revolver Sublimit;

2.7    Manner and Repayment of Advances.

(a)    The Revolving Advances and Swing Loans shall be due and payable in full on the last day of the Term subject to earlier prepayment as herein provided. Notwithstanding the foregoing, all Advances shall be subject to earlier repayment upon (x) acceleration upon the occurrence of an Event of Default under this Agreement or (y) termination of this Agreement. Each payment (including each prepayment) by any Borrower on account of the principal of and interest on the Advances shall be applied, first to the outstanding Swing Loans and next, pro rata according to the Revolving Commitment Percentages of the Lenders, to the outstanding Revolving Advances (subject to any contrary provisions of Section 2.21).

(b)    Each Borrower recognizes that the amounts evidenced by checks, notes, drafts or any other items of payment relating to and/or proceeds of Collateral may not be collectible by Agent on the date received by Agent. Agent shall conditionally credit the Borrowers' Account for each item of payment on the next Business Day after the Business Day on which such item of payment is received by Agent (and the Business Day on which each such item of payment is so credited shall be referred to, with respect to such item, as the "**Application Date**"). Agent is not, however, required to credit the Borrowers' Account for the amount of any item of payment which is unsatisfactory to Agent and Agent may charge the Borrowers' Account for the amount of any item of payment which is returned, for any reason whatsoever, to Agent unpaid. Subject to the foregoing, the Loan Parties agree that for purposes of computing the interest charges under this Agreement, each item of payment received by Agent shall be deemed applied by Agent on account of the Obligations on its respective Application Date. Borrowers further agree that there is a monthly float charge payable to Agent for Agent's sole benefit, in an amount equal to (y) the face amount of all items of payment received during the prior month (including items of payment received by Agent as a wire transfer or electronic depository check) multiplied by (z) the Revolving Interest Rate with respect to Domestic Rate Loans for one (1) Business Day. All

64

proceeds received by Agent shall be applied to the Obligations in accordance with Section 4.8(h).

(c)     All payments of principal, interest and other amounts payable hereunder, or under any of the Other Documents shall be made to Agent at the Payment Office not later than 1:00 P.M. Eastern Standard Time, on the due date therefor in immediately available to Agent. Agent shall have the right to effectuate payment of any and all Obligations due and owing hereunder by charging the Borrowers' Account or by making Advances as provided in Section 2.2 hereof (in the case of payment of costs and expenses pursuant to Section 16.9(b), subject to any review period set forth in the Interim Order or the Final Order).

(d)     Except as expressly provided herein, all payments (including prepayments) to be made by any Borrower on account of principal, interest, fees and other amounts payable hereunder shall be made without deduction, setoff or counterclaim and shall be made to Agent on behalf of the Lenders to the Payment Office, in each case on or prior to 1:00 P.M., Eastern Standard Time, in immediately available funds.

2.8     Repayment of Excess Advances. If at any time, including, without limitation on any Computation Date, the aggregate balance of outstanding Revolving Advances, US-Canada Swing Loans and/or US-Canada Advances taken as a whole, exceeds the maximum amount of such type of Advances and/or Advances individually or taken as a whole (as applicable) permitted hereunder, such excess Advances shall be immediately due and payable without the necessity of any demand, at the Payment Office, whether or not a Default or an Event of Default has occurred.

2.9     Statement of Account.

(a)     US-Canada Borrowers' Account. Agent shall maintain, in accordance with its customary procedures, a loan account ("**US-Canada Borrowers' Account**") in the name of the US-Canada Borrowers in which shall be recorded the date and amount of each US-Canada Advance made by Agent or US-Canada Lenders and the date and amount of each payment in respect thereof; provided, however, the failure by Agent to record the date and amount of any US-Canada Advance shall not adversely affect Agent or any US-Canada Lender. Each month, Agent shall send to Borrowing Agent a statement showing the accounting for the US-Canada Advances made, payments made or credited in respect thereof, and other transactions between Agent, US-Canada Lenders and US-Canada Borrowers during such month. The monthly statements shall be deemed correct and binding upon US-Canada Loan Parties in the absence of manifest error and shall constitute an account stated between US-Canada Lenders and US-Canada Borrowers unless Agent receives a written statement of US-Canada Borrowers' specific exceptions thereto within thirty (30) days after such statement is received by Borrowing Agent. The records of Agent with respect to US-Canada Borrowers' Account shall be conclusive evidence absent manifest error of the amounts of US-Canada Advances and other charges thereto and of payments applicable thereto.

(b)     [Reserved].

2.10     Letters of Credit.

(a)     Notwithstanding anything to the contrary herein, (i) the Existing Letters of Credit issued under (and as defined in) the Pre-Petition Credit Agreement shall be deemed to have

been issued under, and shall be deemed to be Letters of Credit under, this Agreement (the "**US-Canada Letters of Credit**") and (ii) Issuer shall not be under any obligation to issue any other Letter of Credit.

The Maximum Undrawn Amount of all outstanding US-Canada Letters of Credit shall not exceed in the aggregate at any time the US-Canada Letter of Credit Sublimit. All disbursements or payments related to Letters of Credit shall be deemed to be Domestic Rate Loans consisting of Revolving Advances and shall bear interest at the Revolving Interest Rate for Domestic Rate Loans. Letters of Credit that have not been drawn upon shall not bear interest (but fees shall accrue in respect of outstanding Letters of Credit as provided in Section 3.2 hereof). As of the Closing Date, those letters of credit set forth on Schedule 2.10 attached hereto and made a part hereof, which were issued pursuant to the Pre-Petition Credit Agreement and are outstanding on the Closing Date are hereby deemed to be US-Canada Letters of Credit issued and outstanding hereunder.

(b)     Notwithstanding any provision of this Agreement, no Issuer shall be under any obligation to issue any Letter of Credit if (i) any order, judgment or decree of any Governmental Body or arbitrator shall by its terms purport to enjoin or restrain such Issuer from issuing any Letter of Credit, or any Law applicable to such Issuer or any request or directive (whether or not having the force of law) from any Governmental Body with jurisdiction over such Issuer shall prohibit, or request that such Issuer refrain from, the issuance of letters of credit generally or the Letter of Credit in particular or shall impose upon such Issuer with respect to the Letter of Credit any restriction, reserve or capital requirement (for which such Issuer is not otherwise compensated hereunder) not in effect on the date of this Agreement, or shall impose upon such Issuer any unreimbursed loss, cost or expense which was not applicable on the date of this Agreement, and which such Issuer in good faith deems material to it, or (ii) the issuance of the Letter of Credit would violate one or more policies of such Issuer applicable to letters of credit generally.

2.11     Issuance of Letters of Credit.

(a)     [Reserved].

(b)     Each Letter of Credit shall, among other things, (i) provide for the payment of sight drafts, or other written demands for payment, or acceptances of usance drafts when presented for honor thereunder in accordance with the terms thereof and when accompanied by the documents described therein and (ii) have an expiry date not later than twelve (12) months after such Letter of Credit's date of issuance and in no event later than the last day of the Term. Each standby Letter of Credit shall be subject either to the Uniform Customs and Practice for Documentary Credits as most recently published by the International Chamber of Commerce at the time a Letter of Credit is issued (the "**UCP**") or the International Standby Practices (International Chamber of Commerce Publication Number 590) (the "**ISP98 Rules**"), or any subsequent revision thereof at the time a standby Letter of Credit is issued, as determined by the applicable Issuer and each trade Letter of Credit shall be subject to the UCP. In addition, no trade Letter of Credit may permit the presentation of an ocean bill of lading that includes a condition that the original bill of lading is not required to claim the goods shipped thereunder.

(c)    [Reserved].

2.12    <u>Requirements For Issuance of Letters of Credit</u>.

(a)    Borrowing Agent shall authorize and direct any Issuer to name the applicable Borrower as the "Applicant" or "Account Party" of each Letter of Credit. If Agent is not the Issuer of any Letter of Credit, Borrowing Agent shall authorize and direct the applicable Issuer to deliver to Agent all instruments, documents, and other writings and property received by Issuer pursuant to the Letter of Credit and to accept and rely upon Agent's instructions and agreements with respect to all matters arising in connection with the Letter of Credit and the application therefor.

(b)    In connection with all trade Letters of Credit issued or caused to be issued by any Issuer under this Agreement, each Borrower hereby appoints such Issuer, or its designee, as its attorney, with full power and authority if an Event of Default shall have occurred: (i) to sign and/or endorse any such Borrower's name upon any warehouse or other receipts, and acceptances; (ii) to sign any such Borrower's name on bills of lading; (iii) to clear Inventory through the United States of America Customs Department or Canada Border Services Agency or any equivalent agency in any relevant jurisdiction (collectively, "**Customs**") in the name of such Borrower or such Issuer or such Issuer's designee, and to sign and deliver to Customs officials powers of attorney in the name of such Borrower for such purpose; and (iv) to complete in any such Borrower's name or such Issuer's, or in the name of such Issuer's designee, any order, sale or transaction, obtain the necessary documents in connection therewith, and collect the proceeds thereof.  None of Agent, Issuer or any of their attorneys will be liable for any acts or omissions nor for any error of judgment or mistakes of fact or law, except for the Agent's, any Issuer's or their respective attorney's willful misconduct. This power, being coupled with an interest, is irrevocable as long as any Letters of Credit remain outstanding.

2.13    <u>Disbursements, Reimbursement</u>.

(a)    Each Lender holding a Revolving Commitment shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the applicable Issuer a participation in such Letter of Credit and each drawing thereunder in an amount equal to such Lender's Revolving Commitment Percentage of the Maximum Undrawn Amount of such Letter of Credit (as in effect from time to time) and the amount of such drawing, respectively.

(b)    In the event of any request for a drawing under a Letter of Credit by the beneficiary or transferee thereof, the applicable Issuer will promptly notify Agent and Borrowing Agent. Regardless of whether Borrowing Agent shall have received such notice, the Borrowers shall reimburse (such obligation to reimburse such Issuer shall sometimes be referred to as a "**Reimbursement Obligation**") such Issuer prior to 1:00 p.m. Eastern Standard Time, on each date that an amount is paid by any Issuer under any Letter of Credit (each such date, a "**Drawing Date**") in an amount equal to the amount so paid by such Issuer. In the event the Borrowers fail to reimburse any Issuer for the full amount of any drawing under any Letter of Credit by 12:00 Noon Eastern Standard Time, on the Drawing Date, such Issuer will promptly notify Agent and each Lender holding a Revolving Commitment thereof, and the Borrowers shall be automatically deemed to have requested that a Revolving Advance maintained as a Domestic Rate Loan, to be

67

disbursed on the Drawing Date under such Letter of Credit, and the Lenders holding the Revolving Commitments shall be unconditionally obligated to fund such Revolving Advance (all whether or not the conditions specified in Section 8.3 are then satisfied or the commitments of Lenders to make Revolving Advances hereunder have been terminated for any reason) as provided for in Section 2.13(c) immediately below. Any notice given by any Issuer pursuant to this Section 2.13(b) may be oral if promptly confirmed in writing; provided that the lack of such a confirmation shall not affect the conclusiveness or binding effect of such notice.

(c)     Each Lender holding a Revolving Commitment shall upon any notice pursuant to Section 2.13(b) make available to the applicable Issuer through Agent at the Payment Office an amount in immediately available funds equal to its Revolving Commitment Percentage (subject to any contrary provisions of Section 2.21) of the amount of the drawing, whereupon the participating Lenders shall (subject to Section 2.13(d)) each be deemed to have made a Revolving Advance maintained as a Domestic Rate Loan to the Borrowers in that amount. If any Lender holding a Revolving Commitment so notified fails to make available to Agent, for the benefit of the applicable Issuer, the amount of such Lender's Revolving Commitment Percentage of such amount by 2:00 p.m. Local time, on the Drawing Date, then interest shall accrue on such Lender's obligation to make such payment, from the Drawing Date to the date on which such Lender makes such payment (i) at a rate per annum equal to the Effective Federal Funds Rate during the first three (3) days following the Drawing Date and (ii) at a rate per annum equal to the rate applicable to Revolving Advances maintained as a Domestic Rate Loan on and after the fourth day following the Drawing Date. Agent and the applicable Issuer will promptly give notice to the Lenders of the occurrence of the Drawing Date, but failure of the Agent or any Issuer to give any such notice on the Drawing Date or in sufficient time to enable any Lender holding a Revolving Commitment to effect such payment on such date shall not relieve such Lender from its obligations under this Section 2.13(c), provided that such Lender shall not be obligated to pay interest as provided in Section 2.13(c)(i) and Section 2.13(c)(ii) until and commencing from the date of receipt of notice from Agent or the applicable Issuer of a drawing.

(d)     With respect to any unreimbursed drawing that is not converted into a Revolving Advance maintained as a Domestic Rate Loan, to the Borrowers in whole or in part as contemplated by Section 2.13(b), because of the Loan Parties' failure to satisfy the conditions set forth in Section 8.3 hereof (other than any notice requirements) or for any other reason, such Borrowers shall be deemed to have incurred from Agent a borrowing (each a "**Letter of Credit Borrowing**") in the amount of such drawing. Such Letter of Credit Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the rate per annum applicable to a Revolving Advance maintained as a Domestic Rate Loan. Each applicable Lender's payment to Agent pursuant to Section 2.13(c) shall be deemed to be a payment in respect of its participation in such Letter of Credit Borrowing and shall constitute a "**Participation Advance**" from such Lender in satisfaction of its Participation Commitment in respect of the applicable Letter of Credit under this Section 2.13.

(e)     Each applicable Lender's Participation Commitment in respect of the Letters of Credit shall continue until the last to occur of any of the following events: (x) the applicable Issuer ceases to be obligated to issue or cause to be issued Letters of Credit hereunder; (y) no Letter of Credit issued or created hereunder remains outstanding and uncancelled; and (z) all Persons (other than Borrowers) have been fully reimbursed for all payments made under or

68

relating to Letters of Credit.

2.14    Repayment of Participation Advances.

(a)    Upon (and only upon) receipt by Agent for the account of the applicable Issuer of immediately available funds from the Borrowers (i) in reimbursement of any payment made by such Issuer or the Agent under any Letter of Credit with respect to which any Lender has made a Participation Advance to the Agent, or (ii) in payment of interest on such a payment made by such Issuer or the Agent under such a Letter of Credit, Agent will pay to each Lender holding a Revolving Commitment, in the same funds as those received by Agent, the amount of such Lender's Revolving Commitment Percentage of such funds, except Agent shall retain the amount of the Revolving Commitment Percentage of such funds of any Lender holding a Revolving Commitment that did not make a Participation Advance in respect of such payment by Agent (and, to the extent that any of the other Lender(s) holding a Revolving Commitment have funded any portion of any Defaulting Lender's Participation Advance in accordance with the provisions of Section 2.21, Agent will pay over to such Non-Defaulting Lenders a pro rata portion of the funds so withheld from such Defaulting Lender).

(b)    If any Issuer or the Agent is required at any time to return to any Borrower, or to a trustee, receiver, liquidator, custodian, or any official in any insolvency proceeding, any portion of the payments made by any Borrower to such Issuer or the Agent pursuant to Section 2.14(a) in reimbursement of a payment made under any Letter of Credit or interest or fee thereon, each applicable Lender shall, on demand of Agent, forthwith return to such Issuer or the Agent the amount of its Revolving Commitment Percentage of any amounts so returned by such Issuer or the Agent *plus* interest at the Effective Federal Funds Rate.

2.15    Documentation.  Each Borrower agrees to be bound by the terms of any applicable Issuer's form of letter of credit application (the "Letter of Credit Application") and by the applicable Issuer's interpretations of any Letter of Credit issued on behalf of such Borrower and by such Issuer's written regulations and customary practices relating to letters of credit, though such Issuer's interpretations may be different from such Borrower's own. In the event of a conflict between any Letter of Credit Application and this Agreement, this Agreement shall govern. It is understood and agreed that, except in the case of gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment), no Issuer shall be liable for any error, negligence and/or mistakes, whether of omission or commission, in following Borrowing Agent's or any Borrower's instructions or those contained in any Letters of Credit or any modifications, amendments or supplements thereto.

2.16    Determination to Honor Drawing Request. In determining whether to honor any request for drawing under any Letter of Credit by the beneficiary thereof, the applicable Issuer shall be responsible only to determine that the documents and certificates required to be delivered under such Letter of Credit have been delivered and that they comply on their face with the requirements of such Letter of Credit and that any other drawing condition appearing on the face of such Letter of Credit has been satisfied in the manner so set forth.

2.17    Nature of Participation and Reimbursement Obligations. The obligation of each Lender holding a Revolving Commitment in accordance with this Agreement to make the

69

Revolving Advances or Participation Advances as a result of a drawing under a Letter of Credit, and the obligations of the Borrowers to reimburse any Issuer upon a draw under a Letter of Credit, shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Section 2.17 under all circumstances, including the following circumstances:

(i) any set-off, counterclaim, recoupment, defense or other right which such Lender or any Borrower, as the case may be, may have against any Issuer, the Agent, any Borrower or Lender, as the case may be, or any other Person for any reason whatsoever;

(ii) the failure of any Borrower or any other Person to comply, in connection with a Letter of Credit Borrowing, with the conditions set forth in this Agreement for the making of a Revolving Advance, it being acknowledged that such conditions are not required for the making of a Letter of Credit Borrowing and the obligation of the Lenders to make Participation Advances under Section 2.13;

(iii) any lack of validity or enforceability of any Letter of Credit;

(iv) any claim of breach of warranty that might be made by any Borrower, the Agent, any Issuer or any Lender against the beneficiary of a Letter of Credit, or the existence of any claim, set-off, recoupment, counterclaim, cross-claim, defense or other right which any Borrower, the Agent, any Issuer or any Lender may have at any time against a beneficiary, any successor beneficiary or any transferee of any Letter of Credit or assignee of the proceeds thereof (or any Persons for whom any such transferee or assignee may be acting), any Issuer, the Agent or any Lender or any other Person, whether in connection with this Agreement, the transactions contemplated herein or any unrelated transaction (including any underlying transaction between any Borrower or any Subsidiaries of such Borrower and the beneficiary for which any Letter of Credit was procured);

(v) the lack of power or authority of any signer of (or any defect in or forgery of any signature or endorsement on) or the form of or lack of validity, sufficiency, accuracy, enforceability or genuineness of any draft, demand, instrument, certificate or other document presented under or in connection with any Letter of Credit, or any fraud or alleged fraud in connection with any Letter of Credit, or the transport of any property or provision of services relating to a Letter of Credit, in each case even if any Issuer or any of such Issuer's Affiliates has been notified thereof;

(vi) payment by any Issuer under any Letter of Credit against presentation of a demand, draft or certificate or other document which is forged or does not fully comply with the terms of such Letter of Credit (provided that the foregoing shall not excuse such Issuer from any obligation under the terms of any applicable Letter of Credit to require the presentation of documents that on their face appear to satisfy any applicable requirements for drawing under such Letter of Credit prior to honoring or paying any such draw);

(vii) the solvency of, or any acts or omissions by, any beneficiary of any Letter of Credit, or any other Person having a role in any transaction or obligation relating to a Letter of Credit, or the existence, nature, quality, quantity, condition, value or other characteristic of any property or services relating to a Letter of Credit;

(viii) any failure by any Issuer or any of such Issuer's Affiliates to issue any Letter of Credit in the form requested by Borrowing Agent, unless the Agent and such Issuer have each received written notice from Borrowing Agent of such failure within three (3) Business Days after such

70

Issuer shall have furnished Agent and Borrowing Agent a copy of such Letter of Credit and such error is material and no drawing has been made thereon prior to receipt of such notice;

(ix) the occurrence of any Material Adverse Effect;

(x) any breach of this Agreement or any Other Document by any party thereto;

(xi) the occurrence or continuance of an insolvency proceeding or Insolvency Event with respect to any Loan Party;

(xii)    the fact that a Default or an Event of Default shall have occurred and be continuing;

(xiii)    the fact that the Term shall have expired or this Agreement or the obligations of the Lenders to make Advances have been terminated; and

(xiv)    any other circumstance or happening whatsoever, whether or not similar to any of the foregoing.

2.18    Liability for Acts and Omissions.

(a)    As between Borrowers and Issuer, Swing Loan Lender, Agent and Lenders, each Borrower assumes all risks of the acts and omissions of, or misuse of the Letters of Credit by, the respective beneficiaries of such Letters of Credit. In furtherance and not in limitation of the foregoing, no Issuer shall be responsible for: (i) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any party in connection with the application for an issuance of any such Letter of Credit, even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged (even if such Issuer or any of its Affiliates shall have been notified thereof); (ii) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any such Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (iii) the failure of the beneficiary of any such Letter of Credit, or any other party to which such Letter of Credit may be transferred, to comply fully with any conditions required in order to draw upon such Letter of Credit or any other claim of any Borrower against any beneficiary of such Letter of Credit, or any such transferee, or any dispute between or among any Borrower and any beneficiary of any Letter of Credit or any such transferee; (iv) errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, facsimile, telex or otherwise, whether or not they be in cipher; (v) errors in interpretation of technical terms; (vi) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any such Letter of Credit or of the proceeds thereof; (vii) the misapplication by the beneficiary of any such Letter of Credit of the proceeds of any drawing under such Letter of Credit; or (viii) any consequences arising from causes beyond the control of such Issuer, including any Governmental Acts, and none of the above shall affect or impair, or prevent the vesting of, any of such Issuer's rights or powers hereunder. Nothing in the preceding sentence shall relieve any Issuer from liability for such Issuer's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment) in connection with actions or omissions described in such clauses (i) through (viii) of such sentence. In no event shall any Issuer or any Issuer's Affiliates be liable to any Borrower for any indirect, consequential, incidental, punitive, exemplary or special damages or expenses (including without limitation

71

attorneys' fees), or for any damages resulting from any change in the value of any property relating to a Letter of Credit.

(b)      Without limiting the generality of the foregoing, each Issuer and each of its Affiliates: (i) may rely on any oral or other communication believed in good faith by such Issuer or such Affiliate to have been authorized or given by or on behalf of the applicant for a Letter of Credit; (ii) may honor any presentation if the documents presented appear on their face substantially to comply with the terms and conditions of the relevant Letter of Credit; (iii) may honor a previously dishonored presentation under a Letter of Credit, whether such dishonor was pursuant to a court order, to settle or compromise any claim of wrongful dishonor, or otherwise, and shall be entitled to reimbursement to the same extent as if such presentation had initially been honored, together with any interest paid by such Issuer or its Affiliates; (iv) may honor any drawing that is payable upon presentation of a statement advising negotiation or payment, upon receipt of such statement (even if such statement indicates that a draft or other document is being delivered separately), and shall not be liable for any failure of any such draft or other document to arrive, or to conform in any way with the relevant Letter of Credit; (v) may pay any paying or negotiating bank claiming that it rightfully honored under the laws or practices of the place where such bank is located; and (vi) may settle or adjust any claim or demand made on such Issuer or its Affiliate in any way related to any order issued at the applicant's request to an air carrier, a letter of guarantee or of indemnity issued to a steamship agent or carrier or any document or instrument of like import (each an "**Order**") and honor any drawing in connection with any Letter of Credit that is the subject of such Order, notwithstanding that any drafts or other documents presented in connection with such Letter of Credit fail to conform in any way with such Letter of Credit.

(c)      In furtherance and extension and not in limitation of the specific provisions set forth above, any action taken or omitted by any Issuer under or in connection with the Letters of Credit issued by it or any documents and certificates delivered thereunder, if taken or omitted in good faith and without gross negligence (as determined by a court of competent jurisdiction in a final non-appealable judgment), shall not put such Issuer under any resulting liability to any Borrower, the Agent or any Lender.

2.19     <u>Mandatory Prepayments</u>.

(a)      Subject to the last sentence of this Section 2.19(a) and subject to the terms of the ABL Intercreditor Agreement, when any Loan Party receives any net cash proceeds from a sale or other disposition of any Collateral (other than dispositions of Inventory in the Ordinary Course of Business) or any other assets or property (i.e., gross cash proceeds less the reasonable direct costs of such sales or other dispositions approved by Agent, hereinafter, "<u>Net Sales Proceeds</u>"), the Loan Parties shall promptly repay the Obligations in an amount equal to the Net Sale Proceeds by directing payment of the Net Sale Proceeds of such Collateral or other assets or property no later than one (1) Business Day after receipt of such Net Sale Proceeds by such Loan Party in accordance with Section 2.7(c), and until the date of payment, such Net Sales Proceeds shall be held in trust for the Agent; <u>provided</u>, <u>that</u>, the foregoing payment shall not be required if the Loan Parties are in compliance with Section 2.1(a)(A) both before and after giving effect to such sale or other disposition. The foregoing shall not be deemed to be implied consent to any such sale otherwise prohibited by the terms and conditions hereof. Such repayments shall be applied to the Obligations in accordance with the Interim Order and the Final Order, subject to the Borrowers'

ability to reborrow Revolving Advances in accordance with the terms hereof.

(b)    Subject to the terms of the ABL Intercreditor Agreement, in the event of the issuance of any Equity Interests by or capital contributions to any Loan Party, such Loan Party shall, no later than ten (10) Business Days after the receipt by such Loan Party of the net cash proceeds of any issuance of Equity Interests, repay the Obligations in an amount equal to one hundred percent (100%) of such net cash proceeds in the case of an issuance of Equity Interests by or capital contribution to any Loan Party. Such repayments will be applied in the same manner as set forth in Section 11.5 to the Obligations only to the extent permitted in accordance with the Interim Order and, once entered, the Final Order, subject to the Borrowers' ability to reborrow Revolving Advances in accordance with the terms hereof.

(c)    Subject to the last sentence of this Section 2.19(c) and the terms of the ABL Intercreditor Agreement, all proceeds received by any Loan Party or the Agent (i) under any insurance policy on account of damage or destruction of any assets or property of any Loan Party, or (ii) as a result of any taking or condemnation of any assets or property, not permitted to be retained by Loan Parties pursuant to Section 6.7, shall be applied in accordance with Section 6.7 hereof.  Such repayments shall be applied to the Obligations only to the extent permitted in accordance with the Interim Order and, once entered, the Final order, subject to the Borrowers' ability to reborrow Revolving Advances in accordance with the terms hereof.

(d)    If on any Computation Date the aggregate principal amount of:

(i) US-Canada Revolving Advances *plus* US-Canada Swing Loans outstanding at any time exceeds the lesser of (a) the Maximum US-Canada Revolving Advance Amount less the aggregate Maximum Undrawn Amount of all issued and outstanding US-Canada Letters of Credit or (b) the US-Canada Formula Amount (without deduction of US-Canada Swing Loans);

then the Agent shall notify the Borrowing Agent of the same. The Borrowers shall pay or prepay (subject to Borrowers' indemnity obligations under Section 2.2(g)) within one (1) Business Day after receiving such notice such that the aggregate principal amount of:

US-Canada Revolving Advances *plus* US-Canada Swing Loans outstanding shall not exceed the least of (a) the Maximum US-Canada Revolving Advance Amount *less* the aggregate Maximum Undrawn Amount of all issued and outstanding US-Canada Letters of Credit, (b) the US-Canada Formula Amount (without deduction of US-Canada Swing Loans) and (c) the Revolver Sublimit; or in each case after giving effect to such payments or prepayments.

2.20    <u>Use of Proceeds</u>.

(a)    Borrowers shall apply the proceeds of Advances to (i) the payment in full of the Pre-Petition Obligations; (ii) pay fees and expenses payable under this Agreement or any of the Other Documents to the Post-Petition Secured Parties, (iii) reimburse drawings under Letters of Credit and provide for their working capital needs and other general business expenses, (iv) to pay for costs and expenses during the Case, (v) for the payment of other obligations during the Case and (vi) for the payment of other obligations of the Debtors prior to the Petition Date as the Agent and the Lenders shall reasonable agree and the Bankruptcy shall approve, in each case, to

73

the extent such use of proceeds is not otherwise prohibited under the terms of this Agreement and is otherwise consistent with the terms of the Interim Order and the Final Order, as applicable.

(b)      Without limiting the generality of Section 2.20(a) above, none of Borrowers, Guarantors or any other Person which may in the future become party to this Agreement or the Other Documents as a Borrower or Guarantor, intends to use nor shall use any portion of the proceeds of the Advances, directly or indirectly, for any purpose in violation of Applicable Law.

2.21    Defaulting Lender.

(a)      Notwithstanding anything to the contrary contained herein, in the event any Lender is a Defaulting Lender, all rights and obligations hereunder of such Defaulting Lender and of the other parties hereto shall be modified to the extent of the express provisions of this Section 2.21 so long as such Lender is a Defaulting Lender.

(b)      (i) except as otherwise expressly provided for in this Section 2.21, Revolving Advances shall be made pro rata from Lenders holding Revolving Commitments which are not Defaulting Lenders based on their respective Revolving Commitment Percentages, and no Revolving Commitment Percentage of any Lender or any pro rata share of any Revolving Advances required to be advanced by any Lender shall be increased as a result of any Lender being a Defaulting Lender. Amounts received in respect of principal of any type of Revolving Advances shall be applied to reduce such type of Revolving Advances of each Lender (other than any Defaulting Lender) holding a Revolving Commitment in accordance with their Revolving Commitment Percentages; provided, that, Agent shall not be obligated to transfer to a Defaulting Lender any payments received by such Agent for such Defaulting Lender's benefit, nor shall a Defaulting Lender be entitled to the sharing of any payments hereunder (including any principal, interest or fees). Amounts payable to a Defaulting Lender shall instead be paid to or retained by Agent. Agent may hold and, in its discretion, re-lend to the Borrowers the amount of such payments received or retained by it for the account of such Defaulting Lender.

(i) Fees pursuant to Section 3.3 hereof shall cease to accrue in favor of such Defaulting Lender.

(ii) if any Swing Loans are outstanding or any Letter of Credit Obligations (or drawings under any Letter of Credit for which the applicable Issuer has not been reimbursed) are outstanding or exist at the time any such Lender holding a Revolving Commitment becomes a Defaulting Lender, then:

(A) the Defaulting Lender's Participation Commitment in such outstanding Swing Loans and of the Maximum Undrawn Amount of all outstanding Letters of Credit shall be reallocated among the Non-Defaulting Lenders holding Revolving Commitments in proportion to the respective Revolving Commitment Percentages of such Non-Defaulting Lenders to the extent (but only to the extent) that (x) such reallocation does not cause the aggregate sum of outstanding Revolving Advances made by any such Non- Defaulting Lender holding a Revolving Commitment *plus* such Lender's reallocated Participation Commitment in outstanding Swing Loans *plus* such Lender's reallocated Participation Commitment in the aggregate Maximum Undrawn Amount of all outstanding Letters of Credit to exceed the Revolving Commitment Amount of any such Non-Defaulting Lender, and (y) no Default or Event of Default has occurred and is continuing at such

74

time;

(B) if the reallocation described in clause (A) above cannot, or can only partially, be effected, the Borrowers shall within one Business Day following notice by the Agent (x) first, prepay any outstanding Swing Loans that cannot be reallocated, and (y) second, cash collateralize for the benefit of the applicable Issuer, such Borrowers' obligations corresponding to such Defaulting Lender's Participation Commitment in the Maximum Undrawn Amount of all Letters of Credit (after giving effect to any partial reallocation pursuant to clause (A) above) in accordance with Section 3.2(b) for so long as such Obligations are outstanding;

(C) if the Borrowers cash collateralize any portion of such Defaulting Lender's Participation Commitment in the Maximum Undrawn Amount of all Letters of Credit pursuant to clause (B) above, such Borrowers shall not be required to pay any fees to such Defaulting Lender pursuant to Section 3.2(a) with respect to such Defaulting Lender's Revolving Commitment Percentage of Maximum Undrawn Amount of all Letters of Credit during the period such Defaulting Lender's Participation Commitment in the Maximum Undrawn Amount of all Letters of Credit are cash collateralized;

(D) if the Defaulting Lender's Participation Commitment in the Maximum Undrawn Amount of all Letters of Credit is reallocated pursuant to clause (A) above, then the fees payable to the Lenders holding Revolving Commitments pursuant to Section 3.2(a) shall be adjusted and reallocated to the Non-Defaulting Lenders holding Revolving Commitments in accordance with such reallocation; and

(E) if all or any portion of such Defaulting Lender's Participation Commitment in the Maximum Undrawn Amount of all Letters of Credit is neither reallocated nor cash collateralized pursuant to clauses (A) or (B) above, then, without prejudice to any rights or remedies of the applicable Issuer or any other Lender hereunder, all Letter of Credit Fees payable under Section 3.2(a) with respect to such Defaulting Lender's Revolving Commitment Percentage of the Maximum Undrawn Amount of all Letters of Credit shall be payable to the applicable Issuer (and not to such Defaulting Lender) until (and then only to the extent that) such applicable Participation Commitment in the Maximum Undrawn Amount of all Letters of Credit is reallocated and/or cash collateralized; and

(iii) so long as any Lender holding a Revolving Commitment is a Defaulting Lender, Swing Loan Lender shall not be required to fund any Swing Loans and the applicable Issuer shall not be required to issue, amend or increase any Letter of Credit, unless such Swing Loan Lender or Issuer is satisfied that the related exposure and the Defaulting Lender's Participation Commitment in the Maximum Undrawn Amount of all Letters of Credit and all Swing Loans (after giving effect to any such issuance, amendment, increase or funding) will be fully allocated to Non-Defaulting Lenders holding Revolving Commitments and/or cash collateral for such Letters of Credit will be provided by the Borrowers in accordance with clause (A) and (B) above, and participating interests in any newly made Swing Loan or any newly issued or increased Letter of Credit shall be allocated among Non-Defaulting Lenders in a manner consistent with Section 2.21(b)(iii)(A) above (and such Defaulting Lender shall not participate therein).

(c)     A Defaulting Lender shall not be entitled to give instructions to the Agent or to approve, disapprove, consent to or vote on any matters relating to this Agreement and the

Other Documents, and all amendments, waivers and other modifications of this Agreement and the Other Documents may be made without regard to a Defaulting Lender and, for purposes of the definition of "US-Canada Required Lenders", a Defaulting Lender shall not be deemed to be a Lender, to have any outstanding Advances or a Revolving Commitment Percentage.

(d)     Other than as expressly set forth in this Section 2.21, the rights and obligations of a Defaulting Lender (including the obligation to indemnify the Agent) and the other parties hereto shall remain unchanged. Nothing in this Section 2.21 shall be deemed to release any Defaulting Lender from its obligations under this Agreement and the Other Documents, shall alter such obligations, shall operate as a waiver of any default by such Defaulting Lender hereunder, or shall prejudice any rights which any Borrower, the Agent or any Lender may have against any Defaulting Lender as a result of any default by such Defaulting Lender hereunder.

(e)     In the event that the Agent, the Borrowers, Swing Loan Lender and each Issuer agree in writing that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then the Agent will so notify the parties hereto, and, if such cured Defaulting Lender is a Lender holding a Revolving Commitment, then Participation Commitments of the Lenders holding Revolving Commitments (including such cured Defaulting Lender) of the Swing Loans and Maximum Undrawn Amount of all outstanding Letters of Credit shall be reallocated to reflect the inclusion of such Lender's Revolving Commitment, and on such date such Lender shall purchase at par such of the Revolving Advances of the other Lenders as the Agent shall determine may be necessary in order for such Lender to hold such Revolving Advances in accordance with its Revolving Commitment Percentage.

(f)     If Swing Loan Lender or any Issuer has a good faith belief that any Lender holding a Revolving Commitment has defaulted in fulfilling its obligations under one or more other agreements in which such Lender commits to extend credit, such Swing Loan Lender shall not be required to fund any Swing Loans and such Issuer shall not be required to issue, amend or increase any Letter of Credit, unless such Swing Loan Lender or such Issuer, as the case may be, shall have entered into arrangements with Borrowers or such Lender, satisfactory to such Swing Loan Lender or such Issuer, as the case may be, to defease any risk to it in respect of such Lender hereunder.

2.22   <u>Payment of Obligations</u>. Agent may charge to the Borrowers' Account as a Revolving Advance or, at the discretion of the Swing Loan Lender, as a Swing Loan (i) all payments with respect to any of the Obligations required hereunder (including without limitation principal payments, payments of interest, payments of Letter of Credit Fees and all other fees provided for hereunder and payments under Sections 16.5 and 16.9) as and when each such payment shall become due and payable (whether as regularly scheduled, upon or after acceleration, upon maturity or otherwise), (ii) without limiting the generality of the foregoing clause (i), (a) all amounts expended by Agent or any Lender pursuant to Sections 4.2 or 4.3 hereof or any corresponding provision in any Other Document and (b) all expenses which Agent incurs in connection with the forwarding of Advance proceeds and the establishment and maintenance of any Blocked Accounts or Depository Accounts as provided for in Section 4.8(h), and (iii) any sums expended by Agent or any Lender due to any Borrower's failure to perform or comply with its obligations under this Agreement or any Other Document including any Borrower's obligations under Sections 3.3, 3.4, 4.4, 4.7, 6.4, 6.7, 6.8 and 6.9 hereof, any corresponding provision in any

76

Other Document, and all amounts so charged shall be added to the Obligations and shall be secured by the Collateral.  To the extent Revolving Advances are not actually funded by the other Lenders in respect of any such amounts so charged, all such amounts so charged shall be deemed to be Revolving Advances made by and owing to Agent and Agent shall be entitled to all rights (including accrual of interest) and remedies of a Lender under this Agreement and the Other Documents with respect to such Revolving Advances.

## 3.  INTEREST AND FEES.

3.1     <u>Interest</u>. Interest on Advances shall be payable in arrears on the first day of each month, provided further that all accrued and unpaid interest shall be due and payable at the end of the Term (each of the foregoing payment dates, an "**Interest Payment Date**"). Interest charges shall be computed on the actual principal amount of Advances outstanding during the month at a rate per annum equal to the Revolving Interest Rate (as applicable, the "**Contract Rate**"). Except as expressly provided otherwise in this Agreement, any Obligations other than the Advances that are not paid when due shall accrue interest at the applicable Revolving Interest Rate for Domestic Rate Loans, subject to the provision of the final sentence of this Section 3.1 regarding the Default Rate. Whenever, subsequent to the date of this Agreement, the Alternate Base Rate is increased or decreased, the applicable Contract Rate for Domestic Rate Loans shall be similarly changed without notice or demand of any kind by an amount equal to the amount of such change in the Alternate Base Rate during the time such change or changes remain in effect. Upon and after the occurrence of an Event of Default, and during the continuation thereof, at the option of Agent or at the direction of US-Canada Required Lenders (or, in the case of any Event of Default under Section 10.7, immediately and automatically upon the occurrence of any such Event of Default without the requirement of any affirmative action by any party), the Obligations shall bear interest at the Revolving Interest Rate for Domestic Rate Loans set forth in the definition of US-Canada Applicable Margin *plus* two percent (2.00%) per annum (as applicable, the "**Default Rate**").

3.2     <u>Letter of Credit Fees</u>.

(a)     <u>Letter of Credit Fees</u>. The US-Canada Borrowers shall pay (x) to Agent, for the ratable benefit of US-Canada Lenders holding US-Canada Revolving Commitments, fees in Dollars for each US-Canada Letter of Credit for the period from and excluding the date of issuance of same to and including the date of expiration or termination, equal to the average daily amount available to be drawn on each outstanding US-Canada Letter of Credit multiplied by the US-Canada Applicable Margin for US-Canada Revolving Advances consisting of Domestic Rate Loans, such fees to be calculated on the basis of a 360-day year for the actual number of days elapsed and to be payable quarterly in arrears on the first day of each calendar quarter and on the last day of the Term, and (y) to the applicable Issuer, a fronting fee (in Dollars) of one quarter of one percent (0.25%) per annum times the average daily amount available to be drawn of each outstanding Letter of Credit US-Canada Letter of Credit for the period from and excluding the date of issuance of same to and including the date of expiration or termination, to be payable quarterly in arrears on the first day of each calendar quarter and on the last day of the Term (the "**US-Canada Letter of Credit Fees**"). In addition, US-Canada Borrowers shall pay to Agent, for the benefit of the applicable Issuer, any and all administrative, issuance, amendment, payment and negotiation charges with respect to US-Canada Letters of Credit and all fees and expenses as agreed upon by

such Issuer and the Borrowing Agent in connection with any US-Canada Letter of Credit, including in connection with the opening, amendment or renewal of any such US-Canada Letter of Credit and any acceptances created thereunder, all such charges, fees and expenses, if any, to be payable on demand. All such charges shall be deemed earned in full on the date when the same are due and payable hereunder and shall not be subject to rebate or pro-ration upon the termination of this Agreement for any reason. Any such charge in effect at the time of a particular transaction shall be the charge for that transaction, notwithstanding any subsequent change in the applicable Issuer's prevailing charges for that type of transaction. Upon and after the occurrence of an Event of Default, and during the continuation thereof, at the option of Agent or at the direction of US-Canada Required Lenders (or, in the case of any Event of Default under Section 10.7, immediately and automatically upon the occurrence of any such Event of Default without the requirement of any affirmative action by any party), the Letter of Credit Fees described in clause (i)(x) and (ii)(x) of the first sentence of this Section 3.2(a) shall be increased by an additional two percent (2.0%) per annum.

(b)     At any time following the occurrence of an Event of Default, at the option of Agent or at the direction of US-Canada Required Lenders (or, in the case of any Event of Default under Section 10.7, immediately and automatically upon the occurrence of such Event of Default, without the requirement of any affirmative action by any party), or upon the expiration of the Term or any other termination of this Agreement (and also, if applicable, in connection with any mandatory prepayment under Section 2.19), US-Canada Borrowers will cause cash to be deposited and maintained in an account with Agent, as cash collateral, in an amount equal to one hundred and five percent (105%) of the (i) Maximum Undrawn Amount of all outstanding US- Canada Letters of Credit and (ii) Cash Management Liabilities outstanding in respect of purchase cards, and each US-Canada Borrower hereby irrevocably authorizes Agent, in its discretion, on such US-Canada Borrower's behalf and in such US-Canada Borrower's name, to open such an account and to make and maintain deposits therein, or in an account opened by such US-Canada Borrower, in the amounts required to be made by such US-Canada Borrower, out of the proceeds of Receivables or other Collateral or out of any other funds of such US- Canada Borrower coming into any Lender's possession at any time. Agent may, in its discretion, invest such cash collateral (less applicable reserves) in such short-term money-market items as to which Agent and Borrowing Agent mutually agree (or, in the absence of such agreement, as Agent may reasonably select) and the net return on such investments shall be credited to such account and constitute additional cash collateral, or Agent may (notwithstanding the foregoing) establish the account provided for under this Section 3.2(b) as a non-interest bearing account and in such case Agent shall have no obligation (and Borrowers hereby waive any claim) under Article 9 of the Uniform Commercial Code or under any other Applicable Law to pay interest on such cash collateral being held by Agent. No Borrower may withdraw amounts credited to any such account except upon the occurrence of all of the following:  (x) payment and performance in full of all Obligations; (y) expiration of all Letters of Credit; and (z) termination of this Agreement. Borrowers hereby assign, pledge and grant to Agent for its benefit and the ratable benefit of the applicable Issuer, Lenders and each other Secured Party, a continuing security interest in and to and Lien on any such cash collateral and any right, title and interest of Borrowers in any deposit account, securities account or investment account into which such cash collateral may be deposited from time to time to secure the Obligations, specifically including all Obligations with respect to any Letters of Credit. Borrowers agree that upon the coming due of any Reimbursement Obligations (or any other Obligations, including Obligations for Letter of Credit Fees) with respect to the Letters of Credit,

78

Agent may use such cash collateral to pay and satisfy such Obligations.

3.3    Facility Fee. If, for any calendar quarter during the Term, the average daily balance of the sum of US-Canada Revolving Advances (for purposes of this computation, US-Canada Swing Loans shall be deemed to be US-Canada Revolving Advances made by PNC as a US-Canada Lender) *plus* the Maximum Undrawn Amount of all outstanding US-Canada Letters of Credit for each day of such calendar quarter (a) equals or is greater than 50% of the Maximum US-Canada Revolving Advance Amount, then US-Canada Borrowers shall pay to Agent, for the ratable benefit of US-Canada Lenders holding the US-Canada Revolving Commitments based on their US-Canada Revolving Commitment Percentages, a fee at a rate equal to .375% per annum on the amount by which the Maximum US-Canada Revolving Advance Amount exceeds such average daily unpaid balance, or (b) equals 50% or less of the Maximum US-Canada Revolving Advance Amount, US-Canada Borrowers shall pay a Facility Fee at a rate equal to .50% of the amount by which the Maximum US-Canada Revolving Advance Amount exceeds such average daily unpaid balance (the "**Facility Fee**").  Such applicable Facility Fee shall be payable to Agent in arrears on the first day of each calendar quarter with respect to the previous calendar quarter.

3.4    Closing Fee and Collateral Evaluation Fee.

(a)    Borrowers shall pay to the Lenders a closing fee, fully earned on the Closing Date, and due and payable (x) on the Closing Date in an aggregate amount equal to $174,250 and (y) on the Maturity Date in an aggregate amount equal to $174,250 (collectively, the "Closing Fee").  The Closing Fee shall be allocated pro rata between the Lenders based on their respective Revolving Commitment Percentages.

(a)    All of the fees and out-of-pocket costs and expenses of any appraisals conducted pursuant to Section 4.7 hereof shall be paid for when due, in full and without deduction, off-set or counterclaim by Borrowers.

3.5    Computation of Interest and Fees; Criminal Code (Canada). Interest and fees hereunder shall be computed on the basis of a year of 360 days and for the actual number of days elapsed. If any payment to be made hereunder becomes due and payable on a day other than a Business Day, the due date thereof shall be extended to the next succeeding Business Day and interest thereon shall be payable at the applicable Contract Rate during such extension. For purposes of the Interest Act (Canada): (i) whenever any interest or fee under this Agreement is calculated on the basis of a period of time other than a calendar year, such rate used in such calculation, when expressed as an annual rate, is equivalent to (x) such rate, multiplied by (y) the actual number of days in the calendar year in which the period for which such interest or fee is calculated ends, and divided by (z) the number of days in such period of time; (ii) the principle of deemed reinvestment of interest shall not apply to any interest calculation under this Agreement; and (iii) the rates of interest stipulated in this Agreement are intended to be nominal rates and not effective rates or yields. If any provision of this Agreement or Other Documents would oblige any Borrower to make any payment of interest or other amount payable to any Lender in an amount or calculated at a rate which would be prohibited by law or would result in a receipt by that Lender of "interest" at a "criminal rate" (as such terms are construed under the Criminal Code (Canada)),

79

then, notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by Applicable Law or so result in a receipt by that Lender of "interest" at a "criminal rate", such adjustment to be effected, to the extent necessary (but only to the extent necessary), as follows: first, by reducing the amount or rate of interest, and, thereafter, by reducing any fees, commissions, costs, expenses, premiums and other amounts required to be paid to the affected Lender which would constitute interest for purposes of section 347 of the Criminal Code (Canada).

3.6     Maximum Charges. In no event whatsoever shall interest and other charges charged hereunder exceed the highest rate permissible under Applicable Law. In the event interest and other charges as computed hereunder would otherwise exceed the highest rate permitted under Applicable Law: (i) the interest rates hereunder will be reduced to the maximum rate permitted under Applicable Law; (ii) such excess amount shall be first applied to any unpaid principal balance owed by Borrowers; and (iii) if the then remaining excess amount is greater than the previously unpaid principal balance, Lenders shall promptly refund such excess amount to Borrowers and the provisions hereof shall be deemed amended to provide for such permissible rate.

3.7     Increased Costs. In the event that any Applicable Law or any Change in Law or compliance by any Lender (for purposes of this Section 3.7, the term "Lender" shall include the Agent, Swing Loan Lender, any Issuer or any Lender and any corporation or bank controlling the Agent, Swing Loan Lender, any Lender or any Issuer with any request or directive (whether or not having the force of law) from any central bank or other financial, monetary or other authority), shall:

(a)     subject the Agent, Swing Loan Lender, such Lender or such Issuer to any tax of any kind whatsoever with respect to this Agreement, any Letter of Credit, any participation in a Letter of Credit or change the basis of taxation of payments to the Agent, Swing Loan Lender, such Lender or such Issuer in respect thereof (except for Indemnified Taxes or Other Taxes covered by Section 3.10 and the imposition of, or any change in the rate of, any Excluded Tax payable by the Agent, Swing Loan Lender, such Lender or such Issuer);

(b)     impose, modify or deem applicable any reserve, special deposit, assessment, special deposit, compulsory loan, insurance charge or similar requirement against assets held by, or deposits in or for the account of, advances or loans by, or other credit extended by, any office of the Agent, Swing Loan Lender, such Issuer or such Lender, including pursuant to Regulation D of the Board of Governors of the Federal Reserve System; or

(c)     impose on the Agent, Swing Loan Lender, such Lender or such Issuer any other condition, loss or expense (other than Taxes) affecting this Agreement or any Other Document or any Advance made by any Lender, or any Letter of Credit or participation therein;

and the result of any of the foregoing is to increase the cost to the Agent, Swing Loan Lender, such Lender or such Issuer of making, converting to, continuing, renewing or maintaining its Advances hereunder by an amount that the Agent, Swing Loan Lender, such Lender or such Issuer deems to be material or to reduce the amount of any payment (whether of principal, interest

80

or otherwise) in respect of any of the Advances by an amount that the Agent, Swing Loan Lender or such Lender or such Issuer deems to be material, then, in any case the Borrowers shall promptly pay the Agent, Swing Loan Lender, such Lender or such Issuer, upon its demand, such additional amount as will compensate the Agent, Swing Loan Lender or such Lender or such Issuer for such additional cost or such reduction, as the case may be. Such Agent, Swing Loan Lender, such Lender or such Issuer shall certify the amount of such additional cost or reduced amount to the Borrowing Agent, and such certification shall be conclusive absent manifest error.

3.8     Alternate Rate of Interest.

3.8.1     [Reserved].

3.8.2.     Benchmark Replacement Setting.

(a)     Benchmark Replacement. Notwithstanding anything to the contrary herein or in any Other Document (and any agreement executed in connection with an Interest Rate Hedge shall be deemed not to be an "Other Document" for purposes of this Section 3.8.2), if a Benchmark Transition Event has occurred prior to the Reference Time in respect of any setting of the then-current Benchmark, then such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Other Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any Other Document so long as the Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the US-Canada Required Lenders.

(b)     Benchmark Replacement Conforming Changes. In connection with the implementation of a Benchmark Replacement, the Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in the Other Documents, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any Other Document.

(c)     Notices; Standards for Decisions and Determinations. The Agent will promptly notify the Borrowers and the Lenders of (i) any occurrence of a Benchmark Transition Event and its related Benchmark Replacement Date, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Conforming Changes, (iv) the removal or reinstatement of any tenor of a Benchmark pursuant to paragraph (d) below, and (v) the commencement of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Agent or, if applicable any Lender (or group of Lenders) pursuant to this Section 3.8.2 including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any Other Document, except, in each case, as expressly required pursuant to this Section 3.8.2.

(d)     *Unavailability of Tenor of Benchmark*. Notwithstanding anything to the contrary herein or in any of the Other Documents, at any time (including in connection with the

implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor of such Benchmark is or will be no longer representative, then the Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is or will no longer be representative for a Benchmark (including a Benchmark Replacement), then the Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)     *Benchmark Unavailability Period*. During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of the Alternate Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of the Alternate Base Rate.

(f)     Certain Defined Terms. As used in this Section 3.8.2:

*"Available Tenor"* means, as of any date of determination and with respect to the then-current Benchmark, as applicable (x) if the then current Benchmark is a term rate or is based on a term rate, any tenor for such Benchmark that is or may be used for determining the length of an Interest Period or (y) otherwise, any payment period for interest calculated with reference to such Benchmark, as applicable, pursuant to this Agreement as of such date.

*"Benchmark"* means, initially, Daily Simple SOFR; provided that if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to Daily Simple SOFR or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to this Section. Any reference to "Benchmark" shall include, as applicable, the published component used in the calculation thereof.

*"Benchmark Replacement"* means, for any Available Tenor, the sum of: (a) the alternate benchmark rate that has been selected by the Agent and the Borrowers as the replacement for the then-current Benchmark for the applicable Corresponding Tenor giving due consideration to any evolving or then-prevailing market convention, including any applicable recommendations made by the Relevant Governmental Body, for U.S. dollar-denominated syndicated credit facilities at such time and (b) the Benchmark Replacement Adjustment; provided that, if the Benchmark Replacement as determined pursuant to clause (1) or (2) above would be less than 0.25%, the Benchmark Replacement will be deemed to be 0.25% for the purposes of this Agreement and the Other Documents; provided further that any such Benchmark Replacement shall be administratively feasible as determined by the Agent in its sole discretion.

*"Benchmark Replacement Adjustment"* means, with respect to any

replacement of the then current Benchmark with an Unadjusted Benchmark Replacement for any applicable Available Tenor for any setting of such Unadjusted Benchmark Replacement, for purposes of "Benchmark Replacement," the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Agent and the Borrowers for the applicable Corresponding Tenor giving due consideration to any evolving or then- prevailing market convention, including any applicable recommendations made by the Relevant Governmental Body, for U.S. dollar-denominated syndicated credit facilities at such time; provided that, if the then-current Benchmark is a term rate, more than one tenor of such Benchmark is available as of the applicable Benchmark Replacement Date and the applicable Unadjusted Benchmark Replacement will not be a term rate, the Available Tenor of such Benchmark for purposes of this definition of "Benchmark Replacement Adjustment" shall be deemed to be the Available Tenor that has approximately the same length (disregarding business day adjustments) as the payment period for interest calculated with reference to such Unadjusted Benchmark Replacement.

> **"Benchmark Replacement Date"** means a date and time determined by the Agent, which date shall be at the end of an Interest Period and no later than the earliest to occur of the following events with respect to the then-current Benchmark:

> > (l)  in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (A) the date of the public statement or publication of information referenced therein and (B) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

> > (2)  in the case of clause (3) of the definition of "Benchmark Transition Event," the date determined by the Agent, which date shall promptly follow the date of the public statement or publication of information referenced therein.

For the avoidance of doubt, (i) if the event giving rise to the Benchmark Replacement Date occurs on the same day as, but earlier than, the Reference Time in respect of any determination, the Benchmark Replacement Date will be deemed to have occurred prior to the Reference Time for such determination and (ii) the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (1) or (2) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

> **"Benchmark Transition Event"** means the occurrence of one or more of the following events with respect to the then-current Benchmark:

> > (1)  a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the

<div align="center">83</div>

time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(2)    a public statement or publication of information by a Governmental Body having jurisdiction over the Agent, the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or;

(3)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) or a Governmental Body having jurisdiction over the Agent announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer representative.

For avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"*Benchmark Unavailability Period*" means the period (if any) (x) beginning at the time that a Benchmark Replacement Date pursuant to clauses (1) or (2) of that definition has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Other Document in accordance with this Section titled "Benchmark Replacement Setting" and (y) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Other Document in accordance with this Section titled "Benchmark Replacement Setting."

"*Corresponding Tenor*" with respect to any Available Tenor means, as applicable, either a tenor (including overnight) or an interest payment period having approximately the same length (disregarding business day adjustment) as such Available Tenor.

"*Reference Time*" means, with respect to any setting of the then-current Benchmark, the time determined by the Agent in its reasonable discretion.

84

*"Relevant Governmental Body"* means the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or any successor thereto.

*"Unadjusted Benchmark Replacement"* means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

3.9    Capital Adequacy.

(a)    In the event that the Agent, Swing Loan Lender or any Lender shall have determined that any Applicable Law or guideline regarding capital adequacy or liquidity requirements, or any Change in Law or any change in the interpretation or administration thereof by any Governmental Body, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by the Agent, such Swing Loan Lender, such Issuer or any Lender (for purposes of this Section 3.9, the term "Lender" shall include the Agent, Swing Loan Lender, any Issuer or any Lender and any corporation or bank controlling the Agent, Swing Loan Lender or any Lender with any request or directive regarding capital adequacy or liquidity requirements (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on the Agent, such Swing Loan Lender or such Lender's capital as a consequence of its obligations hereunder (including the making of any Swing Loans) to a level below that which the Agent, such Swing Loan Lender or such Lender could have achieved but for such adoption, change or compliance (taking into consideration the Agent's, such Swing Loan Lender's and such Lender's policies with respect to capital adequacy or liquidity requirements) by an amount deemed by the Agent, such Swing Loan Lender or such Lender to be material, then, from time to time, Borrowers shall pay upon demand to the Agent, such Swing Loan Lender or such Lender such additional amount or amounts as will compensate the Agent, such Swing Loan Lender or such Lender for such reduction. In determining such amount or amounts, the Agent, such Swing Loan Lender or such Lender may use any reasonable averaging or attribution methods. The protection of this Section 3.9 shall be available to the Agent, each Swing Loan Lender and each Lender regardless of any possible contention of invalidity or inapplicability with respect to the Applicable Law, rule, regulation, guideline or condition.

(b)    A certificate of the Agent, Swing Loan Lender or any Lender setting forth such amount or amounts as shall be necessary to compensate the Agent, such Swing Loan Lender or such Lender with respect to Section 3.9(a) hereof when delivered to Borrowing Agent shall be conclusive absent manifest error.

3.10    Taxes.

(a)    Any and all payments by or on account of any Obligations hereunder or under any Other Document shall be made free and clear of and without reduction or withholding for any Taxes; provided that if the Loan Parties shall be required by Applicable Law to deduct or withhold any Taxes (including any Other Taxes) from such payments, then (i) if the deduction or withholding is in respect of Indemnified Taxes the sum payable shall be increased as necessary so that after making all required deductions or withholdings (including deductions or withholdings

85

applicable to additional sums payable under this Section 3.10) the Agent, each Swing Loan Lender, each Lender, each Issuer or each Participant, as the case may be, receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the Loan Parties shall make such deductions or withholdings and (iii) the Loan Parties shall timely pay the full amount deducted or withheld to the relevant Governmental Body in accordance with Applicable Law.

(b)    The Loan Parties shall pay and, within three (3) days of demand therefor, indemnify each of the Secured Parties against any cost, liability or loss incurred by the relevant Secured Party in relation to all Other Taxes. Without limiting the provisions of Section 3.10(a) above, the Loan Parties shall timely pay any Other Taxes to the relevant Governmental Body in accordance with Applicable Law.

(c)    Each Loan Party shall indemnify the Agent, Swing Loan Lender, any Lender, any Issuer and any Participant, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 3.10) payable or paid by the Agent, such Swing Loan Lender, such Lender, such Issuer, or such Participant, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Body. A certificate as to the amount of such payment or liability delivered to the Borrowing Agent by any Lender, Swing Loan Lender, any Participant, or any Issuer (with a copy to Agent), or by the Agent on its own behalf or on behalf of Swing Loan Lender, any Lender or any Issuer, shall be conclusive absent manifest error.

(d)    As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Body, the Loan Parties shall deliver to Agent the original or a certified copy of a receipt issued by such Governmental Body evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Agent.

(e)    Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which any US-Canada Borrower is resident for tax purposes, or under any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any Other Document shall deliver to the Borrowing Agent (with a copy to Agent), at the time or times prescribed by Applicable Law or reasonably requested by the Borrowing Agent or Agent, such properly completed and executed documentation prescribed by Applicable Law as will permit such payments to be made without withholding or at a reduced rate of withholding. With respect to any payments by the US Borrowers, notwithstanding the submission of such documentation claiming a reduced rate of or exemption from U.S. withholding tax, Agent shall be entitled to withhold United States federal income taxes at the full 30% withholding rate if in its reasonable judgment it is required to do so under the due diligence requirements imposed upon a withholding agent under § 1.1441-7(b) of the United States Income Tax Regulations or other Applicable Law. Further, Agent is indemnified under § 1.1461-1(e) of the United States Income Tax Regulations against any claims and demands of any Lender, Issuer or assignee or participant of a Lender or Issuer for the amount of any tax it deducts and withholds in accordance with regulations under § 1441 of the Code and under subsection 215(6) of the ITA. In addition, any US-Canada Lender, if requested by the Borrowing Agent or Agent, shall deliver

86

such other documentation prescribed by Applicable Law or reasonably requested by the Borrowing Agent or Agent as will enable the US Borrowers or Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Without limiting the generality of the foregoing, in the event that any US Borrower is resident for tax purposes in the United States of America, any Foreign Lender (or other Lender) under the US-Canada Facility shall deliver to Borrowing Agent and Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender (or other Lender) becomes a US-Canada Lender under this Agreement (and from time to time thereafter upon the request of the Borrowing Agent or Agent, but only if such Foreign Lender (or other Lender) is legally entitled to do so), whichever of the following is applicable: two (2) duly completed valid originals of IRS Form W-8BEN-E claiming eligibility for benefits of an income tax treaty to which the United States of America is a party,

(i)  two (2) duly completed valid originals of IRS Form W-8ECI,

(ii) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of any US Borrower within the meaning of section 881(c)(3)(B) of the Code, (C) a "10 percent shareholder" of US Borrowers within the meaning of section 881(c)(3)(B) of the Code or (D) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) two duly completed valid originals of IRS Form W-8BEN-E,

(iii)any other form prescribed by Applicable Law as a basis for claiming exemption from or a reduction in United States Federal withholding tax duly completed together with such supplementary documentation as may be prescribed by Applicable Law to permit US Borrowers to determine the withholding or deduction required to be made, or

(iv)To the extent that any US-Canada Lender is not a Foreign Lender, such Lender shall submit to Agent two (2) originals of an IRS Form W-9 or any other form prescribed by Applicable Law demonstrating that such Lender is not a Foreign Lender.

<p style="text-align:center;">(f)     [Reserved].</p>

<p style="text-align:center;">(g)     [Reserved].</p>

<p style="text-align:center;">(h)     [Reserved].</p>

(i)     If a payment made to any Lender, Swing Loan Lender, any Participant, any Issuer, or the Agent under this Agreement or any Other Document would be subject to U.S. Federal withholding Tax imposed by FATCA if such Person fails to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender, Swing Loan Lender, Participant, Issuer, or Agent shall deliver to the Agent (in the case of Swing Loan Lender, a Lender, Participant or an Issuer) and the Borrowing Agent (A) a certification signed by the chief financial officer, principal accounting officer, treasurer or controller of such Person, and (B) other documentation reasonably requested by Agent or Borrowing Agent sufficient for Agent and the Loan Parties to

<p style="text-align:center;">87</p>

(j)     comply with their obligations under FATCA and to determine that Swing Loan Lender, such Lender, such Participant, such Issuer, or the Agent has complied with such applicable reporting requirements.

(k)     If the Agent, Swing Loan Lender, any Lender, any Participant or any Issuer determines, in its sole discretion, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by the Loan Parties or with respect to which the Loan Parties have paid additional amounts pursuant to this Section 3.10, it shall pay to the Loan Parties an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Loan Parties under this Section 3.10 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund); net of all out-of-pocket expenses (including Taxes) of the Agent, such Swing Loan Lender, such Lender, such Participant, or such Issuer, as the case may be, and without interest (other than any interest paid by the relevant Governmental Body with respect to such refund), provided that the Loan Parties, upon the request of the Agent, such Swing Loan Lender, such Lender, such Participant, or such Issuer, agrees to repay the amount paid over to the Loan Parties (*plus* any penalties, interest or other charges imposed by the relevant Governmental Body) to the Agent, such Swing Loan Lender, such Lender, such Participant or such Issuer in the event the Agent, such Swing Loan Lender, such Lender, such Participant or such Issuer is required to repay such refund to such Governmental Body. This Section 3.10 shall not be construed to require the Agent, Swing Loan Lender, any Lender, any Participant, or any Issuer to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Loan Parties or any other Person.

(l)     [Reserved].

(m)     [Reserved].

3.11   Replacement of Lenders. If any Lender (an "**Affected Lender**") (a) makes demand upon Borrowers for (or if Borrowers are otherwise required to pay) amounts pursuant to Section 3.7 or 3.9 hereof or (b) is a Defaulting Lender, Borrowers may, within ninety (90) days of receipt of such demand, notice (or the occurrence of such other event causing Borrowers to be required to pay such compensation or causing Section 2.2(h) hereof to be applicable), or such Lender becoming a Defaulting Lender or denial of a request by Agent pursuant to Section 16.2(b) hereof, as the case may be, by notice in writing to Agent and such Affected Lender (i) request the Affected Lender to cooperate with Borrowers in obtaining a replacement Lender satisfactory to Agent and Borrowers (the "**Replacement Lender**"); (ii) request the non-Affected Lenders to acquire and assume all of the Affected Lender's Advances and its Revolving Commitment Percentage, as provided herein, but none of such Lenders shall be under any obligation to do so; or (iii) propose a Replacement Lender subject to approval by Agent in its good faith business judgment. If any satisfactory Replacement Lender shall be obtained, and/or if any one or more of the non-Affected Lenders shall agree to acquire and assume all of the Affected Lender's Advances and its Revolving Commitment Percentage, then such Affected Lender shall assign, in accordance with Section 16.3 hereof, all of its Advances and its Revolving Commitment Percentage and other rights and obligations under this Agreement and the Other Documents to such Replacement Lender or non-Affected Lenders, as the case may be, in exchange for payment of the principal amount so assigned and all interest and fees accrued on the amount so assigned, *plus* all other Obligations then due and payable to the Affected Lender.

88

## 4. COLLATERAL: GENERAL TERMS

4.1    <u>Security Interest in the Collateral</u>. To secure the prompt payment and performance to the Post-Petition Secured Parties of the Post-Petition Obligations (and, upon entry of the Final Order, any and all Obligations, including without limitation, all Pre-Petition Obligations and Post-Petition Obligations) of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, the Agent, for the benefit of itself and the other Secured Parties, shall have and is hereby granted by (x) each Debtor, effective as of the Petition Date, valid and perfected first priority (subject to (x) the priority of Liens set forth Section 10(b) of the Interim Order and (y) the ABL Intercreditor Agreement) security interests and liens in and upon all pre- and post- petition property of such Debtor constituting US Collateral, whether existing on the Petition Date or thereafter acquired (which shall, for the avoidance of doubt, include the property listed in the following clause (y)) and (y) the US Loan Parties a continuing security interest in and to and Lien on all of its US Collateral, whether now owned or existing or hereafter created, acquired or arising and wheresoever located. Each US Loan Party shall mark its books and records as may be necessary or appropriate to evidence, protect and perfect Agent's security interest and shall cause its financial statements to reflect such security interest. Each US Loan Party shall promptly provide Agent with written notice of all commercial tort claims in excess of $500,000 in Officer's Certificate required under Section 9.7 or 9.8, as the case may be, next following the commencement of legal proceedings with respect thereto, such notice to contain the case title together with the applicable court and a brief description of the claim(s), the events out of which such claim(s) arose and the parties against which such claims may be asserted and the case title together with the applicable court and docket number and the express grant by such US Loan Party to Agent of a security interest and lien in and to such commercial tort claim and the proceeds thereof. In the event that such notice does not include such grant of a security interest, the sending thereof by a US Loan Party to Agent shall be deemed to thereby grant to Agent a security interest and lien in and to such commercial tort claims described therein and all proceeds thereof. Each US Loan Party shall provide Agent with written notice promptly upon becoming the beneficiary under any letter of credit or otherwise obtaining any right, title or interest in any letter of credit rights, in each case having a value in excess of $1,000,000, and at Agent's request shall take such actions as Agent may reasonably request for the perfection of Agent's security interest therein.  The Pre-Petition Secured Parties are entitled to adequate protection as set forth in the Interim Order and, once entered, the Final Order.

4.2    <u>Perfection of Security Interest</u>. Subject to the Orders and the ABL Intercreditor Agreement, each US Loan Party shall take all action that may be necessary or desirable, or that Agent may request, so as at all times to maintain the validity, perfection, enforceability and priority (subject to the terms of the ABL Intercreditor Agreement) of Agent's security interest in and Lien on the US Collateral or to enable Agent to protect, exercise or enforce its rights hereunder and in the US Collateral, including, but not limited to, (i) immediately discharging all Liens other than Permitted Encumbrances, (ii) using commercially reasonable efforts to obtain Lien Waiver Agreements, (iii) delivering to Agent, endorsed or accompanied by such instruments of assignment as Agent may specify, and stamping or marking, in such manner as Agent may specify, any and all chattel paper, instruments, letters of credits and advices thereof and documents evidencing or forming a part of the US Collateral, <u>provided</u> that Loan Parties shall not be required to endorse or deliver such chattel paper, instruments, letters of credit and advices thereof individually or in the aggregate with all others not so endorsed and delivered to the Agent and so marked and stamped,

89

having a value less than $500,000, (iv) entering into warehousing, lockbox, customs and freight agreements and other custodial arrangements satisfactory to Agent, and (v) executing and delivering financing statements, control agreements, instruments of pledge, notices and assignments, in each case in form and substance satisfactory to Agent, relating to the creation, validity, perfection, maintenance or continuation of Agent's security interest and Lien under the Uniform Commercial Code or other Applicable Law; provided, however, that control agreements shall not be required with respect to individual deposit accounts having a *de minimis* balance; provided, further, that the aggregate balance of all such deposit accounts described in the foregoing proviso shall not exceed $50,000 at any time. By its signature hereto, each US Loan Party hereby authorizes Agent to file against such US Loan Party, one or more financing, continuation or amendment statements pursuant to the Uniform Commercial Code or similar notices or filings under other Applicable Law, in each case in form and substance satisfactory to Agent (which statements may have a description of collateral which is broader than that set forth herein, including without limitation a description of US Collateral as "all assets" and/or "all personal property" of any US Loan Party). All charges, expenses and fees Agent may incur in doing any of the foregoing, and any local taxes relating thereto, shall be charged to the Borrowers' Account as a Revolving Advance of a Domestic Rate Loan and added to the Obligations, or, at Agent's option, shall be paid by Loan Parties to Agent for its benefit and for the ratable benefit of the Secured Parties immediately upon demand.

4.3     Preservation of Collateral. Subject to the Orders and the ABL Intercreditor Agreement, during the continuance of an Event of Default, in addition to the rights and remedies set forth in Section 11.1 hereof, Agent: (a) may at any time take such steps as Agent deems necessary to protect Agent's interest in and to preserve the US Collateral, including the hiring of security guards or the placing of other security protection measures as Agent may deem appropriate; (b) may employ and maintain at any of any US Loan Party's premises a custodian who shall have full authority to do all acts necessary to protect Agent's interests in the US Collateral; (c) may lease warehouse facilities to which Agent may move all or part of the US Collateral; (d) may use any US Loan Party's owned or leased lifts, hoists, trucks and other facilities or equipment for handling or removing the US Collateral; and (e) shall have, and is hereby granted, a right of ingress and egress to the places where the US Collateral is located, and may proceed over and through any of US Loan Parties' owned or leased property. Each US Loan Party shall cooperate fully with all of Agent's efforts to preserve the US Collateral and will take such actions to preserve the US Collateral as Agent may direct. All of Agent's expenses of preserving the US Collateral, including any expenses relating to the bonding of a custodian, shall be charged to the Borrowers' Account as a Revolving Advance maintained as a Domestic Rate Loan and added to the Obligations.

4.4     Ownership and Location of Collateral.

(a)     With respect to the US Collateral, at the time the US Collateral becomes subject to Agent's security interest: (i) each US Loan Party shall be the sole owner of and fully authorized and able to sell, transfer, pledge and/or grant a first priority (unless otherwise provided for in the ABL Intercreditor Agreement) security interest in each and every item of its respective US Collateral to Agent; and, except for Permitted Encumbrances the US Collateral shall be free and clear of all Liens whatsoever; (ii) each document and agreement executed by each such US Loan Party or delivered to Agent or any Lender in connection with this Agreement shall be true

90

and correct in all respects; (iii) all signatures and endorsements of each such US Loan Party that appear on such documents and agreements shall be genuine and each such US Loan Party shall have full capacity to execute same; and (iv) each such US Loan Party's equipment and Inventory and chief executive office shall be located as set forth on <u>Schedule 4.4</u> and shall not be removed from such location(s) without the prior written consent of Agent except with respect to (x) the sale of Inventory in the Ordinary Course of Business, (y) the sale of equipment to the extent permitted in Section 7.1(b) hereof, and (z) nominal amounts of Inventory that are in the Ordinary Course of Business at other locations for exhibition to potential customers.

(b)      (i) There is no location at which any US Loan Party has any Inventory (except for Inventory in transit) or other Collateral other than those locations listed on <u>Schedule 4.4(b)(i)</u>; <u>Schedule 4.4(b)(ii)</u> hereto contains a correct and complete list, as of the Closing Date, of the legal names and addresses of each warehouse at which Inventory of any such US Loan Party having a value in excess of $250,000 is stored; none of the receipts received by any such US Loan Party from any warehouse states that the goods covered thereby are to be delivered to bearer or to the order of a named Person or to a named Person and such named Person's assigns; <u>Schedule 4.4(b)(iii)</u> hereto sets forth a correct and complete list as of the Closing Date of (A) each place of business of each such US Loan Party and (B) the chief executive office of each US Loan Party; and (iv) <u>Schedule 4.4(b)(iv)</u> hereto sets forth a correct and complete list as of the Closing Date of the location, by state and street address, of all Real Property owned or leased by each such US Loan Party, identifying which properties are owned and which are leased, together with the names and addresses of any landlords.

4.5      <u>Defense of Agent's and Lenders' Interests</u>. Until (a) payment and performance in full of all of the Obligations and (b) termination of this Agreement, Agent's security interests in the US Collateral shall continue in full force and effect. During such period no US Loan Party shall, without Agent's prior written consent, pledge, sell (except for sales or other dispositions otherwise permitted in Section 7.1(b) hereof), assign, transfer, create or suffer to exist a Lien upon or encumber or allow or suffer to be encumbered in any way except for Permitted Encumbrances, any part of the US Collateral. Each US Loan Party shall defend Agent's interests in the US Collateral against any and all Persons whatsoever. At any time following demand by Agent for payment of all Obligations, Agent shall have the right to take possession of the indicia of the US Collateral and the US Collateral in whatever physical form contained, including: labels, stationery, documents, instruments and advertising materials. If Agent exercises this right to take possession of the US Collateral, US Loan Parties shall, upon demand, assemble it in the best manner possible and make it available to Agent at a place reasonably convenient to Agent. In addition, with respect to all US Collateral, Agent and Lenders shall be entitled to all of the rights and remedies set forth herein and further provided by the Uniform Commercial Code or other Applicable Law. During the continuance of an Event of Default, each US Loan Party shall, and Agent may, at its option, instruct all suppliers, carriers, forwarders, warehousers or others receiving or holding cash, checks, Inventory, documents or instruments in which Agent holds a security interest to deliver same to Agent and/or subject to Agent's order and if they shall come into any US Loan Party's possession, they, and each of them, shall be held by such US Loan Party in trust as Agent's trustee, and such US Loan Party will immediately deliver them to Agent in their original form together with any necessary endorsement.

4.6      <u>Inspection of Premises</u>. At all reasonable times and, so long as no Event of Default

91

is continuing, upon prior notice to the Borrowing Agent, and from time to time as often as Agent shall elect in its sole discretion, Agent and each Lender shall have full access to and the right to audit, check, inspect and make abstracts and copies from each US Loan Party's books, records, audits, correspondence and all other papers relating to the US Collateral and the operation of each US Loan Party's business. Agent, any Lender and their agents may enter upon any premises of any US Loan Party at any time during business hours and at any other reasonable time, and from time to time as often as Agent shall elect in its sole discretion, for the purpose of inspecting the US Collateral and any and all records pertaining thereto and the operation of such US Loan Party's business.

4.7     Appraisals. Agent may, in its sole discretion, exercised in a commercially reasonable manner, at any time after the Closing Date and from time to time, engage the services of an independent appraisal firm or firms of reputable standing, satisfactory to Agent, for the purpose of appraising the then current values of the Loan Parties' assets.  Absent the occurrence and continuance of an Event of Default at such time, Agent shall consult with US Loan Parties as to the identity of any such firm.  Not more than one field examination, at US-Canada Borrowers' expense, shall be conducted per annum unless an Event of Default or Default has occurred and is continuing.

4.8     Receivables; Deposit Accounts and Securities Accounts.

(a)     Each of the Receivables shall be a bona fide and valid account representing a bona fide indebtedness incurred by the Customer therein named, for a fixed sum as set forth in the invoice relating thereto (provided immaterial or unintentional invoice errors shall not be deemed to be a breach hereof) with respect to an absolute sale or lease and delivery of goods upon stated terms of the applicable US Loan Party, or work, labor or services theretofore rendered by such US Loan Party as of the date each Receivable is created. Same shall be due and owing in accordance with the applicable US Loan Party's standard terms of sale without dispute, setoff or counterclaim except as may be stated on the accounts receivable schedules delivered by US Loan Parties to Agent.

(b)     Each Customer, to the best of each applicable US Loan Party's knowledge, as of the date each Receivable is created, is and will be solvent and able to pay all Receivables on which the Customer is obligated in full when due. With respect to such Customers of any applicable US Loan Party who are not solvent, such US Loan Party has set up on its books and in its financial records bad debt reserves adequate to cover such Receivables.

(c)     Each US Loan Party's chief executive office is located as set forth on Schedule 4.4(b)(iii). Until written notice is given to Agent by Borrowing Agent of any other office at which any applicable US Loan Party keeps its records pertaining to Receivables, all such records shall be kept at such executive office.

(d)     US Loan Parties shall instruct their Customers to deliver all remittances upon Receivables (whether paid by check or by wire transfer of funds) to the Blocked Account(s) and/or Depository Accounts (and any associated lockboxes) as contemplated by Section 4.8(h) or as otherwise agreed to from time to time by Agent. Each US Loan Party shall deposit in the Blocked Account and/or Depository Account or, upon request by Agent, deliver to Agent, in

92

original form and on the date of receipt thereof, all checks, drafts, notes, money orders, acceptances, cash and other evidences of Indebtedness.

(e)     Agent shall have the right to send notice of the assignment of, and Agent's security interest in and Lien on, the Receivables to any and all Customers or any third party holding or otherwise concerned with any of the US Collateral.  At any time during the continuance of an Event of Default, Agent shall have the sole right to collect the Receivables, take possession of the US Collateral, or both. Agent's actual collection expenses, including, but not limited to, stationery and postage, telephone, facsimile, telegraph, secretarial and clerical expenses and the salaries of any collection personnel used for collection, may be charged to the Borrowers' Account and added to the Obligations.

(f)     Agent shall have the right to receive, endorse, assign and/or deliver in the name of Agent or any US Loan Party any and all checks, drafts and other instruments for the payment of money relating to the Receivables, and each such US Loan Party hereby waives notice of presentment, protest and non-payment of any instrument so endorsed. Each such US Loan Party hereby constitutes Agent or Agent's designee as such Loan Party's attorney with power (i) at any time during the continuance of an Event of Default:  (A) to endorse such US Loan Party's name upon any notes, acceptances, checks, drafts, money orders or other evidences of payment or US Collateral; (B) to sign such US Loan Party's name on any invoice or bill of lading relating to any of the Receivables, drafts against Customers, assignments and verifications of Receivables; (C) to send verifications of Receivables to any Customer;

(g)     (D) to sign such US Loan Party's name on all financing statements or any other documents or instruments deemed necessary or appropriate by Agent to preserve, protect, or perfect Agent's interest in the US Collateral and to file same; and (E) to receive, open and dispose of all mail addressed to any US Loan Party at any post office box/lockbox maintained by Agent for US Loan Parties or at any other business premises of Agent; and (ii) at any time during the continuance of an Event of Default: (A) to demand payment of the Receivables; (B) to enforce payment of the Receivables by legal proceedings or otherwise; (C) to exercise all of such US Loan Party's rights and remedies with respect to the collection of the Receivables and any other US Collateral; (D) to sue upon or otherwise collect, extend the time of payment of, settle, adjust, compromise, extend or renew the Receivables; (E) to settle, adjust or compromise any legal proceedings brought to collect Receivables; (F) to prepare, file and sign such US Loan Party's name on a proof of claim in bankruptcy or similar document against any Customer; (G) to prepare, file and sign such US Loan Party's name on any notice of Lien, assignment or satisfaction of Lien or similar document in connection with the Receivables; (H) to accept the return of goods represented by any of the Receivables; (I) to change the address for delivery of mail addressed to any such US Loan Party to such address as Agent may designate; and (J) to do all other acts and things necessary to carry out this Agreement. All acts of said attorney or designee are hereby ratified and approved, and said attorney or designee shall not be liable for any acts of omission or commission nor for any error of judgment or mistake of fact or of law, unless done maliciously or with gross (not mere) negligence (as determined by a court of competent jurisdiction in a final non-appealable judgment); this power being coupled with an interest is irrevocable while any of the Obligations remain unpaid.

(h)     Neither Agent nor any Lender shall, under any circumstances or in any

93

event whatsoever, have any liability for any error or omission or delay of any kind occurring in the settlement, collection or payment of any of the Receivables or any instrument received in payment thereof, or for any damage resulting therefrom.

(i)     All proceeds of US Priority Collateral shall be deposited by US Loan Parties into either (i) a lockbox account, dominion account or such other "blocked account" ("**Blocked Accounts**") established at a bank or banks (each such bank, a "**Blocked Account Bank**") pursuant to an arrangement with such Blocked Account Bank as may be acceptable to Agent, or (ii) depository accounts ("**Depository Accounts**") established at Agent for the deposit of such proceeds. Each applicable Loan Party, Agent and each Blocked Account Bank shall enter into a deposit account control agreement in form and substance satisfactory to Agent that is sufficient to give Agent "control" (for purposes of Articles 8 and 9 of the Uniform Commercial Code) over such account and which directs such Blocked Account Bank to transfer such funds so deposited on a daily basis or at other times acceptable to Agent, either to any account maintained by Agent at said Blocked Account Bank or by wire transfer to appropriate account(s) at Agent. All funds deposited in such Blocked Accounts or Depository Accounts shall, subject to the notice and hearing requirements set forth in the Interim Order or, after entry of the Final Order, the Final Order, become subject to the security interest of Agent for its own benefit and the ratable benefit of Issuer, Lenders and all other holders of the Obligations, and Borrowing Agent shall obtain the agreement by such Blocked Account Bank to waive any offset rights against the funds so deposited. Neither Agent nor any Lender assumes any responsibility for such blocked account arrangement, including any claim of accord and satisfaction or release with respect to deposits accepted by any Blocked Account Bank thereunder. Agent shall, subject to the remedies process set forth in the Interim Order or, after entry of the Final Order, the Final Order, apply all funds received by it from the Blocked Accounts and/or Depository Accounts to the satisfaction of the Obligations (including the cash collateralization of the Letters of Credit) in such order as Agent shall determine in its sole discretion. Notwithstanding the foregoing, deposit accounts used solely for payroll or benefits related disbursements or in which solely trust or Insurance Subsidiary funds are maintained shall not constitute "Blocked Accounts" or "Depository Accounts.

(j)     The parties hereto hereby acknowledge, confirm and agree that the implementation of the cash management arrangements contemplated herein is a contractual right provided to the Agent and the Lenders hereunder in order for the Agent and the Lenders to manage and monitor their collateral position and not a proceeding for enforcement or recovery of a claim, or pursuant to, or an enforcement of, any security or remedies whatsoever, the cash management arrangements contemplated herein are critical to the structure of the lending arrangements contemplated herein, the Agent and Lenders are relying on the US Loan Parties' acknowledgement, confirmation and agreement with respect to such cash management arrangements in making accommodations of credit available to them and in particular that any accommodations of credit are being provided by the Agent and Lenders strictly on the basis of a borrowing base calculation to fully support and collateralize any such accommodations of credit hereunder.

(k)     No US Loan Party will, without Agent's consent, compromise or adjust any Receivables (or extend the time for payment thereof) or accept any returns of merchandise or grant any additional discounts, allowances or credits thereon, which, in any case, involves (i) any individual Receivable having a value in excess of $250,000 or (ii) an annual aggregate amount of

94

Receivables for all Loan Parties in excess of $1,000,000, except for those compromises, adjustments, returns, discounts, credits and allowances as have been heretofore customary in the Ordinary Course of Business of such US Loan Party.

(l)     All domestic and Canadian deposit accounts (including all Blocked Accounts and Depository Accounts), securities accounts and investment accounts of each applicable US- Canada Loan Party and its Subsidiaries as of the Closing Date are set forth on Schedule 4.8(k). No US-Canada Loan Party shall open any new deposit account, securities account or investment account unless (i) with respect to domestic deposit accounts, such accounts are maintained at PNC, (ii) with respect to Canadian accounts, (w) no Event of Default is continuing, (x) such accounts are maintained at JPMorgan, (y) the accounts are subject to a control agreement in form and substance satisfactory to Agent sufficient to give Agent "control" (for purposes of Articles 8 and 9 of the Uniform Commercial Code) over such account and (z) Borrowing Agent shall give Agent written notice of the establishment of any such Canadian accounts within three (3) days after the establishment thereof and (iii) if such account is to be maintained with a bank, depository institution or securities intermediary that is not Agent, such bank, depository institution or securities intermediary, each applicable US Loan Party and Agent shall first have entered into an account control agreement in form and substance satisfactory to Agent sufficient to give Agent "control" (for purposes of Articles 8 and 9 of the Uniform Commercial Code) over such account.

4.9     Inventory. To the extent Inventory held for sale or lease has been produced by any US Loan Party, it has been and will be produced by such Borrower in material accordance with the Federal Fair Labor Standards Act of 1938, as amended, and all rules, regulations and orders thereunder.

4.10     Maintenance of Equipment. The equipment shall be maintained in good operating condition and repair (reasonable wear and tear and casualty excepted) consistent with past practice and as needed in current operations, and all necessary replacements of and repairs thereto shall be made so that the value and operating efficiency of the equipment shall be maintained and preserved. No US Loan Party shall use or operate the equipment in violation of any law, statute, ordinance, code, rule or regulation.

4.11     Exculpation of Liability. Nothing herein contained shall be construed to constitute Agent or any Lender as any US Loan Party's agent for any purpose whatsoever, nor shall Agent or any Lender be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the US Collateral wherever the same may be located and regardless of the cause thereof. Neither Agent nor any Lender, whether by anything herein or in any assignment or otherwise, assume any of any US Loan Party's obligations under any contract or agreement assigned to Agent or such Lender, and neither Agent nor any Lender shall be responsible in any way for the performance by any US Loan Party of any of the terms and conditions thereof.

4.12     Financing Statements. Except as respects the financing statements filed by Agent, financing statements described on Schedule 1.2, and financing statements filed in connection with Permitted Encumbrances, no financing statement covering any of the US Collateral or any proceeds thereof is or will be on file in any public office.

4.13     Superpriority Claims and Collateral Security.   Each Debtor hereby represents,

95

warrants and covenants that, upon the entry by the Bankruptcy Court of the Interim Order and/or the Final Order, as applicable, the Obligations are entitled to superpriority Liens and claims to the extent provided by Section 7 of the Interim Order and, once entered, the Final Order.

4.14    No Filings Required.  The Liens securing the Obligations of the Debtors shall be deemed valid and perfected and duly recorded by entry of the Interim Order.  Agent shall not be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office or to cause any account control agreements to be entered into by any otherwise applicable parties with respect to any deposit account or securities account or to take any other action in order to validate or perfect the Lien granted by or pursuant to the Interim Order, the Final Order, this Agreement or any Other Document.

4.15    Grants, Rights and Remedies.  The Lien and administrative priority granted by or pursuant to the Interim Order, the Final Order, this Agreement or any Other Document are independently granted.  The Interim Order, the Final Order, this Agreement and the Other Documents supplement each other, and the grants, priorities, rights and remedies of Agent and Lenders hereunder and thereunder are cumulative.

## 5.    REPRESENTATIONS AND WARRANTIES.

Each Loan Party represents and warrants as follows:

5.1    Authority.

(a)    Subject to entry by the Bankruptcy Court of the Interim Order and the Final Order, as applicable, each Loan Party has full power, authority and legal right to enter into this Agreement and the Other Documents to which it is a party and to perform all its respective Obligations hereunder and thereunder. This Agreement and the Other Documents to which it is a party have been duly executed and delivered by each Loan Party, and, subject to entry by the Bankruptcy Court of the Interim Order and the Final Order, this Agreement and the Other Documents to which it is a party constitute the legal, valid and binding obligation of such Loan Party enforceable in accordance with their terms. Subject to entry by the Bankruptcy Court of the Interim Order and the Final Order, as applicable, the execution, delivery and performance of this Agreement and of the Other Documents to which it is a party (a) are within such Loan Party's corporate, company or partnership powers, as applicable, have been duly authorized by all necessary corporate, company or partnership action, as applicable, are not in contravention of law or the terms of such Loan Party's Organizational Documents or to the conduct of such Loan Party's business or of any Material Contract or undertaking to which such Loan Party is a party or by which such Loan Party is bound, (b) will not, in any material respect, conflict with or violate any law or regulation, or any judgment, order or decree of any Governmental Body, (c) will not require the Consent of any Governmental Body, any party to a Material Contract or any other Person, except those Consents set forth on Schedule 5.1 hereto, all of which will have been duly obtained, made or compiled prior to the Closing Date and which are in full force and effect or except to the extent the failure to obtain any consent would not reasonably be expected to have a material and adverse effect on any Loan Party and (d) will not conflict with, nor result in any breach in any of the provisions of or constitute a default under or result in the creation of any Lien except Permitted Encumbrances upon any asset of such Loan Party under the provisions of any agreement,

96

instrument, or other document to which such Loan Party is a party or by which it or its property is a party or by which it may be bound, including the Term DIP Loan Documents.

(b)    [Reserved].

5.2    <u>Formation and Qualification</u>.

(a)    Each Loan Party is duly incorporated or formed, as applicable, and in good standing (or equivalent thereof in any applicable jurisdiction) under the laws of the state, province or country, as applicable, listed on <u>Schedule 5.2(a)</u> and is qualified to do business and is in good standing in the states listed on <u>Schedule 5.2(a)</u> which constitute all states, provinces or countries, as applicable, in which qualification and good standing (or equivalent thereof in any applicable jurisdiction) are necessary for such Loan Party to conduct its business and own its property and where the failure to so qualify could reasonably be expected to have a material and adverse effect on such Loan Party. Each Loan Party has, as of the Closing Date, delivered to Agent true and complete copies of its Organizational Documents and will promptly notify Agent of any amendment or changes thereto.

(b)    The only Subsidiaries of the Company and each Loan Party are listed on <u>Schedule 5.2(b)</u>. <u>Schedule 5.2(b)</u> also designates each of the Material Subsidiaries, US Excluded Subsidiaries and Foreign Excluded Subsidiaries. No Material Subsidiary is a US Excluded Subsidiary except the Insurance Subsidiary.

5.3    <u>Survival of Representations and Warranties</u>. All representations and warranties of such Loan Party contained in this Agreement and the Other Documents to which it is a party shall be true in all material respects at the time of such Loan Party's execution of this Agreement and the Other Documents to which it is a party, and shall survive the execution, delivery and acceptance thereof by the parties thereto and the closing of the transactions described therein or related thereto.

5.4    <u>Tax Returns</u>. Each Loan Party's federal tax identification number (where applicable) is set forth on <u>Schedule 5.4</u>. Each Loan Party has filed all federal, national, state, provincial and material local tax returns and other reports each is required by law to file and has paid all federal, national, state, provincial and all other material taxes, assessments, fees and other governmental charges that are due and payable, except (i) those which are being Properly Contested or (ii) the nonpayment of which is permitted or required by the Bankruptcy Code. The provision for taxes on the books of each Loan Party is adequate for all years not closed by applicable statutes, and for its current fiscal year, and no Loan Party has any knowledge of any deficiency or additional assessment in connection therewith not provided for on its books.

5.5    [Reserved].

5.6    [Reserved].

5.7    [Reserved].

5.8    [Reserved].

5.9    <u>Budget</u>.  The Budget was prepared in good faith and based upon assumptions which

97

were reasonable in light of the conditions existing at the time of delivery thereof and reflect each Debtor's reasonable estimate of its future financial performance for such period (it being understood that projections by their nature are inherently uncertain and the results reflected therein may not actually be achieved and actual results may differ and differences may be material).

5.10    <u>Entity Names</u>. Except as set forth on <u>Schedule 5.10</u>, no Loan Party has been known by any other company or corporate name, as applicable, in the past five (5) years and does not sell Inventory under any other name except as set forth on <u>Schedule 5.10</u>, nor has any Loan Party been the surviving corporation or company, as applicable, of a merger or consolidation or acquired all or substantially all of the assets of any Person during the preceding five (5) years.

5.11    <u>O.S.H.A. Environmental Compliance; Flood Insurance</u>.

(a)    Except to the extent non-compliance would not reasonably be expected to have a Material Adverse Effect, each Loan Party is in compliance with, and its facilities, business, assets, property, leaseholds, Real Property and Fixed Assets are in compliance with, to the extent applicable, the Federal Occupational Safety and Health Act and International Laws. Any outstanding citations, notices or orders of non-compliance issued to any Loan Party or relating to its business, assets, property, leaseholds or Fixed Assets under any such laws, rules or regulations are set forth on <u>Schedule 5.11</u>; <u>provided</u> no such citations, notices or orders of non- compliance would reasonably be expected to have a Material Adverse Effect.

(b)    Each Loan Party has been issued all required federal, state, provincial and local licenses, certificates or permits (collectively, "**Approvals**") required under all applicable Environmental Laws and all such Approvals are current and in full force and effect, except to the extent failure to maintain such Approvals would not reasonably be expected to have a Material Adverse Effect.

(c)    Except as set forth on <u>Schedule 5.11</u>: (i) there have been no releases, spills, discharges, leaks or disposal (collectively referred to as "**Releases**") of Hazardous Materials at, upon, under or migrating from or onto any Real Property owned, leased or occupied by any Loan Party or any Subsidiary thereof, except for those Releases which are in compliance, in all material respects, with Environmental Laws; (ii) there are no underground storage tanks or polychlorinated biphenyls on any Real Property owned, leased or occupied by any Loan Party or any Subsidiary thereof, except for such underground storage tanks or polychlorinated biphenyls that are present in compliance with Environmental Laws, in all material respects; (iii) the Real Property including any premises owned, leased or occupied by any Loan Party or any Subsidiary thereof has never been used by any Loan Party or any Subsidiary thereof to dispose of Hazardous Materials, except as authorized by Environmental Laws; and (iv) no Hazardous Materials are managed by any Loan Party or any Subsidiary thereof on any Real Property including any premises owned, leased or occupied by any Loan Party or any Subsidiary thereof, excepting such quantities as are managed in accordance with all applicable manufacturer's instructions and compliance with Environmental Laws, in all material respects, and as are necessary for the operation of the commercial business of any Loan Party or any Subsidiary thereof or of its tenants.

(d)    All Real Property owned by Loan Parties and their Subsidiaries is insured pursuant to policies and other bonds which are valid and in full force and effect and which provide

98

adequate coverage from reputable and financially sound insurers in amounts sufficient to insure the assets and risks of each such Loan Party or Subsidiary thereof in accordance with prudent business practice in the industry of such Person. Each Loan Party and Subsidiary thereof has taken all actions required under the Flood Laws including, but not limited to, obtaining flood insurance for such property, structures and contents.

5.12 No Litigation, Violation, Indebtedness or Default; ERISA Compliance.

(a) [Reserved].

(b) Except as disclosed in Schedule 5.12(b)(i), no Loan Party has any pending or threatened litigation, arbitration, actions or proceedings which if determined adversely would be reasonably be expected to result in a Material Adverse Effect. No Loan Party has any outstanding Indebtedness other than the Obligations, except for (i) Indebtedness disclosed in Schedule 5.12(b)(ii) and (ii) Indebtedness otherwise permitted under Section 7.8 hereof.

(c) No Loan Party is in violation of any applicable statute, law, rule, regulation or ordinance in any respect which would reasonably be expected be material and adverse to such Loan Party, nor is any Loan Party in violation of any order of any court, Governmental Body or arbitration board or tribunal. Except where any failure would not reasonably be expected to have a Material Adverse Effect, each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other federal or state laws.

(d) No Loan Party or any member of the Controlled Group maintains or is required to contribute to any Plan other than those listed on Schedule 5.12(d) hereto. Except where any failure would not reasonably be expected to have a Material Adverse Effect, (i) each Loan Party and each member of the Controlled Group has met all applicable minimum funding requirements under Section 302 of ERISA and Section 412 of the Code in respect of each Plan, and each Plan is in compliance with Sections 412, 430 and 436 of the Code and Sections 206(g), 302 and 303 of ERISA, without regard to waivers and variances; (ii) each Plan which is intended to be a qualified plan under Section 401(a) of the Code as currently in effect has been determined by the Internal Revenue Service to be qualified under Section 401(a) of the Code and the trust related thereto is exempt from federal income tax under Section 501(a) of the Code or an application for such a determination is currently being processed by the Internal Revenue Code; (iii) neither any Loan Party nor any member of the Controlled Group has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due which are unpaid; (iv) no Plan has been terminated by the plan administrator thereof nor by the PBGC, and there is no occurrence which would cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Plan; (v) the current value of the assets of each Plan exceeds the present value of the accrued benefits and other liabilities of such Plan and neither any Loan Party nor any member of the Controlled Group knows of any facts or circumstances which would materially change the value of such assets and accrued benefits and other liabilities; (vi) neither any Loan Party nor any member of the Controlled Group has breached any of the responsibilities, obligations or duties imposed on it by ERISA with respect to any Plan; (vii) neither any Loan Party nor any member of a Controlled Group has incurred any liability for any excise tax arising under Section 4971, 4972 or 4980B of the Code, and no fact exists which could give rise to any such liability; (viii) neither any Loan Party nor any member of the Controlled

Group nor any fiduciary of, nor any trustee to, any Plan, has engaged in a "prohibited transaction" described in Section 406 of the ERISA or Section 4975 of the Code nor taken any action which would constitute or result in a Termination Event with respect to any such Plan which is subject to ERISA; (ix) no Termination Event has occurred or is reasonably expected to occur; (x) there exists no event described in Section 4043 of ERISA, for which the thirty (30) day notice period has not been waived; (xi) neither any Loan Party nor any member of the Controlled Group has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA; (xii) neither any Loan Party nor any member of the Controlled Group maintains or is required to contribute to any Plan which provides health, accident or life insurance benefits to former employees, their spouses or dependents, other than in accordance with Section 4980B of the Code; (xiii) neither any Loan Party nor any member of the Controlled Group has withdrawn, completely or partially, within the meaning of Section 4203 or 4205 of ERISA, from any Multiemployer Plan so as to incur liability under the Multiemployer Pension Plan Amendments Act of 1980 and there exists no fact which would reasonably be expected to result in any such liability; and (xiv) no Plan fiduciary (as defined in Section 3(21) of ERISA) has any liability for breach of fiduciary duty or for any failure in connection with the administration or investment of the assets of a Plan.

(e)   Except as, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, (a) the Canadian Pension Plans are duly registered under the Income Tax Act (Canada) and any other Applicable Laws which require registration, have been administered in accordance with the Income Tax Act (Canada) and such other Applicable Law and no event has occurred which could cause the loss of such registered status, (b) all obligations of the Canadian Loan Parties and their Subsidiaries (including fiduciary, funding, investment and administration obligations) required to be performed in connection with the Canadian Pension Plans and the funding agreements relating thereto have been performed on a timely basis, and (c) all contributions or premiums required to be made or paid by them to the Canadian Pension Plans have been made on a timely basis in accordance with the terms of such plans and all Applicable Laws.

(f)   [Reserved].

5.13   Patents, Trademarks, Copyrights and Licenses. All material Intellectual Property owned or utilized by any Loan Party: (i) is set forth on Schedule 5.13; and (ii) is valid and has been duly registered or filed with all appropriate Governmental Bodies. The Intellectual Property set forth on Schedule 5.13 constitutes all of the intellectual property rights which are necessary for the operation of each Loan Party's business. Except as set forth in Schedule 5.13 hereto, there is no objection to, pending challenge to the validity of, or proceeding by any Governmental Body to suspend, revoke, terminate or adversely modify, any such Intellectual Property and no Loan Party is aware of any grounds for any challenge or proceedings, and no such matters set forth on Schedule 5.13, if determined adversely to a Loan Party, would reasonably be expected to have a Material Adverse Effect. All material Intellectual Property owned or held by any Loan Party consists of original material or property developed by such Loan Party or was lawfully acquired by such Loan Party from the proper and lawful owner thereof. Each of such items has been maintained so as to preserve the value thereof from the date of creation or acquisition thereof.

5.14   Licenses, Permits and Accreditation. Except as could not, individually or in the aggregate, result in a Material Adverse Effect or result in criminal liability for any Loan Party, (a)

100

each of Loan Parties and their Subsidiaries has, to the extent applicable: (i) obtained and maintains in good standing all required licenses or permits required by any applicable federal, state, provincial or local law, rule or regulation for the operation of its business in each jurisdiction wherein it is now conducting or proposes to conduct business; and (ii) to the extent prudent and customary in the industry in which it is engaged, obtained and maintains accreditation from all generally recognized accrediting agencies; and (b) all such required licenses, permits and accreditations are in full force and effect on the date hereof and have not been revoked or suspended or otherwise limited.

5.15    [Reserved].

5.16    [Reserved].

5.17    No Burdensome Restrictions. No Loan Party is party to any contract or agreement the performance of which would reasonably be expected to have a Material Adverse Effect. As of the Closing Date, each Loan Party has heretofore delivered to Agent true and complete copies of all Material Contracts to which it is a party or to which it or any of its properties is subject. No Loan Party has agreed or consented to cause or permit in the future (upon the happening of a contingency or otherwise) any of its property, whether now owned or hereafter acquired, to be subject to a Lien which is not a Permitted Encumbrance.

5.18    No Labor Disputes. No Loan Party is involved in any labor dispute which would reasonably be expected to have a Material Adverse Effect; there are no material labor disputes, strikes or walkouts or union organization of any Loan Party's employees threatened or in existence and no labor contract is scheduled to expire during the Term other than as set forth on Schedule 5.18 hereto.

5.19    Margin Regulations. No Loan Party is engaged, nor will it engage, principally or as one of its important activities, in the business of extending credit for the purpose of "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U of the Board of Governors of the Federal Reserve System as now and from time to time hereafter in effect. No part of the proceeds of any Advance will be used for "purchasing" or "carrying" "margin stock" as defined in Regulation U of such Board of Governors.

5.20    Investment Company Act. No Loan Party is an "investment company" registered or required to be registered under the Investment Company Act of 1940, as amended, nor is it controlled by such a company.

5.21    Disclosure. No representation or warranty made by any Loan Party in this Agreement, the Term DIP Loan Documents or in any financial statement, report, certificate or any other document furnished in connection herewith or therewith contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements herein or therein not misleading. There is no fact known to any Loan Party or which reasonably should be known to such Loan Party which such Loan Party has not disclosed to Agent in writing with respect to the transactions contemplated by this Agreement or the Term DIP Loan Documents which would reasonably be expected to have a Material Adverse Effect.

5.22    Swaps. No Loan Party is a party to, nor will it be a party to, any swap agreement

101

whereby such Loan Party has agreed or will agree to swap interest rates or currencies unless same provides that damages upon termination following an event of default thereunder are payable on an unlimited "two-way basis" without regard to fault on the part of either party.

5.23    Business and Property of Loan Parties. Upon and after the Closing Date, Loan Parties do not propose to engage in any business that is fundamentally and substantively different from their existing lines of business conducted by them on the Closing Date, taken as a whole, other than activities reasonably related, complementary or ancillary to such existing lines of business or reasonable extensions thereof. On the Closing Date, each Loan Party will own all the property and possess all of the rights and Consents necessary for the conduct of the business of such Loan Party.

5.24    Ineligible Securities. Loan Parties do not intend to use and shall not use any portion of the proceeds of the Advances, directly or indirectly, to purchase during the underwriting period, or for 30 days thereafter, Ineligible Securities being underwritten by a securities Affiliate of Agent or any Lender.

5.25    Federal Securities Laws. None of Loan Parties or any of their Subsidiaries (other than the Company with respect to clauses (i) and (ii)), (i) is required to file periodic reports under the Exchange Act or securities legislation of Canada, France, England or the Netherlands, (ii) has any securities registered under the Exchange Act or securities legislation of Canada, France, England or the Netherlands or (iii) has filed a registration statement that has not yet become effective under the Securities Act or securities legislation of Canada, France, England or the Netherlands.

5.26    Equity Interests. The authorized and outstanding Equity Interests of each Loan Party, and each legal and beneficial holder thereof, are as set forth on Schedule 5.26 hereto. All of the Equity Interests of each Loan Parties have been duly and validly authorized and issued and are fully paid and non-assessable and have been sold and delivered to the holders hereof in compliance with, or under valid exemption from, all federal, provincial and state laws and the rules and regulations of each Governmental Body governing the sale and delivery of securities. Except for the rights and obligations set forth on Schedule 5.26, there are no subscriptions, warrants, options, calls, commitments, rights or agreement by which any Loan Party or any of the shareholders of any Loan Party is bound relating to the issuance, transfer, voting or redemption of shares of its Equity Interests or any pre-emptive rights held by any Person with respect to the Equity Interests of Loan Parties.  Except as set forth on Schedule 5.26, Loan Parties have not issued any securities convertible into or exchangeable for shares of its Equity Interests or any options, warrants or other rights to acquire such shares or securities convertible into or exchangeable for such shares.

5.27    Commercial Tort Claims. No Loan Party has any commercial tort claims in excess of $1,000,000 whether or not a proceeding has been filed, except as set forth on Schedule 5.27 hereto.

5.28    Letter of Credit Rights. No Loan Party has any letter of credit rights in excess of $1,000,000 except as set forth on Schedule 5.28 hereto.

5.29    Material Contracts. Schedule 5.29 sets forth all Material Contracts of Loan Parties

102

and any material defaults thereunder. Except where any failure or default would reasonably be expected to have a Material Adverse Effect, all Material Contracts are in full force and effect and no material defaults currently exist thereunder.

5.30    Fraud and Abuse. Except as would not, individually or in the aggregate, constitute a Material Adverse Effect or result in criminal liability for any Loan Party, neither any Loan Party and its Subsidiaries nor, to the knowledge of any Chief Executive Officer, Chief Financial Officer, Treasurer or Compliance Officer of the Company, any of their officers or directors, have engaged in any activities which are prohibited under federal Medicare and Medicaid statutes, 42 U.S.C. Section 1320a-7b or 42 U.S.C., or any other Applicable Laws in any applicable jurisdiction. Section 1395nn or the regulations promulgated pursuant to such statutes or related state, local or provincial statutes or regulations, or which are prohibited by binding rules of professional conduct, including but not limited to the following: (a) knowingly and willfully making or causing to be made a false statement or misrepresentation of a material fact in any applications for any benefit or payment; (b) knowingly and willfully making or causing to be made any false statement or misrepresentation of a material fact for use in determining rights to any benefit or payment; (c) failing to disclose knowledge by a claimant of the occurrence of any event affecting the initial or continued right to any benefit or payment on its own behalf or on behalf of another with the intent to secure such benefit or payment fraudulently; (d) knowingly and willfully soliciting or receiving any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind, or offering to pay such remuneration (i) in return for referring an individual to a Person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by Medicare, Medicaid or other applicable third party payors, including any Governmental Body, or (ii) in return for purchasing, leasing or ordering or arranging for or recommending the purchasing, leasing or ordering of any good, facility, service, or item for which payment may be made in whole or in part by Medicare, Medicaid or other applicable third party payors, including any Governmental Body.

Notwithstanding the foregoing, Loan Parties are aware of, and have disclosed, the existence of the OIG Investigation and Consent Decree. Loan Parties believe that the programs described in the subpoena are in compliance with all applicable Laws, except where the failure to be in compliance would not constitute a Material Adverse Effect. Loan Parties are cooperating fully with the government inquiry.

5.31    Other Regulatory Protection. Except for oxygen products, none of Loan Parties and their Subsidiaries manufactures pharmaceutical products. Except as set forth on Schedule 5.31, none of Loan Parties and none of the Subsidiaries of Loan Parties (a) participates in Medicare or Medicaid or other similar government programs in applicable jurisdictions as a provider or supplier, rather, Loan Parties and their Subsidiaries are manufacturers and sell to providers for purposes of Medicare, Medicaid and any other Medical Reimbursement Program or other similar government programs in applicable jurisdictions, (b) is a party to any Medicare Provider Agreement or Medicaid Provider Agreement, or (c) bills for items or services to any Medical Reimbursement Program or other similar government programs in applicable jurisdictions. Each of Loan Parties and its Subsidiaries is in compliance with all applicable rules, regulations and other requirements of the Food and Drug Administration and Health Canada (for purposes hereof collectively, "**FDA**"), the Federal Trade Commission (for purposes hereof, "**FTC**"), the Consumer Product Safety Commission, the United States Customs Service and the United States Postal

103

Service and other state, national, provincial or federal regulatory authorities or jurisdictions in which such Loan Party or any of its Subsidiaries do business or distribute and market products, except to the extent that any such noncompliance, individually or in the aggregate, does not constitute a Material Adverse Effect. Neither the FDA, the FTC, the Consumer Product Safety Commission, nor any other such regulatory authority has requested (or, to the knowledge of any authorized officer, are considering requesting) any product recalls or other enforcement actions that (a) if complied with, individually or in the aggregate, would reasonably be expected to constitute a Material Adverse Effect or (b) with which Loan Parties and their Subsidiaries have not complied within the time period allowed, except where any such failure would not reasonably be expected to have a Material Adverse Effect.

5.32    [Reserved].

5.33    Delivery of Term DIP Loan Documents. Agent has received complete copies of the Term DIP Loan Documents. None of such documents and agreements has been amended or supplemented, nor have any of the provisions thereof been waived, except pursuant to a written agreement or instrument which has heretofore been delivered to Agent.

5.34    [Reserved].

5.35    EEA Financial Institution. No Loan Party is an EEA Financial Institution.

5.36    Certificate of Beneficial Ownership. The Certificate of Beneficial Ownership executed and delivered to Agent and Lenders for each Borrower (other than the Company) on or prior to the date of this Agreement, as updated from time to time in accordance with this Agreement, is accurate, complete and correct as of the date hereof and as of the date any such update is delivered. The Borrowers acknowledge and agree that the Certificate of Beneficial Ownership is one of the Other Documents.

5.37    Sanctions and other Anti-Terrorism Laws. No (a) Covered Entity, nor any employees, officers, directors, affiliates, consultants, brokers or agents acting on a Covered Entity's behalf in connection with this Agreement: (i) is a Sanctioned Person; (ii) directly, or indirectly through any third party, is engaged in any transactions or other dealings with or for the benefit of any Sanctioned Person or Sanctioned Jurisdiction, or any transactions or other dealings that otherwise are prohibited by any Anti-Terrorism Laws; (b) Collateral is Embargoed Property.

5.38    Anti-Corruption Laws. Each Covered Entity has (a) conducted its business in compliance with all Anti-Corruption Laws and (b) has instituted and maintains policies and procedures designed to ensure compliance with such Laws.

## 6.  AFFIRMATIVE COVENANTS.

Each Loan Party shall, and shall cause each of its Subsidiaries to, until payment in full of the Obligations and termination of this Agreement:

6.1    Compliance with Laws. Comply in all material respects with all Applicable Laws with respect to the Collateral or any part thereof or to the operation of such Loan Party's business the non-compliance with which would reasonably be expected to be material and adverse to any

Loan Party (except to the extent (a) any separate provision of this Agreement shall expressly require compliance with any particular Applicable Law(s) pursuant to another standard or (b) any Applicable Law is being Properly Contested).

6.2     Conduct of Business and Maintenance of Existence and Assets. (a) Conduct continuously and operate actively its business according to good business practices and maintain all of its properties useful or necessary in its business in good working order and condition (reasonable wear and tear and casualty excepted and except as may be disposed of in accordance with the terms of this Agreement), including all material Intellectual Property and take all actions necessary to enforce and protect the validity of any material intellectual property right or other right included in the Collateral; (b) keep in full force and effect its existence and comply with all laws and regulations governing the conduct of its business where the failure to do so would reasonably be expected to have a Material Adverse Effect; and (c) make all such reports and pay all such franchise and other taxes and license fees and do all such other acts and things as may be lawfully required to maintain its rights, licenses, leases, powers and franchises under the laws of the United States, Canada, France, England or the Netherlands or any political subdivision thereof where the failure to do so would reasonably be expected to have a Material Adverse Effect.

6.3     Books and Records; Inspection Rights.

(a)     Keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to its business and affairs (including without limitation accruals for taxes, assessments, Charges, levies and claims, allowances against doubtful Receivables and accruals for depreciation, obsolescence or amortization of assets), that allow Loan Parties to prepare financial reports in accordance with, or as required by, GAAP consistently applied in the opinion of such independent public accountant as shall then be regularly engaged by Loan Parties.

(b)     Permit any representatives designated by the Agent or any Lender (including employees of the Agent, any Lender or any consultants, accountants, lawyers, agents and appraisers retained by the Agent), upon reasonable prior notice, to visit and inspect its properties, to conduct at such Loan Party's premises field examinations of such Loan Party's assets, liabilities, books and records, including examining and making extracts from its books and records, environmental assessment reports and Phase I or Phase II studies, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested.

6.4     Payment of Taxes. Unless Properly Contested, pay, when due, all Priority Payables and all taxes, assessments and other Charges lawfully levied or assessed upon such Loan Party or any of the Collateral, including real and personal property taxes, assessments and charges and all franchise, income, employment, social security benefits, withholding, and sales taxes, except, in each case, with respect to any Person that is a Debtor under the Cases, the nonpayment of such tax, assessment, or other charge is permitted or required by the Bankruptcy Code. If any tax by any Governmental Body is or may be imposed on or as a result of any transaction between any Loan Party and the Agent or any Lender which the Agent or any Lender may be required to withhold or pay or if any taxes, assessments, or other Charges remain unpaid after the date fixed for their payment, or if any claim shall be made which, in the Agent's opinion, may reasonably be

105

expected to create a valid Lien on the Collateral, the Agent may, upon notice to Loan Parties (or during an Event of Default without notice to Loan Parties) pay the taxes, assessments or other Charges and each Loan Party hereby indemnifies and holds the Agent and each Lender harmless in respect thereof. The amount of any payment by an Agent under this Section 6.4 shall be charged to Borrowers' Account as a Revolving Advance maintained as a Domestic Rate Loan and added to the Obligations and, until Loan Parties shall furnish the Agent with an indemnity therefor (or supply the Agent with evidence satisfactory to the Agent that due provision for the payment thereof has been made), the Agent may hold without interest any balance standing to Loan Parties' credit and the Agent shall retain its security interest in and Lien on any and all Collateral held by the Agent.

6.5     [Reserved].

6.6     [Reserved].

6.7     Insurance.

(a)     (i) Keep all its insurable properties and properties in which such Loan Party has an interest insured against the hazards of fire, flood, sprinkler leakage, those hazards covered by extended coverage insurance and such other hazards, and for such amounts, as is customary in the case of companies engaged in businesses similar in size and scope to such Loan Party's including business interruption insurance; (ii) maintain a bond in such amounts as is customary in the case of companies engaged in businesses similar to such Loan Party insuring against larceny, embezzlement or other criminal misappropriation of insured's officers and employees who may either singly or jointly with others at any time have access to the assets or funds of such Loan Party either directly or through authority to draw upon such funds or to direct generally the disposition of such assets; (iii) maintain public and product liability insurance against claims for personal injury, death or property damage suffered by others; (iv) maintain all such worker's compensation or similar insurance as may be required under the laws of any state, province or jurisdiction in which such Loan Party is engaged in business; (v) furnish Agent with (A) copies of all policies and evidence of the maintenance of such policies by the renewal thereof at least thirty (30) days before any expiration date, and (B) appropriate loss payable endorsements in form and substance satisfactory to Agent, naming Agent as an additional insured and mortgagee and/or lender loss payee (as applicable) as its interests may appear with respect to all insurance coverage referred to in clauses (i) and (ii) above, and providing (I) that all proceeds thereunder shall be payable to Agent, (II) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy, and (III) that such policy and loss payable clauses may not be cancelled, amended or terminated unless at least thirty (30) days prior written notice is given to Agent (or in the case of non-payment, at least ten (10) days prior written notice). All of the coverages required in this Section 6.7(a) shall be maintained with financially sound and reputable carriers having a financial strength rating of at least A- by A.M. Best Company. In the event of any loss thereunder, the carriers named therein hereby are directed by Agent and the applicable Loan Party to make payment for such loss to Agent and not to such Loan Party and Agent jointly. If any insurance losses are paid by check, draft or other instrument payable to any Loan Party and Agent jointly, Agent may endorse such Loan Party's name thereon and do such other things as Agent may deem advisable to reduce the same to cash.

(b)      Each Loan Party shall take all actions required under the Flood Laws and/or requested by Agent to assist in ensuring that each Lender is in compliance with the Flood Laws applicable to the Collateral, including, but not limited to, providing Agent with the address and/or GPS coordinates of each structure on any real property that will be subject to a mortgage in favor of Agent, for the benefit of Lenders, and, to the extent required, obtaining flood insurance for such property, structures and contents prior to such property, structures and contents becoming Collateral, and thereafter maintaining such flood insurance in full force and effect for so long as required by the Flood Laws.

(c)      With respect to any claims in excess of $1,000,000 individually or $5,000,000 in the aggregate in any calendar year and with respect to any claims during the continuance of a Default or Event of Default, Agent is hereby authorized to adjust and compromise claims under insurance coverage referred to in Sections 6.7(a)(i) and (iii) and 6.7(b) above. All loss recoveries received by Agent under any such insurance may be applied to the Obligations, in such order as Agent in its sole discretion shall determine, subject to the terms of the ABL Intercreditor Agreement. Any surplus shall be paid by Agent to Loan Parties or applied as may be otherwise required by law. Any deficiency thereon shall be paid by Loan Parties to Agent, on demand.  Anything hereinabove to the contrary notwithstanding, and subject to the fulfillment of the conditions set forth below, Agent shall remit to Borrowing Agent insurance proceeds received by Agent during any calendar year under insurance policies procured and maintained by Loan Parties which insure Loan Parties' insurable properties to the extent such insurance proceeds do not exceed $5,000,000 in the aggregate during such calendar year or $1,000,000 per occurrence. In the event the amount of insurance proceeds received by Agent for any occurrence exceeds $1,000,000, then Agent shall not be obligated to remit the insurance proceeds to Borrowing Agent unless Borrowing Agent shall provide Agent with evidence reasonably satisfactory to Agent that the insurance proceeds will be used by Loan Parties to repair, replace or restore the insured property which was the subject of the insurable loss.  In the event Borrowing Agent has previously received (or, after giving effect to any proposed remittance by Agent to Borrowing Agent would receive) insurance proceeds which equal or exceed $5,000,000 in the aggregate during any calendar year, then Agent may, in its sole discretion, either remit the insurance proceeds to Borrowing Agent upon Borrowing Agent providing Agent with evidence reasonably satisfactory to Agent that the insurance proceeds will be used by Loan Parties to repair, replace or restore the insured property which was the subject of the insurable loss, or apply the proceeds to the Obligations, as aforesaid.  The agreement of Agent to remit insurance proceeds in the manner above provided shall be subject in each instance to satisfaction of each of the following conditions: (x) No Event of Default or Default shall then have occurred, (y) Loan Parties shall use such insurance proceeds promptly to repair, replace or restore the insurable property which was the subject of the insurable loss and for no other purpose, and (z) such remittances shall be made under such procedures as Agent may establish.

(d)      If any Loan Party fails to obtain insurance as hereinabove provided, or to keep the same in force, Agent, if Agent so elects, may obtain such insurance and pay the premium therefor on behalf of such Loan Party, which payments shall be charged to Borrowers' Account and constitute part of the obligations.

6.8      [Reserved].

6.9     Environmental Matters.

(a)     Except where any non-compliance would not reasonably be expected to have a Material Adverse Effect, result in liability for Loan Parties and their Subsidiaries in excess of $1,000,000 or result in criminal liability for any Loan Party or Subsidiary thereof, ensure that the Real Property and all operations and businesses conducted thereon are in compliance and remain in compliance with all Environmental Laws in all respects and it shall manage any and all Hazardous Materials on any Real Property in compliance with Environmental Laws.

(b)     Establish and maintain an environmental management and compliance system to assure and monitor continued compliance with all applicable Environmental Laws which system shall include periodic environmental compliance audits to be conducted by knowledgeable environmental professionals. All potential violations and violations of Environmental Laws shall be reviewed with legal counsel to determine any required reporting to applicable Governmental Bodies and any required corrective actions to address such potential violations or violations.

(c)     Respond promptly to any Hazardous Discharge or Environmental Complaint and take all necessary action in order to safeguard the health of any Person and to avoid subjecting the Collateral or Real Property to any Lien. If any Loan Party shall fail to respond promptly to any Hazardous Discharge or Environmental Complaint or any Loan Party shall fail to comply with any of the requirements of any Environmental Laws, Agent on behalf of Lenders may, but without the obligation to do so, for the sole purpose of protecting Agent's interest in the Collateral: (i) give such notices or (ii) enter onto the Real Property (or authorize third parties to enter onto the Real Property) and take such actions as Agent (or such third parties as directed by Agent) deem reasonably necessary or advisable, to remediate, remove, mitigate or otherwise manage with any such Hazardous Discharge or Environmental Complaint. All reasonable costs and expenses incurred by Agent and Lenders (or such third parties) in the exercise of any such rights, including any sums paid in connection with any judicial or administrative investigation or proceedings, fines and penalties, together with interest thereon from the date expended at the Default Rate for Domestic Rate Loans constituting Revolving Advances shall be paid upon demand by Loan Parties, and until paid shall be added to and become a part of the Obligations secured by the Liens created by the terms of this Agreement or any other agreement between Agent, any Lender and any Loan Party.

(d)     Promptly upon the written request of Agent from time to time, if any Loan Party has received an Environmental Complaint, or if Agent has a reasonable good faith basis to believe that there has occurred a Hazardous Discharge that requires remedial or investigatory action under Environmental Laws or that is the subject to regulatory inquiry, Loan Parties shall provide Agent, at Loan Parties' expense, with an environmental site assessment or environmental compliance audit report prepared by an environmental engineering firm acceptable in the reasonable opinion of Agent, to assess with a reasonable degree of certainty the existence of a Hazardous Discharge and the potential costs in connection with abatement, remediation and removal of any Hazardous Materials found on, under, at or within the Real Property. Any report or investigation of such Hazardous Discharge proposed and acceptable to the responsible Governmental Body shall be acceptable to Agent. If such estimates, individually or in the aggregate, exceed $250,000, Agent shall have the right to require Loan Parties to post a bond, letter of credit or other security reasonably satisfactory to Agent to secure payment of these costs

108

and expenses.

6.10    Standards of Financial Statements. Cause all financial statements referred to in Sections 9.7, 9.8, 9.9, 9.10, 9.11, 9.12 and 9.13 as to which GAAP is applicable to be complete and correct in all material respects (subject, in the case of interim financial statements, to the absence of footnotes and normal year-end audit adjustments) and to be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein (except as disclosed therein and agreed to by such reporting accountants or officer, as applicable).

6.11    Federal Securities Laws. Promptly notify Agent in writing if any Loan Party (other than, with respect to clause (i) or (ii), the Company) or any of their Subsidiaries (i) is required to file periodic reports under the Exchange Act or securities legislation of Canada, France, England or the Netherlands, (ii) registers any securities under the Exchange Act or securities legislation of Canada, France, England or the Netherlands or (iii) files a registration statement under the Securities Act or securities legislation of Canada, France, England or the Netherlands.

6.12    Execution of Supplemental Instruments. Execute and deliver to Agent from time to time, upon demand, such supplemental agreements, statements, assignments and transfers, or instructions or documents relating to the Collateral, and such other instruments as Agent may request, in order that the full intent of this Agreement may be carried into effect.

6.13    Government Receivables. To the extent any Borrower desires such Receivables to constitute Eligible Receivables, take all steps necessary to protect Agent's interest in the Collateral under the Federal Assignment of Claims Act, the Financial Administration Act (Canada) and any similar applicable provincial statute, the Uniform Commercial Code and all other applicable state, national, provincial or local statutes or ordinances and deliver to Agent appropriately endorsed, any instrument or chattel paper connected with any Receivable arising out of any contract between any Loan Party and the relevant Governmental Body or any department, agency or instrumentality of any of them.

6.14    Keepwell. If it is a Qualified ECP Loan Party, then jointly and severally, together with each other Qualified ECP Loan Party, hereby absolutely unconditionally and irrevocably (a) guarantees the prompt payment and performance of all Swap Obligations owing by each Non-Qualifying Party (it being understood and agreed that this guarantee is a guaranty of payment and not of collection), and (b) undertakes to provide such funds or other support as may be needed from time to time by any Non-Qualifying Party to honor all of such Non-Qualifying Party's obligations under this Agreement or any Other Document in respect of Swap Obligations (provided, however, that each Qualified ECP Loan Party shall only be liable under this Section 6.14 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 6.14, or otherwise under this Agreement or any Other Document, voidable under applicable law, including applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Loan Party under this Section 6.14 shall remain in full force and effect until payment in full of the Obligations and termination of this Agreement and the Other Documents. Each Qualified ECP Loan Party intends that this Section 6.14 constitute, and this Section 6.14 shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support, or other agreement" for the benefit of each other Borrower and Guarantor for all purposes of Section 1a(18)(A)(v)(II) of the

109

CEA.

6.15   [Reserved.]

6.16   <u>Canadian Pension Plans and Canadian Benefit Plans</u>. Except as would not reasonably be expected to have a Material Adverse Effect:

(a)   For each existing, or hereafter adopted, Canadian Pension Plan and Canadian Benefit Plan, each Canadian Loan Party shall, in a timely fashion comply with and perform in all material respects all of its obligations under and in respect of such Canadian Pension Plan or Canadian Benefit Plan, including under any funding agreements and all Applicable Laws (including any fiduciary, funding, investment and administration obligations).

(b)   All employer or employee payments, contributions or premiums required to be remitted, paid to or in respect of each such Canadian Pension Plan or Canadian Benefit Plan shall be paid or remitted by each Canadian Loan Party in a timely fashion and in accordance with the terms thereof(including any funding agreements and all Applicable Laws).

6.17   <u>Certificate of Beneficial Ownership and Other Additional Information.</u> Provide to Agent and the Lenders: (i) confirmation of the accuracy of the information set forth in the most recent Certificate of Beneficial Ownership provided to the Agent and Lenders; (ii) a new Certificate of Beneficial Ownership, in form and substance acceptable to Agent and each Lender, when the individual(s) to be identified as a Beneficial Owner have changed; and (iii) such other information and documentation as may reasonably be requested by Agent or any Lender from time to time for purposes of compliance by Agent or such Lender with applicable laws (including without limitation the USA Patriot Act and other "know your customer" and anti- money laundering rules and regulations), and any policy or procedure implemented by Agent or such Lender to comply therewith.[2]

6.18   <u>Milestones</u>.  Within the time periods set forth below, each Debtor shall perform each action with respect to the Case as set forth below:

(a)   obtain court approval of the Final Order within (40) days of the Petition Date;

(b)   on or before the date that is one hundred ten (110) days (or, (i) following the occurrence of an Initial Maturity Extension, one hundred forty (140) days, and (ii) following the occurrence of a Second Maturity Extension, two hundred (200) days) after the Petition Date, the Bankruptcy Court shall have entered an order confirming the Reorganization Plan (the "<u>Confirmation Order</u>"); and

(c)   within fifteen (15) days (or, (i) following the occurrence of an Initial Maturity Extension, forty five (45) days, and (ii) following the occurrence of a Second Maturity Extension, one hundred five (105) days) after entry of the Confirmation Order, the confirmed Reorganization Plan shall have been consummated.

---

[2]      Note to BR: Please add a post-closing schedule or post-closing letter.

6.19    [Reserved].

6.20    Bankruptcy Schedules and Covenants.

(a)    File with the Bankruptcy Court and deliver to Agent, all Schedules of each Debtor within the time periods required by the Bankruptcy Court.

(b)    Serve all:

(i)  secured creditors, all judgment creditors (if any) actually known to the Debtor, the twenty (20) largest unsecured creditors, the federal and state taxing authorities, any and all Governmental Bodies holding a claim, each of each Debtor's unions, and any other party claiming an interest in the Collateral in accordance with the Federal Rules of Bankruptcy Procedure a copy of the Motion and Interim Order as approved by the Bankruptcy Court in accordance with the Federal Rules of Bankruptcy Procedure; and

(ii) all parties from whom any Debtor has received or that any Debtor believes they may have received goods from within twenty (20) days of the filing of the Case, a copy of the Interim Order and notice of the hearing on entry of the proposed Final Order in accordance with the Federal Rules of Bankruptcy Procedure.

## 7.  NEGATIVE COVENANTS.

No Loan Party shall, or shall permit any of its Subsidiaries to, until satisfaction in full of the Obligations and termination of this Agreement:

7.1    Merger, Consolidation, Acquisition and Sale of Assets.
(a)    Enter into any merger, amalgamation consolidation or other reorganization with or into any other Person or acquire all or a substantial portion of the assets or Equity Interests of any Person or consummate an LLC Division or permit any other Person to consolidate with or merge or amalgamate with it, except (i) any Loan Party other than the Debtors or any other Subsidiary that is not a Loan Party (other than the Insurance Subsidiary) may consolidate or merge into another Loan Party which is wholly-owned by one or more of the other Loan Parties so long as such Loan Party is the survivor, (ii) Excluded Subsidiaries (other than the Insurance Subsidiary) may consolidate or merge into other Excluded Subsidiaries (other than the Insurance Subsidiary), (iii) Foreign Excluded Subsidiaries may consolidate or merge into another such Foreign Excluded Subsidiary, (iv) any Subsidiary (other than the Insurance Subsidiary and other than any Foreign Subsidiary) may merge into the Company so long as the Company is the survivor, (v)  any Subsidiary of the Company permitted to consolidate or merge with the Company or another Subsidiary of the Company pursuant to clauses (i)-(iv) above may, instead of consolidating or merging with the Company or another Subsidiary, transfer all of its assets to the Company or a Subsidiary of the type specified in clauses (i)-(iv) above, respectively, and subsequently the Subsidiary which transferred its assets may be dissolved or liquidated; for example, a Foreign Excluded Subsidiary may transfer all of its assets to another such Foreign Excluded Subsidiary, and the Foreign Excluded Subsidiary which transferred all of its assets may then be dissolved or liquidated  (vi) MCLP may sell all of the Equity Interests in MI to the Company; and (vii) any Subsidiary may merge, consolidate or amalgamate with any other Person in order to effect an

111

Investment permitted pursuant to Section 7.4; provided that the continuing or surviving Person shall be a Subsidiary, which shall have complied with the requirements of Sections 7.12.

(a)     Sell, lease, transfer or otherwise dispose of (including by way of an LLC Division) (x) any of its Revolving Credit Priority Collateral, (y) all or substantially all of the Term Loan Priority Collateral or (z) any portion of the Term Loan Priority Collateral to the extent such disposition has a material impact on the Collateral included in the Formula Amount, except Permitted Dispositions.

7.2     <u>Creation of Liens</u>. Create or suffer to exist any Lien or transfer upon or against any of its property or assets now owned or hereafter created or acquired, except Permitted Encumbrances.

7.3     <u>Guarantees</u>. Become liable upon the obligations or liabilities of any Person by assumption, endorsement or guaranty thereof or otherwise (other than to Lenders) except (a) as disclosed on <u>Schedule 7.3</u>, (b) guarantees by one or more Loan Parties or Subsidiaries thereof of the Indebtedness or obligations of any other Loan Parties or Subsidiaries thereof to the extent such Indebtedness or obligations are permitted to be incurred and/or outstanding pursuant to the provisions of this Agreement and (c) the endorsement of checks in the Ordinary Course of Business.

7.4     <u>Investments</u>. Purchase or acquire obligations or Equity Interests of, or any other interest in, any Person, other than Permitted Investments.

7.5     <u>Loans</u>. Make advances, loans or extensions of credit to any Person, including any Loan Party, or Subsidiary or Affiliate of a Loan Party other than as described in the definition of Permitted Investments.

7.6     <u>Capital Expenditures</u>. Contract for, purchase or make any expenditure or commitments for Capital Expenditures in any fiscal year in an aggregate amount for all Loan Parties in excess of $20,000,000.

7.7     <u>Dividends</u>. Declare, pay or make any dividend or distribution on any Equity Interests of any Loan Party (other than dividends or distributions payable in its stock, or split-ups or reclassifications of its stock) or apply any of its funds, property or assets to the purchase, redemption or other retirement of any Equity Interest, or of any options to purchase or acquire any Equity Interest of any Loan Party, except in respect of dividends and distributions made by any Subsidiary, for dividends and distributions made to Loan Parties or in respect of dividends and distributions made by any Loan Party, for dividends and distributions made to other Loan Parties.

7.8     <u>Indebtedness</u>. Create, incur, assume or suffer to exist any Indebtedness other than Permitted Indebtedness.

7.9     <u>Nature of Business</u>. Substantially change the nature of the business in which it is presently engaged, nor except as specifically permitted hereby purchase or invest, directly or indirectly, in any assets or property other than in the Ordinary Course of Business for assets or property which are useful in, necessary for and are to be used in its business as presently conducted, in each case, except as contemplated by the Orders.

<center>112</center>

7.10    <u>Transactions with Affiliates</u>. Directly or indirectly, purchase, acquire or lease any property from, or sell, transfer or lease any property to, or otherwise enter into any transaction or deal with, any Affiliate, except for (i) transactions among Loan Parties and their Subsidiaries which are not expressly prohibited by the terms of this Agreement and which are in the Ordinary Course of Business, (ii) payment by Loan Parties and their Subsidiaries of dividends and distributions permitted under Section 7.7 hereof, (iii) transactions disclosed to Agent in writing, which are in the Ordinary Course of Business, on an arm's-length basis on terms and conditions no less favorable than terms and conditions which would have been obtainable from a Person other than an Affiliate, (iv) transactions with customers, clients, joint venture partners, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Agreement that are fair to the Company and the Subsidiaries, in the reasonable determination of the Board of Directors or the senior management of the Company, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party, (v) the issuance or transfer of Equity Interests (other than Disqualified Equity Interests) of the Company to any former, current or future director, manager, officer, employee or consultant (or spouses, former spouses, successors, heirs, legatees, distributes or Affiliates of any of the foregoing) of the Company or any of the Subsidiaries, (vi) the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, directors, officers, consultants and employees of the Company and the Subsidiaries in the Ordinary Course of Business to the extent attributable to the ownership or operation of the Company and the Subsidiaries, (vii) employment, consulting, severance and other service or benefit related arrangements between the Company and the Subsidiaries and their respective officers and employees in the ordinary course of business (including loans and advances pursuant to Sections 7.4, salary or guaranteed payments and bonuses) and transactions pursuant to stock option and other equity award plans and employee benefit plans and arrangements in the Ordinary Course of Business, and (viii) issuances of Equity Interests of the Company to the extent otherwise permitted by this Agreement.

7.11    <u>Leases</u>. Enter as lessee into any lease arrangement for real or personal property (unless capitalized and permitted under Section 7.6 hereof or entered into in connection with a Sale and Leaseback Transaction permitted pursuant to clause (D) of the definition of Permitted Dispositions) if after giving effect thereto, aggregate annual rental payments for all leased property would exceed $25,000,000 in any one fiscal year in the aggregate for all Loan Parties and their Subsidiaries.

7.12    <u>Subsidiaries</u>.

(a)    Own or create directly or indirectly any Subsidiaries other than (i) any Subsidiary which has joined this Agreement as a Borrower or Guarantor and the ABL Intercreditor Agreement on the Closing Date and the Excluded Subsidiaries; (ii) any Subsidiary (A) formed (or acquired) after the Closing Date which joins this Agreement as a Guarantor, or elects instead to join this Agreement as a Borrower, and satisfies each other applicable requirement set forth in Section 16.21; <u>provided</u> that notwithstanding any provision of this Agreement or in any Other Document to the contrary, any Subsidiary which (1) is organized under the laws of the United States of America, any State thereof, the District of Columbia, or Canada (or any province thereof) (2) is owned solely by a Foreign Excluded Subsidiary, and (3) is a limited liability company which has not elected to be treated as a corporation for United States federal tax purposes, shall not be

113

required to guaranty the Guarantied Obligations (as defined in the Guaranty Agreement) of any Loan Party, or (B) which is an Excluded Subsidiary as of the Closing Date that subsequently becomes a Material Subsidiary, which joins this Agreement as a Guarantor and satisfies each other applicable requirement set forth in Section 16.21, and (iii) any Foreign Excluded Subsidiary; and

(b)     Become or agree to become a party to a Joint Venture.

7.13   <u>Fiscal Year and Accounting Changes</u>. No US-Canada Loan Party shall change its fiscal year from December 31 or make any change (i) in accounting treatment and reporting practices except as required by GAAP or (ii) in tax reporting treatment except as required by law.

7.14   <u>Pledge of Credit</u>. Now or hereafter pledge Agent's or any Lender's credit on any purchases, commitments or contracts or for any purpose whatsoever or use any portion of any Advance in or for any business other than such Loan Party's business operations as conducted on the Closing Date.

7.15   <u>Amendment of Organizational Documents</u>. (i) Change its legal name, (ii) change its form of legal entity (e.g., converting from a corporation to a limited liability company or vice versa), (iii) change its jurisdiction of organization or become (or attempt or purport to become) organized in more than one jurisdiction, or (iv) otherwise amend, modify or waive any term or material provision of its Organizational Documents unless required by law, in any such case without (x) giving at least thirty (30) days prior written notice of such intended change to Agent, (y) having received from Agent confirmation that Agent has taken all steps necessary for Agent to continue the perfection of and protect the enforceability and priority of its Liens in the Collateral belonging to such Loan Party and in the Equity Interests of such Loan Party and (z) in any case under clause (iv), if the change would be adverse to the Lenders as determined by the Agent, having received the prior written consent of US-Canada Required Lenders to such amendment, modification or waiver.

7.16   <u>Compliance with ERISA; Canadian Pension Plans</u>. (i) (x) Maintain, or permit any member of the Controlled Group to maintain, or (y) become obligated to contribute, or permit any member of the Controlled Group to become obligated to contribute, to any Plan, other than those Plans disclosed on <u>Schedule 5.12(d)</u>, (ii) engage, or permit any member of the Controlled Group to engage, in any non-exempt "prohibited transaction", as that term is defined in Section 406 of ERISA or Section 4975 of the Code, (iii) terminate, or permit any member of the Controlled Group to terminate, any Plan where such event could result in any liability of any Loan Party or any member of the Controlled Group or the imposition of a lien on the property of any Loan Party or any member of the Controlled Group pursuant to Section 4068 of ERISA, (iv) incur, or permit any member of the Controlled Group to incur, any withdrawal liability to any Multiemployer Plan; (v) fail promptly to notify Agent of the occurrence of any Termination Event, (vi) fail to comply, or permit a member of the Controlled Group to fail to comply, with the requirements of ERISA or the Code or other Applicable Laws in respect of any Plan, (vii) fail to meet, permit any member of the Controlled Group to fail to meet, or permit any Plan to fail to meet all minimum funding requirements under ERISA and the Code, without regard to any waivers or variances, or postpone or delay or allow any member of the Controlled Group to postpone or delay any funding requirement with respect of any Plan, (viii) cause, or permit any member of the Controlled Group to cause, a representation or warranty in Section 5.12(d) to cease to be true and correct, (ix) permit

114

its unfunded pension fund obligations and liabilities under any Canadian Pension Plan to remain unfunded other than in accordance with Applicable Law, or (x) maintain, sponsor, administer, contribute to, participate in or assume or incur any liability in respect of any Specified Canadian Pension Plan, or acquire an interest in any Person if such Person sponsors, administers, contributes to, participates in or has any liability in respect of, any Specified Canadian Pension Plan.

7.17    Prepayment of Indebtedness.  At any time, directly or indirectly, prepay any Indebtedness or repurchase, redeem, retire or otherwise acquire any Indebtedness other than (i) on or about the Closing Date directly or indirectly in connection with the Transactions, (ii) Indebtedness of a Loan Party to another Loan Party, (iii) of an Excluded Subsidiary to a Loan Party, (iv) of an Excluded Subsidiary to another Excluded Subsidiary (iv) payments not prohibited under the ABL Intercreditor Agreement and in accordance with the Orders.

7.18    Membership / Partnership Interests. Designate or permit any of their Subsidiaries to (a) treat their limited liability company membership interests or partnership interests, as the case may be, as securities as contemplated by the definition of "security" in Section 8-102(15) and by Section 8-103 of Article 8 of the Uniform Commercial Code or (b) certificate their limited liability membership interests or partnership interests, as applicable.

7.19    Covenants as to Certain Indebtedness. Amend or modify any provisions of the documents governing the 2024 Convertible Notes or the 2026 Convertible Notes, in each case, in any adverse way to any of the Loan Parties or the Lenders without providing at least fifteen (15) calendar days' prior written notice to Agent and Lenders, and obtaining the prior written consent of the US-Canada Required Lenders, it being understood for the avoidance of doubt, that adjustments, amendments, and modifications expressly required to be made pursuant to the terms of the 2024 Convertible Notes or the 2026 Convertible Notes shall be permitted.  Amend or modify any provisions of the Term Loan Documents or the Senior Secured Convertible Notes Documents in any adverse way to any of the Loan Parties or the Lenders without providing at least fifteen (15) calendar days' prior written notice to Agent and Lenders, and obtaining the prior written consent of the US-Canada Required Lenders.

7.20    Agreements Restricting Dividends. Other than the Term Loan Documents, the Term DIP Loan Documents and the Senior Secured Convertible Notes Documents, enter into any Agreement with any Person which restricts any of the Subsidiaries of the Company's right to pay dividends or other distributions to the Company or any other Loan Party or repay intercompany loans from the Subsidiaries of the Company to the Company or any other Loan Party.

7.21    [Reserved].

7.22    Restrictions on Insurance Subsidiary. Permit the Insurance Subsidiary to have any substantial assets, liabilities or business operations, other than such assets, liabilities and operations necessary (a) to provide insurance coverage to the Company and certain of its Subsidiaries, or (b) to comply with applicable Laws.

## 8.  CONDITIONS PRECEDENT.

8.1    Conditions to Initial Advances. The agreement of Lenders to make the initial Advances requested to be made on the Closing Date is subject to the satisfaction, or waiver by

Agent, immediately prior to or concurrently with the making of such Advances, of the following conditions precedent:

(a)     Agent shall have confirmed the receipt of all required court approvals for the execution and performance of the Debtors under the Other Documents;

(b)     Agent shall have received the Interim Order;

(c)     Agent shall have received this Agreement and the Other Documents required by Agent to be delivered in connection herewith, in each case, in form and substance acceptable to Agent and the Lenders;

(d)     Agent shall have received the Term DIP Loan Agreement, which shall, among other things, provide for debtor in possession financing provided by Highbridge Capital Management, LLC, in an aggregate amount not less than $70,000,000; *provided* that the form of Term DIP Loan Agreement attached to the Restructuring Support Agreement shall be deemed acceptable to the Agent;

(e)     Agent shall have received the [First Amendment to Intercreditor Agreement, dated as of the Closing Date, by and among [___]];

(f)     Substantially concurrently with the initial funding under the Term DIP Loan Agreement, Agent shall have received reimbursement in full in cash of the professional fees, costs and expenses of Agent and the Lenders in accordance with the terms of the Interim Order;

(g)     Agent shall have received the initial Budget, setting forth projected cash flows, together with detailed information as to projected disbursements and receipts, including all updates and supplements thereto, to be in form and substance reasonably acceptable to the and the Lenders to the extent material to the interests of the Lenders; and

(h)     the Bankruptcy Court shall have entered a customary "cash management order" adopting and implementing cash management arrangements for the Debtors, which shall be in form and substance and on terms and conditions satisfactory to Agent in its sole and absolute discretion (any such order, the "Cash Management Order").

8.2     [Reserved].

8.3     Conditions to Each Advance. The agreement of Lenders to make any Advance requested to be made on any date (including the initial Advance), is subject to the satisfaction of the following conditions precedent as of the date such Advance is made:

(a)     Representations and Warranties. Each of the representations and warranties made by the Company or any Loan Party in or pursuant to this Agreement, the Other Documents and any related agreements to which it is a party, and each of the representations and warranties contained in any certificate, document or financial or other statement furnished at any time under or in connection with this Agreement, the Other Documents or any related agreement shall be true and correct in all respects on and as of such date as if made on and as of such date (except to the extent any such representation or warranty expressly relates only to any earlier and/or specified

116

date);

(b)     No Default.  No Event of Default or Default shall have occurred and be continuing on such date, or would exist after giving effect to the Advances requested to be made, on such date; provided, however that Agent, in its sole discretion, may continue to make Advances notwithstanding the existence of an Event of Default or Default and that any Advances so made shall not be deemed a waiver of any such Event of Default or Default;

(c)     Maximum Advances. In the case of any type of Advance requested to be made, after giving effect thereto, the aggregate principal amount of such type of Advance shall not exceed the maximum principal amount of such type of Advance permitted under this Agreement;

(d)     [reserved].; and

(e)     Interim Order/Final Order.  The Interim Order, or, after the entry of the Final Order, the Final Order, shall be in full force and effect and shall not be the subject of any appeal, motion for reconsideration, stay, order of reversal, amendment or modification.

Each request for an Advance by any Loan Party hereunder shall constitute a representation and warranty by each Loan Party as of the date of such Advance that the conditions contained in this subsection shall have been satisfied.

## 9.   INFORMATION AS TO LOAN PARTIES.

Each Loan Party shall, or (except with respect to Section 9.11) shall cause Borrowing Agent on its behalf to, until satisfaction in full of the Obligations and the termination of this Agreement:

9.1     Disclosure of Material Matters. Promptly upon learning thereof, report to Agent all matters materially affecting the value, enforceability or collectability of any portion of the Collateral, including any Loan Party's reclamation or repossession of, or the return to any Loan Party of, a material amount of goods or claims or disputes asserted by any Customer or other obligor.

9.2     Schedules; US-Canada Borrowing Base Certificates, etc. Deliver to Agent (i) on (x) on each of February 20, 2023 and March 20, 2023, for the prior month and (y) commencing on April 4, 2023 and on Tuesday of every second week thereafter, for the prior two (2) calendar week period, (a) accounts receivable ageings inclusive of reconciliations to the general ledger, (b) accounts payable schedules inclusive of reconciliations to the general ledger, (c) a US-Canada Borrowing Base Certificate, in form and substance satisfactory to Agent (which shall be calculated as of the last day of the prior month and which shall not be binding upon the Agent or restrictive of the Agent's rights under this Agreement) and (d) a sales report / roll forward. In addition, the Borrowing Agent will deliver to Agent at such intervals as Agent may require: (i) confirmatory assignment schedules; (ii) copies of Customer's invoices; (iii) evidence of shipment or delivery; and (iv) such further schedules, documents and/or information regarding the Collateral as Agent may require including trial balances and test verifications. Agent shall have the right to confirm and verify all Receivables in such Borrower's name by any manner and through any medium it considers advisable and do whatever it may deem reasonably necessary to protect its interests

117

hereunder. The items to be provided under this Section 9.2 are to be in form satisfactory to Agent and executed by Borrowing Agent and delivered to Agent from time to time solely for Agent's convenience in maintaining records of the Collateral, and any Loan Party's failure to deliver any of such items to Agent shall not affect, terminate, modify or otherwise limit the Agent's Lien with respect to the Collateral. Unless otherwise agreed to by the Agent, the items to be provided under this Section 9.2 shall be delivered to Agent by the specific method of Approved Electronic Communication designated by Agent.

9.3     Environmental Reports.

(a)     Furnish Agent, concurrently with the delivery of the financial statements referred to in Sections 9.7 and 9.8, with a certificate signed by the President of Borrowing Agent stating, to the best of his knowledge, that each Loan Party is in compliance in all material respects with all applicable Environmental Laws. To the extent any Loan Party is not in compliance with the foregoing laws, the certificate shall set forth with specificity all areas of non-compliance and the proposed action such Loan Party will implement in order to achieve full compliance.

(b)     In the event any Loan Party obtains, gives or receives notice of any Release or threat of Release of a reportable quantity of any Hazardous Materials at the Real Property (any such event being hereinafter referred to as a "**Hazardous Discharge**") or receives any notice of violation, request for information or notification that it is potentially responsible for investigation or cleanup of environmental conditions at the Real Property, demand letter or complaint, order, citation, or other written notice with regard to any Hazardous Discharge or violation of Environmental Laws affecting the Real Property or any Loan Party's interest therein or the operations or the business (any of the foregoing is referred to herein as an "**Environmental Complaint**") from any Person, including any Governmental Body, then Borrowing Agent shall, within five (5) Business Days, give written notice of same to Agent detailing facts and circumstances of which any Loan Party is aware giving rise to the Hazardous Discharge or Environmental Complaint. Such information is to be provided to allow Agent to protect its security interest in and Lien on the Collateral and is not intended to create nor shall it create any obligation upon Agent or any Lender with respect thereto.

(c)     Borrowing Agent shall promptly forward to Agent copies of any request for information, notification of potential liability, demand letter relating to potential responsibility with respect to the investigation or cleanup of Hazardous Materials at any other site owned, operated or used by any Loan Party to manage of Hazardous Materials and shall continue to forward copies of correspondence between any Loan Party and the Governmental Body regarding such claims to Agent until the claim is settled. Borrowing Agent shall promptly forward to Agent copies of all documents and reports concerning a material Hazardous Discharge or Environmental Complaint at the Real Property, operations or business that any Loan Party is required to file under any Environmental Laws. Such information is to be provided solely to allow Agent to protect Agent's security interest in and Lien on the Collateral.

9.4     Litigation. Promptly notify Agent in writing of any claim, litigation, suit or administrative proceeding affecting any Loan Party, whether or not the claim is covered by insurance, and of any litigation, suit or administrative proceeding, which in any such case affects the Collateral or which could reasonably be expected to have a Material Adverse Effect.

118

9.5     <u>Material Occurrences</u>. Immediately notify Agent and Lenders in writing upon the occurrence of: (a) any Event of Default or Default; (b) any event which with the giving of notice or lapse of time, or both, would constitute an event of default under the Term DIP Loan Documents, the 2024 Convertible Notes and/or the 2026 Convertible Notes; (c) any event, development or circumstance whereby any financial statements or other reports furnished to the Agent fail in any material respect to present fairly, in accordance with GAAP consistently applied, the financial condition or operating results of any Loan Party as of the date of such statements; (d) any accumulated retirement plan funding deficiency which, if such deficiency continued for two plan years and was not corrected as provided in Section 4971 of the Code, could subject any Loan Party to a tax imposed by Section 4971 of the Code; (e) each and every default by any Loan Party which might result in the acceleration of the maturity of any Indebtedness, including the names and addresses of the holders of such Indebtedness with respect to which there is a default existing or with respect to which the maturity has been or could be accelerated, and the amount of such Indebtedness; and (f) any other development in the business or affairs of any Loan Party, which could reasonably be expected to have a Material Adverse Effect; in each case describing the nature thereof and the action Loan Parties propose to take with respect thereto.

9.6     <u>Government Receivables</u>. Notify Agent promptly if any of its Receivables having a value, individually or in the aggregate, in excess of $1,000,000 arise out of contracts between any Borrower and the United States, Canada, any state, province or any department, agency or instrumentality of any of them.

9.7     <u>Annual Financial Statements</u>. Furnish Agent and Lenders within one hundred and twenty (120) days after the end of each fiscal year of Loan Parties, financial statements of the Company and other Loan Parties and their Subsidiaries on a consolidating and consolidated basis including, but not limited to, statements of income and stockholders' equity and cash flow from the beginning of the current fiscal year to the end of such fiscal year and the balance sheet as at the end of such fiscal year, all prepared in accordance with GAAP applied on a basis consistent with prior practices, and in reasonable detail and reported upon without qualification by its current independent certified public accounting firm or another such firm of national standing selected by Loan Parties or any other firm satisfactory to Agent (the "**Accountants**"). The report of the Accountants shall be accompanied by an Officer's Certificate. Loan Parties will be deemed to have complied with this financial statement delivery requirement by delivering, within the required ninety (90) day time period, a copy of its Quarterly Report on Form 10-K as filed with the SEC and the financial statements contained therein.

9.8     <u>Quarterly Financial Statements</u>. Furnish Agent and Lenders within sixty (60) days after the end of each of the first three (3) fiscal quarters in each fiscal year, an unaudited balance sheet of the Company and other Loan Parties and their Subsidiaries on a consolidated and consolidating basis and unaudited statements of income and stockholders' equity and cash flow of Company and other Loan Parties and their Subsidiaries on a consolidated and consolidating basis reflecting results of operations from the beginning of the fiscal year to the end of such quarter and for such quarter, prepared on a basis consistent with prior practices and complete and correct in all material respects, subject to footnotes and normal year-end adjustments that individually and in the aggregate are not material to Loan Parties' business operations and setting forth in comparative form the respective financial statements for the corresponding date and period in the previous fiscal year. The reports shall be accompanied by an Officer's Certificate. Loan Parties will be deemed to

119

have complied with this financial statement delivery requirement by delivering, within the required forty-five (45) day time period, a copy of its Quarterly Report on Form 10-Q as filed with the SEC and the financial statements contained therein.

9.9     Monthly Financial Statements. Commencing with the month ended March 31, 2023, furnish Agent and Lenders within thirty (30) days after the end of each month (other than for the months of March, June, September and December which shall be delivered in accordance with Sections 9.7 and 9.8 as applicable), an unaudited balance sheet of Company and other Loan Parties and their Subsidiaries on a consolidated and consolidating basis and unaudited statements of income and stockholders' equity and cash flow of Company and other Loan Parties and their Subsidiaries on a consolidated and consolidating basis reflecting results of operations from the beginning of the fiscal year to the end of such month and for such month, prepared on a basis consistent with prior practices and complete and correct in all material respects, subject to footnotes and normal year-end adjustments that individually and in the aggregate are not material to Loan Parties' business operations and setting forth in comparative form the respective financial statements for the corresponding date and period in the previous fiscal year.  The reports shall be accompanied by an Officer's Certificate.

9.10    Other Reports. Furnish Agent within ten (10) days after the issuance thereof, with copies of such financial statements, reports and returns as each Loan Party shall send to its stockholders generally, members or material creditors (as applicable), it being understood that any document, report or other information that is not expressly required to be delivered in physical form and that is filed by the Company with the SEC shall be deemed to be delivered to on the date on which such report is posted on the SEC's website at www.sec.gov.

9.11    Additional Information. Furnish Agent with such additional information as Agent shall reasonably request in order to enable Agent to determine whether the terms, covenants, provisions and conditions of this Agreement and the Notes have been complied with by Loan Parties including, without the necessity of any request by the Agent, (a) copies of all environmental audits and reviews, (b) at least thirty (30) days prior thereto, notice of any Loan Parties' opening of any new office or place of business where a material portion of business of any such Loan Party is conducted or Collateral having a value in excess of $500,000 is located or any Loan Party's closing of any existing office or place of business where a material portion of business of any such Loan Party is conducted or Collateral having a value in excess of $500,000 is located, and (c) promptly upon any Loan Party's learning thereof, notice of any labor dispute to which any Loan Party may become a party, any strikes or walkouts relating to any of its plants or other facilities, and the expiration of any labor contract to which any Loan Party is a party or by which any Loan Party is bound.

9.12    Budget and Variance Reports.

        (a)     Debtors shall deliver to Agent all Budgets and promptly following request therefor all material certificates, reports and other documentation required to be delivered to the [Financial Advisor] (as defined in the Term Dip Loan Agreement) pursuant to [Section 5.17] of the Term DIP Loan Agreement.

        (b)     Each Budget delivered pursuant to Section 9.12(a) or any proposed

120

amendment or supplement to the Budget delivered by the Debtors to Agent shall replace, amend or supplement, as the case may be, the prior Budget hereunder.

9.13    [Reserved].

9.14    Notice of Suits, Adverse Events. Furnish Agent with prompt written notice of (i) any lapse or other termination of any Consent issued to any Loan Party by any Governmental Body or any other Person that is material to the operation of any Loan Party's business, (ii) any refusal by any Governmental Body or any other Person to renew or extend any such Consent; and (iii) copies of any periodic or special reports filed by any Borrower or any Guarantor with any Governmental Body or Person, if such reports indicate any material change in the business, operations, affairs or condition of any Borrower or any Guarantor, or if copies thereof are requested by Lender, and (iv) copies of any material notices and other communications from any Governmental Body or Person which specifically relate to any Borrower or any Guarantor, it being understood that any such notice that is filed by the Company with the SEC shall be deemed to be delivered to on the date on which such notice is posted on the SEC's website at www.sec.gov.

9.15    ERISA Notices and Requests; Canadian Pension Plans. Furnish Agent with immediate written notice in the event that (i) any Loan Party knows that a Termination Event has occurred, together with a written statement describing such Termination Event and the action, if any, which such Loan Party or any member of the Controlled Group has taken, is taking, or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, Department of Labor or PBGC with respect thereto, (ii) any Loan Party knows that a prohibited transaction (as defined in Sections 406 of ERISA and 4975 of the Code) has occurred together with a written statement describing such transaction and the action which such Loan Party or any member of the Controlled Group has taken, is taking or proposes to take with respect thereto, (iii) a funding waiver request has been filed with respect to any Plan together with all communications received by any Loan Party with respect to such request, (iv) [reserved], (v) any Loan Party shall receive from the PBGC a notice of intention to terminate a Plan or to have a trustee appointed to administer a Pension Benefit Plan or Multiemployer Plan, together with copies of each such notice, (vi) any Loan Party shall receive any favorable or unfavorable determination letter from the Internal Revenue Service regarding the qualification of a Plan under Section 401(a) of the Code, together with copies of each such letter; (vii) any Loan Party shall receive a notice regarding the imposition of withdrawal liability, together with copies of each such notice; (viii) any Loan Party shall fail to make a material required installment or any other material required payment under the Code or ERISA on or before the due date for such installment or payment; or (ix) any Loan Party knows that (a) a Multiemployer Plan has been terminated, (b) the administrator or plan sponsor of a Multiemployer Plan intends to terminate a Multiemployer Plan, (c) the PBGC has instituted or will institute proceedings under Section 4042 of ERISA to terminate a Multiemployer Plan or (d) a Multiemployer Plan is subject to Section 432 of the Code or Section 305 of ERISA.

Promptly after any Loan Party or any Subsidiary or any Affiliate knows of the occurrence of (i) any violation or asserted violation of any Applicable Law (including any applicable provincial pension benefits legislation) in any material respect with respect to any Canadian Pension Plan or; (ii) any Canadian Pension Termination Event, the Canadian Loan Parties will deliver to the Agent a certificate of a senior officer of the Canadian Loan Parties setting forth

details as to such occurrence and the action, if any, that such Canadian Loan Parties or any Subsidiary or Affiliate thereof is required or proposes to take, together with any notices (required, proposed or otherwise) given to or filed with or by such Canadian Loan Party, such Subsidiary, such Affiliate, FSCO, a Canadian Pension Plan participant (other than notices relating to an individual participant's benefits) or the Canadian Pension Plan administrator with respect thereto.

      9.16   <u>Notices Under Certain Indebtedness Documents</u>. At the same time sent or provided to the Term DIP Loan Agent or to the holders of the 2024 Convertible Notes and/or the 2026 Convertible Notes, as the case may be, (in each case, without duplication), deliver to Agent copies of all notices and reports provided in connection with the Term DIP Loan Documents, the 2024 Convertible Notes and/or the 2026 Convertible Notes, it being understood that any such notices or reports that are filed by the Company with the SEC shall be deemed to be delivered to Agent on the date on which such notices or reports are posted on the SEC's website at www.sec.gov.

      9.17   <u>Consent Decree</u>. Provide to Agent written status updates with respect to the Consent Decree and Consent Decree Event and any other pending governmental and/or regulatory investigations and proceedings involving the Company or any of its Subsidiaries promptly following request therefor by Agent.

      9.18   <u>Additional Documents</u>. Execute and deliver to the Agent, upon request, such documents and agreements as the Agent may, from time to time, reasonably request to carry out the purposes, terms or conditions of this Agreement.

      9.19   <u>Updates to Certain Schedules</u>. Deliver to Agent promptly as shall be required to maintain the related representations and warranties as true and correct, updates to <u>Schedule 4.4</u> (Locations of Chief Executive Offices, Equipment and Inventory), <u>Schedule 5.13</u> (Intellectual Property, Source Code Escrow Agreements), <u>Schedule 5.26</u> (Equity Interests), <u>Schedule 5.27</u> (Commercial Tort Claims), <u>Schedule 5.28</u> (Letter-of-Credit Rights), and <u>Schedule 5.29</u> (Material Contracts); <u>provided</u>, that in the absence of the occurrence and continuance of any Event of Default, Loan Party shall only be required to provide such updates on a quarterly basis in connection with delivery of an Officer's Certificate with respect to the applicable quarter. Any such updated Schedules delivered by Loan Parties to Agent in accordance with this Section 9.19 shall automatically and immediately be deemed to amend and restate the prior version of such Schedule previously delivered to Agent and attached to and made part of this Agreement.

      9.20   <u>Financial Disclosure</u>. Each Borrower hereby irrevocably authorizes and directs all accountants and auditors employed by such Borrower at any time during the Term to exhibit and deliver to Agent and each Lender copies of any of such Borrower's financial statements, trial balances or other accounting records of any sort in the accountant's or auditor's possession, and to disclose to Agent and each Lender any information such accountants may have concerning such Borrower's financial status and business operations. Each Borrower hereby authorizes all Governmental Bodies to furnish to Agent and each Lender copies of reports or examinations relating to such Borrower, whether made by such Borrower or otherwise; however, Agent and each Lender will attempt to obtain such information or materials directly from such Borrower prior to obtaining such information or materials from such accountants or Governmental Bodies.

      9.21   <u>Other Bankruptcy Documents</u>.  Deliver to Agent: (a) copies of all pleadings,

motions, applications, financial information and other papers and documents filed by any Debtor in the Case, with copies of such papers and documents also provided to or served on Agent's counsel; (b) substantially contemporaneous with the receipt and/or execution thereof, copies of all letters of intent, expressions of interest, and offers to purchase with respect to any of the Collateral; (c) substantially contemporaneously with delivery thereof to the Committee or any other official or unofficial committee in the Case, copies of all material written reports and all term sheets for a Reorganization Plan or any sale under Section 363 of the Bankruptcy Code given by any Debtor to the Committee or any other official or unofficial committee in the Case, with copies of such reports and term sheets also provided to or served on Agent's counsel; and (d) projections, operating plans and other financial information and information, reports or statements regarding any Debtor, its business and the Collateral as Agent may from time to time reasonably request.

## 10. EVENTS OF DEFAULT.

The occurrence of any one or more of the following events shall constitute an "Event of Default":

10.1    <u>Nonpayment</u>. Failure by any Loan Party to pay when due (a) any principal or interest on the Obligations (including without limitation pursuant to Section 2.8), or (b) any other fee, charge, amount or liability provided for herein or in any Other Document, in each case whether at maturity, by reason of acceleration pursuant to the terms of this Agreement, by notice of intention to prepay or by required prepayment.

10.2    <u>Breach of Representation</u>. Any representation or warranty made or deemed made by any Loan Party in this Agreement, any Other Document or any related agreement or in any certificate, document or financial or other statement furnished at any time in connection herewith or therewith shall prove to have been incorrect or misleading in any material respect on the date when made or deemed to have been made;

10.3    <u>Financial Information</u>. Failure by any Loan Party to (i) furnish financial information when due or promptly upon request; <u>provided</u>, <u>that</u>, in respect of any failure to furnish financial information pursuant to Section 9.12(a), such failure shall not result in an Event of Default to the extent the Term Loan Agent shall have waived the requirement to deliver such documentation or waived any default in respect of the failure to deliver any such documentation under the Term DIP Loan Agreement, or (ii) permit the inspection of its books or records or access to its premises for audits and appraisals in accordance with the terms hereof;

10.4    <u>Judicial Actions</u>. Issuance of a notice of Lien, levy, assessment, injunction or attachment (a) against any Loan Party's Inventory or Receivables having a value in excess of $1,000,000 or (b) against a material portion of any Loan Party's other property which is not stayed or lifted within thirty (30) days;

10.5    <u>Noncompliance</u>. Except as otherwise provided for in Sections 10.1, 10.3 and 10.5(ii), (i) failure or neglect of any Loan Party or any Person to perform, keep or observe any term, provision, condition or covenant contained in Section 6.17, or (ii) failure or neglect of any Loan Party or any Person to perform, keep or observe any term, provision, condition, covenant herein contained, or contained in any Other Document or any other agreement or arrangement,

123

now or hereafter entered into between any Loan Party or such Person, and the Agent or any Lender which is not cured within ten (10) days from the occurrence of such failure or neglect;

10.6    <u>Judgments</u>. Any (a) judgment or judgments, writ(s), order(s) or decree(s) for the payment of money are rendered against any Borrower or any Guarantor for an aggregate amount (to the extent not covered by independent third-party insurance as to which the insurer does not dispute coverage and is not subject to an insolvency proceeding) in excess of $3,000,000 or against all Borrowers or Guarantors for an aggregate amount in excess of $3,000,000 and (b) (i) action shall be legally taken by any judgment creditor to levy upon assets or properties of any Borrower or any Guarantor to enforce any such judgment, (ii) such judgment shall remain undischarged for a period of sixty (60) consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, shall not be in effect, or (iii) any Liens arising by virtue of the rendition, entry or issuance of such judgment upon assets or properties of any Borrower or any Guarantor shall be senior to any Liens in favor of the Agent on such assets or properties;

10.7    <u>Bankruptcy Defaults</u>.

(a)    The Interim Order or Final Order at any time cease to be in full force and effect, or shall be vacated, reversed or stayed, or modified or amended in a manner that materially and adversely affects the Lenders without the prior written consent of Agent;

(b)    the Bankruptcy Court enters an order: (A) dismissing or converting the any Case to a case under Chapter 7 of the Bankruptcy Code; (B) appointing a Chapter 11 Trustee or an examiner with enlarged powers relating to the operation of the business of any Debtor (powers beyond those expressly set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) in any Case; (C) substantively consolidating the estate of any Loan Party with the estate of any other Person not a Loan Party; or (D) approving a sale of substantially all of the assets of the Debtors and/or of the other Loan Parties which order does not provide that upon consummation of such sale, all of the Obligations shall be Paid in Full;

(c)    the Bankruptcy Court shall enter an order granting relief from the automatic stay to the holder or holders of any Lien to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any Debtor which have an aggregate value in excess of $1,000,000;

(d)    the filing by any Debtor, of any plan of reorganization without the prior written consent of Agent that does not propose to Pay in Full in cash all Obligations and the outstanding Pre-Petition Obligations (if any) on the effective date of such plan prior to the repayment of any other Indebtedness;

(e)    the Bankruptcy Court enters an order granting or permitting the grant of a material Lien (other than as (x) set forth in the Interim Order or (y) after entry, the Final Order, or as permitted under the Agreement and the Other Documents) that is *pari passu* or senior to the Liens granted to Agent under the Agreement and the Other Documents or the Liens granted to Pre-Petition Agent under the Pre-Petition Credit Agreement and Other Documents (as defined in the Pre-Petition Credit Agreement);

(f)    (A) any Debtor engages in or supports any challenge to the validity,

124

perfection, priority, extent or enforceability of this Agreement or the Other Documents or the liens on or security interest in the assets of the Debtors securing the Obligations or the outstanding Pre-Petition Obligations (if any), including without limitation seeking to equitably subordinate or avoid the Liens securing the Pre-Petition Obligations or (B) any Debtor engages in or supports any investigation or assert any claims or causes of action (or directly or indirectly support assertion of the same) against the Agent, the Lenders, the Pre-Petition Agent or the Lenders (as defined in the Pre-Petition Credit Agreement);

(g)     the allowance of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the Revolving Credit Priority Collateral;

(h)     the obligations under the Term DIP Loan Agreement have been accelerated and the commitments have terminated thereunder, and such acceleration continues without subsequent waiver or rescinding of such acceleration, or Term DIP Loan Agent or the lenders under the Term DIP Loan Agreement commence the exercise of remedies against a material portion of the Collateral;

(i)     the entry of a final order of the Bankruptcy Court in the Case, authorizing and approving this Agreement and the Other Documents under, *inter alia*, Sections 364(c) and (d) of the Bankruptcy Code on a final basis and entered at or after a final hearing, that does not contain a waiver of surcharge under Section 5.06(c) of the Bankruptcy Code.

10.8     [Reserved].

10.9     Lien Priority. Any Lien created hereunder or provided for hereby or under any related agreement for any reason ceases to be or is not a valid and perfected Lien having a first priority interest (subject only to Permitted Encumbrances) that have priority as a matter of Applicable Law to the extent such Liens only attach to Collateral other than Receivables;

10.10     Cross Default. (a) A default or event of default has occurred under any Indebtedness in excess of $3,000,000 (other than the Obligations and any prepetition Indebtedness) of any Loan Party, which default shall have resulted in (x) acceleration of such Indebtedness and the termination of commitments under such the documents governing such Indebtedness, and continues without subsequent waiver or rescinding of such acceleration and termination, (y) the exercise of remedies against a material portion of the Collateral or (z) delivery of a notice of intent to exercise rights and remedies thereunder or (b) a default or event of default has occurred under the Term DIP Loan Documents, which default shall have resulted in (x) acceleration of any obligations owing under any of the Term DIP Loan Documents and the termination of commitments under the Term DIP Loan Documents, and continues without subsequent waiver or rescinding of such acceleration and termination, (y) the exercise of remedies against a material portion of the Collateral or (z) delivery of a notice of intent to exercise rights and remedies thereunder;

10.11     Breach of Guaranty or Pledge Agreement. Termination or breach of any Guaranty, Guarantor Security Agreement, Pledge Agreement, the Canadian Security Agreement or similar agreement executed and delivered to the Agent in connection with the Obligations of any Loan Party, or if any Guarantor or pledgor attempts to terminate, challenges the validity of, or its liability

125

under, any such Guaranty, Guarantor Security Agreement, Pledge Agreement, Canadian Security Agreement or similar agreement;

10.12   <u>Change of Control</u>. Any Change of Control shall occur;

10.13   <u>Invalidity</u>. Any material provision of this Agreement or any Other Document shall, for any reason, cease to be valid and binding on any Borrower or any Guarantor, or any Borrower or any Guarantor shall so claim in writing to the Agent or any Lender or any Loan Party challenges the validity of or its liability under this Agreement or any Other Document;

10.14   <u>Seizures</u>. Any (a) portion of the Collateral having a value in excess of $1,000,000 shall be seized, subject to garnishment or taken by a Governmental Body, or any Borrower or any Guarantor, or (b) the title and rights of any Borrower or any Guarantor which is the owner of any material portion of the Collateral shall have become the subject matter of claim, litigation, suit, garnishment or other proceeding which might, in the opinion of the Agent, upon final determination, result in impairment or loss of the security provided by this Agreement or the Other Documents;

10.15   <u>Operations</u>. The operations of any Borrower's or any Guarantor's material manufacturing facilities are interrupted (other than in connection with any regularly scheduled shutdown for employee vacations and/or maintenance in the Ordinary Course of Business) at any time for more than ten (10) consecutive days, unless such Borrower or Guarantor shall (i) be entitled to receive for such period of interruption, proceeds of business interruption insurance sufficient to assure that its per diem cash needs during such period is at least equal to its average per diem cash needs for the consecutive three month period immediately preceding the initial date of interruption and (ii) receive such proceeds in the amount described in clause (i) preceding not later than thirty (30) days following the initial date of any such interruption; <u>provided, however</u>, that notwithstanding the provisions of clauses (i) and (ii) of this section, an Event of Default shall be deemed to have occurred if such Borrower or Guarantor shall be receiving the proceeds of business interruption insurance for a period of ten (10) consecutive days;

10.16   <u>Pension Plans</u>. An event or condition specified in Sections 7.16 or 9.15 hereof shall occur or exist with respect to any Plan and, as a result of such event or condition, together with all other such events or conditions, any Loan Party or any member of the Controlled Group shall incur, or in the opinion of Agent be reasonably likely to incur, a liability to a Plan or the PBGC (or both) which, in the reasonable judgment of Agent, would have a Material Adverse Effect; or the occurrence of any Termination Event, or any Canadian Pension Termination Event, or any Loan Party's failure to immediately report a Termination Event, or a Canadian Pension Termination Event, in accordance with Section 9.15 hereof; in each case that could reasonably be expected to result in a Material Adverse Effect;

10.17   <u>Anti-Money Laundering/International Trade Law Compliance</u>. Any representation, warranty or covenant contained in Section 16.18 is or becomes false or misleading at any time; or

10.18   <u>Any Exclusion from Medical Reimbursement Programs</u>. Any Loan Party shall be temporarily or permanently excluded from any Medical Reimbursement Program or similar government or insurance program in any applicable jurisdiction, where such exclusion arises

126

from fraud or other claims or allegations which, individually or in the aggregate, could cause a Material Adverse Effect.

## 11. LENDERS' RIGHTS AND REMEDIES AFTER DEFAULT.

11.1    <u>Rights and Remedies</u>.

(a)

(i)  Upon the occurrence of and during the continuance of an Event of Default, subject to (x) the delivery by Agent to any Loan Party of a notice of Agent's intent to exercise rights and remedies, (y) the filing by Agent of a motion seeking emergency relief from the automatic stay on at least five (5) Business Days' notice (such notice not to be required in the case of exigent circumstances) and (z) the Interim Order and, upon entry, the Final Order, (i) the Agent and Lenders shall no longer have any obligation to make any Advances (or otherwise extend credit); (ii) all amounts outstanding under this Agreement and the Other Documents shall, at the option of the Agent, be accelerated and become immediately due and payable; (iii) the Agent and the Pre-Petition Agent shall be entitled to immediately terminate each Debtor's right to use Cash Collateral, without further application or order of the Bankruptcy Court, provided, however, that such Debtor shall have the right to use Cash Collateral to pay their weekly ordinary course payroll included in the approved Budget through and including the date immediately following the date on which such Event of Default occurs, (iv) each Debtor shall be bound by all post-default restrictions, prohibitions, and other terms as provided in the Interim Order, this  Agreement, the Other Documents, the Pre-Petition Credit Agreement and the Pre-Petition Other Documents, (v) the Agent shall be entitled to charge the Default Rate of interest under the Credit Agreement and (vi) subject only to (x) the notice requirement set forth in Section 11.1(b) below and (y) the Interim Order or Final Order, as applicable, both the Agent and the Pre-Petition Agent shall be entitled to take any other act or exercise any other right or remedy as provided in this Agreement, the Other Documents, the Pre-Petition Credit Agreement, the Pre-Petition Other Documents, or applicable law, including, without limitation, setting off any Obligations or the outstanding Pre-Petition Obligations (if any) with Collateral, Pre-Petition Collateral or proceeds in the possession of any Pre-Petition Secured Party or Lender, and enforcing any and all rights and remedies with respect to the Collateral or Pre-Petition Collateral, as applicable.

(ii) During the continuance of any Event of Default, the Agent shall have the right to exercise any and all rights and remedies provided for herein, under the Other Documents, under the Uniform Commercial Code, under the PPSA under the terms of the Collateral Documents and at law or equity generally, including the right to foreclose the security interests granted herein and to realize upon any Collateral by any available judicial procedure and/or to take possession of and sell any or all of the Collateral with or without judicial process. Agent may enter any of any Loan Party's premises or other premises without legal process and without incurring liability to any Loan Party therefor, and Agent may thereupon, or at any time thereafter, in its discretion without notice or demand, take the Collateral and remove the same to such place as Agent may deem advisable and Agent may require any or each of Loan Parties to make the Collateral available to Agent at a convenient place. During the continuance of an Event of Default with or without having the Collateral at the time or place of sale, Agent may sell the Collateral, or any part thereof, at public or private sale, at any time or place, in one or more sales, at such price or prices, and upon such

terms, either for cash, credit or future delivery, as Agent may elect.  Except as to that part of the Collateral which is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Agent shall give any or each of the Loan Parties reasonable notification of such sale or sales, it being agreed that in all events written notice mailed to Borrowing Agent at least ten (10) days prior to such sale or sales is reasonable notification. At any public sale Agent or any Lender may bid (including credit bid) for and become the purchaser, and Agent, any Lender or any other purchaser at any such sale thereafter shall hold the Collateral sold absolutely free from any claim or right of whatsoever kind, including any equity of redemption and all such claims, rights and equities are hereby expressly waived and released by each Loan Party (notwithstanding the last sentence of this paragraph). Notwithstanding the last sentence of this paragraph, in connection with the exercise of the foregoing remedies, including the sale of Inventory, Agent is granted a perpetual nonrevocable, royalty free, nonexclusive license and Agent is granted permission to use all of each Loan Party's (a) Intellectual Property which is used or useful in connection with Inventory for the purpose of marketing, advertising for sale and selling or otherwise disposing of such Inventory and (b) equipment for the purpose of completing the manufacture of unfinished goods. The cash proceeds realized from the sale of any Collateral shall be applied to the Obligations in the order set forth in Section 11.5 hereof.  Noncash proceeds will only be applied to the Obligations as they are converted into cash. Notwithstanding the last sentence of this paragraph, if any deficiency shall arise, Loan Parties shall remain liable to Agent and Lenders therefor. Upon the occurrence of an Event of Default which is continuing, Agent may seek the appointment of a receiver, receiver-manager, monitor or keeper (a "**Receiver**") under the laws of Canada or any Province thereof including to take possession of all or any portion of the Collateral of Canadian Loan Parties or to operate same and, to the maximum extent permitted by Applicable Law, may seek the appointment of such a receiver without the requirement of prior notice or a hearing. Any such Receiver shall, so far as concerns responsibility for his/her acts, be deemed agent of such Loan Parties and not Agent and the Lenders, and Agent and the Lenders shall not be in any way responsible for any misconduct, negligence or non-feasance on the part of any such Receiver, his/her servants or employees. Subject to the provisions of the instrument appointing him/her, any such Receiver shall have power to take possession of Collateral of the Canadian Loan Parties, to preserve Collateral of such Loan Parties or its value, to carry on or concur in carrying on all or any part of the business of such Loan Parties and to sell, lease, license or otherwise dispose of or concur in selling, leasing, licensing or otherwise disposing of Collateral of such Loan Parties. To facilitate the foregoing powers, any such Receiver may, to the exclusion of all others, including the Canadian Loan Parties, enter upon, use and occupy all premises owned or occupied by such Loan Parties wherein Collateral of such Loan Parties may be situated, maintain Collateral of such Loan Parties upon such premises, borrow money on a secured or unsecured basis and use Collateral of the Loan Parties directly in carrying on such Loan Parties business or as security for loans or advances to enable the Receiver to carry on such Loan Parties' business or otherwise, as such Receiver shall, in its discretion, determine. Except as may be otherwise directed by Agent, all money received from time to time by such Receiver in carrying out his/her appointment shall be received in trust for and paid over to Agent. Every such Receiver may, in the discretion of Agent, be vested with all or any of the rights and powers of Agent and the Lenders. Agent may, either directly or through its nominees, exercise any or all powers and rights given to a Receiver by virtue of, and in accordance with, the foregoing provisions of this paragraph and Applicable Law. Except as expressly provided herein, this clause (ii) shall not apply to a Loan Party that is a Debtor.

128

(b)        Subject to (x) the delivery by Agent to any Loan Party of a notice of Agent's intent to exercise rights and remedies, (y) the filing by Agent of a motion seeking emergency relief from the automatic stay on at least five (5) Business Days' notice (such notice not to be required in the case of exigent circumstances) and (z) the Interim Order and, upon entry, the Final Order, upon the occurrence and during the continuance of an Event of Default, subject to any notice period set forth in the Interim Order or the Final Order (which notice period only applies to the Collateral enforcement remedies described below) to counsel for the Debtors, counsel for any Committee, the US Trustee, the Agent for the benefit of itself and the Lenders, and the Pre-Petition Agent, for the benefit of itself and the other Pre-Petition Secured Parties, as applicable, shall be entitled to take any action and exercise all rights and remedies provided to them by the Interim Order, this Agreement, the Other Loan Documents or the Pre-Petition Other Documents, or applicable law, unless otherwise ordered by the Bankruptcy Court, as the Agent or the Pre-Petition Agent, as applicable, may deem appropriate in their sole discretion to, among other things, proceed against and realize upon the Collateral (including the Pre-Petition Collateral) or any other assets or properties of the Loan Parties or any Debtor's Estate upon which the Agent, for the benefit of itself and the Lenders, and the Pre-Petition Agent, for the benefit of itself and the other Pre-Petition Secured Parties, has been or may hereafter be granted liens or security interests to obtain the full and indefeasible payment of all the Pre-Petition Obligations and Post-Petition Obligations. Notwithstanding the foregoing or anything in Section 11.1(a) above, Agent may continue to apply proceeds received into the lockbox or collection account to reduce the Pre-Petition Obligations or the Post-Petition Obligations in any order at the sole discretion of the Agent during any notice period set forth in the Interim Order or the Final Order.  During such notice period set forth in the Interim Order or the Final Order, either or both the Debtors and the Committee shall be entitled to seek an emergency hearing with the Bankruptcy Court.

(c)        Additionally, upon the occurrence and during the continuance of an Event of Default and the exercise by Agent or the Pre-Petition Agent of their respective rights and remedies under the Interim Order, the Credit Agreement, the Other Documents, the Pre-Petition Credit Agreement or the Pre-Petition Other Documents, provided that the Debtors and the Agent agree upon a mutually acceptable wind down budget, each Loan Party shall cooperate with the Agent in the exercise of rights and remedies and assist the Agent in effecting any sale or other disposition of the Collateral required by the Agent, including any sale of Collateral pursuant to Bankruptcy Code section 363 or assumption and assignment of Collateral consisting of contracts and leases pursuant to Bankruptcy Code section 365, in each case, upon such terms that are acceptable to the Agent.

(d)        Subject to (x) the delivery by Agent to any Loan Party of a notice of Agent's intent to exercise rights and remedies, (y) the filing by Agent of a motion seeking emergency relief from the automatic stay on at least five (5) Business Days' notice (such notice not to be required in the case of exigent circumstances) and (z) the Interim Order and, upon entry, the Final Order, in connection with a liquidation of any of the Collateral, the Agent (or any of its employees, agents, consultants, contractors, or other professionals) shall have the right, at the sole cost and expense of the Loan Parties, to: (i) enter upon, occupy, and use any real or personal property, fixtures, equipment, leasehold interests, or warehouse arrangements owned or leased by any Loan Party; provided, however, the Agent may only be permitted to do so in accordance with (a) existing rights under applicable non-bankruptcy law, including, without limitation, applicable leases, (b) any pre-petition (and, if applicable, post-petition) landlord waivers or consents, or (c) further order of the

129

Bankruptcy Court on motion and notice appropriate under the circumstances; and (ii) use any and all trademarks, tradenames, copyrights, licenses, patents, equipment or any other similar assets of any Loan Party, or assets which are owned by or subject to a lien of any third party and which are used by any Loan Party in its business.  The Agent and Lenders will be responsible for the payment of any applicable fees, rentals, royalties, or other amounts owing to such lessor, licensor or owner of such property (other than a Loan Party) for the period of time that the Agent actually occupies any real property or uses the equipment or the intellectual property (but in no event for any accrued and unpaid fees, rentals, or other amounts owing for any period prior to the date that the Agent actually occupies or uses such assets or properties).

(e)     To the extent that Applicable Law imposes duties on the Agent to exercise remedies in a commercially reasonable manner, each Loan Party acknowledges and agrees that it is not commercially unreasonable for the Agent: (i) to fail to incur expenses reasonably deemed significant by the Agent to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition; (ii) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of; (iii) to fail to exercise collection remedies against Customers or other Persons obligated on Collateral or to remove Liens on or any adverse claims against Collateral; (iv) to exercise collection remedies against Customers and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists; (v) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature; (vi) to contact other Persons, whether or not in the same business as any Loan Party, for expressions of interest in acquiring all or any portion of such Collateral; (vii) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature; (viii) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets; (ix) to dispose of assets in wholesale rather than retail markets; (x) to disclaim disposition warranties, such as title, possession or quiet enjoyment, (xi) to purchase insurance or credit enhancements to insure the Agent against risks of loss, collection or disposition of Collateral or to provide to the Agent a guaranteed return from the collection or disposition of Collateral; or (xii) to the extent deemed appropriate by the Agent, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Agent in the collection or disposition of any of the Collateral. Each Loan Party acknowledges that the purpose of this Section 11.1(b) is to provide non-exhaustive indications of what actions or omissions by Agent would not be commercially unreasonable in Agent's exercise of remedies against the Collateral and that other actions or omissions by Agent shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 11.1(b). Without limitation upon the foregoing, nothing contained in this Section 11.1(b) shall be construed to grant any rights to any Loan Party or to impose any duties on the Agent that would not have been granted or imposed by this Agreement or by Applicable Law in the absence of this Section 11.1(b).

11.2    <u>Agent's Discretion</u>. Agent shall have the right in its sole discretion to determine which rights, Liens, security interests or remedies Agent may at any time pursue, relinquish, subordinate, or modify, which procedures, timing and methodologies to employ, and what any other action to take with respect to any or all of the Collateral and in what order, thereto and such

130

determination will not in any way modify or affect any of Agent's or Lenders' rights hereunder as against Loan Parties or each other.

11.3    <u>Setoff</u>. Subject to Section 14.13, in addition to any other rights which the Agent or any Lender may have under Applicable Law, during the continuance of any Event of Default hereunder, the Agent and such Lender shall have a right, immediately and without notice of any kind, to apply any Loan Party's property held by the Agent and such Lender or any of their Affiliates to reduce the Obligations and to exercise any and all rights of setoff which may be available to the Agent and such Lender with respect to any deposits held by the Agent or such Lender.

11.4    <u>Rights and Remedies not Exclusive</u>. The enumeration of the foregoing rights and remedies is not intended to be exhaustive and the exercise of any rights or remedy shall not preclude the exercise of any other right or remedies provided for herein or otherwise provided by law, all of which shall be cumulative and not alternative. [The fourteen-day stay provisions of Bankruptcy Rules 6004(h) and 4001(a)(3) are hereby waived.]

11.5    <u>Allocation of Payments After Event of Default</u>. Notwithstanding any other provisions of this Agreement to the contrary, after the occurrence and during the continuance of an Event of Default, all amounts collected or received by the Agent on account of the Obligations (including without limitation any amounts on account of any of Cash Management Liabilities (including JPM European Treasury Management Obligations) or Hedge Liabilities) or in respect of the Collateral shall be paid, subject to the Interim Order, the Final Order (once entered) and the terms of the ABL Intercreditor Agreement, over or delivered as follows:

FIRST, to the payment of all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees) of Agent in connection with enforcing its rights and the rights of Lenders under this Agreement and the Other Documents arising from, related to or connected with the US-Canada Advances and any protective advances made by Agent under or pursuant to the terms of this Agreement (other than with respect to those arising from or connected with any Cash Management Liabilities and/or Hedge Liabilities);

SECOND, to payment of any fees owed to Agent;

THIRD, to the payment of all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees) of each of the Lenders to the extent owing to such Lender pursuant to the terms of this Agreement;

FOURTH, to the payment of all of the Obligations consisting of accrued interest on account of the US-Canada Swing Loans;

FIFTH, to the payment of the outstanding principal amount of the Obligations consisting of US-Canada Swing Loans;

SIXTH, to the payment of all Obligations arising under this Agreement and the Other Documents consisting of accrued fees and interest (other than interest in respect of US-Canada Swing Loans paid pursuant to clause FOURTH above);

131

SEVENTH, to the payment of the outstanding principal amount of the Obligations (other than principal in respect of US-Canada Swing Loans paid pursuant to clause FIFTH above and other than Cash Management Liabilities and Hedge Liabilities) and including the payment or cash collateralization of any outstanding US-Canada Letters of Credit in accordance with Section 3.2(b) hereof;

EIGHTH, to any Cash Management Liabilities (including any JPM European Treasury Management Obligations) and/or Hedge Liabilities;

NINTH, to all other Obligations which shall have become due and payable and not repaid pursuant to clauses "FIRST" through "EIGHTH";

TENTH, to the payment of the surplus, if any, to whoever may be lawfully entitled to receive such surplus.

In carrying out the foregoing, (i) amounts received shall be applied in the numerical order provided until exhausted prior to application to the next succeeding category; (ii) each of Lenders shall receive (so long as it is not a Defaulting Lender) an amount equal to its pro rata share (based on the proportion that the then outstanding US-Canada Advances held by such Lender bears to the aggregate then outstanding US-Canada Advances) of amounts available to be applied pursuant to clauses "SIXTH", "SEVENTH", and "NINTH" above and, with respect to clause "EIGHTH" above, an amount equal to its pro rata share (based on the proportion that the then outstanding Cash Management Liabilities and Hedge Liabilities arising from, related to or connection with US-Canada Advances held by such Lender bears to the aggregate then outstanding Cash Management Liabilities and Hedge Liabilities arising from, related to or connection with US-Canada Advances); (iii) notwithstanding anything to the contrary in this Section 11.1, no Swap Obligations of any Non-Qualifying Party shall be paid with amounts received from such Non-Qualifying Party under its Guaranty (including sums received as a result of the exercise of remedies with respect to such Guaranty) or from the proceeds of such Non- Qualifying Party's Collateral if such Swap Obligations would constitute Excluded Hedge Liabilities; provided, however, that to the extent possible appropriate adjustments shall be made with respect to payments and/or the proceeds of Collateral from other Borrowers and/or Guarantors that are Eligible Contract Participants with respect to such Swap Obligations to preserve the allocation to Obligations otherwise set forth above in this Section 11.5; and (iv) to the extent that any amounts available for distribution pursuant to clause "SEVENTH" above are attributable to the issued but undrawn amount of outstanding US-Canada Letters of Credit, such amounts shall be held by the Agent as cash collateral for the US-Canada Letters of Credit pursuant to Section 3.2(b) hereof and applied (A) first, to reimburse Issuer from time to time for any drawings under such US-Canada Letters of Credit, and (B) then, following the expiration of all Letters of Credit, to all other obligations of the types described in clauses "SEVENTH," "EIGHTH" and "NINTH" above in the manner provided in this Section 11.5.

## 12. WAIVERS AND JUDICIAL PROCEEDINGS.

12.1   Waiver of Notice. Each Loan Party hereby waives notice of non-payment of any of the Receivables, demand, presentment, protest and notice thereof with respect to any and all

instruments, notice of acceptance hereof, notice of loans or advances made, credit extended, Collateral received or delivered, or any other action taken in reliance hereon, and all other demands and notices of any description, except such as are expressly provided for herein.

12.2     Delay. No delay or omission on the Agent's or any Lender's part in exercising any right, remedy or option shall operate as a waiver of such or any other right, remedy or option or of any Default or Event of Default.

12.3     Jury Waiver. EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, COUNTERCLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THIS AGREEMENT, ANY OTHER DOCUMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT, ANY OTHER DOCUMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE AND EACH PARTY HEREBY CONSENTS THAT ANY SUCH CLAIM, COUNTERCLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

## 13. EFFECTIVE DATE AND TERMINATION.

13.1     Term. This Agreement, which shall inure to the benefit of and shall be binding upon the respective successors and permitted assigns of each Loan Party signatory hereto and the Secured Parties, shall become effective on the date hereof and shall, unless sooner terminated as herein provided (including by acceleration by Agent), continue in full force and effect for a period ending on the Maturity Date (such date, the "Termination Date", and such period from of the date hereof through and ending on the Termination Date, the "Term").  Debtors may terminate this Agreement at any time, subject to providing three (3) Business Days' prior written notice to Agent, upon Payment in Full as provided in Section 13.2 hereof.

13.2     Termination.

(a)     The termination of the Agreement shall not affect Agent's or any Lender's rights, or any of the Obligations having their inception prior to the effective date of such termination or any Obligations which pursuant to the terms hereof continue to accrue after such date, and the provisions hereof shall continue to be fully operative until all transactions entered into and rights or interests created hereunder have been concluded or liquidated and Payment in Full.  Each Guaranty and the Liens and rights granted to Agent and Lenders hereunder and the financing statements filed hereunder shall continue in full force and effect, notwithstanding the termination of this Agreement or the fact that US-Canada Borrowers' Account may, from time to

133

time be temporarily in a zero or credit position, until Payment in Full or the Loan Parties have furnished Agent and Lenders with an indemnification satisfactory to Agent and Lenders with respect thereto.  Accordingly, each Loan Party waives any rights which it may have under the Uniform Commercial Code to demand the filing of termination statements with respect to the Collateral, and Agent shall not be required to send such termination statements to any Loan Party, or to file them with any filing office, until Payment in Full and the Secured Parties have received a full release from each Loan Party from all claims of such Loan Party (and in respect of a Debtor, the estate of such Debtor) for any matters arising out of, relating to or in connection, with the Pre-Petition Other Documents, this Agreement and the Other Documents. Furthermore, each Loan Party hereby agrees that upon payment of all Obligations consisting of principal, interest, fees and expenses, in each case owing pursuant to this Agreement, Agent may hold a reserve following the date of payment in full of the Obligations as cash collateral in an amount equal to the sum of (x) cash collateral in an amount to be determined by Agent in its Permitted Discretion for Cash Management Liabilities and professional and legal fees and expenses, plus (y) an amount to be determined by Agent in its Permitted Discretion for legal fees and other costs and expenses Agent reasonably believes it may incur as a result of any claims, actions or challenges in the Case in connection with the Obligations, the Pre-Petition Obligations, the Liens thereon, this Agreement or any other matter related thereto.   The cash collateral referenced in clause (x) above shall be released to Debtors or to such other Person(s) directed by the Bankruptcy Court upon termination and satisfaction of all Cash Management Liabilities and Hedge Liabilities (including any potential contingent claims). The cash collateral referenced in clause (y) above, to the extent any such amounts are deposited with Agent, will be released to Debtors or to such other Person(s) directed by the Bankruptcy Court upon expiration of the Challenge Period with no Objection (as defined in the Interim Order and Final Order) having been threatened or filed against Agent and/or Lenders.

(b)      All representations, warranties, covenants, waivers and agreements contained herein shall survive termination hereof until Payment in Full and the Secured Parties have received a full release from each Loan Party from all claims of such Loan Party (and in respect of a Debtor, the estate of such Debtor) for any matters arising out of, relating to or in connection, with the Pre-Petition Other Documents, this Agreement and the Other Documents.

## 14. REGARDING AGENT.

14.1   14.1   Appointment. Each Lender hereby designates PNC to act as Agent for such Lender under this Agreement and the Other Documents. Each Lender hereby irrevocably authorizes the Agent to take such action on its behalf under the provisions of this Agreement and the Other Documents and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of the Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto and the Agent shall hold all Collateral, payments of principal and interest, fees (except the fees set forth in Sections 2.7(b), 3.3 and 3.4), charges and collections received pursuant to this Agreement, for the ratable benefit of Lenders. Agent may perform any of its duties hereunder by or through its agents or employees. As to any matters not expressly provided for by this Agreement (including collection of the Note) Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of US-Canada Required Lenders, and such instructions shall be binding; provided, however, that Agent shall not be required to take any action which, in the Agent's discretion,

134

exposes the Agent to liability or which is contrary to this Agreement or the Other Documents or Applicable Law unless the Agent is furnished with an indemnification reasonably satisfactory to the Agent with respect thereto.

14.2    Nature of Duties. Agent shall have no duties or responsibilities except those expressly set forth in this Agreement and the Other Documents. Neither Agent nor any of its officers, directors, employees or agents shall be (i) liable for any action taken or omitted by them as such hereunder or in connection herewith, unless caused by their gross (not mere) negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non- appealable judgment), or (ii) responsible in any manner for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement, or in any of the Other Documents or in any certificate, report, statement or other document referred to or provided for in, or received by the Agent under or in connection with, this Agreement or any of the Other Documents or for the value, validity, effectiveness, genuineness, due execution, enforceability or sufficiency of this Agreement, or any of the Other Documents or for any failure of any Loan Party to perform its obligations hereunder.  Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any of the Other Documents, or to inspect the properties, books or records of any Loan Party. The duties of Agent as respects the Advances to Loan Parties shall be mechanical and administrative in nature; Agent shall not have by reason of this Agreement a fiduciary relationship in respect of any Lender; and nothing in this Agreement, expressed or implied, is intended to or shall be so construed as to impose upon the Agent any obligations in respect of this Agreement or the transactions described herein except as expressly set forth herein.

14.3    Lack of Reliance on Agent.  Independently and without reliance upon the Agent or any other Lender, each Lender has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of each Borrower and each Guarantor in connection with the making and the continuance of the Advances hereunder and the taking or not taking of any action in connection herewith, and (ii) its own appraisal of the creditworthiness of each Borrower and each Guarantor. Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before making of the Advances or at any time or times thereafter except as shall be provided by any Loan Party pursuant to the terms hereof. Agent shall not be responsible to any Lender for any recitals, statements, information, representations or warranties herein or in any agreement, document, certificate or a statement delivered in connection with or for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency of this Agreement or any Other Document, or of the financial condition of any Borrower or any Guarantor, or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement, the Note, the Other Documents or the financial condition or prospects of any Loan Party, or the existence of any Event of Default or any Default.

14.4    Resignation of the Agent; Successor Agent. Agent may resign on sixty (60) days written notice to each Lender and Borrowing Agent and upon such resignation, US-Canada Required Lenders will promptly designate a successor Agent reasonably satisfactory to Borrowers (provided that no such approval by Borrowers shall be required (i) in any case where the successor

135

Case 23-90068   Document 96   Filed in TXSB on 02/02/23   Page 452 of 485

Agent is one of Lenders or (ii) after the occurrence and during the continuance of any Event of Default). Any such successor Agent shall succeed to the rights, powers and duties of Agent, and shall in particular, if applicable, succeed to all of the Agent's right, title and interest in and to all of the Liens in the Collateral securing the Obligations created hereunder or any Other Document (including the Pledge Agreement and all account control agreements), and the term "Agent" shall mean such successor agent effective upon its appointment, and the former Agent's rights, powers and duties as the Agent shall be terminated, without any other or further act or deed on the part of such former Agent. However, notwithstanding the foregoing, if at the time of the effectiveness of the new Agent's appointment, any further actions need to be taken in order to provide for the legally binding and valid transfer of any Liens in the Collateral from former Agent to new Agent and/or for the perfection of any Liens in the Collateral as held by new Agent or it is otherwise not then possible for new Agent to become the holder of a fully valid, enforceable and perfected Lien as to any of the Collateral, former Agent shall continue to hold such Liens solely as agent for perfection of such Liens on behalf of new Agent until such time as new Agent can obtain a fully valid, enforceable and perfected Lien on all Collateral, provided that the Agent shall not be required to or have any liability or responsibility to take any further actions after such date as such agent for perfection to continue the perfection of any such Liens (other than to forego from taking any affirmative action to release any such Liens). After the Agent's resignation as an Agent, the provisions of this Article 14, and any indemnification rights under this Agreement, including without limitation, rights arising under Section 16.5 hereof, shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Agent under this Agreement (and in the event such resigning Agent continues to hold any Liens pursuant to the provisions of the immediately preceding sentence, the provisions of this Article 14 and any indemnification rights under this Agreement, including without limitation, rights arising under Section 16.5 hereof, shall inure to its benefit as to any actions taken or omitted to be taken by it in connection with such Liens).

14.5    Certain Rights of Agent.  If the Agent shall request instructions from Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any Other Document, the Agent shall be entitled to refrain from such act or taking such action unless and until the Agent shall have received instructions from US-Canada Required Lenders; and the Agent shall not incur liability to any Person by reason of so refraining. Without limiting the foregoing, Lenders shall not have any right of action whatsoever against the Agent as a result of its acting or refraining from acting hereunder in accordance with the instructions of US- Canada Required Lenders.

14.6    Reliance. Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, email, facsimile, telex, teletype or telecopier message, cablegram, order or other document or telephone message believed by it to be genuine and correct and to have been signed, sent or made by the proper person or entity, and, with respect to all legal matters pertaining to this Agreement and the Other Documents and its duties hereunder, upon advice of counsel selected by it. Agent may employ agents and attorneys-in-fact and shall not be liable for the default or misconduct of any such agents or attorneys-in-fact selected by the Agent with reasonable care.

14.7    Notice of Default. Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder or under the Other Documents, unless

136

the Agent has received notice from a Lender or Borrowing Agent referring to this Agreement or the Other Documents, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Agent receives such a notice, the Agent shall give notice thereof to Lenders. Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by US-Canada Required Lenders; provided, that, unless and until the Agent shall have received such directions, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of Lenders.

14.8    Indemnification. To the extent the Agent is not reimbursed and indemnified by Loan Parties, each Lender will reimburse and indemnify the Agent in proportion to its respective portion of the outstanding Advances and its respective Participation Commitments in the outstanding Letters of Credit and outstanding Swing Loans (or, if no Advances are outstanding, pro rata according to the percentage that its Revolving Commitment Amount constitutes of the total aggregate Revolving Commitment Amounts), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Agent in performing its duties hereunder, or in any way relating to or arising out of this Agreement or any Other Document; provided that Lenders shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Agent's gross (not mere) negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment).

14.9    Agent in its Individual Capacity. With respect to the obligation of the Agent to lend under this Agreement, the Advances made by it shall have the same rights and powers hereunder as any other Lender and as if it were not performing the duties as the Agent specified herein; and the term "Lender" or any similar term shall, unless the context clearly otherwise indicates, include the Agent in its individual capacity as a Lender. Any Agent may engage in business with any Loan Party as if it were not performing the duties specified herein, and may accept fees and other consideration from any Loan Party for services in connection with this Agreement or otherwise without having to account for the same to Lenders.

14.10    Delivery of Documents. To the extent the Agent receives financial statements required under Sections 9.7, 9.8, 9.9, 9.12 and 9.13, US-Canada Borrowing Base Certificates from any Loan Party pursuant to the terms of this Agreement which any Loan Party is not obligated to deliver to each Lender, the Agent will promptly furnish such documents and information to Lenders.

14.11    Loan Parties' Undertaking to Agent. Without prejudice to their respective obligations to Lenders under the other provisions of this Agreement, each Loan Party hereby undertakes with the Agent to pay to the Agent from time to time on demand all amounts from time to time due and payable by it for the account of the Agent or Lenders or any of them pursuant to this Agreement to the extent not already paid. Any payment made pursuant to any such demand shall pro tanto satisfy the relevant Loan Party's obligations to make payments for the account of Lenders or the relevant one or more of them pursuant to this Agreement.

14.12    No Reliance on Agent's Customer Identification Program. To the extent the

Advances or this Agreement is, or becomes, syndicated in cooperation with other Lenders, each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on the Agent to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the USA PATRIOT Act or the regulations thereunder, including the regulations contained in 31 CFR 103.121 (as hereafter amended or replaced, the "**CIP Regulations**"), or any other Anti-Terrorism Law, including any programs involving any of the following items relating to or in connection with any of Loan Parties, their Affiliates or their agents, the Other Documents or the transactions hereunder or contemplated hereby: (i) any identity verification procedures, (ii) any recordkeeping, (iii) comparisons with government lists, (iv) customer notices or (v) other procedures required under the CIP Regulations or such Anti-Terrorism Laws.

14.13   Other Agreements. Each of Lenders agrees that it shall not, without the express consent of Agent, and that it shall, to the extent it is lawfully entitled to do so, upon the request of Agent, set off against the Obligations, any amounts owing by such Lender to any Loan Party or any deposit accounts of any Loan Party now or hereafter maintained with such Lender. Anything in this Agreement to the contrary notwithstanding, each of Lenders further agrees that it shall not, unless specifically requested to do so by the Agent, take any action to protect or enforce its rights arising out of this Agreement or the Other Documents, it being the intent of Lenders that any such action to protect or enforce rights under this Agreement and the Other Documents shall be taken in concert and at the direction or with the consent of Agent or US- Canada Required Lenders.

14.14   [Reserved].

14.15   [Reserved].

14.16   [Reserved].

14.17   [Reserved].

14.18   Erroneous Payments.

(a)   If the Agent notifies a Lender, Issuer or Secured Party, or any Person who has received funds on behalf of a Lender, Issuer or Secured Party (any such Lender, Issuer, Secured Party or other recipient, a "**Payment Recipient**") that the Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds received by such Payment Recipient from the Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender, Issuer, Secured Party or other Payment Recipient on its behalf) (any such funds, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "**Erroneous Payment**") and demands the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of the Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Agent, and such Lender, Issuer or Secured Party shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two Business Days thereafter, return to the Agent the amount of any such Erroneous Payment (or portion thereof)

138

as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Agent in same day funds at the greater of the Overnight Bank Funding Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation from time to time in effect. A notice from the Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error.

(b)     Without limiting immediately preceding clause (a), each Lender, Issuer or Secured Party, or any Person who has received funds on behalf of a Lender, Issuer or Secured Party hereby further agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Agent (or any of its Affiliates) (x) that is in an amount different than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by the Agent (or any of its Affiliates) with respect to such, prepayment or repayment (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Agent (or any of its Affiliates), or (z) that such Lender, Issuer or Secured Party, or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part) in each case:

(i)  (A) In the case of immediately preceding clauses (x) or (y), an error shall be presumed to have been made (absent written confirmation from the Agent to the contrary) or (B) an error has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(ii) such Lender, Issuer or Secured Party shall (and shall cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one Business Day of its knowledge of such error) notify the Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Agent pursuant to this Section 14.18(b),

(c)     Each Lender, Issuer or Secured Party hereby authorizes the Agent to set off, net and apply any and all amounts at any time owing to such Lender, Issuer or Secured Party under any Other Document, or otherwise payable or distributable by the Agent to such Lender, Issuer or Secured Party from any source, against any amount due to the Agent under immediately preceding clause (a) or under the indemnification provisions of this Agreement.

(d)     In the event that an Erroneous Payment (or portion thereof) is not recovered by the Agent for any reason, after demand therefor by the Agent in accordance with immediately preceding clause (a), from any Lender or Issuer that has received such Erroneous Payment (or portion thereof) (and/or from any Payment Recipient who received such Erroneous Payment (or portion thereof) on its respective behalf (such unrecovered amount, an "**Erroneous Payment Return Deficiency**")), upon the Agent's notice to such Lender or Issuer at any time, (i) such Lender or Issuer shall be deemed to have assigned its loans (but not its commitments) of the relevant class with respect to which such Erroneous Payment was made (the "**Erroneous Payment Impacted Class**") in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Agent may specify) (such assignment of the loans (but not commitments) of the

139

Erroneous Payment Impacted Class, the "**Erroneous Payment Deficiency Assignment**") at par plus any accrued and unpaid interest (with the assignment fee to be waived by the Agent in such instance), and is hereby (together with the Borrower) deemed to execute and deliver an assignment and assumption with respect to such Erroneous Payment Deficiency Assignment, and such Lender or Issuer shall deliver any Notes evidencing such loans to the Borrower or the Agent, (ii) the Agent as the assignee Lender shall be deemed to acquire the Erroneous Payment Deficiency Assignment, (iii) upon such deemed acquisition, the Agent as the assignee Lender shall become a Lender or Issuer, as applicable, hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning Lender or assigning Issuer shall cease to be a Lender or Issuer, as applicable, hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding for the avoidance of doubt, its obligations under the indemnification provisions of this Agreement and its applicable commitments which shall survive as to such assigning Lender or assigning Issuer and (iv) the Agent may reflect in the Register its ownership interest in the loans subject to the Erroneous Payment Deficiency Assignment. The Agent may, in its discretion, sell any loans acquired pursuant to an Erroneous Payment Deficiency Assignment and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Lender or Issuer shall be reduced by the net proceeds of the sale of such loan (or portion thereof), and the Agent shall retain all other rights, remedies and claims against such Lender or Issuer (and/or against any recipient that receives funds on its respective behalf). For the avoidance of doubt, no Erroneous Payment Deficiency Assignment will reduce the commitments of any Lender or Issuer and such commitments shall remain available in accordance with the terms of this Agreement. In addition, each party hereto agrees that, except to the extent that the Agent has sold a loan (or portion thereof) acquired pursuant to an Erroneous Payment Deficiency Assignment, and irrespective of whether the Agent may be equitably subrogated, the Agent shall be contractually subrogated to all the rights and interests of the applicable Lender, Issuer or Secured Party under the Other Documents with respect to such Erroneous Payment Return Deficiency (the "**Erroneous Payment Subrogation Rights**").

(e)     The parties hereto agree that an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other loan party, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Agent from the Borrower or any other loan party for the purpose of making such Erroneous Payment.

(f)     To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Agent for the return of any Erroneous Payment received, including without limitation, waiver of any defense based on "discharge for value" or any similar doctrine.

(g)     Each party's obligations under this Section 14.18 shall survive the resignation or replacement of the Agent, the termination of all of the commitments and/or repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Other Document.

## 15. BORROWING AGENCY.

15.1    <u>Borrowing Agency Provisions</u>.

(a)     Each US-Canada Loan Party hereby irrevocably designates Borrowing Agent to be its attorney and agent and in such capacity, whether verbally, in writing or through electronic methods (including, without limitation, an Approved Electronic Communication) to (i) borrow, (ii) request advances, (iii) request the issuance of US-Canada Letters of Credit, (iv) sign and endorse notes, (v) execute and deliver all instruments, documents, applications, security agreements, reimbursement agreements and letter of credit agreements for US-Canada Letters of Credit and all other certificates, notice, writings and further assurances now or hereafter required hereunder, (vi) make elections regarding interest rates, (vii) give instructions regarding US-Canada Letters of Credit and agree with Issuer upon any amendment, extension or renewal of any US-Canada Letter of Credit and (viii) otherwise take action under and in connection with this Agreement and the Other Documents, all on behalf of and in the name such US-Canada Loan Party or US-Canada Loan Parties, and hereby authorizes Agent to pay over or credit all loan proceeds hereunder in accordance with the request of Borrowing Agent.

(b)     [Reserved].

(c)     The handling of this credit facility as a co-borrowing facility with a borrowing agent in the manner set forth in this Agreement is solely as an accommodation to Loan Parties and at their request. Neither the Agent nor any Lender shall incur liability to Loan Parties as a result thereof. To induce the Agent and Lenders to do so and in consideration thereof, each Loan Party hereby indemnifies the Agent and each Lender and holds the Agent and each Lender harmless from and against any and all liabilities, expenses, losses, damages and claims of damage or injury asserted against the Agent or any Lender by any Person arising from or incurred by reason of the handling of the financing arrangements of Loan Parties as provided herein, reliance by the Agent or any Lender on any request or instruction from any Borrowing Agent or any other action taken by the Agent or any Lender with respect to this Section 15.1 except due to willful misconduct or gross (not mere) negligence by the indemnified party (as determined by a court of competent jurisdiction in a final and non-appealable judgment).

(d)     All Obligations shall be joint and several, and each Loan Party shall make payment upon the maturity of the Obligations by acceleration or otherwise, and such obligation and liability on the part of each Loan Party shall in no way be affected by any extensions, renewals and forbearance granted by the Agent or any Lender to any Loan Party, failure of the Agent or any Lender to give any Loan Party notice of borrowing or any other notice, any failure of the Agent or any Lender to pursue or preserve its rights against any Loan Party, the release by the Agent or any Lender of any Collateral now or thereafter acquired from any Loan Party, and such agreement by each Loan Party to pay upon any notice issued pursuant thereto is unconditional and unaffected by prior recourse by the Agent or any Lender to the other Loan Parties or any Collateral for such Loan Party's Obligations or the lack thereof. Each Loan Party waives all suretyship defenses.

15.2    <u>Waiver of Subrogation</u>. Each Loan Party expressly waives any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution of any other claim which such Loan Party may now or hereafter have against the other Loan Parties or any other Person directly or contingently liable for the Obligations hereunder, or against or with respect to any other Loan Parties' property (including, without limitation, any property which is Collateral for the

141

Obligations), arising from the existence or performance of this Agreement, until termination of this Agreement and repayment in full of the Obligations.

15.3     Common Enterprise. The successful operation and condition of each of the Borrowers is dependent on the continued successful performance of the functions of the group of Borrowers as a whole and the successful operation of each Borrower is dependent on the successful performance and operation of each other Borrower. Each of the Borrowers expects to derive benefit (and its board of directors or other governing body has determined that it may reasonably be expected to derive benefit), directly or indirectly, from successful operations of the Loan Parties and each of the other Borrowers. Each Borrower expects to derive benefit (and the board of directors or other governing body of each such Borrower have determined that it may reasonably be expected to derive benefit), directly and indirectly, from the credit extended by the Lenders to the Borrowers hereunder, both in their separate capacities and as members of the group of companies.  Each Borrower has determined that execution, delivery, and performance of this Agreement and any Other Documents to be executed by such Borrower is within its corporate purpose, will be of direct and indirect benefit to such Borrower, and is in its best interest.

## 16. MISCELLANEOUS.

16.1     Governing Law. This Agreement and each Other Document (unless and except to the extent expressly provided otherwise in any such Other Document), and all matters relating hereto or thereto or arising herefrom or therefrom (whether arising under contract law, tort law or otherwise) shall, in accordance with Section 5-1401 of the General Obligations Law of the State of New York, be governed by and construed in accordance with the laws of the State of New York. Each Loan Party hereby consents to and acknowledges the jurisdiction of the Bankruptcy Court over any actions or proceedings arising in connection with the Case, this Agreement and the Other Loan Documents (or in any way connected with or related or incidental to the dealings of the parties hereto in respect of the Case, this Agreement or any of the Other Documents. If (i) the Case is dismissed, (ii) the Bankruptcy Court abstains from hearing any actions or proceedings arising in connection with this Agreement or any of the Other Documents (or in any way connected with or related or incidental to the dealings of the parties hereto in respect of this Agreement or any of the Other Documents or the transactions related hereto or thereto) or (iii) the Bankruptcy Court refuses to exercise jurisdiction over any actions or proceedings arising in connection with this Agreement or any of the Other Documents (or in any way connected with or related or incidental to the dealings of the parties hereto in respect of this Agreement or any of the Other Documents or the transactions related hereto or thereto), then any judicial proceeding brought by or against any Loan Party with respect to any of the Obligations, this Agreement, the Other Documents or any related agreement may be brought in any court of competent jurisdiction in the State of New York, United States of America (unless and except to the extent expressly provided otherwise in any such Other Document or related agreement) and, by execution and delivery of this Agreement, each Loan Party accepts for itself and in connection with its properties, generally and unconditionally, the non-exclusive jurisdiction of the aforesaid courts, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement, but with respect to any Canadian Loan Party only, the Agent and Lenders shall not be precluded from initiating any proceeding against such Canadian Loan Party in the Courts of the Province of Ontario, Canada sitting in Toronto in their absolute and sole discretion. Each Loan Party hereby waives personal service of any and all process upon it and consents that all such service of process may be made by certified

142

or registered mail (return receipt requested) directed to Borrowing Agent at its address set forth in Section 16.6 and service so made shall be deemed completed five (5) days after the same shall have been so deposited in the mails of the United States of America, or, at Agent's option, by service upon Borrowing Agent which each Loan Party irrevocably appoints as such Loan Party's agent for the purpose of accepting service within the State of New York. Nothing herein shall affect the right to serve process in any manner permitted by law or shall limit the right of the Agent or any Lender to bring proceedings against any Loan Party in the courts of any other jurisdiction. Each Loan Party waives any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon forum non conveniens. Each Loan Party waives the right to remove any judicial proceeding brought against such Loan Party in any state court to any federal court. Any judicial proceeding by any Loan Party against the Agent or any Lender involving, directly or indirectly, any matter or claim in any way arising out of, related to or connected with this Agreement or any related agreement, shall be brought only in a federal, state or provincial court located in the County of New York, State of New York.

16.2    <u>Entire Understanding</u>.

(a)    This Agreement and the documents executed concurrently herewith contain the entire understanding between each Loan Party, the Agent and each Lender and supersedes all prior agreements and understandings, if any, relating to the subject matter hereof. Any promises, representations, warranties or guarantees not herein contained and hereinafter made shall have no force and effect unless in writing, signed by each Loan Party's, the Agent's and each Lender's respective officers. Neither this Agreement nor any portion or provisions hereof may be changed, modified, amended, waived, supplemented, discharged, cancelled or terminated orally or by any course of dealing, or in any manner other than by an agreement in writing, signed by the party to be charged. The parties hereto shall be permitted to amend this Agreement and the Other Documents without further approval or order of the Bankruptcy Court; provided, however, that any material modification or amendment to this Agreement or the any Other Documents shall be subject to providing notice of such material modification or amendment to counsel to any Committee and the US Trustee each of whom shall have three (3) Business Days from the date of such notice within which to object in writing to such modification or amendment unless the Committee and the US Trustee agree in writing to a shorter period. Unless the Committee or the US Trustee timely objects to any material modification or amendment to this Agreement or any Other Document, then such modification or amendment shall become effective upon the expiration of the aforementioned notice period. If a timely objection is interposed, the Bankruptcy Court shall resolve such objection prior to such modification or amendment becoming effective. Each Loan Party acknowledges that it has been advised by counsel in connection with the execution of this Agreement and Other Documents and is not relying upon oral representations or statements inconsistent with the terms and provisions of this Agreement.

(b)    US-Canada Required Lenders, Agent with the consent in writing of US-Canada Required Lenders, and Loan Parties may, subject to the provisions of this Section 16.2(b), from time to time enter into written supplemental agreements to this Agreement or the Other Documents executed by Loan Parties, for the purpose of adding or deleting any provisions or otherwise changing, varying or waiving in any manner the rights of Lenders, Agent or Loan Parties

143

thereunder or the conditions, provisions or terms thereof or waiving any Event of Default thereunder, but only to the extent specified in such written agreements; provided, however, that no such supplemental agreement shall:

(i) increase the Revolving Commitment Percentage or the maximum dollar amount of the Revolving Commitment Amount of any Lender without the consent of such Lender directly affected thereby;

(ii) whether or not any Advances are outstanding, extend the Term or the time for payment of principal or interest of any Advance (excluding the due date of any mandatory prepayment of an Advance), or any fee payable to any Lender, or reduce the principal amount of or the rate of interest borne by any Advances or reduce any fee payable to any Lender, without the consent of each Lender directly affected thereby (except that US-Canada Required Lenders may elect to waive or rescind any imposition of the Default Rate under Section 3.1 or of default rates of Letter of Credit fees under Section 3.2 (unless imposed by Agent));

(iii) except in connection with any increase pursuant to Section 2.23 hereof, increase the Maximum US-Canada Revolving Advance Amount, without the consent of each Lender directly affected thereby;

(iv) alter the definition of the terms US-Canada Required Lenders, or Required Lenders for Eligibility or alter, amend or modify this Section 16.2(b) without the consent of all Lenders;

(v) alter, amend or modify the provisions of Section 11.5 without the consent of all Lenders;

(vi) release any US-Canada Collateral during any calendar year (other than in accordance with the provisions of this Agreement) having an aggregate value in excess of $1,000,000 without the consent of all US-Canada Lenders;

(vii)    alter the definition of the term Availability Block, Eligible Domestic Receivables, Eligible Canadian Receivables, US Receivables Advance Rate, US-Canada Formula Amount, or Canadian Receivables Advance Rate, in a manner that has the effect of increasing the US-Canada Formula Amount, without the consent of all of the Required Lenders for Eligibility;

(viii)    change the rights and duties of the Agent without the consent of all Lenders;

(ix) subject to clause (e) below, permit any US-Canada Revolving Advance to be made if after giving effect thereto the total of US-Canada Revolving Advances outstanding hereunder would exceed the US-Canada Formula Amount for more than sixty (60) consecutive Business Days or exceed one hundred and ten percent (110%) of the US-Canada Formula Amount without the consent of each US-Canada Lender directly affected thereby;

(x) increase the Advance Rates above the Advance Rates in effect on the Closing Date without the consent of all of the Required Lenders for Eligibility;

(xi) release any Guarantor or Borrower without the consent of all Lenders; or

(xii)    subordinate all or substantially all of Agent's Liens in the US-Canada Collateral under this

144

Agreement or the Other Documents without the consent of all US- Canada Lenders.

(c)     Any such supplemental agreement shall apply equally to each Lender and shall be binding upon Loan Parties, Lenders and Agent and all future holders of the Obligations. In the case of any waiver, Loan Parties, Agent and Lenders shall be restored to their former positions and rights, and any Event of Default waived shall be deemed to be cured and not continuing, but no waiver of a specific Event of Default shall extend to any subsequent Event of Default (whether or not the subsequent Event of Default is the same as the Event of Default which was waived), or impair any right consequent thereon.

(d)     In the event that an Agent requests the consent of a Lender pursuant to this Section 16.2 in connection with any proposed amendment, waiver or consent requiring the consent of "each Lender" or "each Lender directly affected thereby," the consent of the Required Lenders is obtained, but the consent of other necessary Lenders is not obtained, then Agent may, at its option, require such non-consenting Lender to assign its interest in the Advances to the Agent or to another Lender or to any other Person designated by Agent (the "**Designated Lender**"), for a price equal to (i) the then outstanding principal amount thereof *plus* (ii) accrued and unpaid interest and fees due such Lender, which interest and fees shall be paid when collected from Loan Parties. In the event Agent elects to require any Lender to assign its interest to the Agent or to the Designated Lender, Agent will so notify such Lender in writing within forty five (45) days following such Lender's denial, and such Lender will assign its interest to the Agent or the Designated Lender no later than five (5) days following receipt of such notice pursuant to a Commitment Transfer Supplement executed by such Lender, the Agent or the Designated Lender, as appropriate, and Agent; provided however, that the consent of Loan Parties (such consent not to be unreasonably withheld, conditioned or delayed) shall be required unless (x) an Event of Default or Default has occurred and is continuing at the time of such assignment or (y) such assignment is to a Permitted Assignee; provided further, that Loan Parties

(e)     shall be deemed to have consented to any such assignment unless they shall object thereto by written notice to Agent within ten (10) Business Days after having received prior notice thereof.

(f)     Notwithstanding (i) the existence of a Default or an Event of Default, (ii) that any of the other applicable conditions precedent set forth in Section 8.3 hereof have not been satisfied or the commitments of Lenders to make Revolving Advances hereunder have been terminated for any reason, or (iii) any other contrary provision of this Agreement, Agent may at its discretion and without the consent of any Lender, voluntarily permit the outstanding US-Canada Revolving Advances at any time to exceed the US-Canada Formula Amount at such time by up to ten percent (10%) of the US-Canada Formula Amount for up to sixty (60) consecutive Business Days (the "**Out-of-Formula Loans**"); provided that in no event shall the Revolving Advances (when combined with the outstanding Swing Loans and Letters of Credit) exceed the aggregate Revolving Commitment Amounts of all Lenders. If Agent is willing in its sole and absolute discretion to permit such Out-of-Formula Loans, Lenders holding the Revolving Commitments shall be obligated to fund such Out-of-Formula Loans in accordance with their respective Revolving Commitment Percentages, and such Out-of-Formula Loans shall be payable on demand and shall bear interest at the Default Rate consisting of Domestic Rate Loans; provided that, if Agent does permit Out-of-Formula Loans, neither the Agent nor Lenders shall be deemed

thereby to have changed the limits of Sections 2.1(a) or 2.1(b) nor shall any Lender be obligated to fund Revolving Advances in excess of its Revolving Commitment Amount. For purposes of this paragraph, the discretion granted to Agent hereunder shall not preclude involuntary overadvances that may result from time to time due to the fact that the US- Canada Formula Amount was unintentionally exceeded for any reason, including, but not limited to, Collateral previously deemed to be "Eligible Receivables" becomes ineligible, collections of Receivables applied to reduce outstanding Revolving Advances are thereafter returned for insufficient funds or overadvances are made to protect or preserve the Collateral. In the event Agent involuntarily permits the outstanding US-Canada Revolving Advances to exceed the US- Canada Formula Amount by more than ten percent (10%), Agent shall use its efforts to have the Borrowers decrease such excess in as expeditious a manner as is practicable under the circumstances and not inconsistent with the reason for such excess. Revolving Advances made after Agent has determined the existence of involuntary overadvances shall be deemed to be involuntary overadvances and shall be decreased in accordance with the preceding sentence. To the extent any Out-of-Formula Loans are not actually funded by the other Lenders as provided for in this Section 16.2(e), Agent may elect in its discretion to fund such Out-of-Formula Loans and any such Out-of-Formula Loans so funded by Agent shall be deemed to be Revolving Advances made by and owing to Agent, and Agent shall be entitled to all rights (including accrual of interest) and remedies of a Lender holding a Revolving Commitment under this Agreement and the Other Documents with respect to such Revolving Advances.

(g)     In addition to (and not in substitution of) the discretionary Revolving Advances permitted above in this Section 16.2, Agent is hereby authorized by applicable Loan Parties and applicable Lenders, at any time in Agent's sole discretion, regardless of (i) the existence of a Default or an Event of Default, (ii) whether any of the other applicable conditions precedent set forth in Section 8.3 hereof have not been satisfied or the commitments of Lenders to make Revolving Advances hereunder have been terminated for any reason, or (iii) any other contrary provision of this Agreement, to make Revolving Advances on behalf of such Lenders which Agent, in its reasonable business judgment, deems necessary or desirable (a) to preserve or protect the Collateral, or any portion thereof, (b) to enhance the likelihood of, or maximize the amount of, repayment of the Advances and any other Obligations, or (c) to pay any other amount chargeable to Loan Parties pursuant to the terms of this Agreement (collectively, the "**Protective Advances**"); <u>provided</u>, that at any time after giving effect to any such Protective Advances, the outstanding US-Canada Revolving Advances do not exceed the lesser of (A) one hundred and ten percent (110%) of the US-Canada Formula Amount or (B) the Maximum US-Canada Revolving Advance Amount less the aggregate undrawn amount of outstanding US-Canada Letters of Credit and outstanding amount of US-Canada Swing Loans,. Lenders holding the Revolving Commitments shall be obligated to fund such Protective Advances and effect a settlement with Agent therefor upon demand of Agent in accordance with their respective Revolving Commitment Percentages. To the extent any Protective Advances are not actually funded by the other Lenders as provided for in this Section 16.2(f), any such Protective Advances funded by Agent shall be deemed to be Revolving Advances made by and owing to Agent, and Agent shall be entitled to all rights (including accrual of interest) and remedies of a Lender holding a Revolving Commitment under this Agreement and the Other Documents with respect to such Revolving Advances.

16.3    <u>Successors and Assigns; Participations; New Lenders</u>.

146

(a)     This Agreement shall be binding upon and inure to the benefit of Loan Parties, the Agent, each Lender, all future holders of the Obligations and their respective successors and assigns, except that no Loan Party may assign or transfer any of its rights or obligations under this Agreement (including, in each case, by way of an LLC Division) without the prior written consent of the Agent and each Lender.

(b)     Each Loan Party acknowledges that in the regular course of commercial banking business one or more Lenders may at any time and from time to time sell participating interests in the Advances to Participants. Each Participant may exercise all rights of payment (including rights of set-off) with respect to the portion of such Advances held by it or other Obligations payable hereunder as fully as if such Participant were the direct holder thereof provided that (i) Loan Parties shall not be required to pay to any Participant more than the amount which it would have been required to pay to Lender which granted an interest in its Advances or other Obligations payable hereunder to such Participant had such Lender retained such interest in the Advances hereunder or other Obligations payable hereunder unless the sale of the participation to such Participant is made with Loan Party's prior written consent, and (ii) in no event shall Loan Parties be required to pay any such amount arising from the same circumstances and with respect to the same Advances or other Obligations payable hereunder to both such Lender and such Participant. Each Loan Party hereby grants to any Participant a continuing security interest in any deposits, moneys or other property actually or constructively held by such Participant as security for the Participant's interest in the Advances.

(c)     Any Lender, with the consent of Agent, may sell, assign or transfer all or any part of its rights and obligations under or relating to Revolving Advances under this Agreement and the Other Documents to one or more additional Persons (other than an Ineligible Purchaser) and one or more additional Persons (other than an Ineligible Purchaser) may commit to make Advances hereunder (each a "**Purchasing Lender**"), in minimum amounts of not less than $5,000,000, pursuant to a Commitment Transfer Supplement, executed by a Purchasing Lender, the transferor Lender, and Agent and delivered to Agent for recording, provided, however, that each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to each of the Revolving Advances under this Agreement in which such Lender has an interest. Upon such execution, delivery, acceptance and recording, from and after the transfer effective date determined pursuant to such Commitment Transfer Supplement, (i) Purchasing Lender thereunder shall be a party hereto and, to the extent provided in such Commitment Transfer Supplement, have the rights and obligations of a Lender thereunder with a Revolving Commitment Percentage as set forth therein, and (ii) the transferor Lender thereunder shall, to the extent provided in such Commitment Transfer Supplement, be released from its obligations under this Agreement, the Commitment Transfer Supplement creating a novation for that purpose. Such Commitment Transfer Supplement shall be deemed to amend this Agreement to the extent, and only to the extent, necessary to reflect the addition of such Purchasing Lender and the resulting adjustment of the Revolving Commitment Percentages arising from the purchase by such Purchasing Lender of all or a portion of the rights and obligations of such transferor Lender under this Agreement and the Other Documents. Each Loan Party hereby consents to the addition of such Purchasing Lender and the resulting adjustment of the Revolving Commitment Percentages arising from the purchase by such Purchasing Lender of all or a portion of the rights and obligations of such transferor Lender under this Agreement and the Other Documents. Loan Parties shall execute and deliver such further documents and do such

147

further acts and things in order to effectuate the foregoing provided, however, that the consent of Loan Parties (such consent not to be unreasonably withheld, conditioned or delayed) shall be required unless (x) an Event of Default or Default has occurred and is continuing at the time of such assignment or such assignment is to a Permitted Assignee; provided that Loan Parties shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to Agent within five (5) Business Days after having received prior notice thereof.

(d)      Any Lender, with the consent of Agent which shall not be unreasonably withheld or delayed, may directly or indirectly sell, assign or transfer all or any portion of its rights and obligations under or relating to Revolving Advances under this Agreement and the Other Documents to an entity, whether a corporation, partnership, trust, limited liability company or other entity that (i) is engaged in making, purchasing, holding or otherwise investing in bank loans and similar extensions of credit in the ordinary course of its business and (ii) is administered, serviced or managed by the assigning Lender or an Affiliate of such Lender (a "**Purchasing CLO**" and together with each Participant and Purchasing Lender, each a "**Transferee**" and collectively the "**Transferees**"), pursuant to a Commitment Transfer Supplement modified as appropriate to reflect the interest being assigned ("**Modified Commitment Transfer Supplement**"), executed by any intermediate purchaser, the Purchasing CLO, the transferor Lender, and Agent as appropriate and delivered to Agent for recording. Upon such execution and delivery, from and after the transfer effective date determined pursuant to such Modified Commitment Transfer Supplement, (i) Purchasing CLO thereunder shall be a party hereto and, to the extent provided in such Modified Commitment Transfer Supplement, have the rights and obligations of a Lender thereunder and (ii) the transferor Lender thereunder shall, to the extent provided in such Modified Commitment Transfer Supplement, be released from its obligations under this Agreement, the Modified Commitment Transfer Supplement creating a novation for that purpose. Such Modified Commitment Transfer Supplement shall be deemed to amend this Agreement to the extent, and only to the extent, necessary to reflect the addition of such Purchasing CLO. Each Loan Party hereby consents to the addition of such Purchasing CLO. Loan Parties shall execute and deliver such further documents and do such further acts and things in order to effectuate the foregoing.

(e)      Agent shall maintain at its address a copy of each Commitment Transfer Supplement and Modified Commitment Transfer Supplement delivered to it and a register (in each case, the "**Register**") for the recordation of the names and addresses of each Lender and the outstanding principal, accrued and unpaid interest and other fees due hereunder. The entries in the Register shall be conclusive, in the absence of manifest error, and each Loan Party, Agent and Lenders may treat each Person whose name is recorded in the Register as the owner of the Advance recorded therein for the purposes of this Agreement. The Register shall be available for inspection by Borrowing Agent or any Lender at any reasonable time and from time to time upon reasonable prior notice. Agent shall receive a fee in the amount of $3,500 payable by the applicable Purchasing Lender and/or Purchasing CLO upon the effective date of each transfer or assignment (other than to an intermediate purchaser) to such Purchasing Lender and/or Purchasing CLO.

(f)      Each Loan Party authorizes each Lender to disclose to any Transferee and any prospective Transferee, subject to the provisions of Section 16.15, any and all financial information in such Lender's possession concerning such Loan Party which has been delivered to such Lender by or on behalf of such Loan Party pursuant to this Agreement or in connection with such Lender's credit evaluation of such Loan Party.

148

(g)      Notwithstanding anything to the contrary contained in this Agreement, any Lender may at any time and from time to time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(h)      [Reserved].

16.4    Application of Payments. The Agent shall have the continuing and exclusive right to apply or reverse and re-apply any payment and any and all proceeds of Collateral to any portion of the Obligations, subject to Section 11.5 hereof. To the extent that any Loan Party makes a payment or the Agent or any Lender receives any payment or proceeds of the Collateral for any Loan Party's benefit, which are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other party under any bankruptcy law, common law or equitable cause, then, to such extent, the Obligations or part thereof intended to be satisfied shall be revived and continue as if such payment or proceeds had not been received by the Agent or such Lender.

16.5    Indemnity. Each Loan Party shall defend, protect, indemnify, pay and save harmless Agent, Issuer, each Lender and each of their respective officers, directors, Affiliates, attorneys, employees and agents (each an "**Indemnified Party**") for and from and against any and all claims, demands, liabilities, obligations, losses, damages, penalties, fines, actions, judgments, suits, costs, charges, expenses and disbursements of any kind or nature whatsoever (including reasonable and documented fees and disbursements of counsel) (collectively, "**Claims**") which may be imposed on, incurred by, or asserted against any Indemnified Party in arising out of or in any way relating to or as a consequence, direct or indirect, of: (i) this Agreement, the Other Documents, the Advances and other Obligations and/or the transactions contemplated hereby, (ii) any action or failure to act or action taken only after delay or the satisfaction of any conditions by any Indemnified Party in connection with and/or relating to the negotiation, execution, delivery or administration of the Agreement and the Other Documents, the credit facilities established hereunder and thereunder and/or the transactions contemplated hereby, (iii) any Loan Party's or any Guarantor's failure to observe, perform or discharge any of its covenants, obligations, agreements or duties under or breach of any of the representations or warranties made in this Agreement and the Other Documents, (iv) the enforcement of any of the rights and remedies of the Agent, the Issuer or any Lender under the Agreement and the Other Documents, (v) any threatened or actual imposition of fines or penalties, or disgorgement of benefits, for violation of any Anti-Terrorism Law by any Loan Party, any Affiliate or Subsidiary of any Borrowers, or any Guarantor, and (vi) any claim, litigation, proceeding or investigation instituted or conducted by any Governmental Body or instrumentality or any other Person with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, this Agreement or the Other Documents, whether or not the Agent or any Lender is a party thereto. Without limiting the generality of any of the foregoing, each Loan Party shall defend, protect, indemnify, pay and save harmless each Indemnified Party from (x) any Claims which may be imposed on, incurred by, or asserted against any Indemnified Party arising out of or in any way relating to or as a consequence, direct or indirect, of the issuance of any Letter of Credit hereunder and (y) any Claims which may be imposed on, incurred by, or asserted against any Indemnified Party under any Environmental

149

Laws with respect to or in connection with the Real Property, any Hazardous Discharge, the presence of any Hazardous Materials affecting the Real Property (whether or not the same originates or emerges from the Real Property or any contiguous real estate), including any Claims consisting of or relating to the imposition or assertion of any Lien on any of the Real Property under any Environmental Laws and any loss of value of the Real Property as a result of the foregoing except to the extent such loss, liability, damage and expense is attributable to any Hazardous Discharge resulting from actions on the part of the Agent or any Lender. Loan Parties' obligations under this Section 16.5 shall arise upon the discovery of the presence of any Hazardous Materials at the Real Property, whether or not any federal, state, provincial or local environmental agency has taken or threatened any action in connection with the presence of any Hazardous Materials, in each such case except to the extent that any of the foregoing arises out of the gross negligence or willful misconduct of the Indemnified Party (as determined by a court of competent jurisdiction in a final and non- appealable judgment). Without limiting the generality of the foregoing, this indemnity shall extend to any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including fees and disbursements of counsel) asserted against or incurred by any of the Indemnified Parties by any Person under any Environmental Laws or similar laws by reason of any Loan Party's or any other Person's failure to comply with laws applicable to solid or hazardous waste materials, including Hazardous Materials and Hazardous Waste, or other Toxic Substances. Additionally, if any taxes (excluding taxes imposed upon or measured solely by the net income of Agent and Lenders, but including any intangibles taxes, stamp tax, recording tax or franchise tax) shall be payable by Agent, Lenders or Loan Parties on account of the execution or delivery of this Agreement, or the execution, delivery, issuance or recording of any of the Other Documents, or the creation or repayment of any of the Obligations hereunder, by reason of any Applicable Law now or hereafter in effect, Loan Parties will pay (or will promptly reimburse Agent and Lenders for payment of) all such taxes, including interest and penalties thereon, and will indemnify and hold the Indemnified Parties harmless from and against all liability in connection therewith. Notwithstanding the foregoing, the Loan Parties shall have no obligation to any Indemnified Party under this Section 16.5 with respect to any liability that a court of competent jurisdiction finally determines to have resulted from the gross negligence or willful misconduct of such Indemnified Party or its officers, directors, employees, attorneys, or agents. This Section 16.5 shall not apply to the extent that the losses, claims or damages relate to any Taxes described in Section 3.10.

16.6    Notice. Any notice or request hereunder may be given to Borrowing Agent or any Loan Party or to the Agent or any Lender at their respective addresses set forth below or at such other address as may hereafter be specified in a notice designated as a notice of change of address under this Section 16.6. Any notice, request, demand, direction or other communication (for purposes of this Section 16.6 only, a "**Notice**") to be given to or made upon any party hereto under any provision of this Agreement shall be given or made by telephone or in writing (which includes by means of electronic transmission (i.e., "e-mail")) or by setting forth such Notice on a website to which Loan Parties are directed (an "**Internet Posting**") if Notice of such Internet Posting (including the information necessary to access such site) has previously been delivered to the applicable parties hereto by another means set forth in this Section 16.6) in accordance with this Section 16.6. Any such Notice must be delivered to the applicable parties hereto at the addresses and numbers set forth under their respective names on Section 16.6 hereof or in accordance with any subsequent unrevoked Notice from any such party that is given in accordance with this Section 16.6. Any Notice shall be effective:

<center>150</center>

(a)      In the case of hand-delivery, when delivered;

(b)      If given by mail, four (4) days after such Notice is deposited with the United States Postal Service, Canada Post or other applicable postal service, with first-class postage prepaid, return receipt requested;

(c)      In the case of a telephonic Notice, when a party is contacted by telephone, if delivery of such telephonic Notice is confirmed no later than the next Business Day by hand delivery, an electronic transmission, an Internet Posting or an overnight courier delivery of a confirmatory Notice (received at or before noon on such next Business Day);

(d)      In the case of electronic transmission, when actually received;

(e)      In the case of an Internet Posting, upon delivery of a Notice of such posting (including the information necessary to access such site) by another means set forth in this Section 16.6; and

(f)      If given by any other means (including by overnight courier), when actually received.

Any Lender giving a Notice to any Borrowing Agent or any Loan Party shall concurrently send a copy thereof to Agent, and Agent shall promptly notify the other Agent and other Lenders of its receipt of such Notice.

(A)      If to Agent or PNC at:

PNC Bank, National Association
PNC Agency Services
PNC Firstside Center
500 First Avenue, 4th Floor
Pittsburgh, Pennsylvania 15219
Attention: Cheryl Thon
Telephone: (412) 762-7806
Facsimile: (412) 762-8672

with a copy to:

PNC Bank, National Association
PNC Agency Services
PNC Firstside Center
500 First Avenue, 4th Floor
Pittsburgh, Pennsylvania 15219
Attention: Trina Barkley
Telephone: (412) 768-0423
Facsimile: (412) 705-2006

with an additional copy to:

151

PNC Bank, National Association
1900 East Ninth Street, 9th Floor
Cleveland, Ohio 44114
Attention: Todd Milenius
Telephone: (216) 222-9761
Facsimile: (216) 222-8155

and

Blank Rome LLP
130 North 18th Street
Philadelphia, Pennsylvania 19103
Attention: Michael C. Graziano
Telephone: (215) 569-5387
Facsimile: (215) 832-5387

(B)      [Reserved].

(C)      If to a Lender other than Agent, as specified on the signature pages hereof.

(D)      If to any Borrowing Agent or any Loan Party:

Invacare Corporation
One Invacare Way Elyria, OH 44035
Attention: Kathleen P. Leneghan
Telephone: (440) 329-6717
Email: kleneghan@invacare.com

with a copy to:

Calfee, Halter & Griswold
LLP The Calfee Building
1405 East Sixth Street
Cleveland, OH 44114
Attention: Brian A.
McMahon Telephone: (216)
622-8660 Email:
bmcmahon@calfee.com

16.7    Survival. The obligations of Loan Parties under Sections 2.2(b), 3.7, 3.8, 3.9, 3.10, 16.5 and 16.9 and the obligations of Lenders under Sections 2.2, 2.14(b), 2.15, 2.17, 2.18, 14.8 and 16.5, shall survive termination of this Agreement and the Other Documents and payment in full of the Obligations.

16.8    Severability. If any part of this Agreement is contrary to, prohibited by, or deemed invalid under Applicable Laws, such provision shall be inapplicable and deemed omitted to the

152

extent so contrary, prohibited or invalid, but the remainder hereof shall not be invalidated thereby and shall be given effect so far as possible.

16.9    Expenses.

(a)    Loan Parties shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the Agent and its Affiliates (including the reasonable and documented fees, charges and disbursements of counsel and other professionals for the Agent), and shall pay all reasonable and documented fees and time charges and disbursements for attorneys who may be employees of the Agent, in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration of this Agreement and the Other Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all reasonable and documented out-of-pocket expenses incurred by any Issuer in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder, (iii) all reasonable and documented out-of-pocket expenses incurred by the Agent, any Lender or the Issuer (including the reasonable and documented fees, charges and disbursements of any counsel or other professionals for the Agent, any Lender or the Issuer), and shall pay reasonable and documented all reasonable and documented fees and time charges for attorneys who may be employees of the Agent, any Lender or the Issuer, in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the Other Documents, including its rights under this Section 16.9, or (B) in connection with the Advances made or Letters of Credit issued hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Advances or Letters of Credit, and (iv) all reasonable and documented out-of-pocket expenses of the Agent's regular employees and agents engaged periodically to perform audits of the any Loan Party's or any Loan Party's Affiliate's or Subsidiary's books, records and business properties.

(b)    Loan Parties shall pay all costs and expenses incurred by Agent in connection with the Case, including without limitation, (A) costs and expenses incurred in connection with review of pleadings and other filings made with the Bankruptcy Court, (B) attendance at all hearings in respect of the Case, and (C) defending and prosecuting any actions or proceedings arising out of or relating to the Pre-Petition Obligations, the Obligations, the Liens securing the Pre-Petition Obligations and the Obligations or any transactions related to arising in connection with the Pre-Petition Other Documents or the Other Documents.  Each Loan Party agrees that in the event that any actions or proceedings are in effect or are threatened by or Agent reasonably believes any actions or proceedings may be brought by the Committee or any other party in interest attacking the legality, validity, enforceability of the Pre-Petition Obligations, the Liens arising under the Pre-Petition Credit Agreement or any other matters relating to the Pre-Petition Other Documents at the time of the consummation of any sale of the assets of any Loan Party or at the time that any Loan Party proposes to pay and satisfy the Obligations in full, Agent may hold a reserve following the date of payment in full of the Obligations as cash collateral for the expenses (including the fees, charges and disbursements of counsel and other professionals for Agent and Lenders) reasonably expected in Agent's Permitted Discretion to be incurred in connection with such actions or proceedings until the earliest of (x) Agent's receipt of a general release satisfactory in form and substance to Agent, (y) the entry of a final non-appealable order determining the outcome of such litigation, and (z) the expiration of the Challenge Period so long

153

as no Challenge (as defined in the Interim Order or, if entered, the Final Order) has been asserted by that date.

16.10   <u>Injunctive Relief</u>. Each Loan Party recognizes that, in the event any Loan Party fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, or threatens to fail to perform, observe or discharge such obligations or liabilities, any remedy at law may prove to be inadequate relief to Lenders; therefore, Agent, if the Agent so requests, shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving that actual damages are not an adequate remedy.

16.11   <u>Consequential Damages</u>. Neither the Agent nor any Lender, nor any agent or attorney for any of them, shall be liable to any Borrower, or any Guarantor (or any Affiliate of any such Person) for indirect, punitive, exemplary or consequential damages arising from any breach of contract, tort or other wrong relating to the establishment, administration or collection of the Obligations or as a result of any transaction contemplated under this Agreement or any Other Document.

16.12   <u>Captions</u>. The captions at various places in this Agreement are intended for convenience only and do not constitute and shall not be interpreted as part of this Agreement.

16.13   <u>Counterparts; Facsimile Signatures</u>. This Agreement may be executed in any number of and by different parties hereto on separate counterparts, all of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement. Any signature delivered by a party by facsimile or electronic transmission (including email transmission of a PDF image) shall be deemed to be an original signature hereto.

16.14   <u>Construction</u>. The parties acknowledge that each party and its counsel have reviewed this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments, schedules or exhibits thereto.

16.15   <u>Confidentiality; Sharing Information</u>. The Agent, each Lender and each Transferee shall hold all non-public information obtained by the Agent, such Lender or such Transferee pursuant to the requirements of this Agreement in accordance with the Agent's, such Lender's and such Transferee's customary procedures for handling confidential information of this nature and such non-public information shall not be disclosed by the Agent, such Lender or such Transferee to Persons who are not parties to this Agreement; <u>provided</u>, <u>however</u>, the Agent, each Lender and each Transferee may disclose such confidential information (a) to its employees, officers, directors, examiners, Affiliates, outside auditors, counsel and other professional advisors, (b) to the Agent, any Lender or to any prospective Transferees (so long as the Persons to whom such disclosure is made are informed of the confidential nature of such information and have agreed to keep such information confidential), and (c) as required or requested by any Governmental Body or representative thereof or pursuant to legal process; <u>provided</u>, <u>further</u> that (i) unless specifically prohibited by Applicable Law, the Agent, each Lender and each Transferee shall use its reasonable best efforts prior to disclosure thereof, to notify the applicable Loan Party of the applicable request for disclosure of such non-public information (A) by a Governmental Body or representative thereof (other than any such request in connection with an examination of the financial condition

154

of a Lender or a Transferee by such Governmental Body) or (B) pursuant to legal process and (ii) in no event shall the Agent, any Lender or any Transferee be obligated to return any materials furnished by any Loan Party other than those documents and instruments in possession of the Agent or any Lender in order to perfect its Lien on the Collateral once the Obligations have been paid in full and this Agreement has been terminated; <u>provided</u> that any disclosure under sub-clauses (A) or (B) of this sentence shall be limited to the information required by such Governmental Body or such legal process. Each Loan Party acknowledges that from time to time financial advisory, investment banking and other services may be offered or provided to such Loan Party or one or more of its Affiliates (in connection with this Agreement or otherwise) by any Lender or by one or more Subsidiaries or Affiliates of such Lender and each Loan Party hereby authorizes each Lender to share any information delivered to such Lender by such Loan Party and its Subsidiaries pursuant to this Agreement, or in connection with the decision of such Lender to enter into this Agreement, to any such Subsidiary or Affiliate of such Lender, it being understood that any such Subsidiary or Affiliate of any Lender receiving such information shall be bound by the provisions of this Section 16.15 as if it were a Lender hereunder. Such authorization shall survive the repayment of the other Obligations and the termination of this Agreement. Notwithstanding any non- disclosure agreement or similar document executed by the Agent in favor of any Loan Party or any of any Loan Party's affiliates, the provisions of this Agreement shall supersede such agreements.

16.16   <u>Publicity</u>. Each Loan Party and each Lender hereby authorizes Agent to make appropriate announcements of the financial arrangement entered into among Loan Parties, Agent and Lenders, including announcements which are commonly known as tombstones, in such publications and to such selected parties as Agent shall deem appropriate in consultation with, and subject to the approval of, the Borrowing Agent, such approval not to be unreasonably withheld, conditioned or delayed.

16.17   <u>Certifications From Banks and Participants; USA PATRIOT Act</u>.

(a)   Each Lender or assignee or participant of a Lender that is not incorporated under the Laws of the United States of America or a state thereof (and is not excepted from the certification requirement contained in Section 313 of the USA PATRIOT Act and the applicable regulations because it is both (i) an affiliate of a depository institution or foreign bank that maintains a physical presence in the United States or foreign country, and (ii) subject to supervision by a banking authority regulating such affiliated depository institution or foreign bank) shall deliver to Agent the certification, or, if applicable, recertification, certifying that such Lender is not a "shell" and certifying to other matters as required by Section 313 of the USA PATRIOT Act and the applicable regulations: (1) within ten (10) days after the Closing Date, and (2) as such other times as are required under the USA PATRIOT Act.

(b)   The USA PATRIOT Act requires all financial institutions to obtain, verify and record certain information that identifies individuals or business entities which open an "account" with such financial institution. Consequently, any Lender may from time to time request, and each Loan Party shall provide to such Lender, such Loan Party's name, address, tax identification number and/or such other identifying information as shall be necessary for Lender to comply with the USA PATRIOT Act and any other Anti-Terrorism Law.

155

16.18   <u>Anti-Terrorism Laws</u>.

(a)   Each Borrower and each Guarantor represents and warrants that (i) no Covered Entity is a Sanctioned Person and (ii) no Covered Entity, either in its own right or through any third party, (A) has any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person in violation of any Anti-Terrorism Law; (B) does business in or with, or derives any of its income from investments in or transactions with, any Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law; or (C) engages in any dealings or transactions prohibited by any Anti-Terrorism Law.

(b)   Each Borrower and each Guarantor covenants and agrees that: (A) they shall immediately notify the Agent and each of the Lenders in writing upon the occurrence of a Reportable Compliance Event; and (B) if, at any time, any Collateral becomes Embargoed Property, then, in addition to all other rights and remedies available to the Agent and each of the Lenders, upon request by the Agent or any of the Lenders, the Loan Parties shall provide substitute Collateral acceptable to the Lenders that is not Embargoed Property.

(c)   Each Borrower and each Guarantor covenants and agrees that (i) no Covered Entity will become a Sanctioned Person or allow any employees, officers, directors, affiliates, consultants, brokers, or agents acting on its behalf in connection with this Agreement to become a Sanctioned Person, (ii) no Covered Entity, either in its own right or through any third party, will (A) have any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person in violation of any Anti-Terrorism Law; (B) do business in or with, or derive any of its income from investments in or transactions with, any Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law; (C) engage in any dealings or transactions prohibited by any Anti-Terrorism Law or (D) use the Advances to fund any operations in, finance any investments or activities in, or, make any payments to, a Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law, (iii) the funds used to repay the Obligations will not be derived from any unlawful activity, (iv) each Covered Entity shall comply with all Anti-Terrorism Laws, (v) it will not repay the Loans with Embargoed Property or funds derived from any unlawful activity; (vi) it will not permit any Collateral to become Embargoed Property; and (e) it will not cause any Lender or Agent to violate any Anti- Terrorism Law.

(d)   Each Loan Party has implemented and maintains in effect policies and procedures designed to ensure compliance by such Loan Party, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Terrorism Laws.

In addition to the foregoing, the Loan Parties acknowledge that, pursuant to the Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada) and other applicable anti-money laundering, anti-terrorist financing, government sanction and "know your client" Laws within Canada, the Lenders and the Agent may be required to obtain, verify and record information regarding the Loan Parties, their respective directors, authorized signing officers, direct or indirect shareholders or other Persons in control of the Loan Parties, and the transactions contemplated hereby. The Loan Parties shall promptly provide all such information, including supporting documentation and other evidence, as may be reasonably requested by any Lender or the Agent, or any prospective assign or participant of a Lender or the Agent, in order to comply therewith, whether now or hereafter in existence.

16.19   <u>Liability of Canadian Loan Parties</u>.   Notwithstanding anything in this Agreement or any of the Other Documents to the contrary, the parties intend that this Agreement and the Other Documents do hereby provide, and shall in all circumstances be interpreted to provide, that the Canadian Loan Parties are jointly and severally liable for, and the Canadian Collateral shall secure, all Advances, interest on such Advances, and all other Obligations, including, without limitation, general fees, reimbursements, indemnities and charges hereunder and under any Other Document. Nothing in this Section 16.19 is intended to limit, nor shall it be deemed to limit, any liability of the Company or any other US Loan Party for any of the Obligations, whether in its primary capacity as a Borrower, as a Guarantor, at law or otherwise. All Obligations of the Borrowers and Guarantors, both the US Guarantors and the Canadian Loan Parties, are joint and several.

16.20   [Reserved].

16.21   <u>Joinder of Guarantors and Borrowers.</u> Any Subsidiary of the Company which is required to join this Agreement as a Guarantor, or any Subsidiary of the Company which elects to join this Agreement as a Borrower, pursuant in each case to Section 7.12 shall execute and deliver to Agent (i) a Guarantor Joinder or Borrower Joinder, as applicable, pursuant to which it shall, after acceptance of such Guarantor Joinder or Borrower Joinder by Agent, join this Agreement as a US Loan Party or Canadian Loan Party, as applicable, and join each of the Other Documents to which the US Loan Parties or Canadian Loan Parties, as applicable, are parties, (ii) documents in the forms described in Section 8.1 (or foreign jurisdictional equivalents, if any), modified as appropriate to relate to such Subsidiary, and (iii) documents necessary to grant and perfect Liens in favor of Agent for the benefit of Lenders in the Equity Interest of, and Collateral held by, such Subsidiary. Joinder of each new Loan Party pursuant to this Section shall be subject to compliance with all the other terms and conditions set forth in this Agreement and the Other Documents, including without limitation Section 6.1 and Section 3.10.

16.22   [Reserved].

16.23   <u>continue as such to be secured by the Collateral</u>. Such Obligations shall in all respects be continuing and this Agreement shall not be deemed to evidence or result in a novation or repayment and reborrowing of such Obligations. The Liens securing payment of the Obligations under the Existing Credit Agreement, as amended and restated in the form of this Agreement, shall in all respects be continuing, securing the payment of all Obligations.

16.24   [Reserved].

16.25   <u>Acknowledgment Regarding Any Supported QFCs</u>. To the extent that this Agreement or any of the Other Documents provide support, through a guarantee or otherwise, for any hedges, commodity hedges and/or foreign currency hedges, or any other agreement or instrument that is a QFC (such support, "**QFC Credit Support**" and each such QFC a "**Supported QFC**"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "**U.S. Special Resolution Regimes**") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Other Documents and any Supported QFC may in fact be stated to be governed by the Laws of the State

<center>157</center>

of New York and/or of the United States or any other state of the United States):

(a)     In the event a QFC Covered Entity that is party to a Supported QFC (each, a "**Covered Party**") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the Laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under this Agreement and the Other Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC, this Agreement and the Other Documents were governed by the Laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)     As used in this Section 16.24, the following terms have the following meanings:

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"QFC Covered Entity" means any of the following: (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b), (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

16.26     <u>Acknowledgment and Consent to Bail-In of EEA Financial Institutions</u>. Notwithstanding anything to the contrary in this Agreement, any Other Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under this Agreement or any Other Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by (a) the application of any Write-Down and Conversion Powers by an applicable Resolution Authority to any such liabilities arising hereunder which may

be payable to it by any party hereto that is an Affected Financial Institution; and (b) the effects of any Bail-in Action on any such liability, including, if applicable, (i) a reduction in full or in part or cancellation of any such liability; (ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any Other Document; or (iii) the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any applicable Resolution Authority.

16.27   <u>Exclusive Remedy For Any Alleged Post-Petition Claim</u>.   Notwithstanding anything to the contrary provided for herein, if any Loan Party asserts that it has any adverse claims against any Post-Petition Secured Party with respect to this Agreement and the transactions contemplated hereby, each Loan Party agrees that its sole and exclusive remedy for any and all such adverse claims will be an action for monetary damages (a "<u>Damage Lawsuit</u>").  Any such Damage Lawsuit, regardless of the procedural form in which it is alleged (e.g., by complaint, counterclaim, cross-claim, third-party claim, or otherwise) will be severed from any enforcement by Post-Petition Secured Parties of their legal, equitable, and contractual rights (including collection of the Obligations and foreclosure or other enforcement against the Collateral) pursuant to the Other Documents, and the Damage Lawsuit (including any and all adverse claims alleged against the Post-Petition Secured Parties) cannot be asserted by any Loan Party as a defense, setoff, recoupment, or grounds for delay, stay, or injunction against any enforcement by any Post-Petition Secured Party of their legal, equitable, and contractual rights under the Final Order, the Other Documents, and otherwise.

16.28   <u>Prohibition on Surcharge</u>.   No Person will be permitted to surcharge the Collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the Collateral.  The prohibition on surcharging or priming of the Liens of Agent on the Collateral will survive the termination of this Agreement and the dismissal of the Case, such that no Person will be permitted to obtain a Lien or rights (through any means, at law or in equity) which in any case is equal or senior to the Liens of Agent on the Collateral.  Upon the termination of this Agreement and the dismissal of the Case, the Bankruptcy Court will retain jurisdiction over the Collateral for the limited purpose of enforcing this section.

16.29   <u>Marshalling Obligations</u>.   The Agent shall not be subject to any equitable remedy of marshalling.

16.30   <u>No Discharge; Survival of Claims</u>.   Each Loan Party agrees that (i) the Obligations shall not be discharged by the entry of an order confirming a Reorganization Plan (and the Debtor, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge), (ii) the Superpriority Claim granted to the Post-Petition Secured Parties pursuant to the Interim Order and the Final Order and the Liens granted to Agent, for the benefit of the Post-Petition Secured Parties pursuant to the Interim Order, the Final Order, this Agreement and the Other Documents, shall not be affected in any manner by the entry of an order confirming a Reorganization Plan, (iii) no Debtor shall propose or support any Reorganization Plan that is not conditioned upon Payment in Full and the release of Agent and Lenders in full from all claims of each Loan Party and, in respect of a Debtor, the estate of such Debtor, in each case, on or before the effective date of such

Reorganization Plan, and (iv) no Reorganization Plan shall be confirmed if it does not satisfy the foregoing requirements.

16.31    Disavowal and Waiver of Any Subsequent Relief Based on Changed Circumstances. Each Debtor and the Post-Petition Secured Parties know and understand that there are rights and remedies provided under the Bankruptcy Code, the Federal Rules of Civil Procedure, and the Bankruptcy Rules, pursuant to which parties otherwise bound by a previously entered order can attempt to obtain relief from such an order by alleging circumstances that may warrant a change or modification in the order, or circumstances such as fraud, mistake, inadvertence, excusable neglect, newly discovered evidence, or similar matters that may justify vacating the order entirely, or otherwise changing or modifying it (collectively, "Changed Circumstances"). Rights and remedies based on Changed Circumstances include, but are not limited to, modification of a plan of reorganization after confirmation of the plan and before its substantial consummation, pursuant to Section 1127(b) of the Bankruptcy Code, relief from a final order or judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure and Bankruptcy Rule 9024, and the commencement and prosecution of a serial Chapter 11 case by a debtor which is in default of obligations under a stipulation or plan of reorganization confirmed in an earlier case. With full knowledge and understanding of what are, or may be, its present or future rights and remedies based on allegations of Changed Circumstances, each Debtor: (i) expressly disavows that there are any matters which constitute any kind of Changed Circumstances as of the date of entry of the Interim Order and (ii) expressly disavows that it is aware of any matters whatsoever that it is assuming, contemplating, or expecting in proceeding with the Final Order and the transactions contemplated by this Agreement and having the Final Order entered that would serve as a basis to allege such Changed Circumstances. Each Debtor understands and agrees that the Post-Petition Secured Parties are not willing to bear any of the risks involved in such Debtor's business enterprises and the Post-Petition Secured Parties are not willing to modify any of the rights if such risks cause actual or alleged Changed Circumstances; and each Debtor expressly assumes all risks of any and all such matters, and the consequences that the Post-Petition Secured Parties will enforce their legal, equitable, and contractual rights if the Post-Petition Secured Parties are not paid and dealt with strictly in accordance with the terms and conditions of the Interim Order, the Final Order, this Agreement and the Other Documents. Without limiting the foregoing in any way, each Debtor's use of any cash collateral that is included in the Collateral will be governed exclusively by the terms and conditions of this Agreement, the Interim Order and the Final Order, and, until Payment in Full either before or after a termination of this Agreement, no Debtor will seek authority from the Bankruptcy Court to otherwise use any cash collateral that is included in the Collateral for any purpose whatsoever.

16.32    Interim Order and Final Order Control.  In the event of any conflict between the terms of the Interim Order and/or the Final Order and this Agreement or any Other Document, the terms of the Interim Order and/or the Final Order, as applicable, shall control to the extent the Interim Order and/or Final Order, as applicable, were approved and acceptable to Agent.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**[SIGNATURE PAGE TO DEBTOR-IN-POSSESSION REVOLVING CREDIT AND SECURITY AGREEMENT)**

Each of the parties has signed this Agreement as of the day and year first above written.

**US BORROWERS:**

Invacare Corporation, an Ohio corporation

By: _____
Name:
Title:

Freedom Designs, Inc., a California corporation

By: _____
Name:
Title:

Adaptive Switch Laboratories, Inc., a Texas corporation

By: _____
Name:
Title:

**[SIGNATURE PAGE TO DEBTOR-IN-POSSESSION REVOLVING CREDIT AND SECURITY AGREEMENT)**

Each of the parties has signed this Agreement as of the day and year first above written.

**US GUARANTORS:**

Medbloc, Inc., a Delaware corporation
Invacare Credit Corporation, an Ohio corporation
Invacare Holdings, LLC, an Ohio limited liability company
Invamex Holdings, LLC, a Delaware limited liability company


By: _____
Name:
Title:

**[SIGNATURE PAGE TO DEBTOR-IN-POSSESSION REVOLVING CREDIT AND SECURITY AGREEMENT]**

**CANADIAN LOAN PARTIES:**

Invacare Canada L.P., an Ontario limited partnership, by its general partner, Invacare Canada General Partner Inc.
Motion Concepts L.P., an Ontario limited partnership, by its general partner, Carroll Healthcare Inc.
Perpetual Motion Enterprises Limited, an Ontario corporation
Carroll Healthcare General Partner, Inc., an Ontario corporation
Carroll Healthcare Inc., an Ontario corporation
Invacare Canada General Partner Inc., an Ontario corporation


By: _____
Name:
Title:

**[SIGNATURE PAGE TO DEBTOR-IN-POSSESSION REVOLVING CREDIT AND SECURITY AGREEMENT]**

**PNC BANK, NATIONAL ASSOCIATION,**
as Lender and as Agent

By: _____
Name:
Title:

1900 East Ninth
Street 9th Floor
Cleveland, OH 44114

US-Canada Revolving Commitment Percentage:
[54.28571345%]
US-Canada Revolving Commitment Amount:
[$9,282,857]

164

**[SIGNATURE PAGE TO DEBTOR-IN-POSSESSION REVOLVING CREDIT AND SECURITY AGREEMENT]**

JPMORGAN CHASE BANK, N.A.,
as Lender


By:_____
Name:
Title: Authorized Officer

1300 East 9th Street, 13th Floor Cleveland, Ohio 44114

US-Canada Revolving Commitment Percentage:
[45.71428655%]
US-Canada Revolving Commitment Amount:
[$7,817,143]

## <u>ANNEX A</u>

US Borrowers

Invacare Corporation, an Ohio corporation

Freedom Designs, Inc., a California corporation

Adaptive Switch Laboratories, Inc., a Texas corporation

## **ANNEX B**

US Guarantors

Medbloc, Inc., a Delaware corporation

Invacare Credit Corporation, an Ohio corporation

Invacare Holdings, LLC, an Ohio limited liability company

Invamex Holdings LLC, a Delaware limited liability company

## ANNEX C

Canadian Loan Parties

Invacare Canada L.P., an Ontario limited partnership

Motion Concepts L.P., an Ontario limited partnership

Perpetual Motion Enterprises Limited, an Ontario corporation

Carroll Healthcare General Partner, Inc., an Ontario corporation

Carroll Healthcare Inc., an Ontario corporation

Invacare Canada General Partner Inc., an Ontario corporation

**Exhibit 3**

**Lien Priorities**

| Priority | CF Debt Priority Collateral (as defined in the ABL Intercreditor Agreement) | Revolving Credit Priority Collateral (as defined in the ABL Intercreditor Agreement) | Unencumbered Property of the same type and kind as CF Debt Priority Collateral (as defined in the ABL Intercreditor Agreement) | Unencumbered Property of the same type and kind as Revolving Credit Priority Collateral (as defined in the ABL Intercreditor Agreement) | Term DIP Loan Proceeds Account |
|---|---|---|---|---|---|
| 1st | Term DIP Liens | ABL DIP Liens | Term DIP Liens | ABL DIP Liens | Term DIP Liens |
| 2nd | Term Adequate Protection Liens | ABL Adequate Protection Liens | Term Adequate Protection Liens | ABL Adequate Protection Liens | Term Adequate Protection Liens |
| 3rd | Prepetition Liens of (i) Prepetition Term Loan Secured Parties and (ii) Prepetition Secured Notes Parties | Prepetition Revolving Liens | ABL DIP Liens | Term DIP Liens | |
| 4th | ABL DIP Liens | Term DIP Liens | ABL Adequate Protection Liens | Term Adequate Protection Liens | |
| 5th | ABL Adequate Protection Liens | Term Adequate Protection Liens | | | |
| 6th | Prepetition Revolving Liens | Prepetition Liens of (i) Prepetition Term Loan Secured Parties and (ii) Prepetition Secured Notes Parties | | | |