IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| _____ | ) | Chapter 11 |
| In re: | ) | |
| | ) | Case No. 23-90068 (CML) |
| INVACARE CORPORATION, *et al.*,[1] | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| _____ | ) | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING
THE ADEQUACY OF THE DISCLOSURE STATEMENT, (II) APPROVING THE
SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO
CONFIRMATION OF THE JOINT CHAPTER 11 PLAN OF INVACARE
CORPORATION AND ITS DEBTOR AFFILIATES, (III) APPROVING THE FORMS
OF BALLOTS AND NOTICES IN CONNECTION THEREWITH, (IV) APPROVING
THE RIGHTS OFFERING PROCEDURES AND RELATED MATERIALS, (V)
SCHEDULING CERTAIN DATES WITH RESPECT THERETO, AND
(VI) GRANTING RELATED RELIEF**

**(Relates to Docket No. 180)**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Invacare Corporation (0965); Freedom Designs, Inc. (4857); and Adaptive Switch Laboratories, Inc. (6470). The corporate headquarters and the mailing address for the Debtors is 1 Invacare Way, Elyria, Ohio 44035.

The Official Committee of Unsecured Creditors (the "Committee") of the debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), by and through its undersigned proposed counsel, hereby submits this objection (the "Objection") to the *Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Joint Chapter 11 Plan of Invacare Corporation and Its Debtor Affiliates, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Approving the Rights Offering Procedures and Related Materials, (V) Scheduling Certain Dates with Respect Thereto, and (VI) Granting Related Relief* [Docket No. 180] (the "Disclosure Statement Motion").   In support of this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT[2]

1.      The Debtors seek approval of an inadequate disclosure statement for an unconfirmable plan that proposes to, among other things: (i) deliver substantially all the Reorganized Debtors' value (in the form of debt and equity) to Highbridge Capital Management ("Highbridge") and the Backstop Parties in approximately 100 days from the Petition Date; and (ii) release Highbridge, the Backstop Parties, all insiders (including former officers and directors), Azurite Management LLC (a significant shareholder), and other non-debtor parties from any and all claims that may be asserted against them by the Debtors and a litany of third

---

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to them below or in the Disclosure Statement Motion, the Plan, or the Disclosure Statement, as applicable.  The Committee understands that the Debtors may be filing supplements to the Disclosure Statement that may resolve some of the issues raised herein.  The Committee reserves its rights to address any supplements and is hopeful some or all of its objections can be resolved consensually.  The Committee objects to the relief presently sought in the Debtors' *Motion for Entry of an Order (I) Authorizing Entry into the Backstop Commitment Agreement, (II) Approving the Payment of Fees and Expenses Related Thereto, and (III) Granting Related Relief* [Docket No. 179] and intends to file an objection thereto absent a consensual resolution.

parties, including unsecured creditors.   Meanwhile, basic disclosures that would provide unsecured creditors with a complete picture of Plan Equity Value, liquidation value, and the treatment of their claims are entirely absent from the Disclosure Statement.   Indeed, the informational deficiencies regarding the Disclosure Statement are substantial and range from fundamental information mandated by the Bankruptcy Code (i.e., the Liquidation Analysis) to important details regarding the New Common Equity and New Preferred Equity to be distributed to unsecured creditors.

2. As a result, the Committee submits that, at a minimum, the following informational deficiencies must be addressed immediately (as opposed to being included in the Plan Supplement):

a) *First* and foremost, the Disclosure Statement lacks clear and conspicuous language informing creditors that the Committee (i) does not support the Plan; (ii) does not believe the Plan is confirmable; and (iii) recommends that creditors vote against the Plan.

b) *Second*, the Disclosure Statement does not disclose the Plan Equity Value, which is the lynchpin of the Plan and unsecured creditor recoveries.   Rather, according to the Backstop Commitment Agreement, the Plan Equity Value will be disclosed as part of the Plan Supplement, which may be filed up to one week before the Voting Deadline.   If there is one piece of information that must be prominently disclosed in the Disclosure Statement (not the Plan Supplement), it is the Plan Equity Value.   Without that information, unsecured creditors do not have the bare minimum—let alone adequate information—to make an informed decision about the Plan.

c) *Third*, the Disclosure Statement does not provide the projected recovery for unsecured creditors electing to participate in the Rights Offering versus the projected recovery

for unsecured creditors not electing to participate in the Rights Offering.  In fact, the projected recovery for *every class* of creditors is "TBD".  Based upon the Committee's own calculations, unsecured creditors not electing to participate in the Rights Offering will receive an approximately 4.6% recovery on a fully diluted basis.  This recovery, however, will be in the form of a minority interest in unregistered stock, the terms of which are not included in the Disclosure Statement, and thus its value is likely far less.  The Disclosure Statement also fails to explain what rights (if any) unsecured creditors will be granted as minority equity holders.

d)      *Fourth*, the Disclosure Statement does not include adequate information regarding: (i) the sale of the Debtors' respiratory assets, which closed one day before the Petition Date, and the circumstances and reasoning that caused the Debtors to close such a sale outside the purview of this Court and the Committee;[3] and (ii) the assets and liabilities of each Debtor entity, which is especially important given that the "Plan shall apply as a separate Plan for each of the [three] Debtors."  Plan § III.A.  The Disclosure Statement should also inform creditors of the ramifications of the Backstop Motion and the Committee's lien review (which has only just begun).  However, due to the pace at which these cases are moving—which is entirely driven by Highbridge and the Backstop Parties—the Disclosure Statement does not include that information.

e)      *Fifth*, the Disclosure Statement provides no factual or legal justifications for the proposed Plan releases (including third-party releases) in favor of the Released Parties. Importantly, the Disclosure Statement is silent with respect to what consideration (if any) has

---

[3]  This significant transaction is relegated to a single sentence in a footnote.  *See* Disclosure Statement n.16.

been provided in exchange for the releases.[4]   In addition, the proposed opt-out requirements for the third-party releases are improper considering the "TBD" recoveries to unsecured creditors.

f)      *Sixth*, the Disclosure Statement does not even include the Liquidation Analysis, which is required to demonstrate, among other things, whether the proposed Plan complies with the "best interest of creditors test."   The Disclosure Statement also fails to include (i) any forward-looking financial projections for the Reorganized Debtors, which are especially critical given that the proposed recovery for unsecured creditors will be in the form of new equity interests; and (ii) a valuation analysis, which is necessary to calculate Plan Equity Value and support the proposed distribution of value.   This basic information must be provided from the get-go, and if creditors cannot review as part of the original solicitation package, then it should be deemed as if it were never provided for purposes of section 1125(a).

3.      Simply put, the Disclosure Statement does not enable a "hypothetical reasonable investor" to make an informed decision as to whether to vote for or against the Plan as required by section 1125(a) of the Bankruptcy Code.   As a result, the Disclosure Statement Motion should be denied.

4.      Even if the informational deficiencies discussed in this Objection could be remedied with appropriate and timely disclosures, the Disclosure Statement Motion should still be denied because the Plan is unconfirmable as a matter of law in that it, among other things: (i) impermissibly provides for the release of all claims of the Debtors, their estates, and third parties

---

[4] Among other questionable releases, the Committee believes there is no basis to provide Azurite Management LLC and its principals a release as they are contributing nothing.

for no material, tangible consideration; and (ii) contains overly broad exculpation provisions that violate applicable Fifth Circuit law.[5]

5.      Instead of proceeding with this deficient Disclosure Statement and fatally flawed Plan, the Committee submits that the Disclosure Statement Motion should be denied, and the Debtors, Highbridge, and the Backstop Parties should be required to engage with the Committee to develop a negotiated plan that is fair to all stakeholders and can be expeditiously confirmed with a minimum amount of litigation expense.

## BACKGROUND

6.      On January 31, 2023 (the "Petition Date"), the Debtors commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      On February 2, 2023, the Debtors filed their *Joint Chapter 11 Plan of Invacare Corporation and Its Debtor Affiliates* [Docket No. 94].

8.      On February 14, 2023, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing Entry Into the Backstop Commitment Agreement, (II) Approving the Payment of Fees and Expenses Related Thereto, and (III) Granting Related Relief* [Docket No. 179].

9.      On February 15, 2023, the Debtors filed the Disclosure Statement Motion and their *Disclosure Statement for the Joint Chapter 11 Plan of Invacare Corporation and Its Debtor Affiliates* [Docket No. 183] (the "Disclosure Statement").

10.      Also on February 15, 2023, the Debtors filed a revised *Joint Chapter 11 Plan of*

---

[5]  There are many other objectionable provisions of the Plan that the Committee intends to raise if these cases progress to confirmation.  The Committee reserves all rights with respect thereto.

*Invacare Corporation and Its Debtor Affiliates* [Docket No. 184].

11.     On February 17, 2023, pursuant to section 1102 of the Bankruptcy Code, the United States Trustee for Region 7 appointed the Committee [Docket No. 194].  The Committee was reconstituted on February 21, 2023 [Docket No. 204].

12.     On February 22, 2023, the Committee selected Kilpatrick Townsend & Stockton LLP as its proposed counsel.  On February 24, 2023, the Committee selected Province, Inc. as its proposed financial advisor.[6]  Thus, the Committee has had its professional team on board for less than three weeks.

13.     The Debtors, Highbridge, and the Backstop Parties have insisted on holding the Disclosure Statement and Plan process to the schedule contemplated in the pre-negotiated Restructuring Support Agreement.  These actions forced the Committee to pursue a litigation path in connection with the Disclosure Statement.  Nevertheless, the Committee believes that it is in the best interests of the estates to pursue a consensual restructuring.  As a result, the best outcome for the estates would be disapproval of the Disclosure Statement so that all parties can focus on development of an equitable and confirmable plan of reorganization for the Debtors.

## OBJECTION

14.     The Disclosure Statement (i) does not contain adequate information as required by section 1125 of the Bankruptcy Code; and (ii) describes a Plan that is patently unconfirmable. In addition, certain of the solicitation materials should be revised if the Plan confirmation process is permitted to move forward.  Accordingly, the Disclosure Statement cannot be approved at this time and, therefore, the Disclosure Statement Motion should be denied.

---

[6]  The Committee has also retained Jones Walker LLP as special conflicts counsel.

I.     **THE DISCLOSURE STATEMENT SHOULD NOT BE APPROVED BECAUSE IT DOES NOT CONTAIN ADEQUATE INFORMATION**

A.     **Applicable Law**

15.    It is well-settled that a debtor may only solicit votes to accept or reject a chapter 11 plan after the Court has approved the debtor's written disclosure statement for that plan as containing "adequate information."  11 U.S.C. § 1125(b).  Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as follows:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to . . . a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan[.]

11 U.S.C. § 1125(a)(1).

16.    Adequate disclosure is crucial to the bankruptcy process.  *See, e.g.*, *Westland Oil Dev. v. MCorp Mgmt. Solutions, Inc.*, 157 B.R. 100, 102 (Bankr. S.D. Tex. 1993) (noting disclosure is the "pivotal" concept in reorganization cases).  Courts have also stressed the importance of adequate disclosure in connection with proposed chapter 11 plans: "[W]e cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code['s] standard of 'adequate information.'"  *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988); *see also Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 321 (3d Cir. 2003) (observing that plan proponent has "an affirmative duty to provide creditors with a disclosure statement containing 'adequate information' to 'enable a creditor to make an informed judgment'" about the proposed plan (quoting 11 U.S.C. § 1125(a)(1)).

17.     The plan proponent has the burden of proof regarding the adequacy of a disclosure statement, "including showing that the plan is confirmable or that defects might be cured or involve material facts in dispute." *In re Am. Cap. Equip., LLC*, 688 F.3d 145 (3d Cir. 2012); *see In re Bellows*, 554 B.R. 219 (Bankr. D. Alaska 2016) ("The debtor bears the ultimate burden of proving the adequacy of its disclosure statement."). "[D]isclosure statements which are misleading, or which contain unexplained inconsistencies, should not be approved." *In re Applegate Prop., Ltd.*, 133 B.R. 827, 829 (Bankr. W.D. Tex. 1991).

18.     Whether or not adequate information is given is left to the judicial discretion of the court and will necessarily be governed by the circumstances of the case. *See Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503, 518 (5th Cir. 1998). "The determination of what is adequate information is subjective and made on a case by case basis. This determination is largely within the discretion of the bankruptcy court." *Texas Extrusion Corp. v. Lockheed Corp. (In re Texas Extrusion Corp.),* 844 F.2d 1142, 1157 (5th Cir. 1988), *vacated on other grounds, Adams v. First Fin. Dev. Corp. (In re First Fin. Dev. Corp.)*, 960 F.2d 23 (5th Cir. 1992). In essence, a disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991); *see also Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 100 (3d Cir. 1988) ("[Section] 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote."); 11 Henry J. Sommer & Richard Levin, *Collier on Bankruptcy*, ¶ 1125.03[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (stating courts should "consider the needs of the claims or interest of the class as a whole and not the needs of the most sophisticated or least sophisticated members of a particular class").

19.     In determining whether a disclosure statement satisfies section 1125 of the

Bankruptcy Code, courts consider whether it provides creditors with the necessary information

regarding the following, *inter alia*:

- the events which led to the filing of a bankruptcy petition;
- the relationship of the debtor with its affiliates;
- a description of the available assets and their value;
- the anticipated future of the company;
- the source of information stated in the disclosure statement;
- the present condition of the debtor while in chapter 11;
- claims asserted against the debtor;
- the estimated return to creditors under a chapter 7 liquidation;
- financial information, valuations, and projections relevant to the creditors' decision to accept or reject the chapter 11 plan;
- information relevant to the risks posed to creditors under the plan; and
- the actual or projected realizable value from recovery of preferential or otherwise avoidable transfers.

*See In re U.S. Brass Corp.*, 194 B.R. 420, 424-25 (Bankr. E.D. Tex. 1996); *In re Divine Ripe,*

*L.L.C.*, 554 B.R. 395, 402-03 (Bankr. S.D. Tex. 2016).

20.     For the reasons discussed herein, the Disclosure Statement fails to include

adequate information regarding critical matters that a hypothetical investor would need to

understand to make an informed decision about the Plan.  These matters include, but are not

limited to: (i) the Plan Equity Value; (ii) the projected recoveries for unsecured creditors; (iii) the

difference in recoveries if unsecured creditors elect to participate in the Rights Offering versus if

they do not participate; (iv) the justifications and the consideration paid or exchanged for the

proposed releases embedded in the Plan, including the proposed third-party releases, and the

potential claims being released and the value associated therewith; (v) the Reorganized Debtors'

corporate governance documents; (vi) minority shareholder rights; (vii) the assets and liabilities

of each of the three Debtor entities; (viii) information concerning certain prepetition transactions,

including the January 30, 2023 sale of the Debtors' respiratory business; (ix) the Debtors' post-

emergence business plan; (x) the Valuation Analysis, Liquidation Analysis, and Financial Projections; and (xi) issues regarding the Debtors' cash allegedly being "trapped" in Europe due to international insolvency laws.

**B.    Inadequate Disclosures Regarding Projected Recoveries, Plan Equity Value, New Common Equity, and New Preferred Equity**

21.    Unsecured creditors cannot be expected to vote on a plan without knowing how their claims are being treated and what they are estimated to get.  Yet, this Disclosure Statement includes "[●]" for the projected recovery *for every class of creditors*.  Even worse, the Plan Equity Value, which serves as the underpinning for unsecured creditor recoveries, is also absent from the Disclosure Statement. The Disclosure Statement should be denied on these bases alone.

22.    The Disclosure Statement also fails to disclose how creditor recoveries may vary within the same class.  For example, if unsecured creditors participate in the Rights Offering, their distributions will take the form of New Preferred Equity.  If unsecured creditors do not participate in the Rights Offering, their distributions will take the form of New Common Equity. Despite these important distinctions, the Disclosure Statement fails to differentiate between the projected recoveries on account of New Common Equity versus New Preferred Equity.  Instead, recoveries for Class 5 (Unsecured Notes Claims) and Class 6 (General Unsecured Claims) are each relegated to a single "[●]".

23.    Moreover, the information in the Disclosure Statement regarding the New Common Equity is sparse, at best.  The Disclosure Statement should explain that because the New Common Equity will not be a registered security or traded on an exchange, the only way to transfer the New Common Equity will be through a private transaction.  The lack of an efficient market to buy and sell the New Common Equity and its related impact on the value of the New Common Equity should also be explained, but it is not.  The Disclosure Statement should also

state whether there is a risk of dilution should the Reorganized Debtors choose to issue more equity following Plan confirmation, or whether there will be minority rights for equity holders. While the Debtors propose to provide this information as part of the Plan Supplement, that will be too late for a hypothetical investor to analyze the information (which will likely take the form of complex corporate governance documents) and make a timely decision.

24.     The Disclosure Statement also fails to contain sufficient information regarding the New Preferred Equity, which will be issued to unsecured creditors that subscribe to the Rights Offering.  For example, the Disclosure Statement does not include an enterprise valuation to determine the value of the preferred equity to be distributed under the Plan.  Furthermore, the Disclosure Statement does not explain why the Preferred Equity will be offered by New Intermediate Holding Company, or where New Intermediate Holding Company will be located within the post-emergence corporate structure.  Not only does this lack of information render the Disclosure Statement deficient, but it also has a chilling effect on the subscription process for the Rights Offering.

### C.     Inadequate Disclosures Regarding Valuation and Feasibility

25.     The Disclosure Statement does not include the Liquidation Analysis, Financial Projections, or Valuation Analysis.  The Disclosure Statement also fails to include adequate disclosures regarding the new Management Incentive Program ("MIP") and the go-forward business plan.  This information is especially important given that the Plan proposes to issue new equity to unsecured creditors.[7]  Leaving aside its illiquidity, the value of that equity will depend, in large part, on the future business operations of the Reorganized Debtors, whether the Reorganized Debtors will be profitable, whether the Reorganized Debtors can support the

---

[7]  Not only are unsecured creditor recoveries unknown, but the terms of the MIP, which will dilute unsecured creditor recoveries, are also unknown.

projected debt upon emergence, and whether the Exit Facilities will be sufficient to support operations. Yet the Disclosure Statement does not include any of this information.

26.    This lack of disclosures, among other things, prevent creditors from assessing the substance and feasibility of the proposed Plan. It is well settled that the Debtors must provide sufficient information in the Disclosure Statement to allow creditors to assess for themselves whether the proposed plan is feasible. *See, e.g.*, *In re Ferretti*, 128 B.R. at 21 (where debtor's disclosure statement stated that based on experience the debtor believed the plan was feasible, the court held, "[t]his is totally inadequate for any unsecured creditor to vote on this plan"); *In re Am. Cap. Equip., LLC*, 688 F.3d at 156 (affirming bankruptcy court's decision to decline to approve disclosure statement due to the highly speculative, contingent funding of the plan).

27.    Without this critical information, a creditor cannot make an educated, informed decision as to whether it should vote for or against the Plan. The Debtors may attempt to downplay their failure to timely include certain of this information by indicating that it will be provided to creditors in a late-filed Plan Supplement.[8] However, this type of information must be disclosed to creditors now, and if creditors cannot meaningfully review it prior to voting, then for purposes of section 1125 of the Bankruptcy Code, it should be deemed as if it were never provided. Indeed, only the Disclosure Statement itself can provide the necessary adequate information pursuant to section 1125 of the Bankruptcy Code. *See In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170 (Bankr. S.D. Ohio 1988) ("The disclosure statement was intended by Congress to be the primary source of information upon which creditors and shareholders could rely in making an informed judgment about a plan of reorganization."). The Debtors should not

---

[8]  Pursuant to the Plan, the Debtors may file the Plan Supplement up to one week before the Voting Deadline.

be able to rely on the promise of additional filings to obtain approval of the Disclosure Statement Motion.

### D.    Inadequate Disclosures Regarding Proposed Releases

28.    The Debtors intend to release Highbridge, the Backstop Parties, the Debtors' current and former directors and officers (including Steven Rosen),[9] Azurite, and a litany of other non-debtor parties from any and all claims by way of the Plan.   Unsurprisingly, the Disclosure Statement fails to include any substantive discussion regarding the consideration that the Released Parties are providing in exchange for their broad sweeping releases.   Rather, the Plan states that "for good and valuable consideration" each Released Party is deemed released and discharged by the Debtors.   Plan § VIII.D.[10]   However, no evidence supporting this finding has been offered.

29.    As a preliminary matter, the Committee questions how certain of the Released Parties could have provided *any* consideration to support the releases proposed in the Plan. For example, it is not clear what possible consideration *former* directors and officers of the Debtors could be providing in exchange for receipt of the releases from the Debtors or unsecured creditors.   Furthermore, the current directors and officers have been compensated (and continue to be) for their service to the Debtors, so any tangible consideration from those parties is dubious at best.

30.    For these reasons, the Committee requests that the Disclosure Statement include a detailed analysis as to why the Released Parties should be entitled to the generous releases that

---

[9]  Mr. Rosen, Manager of Azurite, is listed as a director in the statement of financial affairs for Debtor Invacare Corporation.  *See* Docket No. 262 at p. 62 of 134.

[10]  Even if these informational deficiencies regarding the proposed releases were cured, the Committee believes that the Disclosure Statement Motion should be denied because the releases are legally flawed and render the Plan patently unconfirmable, as discussed herein.

are currently proposed in the Plan, what consideration was provided to support such a release, whether any independent managers of the Debtors conducted an investigation as to the propriety of the releases, who hired such independent managers, and the results of any such investigation. Absent adequate disclosure regarding the proposed releases, it is impossible for creditors to understand what is being released and why.

### E.      Inadequate Disclosures Regarding Prepetition Transactions

31.      The Disclosure Statement fails to provide virtually any detail surrounding the Debtors' sale of their respiratory business, and any other asset sales during the past four years. The respiratory business sale closed on January 30, 2023, *just one day prior to the Petition Date*. Given the proximity of the sale to the Petition Date, it is concerning that no disclosure is provided as to whether this was a fire sale, or a fully marketed arms' length sale for fair market value.  Or what if any actions the Debtors' Board of Directors undertook in assessing the fairness of this sale.   Disclosures regarding the Debtors' asset sales during the past four years is particularly important given that the Debtors are attempting to release all Director and Officer claims regarding these sales as part of the Plan.

### F.      Additional Disclosures are Required Prior to Solicitation

32.      In addition to the infirmities identified above, the Committee believes the following additional disclosures are required:

- **Events Leading to Chapter 11**: The Disclosure Statement only briefly describes the alleged events leading to the Debtors' chapter 11 filings.  *See* Disclosure Statement § IV.B.  The Disclosure Statement fails to disclose (i) any empirical information regarding the effect of COVID-19 on the Debtors' operations; (ii) any details regarding the "significant headway in taking steps to improve the Company's financial performance" taken by the Debtors' Board of Directors and equity owners to address the events leading to the Chapter 11 Cases; (iii) all material prepetition restructuring efforts, including any other potential restructuring support agreements; and (iv) any lender prepetition declarations of an event of default.

- **Separate Chapter 11 Plans for Each Debtor**:  The Plan provides that it constitutes three (3) separate Plans, one for each Debtor, and that the Plan shall be deemed to apply separately with respect to each Debtor.  Plan § Introduction; III.A. The Plan references that it does not contemplate substantive consolidation of any of the Debtors.  *Id.*  As each Debtor allegedly has its own separate Plan, the assets and liabilities of each Debtor must be disclosed and discussed in detail in the Disclosure Statement.  Moreover, information must be added to Section III.A. of the Disclosure Statement clearly explaining that (i) the separate corporate existences of the Debtors shall be retained; (ii) the filing of a single Plan does not mean that there is intended to be substantive consolidation or merger of the Debtors; and (iii) each Debtor is proposing its own Plan with respect to the treatment of Claims and Interests applicable to each particular Debtor.

- **The Committee's Investigation and Challenge Period**: The Disclosure Statement fails to explain that (i) the Committee is conducting an investigation into the potential claims against and liens of the Debtors' various lenders, as set forth in more detail in the Final DIP Order [Docket No. 298], and (ii) the Challenge Period (as defined in the Final DIP Order) is scheduled to end on April 20, 2023, subject to further extensions.

33.    In light of these informational defects, the Committee submits that the Disclosure Statement Motion cannot be approved unless the Disclosure Statement is significantly revised to address the issues raised in this Objection.

## II.    THE DISCLOSURE STATEMENT SHOULD NOT BE APPROVED BECAUSE THE PLAN IS PATENTLY UNCONFIRMABLE

34.    Courts routinely hold that, if a plan is not confirmable as a matter of law, the related disclosure statement should not be approved.  *See In re Am. Cap. Equip., LLC*, 688 F.3d at 154 ("Courts have recognized that 'if it appears there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue at the disclosure stage before requiring the parties to proceed with solicitation of acceptances and rejections and a contested confirmation hearing.'" (citation omitted)); *In re Quigley Co., Inc.*, 377 B.R. 110, 115-16 (Bankr. S.D.N.Y. 2007) (stating that if a plan is "patently unconfirmable on its face" then solicitation of votes on the plan would be futile); *In re CRIIMI MAE, Inc.*, 251 B.R. 796, 799 (Bankr. D. Md. 2000) ("It is now well accepted that a court may disapprove of a disclosure statement, even if it provides adequate information about a proposed plan, if the plan could not

possibly be confirmed." (citations omitted)); *In re U.S. Brass Corp.*, 194 B.R. at 422.  The debtor must show that "a proposed or contemplated plan is not patently unconfirmable and has a realistic chance of being confirmed."  *John Hancock Mut. Life Ins. Co. v. Route 37 Business Park Assocs.*, 987 F.2d 154, 157 (3d Cir. 1993) (citation omitted).

35.     A plan is considered "patently unconfirmable" if (i) confirmation defects cannot be overcome by creditor voting results; and (ii) those defects concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing. *In re Am. Cap. Equip.*, 688 F.3d at 154-55 (citing *In re Monroe Well Serv. Inc.*, 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987)).  Where a plan is unconfirmable on its face, bankruptcy courts routinely sustain the creditor's objection and deny approval of the disclosure statement.  *In re First Energy Solutions Corp.*, No 18-50757, Docket No. 2500 (Bankr. N.D. Ohio Apr. 11, 2019); *In re Seasons Apartments, LP,* 215 B.R. 953, 955 (Bankr. W.D. La. 1997); *In re Allied Gaming Mgmt., Inc.*, 209 B.R. 201, 202 (Bankr. W.D. La. 1997) ("[N]otwithstanding adequate disclosure of information required by section 1125(b), a disclosure statement should not be approved if the proposed plan, as a matter of law, cannot be confirmed.").

36.     In such circumstances, the related disclosure statement may not be approved.  To do otherwise would impose upon a debtor's estate the costs and expenses associated with an unnecessary solicitation and allow the debtor to further waste the time and resources of its creditors and the court.  *See In re Valrico Square Ltd. P'ship*, 113 B.R. 794, 796 (Bankr. S.D. Fla. 1990) ("Soliciting votes and seeking court approval on a clearly fruitless venture is a waste of the time of the Court and the parties.").  "[S]uch an exercise in futility only serves to further delay a debtor's attempts to reorganize." *In re Atlanta W. VI*, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988).

37.     For the reasons discussed herein, the Court should deny the Disclosure Statement Motion because the Plan, as currently drafted, is patently unconfirmable and should not be solicited.

### A.     The Proposed Releases Render the Plan Unconfirmable as a Matter of Law

38.     Article VIII of the Plan provides for broad releases of various Debtor and non-Debtor parties (each, a "Released Party" and, collectively, the "Released Parties"), including all insiders, the Term Loan Lenders, the Backstop Parties, the DIP Lenders, and each of their current and former affiliates.[11]   Specifically, Section VIII.C of the Plan (the "Debtor Releases") provides that the Debtors, the Reorganized Debtors, and their Estates will release the Released Parties from "any and all Causes of Action, including any derivative claims," while Section VIII.D  provides that an extensive list of third parties (the "Releasing Parties")[12] will release the Released Parties from the same (the "Third-Party Releases" and, together with the Debtor

---

[11]  "*Released Parties*" means, each of, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each of the Debtors' current and former directors and officers; (d) each DIP Lender; (e) each DIP Agent; (f) the Consenting Term Loan Lender; (g) the Consenting Secured Noteholders; (h) the Consenting Unsecured Noteholders; (i) Azurite Management LLC; (j) each Agent/Trustee; (k) each Backstop Party; (l) the Exit Facilities Lenders; (m) the Exit Secured Noteholders; (n) each current and former Affiliate of each Entity in clause (a) through the following clause (o); and (o) each Related Party of each Entity in clause (a) through clause (n); *provided* that, in each case, an Entity shall not be a Released Party if such Entity: (x) elects to opt out of the releases contained in Article VIII.D of the Plan; or (y) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in Article VIII.D of the Plan that is not resolved before Confirmation.

[12]  "*Releasing Parties*" means, each of, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each of the Debtors' current and former directors and officers; (d) each DIP Lender; (e) each DIP Agent; (f) the Consenting Term Loan Lender; (g) the Consenting Secured Noteholders; (h) the Consenting Unsecured Noteholders; (i) Azurite Management LLC; (j) each Agent/Trustee; (k) each Backstop Party; (l) the Exit Facilities Lenders; (m) the Exit Secured Noteholders; (n) all Holders of Claims; (o) all Holders of Interests; (p) each current and former Affiliate of each Entity in clause (a) through the following clause (q); and (q) each Related Party of each Entity in clause (a) through clause (p) ; *provided* that in each case, an Entity shall not be a Releasing Party if such Entity: (x) elects to opt out of the releases contained in Article VIII.D of the Plan; or (y) timely Files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in Article VIII.D of the Plan that is not resolved before Confirmation.

Releases, the "Releases").  *See* Plan §§ VIII.C - D.  Such Releases are in contravention of Fifth Circuit law and render the Plan unconfirmable.  Accordingly, the Court should deny approval of the Disclosure Statement until the Releases are properly modified.

### i.    The Debtor Releases are Impermissible

39.    The Debtor Releases would release a variety of known and unknown claims against the Released Parties, including certain of the Debtors' current and former directors and officers.  Under Section 1123(b)(3)(A), a plan *may* provide for the settlement or adjustment of a claim belonging to the estates.  *See In re Bigler LP*, 442 B.R. 537, 543-44 (Bankr. S.D. Tex. 2010) (recognizing a debtor's ability to settle claims under 1123(b)(3)(A), including the release of claims by the estate).  Courts within the Fifth Circuit have considered the following factors in approving releases under a plan to determine whether the settlement is fair and equitable and in the best interests of the Debtors' estates: (i) "the probability of success" of litigation; (ii) "the complexity and likely duration" of the litigation, any attendant "expense, inconvenience, [or] delay," and possible problems collecting a judgment; and (iii) "all other factors bearing on the wisdom of the compromise."  *See Off. Comm. of Unsecured Creditors v. Moeller (In re Age Ref., Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015) (citing *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980)).  Other factors that courts within the Fifth Circuit specifically consider include: (i) the best interests of the creditors with proper deference to their reasonable views; and (ii) the extent to which the procurement of the releases is the product of arm's-length bargaining, and not fraud or collusion.  *See In re Mirant Corp.*, 348 B.R. 725, 739-40 (Bankr. N.D. Tex. 2006) (summarizing the above factors); *see also Off. Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 356 (5th Cir. 1997).

40.     According to the Debtors, they "believe that the releases . . . in the Plan are necessary and appropriate and meet the requisite standard under applicable law."  Disclosure Statement, Article III. W.  However, it is unclear how the Debtors reached that conclusion given that the "releases in the Plan are subject to investigation by the disinterested managers of Invacare's board of directors, with the assistance of independent counsel."  *Id.*  Regardless, this conclusory language falls woefully short in supporting the proposed Debtor Releases. Furthermore, the Debtors must disclose, among other things, the results of this alleged investigation, who commissioned the investigation, and who hired the disinterested managers and their counsel.

41.     Moreover, the Debtors have failed to provide any explanation as to what "good and valuable consideration" has been received from each Released Party.  In this regard, no evidence supporting this finding has been offered and perhaps that is because, as to many of the Released Parties, none was given.  This failure to provide consideration in exchange for the Releases renders the Plan fundamentally defective.  *See Bigler*, 442 B.R. at 543-44 (noting releases require consent and consideration to be valid); *In re Wash. Mut. Inc.*, 442 B.R. 314, 354 (Bankr. D. Del. 2011) (finding "no basis" for granting third party releases of the debtor's officers and directors since the "only 'contribution' made by them was in the negotiation of the [g]lobal [s]ettlement and [p]lan" which activities "are nothing more than what is required of directors and officers of debtors in possession" and such "they are insufficient to warrant such broad releases of any claims third parties may have against them").

42.     Accordingly, the Debtors have failed to satisfy the test articulated in the Fifth Circuit for approval of the Debtor Releases.  Such failure renders the Plan patently unconfirmable and warrants denial of the Disclosure Statement Motion.

ii.        **The Third-Party Releases are Impermissible**

43.    Section VIII.D of the Plan provides third party releases of the Debtors, the Debtors' lenders, and current and former directors and officers of the Debtors, among a laundry list of other parties.  The effect of the third-party releases is to improperly insulate not only the Debtors, but Highbridge, the Backstop Parties, and the Debtors' current and former directors and officers from any and all causes of action accruing pre-petition and post-petition through the Plan Effective Date.

44.    The Fifth Circuit has categorically prohibited non-consensual third-party releases. In *In re Patriot Place, Ltd.*, the court stated:

> The Fifth Circuit takes a very restrictive approach to non-debtor releases in bankruptcy cases. Quoting the most recent case from the Fifth Circuit on this subject: non-consensual, non-debtor releases in bankruptcy proceedings in this circuit have been "explicitly prohibited", this circuit has "firmly pronounced its opposition to such releases", and the "Bankruptcy Code precludes non-consensual, non-debtor releases".

486 B.R. 773, 822 (Bankr. W.D. Tex. 2013) (quoting *In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1051-53, 1054-55, 1058-59 (5th Cir. 2012); *see also In re Pac. Lumber Co.,* 584 F.3d 229, 252 (5th Cir. 2009) ("In a variety of contexts, this court has held that Section 524(e) only releases the debtor, not co-liable third parties.  These cases seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions." (citing *In re Coho Res., Inc.,* 345 F.3d 338, 342 (5th Cir. 2003)); *Hall v. Nat'l Gypsum Co.*, 105 F.3d 225, 229 (5th Cir. 1997); *Matter of Edgeworth*, 993 F.2d 51, 53-54 (5th Cir. 1993); *Feld v. Zale Corp. (In re Zale Corp.),* 62 F.3d 746 (5th Cir. 1995)); *In re Pilgrim's Pride Corp.*, No. 08-45664-DML-11, 2010 WL 200000, at *5 (Bankr. N.D. Tex. Jan. 14, 2010) ("Because *Pacific Lumber* is binding precedent, the court may not, over

objection, approve through confirmation of the Plan third-party protections, other than those provided to the Committees, members of the Committees, and the Committees' Professionals.")).

45.     In *Pacific Lumber*, the Fifth Circuit disallowed the release of the debtors' officers, directors, and professionals because there was no evidence that they "were jointly liable for any . . . pre-petition debt. They are not guarantors or sureties, nor are they insurers." *Pac. Lumber*, 584 F.3d at 252-53.  In fact, the Fifth Circuit struck down all non-debtor releases except those releasing the unsecured creditors' committee and its members because "its members are the only disinterested volunteers" seeking a release. *Id.* at 253.

46.     The Third-Party Releases are also inappropriate because they are non-consensual. As currently drafted, all holders of Claims or Interests shall be considered Releasing Parties unless they opt-out by returning a ballot so marked or file an objection to the release with the Bankruptcy Court.  While courts in this district have approved opt-out mechanisms, the Debtors should not be permitted to use one here because unsecured creditors do not know what recovery they will receive under the Plan.  As a result, unsecured creditors are unlikely to pay significant attention to the Plan, let alone the proposed releases contained therein.  Indeed, the proposed Disclosed Statement is over 300 pages, even without the critical missing information noted in this Objection.  It is hard to image that every unsecured creditor will review the 300 plus page Disclosure Statement in detail to decide whether it should opt out of the proposed Releases. Therefore, as a matter of simple fairness, the Third-Party Releases should be stricken as to unsecured creditors or, at a minimum, the "opt-out" should be replaced with an "opt-in" mechanism.

**B.     The Exculpation Provision in the Plan Exceeds the Scope of Section 1125(e) of the Bankruptcy Code**

47.     Section VIII.E of the Plan provides that the Exculpated Parties will be exculpated from liability for, in relevant part:

> any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for claims related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

Plan § VIII.E.

48.     The exculpation provision further provides that the "Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan." *Id.*

49.     The Exculpated Parties means, "collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each manager or director of the Debtors; (d) each of the Consenting Stakeholders; (e) the DIP Agents; (f) each of the DIP Lenders; and (g) with respect to each of the foregoing Entities in clauses (a) through (f), each of the Related Parties of such Entity." *See* Plan, Defined Term #90.

50.     The Plan's exculpation provision is inconsistent with applicable law because it includes parties other than the estate fiduciaries.   Section 1125(e) of the Bankruptcy Code provides a limited safe harbor to non-debtors with respect to the offer or issuance of securities under a plan, provided that such persons acted in good faith and in compliance with the applicable provisions of Title 11.   11 U.S.C. §1125(e).   Section 524(e) addresses the scope of a bankruptcy discharge and states, in relevant part, that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e).

51.     In *Pacific Lumber*, the Fifth Circuit made clear that section 524(e) of the Bankruptcy Code does not absolve non-debtors from liability from any negligent conduct during the chapter 11 cases.   *Pac. Lumber*, 584 F.3d at 252-53.   The Fifth Circuit found that section 524(e) of the Bankruptcy Code, which provides a fresh start to the debtors, is not intended to "absolve the released parties from any negligent conduct that occurred during the course of the bankruptcy." *Id.*   The Fifth Circuit has further held that members of the creditors' committee are "disinterested volunteers" that have a qualified immunity for actions within the scope of their duties and may be exculpated through a chapter 11 plan. *Id.* at 253.   Thus, unless all entities or persons that are not estate fiduciaries are removed from the exculpation provision, the

exculpation provision in the Plan violates the Bankruptcy Code, and the Plan cannot be confirmed.[13]

## III.   THE DEBTORS SHOULD INCLUDE A LETTER FROM THE COMMITTEE IN THE SOLICITATION PACKAGE

52.     If the Disclosure Statement is approved, the Debtors should be required to include a solicitation letter from the Committee in the solicitation package.  The Committee's solicitation letter, among other things, will highlight the many deficiencies with the Plan and, to the extent the Court does not modify the solicitation procedures to require creditors to opt-in to the proposed Releases, encourages holders of unsecured claims to opt-out of the Third-Party Releases.  A copy of the Committee's letter (subject to revisions that may be made prior to or at the hearing on the Disclosure Statement Motion) will be attached to the Committee's Witness and Exhibit list for the Disclosure Statement hearing.

53.     The Committee submits that including the proposed letter is necessary and appropriate.  *See*, *e.g.*, *In re Tailored Brands, Inc.*, No. 20-33900 (Bankr. S.D. Tex. Oct. 9, 2023) [Docket No. 845] (Disclosure Statement noting that solicitation materials would include a letter from the Committee urging creditors to vote against the Plan); *In re Legacy Reserves Inc.*, No. 19-33395 (Bankr. S. D. Tex. Sept. 16, 2019) [Docket No. 494] (allowing inclusion of Committee letter urging creditors to vote against the plan); *In re VER Techs. Holdco LLC*, No. 18-10834 (KG), 2019 WL 4411953 (Bankr. D. Del. Sept. 13, 2018) [Docket No. 415] (allowing inclusion of Committee letter by agreement among parties); *In re Boomerang Tube, LLC*, No. 15-11247, Hr'g Tr. at 5:17-20 (same); *In re Trident Holding Company, LLC*, 19-10384 (SHL) (Bankr.

---

[13]   As noted *infra*, there are many other objectionable provisions of the Plan that the Committee intends to raise if these cases progress to confirmation.  The Committee reserves all rights with respect thereto.

S.D.N.Y. 2019) (allowing inclusion of letter from the official committee of unsecured creditors urging creditors to vote against plan in solicitation package).

## <u>CONCLUSION</u>

**WHEREFORE**, the Committee respectfully requests that the Court enter an order: (i) denying the Disclosure Statement Motion or, in the alternative, requiring the Debtors to amend the Disclosure Statement so as to address the issues and concerns raised in this Objection; and (ii) granting such other and further relief as the Court deems just and proper.

Dated:  March 15, 2023

By: <u>*Paul M. Rosenblatt*</u>
KILPATRICK TOWNSEND & STOCKTON LLP
Daniel F. Shank, Esq.
State Bar No. 18090400
700 Louisiana Street, Suite 4300
Houston, TX 77002
Telephone:  (281) 809-4100
Facsimile:  (281) 929-0787
Email:  dshank@kilpatricktownsend.com

-and-

KILPATRICK TOWNSEND & STOCKTON LLP
Todd C. Meyers, Esq. (admitted pro hac vice)
Paul M. Rosenblatt, Esq.
James R. Risener, Esq. (admitted pro hac vice)
1100 Peachtree Street NE, Suite 2800
Atlanta, GA 30309-4528
Telephone: (404) 815-6500
Facsimile: (404) 815-6555
Email:  tmeyers@kilpatricktownsend.com
          prosenblatt@kilpatricktownsend.com
          jrisener@kilpatricktownsend.com

*Proposed Counsel for the Official Committee of Unsecured Creditors*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of March, 2023, a true and correct copy of the foregoing document was served by electronic transmission upon all parties eligible to receive services through this Court's CM/ECF system, email service upon the Limited Service List, and service via first class mail on the Limited Service List where an email address is unavailable.

*/s/ Paul M. Rosenblatt*
Paul M. Rosenblatt