**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| INVACARE CORPORATION, *et al.*,[1] | ) Case No. 23-90068 (CML) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

**PLAN SUPPLEMENT FOR THE DEBTORS'
FIRST AMENDED JOINT CHAPTER 11 PLAN
OF INVACARE CORPORATION AND ITS DEBTOR AFFILIATES**

**Table of Contents**[2]

| | |
|---|---|
| **Exhibit A** | Form of New Organizational Documents |
| **Exhibit B** | Members of the New Board |
| **Exhibit C** | Litigation Trustee |
| **Exhibit D** | Assumed Executory Contracts and Unexpired Leases Schedule |
| **Exhibit E** | Form of Exit Term Loan Agreement |
| **Exhibit F** | Term Sheet of Exit ABL Agreement |
| **Exhibit G** | Form of Exit Secured Convertible Notes Indenture |
| **Exhibit H** | Rejected Executory Contracts and Unexpired Leases Schedule |
| **Exhibit I** | Schedule of Retained Causes of Action |
| **Exhibit J** | Proposed Restructuring Transactions Memorandum |
| **Exhibit K** | Form of Management Incentive Plan |
| **Exhibit L** | Form of Employment Agreements |
| **Exhibit M** | Form of Litigation Trust Agreement |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Invacare Corporation (0965); Freedom Designs, Inc. (4857); and Adaptive Switch Laboratories, Inc. (6470). The corporate headquarters and the mailing address for the Debtors is 1 Invacare Way, Elyria, Ohio 44035.

[2] Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

**Exhibit A**

**Form of New Organizational Documents**

This **Exhibit A** includes the New Organizational Documents for New Parent and New Intermediate Holding Company:

- **Exhibit A(i)**: Form of Certificate of Incorporation for New Parent

- **Exhibit A(ii)**: Form of Bylaws for New Parent

- **Exhibit A(iii)**: Form of Certificate of Designation

- **Exhibit A(iv)**: Form of Registration Rights Agreement

- **Exhibit A(v)**: Form of Certificate of Incorporation for New Intermediate Holding Company

- **Exhibit A(vi)**: Form of Bylaws for New Intermediate Holding Company

Certain documents, or portions thereof, contained in this **Exhibit A** and the Plan Supplement remain subject to continued negotiations, review and revisions by the Debtors and the Consenting Stakeholders.  The respective rights of the Debtors and the Consenting Stakeholders are expressly reserved, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained therein at any time in accordance with the terms of the Plan, or by order of the Bankruptcy Court; *provided* that if any document in this Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the Confirmation Hearing, the Debtors will file a redline of such document with the Bankruptcy Court.  Each of the documents contained in the Plan Supplement or its amendments are subject to certain consent and approval rights to the extent provided in the Plan or Restructuring Support Agreement.

**<u>Exhibit A(i)</u>**

**Form of Certificate of Incorporation for New Parent**

*Draft 4.17.23*

## AMENDED AND RESTATED CERTIFICATE OF INCORPORATION
## OF
## INVACARE HOLDINGS CORPORATION

Invacare Holdings Corp. (the "***Corporation***"), a corporation organized and existing under the General Corporation Law of the State of Delaware (the "***DGCL***"), hereby certifies as follows:

1.      The original Certificate of Incorporation of the Corporation the (the "***Original Certificate of Incorporation***") was filed with the Secretary of State of the State of Delaware on [●], 2023.

2.      This Amended and Restated Certificate of Incorporation (this "***Certificate of Incorporation***"), which restates and amends the Original Certificate of Incorporation, has been declared advisable and duly adopted by the Board of Directors of the Corporation (the "***Board of Directors***") and the stockholders of the Corporation in accordance with Sections 228, 242 and 245 of the DGCL.

3.      The Original Certificate of Incorporation is hereby amended and restated in its entirety to read as follows:

## ARTICLE I
## NAME

The name of the Corporation is Invacare Holdings Corporation.

## ARTICLE II
## REGISTERED OFFICE; REGISTERED AGENT

 The address of the registered office of the Corporation in the State of Delaware is c/o Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle, Delaware, 19801.  The name of its registered agent at such address is The Corporation Trust Company.

## ARTICLE III
## PURPOSE

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may now or hereafter be organized under the DGCL, as the same exists or may hereafter be amended from time to time.

## ARTICLE IV
## CAPITALIZATION

**Section 4.1      Authorized Shares.** The aggregate number of shares of capital stock that the Corporation will have authority to issue is [●] shares, which shall consist of [●]shares of common stock, par value $0.001 per share (the "***Common Stock***"), and [●] shares of preferred stock, par value $0.001 per share ("***Preferred Stock***").

**Section 4.2     Common Stock.** Each holder of Common Stock, as such, shall be entitled to one vote for each share of Common Stock held by such holder on all matters on which stockholders generally are entitled to vote under applicable law. Except as otherwise provided in this Certificate of Incorporation or required by applicable law, the holders of Common Stock shall vote together as a single class (or, if the holders of one or more series of Preferred Stock are entitled to vote together with the holders of Common Stock, as a single class with the holders of such other series of Preferred Stock) on all matters submitted to a vote of the stockholders generally. Notwithstanding the foregoing, to the fullest extent permitted by applicable law, holders of Common Stock, as such, shall have no voting power with respect to, and shall not be entitled to vote on, any amendment to this Certificate of Incorporation (including any certificate of designation relating to any series of Preferred Stock) that relates solely to the terms of one or more outstanding series of Preferred Stock if the holders of such affected series are entitled, either separately or together with the holders of one or more other such series, to vote thereon pursuant to this Certificate of Incorporation (including any certificate of designation relating to any series of Preferred Stock) or pursuant to the DGCL.

Subject to applicable law, the rights, if any, of the holders of any outstanding series of Preferred Stock having a preference over or the right to participate with the Common Stock with respect to the payment of dividends and other distributions in cash, property or securities of the Corporation, and Article XV, such dividends and other distributions may be declared and paid ratably on the Common Stock out of the assets of the Corporation that are by applicable law available therefor at such times and in such amounts as the Board of Directors in its discretion shall determine.

In the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Corporation, after payment or provision for payment of the debts and other liabilities of the Corporation and subject to the rights, if any, of the holders of Preferred Stock having a preference over or the right to participate with the Common Stock as to distributions upon liquidation, dissolution or winding up, the holders of all outstanding shares of Common Stock shall be entitled to receive the remaining assets of the Corporation available for distribution ratably in proportion to the number of shares held by each such stockholder.

**Section 4.3     Preferred Stock.** Authority is hereby expressly vested in the Board of Directors, subject to any limitations prescribed by the DGCL, to establish one or more series of Preferred Stock from time to time by adoption of a resolution or resolutions setting forth the designation of the series and fixing and determining the designations, powers, preferences, limitations and relative rights, including voting powers, of the shares of any such series to the same extent that such designations, powers, preferences, limitations and relative rights could be stated if fully set forth in this Certificate of Incorporation.

The Board of Directors may increase or decrease the authorized number of shares within each established series of Preferred Stock pursuant to the DGCL; *provided*, *however*, that the Board of Directors may not decrease the number of shares within a series to less than the number of shares within such series that are then issued.

**Section 4.4     Non-Voting Equity.** The Corporation shall not issue nonvoting equity securities to the extent prohibited by Section 1123(a)(6) of title 11 of the United States Code (as

2

amended, the "**Bankruptcy Code**"); *provided*, *however*, that the foregoing restriction shall (a) have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (b) only have such force and effect for so long as Section 1123(a)(6) of the Bankruptcy Code is in effect and applicable to the Corporation, and (c) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

<div align="center">

**ARTICLE V**
**BYLAWS**

</div>

In furtherance and not in limitation of the powers conferred by statute, the bylaws of the Corporation (the "**Bylaws**") may be amended or repealed, and new bylaws may be adopted, by the Board of Directors without any action on the part of the stockholders, and the stockholders may make additional bylaws and may adopt, amend or repeal any bylaws, whether such bylaws were originally adopted by them or otherwise.

<div align="center">

**ARTICLE VI**
**BOARD OF DIRECTORS**

</div>

**Section 6.1      General.** Except as provided in this Certificate of Incorporation or the DGCL, the business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.

**Section 6.2      Number and Term.** Subject to any rights of the holders of any series of Preferred Stock to elect additional directors under specified circumstances, the total number of directors shall be no less than [   ] and no more than [   ] as fixed from time to time in accordance with the Bylaws. Notwithstanding the foregoing, if at any time a vacancy is created on the Board of Directors by reason of the incapacity, death, removal or resignation of a director, such vacancy shall automatically reduce the number of directors *pro tanto*, until such time as such vacancy is filled, whereupon the number of directors shall be automatically increased *pro tanto*. The directors shall consist of a single class, and each director shall hold office until his or her successor shall have been duly elected and qualified, subject, however, to such director's earlier death, resignation, retirement, disqualification or removal.

**Section 6.3      No Requirement of Written Ballot**. Unless and except to the extent that the Bylaws shall so require, the election of the directors need not be by written ballot.

<div align="center">

**ARTICLE VII**
**INDEMNIFICATION**

</div>

**Section 7.1      Right to Indemnification.** To the fullest extent permitted by applicable law, the Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding ("**Proceeding**"), whether civil, criminal, administrative or investigative (other than an action by or in the right of the Corporation), by reason of the fact that he or she is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee, fiduciary or agent of another corporation, partnership, joint venture, limited liability company, trust or other enterprise ("**Other Entity**"), against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and

<div align="center">3</div>

reasonably incurred by the person in connection with such Proceeding if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe the person's conduct was unlawful, *provided*, *however*, that except as set forth in Section 7.3, the Corporation shall not be required to indemnify a person in connection with a Proceeding (or part thereof) commenced by such person unless the commencement of such Proceeding (or part thereof) by such person was authorized in the specific case by the Board of Directors. The termination of any Proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the person did not act in good faith and in a manner which the person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that the person's conduct was unlawful. To the fullest extent permitted by applicable law, the Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgment in its favor by reason of the fact that the person is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee, fiduciary or agent of an Other Entity against expenses (including attorneys' fees) actually and reasonably incurred by the person in connection with the defense or settlement of such action or suit if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the Corporation and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the Corporation unless and only to the extent that the Court of Chancery of the State of Delaware (the "*Court of Chancery*") or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper. Persons who are not directors or officers of the Corporation (or otherwise entitled to indemnification pursuant to this Section 7.1) may be similarly indemnified in respect of service to the Corporation or to an Other Entity at the request of the Corporation to the extent the Board at any time specifies that such persons are entitled to the benefits of this Article VII.

**Section 7.2      Right to Advancement of Expenses.** The Corporation shall, from time to time, reimburse or advance to any director or officer or other person entitled to indemnification hereunder the funds necessary for payment of expenses, including attorneys' fees and disbursements, incurred in connection with any Proceeding, in advance of the final disposition of such Proceeding; *provided*, *however*, that, if required by the DGCL, such expenses incurred by or on behalf of any director or officer or other person may be paid in advance of the final disposition of a Proceeding only upon receipt by the Corporation of an undertaking, by or on behalf of such director or officer (or other person indemnified hereunder), to repay any such amount so advanced if it shall ultimately be determined by final judicial decision from which there is no further right of appeal that such director, officer or other person is not entitled to be indemnified for such expenses.

**Section 7.3      Claims by Indemnifiable Persons**. If a claim for indemnification or advancement of expenses under this Article VII is not paid in full within 30 days after a written claim therefor by any person entitled to indemnification and/or advancement of expenses under

this Article VII (an "**_Indemnifiable Person_**") has been received by the Corporation (and any undertaking required under Section 7.2), the Indemnifiable Person may file suit to recover the unpaid amount of such claim. If successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses, the Indemnifiable Person shall be entitled to be paid the expense of prosecuting or defending such claim to the fullest extent permitted by applicable law. In any such action the Corporation shall have the burden of proving that the Indemnifiable Person is not entitled to the requested indemnification or advancement of expenses under applicable law. Neither the failure of the Corporation (including the Board of Directors or a committee thereof, its independent legal counsel and its stockholders) to have made a determination prior to the commencement of such action that such indemnification or reimbursement or advancement of expenses is proper in the circumstances nor an actual determination by the Corporation (including the Board of Directors or a committee thereof, its independent legal counsel and its stockholders) that such Indemnifiable Person is not entitled to such indemnification or reimbursement or advancement of expenses shall constitute a defense to the action or create a presumption that such Indemnifiable Person is not so entitled. Such an Indemnifiable Person shall also be indemnified, to the fullest extent permitted by applicable law, for any expenses incurred in connection with successfully establishing his or her right to such indemnification or reimbursement or advancement of expenses, in whole or in part, in any such action. Any right to indemnification or reimbursement or advancement of expenses shall be determined by the applicable law in effect at the time indemnification or reimbursement or advancement of expenses is sought.

  **Section 7.4**   **Indemnification Not Exclusive.** The rights to indemnification and reimbursement or advancement of expenses provided by, or granted pursuant to, this Article VII shall not be deemed exclusive of any other rights to which a person seeking indemnification or reimbursement or advancement of expenses may have or hereafter be entitled under any statute, the Bylaws, this Certificate of Incorporation, any agreement (including any policy of insurance purchased or provided by the Corporation under which directors, officers, employees and other agents of the Corporation are covered), any vote of the holders of capital stock of the Corporation entitled to vote or disinterested directors or otherwise, both as to action in his or her official capacity and as to action in another capacity while holding such office.

  **Section 7.5**   **Continuing Rights.** The rights to indemnification and reimbursement or advancement of expenses provided by, or granted pursuant to, this Article VII shall continue as to a person who has ceased to be a director or officer (or other person indemnified hereunder) and shall inure to the benefit of the executors, administrators, legatees and distributees of such person.

  **Section 7.6**   **Insurance.** The Corporation shall have the power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, member, manager, employee or agent of an Other Entity, against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the Corporation would have the power to indemnify such person against such liability under the provisions of this Article VII, the Bylaws, the DGCL or any other applicable law.

**Section 7.7**    **Contract Rights; Amendment or Repeal.** The provisions of this Article VII shall be a contract between the Corporation, on the one hand, and each director and officer who serves in such capacity at any time while this Article VII is in effect and any other person indemnified hereunder, on the other hand, pursuant to which the Corporation and each such director, officer or other person intend to be legally bound. Notwithstanding anything to the contrary contained in this Certificate of Incorporation, no amendment, repeal or modification of this Article VII shall affect any rights or obligations with respect to any state of facts then or theretofore existing or any proceeding theretofore or thereafter brought or threatened based in whole or in part upon any such state of facts.

**Section 7.8**    **Requested Services.** Any director, officer, employee, fiduciary or agent of the Corporation serving in any capacity in (a) another corporation of which the majority of the shares entitled to vote in the election of its directors is held, directly or indirectly, by the Corporation or (b) any employee benefit plan of the Corporation or any corporation referred to in clause (a) shall be deemed to be doing so at the request of the Corporation.

**Section 7.9**    **Indemnitor of First Resort.** It is the intent that with respect to all advancement, reimbursement and indemnification obligations under this Article VII, the Corporation shall be the indemnitor of first resort (i.e., its obligations to Indemnifiable Persons under this Certificate of Incorporation are primary and any obligation of any other person to provide advancement or indemnification for the same losses incurred by any Indemnifiable Person are secondary), and if any person pays or causes to be paid, for any reason, any amounts otherwise indemnifiable hereunder or under any other indemnification agreement (whether pursuant to this Certificate of Incorporation, the Bylaws, contract, applicable law or regulation), then (a) such person shall be fully subrogated to all rights hereunder of the Indemnifiable Person with respect to such payment and (b) the Corporation shall reimburse such person for the payments actually made and waive any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of such person.

**Section 7.10**    **Conversion, Merger or Consolidation.** For purposes of this Article VII and Article IX, references to the "Corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a conversion, consolidation or merger that, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was or agreed to be a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, limited liability company, trust or other enterprise, shall stand in the same position under the provisions of this Article VII and Article IX with respect to the resulting or surviving corporation as he or she would have with respect to such constituent corporation if its separate existence had continued.

## ARTICLE VIII
## NO MONETARY LIABILITY OF DIRECTORS OR OFFICERS

To the fullest extent permitted by the DGCL as it now exists or may hereafter be amended, a director or officer of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for any breach of fiduciary duty as a director or officer.

Neither the amendment nor repeal of this Article VIII, nor the adoption of any provision of this Certificate of Incorporation, nor, to the fullest extent permitted by the DGCL, any modification of law shall eliminate, reduce or otherwise adversely affect any right or protection of a current or former director or officer of the Corporation existing at the time of such amendment, repeal, adoption or modification.

## ARTICLE IX
## BUSINESS COMBINATION LAW

The Corporation shall not to be governed by or subject to Section 203 of the DGCL.

## ARTICLE X
## AMENDMENT

The Corporation reserves the right at any time, and from time to time, to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, and any other provisions authorized by the laws of the State of Delaware at the time in force may be added or inserted, in the manner now or hereafter prescribed herein or by applicable law, and all rights, preferences and privileges of whatsoever nature conferred upon shareholders, directors or any other persons whomsoever by and pursuant to this Certificate of Incorporation in their present form or as hereafter amended are granted subject to this reservation; *provided* that this Article X is subject to the second paragraph of Article XV.

## ARTICLE XI
## STOCKHOLDER ACTION

Special meetings of the stockholders (including without limitation, special meetings of the holders of any class or series capital stock of the Corporation) unless otherwise prescribed by statute, shall be called by the Secretary of the Corporation, or such other officer or director of the Corporation as may be designated by the Board of Directors, stating the purpose or purposes therefor, if requested by either (a) a resolution adopted by not less than the majority of the whole Board of Directors or (b) the written request of holder or holders of shares having not less than [___]% of the voting power at a meeting at which the holders of all shares entitled to vote on the action or actions, as set forth in the proposed purpose or purposes of the meeting, were present and voted. The eligibility of a person or persons to request the meeting under clause (b) of this Article XI shall be conclusively presumed if such person or persons can so demonstrate its or their ownership of such shares pursuant to Regulation 14a-8 promulgated under the Securities Exchange Act of 19334, as amended (as such regulation may be amended from time to time or any successor regulation thereto) or as otherwise provided in the By-laws of the Corporation. The business conducted at any special meeting shall be confined to the purpose or purposes described in the notice thereof.

Any action required or permitted to be taken at any annual meeting or special meeting of the stockholders of the Corporation may be taken without a meeting, without prior notice and without a vote of stockholders, if a consent or consents in writing or by electronic transmission, setting forth the action so taken, is or are signed by the holders of outstanding stock having not

less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.

# ARTICLE XII
## CORPORATE OPPORTUNITIES

Nothing contained in this Certificate of Incorporation or in any other agreement delivered pursuant hereto shall be construed to create any agency relationship among the stockholders.

(I) Members of the Board of Directors who are not employees or officers of the Corporation and (II) stockholders (and holders of convertible debt) of the Corporation, solely by virtue of each such stockholder's (or holder of convertible debt's) status as a stockholder (or holder of convertible debt) of the Corporation (such members of the Board of Directors and stockholders (and holders of convertible debt) and their respective Affiliates and the partners, principals, directors, officers, members and/or employees of each of the foregoing, collectively, the "***Identified Persons***" and each, individually, an "***Identified Person***"), shall, to the fullest extent permitted by applicable law, have no duty to refrain from, directly or indirectly, (a) engaging in the same or similar activities or lines of business in which the Corporation or any of its Affiliates, directly or indirectly, now engages or may engage or (b) otherwise competing with the Corporation or any of its Affiliates, and, to the fullest extent permitted by applicable law, no Identified Person shall be liable to the Corporation or its stockholders or to any Affiliate of the Corporation for breach of any fiduciary duty solely by reason of the fact that such Identified Person engages in any such activities. To the fullest extent permitted by applicable law, the Corporation, pursuant to Section 122(17) of the DGCL, hereby renounces any interest or expectancy in, or right to be offered an opportunity to participate in, any potential transaction or business opportunity for an Identified Person and the Corporation or any of its Affiliates, except as provided in the immediately below paragraph. Subject to the immediately below paragraph, in the event that any Identified Person acquires knowledge of a potential transaction or other business opportunity that may be a corporate opportunity for itself, herself or himself and the Corporation or any of its Affiliates, such Identified Person shall, to the fullest extent permitted by applicable law, have no duty to communicate or offer such transaction or other business opportunity to the Corporation or any of its Affiliates and, to the fullest extent permitted by applicable law, shall not be liable to the Corporation or its stockholders or to any Affiliate of the Corporation for breach of any fiduciary duty as a stockholder, director or officer of the Corporation solely by reason of the fact that such Identified Person pursues or acquires such corporate opportunity for itself, herself or himself, or offers or directs such corporate opportunity to another Person.

Notwithstanding the immediately preceding paragraph, the Corporation does not renounce its interest in any corporate opportunity offered to any Identified Person if such opportunity is (a) expressly offered to such person solely in his or her capacity as a director, officer, consultant or employee of the Corporation or (b) identified by an Identified Person solely through the disclosure of information by or on behalf of the Corporation.

In addition to and notwithstanding the foregoing provisions of this Article XIII, a corporate opportunity shall not be deemed to be a potential corporate opportunity for the Corporation if it is a business opportunity that (a) the Corporation is neither financially or legally able, nor contractually permitted to undertake, (b) from its nature, is not in the line of the Corporation's

business or is of no practical advantage to the Corporation or (c) is one in which the Corporation has no interest or reasonable expectancy.

The Identified Persons may now own, may continue to own, and from time to time may acquire and own, investments in one or more other entities (such entities collectively, "***Related Companies***") that are direct competitors of, or that otherwise may have interests that do or could conflict with those of, the Corporation, any of the Corporation's stockholders or any of their respective Affiliates, and (a) the enjoyment, exercise and enforcement of the rights, interests, privileges, powers and benefits granted or available to the Identified Persons under this Certificate of Incorporation shall not be in any manner reduced, diminished, affected or impaired, and the obligations of the Identified Persons under this Certificate of Incorporation shall not be in any manner augmented or increased, by reason of any act, circumstance, occurrence or event arising from or in any respect relating to (i) the ownership by an Identified Person of any interest in any Related Company, (ii) the affiliation of any Related Company with an Identified Person or (iii) any action taken or omitted by an Identified Person in respect of any Related Company, (b) no Identified Person shall, by reason of such ownership, affiliation or action, become subject to any fiduciary duty to the Corporation, any of the Corporation's stockholders or any of their respective Affiliates, (c) none of the duties imposed on an Identified Person, whether by contract or law, do or shall limit or impair the right of any Identified Person lawfully to compete with the Corporation, any of the Corporation's stockholders or any of their respective Affiliates and (d) the Identified Persons are not and shall not be obligated to disclose to the Corporation, any of the Corporation's stockholders or any of their respective Affiliates any information related to their respective businesses or opportunities, including acquisition opportunities, or to refrain from or in any respect to be restricted in competing against the Corporation, any of the Corporation's stockholders or any of their respective Affiliates in any such business or as to any such opportunities.

## ARTICLE XIII
## SEVERABILITY

If any provision or provisions of this Certificate of Incorporation shall be held to be invalid, illegal or unenforceable as applied to any circumstance for any reason whatsoever: (a) the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Certificate of Incorporation (including each portion of any paragraph of this Certificate of Incorporation containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) shall not, to the fullest extent permitted by applicable law, in any way be affected or impaired thereby and (b) to the fullest extent permitted by applicable law, the provisions of this Certificate of Incorporation (including each such portion of any paragraph of this Certificate of Incorporation containing any such provision held to be invalid, illegal or unenforceable) shall be construed so as to permit the Corporation to protect its directors, officers, employees and agents from personal liability in respect of their good faith service to or for the benefit of the Corporation to the fullest extent permitted by applicable law.

9

## ARTICLE XIV
## FORUM

Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery (of, if the Court of Chancery does not have jurisdiction, the federal district court for the State of Delaware) shall, to the fullest extent permitted by applicable law, be the sole and exclusive forum for (a) any derivative action or proceeding brought on behalf of the Corporation, (b) any action asserting a claim of breach of a fiduciary duty owed by any director, officer, employee or agent of the Corporation to the Corporation or the Corporation's stockholders, (c) any action asserting a claim against the Corporation or any director or officer of the Corporation arising pursuant to any provision of the DGCL, this Certificate of Incorporation or the Bylaws (as either may be amended and/or restated from time to time) or as to which the DGCL confers jurisdiction on the Court of Chancery or (d) any action asserting a claim governed by the internal affairs doctrine. If any action the subject matter of which is within the scope of this Article XIV is filed in a court other than a court located within the State of Delaware (a "***Foreign Action***") in the name of any stockholder, such stockholder shall be deemed to have consented to: (i) the personal jurisdiction of the state and federal courts located within the State of Delaware in connection with any action brought in any such court to enforce this Article XIV (an "**Enforcement Action**"); and (ii) having service of process made upon such stockholder in any such Enforcement Action by service upon such stockholder's counsel in the Foreign Action as agent for such stockholder. Any person or entity purchasing or otherwise acquiring any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Article XIV.

## ARTICLE XV
## COVENANTS

Prior to the Payment in Full of (x) the Credit Agreement Obligations, the Corporation shall comply (or, in the case of Section [6.08], shall not take, or permit to be taken, any action that would result in non-compliance) with the provisions of Sections [6.08][1] and [6.20][2] of the Credit Agreement, (y) the Tranche I Notes Obligations, the Corporation shall comply with the provisions of Sections [4.17] and [4.33] of the Tranche I Indenture and (z) the Tranche II Notes Obligations, the Corporation shall comply with the provisions of Sections [4.17] and [4.33] of the Tranche II Indenture, except, in each case, to the extent permitted by any waiver granted by the applicable Required Holders in writing.

The Corporation will not amend this Article XV (including by merger or otherwise) without the consent of the Required Holders in respect of (i) the Credit Agreement Obligations (unless they have been Paid in Full, (ii) the Tranche I Notes Obligations (unless they have been Paid in Full) and (iii) the Tranche II Notes Obligations (unless they have been Paid in Full).

For purposes of this Article XV, the following terms have the following meanings:

---

[1] NTD: To refer to restricted payment covenant.

[2] NTD: To refer to passive holdings covenant.

"**Credit Agreement**" means the Amended and Restated Credit Agreement dated as of [●], 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among Invacare Holding Corporation, as holdings, Invacare Corporation, as borrower, the lenders from time to time party thereto and the administrative agent and collateral agent referred to therein.

"**Credit Agreement Obligations**" means (a) the due and punctual payment by Invacare Corporation of (i) the principal of and interest at the applicable rate or rates provided in the Credit Agreement (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the loans under the Credit Agreement, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, and (ii) all other monetary obligations of Invacare Corporation under or pursuant to the Credit Agreement and each of the other Loan Documents, including obligations to pay  fees, expense reimbursement obligations and indemnification obligations, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), (b) the due and punctual payment and performance of all other obligations of Invacare Corporation under or pursuant to the Credit Agreement and each of the other Loan Documents and (c) the due and punctual payment and performance of all the obligations of each other Loan Party (as defined in the Credit Agreement) under or pursuant to the Credit Agreement and each of the other Loan Documents (including interest and monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding).

"**Loan Documents**" has the meaning assigned to such term in the Credit Agreement.

"**Required Holders**" means (i) in the case of the Credit Agreement Obligations, the Required Lenders (as defined in the Credit Agreement), (ii) in the case of the Tranche I Notes Obligations, the Required Holders (as defined in the Tranche I Indenture) and (iii) in the case of the Tranche II Notes Obligations, the Required Holders (as defined in the Tranche II Indenture).

"**Tranche I Indenture**" means the indenture dated as of [●], 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), among Invacare Holding Corporation, as issuer, the guarantors listed therein, the collateral agent and trustee referred to therein pursuant to which the 7.50% Convertible Senior Secured Notes due [2028], Tranche [I] are issued.

"**Tranche II Indenture**" means the indenture dated as of [●], 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), among Invacare Holding Corporation, as issuer, the guarantors listed therein, the collateral agent and trustee referred to therein pursuant to which the 7.50% Convertible Senior Secured Notes due [2028], Tranche [II] are issued.

"**Tranche I Notes Documents**" has the meaning assigned to the term "Notes Documents" in the Tranche I Indenture.

"**Tranche II Notes Documents**" has the meaning assigned to the term "Notes Documents" in the Tranche II Indenture.

"**Tranche I Notes Obligations**" means all obligations of Invacare Holding Corporation and the guarantors listed in the Tranche I Indenture under or in respect of the 7.50% Convertible Senior Secured Notes due [2028], Tranche I of Invacare Holding Corporation, the Tranche I Indenture and the other Tranche I Notes Documents.

"**Tranche II Notes Obligations**" means all obligations of Invacare Holding Corporation and the guarantors listed in the Tranche II Indenture under or in respect of the 7.50% Convertible Senior Secured Notes due [2028], Tranche II of Invacare Holding Corporation, the Tranche II Indenture and the other Tranche II Notes Documents.

"**Payment in Full**" means (i) with respect to the Credit Agreement Obligations, the termination of all commitments of the lenders under the Credit Agreement to extend credit thereunder and (ii) with respect to the Credit Agreement Obligations, the Tranche I Notes Obligations and the Tranche II Notes Obligations, the payment in full in cash of all of such obligations, including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding (other than contingent obligations for which no claim has been made at such time), and "Paid in Full" will have a correlative meaning.

IN WITNESS WHEREOF, the undersigned has executed this Amended and Restated Certificate of Incorporation as of this this [    ] day of [    ] 2023.

**INVACARE HOLDINGS CORPORATION**

By: _____
Name: [●]
Title:

**<u>Exhibit A(ii)</u>**

**Form of Bylaws for New Parent**

DRAFT 4.17.23

**AMENDED AND RESTATED BYLAWS**
**OF**
**INVACARE HOLDINGS CORPORATION**

*(Adopted as of [__], 2023)*

**ARTICLE I**
**OFFICES**

**Section 1.1    Registered Office; Registered Agent**. The address of the initial registered office of Invacare Holdings Corporation (the "***Corporation***") in the State of Delaware is c/o Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle, Delaware, 19801. The name of the Corporation's initial registered agent at such address is The Corporation Trust Company. The registered office and/or registered agent of the Corporation may be changed from time to time by action of the board of directors (the "***Board of Directors***").

**Section 1.2    Other Offices**. The Corporation may also have offices at such other places, within or without the State of Delaware, as the Board of Directors may from time to time determine or the business of the Corporation may require.

**ARTICLE II**
**MEETINGS OF STOCKHOLDERS**

**Section 2.1    Time and Place of Meetings**. All meetings of the stockholders shall be held at such place, if any, within or without the State of Delaware, on such date and time as shall be stated in the notice of the meeting or in a duly executed waiver of notice thereof. The Board of Directors may determine that any meeting may be held solely or partially by means of remote communication in accordance with the laws of the State of Delaware.

**Section 2.2    Annual Meetings**. Annual meetings of stockholders shall be held on such date and time as shall be designated from time to time by the Board of Directors and stated in the notice of the meeting. At the annual meeting, the stockholders entitled to vote thereat shall elect a Board of Directors and transact such other business as may properly be brought before the meeting.

**Section 2.3    Special Meetings**. Special meetings of the stockholders, unless otherwise prescribed by statute shall be called by the Secretary of the Corporation, or such other officer or director of the Corporation as may be designated by the Board of Directors, stating the purpose or purposes therefor, if requested by either (a) a resolution adopted by not less than the majority of the whole Board of Directors or (b) the written request of the holder or holders of shares satisfying the ownership requirements as set forth in the Certificate of Incorporation. The business conducted at any special meeting shall be confined to the purpose or purposes described in the notice thereof.

**Section 2.4    Adjournments**. Any meeting of the stockholders, annual or special, may be adjourned from time to time to reconvene at the same or some other place, if any, and notice need not be given of any such adjourned meeting if the time, place, if any, thereof, and the means

of remote communication, if any, are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting. If after the adjournment a new record date is fixed for stockholders entitled to vote at the adjourned meeting, the Board of Directors shall fix a new record date for notice of the adjourned meeting and shall give notice of the adjourned meeting to each stockholder of record entitled to vote at the adjourned meeting as of the record date fixed for notice of the adjourned meeting.

**Section 2.5    Notice of Meetings**. Notice stating the place, if any, date and time of the meeting, the means of any remote communications by which stockholders may be considered present and may vote at the meeting, if any, the record date for determining stockholders entitled to vote at the meeting (if such date is different from the record date for stockholders entitled to notice of the meeting) and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than 10 days (20 days in the case of a meeting to approve a merger agreement to the extent required by the General Corporation Law of the State of Delaware (the "**DGCL**")) nor more than 60 days before the date of the meeting (unless a different time is specified by applicable law), by personal delivery, by mail or, with consent of the stockholder, by electronic transmission, by or at the direction of the officer or person calling the meeting, to each stockholder of record entitled to vote at such meeting as of the record date for determining stockholdings entitled to notice of the meeting. Notice shall be deemed given (a) if mailed, when the notice is deposited in the U.S. mail, postage prepaid, (b) if delivered by courier service, the earlier of when the notice is received or left at such stockholder's address or (c) if given by electronic mail, when directed to such stockholder's electronic mail address unless the stockholder has notified the Corporation in writing or by electronic transmission of an objection to receiving notice by electronic mail or such notice is prohibited by the DGCL. A notice by electronic mail must include a prominent legend that the communication is an important notice regarding the Corporation. Notice of any meeting need not be given to any stockholder who shall, either before or after the meeting, submit a waiver of notice or who shall attend such meeting, except when the stockholder attends for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Any stockholder so waiving notice of the meeting shall be bound by the proceedings of the meeting in all respects as if due notice thereof had been given.

**Section 2.6    Record Date**. In order that the Corporation may determine the stockholders entitled to notice of any meeting of stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall, unless otherwise required by applicable law, not be more than 60 nor less than 10 days before the date of such meeting. If the Board of Directors so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board of Directors determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination. If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of and to vote at a meeting of stockholders shall be at the close of business on the day immediately preceding the day on which notice is given, or, if notice is waived, at the close of

business on the day immediately preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; *provided*, *however*, that the Board of Directors may fix a new record date for the determination of stockholders entitled to vote at the adjourned meeting and in such case shall also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for the determination of stockholders entitled to vote therewith at the adjourned meeting.

In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

**Section 2.7    Stockholder List**. The Corporation shall make, not later than the 10th day before each meeting of stockholders, a complete list of the stockholders entitled to vote at such meeting; *provided*, *however*, if the record date for determining the stockholders entitled to vote is less than 10 days before the meeting date, the list shall reflect the stockholders entitled to vote as of the 10th day before the meeting date, arranged in alphabetical order, with the address of and the number of shares held by each, which list, for a period of 10 days prior to such meeting, shall be kept on file at the principal place of business of the Corporation and shall be subject to inspection by any stockholder at any time during usual business hours. Alternatively, the list of stockholders may be kept on a reasonably accessible electronic network, if the information required to gain access to the list is provided with the notice of the meeting. Except as provided by applicable law, the stock ledger of the Corporation shall be the only evidence as to who are the stockholders entitled to examine the stock ledger and the list of stockholders or to vote in person or by proxy at any meeting of stockholders.

**Section 2.8    Quorum**. A quorum shall be present at a meeting of stockholders if the holder or holders of the majority of the combined voting power of the shares entitled to vote at the meeting (counting for such purposes all abstentions and broker nonvotes) are present in person, represented by a duly authorized representative in the case of a corporation or other legal entity or represented by proxy, unless otherwise provided in the Corporation's Certificate of Incorporation. Unless otherwise provided in the Certificate of Incorporation, once a quorum is present at a duly constituted meeting of stockholders, the stockholders present or represented at the meeting may conduct such business as may be properly brought before the meeting until it is adjourned, and the subsequent withdrawal from the meeting of any stockholder present or represented shall not affect the presence of a quorum at the meeting. Unless otherwise provided in the Certificate of Incorporation, the stockholders entitled to vote and present or represented at a meeting of stockholders at which a quorum is not present may adjourn the meeting until such time and to such place as may be determined by a vote of the holders of the majority of the shares represented at that meeting. At such adjourned meeting at which a quorum shall be present or represented, any business may be conducted which might have been conducted at the meeting as originally notified.

**Section 2.9** **Voting**. With respect to any matter, other than the election of directors, except as otherwise provided by the Certificate of Incorporation, these Bylaws or applicable law, the affirmative vote of the holders of the majority of the combined voting power of the shares entitled to vote on that matter and represented at a meeting of stockholders at which a quorum is present shall be the act of the stockholders. Unless otherwise provided in the Certificate of Incorporation, directors shall be elected by a plurality of the votes cast by the holders of shares entitled to vote in the election of directors (such shares, the "***Voting Stock***") at a meeting of stockholders at which a quorum is present.

**Section 2.10** **Method of Voting**. Each outstanding share shall be entitled to one vote on each matter submitted to a vote at a meeting of stockholders, unless the Certificate of Incorporation provides for more or less than one vote per share or limits, or denies voting rights to the holders of the shares of any class or series or as otherwise provided by applicable law. A stockholder may vote in person, by duly authorized representative in the case of a corporation or other legal entity or by proxy. Without limiting the manner in which a stockholder may authorize another person or persons to act for such stockholder as proxy, the following shall constitute a valid means by which a stockholder may grant such authority: (a) a stockholder may execute a document authorizing another person or persons to act for such stockholder as proxy and such execution may be accomplished by the stockholder or such stockholder's authorized officer, director, employee or agent; and (b) a stockholder may authorize another person or persons to act for such stockholder as proxy by transmitting or authorizing the transmission of an electronic transmission to the person who will be the holder of the proxy or to a proxy solicitation firm, proxy support service organization or like agent duly authorized by the person who will be the holder of the proxy to receive such transmission, *provided* that any such transmission must either set forth or be submitted with information from which it can be determined that the transmission was authorized by the stockholder.   Each proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest. Each proxy shall be filed with the Secretary of the Corporation prior to the time of the meeting.

**Section 2.11** **Inspectors of Election**. The Board of Directors, in advance of any meeting of stockholders, may, and shall if required by applicable law, appoint one or more inspectors, who may be employees of the Corporation, to act at the meeting or any adjournment thereof and make a written report thereof. The Board of Directors may designate one or more persons as alternate inspectors to replace any inspector who fails to act. If no inspector or alternate is able to act at a meeting, the person presiding at the meeting shall appoint one or more inspectors to act at the meeting. Each inspector, before entering upon the discharge of his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability. The inspectors shall (a) ascertain the number of shares outstanding and the voting power of each, (b) determine the shares represented at the meeting, the existence of a quorum and the validity of proxies and ballots, (c) count all votes and ballots, (d) determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspectors, and (e) certify their determination of the number of shares represented at the meeting and their count of all votes and ballots. The inspectors may appoint or retain other persons or entities to assist the inspectors in the performance of their duties. Unless otherwise provided by the Board of Directors, the date and time of the opening and the closing of the polls for each matter upon which the stockholders will vote at a meeting shall be announced at the meeting. No ballot, proxies, votes, or any revocation

thereof or change thereto, shall be accepted by the inspectors after the closing of the polls unless the Court of Chancery of the State of Delaware upon application by a stockholder shall determine otherwise. In determining the validity and counting of proxies and ballots cast at any meeting of stockholders, the inspectors may consider such information as is permitted by applicable law. No person who is a candidate for office at an election may serve as an inspector at such election.

**Section 2.12   Procedure**. The Chairman of the Board, or such other officer of the Corporation designated by the Board of Directors, will call meetings of the stockholders to order and will act as presiding officer at the meetings. Unless otherwise determined by the Board of Directors prior to the meeting, the presiding officer of the meeting of the stockholders will also determine the order of business and have the authority in his or her sole discretion to regulate the conduct of any such meeting, including by imposing restrictions on the persons (other than stockholders of the Corporation or their duly appointed proxies) who may attend such stockholders' meeting, by ascertaining whether any stockholder or his, her or its proxy may be excluded from any meeting of the stockholders based upon any determination by the presiding officer, in his or her sole discretion, that any such person has unduly disrupted or is likely to disrupt the proceedings, and by determining the circumstances in which any person may make a statement or ask questions at any meeting of the stockholders.

## ARTICLE III
## DIRECTORS

**Section 3.1   Responsibilities**. Except as provided in the Certificate of Incorporation or the DGCL, the business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.

**Section 3.2   Number; Election; Term**.

(a)     Subject to any rights of the holders of any series of Preferred Stock to elect additional directors under specified circumstances, the total number of directors shall be no less than [    ] and not more than [    ] directors as fixed from time to time by resolution of a majority of the total number of directors that the Corporation would have if there were no vacancies.

(b)     The directors shall consist of a single class, and each director shall hold office until his or her successor shall have been duly elected and qualified, subject, however, to such director's earlier death, resignation, retirement, disqualification or removal.

**Section 3.3   Vacancies; Increases**. Any vacancy on the Board of Directors shall be filled by (a) election at an annual or special meeting of stockholders called for that purpose or (b) the affirmative vote of the majority of the remaining directors then in office, though less than a quorum, or by the sole remaining director. Each director elected to fill a vacancy shall be elected for the unexpired term of his or her predecessor in office. Any directorship to be filled by reason of an increase in the number of directors may be filled by election at an annual or special

meeting of stockholders called for that purpose or by the Board of Directors for a term of office continuing only until the next election of one or more directors by the stockholders.

**Section 3.4     Removal**. Except as otherwise provided in the Certificate of Incorporation, at any meeting of stockholders called expressly for that purpose, any director may be removed for any reason, with or without cause, by the affirmative vote of the holder or holders of the majority of the combined voting power of the shares entitled to vote thereon.

**Section 3.5     Place of Meetings**. Meetings of the Board of Directors, regular or special, may be held either within or without the State of Delaware.

**Section 3.6     Regular Meetings**. Regular meetings of the Board of Directors may be held at such time and at such place as shall from time to time be determined by the Board of Directors.

**Section 3.7     Special Meetings**. Special meetings of the Board of Directors may be called by the Chairman of the Board or the Chief Executive Officer, the Chief Financial Officer or the General Counsel of the Corporation and shall be called by the Secretary of the Corporation on the written request of not less than two of the directors then in office. Notice specifying the time and place of special meetings shall be given to each director at least one day before the date of the meeting, either personally or by telephone or electronic transmission, or at least three days if the notice is given by mail.

**Section 3.8     Telephone and Similar Meetings**. Unless otherwise restricted by the Certificate of Incorporation, members of the Board of Directors or members of any committee of the Board of Directors may participate in and hold a meeting of the Board of Directors or committee, as the case may be, by means of conference telephone or similar communications equipment, or another suitable electronic communications system, including videoconferencing technology or the Internet, or any combination, if the telephone or other equipment or system permits each person participating in the meeting to communicate with and hear all other persons participating in the meeting, and participation in such a meeting shall constitute presence in person at the meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the basis that the meeting is not lawfully called or convened.

**Section 3.9     Purpose of Meetings**. Neither the purpose of, nor the business to be transacted at, any regular or special meeting of the Board of Directors need be specified in the notice or waiver of notice of such meeting.

**Section 3.10   Quorum; Majority Vote**. At all meetings of the Board of Directors, the majority of the number of the directors fixed in the manner provided in these Bylaws shall constitute a quorum for the transaction of business unless a different number is specifically required or permitted by the Certificate of Incorporation, these Bylaws or applicable law. The affirmative vote of the majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors, unless a vote of a greater number is required by the Certificate of Incorporation, these Bylaws or applicable law. If a quorum shall not be present at any meeting of the Board of Directors, the directors present thereat may adjourn the meeting

from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

Section 3.11 **Adjourned Meetings**. The majority of the directors present at any meeting of the Board of Directors, including an adjourned meeting, whether or not a quorum is present, may adjourn and reconvene such meeting to another time and place. Notice specifying the time and place of any adjourned meetings shall be given to each director, whether or not present at the time of the adjournment, at least one day before the date of the meeting, either personally or by telephone or, with consent of the director, electronic transmission, or at least three days if the notice is given by mail. Any business may be transacted at an adjourned meeting that might have been transacted at the meeting as originally called.

Section 3.12 **Procedure**. At meetings of the Board of Directors, business shall be transacted in such order as the Board of Directors may determine from time to time. The Chairman of the Board or such other person chosen by the Board of Directors from among the directors present, will preside over the meetings of the Board of Directors. The Secretary of the Corporation shall act as the secretary of the meetings of the Board of Directors unless the Board of Directors appoints another person to act as secretary of the meeting. The Board of Directors shall keep regular minutes of its proceedings, which shall be placed in the minute book of the Corporation.

Section 3.13 **Compensation**. Each non-executive member of the Board of Directors shall be entitled to reasonable and customary compensation on the same basis as all other non-executive members of the Board of Directors, and each member of the Board of Directors shall be entitled to reimbursement of reasonable third party out-of-pocket expenses (including travel and lodging expenses) incurred by him or her in connection with services to the Corporation in any capacity, including attending meetings of the Board of Directors or participation on any committees thereof, in each case subject to the Corporation's policies and procedures with respect thereto (including the requirement of reasonable documentation thereof). The Board of Directors shall have authority to fix the compensation paid to directors for attendance at regular or special meetings of the Board of Directors, any committee thereof or for any other services to the Corporation; *provided*, *however*, that nothing contained in these Bylaws shall be construed to preclude any director from serving the Corporation in any other capacity or receiving compensation therefor (*provided,* that such compensation is approved by the Board of Directors).

Section 3.14 **Committees**. The Board of Directors may designate one or more committees, including an Audit Committee, a Compensation Committee and a Nominating and Corporate Governance Committee, each committee to consist of one or more of the directors of the Corporation appointed by a majority vote of the whole Board of Directors. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. If a member of a committee shall be absent from any meeting, or disqualified from voting thereat, the remaining member or members present at the meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member. Any such committee, to the extent permitted by applicable law, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs

of the Corporation and may authorize the seal of the Corporation to be affixed to all papers that may require it to the extent so authorized by the Board of Directors. Unless the Board of Directors provides otherwise, at all meetings of such committee, the majority of the then authorized members of the committee shall constitute a quorum for the transaction of business, and the vote of the majority of the members of the committee present at any meeting at which there is a quorum shall be the act of the committee. Unless the Board of Directors provides otherwise, each committee designated by the Board of Directors may make, alter, and repeal rules and procedures for the conduct of its business. In the absence of such rules and procedures each committee shall conduct its business in the same manner as the Board of Directors conducts its business pursuant to this Article III.

**Section 3.15   Boards of Subsidiaries**. The composition of the board of directors or other governing body of each of the Corporation's subsidiaries shall be determined by the Board of Directors from time to time, and any officer of the Corporation shall be authorized to sign consents or ballots or cast votes to elect such persons so determined by the Board of Directors to comprise the board of directors or other governing body of each of the Corporation's subsidiaries.

**Section 3.16   Action Without Meeting**. Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at a meeting of the Board of Directors or any committee thereof may be taken without a meeting if a consent in writing or by electronic communication, setting forth the action so taken, is given by all the members of the Board of Directors or committee, as the case may be.

**Section 3.17   Chairman of the Board**. The Board of Directors may from time to time elect one of its members by a majority vote of the whole Board of Directors to be Chairman of the Board of Directors (the "***Chairman of the Board***") and may replace or fill any vacancy in the position of Chairman of the Board with a director at such time and in such manner as the Board of Directors shall determine.

**Section 3.18   Board Observers**.  Stockholders may, solely to the extent such right is expressly conferred by the Corporation in an agreement approved by the Board of Directors to which the Corporation is a party, from time to time designate individuals as observers of the Board of Directors and/or one or more committees thereof pursuant to and in accordance with such agreement (each, an "***Observer***"); each Observer so designated shall, from the date such Observer has been designated and until the earlier of the time at which such Observer is removed or the time at which the Observer's term expires, be entitled to: (i) receive written notice of all meetings (both regular and special) of the Board of Directors or committee, as applicable; (ii) attend (or, in the case of telephonic meetings, be connected to) all such meetings; (iii) be reimbursed for all reasonable and documented out-of-pocket expenses incurred in connection with attending such meetings in person; (iv) receive all notices, information and reports which are furnished to other members of the Board of Directors or committee, as applicable, at the same time and in the same manner as the same are furnished to the directors or members of the committee, as applicable; (v) participate in all discussions conducted at such meetings and (vi) receive copies of the minutes of all such meetings as and when such copies are distributed to the directors or members of the committee, as applicable; provided, that any Observer may be excluded from any meeting or portion thereof, and that the Observer need not be given such

notices, information, reports or minutes, to the extent (x) a majority of the directors (in the case of the Board of Directors) or a majority of the members of any committee (in the case of any committee), as applicable, or (y) the officer responsible for providing the notice, information or reports to the Board of Directors or the committee, as applicable, determines (A) that excluding the Observer or failing to give such notices, information or reports to such Observer is necessary or advisable to (x) preserve attorney-client, work product or similar privilege, (y) comply with the terms and conditions of confidentiality agreements with third parties, or (z) comply with applicable law or (B) there exists, with respect to the subject of a meeting or the notices, information or reports provided to the Board of Directors or committee, as applicable, an actual or potential conflict of interest between the Board of Directors, any committee thereof or the Corporation, on the one hand, and such Observer or the stockholder(s) at whose direction such Observer is designated, on the other hand. The rights of the Observers as Observers shall be limited to the rights expressly provided herein (as may be further limited by any agreement between the Corporation and the Observer and/or the stockholder at whose direction the Observer is designated), and no Observer shall have any rights as a director or member of any committee of the Board of Directors under the Certificate of Incorporation, these Bylaws, the DGCL, any such agreement or otherwise. For the avoidance of doubt, each Observer (i) shall not be counted for purposes of determining whether a quorum is present at any meeting of the Board of Directors or any committee thereof, as applicable; (ii) shall not have the right to vote on any matter brought before a meeting of the Board of Directors or any committee thereof or to participate in any action by consent in lieu of a meeting of the Board of Directors or any committee thereof, as applicable (and no vote or consent of any Observer shall be required for purposes of determining whether any matter has been approved by the Board of Director or any committee matter has been approved by the Board of Directors or any committee); and (iii) as an Observer shall not be entitled to any other rights or powers of directors under the Certificate of Incorporation, these Bylaws, the DGCL, applicable law or any agreement to which the Corporation is a party. Any Observer may terminate his or her designation as such at any time by delivering notice in writing or by electronic transmission of such termination to the Corporation. Such termination shall take effect at the time specified in such notice or, if the time be not specified, upon receipt thereof by the Corporation. Unless otherwise specified therein, acceptance of such termination shall not be necessary to make it effective. Prior to the expiration of the term of such Observer, the designation of such Observer may be terminated at any time by the stockholder entitled to designate such Observer. Promptly upon a person's termination as an Observer, such person shall return and/or destroy any and all confidential information regarding the Corporation, its subsidiaries or any of their respective affiliates or representatives that such person may possess by virtue of his or her status as an Observer. Each Observer, by virtue of accepting his or her designation, agrees to be bound by the terms of this Section 3.18 of this Article III and to maintain the confidentiality of all information such Observer obtains in connection with his or her designation or service as such (and, in connection therewith, to execute a reasonable and customary agreement regarding the disclosure and use of confidential information and containing such other provisions regarding the Observer's conduct in such a reasonable and customary form as may be provided to such Observer by the Corporation), *provided*, that the Observer shall be entitled to share such information with the stockholder entitled to designate such Observer, *provided*, *further*, that such stockholder enters into a confidentiality agreement in such a reasonable and customary form as provided by the Corporation.

## ARTICLE IV
## NOTICES

**Section 4.1    Method**. Subject to Sections 3.7, 3.11 and 4.2 hereof, whenever by the Certificate of Incorporation, these Bylaws or applicable law notice is required to be given to a director or stockholder, and no provision is made as to how the notice shall be given, it shall not be construed to be personal notice, but any such notice may be given in writing directed to the stockholder's or director's mailing address (or by electronic transmission directed to the stockholder's or director's electronic mail address, as applicable) as it appears on the records of the Corporation and shall be given (a) if mailed, when the notice is deposited in the U.S. mail, postage prepaid, (b) if delivered by courier service, the earlier of when the notice is received or left at such stockholder's or director's address or (c) if given by electronic mail, when directed to such stockholder's or director's electronic mail address unless the Corporation has been notified in writing or by electronic transmission of an objection to receiving notice by electronic mail or such notice is prohibited by the DGCL. A notice by electronic mail to stockholders must include a prominent legend that the communication is an important notice regarding the Corporation.

**Section 4.2    Waiver**. Whenever by the Certificate of Incorporation, these Bylaws or applicable law any notice is required to be given to a director or stockholder, a waiver thereof in writing or by electronic transmission, given by the person or persons entitled to such notice, or in the case of a corporation or other legal entity by its duly authorized representative, whether before or after the time stated therein, shall be equivalent to the giving of such notice. Attendance of a director, committee member or stockholder at a meeting shall constitute a waiver of notice of such meeting, except where such person attends for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the basis that the meeting is not lawfully called or convened.

## ARTICLE V
## OFFICERS

**Section 5.1    Designation**. The officers of the Corporation elected by the Board of Directors shall include  a Chief Executive Officer, a Chief Financial Officer and a Secretary. The Board of Directors, in its discretion, may also elect a Chairman of the Board (subject to the provisions of Section 3.17 herein), a President, a Chief Operating Officer, a General Counsel, and such other officers (including without limitation any person that shall be an "executive officer" within the meaning of Rule 3b-7 of the Securities Exchange Act of 1937, as amended (as it may be amended from time to time or any successor regulation thereto)) as it shall designate from time to time with such titles, seniority, duties and responsibilities as the Board of Directors shall deem advisable. The Chief Executive Officer, unless otherwise determined by the Board or Directors, shall have the power to appoint such other officers (including, without limitation, a Controller, a Treasurer and one or more Vice Presidents, Assistant Secretaries, Assistant Treasurers and Assistant Controllers) as the Chief Executive Officer shall deem necessary or appropriate in the conduct of the affairs of the Corporation with such designations, titles, seniority, duties and responsibilities as the Chief Executive Officer shall deem advisable. Any two or more offices may be held by the same person.

**Section 5.2     Term**. An officer of the Corporation shall hold office until his or her successor is elected and qualified or appointed, until his or her death or until he or she shall resign or shall have been removed in accordance with these Bylaws.

**Section 5.3     Removal**. Any officer may be removed by the Board of Directors whenever in its judgment the best interests of the Corporation will be served thereby, and, without limiting the foregoing, any officer appointed by the Chief Executive Officer may be removed by the Chief Executive Officer whenever, in his or her judgment, the best interests of the Corporation will be served thereby. No officer shall have any contractual rights against the Corporation for compensation by virtue of his or her election or appointment beyond the date of the election or appointment of his or her successor, his or her death, his or her resignation or his or her removal, whichever event shall first occur, except as otherwise provided in an employment contract or under an employee benefit plan.

**Section 5.4     Compensation**. The compensation of all officers and agents of the Corporation who are also directors of the Corporation shall be fixed by the Board of Directors or a committee thereof. The compensation of the Chief Executive Officer of the Corporation shall be fixed by the Board of Directors or a committee thereof. The compensation of all other officers and agents of the Corporation shall be fixed by the Board of Directors or a committee thereof, or the Board of Directors may delegate the power to fix the compensation of any such other officers and agents of the Corporation to an officer of the Corporation to the extent permitted by applicable law.

**Section 5.5     Duties**. The officers of the Corporation shall have such authority and shall perform such duties as are customarily incident to their respective offices, or as may be specified from time to time by resolution of the Board of Directors regardless of whether such authority and duties are customarily incident to such office.

**Section 5.6     Other Officers**. Such other officers as the Board of Directors may choose shall perform such duties and have such powers as from time to time may be assigned to them by the Board of Directors.  The Board of Directors may delegate to any other officer of the Corporation the power to choose such other officers and to prescribe their respective duties and powers.

**Section 5.7     Execution Authority**. All contracts of the Corporation shall be executed on behalf of the Corporation by (a) the Chief Executive Officer, the President, the Chief Operating Officer, General Counsel or any Vice President, (b) such other officer or employee of the Corporation authorized in writing by the Chief Executive Officer, the President, the Chief Operating Officer, General Counsel or any Vice President, with such limitations and restrictions on such authority as the Board of Directors, Chief Executive Officer, the President, the Chief Operating Officer, General Counsel or Vice President, respectively, deems appropriate, or (c) such other person as may be authorized by the Board of Directors.

# ARTICLE VI
# SHARES OF CAPITAL STOCK

**Section 6.1     Certificates**. Shares of the capital stock of the Corporation shall be certificated; *provided* that the Board of Directors may provide by resolution or resolutions that some or all of any class or series shall be uncertificated shares that may be evidenced by a book-entry system maintained by the registrar of such stock. If shares are represented by certificates, such certificates shall be in the form approved by the Board of Directors and shall be signed by any two authorized officers of the Corporation. Any and all signatures on the certificate may be a facsimile and each such certificate may be sealed with the seal of the Corporation or a facsimile thereof. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate has ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if he or she were such officer, transfer agent or registrar at the date of issue. The certificates shall be consecutively numbered and shall be entered in the books of the Corporation as they are issued and shall exhibit the holder's name and the number of shares.

**Section 6.2     Lost, Stolen or Destroyed Certificates**. The Board of Directors may direct a new certificate or certificates representing shares of stock or uncertificated shares be issued in place of a certificate or certificates representing shares of stock theretofore issued by the Corporation and alleged to have been lost or destroyed upon the making of an affidavit of that fact by the person claiming the certificate or certificates representing shares of stock that was or were lost or destroyed. When authorizing such issue of a new certificate or certificates or uncertificated shares, the Board of Directors may in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost or destroyed certificate or certificates, or his or her legal representative, to advertise the same in such manner as it shall require and/or to give the Corporation a bond with a surety or sureties satisfactory to the Corporation in such sum as it may direct as indemnity against any claim or expense resulting from a claim that may be made against the Corporation with respect to the certificate or certificates alleged to have been lost, stolen or destroyed.

**Section 6.3     Transfer of Shares**. Transfers of stock shall be made on the books of the Corporation only by the holder of record thereof, by such person's attorney lawfully constituted in writing and, in the case of certificated shares, upon the surrender of the certificate thereof, which shall be cancelled before a new certificate or uncertificated shares shall be issued. No transfer of stock shall be valid as against the Corporation for any purpose until it shall have been entered in the stock records of the Corporation by an entry showing from and to whom transferred.

**Section 6.4     Registered Stockholders**. The Corporation shall be entitled to treat the holder of record of any share or shares of stock, whether such shares are evidenced by a certificate or are uncertificated, as the holder in fact thereof and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by applicable law.

**Section 6.5** <u>**Transfer Agents and Registrars**</u>. The Board of Directors may appoint a transfer agent and one or more co-transfer agents and registrar and one or more co-registrars and may make or authorize such agent to make all such rules and regulations deemed expedient concerning the issue, transfer and registration of shares of stock.

**Section 6.6** <u>**Legends**</u>. The Board of Directors shall have the power and authority to provide that the certificates representing shares of stock of the Corporation bear such legends as the Board of Directors deems appropriate to assure that the Corporation does not become liable for violations of federal or state securities laws or other applicable law.

<div align="center">

**ARTICLE VII**
**CORPORATE OPPORTUNITIES**

</div>

Nothing contained in these Bylaws or in any other agreement delivered pursuant hereto shall be construed to create any agency relationship among the stockholders. (I) Members of the Board of Directors who are not employees or officers of the Corporation and (II) stockholders (and holders of convertible debt) of the Corporation, solely by virtue of each such stockholder's (or holder of convertible debt's) status as a stockholder (or holder of convertible debt) of the Corporation (such members of the Board of Directors and stockholders (and holders of convertible debt) and their respective Affiliates and the partners, principals, directors, officers, members and/or employees of each of the foregoing, collectively, the "***Identified Persons***" and each, individually, an "***Identified Person***"), shall, to the fullest extent permitted by applicable law, have no duty to refrain from, directly or indirectly, (a) engaging in the same or similar activities or lines of business in which the Corporation or any of its Affiliates, directly or indirectly, now engages or may engage or (b) otherwise competing with the Corporation or any of its Affiliates, and, to the fullest extent permitted by applicable law, no Identified Person shall be liable to the Corporation or its stockholders or to any Affiliate of the Corporation for breach of any fiduciary duty solely by reason of the fact that such Identified Person engages in any such activities. To the fullest extent permitted by applicable law, the Corporation, pursuant to Section 122(17) of the DGCL, hereby renounces any interest or expectancy in, or right to be offered an opportunity to participate in, any potential transaction or business opportunity for an Identified Person and the Corporation or any of its Affiliates, except as provided in the immediately below paragraph. Subject to the immediately below paragraph, in the event that any Identified Person acquires knowledge of a potential transaction or other business opportunity that may be a corporate opportunity for itself, herself or himself and the Corporation or any of its Affiliates, such Identified Person shall, to the fullest extent permitted by applicable law, have no duty to communicate or offer such transaction or other business opportunity to the Corporation or any of its Affiliates and, to the fullest extent permitted by applicable law, shall not be liable to the Corporation or its stockholders or to any Affiliate of the Corporation for breach of any fiduciary duty as a stockholder, director or officer of the Corporation solely by reason of the fact that such Identified Person pursues or acquires such corporate opportunity for itself, herself or himself, or offers or directs such corporate opportunity to another Person.

Notwithstanding the immediately preceding paragraph, the Corporation does not renounce its interest in any corporate opportunity offered to any Identified Person if such opportunity is (a) expressly offered to such person solely in his or her capacity as a director,

officer, consultant or employee of the Corporation or (b) identified by an Identified Person solely through the disclosure of information by or on behalf of the Corporation.

In addition to and notwithstanding the foregoing provisions of this Article VII, a corporate opportunity shall not be deemed to be a potential corporate opportunity for the Corporation if it is a business opportunity that (a) the Corporation is neither financially or legally able, nor contractually permitted to undertake, (b) from its nature, is not in the line of the Corporation's business or is of no practical advantage to the Corporation or (c) is one in which the Corporation has no interest or reasonable expectancy.

The Identified Persons may now own, may continue to own, and from time to time may acquire and own, investments in one or more other entities (such entities collectively, "**Related Companies**") that are direct competitors of, or that otherwise may have interests that do or could conflict with those of, the Corporation, any of the Corporation's stockholders or any of their respective Affiliates, and (a) the enjoyment, exercise and enforcement of the rights, interests, privileges, powers and benefits granted or available to the Identified Persons under this Certificate of Incorporation shall not be in any manner reduced, diminished, affected or impaired, and the obligations of the Identified Persons under this Certificate of Incorporation shall not be in any manner augmented or increased, by reason of any act, circumstance, occurrence or event arising from or in any respect relating to (i) the ownership by an Identified Person of any interest in any Related Company, (ii) the affiliation of any Related Company with an Identified Person or (iii) any action taken or omitted by an Identified Person in respect of any Related Company, (b) no Identified Person shall, by reason of such ownership, affiliation or action, become subject to any fiduciary duty to the Corporation, any of the Corporation's stockholders or any of their respective Affiliates, (c) none of the duties imposed on an Identified Person, whether by contract or law, do or shall limit or impair the right of any Identified Person lawfully to compete with the Corporation, any of the Corporation's stockholders or any of their respective Affiliates and (d) the Identified Persons are not and shall not be obligated to disclose to the Corporation, any of the Corporation's stockholders or any of their respective Affiliates any information related to their respective businesses or opportunities, including acquisition opportunities, or to refrain from or in any respect to be restricted in competing against the Corporation, any of the Corporation's stockholders or any of their respective Affiliates in any such business or as to any such opportunities.

As used in these Bylaws, "**Affiliate**" means any Person who, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Person specified; "**Person**" means any individual, corporation, general or limited partnership, limited liability company, joint venture, trust, association or any other entity; and "**control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and "**controlled**" and "**under common control with**" have correlative meanings.

# ARTICLE VIII
## GENERAL PROVISIONS

**Section 8.1**    **Distributions and Share Dividends**. Subject to any provision of the Certificate of Incorporation or applicable law, distributions (in the form of cash or property) or share dividends may be declared by the Board of Directors at any regular or special meeting. Dividends may be paid in cash, in property or in shares of the Corporation's capital stock, unless otherwise provided by applicable law or the Certificate of Incorporation.

**Section 8.2**    **Checks**. All checks, demands for money and notes of the Corporation shall be signed by such officer or officers or such other person or persons as the Board of Directors may from time to time designate.

**Section 8.3**    **Fiscal Year**. The fiscal year of the Corporation shall be fixed by resolution of the Board of Directors; *provided*, *however*, that if such fiscal year is not fixed by the Board of Directors and the Board of Directors does not defer determination of the fiscal year, the fiscal year shall be the calendar year.

**Section 8.4**    **Seal**. The Board of Directors may adopt a corporate seal and use the same by causing it or a facsimile thereof to be impressed, affixed, reproduced or otherwise.

**Section 8.5**    **Resignation**. Any director, committee member or officer may resign by so stating at any meeting of the Board of Directors or by giving written notice or notice by electronic communication to the Board of Directors or the Chairman of the Board or the Corporation's Chief Executive Officer, President or Secretary. Such resignation shall take effect at the time specified therein, or immediately if no time is specified therein. Unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

**Section 8.6**    **Amendment of Bylaws**. These Bylaws may be amended or repealed, and new bylaws may be adopted, only in accordance with Article V of the Certificate of Incorporation.

**<u>Exhibit A(iii)</u>**

**Form of Certificate of Designation**

Draft 4/17/23

CERTIFICATE OF DESIGNATIONS
OF
9.00% SERIES A CONVERTIBLE PARTICIPATING PREFERRED STOCK
OF
INVACARE HOLDING CORPORATION

**Section 1** **Designation and Number of Shares**. Pursuant to the Charter, there is hereby created out of the authorized and unissued shares of preferred stock of the Corporation, par value $0.001 per share ("Preferred Stock"), a series of Preferred Stock consisting of [ ],000,000 shares of Preferred Stock designated as the "9.00% Series A Convertible Participating Preferred Stock" (the "Series A Preferred Stock"). Such number of shares may be increased or decreased by resolution of the Board of Directors or any duly authorized committee thereof, subject to the terms and conditions hereof and the requirements of applicable law; provided that (i) no increase shall cause the number of authorized shares of Series A Preferred Stock to exceed the total number of authorized shares of Preferred Stock and (ii) no decrease shall reduce the number of shares of Series A Preferred Stock to a number less than the number of such shares then outstanding.

**Section 2** **General Matters; Ranking**. Each share of Series A Preferred Stock shall be identical in all respects to every other share of Series A Preferred Stock. The Series A Preferred Stock, with respect to dividend rights and/or distribution rights upon the liquidation, winding-up or dissolution, as applicable, of the Corporation, shall rank (i) senior to each class or series of Junior Stock, (ii) on parity with each class or series of Parity Stock, (iii) junior to each class or series of Senior Stock, and (iv) junior to the Corporation's existing and future indebtedness and other liabilities.

**Section 3** **Standard Definitions**. As used herein with respect to the Series A Preferred Stock:

"Agent Members" shall have the meaning set forth in Section 18(a).

"Average VWAP" per share of Common Stock over a certain period means the arithmetic average of the VWAP per share of Common Stock for each Trading Day in the relevant period.

"Backstop Commitment Agreement" shall have the meaning ascribed to the term in the Plan.

"Backstop Party" means the original signatories to the Backstop Commitment Agreement and any Person that, as of the Effective Date, is entitled to exercise Backstop Party Rights pursuant to, and as defined in, the Backstop Commitment Agreement.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

"Board of Directors" shall have the meaning set forth in the Charter.

"Business Day" means any day other than a Saturday or Sunday or any other day on which commercial banks in New York City are authorized or required by law or executive order to close.

"Bylaws" means the Bylaws of the Corporation, as amended or restated from time to time.

"Certificate of Designations" means this document setting forth the designation, powers, preferences and rights, and the qualifications, limitations or restrictions thereto, of the Series A Preferred Stock, as amended from time to time in compliance with applicable laws, the Charter and the provisions hereof.

"Change of Control" means that a Person or "group" (as the term is used in Section 13(d) of the Exchange Act), other than a Change of Control Excluded Person, becomes the direct or indirect beneficial owner (as determined pursuant to Rule 13d-3 or Rule 13d-5 under the Exchange Act) of securities representing more than 50% of the voting power of the Corporation.

"Change of Control Excluded Person" means: (a) a Person that is a Backstop Party (or a Backstop Party's Related Fund); (b) any Person that controls, is controlled by, or is under common control with a Person described in clause (a) of this definition; and (c) a "group" (as the term is used for purposes of Sections 13(d) and 14(d) of the Exchange Act) that includes one or more Change of Control Excluded Persons as defined under clauses (a) or (b) above, where such Change of Control Excluded Persons beneficially own capital stock of the Corporation having more the 50% of the combined voting power in the election of directors of all the capital stock of the Corporation held by such group.

"Charter" means the certificate of incorporation of the Corporation, as amended or restated from time to time.

"Close of Business" means 5:00 p.m., New York City time.

"Code" means the Internal Revenue Code of 1986, as amended.

"Common Stock" means the common stock, par value $[ ] per share, of the Corporation.

"Confirmation Order" means the [            ] Order entered by the Bankruptcy Court on [    ], 2023, in the Chapter 11 Case No. 23-90068 (CML).

"Conversion and Dividend Disbursing Agent" means [        ], the Corporation's duly appointed conversion and dividend disbursing agent for Series A Preferred Stock, and any successor appointed under Section 14.

"Conversion Date" shall have the meaning set forth in Section 10(b).

"Conversion Price" means, (a) as of the Effective Date, $[      ] (the "Initial Conversion Price"); and (b) as of any date thereafter, such Initial Conversion Price, as adjusted pursuant to the provisions of Section 13.

"Corporation" means Invacare Holding Corporation, a Delaware corporation.

"Depositary" means DTC or its nominee or any successor appointed by the Corporation.

"Deemed Liquidation Event" means the occurrence of any of the following:

2

(i)     a merger or consolidation in which the Corporation is a constituent party, or a Subsidiary of the Corporation is a constituent party and the Corporation issues shares of its capital stock pursuant to such merger or consolidation, unless the shares of capital stock of the Corporation outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for shares of capital stock that represent, immediately following such merger or consolidation, at least a majority, by voting power, of the capital stock of (1) the surviving or resulting corporation; or (2) if the surviving or resulting corporation is a wholly owned subsidiary of another corporation immediately following such merger or consolidation, the parent corporation of such surviving or resulting corporation;

(ii)    the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Corporation or any Subsidiary of the Corporation of all or substantially all the assets of the Corporation and its Subsidiaries taken as a whole, or

(iii)   the sale or disposition (whether by merger, consolidation or otherwise, and whether in a single transaction or a series of related transactions) of one or more Subsidiaries of the Corporation if substantially all of the assets of the Corporation and its Subsidiaries taken as a whole are held by such Subsidiary or Subsidiaries, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned Subsidiary of the Corporation;

provided, however, that, prior to the Exit Indebtedness Termination Date, a Deemed Liquidation Event shall not occur unless such Deemed Liquidation Event constitutes an event requiring payment in full of the Exit Term Loan Facility and the Exit Secured Convertible Notes; and provided, further, that no Deemed Liquidation Event shall occur if a majority of the Holders so determine by written notice to the Corporation prior to the effective date of any transaction described in clauses (i), (ii) or (iii) above.

"Dividend Accrual Period" means (a) initially, the period from, and including, the Effective Date to, but excluding, the June 15, 2023, Dividend Payment Date; and (b) thereafter, the period from, and including, each Dividend Payment Date, to, but excluding the next Dividend Payment Date.

"Dividend Payment Date" means March 15, June 15, September 15 and December 15 of each year.

"Dividend Rate" means a rate of 9% per annum computed on the basis of a year of twelve thirty-day months and 360 days.

"Dividends" shall have the meaning set forth in Section 4(a).

"DTC" means The Depository Trust Company.

"Effective Date" has the meaning set forth in the Plan.

3

"Entitled Stockholder" has the meaning set forth in Section 6(e).

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

"Exit Indebtedness Termination Date" means the later of the (i) date on which the Exit Term Loan Facility is repaid in full and (ii) date on which the Exit Secured Convertible Notes are repaid in full.

"Exit Lender" means (a) each Backstop Party, and (b) each Person who participated in the Rights Offering and purchased thereunder shares of Series A Preferred Stock representing at least 5% of all shares of Series A Preferred Stock issued and outstanding on the Effective Date.

"Exit Secured Convertible Notes" means, collectively, the Exit Secured Convertible Tranche I Notes, and the Exit Secured Convertible Tranche II Notes.

"Exit Secured Convertible Tranche I Notes" means the Corporation's 7.50% Convertible Senior Secured Notes due [2028], Tranche I, issued on the Effective Date pursuant to the Exit Secured Convertible Tranche I Notes Indenture.

"Exit Secured Convertible Tranche I Notes Indenture" means the indenture dated [    ], 2023, among the Corporation, as issuer, the guarantors listed therein, and GLAS Trust Corporation Limited, as trustee and notes collateral agent, as from time to time amended in compliance with the provisions thereof.

"Exit Secured Convertible Tranche II Notes" means the Corporation's 7.50% Convertible Senior Secured Notes due [2028], Tranche II, issued on the Effective Date pursuant to the Exit Secured Convertible Tranche II Notes Indenture.

"Exit Secured Convertible Tranche II Notes Indenture" means the indenture dated [    ], 2023, among the Corporation, as issuer, the guarantors listed therein, and GLAS Trust Corporation Limited, as trustee and notes collateral agent, as from time to time amended in compliance with the provisions thereof.

"Exit Term Loan Agreement" means the Amended and Restated Credit Agreement dated as of [    ], 2023, among the Corporation, Reorganized Invacare, the lenders party thereto, Cantor Fitzgerald Securities, as Administrative Agent, and GLAS Trust Corporation Limited, as Collateral Agent, as from time to time amended in compliance with the provisions thereof.

"Exit Term Loan Facility" means the credit facility in the amount of $85,000,000 extended to Reorganized Invacare under the Exit Term Loan Agreement.

"Fair Value" of a share of Common Stock, as of any specified date, means:

    i.    if, at the time, the Common Stock is listed on a Relevant Stock Exchange, the Average VWAP of the Common Stock for the ten Trading Days immediately preceding the specified date (or if the Common Stock has traded on such Relevant

Stock Exchange for less than 10 Trading Days, the Average VWAP for such lesser period of time);

ii.   if, at the time, the Common Stock is publicly traded but not listed on a Relevant Stock Exchange, the average of the reported closing bid and ask prices of a share of Common Stock in the over-the-counter market for the 10 Trading Days immediately preceding the specified date (or if the Common Stock has been publicly traded (but not listed) for less than 10 Trading Days, the average of the reported bid and ask prices for such lesser period of time); or

iii.   in all other cases, such value as reasonably determined in good faith by the Board of Directors.

"Global Preferred Certificate" shall have the meaning set forth in Section 18(c).

"Global Preferred Share" shall have the meaning set forth in Section 18(c).

"Holder" means each Person in whose name shares of Series A Preferred Stock are registered, who shall be treated by the Corporation and the Registrar as the absolute owner of those shares of Series A Preferred Stock for the purpose of making payment and settling conversions and for all other purposes.

"Intermediate HoldCo" means [  ], a Delaware corporation.

"Intermediate HoldCo Common Stock" means the common stock, par value [   ] per share of Intermediate HoldCo.

"Intermediate HoldCo Fundamental Change" means the consummation, at any time after the Effective Date, of (A) any transaction immediately following the consummation of which Intermediate HoldCo ceases to be a Wholly-Owned Subsidiary of the Corporation; (B) the voluntary or involuntary liquidation, winding-up or dissolution of Intermediate HoldCo, (C) any consolidation, merger, binding share exchange, or other combination pursuant to which the Intermediate HoldCo Common Stock will be converted into, or exchanged for, stock, other securities, or other property or assets (including cash), or a combination thereof, in each case after which Intermediate HoldCo will no longer be a Wholly-Owned Subsidiary of the Corporation; or (D) any sale, lease, or other transfer or disposition in one transaction or a series of transactions of all or substantially all of the consolidated assets of Intermediate HoldCo and its Subsidiaries, taken as a whole, to any Person other than the Corporation's Wholly-Owned Subsidiaries.

"Junior Stock" means (i) the Common Stock, and (ii) each other class or series of capital stock of the Corporation the terms of which do not expressly provide that such class or series ranks either (x) senior to the Series A Preferred Stock as to dividend rights and distribution rights upon the Corporation's liquidation, winding-up or dissolution or (y) on parity with the Series A Preferred Stock as to dividend rights or and distribution rights upon the Corporation's liquidation, winding-up or dissolution.

"Liquidation Dividend Amount" shall have the meaning set forth in Section 5(a).

5

"Liquidation Preference" means, with respect to each share of Series A Preferred Stock, an amount initially equal to $[    ] (the "Initial Liquidation Preference"), which shall periodically be reset as follows (and until so reset shall remain at the most-recently set value):

(a) as of the Dividend Payment Date falling on June 15, 2023,   the Liquidation Preference shall increase to the sum of (i) the Initial Liquidation Preference, *plus* (ii) Dividends accrued thereon at the Dividend Rate from, and including, the Effective Date to, but excluding, such Dividend Payment Date; and

(b) as of each Dividend Payment Date thereafter, the Liquidation Preference shall (subject to as provided below) increase to the sum of (i) the Liquidation Preference as re-computed on the immediately preceding Dividend Payment Date, *plus* (ii) Dividends accrued thereon at the Dividend Rate from, and including, such immediately preceding Dividend Payment Date to, but excluding, the Dividend Payment Date as of which the computation is made;

provided, however, that no adjustment to the Liquidation Preference shall occur on any Dividend Payment Date on which the Corporation shall make a payment of Dividends in cash pursuant to Section 4(c).

"Mandatory Redemption Date" shall have the meaning set forth in Section 9(b).

"Mandatory Redemption Event" shall have the meaning set forth in Section 9(a).

"Mandatory Redemption Offer" shall have the meaning set forth in Section 9(b).

"Market Disruption Event" means (i) a failure by the Relevant Stock Exchange to open for trading during its regular trading session; or (ii) the occurrence or existence, prior to 1:00 p.m., New York City time, on any Scheduled Trading Day for the Common Stock, for more than a one half-hour period in the aggregate during regular trading hours, of any suspension or limitation imposed on trading (by reason of movements in price exceeding limits permitted by the Relevant Stock Exchange or otherwise) in the Common Stock.

"New Securities" has the meaning set forth in Section 6(e).

"Offer" has the meaning set forth in Section 6(e).

"Offeree" has the meaning set forth in Section 6(e).

"Offer Notice" has the meaning set forth in Section 6(e).

"Officer" means the Chairman, any Vice Chairman, any Chief Executive Officer, the Chief Administrative Officer, the Treasurer, any Vice President, any Assistant Treasurer, the Principal Accounting Officer, the Chief Financial Officer, the Chief Accounting Officer, the Chief Operating Officer, the General Counsel, the Secretary or any Assistant Secretary of the Corporation, as the case may be.

"Open of Business" means 9:00 a.m., New York City time.

"Parity Stock" means any class or series of capital stock of the Corporation the terms of which expressly provide that such class or series shall rank on parity with the Series A Preferred Stock as to dividend rights and distribution rights upon the Corporation's liquidation, winding-up or dissolution.

"Permitted Encumbrance" means encumbrances for taxes, assessments and other governmental charges not yet due and payable, that are being contested in good faith and for which appropriate reserves have been established.

"Person" means any individual, partnership, firm, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"Plan" means the [First Amended Joint Chapter 11 Plan of Invacare Corporation and its Debtor Affiliates] confirmed by the Bankruptcy Court in the Confirmation Order.

"Preferred Stock" shall have the meaning set forth in Section 1 of this Certificate of Designations.

"Redemption Date" means a Voluntary Redemption Date or a Mandatory Redemption Date, as applicable.

"Redemption Dividend Amount" means, as of a Redemption Date and in respect of each share of Series A Preferred Stock being redeemed on such Redemption Date the Dividends accrued on the Liquidation Preference of such share from, and including, the last Dividend Payment Date immediately preceding such Redemption Date on which all Dividends then due were compounded or paid in cash to, but excluding, such Redemption Date.

"Registrar" initially means [                    ], the Corporation's duly appointed registrar for Series A Preferred Stock and any successor appointed under Section 14.

"Related Fund" means, with respect to a Backstop Party, any Affiliates (including at the institutional level) of such Backstop Party or any fund, account (including any separately managed accounts) or investment vehicle that is controlled, managed, advised or sub-advised by such Backstop Party, an Affiliate of such Backstop Party or by the same investment manager, advisor or subadvisor as such Backstop Party or an Affiliate of such Backstop Party.  For purposes of this definition:

> "Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made (including any Related Funds of such Person); provided that for purposes of this Agreement, no Backstop Party shall be deemed an Affiliate of the Company Parties or any of their Subsidiaries;

> "Company Parties" means the Corporation, Intermediate HoldCo, Reorganized Invacare, Adaptive Switch Laboratories, Inc. a Texas corporation, and Freedom Designs, Inc., a California corporation;

7

"Subsidiary" means, with respect to any Person, any corporation, partnership, joint venture or other legal entity as to which such Person (either alone or through or together with any other subsidiary or Affiliate), (a) owns, directly or indirectly, more than fifty percent (50%) of the stock or other equity interests, (b) has the power to elect a majority of the board of directors or similar governing body thereof or (c) has the power to direct, or otherwise control, the business and policies thereof;

"Contract" means any legally binding agreement, contract or instrument, including any loan, note, bond, mortgage, indenture, guarantee, deed of trust, license, franchise, commitment, lease, franchise agreement, letter of intent, memorandum of understanding or other obligation, and any amendments thereto, whether written or oral, but excluding the Plan; and

the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities, by Contract or otherwise.

"Relevant Stock Exchange" means, as of any date, the principal U.S. national securities exchange on which the Common Stock is then listed.

"Reorganized Invacare" means Invacare Corporation, [a corporation organized under the laws of Ohio], following its emergence from the voluntary bankruptcy proceedings commenced before the Bankruptcy Court on January 31, 2023.

"Reorganized Invacare Common Stock" means the common stock, par value [   ] per share of Reorganized Invacare.

"Reorganized Invacare Fundamental Change" means the consummation , at any time after the Effective Date, of (A) any transaction immediately following the consummation of which Reorganized Invacare ceases to be a Wholly-Owned Subsidiary of the Corporation; (B) the voluntary or involuntary liquidation, winding-up or dissolution of Reorganized Invacare, (C) any consolidation, merger, binding share exchange, or other combination pursuant to which the Reorganized Invacare Common Stock will be converted into, or exchanged for, stock, other securities, or other property or assets (including cash), or a combination thereof, in each case after which Reorganized Invacare will no longer be a Wholly-Owned Subsidiary of the Corporation; or (D) any sale, lease, or other transfer or disposition in one transaction or a series of transactions of all or substantially all of the consolidated assets of Reorganized Invacare and its Subsidiaries, taken as a whole, to any Person other than the Corporation's Wholly-Owned Subsidiaries.

"Rights Offering" shall have the meaning set forth in the Plan.

"Scheduled Trading Day" means any day that is scheduled to be a Trading Day.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations thereunder.

"Senior Stock" means each class or series of capital stock of the Corporation the terms of which expressly provide that such class or series shall rank senior to the Series A Preferred Stock as to dividend rights or distribution rights upon the Corporation's liquidation, winding-up or dissolution.

"Series A Preferred Stock" shall have the meaning set forth in Section 1 of this Certificate of Designations.

"Subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which equity interests representing more than 50.0% of the equity or more than 50.0% of the ordinary voting power or, in the case of a partnership, more than 50.0% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise controlled, by the parent or one or more Subsidiaries of the parent or by the parent and one or more Subsidiaries of the parent.

"Trading Day" means a day on which (i) there is no Market Disruption Event and (ii) trading in Common Stock generally occurs on the Relevant Stock Exchange; provided that if the Common Stock is not listed or admitted for trading, "Trading Day" means any Business Day.

"Transfer Agent" shall initially mean [          ], the Corporation's duly appointed transfer agent for Series A Preferred Stock and any successor appointed under Section 14.

"Voluntary Conversion" shall have the meaning set forth in Section 10(a).

"Conversion Date" shall have the meaning set forth in Section 10(b).

"Voluntary Redemption Date" shall have the meaning set forth in Section 8(a).

"Voting Preferred Stock" means any other class or series of Parity Stock upon which like voting powers for the election of directors as set forth in Section 7 have been conferred and are exercisable.

"VWAP" per share of Common Stock on any Trading Day means the per share volume-weighted average price in respect of the period from the scheduled open of trading until the scheduled close of trading of the primary trading session on the Relevant Stock Exchange on such Trading Day; provided, that if such volume-weighted average price is not available on any Trading Day, the market value per share of Common Stock on such Trading Day as determined by a nationally recognized independent investment banking firm retained by the Corporation for this purpose.

"Wholly-Owned Subsidiary" means, with respect to any Person, any Subsidiary of such Person, except that, solely for purposes of this definition, the reference to "more than 50%" in the definition of "Subsidiary" shall be deemed to be replaced by a reference to "100%".

### Section 4    Dividends.

(a)    Accrual. From and after the Effective Date, Holders of Series A Preferred Stock shall be entitled to receive cumulative dividends, accruing daily, at the Dividend Rate on the Liquidation Preference thereof (the "Dividends"); when, as, and if declared by the Board of Directors, the Corporation shall pay such Dividends out of funds lawfully available therefor.  The Board of Directors shall not be required to declare any Dividends, and any declaration of a Dividends shall be solely at the discretion of the Board of Directors of the Corporation; provided, that prior to the Exit Indebtedness Termination Date no Dividends shall be declared by the Board.

(b)    Priority of Dividends. So long as any share of Series A Preferred Stock remains outstanding, no dividend or distribution shall be declared or paid on the Common Stock or any other class or series of Junior Stock. The foregoing limitation shall not apply to:

(i)    any dividend or distribution payable in shares of Common Stock or other Junior Stock, together with cash in lieu of any fractional share;

(ii)    purchases, redemptions or other acquisitions of Common Stock or other Junior Stock in connection with the administration in the ordinary course of business of any benefit or other incentive plan or employment contract, including (x) the forfeiture of unvested shares of restricted stock or share withholding or other acquisitions or surrender of shares to which the holder may otherwise be entitled upon exercise, delivery or vesting of equity awards (whether in payment of applicable taxes, the exercise price or otherwise), and (y) the payment of cash in lieu of fractional shares;

(iii)    purchases or deemed purchases or acquisitions of fractional interests in shares of any Common Stock or other Junior Stock pursuant to the conversion or exchange provisions of such shares of other Junior Stock or any securities exchangeable for or convertible into shares of Common Stock or other Junior Stock;

(iv)    any dividends or distributions of rights or Common Stock or other Junior Stock in connection with a stockholders' rights plan or any redemption or repurchase of rights pursuant to any stockholders' rights plan; and

(v)    the exchange or conversion of Junior Stock for or into other Junior Stock or of Parity Stock for or into other Parity Stock (with the same or lesser aggregate liquidation preference) or Junior Stock and the payment of cash in lieu of fractional shares.

(c)    Method of Payment of Dividends.

(i)    Dividends shall be payable quarterly and shall compound quarterly and accumulate, whether or not earned or declared, from the most recent date

on which Dividends have been paid, or, if no Dividends have been paid, from the Effective Date.

(ii)     If a Dividend is declared by the Board of Directors, then such Dividend shall be paid in cash.

(iii)    If a cash dividend is not declared and paid in cash on a Dividend Payment Date, then in full discharge of any accrual of cash dividends for such Dividend period, the Liquidation Preference of each outstanding share of Series A Preferred Stock, regardless of its date of issue, shall automatically increase on such Dividend Payment Date, pursuant to clause (a) or clause (b), as applicable, of the "Liquidation Preference" definition, by an amount equal to the Dividend Rate multiplied by the Liquidation Preference in effect immediately after the immediately prior Dividend Payment Date (or the Effective Date in respect of the first Dividend period).

**Section 5     <u>Liquidation, Dissolution or Winding-Up.</u>**

(a)     In the event of any voluntary or involuntary liquidation, winding-up or dissolution of the Corporation, or if a Deemed Liquidation Event shall occur, each Holder shall be entitled to receive, out of the assets of the Corporation legally available for distribution to its stockholders, on the date (the "<u>Final Distribution Date</u>") fixed for this purpose by the Corporation, which in the case of the occurrence of a Deemed Liquidation Event shall be no later than 20 Business Days following such occurrence, in respect of each share of Series A Preferred Stock owned by such Holder:

(i)      after satisfaction of debt and other liabilities owed to the Corporation's creditors and holders of shares of any Senior Stock and before any payment or distribution is made to holders of any Junior Stock, including the Common Stock, an amount equal to the Liquidation Preference at the time in effect, together with Dividends thereon, from, and including, the last Dividend Payment Date immediately preceding the Final Distribution Date on which all Dividends then due were compounded or paid in cash to, but excluding, the Final Distribution Date (the "<u>Liquidation Dividend Amount</u>"); and

(ii)     simultaneously with the distribution made to the holders of Common Stock, if any, ratably with such holders, an amount equal to the positive difference, if any, between (a) the fair market value (as determined in good faith by the Board of Directors) of all cash and other distributions to be received on a per-share basis by the holders of Preferred Stock in respect of the Common Stock that would have been received on conversion had such Preferred Stock been converted to Common Stock immediately prior to the record date for such distribution in accordance with Section 10, and (b) the amount

11

received in respect of the Liquidation Preference at the time in effect pursuant to the immediately preceding paragraph.

(b)     If, upon the voluntary or involuntary liquidation, winding-up or dissolution of the Corporation, the amounts payable with respect to (1) the Liquidation Preference plus the Liquidation Dividend Amount on the shares of the Series A Preferred Stock and (2) the liquidation preference of, and the amount of accumulated and unpaid dividends (to, but excluding, the date fixed for liquidation, winding up or dissolution) on, all Parity Stock, if applicable, are not paid in full, the Holders and all holders of any such Parity Stock shall share equally and ratably in any distribution of the Corporation's assets in proportion to their respective liquidation preferences and amounts equal to the accumulated and unpaid dividends to which they are entitled.

(c)     After the payment to any Holder of the aggregate amounts set forth in Section 5(a) above, such Holder as such shall have no right or claim to any of the remaining assets of the Corporation.

**Section 6**     <u>**Covenants.**</u>

(a)     As long as any shares of Series A Preferred Stock remain outstanding, the Corporation shall:

(i)     Notwithstanding that the Corporation may not be subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, file, and provide the Holders with, such annual and quarterly reports and such information, documents and other reports as are applicable to a United States corporation subject to such Sections, such information, documents and reports to be so filed and provided at the times specified for the filing of such information, documents and reports under such Sections (after giving effect to any grace period provided by Rule 12b-25 under the Exchange Act or any similar or successor grace period); <u>provided</u>, that the Corporation will not be obligated to file such information, documents and reports if such filings are not permitted; and <u>provided</u>, <u>further</u>, that if such filings are not permitted, the Corporation will be required to make public disclosure of any such information, documents or reports that are not so filed at the times specified for such filings under such Sections.

(ii)     upon receipt of written request from Holders of at least 10% of all shares of Series A Preferred Stock at the time issued and outstanding, make available to the Holders one or more representatives of the senior management of the Corporation to discuss with the Holders, via secured video conference or similar telecommunications means, the business and affairs of the Corporation and such other matters as shall be identified in the request to the Corporation; <u>provided</u>, that without the prior written consent of the Corporation, the rights contemplated in this paragraph shall not be exercised more than once per fiscal quarter of the Corporation; and <u>provided</u>, <u>further</u>, that the eligibility of one or more Persons to submit a request pursuant to this Section 6(a)(ii) shall be conclusively presumed if they can demonstrate

12

their ownership of the requisite number of shares of Series A Preferred Stock pursuant to Rule 14a-8 under the Exchange Act (as amended from time to time or any successor rule or regulation) or as otherwise provided in the By-laws of the Corporation;

(iii)    ensure that each of Reorganized Invacare and Intermediate HoldCo remains, at all times, a direct, Wholly-Owned Subsidiary of the Corporation;

(iv)    ensure that substantially all operations within the United States of America are conducted solely through Subsidiaries that are directly or indirectly owned by Reorganized Invacare, and substantially all operations outside of the United States of America are conducted solely through Subsidiaries that are directly or indirectly owned by Intermediate HoldCo;

(v)    not, and shall cause Intermediate HoldCo not to, conduct, transact or otherwise engage in any business or operations, in each case, other than (1) the ownership of the capital stock of Intermediate HoldCo and Reorganized Invacare (in the case of the Corporation), and of such Subsidiaries and other affiliates; (2) the performance of its respective obligations under its organization documents, and the compliance with all laws, rules, regulations, orders, judgements, decrees, or permits applicable to it; (3) the participation in tax, accounting, cash management, cash pooling, transfer pricing, cost-sharing arrangements and other administrative matters related to it or any of its Subsidiaries; (4) the activities described in Section 6.06(a)(iv) and (v) of the Exit Term Loan Agreement, as in effect on the date hereof; (5) incurring fees, costs and expenses relating to overhead and general operating including professional fees for legal, tax and accounting issues and paying taxes, providing indemnification for its current and former officers, directors, members of management, managers, employees and advisors or consultants; and (6) activities incidental to the businesses or activities described in the foregoing clauses;

(vi)    subject the Intermediate HoldCo Common Stock or the Reorganized Invacare Common Stock or any other material asset owned by the Corporation to any lien or encumbrance other than a Permitted Encumbrance;

(vii)    [others TBD]

(b)    Except as permitted under the Exit Term Loan Facility and the Exit Senior Secured Convertible Notes, prior to the Exit Indebtedness Termination Date, the Corporation shall not, without the consent of the majority of the Exit Lenders (determined on the basis of the aggregate number of shares of Series A Preferred Stock held by each as of the date of determination):

(i)    make any cash payment with respect to any share of Series A Preferred Stock, including pursuant to Section 4 or Section 9 hereof; and

13

(ii)     make any payment with respect to any share of shares of capital stock of Intermediate HoldCo.

(c)     The Corporation will use commercially reasonable efforts to ensure that the shares each of the Series A Preferred Stock and the Common Stock issuable upon the conversion of the Series A Preferred Stock are eligible for clearance and settlement through the facilities of the Depositary.

(d)     Notwithstanding anything to the contrary in this Certificate of Designations, for U.S. federal and other applicable state and local income tax purposes, it is intended that (i) the Series A Preferred Stock will not be treated as "preferred stock" within the meaning of Section 305(b)(4) of Code and Treasury Regulations Section 1.305-5(a); and (ii) no Holder will be required to include in income any amounts in respect of the Series A Preferred Stock by operation of Section 305(b) or (c) of the Code. The Company will, and will cause its Subsidiaries and agents to, report consistently with, and take no positions or actions inconsistent with, the foregoing treatment (including by way of withholding) unless otherwise required by a determination within the meaning of Section 1313(a) of the Code.

(e)     If at any time prior to the second anniversary of the Effective Date, the Corporation or any of its Subsidiaries offers to issue or sell, or to enter into any agreement providing for the issuance or sale (contingent or otherwise) (each, an "Offer") of, any capital stock or securities convertible into capital stock of the Corporation ("New Securities") to any Person ("Offeree"), the Corporation shall offer to sell to each Exit Lender that is an "accredited investor," as defined in Rule 501(a) of Regulation D of the Securities Act (each, an "Entitled Stockholder"), on the terms set forth in this Section 6(e) a portion of such New Securities equal to (i) the number of such New Securities being offered to such Offeree *multiplied by* (ii) a fraction (A) the numerator of which is the aggregate number of outstanding shares of Series A Preferred Stock held by such Entitled Stockholder (which for purposes hereof shall include shares held by a depository, broker, financial advisor and/or other nominee for such stockholder) and (B) the denominator of which is the aggregate number of outstanding shares of Series A Preferred Stock held by all Entitled Stockholders; provided that if the Corporation requires an Offeree to also purchase other equity securities or debt securities of the Corporation or any of its subsidiaries, any Entitled Stockholder shall also, as a condition to the exercise of such stockholder's preemptive rights pursuant to this Section 6(e), be required to purchase the same class and type of securities of the Corporation or its subsidiaries on the same terms and conditions; and provided, further, that the term *New Securities* shall not include securities issued, or to be issued, in transactions not of a capital-raising nature such as (i) securities issued to employees, officers or directors pursuant to compensation plans, agreements or other arrangements, (ii) securities issued to sellers of assets or entities acquired by the Corporation or any Subsidiary, whether by merger, asset purchase, reorganization or other transaction the primary purpose of which is not to provide financing to the Corporation or its Subsidiaries, or (iii) securities issued as "equity kickers" to unaffiliated parties providing financing to the Corporation or its Subsidiaries.

The Corporation shall deliver to each Entitled Stockholder a Notice (the "Offer Notice"), describing in reasonable detail the New Securities being offered, the proposed purchase price thereof (which may be a price range), the expected use of proceeds thereof, the payment terms and

conditions and the maximum amount and percentage of the offering such Entitled Stockholder is entitled to purchase.

In order to exercise its purchase rights hereunder, an Entitled Stockholder must, within 20 days after delivery of the Offer Notice, deliver a written notice to the Corporation stating the exercise of such purchase right and the quantity or percentage of New Securities to be purchased by such Entitled Stockholder, which quantity or percentage may be all or any portion of the amount to which such Entitled Stockholder is entitled pursuant to this Section 6(e).

In the event any Entitled Stockholder fails to exercise its rights under this Section 6(e) with respect to any particular New Securities within such 20-day period, the Corporation shall have 180 days thereafter to sell such New Securities, at a price not more favorable and upon general terms not materially more favorable to the purchaser of such New Securities than as specified in the Offer Notice. Any New Securities that are not sold within such 180-day period shall not thereafter be issued or sold without first being reoffered to the Entitled Stockholders pursuant to this Section 4.5(b).

Notwithstanding anything to the contrary set forth in this Section 6(e), the Corporation may comply with the provisions of this Section 6(e) by first selling to such Offeree, subject to the conditions contained in the following sentence, all of the New Securities contemplated to be issued and sold by the Corporation in an Offer and promptly thereafter offering to sell to the Entitled Stockholders the number of such New Securities such Entitled Stockholders are entitled to purchase pursuant to this Section 6(e). In the event that any Entitled Stockholder purchases securities from the Corporation pursuant to this Section 6(e), upon the request of the Board of Directors, the Offeree may, in its discretion, sell to the Corporation for a price per share of Common Stock or other equity security or debt security equal to the original cost thereof, the same number and class of shares of Common Stock or other equity security or debt security acquired by the Offeree that are purchased by such Person(s) exercising their rights under this Section 6(e); provided that in the event the Offeree elects not to sell such securities back to the Corporation pursuant to this sentence, each Person exercising their rights under this Section 6(e) shall be entitled to purchase an amount of additional New Securities from the Corporation so that such Person's Percentage Ownership vis-à-vis such Offeree is the same as it would have been had the Offeree sold such shares of Common Stock or other equity securities or debt securities back to the Corporation pursuant to this sentence.

In the event that the participation in the Offer by an Entitled Stockholder would require under applicable law the registration or qualification of such securities or of any person as a broker or dealer or agent with respect to such securities, such Entitled Stockholder shall not have the right to participate in the Offer. Without limiting the generality of the foregoing, it is understood and agreed that neither the Corporation nor any subsidiary shall be under any obligation to effect a registration of such securities under the Securities Act or similar state statutes.

**Section 7**     **Voting Power.**

    (a)   <u>General.</u>

       (i)   Except as otherwise provided by law, the Charter, or this Certificate of Designations, each Holder shall be entitled to cast, voting together with the holders of Common Stock as a single class, with respect to any matter subject to the approval of holders of the Common Stock, a number of votes and fractions thereof equal to the number of shares of Common Stock and fractions thereof into which each share of Series A Preferred Stock held by such Holder could have been converted on the record date for the determination of the holders of Common Stock entitled to vote thereon.

       (ii)   Except as otherwise provided by law, the Charter, or this Certificate of Designations, each Holder shall be entitled to provide, acting together with the holders of Common Stock as a single class, in connection with any matter submitted to the written consent of the holders of Common Stock, written consent with respect of the number of shares of Common Stock and fractions thereof into which each share of Series A Preferred Stock held by such Holder could have been converted on the record or other date used for the determination of the holders of Common Stock entitled to provide written consent thereto.

    (b)   <u>Other Voting Powers.</u> So long as any shares of Series A Preferred Stock are outstanding, the Corporation shall not, without the affirmative vote or consent of the holders of record of at least a majority of the outstanding shares of the Series A Preferred Stock, given in person or by proxy, either in writing without a meeting or by vote at an annual or special meeting of stockholders:

       (i)   Amend or alter the provisions of the Charter so as to authorize or create, or increase the authorized number of, any class or series of capital stock of the Corporation which would be Senior Stock or Parity Stock;

       (ii)   amend, alter or repeal any provision of the Charter, this Certificate of Designations, or the Bylaws so as to increase the authorized number of shares of Series A Preferred Stock, or to adversely affect the powers, preferences and rights, and the qualifications, limitations or restrictions thereto, of the Series A Preferred Stock, or the obligations of the Corporation to the Holders thereunder or hereunder;

       (iii)   issue, following the Effective Date, any shares of Senior Stock;

       (iv)   sell, transfer, pledge, or otherwise dispose of any securities issued by Intermediate HoldCo or Reorganized Invacare;

       (v)   allow the issuance of any capital stock by Intermediate HoldCo or Reorganized Invacare to any Person other than the Corporation;

       (vi)   consummate, allow to become effective, or approve the consummation of a Deemed Liquidation Event;

(vii)   authorize or allow to become effective an Intermediate HoldCo Fundamental Change or a Reorganized Invacare Fundamental Change; or

(viii)   take any action to liquidate, dissolve or wind up the Corporation.

(ix)   [Others TBD];

(c)   The rules and procedures for calling and conducting any meeting of the Holders (including, without limitation, the fixing of a record date in connection therewith), the solicitation and use of proxies at such a meeting, the obtaining of written consents and any other procedural aspect or matter with regard to such a meeting or such consents shall be governed by any rules the Board of Directors, in its discretion, may adopt from time to time, which rules and procedures shall conform to the requirements of the Charter, the Bylaws, applicable law, and the rules of any national securities exchange or other trading facility on which the Series A Preferred Stock is listed or traded at the time.

**Section 8**   <u>**Redemption at the Election of the Company.**</u>

(a)   Following the occurrence of the Exit Indebtedness Termination Date, the Corporation shall have the right, at any time and from time to time, to call for redemption all or some of the shares of Series A Preferred Stock at the time outstanding, by written notice sent to the Holders not less than 15 and not more than 30 calendar days prior to the date designated by the Corporation for such redemption (each such date, a "<u>Voluntary Redemption Date</u>"); <u>provided</u>, <u>however</u>. that the aggregate Liquidation Preference of all shares of Series A Preferred Stock called for redemption shall be at least $[   ] (or such lower amount as remains at the time outstanding).

(b)   On the Voluntary Redemption Date, the Corporation shall pay to each Holder of shares to be redeemed on such date, per each share of Series A Preferred Stock being so redeemed, an amount equal to the Liquidation Preference at the time in effect, together with the corresponding Redemption Dividend Amount accrued thereon.  After the payment to such Holder of the aggregate amount of the Liquidation Preference at the time in effect and the Redemption Dividend Amount corresponding to all of such Holder's shares of Series A Preferred Stock being redeemed, such Holder shall have no rights or claims to any remaining assets of the Corporation with respect to such shares.

(c)   The delivery of a notice of redemption by the Corporation pursuant to Section 8(a) above shall not impair the Holders' right to convert their respective shares of Series A Preferred Stock as provided in Section 10 below.

**Section 9**   <u>**Mandatory Redemption Offer.**</u>

(a)   The Corporation shall offer to redeem the outstanding shares of the Series A Preferred Stock, to the extent of funds legally available therefor, upon the occurrence, after the Exit Indebtedness Termination Date, of any of the following (each, a "<u>Mandatory Redemption Event</u>"):

(i)   a Change of Control;

17

(ii)    an Intermediate HoldCo Fundamental Change;

(iii)    a Reorganized Invacare Fundamental Change; or

(iv)    [others TDB].

(b)    Upon the occurrence of a Mandatory Redemption Event, the Corporation shall promptly, and in no event more than five Business Days from the date of such occurrence, make a written offer to the Holders (the "Mandatory Redemption Offer") to redeem all of the issued and outstanding shares of Series A Preferred Stock on a date selected by the Corporation that shall be not earlier than 35 and no more than 50 calendar days after the date the offer is delivered to the Holders (such date, the "Mandatory Redemption Date").   The Mandatory Redemption Offer shall include detailed information and, to the extent available, supporting documentation regarding the nature and circumstances of the Mandatory Redemption Event occurred.

(c)    Should the funds legally available to the Corporation for the redemption of the Series A Preferred Stock not be sufficient to pay to all Holders all amounts due pursuant to Section 9(e) below in respect of all shares of Series A Preferred Stock at the time outstanding, the Mandatory Redemption Offer shall (i) indicate the total amount of funds legally available to the Corporation for redemptions of the Series A Preferred Stock, (b) include a detailed explanation of how such amount was determined, and (c) set forth the method, or methods, how the funds will be allocated among Holders, in the event the total number of shares of Series A Preferred Stock tendered for redemption exceeds the funds the Corporation has legally available for that purpose; provided, that any such method shall ensure that each share selected for redemption is redeemed in full.

(d)    Following receipt of a Mandatory Redemption Offer, each Holder shall have ten Business Days to communicate in writing to the Corporation the acceptance thereof.

(e)    On the Mandatory Redemption Date, the Corporation shall pay to each Holder of shares of Series A Preferred Stock being redeemed, in respect of each such share, an amount equal to the Liquidation Preference at the time in effect, together with the corresponding Redemption Dividend Amount accrued thereon.

(f)    After the payment by the Corporation to the respective Holder of the aggregate amount of the Liquidation Preference at the time in effect and the corresponding Redemption Dividend Amount in respect of each share of Series A Preferred Stock being redeemed, such Holder shall have no rights or claims to any remaining assets of the Corporation with respect to such share.

(g)    Following each Mandatory Redemption Date on which the Corporation is unable to redeem all shares of Series A Preferred Stock timely tendered for redemption due to the insufficiency of funds legally available for that purpose, the Corporation shall be required to send to the Holders additional Mandatory Redemption Offers within 20 Business Days from each date on which the Corporation shall receive additional payments or proceeds from the transaction or occurrence that constituted the original Mandatory Redemption Event from which such Mandatory

Redemption Date arose (but only to the extent that at least $[    ] million are legally available to pay for additional redemptions of Series A Preferred Stock).

(h)   The delivery of a Mandatory Redemption Offer by the Corporation as provided above shall not impair the Holders' right to convert their respective shares of Series A Preferred Stock as provided in Section 10 below.

(i)   In connection with any redemption of Series A Preferred Stock pursuant to this Section 9, the Corporation shall (i) comply with the provisions of Rule 13e-4, Rule 14e-1 (or any successor provision) and any other tender offer rules under the Exchange Act that may then be applicable; and (ii) otherwise comply with all federal and state securities laws. To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Section 9, the Corporation's compliance with such laws and regulations shall not in and of itself cause a breach of its obligations under this Section 9.

**Section 10**   <u>**Voluntary Conversion at the Option of the Holder.**</u>

(a)   Subject to satisfaction of the conversion procedures set forth below, the Holders shall have the option to convert, at any time (a "<u>Voluntary Conversion</u>"), a share of Series A Preferred Stock into a number of shares of Common Stock equal to the quotient obtained by dividing (x) the Liquidation Preference as of the calendar day immediately preceding the Conversion Date, into (y) the Conversion Price in effect on the Conversion Date.

(b)   To effect a Voluntary Conversion, a Holder must:

(i)   complete and manually sign the conversion notice on the back of the Series A Preferred Stock certificate or a facsimile of such conversion notice;

(ii)   deliver the completed conversion notice and the certificated shares of Series A Preferred Stock to be converted to the Conversion and Dividend Disbursing Agent;

(iii)   if required, furnish appropriate endorsements and transfer documents; and

(iv)   if required, pay all transfer or similar taxes or duties, if any.

Notwithstanding the foregoing, to effect a Voluntary Conversion of shares of Series A Preferred Stock held in global form, the Holder must, in lieu of the foregoing, comply with the applicable procedures of DTC (or any other Depositary for the shares of Series A Preferred Stock held in global form appointed by the Corporation).

The Voluntary Conversion shall be effective on the date on which a Holder has satisfied the foregoing requirements, to the extent applicable ("<u>Conversion Date</u>").

Subject to any applicable rules and procedures of the Depositary, if more than one share of the Series A Preferred Stock is surrendered for conversion at one time by or for the same Holder,

the number of full shares of Common Stock issuable upon conversion thereof shall be computed on the basis of the aggregate number of shares of the Series A Preferred Stock so surrendered.

A Holder shall not be required to pay any transfer or similar taxes or duties relating to the issuance or delivery of Common Stock upon conversion, but such Holder shall be required to pay any tax or duty that may be payable relating to any transfer involved in the issuance or delivery of Common Stock in a name other than the name of such Holder.

A certificate representing the shares of Common Stock issuable upon conversion shall be issued and delivered to the converting Holder or, if the Series A Preferred Stock being converted are in book-entry form, the shares of Common Stock issuable upon conversion shall be delivered to the converting Holder through book-entry transfer through the facilities of the Depositary, in each case, together with delivery by the Corporation to the converting Holder of any cash to which the converting Holder is entitled, only after all applicable taxes and duties, if any, payable by such converting Holder have been paid in full, and such shares and cash will be delivered on the latest of (i) the second Business Day immediately succeeding the Conversion Date, and (ii) the Business Day after the Holder has paid in full all applicable taxes and duties, if any.

The Person or Persons entitled to receive the shares of Common Stock issuable upon Voluntary Conversion shall be treated for all purposes as the record holder(s) of such shares of Common Stock as of the Close of Business on the applicable Conversion Date. Prior to the Close of Business on such applicable Conversion Date, the shares of Common Stock issuable upon conversion of any shares of Series A Preferred Stock shall not be deemed to be outstanding for any purpose, and Holders shall have no rights, powers or preferences with respect to such shares of Common Stock, including voting powers, rights to respond to tender offers for the Common Stock and rights to receive any dividends or other distributions on the Common Stock, by virtue of holding shares of Series A Preferred Stock.

In the event that a Voluntary Conversion is effected with respect to shares of Series A Preferred Stock representing less than all the shares of the Series A Preferred Stock held by a Holder, upon such Voluntary Conversion the Corporation shall execute and instruct the Transfer Agent and Registrar to countersign and deliver to the Holder thereof, at the expense of the Corporation, a certificate evidencing the shares of Series A Preferred Stock as to which Voluntary Conversion was not effected, or, if the Series A Preferred Stock is held in book-entry form, the Corporation shall cause the Transfer Agent and Registrar to reduce the number of shares of the Series A Preferred Stock represented by the global certificate by making a notation on Schedule I attached to the global certificate or otherwise notate such reduction in the register maintained by such Transfer Agent and Registrar.

(c)    In the event that a Holder shall not by written notice designate the name in which shares of Common Stock to be issued upon conversion of such Series A Preferred Stock should be registered or, if applicable, the address to which the certificate or certificates representing such shares of Common Stock should be sent, the Corporation shall be entitled to register such shares, and make such payment, in the name of the Holder as shown on the records of the Corporation and, if applicable, to send the certificate or certificates representing such shares of Common Stock to the address of such Holder shown on the records of the Corporation.

**Section 11**   <u>**Reservation of Common Stock**</u>.

(a)    The Corporation shall at all times reserve and keep available out of its authorized and unissued Common Stock, solely for issuance upon the conversion of shares of Series A Preferred Stock as herein provided, free from any preemptive or other similar rights, a number of shares of Common Stock equal to the maximum number of shares of Common Stock deliverable upon conversion of all shares of Series A Preferred Stock (which shall initially equal [ ]. For purposes of this Section 11(a), the number of shares of Common Stock that shall be deliverable upon the conversion of all outstanding shares of Series A Preferred Stock shall be computed as if at the time of computation all such outstanding shares were held by a single Holder.

(b)    Notwithstanding the foregoing, the Corporation shall be entitled to deliver upon conversion of shares of Series A Preferred Stock or as payment of any dividend on such shares of Series A Preferred Stock, as herein provided, shares of Common Stock reacquired and held in the treasury of the Corporation (in lieu of the issuance of authorized and unissued shares of Common Stock), so long as any such treasury shares are free and clear of all liens, charges, security interests or encumbrances (other than liens, charges, security interests and other encumbrances created by the Holders).

(c)    All shares of Common Stock delivered upon conversion or redemption of, or as payment of a dividend on, the Series A Preferred Stock shall be duly authorized, validly issued, fully paid and non-assessable, free and clear of all liens, claims, security interests and other encumbrances (other than liens, charges, security interests and other encumbrances created by the Holders) and free of preemptive rights.

(d)    Prior to the delivery of any securities that the Corporation shall be obligated to deliver upon conversion of Series A Preferred Stock, the Corporation shall use commercially reasonable efforts to comply with all federal and state laws and regulations thereunder requiring the registration of such securities with, or any approval of or consent to the delivery thereof by, any governmental authority.

(e)    The Corporation hereby covenants and agrees that, if at any time the Common Stock shall be listed on any national securities exchange or automated quotation system, the Corporation shall, if permitted by the rules of such exchange or automated quotation system, list and use its commercially reasonable efforts to keep listed, so long as the Common Stock shall be so listed on such exchange or automated quotation system, all Common Stock issuable upon conversion of the Series A Preferred Stock.

**Section 12**   <u>**Fractional Shares**</u>.

(a)    No fractional shares of Common Stock shall be issued to Holders as a result of any conversion of shares of Series A Preferred Stock.

(b)    In lieu of any fractional shares of Common Stock otherwise issuable in respect of the aggregate number of shares of the Series A Preferred Stock of any Holder that are converted hereunder, the Corporation shall pay an amount in cash (computed to the nearest cent) equal to the product of (i) that same fraction and (ii) the Fair Value of the Common Stock as of the Trading Day immediately preceding the Conversion Date.

**Section 13**   <u>**Anti-Dilution Adjustments to the Conversion Price**</u>.

(a)   The Conversion Price shall be adjusted as set forth in this Section 13, except that the Corporation shall not make any adjustments to the Conversion Price if each Holder is eligible to participate (other than in the case of a share split or share combination), at the same time and upon the same terms as holders of Common Stock and solely as a result of holding the Series A Preferred Stock, in any of the transactions set forth in Section 13(a)(i)-(iv) without having to convert their Series A Preferred Stock as if such Holder held the number of shares of Common Stock into which the Series A Preferred Stock held by such Holder on the record date for such transaction could be converted into on such date.

(i)   If the Corporation shall, after the Effective Date, (A) pay a dividend or make a distribution or bonus issue on any of its Common Stock in Common Stock, (B) subdivide (by way of a share split or otherwise) or reclassify any of its outstanding Common Stock into a greater number of shares, or (C) combine or reclassify (by way of reverse stock split or otherwise) any of its outstanding Common Stock into a smaller number of shares, then, in each event, the Conversion Price in effect immediately prior to the Close of Business on the relevant record date (in the case of the preceding clause (A)) or immediately prior to the Open of Business on the effective date of the subdivision or combination (in the case of the preceding clauses (B) and (C)) for such dividend, distribution, bonus issue, subdivision, reclassification, or combination shall be adjusted to the number obtained by multiplying such Conversion Price by a fraction (i) the numerator of which shall be the total number of Common Stock issued and outstanding immediately prior to the Close of Business on the relevant record date (in the case of the preceding clause (A)) or immediately prior to the Open of Business on the effective date of the subdivision, reclassification, or combination (in the case of the preceding clauses (B) and (C)) for such dividend, distribution, bonus issue, subdivision,  reclassification, or combination, and (ii) the denominator of which shall be the number of Common Stock issued and outstanding immediately after giving effect to such dividend, distribution, bonus issue, subdivision, reclassification or combination.

Any adjustment made under this Section 13(a)(i) shall become effective immediately after the Close of Business on the relevant record date for such dividend, distribution, or bonus issue (in the case of clause (A)), or immediately after the Open of Business on the effective date for such subdivision, reclassification, or combination (in the case of clauses (B) and (C)). If any dividend or distribution of the type set forth in this Section 13(a)(i) is declared but not so paid or made, the Conversion Price shall be immediately readjusted, effective as of the date the Board of Directors or a committee thereof determines not to pay such dividend, distribution, or bonus issue to the Conversion Price that would then be in effect if such dividend, distribution, or bonus issue had not been declared. For the purposes of this Section 13(a)(i), the number of shares of Common Stock outstanding at any time shall not include shares that the Corporation holds in treasury. The Corporation shall not pay any dividend or make any distribution on shares of Common Stock that it holds in treasury.

(ii)    If the Corporation issues to holders of its Common Stock, or shall fix a record date for the determination of holders of its Common Stock to receive, any right to subscribe for additional Common Stock pursuant to a rights offering at a price per share of Common Stock less than the Fair Value per share of Common Stock as of the Trading Day immediately preceding the date of announcement of such issuance (a "Rights Offering"), then the Conversion Price shall, with effect at the Open of Business on the Business Day immediately following the date on which such Rights Offering is consummated, be decreased to a price determined in accordance with the following formula:

$$CP2 = CP1 * (O + Y) \div (O + X)$$

where,

"CP2" shall mean the Conversion Price in effect immediately after the adjustment provided in this Section 13(a)(ii);

"CP1" shall mean the Conversion Price in effect immediately before the adjustment provided in this Section 13(a)(ii);

"O" shall mean the number of Common Stock outstanding immediately before the consummation of the Rights Offering;

"X" shall mean the number of Common Stock issuable upon exercise of such rights pursuant to the Rights Offering; and

"Y" shall mean the number of Common Stock equal to the aggregate price payable for the Common Stock in the Rights Offering divided by the Fair Value per share of Common Stock as of the Trading Day immediately preceding the announcement date of the Rights Offering.

Any adjustment made under this Section 13(a)(ii) shall be made successively whenever any such rights, options or warrants are issued and shall become effective as of the opening of business on the first Trading Day immediately following the date on which the Rights Offering is consummated.

For the purpose of this Section 13(a)(ii), in determining whether any rights, options or warrants entitle the holders of Common Stock to subscribe for or purchase shares of Common Stock at less than such Fair Value per share as of the Trading Day immediately preceding the date of announcement of such issuance, and in determining the aggregate offering price of such shares of Common Stock, there shall be taken into account any consideration received by the Corporation for such rights, options or warrants and any amount payable on exercise or conversion thereof, the value of such consideration, if other than cash, to be determined by the Board of Directors or a committee thereof.

(iii)   If the Corporation shall, at any time or from time to time after the Effective Date, distribute to the holders of Common Stock any dividend or other distribution of cash, evidences of its indebtedness, other securities or other properties or assets, or any options, warrants or other rights to subscribe for or purchase any of the foregoing (in each case other than (i) dividends or distributions of Common Stock referred to in Section 13(a)(i), or (ii) distributions of rights pursuant to Section 13(a)(ii)), then the Conversion Price shall be decreased to a price determined by multiplying the Conversion Price then in effect by a fraction, the numerator of which shall be   the Fair Value per share of Common Stock as of the Trading Day immediately preceding the record date for such distribution less the sum of (A) the cash portion, if any, of such distribution per share of Common Stock outstanding (exclusive of any treasury shares) on the record date for such distribution plus (B) the fair market value (as determined in good faith by the Board of Directors) on the record date for such distribution of that portion, if any, of such distribution consisting of evidences of indebtedness, other securities, properties, assets, options, warrants or subscription or purchase rights, expressed as an amount per share of Common Stock outstanding as of the record date for such distribution (exclusive of any treasury shares), and the denominator of which shall be the Fair Value per share of Common Stock as of the Trading Day immediately preceding the record date for such distribution.   The adjustments required by this Section 13(a)(iii) shall be made whenever any such distribution occurs retroactive to the record date for the determination of shareholders entitled to receive such distribution.

(iv)   If the Corporation or any of its Subsidiaries shall, at any time or from time to time after the Effective Date, make a payment in respect of a tender or exchange offer, to the extent that the cash and value of any other consideration included in the payment per share of Common Stock exceeds the Fair Value per share of Common Stock as of the Trading Day immediately following the last date on which tenders or exchanges may be made pursuant to such tender or exchange offer (the "Expiration Date"), the Conversion Price shall be decreased to a price determined based on the following formula:

$$CP2 = CP1 * (FMV - P) \div FMV$$

where,

"CP2" shall mean the Conversion Price in effect immediately after the adjustment provided in this Section 13(a)(iv);

"CP1" shall mean the Conversion Price in effect immediately before the adjustment provided in this Section 13(a)(iv);

"FMV" shall mean the product of (x) the total number of shares of Common Stock issued and outstanding immediately prior to the Expiration Date (without giving effect to the purchase of shares accepted for purchase or exchange in such tender or exchange offer); and

24

"P" shall mean the excess paid or payable by the Corporation or its Subsidiary in connection with the tender or exchange offer, over the amount that would have been paid or payable if all shares of Common Stock eligible to participate in the tender or exchange offer were payable at the Fair Value per share of Common Stock as of the Trading Day immediately following the Expiration Date.

The Corporation shall not adjust the Conversion Price:

> (A)   upon the issuance of shares of Common Stock pursuant to any present or future plan providing for the reinvestment of dividends or interest payable on securities of the Corporation and the investment of additional optional amounts in Common Stock under any plan;

> (B)   upon the issuance of any shares of Common Stock or rights or warrants to purchase such shares of Common Stock pursuant to any present or future benefit or other incentive plan or program of or assumed by the Corporation or any of its Subsidiaries;

> (C)   upon the issuance of any shares of Common Stock pursuant to any option, warrant, right or exercisable, exchangeable or convertible security not described in (B) of this 0 and outstanding as of the Effective Date;

> (D)   for a change in par value of the Common Stock; or

> (E)   for any other issuance of shares of Common Stock or any securities convertible into or exchangeable for shares of Common Stock or the right to purchase shares of Common Stock or such convertible or exchangeable securities, except as otherwise stated herein.

(b)   Whenever the Conversion Price is to be adjusted, the Corporation shall:

> (i)   compute such adjusted Conversion Price;

> (ii)   within 10 Business Days after the Conversion Price is to be adjusted, provide or cause to be provided, a written notice to the Holders of the occurrence of such event; and

> (iii)   within 10 Business Days after the Conversion Price is to be adjusted, provide or cause to be provided, to the Holders, a statement setting forth in reasonable detail the method by which the adjustments to the Conversion Price was determined and setting forth such adjusted Conversion Price.

**Section 14   Transfer Agent, Registrar, and Conversion and Dividend Disbursing Agent**. The duly appointed Transfer Agent, Registrar and Conversion and Dividend Disbursing Agent for Series A Preferred Stock shall be [       ]. The Corporation may, in its sole discretion, remove the Transfer Agent, Registrar or Conversion and Dividend Disbursing Agent in accordance

25

with the agreement between the Corporation and the Transfer Agent, Registrar or Conversion and Dividend Disbursing Agent, as the case may be; provided that if the Corporation removes [      ], the Corporation shall appoint a successor transfer agent, registrar or conversion and dividend disbursing agent, as the case may be, who shall accept such appointment prior to the effectiveness of such removal. Upon any such removal or appointment, the Corporation shall give notice thereof to the Holders.

**Section 15   Record Holders**.  To the fullest extent permitted by applicable law, the Corporation and the Transfer Agent may deem and treat the Holder of any shares of Series A Preferred Stock as the true and lawful owner thereof for all purposes.

**Section 16   Notices**.  All notices or communications in respect of Series A Preferred Stock shall be sufficiently given if given in writing and delivered by first class mail, postage prepaid, or if given in such other manner as may be permitted in this Certificate of Designations, in the Charter or the Bylaws and by applicable law. Notwithstanding the foregoing, if the shares of Series A Preferred Stock are represented by a Global Preferred Certificate, such notices may also be given to the Holders in any manner permitted by DTC or any similar facility used for the settlement of transactions in Series A Preferred Stock.

**Section 17   Other Rights**.  The shares of Series A Preferred Stock shall not have any rights, preferences, privileges or voting powers or relative, participating, optional or other special rights, or qualifications, limitations or restrictions thereof, other than as set forth herein or in the Charter or as provided by applicable law.

**Section 18   Book-Entry Form; Global Certificates.**

(a)   Except as provided in Section 18(b) below, shares of the Series A Preferred Stok will be issued only in the form of book entries maintained by the Corporation's Registrar and Transfer Agent.  If necessary to comply with applicable laws, such entries may include notations or other legends reflecting any restrictions the shares evidenced thereby may be subject to.

(b)   When and if accepted for clearance and settlement through the facilities of the Depositary, shares of the Series A Preferred Stock may be issued in the form of one or more permanent global shares of Series A Preferred Stock in definitive, fully registered form with the global legend as set forth on the form of Series A Preferred Stock certificate attached hereto as Exhibit A (each, a "Global Preferred Certificate" and the shares of Series A Preferred Stock represented by such Global Preferred Certificate, the "Global Preferred Shares"), which is hereby incorporated in and expressly made part of this Certificate of Designations. The Global Preferred Certificates shall be signed by the Corporation and countersigned by the Registrar as provided in Section 18(c), and may have notations, legends or endorsements required by law, stock exchange rules, agreements to which the Corporation is subject, if any, or usage (provided that any such notation, legend or endorsement is in a form acceptable to the Corporation).

Each Global Preferred Certificate shall be (i) registered in the name of Cede & Co. or other nominee of the Depositary, and (ii) delivered by the Registrar to, or pursuant to instructions received from, Cede & Co., or held by the Registrar as custodian for the Depositary pursuant to an agreement between the Depositary and the Registrar. Members of, or participants

in, the Depositary ("Agent Members") shall have no rights under this Certificate of Designations with respect to any Global Preferred Share held on their behalf by the Depositary or by the Registrar as the custodian of the Depositary, or under such Global Preferred Share, and the Depositary may be treated by the Corporation, the Registrar and any agent of the Corporation or the Registrar as the absolute owner of such Global Preferred Share for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Corporation, the Registrar or any agent of the Corporation or the Registrar from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices of the Depositary governing the exercise of the rights of a holder of a beneficial interest in any Global Preferred Share. The Holder of the Global Preferred Shares may grant proxies or otherwise authorize any Person to take any action that a Holder is entitled to take pursuant to the Global Preferred Shares, this Certificate of Designations or the Charter.

Owners of beneficial interests in Global Preferred Shares shall not be entitled to receive physical delivery of certificated shares of Series A Preferred Stock, unless (x) the Depositary notifies the Corporation that it is unwilling or unable to continue as Depositary for the Global Preferred Shares and the Corporation does not appoint a qualified replacement for the Depositary within 90 days or (y) the Depositary ceases to be a "clearing agency" registered under the Exchange Act and the Corporation does not appoint a qualified replacement for the Depositary within 90 days. In any such case, the Global Preferred Certificates shall be exchanged in whole for definitive stock certificates that are not issued in global form, with the same terms and of an equal aggregate Liquidation Preference, and such definitive stock certificates shall be registered in the name or names of the Person or Persons specified by the Depositary in a written instrument to the Registrar.

(c)    Signature. Any two authorized Officers shall sign each Global Preferred Certificate for the Corporation, in accordance with the Corporation's Bylaws and applicable Delaware law, by manual or facsimile signature. If an Officer whose signature is on a Global Preferred Certificate no longer holds that office at the time the Registrar countersigned such Global Preferred Certificate, such Global Preferred Certificate shall be valid nevertheless. A Global Preferred Certificate shall not be valid until an authorized signatory of the Registrar manually countersigns such Global Preferred Certificate. Each Global Preferred Certificate shall be dated the date of its countersignature. The foregoing paragraph shall likewise apply to any certificate representing shares of Series A Preferred Stock.

**<u>Exhibit A(iv)</u>**

**Form of Registration Rights Agreement**

Draft 4.17.23

## REGISTRATION RIGHTS AGREEMENT

This Registration Rights Agreement (this "Agreement") is made as of [__], 2023 by and among [New Parent Holdco], a Delaware corporation (the "Company"), and the other parties signatory hereto and any additional parties identified on the signature pages of any joinder agreement executed and delivered pursuant hereto. Certain definitions are set forth in Section 24.

## RECITALS

WHEREAS, on January 31, 2023, Invacare Corporation and certain of its Affiliates (collectively, the "Debtors") filed petitions in the United States Bankruptcy Court for the Southern District of Texas (Houston Division) (the "Bankruptcy Court") seeking relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code");

WHEREAS, on March 29, 2023, the Debtors filed the First Amended Joint Chapter 11 Plan of Reorganization of Invacare Corporation and Its Debtor Affiliates (including all exhibits, schedules and supplements thereto and as amended, modified or supplemented from time to time, the "Chapter 11 Plan");

WHEREAS, on [__], 2023, the Bankruptcy Court entered the [Order Confirming First Amended Joint Chapter 11 Plan of Reorganization of Invacare Corporation and Its Debtor Affiliates];

WHEREAS, immediately prior to the effective date of the Chapter 11 Plan (the "Effective Date"), Invacare Corporation was a reporting company pursuant to Section 12(g) and/or Section 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act");

WHEREAS, pursuant to the Chapter 11 Plan, the Company (i) was formed by the Reorganized Debtors (as defined in the Chapter 11 Plan) as a new holding company (ii) owns, among other things, all of the issued and outstanding common stock of Invacare Corporation and (iii) is intended to be the successor issuer to Invacare Corporation pursuant to Rule 12g-3 under the Exchange Act;

WHEREAS, pursuant to the Chapter 11 Plan, Invacare Corporation, the Backstop Parties (as defined below) and the other parties thereto entered into that certain First Amended and Restated Backstop Commitment Agreement, dated as of [__], 2023 (as it may be amended from time to time, the "Backstop Commitment Agreement");

WHEREAS, upon the Effective Date, pursuant to the Chapter 11 Plan and the Backstop Commitment Agreement, the Company will issue to the Backstop Parties, upon the terms and subject to the conditions set forth in the Chapter 11 Plan and the Backstop Commitment Agreement, shares of the Company's common stock, par value $[0.001] per share ("Common Stock"), and shares of the Company's 9% Series A Convertible Participating Preferred Stock, par value $[0.001] per share ("Convertible Preferred Stock");

WHEREAS, the Backstop Commitment Agreement provides that the Company will enter into a registration rights agreement with the Backstop Parties in form and substance

reasonably acceptable to the Required Backstop Parties and the Company Parties (as such terms are defined in the Backstop Commitment Agreement); and

WHEREAS, the Company and the Initial Holders are entering into this Agreement in furtherance of the aforesaid provisions of the Chapter 11 Plan and the Backstop Commitment Agreement.

## AGREEMENT

NOW, THEREFORE, the parties hereto hereby agree as follows:

1        Shelf Registration Statement.

1.1        As soon as practicable following the Effective Date, but in no event more than [__] days thereafter, the Company shall use reasonable best efforts to file with the Commission a Shelf Registration Statement on Form S-1 (as may be amended from time to time, the "Initial S-1 Shelf") and shall include in the Initial S-1 Shelf the Registrable Securities of each Holder who shall have timely requested inclusion therein of some or all of its Registrable Securities by written notice to the Company. The Company shall use its reasonable best efforts to have the Initial S-1 Shelf declared effective by the Commission as soon as reasonably practicable after the Company files the Initial S-1 Shelf.

1.2        The Company shall use reasonable best efforts to keep the Initial S-1 Shelf continuously effective, and not subject to any stop order, injunction or other similar order or requirement of the Commission, until the earlier of (a) the date on which the Initial S-3 Shelf (as defined below) is effective and (b) the date on which all Registrable Securities covered by the Initial S-1 Shelf shall cease to be Registrable Securities (such earlier date, the "Initial S-1 Shelf Expiration Date").

1.3        Until the Initial S-1 Shelf Expiration Date, the Company shall file any supplements or post-effective amendments required to be filed by applicable law so that (a) the Initial S-1 Shelf does not include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein not misleading and (b) the Company complies with its obligations under Item 512(a)(1) of Regulation S-K; *provided*, *however*, that these obligations remain subject to the Company's rights under Section 5.

1.4        Upon the Company becoming eligible to register the Registrable Securities for resale by the Holders on Form S-3, the Company shall use reasonable best efforts to amend the Initial S-1 Shelf to a Shelf Registration Statement on Form S-3 or file a Shelf Registration Statement on Form S-3 in substitution of the Initial S-1 Shelf (the "Replacement S-3 Shelf") and cause the Replacement S-3 Shelf to be declared effective as soon as reasonably practicable thereafter. After the Replacement S-3 Shelf becomes effective, the Company shall use its reasonable best efforts to keep the Replacement S-3 Shelf continuously effective, and not subject to any stop order, injunction or other similar order or requirement of the Commission, until the date that all Registrable Securities covered by the Replacement S-3 Shelf shall cease to be Registrable Securities (such date, the "Replacement S-3 Shelf Expiration Date").

1.5        If prior to the Replacement S-3 Shelf Expiration Date there is not an effective Shelf Registration Statement on Form S-3, the Company shall promptly file a Shelf Registration Statement on Form S-1 (the "Subsequent S-1 Shelf") and use its reasonable best efforts to have the Subsequent S-1 Shelf declared effective by the Commission as soon as reasonably practicable. In addition, the Company shall use reasonable best efforts to keep the

Subsequent S-1 Shelf continuously effective, and not subject to any stop order, injunction or other similar order or requirement of the Commission, until the earlier of (a) the date on which the Subsequent S-3 Shelf (as defined below) is effective and (b) the date that all Registrable Securities covered by the Subsequent S-1 Shelf shall cease to be Registrable Securities (such earlier date, the "Subsequent S-1 Shelf Expiration Date"). Further, until the Subsequent S-1 Shelf Expiration Date, the Company will file any supplements or post-effective amendments required to be filed by applicable law so that (i) the Subsequent S-1 Shelf does not include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein not misleading and (ii) the Company complies with its obligations under Item 512(a)(1) of Regulation S-K; *provided*, *however*, that these obligations remain subject to the Company's rights under Section 5. Upon the Company becoming eligible to register the Registrable Securities for resale by the Holders on Form S-3, the Company shall use reasonable best efforts to amend the Subsequent S-1 Shelf to a Shelf Registration Statement on Form S-3 or file a Shelf Registration Statement on Form S-3 in substitution of the Subsequent S-1 Shelf (the "Subsequent S-3 Shelf") and cause the Subsequent S-3 Shelf to be declared effective as soon as reasonably practicable thereafter. After the Subsequent S-3 Shelf becomes effective, the Company shall use its reasonable best efforts to keep the Subsequent S-3 Shelf continuously effective, and not subject to any stop order, injunction or other similar order or requirement of the Commission, until the date that all Registrable Securities covered by the Subsequent S-3 Shelf shall cease to be Registrable Securities.

       1.6    Upon the request of any Holder whose Registrable Securities are not included in an effective Shelf Registration Statement at the time of such request, the Company shall use its reasonable best efforts to amend the Initial S-1 Shelf, the Replacement S-3 Shelf, the Subsequent S-1 Shelf or the Subsequent S-3 Shelf, as applicable, to include the Registrable Securities of such Holder; *provided* that the Company shall not be required to so amend such registration statement more than once every 90 days; *provided further* that such Holder delivers all such information regarding the distribution of such Registrable Securities and such other information relating to such Holder and its Registrable Securities as the Company may reasonably request. Within five Business Days after receiving a request pursuant to the immediately preceding sentence, the Company shall give written notice of such request to all other Holders and shall include in such amendment all Registrable Securities with respect to which the Company has received written requests for inclusion therein within ten Business Days after the Company's giving of such notice; *provided* that such requesting Holders promptly deliver all such information regarding the distribution of such Registrable Securities and such other information regarding the distribution of such Registrable Securities and such other information relating to such Holder and its Registrable Securities as the Company may reasonably request; and *provided further* that the Company receives such information within the deadline presented by the Company, which deadline shall not be more than five Business Days prior to the anticipated filing of such amendment, but in no event earlier than three Business Days after the notice of the request for such information is given.

       1.7    Notwithstanding any other provision of this Agreement, if any Commission Guidance sets forth a limitation of the number of Registrable Securities to be registered on a particular Shelf Registration Statement (notwithstanding the Company's commercially reasonable efforts to advocate with the Commission for the registration of all or a greater number of Registrable Securities), which limitation exceeds the number of Registrable Securities not then registered, then, except to the extent that a Holder waives its right to have its Registrable Securities registered on such Shelf Registration Statement, the amount of Registrable Securities to be registered on such Shelf Registration Statement will be

correspondingly reduced pro rata among the Holders based on the total number of unregistered Registrable Securities held by such Holders (such reduced Registrable Securities, the "Removed Shares"). In the event of a share removal of the Holders pursuant to this Section 1.7, the Company shall use its commercially reasonable efforts to promptly register the resale of any Removed Shares pursuant to this Section 1, whether by way of amending the applicable Shelf Registration Statement or by filing a new Shelf Registration Statement.

2       Piggyback Rights.

2.1       If the Company proposes to (a) file a registration statement under the Securities Act with respect to an Underwritten Offering (other than a form not available for registering the resale of the Registrable Securities to the public), for its own account or for the account of a stockholder that is not a party to this Agreement, or (b) conduct an Underwritten Offering pursuant to a Shelf Registration Statement previously filed by the Company, for its own account or for the account of a stockholder that is not a party to this Agreement (such offering referred to in clause (a) or (b), a "Piggyback Offering"), the Company shall promptly give written notice (the "Piggyback Notice") of such Piggyback Offering to the Holders. The Piggyback Notice shall include the amount and class of Registrable Securities proposed to be offered, the expected date of commencement of marketing efforts and any proposed managing underwriter and shall offer the Holders the opportunity to include in such Piggyback Offering such amount of Registrable Securities (of the same class as the Registrable Securities proposed to be offered by the Company) as each Holder may request. The Company shall, subject to the provisions of Section 3, include in each Piggyback Offering 100%, or such portion as permitted by Commission Guidance (*provided* that the Company shall use commercially reasonable efforts to advocate with the Commission for the registration of all or the maximum number of the applicable Registrable Securities as permitted by Commission Guidance), of the applicable Registrable Securities for which the Company has received written requests for inclusion within ten Business Days after the date the Piggyback Notice is given (*provided* that in the case of a "bought deal," "registered direct offering" or "overnight transaction" (any of the foregoing, a "Bought Deal"), such written requests for inclusion must be received within three Business Days after the date the Piggyback Notice is given); *provided*, *however*, that, in the case of a Piggyback Offering in the form of a "takedown" under a Shelf Registration Statement, such Registrable Securities are covered by an existing and effective Shelf Registration Statement that may be utilized for the offering and sale of the Registrable Securities requested to be offered.

2.2       If at any time after giving the Piggyback Notice and prior to the time sales of securities are confirmed pursuant to the Piggyback Offering, the Company determines for any reason not to register or to delay the Piggyback Offering, the Company may, at its election, give notice of its determination to all Holders, and in the case of such a determination, will be relieved of its obligation set forth in Section 2.1 in connection with the abandoned or delayed Piggyback Offering, without prejudice.

2.3       Any Holder requesting to be included in a Piggyback Offering may withdraw its request for inclusion by giving written notice to the Company, (a) at least three Business Days prior to the anticipated effective date of the registration statement filed in connection with such Piggyback Offering if the registration statement requires acceleration of effectiveness or (b) in all other cases, one Business Day prior to the anticipated date of the filing by the Company pursuant to Rule 424 under the Securities Act of a supplemental prospectus (which shall be the preliminary supplemental prospectus, if one is used in the "takedown") with respect to such offering; *provided*, *however*, that the withdrawal will be

4

irrevocable and, after making the withdrawal, a Holder will no longer have any right to include its Registrable Securities in that Piggyback Offering.

2.4    Notwithstanding the foregoing, any Holder may deliver written notice (an "Opt-Out Notice") to the Company at any time requesting that such Holder not receive notice from the Company of any proposed Piggyback Offering; *provided*, *however*, that such Holder may later revoke any such Opt-Out Notice in writing.

2.5    Notwithstanding any other provision of this Agreement, if any Commission Guidance sets forth a limitation on the number of Registrable Securities to be included in a particular Piggyback Offering (notwithstanding the Company's commercially reasonable efforts to advocate with the Commission for the registration of all or a greater number of Registrable Securities), which limitation exceeds the number of Registrable Securities requested by Holders to be included therein pursuant to Section 2.1, then, except to the extent that such a Holder waives its rights to have such Registrable Securities included in such Piggyback Offering, the amount of Registerable Securities included in such Piggyback Offering will be correspondingly reduced pro rata among the Holders requesting such inclusion based on the number of Registrable Securities requested by such Holder to be so included.

3    Underwritten Offerings.

3.1    At any time during which a Shelf Registration Statement covering Registrable Securities is effective, if one or more Holders (the "Requesting Holders") deliver a notice to the Company (a "Takedown Notice") stating that it intends to effect an Underwritten Offering of all or part of its Registrable Securities included by it on the Shelf Registration Statement (a "Demand Underwritten Offering"), then, subject to the conditions described in this Section 3, including Section 3.3, the Company shall amend or supplement the Shelf Registration Statement as may be necessary in order to enable such Registrable Securities to be distributed pursuant to the Demand Underwritten Offering and otherwise use its commercially reasonable best efforts to facilitate such Demand Underwritten Offering as expeditiously as practicable, *provided* that the number of shares of Common Stock requested by the Requesting Holders to be included in the Demand Underwritten Offering shall either (a) equal at least [ten] percent of all outstanding shares of Common Stock or Convertible Preferred Stock, as applicable, at such time or (b) have an anticipated aggregate gross offering price (before deducting underwriting discounts and commissions) of at least $[20.0] million. Within five Business Days after receiving a Takedown Notice, the Company shall give written notice of such request to all other Holders, and subject to the provisions of Section 3.3, include in such Demand Underwritten Offering all such applicable Registrable Securities with respect to which the Company has received written requests for inclusion therein within five Business Days after the Company's giving of such notice (*provided* that in the case of a Bought Deal, such written requests for inclusion must be received within three Business Days after the Company's giving of such notice); *provided*, *however*, that such Registrable Securities are covered by an existing and effective Shelf Registration Statement that may be utilized for the offering and sale of the Registrable Securities requested to be registered.

3.2    With respect to any Demand Underwritten Offering, the Requesting Holders shall select one or more investment banking firms of nationally recognized standing to be the managing underwriters with the consent of the Company, which consent shall not be unreasonably withheld, conditioned or delayed.

3.3    The Company will not be required to undertake a Demand Underwritten Offering if the number of Demand Underwritten Offerings in the immediately preceding 12-month period shall exceed three (and no more than one such Demand Underwritten Offering

5

in any 90-day period); *provided* that a Demand Underwritten Offering shall not be considered made for purposes of this Section 3.3 unless it has resulted in the disposition by the Holders of at least 75% of the amount of Registrable Securities requested to be included.

3.4     All Holders proposing to distribute their securities through an Underwritten Offering, as a condition for inclusion of their Registrable Securities therein, shall agree to enter into an underwriting agreement with the underwriters; *provided*, *however*, that the underwriting agreement is in customary form.

3.5     If the managing underwriters for a Demand Underwritten Offering advise the Requesting Holders that in their opinion the inclusion of all securities requested to be included in the Demand Underwritten Offering (whether by the Company, any other Person, the Requesting Holders or the other Holders) may materially and adversely affect the price, timing, distribution or success of the offering (a "Negative Impact"), then all such securities to be included in such Demand Underwritten Offering shall be limited to the securities that the managing underwriters believe can be sold without a Negative Impact and shall be allocated as follows: (a) first, pro rata among the Requesting Holders and the other Holders who properly requested to include their Registrable Securities in such Demand Underwritten Offering (based on the number of shares of Registrable Securities properly requested by such Holders to be included in the Demand Underwritten Offering), (b) second, to the extent that any additional securities can, in the opinion of such managing underwriters, be sold without a Negative Impact, to the Company, and (c) third, to the extent that any additional securities can, in the opinion of the managing underwriters, be sold without a Negative Impact, to the Company's other stockholders who properly requested to include their securities in such Demand Underwritten Offering pursuant to an agreement, other than this Agreement, with the Company that provides for registration rights in accordance with the terms of such agreement.

3.6     If the managing underwriters for a Piggyback Offering initiated by the Company for its own account advise the Company that in their opinion the inclusion of all shares of capital stock requested to be included in such Piggyback Offering (whether by the Company, the Holders or any other Person) may have a Negative Impact, then all such shares to be included therein shall be limited to the shares that the managing underwriters believe can be sold without a Negative Impact and shall be allocated as follows: (a) first, to the Company, and (b) second, to the extent that any additional shares can, in the opinion of such managing underwriters, be sold without a Negative Impact, pro rata among the Holders who properly requested to include their Registrable Securities and the Company's stockholders who properly requested to include their shares pursuant to an agreement, other than this Agreement, with the Company that provides for registration rights (based on the number of shares of the applicable class of capital stock properly requested by such stockholders to be included in the Piggyback Offering).

3.7     If the managing underwriters for a Piggyback Offering initiated by a stockholder that is not a party to this Agreement pursuant to separate written contractual arrangements for such stockholder's account advise such stockholder that in their opinion the inclusion of all shares of capital stock requested to be included in such Piggyback Offering (whether by the Company, the Holders, the initiating stockholder or any other Person) may have a Negative Impact, then all such shares to be included therein shall be limited to the shares that the managing underwriters believe can be sold without a Negative Impact and shall be allocated as follows: (a) first, to the initiating stockholder, (b) second, to the extent that any additional securities can, in the opinion of such managing underwriters, be sold without a Negative Impact, to the Holders who properly requested to include their Registrable Securities (based on the number of shares of the applicable class of securities subject to the Piggyback

Offering beneficially owned at such time by such Holders), and (c) third, to the extent that any additional securities can, in the opinion of such managing underwriters, be sold without a Negative Impact, to the Company.

4 Lockups.

4.1 In connection with any Underwritten Offering or other underwritten public offering of equity securities by the Company and if requested by the underwriters managing such Underwritten Offering, any Holder of Registrable Securities who participates in such offering shall enter into customary lock-up agreements with the managing underwriter(s) of an Underwritten Offering providing that such Holder will not effect, directly or indirectly, any public sale or distribution (including sales pursuant to Rule 144) of equity securities of the Company, or any securities convertible into or exchangeable or exercisable for such securities, for up to 10 days prior to and up to 90 days following the date of the final Prospectus for such offering (the "Lockup Period"), except as part of such offering and subject to other customary exceptions, unless (i) the Company otherwise agrees by written consent or (ii) the underwriters managing such Underwritten Offering or other underwritten public offering of equity securities of the Company otherwise agree by written consent; provided, that such Lockup Period is applicable on substantially similar terms to the Company and the executive officers and directors of the Company; *provided* **that nothing herein will prevent any Holder from making a distribution of Registrable Securities to any of its partners, members or unitholders thereof or a transfer of Registrable Securities to an Affiliate or Related Fund that is otherwise in compliance with the applicable securities laws, so long as such distributees or transferees, as applicable, agree to be bound by the restrictions set forth in this** Section 4.1. Each such Holder agrees with the Company to execute a lock-up agreement in favor of the Company's underwriters managing such Underwritten Offering or other underwritten public offering of equity securities of the Company to such effect and that such underwriters shall be third party beneficiaries of this Section 4.1. The provisions of this Section 4.1 will no longer apply to a Holder once such Holder ceases to hold Registrable Securities.

4.2 In connection with any Underwritten Offering and if requested by the underwriters managing such Underwritten Offering, the Company shall not effect any public sale or distribution of equity securities of the Company, or any securities convertible into or exchangeable or exercisable for such securities, without prior written consent from such managing underwriters for such Underwritten Offering, during the Lockup Period, except as part of such Underwritten Offering and subject to other customary exceptions as agreed with the managing underwriters of such offering. Notwithstanding the foregoing, the Company may effect a public sale or distribution of securities of the type described above and during the periods described above if such sale or distribution is made pursuant to registrations on Form S-4 or Form S-8 or as part of any registration of securities of offering and sale to employees, directors or consultants of the Company and its subsidiaries pursuant to any employee stock plan or other employee benefit plan arrangement.

5 Grace Periods.

5.1 Notwithstanding anything to the contrary herein, the Company shall be entitled to postpone the filing or effectiveness of, or, at any time after a Registration Statement has been declared effective by the Commission, suspend the use of, a Registration Statement if in the good faith judgment of the Company's Board of Directors (the "Board"), such filing, effectiveness or use would reasonably be expected to materially affect in an adverse manner or materially interfere with any bona fide material financing of the Company or any bona fide

material transaction under consideration by the Company, or would require the disclosure of information that has not been, and is not otherwise required to be, disclosed to the public and the premature disclosure of which would materially affect the Company in an adverse manner (such period of a postponement or suspension, a "Grace Period"); *provided*, *however*, that in the event such Registration Statement relates to a Demand Underwritten Offering pursuant to Section 3.1, then the Holders initiating such Demand Underwritten Offering shall be entitled to withdraw the Demand Underwritten Offering and, if such request is withdrawn, it shall not count against the limits imposed pursuant to Section 3.3 and the Company shall pay all registration expenses in connection with such registration.

5.2    The Company shall (a) promptly notify the Holders in writing of the existence of the event or material non-public information giving rise to a Grace Period (*provided* that the Company shall not disclose the content of such material non-public information to any Holder, without the express consent of such Holder) and the date on which such Grace Period will begin, (b) use reasonable best efforts to terminate a Grace Period as promptly as practicable and (c) promptly notify the Holders in writing of the date on which the Grace Period ends.

5.3    The duration of any one Grace Period shall not exceed 60 days, the aggregate of all Grace Periods during any 365-day period shall not exceed 120 days, and the maximum number of Grace Periods that may be declared by the Company in any fiscal year shall not exceed three. For purposes of determining the length of a Grace Period, the Grace Period shall be deemed to begin on and include the date the Holders receive the notice referred to in clause (a) of Section 5.2 and shall end on and include the later of the date the Holders receive the notice referred to in clause (c) of Section 5.2 and the date referred to in such notice.

6    Other Procedures.

6.1    Before filing a Registration Statement or prospectus or any amendments or supplements thereto, the Company shall furnish to the Holders whose shares are covered by the Registration Statement copies of all such documents, other than documents that are incorporated by reference into such Registration Statement or prospectus, proposed to be filed and such other documents reasonably requested by such Holders (which may be furnished by email).

6.2    The Company shall promptly notify each Holder whose Registrable Securities are covered by a Registration Statement after the Company receives notice thereof, of the time when such Registration Statement has been declared effective or a supplement to any prospectus forming a part of such Registration Statement has been filed.

6.3    With respect to any offering of Registrable Securities pursuant to this Agreement, the Company shall furnish to each selling Holder and the managing underwriters, if any, without charge, such number of copies of the applicable Registration Statement, each amendment and supplement thereto, the prospectus included in such Registration Statement, all exhibits and other documents filed therewith and such other documents as such selling Holder or such managing underwriters may reasonably request.

6.4    The Company shall (a) register or qualify all Registrable Securities covered by a Registration Statement under such other securities or blue sky laws of such states or other jurisdictions of the United States of America as the Holders covered by such Registration Statement shall reasonably request in writing, (b) keep such registration or qualification in effect for so long as such Registration Statement remains in effect and (c) take any other action that may be necessary or reasonably advisable to enable such Holders to

8

consummate the disposition in such jurisdictions of the securities to be sold by such Holders, except that the Company shall not for any such purpose be required to qualify generally to do business as a foreign corporation in any jurisdiction wherein it would not but for the requirements of this <u>Section 6.4</u> be obligated to be so qualified, to subject itself to taxation in such jurisdiction or to consent to general service of process in any such jurisdiction.

6.5     The Company shall cause all Registrable Securities included in a Registration Statement to be registered with or approved by such other federal or state governmental agencies or authorities as necessary upon the opinion of Counsel to the Holders to enable the Holders thereof to consummate the disposition of such Registrable Securities in accordance with their intended method of distribution thereof.

6.6     The Company shall notify each Holder whose Registrable Securities are included in such Registration Statement at any time when a prospectus relating thereto is required to be delivered under the Securities Act, upon discovery that, or upon the happening of any event as a result of which, the prospectus included in such Registration Statement, as then in effect, includes an untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances under which they were made and for which the Company chooses to suspend the use of the Registration Statement and prospectus in accordance with the terms of this Agreement, and, at the written request of any such Holder, promptly prepare and furnish (at the Company's expense) to it a reasonable number of copies of a supplement to or an amendment of such prospectus as may be necessary so that, as thereafter delivered to the purchasers of such securities, such prospectus, as supplemented or amended, shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances under which they were made.

6.7     The Company shall notify each Holder whose Registrable Securities are included in such Registration Statement of any request by the Commission for the amending or supplementing of such Registration Statement or for additional information.

6.8     The Company shall advise each Holder whose Registrable Securities are included in such Registration Statement after the Company receives notice or obtains knowledge of any order suspending the effectiveness of a Registration Statement at the earliest practicable moment and promptly use its commercially reasonable best efforts to obtain the withdrawal.

6.9     With respect to any Underwritten Offering pursuant to this Agreement, upon reasonable advance notice to the Company, the Company shall give the Holders and underwriters participating in the Underwritten Offering and Counsel to the Holders reasonable access during normal business hours to all financial and other records, corporate documents and properties of the Company as shall be necessary, in the reasonable opinion of Counsel to the Holders and such underwriters, to conduct a reasonable due diligence investigation for purposes of the Securities Act and Exchange Act. In addition, upon reasonable advance notice and during normal business hours, the Company shall provide the Holders and underwriters participating in the Underwritten Offering and Counsel to the Holders such reasonable opportunities to discuss the business of the Company with its officers, directors, employees and the independent public accountants who have certified its financial statements as shall be necessary, in the reasonable opinion of Counsel to the Holders and such underwriters, to conduct a reasonable due diligence investigation for purposes of the Securities Act and the Exchange Act.

6.10    With respect to any Underwritten Offering pursuant to this Agreement, the Company shall use its reasonable best efforts to obtain and, if obtained, furnish to each underwriter thereof, (a) an opinion of outside counsel for the Company, dated the date of the closing under the underwriting agreement and addressed to the underwriters, reasonably satisfactory (based on customary form and substance of opinions of issuers' counsel customarily given in such an offering) in form and substance to such underwriters, and (b) a "comfort" letter, dated the date of the underwriting agreement and a "bring-down" comfort letter dated the date of the closing under the underwriting agreement and addressed to the underwriters and signed by the independent public accountants who have certified the Company's financial statements included or incorporated by reference in the applicable Registration Statement, reasonably satisfactory in form and substance to such underwriters.

6.11    The Company shall (a) enter into such agreements (including an underwriting agreement in customary form) and take such other actions as the Holders beneficially owning a majority of the Registrable Securities included in a Registration Statement or the underwriters, if any, shall reasonably request in order to expedite or facilitate the disposition of such Registrable Securities, including customary indemnification, and (b) provide reasonable cooperation, including causing at least one executive officer and a senior financial officer to attend and participate in "road shows" and other information meetings organized by the underwriters, if any, as reasonably requested; *provided*, *however*, that the Company shall have no obligation to participate in more than two "road shows" in any 12-month period and such participation shall not unreasonably interfere with the business operations of the Company.

6.12    Each Holder agrees that it shall not be entitled to be named as a selling securityholder in a Registration Statement unless such Holder has timely returned to the Company a completed and signed Selling Holder Questionnaire and related documents and responded to any reasonable requests for further information.

6.13    The Company shall not name any Holder as an "underwriter" in a Registration Statement without the prior written consent of such Holder.

7    <u>Payment of Expenses.</u> All fees and expenses incident to the Company's performance of or compliance with its obligations under this Agreement (excluding any underwriting discounts, fees or selling commissions or broker or similar commissions or fees, or transfer taxes of any Holder) shall be borne by the Company whether or not any Registrable Securities are sold pursuant to a Registration Statement. The fees and expenses referred to in the foregoing sentence shall include, without limitation, (i) all registration and filing fees (including, without limitation, fees and expenses (A) with respect to filings required to be made with any securities exchange on which shares of Common Stock or Convertible Preferred Stock, as applicable, are then listed for trading, if any, (B) with respect to compliance with applicable state securities or "Blue Sky" laws (including, without limitation, fees and disbursements of counsel for the Company in connection with "Blue Sky" qualifications or exemptions of the Registrable Securities and determination of the eligibility of the Registrable Securities for investment under the laws of such jurisdictions as requested by the Holders) and (C) if not previously paid by the Company in connection with an issuer filing, with respect to any filing that may be required to be made by any broker through which a Holder intends to make sales of Registrable Securities with the Financial Industry Regulatory Authority ("<u>FINRA</u>") pursuant to FINRA Rule 5110, so long as the broker is receiving no more than a customary brokerage commission in connection with such sale, (ii) printing expenses (including, without limitation, expenses of printing certificates for Registrable Securities and of printing prospectuses if the printing of prospectuses is reasonably requested by the Holders

of a majority of the Registrable Securities included in the Registration Statement), (iii) messenger, telephone and delivery expenses, (iv) fees and disbursements of counsel to the Company, (v) the reasonable fees and expenses incurred in connection with any road show for Underwritten Offerings, (vi) Securities Act liability insurance, if the Company so desires such insurance, and (vii) fees and expenses of all other Persons retained by the Company in connection with the consummation of the transactions contemplated by this Agreement. In addition, the Company will pay the reasonable, documented out-of-pocket fees and disbursements of one Counsel to the Holders (not to exceed \$[●] per offering), including, for the avoidance of doubt, any expenses of such Counsel incurred in connection with the filing or amendment of any Registration Statement, prospectus or free writing prospectus hereunder or any Underwritten Offering. The Holder shall bear and pay all underwriting discounts, fees and commissions applicable to the Registrable Securities for the Holder's account.

8    Indemnification and Contribution.

8.1    Indemnification by the Company. The Company shall, notwithstanding any termination of this Agreement, indemnify, defend and hold harmless each Holder, the officers, directors, agents, partners, members, investment manager, managers, stockholders, Affiliates and employees of each of them, each Person who controls any such Holder (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) and the officers, directors, partners, members, investment manager, managers, stockholders, agents and employees of each such controlling Person, to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities, costs (including reasonable costs of preparation and investigation and reasonable attorneys' fees) and expenses (collectively, "Losses"), to which any of them may become subject, that arise out of or are based upon (a) any untrue statement of a material fact contained in any Registration Statement, any prospectus or any form of prospectus or in any amendment or supplement thereto or in any preliminary prospectus or (b) any omission to state a material fact required to be stated therein or necessary to make the statements therein (in the case of any prospectus or form of prospectus or supplement thereto, in the light of the circumstances under which they were made) not misleading, except to the extent, but only to the extent, that (i) any untrue statements or omissions are based upon information regarding such Holder furnished in writing to the Company by such Holder expressly for use therein, or to the extent that such information relates to such Holder or such Holder's proposed method of distribution of Registrable Securities and was provided by such Holder expressly for use in the Registration Statement, such prospectus or such form of prospectus or in any amendment or supplement thereto, or (ii) in the case of an occurrence of an event of the type specified in Section 6.6 or the Company exercises its rights set forth in Section 5, related to the use by a Holder of an outdated or defective prospectus after the Company has notified such Holder in writing that the prospectus is outdated or defective, but only if and to the extent that the misstatement or omission giving rise to such Loss would have been corrected. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of an Indemnified Party (as defined below), shall survive the transfer of the Registrable Securities by the Holders, and shall be in addition to any liability which the Company may otherwise have.

8.2    Indemnification by Holders. Each Holder shall, severally and not jointly, indemnify and hold harmless the Company, its respective directors, officers, agents and employees, each Person who controls the Company (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), and the directors, officers, agents or employees of such controlling Persons, to the fullest extent permitted by applicable law, from and against all Losses, as incurred, arising out of or are based upon any untrue statement of a

11

material fact contained in any Registration Statement, any prospectus, or any form of prospectus, or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or relating to any omission of a material fact required to be stated therein or necessary to make the statements therein (in the case of any prospectus, or any form of prospectus or supplement thereto, in the light of the circumstances under which they were made) not misleading (a) to the extent, but only to the extent, that such untrue statements or omissions are based upon information regarding such Holder furnished in writing to the Company by such Holder expressly for use therein, (b) to the extent, but only to the extent, that such information relates to such Holder or such Holder's proposed method of distribution of Registrable Securities and was provided by such Holder expressly for use in a Registration Statement, such prospectus or such form of prospectus or in any amendment or supplement thereto or (c) in the case of an occurrence of an event of the type specified in <u>Section 6.6</u> or the Company exercises its rights set forth in <u>Section 5</u>, to the extent, but only to the extent, related to the use by such Holder of an outdated or defective prospectus after the Company has notified such Holder in writing that the prospectus is outdated or defective, but only if and to the extent the misstatement or omission giving rise to such Losses would have been corrected. In no event shall the liability of any Holder hereunder be greater in amount than the dollar amount of the net proceeds received by such Holder upon the sale of the Registrable Securities giving rise to such indemnification obligation. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of an Indemnified Party, shall survive the transfer of the Registrable Securities by the Holders, and shall be in addition to any liability which the Holder may otherwise have.

8.3     <u>Conduct of Indemnification Proceedings.</u> If any Proceeding shall be brought or asserted against any Person entitled to indemnity hereunder (an "<u>Indemnified Party</u>"), such Indemnified Party shall promptly notify the Person from whom indemnity is sought (the "<u>Indemnifying Party</u>") in writing, and the Indemnifying Party shall have the right to assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all reasonable fees and expenses incurred in connection with defense thereof; *provided* that the failure of any Indemnified Party to give such notice shall not relieve the Indemnifying Party of its obligations or liabilities pursuant to this Agreement, except (and only) to the extent that such failure shall have materially and adversely prejudiced the Indemnifying Party.

An Indemnified Party shall have the right to employ separate counsel in any such Proceeding and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party or Parties unless (a) the Indemnifying Party has agreed in writing to pay such fees and expenses; (b) the Indemnifying Party shall have failed promptly to assume the defense of such Proceeding and to employ counsel reasonably satisfactory to such Indemnified Party in any such Proceeding; or (c) the named parties to any such Proceeding (including any impleaded parties) include both such Indemnified Party and the Indemnifying Party, and such Indemnified Party shall have been advised by counsel that in the reasonable judgment of such counsel a conflict of interest exists if the same counsel were to represent such Indemnified Party and the Indemnifying Party; *provided* that the Indemnifying Party shall not be liable for the reasonable and documented fees and expenses of more than one separate firm of attorneys at any time for all Indemnified Parties. The Indemnifying Party shall not be liable for any settlement of any such Proceeding effected without its written consent, which consent shall not be unreasonably withheld, delayed or conditioned. No Indemnifying Party shall, without the prior written consent of the Indemnified Party, effect any settlement of any pending Proceeding in respect of which any Indemnified

Party is a party, unless such settlement includes an unconditional release of such Indemnified Party from all liability on claims that are the subject matter of such Proceeding.

Subject to the terms of this Agreement, all reasonable and documented fees and expenses of the Indemnified Party (including reasonable and documented fees and expenses to the extent incurred in connection with investigating or preparing to defend such Proceeding in a manner not inconsistent with this Section 8.3) shall be paid to the Indemnified Party, as incurred, with reasonable promptness after receipt of written notice thereof to the Indemnifying Party; *provided* that the Indemnified Party shall promptly reimburse the Indemnifying Party for that portion of such fees and expenses applicable to such actions for which such Indemnified Party is finally judicially determined to not be entitled to indemnification hereunder. The failure to deliver written notice to the Indemnifying Party within a reasonable time of the commencement of any such action shall not relieve such Indemnifying Party of any liability to the Indemnified Party under this Section 8, except to the extent that the Indemnifying Party is materially and adversely prejudiced in its ability to defend such action.

8.4     Contribution. If a claim for indemnification under Section 8.1 or 8.2 is unavailable to an Indemnified Party or insufficient to hold an Indemnified Party harmless for any Losses, then each Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Losses, in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and Indemnified Party in connection with the actions, statements or omissions that resulted in such Losses as well as any other relevant equitable considerations. The relative fault of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue statement of a material fact or omission of a material fact, has been taken or made by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action, statement or omission.

The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 8.4 were determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to in the immediately preceding paragraph. Notwithstanding the provisions of this Section 8.4, no Holder shall be required to contribute, in the aggregate, any amount in excess of the amount by which the net proceeds actually received by such Holder from the sale of the Registrable Securities subject to the Proceeding exceeds the amount of any damages that such Holder has otherwise been required to pay by reason of such untrue statement or omission. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

9      Transfer of Registration Rights. Any Holder may freely assign its rights hereunder on a pro rata basis in connection with any sale, transfer, assignment or other conveyance (any of the foregoing, a "Transfer") of Registrable Securities to any transferee or assignee; *provided* that all of the following additional conditions are satisfied: (a) such Transfer is effected in accordance with applicable securities laws and the Company's certificate of incorporation and bylaws then in effect; (b) such transferee agrees in writing to become subject to the terms of this Agreement by executing a joinder agreement in the form set forth in Exhibit A hereto and delivers it to the Company as promptly as reasonably practicable; and (c) the Company is given written notice by such Holder of such Transfer, stating the name and address of the transferee and identifying the Registrable Securities with respect to which such rights are being Transferred and provide the amount of any other capital stock of the Company beneficially owned by such transferee; *provided, however*, that (i) except with respect to an

Affiliate or Related Fund of an Initial Holder, any rights assigned hereunder shall apply only in respect of Registrable Securities that are Transferred and not in respect of any other securities that the transferee or assignee may hold and (ii) any Registrable Securities that are Transferred may cease to constitute Registrable Securities following such Transfer in accordance with the terms of this Agreement. Following a Transfer in accordance with this Section 9, the Company shall update the applicable prospectus to include the transferee as a selling holder thereunder promptly upon the receipt of the required information from such transferee.

10      Amendment and Waiver; Exercise of Rights and Remedies.

10.1     This Agreement may be amended or modified, and the provisions hereof may be waived, only by an agreement in writing signed by the Company and the Holders representing more than 50% of the then outstanding Registrable Securities (determined on an as converted basis); *provided, however*, that (i) any such amendment, modification or waiver that would adversely affect the obligations or rights of the Holders of a class or series of Registrable Securities in a manner that is facially disproportionate relative to the Holders of another class or series of Registrable Securities will require the written consent of 50% of the then outstanding Registrable Securities of the class or series then outstanding that is so adversely affected, and (ii) any such amendment, modification or waiver that would adversely affect the obligations or rights of any Holder in a manner that is facially disproportionate relative to other Holders of the same class of securities (other than solely based on the number of shares owned) will require the written consent of the Holder so disproportionately affected. Each amendment, modification and waiver effected in compliance with this Section 10.1 will be binding upon each party hereto. The Company will provide notice as soon as reasonably practicable to each Holder of any amendment, modification or waiver effected in compliance with this Section 10.1. In addition, each party hereto may waive any of its rights hereunder by an instrument in writing signed by such party.

10.2     No delay of or omission in the exercise of any right, power or remedy accruing to any party as a result of any breach or default by any other party under this Agreement shall impair any such right, power or remedy, nor shall it be construed as a waiver of or acquiescence in any such breach or default, or of any similar breach or default occurring later; nor shall any such delay, omission nor waiver of any single breach or default be deemed a waiver of any other breach or default occurring before or after that waiver.

11      Section 4(a)(7), Rule 144 and Rule 144A. The Company will provide reasonable access to management for confirmatory due diligence meetings, as any Initial Holder may reasonably request (which requests shall be made in a manner to accommodate management's existing obligations and responsibilities and not interfere with the operation of the Company), to the extent required from time to time to enable such Holder to sell Registrable Securities without registration under the Securities Act. On and after the Effective Date, the Company will use reasonable best efforts to file in a timely manner all reports and other documents required to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted by the Commission thereunder and make available information necessary, to the extent required from time to time, to enable such Holder to sell Registrable Securities without registration under the Securities Act pursuant to Rule 144 or Rule 144A or Section 4(a)(7) of the Securities Act. Upon the reasonable request of any Holder, the Company will deliver to such Holder a written statement as to whether it has complied with such information requirements, and, if not, the specific reasons for non-compliance.

12      Notices. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given when (a) delivered

personally (in which case, it will be deemed received upon delivery), (b) sent by electronic mail (in which case, it will be deemed received when sent if sent during normal business hours of the recipient and on the next Business Day if sent after normal business hours of the recipient), (c) sent by overnight courier service (in which case, it will be deemed received on the Business Day immediately following the date deposited with such courier service), or (d) mailed by certified or registered mail, return receipt requested, with postage prepaid (in which case, it will be deemed received upon receipt of confirmation of receipt of delivery), to the parties at the addresses listed below (or at such other address for a party as shall be specified by like notice).

<div style="margin-left: 2em;">

If to the Company:

[New Parent Holdco]
[Address]
Attention: [___]
E-mail: [___]

with copies (which shall not constitute notice) to:

[Notice party]
[Address]
Attention: [___]
Email: [___]

If to any Holder, to the address set forth for such Holder on the signature page hereto or to the joinder agreement in the form set forth in Exhibit A hereto.

</div>

13      Entire Agreement; Binding Effect. This Agreement constitutes the entire agreement of the parties with respect to its subject matter, supersedes all prior or contemporaneous oral or written agreements or discussions with respect to such subject matter (including the Chapter 11 Plan), and shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, representatives, successors and permitted assigns.

14      Term. The provisions of this Agreement shall terminate with respect to any Holder and be of no further force or effect when such Holder ceases to hold any Registrable Securities; provided, that the provisions of Section 8 shall survive for any sales of Registrable Securities pursuant to this Agreement.

15      Other Registration Rights. The Company represents and warrants that it has not granted, and is not subject to, any registration rights that are superior to, or that in any way subordinate, the rights granted to the Holders hereby. Without the prior written consent of the Holders holding at least a majority of the then outstanding Registrable Securities, the Company shall not, prior to the termination of this Agreement, grant any registration rights that are superior to, or in any way subordinate, the rights granted to the Holders hereby, including any registration or other right that is directly or indirectly intended to violate or subordinate the rights granted to the Holders hereby.

16      Third Party Beneficiaries. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or

equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement, except as provided in Section 8.

17      Further Action. The parties agree to execute and deliver all documents, provide all information and take or refrain from taking such actions as may be necessary or appropriate to achieve the purposes of this Agreement.

18      Counterparts; Electronic Delivery. This Agreement may be executed in one or more counterparts, all of which taken together shall constitute one and the same instrument. This Agreement and any signed agreement or instrument entered into in connection with this Agreement, and any amendments hereto or thereto, to the extent delivered by means of electronic mail in ".pdf", ".tif" or similar format (any such delivery, an "Electronic Delivery"), shall be treated in all manners and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement, including footers from earlier versions of this Agreement, will be disregarded in determining the effectiveness of such signature. No party hereto or to any such agreement or instrument shall raise (a) the use of Electronic Delivery to deliver a signature or (b) the fact that any signature or agreement or instrument was transmitted or communicated through the use of Electronic Delivery, as a defense to the formation of a contract, and each such party forever waives any such defense, except to the extent such defense is related to lack of authenticity.

19      Severability. Whenever permitted by applicable law, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein or if such term or provision could be drawn more narrowly so as not to be illegal, invalid, prohibited or unenforceable in such jurisdiction, it shall be so narrowly drawn, as to such jurisdiction, without invalidating the remaining terms and provisions of this Agreement or affecting the legality, validity or enforceability of such term or provision in any other jurisdiction.

20      Governing Law. This Agreement shall be governed by and construed in accordance with the domestic substantive laws of the State of Delaware without giving effect to any choice or conflict of laws provision or rule that would cause the application of the domestic substantive laws of any other jurisdiction.

21      Consent to Jurisdiction. Any dispute relating hereto shall be brought in the Court of Chancery of the State of Delaware, or to the extent such court does not have subject matter jurisdiction, the United States District Court for the District of Delaware, or to the extent such court also does not have subject matter jurisdiction, another court of the State of Delaware, County of New Castle (each a "Chosen Court" and collectively, the "Chosen Courts"), so long as one of such courts shall have subject matter jurisdiction over such dispute, and the parties hereto agree to the exclusive jurisdiction and venue of the Chosen Courts. The parties hereto further agree that any Proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement (the "Applicable Matters") shall be brought exclusively in a Chosen Court, and that any Proceeding arising out of this Agreement or any other Applicable Matter shall be deemed to have arisen from a transaction of business in the State of Delaware, and each of the parties hereto hereby irrevocably consents to the jurisdiction

16

of such Chosen Courts in any such Proceeding and irrevocably and unconditionally waives, to the fullest extent permitted by law, any objection that such Person may now or hereafter have to the laying of the venue of any such suit, action or Proceeding in any such Chosen Court or that any such Proceeding brought in any such Chosen Court has been brought in an inconvenient forum. Such Persons further covenant not to bring a Proceeding with respect to the Applicable Matters (or that could affect any Applicable Matter) other than in such Chosen Court and not to challenge or enforce in another jurisdiction a judgment of such Chosen Court. Each party hereto hereby consents to service of process in any such Proceeding in any manner permitted by Delaware law and agrees that service of process on such party as provided for notices in <u>Section 12</u> is reasonably calculated to give actual notice and shall be deemed effective service of process on such Person.

22     <u>WAIVER OF JURY TRIAL.</u> TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH PARTY HERETO HEREBY WAIVES AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE) ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE OR ACTION, CLAIM, CAUSE OF ACTION OR SUIT (IN CONTRACT, TORT OR OTHERWISE), INQUIRY, PROCEEDING OR INVESTIGATION ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE SUBJECT MATTER HEREOF OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE TRANSACTIONS CONTEMPLATED HEREBY, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING. EACH PARTY HERETO ACKNOWLEDGES THAT IT HAS BEEN INFORMED BY THE OTHER PARTIES HERETO THAT THIS <u>SECTION 22</u> CONSTITUTES A MATERIAL INDUCEMENT UPON WHICH THEY ARE RELYING AND WILL RELY IN ENTERING INTO THIS AGREEMENT. ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS <u>SECTION 22</u> WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

23     <u>Certain Matters of Construction.</u>

23.1     The parties hereto have participated jointly in the negotiation and drafting of this Agreement. This Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

23.2     The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement.

23.3     The words "hereof," "herein," "hereunder" and words of similar import shall refer to this Agreement as a whole and not to any particular Section or provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified, and reference to a particular Section of this Agreement shall include all subsections thereof.

23.4     Whenever required or permitted by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa.

23.5     The use of the words "include," "includes" or "including" in this Agreement shall be by way of example rather than by limitation and shall be deemed to be

followed by the words "without limitation." The use of the words "or," "either" and "any" shall not be exclusive.

23.6    Whenever in this Agreement a party hereto is permitted or required to take any action or to make a decision or determination, such Person shall be entitled to take (or omit to take) such action or make such decision or determination in such Person's sole discretion, unless another standard is expressly set forth herein. Whenever in this Agreement a Person is permitted or required to take by any valid means any action or to make a decision or determination in its "sole discretion" or "discretion," with "complete discretion" or under a grant of similar authority or latitude, such Person shall be entitled to consider solely its own interests (and not the interests of any other Person) or, at its election, any such other interests and factors as such Person desires (including the interests of such Holder's Affiliates, employers, partners and their respective Affiliates), or any combination thereof.

23.7    The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

23.8    The word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase will not mean simply "if".

23.9    All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

24    Certain Definitions. For all purposes of and under this Agreement, the following terms shall have the following respective meanings:

24.1    "Affiliate" means any Person who, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Person specified. For purposes of this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlled" and "under common control with" shall have correlative meanings.

24.2    "Automatic Shelf Registration Statement" means an "automatic shelf registration statement" as defined in Rule 405 under the Securities Act, as such definition may be amended from time to time.

24.3    "Backstop Commitment Agreement" has the meaning set forth in the recitals to this Agreement.

24.4    "Backstop Parties" means the Persons identified as Backstop Parties in the Backstop Commitment Agreement, including their permitted successors and assigns pursuant to the terms of that agreement.

24.5    "beneficially own" shall have the meaning given to such term in Rule 13d-3 under the Exchange Act, and any Person's beneficial ownership of securities at any time shall be calculated in accordance with the provisions of such Rule as in effect as of such time.

24.6    "Business Day" means any day, other than a Saturday or Sunday or a day on which commercial banks in New York City are authorized or required by law to be closed.

24.7    "Commission" means the United States Securities and Exchange Commission or any successor governmental agency.

24.8    "Commission Guidance" means (i) any publicly-available written guidance, interpretation, principle or rule of general applicability of the Commission staff, or (ii) written comments, requirements or requests of the Commission staff to the Company in connection with the review of a Registration Statement.

24.9    "Common Stock Equivalents" means, without duplication, Common Stock and any rights, warrants, options, convertible securities, exchangeable securities and other securities convertible or exchangeable into Common Stock, whether at the time of issuance or upon the passage of time or the occurrence of some future event.

24.10   "Convertible Preferred Stock Equivalents" means, without duplication, Convertible Preferred Stock and any rights, warrants, options, convertible securities, exchangeable securities and other securities convertible or exchangeable into Convertible Preferred Stock, whether at the time of issuance or upon the passage of time or the occurrence of some future event.

24.11   "Counsel to the Holders" means (a) with respect to a Shelf Registration Statement, the counsel from no more than one firm of attorneys selected by the beneficial owners of a majority of the then outstanding Registrable Securities, (b) with respect to a Demand Underwritten Offering, the counsel from no more than one firm of attorneys selected by the Requesting Holders, and (c) with respect to a Piggyback Offering, the counsel of no more than one firm of attorneys selected by the Holders that hold a majority of the Registrable Securities requested to be included therein.

24.12   "Exchange Act" means the Securities Exchange Act of 1934, as amended.

24.13   "Form S-1" means form S-1 under the Securities Act or any other form hereafter adopted by the Commission for the general registration of securities under the Securities Act.

24.14   "Form S-3" means form S-3 under the Securities Act, including a form S-3 filed as an Automatic Shelf Registration Statement, or any other form hereafter adopted by the Commission having substantially the same usage.

24.15   "Holders" means the Initial Holders and any joining parties identified as such on the signature pages of any joinder agreement executed and delivered pursuant to this Agreement; *provided*, *however*, that a Person shall cease to be a Holder at such time as it ceases to hold any Registrable Securities.

24.16   "Initial Holders" means the persons identified as Initial Holders on the signature pages hereto.

24.17   "Person" means any individual, corporation, general or limited partnership, limited liability company, joint venture, trust, association or any other entity.

24.18   "Proceeding" means any suit, countersuit, action, cause of action (whether at law or in equity), arbitration, audit, hearing, litigation, claim, counterclaim, complaint, defense, administrative or similar proceeding (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private) commenced, brought, conducted or heard by or before, or otherwise involving, any governmental entity.

24.19   "Registrable Securities" means (a) all shares of Common Stock or Convertible Preferred Stock now or hereinafter beneficially owned by a Holder, or by any Affiliate, Related Fund, or permitted assignee of any Holder, either directly or pursuant to a

joinder or assignment, including all shares of Common Stock issuable upon conversion of the [Senior Secured Convertible Notes] (without regard to any limitation on conversion thereof), and (b) any additional securities paid, issued or distributed in respect of any such securities by way of a dividend, split, reverse split or distribution, or in connection with a combination of securities, and any security into which any such securities, as applicable, shall have been converted or exchanged in connection with a recapitalization, reorganization, reclassification, merger, consolidation, exchange, distribution, redemption or otherwise; *provided, however*, that such shares shall cease to be Registrable Securities when (i) a Registration Statement has become effective under the Securities Act and such shares have been disposed of in accordance with such Registration Statement; (ii) such shares have been Transferred pursuant to Rule 144; (iii) all such shares are eligible for resale without restriction (including any limitation thereunder on volume or manner-of-sale) and without the need for current public information pursuant to Rule 144; or (iv) such shares shall have ceased to be outstanding.

24.20   "Registration Statement" means any a registration statement of the Company filed under the Securities Act that covers the resale of any of the Registrable Securities pursuant to the provisions of this Agreement.

24.21   "Related Fund" means (i) any investment funds or other entities who are managed by or advised by the same investment advisor or investment advisors under common control, and (ii) any investment advisor with respect to an investment fund or entity it advises or manages.

24.22   "Rule 144" means Rule 144 under the Securities Act (or any successor rule).

24.23   "Rule 144A" means Rule 144A under the Securities Act (or any successor rule).

24.24   "Securities Act" means the Securities Act of 1933, as amended.

24.25   "Selling Holder Questionnaire" means a questionnaire reasonably adopted by the Company from time to time.

24.26   "Shelf Registration Statement" means a registration statement filed with the Commission for an offering on a delayed or continuous basis pursuant to Rule 415 under the Securities Act (or any successor rule).

24.27   "Underwritten Offering" means an offering of shares of Common Stock and/or Convertible Preferred Stock under a registration statement in which the shares are sold to an underwriter for reoffering to the public.

[*Signatures appear on the following pages.*]

**IN WITNESS WHEREOF**, each of the undersigned has duly executed this Agreement as of the date first written above.

**THE COMPANY:**

[New Parent Holdco]

By: _____
Name:
Title:

**THE INITIAL HOLDERS:**

[__]

By: _____
Name:
Title:

Address for Notices:

[Street]
Attention: [__]
Email: [__]

## Exhibit A

## JOINDER AGREEMENT

This Joinder Agreement (this "Joinder Agreement") is made as of the date written below by the undersigned (the "Joining Party") in accordance with the Registration Rights Agreement, dated as of [__], 2023, and as amended from time to time (the "Registration Rights Agreement"), among [New Parent Holdco] (the "Company") and the other parties thereto. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Registration Rights Agreement.

The Joining Party hereby acknowledges, agrees and confirms that, by its execution of this Joinder Agreement, the Joining Party shall be deemed to be a party to, and a "Holder" under, the Registration Rights Agreement as of the date hereof as if he, she or it had executed the Registration Rights Agreement. The Joining Party hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Registration Rights Agreement.

This Joinder Agreement shall be governed by and construed in accordance with the domestic substantive laws of the State of Delaware without giving effect to any choice or conflict of laws provision or rule that would cause the application of the domestic substantive laws of any other jurisdiction.

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of the date written below.

Date: [_____ ___, _____]

### JOINING PARTY

By: _____

Name:
Title:
Address:

Email Address:

### AGREED AND ACCEPTED:

### [NEW PARENT HOLDCO]

By: _____

Name:

Title:

**Exhibit A(v)**

**Form of Certificate of Incorporation for New Intermediate Holding Company**

*Draft 4.17.23*

### AMENDED AND RESTATED CERTIFICATE OF INCORPORATION
### OF
### INVACARE INTERNATIONAL HOLDINGS CORP.

Invacare International Holdings Corp. (the "***Corporation***"), a corporation organized and existing under the General Corporation Law of the State of Delaware (the "***DGCL***"), hereby certifies as follows:

1.      The original Certificate of Incorporation of the Corporation the (the "***Original Certificate of Incorporation***") was filed with the Secretary of State of the State of Delaware on [●], 2023.

2.      This Amended and Restated Certificate of Incorporation (this "***Certificate of Incorporation***"), which restates and amends the Original Certificate of Incorporation, has been declared advisable and duly adopted by the Board of Directors of the Corporation (the "***Board of Directors***") and the stockholders of the Corporation in accordance with Sections 228, 242 and 245 of the DGCL.

3.      The Original Certificate of Incorporation is hereby amended and restated in its entirety to read as follows:

### ARTICLE I
### NAME

The name of the Corporation is Invacare International Holdings Corp.

### ARTICLE II
### REGISTERED OFFICE; REGISTERED AGENT

The address of the registered office of the Corporation in the State of Delaware is c/o Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle, Delaware, 19801. The name of its registered agent at such address is The Corporation Trust Company.

### ARTICLE III
### PURPOSE

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may now or hereafter be organized under the DGCL, as the same exists or may hereafter be amended from time to time.

### ARTICLE IV
### CAPITALIZATION

**Section 4.1      Authorized Shares.** The aggregate number of shares of capital stock that the Corporation will have authority to issue is one hundred (100) shares, which shall consist of one hundred (100) shares of common stock, par value $0.001 per share (the "***Common Stock***").

1

**Section 4.2** **Common Stock.** Each holder of Common Stock, as such, shall be entitled to one vote for each share of Common Stock held by such holder on all matters on which stockholders generally are entitled to vote under applicable law. Except as otherwise provided in this Certificate of Incorporation or required by applicable law, the holders of Common Stock shall vote together as a single class on all matters submitted to a vote of the stockholders generally.

Subject to applicable law and Article XIV, such dividends and other distributions may be declared and paid ratably on the Common Stock out of the assets of the Corporation that are by applicable law available therefor at such times and in such amounts as the Board of Directors in its discretion shall determine.

In the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Corporation, after payment or provision for payment of the debts and other liabilities of the Corporation, the holders of all outstanding shares of Common Stock shall be entitled to receive the remaining assets of the Corporation available for distribution ratably in proportion to the number of shares held by each such stockholder.

**Section 4.3** **Non-Voting Equity.** The Corporation shall not issue nonvoting equity securities to the extent prohibited by Section 1123(a)(6) of title 11 of the United States Code (as amended, the "***Bankruptcy Code***"); *provided*, *however*, that the foregoing restriction shall (a) have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (b) only have such force and effect for so long as Section 1123(a)(6) of the Bankruptcy Code is in effect and applicable to the Corporation, and (c) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

## ARTICLE V
## BYLAWS

In furtherance and not in limitation of the powers conferred by statute, the bylaws of the Corporation (the "***Bylaws***") may be amended or repealed, and new bylaws may be adopted, by the Board of Directors without any action on the part of the stockholders, and the stockholders may make additional bylaws and may adopt, amend or repeal any bylaws, whether such bylaws were originally adopted by them or otherwise.

## ARTICLE VI
## BOARD OF DIRECTORS

**Section 6.1** **General.** Except as provided in this Certificate of Incorporation or the DGCL, the business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.

**Section 6.2** **Number and Term.** The total number of directors shall be no less than [   ] and no more than [   ] as fixed from time to time in accordance with the Bylaws. Notwithstanding the foregoing, if at any time a vacancy is created on the Board of Directors by reason of the incapacity, death, removal or resignation of a director, such vacancy shall automatically reduce the number of directors *pro tanto*, until such time as such vacancy is filled, whereupon the number of directors shall be automatically increased *pro tanto*. The directors shall consist of a single class, and each director shall hold office until his or her successor shall have been duly elected and

qualified, subject, however, to such director's earlier death, resignation, retirement, disqualification or removal.

**Section 6.3**    **No Requirement of Written Ballot**. Unless and except to the extent that the Bylaws shall so require, the election of the directors need not be by written ballot.

# ARTICLE VII
# INDEMNIFICATION

**Section 7.1**    **Right to Indemnification.** To the fullest extent permitted by applicable law, the Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding ("***Proceeding***"), whether civil, criminal, administrative or investigative (other than an action by or in the right of the Corporation), by reason of the fact that he or she is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee, fiduciary or agent of another corporation, partnership, joint venture, limited liability company, trust or other enterprise ("***Other Entity***"), against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with such Proceeding if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe the person's conduct was unlawful, *provided*, *however*, that except as set forth in Section 7.3, the Corporation shall not be required to indemnify a person in connection with a Proceeding (or part thereof) commenced by such person unless the commencement of such Proceeding (or part thereof) by such person was authorized in the specific case by the Board of Directors. The termination of any Proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the person did not act in good faith and in a manner which the person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that the person's conduct was unlawful. To the fullest extent permitted by applicable law, the Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgment in its favor by reason of the fact that the person is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee, fiduciary or agent of an Other Entity against expenses (including attorneys' fees) actually and reasonably incurred by the person in connection with the defense or settlement of such action or suit if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the Corporation and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the Corporation unless and only to the extent that the Court of Chancery of the State of Delaware (the "***Court of Chancery***") or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper. Persons who are not directors or officers of the Corporation (or otherwise entitled to indemnification pursuant to this Section 7.1) may be similarly indemnified in respect of service to the Corporation or to an Other Entity at the request of the

Corporation to the extent the Board at any time specifies that such persons are entitled to the benefits of this Article VII.

Section 7.2    **Right to Advancement of Expenses.** The Corporation shall, from time to time, reimburse or advance to any director or officer or other person entitled to indemnification hereunder the funds necessary for payment of expenses, including attorneys' fees and disbursements, incurred in connection with any Proceeding, in advance of the final disposition of such Proceeding; *provided*, *however*, that, if required by the DGCL, such expenses incurred by or on behalf of any director or officer or other person may be paid in advance of the final disposition of a Proceeding only upon receipt by the Corporation of an undertaking, by or on behalf of such director or officer (or other person indemnified hereunder), to repay any such amount so advanced if it shall ultimately be determined by final judicial decision from which there is no further right of appeal that such director, officer or other person is not entitled to be indemnified for such expenses.

Section 7.3    **Claims by Indemnifiable Persons**. If a claim for indemnification or advancement of expenses under this Article VII is not paid in full within 30 days after a written claim therefor by any person entitled to indemnification and/or advancement of expenses under this Article VII (an "***Indemnifiable Person***") has been received by the Corporation (and any undertaking required under Section 7.2), the Indemnifiable Person may file suit to recover the unpaid amount of such claim. If successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses, the Indemnifiable Person shall be entitled to be paid the expense of prosecuting or defending such claim to the fullest extent permitted by applicable law. In any such action the Corporation shall have the burden of proving that the Indemnifiable Person is not entitled to the requested indemnification or advancement of expenses under applicable law. Neither the failure of the Corporation (including the Board of Directors or a committee thereof, its independent legal counsel and its stockholders) to have made a determination prior to the commencement of such action that such indemnification or reimbursement or advancement of expenses is proper in the circumstances nor an actual determination by the Corporation (including the Board of Directors or a committee thereof, its independent legal counsel and its stockholders) that such Indemnifiable Person is not entitled to such indemnification or reimbursement or advancement of expenses shall constitute a defense to the action or create a presumption that such Indemnifiable Person is not so entitled. Such an Indemnifiable Person shall also be indemnified, to the fullest extent permitted by applicable law, for any expenses incurred in connection with successfully establishing his or her right to such indemnification or reimbursement or advancement of expenses, in whole or in part, in any such action. Any right to indemnification or reimbursement or advancement of expenses shall be determined by the applicable law in effect at the time indemnification or reimbursement or advancement of expenses is sought.

Section 7.4    **Indemnification Not Exclusive.** The rights to indemnification and reimbursement or advancement of expenses provided by, or granted pursuant to, this Article VII shall not be deemed exclusive of any other rights to which a person seeking indemnification or reimbursement or advancement of expenses may have or hereafter be entitled under any statute, the Bylaws, this Certificate of Incorporation, any agreement (including any policy of insurance purchased or provided by the Corporation under which directors, officers, employees and other agents of the Corporation are covered), any vote of the holders of capital stock of the Corporation

entitled to vote or disinterested directors or otherwise, both as to action in his or her official capacity and as to action in another capacity while holding such office.

**Section 7.5**    **Continuing Rights**. The rights to indemnification and reimbursement or advancement of expenses provided by, or granted pursuant to, this Article VII shall continue as to a person who has ceased to be a director or officer (or other person indemnified hereunder) and shall inure to the benefit of the executors, administrators, legatees and distributees of such person.

**Section 7.6**    **Insurance.** The Corporation shall have the power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, member, manager, employee or agent of an Other Entity, against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the Corporation would have the power to indemnify such person against such liability under the provisions of this Article VII, the Bylaws, the DGCL or any other applicable law.

**Section 7.7**    **Contract Rights; Amendment or Repeal.** The provisions of this Article VII shall be a contract between the Corporation, on the one hand, and each director and officer who serves in such capacity at any time while this Article VII is in effect and any other person indemnified hereunder, on the other hand, pursuant to which the Corporation and each such director, officer or other person intend to be legally bound. Notwithstanding anything to the contrary contained in this Certificate of Incorporation, no amendment, repeal or modification of this Article VII shall affect any rights or obligations with respect to any state of facts then or theretofore existing or any proceeding theretofore or thereafter brought or threatened based in whole or in part upon any such state of facts.

**Section 7.8**    **Requested Services.** Any director, officer, employee, fiduciary or agent of the Corporation serving in any capacity in (a) another corporation of which the majority of the shares entitled to vote in the election of its directors is held, directly or indirectly, by the Corporation or (b) any employee benefit plan of the Corporation or any corporation referred to in clause (a) shall be deemed to be doing so at the request of the Corporation.

**Section 7.9**    **Indemnitor of First Resort.** It is the intent that with respect to all advancement, reimbursement and indemnification obligations under this Article VII, the Corporation shall be the indemnitor of first resort (i.e., its obligations to Indemnifiable Persons under this Certificate of Incorporation are primary and any obligation of any other person to provide advancement or indemnification for the same losses incurred by any Indemnifiable Person are secondary), and if any person pays or causes to be paid, for any reason, any amounts otherwise indemnifiable hereunder or under any other indemnification agreement (whether pursuant to this Certificate of Incorporation, the Bylaws, contract, applicable law or regulation), then (a) such person shall be fully subrogated to all rights hereunder of the Indemnifiable Person with respect to such payment and (b) the Corporation shall reimburse such person for the payments actually made and waive any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of such person.

**Section 7.10   Conversion, Merger or Consolidation.** For purposes of this Article VII, references to the "Corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a conversion, consolidation or merger that, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was or agreed to be a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, limited liability company, trust or other enterprise, shall stand in the same position under the provisions of this Article VII with respect to the resulting or surviving corporation as he or she would have with respect to such constituent corporation if its separate existence had continued.

## ARTICLE VIII
## NO MONETARY LIABILITY OF DIRECTORS OR OFFICERS

To the fullest extent permitted by the DGCL as it now exists or may hereafter be amended, a director or officer of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for any breach of fiduciary duty as a director or officer.

Neither the amendment nor repeal of this Article VIII, nor the adoption of any provision of this Certificate of Incorporation, nor, to the fullest extent permitted by the DGCL, any modification of law shall eliminate, reduce or otherwise adversely affect any right or protection of a current or former director or officer of the Corporation existing at the time of such amendment, repeal, adoption or modification.

## ARTICLE IX
## AMENDMENT

The Corporation reserves the right at any time, and from time to time, to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, and any other provisions authorized by the laws of the State of Delaware at the time in force may be added or inserted, in the manner now or hereafter prescribed herein or by applicable law, and all rights, preferences and privileges of whatsoever nature conferred upon shareholders, directors or any other persons whomsoever by and pursuant to this Certificate of Incorporation in their present form or as hereafter amended are granted subject to this reservation; *provided* that this Article IX is subject to the second paragraph of Article XIV.

## ARTICLE X
## STOCKHOLDER ACTION

 Special meetings of the stockholders, unless otherwise prescribed by statute, shall be called by the Secretary of the Corporation, or such other officer or director of the Corporation as may be designated by the Board of Directors, stating the purpose or purposes therefor, if requested by either (a) a resolution adopted by not less than the majority of the whole Board of Directors or (b) the written request of holder or holders of shares having not less than 10% of the voting power at a meeting at which the holders of all shares entitled to vote on the action or actions, as set forth in the proposed purpose or purposes of the meeting, were present and voted. The business

conducted at any special meeting shall be confined to the purpose or purposes described in the notice thereof.

Any action required or permitted to be taken at any annual meeting or special meeting of the stockholders of the Corporation may be taken without a meeting, without prior notice and without a vote of stockholders, if a consent or consents in writing or by electronic transmission, setting forth the action so taken, is or are signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.

**ARTICLE XI**
**CORPORATE OPPORTUNITIES**

Nothing contained in this Certificate of Incorporation or in any other agreement delivered pursuant hereto shall be construed to create any agency relationship among the stockholders.

(I) Members of the Board of Directors who are not employees or officers of the Corporation and (II) stockholders of the Corporation, solely by virtue of each such stockholder's status as a stockholder of the Corporation (such members of the Board of Directors and stockholders and their respective Affiliates and the partners, principals, directors, officers, members and/or employees of each of the foregoing, collectively, the "***Identified Persons***" and each, individually, an "***Identified Person***"), shall, to the fullest extent permitted by applicable law, have no duty to refrain from, directly or indirectly, (a) engaging in the same or similar activities or lines of business in which the Corporation or any of its Affiliates, directly or indirectly, now engages or may engage or (b) otherwise competing with the Corporation or any of its Affiliates, and, to the fullest extent permitted by applicable law, no Identified Person shall be liable to the Corporation or its stockholders or to any Affiliate of the Corporation for breach of any fiduciary duty solely by reason of the fact that such Identified Person engages in any such activities. To the fullest extent permitted by applicable law, the Corporation, pursuant to Section 122(17) of the DGCL, hereby renounces any interest or expectancy in, or right to be offered an opportunity to participate in, any potential transaction or business opportunity for an Identified Person and the Corporation or any of its Affiliates, except as provided in the immediately below paragraph. Subject to the immediately below paragraph, in the event that any Identified Person acquires knowledge of a potential transaction or other business opportunity that may be a corporate opportunity for itself, herself or himself and the Corporation or any of its Affiliates, such Identified Person shall, to the fullest extent permitted by applicable law, have no duty to communicate or offer such transaction or other business opportunity to the Corporation or any of its Affiliates and, to the fullest extent permitted by applicable law, shall not be liable to the Corporation or its stockholders or to any Affiliate of the Corporation for breach of any fiduciary duty as a stockholder, director or officer of the Corporation solely by reason of the fact that such Identified Person pursues or acquires such corporate opportunity for itself, herself or himself, or offers or directs such corporate opportunity to another Person.

Notwithstanding the immediately preceding paragraph, the Corporation does not renounce its interest in any corporate opportunity offered to any Identified Person if such opportunity is (a) expressly offered to such person solely in his or her capacity as a director, officer, consultant or

employee of the Corporation or (b) identified by an Identified Person solely through the disclosure of information by or on behalf of the Corporation.

In addition to and notwithstanding the foregoing provisions of this Article XI, a corporate opportunity shall not be deemed to be a potential corporate opportunity for the Corporation if it is a business opportunity that (a) the Corporation is neither financially or legally able, nor contractually permitted to undertake, (b) from its nature, is not in the line of the Corporation's business or is of no practical advantage to the Corporation or (c) is one in which the Corporation has no interest or reasonable expectancy.

The Identified Persons may now own, may continue to own, and from time to time may acquire and own, investments in one or more other entities (such entities collectively, "***Related Companies***") that are direct competitors of, or that otherwise may have interests that do or could conflict with those of, the Corporation, any of the Corporation's stockholders or any of their respective Affiliates, and (a) the enjoyment, exercise and enforcement of the rights, interests, privileges, powers and benefits granted or available to the Identified Persons under this Certificate of Incorporation shall not be in any manner reduced, diminished, affected or impaired, and the obligations of the Identified Persons under this Certificate of Incorporation shall not be in any manner augmented or increased, by reason of any act, circumstance, occurrence or event arising from or in any respect relating to (i) the ownership by an Identified Person of any interest in any Related Company, (ii) the affiliation of any Related Company with an Identified Person or (iii) any action taken or omitted by an Identified Person in respect of any Related Company, (b) no Identified Person shall, by reason of such ownership, affiliation or action, become subject to any fiduciary duty to the Corporation, any of the Corporation's stockholders or any of their respective Affiliates, (c) none of the duties imposed on an Identified Person, whether by contract or law, do or shall limit or impair the right of any Identified Person lawfully to compete with the Corporation, any of the Corporation's stockholders or any of their respective Affiliates and (d) the Identified Persons are not and shall not be obligated to disclose to the Corporation, any of the Corporation's stockholders or any of their respective Affiliates any information related to their respective businesses or opportunities, including acquisition opportunities, or to refrain from or in any respect to be restricted in competing against the Corporation, any of the Corporation's stockholders or any of their respective Affiliates in any such business or as to any such opportunities.

## ARTICLE XII
## SEVERABILITY

If any provision or provisions of this Certificate of Incorporation shall be held to be invalid, illegal or unenforceable as applied to any circumstance for any reason whatsoever: (a) the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Certificate of Incorporation (including each portion of any paragraph of this Certificate of Incorporation containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) shall not, to the fullest extent permitted by applicable law, in any way be affected or impaired thereby and (b) to the fullest extent permitted by applicable law, the provisions of this Certificate of Incorporation (including each such portion of any paragraph of this Certificate of Incorporation containing any such provision held to be invalid, illegal or unenforceable) shall be construed so as to permit the Corporation to protect its directors, officers, employees and agents from personal liability in

respect of their good faith service to or for the benefit of the Corporation to the fullest extent permitted by applicable law.

## ARTICLE XIII
## FORUM

Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery (of, if the Court of Chancery does not have jurisdiction, the federal district court for the State of Delaware) shall, to the fullest extent permitted by applicable law, be the sole and exclusive forum for (a) any derivative action or proceeding brought on behalf of the Corporation, (b) any action asserting a claim of breach of a fiduciary duty owed by any director, officer, employee or agent of the Corporation to the Corporation or the Corporation's stockholders, (c) any action asserting a claim against the Corporation or any director or officer of the Corporation arising pursuant to any provision of the DGCL, this Certificate of Incorporation or the Bylaws (as either may be amended and/or restated from time to time) or as to which the DGCL confers jurisdiction on the Court of Chancery or (d) any action asserting a claim governed by the internal affairs doctrine. If any action the subject matter of which is within the scope of this Article XIII is filed in a court other than a court located within the State of Delaware (a "***Foreign Action***") in the name of any stockholder, such stockholder shall be deemed to have consented to: (i) the personal jurisdiction of the state and federal courts located within the State of Delaware in connection with any action brought in any such court to enforce this Article XIII (an "**Enforcement Action**"); and (ii) having service of process made upon such stockholder in any such Enforcement Action by service upon such stockholder's counsel in the Foreign Action as agent for such stockholder. Any person or entity purchasing or otherwise acquiring any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Article XIII.

## ARTICLE XIV
## COVENANTS

Prior to the Payment in Full of (x) the Credit Agreement Obligations, the Corporation shall comply (or, in the case of Section [6.08], shall not take, or permit to be taken, any action that would result in non-compliance) with the provisions of Sections [6.08][1] and [6.21][2] of the Credit Agreement, (y) the Tranche I Notes Obligations, the Corporation shall comply (or, in the case of Section [4.17], shall not take, or permit to be taken, any action that would result in non-compliance) with the provisions of Sections [4.17] and [4.34] of the Tranche I Indenture and (z) the Tranche II Notes Obligations, the Corporation shall comply (or, in the case of Section [4.17], shall not take, or permit to be taken, any action that would result in non-compliance) with the provisions of Sections [4.17] and [4.34] of the Tranche II Indenture, except, in each case, to the extent permitted by any waiver granted by the applicable Required Holders in writing.

The Corporation will not amend this Article XIV (including by merger or otherwise) without the consent of the Required Holders in respect of (i) Credit Agreement Obligations (unless they have

---

[1] NTD: To refer to restricted payment covenant.

[2] NTD: To refer to passive holdings covenant.

been Paid in Full), (ii) Tranche I Notes Obligations (unless they have been Paid in Full) and (iii) Tranche II Notes Obligations (unless they have been Paid in Full).

"**Credit Agreement**" means the Amended and Restated Credit Agreement dated as of [●], 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among Invacare Holding Corporation, as holdings, Invacare Corporation, as borrower, the lenders from time to time party thereto and the administrative agent and collateral agent referred to therein.

"**Credit Agreement Obligations**" means (a) the due and punctual payment by Invacare Corporation of (i) the principal of and interest at the applicable rate or rates provided in the Credit Agreement (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the loans under the Credit Agreement, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, and (ii) all other monetary obligations of Invacare Corporation under or pursuant to the Credit Agreement and each of the other Loan Documents, including obligations to pay  fees, expense reimbursement obligations and indemnification obligations, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), (b) the due and punctual payment and performance of all other obligations of Invacare Corporation under or pursuant to the Credit Agreement and each of the other Loan Documents and (c) the due and punctual payment and performance of all the obligations of each other Loan Party (as defined in the Credit Agreement) under or pursuant to the Credit Agreement and each of the other Loan Documents (including interest and monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding).

"**Loan Documents**" has the meaning assigned to such term in the Credit Agreement.

"**Required Holders**" means (i) in the case of the Credit Agreement Obligations, the Required Lenders (as defined in the Credit Agreement), (ii) in the case of the Tranche I Notes Obligations, the Required Holders (as defined in the Tranche I Indenture) and (iii) in the case of the Tranche II Notes Obligations, the Required Holders (as defined in the Tranche II Indenture).

"**Tranche I Indenture**" means the indenture dated as of [●], 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), among Invacare Holding Corporation, as issuer, the guarantors listed therein, the collateral agent and trustee referred to therein pursuant to which the 7.50% Convertible Senior Secured Notes due [2028], Tranche [I] are issued.

"**Tranche II Indenture**" means the indenture dated as of [●], 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), among Invacare Holding Corporation, as issuer, the guarantors listed therein, the collateral agent and trustee referred to therein pursuant to which the 7.50% Convertible Senior Secured Notes due [2028], Tranche [II] are issued.

"**Tranche I Notes Documents**" has the meaning assigned to the term "Notes Documents" in the Tranche I Indenture.

"**Tranche II Notes Documents**" has the meaning assigned to the term "Notes Documents" in the Tranche II Indenture.

"**Tranche I Notes Obligations**" means all obligations of Invacare Holding Corporation and the guarantors listed in the Tranche I Indenture under or in respect of the 7.50% Convertible Senior Secured Notes due [2028], Tranche I of Invacare Holding Corporation, the Tranche I Indenture and the other Tranche I Notes Documents.

"**Tranche II Notes Obligations**" means all obligations of Invacare Holding Corporation and the guarantors listed in the Tranche II Indenture under or in respect of the 7.50% Convertible Senior Secured Notes due [2028], Tranche II of Invacare Holding Corporation, the Tranche II Indenture and the other Tranche II Notes Documents.

"**Payment in Full**" means (i) with respect to the Credit Agreement Obligations, the termination of all commitments of the lenders under the Credit Agreement to extend credit thereunder and (ii) with respect to the Credit Agreement Obligations, the Tranche I Notes Obligations and the Tranche II Notes Obligations, the payment in full in cash of all of such obligations, including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding (other than contingent obligations for which no claim has been made at such time), and "Paid in Full" will have a correlative meaning.

IN WHITNESS WHEREOF, the understign has executed this Amended and Restate Certificate of Incorporation as of this this [    ] day of [    ] 2023.

**INVACARE INTERNATIONAL HOLDINGS CORP.**

By: _____

Name: [●]

Title:

**<u>Exhibit A(vi)</u>**

**Form of Bylaws for New Intermediate Holding Company**

Draft 4.17.23

**AMENDED AND RESTATED BYLAWS**
**OF**
**INVACARE INTERNATIONAL HOLDINGS CORP.**

*(Adopted as of [__], 2023)*

## ARTICLE I
## OFFICES

**Section 1.1    Registered Office; Registered Agent**. The address of the initial registered office of Invacare International Holdings Corp. (the "***Corporation***") in the State of Delaware is c/o Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle, Delaware, 19801. The name of the Corporation's initial registered agent at such address is The Corporation Trust Company. The registered office and/or registered agent of the Corporation may be changed from time to time by action of the board of directors (the "***Board of Directors***").

**Section 1.2    Other Offices**. The Corporation may also have offices at such other places, within or without the State of Delaware, as the Board of Directors may from time to time determine or the business of the Corporation may require.

## ARTICLE II
## MEETINGS OF STOCKHOLDERS

**Section 2.1    Time and Place of Meetings**. All meetings of the stockholders shall be held at such place, if any, within or without the State of Delaware, on such date and time as shall be stated in the notice of the meeting or in a duly executed waiver of notice thereof. The Board of Directors may determine that any meeting may be held solely or partially by means of remote communication in accordance with the laws of the State of Delaware.

**Section 2.2    Annual Meetings**. Annual meetings of stockholders shall be held on such date and time as shall be designated from time to time by the Board of Directors and stated in the notice of the meeting. At the annual meeting, the stockholders entitled to vote thereat shall elect a Board of Directors and transact such other business as may properly be brought before the meeting.

**Section 2.3    Special Meetings**. Special meetings of the stockholders, unless otherwise prescribed by statute shall be called by the Secretary of the Corporation, or such other officer or director of the Corporation as may be designated by the Board of Directors, stating the purpose or purposes therefor, if requested by either (a) a resolution adopted by not less than the majority of the whole Board of Directors or (b) the written request of the holder or holders of shares satisfying the ownership requirements as set forth in the Certificate of Incorporation (as in effect from time to time, the "***Certificate of Incorporation***"). The business conducted at any special meeting shall be confined to the purpose or purposes described in the notice thereof.

**Section 2.4    Adjournments**. Any meeting of the stockholders, annual or special, may be adjourned from time to time to reconvene at the same or some other place, if any, and notice

need not be given of any such adjourned meeting if the time, place, if any, thereof, and the means of remote communication, if any, are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting. If after the adjournment a new record date is fixed for stockholders entitled to vote at the adjourned meeting, the Board of Directors shall fix a new record date for notice of the adjourned meeting and shall give notice of the adjourned meeting to each stockholder of record entitled to vote at the adjourned meeting as of the record date fixed for notice of the adjourned meeting.

**Section 2.5**   **Notice of Meetings**. Notice stating the place, if any, date and time of the meeting, the means of any remote communications by which stockholders may be considered present and may vote at the meeting, if any, the record date for determining stockholders entitled to vote at the meeting (if such date is different from the record date for stockholders entitled to notice of the meeting) and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than 10 days (20 days in the case of a meeting to approve a merger agreement to the extent required by the General Corporation Law of the State of Delaware (the "***DGCL***")) nor more than 60 days before the date of the meeting (unless a different time is specified by applicable law), by personal delivery, by mail or, with consent of the stockholder, by electronic transmission, by or at the direction of the officer or person calling the meeting, to each stockholder of record entitled to vote at such meeting as of the record date for determining stockholdings entitled to notice of the meeting. Notice shall be deemed given (a) if mailed, when the notice is deposited in the U.S. mail, postage prepaid, (b) if delivered by courier service, the earlier of when the notice is received or left at such stockholder's address or (c) if given by electronic mail, when directed to such stockholder's electronic mail address unless the stockholder has notified the Corporation in writing or by electronic transmission of an objection to receiving notice by electronic mail or such notice is prohibited by the DGCL. A notice by electronic mail must include a prominent legend that the communication is an important notice regarding the Corporation. Notice of any meeting need not be given to any stockholder who shall, either before or after the meeting, submit a waiver of notice or who shall attend such meeting, except when the stockholder attends for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Any stockholder so waiving notice of the meeting shall be bound by the proceedings of the meeting in all respects as if due notice thereof had been given.

**Section 2.6**   **Record Date**. In order that the Corporation may determine the stockholders entitled to notice of any meeting of stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall, unless otherwise required by applicable law, not be more than 60 nor less than 10 days before the date of such meeting. If the Board of Directors so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board of Directors determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination. If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of and to vote at a meeting of stockholders shall be at the close of business on the day

immediately preceding the day on which notice is given, or, if notice is waived, at the close of business on the day immediately preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; *provided*, *however*, that the Board of Directors may fix a new record date for the determination of stockholders entitled to vote at the adjourned meeting and in such case shall also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for the determination of stockholders entitled to vote therewith at the adjourned meeting.

In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

**Section 2.7     Stockholder List**. The Corporation shall make, not later than the 10th day before each meeting of stockholders, a complete list of the stockholders entitled to vote at such meeting; *provided*, *however*, if the record date for determining the stockholders entitled to vote is less than 10 days before the meeting date, the list shall reflect the stockholders entitled to vote as of the 10th day before the meeting date, arranged in alphabetical order, with the address of and the number of shares held by each, which list, for a period of 10 days prior to such meeting, shall be kept on file at the principal place of business of the Corporation and shall be subject to inspection by any stockholder at any time during usual business hours. Alternatively, the list of stockholders may be kept on a reasonably accessible electronic network, if the information required to gain access to the list is provided with the notice of the meeting. Except as provided by applicable law, the stock ledger of the Corporation shall be the only evidence as to who are the stockholders entitled to examine the stock ledger and the list of stockholders or to vote in person or by proxy at any meeting of stockholders.

**Section 2.8     Quorum**. A quorum shall be present at a meeting of stockholders if the holder or holders of the majority of the combined voting power of the shares entitled to vote at the meeting (counting for such purposes all abstentions and broker nonvotes) are present in person, represented by a duly authorized representative in the case of a corporation or other legal entity or represented by proxy, unless otherwise provided in the Corporation's Certificate of Incorporation. Unless otherwise provided in the Certificate of Incorporation, once a quorum is present at a duly constituted meeting of stockholders, the stockholders present or represented at the meeting may conduct such business as may be properly brought before the meeting until it is adjourned, and the subsequent withdrawal from the meeting of any stockholder present or represented shall not affect the presence of a quorum at the meeting. Unless otherwise provided in the Certificate of Incorporation, the stockholders entitled to vote and present or represented at a meeting of stockholders at which a quorum is not present may adjourn the meeting until such time and to such place as may be determined by a vote of the holders of the majority of the shares represented at that meeting. At such adjourned meeting at which a quorum shall be

present or represented, any business may be conducted which might have been conducted at the meeting as originally notified.

**Section 2.9**   **Voting**. With respect to any matter, other than the election of directors, except as otherwise provided by the Certificate of Incorporation, these Bylaws or applicable law, the affirmative vote of the holders of the majority of the combined voting power of the shares entitled to vote on that matter and represented at a meeting of stockholders at which a quorum is present shall be the act of the stockholders. Unless otherwise provided in the Certificate of Incorporation, directors shall be elected by a plurality of the votes cast by the holders of shares entitled to vote in the election of directors (such shares, the "***Voting Stock***") at a meeting of stockholders at which a quorum is present.

**Section 2.10**   **Method of Voting**. Each outstanding share shall be entitled to one vote on each matter submitted to a vote at a meeting of stockholders, unless the Certificate of Incorporation provides for more or less than one vote per share or limits, or denies voting rights to the holders of the shares of any class or series or as otherwise provided by applicable law. A stockholder may vote in person, by duly authorized representative in the case of a corporation or other legal entity or by proxy. Without limiting the manner in which a stockholder may authorize another person or persons to act for such stockholder as proxy, the following shall constitute a valid means by which a stockholder may grant such authority: (a) a stockholder may execute a document authorizing another person or persons to act for such stockholder as proxy and such execution may be accomplished by the stockholder or such stockholder's authorized officer, director, employee or agent; and (b) a stockholder may authorize another person or persons to act for such stockholder as proxy by transmitting or authorizing the transmission of an electronic transmission to the person who will be the holder of the proxy or to a proxy solicitation firm, proxy support service organization or like agent duly authorized by the person who will be the holder of the proxy to receive such transmission, provided that any such transmission must either set forth or be submitted with information from which it can be determined that the transmission was authorized by the stockholder.  Each proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest. Each proxy shall be filed with the Secretary of the Corporation prior to the time of the meeting.

**Section 2.11**   **Inspectors of Election**. The Board of Directors, in advance of any meeting of stockholders, may, and shall if required by applicable law, appoint one or more inspectors, who may be employees of the Corporation, to act at the meeting or any adjournment thereof and make a written report thereof. The Board of Directors may designate one or more persons as alternate inspectors to replace any inspector who fails to act. If no inspector or alternate is able to act at a meeting, the person presiding at the meeting shall appoint one or more inspectors to act at the meeting. Each inspector, before entering upon the discharge of his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability. The inspectors shall (a) ascertain the number of shares outstanding and the voting power of each, (b) determine the shares represented at the meeting, the existence of a quorum and the validity of proxies and ballots, (c) count all votes and ballots, (d) determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspectors, and (e) certify their determination of the number of shares represented at the meeting and their count of all votes and ballots. The inspectors may appoint or retain other persons or entities to assist the inspectors in the

performance of their duties. Unless otherwise provided by the Board of Directors, the date and time of the opening and the closing of the polls for each matter upon which the stockholders will vote at a meeting shall be announced at the meeting. No ballot, proxies, votes, or any revocation thereof or change thereto, shall be accepted by the inspectors after the closing of the polls unless the Court of Chancery of the State of Delaware upon application by a stockholder shall determine otherwise. In determining the validity and counting of proxies and ballots cast at any meeting of stockholders, the inspectors may consider such information as is permitted by applicable law. No person who is a candidate for office at an election may serve as an inspector at such election.

Section 2.12   **Procedure**. The Chairman of the Board, or such other officer of the Corporation designated by the Board of Directors, will call meetings of the stockholders to order and will act as presiding officer at the meetings. Unless otherwise determined by the Board of Directors prior to the meeting, the presiding officer of the meeting of the stockholders will also determine the order of business and have the authority in his or her sole discretion to regulate the conduct of any such meeting, including by imposing restrictions on the persons (other than stockholders of the Corporation or their duly appointed proxies) who may attend such stockholders' meeting, by ascertaining whether any stockholder or his, her or its proxy may be excluded from any meeting of the stockholders based upon any determination by the presiding officer, in his or her sole discretion, that any such person has unduly disrupted or is likely to disrupt the proceedings, and by determining the circumstances in which any person may make a statement or ask questions at any meeting of the stockholders.

# ARTICLE III
# DIRECTORS

Section 3.1   **Responsibilities**. Except as provided in the Certificate of Incorporation or the DGCL, the business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.

Section 3.2   **Number; Election; Term**.

(a)   The total number of directors shall be no less than [     ] and not more than [     ] directors as fixed from time to time by resolution of a majority of the total number of directors that the Corporation would have if there were no vacancies.

(b)   The directors shall consist of a single class, and each director shall hold office until his or her successor shall have been duly elected and qualified, subject, however, to such director's earlier death, resignation, retirement, disqualification or removal.

Section 3.3   **Vacancies; Increases**. Any vacancy on the Board of Directors shall be filled by (a) election at an annual or special meeting of stockholders called for that purpose or (b) the affirmative vote of the majority of the remaining directors then in office, though less than a quorum, or by the sole remaining director. Each director elected to fill a vacancy shall be elected for the unexpired term of his or her predecessor in office. Any directorship to be filled by reason of an increase in the number of directors may be filled by election at an annual or special

meeting of stockholders called for that purpose or by the Board of Directors for a term of office continuing only until the next election of one or more directors by the stockholders.

**Section 3.4    Removal**. Except as otherwise provided in the Certificate of Incorporation, at any meeting of stockholders called expressly for that purpose, any director may be removed for any reason, with or without cause, by the affirmative vote of the holder or holders of the majority of the combined voting power of the shares entitled to vote thereon.

**Section 3.5    Place of Meetings**. Meetings of the Board of Directors, regular or special, may be held either within or without the State of Delaware.

**Section 3.6    Regular Meetings**. Regular meetings of the Board of Directors may be held at such time and at such place as shall from time to time be determined by the Board of Directors.

**Section 3.7    Special Meetings**. Special meetings of the Board of Directors may be called by the Chairman of the Board or the Chief Executive Officer, the Chief Financial Officer or the General Counsel of the Corporation and shall be called by the Secretary of the Corporation on the written request of not less than two of the directors then in office. Notice specifying the time and place of special meetings shall be given to each director at least one day before the date of the meeting, either personally or by telephone or electronic transmission, or at least three days if the notice is given by mail.

**Section 3.8    Telephone and Similar Meetings**. Unless otherwise restricted by the Certificate of Incorporation, members of the Board of Directors or members of any committee of the Board of Directors may participate in and hold a meeting of the Board of Directors or committee, as the case may be, by means of conference telephone or similar communications equipment, or another suitable electronic communications system, including videoconferencing technology or the Internet, or any combination, if the telephone or other equipment or system permits each person participating in the meeting to communicate with and hear all other persons participating in the meeting, and participation in such a meeting shall constitute presence in person at the meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the basis that the meeting is not lawfully called or convened.

**Section 3.9    Purpose of Meetings**. Neither the purpose of, nor the business to be transacted at, any regular or special meeting of the Board of Directors need be specified in the notice or waiver of notice of such meeting.

**Section 3.10   Quorum; Majority Vote**. At all meetings of the Board of Directors, the majority of the number of the directors fixed in the manner provided in these Bylaws shall constitute a quorum for the transaction of business unless a different number is specifically required or permitted by the Certificate of Incorporation, these Bylaws or applicable law. The affirmative vote of the majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors, unless a vote of a greater number is required by the Certificate of Incorporation, these Bylaws or applicable law. If a quorum shall not be present at any meeting of the Board of Directors, the directors present thereat may adjourn the meeting

from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

Section 3.11   **Adjourned Meetings**. The majority of the directors present at any meeting of the Board of Directors, including an adjourned meeting, whether or not a quorum is present, may adjourn and reconvene such meeting to another time and place. Notice specifying the time and place of any adjourned meetings shall be given to each director, whether or not present at the time of the adjournment, at least one day before the date of the meeting, either personally or by telephone or, with consent of the director, electronic transmission, or at least three days if the notice is given by mail. Any business may be transacted at an adjourned meeting that might have been transacted at the meeting as originally called.

Section 3.12   **Procedure**. At meetings of the Board of Directors, business shall be transacted in such order as the Board of Directors may determine from time to time. The Chairman of the Board or such other person chosen by the Board of Directors from among the directors present, will preside over the meetings of the Board of Directors. The Secretary of the Corporation shall act as the secretary of the meetings of the Board of Directors unless the Board of Directors appoints another person to act as secretary of the meeting. The Board of Directors shall keep regular minutes of its proceedings, which shall be placed in the minute book of the Corporation.

Section 3.13   **Compensation**. Each non-executive member of the Board of Directors shall be entitled to reasonable and customary compensation on the same basis as all other non-executive members of the Board of Directors, and each member of the Board of Directors shall be entitled to reimbursement of reasonable third party out-of-pocket expenses (including travel and lodging expenses) incurred by him or her in connection with services to the Corporation in any capacity, including attending meetings of the Board of Directors or participation on any committees thereof, in each case subject to the Corporation's policies and procedures with respect thereto (including the requirement of reasonable documentation thereof). The Board of Directors shall have authority to fix the compensation paid to directors for attendance at regular or special meetings of the Board of Directors, any committee thereof or for any other services to the Corporation; *provided*, *however*, that nothing contained in these Bylaws shall be construed to preclude any director from serving the Corporation in any other capacity or receiving compensation therefor (*provided* that such compensation is approved by the Board of Directors).

Section 3.14   **Committees**. The Board of Directors may designate one or more committees, including an Audit Committee, a Compensation Committee and a Nominating and Corporate Governance Committee, each committee to consist of one or more of the directors of the Corporation appointed by a majority vote of the whole Board of Directors. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. If a member of a committee shall be absent from any meeting, or disqualified from voting thereat, the remaining member or members present at the meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member. Any such committee, to the extent permitted by applicable law, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs

of the Corporation and may authorize the seal of the Corporation to be affixed to all papers that may require it to the extent so authorized by the Board of Directors. Unless the Board of Directors provides otherwise, at all meetings of such committee, the majority of the then authorized members of the committee shall constitute a quorum for the transaction of business, and the vote of the majority of the members of the committee present at any meeting at which there is a quorum shall be the act of the committee. Unless the Board of Directors provides otherwise, each committee designated by the Board of Directors may make, alter, and repeal rules and procedures for the conduct of its business. In the absence of such rules and procedures each committee shall conduct its business in the same manner as the Board of Directors conducts its business pursuant to this Article III.

**Section 3.15    Boards of Subsidiaries**. The composition of the board of directors or other governing body of each of the Corporation's subsidiaries shall be determined by the Board of Directors from time to time, and any officer of the Corporation shall be authorized to sign consents or ballots or cast votes to elect such persons so determined by the Board of Directors to comprise the board of directors or other governing body of each of the Corporation's subsidiaries.

**Section 3.16    Action Without Meeting**. Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at a meeting of the Board of Directors or any committee thereof may be taken without a meeting if a consent in writing or by electronic communication, setting forth the action so taken, is given by all the members of the Board of Directors or committee, as the case may be.

**Section 3.17    Chairman of the Board**. The Board of Directors may from time to time elect one of its members by a majority vote of the whole Board of Directors to be Chairman of the Board of Directors (the "***Chairman of the Board***") and may replace or fill any vacancy in the position of Chairman of the Board with a director at such time and in such manner as the Board of Directors shall determine.

<div align="center">

**ARTICLE IV**
**NOTICES**

</div>

**Section 4.1    Method**. Subject to Sections 3.7, 3.11 and 4.2 hereof, whenever by the Certificate of Incorporation, these Bylaws or applicable law notice is required to be given to a director or stockholder, and no provision is made as to how the notice shall be given, it shall not be construed to be personal notice, but any such notice may be given in writing directed to the stockholder's or director's mailing address (or by electronic transmission directed to the stockholder's or director's electronic mail address, as applicable) as it appears on the records of the Corporation and shall be given (a) if mailed, when the notice is deposited in the U.S. mail, postage prepaid, (b) if delivered by courier service, the earlier of when the notice is received or left at such stockholder's or director's address or (c) if given by electronic mail, when directed to such stockholder's or director's electronic mail address unless the Corporation has been notified in writing or by electronic transmission of an objection to receiving notice by electronic mail or such notice is prohibited by the DGCL. A notice by electronic mail to stockholders must include a prominent legend that the communication is an important notice regarding the Corporation.

**Section 4.2**    **Waiver**. Whenever by the Certificate of Incorporation, these Bylaws or applicable law any notice is required to be given to a director or stockholder, a waiver thereof in writing or by electronic transmission, given by the person or persons entitled to such notice, or in the case of a corporation or other legal entity by its duly authorized representative, whether before or after the time stated therein, shall be equivalent to the giving of such notice. Attendance of a director, committee member or stockholder at a meeting shall constitute a waiver of notice of such meeting, except where such person attends for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the basis that the meeting is not lawfully called or convened.

<div align="center">

**ARTICLE V**
**OFFICERS**

</div>

**Section 5.1**    **Designation**. The officers of the Corporation elected by the Board of Directors shall include a Chief Executive Officer, a Chief Financial Officer and a Secretary. The Board of Directors, in its discretion, may also elect a Chairman of the Board (subject to the provisions of Section 3.17 herein), a President, a Chief Operating Officer, a General Counsel, and such other officers (including without limitation any person that shall be an "executive officer" within the meaning of Rule 3b-7 of the Securities Exchange Act of 1937, as amended (as it may be amended from time to time or any successor regulation thereto)) as it shall designate from time to time with such titles, seniority, duties and responsibilities as the Board of Directors shall deem advisable. The Chief Executive Officer, unless otherwise determined by the Board or Directors, shall have the power to appoint such other officers (including, without limitation, a Controller, a Treasurer and one or more Vice Presidents, Assistant Secretaries, Assistant Treasurers and Assistant Controllers) as the Chief Executive Officer shall deem necessary or appropriate in the conduct of the affairs of the Corporation with such designations, titles, seniority, duties and responsibilities as the Chief Executive Officer shall deem advisable. Any two or more offices may be held by the same person at the same time.

**Section 5.2**    **Term**. An officer of the Corporation shall hold office until his or her successor is elected and qualified or appointed, until his or her death or until he or she shall resign or shall have been removed in accordance with these Bylaws.

**Section 5.3**    **Removal**. Any officer may be removed by the Board of Directors whenever in its judgment the best interests of the Corporation will be served thereby, and, without limiting the foregoing, any officer appointed by the Chief Executive Officer may be removed by the Chief Executive Officer whenever, in his or her judgment, the best interests of the Corporation will be served thereby. No officer shall have any contractual rights against the Corporation for compensation by virtue of his or her election or appointment beyond the date of the election or appointment of his or her successor, his or her death, his or her resignation or his or her removal, whichever event shall first occur, except as otherwise provided in an employment contract or under an employee benefit plan.

**Section 5.4**    **Compensation**. The compensation of all officers and agents of the Corporation who are also directors of the Corporation shall be fixed by the Board of Directors or a committee thereof. The compensation of the Chief Executive Officer of the Corporation shall be fixed by the Board of Directors or a committee thereof. The compensation of all other officers

and agents of the Corporation shall be fixed by the Board of Directors or a committee thereof, or the Board of Directors may delegate the power to fix the compensation of any such other officers and agents of the Corporation to an officer of the Corporation to the extent permitted by applicable law.

      **Section 5.5**    **Duties**. The officers of the Corporation shall have such authority and shall perform such duties as are customarily incident to their respective offices, or as may be specified from time to time by resolution of the Board of Directors regardless of whether such authority and duties are customarily incident to such office.

      **Section 5.6**    **Other Officers**. Such other officers as the Board of Directors may choose shall perform such duties and have such powers as from time to time may be assigned to them by the Board of Directors.  The Board of Directors may delegate to any other officer of the Corporation the power to choose such other officers and to prescribe their respective duties and powers.

      **Section 5.7**    **Execution Authority**. All contracts of the Corporation shall be executed on behalf of the Corporation by (a) the Chief Executive Officer, the President, the Chief Operating Officer, General Counsel or any Vice President, (b) such other officer or employee of the Corporation authorized in writing by the Chief Executive Officer, the President, the Chief Operating Officer, General Counsel or any Vice President, with such limitations and restrictions on such authority as the Board of Directors, Chief Executive Officer, the President, the Chief Operating Officer, General Counsel or Vice President, respectively, deems appropriate, or (c) such other person as may be authorized by the Board of Directors.

## ARTICLE VI
## SHARES OF CAPITAL STOCK

      **Section 6.1**    **Certificates**. Shares of the capital stock of the Corporation shall be certificated; *provided* that the Board of Directors may provide by resolution or resolutions that some or all of any class or series shall be uncertificated shares that may be evidenced by a book-entry system maintained by the registrar of such stock. If shares are represented by certificates, such certificates shall be in the form approved by the Board of Directors and shall be signed by any two authorized officers of the Corporation. Any and all signatures on the certificate may be a facsimile and each such certificate may be sealed with the seal of the Corporation or a facsimile thereof. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate has ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if he or she were such officer, transfer agent or registrar at the date of issue. The certificates shall be consecutively numbered and shall be entered in the books of the Corporation as they are issued and shall exhibit the holder's name and the number of shares.

      **Section 6.2**    **Lost, Stolen or Destroyed Certificates**. The Board of Directors may direct a new certificate or certificates representing shares of stock or uncertificated shares be issued in place of a certificate or certificates representing shares of stock theretofore issued by the Corporation and alleged to have been lost or destroyed upon the making of an affidavit of that fact by the person claiming the certificate or certificates representing shares of stock that

was or were lost or destroyed. When authorizing such issue of a new certificate or certificates or uncertificated shares, the Board of Directors may in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost or destroyed certificate or certificates, or his or her legal representative, to advertise the same in such manner as it shall require and/or to give the Corporation a bond with a surety or sureties satisfactory to the Corporation in such sum as it may direct as indemnity against any claim or expense resulting from a claim that may be made against the Corporation with respect to the certificate or certificates alleged to have been lost, stolen or destroyed.

Section 6.3    **Transfer of Shares**. Transfers of stock shall be made on the books of the Corporation only by the holder of record thereof, by such person's attorney lawfully constituted in writing and, in the case of certificated shares, upon the surrender of the certificate thereof, which shall be cancelled before a new certificate or uncertificated shares shall be issued. No transfer of stock shall be valid as against the Corporation for any purpose until it shall have been entered in the stock records of the Corporation by an entry showing from and to whom transferred.

Section 6.4    **Registered Stockholders**. The Corporation shall be entitled to treat the holder of record of any share or shares of stock, whether such shares are evidenced by a certificate or are uncertificated, as the holder in fact thereof and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by applicable law.

Section 6.5    **Transfer Agents and Registrars**. The Board of Directors may appoint a transfer agent and one or more co-transfer agents and registrar and one or more co-registrars and may make or authorize such agent to make all such rules and regulations deemed expedient concerning the issue, transfer and registration of shares of stock.

Section 6.6    **Legends**. The Board of Directors shall have the power and authority to provide that the certificates representing shares of stock of the Corporation bear such legends as the Board of Directors deems appropriate to assure that the Corporation does not become liable for violations of federal or state securities laws or other applicable law.

## ARTICLE VII
## CORPORATE OPPORTUNITIES

Nothing contained in these Bylaws or in any other agreement delivered pursuant hereto shall be construed to create any agency relationship among the stockholders. (I) Members of the Board of Directors who are not employees or officers of the Corporation and (II) stockholders of the Corporation, solely by virtue of each such stockholder's status as a stockholder of the Corporation (such members of the Board of Directors and stockholders and their respective Affiliates and the partners, principals, directors, officers, members and/or employees of each of the foregoing, collectively, the "***Identified Persons***" and each, individually, an "***Identified Person***"), shall, to the fullest extent permitted by applicable law, have no duty to refrain from, directly or indirectly, (a) engaging in the same or similar activities or lines of business in which the Corporation or any of its Affiliates, directly or indirectly, now engages or may engage or (b)

otherwise competing with the Corporation or any of its Affiliates, and, to the fullest extent permitted by applicable law, no Identified Person shall be liable to the Corporation or its stockholders or to any Affiliate of the Corporation for breach of any fiduciary duty solely by reason of the fact that such Identified Person engages in any such activities. To the fullest extent permitted by applicable law, the Corporation, pursuant to Section 122(17) of the DGCL, hereby renounces any interest or expectancy in, or right to be offered an opportunity to participate in, any potential transaction or business opportunity for an Identified Person and the Corporation or any of its Affiliates, except as provided in the immediately below paragraph. Subject to the immediately below paragraph, in the event that any Identified Person acquires knowledge of a potential transaction or other business opportunity that may be a corporate opportunity for itself, herself or himself and the Corporation or any of its Affiliates, such Identified Person shall, to the fullest extent permitted by applicable law, have no duty to communicate or offer such transaction or other business opportunity to the Corporation or any of its Affiliates and, to the fullest extent permitted by applicable law, shall not be liable to the Corporation or its stockholders or to any Affiliate of the Corporation for breach of any fiduciary duty as a stockholder, director or officer of the Corporation solely by reason of the fact that such Identified Person pursues or acquires such corporate opportunity for itself, herself or himself, or offers or directs such corporate opportunity to another Person.

Notwithstanding the immediately preceding paragraph, the Corporation does not renounce its interest in any corporate opportunity offered to any Identified Person if such opportunity is (a) expressly offered to such person solely in his or her capacity as a director, officer, consultant or employee of the Corporation or (b) identified by an Identified Person solely through the disclosure of information by or on behalf of the Corporation.

In addition to and notwithstanding the foregoing provisions of this Article VII, a corporate opportunity shall not be deemed to be a potential corporate opportunity for the Corporation if it is a business opportunity that (a) the Corporation is neither financially or legally able, nor contractually permitted to undertake, (b) from its nature, is not in the line of the Corporation's business or is of no practical advantage to the Corporation or (c) is one in which the Corporation has no interest or reasonable expectancy.

The Identified Persons may now own, may continue to own, and from time to time may acquire and own, investments in one or more other entities (such entities collectively, "***Related Companies***") that are direct competitors of, or that otherwise may have interests that do or could conflict with those of, the Corporation, any of the Corporation's stockholders or any of their respective Affiliates, and (a) the enjoyment, exercise and enforcement of the rights, interests, privileges, powers and benefits granted or available to the Identified Persons under this Certificate of Incorporation shall not be in any manner reduced, diminished, affected or impaired, and the obligations of the Identified Persons under this Certificate of Incorporation shall not be in any manner augmented or increased, by reason of any act, circumstance, occurrence or event arising from or in any respect relating to (i) the ownership by an Identified Person of any interest in any Related Company, (ii) the affiliation of any Related Company with an Identified Person or (iii) any action taken or omitted by an Identified Person in respect of any Related Company, (b) no Identified Person shall, by reason of such ownership, affiliation or action, become subject to any fiduciary duty to the Corporation, any of the Corporation's stockholders or any of their respective Affiliates, (c) none of the duties imposed on an Identified

Person, whether by contract or law, do or shall limit or impair the right of any Identified Person lawfully to compete with the Corporation, any of the Corporation's stockholders or any of their respective Affiliates and (d) the Identified Persons are not and shall not be obligated to disclose to the Corporation, any of the Corporation's stockholders or any of their respective Affiliates any information related to their respective businesses or opportunities, including acquisition opportunities, or to refrain from or in any respect to be restricted in competing against the Corporation, any of the Corporation's stockholders or any of their respective Affiliates in any such business or as to any such opportunities.

As used in these Bylaws, "***Affiliate***" means any Person who, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Person specified; "***Person***" means any individual, corporation, general or limited partnership, limited liability company, joint venture, trust, association or any other entity; and "***control***" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and "***controlled***" and "***under common control with***" have correlative meanings.

## ARTICLE VIII
## GENERAL PROVISIONS

**Section 8.1**    **Distributions and Share Dividends**. Subject to any provision of the Certificate of Incorporation or applicable law, distributions (in the form of cash or property) or share dividends may be declared by the Board of Directors at any regular or special meeting. Dividends may be paid in cash, in property or in shares of the Corporation's capital stock, unless otherwise provided by applicable law or the Certificate of Incorporation.

**Section 8.2**    **Checks**. All checks, demands for money and notes of the Corporation shall be signed by such officer or officers or such other person or persons as the Board of Directors may from time to time designate.

**Section 8.3**    **Fiscal Year**. The fiscal year of the Corporation shall be fixed by resolution of the Board of Directors; *provided*, *however*, that if such fiscal year is not fixed by the Board of Directors and the Board of Directors does not defer determination of the fiscal year, the fiscal year shall be the calendar year.

**Section 8.4**    **Seal**. The Board of Directors may adopt a corporate seal and use the same by causing it or a facsimile thereof to be impressed, affixed, reproduced or otherwise.

**Section 8.5**    **Resignation**. Any director, committee member or officer may resign by so stating at any meeting of the Board of Directors or by giving written notice or notice by electronic communication to the Board of Directors or the Chairman of the Board or the Corporation's Chief Executive Officer, President or Secretary. Such resignation shall take effect at the time specified therein, or immediately if no time is specified therein. Unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

**Section 8.6**      **<u>Amendment of Bylaws</u>**. These Bylaws may be amended or repealed, and new bylaws may be adopted, only in accordance with Article V of the Certificate of Incorporation.

**Exhibit B**

**Members of the New Board**

[To be filed]

Certain documents, or portions thereof, contained in this **Exhibit B** and the Plan Supplement remain subject to continued negotiations, review and revisions by the Debtors and the Consenting Stakeholders.  The respective rights of the Debtors and the Consenting Stakeholders are expressly reserved, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained therein at any time in accordance with the terms of the Plan, or by order of the Bankruptcy Court; *provided* that if any document in this Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the Confirmation Hearing, the Debtors will file a redline of such document with the Bankruptcy Court.  Each of the documents contained in the Plan Supplement or its amendments are subject to certain consent and approval rights to the extent provided in the Plan or Restructuring Support Agreement.

On the Effective Date, the terms of the current members of Invacare Corporation's board of directors shall expire, and the New Board will include those managers set forth in the list of managers of Reorganized Invacare included in the Plan Supplement or selected pursuant to the procedures provided in the Plan Supplement.  By the Effective Date, the officers and overall management structure of Reorganized Invacare, and all officers and management decisions with respect to Reorganized Invacare (and/or any of its direct or indirect subsidiaries), compensation arrangements, and affiliate transactions shall only be subject to the approval of the New Board.

By and after the Effective Date, each officer or manager of the Reorganized Debtors shall be appointed and serve pursuant to the terms of their respective charters and bylaws or other formation and constituent documents and the New Organizational Documents, and applicable laws of the respective Reorganized Debtor's jurisdiction of formation.   Each such director shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents.

## Exhibit C

**Identity of Litigation Trustee**

[To be filed]

**Exhibit D**

**Assumed Executory Contracts and Unexpired Leases Schedule**

Certain documents, or portions thereof, contained in this **Exhibit D** and the Plan Supplement remain subject to continued negotiations, review and revisions by the Debtors and the Consenting Stakeholders. The respective rights of the Debtors and the Consenting Stakeholders are expressly reserved, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained therein at any time in accordance with the terms of the Plan, or by order of the Bankruptcy Court; *provided* that if any document in this Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the Confirmation Hearing, the Debtors will file a redline of such document with the Bankruptcy Court. Each of the documents contained in the Plan Supplement or its amendments are subject to certain consent and approval rights to the extent provided in the Plan or Restructuring Support Agreement.

Article V.A of the Plan provides that on the Effective Date, except as otherwise provided in the Plan, the Plan Supplement, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, all Executory Contracts and Unexpired Leases of the Debtors shall be deemed assumed by the Debtors or Reorganized Debtors, as applicable, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract and Unexpired Lease: (1) previously was assumed or rejected by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion to reject Filed on or before the Effective Date; or (4) is identified on the Rejected Executory Contract and Unexpired Lease Schedule. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions or assumption and assignment, as applicable, of such Executory Contracts or Unexpired Leases as provided for in the Plan, pursuant to sections 365(a) and 1123 of the Bankruptcy Code effective as of the Effective Date. Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, shall have the right to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases Schedule identified in Article V.A of the Plan and in the Plan Supplement at any time through and including forty-five (45) days after the Effective Date.

31915590.6

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.   Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|---|---|---|---|---|---|
| 1 | 23-90068 | Invacare Corporation | 1ST AMERICA HOME MEDICAL EQUIPMENT LP | GOLD PROVIDER AGREEMENT | None |
| 2 | 23-90067 | Freedom Designs, Inc. | 1ST AMERICA HOME MEDICAL EQUIPMENT LP | GOLD PROVIDER AGREEMENT | None |
| 3 | 23-90068 | Invacare Corporation | 1ST CLASS MEDICAL INC | PLATINUM PROVIDER AGREEMENT | None |
| 4 | 23-90067 | Freedom Designs, Inc. | 1ST CLASS MEDICAL INC | PLATINUM PROVIDER AGREEMENT | None |
| 5 | 23-90068 | Invacare Corporation | 24/7 MEDICAL LLC | GOLD PROVIDER AGREEMENT | None |
| 6 | 23-90067 | Freedom Designs, Inc. | 24/7 MEDICAL LLC | GOLD PROVIDER AGREEMENT | None |
| 7 | 23-90068 | Invacare Corporation | 24/7 MEDICAL LLC | GOLD PROVIDER AGREEMENT | None |
| 8 | 23-90068 | Invacare Corporation | 4MD MEDICAL SOLUTIONS LLC | GOLD PROVIDER AGREEMENT | None |
| 9 | 23-90067 | Freedom Designs, Inc. | 4MD MEDICAL SOLUTIONS LLC | GOLD PROVIDER AGREEMENT | None |
| 10 | 23-90068 | Invacare Corporation | 4MD MEDICAL SOLUTIONS LLC | CHANNEL PROGRAM PURCHASE AGREEMENT GOLD LEVEL | None |
| 11 | 23-90067 | Freedom Designs, Inc. | 818 MEDICAL SUPPLY LLC | GOLD PROVIDER AGREEMENT | None |
| 12 | 23-90068 | Invacare Corporation | 818 MEDICAL SUPPLY LLC | GOLD PROVIDER AGREEMENT | None |
| 13 | 23-90068 | Invacare Corporation | A & A HOME HEALTH EQUIPMENT INC | GOLD PROVIDER AGREEMENT | None |
| 14 | 23-90067 | Freedom Designs, Inc. | A & A HOME HEALTH EQUIPMENT, INC. | GOLD PROVIDER AGREEMENT | None |
| 15 | 23-90068 | Invacare Corporation | A PLUS HOME MEDICAL, INC. | GOLD PROVIDER AGREEMENT | None |
| 16 | 23-90067 | Freedom Designs, Inc. | A PLUS HOME MEDICAL, INC. | GOLD PROVIDER AGREEMENT | None |
| 17 | 23-90072 | Invacare Corporation | AARON DE ROSE | KEY EMPLOYMENT RETENTION PLAN | None |
| 18 | 23-90066 | Adaptive Switch Laboratories, Inc. | ABILITIES EXPO | NEW YORK METRO BOOTH | None |
| 19 | 23-90068 | Invacare Corporation | ABILITIES EXPO | INVOICE DTD 01/25/2023 | None |
| 20 | 23-90068 | Invacare Corporation | ABILITY MEDICAL SUPPLY INC | GOLD PROVIDER AGREEMENT | None |
| 21 | 23-90067 | Freedom Designs, Inc. | ABILITY MEDICAL SUPPLY, INC. | GOLD PROVIDER AGREEMENT | None |
| 22 | 23-90068 | Invacare Corporation | ACCESS 2 CARE | GOLD PROVIDER AGREEMENT | None |
| 23 | 23-90067 | Freedom Designs, Inc. | ACCESS 2 CARE | GOLD PROVIDER AGREEMENT | None |
| 24 | 23-90068 | Invacare Corporation | ACCESS MEDICAL INC | GOLD PROVIDER AGREEMENT | None |
| 25 | 23-90068 | Invacare Corporation | ACCESS MEDICAL, INC. | PLATINUM PROVIDER AGREEMENT | $2,675.15 |
| 26 | 23-90067 | Freedom Designs, Inc. | ACCESS MEDICAL, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 27 | 23-90067 | Freedom Designs, Inc. | ACCUAIR | EQUIPMENT - ARGON TANKS | None |
| 28 | 23-90068 | Invacare Corporation | ACCURATE BIOMED SERVICES INC | REPAIR SERVICE AGREEMENT CONCENTRATORS & HOMEFILL | None |
| 29 | 23-90068 | Invacare Corporation | ACCURATE BIOMED SERVICES INC | REPAIR SERVICE AGREEMENT CONCENTRATORS & HOMEFILL | None |
| 30 | 23-90068 | Invacare Corporation | ACCURATE BIOMED SERVICES INC | REPAIR SERVICE AGREEMENT CONCENTRATORS & HOMEFILL | None |
| 31 | 23-90068 | Invacare Corporation | ACCURATE HEALTHCARE INC | PLATINUM PROVIDER AGREEMENT | None |
| 32 | 23-90068 | Invacare Corporation | ACCURATE HEALTHCARE INC | CHANNEL PROGRAM PURCHASE AGREEMENT PLATINUM LEVEL | None |
| 33 | 23-90067 | Freedom Designs, Inc. | ACCURATE HEALTHCARE, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 34 | 23-90068 | Invacare Corporation | ACE MEDICAL, INC. | GOLD PROVIDER AGREEMENT | None |
| 35 | 23-90067 | Freedom Designs, Inc. | ACE MEDICAL, INC. | GOLD PROVIDER AGREEMENT | None |
| 36 | 23-90068 | Invacare Corporation | ACTION PRODUCTS INC | SETTLEMENT AND COEXISTENCE AGREEMENT | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|---|---|---|---|---|---|
| 37 | 23-90068 | Invacare Corporation | ACTION REHAB & SUPPLY INC. | GOLD PROVIDER AGREEMENT | None |
| 38 | 23-90067 | Freedom Designs, Inc. | ACTION REHAB & SUPPLY INC. | GOLD PROVIDER AGREEMENT | None |
| 39 | 23-90068 | Invacare Corporation | ACTIVE MEDICAL LLC CO GROUP | GOLD PROVIDER AGREEMENT | None |
| 40 | 23-90067 | Freedom Designs, Inc. | ACTIVE MEDICAL, LLC CO GROUP | GOLD PROVIDER AGREEMENT | None |
| 41 | 23-90068 | Invacare Corporation | ACTIVE MOBILITY CENTER INC | GOLD PROVIDER AGREEMENT | None |
| 42 | 23-90067 | Freedom Designs, Inc. | ACTIVE MOBILITY CENTER, INC. | GOLD PROVIDER AGREEMENT | None |
| 43 | 23-90068 | Invacare Corporation | ADAPTHEALTH | POWER MOBILITY AND SEATING REBATE PROGRAM | None |
| 44 | 23-90067 | Freedom Designs, Inc. | ADAPTHEALTH | POWER MOBILITY AND SEATING REBATE PROGRAM | None |
| 45 | 23-90068 | Invacare Corporation | ADAPTHEALTH HOLDINGS, LLC | DIAMOND PROVIDER AGREEMENT | None |
| 46 | 23-90067 | Freedom Designs, Inc. | ADAPTHEALTH HOLDINGS, LLC | DIAMOND PROVIDER AGREEMENT | None |
| 47 | 23-90068 | Invacare Corporation | ADAPTHEALTH LLC | POWER MOBILITY AND SEATING REBATE PROGRAM | None |
| 48 | 23-90068 | Invacare Corporation | ADAPTHEALTH LLC | DIAMOND PROVIDER AGREEMENT | None |
| 49 | 23-90068 | Invacare Corporation | ADOBE CREATIVE SUITE | DOCUMENTATION SOFTWARE SUITE | None |
| 50 | 23-90068 | Invacare Corporation | ADP INC | PAYROLL, TIME AND ATTENDANCE, HEALTH CARE COMPLIANCE, TAX COMPLIANCE, EQUIPMENT - 4500 NUMERIC ETHERNET TIMECLOCK | None |
| 51 | 23-90068 | Invacare Corporation | ADP INC | 9TH AMENDMENT TO THE MSA | None |
| 52 | 23-90067 | Freedom Designs, Inc. | ADVANCE MEDICAL SERVICE | GOLD PROVIDER AGREEMENT | None |
| 53 | 23-90068 | Invacare Corporation | ADVANCE MEDICAL SERVICE | GOLD PROVIDER AGREEMENT | None |
| 54 | 23-90068 | Invacare Corporation | ADVANCE MEDICAL SUPPLY INC | GOLD PROVIDER AGREEMENT | None |
| 55 | 23-90067 | Freedom Designs, Inc. | ADVANCED MEDICAL SUPPLY INC. | GOLD PROVIDER AGREEMENT | None |
| 56 | 23-90068 | Invacare Corporation | AFTER THE CALL INC | GOLD PROVIDER AGREEMENT | None |
| 57 | 23-90068 | Invacare Corporation | AFTER THE FALL, INC. | GOLD PROVIDER AGREEMENT | None |
| 58 | 23-90067 | Freedom Designs, Inc. | AFTER THE FALL, INC. | GOLD PROVIDER AGREEMENT | None |
| 59 | 23-90068 | Invacare Corporation | AGAWAM MEDICAL SUPPLY INC | GOLD PROVIDER AGREEMENT | None |
| 60 | 23-90067 | Freedom Designs, Inc. | AGAWAM MEDICAL SUPPLY, INC. | GOLD PROVIDER AGREEMENT | None |
| 61 | 23-90068 | Invacare Corporation | AGILITI HEALTH INC | PM & REPAIR SERVICES | $37,743.10 |
| 62 | 23-90068 | Invacare Corporation | AGNESIAN HEALTHCARE ENTERPRISES LLC | GOLD PROVIDER AGREEMENT | None |
| 63 | 23-90067 | Freedom Designs, Inc. | AGNESIAN HEALTHCARE ENTERPRISES, LL | GOLD PROVIDER AGREEMENT | None |
| 64 | 23-90068 | Invacare Corporation | AGNESIAN HEALTHCARE ENTERPRISES, LLC | GOLD PROVIDER AGREEMENT | None |
| 65 | 23-90068 | Invacare Corporation | AIRERX HEALTHCARE LLC | SETTLEMENT AGREEMENT | None |
| 66 | 23-90068 | Invacare Corporation | AIRTUG INC | SERVICES AGREEMENT DTD 9/27/2022 | None |
| 67 | 23-90068 | Invacare Corporation | AIRTUG INC | SERVICES AGREEMENT DTD 10/6/2022 | None |
| 68 | 23-90068 | Invacare Corporation | AIRTUG INC | SERVICES AGREEMENT DTD 11/2/2022 | None |
| 69 | 23-90068 | Invacare Corporation | AIRTUG INC | SERVICES AGREEMENT DTD 11/14/2022 | None |
| 70 | 23-90068 | Invacare Corporation | AIRTUG INC | SERVICES AGREEMENT DTD 1/9/2023 | None |
| 71 | 23-90068 | Invacare Corporation | AIRTUG INC | SERVICES AGREEMENT DTD 1/12/2023 | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 72 | 23-90068 | Invacare Corporation | AIRTUG INC | SERVICES AGREEMENT DTD 1/16/2023 | None |
| 73 | 23-90068 | Invacare Corporation | AIRTUG INC | SERVICES AGREEMENT DTD 9/14/2022 | None |
| 74 | 23-90068 | Invacare Corporation | ALCO SALES & SERVICE CO | GOLD PROVIDER AGREEMENT | None |
| 75 | 23-90067 | Freedom Designs, Inc. | ALCO SALES & SERVICE CO. | GOLD PROVIDER AGREEMENT | None |
| 76 | 23-90068 | Invacare Corporation | ALICKS HOME MEDICAL EQUIPMENT INC | GOLD PROVIDER AGREEMENT | None |
| 77 | 23-90067 | Freedom Designs, Inc. | ALICK'S HOME MEDICAL EQUIPMENT, INC | GOLD PROVIDER AGREEMENT | None |
| 78 | 23-90068 | Invacare Corporation | ALIGHT | BENEFITS ENROLLMENT SYSTEM | None |
| 79 | 23-90068 | Invacare Corporation | ALL IN ONE CARE MEDICAL SERVICES, INC | GOLD PROVIDER AGREEMENT | None |
| 80 | 23-90067 | Freedom Designs, Inc. | ALL IN ONE CARE MEDICAL SERVICES, INC | GOLD PROVIDER AGREEMENT | None |
| 81 | 23-90068 | Invacare Corporation | ALL MEDICAL INC | GOLD PROVIDER AGREEMENT | None |
| 82 | 23-90068 | Invacare Corporation | ALL MEDICAL INC | GOLD PROVIDER AGREEMENT | None |
| 83 | 23-90067 | Freedom Designs, Inc. | ALL MEDICAL, INC. | GOLD PROVIDER AGREEMENT | None |
| 84 | 23-90068 | Invacare Corporation | ALL PURPOSE LLC | REPAIR SERVICE AGREEMENT CONCENTRATORS & HOMEFILL | None |
| 85 | 23-90068 | Invacare Corporation | ALL STAR OXYGEN & HOME MEDICAL EQUIP LLC | GOLD PROVIDER AGREEMENT | None |
| 86 | 23-90067 | Freedom Designs, Inc. | ALL STAR OXYGEN AND HOME MEDICAL EQ | GOLD PROVIDER AGREEMENT | None |
| 87 | 23-90068 | Invacare Corporation | ALLCARE MEDICAL OF FLORIDA LLC | GOLD PROVIDER AGREEMENT | None |
| 88 | 23-90068 | Invacare Corporation | ALLCARE PHARMACY AND HEALTHCARE | GOLD PROVIDER AGREEMENT | None |
| 89 | 23-90067 | Freedom Designs, Inc. | ALLCARE PHARMACY AND HEALTHCARE | GOLD PROVIDER AGREEMENT | None |
| 90 | 23-90072 | Invacare Corporation | ALLEN, CHARLES | KEY EMPLOYMENT RETENTION PLAN | None |
| 91 | 23-90068 | Invacare Corporation | ALLEN, CHARLES | SEVERANCE BENFIT AGREEMENT DTD 2/18/2019 | None |
| 92 | 23-90068 | Invacare Corporation | ALLIANCE REHAB & MEDICAL EQUIPMENT LLC | PLATINUM PROVIDER AGREEMENT | None |
| 93 | 23-90067 | Freedom Designs, Inc. | ALLIANCE REHAB & MEDICAL EQUIPMENT, | PLATINUM PROVIDER AGREEMENT | None |
| 94 | 23-90068 | Invacare Corporation | ALLIANT | ORDINARY COURSE PROFESSIONAL | None |
| 95 | 23-90068 | Invacare Corporation | ALLIANT INSURANCE SERVICES INC | CONSULTING SERVICES AGREEMENT | None |
| 96 | 23-90068 | Invacare Corporation | ALLSTATE MEDICAL SUPPLIES INC | DIAMOND PROVIDER AGREEMENT | None |
| 97 | 23-90067 | Freedom Designs, Inc. | ALLSTATE MEDICAL SUPPLIES INC | DIAMOND PROVIDER AGREEMENT | None |
| 98 | 23-90068 | Invacare Corporation | ALLSTREAM | INTERNET + SIP SERVICES | None |
| 99 | 23-90068 | Invacare Corporation | ALPHA-MED INC | PLATINUM PROVIDER AGREEMENT | None |
| 100 | 23-90068 | Invacare Corporation | ALPHA-MED INC | CHANNEL PROGRAM PURCHASE AGREEMENT | None |
| 101 | 23-90067 | Freedom Designs, Inc. | ALPHA-MED, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 102 | 23-90068 | Invacare Corporation | ALPINE HOME MEDICAL EQUIPMENT, L.C. | DIAMOND PROVIDER AGREEMENT | None |
| 103 | 23-90067 | Freedom Designs, Inc. | ALPINE HOME MEDICAL EQUIPMENT, L.C. | DIAMOND PROVIDER AGREEMENT | None |
| 104 | 23-90068 | Invacare Corporation | ALPINE MEDICAL SUPPLY LLC | GOLD PROVIDER AGREEMENT | None |
| 105 | 23-90068 | Invacare Corporation | ALTENBURGER, ROSS | CHANGE OF CONTROL AGREEMENT | None |
| 106 | 23-90072 | Invacare Corporation | ALTENBURGER, ROSS | KEY EMPLOYMENT RETENTION PLAN | None |
| 107 | 23-90068 | Invacare Corporation | ALTIUM INC. | DESIGNER COMMERCIAL SUBSCRIPTION (SOFTWARE) | None |
| 108 | 23-90068 | Invacare Corporation | ALTRU SPECIALTY SERVICES, INC. | GOLD PROVIDER AGREEMENT | None |
| 109 | 23-90067 | Freedom Designs, Inc. | ALTRU SPECIALTY SERVICES, INC. | GOLD PROVIDER AGREEMENT | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|--------------------|---------------|
| 110 | 23-90068 | Invacare Corporation | AM REP SALES | INDEPENDENT SALES REPRESENTATIVE AGREEMENT | None |
| 111 | 23-90068 | Invacare Corporation | AMERI CRANE & HOIST | CRANE INSPECTION SERVICES | $1,259.82 |
| 112 | 23-90067 | Freedom Designs, Inc. | AMERICAN DISCOUNT HOME MEDICAL | E-COMMERCE ELITE AGREEMENT | None |
| 113 | 23-90068 | Invacare Corporation | AMERICAN DISCOUNT HOME MEDICAL EQUIP INC | E-COMMERCE ELITE AGREEMENT | None |
| 114 | 23-90068 | Invacare Corporation | AMERICAN HOME CARE SYSTEM, INCORPOR | GOLD PROVIDER AGREEMENT | None |
| 115 | 23-90067 | Freedom Designs, Inc. | AMERICAN HOME CARE SYSTEM, INCORPOR | GOLD PROVIDER AGREEMENT | None |
| 116 | 23-90068 | Invacare Corporation | AMERICAN HOME HEALTH CARE CO | GOLD PROVIDER AGREEMENT | None |
| 117 | 23-90067 | Freedom Designs, Inc. | AMERICAN HOME HEALTH CARE CO. | GOLD PROVIDER AGREEMENT | None |
| 118 | 23-90068 | Invacare Corporation | AMERICAN LIFT AIDS | GOLD PROVIDER AGREEMENT | None |
| 119 | 23-90067 | Freedom Designs, Inc. | AMERICAN LIFT AIDS | GOLD PROVIDER AGREEMENT | None |
| 120 | 23-90067 | Freedom Designs, Inc. | AMERICAN MEDICAL & REHAB COMPANY | GOLD PROVIDER AGREEMENT | None |
| 121 | 23-90068 | Invacare Corporation | AMERICAN MEDICAL & REHAB COMPANY | GOLD PROVIDER AGREEMENT | None |
| 122 | 23-90067 | Freedom Designs, Inc. | AMERICAN MEDICAL EQUIPMENT INC | GOLD PROVIDER AGREEMENT | None |
| 123 | 23-90068 | Invacare Corporation | AMERICAN MEDICAL EQUIPMENT INC | GOLD PROVIDER AGREEMENT | None |
| 124 | 23-90068 | Invacare Corporation | AMERICAN MEDICAL RENTALS INC | GOLD PROVIDER AGREEMENT | None |
| 125 | 23-90067 | Freedom Designs, Inc. | AMERICAN MEDICAL RENTALS, INC | GOLD PROVIDER AGREEMENT | None |
| 126 | 23-90068 | Invacare Corporation | AMERICAN QUALITY HEALTH PRODUCTS LTD | E-COMMERCE AGREEMENT | None |
| 127 | 23-90067 | Freedom Designs, Inc. | AMERICAN QUALITY HEALTH PRODUCTS, L | E-COMMERCE AGREEMENT | None |
| 128 | 23-90068 | Invacare Corporation | AMERICOAST HOLDINGS LLC | DIAMOND PROVIDER AGREEMENT | None |
| 129 | 23-90067 | Freedom Designs, Inc. | AMERICOAST HOLDINGS LLC | DIAMOND PROVIDER AGREEMENT | None |
| 130 | 23-90068 | Invacare Corporation | AMERICOAST HOLDINGS LLC | PLATINUM PROVIDER AGREEMENT | None |
| 131 | 23-90068 | Invacare Corporation | ANDERSEN & ASSOCIATES INC. | EQUIPMENT - RAYMOND STAND UP COUNTERLANCE, BATTERY AND CHARGER | $27,097.19 |
| 132 | 23-90068 | Invacare Corporation | ANDERSEN & ASSOCIATES INC. | EQUIPMENT - REACHTRUCK | None |
| 133 | 23-90068 | Invacare Corporation | ANDERSON MEDICAL | REPAIR SERVICE AGREEMENT CONCENTRATORS & HOMEFILL | None |
| 134 | 23-90072 | Invacare Corporation | ANTHONY LAPLACA | KEY EMPLOYMENT RETENTION PLAN | None |
| 135 | 23-90068 | Invacare Corporation | AON PREMIUM FINANCING, LLC | COMMERCIAL INSURANCE PREMIUM FINANCE AND SECURITY AGREEMENT DTD 11/1/22 | None |
| 136 | 23-90068 | Invacare Corporation | AON PREMIUM FINANCING, LLC | COMMERCIAL INSURANCE PREMIUM FINANCE AND SECURITY AGREEMENT DTD 11/23/22 | None |
| 137 | 23-90068 | Invacare Corporation | AON PREMIUM FINANCING, LLC | COMMERCIAL INSURANCE PREMIUM FINANCE AND SECURITY AGREEMENT DTD 10/3/22 | None |
| 138 | 23-90068 | Invacare Corporation | AON RISK SERVICES NORTHEAST INC | ENGAGEMENT LETTER DTD 8/18/2020 | None |
| 139 | 23-90068 | Invacare Corporation | AON RISK SERVICES NORTHEAST, INC. | COMMERCIAL INSURANCE PREMIUM FINANCE AND SECURITY AGREEMENT DTD 11/1/22 | None |
| 140 | 23-90068 | Invacare Corporation | AON RISK SERVICES NORTHEAST, INC. | COMMERCIAL INSURANCE PREMIUM FINANCE AND SECURITY AGREEMENT DTD 11/23/22 | None |
| 141 | 23-90068 | Invacare Corporation | AON RISK SERVICES NORTHEAST, INC. | COMMERCIAL INSURANCE PREMIUM FINANCE AND SECURITY AGREEMENT DTD 10/3/22 | None |
| 142 | 23-90067 | Freedom Designs, Inc. | APEX PHARMACY | GOLD PROVIDER AGREEMENT | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 143 | 23-90068 | Invacare Corporation | APEX PHARMACY | GOLD PROVIDER AGREEMENT | None |
| 144 | 23-90068 | Invacare Corporation | APN HEALTH CARE INC | CHANNEL PROGRAM PURCHASE AGREEMENT | None |
| 145 | 23-90068 | Invacare Corporation | APN HEALTH CARE, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 146 | 23-90067 | Freedom Designs, Inc. | APN HEALTH CARE, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 147 | 23-90068 | Invacare Corporation | APPLE INDEPENDENCE MOBILITY LLC | GOLD PROVIDER AGREEMENT | None |
| 148 | 23-90067 | Freedom Designs, Inc. | APPLE INDEPENDENCE MOBILITY, LLC | GOLD PROVIDER AGREEMENT | None |
| 149 | 23-90068 | Invacare Corporation | APRIA HEALTHCARE LLC | DIAMOND PROVIDER AGREEMENT | None |
| 150 | 23-90068 | Invacare Corporation | AQUA-GULF TRANSPORT | CUSTOMS BROKERAGE / EXPORT EEIS | $14,930.85 |
| 151 | 23-90068 | Invacare Corporation | AQUA-GULF TRANSPORT INC | LIMITED AUTHORIZATION DTD 11/10/2021 | None |
| 152 | 23-90068 | Invacare Corporation | AQUA-GULF TRANSPORT INC | LIMITED POWER OF ATTORNEY | None |
| 153 | 23-90068 | Invacare Corporation | ARK-LA-MISS PATIENT EQUIPMENT INC | PLATINUM PROVIDER AGREEMENT | None |
| 154 | 23-90067 | Freedom Designs, Inc. | ARK-LA-MISS PATIENT EQUIPMENT, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 155 | 23-90068 | Invacare Corporation | ASCENSION VIA CHRISTI HOME MEDICAL | PLATINUM PROVIDER AGREEMENT | None |
| 156 | 23-90067 | Freedom Designs, Inc. | ASCENSION VIA CHRISTI HOME MEDICAL | PLATINUM PROVIDER AGREEMENT | None |
| 157 | 23-90068 | Invacare Corporation | ASCENSION VIA CHRISTI HOME MEDICAL WICHITA LLC | CONFIRMATION OF PRICING, PAYMENT & PURCHASE COMMITMENT PERFORMANCE DTD 10/27/2021 | None |
| 158 | 23-90068 | Invacare Corporation | ASM LLC | GOLD PROVIDER AGREEMENT | None |
| 159 | 23-90067 | Freedom Designs, Inc. | ASM LLC | GOLD PROVIDER AGREEMENT | None |
| 160 | 23-90068 | Invacare Corporation | ASM LLC | GOLD PROVIDER AGREEMENT | None |
| 161 | 23-90067 | Freedom Designs, Inc. | ASSISTIVE TECHNOLOGY SOLUTIONS | GOLD PROVIDER AGREEMENT | None |
| 162 | 23-90068 | Invacare Corporation | ASSISTIVE TECHNOLOGY SOLUTIONS | GOLD PROVIDER AGREEMENT | None |
| 163 | 23-90068 | Invacare Corporation | ATC CORPORATE SERVICES (LUXEMBOURG) S.A. | INDEMNITY AGREEMENT | None |
| 164 | 23-90068 | Invacare Corporation | AVALARA | RESALE CERTIFICATE CAPTURE | None |
| 165 | 23-90068 | Invacare Corporation | AVALINE MEDICAL LLC | E-COMMERCE ELITE AGREEMENT | None |
| 166 | 23-90068 | Invacare Corporation | AVALINE MEDICAL LLC | E-COMMERCE ELITE AGREEMENT | None |
| 167 | 23-90067 | Freedom Designs, Inc. | AVALINE MEDICAL, LLC. | E-COMMERCE ELITE AGREEMENT | None |
| 168 | 23-90068 | Invacare Corporation | AVISON YOUNG COMMERCIAL REAL ESTATE SVCS LP | LISTING AGREEMENT- COMMERCIAL | None |
| 169 | 23-90067 | Freedom Designs, Inc. | AXISCARE HEALTH LOGISTICS | PLATINUM PROVIDER AGREEMENT | None |
| 170 | 23-90068 | Invacare Corporation | AXISCARE HEALTH LOGISTICS | PLATINUM PROVIDER AGREEMENT | None |
| 171 | 23-90068 | Invacare Corporation | BACHIE, STEPHEN | CHANGE OF CONTROL AGREEMENT | None |
| 172 | 23-90072 | Invacare Corporation | BACHIE, STEPHEN | KEY EMPLOYMENT RETENTION PLAN | None |
| 173 | 23-90072 | Invacare Corporation | BARGER, BRANDEL | KEY EMPLOYMENT RETENTION PLAN | None |
| 174 | 23-90072 | Invacare Corporation | BAXTER, LINDA | KEY EMPLOYMENT RETENTION PLAN | None |
| 175 | 23-90068 | Invacare Corporation | BAXTER, LINDA | SEVERANCE BENFIT AGREEMENT DTD 2/15/2019 | None |
| 176 | 23-90068 | Invacare Corporation | BAYCARE HOME CARE, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 177 | 23-90067 | Freedom Designs, Inc. | BAYCARE HOME CARE, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 178 | 23-90068 | Invacare Corporation | BBF BIKE GMBH | TRADEMARKS CO-EXISTENCE AGREEMENT DTD 8/26/2021 | None |
| 179 | 23-90072 | Invacare Corporation | BEATTY III, DONALD | KEY EMPLOYMENT RETENTION PLAN | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 180 | 23-90072 | Invacare Corporation | BEKOSCKE, ROBERT | KEY EMPLOYMENT RETENTION PLAN | None |
| 181 | 23-90067 | Freedom Designs, Inc. | BELLEVUE HEALTHCARE II INC. | DIAMOND PROVIDER AGREEMENT | None |
| 182 | 23-90068 | Invacare Corporation | BELLEVUE HEALTHCARE INC | DIAMOND PROVIDER AGREEMENT | None |
| 183 | 23-90068 | Invacare Corporation | BELTMAN, JOOST | AMENDMENT TO INDEMNITY AGREEMENT DTD 1/25/2023 | None |
| 184 | 23-90068 | Invacare Corporation | BELTMAN, JOOST | CHANGE OF CONTROL AGREEMENT | None |
| 185 | 23-90068 | Invacare Corporation | BELTMAN, JOOST | INDEMNITY AGREEMENT DTD 8/25/2022 | None |
| 186 | 23-90068 | Invacare Corporation | BELTMAN, JOOST | INDEMNITY AGREEMENT DTD 8/26/2020 | None |
| 187 | 23-90068 | Invacare Corporation | BENEFIS COMMUNITY CARE INC | GOLD PROVIDER AGREEMENT | None |
| 188 | 23-90068 | Invacare Corporation | BENEFIS COMMUNITY CARE INC | GOLD PROVIDER AGREEMENT | None |
| 189 | 23-90067 | Freedom Designs, Inc. | BENEFIS COMMUNITY CARE, INC. | GOLD PROVIDER AGREEMENT | None |
| 190 | 23-90068 | Invacare Corporation | BEST CHOICE MEDICAL EQUIPMENT INC | GOLD PROVIDER AGREEMENT | None |
| 191 | 23-90067 | Freedom Designs, Inc. | BEST CHOICE MEDICAL EQUIPMENT, INC. | GOLD PROVIDER AGREEMENT | None |
| 192 | 23-90067 | Freedom Designs, Inc. | BETTER HEALTH CARE OPTIONS LLC | GOLD PROVIDER AGREEMENT | None |
| 193 | 23-90068 | Invacare Corporation | BETTER HEALTH CARE OPTIONS LLC | GOLD PROVIDER AGREEMENT | None |
| 194 | 23-90068 | Invacare Corporation | BETTER HEALTH CARE OPTIONS LLC | GOLD PROVIDER AGREEMENT | None |
| 195 | 23-90067 | Freedom Designs, Inc. | BIKE-ON.COM | E-COMMERCE ELITE AGREEMENT | None |
| 196 | 23-90068 | Invacare Corporation | BIKE-ON.COM | E-COMMERCE ELITE AGREEMENT #15838 / E4400000 | None |
| 197 | 23-90068 | Invacare Corporation | BILL HOLT & ASOOCIATES INC | INDEPENDENT SALES REPRESENTATIVE AGREEMENT | None |
| 198 | 23-90068 | Invacare Corporation | BINDER, MARC | INDEMNITY AGREEMENT DTD 7/11/2022 | None |
| 199 | 23-90068 | Invacare Corporation | BINSON'S HOSPITAL SUPPLIES INC | CONFIRMATION OF PRICING PAYMENT AND PURCHASE COMMITMENT PERFORMANCE LETTER DTD 6/21/2021 | None |
| 200 | 23-90068 | Invacare Corporation | BINSON'S HOSPITAL SUPPLIES, INC | GOLD PROVIDER AGREEMENT | None |
| 201 | 23-90067 | Freedom Designs, Inc. | BINSON'S HOSPITAL SUPPLIES, INC | GOLD PROVIDER AGREEMENT | None |
| 202 | 23-90068 | Invacare Corporation | BISCO HEALTH INC | E-COMMERCE ELITE AGREEMENT #252128/252129 | None |
| 203 | 23-90067 | Freedom Designs, Inc. | BISCO HEALTH INC. | E-COMMERCE ELITE AGREEMENT | None |
| 204 | 23-90068 | Invacare Corporation | BJC HOME MEDICAL EQUIOMENT | DIAMOND PROVIDER AGREEMENT | None |
| 205 | 23-90067 | Freedom Designs, Inc. | BJC HOME MEDICAL EQUIPMENT | DIAMOND PROVIDER AGREEMENT | None |
| 206 | 23-90068 | Invacare Corporation | BLACKBURN'S INC | PLATINUM PROVIDER AGREEMENT | None |
| 207 | 23-90068 | Invacare Corporation | BLACKBURN'S PHYSICIANS PHARMACY, IN | DIAMOND PROVIDER AGREEMENT | None |
| 208 | 23-90067 | Freedom Designs, Inc. | BLACKBURN'S PHYSICIANS PHARMACY, IN | DIAMOND PROVIDER AGREEMENT | None |
| 209 | 23-90068 | Invacare Corporation | BLESSING SPECIALTIES | INDEPENDENT SALES REPRESENTATIVE AGREEMENT | None |
| 210 | 23-90068 | Invacare Corporation | BLOOMBERG FINANCE LP | KYC SERVICES AGREEMENT #3079857 | None |
| 211 | 23-90068 | Invacare Corporation | BLOOMBERG FINANCE LP | ENTITY ENCHANGE ADDENDUM | None |
| 212 | 23-90068 | Invacare Corporation | BLOOMBERG FINANCE LP | PROFESSIONAL SERVICES AGREEMENT #2818545 | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 213 | 23-90068 | Invacare Corporation | BLOOMBERG FINANCE LP | SCHEDULE OF SERVICES ORDER #20427034 DTD 2/26/2009 | None |
| 214 | 23-90068 | Invacare Corporation | BLUE WATER HEALTH CARE | INDEPENDENT SALES RERESENTATIVE AGREEMENT | None |
| 215 | 23-90068 | Invacare Corporation | BONVICINO, RICCARDO | INDEMNITY AGREEMENT | None |
| 216 | 23-90068 | Invacare Corporation | BREWIS GROUP LLC, THE | INDEPENDENT SALES REPRESENTATIVE AGREEMENT | None |
| 217 | 23-90068 | Invacare Corporation | BRIKE INTERNATIONAL LTD | SETTLEMENT AGREEMENT | None |
| 218 | 23-90068 | Invacare Corporation | BRITAKARE HOME MEDICAL OF TEXAS LTD | GOLD PROVIDER AGREEMENT | None |
| 219 | 23-90068 | Invacare Corporation | BRITAKARE HOME MEDICAL OF TEXAS LTD | GOLD PROVIDER AGREEMENT | None |
| 220 | 23-90067 | Freedom Designs, Inc. | BRITKARE HOME MEDICAL OF TEXAS, LTD | GOLD PROVIDER AGREEMENT | None |
| 221 | 23-90068 | Invacare Corporation | BROADWAY HOME MEDICAL INC | GOLD PROVIDER AGREEMENT | None |
| 222 | 23-90067 | Freedom Designs, Inc. | BROADWAY HOME MEDICAL, INC. | GOLD PROVIDER AGREEMENT | None |
| 223 | 23-90068 | Invacare Corporation | BROADWAY MEDICAL SERVICE & SUPPLY INC | GOLD PROVIDER AGREEMENT | None |
| 224 | 23-90067 | Freedom Designs, Inc. | BROADWAY MEDICAL SERVICE AND SUPPLY | GOLD PROVIDER AGREEMENT | None |
| 225 | 23-90072 | Invacare Corporation | BROOKS, TERRIA | KEY EMPLOYMENT RETENTION PLAN | None |
| 226 | 23-90068 | Invacare Corporation | BROWNING-FERRIS INDUSTRIES OF OHIO INC | CUSTOMER SERVICE AGREEMENT #A217401860 | None |
| 227 | 23-90068 | Invacare Corporation | BROWNING-FERRIS INDUSTRIES OF OHIO INC | AMENDMENT TO CUSTOMER SERVICE AGREEMENT | None |
| 228 | 23-90068 | Invacare Corporation | BROWNING-FERRIS INDUSTRIES OF OHIO INC | CUSTOMER SERVICE AGREEMENT #A217403492 | None |
| 229 | 23-90068 | Invacare Corporation | BROWNING-FERRIS INDUSTRIES OF OHIO INC | CUSTOMER SERVICE AGREEMENT #A217402047 DTD 12/2/2021 | None |
| 230 | 23-90068 | Invacare Corporation | BROWNING-FERRIS INDUSTRIES OF OHIO INC | AMENDMENT TO CUSTOMER SERVICE AGREEMENT #A217402047 | None |
| 231 | 23-90068 | Invacare Corporation | BROWNING-FERRIS INDUSTRIES OF OHIO INC | CUSTOMER SERVICE AGREEMENT #A217379302 | None |
| 232 | 23-90068 | Invacare Corporation | BROWNING-FERRIS INDUSTRIES OF OHIO INC | AMENDMENT TO CUSTOMER SERVICE AGREEMENT #A217379302 | None |
| 233 | 23-90068 | Invacare Corporation | BROWNING-FERRIS INDUSTRIES OF OHIO INC | CUSTOMER SERVICE AGREEMENT #A217379303 | None |
| 234 | 23-90068 | Invacare Corporation | BROWNING-FERRIS INDUSTRIES OF OHIO INC | CUSTOMER SERVICE AGREEMENT #3-44532.58111 | None |
| 235 | 23-90068 | Invacare Corporation | BROWNING-FERRIS INDUSTRIES OF OHIO INC | CUSTOMER SERVICE AGREEMENT #A217519622 | None |
| 236 | 23-90068 | Invacare Corporation | BROWNING-FERRIS INDUSTRIES OF OHIO INC | CUSTOMER SERVICE AGREEMENT #A217547508 DTD 12/2/2021 | None |
| 237 | 23-90068 | Invacare Corporation | BROWNING-FERRIS INDUSTRIES OF OHIO INC | AMENDMENT TO CUSTOMER SERVICE AGREEMENT #A217547508 | None |
| 238 | 23-90068 | Invacare Corporation | BROWNING-FERRIS INDUSTRIES OF OHIO INC | CUSTOMER SERVICE AGREEMENT #A217547275 DTD 12/2/2021 | None |
| 239 | 23-90068 | Invacare Corporation | BROWNING-FERRIS INDUSTRIES OF OHIO INC | AMENDMENT TO CUSTOMER SERVICE AGREEMENT #A217547275 | None |
| 240 | 23-90068 | Invacare Corporation | BROWNING'S PHARMACY & HEALTH CARE INC | GOLD PROVIDER AGREEMENT | None |
| 241 | 23-90067 | Freedom Designs, Inc. | BROWNING'S PHARMACY AND HEALTH CARE | GOLD PROVIDER AGREEMENT | None |
| 242 | 23-90068 | Invacare Corporation | BUCKEYE HOME HEALTH CENTER INC | DIAMOND PROVIDER AGREEMENT | None |
| 243 | 23-90068 | Invacare Corporation | BUCKEYE HOME HEALTH CENTER INC | DIAMOND PROVIDER AGREEMENT | None |
| 244 | 23-90067 | Freedom Designs, Inc. | BUCKEYE HOME HEALTH CENTER, INC. | DIAMOND PROVIDER AGREEMENT | None |
| 245 | 23-90068 | Invacare Corporation | BUCKEYE MEDICAL SUPPLY CO, THE | GOLD PROVIDER AGREEMENT | None |
| 246 | 23-90068 | Invacare Corporation | BURBANK MEDICAL SUPPLY INC | GOLD PROVIDER AGREEMENT | None |
| 247 | 23-90067 | Freedom Designs, Inc. | BURBANK MEDICAL SUPPLY, INC. | GOLD PROVIDER AGREEMENT | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 248 | 23-90068 | Invacare Corporation | C STREET ADVISORY GROUP LLC | ADVISORY SERVICES AGREEMENT | None |
| 249 | 23-90066 | Adaptive Switch Laboratories, Inc. | C.R. ASHMORE FAMILY PARTNERSHIP LTD | 125 SPUR 191, SPICEWOOD, TX 78669 | None |
| 250 | 23-90068 | Invacare Corporation | C.R. PHARMACY SERVICES, INC. | GOLD PROVIDER AGREEMENT | None |
| 251 | 23-90067 | Freedom Designs, Inc. | C.R. PHARMACY SERVICES, INC. | GOLD PROVIDER AGREEMENT | None |
| 252 | 23-90068 | Invacare Corporation | CALL2RECYCLE INC | MASTER SERVICES AGREEMENT | $1,085.92 |
| 253 | 23-90068 | Invacare Corporation | CALL2RECYCLE INC | RECHARGEABLE BATTERY STATEMENT OF WORK | None |
| 254 | 23-90066 | Adaptive Switch Laboratories, Inc. | CANOA SYSTEMS | IT SERVICE AND MICROSOFT LICENSES | $14,971.47 |
| 255 | 23-90068 | Invacare Corporation | CAPITAL MEDICAL SUPPLY INC | GOLD PROVIDER AGREEMENT | None |
| 256 | 23-90067 | Freedom Designs, Inc. | CAPITAL MEDICAL SUPPLY, INC. | GOLD PROVIDER AGREEMENT | None |
| 257 | 23-90068 | Invacare Corporation | CAPSTONE MEDICAL INC | GOLD PROVIDER AGREEMENT | None |
| 258 | 23-90068 | Invacare Corporation | CAPSTONE MEDICAL INC | GOLD PROVIDER AGREEMENT | None |
| 259 | 23-90067 | Freedom Designs, Inc. | CAPSTONE MEDICAL INC | GOLD PROVIDER AGREEMENT | None |
| 260 | 23-90068 | Invacare Corporation | CARELINC MEDICAL EQUIPMENT & SUPPLY | PLATINUM PROVIDER AGREEMENT | None |
| 261 | 23-90067 | Freedom Designs, Inc. | CARELINC MEDICAL EQUIPMENT & SUPPLY | PLATINUM PROVIDER AGREEMENT | None |
| 262 | 23-90068 | Invacare Corporation | CARELINC MEDICAL EQUIPMENT & SUPPLY CO LLC | CONFIRMATION OF PRICING PAYMENT & PURCHASE COMMITMENT PERFORMANCE DTD 6/21/2021 | None |
| 263 | 23-90068 | Invacare Corporation | CARESOURCE LLC | CHANNEL PROGRAM PURCHASE AGREEMENT - PLATINUM LEVEL | None |
| 264 | 23-90067 | Freedom Designs, Inc. | CARESOURCE, L.L.C. | PLATINUM PROVIDER AGREEMENT | None |
| 265 | 23-90068 | Invacare Corporation | CARMICHAEL'S CASHWAY PHARMACY INC | GOLD PROVIDER AGREEMENT | None |
| 266 | 23-90067 | Freedom Designs, Inc. | CARMICHAEL'S CASHWAY PHARMACY, INC. | GOLD PROVIDER AGREEMENT | None |
| 267 | 23-90068 | Invacare Corporation | CAROLINA HOME MEDICAL INC | GOLD PROVIDER AGREEMENT | None |
| 268 | 23-90067 | Freedom Designs, Inc. | CAROLINA HOME MEDICAL, INC. | GOLD PROVIDER AGREEMENT | None |
| 269 | 23-90068 | Invacare Corporation | CAROLINA'S HOME MEDICAL EQUIPMENT INC | GOLD PROVIDER AGREEMENT | None |
| 270 | 23-90067 | Freedom Designs, Inc. | CAROLINA'S HOME MEDICAL EQUIPMENT, | GOLD PROVIDER AGREEMENT | None |
| 271 | 23-90068 | Invacare Corporation | CASCADE HEALTHCARE SOLUTIONS LLC | E-COMMERCE ELITE AGREEMENT | None |
| 272 | 23-90067 | Freedom Designs, Inc. | CASCADE HEALTHCARE SOLUTIONS, LLC | E-COMMERCE ELITE AGREEMENT | None |
| 273 | 23-90067 | Freedom Designs, Inc. | CBJ DEVELOPMENT CO . | PLATINUM PROVIDER AGREEMENT | None |
| 274 | 23-90068 | Invacare Corporation | CBJ DEVELOPMENT COMPANY | PLATINUM PROVIDER AGREEMENT | None |
| 275 | 23-90068 | Invacare Corporation | CENTRAL EXTERMINATING CO | PEST CONTROL SERVICE AGREEMENT | $407.39 |
| 276 | 23-90068 | Invacare Corporation | CENTRAL NEW YORK MEDICAL PRODUCTS INC | GOLD PROVIDER AGREEMENT | None |
| 277 | 23-90067 | Freedom Designs, Inc. | CENTRAL NEW YORK MEDICAL PRODUCTS, | GOLD PROVIDER AGREEMENT | None |
| 278 | 23-90068 | Invacare Corporation | CERTIFIED SEATING AND MOBILITY LLC | GOLD PROVIDER AGREEMENT | None |
| 279 | 23-90068 | Invacare Corporation | CERTIFIED SEATING AND MOBILITY LLC | POWER MOBILITY AND SEATING REBATE PROGRAM | None |
| 280 | 23-90068 | Invacare Corporation | CERTIFIED SEATING AND MOBILITY, LLC | GOLD PROVIDER AGREEMENT | None |
| 281 | 23-90067 | Freedom Designs, Inc. | CERTIFIED SEATING AND MOBILITY, LLC | GOLD PROVIDER AGREEMENT | None |
| 282 | 23-90068 | Invacare Corporation | CERTIFITED SEATING AND MOBILITY, LLC | POWER MOBILITY AND SEATING REBATE PROGRAM | None |
| 283 | 23-90067 | Freedom Designs, Inc. | CERTIFITED SEATING AND MOBILITY, LLC | POWER MOBILITY AND SEATING REBATE PROGRAM | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 284 | 23-90066 | Adaptive Switch Laboratories, Inc. | CHARTER COMMUNICATION | FIBER OPTIC INTERNET | $673.50 |
| 285 | 23-90066 | Adaptive Switch Laboratories, Inc. | CHARTER COMMUNICATION | INTERNET | None |
| 286 | 23-90066 | Adaptive Switch Laboratories, Inc. | CHARTER COMMUNICATIONS | INVOICE #0032212013123 DTD 1/31/2023 | None |
| 287 | 23-90067 | Freedom Designs, Inc. | CHARTWELL MIDWEST WISCONSIN | GOLD PROVIDER AGREEMENT | None |
| 288 | 23-90068 | Invacare Corporation | CHARTWELL MIDWEST WISCONSIN | GOLD PROVIDER AGREEMENT | None |
| 289 | 23-90072 | Invacare Corporation | CHETTY, SANKESH | KEY EMPLOYMENT RETENTION PLAN | None |
| 290 | 23-90068 | Invacare Corporation | CHILDREN'S HOME MEDICAL EQUIPMENT INC | GOLD PROVIDER AGREEMENT | None |
| 291 | 23-90067 | Freedom Designs, Inc. | CHILDREN'S HOME MEDICAL EQUIPMENT, | GOLD PROVIDER AGREEMENT | None |
| 292 | 23-90068 | Invacare Corporation | CHME INC | PLATINUM PROVIDER AGREEMENT | None |
| 293 | 23-90067 | Freedom Designs, Inc. | CHME, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 294 | 23-90068 | Invacare Corporation | CHOICE HEALTHCARE INC | GOLD PROVIDER AGREEMENT | None |
| 295 | 23-90068 | Invacare Corporation | CHOICE HEALTHCARE INC | E-COMMERCE ELITE AGREEMENT | None |
| 296 | 23-90067 | Freedom Designs, Inc. | CHOICE HEALTHCARE, INC. | GOLD PROVIDER AGREEMENT | None |
| 297 | 23-90067 | Freedom Designs, Inc. | CHOICE HEALTHCARE, INC. | E-COMMERCE ELITE AGREEMENT | None |
| 298 | 23-90067 | Freedom Designs, Inc. | CHOICE HOME MEDICAL EQUIPMENT | GOLD PROVIDER AGREEMENT | None |
| 299 | 23-90068 | Invacare Corporation | CHOICE HOME MEDICAL EQUIPMENT INC | GOLD PROVIDER AGREEMENT | None |
| 300 | 23-90068 | Invacare Corporation | CIGNA | MEDICAL AND DENTAL INSURANCE FOR US EMPLOYEES | None |
| 301 | 23-90068 | Invacare Corporation | CIGNA | STOP LOSS INSURANCE FOR MEDICAL PLAN | None |
| 302 | 23-90068 | Invacare Corporation | CIGNA BEHAVIORAL HEALTH INC | EAP RENEWAL | None |
| 303 | 23-90068 | Invacare Corporation | CIGNA HEALTH & LIFE INSURANCE CO | INSURANCE POLICY #3146776 DTD 9/23/2022 | None |
| 304 | 23-90067 | Freedom Designs, Inc. | CIMARRON MEDICAL SERVICES | GOLD PROVIDER AGREEMENT | None |
| 305 | 23-90068 | Invacare Corporation | CIMARRON MEDICAL SERVICES | GOLD PROVIDER AGREEMENT | None |
| 306 | 23-90068 | Invacare Corporation | CINARI INC | CHANNEL PROGRAM PURCHASE AGREEMENT - PLATINUM LEVEL | None |
| 307 | 23-90067 | Freedom Designs, Inc. | CINARI, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 308 | 23-90067 | Freedom Designs, Inc. | CINCINNATI CHILDREN'S HOSPITAL MEDI | PLATINUM PROVIDER AGREEMENT | None |
| 309 | 23-90068 | Invacare Corporation | CINCINNATI CHILDREN'S HOSPITAL MEDICAL CTR | PLATINUM PROVIDER AGREEMENT | None |
| 310 | 23-90068 | Invacare Corporation | CINCO ELECTRONICS RECYCLING | DEMANUFACTURING SERVICES AGREEMENT | None |
| 311 | 23-90068 | Invacare Corporation | CIRCA | EEO AND AFFIRMATIVE ACTION COMLIANCE | $9,643.57 |
| 312 | 23-90068 | Invacare Corporation | CITIZENS MEMORIAL HEALTH CARE | GOLD PROVIDER AGREEMENT | None |
| 313 | 23-90067 | Freedom Designs, Inc. | CITIZENS MEMORIAL HEALTH CARE | GOLD PROVIDER AGREEMENT | None |
| 314 | 23-90068 | Invacare Corporation | CITIZENS MEMORIAL HEALTH CARE FOUNDATION | GOLD PROVIDER AGREEMENT | None |
| 315 | 23-90068 | Invacare Corporation | CITY WIDE SOLUTIONS | FIRE/BURGLAR ALARM MONITORING SERVICES | $710.28 |
| 316 | 23-90068 | Invacare Corporation | CITYWHEELCHAIRS INCORPORATED | PLATINUM PROVIDER AGREEMENT | None |
| 317 | 23-90068 | Invacare Corporation | CITYWHEELCHAIRS, INCORPORATED | GOLD PROVIDER AGREEMENT | None |
| 318 | 23-90067 | Freedom Designs, Inc. | CITYWHEELCHAIRS, INCORPORATED | GOLD PROVIDER AGREEMENT | None |
| 319 | 23-90068 | Invacare Corporation | CLARKE HEALTH CARE PRODUCTS INC | DIAMOND PROVIDER AGREEMENT | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 320 | 23-90068 | Invacare Corporation | CLARKE HEALTH CARE PRODUCTS INC | TERMINATION LETTER DTD 12/22/2020 | None |
| 321 | 23-90067 | Freedom Designs, Inc. | CLARKE HEALTH CARE PRODUCTS, INC. | DIAMOND PROVIDER AGREEMENT | None |
| 322 | 23-90068 | Invacare Corporation | CLARKS ORTHOPEDIC & MEDICAL INC | GOLD PROVIDER AGREEMENT | None |
| 323 | 23-90067 | Freedom Designs, Inc. | CLARKS ORTHOPEDIC & MEDICAL, INC. | GOLD PROVIDER AGREEMENT | None |
| 324 | 23-90068 | Invacare Corporation | CLEARSTEAD | INVESTMENT ADVISORY AGREEMENT | None |
| 325 | 23-90068 | Invacare Corporation | CN ENTERPRISES INC | GOLD PROVIDER AGREEMENT | None |
| 326 | 23-90067 | Freedom Designs, Inc. | CN ENTERPRISES, INC. | GOLD PROVIDER AGREEMENT | None |
| 327 | 23-90068 | Invacare Corporation | CNS PROFESSIONAL SERVICES | GOLD PROVIDER AGREEMENT | None |
| 328 | 23-90067 | Freedom Designs, Inc. | CNS PROFESSIONAL SERVICES | GOLD PROVIDER AGREEMENT | None |
| 329 | 23-90068 | Invacare Corporation | CNS PROFESSIONAL SERVICES | GOLD PROVIDER AGREEMENT | None |
| 330 | 23-90068 | Invacare Corporation | COLUMBIA ANCILLARY SERVICES INC | PLATINUM PROVIDER AGREEMENT | None |
| 331 | 23-90067 | Freedom Designs, Inc. | COLUMBIA ANCILLARY SERVICES, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 332 | 23-90067 | Freedom Designs, Inc. | COMFORT MEDICAL SUPPLY | POWER MOBILITY AND SEATING REBATE PROGRAM | None |
| 333 | 23-90068 | Invacare Corporation | COMFORT MEDICAL SUPPLY INC | POWER MOBILITY AND SEATING REBATE PROGRAM | None |
| 334 | 23-90068 | Invacare Corporation | COMFORT MEDICAL SUPPLY INC | GOLD PROVIDER AGREEMENT | None |
| 335 | 23-90067 | Freedom Designs, Inc. | COMFORT MEDICAL SUPPLY, INC. | GOLD PROVIDER AGREEMENT | None |
| 336 | 23-90068 | Invacare Corporation | COMM2000, INC. (UL) | UL STANDARDS | None |
| 337 | 23-90068 | Invacare Corporation | COMMERCE HUB | MASTER SERVICES AGREEMENT - PRODUCT SALES PLATFORM | None |
| 338 | 23-90068 | Invacare Corporation | COMMERCE TECHNOLOGIES LLC | RIDER TO AGREEMENT | None |
| 339 | 23-90068 | Invacare Corporation | COMMERCE TECHNOLOGIES LLC | SUPPLIER MASTER SERVICES AGREEMENT | None |
| 340 | 23-90068 | Invacare Corporation | COMMUNITY HOSPICE OF NE FLORIDA INC | GOLD PROVIDER AGREEMENT | None |
| 341 | 23-90067 | Freedom Designs, Inc. | COMMUNITY HOSPICE OF NORTHEAST FLORIDA, INC. | GOLD PROVIDER AGREEMENT | None |
| 342 | 23-90068 | Invacare Corporation | COMPLETE CARE INC | PLATINUM PROVIDER AGREEMENT | None |
| 343 | 23-90067 | Freedom Designs, Inc. | COMPLETE CARE, INC | PLATINUM PROVIDER AGREEMENT | None |
| 344 | 23-90068 | Invacare Corporation | COMPLETE MEDICAL LLC | GOLD PROVIDER AGREEMENT | None |
| 345 | 23-90068 | Invacare Corporation | COMPLETE MEDICAL, LLC | GOLD PROVIDER AGREEMENT | None |
| 346 | 23-90067 | Freedom Designs, Inc. | COMPLETE MEDICAL, LLC | GOLD PROVIDER AGREEMENT | None |
| 347 | 23-90068 | Invacare Corporation | CONCORDANCE HEALTHCARE SOLUTIONS LLC | GOLD PROVIDER AGREEMENT | None |
| 348 | 23-90068 | Invacare Corporation | CONCORDANCE HEALTHCARE SOLUTIONS, L | GOLD PROVIDER AGREEMENT | None |
| 349 | 23-90067 | Freedom Designs, Inc. | CONCORDANCE HEALTHCARE SOLUTIONS, L | GOLD PROVIDER AGREEMENT | None |
| 350 | 23-90067 | Freedom Designs, Inc. | CONCORDIA MEDICAL EQUIPMENT | GOLD PROVIDER AGREEMENT | None |
| 351 | 23-90068 | Invacare Corporation | CONCORDIA MEDICAL EQUIPMENT | GOLD PROVIDER AGREEMENT | None |
| 352 | 23-90068 | Invacare Corporation | CONNECT MEDICAL GROUP | INDEPENDENT SALES REPRESENTATIVE AGREEMENT | None |
| 353 | 23-90067 | Freedom Designs, Inc. | CONNECT MEDICAL GROUP | INDEPENDENT SALES REPRESENTATIVE AGREEMENT | None |
| 354 | 23-90068 | Invacare Corporation | CONNECT MEDICAL GROUP LLC | INDEPENDENT SALES REPRESENTATIVE AGREEMENT | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 355 | 23-90067 | Freedom Designs, Inc. | CONSOLIDATED MEDICAL & SURGICAL SUP | GOLD PROVIDER AGREEMENT | None |
| 356 | 23-90068 | Invacare Corporation | CONSOLIDATED MEDICAL & SURGICAL SUPPLY CO INC | GOLD PROVIDER AGREEMENT | None |
| 357 | 23-90068 | Invacare Corporation | CONTINUUM LLC | GOLD PROVIDER AGREEMENT | None |
| 358 | 23-90067 | Freedom Designs, Inc. | CONTINUUM, LLC | GOLD PROVIDER AGREEMENT | None |
| 359 | 23-90068 | Invacare Corporation | CORNER HOME MEDICAL INC | PLATINUM PROVIDER AGREEMENT | None |
| 360 | 23-90068 | Invacare Corporation | CORNER HOME MEDICAL, INC. | DIAMOND PROVIDER AGREEMENT | None |
| 361 | 23-90067 | Freedom Designs, Inc. | CORNER HOME MEDICAL, INC. | DIAMOND PROVIDER AGREEMENT | None |
| 362 | 23-90068 | Invacare Corporation | CORNERSTONE MEDICAL SERVICES | GOLD PROVIDER AGREEMENT | None |
| 363 | 23-90068 | Invacare Corporation | CORNERSTONE MEDICAL SERVICES LLC | GOLD PROVIDER AGREEMENT | None |
| 364 | 23-90067 | Freedom Designs, Inc. | CORNERSTONE MEDICAL SERVICES LLC | GOLD PROVIDER AGREEMENT | None |
| 365 | 23-90068 | Invacare Corporation | COURAGE X INC | GOLD PROVIDER AGREEMENT | None |
| 366 | 23-90067 | Freedom Designs, Inc. | COURAGE X, INC. | GOLD PROVIDER AGREEMENT | None |
| 367 | 23-90068 | Invacare Corporation | CR ASHMORE FAMILY PARTNERSHIP LTD, THE | LEASE EXTENSION LETTER DTD 5/23/2002 | None |
| 368 | 23-90068 | Invacare Corporation | CR ASHMORE FAMILY PARTNERSHIP LTD, THE | LEASE PAYMENT ADJUSTMENT LETTER DTD 7/14/2008 | None |
| 369 | 23-90066 | Adaptive Switch Laboratories, Inc. | CR ASHMORE FAMILY PARTNERSHIP LTD, THE | LEASE PAYMENT ADJUSTMENT LETTER DTD 7/14/2008 | None |
| 370 | 23-90066 | Adaptive Switch Laboratories, Inc. | CR ASHMORE FAMILY PARTNERSHIP LTD, THE | LEASE AGREEMENT AND CONDITIONS TERMS AND DEFINITIONS | None |
| 371 | 23-90066 | Adaptive Switch Laboratories, Inc. | CR ASHMORE FAMILY PARTNERSHIP LTD, THE | LEASE EXTENSION LETTER DTD 5/23/2002 | None |
| 372 | 23-90068 | Invacare Corporation | CRAWFORD, EDWARD F. | INDEMNITY AGREEMENT DTD 8/22/2022 | None |
| 373 | 23-90068 | Invacare Corporation | CREST ELECTRONICS INC | CHANNEL PROGRAM PURCHASE AGREEMENT - GOLD LEVEL | None |
| 374 | 23-90068 | Invacare Corporation | CREST ELECTRONICS, INC. | GOLD PROVIDER AGREEMENT | None |
| 375 | 23-90067 | Freedom Designs, Inc. | CREST ELECTRONICS, INC. | GOLD PROVIDER AGREEMENT | None |
| 376 | 23-90068 | Invacare Corporation | CRESTMARK EQUIPMENT | OPTIPLEX 5040 DESKTOPS | None |
| 377 | 23-90068 | Invacare Corporation | CRESTMARK EQUIPMENT | EQUIPMENT - FORKLIFT | None |
| 378 | 23-90068 | Invacare Corporation | CRESTMARK EQUIPMENT FINANCE INC | SCHEDULE# 004 DTD 8/16/2017 | None |
| 379 | 23-90068 | Invacare Corporation | CRESTMARK EQUIPMENT FINANCE INC | MASTER EQUIPMENT LEASE AGREEMENT | None |
| 380 | 23-90068 | Invacare Corporation | CROWN HOSPICE INC | CHANNEL PROGRAM PURCHASE AGREEMENT - GOLD LEVEL | None |
| 381 | 23-90067 | Freedom Designs, Inc. | CROWN HOSPICE, INC. | CHANNEL PROGRAM PURCHASE AGREEMENT - GOLD LEVEL | None |
| 382 | 23-90068 | Invacare Corporation | CT CORPORATION SYSTEM | PRICING OFFER FOR SERVICES DTD 10/19/2017 | $3,493.55 |
| 383 | 23-90068 | Invacare Corporation | CT CORPORATION SYSTEM | ANNUAL REPORT SERVICE ORDER FORM | None |
| 384 | 23-90068 | Invacare Corporation | CT CORPORATION SYSTEM | ANNUAL REPORT SERVICE ORDER FORM DTD 1/28/2016 | None |
| 385 | 23-90068 | Invacare Corporation | CT CORPORATION SYSTEM | NOTIFICATION OF THE ADDITION OF A SUBPROCESSOR DTD 7/16/2021 | None |
| 386 | 23-90068 | Invacare Corporation | CT CORPORATION SYSTEM | HCUE LICENSE, IMPLEMENTATION, & SERVICES AGREEMENT DTD 3/16/2021 | None |
| 387 | 23-90068 | Invacare Corporation | CT CORPORATION SYTEM | CORPORATE ENTITY MANAGEMENT | None |
| 388 | 23-90067 | Freedom Designs, Inc. | CULPEPER PHARMACY | GOLD PROVIDER AGREEMENT | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 389 | 23-90068 | Invacare Corporation | CULPEPER PHARMACY | GOLD PROVIDER AGREEMENT | None |
| 390 | 23-90072 | Invacare Corporation | CUSON, ROB | KEY EMPLOYMENT RETENTION PLAN | None |
| 391 | 23-90068 | Invacare Corporation | CUSTOM HEALTHCARE LLC | GOLD PROVIDER AGREEMENT | None |
| 392 | 23-90067 | Freedom Designs, Inc. | CUSTOM HEALTHCARE, LLC | GOLD PROVIDER AGREEMENT | None |
| 393 | 23-90068 | Invacare Corporation | CUSTOM MEDICAL EQUIPMENT LLC | GOLD PROVIDER AGREEMENT | None |
| 394 | 23-90067 | Freedom Designs, Inc. | CUSTOM MEDICAL EQUIPMENT, LLC | GOLD PROVIDER AGREEMENT | None |
| 395 | 23-90067 | Freedom Designs, Inc. | CUSTOM MOBILITY, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 396 | 23-90068 | Invacare Corporation | CUSTOME MOBILITY INC | PLATINUM PROVIDER AGREEMENT | None |
| 397 | 23-90068 | Invacare Corporation | CUYAHOGA GROUP, THE | HOSPITALITY SERVICES AGREEMENT DTD 4/22/2019 | $4,662.36 |
| 398 | 23-90068 | Invacare Corporation | CUYAHOGA GROUP, THE | OFFICE COFFEE SERVICE AGREEMENT | None |
| 399 | 23-90067 | Freedom Designs, Inc. | D & D MEDICAL EQUIPMENT, INC. | GOLD PROVIDER AGREEMENT | None |
| 400 | 23-90068 | Invacare Corporation | D&D MEDICAL EQUIPMENT INC | GOLD PROVIDER AGREEMENT | None |
| 401 | 23-90068 | Invacare Corporation | D. V.JAHN, INC. | DIAMOND PROVIDER AGREEMENT | None |
| 402 | 23-90067 | Freedom Designs, Inc. | D. V.JAHN, INC. | DIAMOND PROVIDER AGREEMENT | None |
| 403 | 23-90068 | Invacare Corporation | D.V. JAHN INC | PLATINUM PROVIDER AGREEMENT | None |
| 404 | 23-90068 | Invacare Corporation | DAHLLOF, NICLAS | INDEMNITY AGREEMENT | None |
| 405 | 23-90068 | Invacare Corporation | DANIELSON-WEILL, PETRA | INDEMNITY AGREEMENT DTD 5/17/2018 | None |
| 406 | 23-90068 | Invacare Corporation | DANSONS MEDICAL LLC | E-COMMERCE AGREEMENT | None |
| 407 | 23-90068 | Invacare Corporation | DANSONS MEDICAL, LLC. | E-COMMERCE AGREEMENT | None |
| 408 | 23-90067 | Freedom Designs, Inc. | DANSONS MEDICAL, LLC. | E-COMMERCE AGREEMENT | None |
| 409 | 23-90068 | Invacare Corporation | DCH REGIONAL MEDICAL CENTER | GOLD PROVIDER AGREEMENT | None |
| 410 | 23-90067 | Freedom Designs, Inc. | DCH REGIONAL MEDICAL CENTER | GOLD PROVIDER AGREEMENT | None |
| 411 | 23-90068 | Invacare Corporation | DE LA FUENTE VAN BAAL, DESIREE | INDEMNITY AGREEMENT DTD 8/25/2022 | None |
| 412 | 23-90068 | Invacare Corporation | DE LAGE LANDEN FINANCIAL SVCS INC | 9TH AMENDMENT TO MASTER CONTRACT FINANCING PROGRAM AGREEMENT | None |
| 413 | 23-90068 | Invacare Corporation | DE LAGE LANDEN FINANCIAL SVCS INC | 11TH AMENDMENT TO MASTER CONTRACT FINANCING PROGRAM AGREEMENT DTD 9/30/2011 | None |
| 414 | 23-90068 | Invacare Corporation | DE LAGE LANDEN FINANCIAL SVCS INC | 1ST AMENDMENT TO MASTER CONTRACT FINANCING PROGRAM AGREEMENT DTD 1/26/2001 | None |
| 415 | 23-90068 | Invacare Corporation | DE LAGE LANDEN FINANCIAL SVCS INC | 2ND AMENDMENT TO MASTER CONTRACT FINANCING PROGRAM AGREEMENT | None |
| 416 | 23-90068 | Invacare Corporation | DE LAGE LANDEN FINANCIAL SVCS INC | 3RD AMENDMENT TO MASTER CONTRACT FINANCING PROGRAM AGREEMENT | None |
| 417 | 23-90068 | Invacare Corporation | DE LAGE LANDEN FINANCIAL SVCS INC | 5TH AMENDMENT TO MASTER CONTRACT FINANCING PROGRAM AGREEMENT | None |
| 418 | 23-90068 | Invacare Corporation | DE LAGE LANDEN FINANCIAL SVCS INC | 7TH AMENDMENT TO MASTER CONTRACT FINANCING PROGRAM AGREEMENT | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 419 | 23-90068 | Invacare Corporation | DE LAGE LANDEN FINANCIAL SVCS INC | 8TH AMENDMENT TO MASTER CONTRACT FINANCING PROGRAM AGREEMENT DTD 2/12/2007 | None |
| 420 | 23-90068 | Invacare Corporation | DE LAGE LANDEN FINANCIAL SVCS INC | 10TH AMENDMENT TO MASTER CONTRACT FINANCING PROGRAM AGREEMENT | None |
| 421 | 23-90068 | Invacare Corporation | DE LAGE LANDEN FINANCIAL SVCS INC | MASTER CONTRACT FINANCING PROGRAM AGREEMENT | None |
| 422 | 23-90068 | Invacare Corporation | DE LAGE LANDEN FINANCIAL SVCS INC | 4TH AMENDMENT TO MASTER CONTRACT FINANCING PROGRAM AGREEMENT DTD 11/19/2002 | None |
| 423 | 23-90068 | Invacare Corporation | DE LAGE LANDEN FINANCIAL SVCS INC | 6TH AMENDMENT TO MASTER CONTRACT FINANCING PROGRAM AGREEMENT DTD 7/15/2005 | None |
| 424 | 23-90068 | Invacare Corporation | DEDICATED DISTRIBUTION INC | NATIONAL DISTRIBUTOR PURCHASE AGREEMENT | None |
| 425 | 23-90067 | Freedom Designs, Inc. | DEEP SOUTH MOBILITY | GOLD PROVIDER AGREEMENT | None |
| 426 | 23-90068 | Invacare Corporation | DEEP SOUTH MOBILITY | GOLD PROVIDER AGREEMENT | None |
| 427 | 23-90072 | Invacare Corporation | DEFERRED COMPENSATION PLAN | DEFERRED COMPENSATION PLAN "DC PLUS PLAN" | None |
| 428 | 23-90068 | Invacare Corporation | DELIGHT MEDICALS INC | GOLD PROVIDER AGREEMENT | None |
| 429 | 23-90068 | Invacare Corporation | DELIGHT MEDICALS INC. | GOLD PROVIDER AGREEMENT | None |
| 430 | 23-90067 | Freedom Designs, Inc. | DELIGHT MEDICALS INC. | GOLD PROVIDER AGREEMENT | None |
| 431 | 23-90072 | Invacare Corporation | DELURY, KEVIN | KEY EMPLOYMENT RETENTION PLAN | None |
| 432 | 23-90068 | Invacare Corporation | DIAMEDICAL USA EQUIPMENT LLC | PLATINUM PROVIDER AGREEMENT | None |
| 433 | 23-90067 | Freedom Designs, Inc. | DIAMEDICAL USA EQUIPMENT, LLC | PLATINUM PROVIDER AGREEMENT | $815.68 |
| 434 | 23-90068 | Invacare Corporation | DICK'S HOME CARE, INC. | GOLD PROVIDER AGREEMENT | None |
| 435 | 23-90067 | Freedom Designs, Inc. | DICK'S HOME CARE, INC. | GOLD PROVIDER AGREEMENT | None |
| 436 | 23-90068 | Invacare Corporation | DILIGENT BOARD MEMBER SERVICES AGREEMENT, INC. | BOARD MEMBER SERVICES | None |
| 437 | 23-90067 | Freedom Designs, Inc. | DIRECT SUPPLY INC | NATIONAL PROVIDER AGREEMENT | None |
| 438 | 23-90068 | Invacare Corporation | DIRECT SUPPLY INC | 15TH AMENDMENT TO CUSTOMER PURCHASE AGREEMENT | None |
| 439 | 23-90068 | Invacare Corporation | DISCOVERY BENEFITS INC | ADMINISTRATIVE SERVICES AGREEMENTS | None |
| 440 | 23-90068 | Invacare Corporation | DME EXPRESS LLC | DIAMOND PROVIDER AGREEMENT | None |
| 441 | 23-90067 | Freedom Designs, Inc. | DME EXPRESS, LLC | DIAMOND PROVIDER AGREEMENT | None |
| 442 | 23-90068 | Invacare Corporation | DME SERVICES LLC | GOLD PROVIDER AGREEMENT | None |
| 443 | 23-90067 | Freedom Designs, Inc. | DME SERVICES, LLC | GOLD PROVIDER AGREEMENT | None |
| 444 | 23-90068 | Invacare Corporation | DMSC | REPAIR SERVICE AGREEMENT CONCENTRATORS & HOMEFILL | None |
| 445 | 23-90068 | Invacare Corporation | DOC SUPPLY OF WEST TENNESSEE LLC | GOLD PROVIDER AGREEMENT | None |
| 446 | 23-90067 | Freedom Designs, Inc. | DOC SUPPLY OF WEST TENNESSEE, LLC | GOLD PROVIDER AGREEMENT | None |
| 447 | 23-90067 | Freedom Designs, Inc. | DOCTOR'S EQUIPMENT SERVICE | GOLD PROVIDER AGREEMENT | None |
| 448 | 23-90067 | Freedom Designs, Inc. | DOWN EAST MEDICAL SUPPLY | GOLD PROVIDER AGREEMENT | None |
| 449 | 23-90068 | Invacare Corporation | DOWN EAST MEDICAL SUPPLY | GOLD PROVIDER AGREEMENT | None |
| 450 | 23-90072 | Invacare Corporation | DOWNS, MICK | KEY EMPLOYMENT RETENTION PLAN | None |
| 451 | 23-90068 | Invacare Corporation | DURABLE MEDICAL EQUIPMENT INC | GOLD PROVIDER AGREEMENT | None |
| 452 | 23-90067 | Freedom Designs, Inc. | DURABLE MEDICAL EQUIPMENT, INC. | GOLD PROVIDER AGREEMENT | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 453 | 23-90068 | Invacare Corporation | DURAMED INC | DIAMOND PROVIDER AGREEMENT | None |
| 454 | 23-90067 | Freedom Designs, Inc. | DURAMED, INC. | DIAMOND PROVIDER AGREEMENT | None |
| 455 | 23-90067 | Freedom Designs, Inc. | DUSARA CORPORATION | PLATINUM PROVIDER AGREEMENT | None |
| 456 | 23-90068 | Invacare Corporation | DUSARA CORPORATION | PLATINUM PROVIDER AGREEMENT | None |
| 457 | 23-90068 | Invacare Corporation | DYNAMIC HEALTHCARE INC | CHANNEL PROGRAM PURCHASE AGREEMENT - PLATINUM LEVEL | None |
| 458 | 23-90067 | Freedom Designs, Inc. | DYNAMIC HEALTHCARE, INC. | CHANNEL PROGRAM PURCHASE AGREEMENT - PLATINUM LEVEL | None |
| 459 | 23-90068 | Invacare Corporation | E CARE MEDICAL SUPPLIES LLC | GOLD PROVIDER AGREEMENT | None |
| 460 | 23-90067 | Freedom Designs, Inc. | E CARE MEDICAL SUPPLIES, LLC | GOLD PROVIDER AGREEMENT | None |
| 461 | 23-90068 | Invacare Corporation | EAP - EVERNORTH, ACQUIRED FROM CIGNA | EMPLOYEE ASSISTANCE PROGRAM | None |
| 462 | 23-90067 | Freedom Designs, Inc. | EAST ALABAMA MEDICAL CENTER | GOLD PROVIDER AGREEMENT | None |
| 463 | 23-90068 | Invacare Corporation | EAST ALABAMA MEDICAL CENTER | GOLD PROVIDER AGREEMENT | None |
| 464 | 23-90068 | Invacare Corporation | ECLIPSE MOBILITY LLC | GOLD PROVIDER AGREEMENT | None |
| 465 | 23-90067 | Freedom Designs, Inc. | ECLIPSE MOBILITY, LLC | GOLD PROVIDER AGREEMENT | None |
| 466 | 23-90068 | Invacare Corporation | ECONOCARE INC | PLATINUM PROVIDER AGREEMENT | None |
| 467 | 23-90067 | Freedom Designs, Inc. | ECONOCARE, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 468 | 23-90068 | Invacare Corporation | ELDERCARE MANAGEMENT SERVICES INC | CHANNEL PROGRAM PURCHASE AGREEMENT - PLATINUM LEVEL | None |
| 469 | 23-90067 | Freedom Designs, Inc. | ELDERCARE MANAGEMENT SERVICES, INC. | CHANNEL PROGRAM PURCHASE AGREEMENT - PLATINUM LEVEL | None |
| 470 | 23-90068 | Invacare Corporation | ELYRIA TAYLOR LLC | TAX APPEAL LETTER AGREEMENT DTD 3/27/2019 | None |
| 471 | 23-90066 | Adaptive Switch Laboratories, Inc. | EMBEDDED WIZARDLY LLC | PROFESSIONAL SERVICES AGREEMENT DTD 8/14/19 | $1,785.00 |
| 472 | 23-90068 | Invacare Corporation | EMPIRE HOME INFUSION SERVICE INC | PLATINUM PROVIDER AGREEMENT | None |
| 473 | 23-90067 | Freedom Designs, Inc. | EMPIRE HOME INFUSION SERVICE, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 474 | 23-90068 | Invacare Corporation | EMSAR | PM & REPAIR SERVICES | $25,639.52 |
| 475 | 23-90068 | Invacare Corporation | ENGINEERED COOLING SERVICES | SERVICE AGREEMENT DTD 9/22/2021 | None |
| 476 | 23-90068 | Invacare Corporation | ENGINEERED COOLING SERVICES | SERVICE AGREEMENT DTD 9/22/2021 | None |
| 477 | 23-90068 | Invacare Corporation | ENSIGN SERVICES INC | CHANNEL PROGRAM PURCHASE AGREEMENT - PLATINUM LEVEL | None |
| 478 | 23-90067 | Freedom Designs, Inc. | ENSIGN SERVICES, INC. | CHANNEL PROGRAM PURCHASE AGREEMENT - PLATINUM LEVEL | None |
| 479 | 23-90068 | Invacare Corporation | EPIQ CORPORATE RESTRUCTURING LLC | STANDARD SERVICES AGREEMENT | None |
| 480 | 23-90068 | Invacare Corporation | EQUINITI TRUST COMPANY | TRANSFER AGENT FOR COMMON STOCK OUTSTANDING | $3,400.89 |
| 481 | 23-90067 | Freedom Designs, Inc. | EQUIPMED LLC | GOLD PROVIDER AGREEMENT | None |
| 482 | 23-90068 | Invacare Corporation | EQUIPMEN LLC | GOLD PROVIDER AGREEMENT | None |
| 483 | 23-90067 | Freedom Designs, Inc. | ERICKSON HOME MEDICAL EQUIPMENT LLC | GOLD PROVIDER AGREEMENT | None |
| 484 | 23-90068 | Invacare Corporation | ERP INTEGRATED SOLUTIONS LLC | MASTER SERVICES AGREEMENT DTD 8/10/2022 | None |
| 485 | 23-90068 | Invacare Corporation | ERP INTEGRATED SOLUTIONS LLC | MASTER SERVICES AGREEMENT DTD 8/10/2022 | None |
| 486 | 23-90068 | Invacare Corporation | ERP INTEGRATED SOLUTIONS LLC | SHIPERP LICENSE AGREEMENT | None |
| 487 | 23-90068 | Invacare Corporation | ETQ | MAINTENANCE SERVICES | None |
| 488 | 23-90068 | Invacare Corporation | ETQ RELIANCE | QUALITY SYSTEM SOFTWARE | None |
| 489 | 23-90072 | Invacare Corporation | EVANS, LEISA | KEY EMPLOYMENT RETENTION PLAN | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 490 | 23-90068 | Invacare Corporation | EVERGREEN INTERNATIONAL GROUP | CHANNEL PROGRAM PURCHASE AGREEMENT - GOLD LEVEL | None |
| 491 | 23-90067 | Freedom Designs, Inc. | EVERGREEN INTERNATIONAL GROUP | CHANNEL PROGRAM PURCHASE AGREEMENT - GOLD LEVEL | None |
| 492 | 23-90068 | Invacare Corporation | EVERGREEN RESOURCES LLC | BATTERY, MATERIAL HANDLING EQUIPMENT | $2,236.56 |
| 493 | 23-90068 | Invacare Corporation | EVERGREEN RESOURCES LLC | EQUIPMENT - RAYMOND STAND UP COUNTERBALANCE, BATTERY AND CHARGER | None |
| 494 | 23-90067 | Freedom Designs, Inc. | EVERYTHING MEDICAL | GOLD PROVIDER AGREEMENT | None |
| 495 | 23-90068 | Invacare Corporation | EVERYTHING MEDICAL | GOLD PROVIDER AGREEMENT | None |
| 496 | 23-90068 | Invacare Corporation | EXACTLYIT INC | SERVICE DESK MASTER SERVICES AGGREEMENT | None |
| 497 | 23-90068 | Invacare Corporation | EXAMWORKS (FORMERLY GOULD & LAMB, LLC) | MMSEA MANDATORY INSURANCE REPORTING SERVICES AGREEMENT | None |
| 498 | 23-90068 | Invacare Corporation | EXTREME MOBILITY INC | GOLD PROVIDER AGREEMENT | None |
| 499 | 23-90067 | Freedom Designs, Inc. | EXTREME MOBILITY, INC. | GOLD PROVIDER AGREEMENT | None |
| 500 | 23-90068 | Invacare Corporation | F2 LABS | PRODUCT TESTING AND CALIBRATION SERVICES | None |
| 501 | 23-90068 | Invacare Corporation | FALLS & CO | MAINTENACE & SUPPORT CONTRACT DTD 9/27/2022 | None |
| 502 | 23-90068 | Invacare Corporation | FALLS DIGITAL LLC | MASTER SERVICES AGREEMENT DTD 1/29/2019 | None |
| 503 | 23-90068 | Invacare Corporation | FAMILY MEDICAL SUPPLY INC | GOLD PROVIDER AGREEMENT | None |
| 504 | 23-90067 | Freedom Designs, Inc. | FAMILY MEDICAL SUPPLY, INC. | GOLD PROVIDER AGREEMENT | None |
| 505 | 23-90072 | Invacare Corporation | FARRELL, MICHAEL | KEY EMPLOYMENT RETENTION PLAN | None |
| 506 | 23-90068 | Invacare Corporation | FEDEX TRADE NETWORKS | CUSTOMS BROKERAGE / EXPORT EEIS | None |
| 507 | 23-90068 | Invacare Corporation | FEDEX TRADE NETWORKS TRANSPORT & BROKERAGE INC | CUSTOMS POA, DESIGNATION AS EXPORT FORWARDING AGENT & ACKNOWLEDGEMENT OF TERMS & CONDITIONS | None |
| 508 | 23-90068 | Invacare Corporation | FERREIRA, CINTIA | CHANGE OF CONTROL AGREEMENT | None |
| 509 | 23-90072 | Invacare Corporation | FERREIRA, CINTIA | KEY EMPLOYMENT RETENTION PLAN | None |
| 510 | 23-90068 | Invacare Corporation | FERREIRA, CINTIA | INDEMNITY AGREEMENT DTD 12/9/2022 | None |
| 511 | 23-90068 | Invacare Corporation | FG LLC | CHANNEL PROGRAM PURCHASE AGREEMENT - PLATINUM LEVEL | None |
| 512 | 23-90067 | Freedom Designs, Inc. | FG, LLC | PLATINUM PROVIDER AGREEMENT | None |
| 513 | 23-90068 | Invacare Corporation | FIDELITY | 401 K ADMINISTRATOR | None |
| 514 | 23-90072 | Invacare Corporation | FIEST, JASON | KEY EMPLOYMENT RETENTION PLAN | None |
| 515 | 23-90067 | Freedom Designs, Inc. | FINLEY HARTIG HOMECARE | GOLD PROVIDER AGREEMENT | None |
| 516 | 23-90068 | Invacare Corporation | FINLEY HARTIG HOMECARE | GOLD PROVIDER AGREEMENT | None |
| 517 | 23-90068 | Invacare Corporation | FIRST COMMUNITY CARE LLC | GOLD PROVIDER AGREEMENT | None |
| 518 | 23-90067 | Freedom Designs, Inc. | FIRST COMMUNITY CARE, LLC | GOLD PROVIDER AGREEMENT | None |
| 519 | 23-90068 | Invacare Corporation | FIRST INSURANCE FUNDING | SERVICES AGREEMENT | None |
| 520 | 23-90068 | Invacare Corporation | FIS | TREASURY WORKSTATION | None |
| 521 | 23-90068 | Invacare Corporation | FIS CAPITAL MARKETS US LLC | AMENDMENT NO 3 TO AGREEMENT | None |
| 522 | 23-90072 | Invacare Corporation | FITZGERALD, MARIA | KEY EMPLOYMENT RETENTION PLAN | None |
| 523 | 23-90067 | Freedom Designs, Inc. | FITZSIMMONS SURGICAL SUPPLY | DIAMOND PROVIDER AGREEMENT | None |
| 524 | 23-90068 | Invacare Corporation | FITZSIMMONS SURGICAL SUPPLY | PLATINUM PROVIDER AGREEMENT | None |
| 525 | 23-90068 | Invacare Corporation | FLINT BIOMEDICAL | RESPIRATORY WARRANTY REPAIR SERVICE | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 526 | 23-90068 | Invacare Corporation | FLORIDA PALLIATIVE & EQUIPMENT LLC | GOLD PROVIDER AGREEMENT | None |
| 527 | 23-90068 | Invacare Corporation | FLORIDA PALLIATIVE & EQUIPMENT LLC | GOLD PROVIDER AGREEMENT | None |
| 528 | 23-90067 | Freedom Designs, Inc. | FLORIDA PALLIATIVE & EQUIPMENT, LLC | GOLD PROVIDER AGREEMENT | None |
| 529 | 23-90068 | Invacare Corporation | FOCALPOINT | CNC SOFTWARE | None |
| 530 | 23-90068 | Invacare Corporation | FONTE SURGICAL SUPPLY INC | GOLD PROVIDER AGREEMENT | None |
| 531 | 23-90068 | Invacare Corporation | FONTE SURGICAL SUPPLY INC | GOLD PROVIDER AGREEMENT | None |
| 532 | 23-90067 | Freedom Designs, Inc. | FONTE SURGICAL SUPPLY, INC. | GOLD PROVIDER AGREEMENT | None |
| 533 | 23-90072 | Invacare Corporation | FORMAN, LORNA | KEY EMPLOYMENT RETENTION PLAN | None |
| 534 | 23-90068 | Invacare Corporation | FRED HAUBER GMBH & CO KG | TRADEMARK AGREEMENT | None |
| 535 | 23-90068 | Invacare Corporation | FREEDOM IN MOBILITY INC | GOLD PROVIDER AGREEMENT | None |
| 536 | 23-90068 | Invacare Corporation | FREEDOM IN MOBILITY INC | GOLD PROVIDER AGREEMENT | None |
| 537 | 23-90068 | Invacare Corporation | FREEDOM IN MOBILITY LLC | GOLD PROVIDER AGREEMENT | None |
| 538 | 23-90067 | Freedom Designs, Inc. | FREEDOM IN MOBILITY, LLC | GOLD PROVIDER AGREEMENT | None |
| 539 | 23-90067 | Freedom Designs, Inc. | FREEDOM MOBILITY, LLC | GOLD PROVIDER AGREEMENT | None |
| 540 | 23-90068 | Invacare Corporation | FRONTIER HOME MEDICAL INC | GOLD PROVIDER AGREEMENT | None |
| 541 | 23-90068 | Invacare Corporation | FRONTIER HOME MEDICAL LLC | E-COMMERCE AGREEMENT | None |
| 542 | 23-90067 | Freedom Designs, Inc. | FRONTIER HOME MEDICAL, INC. | GOLD PROVIDER AGREEMENT | None |
| 543 | 23-90067 | Freedom Designs, Inc. | FRONTIER MEDICAL L.L.C. | E-COMMERCE AGREEMENT | None |
| 544 | 23-90068 | Invacare Corporation | FTI CONSULTING | TRIAL SUPPORT | None |
| 545 | 23-90068 | Invacare Corporation | FTI CONSULTING INC | CONSULTING AGREEMENT LETTER DTD 5/12/2022 | None |
| 546 | 23-90068 | Invacare Corporation | FUNDAMENTAL MEDICAL SUPPLY INC | GOLD PROVIDER AGREEMENT | None |
| 547 | 23-90067 | Freedom Designs, Inc. | FUNDAMENTAL MEDICAL SUPPLY, INC. | GOLD PROVIDER AGREEMENT | None |
| 548 | 23-90068 | Invacare Corporation | GAMMIE HOMECARE INC | GOLD PROVIDER AGREEMENT | None |
| 549 | 23-90067 | Freedom Designs, Inc. | GAMMIE HOMECARE, INC. | GOLD PROVIDER AGREEMENT | None |
| 550 | 23-90068 | Invacare Corporation | GARDINER | ADDENDUM TO MAINTENANCE AGREEMENT DTD 3/15/2022 | $3,282.50 |
| 551 | 23-90066 | Adaptive Switch Laboratories, Inc. | GARY E. CHOPCINSKI | PROFESSIONAL SERVICES AGREEMENT DTD 10/15/2020 | None |
| 552 | 23-90067 | Freedom Designs, Inc. | GEN VENTURES | GOLD PROVIDER AGREEMENT | None |
| 553 | 23-90068 | Invacare Corporation | GEN VENTURES | GOLD PROVIDER AGREEMENT | None |
| 554 | 23-90068 | Invacare Corporation | GEORGES FAMILY PHARMACY INC | GOLD PROVIDER AGREEMENT | None |
| 555 | 23-90068 | Invacare Corporation | GEORGES FAMILY PHARMACY INC | GOLD PROVIDER AGREEMENT | None |
| 556 | 23-90067 | Freedom Designs, Inc. | GEORGE'S FAMILY PHARMACY, INC. | GOLD PROVIDER AGREEMENT | None |
| 557 | 23-90067 | Freedom Designs, Inc. | GERIATRIC MEDICAL & SURGICAL SUPPLY | PLATINUM PROVIDER AGREEMENT | None |
| 558 | 23-90068 | Invacare Corporation | GERIATRIC MEDICAL & SURGICAL SUPPLY INC | PLATINUM PROVIDER AGREEMNT | None |
| 559 | 23-90068 | Invacare Corporation | GERIMEDIX INC. | GOLD PROVIDER AGREEMENT | $17.05 |
| 560 | 23-90067 | Freedom Designs, Inc. | GERIMEDIX, INC. | GOLD PROVIDER AGREEMENT | None |
| 561 | 23-90068 | Invacare Corporation | GIBBSCAM | CAD/CAM SOFTWARE | None |
| 562 | 23-90068 | Invacare Corporation | GIBELEY, MARC M. | INDEMNITY AGREEMENT DTD 11/20/2015 | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 563 | 23-90067 | Freedom Designs, Inc. | GINNY S. MALOCO AS TRUSTEE OF THE GINNY SUE MALOCO 1990 REVOCABLE TRUST | 2241 MADERA BUILDING - 14,080 SQUARE FEET | None |
| 564 | 23-90067 | Freedom Designs, Inc. | GINNY SUE MALOCO 1990 REV TRUST, THE | 1ST AMENDMENT TO LEASE | None |
| 565 | 23-90067 | Freedom Designs, Inc. | GINNY SUE MALOCO 1990 REV TRUST, THE | 2ND AMENDMENT TO LEASE: EXTENSION OF TERM | None |
| 566 | 23-90067 | Freedom Designs, Inc. | GINNY SUE MALOCO 1990 REV TRUST, THE | LEASE AGREEMENT DTD 3/1/2004 | None |
| 567 | 23-90067 | Freedom Designs, Inc. | GINNY SUE MALOCO 1990 REV TRUST, THE | 4TH AMENDMENT TO LEASE: EXTENSION OF TERM | None |
| 568 | 23-90067 | Freedom Designs, Inc. | GINNY SUE MALOCO 1990 REV TRUST, THE | 3RD AMENDMENT TO LEASE: EXTENSION OF TERM | None |
| 569 | 23-90067 | Freedom Designs, Inc. | GINNY SUE MALOCO 1990 REV TRUST, THE | 4TH AMENDMENT TO LEASE: EXTENSION OF TERM | None |
| 570 | 23-90072 | Invacare Corporation | GIRARDEAU, IBTIHAJE | KEY EMPLOYMENT RETENTION PLAN | None |
| 571 | 23-90068 | Invacare Corporation | GLOBAL RESEARCH & INNOVATION & TECHNOLOGY INC | GOLD PROVIDER AGREEMENT | None |
| 572 | 23-90067 | Freedom Designs, Inc. | GLOBAL RESEARCH AND INNOVATATION AN | GOLD PROVIDER AGREEMENT | None |
| 573 | 23-90068 | Invacare Corporation | GOENGINEER LLC | RENEWAL INVOICE #R2311546 DTD 12/20/2022 | None |
| 574 | 23-90068 | Invacare Corporation | GOLDEN LIFE MANOR | CHANNEL PROGRAM PURCHASE AGREEMENT - GOLD LEVEL | None |
| 575 | 23-90067 | Freedom Designs, Inc. | GOLDEN LIFE MANOR CO | CHANNEL PROGRAM PURCHASE AGREEMENT - GOLD LEVEL | None |
| 576 | 23-90068 | Invacare Corporation | GONCLAVES, DANIEL | INDEMNITY AGREEMENT | None |
| 577 | 23-90068 | Invacare Corporation | GOODWIN, ANGELA | INDEMNITY AGREEMENT DTD 5/21/2020 | None |
| 578 | 23-90067 | Freedom Designs, Inc. | GRAND WHEELCHAIR & MEDICAL SUPPLY I | GOLD PROVIDER AGREEMENT | None |
| 579 | 23-90068 | Invacare Corporation | GRAND WHEELCHAIR & MEDICAL SUPPLY INC | GOLD PROVIDER AGREEMENT | None |
| 580 | 23-90072 | Invacare Corporation | GRESSIER, CLEMENT | KEY EMPLOYMENT RETENTION PLAN | None |
| 581 | 23-90068 | Invacare Corporation | GROVE MEDICAL INC | CHANNEL PROGRAM PURCHASE AGREEMENT - GOLD LEVEL | None |
| 582 | 23-90067 | Freedom Designs, Inc. | GROVE MEDICAL, INC. | GOLD PROVIDER AGREEMENT | None |
| 583 | 23-90067 | Freedom Designs, Inc. | GSH HOME MED CARE | GOLD PROVIDER AGREEMENT | None |
| 584 | 23-90068 | Invacare Corporation | GSH HOME MED CARE | GOLD PROVIDER AGREEMENT | None |
| 585 | 23-90067 | Freedom Designs, Inc. | GUTHRIE HEALTHCARE SYSTEM | GOLD PROVIDER AGREEMENT | None |
| 586 | 23-90068 | Invacare Corporation | GUTHRIE HEALTHCARE SYSTEM | GOLD PROVIDER AGREEMENT | None |
| 587 | 23-90068 | Invacare Corporation | H & R HEALTHCARE INC | GOLD PROVIDER AGREEMENT | None |
| 588 | 23-90067 | Freedom Designs, Inc. | H & R HEALTHCARE, INC. | GOLD PROVIDER AGREEMENT | None |
| 589 | 23-90067 | Freedom Designs, Inc. | HAMMER INCORPORATED | PLATINUM PROVIDER AGREEMENT | None |
| 590 | 23-90068 | Invacare Corporation | HAMMER INCORPORATION | PLATINUM PROVIDER AGREEMNT | None |
| 591 | 23-90068 | Invacare Corporation | HANDI MEDICAL SUPPLY INC | POWER MOBILITY AND SEATING REBATE PROGRAM | None |
| 592 | 23-90068 | Invacare Corporation | HANDI MEDICAL SUPPLY INC | POWER MOBILITY AND SEATING REBATE PROGRAM | None |
| 593 | 23-90068 | Invacare Corporation | HANDI MEDICAL SUPPLY INC | DIAMOND PROVIDER AGREEMENT | None |
| 594 | 23-90067 | Freedom Designs, Inc. | HANDI MEDICAL SUPPLY, INC | POWER MOBILITY AND SEATING REBATE PROGRAM | None |
| 595 | 23-90067 | Freedom Designs, Inc. | HANDI MEDICAL SUPPLY, INC. | DIAMOND PROVIDER AGREEMENT | None |
| 596 | 23-90068 | Invacare Corporation | HASTINGS HOME HEALTH CENTER INC | GOLD PROVIDER AGREEMENT | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 597 | 23-90068 | Invacare Corporation | HASTINGS HOME HEALTH CENTER INC | GOLD PROVIDER AGREEMENT | None |
| 598 | 23-90067 | Freedom Designs, Inc. | HASTINGS HOME HEALTH CENTER, INC. | GOLD PROVIDER AGREEMENT | None |
| 599 | 23-90068 | Invacare Corporation | HAYS DIME INC | GOLD PROVIDER AGREEMENT | None |
| 600 | 23-90067 | Freedom Designs, Inc. | HAYS DME, INC. | GOLD PROVIDER AGREEMENT | None |
| 601 | 23-90068 | Invacare Corporation | HCA OF PALM BEACH INC | GOLD PROVIDER AGREEMENT | None |
| 602 | 23-90067 | Freedom Designs, Inc. | HCA OF PALM BEACH INC. | GOLD PROVIDER AGREEMENT | None |
| 603 | 23-90067 | Freedom Designs, Inc. | HD SUPPLY FACILITIES MAINTENANCE, L | DIAMOND PROVIDER AGREEMENT | None |
| 604 | 23-90068 | Invacare Corporation | HD SUPPLY SUPPORT SERVICES INC | 12TH AMENDMENT TO THE SUPPLIER COMMERCIAL TERMS AGREEMENT DTD 1/1/2022 | None |
| 605 | 23-90068 | Invacare Corporation | HEALTH AID OF OHIO | PLATINUM PROVIDER AGREEMENT | None |
| 606 | 23-90067 | Freedom Designs, Inc. | HEALTH AID OF OHIO, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 607 | 23-90068 | Invacare Corporation | HEALTH CARE EQUIPMENT & PARTS | DIAMOND PROVIDER AGREEMENT | None |
| 608 | 23-90067 | Freedom Designs, Inc. | HEALTH CARE EQUIPMENT & PARTS COMPA | DIAMOND PROVIDER AGREEMENT | None |
| 609 | 23-90067 | Freedom Designs, Inc. | HEALTH ESSENTIAL | PLATINUM PROVIDER AGREEMENT | None |
| 610 | 23-90068 | Invacare Corporation | HEALTH ESSENTIAL | PLATINUM PROVIDER AGREEMENT | None |
| 611 | 23-90068 | Invacare Corporation | HEALTH GROUP MANAGEMENT | CHANNEL PROGRAM PURCHASE AGREEMENT - PLATINUM LEVEL | None |
| 612 | 23-90067 | Freedom Designs, Inc. | HEALTH GROUP MANAGEMENT (HAVEN) | CHANNEL PROGRAM PURCHASE AGREEMENT - PLATINUM LEVEL | None |
| 613 | 23-90068 | Invacare Corporation | HEALTH INNOVATIONS UNLIMITED INC | CONFIRMATION OF PRICING PAYMENT & PURCHASE COMMITMENT PERFORMANCE DTD 5/15/2017 | None |
| 614 | 23-90067 | Freedom Designs, Inc. | HEALTH INNOVATIONS UNLIMITED, INC. | GOLD PROVIDER AGREEMENT | None |
| 615 | 23-90067 | Freedom Designs, Inc. | HEALTH SYSTEM SERVICES | GOLD PROVIDER AGREEMENT | None |
| 616 | 23-90068 | Invacare Corporation | HEALTH SYSTEMS SERVICES | CHANNEL PROGRAM PURCHASE AGREEMENT - GOLD LEVEL | None |
| 617 | 23-90068 | Invacare Corporation | HEALTHBRIDGE MEDICAL INC | GOLD PROVIDER AGREEMENT | None |
| 618 | 23-90067 | Freedom Designs, Inc. | HEALTHBRIDGE MEDICAL, INC. | GOLD PROVIDER AGREEMENT | None |
| 619 | 23-90068 | Invacare Corporation | HEALTHCARE EQUIPMENT INC | GOLD PROVIDER AGREEMENT | None |
| 620 | 23-90067 | Freedom Designs, Inc. | HEALTHCARE EQUIPMENT, INC. | GOLD PROVIDER AGREEMENT | None |
| 621 | 23-90067 | Freedom Designs, Inc. | HEALTHCARE ESSENTIALS SOUTH LLC | PLATINUM PROVIDER AGREEMENT | None |
| 622 | 23-90068 | Invacare Corporation | HEALTHCARE ESSENTIALS SOUTH LLC | CHANNEL PROGRAM PURCHASE AGREEMENT - PLATINUM LEVEL | None |
| 623 | 23-90068 | Invacare Corporation | HEALTHCARE INTERNATIONAL PARTNERS LLC | DEALER AGREEMENT | None |
| 624 | 23-90068 | Invacare Corporation | HEALTHCARE INTERNATIONAL PARTNERS LLC | PROFESSIONAL SERVICES AGREEMENT | None |
| 625 | 23-90068 | Invacare Corporation | HEALTHCARE INTERNATIONAL PARTNERS LLC | STATEMENT OF WORK | None |
| 626 | 23-90067 | Freedom Designs, Inc. | HEARTWELL MEDICAL SUPPLIES LLC | GOLD PROVIDER AGREEMENT | None |
| 627 | 23-90068 | Invacare Corporation | HEARTWELL MEDICAL SUPPLIES LLC | GOLD PROVIDER AGREEMENT | None |
| 628 | 23-90068 | Invacare Corporation | HEARTWELL MEDICAL SUPPLIES LLC | GOLD PROVIDER AGREEMENT | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 629 | 23-90068 | Invacare Corporation | HEDGEMARK BRENTWOOD PHARMACY INC | GOLD PROVIDER AGREEMENT | None |
| 630 | 23-90067 | Freedom Designs, Inc. | HEDGEMARK BRENTWOOD PHARMACY, INC. | GOLD PROVIDER AGREEMENT | None |
| 631 | 23-90068 | Invacare Corporation | HENRY SCHEIN INC | CONFIRMATION OF PRICING AND PAYMENT TERMS AND CONDITIONS DTD 1/15/2020 | None |
| 632 | 23-90067 | Freedom Designs, Inc. | HIGH DESERT RESPIRATORY | GOLD PROVIDER AGREEMENT | None |
| 633 | 23-90068 | Invacare Corporation | HIGH DESERT RESPIRATORY | GOLD PROVIDER AGREEMENT | None |
| 634 | 23-90068 | Invacare Corporation | HIRERIGHT LLC | MODIFICATION TO SERVICES AGREEMENT SCHEDULE OF FEES | $11.30 |
| 635 | 23-90068 | Invacare Corporation | HODGES-MACE LLC | BENEFIT SERVICES AGREEMENT | $16,716.24 |
| 636 | 23-90068 | Invacare Corporation | HOME DIAGNOSTICS INC | SETTLEMENT & CONSENT AGREEMENT | None |
| 637 | 23-90068 | Invacare Corporation | HOME EQUIPMENT COMPANY, THE | GOLD PROVIDER AGREEMENT | None |
| 638 | 23-90068 | Invacare Corporation | HOME HEALTH CARE INC | GOLD PROVIDER AGREEMENT | None |
| 639 | 23-90067 | Freedom Designs, Inc. | HOME HEALTH CARE,INC. | GOLD PROVIDER AGREEMENT | None |
| 640 | 23-90068 | Invacare Corporation | HOME HEALTH PAVILION INC | POWER MOBILITY AND SEATING REBATE PROGRAM | None |
| 641 | 23-90068 | Invacare Corporation | HOME HEALTH PAVILION INC | POWER MOBILITY AND SEATING REBATE PROGRAM | None |
| 642 | 23-90068 | Invacare Corporation | HOME HEALTH PAVILION INC | GOLD PROVIDER AGREEMENT | None |
| 643 | 23-90067 | Freedom Designs, Inc. | HOME HEALTH PAVILION, INC. | GOLD PROVIDER AGREEMENT | None |
| 644 | 23-90067 | Freedom Designs, Inc. | HOME HEALTH PAVILION, INC. | POWER MOBILITY AND SEATING REBATE PROGRAM | None |
| 645 | 23-90068 | Invacare Corporation | HOME MEDICAL EQUIPMENT SPECIALISTS LLC | PLATINUM PROVIDER AGREEMENT | None |
| 646 | 23-90068 | Invacare Corporation | HOME MEDICAL EQUIPMENT SPECIALISTS LLC | PLATINUM PROVIDER AGREEMENT | None |
| 647 | 23-90067 | Freedom Designs, Inc. | HOME MEDICAL EQUIPMENT SPECIALISTS, | DIAMOND PROVIDER AGREEMENT | None |
| 648 | 23-90068 | Invacare Corporation | HOME MEDICAL PRODUCTS INC | MASTER SUPPLY AGREEMENT #1194 | None |
| 649 | 23-90068 | Invacare Corporation | HOME MEDICAL SUPPLY CENTER INC | E-COMMERCE ELITE AGREEMENT | None |
| 650 | 23-90068 | Invacare Corporation | HOME MEDICAL SUPPLY CENTER INC | E-COMMERCE ELITE AGREEMENT | None |
| 651 | 23-90067 | Freedom Designs, Inc. | HOME MEDICAL SUPPLY CENTER, INC. | E-COMMERCE ELITE AGREEMENT | None |
| 652 | 23-90068 | Invacare Corporation | HOME OXYGEN COMPANY LLC | PLATINUM PROVIDER AGREEMENT | None |
| 653 | 23-90067 | Freedom Designs, Inc. | HOME OXYGEN COMPANY, LLC. | PLATINUM PROVIDER AGREEMENT | None |
| 654 | 23-90068 | Invacare Corporation | HOMECARE TECHNICAL SERVICES | RESPIRATORY WARRANTY REPAIR SERVICE | None |
| 655 | 23-90068 | Invacare Corporation | HOMECARE TECHNICAL SERVICES | RESPIRATORY WARRANTY REPAIR SERVICE | None |
| 656 | 23-90068 | Invacare Corporation | HOMEPRO MEDICAL SUPPLIES LLC | PLATINUM PROVIDER AGREEMENT | None |
| 657 | 23-90067 | Freedom Designs, Inc. | HOMEPRO MEDICAL SUPPLIES, LLC | PLATINUM PROVIDER AGREEMENT | None |
| 658 | 23-90067 | Freedom Designs, Inc. | HOMETOWN HEALTH CARE, INC. | GOLD PROVIDER AGREEMENT | None |
| 659 | 23-90068 | Invacare Corporation | HOMETOWN HEALTHCARE INC | GOLD PROVIDER AGREEMENT | None |
| 660 | 23-90068 | Invacare Corporation | HOMETOWN HEALTHCARE INC | GOLD PROVIDER AGREEMENT | None |
| 661 | 23-90067 | Freedom Designs, Inc. | HOMETOWN HEALTHCARE, INC. | GOLD PROVIDER AGREEMENT | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 662 | 23-90068 | Invacare Corporation | HOMETOWN MEDICAL LLC | GOLD PROVIDER AGREEMENT | None |
| 663 | 23-90067 | Freedom Designs, Inc. | HOMETOWN MEDICAL, LLC | GOLD PROVIDER AGREEMENT | None |
| 664 | 23-90068 | Invacare Corporation | HORIZON OXYGEN & MEDICAL EQUIPMENT INC | DIAMOND PROVIDER AGREEMENT | None |
| 665 | 23-90067 | Freedom Designs, Inc. | HORIZON OXYGEN AND MEDICAL EQUIPMEN | DIAMOND PROVIDER AGREEMENT | None |
| 666 | 23-90068 | Invacare Corporation | HOSPICE MANAGEMENT PARTNERS LC | GOLD PROVIDER AGREEMENT | None |
| 667 | 23-90067 | Freedom Designs, Inc. | HOSPICE MANAGEMENT PARTNERS, L.C. | GOLD PROVIDER AGREEMENT | None |
| 668 | 23-90067 | Freedom Designs, Inc. | HOSPICE OF MONTANA LLC | GOLD PROVIDER AGREEMENT | None |
| 669 | 23-90068 | Invacare Corporation | HOSPICE OF MONTANA LLC | GOLD PROVIDER AGREEMENT | None |
| 670 | 23-90068 | Invacare Corporation | HOSPICE OF THE FL SUNCOAST INC, THE | PLATIUM PROVIDER AGREEMENT | None |
| 671 | 23-90068 | Invacare Corporation | HOSPICE SOURCE LLC | PLATIUM PROVIDER AGREEMENT | None |
| 672 | 23-90067 | Freedom Designs, Inc. | HOSPICE SOURCE, LLC. | PLATINUM PROVIDER AGREEMENT | None |
| 673 | 23-90068 | Invacare Corporation | HRC LLC | CHANNEL PROGRAM PURCHASE AGREEMENT - GOLD LEVEL | None |
| 674 | 23-90067 | Freedom Designs, Inc. | HRC LLC | CHANNEL PROGRAM PURCHASE AGREEMENT - GOLD LEVEL | None |
| 675 | 23-90072 | Invacare Corporation | HUGHES, DAVID SCOTT | KEY EMPLOYMENT RETENTION PLAN | None |
| 676 | 23-90072 | Invacare Corporation | HUSIEN, MUHAMMAD | KEY EMPLOYMENT RETENTION PLAN | None |
| 677 | 23-90068 | Invacare Corporation | HYLAND AFRM | LICENSE | $13,949.30 |
| 678 | 23-90068 | Invacare Corporation | HYLAND SOFTWARE INC | ONBASE ONLINE HOSTED SOLUTION AGREEMENT #0000-05052011-30421 | None |
| 679 | 23-90068 | Invacare Corporation | HYLAND SOFTWARE INC | AMENDMENT TO ONBASE ONLINE HOSTED SOLUTION AGREEMENT | None |
| 680 | 23-90068 | Invacare Corporation | HZW ENVIRONMENTAL CONSULTANTS LLC | ENVIRONMENTAL CONSULTING | None |
| 681 | 23-90068 | Invacare Corporation | HZW ENVIRONMENTAL CONSULTANTS LLC | WORKPLAN FOR SOIL SAMPLING INVESTIGATION DTD 8/9/2021 | None |
| 682 | 23-90068 | Invacare Corporation | I.C RESULTS INC | DIAMOND PROVIDER AGREEMENT | None |
| 683 | 23-90067 | Freedom Designs, Inc. | I.C. RESULTS, INC. | DIAMOND PROVIDER AGREEMENT | None |
| 684 | 23-90068 | Invacare Corporation | ICP ONE LLC | TAX APPEAL LETTER AGREEMENT DTD 3/27/2019 | None |
| 685 | 23-90067 | Freedom Designs, Inc. | IHC HOME CARE SERVICES | DIAMOND PROVIDER AGREEMENT | None |
| 686 | 23-90068 | Invacare Corporation | IHC HOME CARE SERVICES | CONFIRMATION OF PRICING PAYMENT & PURCHASE COMMITMENT PERFORMANCE DTD 10/25/2022 | None |
| 687 | 23-90068 | Invacare Corporation | INDEPENDENT LIVING EQUIPMENT & SVCS INC | GOLD PROVIDER AGREEMENT | None |
| 688 | 23-90067 | Freedom Designs, Inc. | INDEPENDENT LIVING EQUIPMENT AND | GOLD PROVIDER AGREEMENT | None |
| 689 | 23-90068 | Invacare Corporation | INFINITELY VIRTUAL | GLOBAL & REHAB WEBSITE SERVER HOSTING SERVICES | None |
| 690 | 23-90068 | Invacare Corporation | INFOSOFT GROUP LLC, THE | SUBSCRIPTION AGREEMENT DTD 1/8/2021 | None |
| 691 | 23-90068 | Invacare Corporation | INFOTRAC INC | EMERGENCY RESPONSE INFORMATION SERVICES REGISTRATION & T&C (GLOBAL) | None |
| 692 | 23-90068 | Invacare Corporation | INFOTRAC INC | MEMBERSHIP AGREEMENT DTD 12/16/2021 | None |
| 693 | 23-90068 | Invacare Corporation | IN-HOME MEDICAL & RESPIRATORY SVCS INC | PLATIUM PROVIDER AGREEMENT | None |
| 694 | 23-90067 | Freedom Designs, Inc. | IN-HOME MEDICAL AND RESPIRATORY SERVICES, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 695 | 23-90068 | Invacare Corporation | INLAND MEDICAL & REHAB INC | PLATINUM PROVIDER AGREEMENT | None |
| 696 | 23-90067 | Freedom Designs, Inc. | INLAND MEDICAL & REHAB, INC. | GOLD PROVIDER AGREEMENT | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 697 | 23-90068 | Invacare Corporation | INSIGHTSOFTWARE, LLC | MANAGEMENT OF STOCK COMPENSATION GRANTS (PREVIOUSLY UNDER CERTENT) | None |
| 698 | 23-90068 | Invacare Corporation | INTEGRA HEALTHCARE EQUIPMENT LLC | PLATIUM PROVIDER AGREEMENT | None |
| 699 | 23-90067 | Freedom Designs, Inc. | INTEGRA HEALTHCARE EQUIPMENT, LLC | DIAMOND PROVIDER AGREEMENT | None |
| 700 | 23-90068 | Invacare Corporation | INTELEX ENTERPRISES LLC | CHANNEL PROGRAM PURCHASE AGREEMENT - PLATIUM LEVEL | None |
| 701 | 23-90067 | Freedom Designs, Inc. | INTELEX ENTERPRISES, LLC | PLATINUM PROVIDER AGREEMENT | None |
| 702 | 23-90068 | Invacare Corporation | INTERACTIVE MEDICAL SYSTEMS INC | PLATIUM PROVIDER AGREEMENT | None |
| 703 | 23-90067 | Freedom Designs, Inc. | INTERACTIVE MEDICAL SYSTEMS, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 704 | 23-90067 | Freedom Designs, Inc. | INTERLANG LLC | PLATINUM PROVIDER AGREEMENT | None |
| 705 | 23-90068 | Invacare Corporation | INTERNATIONAL SAFE TRANSIT ASSOCIATION | MEMBERSHIP INVOICE #14860 DTD 11/1/2022 | None |
| 706 | 23-90068 | Invacare Corporation | INTERSTATE GAS SUPPLY INC | NATURAL GAS PURCHASE CONTRACT | $25,633.96 |
| 707 | 23-90068 | Invacare Corporation | INTERSTATE GAS SUPPLY INC | ELECTRICITY PURCHASE CONTRACT | None |
| 708 | 23-90068 | Invacare Corporation | INTERSTATE GAS SUPPLY, INC | ELECTRICITY PURCHASE CONTRACT (ELYRIA, OH) | None |
| 709 | 23-90068 | Invacare Corporation | INTERSTATE GAS SUPPLY, INC | NATURAL GAS PURCHASE CONTRACT (ELYRIA, OH) | None |
| 710 | 23-90068 | Invacare Corporation | INTERTEK | 2023 ETL CERTIFICATION FEES | None |
| 711 | 23-90068 | Invacare Corporation | INTERTEK TESTING NA | STANDARD UPDATE NOTIFICATION LETTER DTD 1/11/2023 | None |
| 712 | 23-90068 | Invacare Corporation | INTERTEK TESTING SERVICES NA INC | LISTING CONSTRUCTIONAL DATA REPORT DTD 5/19/2021 | None |
| 713 | 23-90068 | Invacare Corporation | INTERTEK TESTING SERVICES NA INC | AUTHORIZATION TO MARK | None |
| 714 | 23-90068 | Invacare Corporation | INTERTEK TESTING SERVICES NA INC | 2023 ETL CERTIFICATION FEES | None |
| 715 | 23-90066 | Adaptive Switch Laboratories, Inc. | INTUIT, INC. | QUICKBOOKS LICENSES | None |
| 716 | 23-90068 | Invacare Corporation | INVOCARE AUSTRALIA PTY LTD | SETTLEMENT AGREEMENT | None |
| 717 | 23-90068 | Invacare Corporation | INVOCARE AUSTRALIA PTY LTD | SETTLEMENT AGREEMENT | None |
| 718 | 23-90066 | Adaptive Switch Laboratories, Inc. | IPRO MEDIA | PHONE SERVICE | None |
| 719 | 23-90068 | Invacare Corporation | IRB MEDICAL EQUIPMENT LLC | CONFIRMATION OF PRICING PAYMENT & PURCHASE COMMITMENT PERFORMANCE DTD 6/21/2021 | None |
| 720 | 23-90067 | Freedom Designs, Inc. | IRB MEDICAL EQUIPMENT, LLC | PLATINUM PROVIDER AGREEMENT | None |
| 721 | 23-90068 | Invacare Corporation | ITSEEZ3D, INC. | 3D SCANNING SERVICES - PINDOT | None |
| 722 | 23-90068 | Invacare Corporation | J MAC DRUG INC | GOLD PROVIDER AGREEMENT | None |
| 723 | 23-90067 | Freedom Designs, Inc. | J. MAC DRUG, INC. | GOLD PROVIDER AGREEMENT | None |
| 724 | 23-90068 | Invacare Corporation | J.C. HOME CARE INC | PLATIUM PROVIDER AGREEMENT | None |
| 725 | 23-90067 | Freedom Designs, Inc. | J.C. HOME CARE, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 726 | 23-90072 | Invacare Corporation | JEAN-FRANCOIS GSELL | KEY EMPLOYMENT RETENTION PLAN | None |
| 727 | 23-90068 | Invacare Corporation | JI MEDICAL INC | CHANNEL PROGRAM PURCHASE AGREEMENT - DIAMOND LEVEL | None |
| 728 | 23-90067 | Freedom Designs, Inc. | JI MEDICAL, INC | DIAMOND PROVIDER AGREEMENT | None |
| 729 | 23-90067 | Freedom Designs, Inc. | JOHN HOPKINS PHARMAQUIP, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 730 | 23-90068 | Invacare Corporation | JOHNSON BATTERY COMPANY INC | REPLACEMENT BATTERY QUOTE #6404 V2 DTD 3/2/2020 | $2,852.62 |
| 731 | 23-90068 | Invacare Corporation | JOHNSON CONTROL BATTERY | EQUIPMENT - FORKLIFT | None |
| 732 | 23-90068 | Invacare Corporation | JONES ADAPTIVE MOBILITY LLC | GOLD PROVIDER AGREEMENT | None |
| 733 | 23-90067 | Freedom Designs, Inc. | JONES ADAPTIVE MOBILITY, LLC | GOLD PROVIDER AGREEMENT | None |
| 734 | 23-90068 | Invacare Corporation | JONES COUNTY MEDICAL SUPPLIES INC | GOLD PROVIDER AGREEMENT | None |
| 735 | 23-90068 | Invacare Corporation | JONES COUNTY MEDICAL SUPPLIES INC | GOLD PROVIDER AGREEMENT | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|--------------------|---------------|
| 736 | 23-90067 | Freedom Designs, Inc. | JONES COUNTY MEDICAL SUPPLIES, INC. | GOLD PROVIDER AGREEMENT | None |
| 737 | 23-90068 | Invacare Corporation | JP MORGAN BANK | DAILY BANKING SERVICES | None |
| 738 | 23-90068 | Invacare Corporation | JR WEINSTEIN INC | CHANNEL PROGRAM PURCHASE AGREEMENT - PLATIUM LEVEL | None |
| 739 | 23-90067 | Freedom Designs, Inc. | JR WEINSTEIN, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 740 | 23-90068 | Invacare Corporation | JUST WHAT THE DOCTOR ORDERED INC | GOLD PROVIDER AGREEMENT | None |
| 741 | 23-90068 | Invacare Corporation | JUST WHAT THE DOCTOR ORDERED INC | GOLD PROVIDER AGREEMENT | None |
| 742 | 23-90067 | Freedom Designs, Inc. | JUST WHAT THE DOCTOR ORDERED, INC. | GOLD PROVIDER AGREEMENT | None |
| 743 | 23-90068 | Invacare Corporation | JVA MOBILITY INC | PLATIUM PROVIDER AGREEMENT | None |
| 744 | 23-90067 | Freedom Designs, Inc. | JVA MOBILITY, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 745 | 23-90068 | Invacare Corporation | KAISER | MEDICAL INSURANCE AT FREEDOM | None |
| 746 | 23-90067 | Freedom Designs, Inc. | KAISER FOUNDATION HEALTH PLAN INC | RENEWAL NOTICE FOR GROUP #226459 DTD 8/16/2022 | None |
| 747 | 23-90068 | Invacare Corporation | KENNEBEC PHARMACY & HOME CARE LLC | PLATIUM PROVIDER AGREEMENT | None |
| 748 | 23-90067 | Freedom Designs, Inc. | KENNEBEC PHARMACY AND HOME CARE, LL | PLATINUM PROVIDER AGREEMENT | None |
| 749 | 23-90068 | Invacare Corporation | KERMA MEDICAL PRODUCTS INC | GOLD PROVIDER AGREEMENT | None |
| 750 | 23-90067 | Freedom Designs, Inc. | KERMA MEDICAL PRODUCTS, INC. | GOLD PROVIDER AGREEMENT | None |
| 751 | 23-90068 | Invacare Corporation | KESSINGER/HUNTER&CO | BUILDING LEASE, 4900 INDUSTRIAL BLVD, KINGMAN AZ  (24,256 SQ FT) | None |
| 752 | 23-90068 | Invacare Corporation | KG SOLUTIONS, LLC | PROFESSIONAL SERVICES AGREEMENT | None |
| 753 | 23-90068 | Invacare Corporation | KINGMAN III PROPERTY LLC | COMMERCIAL LEASE AGREEMENT | None |
| 754 | 23-90068 | Invacare Corporation | KINGMAN III PROPERTY LLC | COMMERCIAL LEASE AGREEMENT | None |
| 755 | 23-90068 | Invacare Corporation | KINGMAN III PROPERTY LLC | COMMERCIAL LEASE AGREEMENT | None |
| 756 | 23-90068 | Invacare Corporation | KINGMAN III PROPERTY LLC | COMMERCIAL LEASE AGREEMENT DTD 5/16/2022 | None |
| 757 | 23-90068 | Invacare Corporation | KINGMAN III PROPERTY LLC | COMMERCIAL LEASE AGREEMENT DTD 5/16/2022 | None |
| 758 | 23-90068 | Invacare Corporation | KINGMAN III PROPERTY LLC | COMMERCIAL LEASE AGREEMENT DTD 5/16/2022 | None |
| 759 | 23-90068 | Invacare Corporation | KKSG & ASSOCIATES | WORKERS COMP TPA | None |
| 760 | 23-90068 | Invacare Corporation | KNOWB4 | IT SECURITY TRAINING SUBSCRIPTION | $877.08 |
| 761 | 23-90068 | Invacare Corporation | KNOWBE4, INC. | SERVICE LEVEL AGREEMENT | None |
| 762 | 23-90068 | Invacare Corporation | KONICA MINOLTA BUSINESS SOLUTIONS USA INC | EQUIPMENT - COPIERS / PRINTERS | $6,867.04 |
| 763 | 23-90068 | Invacare Corporation | KOOLE, MARCO | INDEMNITY AGREEMENT DTD 8/25/2022 | None |
| 764 | 23-90072 | Invacare Corporation | KOOLE, MARCO | KEY EMPLOYMENT RETENTION PLAN | None |
| 765 | 23-90068 | Invacare Corporation | KREMER, DAWN | SEVERANCE BENFIT AGREEMENT DTD 3/28/2019 | None |
| 766 | 23-90072 | Invacare Corporation | KRUEGER, TYLER | KEY EMPLOYMENT RETENTION PLAN | None |
| 767 | 23-90072 | Invacare Corporation | KRUGMAN, DIANE | KEY EMPLOYMENT RETENTION PLAN | None |
| 768 | 23-90068 | Invacare Corporation | KUBAT PHARMACY INC | GOLD PROVIDER AGREEMENT | None |
| 769 | 23-90067 | Freedom Designs, Inc. | KUBAT PHARMACY, INC. | GOLD PROVIDER AGREEMENT | None |
| 770 | 23-90068 | Invacare Corporation | KYTO INC MOBILITY & MORE | GOLD PROVIDER AGREEMENT | None |
| 771 | 23-90067 | Freedom Designs, Inc. | KYTO, INC DBA/ MOBILITY AND MORE | GOLD PROVIDER AGREEMENT | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 772 | 23-90068 | Invacare Corporation | LA SANTE WISCONSIN INC | GOLD PROVIDER AGREEMENT | None |
| 773 | 23-90067 | Freedom Designs, Inc. | LA SANTE WISCONSIN, INC. | GOLD PROVIDER AGREEMENT | None |
| 774 | 23-90068 | Invacare Corporation | LAKE COURT MEDICAL SUPPLIES | NATIONAL DIAMOND DISTRIBUTOR AGREEMENT | None |
| 775 | 23-90067 | Freedom Designs, Inc. | LAKE COURT MEDICAL SUPPLIES, INC. | DIAMOND PROVIDER AGREEMENT | None |
| 776 | 23-90068 | Invacare Corporation | LANDMARK MEDICAL INC | GOLD PROVIDER AGREEMENT | None |
| 777 | 23-90068 | Invacare Corporation | LANDMARK MEDICAL INC | GOLD PROVIDER AGREEMENT | None |
| 778 | 23-90067 | Freedom Designs, Inc. | LANDMARK MEDICAL, INC. | GOLD PROVIDER AGREEMENT | None |
| 779 | 23-90068 | Invacare Corporation | LAPLACA, ANTHONY | CHANGE OF CONTROL AGREEMENT | None |
| 780 | 23-90076 | Invacare Corporation | LAPLACA, ANTHONY | DEATH BENEFIT ONLY AGREEMENT | None |
| 781 | 23-90068 | Invacare Corporation | LAPLACA, ANTHONY | LETTER AGREEMENT DTD 7/31/2008 | None |
| 782 | 23-90068 | Invacare Corporation | LAPLACA, ANTHONY | OFFER LETTER DTD 7/31/2008 | None |
| 783 | 23-90069 | Invacare Corporation | LAPLACA, ANTHONY | SUPPLEMENTAL EXECUTIVE RETIREMENT PLAN | None |
| 784 | 23-90068 | Invacare Corporation | LAPLACA, ANTHONY | INDEMNITY AGREEMENT DTD 12/29/2008 | None |
| 785 | 23-90072 | Invacare Corporation | LAVIN, PAUL | KEY EMPLOYMENT RETENTION PLAN | None |
| 786 | 23-90068 | Invacare Corporation | LEASE ACCELERATOR SERVICES LLC | MANAGES SOFTWARE FOR LEASE ACCOUNTING TRACKING AND REPORTING GLOBALLY | None |
| 787 | 23-90068 | Invacare Corporation | LEASE CORPORATION OF AMERICA | MULTIFUNC LASER PRINTER M3450I | $2,804.37 |
| 788 | 23-90068 | Invacare Corporation | LEASE CORPORATION OF AMERICA | MULTIFUNC LASER PRINTER M3540MFP | None |
| 789 | 23-90068 | Invacare Corporation | LEASE CORPORATION OF AMERICA | LASER PRINTER P-3050DN | None |
| 790 | 23-90068 | Invacare Corporation | LEASEACCELERATOR SERVICES LLC | FIRST ORDER FORM RENEWAL OF SAAS ORDER FORM NO.1 | None |
| 791 | 23-90068 | Invacare Corporation | LEE, LOIS | CHANGE OF CONTROL AGREEMENT | None |
| 792 | 23-90072 | Invacare Corporation | LEE, LOIS | KEY EMPLOYMENT RETENTION PLAN | None |
| 793 | 23-90067 | Freedom Designs, Inc. | LEGEND SERVICES INC | GOLD PROVIDER AGREEMENT | None |
| 794 | 23-90068 | Invacare Corporation | LEGEND SERVICES INC | GOLD PROVIDER AGREEMENT | None |
| 795 | 23-90068 | Invacare Corporation | LENEGHAN, KATHLEEN | CHANGE OF CONTROL AGREEMENT | None |
| 796 | 23-90083 | Invacare Corporation | LENEGHAN, KATHLEEN | DEATH BENEFIT ONLY AGREEMENT | None |
| 797 | 23-90068 | Invacare Corporation | LENEGHAN, KATHLEEN | LETTER AGREEMENT DTD 2/20/2018 | None |
| 798 | 23-90068 | Invacare Corporation | LENEGHAN, KATHLEEN P. | INDEMNITY AGREEMENT DTD 11/1/2017 | None |
| 799 | 23-90072 | Invacare Corporation | LENEGHAN, KATHY | KEY EMPLOYMENT RETENTION PLAN | None |
| 800 | 23-90068 | Invacare Corporation | LESHER PRINTERS INC | MASTER SUPPLY AGREEMENT #387 DTD 1/9/2009 | None |
| 801 | 23-90067 | Freedom Designs, Inc. | LESTER E COX MEDICAL CENTERS | DIAMOND PROVIDER AGREEMENT | None |
| 802 | 23-90068 | Invacare Corporation | LESTER E COX MEDICAL CENTERS | DIAMOND PROVIDER AGREEMENT | None |
| 803 | 23-90068 | Invacare Corporation | LESTER E COX MEDICAL CENTERS | DIAMOND PROVIDER AGREEMENT | None |
| 804 | 23-90072 | Invacare Corporation | LEWIS, HELEN | KEY EMPLOYMENT RETENTION PLAN | None |
| 805 | 23-90067 | Freedom Designs, Inc. | LIBERTY HEALTHCARE MANAGEMENT | CHANNEL PROGRAM PURCHASE AGREEMENT - PLATINUM LEVEL | None |
| 806 | 23-90068 | Invacare Corporation | LIBERTY HEALTHCARE MANAGEMENT INC | CHANNEL PROGRAM PURCHASE AGREEMENT - PLATINUM LEVEL | None |
| 807 | 23-90068 | Invacare Corporation | LIBERTY MEDICAL SPECIALTIES INC | DIAMOND PROVIDER AGREEMENT | None |
| 808 | 23-90067 | Freedom Designs, Inc. | LIBERTY MEDICAL SPECIALTIES, INC. | DIAMOND PROVIDER AGREEMENT | None |
| 809 | 23-90067 | Freedom Designs, Inc. | LIFE HEALTHCARE SERVICES, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 810 | 23-90068 | Invacare Corporation | LIFEHME INC | PLATINUM PROVIDER AGREEMENT | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 811 | 23-90067 | Freedom Designs, Inc. | LIFEHME, INC. | DIAMOND PROVIDER AGREEMENT | None |
| 812 | 23-90068 | Invacare Corporation | LINCARE PROCUREMENT INC | CONFIRMATION OF PRICING AND PAYMENT TERMS DTD 2/12/2019 | None |
| 813 | 23-90067 | Freedom Designs, Inc. | LINCARE PROCUREMENT INC. | DIAMOND PROVIDER AGREEMENT | None |
| 814 | 23-90068 | Invacare Corporation | LINKEDIN | RECRUITING SERVICES | None |
| 815 | 23-90068 | Invacare Corporation | LINKEDIN CORPORATION | ORDER FORM #FLD8557711224 | $94.22 |
| 816 | 23-90068 | Invacare Corporation | LIONBRIDGE | DOCUMENTATION TRANSLATION SERVICES | None |
| 817 | 23-90068 | Invacare Corporation | LIONBRIDGE TECHNOLOGIES INC | MASTER SERVICES AGREEMENT | None |
| 818 | 23-90068 | Invacare Corporation | LOFGREN, MICHAEL S | SETTLEMENT AGREEMENT | None |
| 819 | 23-90068 | Invacare Corporation | LONG TERM MEDICAL SUPPLY | CHANNEL PROGRAM PURCHASE AGREEMENT - PLATINUM LEVEL | None |
| 820 | 23-90067 | Freedom Designs, Inc. | LONG TERM MEDICAL SUPPLY CORPORATIO | GOLD PROVIDER AGREEMENT | None |
| 821 | 23-90068 | Invacare Corporation | LOOPE, RYAN | INDEPENDENT SALES RERESENTATIVE AGREEMENT | None |
| 822 | 23-90068 | Invacare Corporation | LRM TECHNOLOGIES LLC | SOFTWARE LICENSE & SERVICES AGREEMENT | None |
| 823 | 23-90068 | Invacare Corporation | LSI STAFFING | TEMPORARY LABOR FOR KINGMAN DC | None |
| 824 | 23-90068 | Invacare Corporation | LSI STAFFING | CLIENT SERVICE/SAFETY BUSINESS AGREEMENT | None |
| 825 | 23-90068 | Invacare Corporation | LUMEN (MPLS/VOICE & IP DATA ) | TELECOM & NETWORKING | None |
| 826 | 23-90068 | Invacare Corporation | M & M EQUIPMENT REPAIR, INC. | RESPIRATORY WARRANTY REPAIR SERVICE | None |
| 827 | 23-90068 | Invacare Corporation | M ROGERS INC & SUBSIDIARY | GOLD PROVIDER AGREEMENT | None |
| 828 | 23-90067 | Freedom Designs, Inc. | M. ROGERS INC. | GOLD PROVIDER AGREEMENT | None |
| 829 | 23-90068 | Invacare Corporation | MACKMALTER ENTERPRISES INC | GOLD PROVIDER AGREEMENT | None |
| 830 | 23-90067 | Freedom Designs, Inc. | MACKMALTER ENTERPRISES, INC. | GOLD PROVIDER AGREEMENT | None |
| 831 | 23-90068 | Invacare Corporation | MACPHERSON'S INC | GOLD PROVIDER AGREEMENT | None |
| 832 | 23-90067 | Freedom Designs, Inc. | MACPHERSON'S, INC. | GOLD PROVIDER AGREEMENT | None |
| 833 | 23-90068 | Invacare Corporation | MADCAP SOFTWARE | DOCUMENTATION SOFTWARE SUITE | None |
| 834 | 23-90068 | Invacare Corporation | MADTRANSLATIONS | DOCUMENTATION TRANSLATION SERVICES | None |
| 835 | 23-90067 | Freedom Designs, Inc. | MALACO, GINNY | LEASE ABSTRACT 2ND AMENDMENT DTD 1/31/2019 | None |
| 836 | 23-90067 | Freedom Designs, Inc. | MALACO, GINNY | NOTICE OF LEASE RENEWAL DTD 1/30/2009 | None |
| 837 | 23-90067 | Freedom Designs, Inc. | MALACO, GINNY | BUILDING LEASE | None |
| 838 | 23-90068 | Invacare Corporation | MALLARD EQUIPMENT SUPPLY LLC | CHANNEL PROGRAM PURCHASE AGREEMENT - GOLD LEVEL | None |
| 839 | 23-90067 | Freedom Designs, Inc. | MALLARD EQUIPMENT SUPPLY, LLC | GOLD PROVIDER AGREEMENT | None |
| 840 | 23-90068 | Invacare Corporation | MALLORY ALEXANDER INT'L LOGISTICS (NY) LLC | CUSTOMS POWER OF ATTORNEY | None |
| 841 | 23-90068 | Invacare Corporation | MALOCO, GINNY S, TRUSTEE | NOTICE OF LEASE RENEWAL DTD 1/30/2009 | None |
| 842 | 23-90072 | Invacare Corporation | MARCHIONY, MICHELLE ZIMMERMAN | KEY EMPLOYMENT RETENTION PLAN | None |
| 843 | 23-90068 | Invacare Corporation | MARINA HOME HEALTH LLC | PLATINUM PROVIDER AGREEMENT | None |
| 844 | 23-90067 | Freedom Designs, Inc. | MARINA HOME HEALTH, LLC | PLATINUM PROVIDER AGREEMENT | None |
| 845 | 23-90068 | Invacare Corporation | MARKEN INTERNATIONAL INC | SETTLEMENT AGREEMENT LETTER | None |
| 846 | 23-90068 | Invacare Corporation | MATHENY SCHOOL AND HOSPITAL INC, THE | GOLD PROVIDER AGREEMENT | None |
| 847 | 23-90068 | Invacare Corporation | MATRIX AUTOMATION | PURCHASE ORDER #5022231477 DTD 11/23/2022 | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 848 | 23-90068 | Invacare Corporation | MATRIX AUTOMATION INC | MASTER SALES AND SUPPORT AGREEMENT | None |
| 849 | 23-90068 | Invacare Corporation | MATRIX AUTOMATION INC | AGREEMENT | None |
| 850 | 23-90068 | Invacare Corporation | MATTRESS RECYCLING COUNCIL | MATTRESS STEWARDSHIP PARTICIPANT AGREEMENT & REGISTRATION | $2,560.97 |
| 851 | 23-90068 | Invacare Corporation | MAXCARE LLC | GOLD PROVIDER AGREEMENT | None |
| 852 | 23-90067 | Freedom Designs, Inc. | MAXCARE, LLC | GOLD PROVIDER AGREEMENT | None |
| 853 | 23-90068 | Invacare Corporation | MCKESSON MEDICAL-SURGICAL INC | CONFIRMATION OF PRICING AND PAYMENT TERMS DTD 6/4/2021 | None |
| 854 | 23-90067 | Freedom Designs, Inc. | MCKESSON MEDICAL-SURGICAL INC. | NATIONAL PROVIDER AGREEMENT | $1,553.92 |
| 855 | 23-90068 | Invacare Corporation | MED RESOURCES | CHANNEL PROGRAM PURCHASE AGREEMENT - PLATINUM LEVEL | None |
| 856 | 23-90067 | Freedom Designs, Inc. | MED RESOURCES, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 857 | 23-90068 | Invacare Corporation | MEDCARE EQUIPMENT CO INC | PLATINUM PROVIDER AGREEMENT | None |
| 858 | 23-90067 | Freedom Designs, Inc. | MEDCARE EQUIPMENT CO, INC | PLATINUM PROVIDER AGREEMENT | None |
| 859 | 23-90068 | Invacare Corporation | MEDCO LLC | GOLD PROVIDER AGREEMENT | None |
| 860 | 23-90067 | Freedom Designs, Inc. | MEDCO, LLC. | GOLD PROVIDER AGREEMENT | None |
| 861 | 23-90068 | Invacare Corporation | MEDEQUIP SERVICE SOLUTIONS | RESPIRATORY WARRANTY REPAIR SERVICE | None |
| 862 | 23-90067 | Freedom Designs, Inc. | MEDEQUIPPED LLC | POWER MOBILITY AND SEATING REBATE PROGRAM | None |
| 863 | 23-90068 | Invacare Corporation | MEDEQUIPPED LLC | POWER MOBILITY AND SEATING REBATE PROGRAM | None |
| 864 | 23-90066 | Adaptive Switch Laboratories, Inc. | MEDIA TEMPLE | INVOICE #206531-132 DTD 10/10/2022 | None |
| 865 | 23-90066 | Adaptive Switch Laboratories, Inc. | MEDIA TEMPLE (GODADDY) | WEBSITE HOSTING | None |
| 866 | 23-90068 | Invacare Corporation | MEDICAL CENTER PHARMACY OF DURANT INC | GOLD PROVIDER AGREEMENT | None |
| 867 | 23-90067 | Freedom Designs, Inc. | MEDICAL CENTER PHARMACY OF DURANT, | GOLD PROVIDER AGREEMENT | None |
| 868 | 23-90068 | Invacare Corporation | MEDICAL COMFORT SYSTEMS INC | GOLD PROVIDER AGREEMENT | None |
| 869 | 23-90068 | Invacare Corporation | MEDICAL COMFORT SYSTEMS INC | GOLD PROVIDER AGREEMENT | None |
| 870 | 23-90067 | Freedom Designs, Inc. | MEDICAL COMFORT SYSTEMS, INC. | GOLD PROVIDER AGREEMENT | None |
| 871 | 23-90067 | Freedom Designs, Inc. | MEDICAL EQUIPMENT & SUPPLIES OF AM (MESA) | PLATINUM PROVIDER AGREEMENT | None |
| 872 | 23-90068 | Invacare Corporation | MEDICAL EQUIPMENT & SUPPLIES OF AMERICA LLC | PLATINUM PROVIDER AGREEMENT | None |
| 873 | 23-90068 | Invacare Corporation | MEDICAL PARTS SOURCE INC | CHANNEL PROGRAM PURCHASE AGREEMENT - PLATINUM LEVEL | None |
| 874 | 23-90067 | Freedom Designs, Inc. | MEDICAL PARTS SOURCE, INC | PLATINUM PROVIDER AGREEMENT | None |
| 875 | 23-90068 | Invacare Corporation | MEDICAL PLUS SUPPLIES INC | GOLD PROVIDER AGREEMENT | None |
| 876 | 23-90067 | Freedom Designs, Inc. | MEDICAL PLUS SUPPLIES, INC. | GOLD PROVIDER AGREEMENT | None |
| 877 | 23-90068 | Invacare Corporation | MEDICAL SCIENCE CENTER | RESPIRATORY WARRANTY REPAIR SERVICE | None |
| 878 | 23-90068 | Invacare Corporation | MEDICAL SCIENCE CENTER | RESPIRATORY WARRANTY REPAIR SERVICE | None |
| 879 | 23-90068 | Invacare Corporation | MEDICAL SCIENCE CENTER | RESPIRATORY WARRANTY REPAIR SERVICE | None |
| 880 | 23-90067 | Freedom Designs, Inc. | MEDICALESHOP INC | E-COMMERCE AGREEMENT | None |
| 881 | 23-90068 | Invacare Corporation | MEDICALSHOP INC | E-COMMERCE AGREEMENT | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 882 | 23-90068 | Invacare Corporation | MEDICOR HEALTHCARE INC | PLATINUM PROVIDER AGREEMENT | None |
| 883 | 23-90067 | Freedom Designs, Inc. | MEDICOR HOMECARE, INC. | DIAMOND PROVIDER AGREEMENT | None |
| 884 | 23-90068 | Invacare Corporation | MEDIREST INC | GOLD PROVIDER AGREEMENT | None |
| 885 | 23-90067 | Freedom Designs, Inc. | MEDIREST, INC. | GOLD PROVIDER AGREEMENT | None |
| 886 | 23-90068 | Invacare Corporation | MEDLAB INTERNATIONAL INC | PLATINUM PROVIDER AGREEMENT | None |
| 887 | 23-90068 | Invacare Corporation | MEDLAB INTERNATIONAL INC | PLATINUM PROVIDER AGREEMENT | None |
| 888 | 23-90067 | Freedom Designs, Inc. | MEDLAB INTERNATIONAL, INC. | DIAMOND PROVIDER AGREEMENT | None |
| 889 | 23-90068 | Invacare Corporation | MEDONE HEALTHCARE LLC | GOLD PROVIDER AGREEMENT | None |
| 890 | 23-90067 | Freedom Designs, Inc. | MEDONE HEALTHCARE, LLC | GOLD PROVIDER AGREEMENT | None |
| 891 | 23-90068 | Invacare Corporation | MEDOX SERVICES INC | GOLD PROVIDER AGREEMENT | None |
| 892 | 23-90067 | Freedom Designs, Inc. | MEDOX SERVICES, INC. | GOLD PROVIDER AGREEMENT | None |
| 893 | 23-90067 | Freedom Designs, Inc. | MEDREP ENTERPRISES | INDEPENDENT SALES REPRESENTATIVE AGREEMENT | $701.58 |
| 894 | 23-90068 | Invacare Corporation | MEDREP ENTERPRISES | INDEPENDENT SALES REPRESENTATIVE AGREEMENT | None |
| 895 | 23-90067 | Freedom Designs, Inc. | MEMORIAL HOME SERVICES OF CENTRAL | PLATINUM PROVIDER AGREEMENT | None |
| 896 | 23-90068 | Invacare Corporation | MEMORIAL HOME SVCS OF CENTRAL ILLINOIS INC | CONFIRMATION OF PRICING PAYMENT & PURCHASE COMMITMENT PERFORMANCE DTD 10/9/2018 | None |
| 897 | 23-90068 | Invacare Corporation | MERC MEDICAL SUPPLY CO INC | GOLD PROVIDER AGREEMENT | None |
| 898 | 23-90067 | Freedom Designs, Inc. | MERC MEDICAL SUPPLY CO. INC. | GOLD PROVIDER AGREEMENT | None |
| 899 | 23-90068 | Invacare Corporation | MERCHANT HOME MEDICAL SERVICES LLC | GOLD PROVIDER AGREEMENT | None |
| 900 | 23-90067 | Freedom Designs, Inc. | MERCHANT HOME MEDICAL SERVICES, L.L | GOLD PROVIDER AGREEMENT | None |
| 901 | 23-90068 | Invacare Corporation | MERCY HEALTH SERVICES IOWA CORP | GOLD PROVIDER AGREEMENT | None |
| 902 | 23-90067 | Freedom Designs, Inc. | MERCY HOME HEALTHCARE | GOLD PROVIDER AGREEMENT | None |
| 903 | 23-90067 | Freedom Designs, Inc. | MERCY MEDICAL EQUIPMENT COMPANY | PLATINUM PROVIDER AGREEMENT | None |
| 904 | 23-90068 | Invacare Corporation | MERCY MEDICAL EQUIPMENT COMPANY | PLATINUM PROVIDER AGREEMENT | None |
| 905 | 23-90068 | Invacare Corporation | MERIDIAN LEASING | RAYMOND STAND UP COUNTER BALANCE AND BATTERY | $363.36 |
| 906 | 23-90068 | Invacare Corporation | MERITUS ENTERPRISES INC | GOLD PROVIDER AGREEMENT | None |
| 907 | 23-90067 | Freedom Designs, Inc. | MERITUS ENTERPRISES, INC. | GOLD PROVIDER AGREEMENT | None |
| 908 | 23-90068 | Invacare Corporation | MERRMAN, JR., MICHAEL J. | INDEMNITY AGREEMENT DTD 8/28/2022 | None |
| 909 | 23-90068 | Invacare Corporation | METRO MEDICAL EQUIPMENT INC | GOLD PROVIDER AGREEMENT | None |
| 910 | 23-90067 | Freedom Designs, Inc. | METRO MEDICAL EQUIPMENT INC. | GOLD PROVIDER AGREEMENT | None |
| 911 | 23-90068 | Invacare Corporation | MICROSOFT AZURE | CLOUD SUBSCRIPTION | None |
| 912 | 23-90068 | Invacare Corporation | MICROSOFT CORPORATION | MICROSOFT PROFESSIONAL SERVICES DATA PROTECTION ADDENDUM | $459,326.71 |
| 913 | 23-90068 | Invacare Corporation | MICROSOFT ENTERPRISE AGREEMENT | LICENSE | None |
| 914 | 23-90068 | Invacare Corporation | MID NEBRASKA MOBILITY INC | GOLD PROVIDER AGREEMENT | None |
| 915 | 23-90067 | Freedom Designs, Inc. | MID NEBRASKA MOBILITY, INC. | GOLD PROVIDER AGREEMENT | None |
| 916 | 23-90068 | Invacare Corporation | MIDWEST RESPIRATORY CARE INC | PLATINUM PROVIDER AGREEMENT | None |
| 917 | 23-90067 | Freedom Designs, Inc. | MIDWEST RESPIRATORY CARE, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 918 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-00995494-M001 | $2,674.56 |
| 919 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01027807 | $1,488.37 |
| 920 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01027330 | $1,392.06 |
| 921 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01026821 | $1,234.03 |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 922 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01021853-M001 | $744.12 |
| 923 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01034913 | $632.42 |
| 924 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01034916 | $544.67 |
| 925 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01034929 | $451.69 |
| 926 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01032605 | $418.72 |
| 927 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-00995833-M001 | $146.66 |
| 928 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-00992282-M01 | $125.10 |
| 929 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01026822 | $105.45 |
| 930 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01020648-M001 | $66.60 |
| 931 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-00971846-M01 | None |
| 932 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-00977047-M01 | None |
| 933 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-00990915-M01 | None |
| 934 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01010309-M001 | None |
| 935 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01017835-M001 | None |
| 936 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01019370-M001 | None |
| 937 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01020646-M001 | None |
| 938 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01020651-M001 | None |
| 939 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01026927 | None |
| 940 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01026928 | None |
| 941 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01026929 | None |
| 942 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01026959 | None |
| 943 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01027776 | None |
| 944 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01027806 | None |
| 945 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01032606 | None |
| 946 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01033111 | None |
| 947 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01033112 | None |
| 948 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01033597 | None |
| 949 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01034912 | None |
| 950 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01034914 | None |
| 951 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01034915 | None |
| 952 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01034927 | None |
| 953 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01034928 | None |
| 954 | 23-90068 | Invacare Corporation | MILLER'S RENTAL & SALES CO INC | PLATINUM PROVIDER AGREEMENT | None |
| 955 | 23-90068 | Invacare Corporation | MILLERS RENTAL & SALES INC | POWER MOBILITY AND SEATING REBATE PROGRAM | None |
| 956 | 23-90067 | Freedom Designs, Inc. | MILLER'S RENTAL AND SALES COMPANY | PLATINUM PROVIDER AGREEMENT | None |
| 957 | 23-90067 | Freedom Designs, Inc. | MILLER'S RENTAL AND SALES COMPANY | POWER MOBILITY AND SEATING REBATE PROGRAM | None |
| 958 | 23-90068 | Invacare Corporation | MILNER-RUSHING DISCOUNT DRUGS INC | GOLD PROVIDER AGREEMENT | None |
| 959 | 23-90067 | Freedom Designs, Inc. | MILNER-RUSHING DISCOUNT DRUGS, INC. | GOLD PROVIDER AGREEMENT | None |
| 960 | 23-90068 | Invacare Corporation | MOBILIS INC | GOLD PROVIDER AGREEMENT | None |
| 961 | 23-90067 | Freedom Designs, Inc. | MOBILIS, INC. | GOLD PROVIDER AGREEMENT | None |
| 962 | 23-90068 | Invacare Corporation | MOBILITY CENTRAL INC | GOLD PROVIDER AGREEMENT | None |
| 963 | 23-90067 | Freedom Designs, Inc. | MOBILITY CENTRAL, INC. | GOLD PROVIDER AGREEMENT | None |
| 964 | 23-90068 | Invacare Corporation | MOBILITY FIRST INC | GOLD PROVIDER AGREEMENT | None |
| 965 | 23-90067 | Freedom Designs, Inc. | MOBILITY FIRST, INC. | GOLD PROVIDER AGREEMENT | None |
| 966 | 23-90068 | Invacare Corporation | MOBILITY LIVING INC | GOLD PROVIDER AGREEMENT | None |
| 967 | 23-90067 | Freedom Designs, Inc. | MOBILITY LIVING, INC. | GOLD PROVIDER AGREEMENT | None |
| 968 | 23-90068 | Invacare Corporation | MOBILITY MEDICAL INC | GOLD PROVIDER AGREEMENT | None |
| 969 | 23-90067 | Freedom Designs, Inc. | MOBILITY MEDICAL, INCORPORATED | GOLD PROVIDER AGREEMENT | None |
| 970 | 23-90067 | Freedom Designs, Inc. | MOBILITY PLUS LLC | GOLD PROVIDER AGREEMENT | None |
| 971 | 23-90068 | Invacare Corporation | MOBILITY PLUS LLC | GOLD PROVIDER AGREEMENT | None |
| 972 | 23-90068 | Invacare Corporation | MOBILITY PROFESSIONALS INC | GOLD PROVIDER AGREEMENT | None |
| 973 | 23-90067 | Freedom Designs, Inc. | MOBILITY PROFESSIONALS, INC. | GOLD PROVIDER AGREEMENT | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 974 | 23-90068 | Invacare Corporation | MOBILITY SOLUTIONS INC | GOLD PROVIDER AGREEMENT | None |
| 975 | 23-90067 | Freedom Designs, Inc. | MOBILITY SOLUTIONS, INC. | GOLD PROVIDER AGREEMENT | None |
| 976 | 23-90068 | Invacare Corporation | MONAGHAN, MATTHEW E | TECHNICAL INFORMATION & NON-COMPETITION AGREEMENT DTD 4/1/2015 | None |
| 977 | 23-90072 | Invacare Corporation | MONEY, TRACI | KEY EMPLOYMENT RETENTION PLAN | None |
| 978 | 23-90068 | Invacare Corporation | MONEY, TRACI | SEVERANCE BENFIT AGREEMENT DTD 3/28/2019 | None |
| 979 | 23-90068 | Invacare Corporation | MONTGOMERY DME LLC | PLATIUM PROVIDER AGREEMENT | None |
| 980 | 23-90067 | Freedom Designs, Inc. | MONUMENT HEALTH RAPID CITY HOSPITAL | GOLD PROVIDER AGREEMENT | None |
| 981 | 23-90068 | Invacare Corporation | MONUMENT HEALTH RAPID CITY HOSPITAL INC | GOLD PROVIDER AGREEMENT | None |
| 982 | 23-90068 | Invacare Corporation | MOTION MOBILITY & DESIGN INC | GOLD PROVIDER AGREEMENT | None |
| 983 | 23-90067 | Freedom Designs, Inc. | MOTION MOBILITY & DESIGN, INC. | GOLD PROVIDER AGREEMENT | None |
| 984 | 23-90068 | Invacare Corporation | MOTUS LLC | SOLUTION ORDER FORM | None |
| 985 | 23-90068 | Invacare Corporation | MP2 DATASTREAM | PREVENTITIVE MAINTENANCE SOFTWARE | None |
| 986 | 23-90068 | Invacare Corporation | MR. WHEELCHAIR INC | GOLD PROVIDER AGREEMENT | None |
| 987 | 23-90067 | Freedom Designs, Inc. | MR. WHEELCHAIR, INC. | GOLD PROVIDER AGREEMENT | None |
| 988 | 23-90067 | Freedom Designs, Inc. | MRS HOMECARE INC | GOLD PROVIDER AGREEMENT | None |
| 989 | 23-90068 | Invacare Corporation | MRS. HOMECARE INC | GOLD PROVIDER AGREEMENT | None |
| 990 | 23-90068 | Invacare Corporation | MT VERNON COMMUNITY PHARMACY INC | GOLD PROVIDER AGREEMENT | None |
| 991 | 23-90067 | Freedom Designs, Inc. | MT. VERNON COMMUNITY PHARMACY, INC. | GOLD PROVIDER AGREEMENT | None |
| 992 | 23-90067 | Freedom Designs, Inc. | MYT HOME HEALTH CARE, LLC | GOLD PROVIDER AGREEMENT | None |
| 993 | 23-90067 | Freedom Designs, Inc. | N.P.L. HOMECARE, INC. | GOLD PROVIDER AGREEMENT | None |
| 994 | 23-90068 | Invacare Corporation | NASTAS, CLIFFORD D. | INDEMNITY AGREEMENT DTD 5/14/2015 | None |
| 995 | 23-90068 | Invacare Corporation | NATIONAL AQUISITION CENTER / VA | REBATE / FEE | None |
| 996 | 23-90068 | Invacare Corporation | NATIONAL DISTRIBUTING & CONTRACTING INC | VENDOR DIRECT AGREEMENT | $1,004.17 |
| 997 | 23-90068 | Invacare Corporation | NATIONAL DISTRIBUTING & CONTRACTING INC | AMENDMENT #7 TO VENDOR DIRECT AGREEMENT | None |
| 998 | 23-90067 | Freedom Designs, Inc. | NATIONAL HME, INC. | DIAMOND PROVIDER AGREEMENT | None |
| 999 | 23-90068 | Invacare Corporation | NATIONAL MEDICAL EQUIPMENT INC | CHANNEL PROGRAM PURCHASE AGREEMENT - DIAMOND LEVEL | None |
| 1000 | 23-90068 | Invacare Corporation | NATIONAL MEDICAL EQUIPMENT INC | FIRST AMENDMENT TO CHANNEL PROGRAM PURCHASE AGREEMENT | None |
| 1001 | 23-90067 | Freedom Designs, Inc. | NATIONAL MEDICAL EQUIPMENT, INC | DIAMOND PROVIDER AGREEMENT | None |
| 1002 | 23-90068 | Invacare Corporation | NATIONAL SEATING & MOBILITY INC | NATIONAL PROVIDER AGREEMENT | None |
| 1003 | 23-90067 | Freedom Designs, Inc. | NATIONAL SEATING & MOBILITY INC | NATIONAL PROVIDER AGREEMENT | None |
| 1004 | 23-90067 | Freedom Designs, Inc. | NATIONAL SEATING & MOBILITY, INC | DIAMOND PROVIDER AGREEMENT | None |
| 1005 | 23-90068 | Invacare Corporation | NATION'S HEALTHCARE LLC | GOLD PROVIDER AGREEMENT | None |
| 1006 | 23-90067 | Freedom Designs, Inc. | NATION'S HEALTHCARE, LLC | GOLD PROVIDER AGREEMENT | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|---|---|---|---|---|---|
| 1007 | 23-90068 | Invacare Corporation | NAVEX GLOBAL INC | THIRD AMENDMENT TO SERVICES AGREEMENT | None |
| 1008 | 23-90068 | Invacare Corporation | NAVEX GLOBAL INC | ORDER FORM #591695 | None |
| 1009 | 23-90068 | Invacare Corporation | NAVEX GLOBAL, INC. | WHISTLEBLOWER HOTLINE SERVICES | None |
| 1010 | 23-90068 | Invacare Corporation | NAVEX GLOBAL, INC. | WHISTLBLOWER HOTLINE | None |
| 1011 | 23-90068 | Invacare Corporation | NCS | ORDINARY COURSE PROFESSIONAL | None |
| 1012 | 23-90068 | Invacare Corporation | NDC CO GROUP | GOLD PROVIDER AGREEMENT | None |
| 1013 | 23-90068 | Invacare Corporation | NESCO RESOURCE LLC | STATEMENT OF WORK DTD 10/29/2019 | $6,913.95 |
| 1014 | 23-90068 | Invacare Corporation | NETWORK SOLUTIONS | WEBSITE DOMAIN NAMES | None |
| 1015 | 23-90067 | Freedom Designs, Inc. | NEW LIFE HOME MEDICAL EQUIPMENT | GOLD PROVIDER AGREEMENT | None |
| 1016 | 23-90068 | Invacare Corporation | NEW LIFE HOME MEDICAL EQUIPMENT | GOLD PROVIDER AGREEMENT | None |
| 1017 | 23-90068 | Invacare Corporation | NEW WEST MEDICAL INC | GOLD PROVIDER AGREEMENT | None |
| 1018 | 23-90067 | Freedom Designs, Inc. | NEW WEST MEDICAL, INC. | GOLD PROVIDER AGREEMENT | None |
| 1019 | 23-90068 | Invacare Corporation | NEWLEAF HEALTH INC | E-COMMERCE AGREEMENT | None |
| 1020 | 23-90067 | Freedom Designs, Inc. | NEWLEAF HEALTH, LLC | E-COMMERCE AGREEMENT | None |
| 1021 | 23-90068 | Invacare Corporation | NEWPORT GROUP | NONQUALIFIED PLAN ADMINISTRATION | None |
| 1022 | 23-90068 | Invacare Corporation | NH MED SERVICES LLC | GOLD PROVIDER AGREEMENT | None |
| 1023 | 23-90067 | Freedom Designs, Inc. | NH MED SERVICES, LLC. | GOLD PROVIDER AGREEMENT | None |
| 1024 | 23-90068 | Invacare Corporation | NORCO INC | PLATINUM PROVIDER AGREEMENT | None |
| 1025 | 23-90067 | Freedom Designs, Inc. | NORCO, INC. | DIAMOND PROVIDER AGREEMENT | None |
| 1026 | 23-90068 | Invacare Corporation | NORDEA FINANS DANMARK A/S | SURETYSHIP AGREEMENT ON PURCHASE OF RECEIVABLES | None |
| 1027 | 23-90068 | Invacare Corporation | NORDEA FINANS DANMARK A/S | FRAMEWORK AGREEMENT ON PURCHASE OF RECEIVABLES DTD 5/12/2021 | None |
| 1028 | 23-90067 | Freedom Designs, Inc. | NORTH CENTRAL MEDICAL RESOURCE | PLATINUM PROVIDER AGREEMENT | None |
| 1029 | 23-90068 | Invacare Corporation | NORTH CENTRAL MEDICAL RESOURCE | PLATINUM PROVIDER AGREEMENT | None |
| 1030 | 23-90068 | Invacare Corporation | NORTHERN REFRIGERATION | EQUIPMENT - ICE MACHINES | $9,387.63 |
| 1031 | 23-90068 | Invacare Corporation | NORTHERN REFRIGERATION | EQUIPMENT - PAINT LINE OVEN | None |
| 1032 | 23-90068 | Invacare Corporation | NORTHERN REFRIGERATION | HVAC SERVICES | None |
| 1033 | 23-90068 | Invacare Corporation | NPL HOMECARE INC | GOLD PROVIDER AGREEMENT | None |
| 1034 | 23-90067 | Freedom Designs, Inc. | NSM MARKETING  (DOVE) | INDEPENDENT SALES REPRESENTATIVE AGREEMENT | None |
| 1035 | 23-90068 | Invacare Corporation | NSM MARKETING INC | LETTER AGREEMENT DTD 9/21/2021 | None |
| 1036 | 23-90068 | Invacare Corporation | NSM MARKETING INC | INDEPENDENT SALES REPRESENTATIVE AGREEMENT | None |
| 1037 | 23-90068 | Invacare Corporation | NV MEDICAL SUPPLIES LLC | GOLD PROVIDER AGREEMENT | None |
| 1038 | 23-90067 | Freedom Designs, Inc. | NV MEDICAL SUPPLIES, LLC. | GOLD PROVIDER AGREEMENT | None |
| 1039 | 23-90068 | Invacare Corporation | O.E. MEYER | WELDING/ ROBOT SUPPORT SERVICES | None |
| 1040 | 23-90067 | Freedom Designs, Inc. | OCEAN CONVERSIONS & MOBILITY OF FT. | GOLD PROVIDER AGREEMENT | None |
| 1041 | 23-90067 | Freedom Designs, Inc. | OCELCO, INC | E-COMMERCE AGREEMENT | None |
| 1042 | 23-90068 | Invacare Corporation | OHIO ELEVATOR | TAYLOR STREET ELEVATOR MAINTENANCE | $1,189.86 |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 1043 | 23-90068 | Invacare Corporation | OHIO ELEVATOR & LIFT INC | INVOICE #5504 DTD 10/1/2022 | None |
| 1044 | 23-90067 | Freedom Designs, Inc. | OLYMPIC PHARMACY & HEALTH CARE SERV | GOLD PROVIDER AGREEMENT | None |
| 1045 | 23-90068 | Invacare Corporation | OLYMPIC PHARMACY & HEALTH CARE SERVICES | GOLD PROVIDER AGREEMENT | None |
| 1046 | 23-90068 | Invacare Corporation | OLYMPIC PHARMACY & HEALTH CARE SERVICES | GOLD PROVIDER AGREEMENT | None |
| 1047 | 23-90067 | Freedom Designs, Inc. | O'NEILL MANAGEMENT, LLC. | CHANNEL PROGRAM PURCHASE AGREEMENT - GOLD LEVEL | None |
| 1048 | 23-90068 | Invacare Corporation | O'NELL MANAGEMENT LLC | GOLD PROVIDER AGREEMENT | None |
| 1049 | 23-90072 | Invacare Corporation | OPFERMANN, REGIS | KEY EMPLOYMENT RETENTION PLAN | None |
| 1050 | 23-90067 | Freedom Designs, Inc. | OPTION CARE HEALTH, INC. | GOLD PROVIDER AGREEMENT | None |
| 1051 | 23-90068 | Invacare Corporation | OPTISOURCE CO GROUP | PLATINUM PROVIDER AGREEMENT | None |
| 1052 | 23-90068 | Invacare Corporation | ORACLE | LICENSE | $7,087.05 |
| 1053 | 23-90068 | Invacare Corporation | ORACLE | SOFTWARE+ H/WARE SUPPORT | None |
| 1054 | 23-90068 | Invacare Corporation | ORACLE | HARDWARE AMC | None |
| 1055 | 23-90068 | Invacare Corporation | ORACLE AMERICA INC | ORACLE CLOUD SERVICES AGREEMENT | None |
| 1056 | 23-90068 | Invacare Corporation | ORACLE AMERICA INC | AMENDMENT ONE | None |
| 1057 | 23-90068 | Invacare Corporation | ORACLE AMERICA INC | ORACLE SOFTWARE AS A SERVICE ORDERING DOCUMENT | None |
| 1058 | 23-90068 | Invacare Corporation | ORACLE CLOUD | LICENSE | None |
| 1059 | 23-90068 | Invacare Corporation | ORACLE ELOQUA | LICENSE | None |
| 1060 | 23-90068 | Invacare Corporation | ORACLE ELOQUA | LICENSE | None |
| 1061 | 23-90068 | Invacare Corporation | ORACLE SUN-NK20241436 | SOFTWARE AMC | None |
| 1062 | 23-90068 | Invacare Corporation | OTIS ELEVATOR SERVICE | HQ ELEVATOR MAINTENANCE SERVICES | None |
| 1063 | 23-90067 | Freedom Designs, Inc. | OWENS HEALTHCARE - MEDICAL EQUIPMEN | GOLD PROVIDER AGREEMENT | None |
| 1064 | 23-90068 | Invacare Corporation | OXYGEN RICH LLC | GOLD PROVIDER AGREEMENT | None |
| 1065 | 23-90067 | Freedom Designs, Inc. | OXYGEN RICH, LLC | GOLD PROVIDER AGREEMENT | None |
| 1066 | 23-90068 | Invacare Corporation | P Q SYSTEMS | PURCHASE ORDER #3063583 DTD 8/29/2022 | None |
| 1067 | 23-90067 | Freedom Designs, Inc. | PALM GARDEN HEALTHCARE HOLDINGS LLC | CHANNEL PROGRAM PURCHASE AGREEMENT - PLATINUM LEVEL | None |
| 1068 | 23-90068 | Invacare Corporation | PALMCO INC | GOLD PROVIDER AGREEMENT | None |
| 1069 | 23-90067 | Freedom Designs, Inc. | PALMCO, INC. | GOLD PROVIDER AGREEMENT | None |
| 1070 | 23-90068 | Invacare Corporation | PARKER & COMPANY | LEASE - 7801 SOUTH JACKSON ROAD, PHARR TX 78577 | None |
| 1071 | 23-90068 | Invacare Corporation | PARKER AND COMPANY | LEASE RENEWAL LETTER DTD 11/3/2014 | None |
| 1072 | 23-90068 | Invacare Corporation | PARKER LOGISTICS | CUSTOMS BROKERAGE SERVICES | None |
| 1073 | 23-90068 | Invacare Corporation | PARKERCO INC | LEASE RENEWAL LETTER DTD 3/31/2022 | None |
| 1074 | 23-90068 | Invacare Corporation | PARKERCO INC | PROPERTY LEASE AMENDMENT | None |
| 1075 | 23-90068 | Invacare Corporation | PARKERCO INC | LEASE RENEWAL LETTER DTD 9/20/2017 | None |
| 1076 | 23-90068 | Invacare Corporation | PARKERCO INC | LEASE RENEWAL LETTER DTD 9/21/2012 | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 1077 | 23-90068 | Invacare Corporation | PARKERCO INC | LEASE RENEWAL LETTER DTD 2/12/2018 | None |
| 1078 | 23-90068 | Invacare Corporation | PARKERCO INC | LEASE RENEWAL LETTER DTD 2/12/2019 | None |
| 1079 | 23-90068 | Invacare Corporation | PARKERCO INC | LEASE RENEWAL LETTER DTD 1/29/2020 | None |
| 1080 | 23-90067 | Freedom Designs, Inc. | PARTNERS MEDICAL SUPPLIES INC. | GOLD PROVIDER AGREEMENT | None |
| 1081 | 23-90067 | Freedom Designs, Inc. | PATHWAYS (CRESTMARK) | LEASE OF CNC MACHINES | $23,585.32 |
| 1082 | 23-90067 | Freedom Designs, Inc. | PATIENT AIDS, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 1083 | 23-90068 | Invacare Corporation | PATIENT CARE SOLUTIONS INC | CONFIDENTIAL SETTLEMENT AGREEMENT | None |
| 1084 | 23-90068 | Invacare Corporation | PATIENT CARE SOLUTIONS INC | CONFIDENTIAL SETTLEMENT AGREEMENT | None |
| 1085 | 23-90068 | Invacare Corporation | PATIENT LIFT USA LLC | E-COMMERCE AGREEMENT | None |
| 1086 | 23-90067 | Freedom Designs, Inc. | PATIENT LIFT USA, LLC. | E-COMMERCE AGREEMENT | None |
| 1087 | 23-90067 | Freedom Designs, Inc. | PATIENT'S CHOICE, LLC | GOLD PROVIDER AGREEMENT | None |
| 1088 | 23-90068 | Invacare Corporation | PAYMETRIC INC | ON-DEMAND SOLUTIONS SUBSCRIPTION AGREEMENT DTD 5/1/2020 | $67,000.00 |
| 1089 | 23-90068 | Invacare Corporation | PAYMETRIC INC | SOW #262734 | None |
| 1090 | 23-90067 | Freedom Designs, Inc. | PEDIATRIC HOME SERVICE | GOLD PROVIDER AGREEMENT | None |
| 1091 | 23-90072 | Invacare Corporation | PEMBERTON, MONICA | KEY EMPLOYMENT RETENTION PLAN | None |
| 1092 | 23-90067 | Freedom Designs, Inc. | PENNYRILE HOME MEDICAL, INC. | GOLD PROVIDER AGREEMENT | None |
| 1093 | 23-90068 | Invacare Corporation | PEOPLE FIRST MOBILITY LLC | POWER MOBILITY AND SEATING REBATE PROGRAM | None |
| 1094 | 23-90068 | Invacare Corporation | PEOPLE FIRST MOBILITY LLC | POWER MOBILITY AND SEATING REBATE PROGRAM | None |
| 1095 | 23-90068 | Invacare Corporation | PEOPLE FIRST MOBILITY LLC | GOLD PROVIDER AGREEMENT | None |
| 1096 | 23-90067 | Freedom Designs, Inc. | PEOPLE FIRST MOBILITY, LLC. | GOLD PROVIDER AGREEMENT | None |
| 1097 | 23-90067 | Freedom Designs, Inc. | PEOPLE FIRST MOBILITY, LLC. | POWER MOBILITY AND SEATING REBATE PROGRAM | None |
| 1098 | 23-90068 | Invacare Corporation | PEOPLE SYSTEMS | UNEMPLOYMENT COMPLIANCE | None |
| 1099 | 23-90067 | Freedom Designs, Inc. | PEOPLE'S CARE MEDICAL SUPPLY | GOLD PROVIDER AGREEMENT | None |
| 1100 | 23-90068 | Invacare Corporation | PERFORMANCE HEALTH HOLDINGS INC | THIRD AMENDMENT TO DISTRIBUTION AGREEMENT | None |
| 1101 | 23-90067 | Freedom Designs, Inc. | PERFORMANCE HEALTH HOLDINGS, INC. | GOLD PROVIDER AGREEMENT | None |
| 1102 | 23-90068 | Invacare Corporation | PERMOBIL AB | MUTUAL NON-ASSERTION AGREEMENT DTD 12/4/2008 | None |
| 1103 | 23-90068 | Invacare Corporation | PERMOBIL AB | MUTUAL NON-ASSERTION AGREEMENT DTD 12/4/2008 | None |
| 1104 | 23-90068 | Invacare Corporation | PERMOBIL AB | MUTUAL NON-ASSERTION AGREEMENT DTD 12/4/2008 | None |
| 1105 | 23-90072 | Invacare Corporation | PETERS, DARRYL | KEY EMPLOYMENT RETENTION PLAN | None |
| 1106 | 23-90067 | Freedom Designs, Inc. | PETERSEN DRUG SERVICE DRUG INC. | GOLD PROVIDER AGREEMENT | None |
| 1107 | 23-90068 | Invacare Corporation | PHARMACY SERVICES INC | GOLD PROVIDER AGREEMENT | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 1108 | 23-90067 | Freedom Designs, Inc. | PHOENIX TEXTILES | PLATINUM PROVIDER AGREEMENT | None |
| 1109 | 23-90068 | Invacare Corporation | PIPKINS | CUSTOMER SERVICE PHONE CONTRACT | $6,980.00 |
| 1110 | 23-90068 | Invacare Corporation | PITCOCK BIOMEDICAL | RESPIRATORY WARRANTY REPAIR SERVICE | None |
| 1111 | 23-90068 | Invacare Corporation | PNC BANK | DAILY BANKING SERVICES | None |
| 1112 | 23-90068 | Invacare Corporation | PNC BANK NA | MASTER RESOLUTIONS & AUTHORIZATIONS FOR SERVICES & PRODUCTS | None |
| 1113 | 23-90068 | Invacare Corporation | PNC NATIONAL ASSOCIATION | COMMERCIAL PROGRAM AUTHORIZATION AND AGREEMENT | None |
| 1114 | 23-90072 | Invacare Corporation | POWELL, DYLAN | KEY EMPLOYMENT RETENTION PLAN | None |
| 1115 | 23-90068 | Invacare Corporation | PQ SYSTEMS | GAGEPACK GAUGE CALIBRATION SOFTWARE | None |
| 1116 | 23-90068 | Invacare Corporation | PRACTICAL LAW | ORDINARY COURSE PROFESSIONAL | None |
| 1117 | 23-90068 | Invacare Corporation | PRAN MEDICAL LLC | GOLD PROVIDER AGREEMENT | None |
| 1118 | 23-90067 | Freedom Designs, Inc. | PRAN MEDICAL, LLC | GOLD PROVIDER AGREEMENT | None |
| 1119 | 23-90067 | Freedom Designs, Inc. | PREFERRED MEDICAL | GOLD PROVIDER AGREEMENT | None |
| 1120 | 23-90067 | Freedom Designs, Inc. | PRESTIGE ADMINISTRATIVE SERVICES | CHANNEL PROGRAM PURCHASE AGREEMENT - GOLD LEVEL | None |
| 1121 | 23-90068 | Invacare Corporation | PRESTIGE ADMINISTRATIVE SERVICES LLC | GOLD PROVIDER AGREEMENT | None |
| 1122 | 23-90067 | Freedom Designs, Inc. | PRICE RITE MEDICAL EQUIPMENT, INC. | GOLD PROVIDER AGREEMENT | None |
| 1123 | 23-90068 | Invacare Corporation | PRIDE | SUMMARY OF WHEELCHAIR-RELATED AGREEMENTS | None |
| 1124 | 23-90068 | Invacare Corporation | PRIDE MOBILITY PRODUCTS CORP | MUTUAL NON-ASSERTION AGREEMENT DTD 9/26/2007 | None |
| 1125 | 23-90068 | Invacare Corporation | PRIDE MOBILITY PRODUCTS CORP | MUTUAL NON-ASSERTION AGREEMENT DTD 9/26/2007 | None |
| 1126 | 23-90068 | Invacare Corporation | PRIDE MOBILITY PRODUCTS CORP | MUTUAL NON-ASSERTION AGREEMENT DTD 9/26/2007 | None |
| 1127 | 23-90067 | Freedom Designs, Inc. | PRISM HEALTHCARE SERVICES | GOLD PROVIDER AGREEMENT | None |
| 1128 | 23-90067 | Freedom Designs, Inc. | PRISMA HEALTH | PLATINUM PROVIDER AGREEMENT | None |
| 1129 | 23-90067 | Freedom Designs, Inc. | PROCARE BIO MEDICAL REPAIR LLC | GOLD PROVIDER AGREEMENT | None |
| 1130 | 23-90067 | Freedom Designs, Inc. | PROCARE HOME MEDICAL, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 1131 | 23-90068 | Invacare Corporation | PROCURE ADVANTAGE GPO | PLATINUM PROVIDER AGREEMENT | None |
| 1132 | 23-90068 | Invacare Corporation | PROCURE ADVANTAGE LLC | 3RD AMENDMENT TO GROUP PURCHASING ORGANIZATION AGREEMENT | None |
| 1133 | 23-90068 | Invacare Corporation | PROCURE ADVANTAGE LLC | GROUP PURCHASING ORGANIZATION AGREEMENT | None |
| 1134 | 23-90068 | Invacare Corporation | PRODUCTIVITY-QUALITY SYSTEMS INC | LICENSE CERTIFICATE BENEFITS DTD 8/29/2022 | None |
| 1135 | 23-90067 | Freedom Designs, Inc. | PROGRESSIVE MEDICAL CONCEPTS, LLC | PLATINUM PROVIDER AGREEMENT | None |
| 1136 | 23-90067 | Freedom Designs, Inc. | PROMEDICA HEALTH SYSTEM, INC. | DIAMOND PROVIDER AGREEMENT | None |
| 1137 | 23-90067 | Freedom Designs, Inc. | PROSOURCE FACILITY SUPPLY | PLATINUM PROVIDER AGREEMENT | None |
| 1138 | 23-90067 | Freedom Designs, Inc. | PROVIDENCE HOME SERVICES | DIAMOND PROVIDER AGREEMENT | None |
| 1139 | 23-90067 | Freedom Designs, Inc. | PRUITTHEALTH MEDICAL SUPPLY, LLC | CHANNEL PROGRAM PURCHASE AGREEMENT - PLATINUM LEVEL | None |
| 1140 | 23-90072 | Invacare Corporation | PURTILL, GEOFF | KEY EMPLOYMENT RETENTION PLAN | None |
| 1141 | 23-90068 | Invacare Corporation | PURTILL, GEOFFREY P | CHANGE OF CONTROL AGREEMENT | None |
| 1142 | 23-90068 | Invacare Corporation | PURTILL, GEOFFREY P | INDEMNITY AGREEMENT DTD 1/12/2021 | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 1143 | 23-90068 | Invacare Corporation | PURTILL, GEOFFREY P | INDEMNITY AGREEMENT DTD 8/25/2022 | None |
| 1144 | 23-90068 | Invacare Corporation | PURTILL, GEOFFREY P | OFFER LETTER DTD 11/21/2022 | None |
| 1145 | 23-90068 | Invacare Corporation | QUAISAR ENTERPRISES LLC | E-COMMERCE ELITE AGREEMENT | None |
| 1146 | 23-90067 | Freedom Designs, Inc. | QUAISAR ENTERPRISES, LLC | E-COMMERCE ELITE AGREEMENT | None |
| 1147 | 23-90068 | Invacare Corporation | QUALITY BIOMEDICAL | RESPIRATORY WARRANTY REPAIR SERVICE | None |
| 1148 | 23-90067 | Freedom Designs, Inc. | QUALITY HOME MEDICAL EQUIPMENT, INC | PLATINUM PROVIDER AGREEMENT | None |
| 1149 | 23-90068 | Invacare Corporation | QUALITYHUB INC | PROFESSIONAL SERVICES AGREEMENT | None |
| 1150 | 23-90068 | Invacare Corporation | QUEEN CITY MED MART INC | POWER MOBILITY AND SEATING REBATE PROGRAM | None |
| 1151 | 23-90068 | Invacare Corporation | QUEEN CITY MED MART INC | POWER MOBILITY AND SEATING REBATE PROGRAM | None |
| 1152 | 23-90068 | Invacare Corporation | QUEEN CITY MED MART LLC | E-COMMERCE AGREEMENT | None |
| 1153 | 23-90067 | Freedom Designs, Inc. | QUEEN CITY MED MART, INC. | E-COMMERCE AGREEMENT | None |
| 1154 | 23-90067 | Freedom Designs, Inc. | QUEEN CITY MED MART, LLC. | PLATINUM PROVIDER AGREEMENT | None |
| 1155 | 23-90067 | Freedom Designs, Inc. | QUEEN CITY MED MART, LLC. | POWER MOBILITY AND SEATING REBATE PROGRAM | None |
| 1156 | 23-90068 | Invacare Corporation | RABSON REHAB SALES | INDEPENDENT SALES REPRESENTATIVE AGREEMENT | None |
| 1157 | 23-90068 | Invacare Corporation | RAINBOW CARE & CONSULTANTS INC | CHANNEL PROGRAM PURCHASE AGREEMENT- GOLD LEVEL | None |
| 1158 | 23-90067 | Freedom Designs, Inc. | RAINBOW CARE & CONSULTANTS INC. | GOLD PROVIDER AGREEMENT | None |
| 1159 | 23-90067 | Freedom Designs, Inc. | RAINBOW MEDICAL SUPPLY, INC. | GOLD PROVIDER AGREEMENT | None |
| 1160 | 23-90072 | Invacare Corporation | RAMBHATLA, RAMAKANT | KEY EMPLOYMENT RETENTION PLAN | None |
| 1161 | 23-90067 | Freedom Designs, Inc. | RANDOLPH MEDICAL PLUS, LLC | GOLD PROVIDER AGREEMENT | None |
| 1162 | 23-90068 | Invacare Corporation | RATELINX | SHIPPING SOFTWARE AND AUDIT SERVICES | None |
| 1163 | 23-90068 | Invacare Corporation | RAYMOND LEASING CORPORATION. | EQUIPMENT - RAYMOND STAND UP COUNTERLANCE, BATTERY AND CHARGER | $138.23 |
| 1164 | 23-90068 | Invacare Corporation | RAYMOND LEASING CORPORATION. | ELECTRIC PALLET TRUCK | None |
| 1165 | 23-90068 | Invacare Corporation | RAYMOND LEASING CORPORATION. | EQUIPMENT - COUNTERBALANCE LIFT TRUCK | None |
| 1166 | 23-90068 | Invacare Corporation | RAYMOND LEASING CORPORATION. | EQUIPMENT - REACH LIFT TRUCK | None |
| 1167 | 23-90067 | Freedom Designs, Inc. | REDI-QUIP MEDICAL EQUIPMENT & SUPPL | GOLD PROVIDER AGREEMENT | None |
| 1168 | 23-90068 | Invacare Corporation | REFINITIV / FXALL | FOREIGN EXCHANGE PROVIDER | $217.26 |
| 1169 | 23-90067 | Freedom Designs, Inc. | REGIONAL HOME CARE, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 1170 | 23-90068 | Invacare Corporation | REGIONAL MEDICAL CENTER | GOLD PROVIDER AGREEMENT | None |
| 1171 | 23-90072 | Invacare Corporation | REGIS, ERIC | KEY EMPLOYMENT RETENTION PLAN | None |
| 1172 | 23-90068 | Invacare Corporation | REHAB MEDICAL INC | GOLD PROVIDER AGREEMENT | None |
| 1173 | 23-90067 | Freedom Designs, Inc. | REHAB MEDICAL, INC. | GOLD PROVIDER AGREEMENT | None |
| 1174 | 23-90068 | Invacare Corporation | REHAB REPRESENTATIVES | INDEPENDENT SALES REPRESENTATIVE AGREEMENT | None |
| 1175 | 23-90067 | Freedom Designs, Inc. | REHABILITATION EQUIPMENT ASSOCIATES | GOLD PROVIDER AGREEMENT | None |
| 1176 | 23-90067 | Freedom Designs, Inc. | REHABILITATION MEDICAL SUPPLY | GOLD PROVIDER AGREEMENT | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 1177 | 23-90067 | Freedom Designs, Inc. | REHABMART, LLC | E-COMMERCE ELITE AGREEMENT | None |
| 1178 | 23-90068 | Invacare Corporation | REINER, HANSJORG | INDEMNITY AGREEMENT DTD 7/11/2022 | None |
| 1179 | 23-90067 | Freedom Designs, Inc. | RELIABLE MEDICAL SUPPLY INC | POWER MOBILITY AND SEATING REBATE PROGRAM | None |
| 1180 | 23-90068 | Invacare Corporation | RELIABLE MEDICAL SUPPLY INC | POWER MOBILITY AND SEATING REBATE PROGRAM | None |
| 1181 | 23-90068 | Invacare Corporation | RELIABLE MEDICAL SUPPLY LLC | PLATINUM PROVIDER AGREEMENT | None |
| 1182 | 23-90067 | Freedom Designs, Inc. | RELIABLE MEDICAL SUPPLY, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 1183 | 23-90067 | Freedom Designs, Inc. | RELIABLE RESPIRATORY, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 1184 | 23-90067 | Freedom Designs, Inc. | REMED SERVICES, LLC | PLATINUM PROVIDER AGREEMENT | None |
| 1185 | 23-90068 | Invacare Corporation | REMEDY (FMLY SELECT STAFFING) | TEMPORARY STAFFING SERVICES | None |
| 1186 | 23-90068 | Invacare Corporation | RENMAR DME INC | GOLD PROVIDER AGREEMENT | None |
| 1187 | 23-90067 | Freedom Designs, Inc. | RENMAR DME INC. | GOLD PROVIDER AGREEMENT | None |
| 1188 | 23-90068 | Invacare Corporation | RENTAL CONCEPTS INC | AUTO PHYSICAL DAMAGE CLAIMS MANAGEMENT | None |
| 1189 | 23-90068 | Invacare Corporation | REOX MEDICAL SERVICES LLC | REPAIR SERVICE AGREEMENT | None |
| 1190 | 23-90068 | Invacare Corporation | REPAIR AUTHORITY (TRC) | RESPIRATORY WARRANTY REPAIR SERVICE | None |
| 1191 | 23-90068 | Invacare Corporation | REPUBLIC SERVICES | CARDBOARD COMPACTOR CONTRACT (1200 TAYLOR STREET) | None |
| 1192 | 23-90068 | Invacare Corporation | REPUBLIC SERVICES | TRASH COMPACTOR CONTRACT (1200 TAYLOR STREET) | None |
| 1193 | 23-90068 | Invacare Corporation | REPUBLIC SERVICES | OPEN TOP (BULK TRASH) CONTRACT (1200 TAYLOR STREET) | None |
| 1194 | 23-90068 | Invacare Corporation | REPUBLIC SERVICES | TRASH & RECYCLING CONTRACT (1166 TAYLOR STREET) | None |
| 1195 | 23-90068 | Invacare Corporation | REPUBLIC SERVICES | OPEN TOP (BULK TRASH) CONTRACT (39400 TAYLOR PARKWAY) | None |
| 1196 | 23-90068 | Invacare Corporation | REPUBLIC SERVICES | CARDBOARD COMPACTOR CONTRACT (39400 TAYLOR PARKWAY) | None |
| 1197 | 23-90068 | Invacare Corporation | REPUBLIC SERVICES | TRASH COMPACTOR CONTRACT (39400 TAYLOR PARKWAY) | None |
| 1198 | 23-90068 | Invacare Corporation | REPUBLIC SERVICES | RECYCLING CONTRACT (ONE INVACARE WAY) | None |
| 1199 | 23-90068 | Invacare Corporation | REPUBLIC SERVICES | TRASH CONTRACT (ONE INVACARE WAY) | None |
| 1200 | 23-90068 | Invacare Corporation | RESOURCES CONNECTION LLC | TERMS & CONDITIONS TO ENGAGEMENT LETTER | None |
| 1201 | 23-90068 | Invacare Corporation | RESOURCES GLOBAL PROFESSIONALS | FINANCE BACKFILL/STAFFING COMPANY. | None |
| 1202 | 23-90068 | Invacare Corporation | RFS/ DBA ANDERSON MEDICAL | RESPIRATORY WARRANTY REPAIR SERVICE | None |
| 1203 | 23-90067 | Freedom Designs, Inc. | RGH ENTERPRISES, INC. | DIAMOND PROVIDER AGREEMENT | None |
| 1204 | 23-90068 | Invacare Corporation | RHINOMED LTD | LETTER OF CONSENT DTD 8/12/2020 | None |
| 1205 | 23-90068 | Invacare Corporation | RICHESON, RONALD | CHANGE OF CONTROL AGREEMENT | None |
| 1206 | 23-90072 | Invacare Corporation | RICHESON, RONALD | KEY EMPLOYMENT RETENTION PLAN | None |
| 1207 | 23-90072 | Invacare Corporation | RICKER, PAUL | KEY EMPLOYMENT RETENTION PLAN | None |
| 1208 | 23-90067 | Freedom Designs, Inc. | RIDER MOBILITY INC. | GOLD PROVIDER AGREEMENT | $1,965.09 |
| 1209 | 23-90067 | Freedom Designs, Inc. | RL HEALTHCARE SOLUTIONS CORP. | PLATINUM PROVIDER AGREEMENT | None |
| 1210 | 23-90067 | Freedom Designs, Inc. | RLN ENTERPRISES, INC. | GOLD PROVIDER AGREEMENT | None |
| 1211 | 23-90068 | Invacare Corporation | RLR SUPPLIES INC | PLATINUM PROVIDER AGREEMENT | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|---|---|---|---|---|---|
| 1212 | 23-90067 | Freedom Designs, Inc. | RLR SUPPLIES INC. | PLATINUM PROVIDER AGREEMENT | None |
| 1213 | 23-90072 | Invacare Corporation | ROBINSON, TASMERE | KEY EMPLOYMENT RETENTION PLAN | None |
| 1214 | 23-90067 | Freedom Designs, Inc. | ROLLING IN PARADISE (ANNALISA SQUIRES) | GOLD PROVIDER AGREEMENT | None |
| 1215 | 23-90068 | Invacare Corporation | RON ANDREWS MEDICAL CO | GOLD PROVIDER AGREEMENT | None |
| 1216 | 23-90067 | Freedom Designs, Inc. | RON ANDREWS MEDICAL CO. | GOLD PROVIDER AGREEMENT | None |
| 1217 | 23-90068 | Invacare Corporation | ROSEN, STEVEN H. | INDEMNITY AGREEMENT DTD 8/22/2022 | None |
| 1218 | 23-90068 | Invacare Corporation | RQM + CORP | PROFESSIONAL SERVICES AGREEMENT | None |
| 1219 | 23-90072 | Invacare Corporation | RUSSELL, JAMES | KEY EMPLOYMENT RETENTION PLAN | None |
| 1220 | 23-90067 | Freedom Designs, Inc. | RXESSENTIALS, LLC. | GOLD PROVIDER AGREEMENT | None |
| 1221 | 23-90067 | Freedom Designs, Inc. | S & G HOMECARE, INC | GOLD PROVIDER AGREEMENT | None |
| 1222 | 23-90067 | Freedom Designs, Inc. | S&E MEDICAL SUPPLY COMPANY, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 1223 | 23-90067 | Freedom Designs, Inc. | S&J SERVICES AND REPAIRS LLC | GOLD PROVIDER AGREEMENT | None |
| 1224 | 23-90068 | Invacare Corporation | S&J SERVICES AND REPAIRS LLC | GOLD PROVIDER AGREEMENT | None |
| 1225 | 23-90068 | Invacare Corporation | SAFETY-KLEEN SYSTEMS INC | SCHEDULE FORM AMENDMENT | None |
| 1226 | 23-90068 | Invacare Corporation | SAFETY-KLEEN SYSTEMS INC | UNIVERSAL SERVICES AGREEMENT | None |
| 1227 | 23-90068 | Invacare Corporation | SAFETY-KLEEN SYSTEMS, INC. | PARTS WASHER SERVICE CONTRACT (ELYRIA, OH) | None |
| 1228 | 23-90067 | Freedom Designs, Inc. | SAFEWAY MEDICAL CORPORATION | GOLD PROVIDER AGREEMENT | None |
| 1229 | 23-90068 | Invacare Corporation | SAGE FIXED ASSETS | TAX FIXED ASSET SOFTWARE | None |
| 1230 | 23-90068 | Invacare Corporation | SAGE SOFTWARE INC | FIXED ASSETS RENEWAL INVOICE #2002551149 DTD 11/26/2022 | $5,014.02 |
| 1231 | 23-90068 | Invacare Corporation | SAGEWELL HEALTHCARE BENEFITS TRUST | GROUP INSURANCE MASTER SUMMARY NON-PARTICIPATING | None |
| 1232 | 23-90072 | Invacare Corporation | SALIGA, ANDREW | KEY EMPLOYMENT RETENTION PLAN | None |
| 1233 | 23-90067 | Freedom Designs, Inc. | SAMARITAN MEDICAL EQUIPMENT | GOLD PROVIDER AGREEMENT | None |
| 1234 | 23-90068 | Invacare Corporation | SAMARITAN MEDICAL EQUIPMENT | GOLD PROVIDER AGREEMENT | None |
| 1235 | 23-90067 | Freedom Designs, Inc. | SANFORD HEALTHCARE ACCESSORIES, LLC | GOLD PROVIDER AGREEMENT | None |
| 1236 | 23-90072 | Invacare Corporation | SANKOVICH, COURTNEY | KEY EMPLOYMENT RETENTION PLAN | None |
| 1237 | 23-90068 | Invacare Corporation | SAP | SAP SERVICE PROVIDER EMAIL | None |
| 1238 | 23-90068 | Invacare Corporation | SAP | CERTIFICATE OF COMPLETION | None |
| 1239 | 23-90068 | Invacare Corporation | SAP AMERICA | SOFTWARE LICENSE AND SUPPORT AGREEMENT | $377,664.53 |
| 1240 | 23-90068 | Invacare Corporation | SAP AMERICA INC | ORDER FORM# 0221171823 | None |
| 1241 | 23-90068 | Invacare Corporation | SAP AMERICA INC | ORDER FORM# 0221171818 | None |
| 1242 | 23-90068 | Invacare Corporation | SAP AMERICA INC | GENERAL TREMS AND CONDITIONS FOR CLOUD SERVICES | None |
| 1243 | 23-90068 | Invacare Corporation | SAP AMERICA INC | SOFTWARE ORDER FORM #1 | None |
| 1244 | 23-90068 | Invacare Corporation | SAP HPQC | LICENSE | None |
| 1245 | 23-90067 | Freedom Designs, Inc. | SARAH MEDICAL EQUIPMENT INC. | GOLD PROVIDER AGREEMENT | None |
| 1246 | 23-90068 | Invacare Corporation | SAS FM | SOFTWARE AMC | None |
| 1247 | 23-90068 | Invacare Corporation | SAS FM | EMAIL REQUESTING COPY OF SUPPLEMENT #3 | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 1248 | 23-90068 | Invacare Corporation | SAS INSTITUTE INC | AMENDMENT #1 TO SUPPLEMENT #4 TO MLA #56843 | None |
| 1249 | 23-90068 | Invacare Corporation | SAS INSTITUTE INC | SERVICES SUPPLEMENT #9 TIME & MATERIALS | None |
| 1250 | 23-90068 | Invacare Corporation | SAS INSTITUTE INC | AMENDMENT #1 TO MLA #56843 | None |
| 1251 | 23-90068 | Invacare Corporation | SAS INSTITUTE INC | AMENDMENT #2 TO SUPPLEMENT #4 TO MLA #56843 | None |
| 1252 | 23-90068 | Invacare Corporation | SAS INSTITUTE INC | SUPPLEMENT #3 | None |
| 1253 | 23-90068 | Invacare Corporation | SAS INSTITUTE INC | MASTER LICENSE AGREEMENT #56843 | None |
| 1254 | 23-90068 | Invacare Corporation | SAS INSTITUTE INC | SUPPLEMENT NO. 6 TO MASTER LICENSE AGREEMENT | None |
| 1255 | 23-90068 | Invacare Corporation | SAS INSTITUTE INC | AMENDMENT #1 TO SUPPLEMENT #5 TO MLA #56843 | None |
| 1256 | 23-90068 | Invacare Corporation | SAS INSTITUTE INC | SUPPLEMENT #4 | None |
| 1257 | 23-90068 | Invacare Corporation | SAS INSTITUTE INC | SUPPLEMENT #5 | None |
| 1258 | 23-90068 | Invacare Corporation | SCANGLOBAL / TRANSGROUP | CUSTOMS BROKERAGE / EXPORT EEIS | None |
| 1259 | 23-90067 | Freedom Designs, Inc. | SCHEIN, HENRY | DIAMOND PROVIDER AGREEMENT | None |
| 1260 | 23-90068 | Invacare Corporation | SCHRAG, DAN | INTERNAL AUDIT SERVICES | None |
| 1261 | 23-90068 | Invacare Corporation | SCHULER, GRETCHEN | CHANGE OF CONTROL AGREEMENT | None |
| 1262 | 23-90072 | Invacare Corporation | SCHULER, GRETCHEN | KEY EMPLOYMENT RETENTION PLAN | None |
| 1263 | 23-90068 | Invacare Corporation | SCHWARTZ, ARON I. | INDEMNITY AGREEMENT DTD 3/21/2022 | None |
| 1264 | 23-90072 | Invacare Corporation | SCRANTON, JEFFREY | KEY EMPLOYMENT RETENTION PLAN | None |
| 1265 | 23-90068 | Invacare Corporation | SCRANTON, JEFFREY D | CHANGE OF CONTROL AGREEMENT | None |
| 1266 | 23-90067 | Freedom Designs, Inc. | SCRIP, INC. | E-COMMERCE AGREEMENT | None |
| 1267 | 23-90068 | Invacare Corporation | SEALED AIR CORPORATION | INSTAPAK/INFLATABLE/PAPER - SERVICE AGREEMENT DTD 10/21/2022 | None |
| 1268 | 23-90068 | Invacare Corporation | SEASONS HOSPICE INC | PLATINUM PROVIDER AGREEMENT | $12,952.43 |
| 1269 | 23-90067 | Freedom Designs, Inc. | SEASONS HOSPICE INC. | PLATINUM PROVIDER AGREEMENT | None |
| 1270 | 23-90068 | Invacare Corporation | SEDGWICK CLAIMS MANAGEMENT SERVICES INC | SERVICE AGREEMENT FOR ADMINISTRATION OF A CLAIMS PROGRAM DTD 9/1/21 | $1,233.88 |
| 1271 | 23-90067 | Freedom Designs, Inc. | SEELEY ENTERPRISES COMPANY | PLATINUM PROVIDER AGREEMENT | None |
| 1272 | 23-90068 | Invacare Corporation | SEELEY ENTERPRISES COMPANY | PLATINUM PROVIDER AGREEMENT | None |
| 1273 | 23-90068 | Invacare Corporation | SELECT STAFFING INC | STANDARD CLIENT SERVICE AGREEMENT DTD 8/5/2008 | None |
| 1274 | 23-90068 | Invacare Corporation | SELECTREMEDY | FORKLIFT OPERATION AGREEMENT | None |
| 1275 | 23-90067 | Freedom Designs, Inc. | SENIOR MOBILITY AIDS, INC. | GOLD PROVIDER AGREEMENT | None |
| 1276 | 23-90068 | Invacare Corporation | SENTRY CASUALTY COMPANY | CASUALTY INSURANCE AGREEMENT | None |
| 1277 | 23-90068 | Invacare Corporation | SENTRY INSURACE COMPANY | CASUALTY INSURANCE AGREEMENT | $11,941.24 |
| 1278 | 23-90068 | Invacare Corporation | SHAMROCK MEDICAL INC | PLATINUM PROVIDER AGREEMENT | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 1279 | 23-90067 | Freedom Designs, Inc. | SHAMROCK MEDICAL INC. | PLATINUM PROVIDER AGREEMENT | None |
| 1280 | 23-90068 | Invacare Corporation | SHERLOCK | SERVICES | $25,199.38 |
| 1281 | 23-90067 | Freedom Designs, Inc. | SHERMAN OAKS MEDICAL SUPPLIES, INC | PLATINUM PROVIDER AGREEMENT | None |
| 1282 | 23-90068 | Invacare Corporation | SHIPERP | SHIPPING SOFTWARE AND AUDIT SERVICES | None |
| 1283 | 23-90072 | Invacare Corporation | SHOWMAN, DANIEL | KEY EMPLOYMENT RETENTION PLAN | None |
| 1284 | 23-90068 | Invacare Corporation | SILKROAD | APPLICANT TRACKING AND ONBOARDING | $3,611.41 |
| 1285 | 23-90068 | Invacare Corporation | SILKROAD TECHNOLOGY INC | SUBSCRIPTION RENEWAL ORDER FORM #Q-28149 DTD 12/16/2022 | $3,611.41 |
| 1286 | 23-90068 | Invacare Corporation | SILVA, EZEQUIEL | INDEMNITY AGREEMENT | None |
| 1287 | 23-90067 | Freedom Designs, Inc. | SILVERCARE CUSTOM WHEELCHAIR SPECIA | GOLD PROVIDER AGREEMENT | None |
| 1288 | 23-90068 | Invacare Corporation | SILVERCARE CUSTOM WHEELCHAIR SPECIALIST LLC | POWER MOBILITY AND SEATING REBATE PROGRAM | None |
| 1289 | 23-90067 | Freedom Designs, Inc. | SKILLED MEDICAL SOLUTIONS INC | PLATINUM PROVIDER AGREEMENT | None |
| 1290 | 23-90068 | Invacare Corporation | SKS REHAB AG | TRADE MARKS CO-EXISTENCE AGREEMENT DTD 9/29/2020 | None |
| 1291 | 23-90072 | Invacare Corporation | SLATER, JIM | KEY EMPLOYMENT RETENTION PLAN | None |
| 1292 | 23-90067 | Freedom Designs, Inc. | SLP INVESTMENTS, INC. | GOLD PROVIDER AGREEMENT | None |
| 1293 | 23-90067 | Freedom Designs, Inc. | SMITHERS MERCHANT BUILDERS, LP | DIAMOND PROVIDER AGREEMENT | None |
| 1294 | 23-90068 | Invacare Corporation | SONSHINE MEDICAL INC | PLATINUM PROVIDER AGREEMENT | None |
| 1295 | 23-90067 | Freedom Designs, Inc. | SONSHINE MEDICAL INC. | GOLD PROVIDER AGREEMENT | None |
| 1296 | 23-90068 | Invacare Corporation | SOUTH BAY HOME CARE | GOLD PROVIDER AGREEMENT | None |
| 1297 | 23-90068 | Invacare Corporation | SOUTHEASTERN BIOMEDICAL | RESPIRATORY WARRANTY REPAIR SERVICE | None |
| 1298 | 23-90068 | Invacare Corporation | SOUTHEASTERN MEDICAL SUPPLY INC | GOLD PROVIDER AGREEMENT | None |
| 1299 | 23-90067 | Freedom Designs, Inc. | SOUTHEASTERN MEDICAL SUPPLY, INC. | GOLD PROVIDER AGREEMENT | None |
| 1300 | 23-90067 | Freedom Designs, Inc. | SOUTHEASTERN REGIONAL MEDICAL CENTE | GOLD PROVIDER AGREEMENT | None |
| 1301 | 23-90068 | Invacare Corporation | SOUTHERN MEDICAL EQUIPMENT CORP | GOLD PROVIDER AGREEMENT | None |
| 1302 | 23-90067 | Freedom Designs, Inc. | SOUTHERN MEDICAL, INC. | GOLD PROVIDER AGREEMENT | None |
| 1303 | 23-90067 | Freedom Designs, Inc. | SOUTHERN MOBILTY SPECIALISTS, INC. | GOLD PROVIDER AGREEMENT | None |
| 1304 | 23-90067 | Freedom Designs, Inc. | SOUTHWESTMEDICAL.COM LLC | E-COMMERCE AGREEMENT | None |
| 1305 | 23-90068 | Invacare Corporation | SOUTHWESTMEDICAL.COM LLC | E-COMMERCE AGREEMENT | None |
| 1306 | 23-90066 | Adaptive Switch Laboratories, Inc. | SPARKLETTS & SIERRA SPRINGS | DRINKING WATER | $586.22 |
| 1307 | 23-90067 | Freedom Designs, Inc. | SPECIAL CARE MEDICAL OF SOUTH CAROL | PLATINUM PROVIDER AGREEMENT | None |
| 1308 | 23-90068 | Invacare Corporation | SPECTRUM MEDICAL INC | GOLD PROVIDER AGREEMENT | None |
| 1309 | 23-90067 | Freedom Designs, Inc. | SPECTRUM MEDICAL, INC. | GOLD PROVIDER AGREEMENT | None |
| 1310 | 23-90067 | Freedom Designs, Inc. | SPELLMAN BRADY & COMPANY | GOLD PROVIDER AGREEMENT | None |
| 1311 | 23-90068 | Invacare Corporation | SPINLIFE.COM LLC | E-COMMERCE ELITE AGREEMENT | None |
| 1312 | 23-90067 | Freedom Designs, Inc. | SPINLIFE.COM,LLC | E-COMMERCE ELITE AGREEMENT | None |
| 1313 | 23-90067 | Freedom Designs, Inc. | SPORTAID | E-COMMERCE ELITE AGREEMENT | None |
| 1314 | 23-90067 | Freedom Designs, Inc. | SS MEDICAL, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 1315 | 23-90067 | Freedom Designs, Inc. | ST. ALEXIUS MEDICAL CENTER, INC. | GOLD PROVIDER AGREEMENT | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 1316 | 23-90067 | Freedom Designs, Inc. | STALLS MEDICAL, INC. | GOLD PROVIDER AGREEMENT | None |
| 1317 | 23-90068 | Invacare Corporation | STAR MEDICAL EQUIPMENT RENTAL INC | CHANNEL PROGRAM PURCHASE AGREEMENT | None |
| 1318 | 23-90067 | Freedom Designs, Inc. | STAR MEDICAL EQUIPMENT RENTAL, INC. | GOLD PROVIDER AGREEMENT | None |
| 1319 | 23-90067 | Freedom Designs, Inc. | STARR MEDICAL SUPPLY INC. | GOLD PROVIDER AGREEMENT | None |
| 1320 | 23-90068 | Invacare Corporation | STAT MEDICAL INC | PLATINUM PROVIDER AGREEMENT | None |
| 1321 | 23-90067 | Freedom Designs, Inc. | STAT MEDICAL, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 1322 | 23-90072 | Invacare Corporation | STEIRA, ERIC | KEY EMPLOYMENT RETENTION PLAN | None |
| 1323 | 23-90072 | Invacare Corporation | STEPNIEWICZ, MAGDA | KEY EMPLOYMENT RETENTION PLAN | None |
| 1324 | 23-90068 | Invacare Corporation | STERICYCLE INC | MULTI-SITE SERVICE AGREEMENT | $2,221.62 |
| 1325 | 23-90068 | Invacare Corporation | STERICYCLE, INC. | REGULATED MEDICAL WASTE SERVICES AGREEMENT (ELYRIA, OH) | None |
| 1326 | 23-90067 | Freedom Designs, Inc. | STERLING TEXTILE & DRAPERY | PLATINUM PROVIDER AGREEMENT | None |
| 1327 | 23-90068 | Invacare Corporation | STERLING TEXTILE & DRAPERY INC | CHANNEL PROGRAM PURCHASE AGREEMENT | None |
| 1328 | 23-90067 | Freedom Designs, Inc. | STEVEN DOUGLAS INC | POWER MOBILITY AND SEATING REBATE PROGRAM | None |
| 1329 | 23-90068 | Invacare Corporation | STEVEN DOUGLAS INC | POWER MOBILITY AND SEATING REBATE PROGRAM | None |
| 1330 | 23-90067 | Freedom Designs, Inc. | STEVEN DOUGLAS INC. | GOLD PROVIDER AGREEMENT | None |
| 1331 | 23-90068 | Invacare Corporation | STEWART, BRIAN C | SETTLEMENT AGREEMENT | None |
| 1332 | 23-90068 | Invacare Corporation | STRATEGIC AQUISITION CENTER / VA | REBATE / FEE | None |
| 1333 | 23-90067 | Freedom Designs, Inc. | STRIDE MOBILITY GROUP, LLC | GOLD PROVIDER AGREEMENT | None |
| 1334 | 23-90072 | Invacare Corporation | STRIKER, FRANCIS | KEY EMPLOYMENT RETENTION PLAN | None |
| 1335 | 23-90068 | Invacare Corporation | SUNRISE MEDICAL (US) LLC | COVENANT NOT TO SUE DTD 2/17/2015 | None |
| 1336 | 23-90068 | Invacare Corporation | SUNRISE MEDICAL GMBH & CO KG | COVENANT NOT TO SUE DTD 2/17/2015 | None |
| 1337 | 23-90068 | Invacare Corporation | SUNRISE MEDICAL GMBH & CO KG | COVENANT NOT TO SUE DTD 2/17/2015 | None |
| 1338 | 23-90068 | Invacare Corporation | SUNRISE MEDICAL HHG INC | SETTLEMENT AGREEMENT LETTER DTD 6/14/2005 | None |
| 1339 | 23-90068 | Invacare Corporation | SUNRISE MEDICAL HHG INC. | SETTLEMENT AGREEMENT DTD 11/18/1997 | None |
| 1340 | 23-90068 | Invacare Corporation | SUNRISE MEDICAL INC | SETTLEMENT AGREEMENT LETTER DTD 6/14/2005 | None |
| 1341 | 23-90068 | Invacare Corporation | SUNRISE MEDICAL INC | SETTLEMENT AGREEMENT LETTER DTD 6/14/2005 | None |
| 1342 | 23-90067 | Freedom Designs, Inc. | SUPER CARE, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 1343 | 23-90068 | Invacare Corporation | SUPERCARE INC | PLATINUM PROVIDER AGREEMENT | None |
| 1344 | 23-90067 | Freedom Designs, Inc. | SUPERIOR MOBILITY, INC. | GOLD PROVIDER AGREEMENT | None |
| 1345 | 23-90068 | Invacare Corporation | SUPREME MEDICAL FULFILLMENT INC | NATIONAL DISTRIBUTOR PURCHASE AGREEMENT | None |
| 1346 | 23-90067 | Freedom Designs, Inc. | SUPREME MEDICAL FULLFILLMENT SYSTEM | GOLD PROVIDER AGREEMENT | None |
| 1347 | 23-90067 | Freedom Designs, Inc. | SURF DRUGS, INC. | GOLD PROVIDER AGREEMENT | None |
| 1348 | 23-90067 | Freedom Designs, Inc. | SUSQUEHANNA VALLEY MOBILITY SERVICE | GOLD PROVIDER AGREEMENT | None |
| 1349 | 23-90068 | Invacare Corporation | SUSQUEHANNA VALLEY MOBILITY SERVICES INC | GOLD PROVIDER AGREEMENT | None |
| 1350 | 23-90068 | Invacare Corporation | T E CONNECTIVITY CORPORATION | TERM MACH-AOL (565435-5 TERMINATING MACHINE) | $550.50 |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 1351 | 23-90068 | Invacare Corporation | TAAZAA | CUSTOM SOFTWARE DEVELOPMENT CO. - MARKETING RESOURCE CENTER (MRC) HOST | None |
| 1352 | 23-90068 | Invacare Corporation | TAAZAA | CUSTOM SOFTWARE DEVELOPMENT CO.- MARKETING RESOURCE CENTER (MRC) HOST | None |
| 1353 | 23-90068 | Invacare Corporation | TAAZAA INC | STATEMENT OF WORK #22-010303 DTD 1/7/2022 | None |
| 1354 | 23-90067 | Freedom Designs, Inc. | TALLWOOD MEDICAL EQUIPMENT & SUPPLY | GOLD PROVIDER AGREEMENT | None |
| 1355 | 23-90068 | Invacare Corporation | TALLWOOD MEDICAL EQUIPMENT & SUPPLY INC | GOLD PROVIDER AGREEMENT | None |
| 1356 | 23-90068 | Invacare Corporation | TANGLEWOOD MEDICAL SUPPLIES, INC | PLATINUM PROVIDER AGREEMENT | None |
| 1357 | 23-90067 | Freedom Designs, Inc. | TANGLEWOOD MEDICAL SUPPLIES, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 1358 | 23-90068 | Invacare Corporation | TECHNICAL GAS PRODUCTS INC | GOLD PROVIDER AGREEMENT | None |
| 1359 | 23-90067 | Freedom Designs, Inc. | TECHNICAL GAS PRODUCTS, INC. | GOLD PROVIDER AGREEMENT | None |
| 1360 | 23-90068 | Invacare Corporation | TEKTRONIX SERVICE SOLUTIONS INC | PO #3064004 DTD 1/19/2023 | $6,729.02 |
| 1361 | 23-90068 | Invacare Corporation | TENDER CARE PEDIATRIC SERVICES INC | PLATINUM PROVIDER AGREEMENT | None |
| 1362 | 23-90067 | Freedom Designs, Inc. | TENDER CARE PEDIATRIC SERVICES, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 1363 | 23-90067 | Freedom Designs, Inc. | THE BUCKEYE MEDICAL SUPPLY CO. | GOLD PROVIDER AGREEMENT | None |
| 1364 | 23-90067 | Freedom Designs, Inc. | THE GREAT AMERICAN SCOOTER COMPANY | GOLD PROVIDER AGREEMENT | None |
| 1365 | 23-90067 | Freedom Designs, Inc. | THE HOME EQUIPMENT COMPANY | GOLD PROVIDER AGREEMENT | None |
| 1366 | 23-90067 | Freedom Designs, Inc. | THE HOSPICE OF THE FLORIDA SUNCOAST | PLATINUM PROVIDER AGREEMENT | None |
| 1367 | 23-90067 | Freedom Designs, Inc. | THE MATHENY SCHOOL AND HOSPITAL, IN | GOLD PROVIDER AGREEMENT | None |
| 1368 | 23-90067 | Freedom Designs, Inc. | THE MEDICAL STORE, INC. | GOLD PROVIDER AGREEMENT | None |
| 1369 | 23-90067 | Freedom Designs, Inc. | THE MOBILITY DEPOT LLC | GOLD PROVIDER AGREEMENT | None |
| 1370 | 23-90067 | Freedom Designs, Inc. | THE STATESERV COMPANIES, L.L.C. | DIAMOND PROVIDER AGREEMENT | None |
| 1371 | 23-90067 | Freedom Designs, Inc. | THOME ENTERPRISE L.L.C. | GOLD PROVIDER AGREEMENT | None |
| 1372 | 23-90068 | Invacare Corporation | THOMSON REUTERS | ORDINARY COURSE PROFESSIONAL | None |
| 1373 | 23-90068 | Invacare Corporation | THOMSON REUTERS (TAX & ACCOUNTING) INC | MULTI YEAR ORDER FORM QUOTE #2022-870770 | $3,931.00 |
| 1374 | 23-90068 | Invacare Corporation | THOMSON REUTERS ENTERPRISE CENTRE GMBH | ORDER FORM RD: Q-04679522 | None |
| 1375 | 23-90068 | Invacare Corporation | THRIFT-TOWN HEALTHMART LLC | GOLD PROVIDER AGREEMENT | None |
| 1376 | 23-90067 | Freedom Designs, Inc. | THRIFT-TOWN HEALTHMART, L.L.C. | GOLD PROVIDER AGREEMENT | None |
| 1377 | 23-90067 | Freedom Designs, Inc. | TIGER SUPPLIES INC | GOLD PROVIDER AGREEMENT | None |
| 1378 | 23-90068 | Invacare Corporation | TIGER SUPPLIES INC | GOLD PROVIDER AGREEMENT | None |
| 1379 | 23-90068 | Invacare Corporation | TIMEVALUE - SOFTWARE | INTEREST CALCULATIONS | None |
| 1380 | 23-90068 | Invacare Corporation | TIMG | LICENSE | None |
| 1381 | 23-90067 | Freedom Designs, Inc. | TIM'S HOME MEDICAL SUPPLIES | GOLD PROVIDER AGREEMENT | None |
| 1382 | 23-90068 | Invacare Corporation | TIM'S HOME MEDICAL SUPPLIES | GOLD PROVIDER AGREEMENT | None |
| 1383 | 23-90068 | Invacare Corporation | TK ELEVATOR CORPORATION | MAINTENANCE INVOICE #3007018384 DTD 1/1/2023 | None |
| 1384 | 23-90068 | Invacare Corporation | TODD ORGANIZATION OF OHIO, THE | SERVICE AGREEMENT DTD 1/1/2005 | None |
| 1385 | 23-90068 | Invacare Corporation | TOP END SPORTS, LLC | ASSET PURCHASE AGREEMENT DTD 1/27/2023 | None |
| 1386 | 23-90068 | Invacare Corporation | TOP END SPORTS, LLC | TRANSITION SERVICES AGREEMENT DTD 1/27/2023 | None |
| 1387 | 23-90068 | Invacare Corporation | TOP END SPORTS, LLC | SECURED PROMISSORY NOTE DTD 1/27/2023 | None |
| 1388 | 23-90068 | Invacare Corporation | TOTAL RESPIRATORY & REHAB INC | PLATINUM PROVIDER AGREEMENT | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|---|---|---|---|---|---|
| 1389 | 23-90067 | Freedom Designs, Inc. | TOTAL RESPIRATORY & REHAB, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 1390 | 23-90067 | Freedom Designs, Inc. | TOTALCARE COMPREHENSIVE HOME HEALTH | GOLD PROVIDER AGREEMENT | None |
| 1391 | 23-90068 | Invacare Corporation | TRALIANT | REQUIRED ANNUAL TRAINING | None |
| 1392 | 23-90067 | Freedom Designs, Inc. | TRI-STATE SURGICAL SUPPLY & EQUIPME | DIAMOND PROVIDER AGREEMENT | None |
| 1393 | 23-90067 | Freedom Designs, Inc. | TRITON SUPPLY LLC | PLATINUM PROVIDER AGREEMENT | None |
| 1394 | 23-90068 | Invacare Corporation | TRITON SUPPLY LLC | PLATINUM PROVIDER AGREEMENT | None |
| 1395 | 23-90068 | Invacare Corporation | TRUMPF TRUTOPS | SOFTWARE FOR PROGRAMMING LASERS | None |
| 1396 | 23-90068 | Invacare Corporation | TRUST ARC | PRIVACY SERVICES | None |
| 1397 | 23-90068 | Invacare Corporation | TRUSTARC INC | QUOTE #00060666 | None |
| 1398 | 23-90068 | Invacare Corporation | TRUSTARC INC | QUOTE #QTC0057029 | None |
| 1399 | 23-90068 | Invacare Corporation | TRUSTBRIDGE INC | GOLD PROVIDER AGREEMENT | None |
| 1400 | 23-90068 | Invacare Corporation | TRUSTBRIDGE INC | GOLD PROVIDER AGREEMENT | None |
| 1401 | 23-90067 | Freedom Designs, Inc. | TRUSTBRIDGE, INC. | GOLD PROVIDER AGREEMENT | None |
| 1402 | 23-90072 | Invacare Corporation | TUCKER, RONALD | KEY EMPLOYMENT RETENTION PLAN | None |
| 1403 | 23-90068 | Invacare Corporation | TYCON MEDICAL SYSTEMS INC | PLATINUM PROVIDER AGREEMENT | None |
| 1404 | 23-90067 | Freedom Designs, Inc. | TYCON MEDICAL SYSTEMS, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 1405 | 23-90067 | Freedom Designs, Inc. | UDS MEDICAL EQUIPMENT, LLC | GOLD PROVIDER AGREEMENT | None |
| 1406 | 23-90068 | Invacare Corporation | U-HAUL INTERNATIONAL INC | MASTER AGREEMENT - STORAGE SERVICES | $10,796.26 |
| 1407 | 23-90068 | Invacare Corporation | UHL, EDWARD | CHANGE OF CONTROL AGREEMENT | None |
| 1408 | 23-90072 | Invacare Corporation | UHL, EDWARD | KEY EMPLOYMENT RETENTION PLAN | None |
| 1409 | 23-90068 | Invacare Corporation | UHS OF TEXOMA INC | GOLD PROVIDER AGREEMENT | None |
| 1410 | 23-90067 | Freedom Designs, Inc. | UHS OF TEXOMA, INC. | GOLD PROVIDER AGREEMENT | None |
| 1411 | 23-90067 | Freedom Designs, Inc. | UNC HOMECARE SPECIALISTS | PLATINUM PROVIDER AGREEMENT | None |
| 1412 | 23-90067 | Freedom Designs, Inc. | UNITED SEATING & MOBILITY LLC | DIAMOND PROVIDER AGREEMENT | None |
| 1413 | 23-90068 | Invacare Corporation | UNITED SEATING AND MOBILITY LLC | 1ST AMENDMENT TO NATIONAL PROVIDER AGREEMENT | None |
| 1414 | 23-90068 | Invacare Corporation | UNITED WORLD LINE INC | COMBINE EXPORT/IMPORT POWER OF ATTORNEY | None |
| 1415 | 23-90067 | Freedom Designs, Inc. | UNITYPOINT AT HOME | DIAMOND PROVIDER AGREEMENT | None |
| 1416 | 23-90068 | Invacare Corporation | UNIVERSITY OF IA COMMUNITY MEDICAL SVCS LLC | GOLD PROVIDER AGREEMENT | None |
| 1417 | 23-90067 | Freedom Designs, Inc. | UNIVERSITY OF IOWA COMMUNITY MEDICAL SERVICES, LLC | GOLD PROVIDER AGREEMENT | None |
| 1418 | 23-90067 | Freedom Designs, Inc. | UNIVERSITY OF MICHIGAN | GOLD PROVIDER AGREEMENT | None |
| 1419 | 23-90068 | Invacare Corporation | UNIVERSITY OF MICHIGAN | PURCHASING AGREEMENT LETTER DTD 4/20/2022 | None |
| 1420 | 23-90068 | Invacare Corporation | UNUM | LIFE INURANCE, STD, LTD, FMLA | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 1421 | 23-90068 | Invacare Corporation | UNUM LIFE INSURANCE CO OF AMERICA | GROUP INSURANCE MASTER SUMMARY NON-PARTICIPATING | None |
| 1422 | 23-90068 | Invacare Corporation | US DEPT OF VETERANS AFFAIRS | AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT #P00001 | None |
| 1423 | 23-90068 | Invacare Corporation | US DEPT OF VETERANS AFFAIRS | SOLICITATION/CONTRACT/ORDER FOR COMMERCIAL ITEMS #36C10G20D0018 | None |
| 1424 | 23-90068 | Invacare Corporation | US DEPT OF VETERANS AFFAIRS | AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT #P00005 | None |
| 1425 | 23-90068 | Invacare Corporation | US DEPT OF VETERANS AFFAIRS | FEDERAL SUPPLY SCHEDULE - CONTRACT EXTENSION DTD 2/22/2022 | None |
| 1426 | 23-90068 | Invacare Corporation | US DEPT OF VETERANS AFFAIRS | SOLICITATION/CONTRACT/ORDER FOR COMMERCIAL ITEMS #V797D-70085 | None |
| 1427 | 23-90068 | Invacare Corporation | US DEPT OF VETERANS AFFAIRS | SOLICITATION/CONTRACT/ORDER FOR COMMERCIAL ITEMS #36C10G22D0003 | None |
| 1428 | 23-90068 | Invacare Corporation | UWL | CUSTOMS BROKERAGE | None |
| 1429 | 23-90067 | Freedom Designs, Inc. | UWL INC | COMBINE EXPORT/IMPORT POWER OF ATTORNEY | None |
| 1430 | 23-90067 | Freedom Designs, Inc. | VAL-MAR SURGICAL SUPPLIES, INC. | GOLD PROVIDER AGREEMENT | None |
| 1431 | 23-90072 | Invacare Corporation | VAN DER BREGGEN, MICHAEL | KEY EMPLOYMENT RETENTION PLAN | None |
| 1432 | 23-90067 | Freedom Designs, Inc. | VANCREST MANAGEMENT CORP. CO | CHANNEL PROGRAM PURCHASE AGREEMENT - GOLD LEVEL | None |
| 1433 | 23-90068 | Invacare Corporation | VENTEC LIFE SYSTEMS, INC. | ASSET PURCHASE AGREEMENT DATED AS OF 1/30/2023, BETWEEN INVACARE CORPORATION AND VENTEC LIFE SYSTEMS, INC. | None |
| 1434 | 23-90068 | Invacare Corporation | VENTEC LIFE SYSTEMS, INC. | SUPPLY AGREEMENT DTD 1/30/2023 | None |
| 1435 | 23-90068 | Invacare Corporation | VENTEC LIFE SYSTEMS, INC. | TRANSITION SERVICES AGREEMENT DTD 1/30/2023 | None |
| 1436 | 23-90068 | Invacare Corporation | VERCAEMER, SOFIE | INDEMNITY AGREEMENT | None |
| 1437 | 23-90068 | Invacare Corporation | VERIZON | TELECOM & NETWORKING SERVICES | $11,964.26 |
| 1438 | 23-90067 | Freedom Designs, Inc. | VIP MEDICAL SUPPLY | GOLD PROVIDER AGREEMENT | None |
| 1439 | 23-90068 | Invacare Corporation | VIP MEDICAL SUPPLY | GOLD PROVIDER AGREEMENT | None |
| 1440 | 23-90068 | Invacare Corporation | VIRGINIA MEDICAL REPAIR | RESPIRATORY WARRANTY REPAIR SERVICE | None |
| 1441 | 23-90068 | Invacare Corporation | VITAL RECORDS CONTROL | MASTER SERVICE AGREEMENT DTD 4/11/2022 | $2,894.17 |
| 1442 | 23-90068 | Invacare Corporation | VITAL RECORDS CONTROL | INVOICE #3291444 DTD 1/31/2023 | None |
| 1443 | 23-90067 | Freedom Designs, Inc. | VITALITY MEDICAL INC | E-COMMERCE ELITE AGREEMENT | None |
| 1444 | 23-90068 | Invacare Corporation | VITALITY MEDICAL INC | E-COMMERCE ELITE AGREEMENT | None |
| 1445 | 23-90067 | Freedom Designs, Inc. | VITAS HEALTHCARE CORPORATION | DIAMOND PROVIDER AGREEMENT | None |
| 1446 | 23-90068 | Invacare Corporation | VSP | EMPLOYEE VISION INSURANCE | None |
| 1447 | 23-90067 | Freedom Designs, Inc. | VZ, LTD | GOLD PROVIDER AGREEMENT | None |
| 1448 | 23-90067 | Freedom Designs, Inc. | WALKER HOME MEDICAL, INC | GOLD PROVIDER AGREEMENT | None |
| 1449 | 23-90072 | Invacare Corporation | WARDEN, DEBBIE | KEY EMPLOYMENT RETENTION PLAN | None |
| 1450 | 23-90067 | Freedom Designs, Inc. | WARRIOR SERVICE COMPANY LLC | PLATINUM PROVIDER AGREEMENT | None |
| 1451 | 23-90068 | Invacare Corporation | WARRIOR SERVICE COMPANY LLC | PLATINUM PROVIDER AGREEMENT | None |
| 1452 | 23-90067 | Freedom Designs, Inc. | WASEM'S INC | GOLD PROVIDER AGREEMENT | None |
| 1453 | 23-90067 | Freedom Designs, Inc. | WASHINGTON MEDICAL SUPPLIES | GOLD PROVIDER AGREEMENT | None |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description | Proposed Cure |
|-----|-------------|-------------|-------------------|---------------------|---------------|
| 1454 | 23-90068 | Invacare Corporation | WELLS FARGO BANK NA | TRANSFER AGENT SERVICES AGREEMENT | None |
| 1455 | 23-90068 | Invacare Corporation | WELLS FARGO EQUIPMENT FINANCE | FORKLIFT | None |
| 1456 | 23-90066 | Adaptive Switch Laboratories, Inc. | WELLS FARGO FINANCIAL LEASING INC | XEROX COPIER | $1,011.21 |
| 1457 | 23-90066 | Adaptive Switch Laboratories, Inc. | WELLS FARGO FINANCIAL LEASING INC | XEROX WORK SURFACE 81XX, ALTALINK C8145H2 IOT(EHQ+GPZ),2/3 HOLE PUNCH FOR OFFICE FINISHER, STAPLER KIT, AND OFFICE FINISHER (EZK213611). | None |
| 1458 | 23-90068 | Invacare Corporation | WELLS FARGO SHAREOWNER SERVICES | TRANSFER AGENT SERVICES FEE SCHEDULE AND ANNUAL ESTIMATE DTD 9/8/2017 | None |
| 1459 | 23-90068 | Invacare Corporation | WEST PUBLISHING CORPORATION | TRACKER SERVICE AGREEMENT | None |
| 1460 | 23-90068 | Invacare Corporation | WEST PUBLISHING CORPORATION | TRACKER SERVICE AGREEMENT | None |
| 1461 | 23-90068 | Invacare Corporation | WEST PUBLISHING CORPORATION | SHORT TERM BRIDGE AMENDMENT | None |
| 1462 | 23-90068 | Invacare Corporation | WEST PUBLISHING CORPORATION | ORDER FORM RD: Q-04679522 | None |
| 1463 | 23-90068 | Invacare Corporation | WEST PUBLISHING CORPORATION - PRACTICAL LAW | LEGAL RESEARCH TOOL | None |
| 1464 | 23-90068 | Invacare Corporation | WEST PUBLISHING CORPROATION D/B/A SERENGETI LAW | LEGAL DEPT MATTER MANAGEMENT | None |
| 1465 | 23-90068 | Invacare Corporation | WESTMORELAND MEDICAL EQUIPMENT INC | GOLD PROVIDER AGREEMENT | None |
| 1466 | 23-90067 | Freedom Designs, Inc. | WESTMORELAND MEDICAL EQUIPMENT, INC. | GOLD PROVIDER AGREEMENT | None |
| 1467 | 23-90068 | Invacare Corporation | WEX (FORMERLY DISCOVERY BENEFITS) | FSA AND COBRA | None |
| 1468 | 23-90067 | Freedom Designs, Inc. | WHEELCHAIR CLASSICS CHARITIES, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 1469 | 23-90067 | Freedom Designs, Inc. | WHEELCHAIR DYNAMICS, INC. | GOLD PROVIDER AGREEMENT | None |
| 1470 | 23-90067 | Freedom Designs, Inc. | WHEELCHAIR RESOURCES, INC. | GOLD PROVIDER AGREEMENT | None |
| 1471 | 23-90067 | Freedom Designs, Inc. | WHEELCHAIRS AND MORE CORP. | GOLD PROVIDER AGREEMENT | None |
| 1472 | 23-90072 | Invacare Corporation | WHITESEL, MARY | KEY EMPLOYMENT RETENTION PLAN | None |
| 1473 | 23-90067 | Freedom Designs, Inc. | WHOLESALE MEDICAL PRODUCTS, LLC. | PLATINUM PROVIDER AGREEMENT | None |
| 1474 | 23-90068 | Invacare Corporation | WILLIS TOWERS WATSON | COMP SERVICES | None |
| 1475 | 23-90068 | Invacare Corporation | WILLIS TOWERS WATSON US LLC | ENGAGEMENT LETTER DTD 1/16/2023 | None |
| 1476 | 23-90067 | Freedom Designs, Inc. | WILPAGE, INC. | GOLD PROVIDER AGREEMENT | None |
| 1477 | 23-90067 | Freedom Designs, Inc. | WINCARE, INC. | PLATINUM PROVIDER AGREEMENT | None |
| 1478 | 23-90068 | Invacare Corporation | WINDSTREAM | TELECOM & NETWORKING | $1,580.89 |
| 1479 | 23-90068 | Invacare Corporation | WORKIVA INC | RENEWAL NOTICE  #041819-8913 | None |
| 1480 | 23-90068 | Invacare Corporation | XANTEL AMAPS- MAINFRAME MAINTENANCE | SOFTWARE AMC | None |
| 1481 | 23-90066 | Adaptive Switch Laboratories, Inc. | XEROX BUSINESS SOLUTIONS SOUTHWEST | MANAGED DOCUMENT SERVICES AGREEMENT | None |
| 1482 | 23-90067 | Freedom Designs, Inc. | XYZ MOBILITY LLC | GOLD PROVIDER AGREEMENT | None |
| 1483 | 23-90067 | Freedom Designs, Inc. | YANCEY HOMECARE, INC. | GOLD PROVIDER AGREEMENT | None |
| 1484 | 23-90067 | Freedom Designs, Inc. | Z&D MEDICAL SERVICES INC. | PLATINUM PROVIDER AGREEMENT | None |
| 1485 | 23-90072 | Invacare Corporation | ZHU, KAI | KEY EMPLOYMENT RETENTION PLAN | None |
| 1486 | 23-90068 | Invacare Corporation | ZHU, KAI | INDEMNITY AGREEMENT DTD 7/7/2022 | None |
| 1487 | 23-90067 | Freedom Designs, Inc. | ZOETEK MEDICAL SALES & SERVICE, INC | PLATINUM PROVIDER AGREEMENT | None |

## **Exhibit E**

### **Form of Exit Term Loan Agreement**

Certain documents, or portions thereof, contained in this **Exhibit E** and the Plan Supplement remain subject to continued negotiations, review and revisions by the Debtors and the Consenting Stakeholders.  The respective rights of the Debtors and the Consenting Stakeholders are expressly reserved, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained therein at any time in accordance with the terms of the Plan, or by order of the Bankruptcy Court; *provided* that if any document in this Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the Confirmation Hearing, the Debtors will file a redline of such document with the Bankruptcy Court.  Each of the documents contained in the Plan Supplement or its amendments are subject to certain consent and approval rights to the extent provided in the Plan or Restructuring Support Agreement.

**Draft 4/15/2023**

AMENDED AND RESTATED CREDIT AGREEMENT

dated as of

[   ], 2023

among

[INVACARE HOLDING CORPORATION],

as Holdings,

INVACARE CORPORATION,

as the Borrower,

The LENDERS Party Hereto,

CANTOR FITZGERALD SECURITIES,

as Administrative Agent,

and

GLAS TRUST CORPORATION LIMITED,

as Collateral Agent

### TABLE OF CONTENTS

**Page**

**ARTICLE I DEFINITIONS** ..................................................................................2

Section 1.01   Defined Terms ..............................................................................2
Section 1.02   Classification of Loans and Borrowings..................................60
Section 1.03   Terms Generally ........................................................................60
Section 1.04   Accounting Terms; GAAP .......................................................60
Section 1.05   Currency Translation; Rates ....................................................61
Section 1.06   Timing of Payment of Performance ........................................61
Section 1.07   Cashless Rollovers....................................................................62
Section 1.08   Certain Calculations and Tests ................................................62
Section 1.09   Rounding....................................................................................62
Section 1.10   Divisions ...................................................................................62
Section 1.11   Term SOFR Notification ..........................................................62
Section 1.12   Benchmark Replacement Conforming Changes Relating to Term
                        SOFR Rate.................................................................................63
Section 1.13   Quebec Matters.........................................................................63
Section 1.14   French terms ..............................................................................63
Section 1.15   Luxembourg terms ....................................................................64
Section 1.16   Swiss terms ...............................................................................65
Section 1.17   Australian matters .....................................................................65
Section 1.18   Danish terms .............................................................................65

**ARTICLE II THE CREDITS**................................................................................66

Section 2.01   Commitments..............................................................................66
Section 2.02   Loans and Borrowings...............................................................66
Section 2.03   Requests for Borrowings ..........................................................67
Section 2.04   [Reserved]..................................................................................68
Section 2.05   [Reserved]..................................................................................68
Section 2.06   Funding of Borrowings..............................................................68
Section 2.07   Interest Elections ......................................................................68
Section 2.08   Termination and Reduction of Commitments ..........................70
Section 2.09   Repayment of Loans; Evidence of Debt...................................70
Section 2.10   [Reserved]..................................................................................70
Section 2.11   Prepayment of Loans .................................................................70
Section 2.12   Fees ...........................................................................................73
Section 2.13   Interest ......................................................................................73
Section 2.14   Alternate Rate of Interest..........................................................75
Section 2.15   Increased Costs .........................................................................80
Section 2.16   Break Funding Payments ..........................................................82
Section 2.17   Taxes..........................................................................................82
Section 2.18   Payments Generally; Pro Rata Treatment; Sharing of Setoffs .................86
Section 2.19   Mitigation Obligations; Replacement of Lenders......................88

Section 2.20   [Reserved] ..................................................................................................89
Section 2.21   [Reserved] ..................................................................................................89
Section 2.22   [Reserved] ..................................................................................................89
Section 2.23   Illegality .....................................................................................................89

**ARTICLE III REPRESENTATIONS AND WARRANTIES** ...........................................**90**

Section 3.01   Organization; Powers ................................................................................90
Section 3.02   Authorization; Enforceability ...................................................................90
Section 3.03   Governmental Approvals; No Conflicts ....................................................90
Section 3.04   Financial Condition; No Material Adverse Effect......................................91
Section 3.05   Properties ....................................................................................................91
Section 3.06   Litigation and Environmental Matters........................................................91
Section 3.07   Compliance with Laws and Agreements ....................................................92
Section 3.08   Investment Company Status .......................................................................92
Section 3.09   Taxes ...........................................................................................................92
Section 3.10   ERISA ..........................................................................................................92
Section 3.11   Disclosure ...................................................................................................92
Section 3.12   Subsidiaries .................................................................................................93
Section 3.13   Intellectual Property; Licenses, Etc...........................................................93
Section 3.14   Solvency ......................................................................................................93
Section 3.15   Senior Indebtedness....................................................................................93
Section 3.16   Federal Reserve Regulations ......................................................................93
Section 3.17   Security Interest in Collateral.....................................................................94
Section 3.18   PATRIOT Act, OFAC and FCPA ...............................................................94
Section 3.19   Luxembourg Law.........................................................................................95
Section 3.20   [Reserved] ..................................................................................................95
Section 3.21   [Reserved] ..................................................................................................95
Section 3.22   Intermediate Holdcos..................................................................................95

**ARTICLE IV CONDITIONS** ...............................................................................................**95**

Section 4.01   Effective Date .............................................................................................95

**ARTICLE V AFFIRMATIVE COVENANTS** .....................................................................**99**

Section 5.01   Financial Statements and Other Information .............................................99
Section 5.02   Notices of Material Events .......................................................................102
Section 5.03   Information Regarding Collateral .............................................................102
Section 5.04   Existence; Conduct of Business................................................................103
Section 5.05   Payment of Taxes, Etc ..............................................................................103
Section 5.06   Maintenance of Properties ........................................................................103
Section 5.07   Insurance ...................................................................................................103
Section 5.08   Books and Records; Inspection and Audit Rights ...................................104
Section 5.09   Compliance with Laws .............................................................................104
Section 5.10   Use of Proceeds ........................................................................................105
Section 5.11   Additional Subsidiaries.............................................................................105

Section 5.12    Further Assurances ...................................................................106
Section 5.13    Cash Management and Collections .........................................106
Section 5.14    Certain Post-Closing Obligations ..........................................106

**ARTICLE VI NEGATIVE COVENANTS** ............................................................**107**

Section 6.01    Indebtedness; Certain Equity Securities ................................107
Section 6.02    Liens .......................................................................................110
Section 6.03    Fundamental Changes ............................................................114
Section 6.04    Investments, Loans, Advances, Guarantees and Acquisitions ................116
Section 6.05    Asset Sales .............................................................................119
Section 6.06    Intermediate Holdco Covenant .............................................122
Section 6.07    Negative Pledge .....................................................................123
Section 6.08    Restricted Payments; Certain Payments of Indebtedness ........124
Section 6.09    Transactions with Affiliates ..................................................128
Section 6.10    Liquidity ................................................................................129
Section 6.11    Change in Nature of Business ................................................130
Section 6.12    Accounting Changes ..............................................................130
Section 6.13    Amendments or Waivers of Organizational Documents ........130
Section 6.14    Intellectual Property...............................................................130
Section 6.15    [Reserved]...............................................................................130
Section 6.16    Additional Limitations on Certain Investments.....................130
Section 6.17    Limitations on Amendments...................................................131
Section 6.18    Limitations on the German Group ..........................................131
Section 6.19    Danish Collateral ...................................................................132
Section 6.20    Holdings Covenant .................................................................132
Section 6.21    New Intermediate Holdings Covenant....................................133

**ARTICLE VII EVENTS OF DEFAULT** ............................................................**134**

Section 7.01    Events of Default ....................................................................134
Section 7.02    [Reserved]...............................................................................137
Section 7.03    Application of Proceeds..........................................................137

**ARTICLE VIII THE ADMINISTRATIVE AGENT AND COLLATERAL AGENT** .......**137**

**ARTICLE IX MISCELLANEOUS**.....................................................................**146**

Section 9.01    Notices ...................................................................................146
Section 9.02    Waivers; Amendments............................................................148
Section 9.03    Expenses; Indemnity; Damage Waiver ..................................150
Section 9.04    Successors and Assigns ..........................................................152
Section 9.05    Survival...................................................................................158
Section 9.06    Counterparts; Integration; Effectiveness ...............................158
Section 9.07    Severability.............................................................................158
Section 9.08    Right of Setoff........................................................................158
Section 9.09    Governing Law; Jurisdiction; Consent to Service of Process ................159

Section 9.10   WAIVER OF JURY TRIAL ................................................................159
Section 9.11   Headings ......................................................................................160
Section 9.12   Confidentiality ...............................................................................160
Section 9.13   USA Patriot Act ............................................................................161
Section 9.14   Judgment Currency .......................................................................161
Section 9.15   Release of Liens and Guarantees..................................................162
Section 9.16   No Fiduciary Relationship .............................................................163
Section 9.17   Permitted Intercreditor Agreements .............................................163
Section 9.18   Acknowledgement and Consent to Bail-In of EEA Financial
              Institutions ...................................................................................165
Section 9.19   [Reserved].....................................................................................165
Section 9.20   Amendments for Guarantee Limitations .......................................165
Section 9.21   Parallel Debt; Parallel Debt owed to the Collateral Agent .....................165
Section 9.22   Erroneous Payments. ....................................................................171
Section 9.23   Original Issue Discount .................................................................172
Section 9.24   Amendment and Restatement; No Novation ..........................................173

SCHEDULES:

Schedule 1.01(a)    —    Excluded Subsidiaries
Schedule 1.01(b)    —    Collateral Documents
Schedule 1.01(c)    —    Guarantors
Schedule 2.01       —    Commitments
Schedule 3.05       —    Effective Date Material Real Property
Schedule 3.12       —    Subsidiaries
Schedule 5.14       —    Post-Closing Matters
Schedule 6.01       —    Existing Indebtedness
Schedule 6.02       —    Existing Liens
Schedule 6.04(f)    —    Existing Investments
Schedule 6.07       —    Existing Restrictions
Schedule 6.09       —    Existing Affiliate Transactions

EXHIBITS:

Exhibit A      —    [Reserved]
Exhibit B      —    Form of Assignment and Assumption
Exhibit C      —    Form of Borrowing Request
Exhibit D      —    Form of U.S. Collateral Agreement
Exhibit E      —    [Reserved]
Exhibit F      —    [Reserved]
Exhibit G-1    —    Form of ABL North America Intercreditor Agreement
Exhibit G-2    —    [Reserved]
Exhibit G-3    —    Form of Pari Passu Intercreditor Agreement
Exhibit H-1    —    Form of Domestic Guarantee Agreement
Exhibit H-2    —    Form of Foreign Guarantee Agreement
Exhibit I      —    Form of Interest Election Request

Exhibit J          —   Form of Perfection Certificate
Exhibit K          —   [Reserved]
Exhibit L          —   [Reserved]
Exhibit M          —   [Reserved]
Exhibit N          —   [Reserved]
Exhibit O          —   [Reserved]
Exhibit P          —   Form of Notice of Prepayment
Exhibit Q-1        —   Form of U.S. Tax Compliance Certificate (For Non-U.S. Lenders
                       That Are Not Partnerships For U.S. Federal Income Tax Purposes)
Exhibit Q-2        —   Form of U.S. Tax Compliance Certificate (For Non-U.S. Lenders
                       That Are Partnerships For U.S. Federal Income Tax Purposes)
Exhibit Q-3        —   Form of U.S. Tax Compliance Certificate (For Non-U.S. Participants
                       That Are Not Partnerships For U.S. Federal Income Tax Purposes)
Exhibit Q-4        —   Form of U.S. Tax Compliance Certificate (For Non-U.S. Participants
                       That Are Partnerships For U.S. Federal Income Tax Purposes)
Exhibit R          —   Form of Closing Certificate
Exhibit S          —   Form of Intercompany Subordination Agreement
Exhibit T          —   [Reserved]

Annex I            —   [Reserved]
Annex II           —   [Reserved]
Annex III          —   Agreed Security Principles

AMENDED AND RESTATED CREDIT AGREEMENT dated as of [   ], 2023 (this "<u>Agreement</u>"), among [INVACARE HOLDING CORPORATION] ("<u>Holdings</u>"), INVACARE CORPORATION (the "<u>Borrower</u>"), the LENDERS party hereto, CANTOR FITZGERALD SECURITIES, as Administrative Agent, and GLAS TRUST CORPORATION LIMITED, as Collateral Agent.

<div align="center">

**RECITALS**

</div>

WHEREAS, on January 31, 2023 (the "<u>Petition Date</u>"), the Borrower and certain Subsidiaries of the Borrower (collectively, and together with any other Affiliates that became debtors-in-possession in the Cases, the "<u>Debtors</u>") filed voluntary petitions with the Bankruptcy Court initiating their respective cases under Chapter 11 of the Bankruptcy Code (each case of the Borrower and such Subsidiaries, a "<u>Case</u>" and, collectively, the "<u>Cases</u>");

WHEREAS, in connection with the Cases, the Debtors and the Consenting Stakeholders entered into the Restructuring Support Agreement, dated as of January 31, 2023 (as amended and supplemented from time to time, the "<u>RSA</u>");

WHEREAS, the Lenders provided financing to the Borrower pursuant to the Credit Agreement, originally dated as of July 26, 2022, among the Borrower, the lenders party thereto, Cantor Fitzgerald Securities, as administrative agent for the lenders thereunder and GLAS Trust Corporation Limited, as collateral agent for the secured parties thereunder (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>Prepetition Term Loan Agreement</u>");

WHEREAS, the Lenders provided financing to the Borrower pursuant to the Superpriority Secured Debtor-In-Possession Credit Agreement, dated as of February 2, 2023, among the Borrower, the lenders party thereto, Cantor Fitzgerald Securities, as administrative agent for the lenders thereunder and GLAS Trust Corporation Limited, as collateral agent for the secured parties thereunder (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>DIP Term Loan Credit Agreement</u>");

WHEREAS, on [   ], 2023, the Bankruptcy Court entered the Confirmation Order (as defined in the RSA), and on [   ], 2023, the Effective Date (as defined in the First Amended Joint Chapter 11 Plan of Invacare Corporation and its Debtor Affiliates, dated as of February 14, 2023 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Reorganization Plan</u>")) occurred;

WHEREAS, on the Effective Date (as defined in the Reorganization Plan), and subject to the terms and conditions set forth herein, the Term Loan Claims (as defined in the Reorganization Plan) under the Prepetition Term Loan Agreement which remain owed to the Lenders on the Effective Date shall be, pursuant to the Reorganization Plan, (i) with respect to Term Loan Claims representing principal amounts owed, continued as Loans hereunder in an aggregate principal amount equal to $55,500,000 (the "<u>Exit Prepetition Continued Loans</u>") and (ii) with respect to all other Term Loan Claims, paid in full in cash;

WHEREAS, on the Effective Date (as defined in the Reorganization Plan), and subject to the terms and conditions set forth herein, the DIP Term Loan Claims (as defined in the

Reorganization Plan) under the DIP Term Loan Credit Agreement which remain owed to the Lenders on the Effective Date shall be, pursuant to the Reorganization Plan, (i) in the case of DIP Term Loan Claims in respect of Roll-Up Loans (as defined in the DIP Term Loan Credit Agreement), converted into and deemed made as Loans hereunder in an aggregate principal amount equal to $29,500,000 (the "Exit DIP Converted Loans") and (ii) with respect to principal amounts in excess of $29,500,000 (including both Roll-Up Loans and New Money Loans (as defined in the DIP Term Loan Credit Agreement)), paid in full in cash with the proceeds of the Rights Offering (as defined in the Reorganization Plan);

WHEREAS, the Exit Prepetition Continued Loans and the Exit DIP Converted Loans consist of a single class of loans hereunder consisting of Term Loans in an aggregate principal amount of $85,000,000;

NOW THEREFORE, the parties hereto agree as follows:

ARTICLE I
DEFINITIONS

Section 1.01   Defined Terms. As used in this Agreement, the following terms have the meanings specified below:

["ABL North America Agent" means the Agent, under and as defined in, the ABL North America Credit Agreement, or any successor agent under the ABL North America Credit Documents.

"ABL North America Credit Agreement" means the [Revolving Credit and Security Agreement], dated as of [  ], 2023, by and among the Borrower, as a borrower, [  ], as lender and agent thereunder, the other Borrowers (as defined therein) from time to time thereunder, the other Guarantors (as defined therein) from time to time thereunder, and the other agents and lenders from time to time party thereto, as the same may be amended, restated, modified, supplemented, extended, renewed, refunded, replaced or refinanced from time to time; provided that it is agreed that a Permitted ABL EMEA Credit Facility may be documented via an amendment to the ABL North America Credit Agreement to also include a Permitted ABL EMEA Credit Facility.

"ABL North America Credit Documents" means the ABL North America Credit Agreement and the ["Other Documents"] as defined in the ABL North America Credit Agreement.

"ABL North America Intercreditor Agreement" means the Intercreditor Agreement, in substantially the form of Exhibit G-1, dated as of the Effective Date, by and among the Collateral Agent, the ABL North America Agent, and each additional representative party thereto from time to time, as acknowledged by certain of the Loan Parties, as amended, restated or otherwise modified from time to time in accordance with the terms thereof.

"ABL North America Obligations" means ["Revolving Obligations"] as defined in the ABL North America Intercreditor Agreement.

"ABL Priority Collateral" means ["Revolving Credit Priority Collateral"] as defined in the ABL North America Intercreditor Agreement.][1]

"ABR" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"ABR Term SOFR Determination Date" shall have the meaning assigned to such term in the definition of "Term SOFR Rate".

"Accounting Changes" has the meaning assigned to such term in Section 1.04(d).

"Administrative Agent" means Cantor Fitzgerald Securities, in its capacity as administrative agent hereunder and under the other Loan Documents, and its successors in such capacity as provided in Article VIII.

"Administrative Agent Fee Letter" means that certain letter, dated as of the Effective Date, between the Borrower and the Administrative Agent.

"Administrative Questionnaire" means an administrative questionnaire in a form approved by the Administrative Agent.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means, with respect to a specified Person, another Person that directly or indirectly Controls or is Controlled by or is under common Control with the Person specified.

"Agent" means the Administrative Agent, the Collateral Agent, any subagents thereof and any successors and assigns in such capacity, and "Agents" means two or more of them.

"Agent Related Person" has the meaning provided in Section 5.01.

"Agreed Security Principles" has the meaning set forth on Annex III.

"Agreement" has the meaning provided in the preamble hereto.

"Agreement Currency" has the meaning assigned to such term in Section 9.14(b).

"Alber" means Alber GmbH, a limited liability company (*Gesellschaft mit beschränkter Haftung*), incorporated and existing under the laws of the Federal Republic of Germany, registered in the commercial register (*Handelsregister*) of the local court (*Amtsgericht*) of Stuttgart under HRB 401393, with registered seat in Albstadt, Germany.

"Alternate Base Rate" means, for any day, a per annum rate of interest equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such

---

[1] NTD: Treatment of ABL is subject to review.

3

day plus 1/2 of 1% per annum and (c) the Term SOFR Rate published on such day (or if such day is not a Business Day, the next previous Business Day) for an Interest Period of one month (taking into account the SOFR Floor) plus 1% per annum; provided, however, if the Alternate Base Rate as determined above would be less than 2.50%, then such rate shall be deemed to be 2.50%. Any change in the Alternate Base Rate (or any component thereof) shall be effective from and including the effective date of such change.

"Applicable Account" means, with respect to any payment to be made to the Administrative Agent hereunder, the account specified by the Administrative Agent from time to time for the purpose of receiving payments of such type.

"Applicable Creditor" has the meaning assigned to such term in Section 9.14(b).

"Applicable Rate" means, for any day, with respect to any Term Loan, (i) 7.00% per annum, in the case of an ABR Loan and (ii) 8.00% per annum, in the case of a Term SOFR Loan.

"Approved Bank" has the meaning assigned to such term in the definition of "Permitted Investments."

"Approved Foreign Bank" has the meaning assigned to such term in the definition of "Permitted Investments."

"Approved Fund" means, with respect to any Lender, (i) any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities and is administered, advised or managed by (a) such Lender, (b) any Affiliate of such Lender or (c) any entity or any Affiliate of any entity that administers, advises or manages such Lender and (ii) (a) any fund or similar investment vehicle the investment decisions with respect to which are made by (x) such Lender or (y) an investment manager or other Person that manages such Lender or (b) the Affiliates of each of the foregoing to the extent that the investment decisions with respect to which are made as specified in (x) and (y) above.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any Person whose consent is required by Section 9.04), or as otherwise required to be entered into under the terms of this Agreement, substantially in the form of Exhibit B or any other form reasonably approved by the Administrative Agent.

"Attributable Debt" means, in respect of a sale/leaseback transaction, at the time of determination, the present value of the obligation of the Loan Party or its Subsidiary that acquires, leases or licenses back the right to use all or a material portion of the subject property for net rental, license or other payments during the remaining term of the lease, license or other arrangement included in such sale/leaseback transaction including any period for which such lease, license or other arrangement has been extended or may, at the sole option of the other party (or parties) thereto, be extended.

"Audited Financial Statements" means the audited consolidated balance sheets of the Borrower and its consolidated subsidiaries for the fiscal year ended December 31, 2022, and the

related consolidated statements of operations, comprehensive income/(loss), stockholders' equity/deficiency and cash flows of the Borrower and its consolidated subsidiaries, including the notes thereto.

"Australia" shall mean the Commonwealth of Australia (and includes, where the context requires, any State or Territory of Australia).

"Australian Collateral Agreements" means the collateral agreements listed on Schedule 1.01(b) as the Australian Collateral Agreements.

"Australian Collateral Documents" means each of the Australian Collateral Agreements, and each other security agreement, pledge, debenture, hypothec, mortgage, consent or other instrument or document, as applicable, executed and delivered by any Australian Loan Party in connection with this Agreement and the Agreed Security Principles to secure the applicable Secured Obligations.

"Australian Corporations Act" means the *Corporations Act 2001* (Cth) (Australia).

"Australian Controller" has the meaning given to the term "controller", "administrator" or "deed administrator" in the Australian Corporations Act.

"Australian Loan Party" means a Loan Party incorporated or otherwise organized under the laws of Australia who becomes a party to the Foreign Guarantee Agreement and its respective successors and assigns.

"Australian PPSA" means the *Personal Property Securities Act 2009* (Cth) of Australia and includes any regulations made thereunder.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"Basel III" means, collectively, those certain agreements on capital requirements, a leverage ratio and liquidity standards contained in "Basel III: A Global Regulatory Framework for More Resilient Banks and Banking Systems," "Basel III: International Framework for Liquidity Risk Measurement, Standards and Monitoring," and "Guidance for National Authorities Operating the Countercyclical Capital Buffer," each as published by the Basel Committee on Banking

Supervision in December 2010 (as revised from time to time), and as implemented by a Lender's primary banking regulatory authority.

"<u>Beneficial Ownership Certification</u>" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"<u>Beneficial Ownership Regulation</u>" means 31 C.F.R. § 1010.230.

"<u>BIA</u>" means the *Bankruptcy and Insolvency Act* (Canada).

"<u>Board of Directors</u>" means, with respect to any Person, (a) in the case of any corporation, the board of directors of such Person or any committee thereof duly authorized to act on behalf of such board, (b) in the case of any limited liability company, the board of managers, board of directors, manager or managing member of such Person or the functional equivalent of the foregoing, (c) in the case of any partnership, the board of directors, board of managers, manager or managing member of a general partner of such Person or the functional equivalent of the foregoing and (d) in any other case, the functional equivalent of the foregoing.

"<u>Board of Governors</u>" means the Board of Governors of the Federal Reserve System of the United States of America.

"<u>Borrower</u>" has the meaning assigned to such term in the introductory paragraph hereto.

"<u>Borrowing</u>" means Loans of the same Type, made, converted or continued on the same date in the same currency and, in the case of Term SOFR Loans, as to which a single Interest Period is in effect.

"<u>Borrowing Minimum</u>" means $1,000,000.

"<u>Borrowing Multiple</u>" means $1,000,000.

"<u>Borrowing Request</u>" means a request by the Borrower for a Borrowing in accordance with <u>Section 2.03</u> and substantially in the form attached hereto as <u>Exhibit C</u>.

"<u>Budget</u>" means the [Budget] delivered to the Lenders on or prior to the Effective Date.

"<u>Business Day</u>" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed. Notwithstanding the foregoing, when the term "Business Day" is used (a) in connection with an amount that bears interest at a rate based on SOFR or any direct or indirect calculation or determination of SOFR, the "Business Day" means any such day that is also a U.S. Government Securities Business Day, or (b) in any Foreign Loan Document or in relation to the performance of any obligation under the Loan Documents by any Foreign Loan Party that is a party, the "Business Day" means any day other than a day on which commercial banks in the applicable jurisdiction are authorized or required by law to remain closed.

"<u>Canadian Collateral Agreement</u>" means the collateral agreement listed on <u>Schedule 1.01(b)</u> as the Canadian Collateral Agreement.

6

"Canadian Collateral and Guarantee Requirement" means, at any time and solely with respect to each Canadian Loan Party or Canadian Subsidiary of Holdings not constituting an Excluded Subsidiary, the requirement that:

(a)        the Administrative Agent shall have received from (i) each Canadian Loan Party or Canadian Subsidiary of Holdings not constituting an Excluded Subsidiary either (x) a counterpart of the Foreign Guarantee Agreement duly executed and delivered on behalf of such Person or (y) in the case of any Person that becomes or is required to become a Canadian Loan Party after the Effective Date (including by ceasing to be an Excluded Subsidiary), a supplement to the Foreign Guarantee Agreement, in the form specified therein, duly executed and delivered on behalf of such Person, (ii) each Canadian Loan Party or Canadian Subsidiary of Holdings not constituting an Excluded Subsidiary either (x) a counterpart of the Canadian Collateral Agreement duly executed and delivered on behalf of such Person or (y) in the case of any Person that becomes or is required to become a Canadian Loan Party after the Effective Date (including by ceasing to be an Excluded Subsidiary), a supplement to the Canadian Collateral Agreement, in the form specified therein, duly executed and delivered on behalf of such Person and (iii) each Canadian Loan Party or Canadian Subsidiary of Holdings not constituting an Excluded Subsidiary either (x) a counterpart of each Intercreditor Agreement then in effect duly executed and delivered on behalf of such Person or (y) in the case of any Person that becomes or is required to become a Canadian Loan Party after the Effective Date (including by ceasing to be an Excluded Subsidiary), a supplement to each Intercreditor Agreement then in effect, in the form specified therein, duly executed and delivered on behalf of such Person, in each case under this clause (a) together with, in the case of any such Loan Documents executed and delivered after the Effective Date, documents and, to the extent reasonably requested by the Administrative Agent, (acting at the direction of Required Lenders), opinions, documents and certificates of the type referred to in Section 4.01(b), Section 4.01(c) and Section 4.01(d);

(b)        all outstanding Equity Interests of the Canadian Loan Parties (other than any Equity Interests constituting Excluded Assets) owned by or on behalf of any Canadian Loan Party shall have been pledged pursuant to the Canadian Collateral Agreement and (except in the case of Equity Interests of Immaterial Interest solely because such stock is redeemable or subject to repurchase pursuant to any customary stock option, employee stock award or similar agreement that may be in effect from time to time Subsidiaries), the Collateral Agent shall have received certificates or other instruments representing all such Equity Interests (if any), together with undated stock powers or other instruments of transfer with respect thereto endorsed in blank;

(c)        if any Indebtedness for borrowed money of Holdings or any Subsidiary in a principal amount of $500,000 or more is owing by such obligor to any Canadian Loan Party and if such Indebtedness shall be evidenced by a promissory note, such promissory note shall have been pledged pursuant to the Canadian Collateral Agreement and the Collateral Agent shall have received all such promissory notes, together with undated instruments of transfer with respect thereto endorsed in blank;

(d)      all certificates, agreements, documents and instruments, including Personal Property Security Act financing statements, intellectual property security agreements, collateral control agreements, required by the Canadian Collateral Agreement, Requirements of Law and reasonably requested by the Administrative Agent, acting at the direction of the Required Lenders, to be filed, delivered, registered or recorded to create, perfect, or preserve the Liens intended to be created by the Canadian Collateral Agreement and perfect such Liens to the extent required by, and with the priority required by, the Canadian Collateral Agreement and the other provisions of the term  "Canadian Collateral and Guarantee Requirement," shall have been filed, registered or recorded or delivered to the Required Lenders in proper form for filing, registration or recording;

(e)      the Administrative Agent shall have received (i) counterparts of a Mortgage with respect to each Mortgaged Property, duly executed and delivered by the record owner of such Mortgaged Property, (ii) a policy or policies of title insurance (or marked unconditional commitment to issue such policy or policies) in the amount equal to not less than 100% (or such lesser amount as reasonably agreed to by the Administrative Agent, acting at the direction of the Required Lenders) of the Fair Market Value of such Mortgaged Property and fixtures, as reasonably determined by the Borrower and agreed to by the Administrative Agent, acting at the direction of the Required Lenders, issued by a nationally recognized title insurance company reasonably acceptable to the Administrative Agent, acting at the direction of the Required Lenders,  insuring the Lien of each such Mortgage as a first priority Lien on the Mortgaged Property described therein, free of any other Liens except as expressly permitted by Section 6.02, together with such endorsements (other than a creditor's rights endorsement), coinsurance and reinsurance as the Administrative Agent, acting at the direction of the Required Lenders, may reasonably request to the extent available in the applicable jurisdiction at commercially reasonable rates, (iii) such affidavits, instruments of indemnification (including a so-called "gap" indemnification) as are customarily requested by the title company to induce the title company to issue the title policies and endorsements contemplated above, (iv) evidence reasonably acceptable to the Administrative Agent, acting at the direction of the Required Lenders, of payment by the Borrower or any Subsidiary of all title policy premiums, search and examination charges, escrow charges and related charges, mortgage recording taxes, fees, charges,  costs and expenses required for the recording of the Mortgages and issuance of the title policies referred to above, (v) a survey of each Mortgaged Property in such form as shall be required by the title company to issue the so-called comprehensive and other survey-related endorsements and to remove the standard survey exceptions from the title policies and endorsements contemplated above (provided, however, that a survey shall not be required to the extent that the issuer of the applicable title insurance policy provides reasonable and customary survey-related coverages (including, without limitation, survey-related endorsements) in the applicable title insurance policy based on an existing survey and/or such other documentation as may be reasonably satisfactory to the title insurer), and (vi) such legal opinions as the Administrative Agent, acting at the direction of the Required Lenders may reasonably request with respect to any such Mortgage or Mortgaged Property; and

(f)      (i) with respect to any deposit account or securities account of any of the Canadian Loan Parties that has been identified by the Administrative Agent (at the

8

direction of the Required Lenders) as requiring a control agreement to be put in place to provide the Administrative Agent with control over such accounts each Canadian Loan Party shall have obtained a Control Agreement with respect to such Required Account, as soon as possible and in any event within 60 days after the Effective Date (or such later date as the Administrative Agent, acting at the direction of the Required Lenders, shall reasonably agree), (ii) with respect to any Required Account established by a Canadian Loan Party after the Effective Date,  each Canadian Loan Party shall have obtained a Control Agreement with respect to such Required Account contemporaneously with the opening of such Required Account, and (iii) with respect to any Required Account acquired by a Canadian Loan Party after the Effective Date, each Canadian Loan Party shall have obtained a Control Agreement with respect to such Required Account, as soon as possible and in any event within 60 days after the date of such acquisition (or such later date as the Administrative Agent, acting at the direction of the Required Lenders, shall reasonably agree) (unless such account is closed prior to such date), in each case, unless waived by the Administrative Agent at the direction of the Required Lenders. Notwithstanding the foregoing, no Control Agreement shall be required with respect to any Canadian Required Account so long as such Required Account constitutes ABL Priority Collateral and the Lien thereon securing the obligations under the ABL North America Credit Agreement is subject to the ABL North America Intercreditor Agreement.

Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary, (a) the foregoing provisions of this definition shall not require the creation or perfection of pledges of or security interests in, or the obtaining of title insurance, legal opinions or other deliverables with respect to, particular assets of the Canadian Loan Parties, or the provision of Guarantees by any Subsidiary (i) if, and for so long as and to the extent that the Administrative Agent, acting at the direction of the Required Lenders, and the Borrower reasonably agree that the cost, burden, difficulty or consequence of creating or perfecting such pledges or security interests in such assets, or obtaining such title insurance,  legal opinions or other deliverables in respect of such assets, or providing such Guarantees  (taking into account any material adverse Tax consequences to Holdings and its Subsidiaries (including the imposition of material withholding or other Taxes)), outweighs the benefits to be obtained by the Lenders therefrom and/or (ii) the grant or perfection of a security interest in such asset would (A) be prohibited by enforceable anti-assignment provisions of any applicable law,  (B) violate the terms of any contract (to the extent binding on such property at the time of the acquisition thereof and not incurred in contemplation of such acquisition) (in each case, after giving effect to the applicable anti-assignment provisions of the PPSA or other applicable law) or (C) trigger termination of any contract pursuant to any "change of control" or similar provision (to the extent binding on such property at the time of the acquisition thereof and not incurred in contemplation of such acquisition); it being understood that the Canadian Collateral shall include any proceeds and/or receivables arising out of any contract described in this clause (ii) to the extent the assignment of such proceeds or receivables is expressly deemed effective under the PPSA or other applicable law notwithstanding the relevant prohibition, violation or termination right,  (b) Liens required to be granted from time to time pursuant to the term "Canadian Collateral and Guarantee Requirement" shall be subject to exceptions and limitations set forth in the Canadian Collateral Agreement, (c) except with respect to any Required Accounts, in no event shall control agreements or other control or similar arrangements be required with respect to deposit accounts,  securities accounts, commodities accounts or other assets specifically requiring perfection by control

agreements, (d) no perfection actions shall be required with respect to Vehicles and other assets subject to certificates of title (other than the filing of PPSA financing statements), (e) no perfection actions shall be required with respect to commercial tort claims with a value less than $500,000 and, other than the filing of PPSA financing statements, no perfection shall be required with respect to promissory notes evidencing debt for borrowed money in a principal amount of less than $500,000, (f) except as set forth in the Foreign Loan Documents, no actions in any non-U.S. jurisdiction or required by the laws of any non-U.S. jurisdiction shall be required to be taken to create any security interests in assets located or titled outside of the United States (including any Equity Interests of Foreign Subsidiaries and any Foreign Intellectual Property) or to perfect or make enforceable any security interests in any such assets, (g) no actions shall be required to perfect a security interest in letter of credit rights (other than the filing of PPSA financing statements), (h) no Loan Party shall be required to seek any landlord lien waiver, estoppel, warehouseman waiver or other collateral access or similar letter or agreement, (i) no action shall be required to perfect any Lien with respect to (i) the Equity Interests of any Immaterial Subsidiary and/or (ii) the Equity Interests of a Person that is not a subsidiary, which Person, if a subsidiary, would constitute an Immaterial Subsidiary, in each case except to the extent that a security interest therein can be perfected by filing a Financing Statement pursuant to the PPSA, and (j) in no event shall the Collateral include any Excluded Assets. The Administrative Agent, acting at the direction of the Required Lenders, may grant extensions of time for the creation and perfection of security interests in or the obtaining of title insurance, legal opinions or other deliverables with respect to particular assets or the provision of any Guarantee by any Subsidiary (including extensions beyond the Effective Date or in connection with assets acquired, or Subsidiaries formed or acquired, after the Effective Date) where it determines that such action cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required to be accomplished by this Agreement or the Security Documents.

Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary, to the extent any perfection actions are required to be taken with respect to any asset under the ABL North America Credit Agreement, such perfection actions shall be required to be taken hereunder with respect to such asset.

"Canadian Collateral Documents" means the Canadian Collateral Agreement, and each other security agreement, pledge, debenture, hypothec, mortgage, consent or other instrument or document, as applicable, governed by Canadian law in connection with this Agreement to secure the applicable Secured Obligations.

"Canadian Loan Party" means any Loan Party incorporated or otherwise organized under the laws of Canada or any province or territory thereof.

"Canadian Insolvency Laws" means the BIA, the CCAA, WURA and any applicable corporations legislation to the extent the relief sought under such corporations legislation relates to or involves the compromise, settlement, adjustment or arrangement of debt.

"Capital Expenditure Cap" means, (x) prior to [  ]², the amount set forth in the [Budget] as [  ], and (y) thereafter, $[  ].

"Capital Lease Obligation" means an obligation that is a Capitalized Lease; and the amount of Indebtedness represented thereby at any time shall be the amount of the liability in respect thereof that would at that time be required to be capitalized on a balance sheet in accordance with GAAP.

"Capitalized Leases" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases.

"Capitalized Software Expenditures" means, for any period, the aggregate of all expenditures (whether paid in cash or accrued as liabilities) by Holdings and the Restricted Subsidiaries during such period in respect of purchased software or internally developed software and software enhancements that, in conformity with GAAP, are or are required to be reflected as capitalized costs on the consolidated balance sheet of Holdings and the Restricted Subsidiaries.

"Case" or "Cases" has the meaning assigned to such term in the recitals hereto.

"Cash Management Obligations" means (a) obligations in respect of any treasury management services, overdraft and related liabilities arising from treasury, depository, cash pooling arrangements and cash management services or any automated clearing house transfers of funds and (b) other obligations in respect of netting services, employee credit, commercial credit card, debit card, stored value card or purchase card programs and similar arrangements.

"Casualty Event" means any event that gives rise to the receipt by Holdings or any Restricted Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"CCAA" means the *Companies' Creditors Arrangement Act* (Canada).

"Change in Control" means the occurrence of:

(a) any Person or "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act as in effect on the date of this Agreement, but excluding Holdings, the Borrower, the Subsidiaries, any employee benefit plan and/or Person acting as the trustee, agent or other fiduciary or administrator therefor) shall at any time have acquired direct or indirect beneficial ownership of voting power of the outstanding Voting Stock or economic interests in Holdings having more than 50% of the outstanding Voting Stock or economic interests of Holdings;

(b) the consummation of any sale, lease or other transfer in one transaction or a series of transactions of all or substantially all of the consolidated assets of Holdings and its Subsidiaries, taken as a whole, to any Person other than one of Holdings or its

---

² NTD: To be the end of the budgeted period.

Subsidiaries; *provided, however*, that a transaction in which the holders of all classes of Holdings' Common Equity immediately prior to such transaction own, directly or indirectly, more than 50% of all classes of Common Equity of the continuing or surviving person or transferee or the parent thereof immediately after such transaction in substantially the same proportions as such ownership immediately prior to such transaction shall not be a Change in Control pursuant to this <u>clause (b)</u>; or

(c)     the failure of Holdings to directly own all of the Equity Interests in each of the Borrower and New Intermediate Holdings.

For purposes of this definition, (i) "beneficial ownership" shall be as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act as in effect on the date of this Agreement and (ii) the phrase Person or "group" is within the meaning of Section 13(d) or 14(d) of the Exchange Act as in effect on the date of this Agreement, but excluding any employee benefit plan of such Person or "group" and its subsidiaries and any Person acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan.

For the avoidance of doubt, the conversion of (x) any preferred stock issued in accordance with the Reorganization Plan or (y) any Senior Secured Convertible Notes shall not constitute a "Change in Control".

 "Change in Law" means (a) the adoption of any rule, regulation, treaty or other law after the date of this Agreement, (b) any change in any rule, regulation, treaty or other law or in the administration, interpretation, implementation or application thereof by any Governmental Authority after the date of this Agreement or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority made or issued after the date of this Agreement; provided that, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 and any requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) any requests, rules, guidelines or directives promulgated by the Bank of International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case shall be deemed to be a "Change in Law," regardless of the date enacted, adopted, promulgated or issued after the date of this Agreement, but only to the extent the relevant increased costs or loss of yield would have been included if they had been imposed under applicable increased cost provisions, including, without limitation, for purposes of Section 2.14(a).

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means any and all assets, whether real or personal, tangible or intangible, on which Liens are purported to be granted pursuant to the Security Documents as security for the Secured Obligations but shall in all events with respect to Loan Parties organized or incorporated outside the United States (or any state or territory thereof), other than the Canadian Loan Parties, be limited by and subject in all respects to the Agreed Security Principles (including, without limitation, the Overriding Principle (as defined in the Agreed Security Principles)) and exclude all Foreign Excluded Assets.

"Collateral Agent" means GLAS Trust Corporation Limited, in its capacity as collateral agent hereunder and under the other Loan Documents, and its successors in such capacity as provided in Article VIII.

"Collateral Agent Fee Letter" means that certain letter, dated as of the Original Effective Date, between the Borrower and the Collateral Agent.

"Collateral Agreements" means the Amended and Restated U.S. Collateral Agreement among Holdings, the Borrower, each other Loan Party and the Collateral Agent (the "U.S. Collateral Agreement"), the Canadian Collateral Agreement, the Dutch Collateral Agreements, the English Collateral Agreement, the Luxembourg Collateral Agreements, the German Collateral Agreements, the French Collateral Agreements, the Swiss Collateral Agreements, the Australian Collateral Agreements, the Norwegian Collateral Agreements, the NZ Collateral Agreements, the Danish Collateral Agreement and each other security agreement, pledge, debenture, hypothec, mortgage, consent or other instrument or document, as applicable, executed and delivered by the Borrower and/or the other Guarantors in connection with this Agreement and the Agreed Security Principles to secure the applicable Secured Obligations.

"Collateral and Guarantee Requirement" means, at any time, collectively, the Domestic Collateral and Guarantee Requirement, the Canadian Collateral and Guarantee Requirement and the Agreed Security Principles.

"Commitment" means, with respect to any Lender, its Term Loan Commitment.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Common Equity" of any Person means Equity Interests of such Person that is generally entitled (a) to vote in the election of directors of such Person or (b) if such Person is not a corporation, to vote or otherwise participate in the selection of the governing body, partners, managers or others that will control the management or policies of such Person.

"Company Materials" has the meaning assigned to such term in Section 5.01.

"Compliance Certificate" means a Compliance Certificate required to be delivered pursuant to Section 5.01 in the form of Exhibit A.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated EBITDA" means, for any period, the Consolidated Net Income for such period, plus:

> (a)    without duplication and to the extent already deducted (and not added back) in arriving at such Consolidated Net Income, the sum of the following amounts for such period:

(i)     total interest expense and, to the extent not reflected in such total interest expense, any losses on hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such hedging obligations or such derivative instruments, and bank and letter of credit fees and costs of surety bonds in connection with financing activities (whether amortized or immediately expensed),

(ii)    provision for taxes based on income, profits, revenue or capital, including federal, foreign and state income, franchise, and similar taxes based on income, profits, revenue or capital and foreign withholding taxes paid or accrued during such period (including in respect of repatriated funds) including penalties and interest related to such taxes or arising from any tax examinations,

(iii)   depreciation and amortization (including amortization of Capitalized Software Expenditures and amortization of deferred financing fees or costs (including original issue discount)),

(iv)    (A) any costs or expenses incurred or paid by Holdings or any Restricted Subsidiary pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or long term incentive plan or agreement, any severance agreement or any stock subscription or shareholder agreement, and (B) any charge in connection with the rollover, acceleration or payout of equity interests held by management and members of the board of Holdings, in each case under this clause (B), to the extent any such cash charge is funded with net cash proceeds contributed to Holdings as a capital contribution or as a result of Net Proceeds of an issuance of Equity Interests (other than Disqualified Equity Interests) of Holdings,

(v)     any net pension or other post-employment benefit costs representing amortization of unrecognized prior service costs, actuarial losses, including amortization of such amounts arising in prior periods, amortization of the unrecognized net obligation (and loss or cost) existing at the date of initial application of FASB Accounting Standards Codification 715, and any other items of a similar nature,

(vi)    to the extent not otherwise included in Consolidated Net Income, proceeds of business interruption insurance in an amount representing the earnings for the applicable period that such proceeds are intended to replace (whether or not then received so long as the Borrower in good faith expects to receive such proceeds within the next four fiscal quarters (it being understood that to the extent such proceeds are not actually received within such fiscal quarters, such proceeds shall be deducted in calculating Consolidated EBITDA for such fiscal quarters)), severance, integration restructuring charges, accruals or reserves (including adjustments to existing reserves and any restructuring charge relating to any tax restructuring), whether or not classified as restructuring expense on the consolidated financial statements, systems implementation charges, consulting charges, transition costs, costs related to closure/consolidation of facilities or

operations and curtailments or modifications to pension and post-retirement employee benefit plans (including any settlement of multi-employer plan or pension liabilities), for such period,

less

      (b)     without duplication and to the extent included in arriving at such Consolidated Net Income, non-cash gains (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated Net Income or Consolidated EBITDA in any prior period),

in each case, as determined on a consolidated basis for Holdings and the Restricted Subsidiaries in accordance with GAAP; provided, that Consolidated EBITDA shall exclude adjustments (whether positive or negative) in Holdings' consolidated financial statements pursuant to GAAP resulting from the application of fresh start accounting principles as a result of the Debtors' emergence from the Cases.

    "Consolidated Net Income" means, for any period, the net income (loss) of Holdings and the Restricted Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, excluding, without duplication:

      (a)     extraordinary, non-recurring or unusual gains or losses (less all fees and expenses relating thereto) or expenses (including any unusual or non-recurring operating expenses directly attributable to the implementation of cost savings initiatives and any accruals or reserves in respect of any extraordinary, non-recurring or unusual items),

      (b)     the cumulative effect of a change in accounting principles during such period to the extent included in Consolidated Net Income,

      (c)     Transaction Costs,

      (d)     the net income (loss) for such period of any Person that is not a Subsidiary or that is accounted for by the equity method of accounting, except to the extent of the amount of dividends or distributions or other similar payments that are actually paid in cash (or to the extent converted into cash) by such Person to Holdings or any Restricted Subsidiary during such period,

      (e)     any fees and expenses incurred during such period, or any amortization thereof for such period, in connection with any asset disposition, issuance or repayment of debt, issuance of equity securities, refinancing or debt exchange transaction or amendment or other modification of any debt instrument, in each case whether or not such transaction is completed (including, for the avoidance of doubt, the effects of expensing such transaction-related expenses in accordance with FASB Accounting Standards Codification 805 and gains or losses associated with FASB Accounting Standards Codification 460),

      (f)     any income (loss) for such period attributable to the early extinguishment of Indebtedness including debt finance charges and fees, hedging agreements or other derivative instruments,

(g)     accruals and reserves that are established or adjusted in accordance with GAAP (including any adjustment of estimated payouts on existing earnouts, inventory, property and equipment, leases, rights fee arrangements, software, goodwill, intangible assets, in-process research and development, deferred revenue, advanced billings and debt line items thereof resulting from the application of recapitalization accounting or the acquisition method of accounting, as the case may be, in relation to the Transactions or any consummated acquisition or the amortization or write-off of any amounts thereof) or changes as a result of the adoption or modification of accounting policies during such period,

(h)     all Non-Cash Compensation Expenses,

(i)     any non-cash income (loss) attributable to deferred compensation plans or trusts, any employment benefit scheme or any similar equity plan or agreement,

(j)     any income (loss) from investments recorded using the equity method of accounting (but including any cash dividends or distributions actually received by Holdings or any Restricted Subsidiary in respect of such investment),

(k)     any gain (loss) on asset sales, disposals or abandonments (other than asset sales, disposals or abandonments in the ordinary course of business) or income (loss) from discontinued operations (but if such operations are classified as discontinued due to the fact that they are subject to an agreement to dispose of such operations, only when and to the extent such operations are actually disposed of),

(l)     any non-cash gain (loss) attributable to the mark to market movement in the valuation of hedging obligations or other derivative instruments pursuant to FASB Accounting Standards Codification 815-Derivatives and Hedging or mark to market movement of other financial instruments pursuant to FASB Accounting Standards Codification 825-Financial Instruments; provided that any cash payments or receipts relating to transactions realized in a given period shall be taken into account in such period,

(m)     any non-cash gain (loss) related to currency remeasurements of Indebtedness (including the net loss or gain resulting from hedging agreements for currency exchange risk and revaluations of intercompany balances or any other currency-related risk), unrealized or realized net foreign currency translation or transaction gains or losses impacting net income,

(n)     any non-cash expenses, accruals or reserves related to adjustments to historical tax exposures (provided, in each case, that the cash payment in respect thereof in such future period shall be subtracted from Consolidated Net Income for the period in which such cash payment was made), and

(o)     any non-cash impairment charge or asset write-off or write-down related to intangible assets (including goodwill), long-lived assets, and investments in debt and equity securities.

In addition, to the extent not already included in Consolidated Net Income, Consolidated Net Income shall include the amount of proceeds received or, so long as the Borrower has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer or indemnifying party and only to the extent that such amount is in fact reimbursed within 365 days of the date of the insurable or indemnifiable event (net of any amount so added back in any prior period to the extent not so reimbursed within the applicable 365-day period), due from business interruption insurance. Consolidated Net Income shall exclude adjustments (whether positive or negative) in Holdings's consolidated financial statements pursuant to GAAP resulting from the application of fresh start accounting principles as a result of the Debtors' emergence from the Cases.

"Consolidated Working Capital" means, at any date, the excess of (a) the sum of all amounts (other than cash and Permitted Investments) that would, in conformity with GAAP, be set forth opposite the caption "total current assets" (or any like caption) on a consolidated balance sheet of Holdings and the Restricted Subsidiaries at such date, excluding the current portion of current and deferred income taxes over (b) the sum of all amounts that would, in conformity with GAAP, be set forth opposite the caption "total current liabilities" (or any like caption) on a consolidated balance sheet of  Holdings and the Restricted Subsidiaries on such date, including deferred revenue but excluding, without duplication, (i) the current portion of any funded indebtedness, (ii) all Indebtedness consisting of Loans and obligations under letters of credit to the extent otherwise included therein, (iii) the current portion of interest and (iv) the current portion of current and deferred income taxes; provided that, for purposes of calculating Excess Cash Flow, increases or decreases in working capital (A) arising from acquisitions or dispositions by Holdings and the Restricted Subsidiaries shall be measured from the date on which such acquisition or disposition occurred until the first anniversary of such acquisition or disposition with respect to the Person subject to such acquisition or disposition and (B) shall exclude (I) the impact of non-cash adjustments contemplated in the Excess Cash Flow calculation, (II) the impact of adjusting items in the definition of "Consolidated Net Income" and (III) any changes in current assets or current liabilities as a result of (x) the effect of fluctuations in the amount of accrued or contingent obligations, assets or liabilities under hedging agreements or other derivative obligations, (y) any reclassification in accordance with GAAP of assets or liabilities, as applicable, between current and noncurrent or (z) the effects of acquisition method accounting.

 "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, or the dismissal or appointment of the management, of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Control Agreement" means an agreement, in form and substance reasonably satisfactory to the Required Lenders (and, in the case of protections for the benefit of the Collateral Agent or obligations of the Collateral Agent, the Collateral Agent), which provides for the Collateral Agent to have "control" (as defined in Section 9-104 of the UCC or Section 8-106 of the UCC, as applicable) of Deposit Accounts (as defined in the UCC or the Canadian Collateral Agreement, as applicable) or Securities Accounts (as defined in the UCC or PPSA), as applicable.

"Danish Collateral Agreement" means the collateral agreement listed on Schedule 1.01(b) as the Danish Collateral Agreement governed by Danish law.

"Danish Collateral Documents" means the Danish Collateral Agreement, and each other security agreement, pledge, assignment, mortgage, consent or other instrument or document, as applicable, governed by Danish law in connection with this Agreement and the Agreed Security Principles to secure the applicable Secured Obligations.

"Danish Loan Party" means any Loan Party incorporated or otherwise organized under the laws of the Denmark.

"Danish Share Pledge" means the Danish law governed share pledge agreement between Invacare Holdings Two Netherlands as pledgor and the Collateral Agent as security agent relating to the shares in Invacare A/S, a public limited liability company incorporated under the laws of Denmark, having its registered address at Søndre Ringvej 37, 2605 Brøndby, Denmark, with CVR no. 18058936.

"Debtors" has the meaning assigned to such term in the recitals hereto.

"Default" means any event or condition that constitutes an Event of Default or that upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"De Lage Program" has the meaning assigned to such term in the definition of Vendor Financing Program.

"DIP Term Loan Credit Agreement" has the meaning assigned to such term in the recitals hereto.

"Disposition" has the meaning assigned to such term in Section 6.05.

"Disqualified Equity Interest" means, with respect to any Person, any Equity Interest in such Person that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable, either mandatorily or at the option of the holder thereof), or upon the happening of any event or condition:

(a)     matures or is mandatorily redeemable (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests), whether pursuant to a sinking fund obligation or otherwise;

(b)     is convertible or exchangeable, either mandatorily or at the option of the holder thereof, for Indebtedness or Equity Interests (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests); or

(c)     is redeemable (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests) or is required to be repurchased by such Person or any of its Affiliates, in whole or in part, at the option of the holder thereof;

in each case, on or prior to the date 91 days after the Latest Maturity Date (determined as of the date of issuance thereof or, in the case of any such Equity Interests outstanding on the date hereof, the date hereof); provided, however, that (i) an Equity Interest in any Person that would not constitute a Disqualified Equity Interest but for terms thereof giving holders thereof the right to require such Person to redeem or purchase such Equity Interest upon the occurrence of an "asset sale," a "change of control" or similar event shall not constitute a Disqualified Equity Interest if any such requirement becomes operative only after repayment in full of all the Loans and all other Loan Document Obligations that are accrued and payable, (ii) if an Equity Interest in any Person is issued pursuant to any plan for the benefit of directors, officers, employees, members of management, managers or consultants, of Holdings, the Borrower or any Subsidiary or by any such plan to such employees, such Equity Interest shall not constitute a Disqualified Equity Interest solely because it may be required to be repurchased by Holdings, the Borrower or any Subsidiary in order to satisfy applicable statutory or regulatory obligations of such Person and (iii) no Equity Interest held by any future, present or former employee, director, officer, manager, member of management, consultant or independent contractor (or their respective affiliates or immediate family members) of Holdings (or any subsidiary) shall be considered a Disqualified Equity Interest solely because such stock is redeemable or subject to repurchase pursuant to any customary stock option, employee stock award or similar agreement that may be in effect from time to time.

"Dollars" or "$" refers to lawful money of the United States of America.

"Dollar Equivalent" means, at any time, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount denominated in Sterling or Euros, the equivalent amount thereof in Dollars as determined by the Administrative Agent at such time in accordance with Section 1.05 hereof.

"Domestic Collateral and Guarantee Requirement" means, at any time and solely with respect to each Domestic Loan Party or Domestic Subsidiary of Holdings not constituting an Excluded Subsidiary, the requirement that:

(a)     the Administrative Agent shall have received from (i) each Domestic Loan Party or Domestic Subsidiary of Holdings not constituting an Excluded Subsidiary either (x) a counterpart of the Domestic Guarantee Agreement duly executed and delivered on behalf of such Person or (y) in the case of any Person that becomes or is required to become a Domestic Loan Party after the Effective Date (including by ceasing to be an Excluded Subsidiary), a supplement to the Domestic Guarantee Agreement, in the form specified therein, duly executed and delivered on behalf of such Person, (ii) each Domestic Loan Party or Domestic Subsidiary of Holdings not constituting an Excluded Subsidiary either (x) a counterpart of the U.S. Collateral Agreement duly executed and delivered on behalf of such Person or (y) in the case of any Person that becomes or is required to become a Domestic Loan Party after the Effective Date (including by ceasing to be an Excluded Subsidiary), a supplement to the U.S. Collateral Agreement, in the form specified therein, duly executed and delivered on behalf of such Person and (iii) each Domestic Loan Party or Domestic Subsidiary of Holdings not constituting an Excluded Subsidiary either (x) a counterpart of each Intercreditor Agreement then in effect duly executed and delivered on behalf of such Person or (y) in the case of any Person that becomes or is required to become a Domestic Loan Party after the Effective Date (including by ceasing to be an Excluded

Subsidiary), a supplement to each Intercreditor Agreement then in effect, in the form specified therein, duly executed and delivered on behalf of such Person in each case under this underline(clause (a)) together with, in the case of any such Loan Documents executed and delivered after the Effective Date, documents and, to the extent reasonably requested by the Administrative Agent (acting at the direction of Required Lenders), opinions, documents and certificates of the type referred to in [Section 4.01(b), Section 4.01(c) and Section 4.01(d)];

(b)      all outstanding Equity Interests of Holdings and the Restricted Subsidiaries (other than any Equity Interests constituting Excluded Assets) owned by or on behalf of any Domestic Loan Party shall have been pledged pursuant to the U.S. Collateral Agreement and (except in the case of Equity Interests of Immaterial Subsidiaries), the Collateral Agent shall have received certificates or other instruments representing all such Equity Interests (if any), together with undated stock powers or other instruments of transfer with respect thereto endorsed in blank;

(c)      if any Indebtedness for borrowed money of Holdings, the Borrower or any Subsidiary in a principal amount of $500,000 or more is owing by such obligor to any Domestic Loan Party and if such Indebtedness shall be evidenced by a promissory note, such promissory note shall have been pledged pursuant to the U.S. Collateral Agreement and the Collateral Agent shall have received all such promissory notes, together with undated instruments of transfer with respect thereto endorsed in blank;

(d)      all certificates, agreements, documents and instruments, including Uniform Commercial Code financing statements and intellectual property security agreements, required by the Security Documents, Requirements of Law and reasonably requested by the Administrative Agent, acting at the direction of the Required Lenders, to be filed, delivered, registered or recorded to create the Liens intended to be created by the Security Documents and perfect such Liens to the extent required by, and with the priority required by, the Security Documents and the other provisions of the term "Domestic Collateral and Guarantee Requirement," shall have been filed, registered or recorded or delivered to the Required Lenders in proper form for filing, registration or recording;

(e)      the Administrative Agent shall have received (i) counterparts of a Mortgage with respect to each Mortgaged Property duly executed and delivered by the record owner of such Mortgaged Property, (ii) a policy or policies of title insurance (or marked unconditional commitment to issue such policy or policies) in the amount equal to not less than 100% (or such lesser amount as reasonably agreed to by the Administrative Agent, acting at the direction of the Required Lenders) of the Fair Market Value of such Mortgaged Property and fixtures, as reasonably determined by the Borrower and agreed to by the Administrative Agent, acting at the direction of the Required Lenders, issued by a nationally recognized title insurance company reasonably acceptable to the Administrative Agent, acting at the direction of the Required Lenders, insuring the Lien of each such Mortgage as a first priority Lien on the Mortgaged Property described therein, free of any other Liens except as expressly permitted by Section 6.02, together with such endorsements (other than a creditor's rights endorsement), coinsurance and reinsurance as the Administrative Agent, acting at the direction of the Required Lenders, may reasonably

20

request to the extent available in the applicable jurisdiction at commercially reasonable rates, (iii) such affidavits, instruments of indemnification (including a so-called "gap" indemnification) as are customarily requested by the title company to induce the title company to issue the title policies and endorsements contemplated above, (iv) evidence reasonably acceptable to the Administrative Agent, acting at the direction of the Required Lenders, of payment by the Borrower or any Subsidiary of all title policy premiums, search and examination charges, escrow charges and related charges, mortgage recording taxes, fees, charges, costs and expenses required for the recording of the Mortgages and issuance of the title policies referred to above, (v) a survey of each Mortgaged Property in such form as shall be required by the title company to issue the so-called comprehensive and other survey-related endorsements and to remove the standard survey exceptions from the title policies and endorsements contemplated above (provided, however, that a survey shall not be required to the extent that the issuer of the applicable title insurance policy provides reasonable and customary survey-related coverages (including, without limitation, survey-related endorsements) in the applicable title insurance policy based on an existing survey and/or such other documentation as may be reasonably satisfactory to the title insurer), (vi) completed "Life-of-Loan" Federal Emergency Management Agency ("FEMA") Standard Flood Hazard Determination with respect to each Mortgaged Property subject to the applicable FEMA rules and regulations (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and each Loan Party relating thereto), (vii) if any Mortgaged Property is located in an area determined by FEMA to have special flood hazards, evidence of such flood insurance as may be required under applicable law, including Regulation H of the Board of Governors and the other Flood Insurance Laws and as required under Section 5.07, and (viii) such legal opinions as the Administrative Agent, acting at the direction of the Required Lenders may reasonably request with respect to any such Mortgage or Mortgaged Property; and

(f)      (i) with respect to any Required Account maintained by a Domestic Loan Party on the Effective Date, each Domestic Loan Party shall have obtained a Control Agreement with respect to such Required Account, as soon as possible and in any event within 60 days after the Effective Date (or such later date as the Administrative Agent, acting at the direction of the Required Lenders, shall reasonably agree), (ii) with respect to any Required Account established by a Domestic Loan Party after the Effective Date, each Domestic Loan Party shall have obtained a Control Agreement with respect to such Required Account contemporaneously with the opening of such Required Account, and (iii) with respect to any Required Account acquired by a Domestic Loan Party after the Effective Date, each Domestic Loan Party shall have obtained a Control Agreement with respect to such Required Account, as soon as possible and in any event within 90 days after the date of such acquisition (or such later date as the Administrative Agent, acting at the direction of the Required Lenders, shall reasonably agree) (unless such account is closed prior to such date), in each case, unless waived by the Administrative Agent at the direction of the Required Lenders. Notwithstanding the foregoing, no Control Agreement shall be required with respect to any Required Account so long as such Required Account constitutes ABL Priority Collateral and the Lien thereon securing the obligations under the ABL North America Credit Agreement is subject to the ABL North America Intercreditor Agreement.

Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary, (a) the foregoing provisions of this definition shall not require the creation or perfection of pledges of or security interests in, or the obtaining of title insurance, legal opinions or other deliverables with respect to, particular assets of the Loan Parties, or the provision of Guarantees by any Subsidiary (i) if, and for so long as and to the extent that the Administrative Agent, acting at the direction of the Required Lenders, and the Borrower reasonably agree that the cost, burden, difficulty or consequence of creating or perfecting such pledges or security interests in such assets, or obtaining such title insurance, legal opinions or other deliverables in respect of such assets, or providing such Guarantees (taking into account any material adverse Tax consequences to Holdings and its Subsidiaries (including the imposition of material withholding or other Taxes)), outweighs the benefits to be obtained by the Lenders therefrom and/or (ii) the grant or perfection of a security interest in such asset would (A) be prohibited by enforceable anti-assignment provisions of any applicable law, (B) violate the terms of any contract (to the extent binding on such property at the time of the acquisition thereof and not incurred in contemplation of such acquisition) (in each case, after giving effect to the applicable anti-assignment provisions of the UCC or other applicable law) or (C) trigger termination of any contract pursuant to any "change of control" or similar provision (to the extent binding on such property at the time of the acquisition thereof and not incurred in contemplation of such acquisition); it being understood that the Collateral shall include any proceeds and/or receivables arising out of any contract described in this <u>clause (ii)</u> to the extent the assignment of such proceeds or receivables is expressly deemed effective under the UCC or other applicable law notwithstanding the relevant prohibition, violation or termination right, (b) Liens required to be granted from time to time pursuant to the term "Domestic Collateral and Guarantee Requirement" shall be subject to exceptions and limitations set forth in the Security Documents, (c) except with respect to any Required Accounts, in no event shall control agreements or other control or similar arrangements be required with respect to deposit accounts, securities accounts, commodities accounts or other assets specifically requiring perfection by control agreements, (d) no perfection actions shall be required with respect to Vehicles and other assets subject to certificates of title (other than the filing of UCC financing statements), (e) no perfection actions shall be required with respect to commercial tort claims with a value less than $500,000 and, other than the filing of UCC financing statements, no perfection shall be required with respect to promissory notes evidencing debt for borrowed money in a principal amount of less than $500,000, (f) except as set forth in the Foreign Loan Documents or as expressly required by the Agreed Security Principles, no actions in any non-U.S. jurisdiction or required by the laws of any non-U.S. jurisdiction shall be required to be taken to create any security interests in assets located or titled outside of the United States (including any Equity Interests of Foreign Subsidiaries and any Foreign Intellectual Property) or to perfect or make enforceable any security interests in any such assets (it being understood that except as set forth in the Foreign Loan Documents or as expressly required by the Agreed Security Principles, there shall be no security agreements or pledge agreements governed under the laws of any non-U.S. jurisdiction), (g) no actions shall be required to perfect a security interest in letter of credit rights (other than the filing of UCC financing statements), (h) no Loan Party shall be required to seek any landlord lien waiver, estoppel, warehouseman waiver or other collateral access or similar letter or agreement, (i) no action shall be required to perfect any Lien with respect to (i) the Equity Interests of any Immaterial Subsidiary and/or (ii) the Equity Interests of a Person that is not a subsidiary, which Person, if a subsidiary, would constitute an Immaterial Subsidiary, in each case except to the extent that a security interest therein can be perfected by filing a Form

22

UCC-1 (or similar) financing statement under the UCC, and (j) in no event shall the Collateral include any Excluded Assets.  The Administrative Agent, acting at the direction of the Required Lenders, may grant extensions of time for the creation and perfection of security interests in or the obtaining of title insurance, legal opinions or other deliverables with respect to particular assets or the provision of any Guarantee by any Subsidiary (including extensions beyond the Effective Date or in connection with assets acquired, or Subsidiaries formed or acquired, after the Effective Date) where it determines that such action cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required to be accomplished by this Agreement or the Security Documents.

Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary, subject to the terms of the ABL North America Intercreditor Agreement (including any bailee provisions therein), to the extent any perfection actions are required to be taken with respect to any asset under the ABL North America Credit Agreement, such perfection actions shall be required to be taken hereunder with respect to such asset.

"Domestic Guarantee Agreement" means the Amended & Restated Domestic Guarantee Agreement, dated as of the Effective Date and as further supplemented or modified from time to time, among the Domestic Loan Parties (other than the Borrower) and the Administrative Agent.

"Domestic Loan Party" means any Loan Party that is not a Foreign Loan Party.

"Domestic Perfection Requirements" means the filing of appropriate financing statements with the office of the Secretary of State or other appropriate office of the state of organization of each Loan Party, the filing of appropriate assignments or notices with the U.S. Patent and Trademark Office and the U.S. Copyright Office, the proper recording or filing, as applicable, of Mortgages and fixture filings with respect to any Mortgaged Property, in each case in favor of the Collateral Agent for the benefit of the applicable Secured Parties and the delivery to the Collateral Agent of any stock certificate or promissory note required to be delivered pursuant to the applicable Loan Documents, together with instruments of transfer executed in blank.

"Domestic Subsidiary" means any Subsidiary that is not a Foreign Subsidiary.

"Domestic Subsidiary Guarantor" means any Subsidiary Loan Party that is a Domestic Subsidiary.

"Dutch Collateral Agreements" means the collateral agreements listed on Schedule 1.01(b) as the Dutch Collateral Agreements.

"Dutch Collateral Documents" means each of the Dutch Collateral Agreements, and each other security agreement, pledge, debenture, hypothec, mortgage, consent or other instrument or document, as applicable, governed by Dutch law in connection with this Agreement and the Agreed Security Principles to secure the applicable Secured Obligations.

"Dutch Loan Party" means any Loan Party incorporated or otherwise organized under the laws of the Netherlands or any province or territory thereof.

"<u>EEA Financial Institution</u>" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in <u>clause (a)</u> of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in <u>clauses (a)</u> or <u>(b)</u> of this definition and is subject to consolidated supervision with its parent.

"<u>EEA Member Country</u>" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"<u>EEA Resolution Authority</u>" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"<u>Effective Date</u>" means the date on which the conditions specified in <u>Section 4.01</u> are satisfied (or waived in accordance with <u>Section 9.02</u>).

"<u>Eligible Assignee</u>" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund and (d) any other Person (other than Holdings, the Borrower or any of the Subsidiaries or Affiliates), other than, in each case, a natural person.

"<u>EMEA Loan Parties</u>" means the Foreign Loan Parties organized in any jurisdiction other than the United States and Canada.

"<u>EMU Legislation</u>" means the legislative measures of the European Council for the introduction of, changeover to or operation of a single or unified European currency.

"<u>English Collateral Agreement</u>" the collateral agreement listed on <u>Schedule 1.01(b)</u> as the English Collateral Agreement.

"<u>English Collateral Documents</u>" means (a) the English Collateral Agreement and (b) each other security agreement, pledge, debenture, hypothec, mortgage, consent or other instrument or document, as applicable, governed by English law in connection with this Agreement and the Agreed Security Principles to secure the applicable Secured Obligations.

"<u>English Loan Party</u>" means any Loan Party incorporated or otherwise organized under the laws of England and Wales.

"<u>Environmental Laws</u>" means applicable common law and all applicable treaties, rules, regulations, codes, ordinances, judgments, orders, decrees and other applicable Requirements of Law, and all applicable injunctions or binding agreements issued, promulgated or entered into by or with any Governmental Authority, in each instance relating to the protection of the environment, including with respect to the preservation or reclamation of natural resources or the Release or threatened Release of any Hazardous Material, or to the extent relating to exposure to Hazardous Materials, the protection of human health or safety.

"<u>Environmental Liability</u>" means any liability, obligation, loss, claim, action, order or cost, contingent or otherwise (including any liability for damages, costs of medical monitoring, costs of

24

environmental remediation or restoration, administrative oversight costs, consultants' fees, fines, penalties and indemnities), of Holdings, the Borrower or any Subsidiary directly or indirectly resulting from or based upon (a) any actual or alleged violation of any Environmental Law or permit, license or approval issued thereunder, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in, or interests in a Person, including any preferred stock or shares.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or Section 414(c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Sections 414(b), (c), (m) and (o) of the Code.

"ERISA Event" means (a) any "reportable event," as defined in Section 4043(c) of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30 day notice period is waived); (b) any failure by a Loan Party or any ERISA Affiliate to satisfy the minimum funding standards (within the meaning of Section 412 or Section 430 of the Code or Section 302 or Section 303 of ERISA) applicable to any Plan, whether or not waived; (c) the filing pursuant to Section 412 of the Code or Section 302 of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) a determination that any Plan is, or is expected to be, in "at-risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code); (e) the incurrence by a Loan Party or any ERISA Affiliate of any liability under Title IV of ERISA (other than premiums due and not delinquent under Section 4007 of ERISA) with respect to the termination of any Plan; (f) the receipt by a Loan Party or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans under Section 4041 of ERISA or to appoint a trustee to administer any Plan under Section 4042 of ERISA; (g) the incurrence by a Loan Party or any ERISA Affiliate of any liability with respect to the withdrawal from any Plan subject to Section 4063 of ERISA during a plan year in which it was a "substantial employer" (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA), or a complete or partial withdrawal (within the meanings of Section 4203 and Section 4205 of ERISA, respectively) from a Multiemployer Plan; (h) the receipt by a Loan Party or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from a Loan Party or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, "insolvent," within the meaning of Section 4245 of ERISA, or in "endangered or critical status," within the meaning of Section 305 of ERISA or Section 432 of the Code; or (i) a Foreign Pension Event.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"European Loan Party" means any Foreign Loan Party that is not a Canadian Loan Party.

"Euros" and "€" mean the single currency of the European Union as constituted by the Treaty on European Union and as referred to in the EMU Legislation.

"Event of Default" has the meaning assigned to such term in Section 7.01.

"Exchange Act" means the United States Securities Exchange Act of 1934, as amended from time to time.

"Exchange Rate" means on any day, for purposes of determining the Dollar Equivalent of any currency other than Dollars, the rate at which such other currency may be exchanged into Dollars at the time of determination on such day as set forth on the Reuters WRLD Page for such currency. In the event that such rate does not appear on any Reuters WRLD Page, the Exchange Rate shall be determined by reference to such other publicly available service for displaying exchange rates as may be agreed upon by the Administrative Agent and the Borrower or, in the absence of such an agreement, such Exchange Rate shall instead be the arithmetic average of the Exchange Rates of exchange of the Administrative Agent in the market where its foreign currency exchange operations in respect of such currency are then being conducted, at or about such time as the Administrative Agent shall elect after determining that such rates shall be the basis for determining the Exchange Rate, on such date for the purchase of Dollars for delivery two Business Days later; provided that if at the time of any such determination, for any reason, no such Exchange Rate is being quoted, the Administrative Agent may use any reasonable method it deems appropriate to determine such rate, and such determination shall be conclusive absent manifest error.

"Excess Cash Flow" means, for any period, an amount (if positive) equal to the excess of:

(a)     the sum (in each case, for Holdings and the Restricted Subsidiaries on a consolidated basis), without duplication, of:

(i)     Consolidated Net Income for such period,

(ii)     an amount equal to the amount of all non-cash charges to the extent deducted in arriving at such Consolidated Net Income (provided, in each case, that if any non-cash charge represents an accrual or reserve for cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from Excess Cash Flow in such future period),

(iii)     decreases in Consolidated Working Capital,

(iv)     an amount equal to the aggregate net non-cash loss on Dispositions by Holdings and the Restricted Subsidiaries during such period (other than dispositions in the ordinary course of business) to the extent deducted in arriving at such Consolidated Net Income, less:

(b)      the sum (in each case, for Holdings and the Restricted Subsidiaries on a consolidated basis), without duplication (including in any subsequent fiscal years), of:

(i)      an amount equal to the amount of all non-cash credits included in arriving at such Consolidated Net Income (including any amounts included in Consolidated Net Income pursuant to the last sentence of the definition of "Consolidated Net Income" to the extent such amounts are due but not received during such period),

(ii)      the amount of Capital Expenditures made or accrued in cash during such period or, at the option of the Borrower, made prior to the date the Borrower is required to make a payment of Excess Cash Flow in respect of such period, except to the extent that such Capital Expenditures were financed with Indebtedness; provided that the amount of Capital Expenditures deducted pursuant to this clause (ii) shall not exceed the Capital Expenditure Cap in any period,

(iii)      the aggregate amount of all principal payments of Indebtedness, including (A) the principal component of payments in respect of Capitalized Leases and (B) the amount of any mandatory prepayment of Loans to the extent required due to a Disposition that resulted in an increase to Consolidated Net Income and not in excess of the amount of such increase but excluding (I) all other prepayments of Term Loans, (II) all prepayments of revolving loans and swingline loans made during such period (other than in respect of any revolving credit facility to the extent there is an equivalent permanent reduction in commitments thereunder) and (III) all such principal payments of Indebtedness to the extent financed with long-term Indebtedness (other than revolving Indebtedness),

(iv)      an amount equal to the aggregate net non-cash gain on Dispositions by Holdings and the Restricted Subsidiaries during such period (other than Dispositions in the ordinary course of business) to the extent included in arriving at such Consolidated Net Income,

(v)      increases in Consolidated Working Capital,

(vi)      the amount of Investments (other than Investments in Permitted Investments) and acquisitions not prohibited by this Agreement made in cash during such period, to the extent that such Investments and acquisitions were not financed with long-term Indebtedness; provided that the amount of Investments deducted pursuant to this clause (vi) shall not exceed $[1,000,000] in any period, and

(vii)      the amount of taxes (including penalties and interest) paid in cash and/or tax reserves set aside, payable, or reasonably estimated to be payable (without duplication) in such period to the extent they exceed the amount of tax expense deducted in determining Consolidated Net Income for such period.

"Excluded Assets" means (a) any fee-owned real property with a Fair Market Value of less than $1,000,000 as determined on the Effective Date for existing real property and on the date

of acquisition for after-acquired real property, (b) all leasehold interests in real property, (c) any governmental licenses or state or local franchises, charters or authorizations, to the extent a security interest in any such license, franchise, charter or authorization would be prohibited or restricted thereby (including any legally effective prohibition or restriction, but excluding any prohibition or restriction that is ineffective under the PPSA or Uniform Commercial Code of any applicable jurisdiction), (d) any asset if, to the extent that and for so long as the grant of a Lien thereon to secure the Secured Obligations is prohibited by any Requirements of Law (other than to the extent that any such prohibition would be rendered ineffective pursuant to any other applicable Requirements of Law, including the PPSA or the Uniform Commercial Code of any applicable jurisdiction), or would require consent or approval of any Governmental Authority, (e) the Equity Interests of any (i) captive insurance company, (ii) not-for-profit subsidiary, (f) margin stock and, to the extent (i) prohibited by the terms of, creating an enforceable right of termination in favor of any other party thereto (other than any Loan Party) or requiring the consent of one or more third parties (other than Holdings, the Borrower or any of their subsidiaries) under and/or (ii) any pledge could give rise to a "right of first refusal", a "right of first offer" or a similar right that may be exercised by any third party (other than Holdings, the Borrower or any of their subsidiaries) pursuant to, any applicable Organizational Documents, joint venture agreement or shareholders' agreement, Equity Interests in any Person other than the Borrower and Restricted Subsidiaries that are wholly-owned subsidiaries, (g) assets of any (i) direct or indirect Foreign Subsidiary of Holdings organized outside of a Specified Jurisdiction ("Excluded Foreign Subsidiary") and (ii) direct or indirect Domestic Subsidiary of an Excluded Foreign Subsidiary to the extent a security interest or grant of perfection in such assets would result in material adverse Tax consequences to Holdings, the Borrower or one of the Restricted Subsidiaries as reasonably determined by the Borrower in consultation with the Administrative Agent (acting at the direction of the Required Lenders), (h) Foreign Intellectual Property (except with respect to any Intellectual Property governed by or arising or existing under, pursuant to or by virtue of the laws of any Specified Jurisdiction) and any intent-to-use trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, (i) any lease, license or other agreement or any property subject thereto (including pursuant to a purchase money security interest, capital lease or similar arrangement) to the extent that a grant of a security interest therein would violate or invalidate such lease, license or agreement or purchase money arrangement or capital lease or create a breach, default or right of termination in favor of any other party thereto (other than any Loan Party) after giving effect to the applicable anti-assignment provisions of the PPSA or Uniform Commercial Code of any applicable jurisdiction or other similar applicable law, other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the PPSA or Uniform Commercial Code of any applicable jurisdiction or other similar applicable law notwithstanding such prohibition, (j) [reserved], (k) cash or cash equivalents maintained in any deposit account that are comprised of (i) funds used or to be used for payroll and payroll taxes and other employee benefit payments to or for the benefit of the employees of Holdings and/or any Restricted Subsidiary, in each case, during the applicable period, (ii) funds used or to be used to pay any taxes required to be collected, remitted or withheld during the current period and (iii) other funds which any Loan Party holds as an escrow or fiduciary for the benefit of any third person, but in each case subject to the terms of the Agreed Security Principles (including, without limitation, the Overriding Principle (as defined in the Agreed Security Principles)) (other than to the extent no additional action needs to be taken with respect to any such assets to create or perfect a security interest in any such assets) and [(l) the Common Equity

of the Borrower held by Holdings and the Common Equity of New Intermediate Holdings held by Holdings][3]. Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary, any asset that does not constitute "Excluded Property" under and as defined in the ABL North America Credit Agreement shall not constitute an "Excluded Asset" for purposes of this Agreement and the other Loan Documents.

"Excluded Subsidiary" means any of the following (except as otherwise provided in clause (b) of the definition of "Subsidiary Loan Party"): (a) any Subsidiary that is not a wholly-owned subsidiary of Holdings; provided, that no Subsidiary Loan Party shall become an Excluded Subsidiary and cease being a Subsidiary Loan Party solely as a result of no longer constituting a wholly-owned subsidiary of Holdings unless such Subsidiary Loan Party no longer constitutes a Subsidiary, (b) each Subsidiary listed on Schedule 1.01(a), (c) [reserved], (d) each Immaterial Subsidiary, (e) any Subsidiary that is prohibited by (i) applicable Requirements of Law or (ii) any contractual obligation existing on the Effective Date or on the date any such Subsidiary is acquired (so long as, in respect of any such contractual prohibition, such prohibition is not incurred in contemplation of such acquisition), in each case from guaranteeing the Secured Obligations or which would require governmental (including regulatory) consent, approval, license or authorization to provide a Guarantee, (f) any Excluded Foreign Subsidiary, (g) any direct or indirect Domestic Subsidiary of an Excluded Foreign Subsidiary to the extent a security interest or grant of perfection in such assets would result in material adverse Tax consequences to Holdings, the Borrower or one of the Restricted Subsidiaries as reasonably determined by the Borrower in consultation with the Administrative Agent (acting at the direction of the Required Lenders), (h) [reserved], (i) any other Subsidiary excused from becoming a Loan Party pursuant to clause (a) of the last paragraph of the definition of the term "Domestic Collateral and Guarantee Requirement," or the terms of the Agreed Security Principles" (j) [reserved], (k) [reserved] and (l) any not-for-profit Subsidiaries or captive insurance companies. Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary, any subsidiary that does not constitute (i) an "Excluded Subsidiary" under and as defined in the ABL North America Credit Agreement or (ii) an "Excluded Subsidiary" (or equivalent term) under and as defined in the ABL EMEA Credit Agreement shall not, in each case, constitute an "Excluded Subsidiary" for purposes of this Agreement and the other Loan Documents.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender or any other recipient (each referred to for purposes of this definition a "recipient") of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document, (a) Taxes imposed on (or measured by) its net income (however denominated), branch profits Taxes and franchise Taxes, in each case (i) imposed by a jurisdiction as a result of such recipient being organized or having its principal office located in or, in the case of any Lender, having its applicable lending office located in, such jurisdiction or (ii)  that are Other Connection Taxes, (b) any withholding Tax that is attributable to a Lender's failure to comply with Section 2.17(e), (c) except in the case of an assignee pursuant to a request by the Borrower under Section 2.19, any U.S. federal withholding Taxes imposed on amounts payable to or for the account of a Lender due to a Requirement of Law in effect at the time the Lender becomes a party hereto (or designates a new lending office), except to the extent that such Lender (or its assignor, if any) was

---

[3] NTD: Structure remains subject to review.

entitled, immediately prior to the time of designation of a new lending office (or assignment), to receive additional amounts with respect to such withholding Tax under Section 2.17(a), (d) any federal withholding Tax imposed pursuant to FATCA, (e) any Taxes imposed on payments to a Lender by the German tax authorities under § 49 para. 1 Nr. 5 lit. c (aa) or § 50a para. 7 German income tax act by virtue of the Lender having security over German-situs real estate (*inländischen Grundbesitz*) or over rights subject to the civil law provisions applicable to real estate (*inländische Rechte, die den Vorschriften des bürgerlichen Rechts über Grundstücke unterliegen*), (f) any Taxes imposed by Germany because the relevant recipient is a Non-Cooperative Jurisdiction Resident Party, (g) any Luxembourg withholding Taxes imposed under the amended Luxembourg law of 23 December 2005 introducing a final withholding tax on certain interest payments and (h) any Canadian withholding Taxes arising as a result of (i) the recipient not dealing at arm's length (within the meaning of the ITA) with any Loan Party, (ii) the recipient being a "specified non-resident shareholder" (as defined in subsection 18(5) of the ITA) of any Loan Party or not dealing at arm's length (for the purposes of the ITA) with a "specified shareholder" (as defined in subsection 18(5) of the ITA) of the Loan Party or of any partner of the Loan Party (and if a partnership, any partner thereof), or (iii) the recipient being a "specified entity" (as defined in subsection 18.4(1) of the ITA, as it is proposed to be amended by certain Tax proposals released by the Department of Finance (Canada) on April 29, 2022) of the Loan Party, except in the case of (i) through (iii) where (x) the non-arm's length relationship or (y) the recipient being a "specified non-resident shareholder" of the Loan Party or not dealing at arm's length with a "specified shareholder" of the Loan Party.

"Exit DIP Converted Loan Commitment" means, with respect to any Lender, the commitment of such Lender to convert its DIP Term Loan Claims (as defined in the Reorganization Plan) into Term Loans hereunder to the Borrower in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 under the heading "Exit DIP Converted Loan Commitments". The aggregate amount of the Lenders' Exit DIP Converted Loan Commitments on the Effective Date is $29,500,000.

"Exit DIP Converted Loans" has the meaning set forth in the recitals hereto.

"Exit Prepetition Continued Loan Commitment" means, with respect to any Lender, the commitment of such Lender to continue its loans constituting Term Loan Claims (as defined in the Reorganization Plan) as Term Loans to the Borrower hereunder in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 under the heading "Exit Prepetition Continued Loan Commitments". The aggregate amount of the Lenders' Exit Prepetition Continued Loan Commitments on the Effective Date is $55,500,000.

"Exit Prepetition Continued Loans" has the meaning set forth in the recitals hereto.

"Fair Market Value" means with respect to any asset or group of assets on any date of determination, the value of the consideration obtainable in a sale of such asset at such date of determination assuming a sale by a willing seller to a willing purchaser dealing at arm's length and arranged in an orderly manner over a reasonable period of time having regard to the nature and characteristics of such asset. Except as otherwise expressly set forth herein, such value shall be determined in good faith by the Borrower.

"FATCA" means Sections 1471 through 1474 of the Code as in effect on the date hereof (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future Treasury regulations or official administrative interpretations thereof, any agreements entered into pursuant to current Section 1471(b)(1) of the Code and any intergovernmental agreements entered into in connection with the implementation of such current Sections of the Code (or any such amended or successor version described above).

"FCPA" has the meaning assigned to such term in Section 3.18(b).

"Federal Funds Effective Rate" means, for any day, the rate of interest per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) quoted to Administrative Agent on such day on such transactions as determined by Administrative Agent.

"Fee Letters" means the Administrative Agent Fee Letter and the Collateral Agent Fee Letter.

"FEMA" has the meaning assigned to such term in the definition of "Domestic Collateral and Guarantee Requirement."

"Financial Officer" means the chief financial officer, principal accounting officer, treasurer or controller of the Borrower.

"Flood Insurance Laws" means, collectively, (a) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (b) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (c) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto, (e) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (e) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"Foreign Excluded Assets" means any asset or undertaking not required to be charged or secured or not subject to any applicable Security Document pursuant to and in accordance with the terms of the Agreed Security Principles.

"Foreign Guarantee Agreement" means the Amended and Restated Foreign Guarantee Agreement, dated as of the Effective Date and as further supplemented or modified from time to time, among the Foreign Loan Parties and the Administrative Agent.

"Foreign Intellectual Property" means any right, title or interest in or to any Intellectual Property governed by or arising or existing under, pursuant to or by virtue of the laws of any jurisdiction other than the United States of America or any state thereof.

"Foreign Loan Documents" means (i) the Canadian Collateral Documents, (ii) the English Collateral Documents, (iii) the Dutch Collateral Documents, (iv) the Luxembourg Collateral Documents, (v) the German Collateral Documents, (vi) the Swiss Collateral Documents, (vii) the French Collateral Documents, (viii) the Australian Collateral Documents, (ix) the Norwegian Collateral Documents, (x) the NZ Collateral Documents, (xi) the Danish Collateral Documents and (xii) any other Loan Document which is not governed by the laws of the United States of America or any state, province or territory thereof.

"Foreign Loan Party" means a Loan Party that is a Foreign Subsidiary organized in a Specified Jurisdiction.

"Foreign Pension Event" means, with respect to any Foreign Pension Plan, (a) the existence of unfunded liabilities in excess of the amount permitted under any applicable law or in excess of the amount that would be permitted absent a waiver from applicable Governmental Authority or (b) the failure to make the required contributions or payments, under any applicable law, on or before the due date for such contributions or payments.

"Foreign Pension Plan" means any benefit plan that under applicable law (other than the laws of the United States or any political subdivision thereof) is required to be funded through a trust or other funding vehicle other than a trust or funding vehicle maintained exclusively by a Governmental Authority and with respect to which the Borrower or any Restricted Subsidiary has any liability.

"Foreign Perfection Requirements" means any registration, acknowledgement, filing, endorsement, notarisation, stamping, notification or other action or step to be made or procured in a Specified Jurisdiction in order to create, perfect or enforce the Lien created by a Foreign Loan Document and/or achieve the relevant priority for the Lien created thereunder.

"Foreign Subsidiary" means any Subsidiary that is organized under the laws of a jurisdiction other than the United States of America, any State thereof or the District of Columbia.

"Foreign Subsidiary Guarantor" means a Subsidiary Guarantor that is a Foreign Subsidiary organized in a Specified Jurisdiction.

"French Collateral Agreements" means the collateral agreements listed on Schedule 1.01(b) as the French Collateral Agreements.

"French Collateral Documents" means the French Collateral Agreements and each security agreement, pledge, hypothec, mortgage or other instrument or document, as applicable, governed by French law in connection with this Agreement and the Agreed Security Principles to secure the applicable Secured Obligations.

"French Loan Party" means any Loan Party incorporated or otherwise organized under the laws of France.

"GAAP" means generally accepted accounting principles in the United States of America, as in effect from time to time; provided, however, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of

any change occurring after the Effective Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith; provided, further, that if such an amendment is requested by the Borrower or the Required Lenders, then the Borrower and the Administrative Agent, acting at the direction of the Required Lenders, shall negotiate in good faith to enter into an amendment of the relevant affected provisions (without the payment of any amendment or similar fee to the Lenders) to preserve the original intent thereof in light of such change in GAAP or the application thereof. Notwithstanding any other provision contained herein, (a) all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under FASB Accounting Standards Codification 825-Financial Instruments, or any successor thereto (including pursuant to the FASB Accounting Standards Codification), to value any Indebtedness of Holdings or any subsidiary at "fair value," as defined therein and (b) the amount of any Indebtedness under GAAP with respect to Capital Lease Obligations shall be determined in accordance with Section 1.04(e).

"German Collateral Agreements" means the collateral agreements listed on Schedule 1.01(b) as the German Collateral Agreements.

"German Collateral Documents" means each of the German Collateral Agreements, and each other security agreement, pledge, debenture, hypothec, mortgage, consent or other instrument or document, as applicable, governed by German law in connection with this Agreement and the Agreed Security Principles to secure the applicable Secured Obligations.

"German Group" means Invacare Germany Holding and each subsidiary of Invacare Germany Holding.

"German Loan Party" means any Loan Party incorporated or otherwise organized under the laws of Germany.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, provincial or territorial, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including the National Association of Insurance Commissioners ("NAIC") and any supra-national bodies such as the European Union or the European Central Bank).

"Granting Lender" has the meaning assigned to such term in Section 9.04(f).

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness of any other Person (the "primary obligor") in any manner, whether directly or

indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness; provided that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Effective Date or entered into after the Effective Date in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined in good faith by a Financial Officer.  The term "Guarantee" as a verb has a corresponding meaning.

"Guarantors" means, subject to the Agreed Security Principles, collectively, (i) Holdings, (ii) the Subsidiary Loan Parties that have Guaranteed the Secured Obligations on the Effective Date and (iii) any Subsidiary that will Guarantee the Secured Obligations after the Effective Date in accordance with the Agreed Security Principles and terms of this Agreement which such Subsidiaries, in the case of clause (ii), are listed on Schedule 1.01(c) hereto; provided that no Guarantor under clause (iii) above shall be deemed to have Guaranteed any Secured Obligations until it becomes a Loan Party in accordance with the terms of this Agreement (including the satisfaction of all applicable conditions contemplated on Schedule 5.14) and the Agreed Security Principles.

"Hazardous Materials" means all explosive, radioactive, hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum by-products or distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated as hazardous or toxic, or any other term of similar import, pursuant to any Environmental Law.

"Highbridge" means, collectively, Highbridge Tactical Credit Master Fund, L.P. and Highbridge Convertible Dislocation Fund, L.P.

"Holdings" has the meaning provided in the preamble to this Agreement.

"Holdings Certificate of Designations" means the Certificate of Designations of 9.00% Series A Convertible Participating Preferred Stock of Holdings.

"Holdings Preferred Equity Documents" means [the Holdings Certificate of Designations and each other document or certificate executed or delivered in connection therewith.]

"Holdings Preferred Equity Interests" means the 9.00% Series A Convertible Participating Preferred Stock issued by Holdings.

"IFRS" means international accounting standards as promulgated by the International Accounting Standards Board.

"Immaterial Subsidiary" means any Subsidiary that is not a Material Subsidiary.

"Impacted Loans" has the meaning assigned to such term in Section 2.14(a)(ii).

"Indebtedness" of any Person means, without duplication,

(a)     all obligations of such Person for borrowed money,

(b)     all obligations of such Person evidenced by bonds, debentures, notes or similar instruments to the extent the same would appear as a liability on a balance sheet of such Person prepared in accordance with GAAP,

(c)     all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person,

(d)     all obligations of such Person in respect of the deferred purchase price of property or services (excluding (i) trade accounts payable in the ordinary course of business, (ii) any earn-out obligation, purchase price adjustment or similar obligation until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP and if not paid after being due and payable and (iii) liabilities associated with customer prepayments and deposits),

(e)     all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed,

(f)     all Guarantees by such Person of Indebtedness of others,

(g)     all Capital Lease Obligations of such Person,

(h)     all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty; and

(i)     all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances;

provided that the term "Indebtedness" shall not include (i) deferred or prepaid revenue and (ii) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the seller.

The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner), to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable

therefor. The amount of Indebtedness of any Person for purposes of <u>clause (e)</u> above shall (unless such Indebtedness has been assumed by such Person) be deemed to be equal to the lesser of (A) the aggregate unpaid amount of such Indebtedness and (B) the Fair Market Value of the property encumbered thereby as determined by such Person in good faith. For all purposes hereof, the Indebtedness of Holdings and the Restricted Subsidiaries shall exclude intercompany liabilities arising from their cash management, tax, and accounting operations and intercompany loans, advances or Indebtedness having a term not exceeding 364 days (inclusive of any rollover or extensions of terms) and made in the ordinary course of business.

"<u>Indemnified Taxes</u>" means all Taxes, other than Excluded Taxes and Other Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document.

"<u>Indemnitee</u>" has the meaning assigned to such term in <u>Section 9.03(b)</u>.

"<u>Information</u>" has the meaning assigned to such term in <u>Section 9.12(a)</u>.

"<u>Insurance Subsidiary</u>" means Invaction Insurance Company, a Vermont corporation.

"<u>Intellectual Property</u>" has the meaning assigned to such term in the U.S. Collateral Agreement, the Canadian Collateral Agreement, the English Collateral Agreement or the Dutch Collateral Agreements, as applicable.

"<u>Intercreditor Agreements</u>" means the ABL North America Intercreditor Agreement, the Pari Passu Intercreditor Agreement, any Permitted ABL EMEA Intercreditor Agreement and any Subordination Agreement.

"<u>Interest Election Request</u>" means a request by the Borrower to convert or continue a Borrowing in accordance with <u>Section 2.07</u> substantially in the form of <u>Exhibit I</u> hereto.

"<u>Interest Payment Date</u>" means (a) with respect to any ABR Loan, the last Business Day of each March, June, September and December and (b) with respect to any Term SOFR Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Term SOFR Borrowing with an Interest Period of more than three month's duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period.

"<u>Interest Period</u>" means, with respect to any Term SOFR Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, three or six months thereafter; <u>provided</u> that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, and (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is

made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

["Intermediate Holdcos" means, collectively, Invacare Holdings Netherlands, Invacare Holdings Lux, Invacare Holdings Two Lux, Invacare Holdings Two Netherlands and Invacare Germany Holding.][4]

"Intermediate Holdco Subsidiaries" means, as to each Intermediate Holdco, such Intermediate Holdco's subsidiaries.

"Invacare Germany Holding" means Invacare Germany Holding GmbH, a limited liability company (*Gesellschaft mit beschränkter Haftung*), incorporated and existing under the laws of the Federal Republic of Germany, registered in the commercial register (*Handelsregister*) of the local court (*Amtsgericht*) of Ulm under HRB 621121, with registered seat in Isny, Germany.

"Invacare Holdings Lux" means Invacare Holdings S.à. r.l., a Luxembourg private limited liability company (*société à responsabilité limitée*) having its registered office located at 6, rue Eugène Ruppert, L-2453 Luxembourg, and registered with the Luxembourg Trade and Companies Register (*Registre de Commerce et des Sociétés*) under number B169.438.

"Invacare Holdings Netherlands" means Invacare Holdings C.V., a limited partnership (*commanditaire vennootschap*) formed under the laws of the Netherlands, having its registered office at [Benkenstrasse 260, 4108 Witterswil][5], Switzerland, and registered with the commercial register of the Chamber of Commerce (*Kamer van Koophandel*) for indefinite period under number 09123986.

"Invacare Holdings Two Lux" means Invacare Holdings Two S.à. r.l., a Luxembourg private limited liability company (*société à responsabilité limitée*) having its registered office located at 6, rue Eugène Ruppert, L-2453 Luxembourg, and registered with the Luxembourg Trade and Companies Register (*Registre de Commerce et des Sociétés*) under number B169458.

"Invacare Holdings Two Netherlands" means Invacare Holdings Two B.V., a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*) incorporated under the laws of the Netherlands, having its corporate seat (*statutaire zetel*) at Amsterdam, the Netherlands, its registered office at Galvanistraat 14 3, 6716 AE Ede, the Netherlands, and registered with the trade register of the Chamber of Commerce (*Kamer van Koophandel*) under number 34058960.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or Indebtedness or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other Indebtedness or equity participation or interest in, another Person, including any partnership or

---

[4] NTD: Subject to review of org chart.

[5] NTD: Address to be confirmed.

joint venture interest in such other Person (excluding, in the case of Holdings and the Restricted Subsidiaries, (i) intercompany advances arising from their cash management, cash pooling, tax, and accounting operations, (ii) intercompany loans, advances or Indebtedness having a term not exceeding 364 days (inclusive of any rollover or extensions of terms) and made in the ordinary course of business) and (iii) intercompany advances, transfer pricing and cost-sharing arrangements that are in the ordinary course of business or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person. The amount, as of any date of determination, of (i) any Investment in the form of a loan or an advance shall be the principal amount thereof outstanding on such date, minus, to the extent any such loan or advance is made to any third party unaffiliated with Holdings and its Subsidiaries, any cash payments actually received by such investor representing interest in respect of such Investment (to the extent any such payment to be deducted does not exceed the remaining principal amount of such Investment), but without any adjustment for writedowns or write-offs (including as a result of forgiveness of any portion thereof) with respect to such loan or advance after the date thereof, (ii) any Investment in the form of a Guarantee shall be equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof, as determined in good faith by a Financial Officer, (iii) any Investment in the form of a transfer of Equity Interests or other non-cash property by the investor to the investee, including any such transfer in the form of a capital contribution, shall be the Fair Market Value of such Equity Interests or other property as of the time of the transfer, without any other adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment after the date of such Investment, and (iv) any Investment (other than any Investment referred to in clause (i), (ii) or (iii) above) by the specified Person in the form of a purchase or other acquisition for value of any Equity Interests (including through any capital contribution), evidences of Indebtedness or other securities of any other Person shall be the original cost of such Investment (including any Indebtedness assumed in connection therewith), plus (A) the cost of all additions thereto, and minus (B) to the extent such original Investment was made in cash, the amount of any portion of such Investments that has been repaid to the investor in cash as a repayment of principal or a return of capital, and of any cash payments actually received by such investor representing interest, dividends or other distributions in respect of such Investment (in all of the foregoing cases in this clause (B), to the extent such payments do not exceed, in the aggregate, the original cash amount of such Investment), but without any other adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment after the date of such Investment. For purposes of Section 6.04, if an Investment involves the acquisition of more than one Person, the amount of such Investment shall be allocated among the acquired Persons in accordance with GAAP; provided that pending the final determination of the amounts to be so allocated in accordance with GAAP, such allocation shall be as reasonably determined by a Financial Officer.

"IRS" means the United States Internal Revenue Service.

"ITA" means the Income Tax Act (Canada), as amended from time to time.

"Judgment Currency" has the meaning assigned to such term in Section 9.14(b).

"Junior Financing" means any Indebtedness (other than any permitted intercompany Indebtedness owing to the Borrower or any Restricted Subsidiary and, for the avoidance of doubt, other than (u) Indebtedness incurred under Section 6.01(a)(xxiii)(A), (v) Indebtedness incurred under Section 6.01(a)(xxiii)(B) solely to the extent such Indebtedness has the same lien priorities as the Indebtedness under the Senior Secured Convertible Notes Indenture, (w) Indebtedness incurred under Section 6.01(a)(xxii)(A), (x) Indebtedness incurred under Section 6.01(a)(xxii)(B) solely to the extent such Indebtedness has the same lien priorities as the Indebtedness under the ABL North America Credit Agreement, (y) Indebtedness incurred under Section 6.01(a)(xxv)(A) solely to the extent secured by Liens permitted under Section 6.02(xix)(B) and (z) Indebtedness incurred under Section 6.01(a)(xxv)(B) solely to the extent such Indebtedness has the same lien priorities as the Indebtedness refinanced by such Indebtedness) that is (a) subordinated in right of payment to the Loan Document Obligations, (b) Indebtedness that is secured on a junior basis to the Liens securing the Secured Obligations in respect of the Term Loan or (c) Indebtedness that is unsecured; provided that (i) no such Junior Financing incurred or assumed on or after the Effective Date shall provide for any payments of principal, interest, fees or other amounts (other than customary third party agent or trustee fees) in cash on or prior to the date that is 91 days after the Latest Maturity Date (determined as of the date of incurrence or assumption of such Junior Financing) and (ii) for purposes of Section 6.08(b), Indebtedness of the type described in clauses (a) through (c) shall constitute Junior Financing only to the extent the aggregate principal amount of such Indebtedness, when taken together with the aggregate principal amount of all other Indebtedness of the type described in clause (a) through (c), respectively, outstanding at such time, is greater than $1,000,000.

"Latest Maturity Date" means, at any date of determination, the latest maturity or expiration date applicable to any Loan or Commitment  hereunder at such time, in each case as extended in accordance with this Agreement from time to time.

"Legal Reservations" means, in the case of any Foreign Loan Party or any Foreign Loan Document: (i) the principle that certain remedies may be granted or refused at the discretion of the court, the limitation of enforcement by laws relating to bankruptcy, insolvency, liquidation, reorganization, court schemes, moratoria, administration and other laws generally affecting the rights of creditors and secured creditors; (ii) the time barring of claims under applicable limitation laws and defenses of acquiescence, set-off or counterclaim and the possibility that an undertaking to assume liability for or to indemnify a person against non-payment of stamp duty may be void; (iii) the principle that in certain circumstances Liens granted by way of fixed charge may be recharacterized as a floating charge or that Liens purported to be constituted as an assignment may be recharacterized as a charge; (iv) the principle that additional interest imposed pursuant to any relevant agreement may be held to be unenforceable on the grounds that it is a penalty and thus void; (v) the principle that a court may not give effect to an indemnity for legal costs incurred by an unsuccessful litigant; (vi) the principle that the creation or purported creation of Liens over any contract or agreement which is subject to a prohibition on transfer, assignment or charging may be void, ineffective or invalid and may give rise to a breach of the contract or agreement over which Liens has purportedly been created; (vii) similar principles, rights and defenses under the laws of any relevant jurisdiction; (viii) the principle that a court may not give effect to any parallel debt provisions, covenants to pay the Collateral Agent or other similar provisions; (ix) the principle that in certain circumstances pre-existing Liens purporting to secure further advances may be void, ineffective, invalid or unenforceable; (x) the Swiss general principle of reasonableness and fairness

39

(*Treu und Glauben*) and similar principles under the laws of any applicable jurisdiction; (xi) mandatory provisions (*lois de police*) under Luxembourg law; and (xii) any other matters which are (or would in respect of any legal opinion provided by counsel to any Lender customarily be) set out as qualifications or reservations (however described) as to matters of law in any legal opinion delivered to the Administrative Agent pursuant to any Loan Document.

"Lenders" means the Term Lenders and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset, and (c) in the case of any Collateral under an Australian Collateral Document, any "security interest" as defined in sections 12(1) and 12(2) of the Australian PPSA.

 "Liquidity" means, as of any date of determination, the sum of (w) the aggregate amount of unrestricted cash (other than to the extent restricted in favor of the Term Facility or any Indebtedness permitted under Section 6.01(a)(xxii), Section 6.01(a)(xxiii) or Section 6.01(a)(xxv)) and Permitted Investments owned by the Loan Parties, as reflected on a balance sheet prepared as of such date on a consolidated basis in accordance with GAAP, to the extent such cash and Permitted Investments are free and clear of any Liens (other than (x) non-consensual Liens permitted by Section 6.02 and (y) consensual Liens permitted by Section 6.02(a)(i), 6.02(a)(xvi), 6.02(a)(xix) or 6.02(xxii)) and the use thereof for the application to the payment of Indebtedness is not prohibited by law or any contract to which Holdings or any Restricted Subsidiary is a party, (x) cash and Permitted Investments of the Loan Parties restricted or subject to a Lien in favor of the Term Facility (which may also include cash and Permitted Investments securing other Indebtedness permitted hereunder that is secured by a Lien on the Collateral along with the Term Facility) and (y) the aggregate amount that is then available to be borrowed under the ABL North America Credit Agreement (for the avoidance of doubt, after giving effect to the "borrowing base" provided for thereunder).

"Loan Document Obligations" means (a) the due and punctual payment by the Borrower of (i) the principal of and interest at the applicable rate or rates provided in this Agreement (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, and (ii) all other monetary obligations of the Borrower under or pursuant to this Agreement and each of the other Loan Documents, including obligations to pay  fees, expense reimbursement obligations and indemnification obligations, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), (b) the due and punctual payment and performance of all other obligations of the Borrower under or pursuant to this Agreement and each of the other Loan Documents and (c) the due and punctual payment and performance of all the obligations of each other Loan Party under or pursuant to this Agreement and each of the other

Loan Documents (including interest and monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding).

"Loan Documents" means, collectively, this Agreement, the Domestic Guarantee Agreement, the Foreign Guarantee Agreement, the Foreign Loan Documents, the Collateral Agreements, the Fee Letters, the ABL North America Intercreditor Agreement, the Pari Passu Intercreditor Agreement, any Permitted ABL EMEA Intercreditor Agreement, the other Security Documents and, except for purposes of Section 9.02, any promissory notes delivered pursuant to Section 2.09(e).

"Loan Parties" means Holdings, the Borrower and the Subsidiary Loan Parties.

"Loans" means the loans made, continued or deemed made by the Lenders to the Borrower pursuant to this Agreement, including, for the avoidance of doubt, Term Loans.

"Luxembourg" means the Grand Duchy of Luxembourg.

"Luxembourg Civil Code" means the Luxembourg Civil Code (*Code civil*).

"Luxembourg Collateral Agreements" means the collateral agreements listed on Schedule 1.01(b) as the Luxembourg Collateral Agreement.

"Luxembourg Collateral Documents" means each of the Luxembourg Collateral Agreements, and each other security agreement, pledge, mortgage, or other instrument or document, as applicable, governed by Luxembourg law in connection with this Agreement and the Agreed Security Principles to secure the applicable Secured Obligations.

"Luxembourg Loan Party" means any Loan Party incorporated or otherwise organized under the laws of the Luxembourg.

"Master Agreement" has the meaning assigned to such term in the definition of "Swap Agreement."

"Material Adverse Effect" means after the Effective Date, a material adverse effect on (a) the business, assets, financial condition or results of operations, in each case, of Holdings and its Restricted Subsidiaries, taken as a whole, (b) the rights and remedies (taken as a whole) of the Administrative Agent and the Lenders under the applicable Loan Documents or (c) the ability of the Loan Parties (taken as a whole) to perform their payment obligations under the applicable Loan Documents.

"Material Indebtedness" means (without duplication) (x) Indebtedness for borrowed money (other than the Loan Document Obligations), Capital Lease Obligations, unreimbursed obligations for letter of credit drawings and financial guarantees (other than ordinary course of business contingent reimbursement obligations) or obligations in respect of one or more Swap Agreements, of any one or more of Holdings, the Borrower and the Restricted Subsidiaries in an aggregate principal amount exceeding $5,000,000, (y) Indebtedness under the ABL North America Credit Agreement and (z) Indebtedness under any Permitted ABL EMEA Credit Facility. For

purposes of determining Material Indebtedness, the "principal amount" of the obligations in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Borrower or any Restricted Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

"Material Subsidiary" means (a) each Restricted Subsidiary that, as of the last day of the fiscal quarter of the Borrower most recently ended for which financial statements are available, had revenues or total assets (determined on a consolidated basis for such Restricted Subsidiary and its Restricted Subsidiaries) for such quarter in excess of 2.5% of the consolidated revenues or total assets, as applicable, of Holdings and the Restricted Subsidiaries for such quarter or that is designated by the Borrower as a Material Subsidiary and (b) any Restricted Subsidiary that is part of a group comprising Restricted Subsidiaries that each would not have been a Material Subsidiary under clause (a) but that, taken together, as of the last day of the fiscal quarter of the Borrower most recently ended for which financial statements are available, had revenues or total assets (determined on a consolidated basis for all such Restricted Subsidiaries and their respective Restricted Subsidiaries) for such quarter in excess of 5.0% of the consolidated revenues or total assets, as applicable, of Holdings and the Restricted Subsidiaries for such quarter. Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary, any subsidiary that constitutes a "Material Subsidiary" under and as defined in the ABL North America Credit Agreement shall constitute a "Material Subsidiary" for purposes of this Agreement and the other Loan Documents.

"Minimum Liquidity ECF Amount" means the amount of Excess Cash Flow the application of which to the Term Loans would not cause Liquidity to be less than $75,000,000 after giving effect to such application.

"Moody's" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"Mortgage" means a mortgage, deed of trust, assignment of leases and rents or other security document granting a Lien on any Mortgaged Property to secure the Secured Obligations, provided, however, in the event any Mortgaged Property is located in a jurisdiction which imposes mortgage recording taxes or similar fees, the applicable Mortgage shall not secure an amount in excess of 100% of the Fair Market Value of such Mortgaged Property. Each Mortgage shall be in a form reasonably acceptable to the Required Lenders.

"Mortgaged Property" means any real property and the improvements thereon owned in fee by a Loan Party with respect to which a Mortgage is granted pursuant to Section 4.01(f) (if any) or Section 5.11 and Section 5.12 (if any).

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which a Loan Party or any ERISA Affiliate makes or is obligated to make contributions or with respect to which any Loan Party or ERISA Affiliate could have liability.

"Net Proceeds" means, with respect to any event, (a) the proceeds received in respect of such event in cash or Permitted Investments, including (i) any cash or Permitted Investments received in respect of any non-cash proceeds, including any cash payments received by way of

42

deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment or earn-out (but excluding any interest payments), but only as and when received, (ii) in the case of a casualty, insurance proceeds that are actually received, (iii) [reserved], and (iv) in the case of a condemnation or similar event, condemnation awards and similar payments that are actually received, minus (b) the sum of (i) all fees and out-of-pocket expenses paid by Holdings and the Restricted Subsidiaries in connection with such event (including attorney's fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, underwriting discounts and commissions, other customary expenses and brokerage, consultant, accountant and other customary fees), (ii) in the case of a Disposition of an asset (including pursuant to a Casualty Event or similar proceeding), (x) the amount of all payments that are permitted hereunder and are made by Holdings and the Restricted Subsidiaries as a result of such event to repay Indebtedness permitted to be incurred hereunder (other than (x) the Loans or (y) other pari passu or junior Financing secured by a Lien on the Collateral and incurred pursuant to Section 6.01(a)) and secured by such asset or otherwise subject to mandatory prepayment as a result of such event, (y) the pro rata portion of net cash proceeds thereof (calculated without regard to this clause (y)) attributable to minority interests and not available for distribution to or for the account of Holdings and the Restricted Subsidiaries as a result thereof and (z) the amount of any liabilities directly associated with such asset and retained by the Borrower or the Restricted Subsidiaries and (iii) the amount of all Taxes paid (or reasonably estimated to be payable), and the amount of any reserves established by Holdings and the Restricted Subsidiaries to fund contingent liabilities reasonably estimated to be payable, that are directly attributable to such event, provided that any reduction at any time in the amount of any such reserves (other than as a result of payments made in respect thereof) shall be deemed to constitute the receipt by the Borrower at such time of Net Proceeds in the amount of such reduction.

"New Intermediate Holdings" means [Invacare Intermediate Holdco Corporation], a Delaware corporation.

"Non-Cash Compensation Expense" means any non-cash expenses and costs that result from the issuance of stock-based awards, partnership interest-based awards and similar incentive based compensation awards or arrangements.

"Non-Consenting Lender" has the meaning assigned to such term in Section 9.02(c).

"Non-Cooperative Jurisdiction" means a non-cooperative tax jurisdiction (*nicht kooperierendes Steuerhoheitsgebiet*) within the meaning of the German Defense against Tax Havens Act (*Gesetz zur Abwehr von Steuervermeidung und unfairem Steuerwettbewerb und zur Änderung weiterer Gesetze*, the "SteueroasenAbwG") and the and the respective legislative decree (*Rechtsverordnung*), each as amended, supplemented or restated.

"Non-Cooperative Jurisdiction Resident Party" means a Party that is resident in a Non-Cooperative Jurisdiction.

"Norwegian Collateral Agreements" means the collateral agreements listed on Schedule 1.01(b) as the Norwegian Collateral Agreements.

43

"Norwegian Collateral Documents" means each of the Norwegian Collateral Agreements, and each other security agreement, pledge, debenture, hypothec, mortgage, consent or other instrument or document, as applicable, executed and delivered by any Norwegian Loan Party in connection with this Agreement and the Agreed Security Principles to secure the applicable Secured Obligations.

"Norwegian Loan Party" means any Loan Party incorporated or otherwise organized under the laws of Norway.

"Notice of Prepayment" shall have the meaning assigned to such term in Section 2.11(e).

"NZ Collateral Agreements" means the collateral agreements listed on Schedule 1.01(b) as the NZ Collateral Agreements.

"NZ Collateral Documents" means each of the NZ Collateral Agreements, and each other security agreement, pledge, debenture, hypothec, mortgage, consent or other instrument or document, as applicable, executed and delivered by any NZ Loan Party in connection with this Agreement and the Agreed Security Principles to secure the applicable Secured Obligations.

"NZ Loan Party" means any Loan Party incorporated or otherwise organized under the laws of New Zealand.

"OFAC" has the meaning assigned to such term in Section 3.18(c).

"Original Effective Date" means July 26, 2022.

"Organizational Documents" means (a) with respect to any corporation, the certificate or articles of incorporation, amendment or amalgamation, the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction) and/or any shareholder(s) agreements; (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction) and, with respect to any German Loan Party, the shareholder list (*Gesellschafterliste*); and (c) with respect to any partnership, limited partnership, joint venture, trust or other form of business entity, the partnership, limited partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Connection Taxes" means, with respect to any recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means any and all present or future intangible, filing, recording, stamp, documentary, transfer, sales, property or similar Taxes arising from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except for (i) any such Taxes that are Other Connection Taxes imposed with respect to an assignment, other than an assignment pursuant to Section 2.19 and (ii) any Luxembourg registration duties (*droits d'enregistrement*) payable in the case of voluntary registration of any Loan Document by the Loan Parties with the *Administration de l'Enregistrement des Domaines et de la TVA* in Luxembourg, or registration of the Notes in Luxembourg when such registration is not reasonably required to enforce the rights of that Loan Party under the Loan Document.

"Pari Passu Intercreditor Agreement" means the Pari Passu Intercreditor Agreement, in substantially the form of Exhibit G-3, dated as of the Effective Date, by and among the Collateral Agent, the Senior Secured Convertible Notes Agent, and each additional representative party thereto from time to time, as acknowledged by the Loan Parties, as amended, restated or otherwise modified from time to time in accordance with the terms thereof.

"Participant" has the meaning assigned to such term in Section 9.04(c)(i).

"Participant Register" has the meaning assigned to such term in Section 9.04(c)(iii).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"PCMLTF Act" means the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada).

"Perfection Certificate" means a certificate in the form of Exhibit J or any other form approved by the Administrative Agent at the direction of the Required Lenders.

"Permitted ABL EMEA Credit Facility" means a revolving credit facility availability in respect of which is determined by reference to a borrowing base based on accounts receivable and/or inventory that may be entered into by one or more of the EMEA Loan Parties providing for credit loans, letters of credit or other indebtedness or advances; provided that it is agreed that a Permitted ABL EMEA Credit Facility may be documented via an amendment to the ABL North America Credit Agreement to also include a Permitted ABL EMEA Credit Facility.

"Permitted ABL EMEA Intercreditor Agreement" means an intercreditor agreement that the Required Lenders and, so long as Highbridge is a Lender, Highbridge shall negotiate in good faith with the EMEA Loan Parties.

"Permitted Encumbrances" means:

(a)     Liens for Taxes that are not overdue for a period of more than 30 days or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, in each case, the nonpayment of which could not reasonably be expected to result in a Material Adverse Effect;

(b)      Liens imposed by law, such as carriers', warehousemen's, mechanics', materialmen's, repairmen's or construction contractors' Liens and other similar Liens, arising in the ordinary course of business that secure amounts not overdue for a period of more than 30 days or, if more than 30 days overdue, are unfiled and no other action has been taken to enforce such Liens or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, in each case so long as such Liens could not reasonably be expected to individually or in the aggregate have a Material Adverse Effect;

(c)      Liens incurred or deposits made in the ordinary course of business (i) in connection with workers' compensation, unemployment insurance and other social security legislation or (ii) securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees or similar instruments for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any Restricted Subsidiary or otherwise supporting the payment of items of the type set forth in the foregoing clause (i);

(d)      Liens incurred or deposits made to secure the performance of tenders, bids, trade contracts (other than for the payment of Indebtedness), governmental contracts and leases (other than Capital Lease Obligations), statutory obligations, surety, stay, customs and appeal bonds, performance bonds, bankers acceptance facilities and other obligations of a like nature (including those to secure health, safety and environmental obligations) and obligations in respect of letters of credit, bank guarantees or similar instruments that have been posted to support the same, in each case incurred in the ordinary course of business or consistent with past practices;

(e)      easements, rights-of-way, restrictions, encroachments, protrusions, zoning restrictions and other similar encumbrances and minor title defects affecting real property that, in the aggregate, do not in any case materially interfere with the ordinary conduct of the business of the Borrower and the Restricted Subsidiaries, taken as a whole;

(f)      (i) Liens securing, or otherwise arising from, judgments, awards attachments and/or decrees and notices of *lis pendens* and associated rights relating to litigation being contested in good faith not constituting an Event of Default under Section 7.01(j) and (ii) any pledge and/or deposit securing any settlement of litigation;

(g)      Liens on goods the purchase price of which is financed by a documentary letter of credit issued for the account of the Borrower or any of the Restricted Subsidiaries or Liens on bills of lading, drafts or other documents of title arising by operation of law or pursuant to the standard terms of agreements relating to letters of credit, bank guarantees and other similar instruments; provided that such Lien secures only the obligations of the Borrower or such Restricted Subsidiaries in respect of such letter of credit, bank guarantee or other similar instrument to the extent such obligations are permitted by Section 6.01;

(h)      rights of setoff, banker's lien, netting agreements and other Liens arising by operation of law or by of the terms of documents of banks or other financial institutions in

46

relation to the maintenance of administration of deposit accounts, securities accounts or cash management arrangements or in connection with the issuance of letters of credit, bank guarantees or other similar instruments;

(i)     Liens arising from precautionary Uniform Commercial Code financing statements or any similar filings made in respect of operating leases or consignment or bailee arrangements entered into by the Borrower or any of the Restricted Subsidiaries;

(j)     Liens or right of set-off arising under the general banking conditions (*algemene bankvoorwaarden*) or any non-Dutch equivalent thereof;

(k)     any Lien deemed to be granted under section 12(3) of the Australian PPSA which does not secure payment or performance of an obligation; and[6]

(a)     [cash collateral in an amount not to exceed $[  ] securing Cash Management Obligations.]

"Permitted Investments" means any of the following, to the extent owned by the Borrower or any Restricted Subsidiary:

Dollars, Euros, Sterling, Australian Dollars, Canadian dollars and such other currencies held by it from time to time in the ordinary course of business;

(a)     readily marketable obligations issued or directly and fully guaranteed or insured by the government or any agency or instrumentality of (i) the United States or (ii) any member nation of the European Union rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, having average maturities of not more than 24 months from the date of acquisition thereof; provided that the full faith and credit of the United States or such member nation of the European Union is pledged in support thereof;

(b)     time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) is a Lender or (ii) has combined capital and surplus of at least (x) $250,000,000 in the case of U.S. banks and (y) $100,000,000 (or the Dollar Equivalent as of the date of determination) in the case of non-U.S. banks (any such bank meeting the requirements of clause (i) or (ii) above being an "Approved Bank"), in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(c)     commercial paper and variable or fixed rate notes issued by an Approved Bank (or by the parent company thereof) or any variable or fixed rate note issued by, or guaranteed by, a corporation rated A-2 (or the equivalent thereof) or better by S&P or P-2

---

[6] Note to K&E: Please let us know the business justifications for the cash collateralization of LCs and cash management obligations.

(or the equivalent thereof) or better by Moody's, in each case with average maturities of not more than 24 months from the date of acquisition thereof;

(d)     repurchase agreements entered into by any Person with an Approved Bank, a bank or trust company (including any of the Lenders) or recognized securities dealer, in each case, having capital and surplus in excess of (x) $250,000,000 in the case of U.S. banks and (y) $100,000,000 (or the Dollar Equivalent as of the date of determination) in the case of non-U.S. banks, in each case, for direct obligations issued by or fully guaranteed or insured by the government or any agency or instrumentality of (i) the United States or (ii) any member nation of the European Union rated A (or the equivalent thereof) or better by S&P and A2 (or the equivalent thereof) or better by Moody's, in which such Person shall have a perfected first priority security interest (subject to no other Liens) and having, on the date of purchase thereof, a Fair Market Value of at least 100% of the amount of the repurchase obligations;

(e)     marketable short-term money market and similar highly liquid funds either (i) having assets in excess of (x) $250,000,000 in the case of U.S. banks or other U.S. financial institutions or (y) $100,000,000 (or the Dollar Equivalent as of the date of determination) in the case of non-U.S. banks or other non-U.S. financial institutions or (ii) having a rating of at least A-2 or P-2 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized rating service);

(f)     securities with average maturities of 24 months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, or by any political subdivision or taxing authority of any such state, commonwealth or territory or by a foreign government having an investment grade rating from either S&P or Moody's (or the equivalent thereof);

(g)     investments with average maturities of 12 months or less from the date of acquisition in mutual funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's;

(h)     instruments equivalent to those referred to in clauses (a) through (h) above denominated in Euros or any other foreign currency comparable in credit quality and tenor to those referred to above and customarily used by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by any Subsidiary organized in such jurisdiction;

(i)     investments, classified in accordance with GAAP as current assets, in money market investment programs that are registered under the Investment Company Act of 1940 or that are administered by financial institutions having capital of at least $250,000,000, and, in either case, the portfolios of which are limited such that substantially all of such investments are of the character, quality and maturity described in clauses (a) through (i) of this definition;

(j)     with respect to any Foreign Subsidiary: (i) obligations of the national government of the country or jurisdiction in which such Foreign Subsidiary maintains its chief executive office and principal place of business; provided such country or jurisdiction is a member of the Organization for Economic Cooperation and Development, in each case maturing within one year after the date of investment therein, (ii) certificates of deposit of, bankers acceptances of, or time deposits with, any commercial bank which is organized and existing under the laws of the country in which such Foreign Subsidiary maintains its chief executive office and principal place of business; provided such country or jurisdiction is a member of the Organization for Economic Cooperation and Development, and whose short-term commercial paper rating from S&P is at least "A-2" or the equivalent thereof or from Moody's is at least "P-2" or the equivalent thereof (any such bank being an "Approved Foreign Bank"), and in each case with maturities of not more than 24 months from the date of acquisition and (iii) the equivalent of demand deposit accounts which are maintained with an Approved Foreign Bank;

(k)     interest bearing instruments with a maximum maturity of 180 days in respect of which the obligor is a G8 government or other G8 governmental agency or a G8 financial institution with credit ratings from S&P of at least "A-2" or the equivalent thereof or from Moody's of at least "P-2" or the equivalent thereof; and

(l)     investment funds investing at least 90% of their assets in securities of the types described in clauses (a) through (l) above.

"Permitted Refinancing" means, with respect to any Person, any modification, refinancing, refunding, renewal or extension of any Indebtedness of such Person; provided that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed or extended except (i) by an amount equal to unpaid accrued interest and premium (including tender premiums) thereon plus underwriting discounts, other amounts paid, and fees, commissions and expenses (including upfront fees, original issue discount or initial yield payments) incurred, in connection with such modification, refinancing, refunding, renewal or extension and (ii) by an amount equal to any existing revolving commitments unutilized thereunder to the extent that the portion of any existing and unutilized revolving commitment being refinanced was permitted to be drawn under Section 6.01 immediately prior to such refinancing (other than by reference to a Permitted Refinancing) and such drawing shall be deemed to have been made, (b) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 6.01(a)(v) and Section 6.01(a)(xiv), Indebtedness resulting from such modification, refinancing, refunding, renewal or extension (x) has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed or extended and (y) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 6.01(a)(xxii) or Section 6.01(a)(xxv), has a final maturity date later than 180 days after the Latest Maturity Date, (c) if the Indebtedness being modified, refinanced, refunded, renewed or extended is subordinated in right of payment to the Loan Document Obligations, Indebtedness resulting from such modification, refinancing, refunding, renewal or extension is subordinated in right of payment to the Loan Document Obligations on terms at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness

being modified, refinanced, refunded, renewed or extended, (d) [reserved], (e) immediately after giving effect thereto, no Event of Default shall have occurred and be continuing, and (f) if the Indebtedness being modified, refinanced, refunded, renewed or extended is permitted pursuant to Section 6.01(a)(ii), (a)(xii) or (a)(xxiii), (i) the terms and conditions (including Lien priority, but excluding as to subordination, interest rate (including whether such interest is payable in cash or in kind), rate floors, fees, discounts and premiums) of Indebtedness resulting from such modification, refinancing, refunding, renewal or extension are, taken as a whole, not materially more favorable to the investors providing such Indebtedness than the terms and conditions of the Indebtedness being modified, refinanced, refunded, renewed or extended (except for covenants or other provisions applicable to periods after the Latest Maturity Date at the time such Indebtedness is incurred) (it being understood that, to the extent that any financial maintenance covenant is added for the benefit of any such Permitted Refinancing, the terms shall not be considered materially more favorable if such financial maintenance covenant is either (A) also added for the benefit of any Loans remaining outstanding after the issuance or incurrence of such Permitted Refinancing or (B) only applicable after the Latest Maturity Date at the time of such refinancing); provided that the primary obligor in respect of, and/or the Persons (if any) that Guarantee, the Indebtedness resulting from such modification, refinancing, refunding, renewal or extension is the primary obligor in respect of, and/or Persons (if any) that Guaranteed the Indebtedness being modified, refinanced, refunded, renewed or extended; provided further that such Indebtedness resulting from such modification, refinancing, refunding, renewal or extension shall not be secured by any assets other than Collateral and the lien securing such Indebtedness shall not have greater priority than the lien securing the Indebtedness that is being modified, refinanced, refunded, renewed or extended (and if the Indebtedness being refinanced is unsecured, such Indebtedness resulting from such modification, refinancing, refunding, renewal or extension shall be unsecured). For the avoidance of doubt, it is understood that a Permitted Refinancing may constitute a portion of an issuance of Indebtedness in excess of the amount of such Permitted Refinancing; provided that such excess amount is otherwise permitted to be incurred under Section 6.01. For the avoidance of doubt, it is understood and agreed that a Permitted Refinancing includes successive Permitted Refinancings of the same Indebtedness.

"Permitted Transferees" means, with respect to any Person that is a natural person (and any Permitted Transferee of such Person), (a) such Person's immediate family, including his or her spouse, ex-spouse, children, step-children and their respective lineal descendants, (b) any trust or other legal entity the beneficiary of which is such Person's immediate family, including his or her spouse, ex-spouse, children, stepchildren or their respective lineal descendants and (c) without duplication with any of the foregoing, such Person's heirs, executors and/or administrators upon the death of such Person and any other Person who was an Affiliate of such Person upon the death of such Person and who, upon such death, directly or indirectly owned Equity Interests in the Borrower.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, Governmental Authority or other entity.

"Petition Date" has the meaning assigned to such term in the recitals hereto.

"Plan" means any "employee pension benefit plan" as defined in Section 3(2) of ERISA (other than a Multiemployer Plan) which is subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which a Loan Party or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Platform" has the meaning assigned to such term in Section 5.01.

"PPSA" means the *Personal Property Security Act* (Ontario) including the regulations thereto, provided that if perfection or the effect of perfection or non-perfection or the priority of any Lien created hereunder or under any other Loan Document on the Collateral is governed by the personal property security legislation or other applicable legislation with respect to personal property security in effect in a jurisdiction in Canada other than the Province of Ontario, "PPSA" means the Personal Property Security Act or such other applicable legislation (including the Civil Code of Quebec) in effect from time to time in such other jurisdiction in Canada for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"Prepetition Term Loan Agreement" has the meaning assigned to such term in the recitals hereto.

"Present Fair Saleable Value" means the amount that could be obtained by an independent willing seller from an independent willing buyer if the assets of Holdings and its Subsidiaries taken as a whole are sold with reasonable promptness in an arm's length transaction under present conditions for the sale of comparable business enterprises insofar as such conditions can be reasonably evaluated.

"Prior Loan Documents" has the meaning assigned to such term in Section 9.24.

"Prime Rate" means the rate last quoted by *The Wall Street Journal* (or another national publication selected by Administrative Agent) as the U.S. "Prime Rate".

"Proposed Change" has the meaning assigned to such term in Section 9.02(c).

"Public Lender" has the meaning assigned to such term in Section 5.01.

"Qualified Equity Interests" means Equity Interests other than Disqualified Equity Interests.

"Register" has the meaning assigned to such term in Section 9.04(b)(iv).

"Regulation" has the meaning assigned to such term in Section 3.22(b).

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the partners, directors, officers, employees, trustees, agents, controlling persons, advisors, servicers, financing sources and other representatives of such Person and of each of such Person's Affiliates and permitted successors and assigns.

"Release" means any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into the environment (including ambient air, surface water, groundwater, land surface or subsurface strata) and including the environment within any building or other structure.

"Reorganization Plan" has the meaning assigned to such term in the recitals hereto.

"Representative" has the meaning assigned to such term in Section 9.12.

"Required Accounts" means, (A) all deposit accounts or securities accounts of the Domestic Loan Parties and the Canadian Loan Parties, other than (i) accounts having a de minimis balance and (ii) accounts that are zero balance accounts; provided that the aggregate balance in all accounts excluded by de minimis threshold set forth in clause (i) shall not exceed $50,000 at any time and (B) all deposit accounts and securities accounts that are subject to control agreements in favor of the ABL North America Agent.  Notwithstanding the foregoing, accounts used solely for payroll or benefits related disbursements or in which trust or the Insurance Subsidiary funds are maintained shall not constitute "Required Accounts".

"Required Additional Debt Terms" means, with respect to any Indebtedness, (a) such Indebtedness does not mature earlier than 180 days after the Latest Maturity Date or have a Weighted Average Life to Maturity less than the greatest Weighted Average Life to Maturity of the then-existing Term Loans outstanding at the time of incurrence of such Indebtedness, (b) such Indebtedness does not have mandatory prepayment or redemption provisions (other than customary asset sale proceeds events, insurance and condemnation proceeds events, change of control offers or events of default) that could result in the prepayment or redemption of such Indebtedness prior to the Latest Maturity Date, (c) such Indebtedness is not guaranteed by any entity that is not a Loan Party, (d) such Indebtedness that is secured (i) is not secured by any assets not securing the Secured Obligations, (ii) is secured on a junior basis to the Liens securing the Secured Obligations and is subject to the relevant Intercreditor Agreement(s) and (iii) is subject to security agreements relating to such Indebtedness that are substantially the same as the Security Documents (with such differences as are reasonably satisfactory to the Required Lenders), (e) [reserved] and (f) the terms and conditions of such Indebtedness (excluding pricing, interest rate margins, rate floors, discounts, fees, premiums and, subject to clauses (a) and (b) above, prepayment or redemption provisions, are not materially more favorable (when taken as a whole) to the lenders or investors providing such Indebtedness than the terms and conditions of this Agreement (when taken as a whole) are to the Lenders (except for covenants or other provisions applicable only to periods after the Latest Maturity Date at such time) (it being understood that, to the extent that any financial maintenance covenant is added for the benefit of any such Indebtedness, no consent shall be required by the Administrative Agent or any of the Lenders if such financial maintenance covenant is either (i) also added for the benefit of any Loans remaining outstanding after the issuance or incurrence of any such Indebtedness in connection therewith or (ii) only applicable after the Latest Maturity Date at such time); provided that a certificate of a Responsible Officer of the Borrower delivered to the Administrative Agent at least five Business Days prior to the incurrence of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the foregoing requirement, shall be conclusive evidence that such terms and conditions

satisfy the foregoing requirement unless the Administrative Agent, acting at the direction of the Required Lenders, notifies the Borrower within such five Business Day period that it disagrees with such determination (including a reasonable description of the basis upon which it disagrees).

"Required Lenders" means, at any time, Lenders holding Term Loans and Commitments representing more than 50.0% of the sum of (i) the aggregate outstanding Term Loans at such time and (ii) the Commitments then in effect.

"Requirements of Law" means, with respect to any Person, any statutes, laws, treaties, rules, regulations, orders, decrees, writs, injunctions or determinations of any arbitrator or court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Resignation Effective Date" has the meaning assigned to such term in Article VIII.

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer" means the chief executive officer, president, vice president, chief financial officer, secretary, treasurer or assistant treasurer, in relation to a German Loan Party, managing director (*Geschäftsführer*) or other similar officer, manager or a director of a Loan Party and with respect to certain limited liability companies or partnerships that do not have officers, any manager, sole member, managing member or general partner thereof. Any document delivered hereunder that is signed by one or more Responsible Officers of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Debt Payment" has the meaning assigned to such term in Section 6.08(b).

"Restricted Debt Payment Amount" means, at any time on or after the Effective Date, $2,500,000 minus the amount of Restricted Debt Payments made by the Borrower or any Restricted Subsidiary in reliance on Section 6.08(b)(iv).

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Borrower or any Restricted Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interests in the Borrower or any Restricted Subsidiary or any option, warrant or other right to acquire any such Equity Interests, including, for the avoidance of doubt, any payments made to settle or otherwise redeem any convertible indebtedness that are in excess of the principal amount thereof.

"Restricted Subsidiary" means any Subsidiary.

"RSA" has the meaning assigned to such term in the recitals hereto.

"<u>S&P</u>" means Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business, and any successor to its rating agency business.

"<u>Sanctions</u>" means economic sanctions administered or enforced by the United States Government (including without limitation, sanctions enforced by OFAC and the Department of State), the United Nations Security Council, the European Union, Foreign Affairs, Trade and Development Canada, Public Safety Canada, or His Majesty's Treasury of the United Kingdom.

"<u>SEC</u>" means the Securities and Exchange Commission or any Governmental Authority succeeding to any of its principal functions.

"<u>Secured Obligations</u>" means the Loan Document Obligations.

"<u>Secured Parties</u>" means (a) each Lender, (b) the Administrative Agent, (c) the Collateral Agent, (d) each other Agent, (e) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document owed to a Lender or any of its Affiliates or an Agent Related Person of an Agent or any of its Affiliates and (f) the successors and permitted assigns of each of the foregoing.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended.

"<u>Security Documents</u>" means each of the Collateral Agreements, the relevant Foreign Loan Documents, the Mortgages, the Control Agreements and each other security agreement or pledge agreement, including any intellectual property security agreement executed and delivered pursuant to the Collateral and Guarantee Requirement, <u>Section 4.01(f)</u>, <u>Section 5.11</u> or <u>Section 5.12</u> to secure any of the Secured Obligations.

"<u>Senior Secured Convertible Notes Agent</u>" means GLAS Trust Corporation Limited, as collateral agent in respect of the Senior Secured Convertible Notes.

"<u>Senior Secured Convertible Notes</u>" means Holdings' [  ]% senior secured notes issued pursuant to the Senior Secured Convertible Notes Indenture.

"<u>Senior Secured Convertible Notes Documents</u>" means the Senior Secured Convertible Notes Indenture and the other transaction documents referred to therein (including the related guarantee, the notes and notes purchase agreement).

"<u>Senior Secured Convertible Notes Indenture</u>" means, collectively, the indentures, each dated the Effective Date, among Holdings, as issuer, the guarantors listed therein, the Senior Secured Convertible Notes Agent and the trustee referred to therein pursuant to which the Senior Secured Convertible Notes are issued, as such indentures may be amended or supplemented from time to time.

"<u>Significant Subsidiary</u>" means any Restricted Subsidiary that, or any group of Restricted Subsidiaries that, taken together, as of the last day of the fiscal quarter of Holdings most recently ended for which financial statements are available, had revenues or total assets (determined on a consolidated basis for such Restricted Subsidiary and its Restricted Subsidiaries or such group of Restricted Subsidiaries and their respective Restricted Subsidiaries, as applicable) for such quarter

in excess of 5.0% of the consolidated revenues or total assets, as applicable, of Holdings and the Restricted Subsidiaries for such quarter.

"SOFR" shall mean, for any day, a rate equal to the secured overnight financing rate as administered by the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"SOFR Floor" means a rate of interest per annum equal to 2.00%.

"SOFR Reserve Percentage" shall mean, for any day, the maximum effective percentage in effect on such day, if any, as prescribed by the Board of Governors of the Federal Reserve.

"Solvent" means (a) the sum of the debt (including contingent liabilities) of Holdings and its subsidiaries, on a consolidated basis, does not exceed the fair value or the Present Fair Saleable Value of the assets of Holdings and its subsidiaries, on a consolidated basis; (b) Holdings and its subsidiaries, on a consolidated basis, are able to pay their debts, on a consolidated basis, as they become due generally, (c) the capital of Holdings and its subsidiaries, on a consolidated basis, is not unreasonably small in relation to the business of Holdings or its subsidiaries, on a consolidated basis, in existence or otherwise contemplated as of the date hereof; and (d) Holdings and its subsidiaries, on a consolidated basis, do not intend to incur, or believe that they will incur, debts (including current obligations and contingent liabilities) beyond their ability to pay such debt as they mature in the ordinary course of business. For purposes hereof, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"Specified Jurisdictions" means England and Wales, Canada (including any province and territory thereof), Luxembourg, the Netherlands, Germany, Switzerland, France, Norway, Denmark, Australia and New Zealand.

"SPV" has the meaning assigned to such term in Section 9.04(f).

"Sterling" means the lawful currency of the United Kingdom from time to time.

"Subordinated Indebtedness" means any Junior Financing under clause (a) of the definition thereof.

"subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which Equity Interests representing more than 50.0% of the equity or more than 50.0% of the ordinary voting power or, in the case of a partnership, more than 50.0% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" means any subsidiary of Holdings.

"Subsidiary Loan Party" means (a) each Subsidiary that is a party to the Domestic Guarantee Agreement, (b) each Subsidiary that is party to the Foreign Guarantee Agreement and (c) any other Subsidiary of Holdings (other than the Borrower) that may be designated by the Borrower (subject to the requirements of the Agreed Security Principles in the case of a Foreign Subsidiary) by way of delivering to the Collateral Agent a supplement to the U.S. Collateral Agreement and a supplement to the Domestic Guarantee Agreement or the Foreign Guarantee Agreement, as applicable, in each case, duly executed by such Subsidiary) in its sole discretion from time to time to be a guarantor in respect of the Secured Obligations, whereupon such Subsidiary shall be obligated to comply with the other requirements of Section 5.11 as if it were newly acquired; provided, in the case of this clause (c), that, in the case of a Foreign Subsidiary, the jurisdiction of incorporation, organization or formation of such Foreign Subsidiary shall be reasonably acceptable to the Required Lenders (it being acknowledged and agreed that the Specified Jurisdictions are reasonably acceptable); provided, further, that the Borrower shall not constitute a Subsidiary Loan Party.

"Swap" means any agreement, contract, or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Swap Agreement" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swiss Collateral Agreements" the collateral agreements listed on Schedule 1.01(b) as the Swiss Collateral Agreements.

"Swiss Collateral Documents" means each of the Swiss Collateral Agreements, and each other security agreement, pledge, debenture, mortgage or other instrument or document, as applicable, governed by Swiss law in connection with this Agreement and the Agreed Security Principles to secure the applicable Secured Obligations.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges, fees, assessments or withholdings (including backup withholdings) imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Facility" means the Term Loans or any refinancing thereof.

"Term Lenders" means, at any time, Lenders holding Term Loans or unused Commitments and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption in respect of any Term Loans, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"Term Loan Commitments" means, collectively, the Exit Prepetition Continued Loan Commitments and the Exit DIP Converted Loan Commitments.

"Term Loan" has the meaning assigned to such term in Section 2.01.

"Term Maturity Date" means [ ], 2027; provided, that if such Term Maturity Date is not a Business Day, the Term Maturity Date shall be the immediately preceding Business Day.

"Termination Date" means the date on which all Loan Document Obligations (other than in respect of contingent indemnification and expense reimbursement claims not then due) shall have been paid in full.

"Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion (at the direction of the Required Lenders)).

"Term SOFR Determination Date" shall have the meaning assigned to such term in the definition of "Term SOFR Rate".

"Term SOFR Loan" means a Borrowing that bears interest based on Term SOFR Rate.

"Term SOFR Rate" means,

(a)     for any calculation with respect to a Term SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "Term SOFR Determination Date") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Term SOFR Determination Date the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then the Term SOFR Rate will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Term SOFR Determination Date, and

(b)     for any calculation with respect to an ABR Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "ABR Term SOFR Determination Date") that is two (2) U.S. Government Securities Business Days

prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any ABR Term SOFR Determination Date the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR Rate will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such ABR SOFR Determination Date;

provided, further, that if the Term SOFR Rate determined as provided above (including pursuant to the proviso under clause (a) or clause (b) above) shall ever be less than the SOFR Floor, then the Term SOFR Rate shall be deemed to be the SOFR Floor.

"Term SOFR Reference Rate" shall mean the forward-looking term rate based on SOFR.

"Test Period" means, at any date of determination, the most recently completed four consecutive fiscal quarters of Holdings ending on or prior to such date for which financial statements have been (or were required to have been) delivered pursuant to Section 5.01(a) or 5.01(b).

"Transaction Costs" means any fees, expenses and other transaction costs incurred or paid by Holdings, the Borrower or any of the Subsidiaries in connection with the Transactions, this Agreement and the other Loan Documents, and the transactions contemplated hereby and thereby.

"Transactions" means, collectively, the transactions that are contemplated by the Loan Documents, the Plan and the RSA to occur on the Effective Date, including (a) the execution, delivery and performance of the Loan Documents to be entered into on the Effective Date, (b) the issuance and deemed funding of the Term Loans on the Effective Date, (c) the consummation of the other transactions contemplated by this Agreement, the ABL North America Credit Agreement, the Senior Secured Convertible Notes Documents, the Holdings Preferred Equity Documents, the Plan and the RSA and (d) the payment of the fees and expenses incurred in connection with any of the foregoing (including the Transaction Costs).

"Type," when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Term SOFR Rate or the Alternate Base Rate.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that, at any time, if by reason of mandatory provisions of law, any or all of the perfection or priority of the Collateral Agent's security interest in any item or portion of the Collateral is governed by the Uniform Commercial Code as in effect in a U.S. jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for

purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"U.S. Government Securities Business Day" means any day except for (a) a Saturday or Sunday or (b) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Tax Compliance Certificate" has the meaning assigned to such term in Section 2.17(e).

"USA Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended from time to time.

"Vehicles" means all railcars, cars, trucks, trailers, construction and earth moving equipment and other vehicles covered by a certificate of title law of any state and all tires and other appurtenances to any of the foregoing.

"Vendor Financing Program" means the sale of customer accounts receivables in the ordinary course of business by (i) Subsidiaries of Holdings incorporated in Denmark, Sweden and/or Norway to Nordea Finans Danmark A/S pursuant to the agreements on purchase of receivables each dated May 12, 2021 and any amendments, extensions, renewals or replacements thereof and (ii) any Subsidiaries of Holdings to De Lage Landen Financial Services, Inc. under the program in existence on the Effective Date and any amendments, extensions, renewals or replacements thereof (the, "De Lage Program").

"Voting Stock" means, with respect to any Person, such Person's Equity Interests having the right to vote for the election of directors of such Person under ordinary circumstances.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

"wholly-owned subsidiary" means, with respect to any Person at any date, a subsidiary of such Person of which securities or other ownership interests representing 100% of the Equity Interests (other than (a) directors' qualifying shares and (b) nominal shares issued to foreign nationals to the extent required by applicable Requirements of Law) are, as of such date, owned, controlled or held by such Person or one or more wholly-owned subsidiaries of such Person or by such Person and one or more wholly-owned subsidiaries of such Person.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Withholding Agent" means any Loan Party, the Administrative Agent and, in the case of any U.S. federal withholding tax, any other withholding agent, if applicable.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom,  any powers of the applicable Resolution Authority  under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution  or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

"WURA" means the *Winding-Up and Restructuring Act* (Canada).

Section 1.02   Classification of Loans and Borrowings. For purposes of this Agreement, Loans and Borrowings may be classified and referred to by Type (e.g., a "Term SOFR Loan").

Section 1.03   Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (a) any definition of or reference to any agreement (including this Agreement and the other Loan Documents), instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein

to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. Any references to "as of the date hereof" or similar terms or references shall be deemed to refer to the Effective Date.

Section 1.04    Accounting Terms; GAAP.

(a)    All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein.

(b)    [Reserved].

(c)    [Reserved].

(d)    In the event that Holdings elects to prepare its financial statements in accordance with IFRS and such election results in a change in the method of calculation of financial covenants, standards or terms (collectively, the "Accounting Changes") in this Agreement, the Borrower and the Administrative Agent, acting at the direction of the Required Lenders, agree to enter into good faith negotiations in order to amend such provisions of this Agreement so as to reflect equitably the Accounting Changes with the desired result that the criteria for evaluating Holdings's financial condition shall be substantially the same after such change as if such change had not been made. Until such time as such an amendment shall have been executed and delivered by the Borrower, the Administrative Agent and the Required Lenders, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed in accordance with GAAP (as determined in good faith by a Responsible Officer of the Borrower) (it being agreed that the reconciliation between GAAP and IFRS used in such determination shall be made available to Lenders) as if such change had not occurred.

(e)    Notwithstanding any other provision contained herein, for purposes of determining compliance with any provision of this Agreement and any related definitions, the determination of whether a lease is to be treated as an operating lease or capital lease shall be made without giving effect to any change in GAAP that becomes effective on or after November 30, 2016 that would require operating leases to be treated similarly to capital leases.

Section 1.05    Currency Translation; Rates.

(a)    For purposes of any determination under Article V, Article VI or Article VII or any determination under any other provision of this Agreement expressly requiring the use of a current exchange rate, all amounts incurred, outstanding or proposed to be incurred or outstanding in currencies other than Dollars shall be translated into Dollars at the Exchange Rate (rounded to the nearest currency unit, with 0.5 or more of a currency unit being rounded upward); provided, however, that for purposes of determining compliance with Article VI with respect to the amount of any Indebtedness, Investment, Disposition or Restricted Payment in a currency other than Dollars, no Default or Event of Default shall be deemed to have occurred solely as a result of

changes in rates of exchange occurring after the time such Indebtedness or Investment is incurred or Disposition or Restricted Payment made; provided further that, for the avoidance of doubt, the foregoing provisions of this Section 1.05 shall otherwise apply to such Sections, including with respect to determining whether any Indebtedness or Investment may be incurred or Disposition or Restricted Payment made at any time under such Sections. Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent, acting at the direction of the Required Lenders, may from time to time specify with the Borrower's consent (such consent not to be unreasonably withheld) to appropriately reflect a change in currency of any country and any relevant market conventions or practices relating to such change in currency.

(b)      The Administrative Agent does not warrant, nor accept responsibility, nor shall the Administrative Agent have any liability with respect to the administration, submission or any other matter related to the rates in the definition of "Term SOFR Rate" or with respect to any comparable or successor rate thereto, or with respect to any Benchmark Replacement Conforming Amendments.

Section 1.06   Timing of Payment of Performance. When payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or required on a day which is not a Business Day, the date of such payment (other than as described in the definition of "Interest Period") or performance shall extend to the immediately succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.

Section 1.07   Cashless Rollovers. Notwithstanding anything to the contrary contained in this Agreement or in any other Loan Document, to the extent that any Lender extends the maturity date of, or replaces, renews or refinances, any of its then-existing Loans with loans that refinance in full or fully replace the Term Loans or loans incurred under a new credit facility, in each case, to the extent such extension, replacement, renewal or refinancing is effected by means of a "cashless roll" by such Lender, such extension, replacement, renewal or refinancing shall be deemed to comply with any requirement hereunder or any other Loan Document that such payment be made "in Dollars", "in immediately available funds", "in Cash" or any other similar requirement.

Section 1.08   Certain Calculations and Tests. Notwithstanding anything to the contrary herein, to the extent that the terms of this Agreement require the absence of a Default or Event of Default (or any type of Default or Event of Default) as a condition to the consummation of any transaction in connection with any acquisition or similar Investment (including the assumption or incurrence of Indebtedness), the determination of whether the relevant condition is satisfied may be made, at the election of the Borrower, in the case of any acquisition or similar Investment, at the time of (or on the basis of the financial statements for the most recently ended Test Period at the time of) either (x) the execution of the definitive agreement with respect to such acquisition or Investment or (y) the consummation of such acquisition or Investment; provided that if the Borrower elects to have such determination occur at the time of entry into the definitive agreement with respect to such acquisition or Investment, any testing of compliance with any test shall be tested on a pro forma basis assuming such acquisition or Investment and other transactions in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) had been consummated.

Section 1.09    Rounding. Any financial ratios required to be maintained by the Borrower pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding up for five).

Section 1.10    Divisions.    For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

Section 1.11    Term SOFR Notification. Section 2.14 of this Agreement provides a mechanism for determining an alternate rate of interest in the event that the Term SOFR Rate is no longer available or in certain other circumstances. The Administrative Agent does not warrant or accept any responsibility for and shall not have any liability with respect to, the administration, submission or any other matter related to the Term SOFR Rate or with respect to any alternative or successor rate thereto, or replacement rate therefor. The Required Lenders and the Borrower agree to cooperate with the Administrative Agent in making any determinations with respect to the comparable or successor rate to Term SOFR or any other benchmark.

Section 1.12    Benchmark Replacement Conforming Changes Relating to Term SOFR Rate. With respect to the Term SOFR Rate, the Administrative Agent and the Required Lenders will have the right (but not the obligation) to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document; provided that, with respect to any such amendment effected, the Administrative Agent shall provide notice to the Borrower and the Lenders of each such amendment implementing such Benchmark Replacement Conforming Changes reasonably promptly after such amendment becomes effective.

Section 1.13    Quebec Matters. For purposes of any assets, liabilities or entities located in the Province of Québec and for all other purposes pursuant to which the interpretation or construction of this Agreement may be subject to the laws of the Province of Québec or a court or tribunal exercising juris diction in the Province of Québec, (a) "personal property" shall include "movable property", (b) "real property" or "real estate" shall include "immovable property", (c) "tangible property" shall include "corporeal property", (d) "intangible property" shall include "incorporeal property", (e) "security interest", "mortgage" and "lien" shall include a "hypothec", "right of retention", "prior claim" , "reservation of ownership" and a resolutory clause, (f) all references to filing, perfection, priority, remedies, registering or recording under the UCC or a PPSA shall include publication under the *Civil Code of Québec,* (g) all references to "perfection" of or "perfected" liens or security interest shall include a reference to an "opposable" or "set up" hypothec as against third parties, (h) any "right of offset", "right of setoff" or similar expression

shall include a "right of compensation", (i) "goods" shall include "corporeal movable property" other than chattel paper, documents of title, instruments, money and securities, (j) an "agent" shall include a "mandatary", (k) "construction liens" or "mechanics, materialmen, repairmen, construction contractors or other like Liens" shall include "legal hypothecs" and "legal hypothecs in favour of persons having taken part in the construction or renovation of an immovable", (l) "joint and several" shall include "solidary", (m) "gross negligence or wilful misconduct" shall be deemed to be "intentional or gross fault", (n) "beneficial ownership" shall include "ownership on behalf of another as mandatary", (o) "easement" shall include "servitude", (p) "priority" shall include "rank" or "prior claim", as applicable (q) "survey" shall include "certificate of location and plan", (r) "state" shall include "province", (s) "fee simple title" shall include "absolute ownership" and "ownership" (including ownership under a right of superficies), (t) "accounts" shall include "claims", (u) "legal title" shall be including "holding title on behalf of an owner as mandatory or prete-nom", (v) "ground lease" shall include "emphyteusis" or a "lease with a right of superficies, as applicable, (w) "leasehold interest" shall include a "valid lease", (x) "lease" shall include a "leasing contract" and (y) "guarantee" and "guarantor" shall include "suretyship" and "surety", respectively.

Section 1.14   <u>French terms</u>. In this Agreement, where it relates to a French entity and unless the contrary intention appears, a reference to: (a) an "administrator" or a "similar officer" includes an *administrateur judiciaire*, a *mandataire ad hoc*, a *conciliateur*, a *mandataire liquidateur* or any other person appointed as a result of any proceedings under articles L. 611-3 to L. 611-16 of the French Commercial Code; (b) a "winding-up", "dissolution", "administration", or "amalgamation" includes (without limitation) a *redressement judiciaire*, *cession totale ou partielle de l'entreprise*, *liquidation judiciaire* or a *procédure de sauvegarde* under Livre Sixième of the French Commercial Code; (c) "any analogous procedure or step" or "legal proceedings or other procedures" shall include, without limitation: (i) proceedings for the appointment of a *mandataire ad hoc* for a *conciliation* in accordance with Articles L.611-3 to L.611-16 of the French Commercial Code, and (ii) the entry of a judgment for *sauvegarde, redressement judiciaire, cession totale de l'entrepris, liquidation judiciaire* or *cession totale de l'entreprise* under Articles L.620-1 to L.670-8 of the French Commercial Code; (d) a person being unable to pay its debts is that person being in a state of *cessation des paiements* within the meaning of the French Commercial Code; (e) "control" has the meaning given in article L.233-3 I and II of the French Commercial Code; (f) "gross negligence" means "*faute lourde*"; (g) "merger" includes any fusion implemented in accordance with articles L.236-1 to L.236-24 of the French Commercial Code; (h) a "guarantee" includes, as regards French law, any "*cautionnement*", "*aval*", any "*garantie*" which is independent from the debt to which it relates and any type of "*sûreté personnelle*"; (i) a "security interest" includes any type of security (*sûreté réelle*) and transfer by way of security and fiducie sûreté; (j) "wilful misconduct" means "*dol*"; (k) the "French Civil Code" means the *Code Civil*; (l) the "French Commercial Code" means the *Code de commerce*.

Section 1.15   <u>Luxembourg terms</u>.

Luxembourg legal concepts expressed in English terms in this Agreement may not correspond to the original French or German terms relating thereto.

In this Agreement, where it relates to a Luxembourg Loan Party, a reference to:

(a)    a winding up, dissolution, administration or moratorium includes:

(i)    bankruptcy (faillite déclarée);

(ii)    voluntary or compulsory liquidation (liquidation volontaire or liquidation judiciaire);

(iii)    controlled management (gestion contrôlée);

(iv)    reprieve from payment (sursis de paiement) or a composition with creditors (concordat préventif de faillite); and

(v)    administrative dissolution without liquidation (dissolution administrative sans liquidation).

(b)    a trustee, an administrator, a receiver or a similar office includes *a commissaire*, *juge-commissaire*, *mandataire ad hoc*, *administrateur provisoire*, *liquidateur*, *curateur* or a *juge délégué*;

(c)    guarantee includes any *garantie* which is independent from the debt to which it relates and excludes any suretyship (*cautionnement*) within the meaning of Articles 2011 et seq. of the Luxembourg Civil Code;

(d)    a person being unable to pay its debts includes that person being in a state of cessation of payments (*cessation de paiements*) and has lost its creditworthiness (*ebranlement du credit*) ; and

(e)    an attachment includes a *saisie*;

(f)    by-laws or constitutional documents includes its up-to-date (restated) articles of association (*statuts coordonnés*); and

(g)    a director includes a *gérant* or an *administrateur*.

Section 1.16    Swiss terms. In respect of any Loan Party incorporated in Switzerland, any obligations of, and the use of any enforcement proceeds of security provided by, such Loan Party set out in this Agreement or any other Loan Document shall be limited as set out in Section 6.03 (Swiss Guaranty Limitations) of the Foreign Guarantee Agreement, which shall apply mutatis mutandis.

Section 1.17    Australian matters.

(a)    Without prejudice to the generality of any provision of this Agreement, in this Agreement where it relates to an Australian Collateral Document, an Australian Loan Party or any of their Subsidiaries incorporated under the laws of Australia or any state or territory thereof, a reference in this Agreement to:

(i)      with respect to any reference to an Affiliate, "Control" has the meaning given to it in section 50AA of the Australian Corporations Act;

(ii)     "receiver" or "receiver and manager" has the meaning given to it in section 9 of the Australian Corporations Act;

(iii)    "Inventory" has the meaning provided in section 10 of the Australian PPSA; and

(iv)     "Subsidiary" means a subsidiary within the meaning given in Part 1.2 Division 6 of the Australian Corporations Act.

(b)      The parties agree that the Australian Banking Association Banking Code of Practice published by the Australian Bankers' Association (as amended, revised or amended and restated from time to time) does not apply to the Loan Documents or the transactions under them.

Section 1.18    Danish terms.

(a)      The guarantee and indemnity obligations or any third party Collateral of any Danish Loan Party under any Loan Document shall be deemed not to be assumed (and any Collateral created in relation thereto shall be limited) to the extent that the same would otherwise constitute unlawful financial assistance within the meaning of §§ 206-212 of the Danish Companies Act (in Danish: *selskabsloven*).

(b)      Any Guarantor's guarantee and indemnity obligations in relation to obligations not incurred as a result of direct or indirect borrowings under any Loan Document by such Guarantor or by a direct or indirect Subsidiary of such Guarantor shall further be limited to an amount equal to the higher of (i) the equity (in Danish: *egenkapital*) of such Guarantor at the date hereof or, if such Guarantor is not party to this Agreement at the date hereof, the date of accession by such Guarantor to this Agreement, and (ii) the date when a claim is made against such Guarantor calculated in accordance with IFRS, however, adjusted upwards to the extent market values are higher than book values.

(c)      The limitations in Section 1.18(a) and Section 1.18(b) shall apply to any security by guarantee, indemnity, joint and several liability, collateral or otherwise and to subordination of rights and claims, subordination or turn over of rights of recourse, application of proceeds and any other means of direct and indirect financial assistance.

ARTICLE II
THE CREDITS

Section 2.01    Commitments. Subject to the terms and conditions set forth herein, each Term Lender having a Term Loan Commitment severally (i) with respect to its Exit Prepetition Continued Loans, continued its loans constituting Term Loan Claims (as defined in the Reorganization Plan) as loans to the Borrower hereunder in Dollars in an aggregate amount not exceeding any such Term Lender's Exit Prepetition Continued Loan Commitment and (ii) with respect to its Exit DIP Converted Loans, was deemed to have made loans to the Borrower hereunder in Dollars in an aggregate amount not exceeding any such Term Lender's Exit DIP

Converted Loan Commitment, in each case, on a several and not joint basis (such continued loans and loans deemed made hereunder, collectively, the "Term Loans" and each, a "Term Loan"). Amounts repaid or prepaid in respect of Term Loans may not be reborrowed. The Term Loan Commitment of each Lender was automatically and permanently reduced to $0 upon the continuation and deemed making of such Lender's Term Loans on the Effective Date.

Section 2.02    Loans and Borrowings.

(a)    Each Loan shall be made, continued, or deemed made, by the Lenders ratably in accordance with their respective Term Loan Commitments. The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; provided that the Term Loan Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Term Loans as required hereby.

(b)    Subject to Section 2.14, each Term Loan Borrowing shall be comprised entirely of ABR Loans or Term SOFR Loans as the Borrower may request in accordance herewith. Each Lender at its option may make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that (i) any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement, (ii) such Loan shall be deemed to have been made and held by such Lender, and the obligation of the Borrower to repay such Loan shall nevertheless be to such Lender for the account of such domestic or foreign branch or Affiliate of such Lender and (iii) in exercising such option, such Lender shall use reasonable efforts to minimize increased costs to the Borrower resulting therefrom (which obligation of such Lender shall not require it to take, or refrain from taking, actions that it determines would result in increased costs for which it will not be compensated hereunder or that it otherwise determines would be disadvantageous to it and in the event of such request for costs for which compensation is provided under this Agreement, the provisions of Section 2.14(a) shall apply); provided, further, that no such domestic or foreign branch or Affiliate of such Lender shall be entitled to any greater indemnification under Section 2.17 with respect to such Loan than that to which the applicable Lender was entitled on the date on which such Loan was made (except in connection with any indemnification entitlement arising as a result of any Change in Law after the date on which such Loan was made).

(c)    At the commencement of each Interest Period for any Term SOFR Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum; provided that a Term SOFR Borrowing that results from a continuation of an outstanding Term SOFR Borrowing may be in an aggregate amount that is equal to such outstanding Borrowing. At the time that each ABR Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum. Borrowings of more than one Type may be outstanding at the same time; provided that there shall not at any time be more than a total of 4 Term SOFR Borrowings outstanding.

Section 2.03    Requests for Borrowings. To request a Borrowing, the Borrower shall notify the Administrative Agent of such request by delivery (by hand delivery, facsimile or other electronic transmission) of a written Borrowing Request signed by the Borrower to the Administrative Agent (a) in the case of a Term SOFR Borrowing, not later than 11:00 a.m., New

York City time, three Business Days before the date of the proposed Borrowing (or one Business Day in the case of any Term SOFR Borrowing to be made, continued or deemed made on the Effective Date), or (b) in the case of an ABR Borrowing, not later than 11:00 a.m., New York City time, one Business Day before the date of the proposed Borrowing. Each such Borrowing Request shall be irrevocable upon delivery and shall specify the following information:

(i)     the aggregate amount and the currency of such Borrowing;

(ii)    the date of such Borrowing, which shall be a Business Day;

(iii)   whether such Borrowing is to be an ABR Borrowing or a Term SOFR Borrowing;

(iv)    in the case of a Term SOFR Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period";

(v)     [reserved]; and

(vi)    that, as of the date of such Borrowing, the conditions set forth in Section 4.01(l) and (m) are satisfied.

If no election as to the Type of Borrowing is specified as to any Borrowing, then the requested Borrowing shall be an ABR Borrowing. If no Interest Period is specified with respect to any requested Term SOFR Borrowing, then the Borrower shall be deemed to have selected an Interest Period of three (3) months' duration. Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

Section 2.04    [Reserved].

Section 2.05    [Reserved].

Section 2.06    Funding of Borrowings.

(a)     Subject to the satisfaction or waiver of the conditions precedent set forth in Section 4.01 in accordance with the terms hereof, the Term Loans shall be continued or deemed made hereunder upon the effectiveness of the Reorganization Plan.

(b)     Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section and may, in reliance on such assumption and in its sole discretion (but without obligation), make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender agrees to pay to the Administrative Agent an amount equal to such share on demand of the Administrative Agent. If such Lender does not pay such corresponding

amount forthwith upon demand of the Administrative Agent therefor, the Administrative Agent shall promptly notify the Borrower, and the Borrower agrees to pay such corresponding amount to the Administrative Agent forthwith on demand. The Administrative Agent shall also be entitled to recover from such Lender or the Borrower interest on such corresponding amount, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrower, the interest rate applicable to such Borrowing in accordance with Section 2.13. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.

(c)     Obligations of the Lenders hereunder to make Term Loans and to make payments pursuant to Section 9.03(c) are several and not joint. The failure of any Lender to make any Loan, to fund any such participation or to make any payment under Section 9.03(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment under Section 9.03(c).

Section 2.07     Interest Elections.

(a)     Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request or designated by Section 2.03 and, in the case of a Term SOFR Borrowing, shall have an initial Interest Period as specified in such Borrowing Request or designated by Section 2.03. Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Term SOFR Borrowing, may elect Interest Periods therefor, all as provided in this Section. The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)     To make an election pursuant to this Section, the Borrower shall notify the Administrative Agent of such election by delivery (by hand delivery, facsimile or other electronic transmission) to the Administrative Agent of a written Interest Election Request signed by the Borrower by the time that a Borrowing Request would be required under Section 2.03 if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election. Each such Interest Election Request shall be irrevocable upon delivery.

(c)     Each Interest Election Request shall specify the following information in compliance with Section 2.03:

(i)     the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)     the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)     whether the resulting Borrowing is to be an ABR Borrowing or a Term SOFR Borrowing; and

(iv)     if the resulting Borrowing is to be a Term SOFR Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period."

If any such Interest Election Request requests a Term SOFR Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of three (3) months' duration.

(d)     Promptly following receipt of an Interest Election Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)     If the Borrower fails to deliver a timely Interest Election Request with respect to a Term SOFR Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the Borrower, then, so long as an Event of Default is continuing, (i) no outstanding Borrowing may be converted to or continued as a Term SOFR Borrowing and (ii) unless repaid, each Term SOFR Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

Section 2.08     Termination and Reduction of Commitments. Unless previously terminated, the Term Loan Commitment shall terminate upon the deemed making of the Term Loans on the Effective Date.

Section 2.09     Repayment of Loans; Evidence of Debt.

(a)     The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Term Loan of such Lender on the Term Maturity Date.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)     The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)      The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein, underlined provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to pay any amounts due hereunder in accordance with the terms of this Agreement. In the event of any inconsistency between the entries made pursuant to paragraphs (b) and (c) of this Section, the accounts maintained by the Administrative Agent pursuant to paragraph (c) of this Section shall control.

(e)      Any Lender may request through the Administrative Agent that Loans made by it be evidenced by a promissory note. In such event, the Borrower shall execute and deliver to such Lender a promissory note payable to such Lender or its registered assigns and in a form provided by the Administrative Agent and approved by the Borrower.

Section 2.10    [Reserved].

Section 2.11    Prepayment of Loans.

(a)      The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, without premium or penalty; provided, that:

(i)      any voluntary prepayment of the Loans pursuant to Section 2.11(a) prior to the first anniversary of the Effective Date (including following an acceleration of the Loans pursuant to Section 7.01) shall be accompanied by a premium equal to 3% of the aggregate principal amount of the Loans so prepaid;

(ii)      any voluntary prepayment of the Loans pursuant to Section 2.11(a) on or after the first anniversary of the Effective Date and prior to the second anniversary of the Effective Date (including following an acceleration of the Loans pursuant to Section 7.01) shall be accompanied by a premium equal to 2% of the aggregate principal amount of the Loans so prepaid; and

(iii)      any voluntary prepayment of the Loans pursuant to Section 2.11(a) on or after the second anniversary of the Effective Date and prior to the third anniversary of the Effective Date (including following an acceleration of the Loans pursuant to Section 7.01) shall be accompanied by a premium equal to 1% of the aggregate principal amount of the Loans so prepaid.

(b)      Subject to any applicable Intercreditor Agreement, following the end of the second fiscal quarter of each fiscal year of Holdings, commencing with fiscal quarter ending June 30, 2024, the Borrower shall prepay the Term Loans in an aggregate amount equal to the lesser of (x) 50% of Excess Cash Flow for such fiscal year and (y) the Minimum Liquidity ECF Amount. Each prepayment pursuant to this paragraph shall be made on or before the date that is five (5) days after the date on which financial statements are required to be delivered pursuant to Section 5.01 with respect to the fiscal year for which Excess Cash Flow is being calculated.

(c)      Subject to any applicable Intercreditor Agreement, concurrently with each borrowing under any Permitted ABL EMEA Credit Facility immediately following which the

aggregate principal amount of loans then outstanding under such Permitted ABL EMEA Credit Facility exceeds the maximum aggregate principal amount of loans outstanding under such Permitted ABL EMEA Credit Facility on any previous date, the Borrower shall prepay the Term Loans in an aggregate principal amount equal to 33.33% of such excess. Each prepayment pursuant to this paragraph shall be made on the date of any such ABL EMEA Borrowing.

(d)     When any Loan Party sells or otherwise disposes of any assets pursuant to Section 6.05(j), such Loan Party shall prepay the Term Loans in an amount equal to the Net Proceeds of such sale (i.e., gross proceeds less the reasonable direct costs of such sales or other dispositions), such repayments to be made promptly but in no event more than five (5) Business Days following receipt of such net proceeds, and until the date of payment, such proceeds shall be held in trust for the Administrative Agent; provided that any such prepayment shall be subject to Section 2.11(a) (as if it were a voluntary prepayment); provided further that no such prepayment shall be required to be made (but, in the sole discretion of the Borrower, may be made) until and unless the aggregate amount of Net Proceeds in respect of all Asset Sales exceed $2,500,000 in any Fiscal Year, at which time the prepayment shall be required to be made only with respect to such Net Proceeds in excess of such annual amount The foregoing shall not be deemed to be implied consent to any such sale otherwise prohibited by the terms and conditions hereof. Such prepayments shall be applied to outstanding Term Loans.

(e)     Prior to any optional or mandatory prepayment of Borrowings hereunder, the Borrower shall select the Borrowing or Borrowings to be prepaid and shall specify such selection in the notice of such prepayment pursuant to paragraph (f) of this Section substantially in the form of Exhibit P hereto (the "Notice of Prepayment").

(f)     The Borrower shall notify the Administrative Agent of any optional prepayment pursuant to Section 2.11(a) and any mandatory prepayment pursuant to Section 2.11(b), Section 2.11(c) and Section 2.11(d) and, to the extent practicable, any mandatory prepayment hereunder by delivering a Notice of Prepayment to the Administrative Agent (i) in the case of prepayment of a Term SOFR Borrowing, not later than 11:00 a.m., New York City time, three Business Days before the date of prepayment or (ii) in the case of prepayment of an ABR Borrowing, not later than 11:00 a.m., New York City time, one Business Day before the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment; provided that a notice of optional prepayment may state that such notice is conditional upon the effectiveness of other credit facilities or the receipt of the proceeds from the issuance of other Indebtedness or the occurrence of some other identifiable refinancing event or condition, in which case such notice of prepayment may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified date of prepayment) if such condition is not satisfied. Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment. Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing. Prepayments shall be accompanied by accrued interest to the extent required by Section 2.13.

(g)     Notwithstanding the foregoing or any other provision in this Agreement, each Lender, by written notice to the Borrower and the Administrative Agent, received no later than one Business Day prior to the date of such prepayment, shall have the right to reject its applicable percentage of any prepayment pursuant to Section 2.11(d), in which case the principal amounts so rejected shall be applied to make an offer to purchase the Senior Secured Convertible Notes.

(h)     Notwithstanding the foregoing, to the extent the Borrower reasonably determines that the repatriation of any portion of any prepayment required pursuant to this Section 2.11 by a Foreign Subsidiary to effect such prepayment would (i) have a material adverse tax or cost consequence for the Loan Parties or their beneficial owners, (ii) contravene or be delayed by applicable Requirements of Law from being repatriated to the United States, (iii) give rise to a risk of liability for the directors of such Foreign Subsidiaries, or (iv) be prohibited by the organizational document restrictions of any non-controlled entities, the affected portion of such prepayment amount shall not be required to be applied to prepay the Loans at the times provided in this Section 2.11 (and, for the avoidance of doubt, the Restricted Subsidiaries shall not be required to increase the amount of the prepayment required to be made to offset the application of such limitation and any reduction of such prepayment as a result thereof); provided, that, in the case of clauses (ii) through (iii), the Loan Parties and the applicable Foreign Subsidiary shall take commercially reasonable actions required by applicable Requirements of Law to permit such repatriation. Such amounts may be retained by the applicable Foreign Subsidiary so long, but only so long, as the applicable restrictions or conditions in the preceding clauses (i) through (iv) are in effect, and once such repatriation of any of such affected amount is permitted under the applicable local law or such adverse consequence would no longer result, such repatriation will be effected promptly and such repatriated amounts will be promptly (and in any event not later than three (3) Business Days after such repatriation) applied to the repayment of the Term Loan pursuant to this Section 2.11 to the extent provided herein.  Notwithstanding the foregoing, any prepayments required after application of the above provision shall be net of any costs, expenses or taxes incurred by the Loan Parties and arising as a result of compliance with the preceding sentence. Notwithstanding anything herein to the contrary, the non-application of any such prepayment amounts as a result of the foregoing provisions will not constitute a Default or an Event of Default and such amounts shall be available for working capital purposes of the Loan Parties.

Section 2.12   Fees.

(a)     The Borrower agrees to pay (i) to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent pursuant to the Administrative Agent Fee Letter and (ii) to the Collateral Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between the Borrower and the Collateral Agent pursuant to the Collateral Agent Fee Letter.

(b)     [Reserved].

(c)     [Reserved].

(d)      All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Administrative Agent. Fees paid hereunder shall not be refundable under any circumstances.

Section 2.13      Interest.

(a)      The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Rate.

(b)      The Loans comprising each Term SOFR Borrowing shall bear interest at the Term SOFR Rate for the Interest Period in effect for such Borrowing plus the Applicable Rate.

(c)      [reserved].

(d)      Notwithstanding the foregoing, if any Event of Default shall have occurred and be continuing and the Required Lenders have directed the Administrative Agent to apply the Default Rate (which election shall be automatic upon the occurrence of an Event of Default under Section 7.01(h) or (i)), all outstanding Loan Document Obligations shall bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of any principal or interest of any Loan, 2.00% per annum plus the rate otherwise applicable to Term Loans as provided in the preceding paragraphs of this Section or (ii) in the case of any other amount, 2.00% per annum plus the rate applicable to Loans that are ABR Loans as provided in paragraph (a) of this Section (the "Default Rate").

(e)      Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan, provided that (i) interest accrued pursuant to paragraph (d) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Term SOFR Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(f)      All computations of interest for ABR Loans (when the Alternate Base Rate is based on the U.S. "Prime Rate") shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed. All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed. Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.18, bear interest for one day. Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(g)      For the purposes of the Interest Act (Canada) and disclosure thereunder, whenever any interest or any fee to be paid under any Loan Document is to be calculated on the basis of a 360-day or 365-day year, the yearly rate of interest to which the rate used in such calculation is equivalent is the rate so used multiplied by the actual number of days in the calendar year in which the same is to be ascertained and divided by 360 or 365, as applicable. The rates of

interest under this Agreement are nominal rates, and not effective rates or yields. The principle of deemed reinvestment of interest does not apply to any interest calculation under this Agreement.

(h)     If any provision of this Agreement would oblige a Canadian Loan Party to make any payment of interest or other amount payable to any Lender in an amount or calculated at a rate which would be prohibited by applicable laws or would result in a receipt by that Lender of "interest" at a "criminal rate" (as such terms are construed under the Criminal Code (Canada)), then, notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by law or so result in a receipt by that Lender of "interest" at a "criminal rate", such adjustment to be effected, to the extent necessary (but only to the extent necessary), as follows: (a) first, by reducing the amount or rate of interest to be paid to such Lender; and (b) thereafter, by reducing any fees, commissions, costs, expenses, premiums and other amounts required to be paid to such Lender which would constitute "interest" for purposes of section 347 of the Criminal Code (Canada).

Section 2.14    Alternate Rate of Interest.

(a)     If at least two Business Days prior to the commencement of any Interest Period for a Term SOFR Borrowing:

(i)     the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Term SOFR Rate for such Interest Period; or

(ii)     the Administrative Agent is advised by the Required Lenders that the Term SOFR Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period (in each case with respect to the Loans impacted by this clause (ii) or clause (i) above, "Impacted Loans"),

then the Administrative Agent shall give written notice thereof to the Borrower and the Lenders by hand delivery, facsimile or other electronic transmission as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Term SOFR Borrowing shall be ineffective and (ii) if any Borrowing Request requests a Term SOFR Borrowing, then such Borrowing shall be made as an ABR Borrowing and the utilization of the Term SOFR Rate component in determining the Alternate Base Rate shall be suspended; provided, however, that, in each case, the Borrower may revoke any Borrowing Request that is pending when such notice is received.

(b)     Notwithstanding the foregoing, if the Administrative Agent (at the direction of the Required Lenders) has made the determination described in clause (a)(i) of this Section 2.14 and/or is advised by the Required Lenders of their determination in accordance with clause (a)(ii) of this Section 2.14 and the Borrower shall so request, the Administrative Agent, the Required Lenders and the Borrower shall negotiate in good faith to amend the definition of "Term SOFR

Rate" and other applicable provisions to preserve the original intent thereof in light of such change; provided, that, until so amended, such Impacted Loans will be handled as otherwise provided pursuant to the terms of this Section 2.14.

(c)     Benchmark Replacement. Notwithstanding anything to the contrary herein or in any other Loan Documents, if the Administrative Agent (at the direction of the Required Lenders) determines that a Benchmark Transition Event has occurred, the Administrative Agent (at the direction of the Required Lenders), the Required Lenders and the Borrower may amend this Agreement to replace the Term SOFR Rate with a Benchmark Replacement in accordance with this Section 2.14(c); and any such amendment shall be in writing, shall specify the date that the Benchmark Replacement is effective and will not require any further action or consent of any other party to this Agreement.  Until the Benchmark Replacement is effective, each advance, conversion and renewal of a Term SOFR Loan will continue to bear interest with reference to the Term SOFR Rate; provided, however, during a Benchmark Unavailability Period (i) any pending selection of, conversion to or renewal of a Term SOFR Borrowing that has not yet gone into effect shall be deemed to be a selection of, conversion to or renewal of an ABR Borrowing, (ii) all outstanding Term SOFR Loans shall automatically be converted to ABR Loans at the expiration of the existing Interest Period (or sooner, if Administrative Agent cannot continue to lawfully maintain such affected Term SOFR Loan) and (iii) the component of the Alternate Base Rate based upon the Term SOFR Rate will not be used in any determination of the Alternate Base Rate.

(d)     Benchmark Replacement Conforming Changes.  In connection with the implementation of a Benchmark Replacement, the Administrative Agent (at the direction of the Required Lenders) and the Required Lenders will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in the other Loan Documents, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.  Prior to implementing a Benchmark Replacement and/or any Benchmark Replacement Conforming Changes, the Administrative Agent, the Required Lenders and the Borrower shall use commercially reasonably efforts (exercised in good faith) to implement such Benchmark Replacement and/or any Benchmark Replacement Confirming Changes in a manner that is intended to comply with the terms of United States Treasury Regulation Section 1.1001-6 (or any successor or similar Treasury Regulations) such that the Benchmark Replacement and/or Benchmark Replacement Conforming Changes do not constitute a "significant modification" for purposes of United States Treasury Regulation Section 1.1001-3 (including, but not limited to, using commercially reasonably efforts to implement a Benchmark Replacement that is a "qualified rate," as defined in United States Treasury Regulation Section 1.1001-6), as determined in good faith by the Borrower.

(e)     Notices; Standards for Decisions and Determinations.  The Administrative Agent will promptly notify the Borrower of (i) any occurrence of a Benchmark Transition Event and its related Benchmark Replacement Date, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes, (iv) the removal or reinstatement of any tenor of a Benchmark pursuant to paragraph (f) below, and (v) the commencement of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the Administrative Agent (at the direction of the Required Lenders) pursuant to this Section 2.14 including any determination with respect to a tenor, rate or adjustment or of

76

the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its sole discretion and without consent from any other party hereto (other than the Required Lenders), except, in each case, as expressly required pursuant to this <u>Section 2.14</u>.

(f)    <u>Unavailability of Tenor of Benchmark</u>.  Notwithstanding anything to the contrary herein or in any of the other Loan Documents, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor of such Benchmark is or will be no longer representative, then the Administrative Agent (at the direction of the Required Lenders) may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to <u>clause (i)</u> above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is or will no longer be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent (at the direction of the Required Lenders) may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(g)    <u>Benchmark Unavailability Period</u>.  Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any request for a Borrowing bearing interest based on the Term SOFR Rate, conversion to or continuation of Borrowings bearing interest based on the Term SOFR Rate to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for an ABR Loan.  During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of the Alternate Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of the Alternate Base Rate.

(h)    <u>Certain Defined Terms</u>. As used in this <u>Section 2.14</u>:

"<u>Available Tenor</u>" means, as of any date of determination and with respect to the then-current Benchmark, as applicable (x) if the then current Benchmark is a term rate or is based on a term rate, any tenor for such Benchmark that is or may be used for determining the length of an Interest Period or (y) otherwise, any payment period for interest calculated with reference to such Benchmark, as applicable, pursuant to this Agreement as of such date.

"<u>Benchmark</u>" means, initially, the Term SOFR Rate; provided that if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the Term SOFR Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior

benchmark rate pursuant to this Section. Any reference to "Benchmark" shall include, as applicable, the published component used in the calculation thereof.

"Benchmark Replacement" means, for any Available Tenor, the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

(1)     the sum of: (a) Daily Simple SOFR and (b) the related Benchmark Replacement Adjustment;

(2)     the sum of: (a) the alternate benchmark rate that has been selected by the Administrative Agent (at the direction of the Required Lenders) giving due consideration to (i) any selection or recommendation of a replacement rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a rate of interest as a replacement to the Term SOFR Rate for U.S. dollar-denominated credit facilities and (b) the Benchmark Replacement Adjustment; provided that, if the Benchmark Replacement as so determined would be less than 1.50%, the Benchmark Replacement will be deemed to be 1.50% for the purposes of this Agreement.

 "Benchmark Replacement Adjustment" means, with respect to any replacement of the then current Benchmark with an Unadjusted Benchmark Replacement for each applicable Interest Period (where applicable):

(1)     for purposes of clause (1) of the definition of "Benchmark Replacement," the applicable amount(s) set forth below:

| Available Tenor | Benchmark Replacement Adjustment* |
| --- | --- |
| One-Month | 0.0%   (0 basis points) |
| Three-Months | 0.0%   (0 basis points) |
| Six-Months | 0.0%   (0 basis points) |
| Twelve-Months | 0.0%   (0 basis points) |

(2)     for purposes of clause (2) of the definition of "Benchmark Replacement", the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent (at the direction of the Required Lenders) (a) giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the Term SOFR Rate with the applicable Benchmark Replacement (excluding such spread adjustment) by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread

adjustment, for such replacement of the Term SOFR Rate for U.S. dollar denominated credit facilities at such time and (b) which may also reflect adjustments to account for (i) the effects of the transition from the Term SOFR Rate to the Benchmark Replacement and (ii) yield- or risk-based differences between the Term SOFR Rate and the Benchmark Replacement.

In each case, the Required Lenders shall direct the Administrative Agent in connection with selecting a Benchmark Replacement Adjustment that is administratively feasible to the Administrative Agent and the Administrative Agent shall have no obligation to make any such determination in the absence of such direction.

"Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest and other administrative matters) that the Administrative Agent (at the direction of the Required Lenders) decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent or the Required Lenders determine that no market practice for the administration of the Benchmark Replacement exists, in such other manner of administration as the Administrative Agent (at the direction of the Required Lenders) decides is reasonably necessary in connection with the administration of this Agreement).

"Benchmark Replacement Date" means the earlier to occur of the following events with respect to the Term SOFR Rate:

(1)     in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of the Term SOFR Rate permanently or indefinitely ceases to provide the Term SOFR Rate; or

(2)     in the case of clause (3) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein.

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the Term SOFR Rate:

(1)     a public statement or publication of information by or on behalf of the administrator of the Term SOFR Rate announcing that such administrator has ceased or will cease to provide the Term SOFR Rate, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Term SOFR Rate;

(2)     a public statement or publication of information by a Governmental Body having jurisdiction over the Administrative Agent, the regulatory supervisor for the administrator of the Term SOFR Rate, the U.S. Federal Reserve System, an

insolvency official with jurisdiction over the administrator for the Term SOFR Rate, a resolution authority with jurisdiction over the administrator for the Term SOFR Rate or a court or an entity with similar insolvency or resolution authority over the administrator for the Term SOFR Rate, which states that the administrator of the Term SOFR Rate has ceased or will cease to provide the Term SOFR Rate permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Term SOFR Rate; or

(3)     a public statement or publication of information by the regulatory supervisor for the administrator of the Term SOFR Rate or a Governmental Body having jurisdiction over the Administrative Agent announcing that the Term SOFR Rate is no longer representative.

"Benchmark Unavailability Period" means, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the Term SOFR Rate and solely to the extent that the Term SOFR Rate has not been replaced with a Benchmark Replacement, the period (x) beginning at the time that such Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the Term SOFR Rate for all purposes hereunder in accordance with Section 2.14 and (y) ending at the time that a Benchmark Replacement has replaced the Term SOFR Rate for all purposes hereunder pursuant to Section 2.14.

"Daily Simple SOFR" means, for any day (a "SOFR Rate Day"), the interest rate per annum determined by the Administrative Agent by dividing (the resulting quotient rounded upwards, to the nearest 1/100th of 1%) (A) SOFR for the day (the "SOFR Determination Date") that is five (5) Business Days prior to (i) such SOFR Rate Day if such SOFR Rate Day is a Business Day or (ii) the Business Day immediately preceding such SOFR Rate Day if such SOFR Rate Day is not a Business Day, by (B) a number equal to 1.00 minus the SOFR Reserve Percentage.  If Daily Simple SOFR as determined above would be less than the SOFR Floor, then Daily Simple SOFR shall be deemed to be the SOFR Floor.  If SOFR for any SOFR Determination Date has not been published or replaced with a Benchmark Replacement by 5:00 p.m. (New York, New York time) on the second Business Day immediately following such SOFR Determination Date, then SOFR for such SOFR Determination Date will be SOFR for the first Business Day preceding such SOFR Determination Date for which SOFR was published in accordance with the definition of "SOFR"; provided that SOFR determined pursuant to this sentence shall be used for purposes of calculating Daily Simple SOFR for no more than three (3) consecutive SOFR Rate Days.  If and when Daily Simple SOFR as determined above changes, any applicable rate of interest based on Daily Simple SOFR will change automatically without notice to the Borrower, effective on the date of any such change.

"Relevant Governmental Body" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

Section 2.15    Increased Costs.

(a)     If any Change in Law shall:

(i)        impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any such reserve requirement reflected in the Term SOFR Rate); or

(ii)       subject any recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)      impose on any Lender or the London interbank market any other condition, cost or expense (other than with respect to Taxes) affecting this Agreement or Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to the Administrative Agent or such Lender of making or maintaining any Term SOFR Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to the Administrative Agent or such Lender or to reduce the amount of any sum received or receivable by the Administrative Agent or such Lender hereunder (whether of principal, interest or otherwise), then, from time to time upon request of the Administrative Agent or such Lender, the Borrower will pay to the Administrative Agent or such Lender, as the case may be, such additional amount or amounts as will compensate the Administrative Agent or such Lender, as the case may be, for such increased costs actually incurred or reduction actually suffered, provided that the Borrower shall not be liable for such compensation if, in the case of requests for reimbursement under clause (ii) above resulting from a market disruption, (A) the relevant circumstances are not generally affecting the banking market or (B) the applicable request has not been made by Lenders constituting Required Lenders; provided, further, that to the extent any such costs or reductions are incurred by any Lender as a result of any requests, rules, guidelines or directives enacted or promulgated under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 and Basel III, then such Lender shall be compensated pursuant to this (a) only to the extent such Lender is imposing such charges on similarly situated borrowers where the terms of other syndicated credit facilities permit it to impose such charges.

(b)       If any Lender determines that any Change in Law regarding capital or liquidity requirements has the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy and liquidity), then, from time to time upon request of such Lender contemplated by clause (c) below, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction actually suffered.

(c)     Any Lender requesting compensation under this Section 2.14(a) shall be required to deliver a certificate to the Borrower, (i) setting forth the amount or amounts necessary to compensate such Lender or its holding company in reasonable detail, as the case may be, as specified in paragraph (a) or (b) of this Section, (ii) setting forth, in reasonable detail, the manner in which such amount or amounts were determined and (iii) certifies that such Lender is generally charging such amounts to similarly situated borrowers, which certificate shall be conclusive absent manifest error. The Borrower shall pay such Lender, as the case may be, the amount shown as due on any such certificate within 15 days after receipt thereof.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs incurred or reductions suffered more than 180 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 2.16     Break Funding Payments. In the event of (a) the payment of any principal of any Term SOFR Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Term SOFR Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Term Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.11(f) and is revoked in accordance therewith) or (d) the assignment of any Term SOFR Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.19 or Section 9.02(c), then, in any such event, the Borrower shall, after receipt of a written request by any Lender affected by any such event (which request shall set forth in reasonable detail the basis for requesting such amount), compensate each Lender for the actual loss, cost and expense incurred by such Lender attributable to such event (other than loss of profit). For purposes of calculating amounts payable by the Borrower to the Lenders under this Section 2.16, each Lender shall be deemed to have funded each Term SOFR Loan made by it at the Term SOFR Rate for such Loan by a matching deposit or other borrowing for a comparable amount and for a comparable period, whether or not such Term SOFR Loan was in fact so funded. Any Lender requesting compensation under this Section 2.16 shall be required to deliver a certificate to the Borrower setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section, the basis therefor and, in reasonable detail and the manner in which such amount or amounts were determined, which certificate shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 15 days after receipt of such demand. Notwithstanding the foregoing, this Section 2.16 will not apply to losses, costs or expenses resulting from Taxes, as to which Section 2.17 shall govern.

Section 2.17     Taxes.

(a)     Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made free and clear of and without deduction or withholding for any Taxes, provided that if the applicable Withholding Agent shall be required by applicable

Requirements of Law (as determined in the good faith discretion of the applicable Withholding Agent) to deduct or withhold any Taxes from such payments, then (i) the applicable Withholding Agent shall make such deductions or withholdings, (ii) the applicable Withholding Agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Requirements of Law and (iii) if the Tax in question is an Indemnified Tax or Other Tax, the amount payable by the applicable Loan Party shall be increased as necessary so that after all required deductions or withholdings have been made (including deductions and withholdings applicable to additional amounts payable under this Section 2.17) the Lender (or, in the case of a payment received by the Administrative Agent for its own account, the Administrative Agent) receives an amount equal to the sum it would have received had no such deductions or withholdings been made.

(b)     Without duplication of any obligation under paragraph (a) above, the Loan Parties shall timely pay to the relevant Governmental Authority in accordance with Requirements of Law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)     The Loan Parties shall jointly and severally indemnify the Administrative Agent and each Lender, within 30 days after written demand therefor, for the full amount of any Indemnified Taxes and/or Other Taxes payable or paid by, or required to be withheld or deducted from a payment to, the Administrative Agent or such Lender, as the case may be (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.17) and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate setting forth in reasonable detail the basis and calculation of the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent) or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)     As soon as practicable after any payment of Indemnified Taxes or Other Taxes by a Loan Party to a Governmental Authority pursuant to this Section 2.17, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Requirements of Law and such other documentation reasonably requested by the Borrower or the Administrative Agent (i) as will permit such payments to be made without, or at a reduced rate of, withholding or (ii) as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding sentence, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.17(e)(1)-(3) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost

or expense or would materially prejudice the legal or commercial position of such Lender. Each Lender shall, if a lapse or time or change in circumstances renders such documentation obsolete, expired or inaccurate in any material respect, deliver promptly to the Borrower and the Administrative Agent upon their reasonable request updated or other appropriate documentation (including any new documentation) or promptly notify the Borrower and the Administrative Agent in writing of its legal ineligibility to do so. Each Lender hereby authorizes the Administrative Agent to deliver to the Loan Parties and to any successor Administrative Agent any documentation provided by such Lender to the Administrative Agent pursuant to this <u>Section 2.17</u>.

Without limiting the foregoing:

(1)    Each Lender and Administrative Agent that is a "United States person" within the meaning of Section 7701(a)(30) of the Code shall deliver to the Borrower and the Administrative Agent on or about the date on which it becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent) two properly completed and duly signed copies of IRS Form W-9 or successor form certifying that such Lender or Administrative Agent is exempt from U.S. federal backup withholding.

(2)    Each Lender that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code shall deliver to the Borrower and the Administrative Agent on or about the date on which it becomes a party to this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent) whichever of the following is applicable:

(A)    two properly completed and duly signed copies of IRS Form W-8BEN or IRS Form W-8BEN-E (or any successor forms), as applicable, claiming eligibility for the benefits of an income tax treaty to which the United States is a party, establishing an exemption from, or reduction of, U.S. federal withholding Tax (i) pursuant to the "interest" article of such tax treaty with respect to payments of interest under any Loan Document and (ii) pursuant to the "business profits" or "other income" article of such tax treaty with respect to any other applicable payments under any Loan Document,

(B)    two properly completed and duly signed copies of IRS Form W-8ECI (or any successor forms),

(C)    in the case of a Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or Section 881(c) of the Code, (x) two properly completed and duly signed certificates substantially in the form of <u>Exhibit Q-1</u>, <u>Q-2</u>, <u>Q-3</u> and <u>Q-4</u>, as applicable, (any such certificate, a "U.S. Tax Compliance Certificate") and (y) two properly completed and duly signed copies of IRS Form W-8BEN or IRS Form W-8BEN-E (or any successor forms), as applicable,

(D)     to the extent a Lender is not the beneficial owner (for example, where the Lender is a partnership or a participating Lender), two properly completed and duly signed copies of IRS Form W-8IMY (or any successor forms) of the Lender, accompanied by an IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, U.S. Tax Compliance Certificate, IRS Form W-9, IRS Form W-8IMY or any other information (or any successor forms) from each beneficial owner that would be required under this Section 2.17(e) if such beneficial owner were a Lender, as applicable (provided that, if the Lender is a partnership for U.S. federal income tax purposes (and not a participating Lender) and one or more direct or indirect partners are claiming the portfolio interest exemption, the U.S. Tax Compliance Certificate may be provided by such Lender on behalf of such direct or indirect partner(s)), or

(E)     two properly completed and duly signed copies of any other form prescribed by applicable U.S. federal income tax laws as a basis for claiming a complete exemption from, or a reduction in, U.S. federal withholding tax on any payments to such Lender under the Loan Documents, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made.

(3)     If a payment made to a Lender or Administrative Agent under any Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender or Administrative Agent were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender or Administrative Agent shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender or Administrative Agent has or has not complied with such Lender's or Administrative Agent's obligations under FATCA and, if necessary, to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (3), "FATCA" shall include any amendments made to FATCA after the date hereof.

(4)     If the Administrative Agent is not a "United States person" within the meaning of Section 7701(a)(30) of the Code, it shall provide to the Borrower on or prior to the date on which it becomes an Administrative Agent under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower): (A) two executed copies of Form W-8ECI with respect to any amounts payable to the Administrative Agent for its own account, and (B) two executed copies of Form W-8IMY with respect to any amounts payable to the Administrative Agent for the account of others, certifying that it is a "U.S. branch" and that the payments it receives for the account of others are not effectively connected with the conduct of its trade or business within the United States and

that it is using such form as evidence of its agreement with the Borrower to be treated as a U.S. Person with respect to such payments (and the Borrower and the Administrative Agent agree to so treat the Administrative Agent as a "United States person" with respect to such payments as contemplated by Section 1.1441-1(b)(2)(iv) of the United States Treasury Regulations).

Each Lender or Administrative Agent agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so. Notwithstanding any other provisions of this paragraph (e), a Lender shall not be required to deliver any form or other documentation that such Lender is not legally eligible to deliver.

(f)     If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.17, it shall pay over such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Borrower, upon the request of the Administrative Agent or such Lender, agrees promptly to repay the amount paid over to the Borrower pursuant to this Section 2.17(f) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. The Administrative Agent or such Lender, as the case may be, shall, at the Borrower's request, provide the Borrower with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant taxing authority (provided that the Administrative Agent or such Lender may delete any information therein that the Administrative Agent or such Lender deems confidential). Notwithstanding anything to the contrary in this Section 2.17(f), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this Section 2.17(f) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This Section 2.17(f) shall not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other information relating to Taxes which it deems confidential to any Loan Party or any other Person).

(g)     Each party's obligations under this Section 2.17 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, or the consummation of the transactions contemplated hereby, the repayment, satisfaction or discharge of all obligations under any Loan Document or the termination of this Agreement or any provision hereof.

Section 2.18   Payments Generally; Pro Rata Treatment; Sharing of Setoffs.

(a)     The Borrower shall make each payment required to be made by it under any Loan Document (whether of principal, interest, fees, or of amounts payable under Section 2.14(a), Section 2.16, Section 2.17, or otherwise) prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without setoff or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to such account as may be specified by the Administrative Agent, shall be made as expressly provided herein and except that payments pursuant to Sections 2.14(a), Section 2.16, Section 2.17 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment (other than payments on the Term SOFR Loans) under any Loan Document shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day. If any payment on a Term SOFR Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day. In the case of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate for the period of such extension. All payments or prepayments of any Loan (or of interest thereon) and all other payments under each Loan Document shall be made in Dollars.

(b)     If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, any fees that are due hereunder to the Administrative Agent or the Collateral Agent, (ii) second, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (iii) third, towards payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)     If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender with outstanding Loans, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders at such time outstanding to the extent necessary so that the benefit of all such payments shall be shared by the Lenders of such class ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest and (ii) the provisions of this paragraph shall not be construed to apply to (A) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement, (B) any payment obtained by a Lender as consideration for any permitted assignment of or sale of a participation in any of its Loans to any assignee or participant, including any payment made or deemed made in connection with

Section 9.02 or (C) any disproportionate payment obtained by a Lender as a result of the extension by Lenders of the maturity date or expiration date of some but not all Loans or Commitments or any increase in the Applicable Rate in respect of Loans of Lenders that have consented to any such extension. The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)     Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may (but shall not be obligated to), in reliance upon such assumption and in its sole discretion, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)     If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.06(a), Section 2.06(b), Section 2.18(d) or Section 9.03(c), then the Administrative Agent may, in its discretion and in the order determined by the Administrative Agent (notwithstanding any contrary provision hereof), (i) apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Section until all such unsatisfied obligations are fully paid and/or (ii) hold any such amounts in a segregated account as cash collateral for, and to be applied to, any future funding obligations of such Lender under any such Section.

Section 2.19     Mitigation Obligations; Replacement of Lenders.

(a)     If any Lender requests compensation under Section 2.14(a), or if any Loan Party is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17 or any event that gives rise to the operation of Section 2.23, then such Lender shall (at the request of the Borrower) use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder affected by such event, or to assign and delegate its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such Lender, such designation or assignment and delegation (i) would eliminate or reduce amounts payable pursuant to Section 2.14(a) or Section 2.17 or mitigate the applicability of Section 2.23, as the case may be and (ii) would not subject such Lender to any unreimbursed cost or expense and would not be inconsistent with the internal policies of, or otherwise be disadvantageous in any economic, legal or regulatory respect to, such Lender.

88

(b)        If (i) any Lender requests compensation under Section 2.14(a) or gives notice under Section 2.23 or (ii) the Borrower is required to pay any additional amount to any Lender or to any Governmental Authority for the account of any Lender pursuant to Section 2.17, and, in each case, such Lender has declined or is unable to designate a different lending office in accordance with paragraph (a) of this Section, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate (and such Lender shall be obligated to assign and delegate), without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights (other than its existing rights to payments pursuant to Section 2.15 or Section 2.17) and obligations under this Agreement and the other Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment and delegation), provided that (A) the Borrower shall have received the prior written consent of the Administrative Agent to the extent such consent would be required under Section 9.04(b) for an assignment of Loans or Commitments, as applicable, which consents, in each case, shall not unreasonably be withheld or delayed, (B) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued but unpaid interest thereon, accrued but unpaid fees and all other amounts payable to it hereunder from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts), (C) the Borrower or such assignee shall have paid (unless waived) to the Administrative Agent the processing and recordation fee specified in Section 9.04(b)(ii) and (D) in the case of any such assignment resulting from a claim for compensation under Section 2.14(a), payments required to be made pursuant to Section 2.17 or a notice given under Section 2.23, such assignment will result in a material reduction in such compensation or payments. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise (including as a result of any action taken by such Lender under paragraph (a) above), the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 2.20    [Reserved].

Section 2.21    [Reserved].

Section 2.22    [Reserved].

Section 2.23    Illegality. If any Lender determines that any law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender to make, maintain or fund Loans whose interest is determined by reference to the Term SOFR Rate or to determine or charge interest rates based upon the Term SOFR Rate, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, any obligation of such Lender to make or continue Term SOFR Loans or to convert ABR Loans to Term SOFR Loans shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, (x) the Borrower shall, upon three Business Days' notice from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Term SOFR Loans of such Lender to ABR Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Term SOFR Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Term SOFR Loans, and (y) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the Term SOFR Rate, the

Administrative Agent shall, during the period of such suspension, compute the Alternate Base Rate applicable to such Lender without reference to the Term SOFR Rate component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon the Term SOFR Rate. Each Lender agrees to notify the Administrative Agent and the Borrower in writing promptly upon becoming aware that it is no longer illegal for such Lender to determine or charge interest rates based upon the Term SOFR Rate. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

<div align="center">

ARTICLE III
REPRESENTATIONS AND WARRANTIES

</div>

Each of Holdings and the Borrower (as to itself and its Restricted Subsidiaries) represents and warrants to the Lenders and the Agents that:

Section 3.01    Organization; Powers.Each of Holdings, the Borrower and each Restricted Subsidiary is (a) duly organized or incorporated and validly existing and (to the extent such concept exists in the relevant jurisdictions) in good standing under the laws of the jurisdiction of its organization or incorporation or amalgamation, (b) has the corporate, constitutional power, or other organizational power and authority to carry on its business as now conducted and to execute, deliver and perform its obligations under each Loan Document to which it is a party and (c) is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except in the case of clause (a) (other than with respect to Holdings and the Borrower), clause (b) (other than with respect to the Borrower) and clause (c), where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 3.02    Authorization; Enforceability. This Agreement has been duly authorized, executed and delivered by Holdings and the Borrower and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of Holdings, the Borrower or such Loan Party, as the case may be, enforceable against it in accordance with its terms, subject to (i) applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law and (ii) in the case of each Foreign Loan Party and each Foreign Loan Document, (x) the need for filings and registrations necessary to create or perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties, and (y) the Legal Reservations and the Foreign Perfection Requirements.

Section 3.03    Governmental Approvals; No Conflicts. The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect and except filings necessary to perfect Liens created under the Loan Documents, (b) will not violate (i) the Organizational Documents of Holdings, the Borrower or any other Loan Party, or (ii) any Requirements of Law applicable to Holdings, the Borrower or any Restricted Subsidiary, (c) will not violate or result in a default under any indenture or other agreement or instrument binding upon Holdings, the Borrower or any Restricted Subsidiary or their respective

<div align="center">90</div>

assets, or give rise to a right thereunder to require any payment, repurchase or redemption to be made by Holdings, the Borrower or any Restricted Subsidiary, or give rise to a right of, or result in, termination, cancellation or acceleration of any obligation thereunder, and (d) will not result in the creation or imposition of any Lien on any asset of Holdings, the Borrower or any Restricted Subsidiary, except Liens created under the Loan Documents and the Senior Secured Convertible Notes Documents, except (in the case of each of clauses (a), (b)(ii) and (c)) to the extent that the failure to obtain or make such consent, approval, registration, filing or action, or such violation, default or right as the case may be, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, and, in case of each Foreign Loan Party and each Foreign Loan Document, subject to the Legal Reservations and the Foreign Perfection Requirements.

Section 3.04   Financial Condition; No Material Adverse Effect.

(a)   The Audited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly indicated therein, including the notes thereto, and (ii) fairly present in all material respects the consolidated financial position of the Borrower and its consolidated subsidiaries as of the respective dates thereof and the consolidated results of their operations for the respective periods then ended in accordance with GAAP consistently applied during the periods referred to therein, except as otherwise expressly indicated therein, including the notes thereto.

(b)   [Reserved].

(c)   Since the Effective Date, there has been no event, circumstance or condition that has had, or could reasonably be expected to have, a Material Adverse Effect.

Section 3.05   Properties.

(a)   Holdings, the Borrower and each Restricted Subsidiary has good title to, or valid leasehold interests in, all its real and personal property material to its business (including the Mortgaged Properties, if any), (i) free and clear of all Liens except for Liens permitted by Section 6.02 and (ii) except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or as proposed to be conducted or to utilize such properties for their intended purposes, in each case, except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)   As of the Effective Date, Schedule 3.05 contains a true and complete list of each fee owned parcel of real property owned by a Loan Party having a Fair Market Value equal to or in excess of $1,000,000.

Section 3.06   Litigation and Environmental Matters.

(a)   There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened in writing against or affecting Holdings, the Borrower or any Restricted Subsidiary that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)     Except with respect to any matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, none of Holdings, the Borrower or any Restricted Subsidiary (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has, to the knowledge of the Borrower, become subject to any Environmental Liability, (iii) has received written notice of any claim with respect to any Environmental Liability or (iv) has, to the knowledge of the Borrower, any basis to reasonably expect that Holdings, the Borrower or any Restricted Subsidiary will become subject to any Environmental Liability.

Section 3.07   Compliance with Laws and Agreements. Each of Holdings, the Borrower and each Restricted Subsidiary is in compliance with (a) all Requirements of Law applicable to it or its property and (b) all indentures and other agreements and instruments binding upon it or its property, except, where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 3.08   Investment Company Status. None of Holdings, the Borrower or any other Loan Party is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended from time to time, subject, in case of each Foreign Loan Party and each Foreign Loan Documents, to the Legal Reservations and the Foreign Perfection Requirements.

Section 3.09   Taxes. Except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, Holdings, the Borrower and each Restricted Subsidiary (a) have timely filed or caused to be filed all Tax returns required to have been filed and (b) have paid or caused to be paid all Taxes required to have been paid (whether or not shown on a Tax return) including in their capacity as tax withholding agents, except any Taxes (i) that are not overdue by more than 30 days or (ii) that are being contested in good faith by appropriate proceedings; provided that Holdings, the Borrower or such Restricted Subsidiary, as the case may be, has set aside on its books adequate reserves therefor in accordance with GAAP.

Section 3.10   ERISA.

(a)     Except as could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with the applicable provisions of ERISA, the Code and other federal or state laws.

(b)     Except as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (i) no ERISA Event has occurred during the five year period prior to the date on which this representation is made or deemed made or is reasonably expected to occur, (ii) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Plan (other than premiums due and not delinquent under Section 4007 of ERISA), (iii) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 or 4243 of ERISA with respect to a Multiemployer Plan and (iv)

neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

Section 3.11   Disclosure. (a) As of the Effective Date, no written information (other than projections, other forward-looking and/or projected information and information of a general economic or industry specific nature) furnished by Holdings, the Borrower or any of their respective representatives on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or delivered thereunder (as modified or supplemented by other information so furnished on or prior to the Effective Date) on or before the Effective Date, when taken as a whole, did not, when furnished, contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading (after giving effect to all supplements and updates thereto from time to time), provided that, with respect to projections and other forward-looking information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed by it to be reasonable at the time delivered, it being understood that any such projections and other forward-looking information are not to be viewed as facts and are subject to significant uncertainties and contingencies, many of which are beyond the control of the Borrower and that actual results may vary from projected results and such variations may be material.

(b)   As of the Effective Date, the information included in the Beneficial Ownership Certification is true and correct in all material respects.

Section 3.12   Subsidiaries. As of the Effective Date, Schedule 3.12 sets forth the name of, and the ownership interest of Holdings, the Borrower, New Intermediate Holdings and each Subsidiary in, the Borrower, New Intermediate Holdings and each Subsidiary.

Section 3.13   Intellectual Property; Licenses, Etc. Except as could not reasonably be expected to have a Material Adverse Effect, each of the Borrower and each Restricted Subsidiary owns, licenses or possesses the right to use, all of the rights to Intellectual Property that are reasonably necessary for the operation of its business as currently conducted, and, without conflict with the rights of any Person. The Borrower or each Restricted Subsidiary do not, in the operation of their businesses as currently conducted, infringe upon any Intellectual Property rights held by any Person except for such infringements, individually or in the aggregate, which could not reasonably be expected to have a Material Adverse Effect. No claim or litigation regarding any of the Intellectual Property owned by the Borrower or any Restricted Subsidiary is pending or, to the knowledge of the Borrower, threatened in writing against the Borrower or any Restricted Subsidiary, which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 3.14   Solvency. On the Effective Date, and after giving effect to the Transactions, Holdings and its Subsidiaries, on a consolidated basis, are Solvent.

Section 3.15   Senior Indebtedness. The Loan Document Obligations constitute "Senior Indebtedness" and "Designated Senior Indebtedness" (or any comparable terms) under and as defined in the documentation governing any Subordinated Indebtedness.

Section 3.16   <u>Federal Reserve Regulations</u>. None of Holdings, the Borrower or any Restricted Subsidiary is engaged or will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors), or extending credit for the purpose of purchasing or carrying margin stock. No part of the proceeds of the Loans will be used, directly or indirectly, to purchase or carry any margin stock or to refinance any Indebtedness originally incurred for such purpose, or for any other purpose that entails a violation (including on the part of any Lender) of the provisions of Regulations U or X of the Board of Governors.

Section 3.17   <u>Security Interest in Collateral</u>. Subject to the provisions of this Agreement (including, without limitation, the terms of the proviso to <u>clause (f)</u> of <u>Section 4.01</u>) and the other relevant Loan Documents, the Security Documents create legal, valid and enforceable Liens on all of the Collateral in favor of the Collateral Agent, for the benefit of itself and the other applicable Secured Parties, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law. With respect to Liens on assets of Domestic Loan Parties, upon the satisfaction of the applicable Domestic Perfection Requirements, such Liens constitute perfected Liens (with the priority that such Liens are expressed to have under the relevant Security Documents) on the applicable Collateral (to the extent such Liens are required to be perfected under the terms of the Loan Documents) securing the applicable Secured Obligations, in each case as and to the extent set forth therein, provided that in the case of each Foreign Loan Party and each Foreign Loan Document, each representation and warranty made in this <u>Section 3.17</u> shall be subject to the Legal Reservations and the Foreign Perfection Requirements.

Section 3.18   <u>PATRIOT Act, OFAC and FCPA</u>.

(a)   Holdings, the Borrower and the Restricted Subsidiaries will not, directly or indirectly, use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other Person, for the purpose of funding (i) any activities of or business with any Person who is the subject of Sanctions, or in any country or territory to the extent that such country or territory is the subject of Sanctions, or (ii) any other transaction that will result in a violation by any Person (including any Person participating in the transaction, whether as underwriter, advisor, investor, lender or otherwise) of Sanctions.

(b)   Holdings, the Borrower and the Restricted Subsidiaries will not use the proceeds of the Loans directly, or, to the knowledge of Holdings and the Borrower, indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended (the "<u>FCPA</u>") or other applicable anti-corruption laws and regulations.

(c)   Each of Holdings, the Borrower and the Restricted Subsidiaries is in compliance in all material respects with applicable Sanctions, including without limitation regulations of the United States Department of the Treasury's Office of Foreign Assets Control ("<u>OFAC</u>"), Title III of the USA Patriot Act and other applicable anti-terrorism laws and

regulations, and the FCPA and other applicable anti-corruption laws and regulations, and have instituted and maintain policies and procedures reasonably designed to ensure compliance with such laws and regulations.

(d)     To the knowledge of Holdings and the Borrower, none of Holdings, the Borrower or the Restricted Subsidiaries has, in the three years prior to the Effective Date, committed a material violation of Sanctions, Title III of the USA Patriot Act or other applicable anti-terrorism laws and regulations, or the FCPA or other applicable anti-corruption laws and regulations.

(e)     None of the Loan Parties, none of the Restricted Subsidiaries that are not Loan Parties or other Restricted Subsidiaries, nor to the knowledge of Holdings or the Borrower, any director, officer, employee or agent of any Loan Party or Restricted Subsidiary, in each case, (i) is an individual or entity currently on OFAC's list of Specially Designated Nationals and Blocked Persons, the "Consolidated Canadian Autonomous Sanctions List", or any other list of targets identified or designated pursuant to any Sanctions, (ii) is located, organized or resident in a country or territory that is the subject of Sanctions, or (iii) is otherwise the Subject or target of Sanctions, or 50% or more in the aggregate owned or controlled by any such Person or Persons.

(f)     This Section 3.18 shall not be interpreted or applied in respect of any German Loan Party to the extent that any such undertaking would violate or expose such entity or any directors, officer or employee thereof to any liability, under section 7 of the German Foreign Trade Ordinance (*Außenwirtschaftsverordnung*), any provision of Council Regulation (EC) 2271/1996, as amended, or any similar applicable antiboycott or blocking law or regulation binding on the relevant German Loan Party.

Section 3.19   Luxembourg Law. Any Luxembourg Loan Party complies with all the provisions of the Luxembourg law of 31 May 1999 governing the domiciliation of companies, as amended.

Section 3.20   [Reserved].

Section 3.21   [Reserved].

Section 3.22   Intermediate Holdcos.

(a)     From and after the Effective Date, each Intermediate Holdco has not traded, carried on any business, owned any assets or incurred any material liabilities except to the extent permitted under Section 6.06.

(b)     For the purposes of Regulation (EU) No. 2015/848 of the European Parliament and of the Council of 20 May 2015 on Insolvency Proceedings (recast) (the "Regulation"), each Intermediate Holdco's Centre of Main Interest (as that term is used in Article 3(1) of the Regulation) is situated in its jurisdiction of incorporation and it has no "establishment" (as that term is used in Article 2(h) of the Regulation) in any other jurisdiction.

ARTICLE IV
CONDITIONS

Section 4.01    Effective Date. The obligations of the Lenders to make the Term Loans hereunder (or for the Term Loans to be continued or deemed made, as the case may be) shall not become effective until the date on which each of the following conditions shall be satisfied (or waived in accordance with Section 9.02):

(a)    The Administrative Agent (or its counsel) (on behalf of the Lenders) shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of each party hereto or (ii) written evidence satisfactory to the Administrative Agent (which may include a copy transmitted by facsimile or other electronic transmission of a signed counterpart of this Agreement) that each party hereto has signed a counterpart of this Agreement;

(b)    The Administrative Agent shall have received a written opinion (addressed to the Administrative Agent, the Collateral Agent and the Lenders and dated the Effective Date) of each of (i) Kirkland & Ellis LLP, as special New York counsel for the Loan Parties, (ii) Kirkland & Ellis LLP, Munich, as German counsel for the Loan Parties as to the capacity of the Loan Parties incorporated in Germany to enter into the Loan Documents to which they are a Party, (iii) Baker McKenzie Rechtsanwaltsgesellschaft mbH von Rechtsanwälten und Steuerberatern, as German counsel for the Lenders on the validity of the German Collateral Agreements, (iv) Blake, Cassels & Graydon LLP, as Canadian counsel for the Loan Parties, (v) Baker & McKenzie Amsterdam N.V., as Dutch counsel for the Lenders as to the capacity of the Loan Parties incorporated in the Netherlands to enter into the Loan Documents to which they are a party, (vi) Loyens & Loeff Luxembourg S.à r.l., as Luxembourg counsel for the Loan Parties as to the capacity of the Loan Parties incorporated in Luxembourg to enter into the Loan Documents to which they are a party, (vii) Baker & McKenzie LLP as English counsel for the Lenders as to the capacity of the Loan Parties incorporated in England and Wales to enter into the Loan Documents to which they are a party and as to the enforceability of the English Collateral Documents, (viii) Kirkland & Ellis International LLP, as French counsel for the Loan Parties as to the capacity of the Loan Parties incorporated in France to enter into the Loan Documents to which they are a party and (ix) Baker & McKenzie Australia, as Australian counsel to the Lenders as to the capacity of the Loan Parties incorporated in Australia to enter into the Loan Documents to which they are a party and and as to the enforceability of the Australian Collateral Documents.

(c)    The Administrative Agent shall have received a certificate of each Loan Party, dated the Effective Date, substantially in the form of Exhibit R with appropriate insertions or as otherwise customary in the relevant jurisdiction of incorporation of a Foreign Loan Party, executed by any Responsible Officer of such Loan Party, and including or attaching the documents referred to in clauses (d)(i) through (d)(iii) of this Section and, in the case of the certificate delivered by the Borrower, confirming compliance with the conditions set forth in paragraphs (l) and (m) of this Section 4.01.

(d)    The Administrative Agent shall have received a copy of (i) each Organizational Document of each Loan Party certified, to the extent applicable, as of a recent date by the applicable Governmental Authority, (ii) to the extent applicable in the relevant jurisdiction of incorporation of a Foreign Loan Party, signature and incumbency certificates of the Responsible

Officers of each Loan Party executing the Loan Documents to which it is a party, (iii) resolutions of the Board of Directors, holders of all issued shares in and/or other corporate body of each Loan Party (as applicable), if applicable, the supervisory board of directors, and if applicable, an unconditional positive or neutral advice (*advies*) from each relevant works council, including the request for advice of such Loan Party approving and authorizing the execution, delivery and performance of Loan Documents to which it is a party, to the extent applicable in the relevant jurisdiction of incorporation of a Foreign Loan Party, certified as of the Effective Date by a Responsible Officer as being in full force and effect without modification or amendment, (iv) a good standing certificate, certificate of compliance, certificate of status or another analogous certificate (to the extent such concept exists) from the applicable Governmental Authority of each Loan Party's jurisdiction of incorporation, organization or formation, (v) [reserved] and (vi) in the case of a Loan Party incorporated in England and Wales the shares of which are to become the subject of a Lien in accordance with the English Collateral Agreement (a "Charged Company"), either: (A) a certificate of an authorised signatory of the shareholder(s) of that Loan Party certifying that: (1) the shareholder(s) of that Loan Party and their respective subsidiaries (however described) from time to time have complied within the relevant timeframe with any notice it has received pursuant to Part 21A of the Companies Act 2006 from the Charged Company, and (2) no "warning notice" or "restrictions notice" (in each case as defined in Schedule 1B of the Companies Act 2006) has been issued in respect of those shares, together with a copy of the "PSC register" (within the meaning of section 790C(10) of the Companies Act 2006) of that Charged Company which, in the case of that Charged Company, are certified by an authorised signatory of the shareholder(s) of that Loan Party  to be correct, complete and has not been amended or superseded as at a date no earlier than the date of this Agreement, or (B) a certificate of an authorised signatory of the shareholder(s) of that Charged Company certifying that the Charged Company is not required to comply with Part 21A of the Companies Act 2006.

(e)     Prior to or substantially concurrently with the funding, continuation or deemed funding of the Term Loans hereunder on the Effective Date, the Administrative Agent and the Lenders shall have received (i) all fees required to be paid by the Borrower on the Effective Date hereunder and under the Fee Letters and (ii) all expenses required to be paid by the Borrower for which invoices have been presented at least three Business Days prior to the Effective Date (except as otherwise agreed by the Borrower), which amounts, in the case of the Lenders, may be offset against the proceeds of the Loans.

(f)     The Collateral and Guarantee Requirement shall have been satisfied. The Collateral Agent shall have received a completed Perfection Certificate dated the Effective Date and signed by a Responsible Officer of each of the Borrower and each Loan Party, together with all attachments contemplated thereby.

(g)     Subject to the proviso in paragraph (f) above, each document (including any UCC, PPSA (or similar) financing statement and intellectual property security agreements) required by any Security Document or under applicable Requirements of Law to be filed, registered or recorded in order to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a perfected Lien on the Collateral required to be delivered pursuant to such Security Document (unless such Security Document provides for any such requirement to be provided at a later point in time), shall be in proper form for filing, registration or recordation and the Required Lenders have made arrangements for such filing, registration or recordation.

(h)      The Holdings Preferred Equity Documents shall be reasonably satisfactory to the Lenders.

(i)      The Administrative Agent shall have received a certificate from the chief financial officer (or other officer with reasonably equivalent responsibilities) of the Borrower certifying that Holdings and its Subsidiaries on a consolidated basis after giving effect to the Transactions are Solvent.

(j)      Each applicable Lender shall have received at least three Business Days prior to the Effective Date all documentation and other information about the Loan Parties required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation Title III of the USA Patriot Act, that shall have been reasonably requested by an initial Lender in writing at least 10 Business Days prior to the Effective Date.

(k)      Except to the extent set forth in Section 5.14, the Administrative Agent shall have received evidence that the insurance required by Section 5.07 is in effect and (ii) the Collateral Agent (A) shall have been named as loss payee or additional insured, as appropriate, under each such insurance policy to the extent required by Section 5.07 and (B) shall have received customary insurance certificates containing notification endorsements reasonably satisfactory to the Collateral Agent and the Required Lenders in respect of each such insurance policy under which the Collateral Agent is named as loss payee or additional insured.

(l)      The representations and warranties of each Loan Party set forth in the Loan Documents shall be true and correct in all material respects on and as of the Effective Date; provided that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided further that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct in all respects on the date of such credit extension or on such earlier date, as the case may be.

(m)      No Default shall have occurred and be continuing.

(n)      The Administrative Agent shall have received a Borrowing Request in accordance with Section 2.03.

(o)      The Senior Secured Convertible Notes shall have been issued or shall be issued substantially concurrently with the funding of the Term Loans on the Effective Date.

(p)      The Administrative Agent shall have received, in the case of each Loan Party incorporated in Luxembourg, an excerpt of the Luxembourg Trade and Companies Register (*Registre de Commerce et des Sociétés*) dated no earlier than 2 Business Days earlier than the date of the Effective Date and a certificate of non-inscription of a judicial decision or administrative dissolution without liquidation (*certificat de non inscription de decision judiciaire ou de dissolution administrative sans liquidation*) in respect of each Luxembourg Loan Party issued by the Luxembourg Register of Commerce and Companies, dated no earlier than 2 Business Days earlier than the Effective Date.

(q)     The Bankruptcy Court shall have entered the Confirmation Order (as defined in the RSA), and the Restructuring Transactions (as defined in the RSA) shall have been, or shall be substantially concurrently, consummated in accordance with the Reorganization Plan (including, for the avoidance of doubt, (i) that all amounts owing under the Prepetition Term Loan Agreement and the DIP Term Loan Credit Agreement shall have been discharged, repaid, defeased or converted in accordance with the terms hereof and (ii) that the issuance of the Holdings Preferred Equity Interests shall have been consummated or shall be consummated in a manner consistent with the Reorganization Plan).

(r)     The making of the Term Loans shall not violate any material applicable requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

For purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement (and each prospective Lender participating in the primary syndication of the Loans) shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required hereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender or prospective Lender prior to the proposed Effective Date specifying its objection thereto.

ARTICLE V
AFFIRMATIVE COVENANTS

Until the Termination Date shall have occurred, each of Holdings and the Borrower covenants and agrees with the Administrative Agent, the Collateral Agent and the Lenders that:

Section 5.01   Financial Statements and Other Information. The Borrower and/or Holdings will furnish to the Administrative Agent, on behalf of each Lender:

(a)     commencing with the financial statements for the fiscal year ending December 31, 2023, on or before the date on which such financial statements are required or permitted to be filed with the SEC (or, if such financial statements are not required to be filed with the SEC, on or before the date that is 120 days after the end of each such fiscal year of Holdings (or 150 days after the end of the Fiscal Year ending on December 31, 2023), audited consolidated balance sheets and related audited consolidated statements of operations, comprehensive income/(loss), stockholders' equity/deficiency and cash flows of Holdings as of the end of and for such year, and related notes and related explanations thereto, setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by Ernst & Young LLP, Deloitte, KPMG, PWC, RSM, Grant Thornton, BDO USA or other independent public accountants of recognized national standing (without a "going concern" or like qualification or exception) to the effect that such consolidated financial statements present fairly in all material respects the consolidated financial position and consolidated results of operations and cash flows of Holdings and its consolidated Subsidiaries as of the end of and for such year on a consolidated basis in accordance with GAAP consistently applied;

(b)     commencing with the financial statements for the fiscal quarter ended June 30, 2023, on or before the date on which such financial statements are required or permitted to be

filed with the SEC with respect to each fiscal quarter (including the fourth fiscal quarter) of each fiscal year of Holdings (or, if such financial statements are not required to be filed with the SEC, on or before the date that is 60 days after the end of each such fiscal quarter (or 75 days after the end of the fiscal quarters ended on June 30, 2023, September 30, 2023 and December 31, 2023)[7], unaudited consolidated balance sheets and related unaudited consolidated statements of operations, comprehensive income/(loss) and cash flows of Holdings and related explanations as of the end of and for such fiscal quarter (except in the case of cash flows) and the then elapsed portion of the fiscal year, and setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheets, as of the end of) the previous fiscal year, all certified by a Financial Officer as presenting fairly in all material respects the consolidated financial position and consolidated results of operations and cash flows of Holdings and its consolidated Subsidiaries as of the end of and for such fiscal quarter (except in the case of cash flows) and such portion of the fiscal year on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c)      [reserved];

(d)      not later than five days after any delivery of financial statements under clause (b) above, a Compliance Certificate of a Financial Officer (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto and (ii) setting forth reasonably detailed calculations demonstrating compliance with Section 6.10 as of the last day of the applicable fiscal quarter;

(e)      solely upon the request of the Administrative Agent, acting at the direction of the Required Lenders, not later than 90 days after the commencement of each fiscal year of Holdings, a detailed consolidated budget for Holdings and its Subsidiaries for such fiscal year (including a projected consolidated statement of financial position and consolidated statements of projected operations and cash flows as of the end of and for such fiscal year and setting forth the material assumptions used for purposes of preparing such budget);

(f)      promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and registration statements (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered to the Administrative Agent), exhibits to any registration statement and, if applicable, any registration statement on Form S-8) filed by Holdings or any Subsidiary with the SEC or with any national securities exchange;

(g)      promptly following any request therefor, (i) such other information (which may be in the form of an officer's certificate) regarding the operations, business affairs and financial condition of Holdings or any Restricted Subsidiary, or compliance with the terms of any Loan Document, as the Administrative Agent on its own behalf or on behalf of any Lender may reasonably request in writing or (ii) information and documentation reasonably requested by the

---

[7] NTD: Subject to review of ABL delivery requirements.

Administrative Agent or any Lender for purposes of compliance with applicable "know your customer" requirements under the PATRIOT Act, the PCMLTF Act or other applicable anti-money laundering laws; and

(h)     promptly after the furnishing thereof, copies of any material requests or material notices received by any Loan Party, in each case, as reasonably determined by the Loan Parties in good faith or information regularly furnished to any holder of the Holdings Preferred Equity Interests in its capacity as such pursuant to the terms of the Holdings Preferred Equity Documents, as applicable, and not otherwise required to be furnished to the Lenders pursuant to any other clause of this Section 5.01.

Solely at the request of the Administrative Agent, acting at the direction of the Required Lenders, Holdings will hold and participate in up to four conference calls each fiscal year for Lenders to discuss financial information. To the extent the rights contemplated by Section 6(a)(ii) of the Holdings Certificate of Designations are exercised by the holders of the Holdings Preferred Equity Interests, the Borrower shall notify the Lenders and, at the request of the Administrative Agent, acting at the direction of the Required Lenders, invite the Lenders to the applicable conference call. To the extent any such conference call is requested by the Administrative Agent, prior to each such conference call, Holdings shall notify the Administrative Agent of the time and date of such conference call.

Notwithstanding the foregoing, the obligations in clauses (a) or (b) of this Section 5.01 may be satisfied with respect to financial information of Holdings and its Subsidiaries by furnishing the Form 10-K or 10-Q (or the equivalent), as applicable, of Holdings filed with the SEC to the extent such filing includes the information required by such clauses.

Documents required to be delivered pursuant to Section 5.01 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the earlier of the date (A) on which Holdings posts such documents, or provides a link thereto, on Holdings' or one of its Affiliates' website on the Internet or (B) on which such documents are posted on Holdings' behalf on IntraLinks/IntraAgency or another website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that: (i) Holdings shall deliver such documents to the Administrative Agent upon its reasonable request until a written notice to cease delivering such documents is given by the Administrative Agent and (ii) Holdings shall notify the Administrative Agent (by telecopier or electronic mail) of the posting of any such documents and upon its reasonable request, provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. The Administrative Agent shall have no obligation to request the delivery of or maintain paper copies of the documents referred to above, and each Lender shall be solely responsible for timely accessing posted documents and maintaining its copies of such documents.

The Borrower and Holdings hereby acknowledge that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of Holdings hereunder (collectively, "Company Materials") by posting the Company Materials on IntraLinks or another similar electronic system (the "Platform") and (b) certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive material nonpublic information with

respect to Holdings or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities. Holdings hereby agrees that it will, upon the Administrative Agent's reasonable request, identify that portion of the Company Materials that may be distributed to the Public Lenders and that (i) all such Company Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (ii) by marking Company Materials "PUBLIC," Holdings shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Company Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to Holdings or its respective Affiliates or their respective securities for purposes of United States federal and state securities laws (provided, however, that to the extent such Company Materials constitute Information, they shall be treated as set forth in Section 9.12); (iii) all Company Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (iv) the Administrative Agent shall be entitled to treat any Company Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."

The Platform is provided "as is" and "as available." The Agent Related Persons (as defined below) do not warrant the adequacy of the Platform and expressly disclaim liability for errors or omissions in the Company Materials or Communications. No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by any Agent Related Person in connection with the Company Materials, the Communications or the Platform. In no event shall the Agent or any agent or affiliate thereof (collectively, the "Agent Related Person") have any liability to Holdings or the other Loan Parties, any Lender or any other Person or entity for damages of any kind, including, without limitation, direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of Holdings', any Loan Party's or the Administrative Agent's transmission of communications through the Platform. "Communications" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of any Loan Party pursuant to any Loan Document or the transactions contemplated therein which is distributed to the Administrative Agent or any Lender by means of electronic communications pursuant to this Section and Section 9.01, including through the Platform.

Section 5.02    Notices of Material Events. Promptly after any Responsible Officer of the Borrower or Holdings obtains actual knowledge thereof, the Borrower will furnish to the Administrative Agent (for distribution to each Lender through the Administrative Agent) written notice of the following:

(a)    the occurrence of any Default; and

(b)    the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or, to the knowledge of a Financial Officer or another senior executive officer of the Borrower, affecting Holdings or any of its Subsidiaries or the receipt of a written notice of an Environmental Liability or the occurrence of an ERISA Event, in each case, that could reasonably be expected to result in a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a written statement of a Responsible Officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 5.03    Information Regarding Collateral.

(a)    The Borrower will furnish to the Administrative Agent promptly (and in any event within 30 days or such longer period as reasonably agreed to by the Administrative Agent acting at the direction of the Required Lenders) written notice of any change (i) in any Loan Party's legal name (as set forth in its certificate of organization or like document), (ii) in the jurisdiction of incorporation or organization or the location of the chief executive office of any Loan Party or in the form of its organization or (iii) in any Loan Party's organizational identification number to the extent that such Loan Party is organized or owns Mortgaged Property in a jurisdiction where an organizational identification number is required to be included in a UCC financing statement for such jurisdiction, together with any necessary or advisable financing statements or amendments to maintain the perfection of the Collateral Agent's Liens on the Collateral.

(b)    Not later than five days after any delivery of financial statements pursuant to Section 5.01(a), the Borrower shall deliver to the Administrative Agent a certificate executed by a Responsible Officer of the Borrower identifying any Domestic Subsidiary that is a Restricted Subsidiary and that has become, or ceased to be, a Material Subsidiary during the most recently ended fiscal quarter.

Section 5.04    Existence; Conduct of Business. Each of Holdings and the Borrower will, and will cause each Restricted Subsidiary to, do or cause to be done all things necessary to obtain, preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges, franchises, the patents, copyrights, trademarks and trade names material to the conduct of its business, in each case (other than the preservation of the existence of the Borrower) to the extent that the failure to do so could reasonably be expected to have a Material Adverse Effect, provided that the foregoing shall not prohibit any merger, amalgamation, consolidation, liquidation or dissolution permitted under Section 6.03, 6.06, 6.20 or 6.21 or any Disposition permitted by Section 6.05.

Section 5.05    Payment of Taxes, Etc. Each of Holdings and the Borrower will, and will cause each Restricted Subsidiary to, pay its obligations in respect of Taxes before the same shall become delinquent or in default, except (a) where the failure to make payment could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, or (b) that are being contested in good faith by appropriate proceedings for which adequate reserves have been made in accordance with GAAP.

Section 5.06    Maintenance of Properties. Each of Holdings and the Borrower will, and will cause each Restricted Subsidiary to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, except where the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.07    <u>Insurance</u>.

(a)    Each of Holdings and the Borrower will, and will cause each Restricted Subsidiary to, maintain, with insurance companies that the Borrower believes (in the good faith judgment of the management of the Borrower) are financially sound and responsible at the time the relevant coverage is placed or renewed, insurance in at least such amounts (after giving effect to any self-insurance which the Borrower believes (in the good faith judgment of management the Borrower) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as the Borrower believes (in the good faith judgment of the management the Borrower) are reasonable and prudent in light of the size and nature of its business; and will furnish to the Lenders, upon written request from the Administrative Agent (acting at the direction of Required Lenders), information presented in reasonable detail as to the insurance so carried. Each such policy of insurance maintained by a Loan Party shall (i) name the Administrative Agent and the Collateral Agent, on behalf of the applicable Secured Parties, as an additional insured thereunder as its interests may appear and (ii) in the case of each casualty insurance policy (excluding any business interruption insurance, workers' compensation policy or employee liability policy), contain a loss payable/mortgagee clause or endorsement that names Collateral Agent, on behalf of the applicable Secured Parties, as the loss payee/mortgagee thereunder.

(b)    If any portion of any Mortgaged Property subject to FEMA rules and regulations is at any time located in an area identified by FEMA (or any successor agency) as a Special Flood Hazard Area with respect to which flood insurance has been made available under the Flood Insurance Laws, then the Borrower shall, or shall cause the relevant Loan Party to, (i) maintain or cause to be maintained, flood insurance sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) deliver to the Administrative Agent evidence of such compliance, which evidence complies with applicable Flood Insurance Laws and rules and regulations promulgated pursuant thereto.

Section 5.08    <u>Books and Records; Inspection and Audit Rights</u>. Each of Holdings and the Borrower will, and will cause each Restricted Subsidiary to, maintain proper books of record and account in which entries that are full, true and correct in all material respects and are in conformity with GAAP (or applicable local standards) consistently applied shall be made of all material financial transactions and matters involving the assets and business of the Borrower or the Restricted Subsidiaries, as the case may be. The Borrower will, and will cause the Restricted Subsidiaries to, permit any representatives designated by the Administrative Agent or any Lender, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested; provided that, excluding any such visits and inspections during the continuation of an Event of Default, only the Administrative Agent on behalf of the Lenders (provided that a representative of the Lenders may accompany the Administrative Agent) may exercise visitation and inspection rights of the Administrative Agent and the Lenders under this <u>Section 5.08</u> and the Administrative Agent shall not exercise such rights more often than one time during any calendar year absent the existence of an Event of Default, which visitation and inspection shall be at the reasonable expense of the Borrower; provided, further that (a) when an Event of Default exists, the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may

do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice and (b) the Administrative Agent and the Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants.

Section 5.09   Compliance with Laws. Each of Holdings and the Borrower will, and will cause each Restricted Subsidiary to, comply with its Organizational Documents and all Requirements of Law (including Environmental Laws, ERISA, FCPA, Sanctions, the USA Patriot Act, the PCMLTF Act and other anti-terrorism and anti-corruption laws) applicable to it or its property, except where the failure to do so (other than compliance with FCPA, Sanctions, the USA Patriot Act and other anti-terrorism and anti-corruption laws), individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. This Section 5.09 shall not be interpreted or applied in respect of any German Loan Party to the extent that any such undertaking would violate or expose such entity or any directors, officer or employee thereof to any liability, under section 7 of the German Foreign Trade Ordinance (*Außenwirtschaftsverordnung*), any provision of Council Regulation (EC) 2271/1996, as amended, or any similar applicable antiboycott or blocking law or regulation binding on the relevant German Loan Party.

Section 5.10   Use of Proceeds. The Borrower will use the proceeds of the Term Loans made, continued or deemed made on the Effective Date to refinance the Term Loan Claims and a portion of the DIP Term Loan Claims in accordance with the Reorganization Plan. Holdings, the Borrower and the Restricted Subsidiaries will not, directly or indirectly, use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other Person, for the purpose of funding (i) any activities of or business with any Person who is the subject of Sanctions, or in any country or territory to the extent that such country or territory is the subject of Sanctions, or (ii) any other transaction that will result in a violation by any Person (including any Person participating in the transaction, whether as underwriter, advisor, investor, lender or otherwise) of Sanctions. Holdings, the Borrower and the Restricted Subsidiaries will not use the proceeds of the Loans directly or, to the knowledge of the Borrower, indirectly in any manner that would violate the FCPA or other applicable anti-corruptions laws or regulations, or the USA Patriot Act or other applicable anti-terrorism laws or regulations. Any amounts used to repay the Term Loans shall not be derived from transactions that violate Sanctions. This Section 5.10 shall not be interpreted or applied in respect of any German Loan Party to the extent that any such undertaking would violate or expose such entity or any directors, officer or employee thereof to any liability, under section 7 of the German Foreign Trade Ordinance (*Außenwirtschaftsverordnung*), any provision of Council Regulation (EC) 2271/1996, as amended, or any similar applicable antiboycott or blocking law or regulation binding on the relevant German Loan Party.  The Borrower shall ensure that no proceeds borrowed under this Agreement will be used in a manner which constitutes a "use of proceeds in Switzerland" as interpreted by Swiss tax authorities when assessing whether or not interest payable with respect to such borrowing is subject to Swiss withholding tax, except and to the extent that a written confirmation or tax ruling countersigned by the Swiss Federal Tax Administration (*Eidgenössische Steuerverwaltung*) has been obtained (in a form satisfactory to the Administrative Agent (at the direction of the Required Lenders)) confirming that the intended "use of proceeds in Switzerland" does not result in any Loans qualifying as a Swiss financing for Swiss withholding tax purposes

and that, accordingly, no Swiss withholding tax is or becomes payable on the interest payments made under this Agreement.

Section 5.11    Additional Subsidiaries. If any additional Restricted Subsidiary is formed or acquired after the Effective Date, the Borrower will, within 60 days (or such longer period contemplated by the Agreed Security Principles or as the Administrative Agent acting at the direction of the Required Lenders shall reasonably agree) after such newly formed or acquired Restricted Subsidiary is formed or acquired (unless such Subsidiary is an Excluded Subsidiary), notify the Administrative Agent thereof, and shall take all actions (if any) required to be taken with respect to such newly formed or acquired Subsidiary in order to satisfy the Collateral and Guarantee Requirement with respect to such Subsidiary, the assets of such Subsidiary and with respect to any Equity Interest in or Indebtedness of such Subsidiary owned by or on behalf of any Loan Party within 60 days after such formation or acquisition (or such longer period contemplated by the Agreed Security Principles or  as the Administrative Agent, acting at the direction of the Required Lenders, shall reasonably agree).

Section 5.12    Further Assurances.

(a)    Each of Holdings and the Borrower will, and will, subject in the case of the Foreign Loan Parties to the Agreed Security Principles, cause each Loan Party to, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents), that may be required under any applicable law and that the Administrative Agent or the Required Lenders may reasonably request, to cause the applicable Collateral and Guarantee Requirement to be and remain satisfied at all times, all at the expense of the Loan Parties and subject to the Legal Reservations and Foreign Perfection Requirements (if applicable).

(b)    If, after the Effective Date, any material assets (including any owned (but not leased) real property and improvements thereto or any interest therein) with a Fair Market Value in excess of $1,000,000, are acquired by Holdings, the Borrower or any other Loan Party or are owned by any Subsidiary on or after the time it becomes a Loan Party pursuant to Section 5.11 (other than assets constituting Collateral under a Security Document that become subject to the Lien created by such Security Document upon acquisition thereof or constituting Excluded Assets), or the Borrower will promptly notify the Administrative Agent thereof, and, if requested by the Required Lenders, the Borrower will cause such assets to be subjected to a Lien securing the applicable Secured Obligations and will take and cause the other Loan Parties to take, such actions as shall be necessary and reasonably requested by the Required Lenders and consistent with the applicable Collateral and Guarantee Requirement to grant and perfect such Liens, including actions described in paragraph (a) of this Section, all at the expense of the Loan Parties and on the terms set forth in, and subject to last paragraph of, the definition of the term of the "Domestic Collateral and Guarantee Requirement", the definition of the term "Canadian Collateral and Guarantee Requirement" and the Agreed Security Principles.

Section 5.13    Cash Management and Collections. Without the consent of the Required Lenders (not to be unreasonably withheld, conditioned or delayed; provided, that it is acknowledged and agreed that it shall not be unreasonable to withhold consent to any such

transaction that will have a material adverse impact on the Guarantees or the Collateral), each of Holdings, the Borrower and New Intermediate Holdings shall ensure that the primary European cash collections and cash pooling arrangements of the European Loan Parties and their subsidiaries as in effect on the Effective Date shall not be modified in any material manner if the result of such modification would be (x) to cause material amounts of cash to be concentrated or pooled into bank accounts located in any jurisdiction other than the Netherlands, the United Kingdom, Sweden, Norway or Denmark or (y) materially adverse to the scope of collateral and lien perfection (with respect to cash and deposit accounts) contemplated by the parties hereto on the Effective Date (including pursuant to <u>Section 5.14</u>).

Section 5.14   <u>Certain Post-Closing Obligations</u>.

(a)   As promptly as practicable, and in any event within the time periods after the Effective Date specified in Schedule 5.14 or such later date as the Administrative Agent acting at the direction of the Required Lenders reasonably agrees to in writing, Holdings, the Borrower and each other Loan Party, as applicable, shall deliver the documents or take the actions specified on Schedule 5.14 that would have been required to be delivered or taken on the Effective Date but for the proviso to <u>Section 4.01(f)</u>, in each case except to the extent otherwise agreed by the Administrative Agent pursuant to its authority as set forth in the definitions of "Domestic Collateral and Guarantee Requirement" and "Canadian Collateral and Guarantee Requirement" and the Agreed Security Principles.

<div align="center">

ARTICLE VI
NEGATIVE COVENANTS

</div>

Until the Termination Date shall have occurred, each of Holdings and the Borrower covenants and agrees with the Administrative Agent, the Collateral Agent and the Lenders that:

Section 6.01   <u>Indebtedness; Certain Equity Securities</u>.

(a)   Holdings and the Borrower will not, nor will they permit any Restricted Subsidiary to, create, incur, assume or permit to exist any Indebtedness, except:

(i)   Indebtedness of the Loan Parties under the Loan Documents;

(ii)   Indebtedness outstanding on the Effective Date and listed on <u>Schedule 6.01</u> and any Permitted Refinancing thereof;

(iii)   Guarantees by the Borrower and the Restricted Subsidiaries in respect of Indebtedness of the Borrower or any Restricted Subsidiary otherwise permitted hereunder (other than (x) Guarantees by Restricted Subsidiaries that are not Domestic Loan Parties or Canadian Loan Parties of Indebtedness incurred pursuant to <u>Section 6.01(a)(xxii)</u> and (y) Guarantees by Restricted Subsidiaries that are not EMEA Loan Parties of Indebtedness incurred pursuant to <u>Section 6.01(a)(xxv)</u>); <u>provided</u> that (A) such Guarantee is otherwise permitted by <u>Section 6.04</u>, (B) no Guarantee by any Restricted Subsidiary of any Junior Financing shall be permitted unless such Restricted Subsidiary shall have also provided a Guarantee of the Loan Document Obligations pursuant to the Domestic Guarantee Agreement

<div align="center">107</div>

or the Foreign Guarantee Agreement, as applicable and (C) if the Indebtedness being Guaranteed is subordinated to the Loan Document Obligations, such Guarantee shall be subordinated to the Guarantee of the Loan Document Obligations on terms at least as favorable (as reasonably determined by the Required Lenders) taken as a whole, to the Lenders as those contained in the subordination of such Indebtedness;

(iv)     Indebtedness of the Borrower or any Restricted Subsidiary owing to Holdings, the Borrower or any Restricted Subsidiary to the extent permitted by Section 6.04; provided that all such Indebtedness of any Loan Party owing to any Restricted Subsidiary that is not a Loan Party shall be subordinated to the Loan Document Obligations (but only to the extent permitted by applicable law and not giving rise to material adverse Tax consequences) on terms (A) at least as favorable to the Lenders as those set forth in the form of intercompany subordination agreement attached as Exhibit S or (B) otherwise reasonably satisfactory to the Required Lenders;

(v)     (A) Indebtedness (including Capital Lease Obligations) of the Borrower or any Restricted Subsidiary financing the acquisition, construction, repair, replacement, installation or improvement of any property (real or personal, and whether through the direct purchase of property or the Equity Interest of any person owning such property); provided that such Indebtedness is incurred concurrently with or within 270 days after the applicable acquisition, construction, repair, replacement, installation or improvement, and (B) any Permitted Refinancing of any Indebtedness set forth in the immediately preceding subclause (A); provided further that, at the time of any such incurrence of Indebtedness and after giving pro forma effect thereto and to the use of the proceeds thereof, the aggregate principal amount of Indebtedness that is outstanding in reliance on this subclause (v) shall not exceed $20,000,000 as of such time;

(vi)     Indebtedness in respect of Swap Agreements entered into to hedge or mitigate risks to which Holdings or any Restricted Subsidiary has actual exposure (other than those in respect of shares of capital stock or other Equity Interests of Holdings or any Restricted Subsidiary), including Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of Holdings or any Restricted Subsidiary;

(vii)     Indebtedness incurred pursuant to Section 8a of the German Old Age Employees Retirement Act (*Altersteilzeitgesetz*) or Section 7e of the Fourth Book of the German Social Security Code IV (*Sozialgesetzbuch IV*);

(viii)     Indebtedness consisting of unsecured promissory notes issued by any Loan Party to current or former officers, managers, consultants, independent contractors, directors and employees or their respective estates, successors, spouses, former spouses, domestic partners, heirs, legatees or distributees to finance

the purchase or redemption of Equity Interests of Holdings permitted by Section 6.08(a);

(ix)     (A) Indebtedness arising from an agreement providing for indemnification obligations or obligations in respect of purchase price (including earnouts) or other similar adjustments incurred in any Investment or any Disposition, in each case permitted under this Agreement and (B) Indebtedness arising from guaranties, letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments securing the performance pursuant to any such agreement described in clause (A);

(x)     Indebtedness consisting of obligations under deferred compensation or other similar arrangements incurred (A) in the ordinary course of business to current or former directors, officers, employees, members of management, managers and consultants of Holdings and/or any Restricted Subsidiary and (B) in connection with any Investment permitted hereunder;

(xi)     Cash Management Obligations and other Indebtedness in respect of netting services, cash pooling, overdraft protections and similar arrangements and Indebtedness arising from the honoring of a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds, in each case in the ordinary course of business;

(xii)     Indebtedness of the Domestic Loan Parties and the Canadian Loan Parties; provided that at the time of the incurrence thereof and after giving pro forma effect thereto, the aggregate principal amount of Indebtedness outstanding in reliance on this clause (xii) shall not exceed $10,000,000 and shall be subject to the Required Additional Debt Terms;

(xiii)     Indebtedness consisting of (A) the financing of insurance premiums or (B) take-or-pay obligations contained in supply arrangements, in each case in the ordinary course of business;

(xiv)     Indebtedness incurred by the Borrower or any Restricted Subsidiary in respect of letters of credit, bank guarantees, bankers' acceptances, or similar instruments issued or created, or related to obligations or liabilities (other than Indebtedness) incurred in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other reimbursement-type obligations regarding workers compensation claims;

(xv)     obligations in respect of performance, bid, appeal and surety bonds and performance, bankers acceptance facilities and completion guarantees, leases, government or trade contracts and similar obligations provided by the Borrower or any Restricted Subsidiary or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(xvi)   [reserved];

(xvii)   Indebtedness under the De Lage Program in the ordinary course of business and consistent with past practice and any Permitted Refinancing thereof in an aggregate amount at any time outstanding not to exceed $10,000,000;

(xviii)   Indebtedness supported by a Letter of Credit (as defined in the ABL North America Credit Agreement or equivalent term under any document governing any other revolving credit facility), in a principal amount not to exceed the face amount of such Letter of Credit (as defined in the ABL North America Credit Agreement or equivalent term under any document governing any other revolving credit facility);

(xix)   any liability in respect of any Loan Party arising under a declaration of joint and several liability (*hoofdelijke aansprakelijkheid*) as referred to in Section 2:403 of the Dutch Civil Code (and any residual liability under such declaration arising pursuant to Section 2:404(2) of the Dutch Civil Code;

(xx)   any liability arising as a result of a fiscal unity (*fiscale eenheid*) between Loan Parties;

(xxi)   [reserved];

(xxii)   Indebtedness of the Borrower, any Canadian Loan Party and/or any Domestic Subsidiary Guarantor under (A) the ABL North America Credit Agreement and (B) any Permitted Refinancing of Indebtedness incurred pursuant to the foregoing subclause (A); provided that the aggregate principal amount of Indebtedness outstanding in reliance on this clause (xxii) shall not exceed $[40,000,000]; provided, that any such Indebtedness, if secured, shall be secured only by Liens permitted under Section 6.02(xix)(B);

(xxiii)   Indebtedness in respect of (A) the Senior Secured Convertible Notes and (B) any Permitted Refinancing thereof; provided that the aggregate principal amount of Indebtedness outstanding in reliance on this clause (xxiii) shall not exceed $[46,475,000][8];

(xxiv)   [reserved];

(xxv)   Indebtedness of any EMEA Loan Party under (A) a Permitted ABL EMEA Credit Facility and (B) any Permitted Refinancing of Indebtedness incurred pursuant to the foregoing subclause (A); provided that the aggregate principal amount of Indebtedness outstanding in reliance on this clause (xxv) shall not exceed $[30,000,000]; provided, that any such Indebtedness incurred in reliance on this

---

[8] Note to K&E team - please let us know the calculation you used to arrive at this amount.

clause (xxv) if secured, shall be secured only by Liens permitted under Section 6.02(xix)(B); and

(xxvi)  all premiums (if any), interest (including interest paid in kind and post-petition interest), accretion or amortization of original issue discount, fees, expenses, charges and additional or contingent interest on obligations described in clauses (i) through (xxv) above.

(b)  Holdings will not, nor will it permit any Restricted Subsidiary to, issue any preferred Equity Interests or any Disqualified Equity Interests.

Section 6.02    Liens. Holdings will not, nor will it permit any Restricted Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, except:

(i)  Liens created under the Loan Documents;

(ii)  Permitted Encumbrances;

(iii)  Liens existing on the Effective Date (other than Liens created under the ABL North America Credit Documents or the Senior Secured Convertible Notes Documents); provided that any Lien securing Indebtedness or other obligations in excess of $1,000,000 individually shall only be permitted if set forth on Schedule 6.02, and any modifications, replacements, renewals or extensions thereof; provided that (1) such modified, replacement, renewal or extension Lien does not extend to any additional property other than (a) after-acquired property that is affixed or incorporated into the property covered by such Lien and (b) proceeds and products thereof, and (2) the obligations secured or benefited by such modified, replacement, renewal or extension Lien are permitted by Section 6.01;

(iv)  Liens securing Indebtedness permitted under Section 6.01(a)(v); provided that (A) such Liens attach concurrently with or within 270 days after the acquisition, repair, replacement, construction or improvement (as applicable) of the property subject to such Liens, (B) such Liens do not at any time encumber any property other than the property financed by such Indebtedness, except for accessions to such property and the proceeds and the products thereof, and any lease of such property (including accessions thereto) and the proceeds and products thereof and (C) with respect to Capital Lease Obligations, such Liens do not at any time extend to or cover any assets (except for accessions to or proceeds of such assets) other than the assets subject to such Capital Lease Obligations; provided further that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

(v)  leases, licenses, subleases or sublicenses granted to others (whether on an exclusive or non-exclusive basis) that are entered into in the ordinary course of business or that do not interfere in any material respect with the business of the Borrower and the Restricted Subsidiaries, taken as a whole;

(vi)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(vii)    Liens (A) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection and (B) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of setoff) and that are within the general parameters customary in the banking industry;

(viii)   Liens (A) on cash advances or escrow deposits in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 6.04 to be applied against the purchase price for such Investment or otherwise in connection with any escrow arrangements with respect to any such Investment or any Disposition permitted under Section 6.05 (including any letter of intent or purchase agreement with respect to such Investment or Disposition) or (B) consisting of an agreement to dispose of any property in a Disposition permitted under Section 6.05 in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(ix)     Liens on property and Equity Interests, in each case, that are not Collateral, which Liens secure Indebtedness of a Restricted Subsidiary that is not a Loan Party that is permitted under Section 6.01(a);

(x)      Liens granted by a Restricted Subsidiary that is not a Loan Party in favor of any Loan Party (other than Holdings, New Intermediate Holdings or any Intermediate Holdco), Liens granted by a Restricted Subsidiary that is not a Loan Party in favor of Restricted Subsidiary that is not a Loan Party and Liens granted by a Loan Party (other than Holdings, New Intermediate Holdings or any Intermediate Holdco) in favor of any other Loan Party;

(xi)     Liens existing on property at the time of its acquisition or existing on the property of any Person at the time such Person becomes a Restricted Subsidiary, in each case after the Effective Date (other than Liens on the Equity Interests of any Person that becomes a Restricted Subsidiary); provided that (A) such Lien was not created in contemplation of such acquisition or such Person becoming a Restricted Subsidiary, (B) such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof and other than after-acquired property subject to a Lien securing Indebtedness and other obligations incurred prior to such time and which Indebtedness and other obligations are permitted hereunder that require or include, pursuant to their terms at such time, a pledge of after-acquired property, it being understood that such requirement shall not be permitted to apply to any property to which such requirement would not have applied but for such acquisition), and (C) the Indebtedness secured thereby is permitted under Section 6.01(a)(v);

112

(xii)    any interest or title (and all encumbrances and other matters affecting such interest or title) of a lessor, sublessor, licensor or sublicensor or secured by a lessor's sublessor's, licensor's or sublicensor's interest under leases (other than leases constituting Capital Lease Obligations), subleases, licenses, cross-licenses or sublicense entered into by the Borrower or any Restricted Subsidiary in the ordinary course of business;

(xiii)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale or purchase of goods by the Borrower or any Restricted Subsidiary in the ordinary course of business;

(xiv)    Liens deemed to exist in connection with Investments in repurchase agreements permitted under clause (e) of the definition of the term "Permitted Investments";

(xv)    [reserved];

(xvi)    Liens that are contractual rights of setoff (A) relating to the establishment of depository relations with banks not given in connection with the incurrence of Indebtedness, including liens or rights of set-off arising under the general terms and conditions of banks with whom any group member maintains a banking relationship in the ordinary course of business; including liens of group members under the German general terms and condition of banks and saving banks (*Allgemeine Geschäftsbedingungen der Banken und Sparkassen*) (B) relating to pooled deposit or sweep accounts to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and the Restricted Subsidiaries or (C) relating to purchase orders and other agreements entered into with customers of the Borrower or any Restricted Subsidiary in the ordinary course of business;

(xvii)    ground leases in respect of real property on which facilities owned or leased by the Borrower or any Restricted Subsidiary are located and, in respect of real property located in Germany, any landlord' lien (*Vermieter- oder Verpächterpfandrecht*);

(xviii)    Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(xix)    Liens (A) on the Collateral of the Domestic Loan Parties and/or the Canadian Loan Parties in each case securing the ABL North America Obligations, provided that such Liens shall be subject to the ABL North America Intercreditor Agreement and (B) on the Collateral of the EMEA Loan Parties securing indebtedness permitted to be incurred in reliance on Section 6.01(xxv); provided that such Liens shall be subject to a Permitted ABL EMEA Intercreditor Agreement which may provide for such Liens on accounts receivable and inventory (and the proceeds thereof) to be senior to the Liens on such assets securing the Loan Document Obligations;

(xx)     other Liens; provided that at the time of incurrence of such Liens and the obligations secured thereby (after giving pro forma effect to any such obligations) the aggregate outstanding face amount of obligations secured by Liens existing in reliance on this clause (xx) shall not exceed $5,000,000;

(xxi)    any security or quasi-security granted under mandatory law (sections 22, 204 of the German Transformation Act (Umwandlungsgesetz)) in favor of creditors as a consequence of a merger or conversion permitted under this Agreement;

(xxii)   Liens on the Collateral (or a portion thereof) securing Indebtedness permitted under Section 6.01(a)(xxiii); provided that such Liens shall be pari passu with the Liens securing the Secured Obligations in respect of the Term Loans and shall be subject to the Pari Passu Intercreditor Agreement;

(xxiii)  receipt of progress payments and advances from customers in the ordinary course of business to the extent the same creates a Lien on the related inventory and proceeds thereof;

(xxiv)  (i) Liens on Equity Interests of joint ventures securing capital contributions to, or obligations of, such Persons and (ii) customary rights of first refusal and tag, drag and similar rights in joint venture agreements;

(xxv)    Liens on amounts under pension standard legislation of Canada or any province thereto applicable to any Foreign Pension Plan that relate to contributions withheld from pay but not yet due to be remitted; and

(xxvi)   Liens on cash and Permitted Investments arising in connection with the defeasance, discharge or redemption of Indebtedness for no longer than 60 days prior to such defeasance, discharge or redemption.

In addition, if the Required Lenders shall have consented (which consent shall not be unreasonably withheld, delayed, conditioned or denied), the Borrower and the Restricted Subsidiaries may post cash collateral up to the amount so agreed by the Required Lenders to secure Indebtedness permitted pursuant to Section 6.01(a)(vi), but only to the extent such Indebtedness is not secured by any Liens on the Collateral that are otherwise permitted under this Section 6.02.

Notwithstanding the foregoing, neither Holdings nor the Borrower will, nor will they permit any Restricted Subsidiary to, create, incur, assume or permit to exist any consensual Lien on any Equity Interests (x) of any Intermediate Holdco, except (i) Liens created under the Loan Documents and (ii) Liens securing Indebtedness permitted under Section 6.01(a)(xxiii) or (y) of the Borrower or New Intermediate Holdings.

Section 6.03    Fundamental Changes. Neither Holdings nor the Borrower will, nor will they permit any Restricted Subsidiary to, merge into, amalgamate or consolidate or amalgamate with any other Person, or permit any Person to merge into or consolidate with it, or liquidate or dissolve, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of the assets (whether now owned or hereafter acquired) of Holdings, the Borrower

114

and the Restricted Subsidiaries, taken as a whole, to or in favor of any Person (other than as part of the Transactions), except that:

(a)        any Restricted Subsidiary (other than New Intermediate Holdings or any Intermediate Holdco) may merge, amalgamate, consolidate or amalgamate with (A) the Borrower; provided that the Borrower shall be the continuing or surviving Person or (B) one or more other Restricted Subsidiaries of the Borrower; provided that, except with the consent of the Required Lenders (such consent not to be unreasonably withheld, conditioned or delayed; provided, that it is acknowledged and agreed that it shall not be unreasonable to withhold consent to any such transaction that will have a material adverse impact on the Guarantees or the Collateral), when Domestic Subsidiary Guarantor or any Canadian Loan Party is merging, consolidating or amalgamating with any other Restricted Subsidiary the continuing or surviving Person shall be a Domestic Subsidiary Guarantor or a Canadian Loan Party; provided, further that, except with the consent of the Required Lenders (such consent not to be unreasonably withheld, conditioned or delayed; provided, that it is acknowledged and agreed that it shall not be unreasonable to withhold consent to any such transaction that will have a material adverse impact on the Guarantees or the Collateral), when any European Loan Party is merging, consolidating or amalgamating with any other Restricted Subsidiary the continuing or surviving Person shall be a Domestic Subsidiary Guarantor, a Canadian Loan Party or Subsidiary Loan Party organized in the same Specified Jurisdiction as such European Loan Party;

(b)        any Restricted Subsidiary (other than New Intermediate Holdings or any Intermediate Holdco) may liquidate or dissolve if the Borrower determines in good faith that such action is in the best interests of Holdings, the Borrower and the Restricted Subsidiaries, taken as a whole, and is not materially disadvantageous to the Lenders;

(c)        any Restricted Subsidiary (other than New Intermediate Holdings or any Intermediate Holdco) may make a Disposition of all or substantially all of its assets (upon voluntary liquidation or otherwise) to any other Restricted Subsidiary; provided that if the transferor in such a transaction is a Loan Party, then either (A) the transferee must be a Loan Party (other than Holdings, New Intermediate Holdings or an Intermediate Holdco), (B) to the extent constituting an Investment, such Investment must be an Investment in a Restricted Subsidiary that is not a Loan Party permitted by Section 6.04 and Section 6.16 or (C) to the extent constituting a Disposition to a Restricted Subsidiary that is not a Loan Party, such Disposition is for Fair Market Value and any promissory note or other non-cash consideration received in respect thereof is an Investment in a Restricted Subsidiary that is not a Loan Party permitted by Section 6.04 and Section 6.16; provided that the aggregate amount of Dispositions made in reliance on subclauses (B) and (C) of this clause (c), together with (x) all other Investments made in and Dispositions made to Restricted Subsidiaries that are not Loan Parties by any Loan Party after the Effective Date and (y) all Investments and Dispositions made in reliance on Section 6.16(ii), shall not exceed, at the time of the making thereof, and after giving pro forma effect thereto, $7,500,000;

(d)        the Borrower may merge, amalgamate or consolidate with any other Person (other than Holdings, New Intermediate Holdings or any Intermediate Holdco); provided that the Borrower shall be the continuing or surviving Person;

(e)        [reserved];

115

(f)      any Restricted Subsidiary may merge, consolidate or amalgamate with any other Person (other than Holdings, New Intermediate Holdings or any Intermediate Holdco) in order to effect an Investment permitted pursuant to <u>Section 6.04</u>; <u>provided</u> that the continuing or surviving Person shall be a Restricted Subsidiary, which shall have complied with the requirements of <u>Sections 5.11</u> and <u>5.12</u>; provided further, that no such merger, consolidation or amalgamation involving any European Loan Party shall be permitted pursuant to this clause (f) unless the same has been consented to by the Required Lenders (such consent not to be unreasonably withheld, conditioned or delayed; <u>provided</u>, that it is acknowledged and agreed that it shall not be unreasonable to withhold consent to any such transaction that will have a material adverse impact on the Guarantees or the Collateral);

(g)      [reserved];

(h)      [reserved]; and

(i)      any Restricted Subsidiary (other than New Intermediate Holdings or any Intermediate Holdco) may effect a merger, dissolution, liquidation consolidation or amalgamation to effect a Disposition permitted pursuant to <u>Section 6.05</u>; provided further, that no such merger, consolidation or amalgamation involving any European Loan Party shall be permitted pursuant to this clause (i) unless the same has been consented to by the Required Lenders (such consent not to be unreasonably withheld, conditioned or delayed; <u>provided</u>, that it is acknowledged and agreed that it shall not be unreasonable to withhold consent to any such transaction that will have a material adverse impact on the Guarantees or the Collateral).

Section 6.04    <u>Investments, Loans, Advances, Guarantees and Acquisitions</u>. Neither Holdings nor the Borrower will, nor will they permit any Restricted Subsidiary to, make or hold any Investment, except:

(a)      Permitted Investments at the time such Permitted Investment is made;

(b)      loans or advances to present or former officers, directors, managers, members of management, consultants, independent contractors and employees of Holdings and the Restricted Subsidiaries (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes, (ii) in connection with such Person's purchase of Equity Interests in Holdings (<u>provided</u> that the amount of such loans and advances made in cash to such Person shall be contributed to Holdings in cash as common equity or Qualified Equity Interests) and (iii) for purposes not described in the foregoing <u>clauses (i)</u> and <u>(ii)</u>; <u>provided</u> that at the time of incurrence thereof and after giving pro forma effect thereto, the aggregate principal amount outstanding in reliance on this <u>clause (iii)</u> shall not exceed $5,000,000;

(c)      Investments (i) by the Borrower or any Restricted Subsidiary in any Loan Party (other than Holdings); provided that to the extent the aggregate amount of Investments by a Restricted Subsidiary that is not a Loan Party in a Loan Party exceeds $1,000,000, such non-Loan Party Restricted Subsidiary shall have acceded to the Pari Passu Intercreditor Agreement pursuant to the terms thereof,  (ii) by any Restricted Subsidiary that is not a Loan Party in any other Restricted Subsidiary that is also not a Loan Party, (iii) by the Borrower or any Restricted Subsidiary (A) in any Restricted Subsidiary; <u>provided</u> that (x) the aggregate amount of such

116

Investments made by Loan Parties after the Effective Date in Restricted Subsidiaries that are not Loan Parties in reliance on this <u>clause (iii)(A)</u>, together with the aggregate amount of (x) all other Investments made in and Dispositions made to Restricted Subsidiaries that are not Loan Parties by any Loan Parties after the Effective Date and (y) all Investments and Dispositions made in reliance on <u>Section 6.16(ii)</u>, shall not exceed, at the time of the making thereof and after giving pro forma effect thereto, $7,500,000, (y) no Event of Default has occurred and is continuing and (z) all Investments made by Loan Parties in Restricted Subsidiaries that are not Loan Parties in reliance on this <u>clause (iii)(A)</u> shall be made only for the purpose of financing working capital needs of such non Loan Parties or another purpose agreed to by the Required Lenders (such consent not to be unreasonably withheld, conditioned or delayed; provided, that it is acknowledged and agreed that it shall not be unreasonable to withhold consent to any such transaction that will have a material adverse impact on the Guarantees or the Collateral) and shall be evidenced by an intercompany note that has been pledged as Collateral, (B) [reserved] or (C) constituting Guarantees of Indebtedness or other monetary obligations of Restricted Subsidiaries that are not Loan Parties owing to any Loan Party, (iv) by the Borrower or any Restricted Subsidiary in Restricted Subsidiaries that are not Loan Parties so long as such transaction is part of a series of simultaneous transactions that results in the proceeds of the initial Investment being invested in one or more Loan Parties (other than Holdings), (v) subject to the consent of the Required Lenders (such consent not to be unreasonably withheld, conditioned or delayed; <u>provided</u>, that it is acknowledged and agreed that it shall not be unreasonable to withhold consent to any such transaction that will have a material adverse impact on the Guarantees or the Collateral), by the Borrower or any Restricted Subsidiary in any Restricted Subsidiary that is not a Loan Party, consisting of the contribution of Equity Interests of any other Restricted Subsidiary that is not a Loan Party so long as the Equity Interests of the transferee Restricted Subsidiary is pledged to secure the Secured Obligations;

(d)     Investments consisting of deposits, prepayments and/or other credits to suppliers in the ordinary course of business;

(e)     Investments consisting of extensions of trade credit in the ordinary course of business;

(f)     Investments (i) existing or contemplated on the date hereof and set forth on <u>Schedule 6.04(f)</u> and any modification, replacement, renewal, reinvestment or extension thereof and (ii) existing on the Effective Date by the Borrower or any Restricted Subsidiary and any modification, renewal or extension thereof; <u>provided</u> that the amount of the original Investment is not increased except by the terms of such Investment to the extent set forth on <u>Schedule 6.04(f)</u> or as otherwise permitted by this <u>Section 6.04</u>;

(g)     Investments in Swap Agreements permitted under <u>Section 6.01</u>;

(h)     promissory notes and other non-cash consideration received in connection with Dispositions permitted by <u>Section 6.05</u>;

(i)     Investments made in connection with the Transactions (other than borrowings under the ABL North America Credit Agreement);

(j)      subject to the consent of the Required Lenders (such consent not to be unreasonably withheld, conditioned or delayed; provided, that it is acknowledged and agreed that it shall not be unreasonable to withhold consent to any such transaction that will have a material adverse impact on the Guarantees or the Collateral), Investments made by any Loan Party (other than Holdings) in any non-Loan Party (other than Holdings) consisting of contributions or other Dispositions of Equity Interests of Persons that are non-Loan Parties; provided that, prior to such contribution or Disposition, such Equity Interests were not owned directly by a Loan Party or such Equity Interests are contributed or disposed to a Non-Loan Party that is a wholly owned Restricted Subsidiary of a Loan Party;

(k)      Investments in the ordinary course of business consisting of endorsements for collection or deposit and customary trade arrangements with customers consistent with past practices;

(l)      Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers, from financially troubled account debtors or in settlement of delinquent obligations of, or other disputes with, customers and suppliers or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(m)      subject to the consent of the Required Lenders (such consent not to be unreasonably withheld, conditioned or delayed; provided, that it is acknowledged and agreed that it shall not be unreasonable to withhold consent to any such transaction that will have a material adverse impact on the Guarantees or the Collateral), cash or property distributed from any Restricted Subsidiary that is not a Loan Party (i) may be contributed to other Restricted Subsidiaries that are not Loan Parties, and (ii) may pass through Holdings, the Borrower and/or any intermediate Restricted Subsidiaries in order to effect the contribution described in clause (i), so long as part of a series of related transactions and such transaction steps are not unreasonably delayed and are otherwise permitted hereunder;

(n)      additional Investments and other acquisitions made and held by the Loan Parties (other than Holdings); provided that at the time any such Investment or other acquisition is made, the aggregate outstanding amount of such Investment or acquisition made in reliance on this clause (n), (including the aggregate amount of all consideration paid in connection with all other Investments and acquisitions made in reliance on this clause (n)), whether in the form of Indebtedness assumed or otherwise), shall not exceed at the time of incurrence thereof and after giving pro forma effect thereto, $2,500,000; provided that (x) the aggregate amount of such Investments made by Loan Parties after the Effective Date in Restricted Subsidiaries that are not Loan Parties in reliance on this clause (n), together with the aggregate amount of (x) all other Investments made in and Dispositions made to Restricted Subsidiaries that are not Loan Parties by Loan Parties after the Effective Date and (y) all Investments and Dispositions made in reliance on Section 6.16(ii), shall not exceed, at the time of the making thereof and after giving pro forma effect thereto, $7,500,000 at any time outstanding and (y) all Investments made by Loan Parties in Restricted Subsidiaries that are not Loan Parties in reliance on this clause (n) shall be made only for the purpose of financing working capital needs  of such non Loan Parties or another purpose agreed to by the Required Lenders (such consent not to be unreasonably withheld, conditioned or delayed; provided, that it is acknowledged and agreed that it shall not be unreasonable to withhold

consent to any such transaction that will have a material adverse impact on the Guarantees or the Collateral) and shall be evidenced by an intercompany note that has been pledged as Collateral;

(o)     [reserved];

(p)     advances of payroll payments to employees in the ordinary course of business;

(q)     Investments and other acquisitions to the extent that payment for such Investments is made with Qualified Equity Interests of Holdings; provided that any other amounts used for such an Investment or other acquisition that are not Qualified Equity Interests of Holdings shall otherwise be permitted pursuant to this Section 6.04;

(r)     [reserved];

(s)     [reserved];

(t)     Investments consisting of Indebtedness, Liens, fundamental changes, Dispositions and Restricted Payments permitted (other than by reference to this Section 6.04(t)) under Sections 6.01, 6.02, 6.03, 6.05 and 6.08, respectively;

(u)     [reserved];

(v)     contributions to a "rabbi" trust for the benefit of employees, directors, consultants, independent contractors or other service providers of Holdings or any Restricted Subsidiary or other grantor trust subject to claims of creditors in the case of a bankruptcy of Holdings;

(w)     to the extent that they constitute Investments, purchases and acquisitions of inventory, supplies, materials or equipment or purchases, acquisitions, licenses or leases of other assets, Intellectual Property, or other rights, in each case in the ordinary course of business;

(x)     [reserved];

(y)     [reserved];

(z)     [reserved];

(aa)     [reserved]; and

(bb)     unfunded pension fund and other employee benefit plan obligations and liabilities to the extent that the same are permitted to remain unfunded under applicable Requirements of Law.

Section 6.05   Asset Sales. (i) Neither Holdings nor the Borrower will, nor will htey permit any Restricted Subsidiary to, sell, transfer, lease, license or otherwise dispose of any asset, including any Equity Interest and any Intellectual Property owned by it, and (ii) the Borrower will not permit any Restricted Subsidiary to issue any additional Equity Interest following the

Effective Date (other than (A) issuing directors' qualifying shares, nominal shares issued to foreign nationals to the extent required by applicable Requirements of Law, (B) issuing Equity Interests to any Restricted Subsidiary in compliance with Section 6.04(c), (C) any non-wholly-owned Restricted Subsidiary issuing Equity Interests of such Subsidiary to each owner of Equity Interests of such Subsidiary ratably based on their relative ownership interests) and (D) issuing securities pursuant to a management equity plan, stock option plan, phantom equity plan or any other management, employee benefit or other compensatory plan or agreement (and any successor plans or arrangements thereto)), in each case, having a fair market value (x) in excess of $500,000 in a single transaction or a series of related transactions or (y) in excess of $2,500,000 in any fiscal year (each, a "Disposition"), except:

(a)     Dispositions of obsolete or worn out property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used or useful, or economically practicable to maintain, in the conduct of the business of the Borrower and the Restricted Subsidiaries (including (i) allowing any registration or application for registration of any Intellectual Property that is no longer used or useful, or economically practicable to maintain, to lapse, go abandoned, or be invalidated or (ii) disposing of, discontinuing the use or maintenance of, abandoning, failing to pursue or otherwise allowing to lapse, expire, terminate or put into the public domain any of its Intellectual Property if the Borrower determines in its reasonable business judgment that such discontinuance is desirable in the conduct of its business);

(b)     Dispositions of inventory in the ordinary course of business (including on an intercompany basis);

(c)     Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property, or other assets of comparable or greater value or usefulness to the business or (ii) an amount equal to the Net Proceeds of such Disposition are promptly applied to the purchase price of such replacement property;

(d)     Dispositions of property to the Borrower or any Restricted Subsidiary; provided that if the transferor in such a transaction is a Loan Party, then either (i) the transferee must be a Loan Party (other than Holdings), (ii) to the extent constituting an Investment, such Investment must be an Investment in a Restricted Subsidiary that is not a Loan Party permitted by Section 6.04 and Section 6.16 or (iii) to the extent constituting a Disposition to a Restricted Subsidiary that is not a Loan Party, such Disposition is for Fair Market Value and any promissory note or other non-cash consideration received in respect thereof is an Investment in a Restricted Subsidiary that is not a Loan Party permitted by Section 6.04 and Section 6.16; provided that the aggregate amount of such Dispositions made by Loan Parties after the Effective Date in Restricted Subsidiaries that are not Loan Parties in reliance on this clause (d), together with the aggregate amount of (x) all other Investments made in and Dispositions made to Restricted Subsidiaries that are not Loan Parties by Loan Parties after the Effective Date and (y) all Investments and Dispositions made in reliance on Section 6.16(ii), shall not exceed $7,500,000;

(e)     Dispositions permitted by Section 6.03, Investments permitted by Section 6.04, Restricted Payments permitted by Section 6.08 and Liens permitted by Section 6.02, in each case, other than by reference to this Section 6.05(e);

(f)        Dispositions of cash and/or Permitted Investments and/or other assets that were Permitted Investments when the relevant original Investment was made;

(g)        the sale or discount, in each case without recourse, of past due accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof and not for financing purposes;

(h)        leases, subleases, licenses or sublicenses, in each case in the ordinary course of business and that do not materially interfere with the business of the Borrower and the Restricted Subsidiaries, taken as a whole;

(i)        transfers of property subject to Casualty Events upon receipt of the Net Proceeds of such Casualty Event;

(j)        Dispositions of property to Persons other than Holdings, the Borrower or any Restricted Subsidiary (including the sale or issuance of Equity Interests (other than Disqualified Equity Interests) in a Restricted Subsidiary) not otherwise permitted under this Section 6.05 in an aggregate amount during the term of this Agreement not to exceed $40,000,000; provided, that (i) such Disposition is made for Fair Market Value and (ii) the Borrower or any Restricted Subsidiary shall receive not less than 75.0% of such consideration in the form of cash or Permitted Investments (provided, that for purposes of this clause (ii), the following shall be deemed to be cash or Permitted Investments: (1) any liabilities (as shown on the Borrower's or such Restricted Subsidiary's most recent balance sheet or in the notes thereto for which internal financial statements are available immediately preceding such date or, if incurred or accrued subsequent to the date of such balance sheet, such liabilities that would have been reflected on the Borrower's or such Restricted Subsidiary's balance sheet or in the footnotes thereto if such incurrence or accrual had taken place on or prior to the date of such balance sheet in the good faith determination of the Borrower) of the Borrower or any of the Restricted Subsidiaries (other than liabilities that are by their terms subordinated to the Secured Obligations) that are extinguished in connection with the transactions relating to such Disposition, or that are assumed by the transferee, in each case, pursuant to an agreement that releases or indemnifies the Borrower and/or the applicable Restricted Subsidiaries, as the case may be, from further liability and (2) any notes or other obligations or other securities or assets received by the Borrower or any of the Restricted Subsidiaries from such transferee that are converted by the Borrower or such Restricted Subsidiary into cash or Cash Equivalents, or by their terms are required to be satisfied for cash or Permitted Investments (to the extent of the cash or Permitted Investments received), in each case, within 60 days of the receipt thereof);  provided, further,  that the Net Proceeds thereof shall be applied in accordance with Section 2.11(d);

(k)        Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between the joint venture parties set forth in, joint venture agreements and similar binding arrangements;

(l)        [reserved];

(m)        transfers of condemned property as a result of the exercise of "eminent domain" or other similar powers to the respective Governmental Authority or agency that has

condemned the same (whether by deed in lieu of condemnation or otherwise), and transfers of property arising from foreclosure or similar action or that have been subject to a casualty to the respective insurer of such real property as part of an insurance settlement;

       (n)    [reserved];

       (o)    [reserved];

       (p)    [reserved];

       (q)    any merger, amalgamation, consolidation, Disposition or conveyance the sole purpose of which is to reincorporate or reorganize (i) any Domestic Subsidiary in another jurisdiction in the U.S. and/or (ii) any Foreign Subsidiary in the U.S. or, subject to the consent of the Required Lenders (such consent not to be unreasonably withheld, conditioned or delayed; provided, that it is acknowledged and agreed that it shall not be unreasonable to withhold consent to any such transaction that will have a material adverse impact on the Guarantees or the Collateral), any other jurisdiction; and

       (r)    Dispositions of customer accounts receivable in connection with a Vendor Financing Program.

Subject to Section 6.19, to the extent that any Collateral is Disposed of as expressly permitted by this Section 6.05 to any Person other than a Loan Party, subject to the proviso set forth in clause (a) of the definition of Excluded Subsidiary with respect to any Disposition of less than 100% of the Equity Interests of a wholly-owned subsidiary, such Collateral shall be sold free and clear of the Liens created by the Loan Documents, which Liens shall be automatically released upon the consummation of such Disposition; it being understood and agreed that the Administrative Agent, acting at the direction of the Required Lenders, shall be authorized to take, and shall take, any actions deemed appropriate in order to effect the foregoing, and shall be entitled to rely, without independent investigation on a certificate of Responsible Officer of the Borrower in connection with the foregoing (which shall be delivered to the Administrative Agent upon request therefor).

       Section 6.06    Intermediate Holdco Covenant.

       (a)    No Intermediate Holdco will incur any Indebtedness or Liens or engage in any activities or consummate any transactions (including, without limitation, any Investments or Dispositions) and will not conduct, transact or otherwise engage in any business or operations, in each case, other than:

       (i)    the ownership and/or acquisition of the Equity Interests of direct subsidiaries of such Intermediate Holdco that are in existence on the Effective Date;

       (ii)    the performance of obligations under and compliance with its Organizational Documents, or other Requirement of Law (including the maintenance of its legal existence, including the ability to incur fees, costs and expenses relating to such maintenance), ordinance, regulation, rule, order, judgment, decree or permit, including without limitation as a result of or in connection with the activities of the Restricted Subsidiaries;

(iii)    participating in tax, accounting, cash management, cash pooling, transfer pricing, cost-sharing arrangements and other administrative matters related to Holdings or any of its Subsidiaries;

(iv)    the entry into, and exercise rights and performance of its obligations under and in connection with the Transactions (other than any such obligations under the ABL North America Credit Agreement), including the Loan Documents and the Indebtedness permitted to be incurred pursuant to Section 6.01(a)(xxiii);

(v)    holding of any cash, Permitted Investments and other assets received from the Borrower or any Restricted Subsidiary, in each case, pending prompt application thereof in a manner permitted by the terms of this Agreement (including by way of Restricted Payments pursuant to Section 6.08(a)(i));

(vi)    incurring fees, costs and expenses relating to overhead and general operating including professional fees for legal, tax and accounting issues and paying taxes, providing indemnification for its current and former officers, directors, members of management, managers, employees and advisors or consultants; and

(vii)   activities incidental to the businesses or activities described in the foregoing clauses.

(b)    No Intermediate Holdco shall, without the prior written consent of the Required Lenders, cause or allow its Centre of Main Interest (as that term is used in Article 3(1) of the Regulation) to change.

(c)    No direct or indirect wholly-owned subsidiary of an Intermediate Holdco shall cease to be a direct or indirect wholly-owned subsidiary of an Intermediate Holdco except (x) in connection with any transaction solely among one or more subsidiaries of such Intermediate Holdco that is permitted by Section 6.03 or (y) in any transaction consented to by the Required Lenders (such consent not to be unreasonably withheld, conditioned or delayed; provided, that it is acknowledged and agreed that it shall not be unreasonable to withhold consent to any such transaction that will have a material adverse impact on the Guarantees or the Collateral).

(d)    No Intermediate Holdco shall merge, amalgamate or consolidate with any other Person without the consent of the Required Lenders (such consent not to be unreasonably conditioned, withheld or delayed).

Section 6.07   Negative Pledge. Neither Holdings nor the Borrower will, nor will they permit any Restricted Subsidiary to, enter into any agreement, instrument, deed or lease that prohibits or limits the ability of any Loan Party to create, incur, assume or suffer to exist any Lien upon any of their respective properties or revenues, whether now owned or hereafter acquired, for the benefit of the applicable Secured Parties with respect to the applicable Secured Obligations or under the Loan Documents; provided that the foregoing shall not apply to:

(a)    restrictions and conditions imposed by (i) Requirements of Law, (ii) any Loan Document, (iii) the ABL North America Credit Documents, (iv) the Senior Secured

123

Convertible Notes Documents, (v) any Permitted ABL EMEA Credit Facility, (vi) [reserved], (vii) [reserved] and (viii) any documentation governing any Permitted Refinancing incurred to refinance any such Indebtedness referenced in clauses (i) through (vii) above;

(b)     customary restrictions and conditions existing on the Effective Date and any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

(c)     restrictions and conditions contained in agreements relating to the Disposition of a Subsidiary or any assets pending such Disposition; provided that such restrictions and conditions apply only to the Subsidiary or assets that is or are subject of such Disposition and such Disposition is permitted hereunder;

(d)     customary provisions in leases, subleases, licenses, cross-licenses or sublicenses and other contracts restricting the assignment thereof;

(e)     restrictions imposed by any agreement relating to secured Indebtedness permitted by this Agreement to the extent such restriction applies only to the property securing by such Indebtedness;

(f)     any restrictions or conditions set forth in any agreement in effect at any time any Person becomes a Restricted Subsidiary (but not any modification or amendment expanding the scope of any such restriction or condition); provided that such agreement was not entered into in contemplation of such Person becoming a Restricted Subsidiary and the restriction or condition set forth in such agreement does not apply to the Borrower or any Restricted Subsidiary;

(g)     restrictions or conditions in any Indebtedness permitted pursuant to Section 6.01 that is incurred or assumed by Restricted Subsidiaries that are not Loan Parties to the extent such restrictions or conditions are no more restrictive in any material respect than the restrictions and conditions in the Loan Documents or, in the case of Junior Financing, are market terms at the time of issuance and are imposed solely on such Restricted Subsidiary and its Subsidiaries;

(h)     restrictions on cash (or Permitted Investments) or other deposits imposed by agreements entered into in the ordinary course of business (or other restrictions on cash or deposits constituting Permitted Encumbrances);

(i)     restrictions set forth on Schedule 6.07 and any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

(j)     customary provisions in partnership agreements, limited liability company organizational governance documents, sale leaseback agreements, joint venture agreements and other similar agreements, in each case, entered into in the ordinary course of business;

(k)     customary net worth provisions contained in real property leases entered into by Subsidiaries, so long as the Borrower has determined in good faith that such net worth provisions could not reasonably be expected to impair the ability of the Borrower and the Subsidiaries to meet their ongoing obligations; and

(l)     restrictions arising in any Swap Agreement and/or any agreement relating to any Cash Management Obligation.

Section 6.08    Restricted Payments; Certain Payments of Indebtedness.

(a)     Neither Holdings nor the Borrower will, nor will they permit any Restricted Subsidiary to, pay or make, directly or indirectly, any Restricted Payment, except:

(i)     each Restricted Subsidiary of the Borrower may make Restricted Payments to the Borrower or any Restricted Subsidiary of the Borrower (and, in the case of any such Subsidiary that is not a wholly-owned Subsidiary, to each other owner of Equity Interests of such Subsidiary ratably based on their relative ownership interests of the relevant class of Equity Interests);

(ii)     to the extent constituting a Restricted Payment, the Borrower, New Intermediate Holdings and any Restricted Subsidiary may consummate any transaction permitted by Section 6.03 and Section 6.04 (other than Section 6.04(j), (m), (n), (q) and (t));

(iii)     to the extent constituting a Restricted Payment, the conversion of the Senior Secured Convertible Notes into Equity Interests pursuant to the terms thereof;

(iv)     Restricted Payments by the Borrower or New Intermediate Holdings to Holdings the proceeds of which are used by Holdings to make repurchases, redemptions or reductions in number of shares issued (including, by utilization of the "net share" concept) by Holdings of any Equity Interests in Holdings, as applicable, made in connection with (I) the surrender of shares by employees to (x) facilitate the payment by such employees of the taxes associated with compensation received by such employees under Holdings' stock-based compensation plans and, (y) to satisfy the purchase price of nonqualified stock options and (II) the deduction by Holdings, of a portion of restricted stock or performance shares previously (i.e. prior to the date of the deduction) granted to employees under Holdings' stock-based compensation plans to facilitate the payment by such employees of the taxes associated with the vesting of such restricted stock and performance shares, in an amount not to exceed (for both clauses (I) and (II)), together with all Restricted Payments made pursuant to Section 6.08(a)(xiv), $4,000,000 in the aggregate in any fiscal year; provided, in each case, that prior to and after giving effect to such repurchases, redemptions or reductions no Default or Event of Default exists or is continuing;

(v)     the Borrower and New Intermediate Holdings may make Restricted Payments in cash to Holdings:

(A)     the proceeds of which shall be used by Holdings to pay its Taxes or Taxes of the Borrower, New Intermediate Holdings, any other Subsidiary of the Borrower or New Intermediate Holdings or any group that includes Holdings, the Borrower, New Intermediate Holdings or any other

125

Subsidiary of Holdings and that files Taxes on a consolidated, combined, affiliated, unitary or similar basis, in each case attributable to the taxable income of Holdings and its Subsidiaries, and computed at the highest applicable combined federal, state, and local marginal tax rate; provided that Restricted Payments pursuant to this subclause (A) shall not exceed the amount of Taxes that Holdings would have paid if Holdings and its Subsidiaries were a stand-alone taxpayer or stand-alone tax group;

(B)     the proceeds of which shall be used by Holdings to pay (1) its operating expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting, tax reporting and similar expenses payable to third parties), that are reasonable and customary and incurred in the ordinary course of business, (2) any reasonable and customary indemnification claims made by directors, officers, members of management, managers, employees or consultants of Holdings attributable to the ownership or operations of the Borrower, New Intermediate Holdings and the Restricted Subsidiaries and (3) franchise and similar Taxes, and other fees and expenses required to maintain its organizational existence; and

(C)     the proceeds of which shall be used by Holdings to satisfy its obligations under the Senior Secured Convertible Notes;

(vi)     [reserved];

(vii)     [reserved];

(viii)     [reserved];

(ix)     redemptions in whole or in part of any of its Equity Interests for another class of its Equity Interests or with proceeds from substantially concurrent equity contributions or issuances of new Equity Interests; provided that such new Equity Interests contain terms and provisions at least as advantageous to the Lenders in all respects material to their interests as those contained in the Equity Interests redeemed thereby;

(x)     payments made or expected to made in respect of withholding or similar Taxes payable by any future, present or former employee, director, manager or consultant and any repurchases of Equity Interests in consideration of such payments including deemed repurchases in connection with the exercise of stock options and the vesting of restricted stock and restricted stock units;

(xi)     the Borrower and New Intermediate Holdings may make Restricted Payments to Holdings to enable Holdings to (A) pay cash in lieu of fractional Equity Interests in connection with any dividend, split or combination thereof and (B) honor any conversion request by a holder of convertible Indebtedness and make cash payments in lieu of fractional shares in connection with any such conversion

and may make payments on convertible Indebtedness in accordance with its terms, in both cases of (A) and (B), in an amount not to exceed $500,000 in the aggregate;

(xii)   [reserved];

(xiii)   any Restricted Payment made on the Effective Date required to consummate the Reorganization Plan; and

(xiv)   payments made by the Borrower or New Intermediate Holdings or any Restricted Subsidiary (including payments to Holdings to enable Holdings to make such payments) in respect of withholding or similar taxes payable upon exercise of Equity Interests by any future, present or former employee, director, officer, manager or consultant (or their respective controlled Affiliates or Permitted Transferees) and any repurchases of Equity Interests deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants or required withholding or similar taxes (including payments to Holdings in respect of the foregoing), in an amount not to exceed, together with all Restricted Payments made pursuant to Section 6.08(a)(iv), $4,000,000 in the aggregate in any fiscal year.

(b)   Neither Holdings nor the Borrower will, nor will they permit any Restricted Subsidiary to, make or pay, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Junior Financing, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Indebtedness prior to the scheduled maturity date thereof (collectively, "Restricted Debt Payments"), except:

(i)   payment of regularly scheduled interest and principal payments, payments of fees, expenses and indemnification obligations when due in respect of any Indebtedness, other than payments in respect of any Junior Financing prohibited by the subordination provisions thereof;

(ii)   refinancings of Indebtedness with proceeds of Permitted Refinancing Indebtedness permitted to be incurred under Section 6.01;

(iii)   the conversion of any Junior Financing to or payments with Equity Interests (other than Disqualified Equity Interests) of Holdings;

(iv)   prepayments, redemptions, purchases, defeasances and other payments or distributions in respect of Junior Financings prior to their scheduled maturity in an aggregate amount not to exceed an amount at the time of making any such prepayment, redemption, purchase, defeasance or other payment or distributions, together with any other such prepayment, redemption, purchase, defeasance or other payment or distributions made utilizing this clause (iv), not to exceed the portion, if any, of the Restricted Debt Payment Amount that the Borrower elects to apply pursuant to this clause (iv);

(v)     any Restricted Debt Payments made on the Effective Date required to consummate the Reorganization Plan;

(vi)     [reserved];

(vii)     [reserved];

(viii)     [reserved];

(ix)     [reserved]; and

(x)     payments as part of an applicable high yield discount obligation or AHYDO catch-up payment.

(c)     Neither Holdings nor the Borrower will, nor will they permit any Restricted Subsidiary to, amend or modify any documentation governing any Junior Financing, in each case if the effect of such amendment or modification (when taken as a whole) is in violation of any Intercreditor Agreement or other applicable intercreditor agreement or subordination agreement.

Notwithstanding anything herein to the contrary, the foregoing provisions of this Section 6.08 will not prohibit the payment of any Restricted Payment or the consummation of any irrevocable redemption, purchase, defeasance or other payment within 60 days after the date of declaration of such Restricted Payment or the giving of irrevocable notice of such redemption, purchase, defeasance or other payment, as applicable, if at the date of declaration or the giving of such notice such payment would have complied with the provisions of this Agreement.

Section 6.09     Transactions with Affiliates. Neither Holdings nor the Borrower will, nor will they permit any Restricted Subsidiary to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except:

(i)     (A) transactions among Loan Parties (other than Holdings (other than intercompany transactions otherwise permitted hereunder the proceeds of which are promptly invested by Holdings in a Restricted Subsidiary pursuant to a transaction permitted hereunder)) and, to the extent not otherwise prohibited hereunder, their Restricted Subsidiaries and (B) transactions involving aggregate payments or consideration of less than $1,000,000 (in one transaction or a series of transactions);

(ii)     on terms substantially as favorable to the Borrower or such Restricted Subsidiary as would be obtainable by such Person at the time in a comparable arm's-length transaction with a Person other than an Affiliate;

(iii)     guaranty fees among the Loan Parties (other than Holdings);

(iv)     issuances of Equity Interests of the Borrower to the extent otherwise permitted by this Agreement;

(v)      employment, consulting, severance and other service or benefit related arrangements between Holdings, the Borrower and the Restricted Subsidiaries and their respective officers and employees in the ordinary course of business (including loans and advances pursuant to Section 6.04(b), salary or guaranteed payments and bonuses) and transactions pursuant to stock option and other equity award plans and employee benefit plans and arrangements in the ordinary course of business;

(vi)      payments by the Borrower and the Restricted Subsidiaries pursuant to tax sharing agreements among Holdings, the Borrower and the Restricted Subsidiaries on customary terms to the extent attributable to the ownership or operation of the Borrower and the Restricted Subsidiaries, to the extent payments are permitted by Section 6.08;

(vii)      the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, directors, officers, consultants and employees of the Borrower and the Restricted Subsidiaries in the ordinary course of business to the extent attributable to the ownership or operation of the Borrower and the Restricted Subsidiaries;

(viii)      transactions pursuant to permitted agreements in existence or contemplated on the Effective Date and set forth on Schedule 6.09 or any amendment thereto to the extent such an amendment is not adverse to the Lenders in any material respect;

(ix)      Restricted Payments permitted under Section 6.08;

(x)      the Transactions and the payment of all fees, costs and expenses (including all legal, accounting and other professional fees, costs and expenses) related to the Transactions, including Transaction Expenses;

(xi)      [reserved];

(xii)      [reserved];

(xiii)      [reserved];

(xiv)      [reserved];

(xv)      (A) Guarantees permitted by Section 6.01 or Section 6.04 and (B) Investments permitted by Section 6.04(aa); and

(xvi)      transactions with customers, clients, joint venture partners, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Agreement that are fair to the Borrower and the Restricted Subsidiaries, in the reasonable determination of the Board of Directors or the senior management of the Borrower, or are on terms

at least as favorable as might reasonably have been obtained at such time from an unaffiliated party.

Section 6.10    Liquidity.  The Borrower shall not permit Liquidity at any time to be less than $20,000,000.

Section 6.11    Change in Nature of Business. Holdings, the Borrower and the Restricted Subsidiaries, taken as a whole, will not enter into any new line of business that is fundamentally and substantively different from their existing lines of business conducted by them on the Effective Date, taken as a whole, other than activities reasonably related, complementary or ancillary to such existing lines of business or reasonable extensions thereof.

Section 6.12    Accounting Changes. Holdings shall not make any change in its fiscal year; provided, however, that Holdings may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the Required Lenders, in which case, Holdings, the Borrower and the Administrative Agent, acting at the direction of the Required Lenders, will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

Section 6.13    Amendments or Waivers of Organizational Documents. The Borrower and Holdings shall not, nor shall they permit any Subsidiary Loan Party to, amend or modify their respective Organizational Documents in a manner that is materially adverse to the Lenders (in their capacities as such); provided that, for purposes of clarity, it is understood and agreed that the Borrower and/or any Subsidiary Loan Party may effect a change to its respective organizational form and/or consummate any other transaction that is permitted under Section 6.03 or that is done in accordance with the Plan on the Effective Date.

Section 6.14    Intellectual Property. Notwithstanding anything in this Agreement to the contrary, no Disposition or transfer (via an Investment, Disposition or otherwise) of Intellectual Property material to the business or operations of the Borrower and the Restricted Subsidiaries owned by a Loan Party may be made to a Restricted Subsidiary that is not a Loan Party.

Section 6.15    [Reserved].

Section 6.16    Additional Limitations on Certain Investments. Notwithstanding anything to the contrary herein (including in Section 6.04), and without limiting any other provision of this Agreement, the Borrower will not, and will not permit any other Domestic Loan Party or Canadian Loan Party to, directly or indirectly make any Investment in any European Loan Party, other than (i) Investments in the form of cash and Permitted Investments made for bona fide business purposes; provided that any such Investments shall be made in the form of intercompany loans evidenced by an intercompany note that has been pledged as Collateral and (ii) other Investments in an amount not to exceed, at the time of the making thereof and after giving pro forma effect thereto, together with (x) all other Investments and Dispositions made by the Domestic Loan Parties and Canadian Loan Parties to European Loan Parties after the Effective Date and (y) all Investments and Dispositions made pursuant to Section 6.03(c)(B) and (C), Section 6.04(c)(iii)(A), Section 6.04(n) and Section 6.05(d), $7,500,000.

Section 6.17   <u>Limitations on Amendments</u>.  [The Borrower will not, nor will it permit any Restricted Subsidiary to, amend or modify any provision of any ABL North America Credit Document if the effect of such amendment or modification is material and adverse with respect to the interests of any of the Loan Parties or the Lenders (it being understood and agreed that, without limitation, (x) any changes to the interest rate, redemption requirements, amortization schedule, negative covenants or events of default set forth in the ABL North America Credit Documents and any changes to Section [  ][9] of the ABL North America Credit Agreement shall, in each case, be deemed to be material for purposes hereof, (y) any changes to Section [  ][10] of the ABL North America Credit Agreement that impose new or increased limitations on the making of the payments described in such Section [  ] of the ABL North America Credit Agreement shall be deemed to be material and adverse for purposes hereof and (z) any changes to the [US-Canada Formula Amount] (as defined in the ABL North America Credit Agreement) or the component definitions thereof shall not be deemed to be material and adverse for purposes hereof) unless (x) the Borrower shall have provided at least fifteen (15) calendar days' prior written notice to the Administrative Agent and Lenders of any such amendment or modification and (y) the Required Lenders shall have consented in writing prior to the date of any such amendment or modification.][11]

Section 6.18   <u>Limitations on the German Group</u>. Without consent of the Required Lenders (such consent not to be unreasonably withheld), no member of the German Group (other than Alber) will (A) conduct its business (including, without limitation, financing activities and the entry into leasing arrangements) in any manner that is outside the ordinary course of its business or inconsistent with past practice in any material respect or (B) incur any funded debt for borrowed money or any Capitalized Lease Obligations (excluding, for the avoidance of doubt and to the extent the same are otherwise permitted hereunder (including under this Section 6.18), intercompany loans, Capitalized Lease Obligations in existence on the date hereof and any renewals or replacements thereof that do not result in a material liability increase and purchase money and similar obligations).

Section 6.19   <u>Danish Collateral</u>. Notwithstanding any other provision of this Agreement, Invacare Holdings Two Netherlands shall not dispose of the Equity Interests of Invacare A/S pledged pursuant to the Danish Share Pledge or any other Danish Collateral Document entered into from time to time.

Section 6.20   <u>Holdings Covenant</u>.  Notwithstanding anything to the contrary herein, Holdings will not incur any Indebtedness or Liens or engage in any activities or consummate any transactions (including, without limitation, any Restricted Payments, Investments or Dispositions) and will not conduct, transact or otherwise engage in any business or operations, in each case, other than:

---

[9] NTD: To refer to negative covenant section covering CF Debt Priority Obligations

[10] NTD: To refer to negative covenant section covering CF Debt Priority Obligations

[11] Subject to review of ICA.

(i)      the ownership and/or acquisition of the Equity Interests of the Borrower and New Intermediate Holdings;

(ii)      the performance of obligations under and compliance with the Holdings Preferred Equity Documents, its Organizational Documents, or other Requirement of Law (including the maintenance of its legal existence, including the ability to incur fees, costs and expenses relating to such maintenance), ordinance, regulation, rule, order, judgment, decree or permit, including without limitation as a result of or in connection with the activities of the Restricted Subsidiaries;

(iii)      participating in tax, accounting, cash management, cash pooling, transfer pricing, cost-sharing arrangements and other administrative matters related to Holdings or any of its Subsidiaries;

(iv)      the entry into, and exercise of rights and performance of its obligations under and in connection with the Loan Documents, the Indebtedness permitted to be incurred pursuant to Section 6.01(a)(xxii) and Section 6.01(a)(xxiii) (including the conversion of the Senior Secured Convertible Notes into Equity Interests pursuant to the terms thereof);

(v)      the issuance of the Holdings Preferred Equity Interests and the common Equity Interests of Holdings;

(vi)      holding of any cash, Permitted Investments and other assets received from the Borrower or any Restricted Subsidiary, in each case, pending prompt investment thereof in a manner permitted by the terms of this Agreement;

(vii)      incurring fees, costs and expenses relating to overhead and general operating including professional fees for legal, tax and accounting issues and paying taxes, providing indemnification for its current and former officers, directors, members of management, managers, employees and advisors or consultants;

(viii)      the consummation of the Transactions on the Effective Date; and

(ix)      activities incidental to the businesses or activities described in the foregoing clauses.

Section 6.21   New Intermediate Holdings Covenant.

(a)      Notwithstanding anything to the contrary herein, New Intermediate Holdings will not incur any Indebtedness or Liens or engage in any activities or consummate any transactions (including, without limitation, any Investments or Dispositions) and will not conduct, transact or otherwise engage in any business or operations, in each case, other than:

(i)       the ownership and/or acquisition of the Equity Interests of direct subsidiaries of New Intermediate Holdings that are in existence on the Effective Date;

(ii)      the performance of obligations under and compliance with its Organizational Documents, or other Requirement of Law (including the maintenance of its legal existence, including the ability to incur fees, costs and expenses relating to such maintenance), ordinance, regulation, rule, order, judgment, decree or permit, including without limitation as a result of or in connection with the activities of the Restricted Subsidiaries;

(iii)     participating in tax, accounting, cash management, cash pooling, transfer pricing, cost-sharing arrangements and other administrative matters related to Holdings or any of its Subsidiaries;

(iv)     the entry into, and exercise rights and performance of its obligations under and in connection with the Transactions (other than any such obligations under the ABL North America Credit Agreement), including the Loan Documents and the Indebtedness permitted to be incurred pursuant to Section 6.01(a)(xxiii);

(v)      holding of any cash, Permitted Investments and other assets received from Holdings or any Restricted Subsidiary, in each case, pending prompt application thereof in a manner permitted by the terms of this Agreement (including by way of Restricted Payments pursuant to Section 6.08(a)(i));

(vi)     incurring fees, costs and expenses relating to overhead and general operating including professional fees for legal, tax and accounting issues and paying taxes, providing indemnification for its current and former officers, directors, members of management, managers, employees and advisors or consultants; and

(vii)    activities incidental to the businesses or activities described in the foregoing clauses.

(b)      No direct or indirect wholly-owned subsidiary of New Intermediate Holdings shall cease to be a direct or indirect wholly-owned subsidiary of New Intermediate Holdings except (x) in connection with any transaction solely among one or more subsidiaries of New Intermediate Holdings that is permitted by Section 6.03 or (y) in any transaction consented to by the Required Lenders (such consent not to be unreasonably withheld, conditioned or delayed; provided, that it is acknowledged and agreed that it shall not be unreasonable to withhold consent to any such transaction that will have a material adverse impact on the Guarantees or the Collateral).

(c)      New Intermediate Holdings shall not merge, amalgamate or consolidate with any other Person without the consent of the Required Lenders (such consent not to be unreasonably conditioned, withheld or delayed).

ARTICLE VII
EVENTS OF DEFAULT

Section 7.01   <u>Events of Default</u>.    If any of the following events (any such event, an "<u>Event of Default</u>") shall occur:

(a)    the Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable and in the currency required hereunder, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)    the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in <u>clause (a)</u> of this Section) payable under any Loan Document, when and as the same shall become due and payable and in the currency required hereunder, and such failure shall continue unremedied for a period of five Business Days;

(c)    any representation or warranty made or deemed made by or on behalf of Holdings, the Borrower or any Restricted Subsidiary in or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(d)    Holdings, the Borrower or any Restricted Subsidiary shall fail to observe or perform any covenant, condition or agreement contained in <u>Section 5.02(a)</u> or <u>5.04</u> (with respect to the existence of the Borrower) or in <u>Article VI</u>;

(e)    any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document (other than those specified in <u>clause (a)</u>, <u>(b)</u> or <u>(d)</u> of this Section), and such failure shall continue unremedied for a period of 30 days after written notice thereof from the Administrative Agent (acting at the direction of Required Lenders) to the Borrower;

(f)    Holdings, the Borrower or any Restricted Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable (after giving effect to any applicable grace period); provided, that immediately upon a cure or waiver of the default described in this clause (f) with respect to such Material Indebtedness, such default hereunder shall be immediately and automatically cured without any further action by any Person;

(g)    any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with all applicable grace periods having expired) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity (including, for the avoidance of doubt, the occurrence of any "Fundamental Change" (as defined in any of Holdings' or the Borrower's convertible Indebtedness)); <u>provided</u> that this <u>clause (g)</u> shall not apply (i) to secured Indebtedness that becomes due as a result of the sale, transfer or other disposition (including as a result of a casualty or condemnation event) of the property or assets

securing such Indebtedness (to the extent such sale, transfer or other disposition is not prohibited under this Agreement) or (ii) termination events or similar events occurring under any Swap Agreement that constitutes Material Indebtedness (it being understood that <u>clause (f)</u> of this Section will apply to any failure to make any payment required as a result of any such termination or similar event); provided, further, that immediately upon a cure or waiver of the default described in this clause (g) with respect to such Material Indebtedness, such default hereunder shall be immediately and automatically cured without any further action by any Person;

(h)     an involuntary proceeding shall be commenced or an involuntary petition or application shall be filed seeking (i) liquidation, court protection, reorganization or other relief in respect of Holdings, the Borrower, any Guarantor or any Significant Subsidiary or its debts, or of a material part of its assets, under any Federal, state, provincial, territorial or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, Australian Controller, interim receiver, receiver and manager, monitor, trustee, custodian, examiner, sequestrator, conservator or similar official for Holdings, the Borrower, any Guarantor or any Significant Subsidiary or for a material part of its assets, and, in any such case, such proceeding or petition shall continue undismissed or unstayed for 60 consecutive days or an order or decree approving or ordering any of the foregoing shall be entered;

(i)     the Borrower, any Guarantor or any Significant Subsidiary shall (i) voluntarily commence any proceeding or file any petition or application seeking liquidation, court protection, reorganization or other relief under any Federal, state, provincial, territorial or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in <u>clause (h)</u> of this Section, (iii) apply for or consent to the appointment of a receiver, Australian Controller, interim receiver, receiver and manager, manager, monitor, trustee, examiner, custodian, sequestrator, conservator or similar official for the Borrower, any Guarantor or any Significant Subsidiary or for a material part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding or (v) make a general assignment for the benefit of creditors;

(j)     one or more enforceable judgments for the payment of money in an aggregate amount in excess of $5,000,000 (to the extent not covered by insurance as to which the insurer has been notified of such judgment or order and has not denied its obligation) shall be rendered against Holdings, the Borrower, any Restricted Subsidiary or any combination thereof and the same shall remain unpaid, undischarged, unvacated, unbonded or unstayed pending appeal for a period of 60 consecutive days;

(k)     (i) an ERISA Event occurs that, individually or in the aggregate with all other ERISA Events that have occurred, has resulted or would reasonably be expected to result in a Material Adverse Effect or (ii) any of Holdings, the Borrower or any Restricted Subsidiary or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its Withdrawal Liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount that could reasonably be expected to result in a Material Adverse Effect;

135

(l)      any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by any Loan Party in writing not to be, a valid and perfected Lien on any material portion of the Collateral, except (i) as a result of the sale or other disposition of the applicable Collateral to a Person that is not a Loan Party in a transaction permitted under the Loan Documents, (ii) as a result of the Collateral Agent's failure to maintain possession of any stock certificates, promissory notes or other instruments delivered to it under the Security Documents, (iii) as a result of the Collateral Agent's failure to file Uniform Commercial Code continuation statements or (iv) as to Collateral consisting of real property, to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage; or

(m)      (i) this Agreement, any material Security Document or any material Guarantee of the Secured Obligations shall for any reason not be (or asserted by any Loan Party in writing not to be) a legal, valid and binding obligation of any Loan Party party thereto other than as expressly permitted hereunder or thereunder; or (ii) any subordination provision in respect of any Material Indebtedness shall for any reason not be (or asserted by any Loan Party in writing not to be) a legal, valid and binding obligation of any Loan Party party thereto other than as expressly permitted hereunder or thereunder; provided, that immediately upon a cure of the Default described in this clause(m)(ii) with respect to such Material Indebtedness, such Default hereunder shall be immediately and automatically cured without any further action by any Person so long as such Default did not have an adverse impact on the Lenders; or

(n)      a Change in Control shall occur; or

(o)      [reserved]; or

(p)      an Australian Controller shall be appointed to any Guarantor;

then, and in every such event (other than an event with respect to the Borrower described in clause (h) or (i) of this Section), and at any time thereafter during the continuance of such event, the Administrative Agent at the request of the Required Lenders (subject to Article VIII) shall, by notice to the Borrower, take any or all of the following actions, at the same or different times: declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder), shall become due and payable immediately, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower and each other Loan Party; and in the case of any event with respect to the Borrower described in clause (h) or (i) of this Section, the principal of the Loans then outstanding, together with accrued interest thereon and all fees, premiums, and other obligations of the Borrower accrued hereunder, shall immediately and automatically become due and payable, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower and each other Loan Party.

If the Loans are accelerated pursuant to this Section 7.01 prior to the third anniversary of the Effective Date, the applicable prepayment fee provided for in Section 2.11(a) shall become automatically due and payable as if the Loans had been prepaid or repaid on such date of acceleration.

Any Default or Event of Default (including any default or event of default (or similar term) resulting from a failure to provide notice of a default or event of default) shall be deemed not to "exist" or be "continuing" if with respect to any default or event of default that occurs due to a failure by Holdings, the Borrower or any of the Restricted Subsidiaries to take any action (including taking any action by a specified time, but other than any action under <u>Section 5.13</u>), Holdings, the Borrower or such Restricted Subsidiary takes such action.

Section 7.02   [Reserved].

Section 7.03   <u>Application of Proceeds</u>. After the exercise of remedies provided for in <u>Section 7.01</u>, subject to the terms of any applicable Intercreditor Agreement, any amounts received on account of the Secured Obligations shall be applied by the Administrative Agent in accordance with <u>Section 4.02</u> of the U.S. Collateral Agreement and/or the similar provisions in the other Security Documents.

<div align="center">ARTICLE VIII<br>THE ADMINISTRATIVE AGENT AND COLLATERAL AGENT</div>

Each of the Lenders hereby irrevocably appoints Cantor Fitzgerald Securities to serve as Administrative Agent and GLAS Trust Corporation Limited to serve as Collateral Agent under the Loan Documents, and authorizes each of the Administrative Agent and Collateral Agent to execute, deliver and administer the Loan Documents to which it is a party and to take such actions and to exercise such powers as are delegated to the Administrative Agent and Collateral Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Administrative Agent, the Collateral Agent and the Lenders, and none of Holdings, the Borrower or any other Loan Party shall have any rights as a third party beneficiary of any such provisions. It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law, regardless of whether a Default or Event of Default shall have occurred or is continuing.  Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

Without limiting the foregoing, the Collateral Agent shall act as the "collateral agent" under the Loan Documents, and each of the Lenders and each other Secured Party hereby irrevocably appoints and authorizes the Collateral Agent to act as the agent (i) for itself and for and on behalf of the other Secured Parties as direct representative (*direkter Stellvertreter*) as far as Swiss law governed security interests are concerned which are accessory in nature (*akzessorisch*) and (ii) for the benefit of the other Secured Parties (*Halten unter einem Treuhandverhältnis*) as far as Swiss law governed security interests are concerned that are non-accessory in nature (*nicht akzessorisch*) and (ii) for itself and for and on behalf of the other Secured Parties as far as Luxembourg law governed security interests are concerned, with all rights under Article 2(4) of the Luxembourg law of 5 August 2005 on financial collateral arrangements as amended from time to time) for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Secured Obligations, together with such powers and discretion as are reasonably incidental thereto.

The Person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender, if applicable, as any other Lender and may exercise the same as though it were not an Agent, and such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with Holdings, the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders.

No Agent shall have any duties or obligations except those expressly set forth in the Loan Documents. Without limiting the generality of the foregoing, (a) no Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) no Agent shall have any duty to take any discretionary action or to exercise any discretionary power, except discretionary rights and powers expressly contemplated by the Loan Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in the Loan Documents); provided that such Agent shall not be required to take any action that, in its opinion, may expose any Agent to liability or that is contrary to any Loan Document or applicable law, or for which the Agents are not indemnified to their satisfaction, and (c) except as expressly set forth in the Loan Documents, no Agent shall have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to Holdings, the Borrower, any Subsidiary or any other Affiliate of any of the foregoing that is communicated to or obtained by the Person serving as Agent or any of its Affiliates in any capacity. No Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith to be necessary, under the circumstances as provided in Section 9.02) or in the absence of its own gross negligence or willful misconduct (such absence to be presumed unless otherwise determined by a court of competent jurisdiction by a final and nonappealable judgment). No Agent shall be deemed to have knowledge of any Default unless and until written notice thereof is given to such Agent by Holdings, the Borrower or a Lender, such notice referring to this Agreement and describing such Default and stating that such notice is a "notice of default." No Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, (v) the existence, value, sufficiency or collectability of any Collateral or creation, perfection or priority of any Lien purported to be created by the Security Documents, (vi) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document or (vii) whether any Loan Party has complied with its obligations under the Loan Documents, including in respect of documents, notices and certificates that are required to be delivered to the Agents or as to the matters described therein being acceptable or satisfactory to the Agents. No Agent shall be responsible or liable to the Lenders or any other Secured Parties for any failure to monitor or maintain any portion of the Collateral or for the perfection of any Lien on the Collateral. Each party to this Agreement acknowledges and agrees that no Agent shall have any obligation to file financing statements, amendments to financing statements, or continuation statements, or to perfect or maintain the perfection of any Agent's Lien on the Collateral. Notwithstanding anything

herein to the contrary, no Agent shall have any liability arising from any confirmation or determination of the terms and conditions of any Intercreditor Agreement.

Each Agent shall be entitled to rely, and shall not incur any liability for relying, upon any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person (including, if applicable, a Responsible Officer or Financial Officer of such Person). Each Agent also may rely, and shall not incur any liability for relying, upon any statement made to it orally or by telephone and believed by it to be made by the proper Person (including, if applicable, a Financial Officer or a Responsible Officer of such Person), and may act upon any such statement prior to receipt of written confirmation thereof. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

In no event shall any Agent be responsible or liable for any failure or delay in the performance of their obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, future changes in applicable law or regulation, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that such Agent shall use commercially reasonable efforts consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

The Agents may perform any of and all its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by such Agent. The Agents and any such sub-agent may perform any of and all their duties and exercise their rights and powers through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Agents and any such sub-agent. No Agent shall be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Each Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice, concurrence, instruction or direction of the Required Lenders or all Lenders, as it deems appropriate, or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense (except those incurred solely as a result of such Agent's gross negligence or willful misconduct as determined by the final non-appealable judgment of a court of competent jurisdiction) which may be incurred by it by reason of taking or continuing to take any such action.  Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other

Loan Documents in accordance with a request of the Required Lenders or all Lenders, as may be required, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans. Such advice, concurrence, instruction or direction, may, in such Agent's sole discretion, be delivered by e-mail from the Required Lenders or their counsel, who, as of the date hereof is Davis Polk & Wardwell LLP.

Subject to the appointment and acceptance of a successor Administrative Agent or Collateral Agent as provided in this paragraph, the Administrative Agent or Collateral Agent may resign upon 10 days' notice to the Lenders and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, with the Borrower's consent (unless an Event of Default under Section 7.01(a), (b), (h) or (i) has occurred and is continuing), to appoint a successor, which shall be a commercial bank or trust company or such other Person that regularly acts as agent for similar types of credit arrangements with an office in the United States, or an Affiliate of any such bank with an office in the United States. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent or Collateral Agent gives notice of its resignation, then the retiring Administrative Agent or Collateral Agent may (but shall not be obligated to) on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications above (the date upon which the retiring Administrative Agent or Collateral Agent is replaced, the "Resignation Effective Date").

With effect from the Resignation Effective Date (1) the retiring Administrative Agent or Collateral Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except (i) that in the case of any collateral security held by the Collateral Agent on behalf of the Lenders under any of the Loan Documents, the retiring Collateral Agent shall continue to hold such collateral security until such time as a successor Administrative Agent or Collateral Agent is appointed and (ii) with respect to any outstanding payment obligations) and (2) except for any indemnity payments or other amounts then owed to the retiring Administrative Agent or Collateral Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders or the retiring Administrative Agent or Collateral Agent appoint a successor Administrative Agent or Collateral Agent as provided for above. Upon the acceptance of a successor's appointment as Administrative Agent or Collateral Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Administrative Agent or Collateral Agent (other than any rights to indemnity payments or other amounts owed to the retiring Administrative Agent or Collateral Agent as of the Resignation Effective Date), and the retiring Administrative Agent or Collateral Agent shall be discharged from all of its duties and obligations hereunder and under the other Loan Documents as set forth in this Section. The fees payable by the Borrower to a successor Administrative Agent or Collateral Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Administrative Agent's or Collateral Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 9.03 shall continue in effect for the benefit of such retiring Administrative Agent or Collateral Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent or Collateral Agent was acting as Administrative Agent or Collateral Agent and in respect of the matters referred to under clause (1) above.

Each Lender acknowledges that it has, independently and without reliance upon any Agent or any other Lender or any of the Related Parties of any of the foregoing, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, the Collateral Agent or any other Lender or any of the Related Parties of any of the foregoing, and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Each Lender, by delivering its signature page to this Agreement and funding its Loans on the Effective Date, or delivering its signature page to an Assignment and Assumption pursuant to which it shall become a Lender hereunder, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be delivered to, or be approved by or satisfactory to, the Administrative Agent or the Lenders on the Effective Date.

Except with respect to the exercise of setoff rights of any Lender in accordance with Section 9.08 or with respect to a Lender's right to file a proof of claim in an insolvency proceeding, no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce any Guarantee of the Secured Obligations, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Administrative Agent or the Collateral Agent, as applicable, on behalf of the applicable Secured Parties in accordance with the terms thereof. In the event of a foreclosure by the Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition, the Collateral Agent, the Administrative Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition, and the Administrative Agent, as agent for and representative of the applicable Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled (but not obligated), for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Loan Document Obligations as a credit on account of the purchase price for any collateral payable by the Administrative Agent on behalf of the applicable Secured Parties at such sale or other disposition. Each Secured Party, whether or not a party hereto, will be deemed, by its acceptance of the benefits of the Collateral and of the Guarantees of the Secured Obligations, to have agreed to the provisions of this Article, Section 9.15 and Section 9.17.

The Lenders and each other holder of a Loan Document Obligation under a Loan Document shall act collectively through the Administrative Agent with respect to the exercise of rights and remedies under the Loan Documents. The Administrative Agent, acting at the direction of Required Lenders,  shall direct the course of action with respect to the exercise of rights and remedies hereunder and under other Loan Documents (including with respect to alleging the existence or occurrence of, and exercising rights and remedies as a result of, any Default or Event of Default), and the exercise of rights and remedies hereunder or under any other Loan Document with respect to (i) the Term Loans, (ii) any Collateral, and (iii) any other property of any Loan Party or any past, present, or future Related Party of any Loan Party.  Any such rights and remedies shall not be exercised other than through the Administrative Agent. Each Lender agrees that it

141

shall not, and hereby waives any right to, take or institute any actions or proceedings, judicial or otherwise, in each case with respect to the exercise of rights and remedies under the Loan Documents against any Loan Party or any past, present, or future Subsidiary or Affiliate of any Loan Party concerning this Agreement, the other Loan Documents, the Term Loans, any Collateral, or any other property of any Loan Party or any past, present, or future Related Party of any Loan Party other than through the Administrative Agent.

Each of the Lenders and other Secured Parties irrevocably authorizes and directs the Administrative Agent and the Collateral Agent to, and the Administrative Agent and Collateral Agent, as applicable, shall, subject to receipt of a certificate of a Responsible Officer of the Borrower (it being understood that the Administrative Agent and the Collateral Agent may rely, without independent investigation, on any such certificate), (a) release and terminate, or to confirm or evidence any automatic release and termination of, any Guarantees and Liens created under the Loan Documents as provided in Section 9.15 or in any other Security Document and (b) subordinate, at the request of the Borrower, any Lien on any property granted to or held by the Collateral Agent under any Security Document to the holder of any Lien on such property that is permitted by Section 6.02(iv).

In case of the pendency of any proceeding with respect to any Loan Party under any federal, state, provincial, territorial or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Secured Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim under Section 2.12, Section 2.13, Section 2.14(a), Section 2.16, Section 2.17 and Section 9.03) allowed in such judicial proceeding; and

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, interim receiver, receiver and manager, manager, monitor, assignee, trustee, liquidator, sequestrator or other similar official in any such proceeding is hereby authorized by each Lender and each other Secured Party to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders or the other Secured Parties, to pay to the Administrative Agent any amount due to it, in its capacity as the Administrative Agent under the Loan Documents (including under Section 9.03).

To the extent required by any applicable Requirements of Law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. Without limiting or expanding the provisions of Section 2.17, each Lender shall indemnify the Administrative Agent against, and shall make payable in respect thereof within 30

days after demand therefor, any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the IRS or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold tax from amounts paid to or for the account of any Lender for any reason (including, without limitation, because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding tax ineffective, or because such Lender's failure to comply with the provisions of Section 9.04 relating to the maintenance of a Participant Register), but in each case only to the extent that any Loan Party has not already indemnified the Administrative Agent for such amounts and without limiting the obligation of the Loan Parties to do so. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this paragraph. The agreements in this paragraph shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender and the repayment, satisfaction or discharge of all other obligations under any Loan Document.

Each Lender and other Secured Party hereby appoints the Administrative Agent and Collateral Agent to act as its agent  (i) for itself and for and on behalf of the other Secured Parties as direct representative (*direkter Stellvertreter*) as far as Swiss law governed security interests are concerned which are accessory in nature (*akzessorisch*) and (ii) for the benefit of the other Secured Parties (*Halten unter einem Treuhandverhältnis*) as far as Swiss law governed security interests are concerned that are non-accessory in nature (*nicht akzessorisch*) under and in connection with the relevant Security Documents and any Intercreditor Agreements and instructs the Administrative Agent and Collateral Agent, as applicable, to enter into the ABL North America Intercreditor Agreement, any Permitted ABL EMEA Intercreditor Agreement and the Pari Passu Intercreditor Agreement and agrees that (i) the Secured Obligations are subject to, and bound by, the provisions of the ABL North America Intercreditor Agreement, any Permitted ABL EMEA Intercreditor Agreement and the Pari Passu Intercreditor Agreement and (ii) each Secured Party will be subject to, and bound by, the provisions of the ABL North America Intercreditor Agreement, any Permitted ABL EMEA Intercreditor Agreement and the Pari Passu Intercreditor Agreement, in each case in its capacity as holder of Secured Obligations.

All provisions of this Article VIII applicable to the Administrative Agent shall apply to the Collateral Agent and the Collateral Agent shall be entitled to all the benefits and indemnities applicable to the Administrative Agent under this Agreement.  The provisions of this Article VIII and Section 9.03 hereof and Section 5.03 of the U.S. Collateral Agreement, applicable to the Administrative Agent or the Collateral Agent, shall apply to the Administrative Agent and the Collateral Agent when acting in any capacity under any other Loan Document, whether or not such provision is set forth in such other Loan Document.  Without limiting the scope of the immediately preceding sentence, all rights, privileges, immunities and indemnities of the Administrative Agent and the Collateral Agent set forth in this Article VIII and Section 9.03 and Section 5.03 of the U.S. Collateral Agreement shall apply to GLAS Trust Corporation Limited, as security trustee, security agent, collateral agent, administrator, agent, representative, pledgee, chargee and/or similar concept under the Foreign Loan Documents, and for the avoidance of doubt, Cantor Fitzgerald

Securities and GLAS Trust Corporation Limited shall not be subject to any fiduciary or other implied duties, and shall be entitled to all benefits and indemnities applicable to the Administrative Agent and the Collateral Agent under this Agreement and the other Loan Documents as if such benefits and indemnities were set forth in such Foreign Loan Document.

Each Secured Party hereby authorizes the Collateral Agent to enter into the Foreign Loan Documents, and acknowledges and agrees that in connection therewith the Borrower, the Administrative Agent and the Collateral Agent may amend this Agreement (and the Borrower hereby agrees to amend this Agreement) without the consent of any other Lender or any other Person to, to include provisions appointing the Collateral Agent as security trustee or other concept under applicable foreign law, to hold the security under the Foreign Loan Documents and to provide the Collateral Agent with the maximum protections under applicable foreign law (including, without limitation, to provide for releases of liability for the Collateral Agent and to disclaim any fiduciary or other obligations or duties of, or restrictions on, the Collateral Agent under applicable law and to provide for indemnification and exculpation of the Collateral Agent) and otherwise to implement the Foreign Loan Documents.  Each Secured Party acknowledges and agrees that it shall be bound by such provisions, as if fully set forth in <u>Article VIII</u> of this Agreement.  To the extent required under the laws of any jurisdiction other than the United States of America, each of the Lenders hereby grants to the Administrative Agent and the Collateral Agent any required powers of attorney to execute and perform under any Foreign Loan Documents on its behalf.

The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Secured Obligations (including by accepting some or all of the Collateral in satisfaction of some or all of the Secured Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code or Canadian Insolvency Laws, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, Section 36 of the CCAA, Section 65.13 of the BIA, or any similar laws in any other jurisdictions to which a Loan Party is subject, or (b) at any other sale, foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable law.  In connection with any such credit bid and purchase, the Secured Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid by the Administrative Agent at the direction of the Required Lenders on a ratable basis (with Secured Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase).  In connection with any such bid, (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles and to assign any successful credit bid to such acquisition vehicle or vehicles, (ii) each of the Secured Parties' ratable interests in the Secured Obligations which were credit bid shall be deemed without any further action under this Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (iii) the Administrative Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such

acquisition vehicle or vehicles, including any disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall provide for, control by the vote of the Required Lenders or their permitted assignees under the terms of this Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 9.02 of this Agreement), (iv) the Administrative Agent on behalf of such acquisition vehicle or vehicles shall be authorized to issue to each of the Secured Parties, ratably on account of the relevant Secured Obligations which were credit bid, interests, whether as equity, partnership interests, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any Secured Party or acquisition vehicle to take any further action, and (v) to the extent that Secured Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Secured Obligations assigned to the acquisition vehicle exceeds the amount of Secured Obligations credit bid by the acquisition vehicle or otherwise), such Secured Obligations shall automatically be reassigned to the Secured Parties pro rata with their original interest in such Secured Obligations and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Secured Obligations shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action. Notwithstanding that the ratable portion of the Secured Obligations of each Secured Party are deemed assigned to the acquisition vehicle or vehicles as set forth in clause (ii) above, each Secured Party shall execute such documents and provide such information regarding the Secured Party (and/or any designee of the Secured Party which will receive interests in or debt instruments issued by such acquisition vehicle) as the Administrative Agent may reasonably request in connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid. Notwithstanding the grant of authority to the Administrative Agent in this paragraph, nothing herein shall impose an obligation on the Administrative Agent or the Collateral Agent to credit bid any of the Loan Document Obligations, it being expressly understood and agreed by the Lenders and the other Secured Parties that the Administrative Agent may appoint a third-party to perform such functions, and such third-party shall be entitled to all of the protections granted to an Agent under this Agreement and the other Loan Documents.

For the purposes of the grant of security under the laws of the Province of Québec which may now or in the future be required to be provided by any Loan Party, the Collateral Agent is hereby irrevocably authorized and appointed by each of the Lenders hereto to act as hypothecary representative (within the meaning of Article 2692 of the Civil Code of Québec) for all present and future Lenders (in such capacity, the "Hypothecary Representative") in order to hold any hypothec granted under the laws of the Province of Quebec and to exercise such rights and duties as are conferred upon the Hypothecary Representative under the relevant deed of hypothec and applicable Laws (with the power to delegate any such rights or duties). The execution prior to the date hereof by the Collateral Agent in its capacity as the Hypothecary Representative of any deed of hypothec or other security documents made pursuant to the laws of the Province of Québec, is hereby ratified and confirmed. Any Person who becomes a Lender or successor Collateral Agent shall be deemed to have consented to and ratified the foregoing appointment of the Collateral Agent as the Hypothecary Representative on behalf of all Lenders, including such Person and any Affiliate of such Person designated above as a Lender. For greater certainty, the Collateral Agent,

acting as the Hypothecary Representative, shall have the same rights, powers, immunities, indemnities and exclusions from liability as are prescribed in favor of the Collateral Agent in this Agreement, which shall apply mutatis mutandis. In the event of the resignation of the Collateral Agent (which shall include its resignation as the Hypothecary Representative) and appointment of a successor Collateral Agent, such successor Collateral Agent shall also act as the Hypothecary Representative, as contemplated above.

Despite any other provision of this Agreement, if an administrator is appointed to an Australian Loan Party under Part 5.3A of the Australian Corporations Act and the Administrative Agent and/or the Collateral Agent (as applicable) has not received instructions under this Article VIII in time to enable it to appoint an Australian Controller under the relevant Australian Collateral Documents within the decision period (as defined in the Australian Corporations Act) then despite any other provision of this Agreement, the Collateral Agent must, if it is entitled to do, appoint an Australian Controller within that decision period.

## ARTICLE IX
## MISCELLANEOUS

Section 9.01 _Notices_.     Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax, e-mail or other electronic transmission, as follows:

(a)     If to the Borrower, to Invacare Corporation, One Invacare Way, Elyria, OH 44035, Attention: Kathleen P. Leneghan, Telephone: (440) 329-6717, Email: kleneghan@invacare.com with a copy (which shall not constitute notice) to Brian Ford, c/o Kirkland & Ellis LLP, 2049 Century Park East, Suite 3700, Los Angeles, CA 90067, Tel: (310) 552-4307, Fax: (310) 552-5900;

(b)     If to the Administrative Agent, to: Cantor Fitzgerald Securities, 900 West Trade, Suite 725, Charlotte, North Carolina 28202, Attention:  Bobbie Young (Invacare Corporation),     Telephone:     704-374-0574,     Facsimile:     646-390-1764,     E-mail: BankLoansAgency@cantor.com; with a copy to Cantor Fitzgerald Securities, 110 East 59th Street, New York, NY 10022, Attention: Michael Bennett (Invacare Corporation), Telephone: 212-915-1752, with a copy (which shall not constitute notice) to Shipman & Goodwin LLP, One Constitution Plaza, Hartford, Connecticut 06103, Attention:   Nathan Plotkin; E-mail: nplotkin@goodwin.com;

(c)     If to the Collateral Agent, to: GLAS Trust Corporation Limited, 55 Ludgate Hill, Level 1 West, EC4M 7JW, London, United Kingdom, Attention: DCM Team Project Impact Invacare, Telephone: +44 (0) 20 4542 5457 ext. 414, E-mail: DCM@glas.agency;

(d)     [reserved]; and

(e)      If to any Lender, to it at its address (or fax number or email address) set forth in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by fax or other electronic transmission shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).

The Agents or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications. Unless the Agents otherwise prescribe, (i) notices and other communications sent to an e-mail address of such Agent shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

The Borrower may change its address, email or facsimile number for notices and other communications hereunder by notice to the Administrative Agent and Collateral Agent, the Administrative Agent and Collateral Agent may change their address, email or facsimile number for notices and other communications hereunder by notice to the Borrower and the Lenders may change their address, email or facsimile number for notices and other communications hereunder by notice to the Administrative Agent. Notices and other communications to the Lenders hereunder may also be delivered or furnished by electronic transmission (including email and Internet or intranet websites) pursuant to procedures reasonably approved by the Administrative Agent; provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic transmission.

The Borrower agrees that the Agent may, but shall not be obligated to, make the Communications (as defined below) available to the Lenders by posting the Communications (as defined below) on the Platform.

Section 9.02   Waivers; Amendments.

(a)      No failure or delay by the Administrative Agent or any Lender in exercising any right or power under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights

or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent, any Lender may have had notice or knowledge of such Default at the time. No notice or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

(b)     Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower, the Administrative Agent (to the extent that such waiver, amendment or modification does not affect the rights, duties, privileges or obligations of the Administrative Agent under this Agreement, the Administrative Agent shall execute such waiver, amendment or other modification to the extent approved by the Required Lenders) and the Required Lenders or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent, the Collateral Agent, if applicable, and the Loan Party or Loan Parties that are parties thereto, in each case with the consent of the Required Lenders, underlined provided that no such agreement shall (i) increase the Commitment of any Lender without the written consent of such Lender (but not the consent of the Required Lenders) (it being understood that the waiver of any Default, Event of Default or mandatory prepayment shall not constitute an extension or increase of any Commitment of any Lender), (ii) reduce the principal amount of any Loan (it being understood that a waiver of any Default, Event of Default or mandatory prepayment shall not constitute a reduction in principal) or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender directly and adversely affected thereby (but not the consent of the Required Lenders) (it being understood that any change to the definition of any ratio used in the calculation of the interest rate or fees therein or in the component definitions thereof shall not constitute a reduction of interest or fees), underlined provided that the consent of the Required Lenders shall be necessary to waive any obligation of the Borrower to pay default interest pursuant to Section 2.13(d), (iii) postpone the maturity of any Loan (it being understood that a waiver of any Default, Event of Default or mandatory prepayment shall not constitute a postponement of any maturity date), or any date for the payment of any interest or fees payable hereunder, without the written consent of each Lender directly and adversely affected thereby (but not the consent of the Required Lenders), (iv) change any of the provisions of this Section or the percentage set forth in the definition of "Required Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any right thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender, (v) release all or substantially all the value of the Guarantees under the Domestic Guarantee Agreement or the Foreign Guarantee Agreement (except as expressly provided in the Loan Documents), without the written consent of each Lender, (vi) release all or substantially all the Collateral from the Liens of the Security Documents, without the written consent of each Lender (except as expressly provided in the Loan Documents) or (vii) (1) waive, amend or modify Section 2.18, Section 7.03 or Section 4.02 of the U.S. Collateral Agreement or any other provision hereof in a manner that would have the effect of altering the ratable reduction of Commitments or the pro rata sharing of payments otherwise required hereunder, (2) subordinate, or have the effect of subordinating, the Secured Obligations hereunder to any other Indebtedness or other obligation,

except in the case of (w) any Indebtedness under a Permitted ABL EMEA Credit Facility in accordance with a Permitted ABL EMEA Intercreditor Agreement, (x) any Indebtedness under the ABL North America Credit Agreement in accordance with the ABL North America Intercreditor Agreement, (y) any "debtor in-possession" facility (or similar facility under applicable law) or (z) any Indebtedness with respect to which such Lender has been provided with a bona fide opportunity to participate in such Indebtedness, (3) subordinate, or have the effect of subordinating, the Liens securing the Secured Obligations with respect to all or substantially all of the Collateral to Liens securing any other Indebtedness or other obligation, except in the case of (x) any Indebtedness under a Permitted ABL EMEA Credit Facility in accordance with a Permitted ABL EMEA Intercreditor Agreement, (x) any Indebtedness under the ABL North America Credit Agreement in accordance with the ABL North America Intercreditor Agreement (y) any "debtor in-possession" facility (or similar facility under applicable law) or (z) any Indebtedness with respect to which such Lender has been provided with a bona fide opportunity to participate in such Indebtedness, (4) release, or have the effect of releasing, all or substantially all of the Collateral securing the Secured Obligations, or (5) release, or have the effect of releasing, all or substantially all of the value of the Guarantees of the Secured Obligations, in each case, without the written consent of each Lender directly and adversely affected thereby (except as provided in this Section 9.02); provided further that (A) no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or the Collateral Agent without the prior written consent of the Administrative Agent and the Collateral Agent, as applicable, and (B) any provision of this Agreement or any other Loan Document may be amended by an agreement in writing entered into by the Borrower and the Administrative Agent to cure any ambiguity, omission, defect or inconsistency. Notwithstanding the foregoing, upon notice thereof by the Borrower to the Administrative Agent with respect to the inclusion of any previously absent financial maintenance covenant, this Agreement shall be amended by an agreement in writing entered into by the Borrower and the Administrative Agent without the need to obtain the consent of any Lender to include such covenant on the date of the incurrence of the applicable Indebtedness to the extent required by the terms of such definition or section. Notwithstanding the foregoing, (a) this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (i) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents (and to the extent such credit facilities are pari passu in right of payment and security with any then existing Loans, to share ratably in prepayments with such Loans) and (ii) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders on substantially the same basis as the Lenders prior to such inclusion and (b) this Agreement and other Loan Documents may be amended or supplemented by an agreement or agreements in writing entered into by the Administrative Agent and the Borrower or any Loan Party as to which such agreement or agreements is to apply, without the need to obtain the consent of any Lender, to include "parallel debt" or similar provisions, and any authorizations or granting of powers by the Lenders and the other Secured Parties in favor of the Administrative Agent, in each case required to create in favor of the Administrative Agent any security interest contemplated to be created under this Agreement, or to perfect any such security interest, where the Required Lenders have determined that such provisions are necessary or advisable under local law for such purpose (with the Borrower hereby agreeing to, and to cause its subsidiaries to, enter into any such agreement or agreements upon

reasonable request of the Administrative Agent (acting at the direction of Required Lenders) promptly upon such request).

(c)       In connection with any proposed amendment, modification, waiver or termination (a "Proposed Change") requiring the consent of all Lenders or all directly and adversely affected Lenders, if the consent of the Required Lenders to such Proposed Change is obtained, but the consent to such Proposed Change of other Lenders whose consent is required is not obtained (any such Lender whose consent is not obtained as described in paragraph (b) of this Section being referred to as a "Non-Consenting Lender"), then, the Borrower may, at its sole expense and effort, upon notice to such Non-Consenting Lender and the Administrative Agent, (x) terminate the applicable Commitments of such Lender, and repay all obligations of the Borrower owing to such Lender relating to the applicable Loans and participations held by such Lender as of such termination date or (y) require such Non-Consenting Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement to an Eligible Assignee that shall assume such obligations (which Eligible Assignee may be another Lender, if a Lender accepts such assignment), provided that (a) in the case of clause (y) above, the Borrower shall have received the prior written consent of the Administrative Agent to the extent such consent would be required under Section 9.04(b) for an assignment of Loans or Commitments, as applicable, which consent shall not unreasonably be withheld, (b) such Non-Consenting Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees, any redemption premium, any prepayment premium and all other amounts (including any amounts under Section 2.11(a)(i)), payable to it hereunder from the Borrower or Eligible Assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (c) in the case of clause (y) above, unless waived, the Borrower or such Eligible Assignee shall have paid to the Administrative Agent the processing and recordation fee specified in Section 9.04(b).

Section 9.03       Expenses; Indemnity; Damage Waiver.

(a)       The Borrower shall pay (i) all reasonable and documented or invoiced fees and out of pocket expenses incurred by the Lender, the Administrative Agent, the Collateral Agent and their Affiliates (without duplication), including the reasonable fees, charges and disbursements of Davis Polk & Wardwell LLP, Shipman & Goodwin LLP, and, to the extent reasonably determined by the Lenders and the Administrative Agent and the Collateral Agent to be necessary one local counsel in each applicable jurisdiction or otherwise retained with the Borrower's consent, in each case for the Administrative Agent, Collateral Agent and Lenders in connection with the preparation, execution, delivery or administration of the Loan Documents or any amendments, modifications or waivers of the provisions thereof and (ii) all reasonable and documented or invoiced fees and out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent or any Lender, including the fees, charges and disbursements of counsel for the Administrative Agent, the Collateral Agent and the Lenders, in connection with the enforcement or protection of its rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Loans made hereunder (including, but not limited to, all out-of-pocket costs and expenses associated with creating and maintaining the Platform and providing accounting for the Lenders), including all such fees and out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans; provided that such counsel

shall be limited to one counsel for the Administrative Agent, one counsel for the Collateral Agent, and one counsel for the Lenders taken as a whole, and, if necessary, one local counsel in each applicable jurisdiction and one foreign counsel for the Administrative Agent, one separate counsel for the Collateral Agent and one local counsel in each applicable jurisdiction and one foreign counsel for the Lenders taken as a whole.

(b)     The Borrower shall indemnify each Agent, each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and reasonable and documented or invoiced fees and out-of-pocket expenses of one counsel to the Administrative Agent and its Related Parties taken as a whole, one counsel to the Collateral Agent and its Related Parties taken as a whole and one counsel to the Lenders and their Related Parties taken as a whole, if reasonably necessary, and one local counsel in each relevant material jurisdiction (and, in the case of an actual or potential conflict of interest, one additional counsel to all affected Indemnitees, taken as a whole) for all affected Indemnitees, incurred by or asserted against any Indemnitee by any third party or by Holdings, the Borrower or any Subsidiary arising out of, in connection with, or as a result of (i) the preparation, execution, delivery or administration of the Loan Documents or any other agreement or instrument contemplated thereby or any amendments, modifications or waivers of the provisions thereof, the performance by the parties to the Loan Documents of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated thereby, (ii) any Loan or the use of the proceeds therefrom, (iii) to the extent in any way arising from or relating to any of the foregoing, any actual or alleged presence or Release of Hazardous Materials on, at or from any Mortgaged Property or any other property currently or formerly owned or operated by Holdings, the Borrower or any Restricted Subsidiary, or any other Environmental Liability, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any Subsidiary and regardless of whether any Indemnitee is a party thereto, provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (i) are determined by a court of competent jurisdiction by final, non-appealable judgment to have resulted from the gross negligence or willful misconduct of, or, other than the Agents and their Related Parties, bad faith or (ii) have resulted from any dispute solely between and among Indemnitees that does not involve an act or omission by Holdings, the Borrower or any of their Subsidiaries (other than with respect to a claim against an Indemnitee acting in its capacity as an Agent or similar role under the Loan Documents, except to the extent that any of the exceptions set forth in clause (i) applies to such Indemnitee with respect to such claim at such time); provided that this Section 9.03(b) shall not apply with respect to Taxes other than any Taxes that represent losses or damages arising from any non-Tax claim.

(c)     To the extent that Holdings or the Borrower fails to pay any amount required to be paid by it to any Agent (or any sub-agent thereof) or any Related Party of any of the foregoing under paragraph (a) or (b) of this Section, and without limiting Holdings' or the Borrower's obligation to do so, each Lender severally agrees to pay to such Agent (or such sub-agent) or such Related Party, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against such Agent (or such sub-agent),

in its capacity as such, or against any Related Party of any of the foregoing acting for such Agent (or any such sub-agent) in connection with such capacity. For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the aggregate outstanding Loans at the time.

(d)     To the fullest extent permitted by applicable law, neither Holdings nor the Borrower shall assert, or permit any of their Affiliates or Related Parties to assert, and each hereby waives, any claim against any Indemnitee (i) for any damages arising from the use by others of information or other materials obtained through telecommunications, electronic or other information transmission systems (including the Internet), provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such damages are determined by a court of competent jurisdiction by final, non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or its Related Parties, or (ii) on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, any Loan Document or any agreement or instrument contemplated thereby, the Transactions, any Loan or the use of the proceeds thereof.

(e)     All amounts due under this Section shall be payable not later than 30 days (x) after written demand therefor, in the case of any indemnification obligations and (y) in the case of reimbursement of costs and expenses, after receipt by the Borrower of an invoice setting forth such costs and expenses in reasonable detail, together with backup documentation supporting the relevant reimbursement request; provided, however, that any Indemnitee shall promptly refund or return an indemnification payment received hereunder to the extent that such Indemnitee was not entitled to indemnification with respect to such payment pursuant to this Section 9.03.

(f)     All amounts reimbursable by Holdings and the Borrower under this Section 9.03 shall constitute Loan Document Obligations secured by the Collateral.  Each party's obligations under this Section 9.03 shall survive the termination of the Loan Documents and payment of the obligations hereunder or the earlier resignation or removal of any Agent.

Section 9.04    Successors and Assigns.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) except as provided in clause (d), the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section) and, to the extent expressly contemplated hereby, the sub-agents of the Administrative Agent, the other Agents, the Related Parties of each of the Agents and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     (i) Subject to the conditions set forth in clause (ii) and paragraph (g) below, any Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments outstanding at

such time and/or Loans at the time owing to it) with the prior written consent of (A) the Borrower (such consent not to be unreasonably withheld), provided that no consent of the Borrower shall be required for an assignment (1) by a Lender to any Lender or an Affiliate of any Lender, (2) by a Lender to an Approved Fund or (3) if an Event of Default under Section 7.01(a), (b), (h) or (i) has occurred and is continuing, by a Lender to any other assignee; and provided further that the Borrower shall have the right to withhold its consent to any assignment if, in order for such assignment to comply with applicable law, the Borrower would be required to obtain the consent of, or make any filing or registration with, any Governmental Authority, and (B) the Administrative Agent (such consent not to be unreasonably withheld or delayed); provided that no consent of the Administrative Agent shall be required for an assignment to a Lender, an Affiliate of any Lender or an Approved Fund. Notwithstanding anything in this Section 9.04 to the contrary, if any Person the consent of which is required by this paragraph with respect to any assignment of Loans has not given the Administrative Agent written notice of its objection to such assignment within 10 Business Days after written notice to such Person, such Person shall be deemed to have consented to such assignment.

(ii)     Assignments shall be subject to the following additional conditions: (A) except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the trade date specified in the Assignment and Assumption with respect to such assignment or, if no trade date is so specified, as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 (and integral multiples of $1,000,000 in excess thereof), unless the Borrower and the Administrative Agent otherwise consent (such consent not to be unreasonably withheld or delayed), (B) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together (unless waived by the Administrative Agent) with a processing and recordation fee of $3,500, provided that assignments made pursuant to Section 2.19 or Section 9.02(c) shall not require the signature of the assigning Lender to become effective, and (C) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent any tax documentation required by Section 2.17(e) and an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower, the Loan Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws.

(iii)     Subject to acceptance and recording thereof pursuant to clause (v) of this paragraph (b), from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an

Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of (subject to the obligations and limitations of) Sections 2.14(a), Section 2.16, Section 2.17 and 9.03 and to any fees payable hereunder that have accrued for such Lender's account but have not yet been paid). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 9.04(c)(i).

(iv)     The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal and stated interest amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Borrower, the other Loan Parties, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and, solely with respect to its Loans or Commitments, any Lender, at any reasonable time and from time to time upon reasonable prior notice. The parties intend that Loans are at all times maintained in "registered form" within the meaning of Section 163(f), 871(h)(2) and 881(c)(2) of the Code and any related Treasury regulations (or any other relevant or successor provisions of the Code or of such Treasury regulations).

(v)     Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire and the documentation required by Section 2.17(e) (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in this paragraph (b) and any written consent to such assignment required by this paragraph (b), the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph (b).

(vi)     The words "execution," "signed," "signature" and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act.

(vii)    With respect to the Luxembourg Collateral Documents, each Guarantor hereby expressly accepts and confirms, for the purpose of article 1278 et seq. of the Luxembourg Civil Code, that notwithstanding any assignment, transfer and/or novation permitted under, and made in accordance with the provisions of this Agreement, any Security Documents and all guarantees created under the Loan  Documents shall be preserved for the benefit of any Eligible Assignee.

(c)    (i)    Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other Persons (other than to a Person that is not an Eligible Assignee) (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and Loans); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents, provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that directly and adversely affects such Participant. Subject to clause (ii) below, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.14(a), Section 2.16 and Section 2.17 (subject to the obligations and limitations therein including the requirements under Section 2.17(e), it being understood that the documentation required by Section 2.17(e) shall be provided to the Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender, provided that such Participant shall be subject to Section 2.18(c) as though it were a Lender.

(ii)    No Participant shall be entitled to receive any greater payment under Section 2.14(a), Section 2.16 or Section 2.17 than the participating Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent (not to be unreasonably withheld or delayed) expressly acknowledging that such Participant's entitlement to benefits under Section 2.14(a), Section 2.16 or Section 2.17 is not limited to what the participating Lender would have been entitled to receive absent the participation.

(iii)    Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal and stated interest amounts of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest

155

in any commitments, loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive (absent manifest error), and each Person whose name is recorded in the Participant Register pursuant to the terms hereof shall be treated as a Participant for all purposes of this Agreement, notwithstanding notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)     Any Lender may, without the consent of the Borrower or the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central bank, and this Section shall not apply to any such pledge or assignment of a security interest, provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)     [reserved].

(f)     Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle (an "SPV"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to the Borrower pursuant to this Agreement, provided that (i) nothing herein shall constitute a commitment by any SPV to make any Loan and (ii) if an SPV elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. The making of a Loan by an SPV hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that no SPV shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender). In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPV, such party will not institute against, or join any other person in instituting against, such SPV any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof. In addition, notwithstanding anything to the contrary contained in this Section 9.04, any SPV may (i) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrower and Administrative Agent) providing liquidity or credit support to or for the account of such SPV to support the funding or maintenance of Loans and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPV.

(g)     [reserved].

(h)     (i) In the event of any assignment or participation by a Lender without the Borrower's consent or deemed consent (if applicable) (A) [reserved] or (B) to the extent the Borrower's consent is required under this Section 9.04, to any other Person, the Borrower shall be entitled to seek specific performance to unwind any such assignment or participation in addition to injunctive relief (without posting a bond or presenting evidence of irreparable harm) or any other remedies available to the Borrower at law or in equity in respect of such assignor or assignee; it being understood and agreed that Holdings, the Borrower and their subsidiaries will suffer irreparable harm if any Lender breaches any obligation under this Section 9.04 as it relates to any assignment, participation or pledge of any Loan or Commitment to any Person to whom the Borrower's consent is required but not obtained (or has not been deemed consented to).

(ii)     [reserved].

(iii)     Upon the cancellation or retirement of any Loans pursuant to this Section 9.04, (A) the aggregate principal amount (calculated on the face amount thereof) shall be deemed reduced by the full par value of the aggregate principal amount of the Term Loans so retired or cancelled and (B) the Administrative Agent shall record such cancellation or retirement in the Register.

(i)     Any Lender may, if it considers it necessary to make the present transfer effective as against a Loan Party incorporated or resident for tax purposes under the laws of France (a "French Obligor"), arrange for such transfer to be notified to that French Obligor or acknowledged by that French Obligor in accordance with article 1216 of the French Civil Code. Each Party agrees that in case of an assignment or transfer pursuant to this Section 9.04(i), the French Collateral granted under the French Collateral Documents and the guarantees granted by any French Obligor under the relevant Foreign Guarantee Agreement shall be preserved for the benefit of the Collateral Agent, the new Lender and the other Secured Parties (as applicable). In addition, for the purpose of the provisions of paragraph 2 of article 1334 of the French Civil Code and any similar provisions under any other applicable law, each party agrees that following a transfer by way of novation under this Agreement, any French Collateral granted under the French Collateral Documents and the obligations of any French Obligor under the Foreign Guarantee Agreement will be reserved and will continue in full force for the benefit of the Collateral Agent, the new Lender and the other Secured Parties. A transfer by way of novation under this Section 9.04(i) shall be deemed to be also a novation (*novation*) within the meaning of articles 1329 et seq. of the French Civil Code.

Section 9.05   Survival. All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to any Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement

is outstanding and unpaid and so long as the Commitments have not expired or terminated. The provisions of Sections 2.14(a), Section 2.16, Section 2.17 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitment, the termination of this Agreement or any provision hereof, and in the case of Article VIII and Section 9.03, the resignation or removal of any Agent.

Section 9.06    Counterparts; Integration; Effectiveness. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents, the Fee Letters and any separate letter agreements with respect to fees payable to the Lenders or any Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic means shall be effective as delivery of an original counterpart of this Agreement.

Section 9.07    Severability. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 9.08    Right of Setoff. If an Event of Default under Section 7.01(a), (b), (h) or (i) shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) (other than escrow, payroll, employee health and benefits, pension, fiduciary, 401(K), petty cash, trust and tax accounts) or other amounts at any time held and other obligations (in whatever currency) at any time owing by such Lender, to or for the credit or the account of Holdings or the Borrower against any of and all the obligations of Holdings or the Borrower then due and owing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness. The applicable Lender shall notify the Borrower and the Administrative Agent of such setoff and application, provided that any failure to give or any delay in giving such notice shall not affect the validity of any such setoff and application under this Section. The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender may have.

Section 9.09    Governing Law; Jurisdiction; Consent to Service of Process.

(a)     This Agreement shall be construed in accordance with and governed by the law of the State of New York.

(b)     Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York sitting in New York County, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in any Loan Document shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to any Loan Document against Holdings, the Borrower or their respective properties in the courts of any jurisdiction.

(c)     Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to any Loan Document in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in <u>Section 9.01</u>. Nothing in any Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 9.10   <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 9.11   <u>Headings</u>. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 9.12   <u>Confidentiality</u>.

(a)      Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees, servicers, financing sources, trustees and agents, including accountants, legal counsel and other agents and advisors (collectively, the "Representatives") on a "need to know" basis solely in connection with the transactions contemplated hereby (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential and any failure of such Persons to comply with this Section 9.12 shall constitute a breach of this Section 9.12 by the Administrative Agent or the relevant Lender, as applicable); provided that, unless the Borrower otherwise consents, no such disclosure shall be made by the Administrative Agent, any Lender or any Affiliate or Representative thereof to any Affiliate or Representative of the Administrative Agent, (b) (x) to the extent requested by any regulatory authority (including the NAIC), required by applicable law or by any subpoena or similar legal process or (y) necessary in connection with the exercise of remedies; provided that, (i) in each case, unless specifically prohibited by applicable law or court order, each Lender and the Administrative Agent shall promptly notify the Borrower of any request by any governmental agency or representative thereof (other than any such request in connection with an examination of the financial condition of such Lender by such governmental agency or other routine examinations of such Lender by such governmental agency) for disclosure of any such non-public information prior to disclosure of such information and (ii) in the case of clause (y) only, each Lender and the Administrative Agent shall use reasonable best efforts to ensure that such Information is kept confidential in connection with the exercise of such remedies, and provided, further, that in no event shall any Lender or the Administrative Agent be obligated or required to return any materials furnished by Holdings or any of its Subsidiaries, (c) to any other party to this Agreement, (d) subject to an acknowledgment and acceptance by the relevant recipient that such Information is being disseminated on a confidential basis (on substantially similar terms to those of this Section or as otherwise reasonably acceptable to the Borrower and the Administrative Agent), to any Eligible Assignee of or Participant in, or any prospective Eligible Assignee of or prospective Participant in, any of its rights or obligations under this Agreement, (e) with the consent of the Borrower, in the case of Information provided by Holdings, the Borrower or any Subsidiary, (f) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent or any Lender on a nonconfidential basis from a source other than Holdings or the Borrower or (g) subject to the Borrower's prior approval of the information to be disclosed (not to be unreasonably withheld), to Moody's or S&P on a confidential basis in connection with obtaining or maintaining ratings. In addition, the Agents and the Lenders may disclose the existence of this Agreement and publicly available information about this Agreement to market data collectors, similar service providers to the lending industry, and service providers to the Agents and the Lenders in connection with the administration and management of this Agreement, the other Loan Documents, the Commitments and the Borrowings hereunder. For the purposes of this Section, "Information" means all information received from Holdings or the Borrower relating to Holdings, the Borrower, any Subsidiary or their business, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by Holdings or the Borrower. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same

degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

(b)     EACH LENDER ACKNOWLEDGES THAT INFORMATION AS DEFINED IN <u>SECTION **9.12**(a)</u> FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING HOLDINGS, THE BORROWER, THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

(c)     ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS FURNISHED BY THE BORROWER OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT, WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT HOLDINGS, THE BORROWER, THE OTHER LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES. ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWER AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

Section 9.13    <u>USA Patriot Act</u>. Each Lender and the Agents (for itself and not on behalf of any Lender) hereby notifies each Loan Party that pursuant to the requirements of Title III of the USA Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender or such Agent, as applicable, to identify each Loan Party in accordance with the Title III of the USA Patriot Act.

Section 9.14    <u>Judgment Currency</u>.

(a)     If, for the purpose of obtaining judgment in any court, it is necessary to convert a sum owing hereunder in one currency into another currency, each party hereto agrees, to the fullest extent that it may effectively do so, that the rate of exchange used shall be that at which in accordance with normal banking procedures in the relevant jurisdiction the first currency could be purchased with such other currency on the Business Day immediately preceding the day on which final judgment is given.

(b)     The obligations of the Borrower in respect of any sum due to any party hereto or any holder of any obligation owing hereunder (the "<u>Applicable Creditor</u>") shall, notwithstanding any judgment in a currency (the "<u>Judgment Currency</u>") other than the currency in which such sum is stated to be due hereunder (the "<u>Agreement Currency</u>"), be discharged only to the extent that, on the Business Day following receipt by the Applicable Creditor of any sum

adjudged to be so due in the Judgment Currency, the Applicable Creditor may in accordance with normal banking procedures in the relevant jurisdiction purchase the Agreement Currency with the Judgment Currency; if the amount of the Agreement Currency so purchased is less than the sum originally due to the Applicable Creditor in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Applicable Creditor against such loss. The obligations of the Borrower under this Section shall survive the termination of this Agreement, the resignation or removal of any Agent and the payment of all other amounts owing hereunder.

Section 9.15   Release of Liens and Guarantees. A Subsidiary Loan Party shall automatically be released from its obligations under the Loan Documents, and all security interests created by the Security Documents in Collateral owned by such Subsidiary Loan Party shall be automatically released, (1) upon the consummation of any single transaction or related series of transactions permitted by this Agreement as a result of which such Subsidiary Loan Party ceases to be a Restricted Subsidiary or becomes an Excluded Subsidiary  (subject to the proviso set forth in clause (a) of the Excluded Subsidiary definition) or (2) upon the request of the Borrower, in connection with a transaction permitted under this Agreement, as a result of which such Subsidiary Loan Party ceases to be a wholly-owned Subsidiary (subject to the proviso set forth in clause (a) of the Excluded Subsidiary definition). Subject to Section 6.19, (i) upon any sale or other transfer as part of or in connection with a Disposition by any Loan Party (other than to the Borrower or any other Loan Party) of any Collateral in a transaction permitted under this Agreement, (ii) if any property granted to or held by the Collateral Agent under any Loan Documents does not constitute (or ceases to constitute) and is not required to be Collateral or (iii) upon the effectiveness of any written consent to the release of the Lien or security interest created under any Security Document in any Collateral or the release of any Loan Party from its Guarantee under the Domestic Guarantee Agreement or the Foreign Guarantee Agreement, as applicable, pursuant to Section 9.02, the security interests in such Collateral created by the Security Documents or such Guarantee shall be automatically released. The security interest in any Collateral of a Foreign Loan Party will also be released pursuant to Foreign Loan Documents as specified by the Agreed Security Principles or the Canadian Collateral and Guarantee Requirement, as applicable. Upon the occurrence of the Termination Date, all obligations under the Loan Documents and all security interests created by the Security Documents shall be automatically released. In connection with any termination or release pursuant to this Section or in connection with any subordination of its interest as required by Article VIII, the Administrative Agent or Collateral Agent, as applicable, acting at the direction of the Required Lenders, shall execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such termination or release. Any execution and delivery of documents pursuant to this Section shall be without recourse to or warranty by the Administrative Agent or Collateral Agent. The Lenders irrevocably authorize the Administrative Agent and Collateral Agent, as applicable, to release or subordinate any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 6.02(iv) to the extent required by the terms of the obligations secured by such Liens at the Loan Parties' reasonable request.   The parties hereto acknowledge and agree that the Administrative Agent and the Collateral Agent may rely conclusively as to any of the matters described in this Section 9.15 (including as to its authority hereunder) on a certificate or similar instrument provided to it by any Loan Party without further inquiry or investigation, which certificate shall be delivered to the Administrative Agent and the Collateral Agent by the Loan Parties upon request.

In the event of any conflict or inconsistency between any term of the Agreed Security Principles, if applicable, and any term of a Foreign Loan Document, the Secured Parties authorize, instruct and direct the Collateral Agent to, and the Collateral Agent shall promptly upon written request of the Borrower (i) enter into such amendments to such Foreign Loan Document or (ii) release and terminate such Foreign Loan Document and enter into a replacement Security Document on such amended terms, in each case as shall be necessary or desirable to cure such conflict or inconsistency as the Borrower and the Administrative Agent (acting at the direction of the Required Lenders) shall determine in their reasonable discretion.

Upon request by the Administrative Agent or Collateral Agent at any time, the Required Lenders will confirm in writing such Agent's authority to release particular types or items of Collateral pursuant to this Section and the other Loan Documents.

Section 9.16    No Fiduciary Relationship. Each of Holdings and the Borrower, on behalf of itself and its Subsidiaries, agrees that in connection with all aspects of the transactions contemplated hereby and any communications in connection therewith, Holdings, the Borrower, the Subsidiaries and their Affiliates, on the one hand, and the Administrative Agent, the Collateral Agent, the Lenders and their Affiliates, on the other hand, will have a business relationship that does not create, by implication or otherwise, any fiduciary duty on the part of the Administrative Agent, the Collateral Agent, the Lenders or their Affiliates, and no such duty will be deemed to have arisen in connection with any such transactions or communications.

Section 9.17    Permitted Intercreditor Agreements.

(a)    Each of the Lenders and the other Secured Parties acknowledges that obligations of the Borrower and the Guarantors under the ABL North America Credit Documents, the Senior Secured Convertible Notes Documents and any Indebtedness permitted by Section 6.01(a)(xii) may be secured by Liens on assets of the Borrower and the Guarantors that constitute Collateral to the extent otherwise permitted under this Agreement. Each of the Lenders and the other Secured Parties hereby irrevocably authorizes and directs each of the Administrative Agent and the Collateral Agent to execute and deliver, in each case on behalf of such Secured Party and without any further consent, authorization or other action by such Secured Party (other than direction from the Required Lenders contemplated below), (i) from time to time upon the request of the Borrower, in connection with the establishment, incurrence, amendment, refinancing or replacement of any such Indebtedness, any applicable Intercreditor Agreement (it being understood that each of the Administrative Agent and the Collateral Agent shall be acting pursuant to direction of Required Lenders, and Required Lenders are hereby authorized to determine the terms and conditions of any such Intercreditor Agreement, and (ii) any documents relating thereto.

(b)    Each of the Lenders and the other Secured Parties hereby irrevocably (i) consents to the treatment of Liens to be provided for under the Intercreditor Agreements, (ii) agrees that, upon the execution and delivery thereof, such Secured Party will be bound by the provisions of any Intercreditor Agreement as if it were a signatory thereto and will take no actions contrary to the provisions of any Intercreditor Agreement, (iii) agrees that no Secured Party shall have any right of action whatsoever against the Administrative Agent or the Collateral Agent as a result of any action taken by the Administrative Agent or the Collateral Agent pursuant to this Section or in accordance with the terms of any Intercreditor Agreement and (iv) authorizes and directs each

of the Administrative Agent and the Collateral Agent to carry out the provisions and intent of each such document.

(c)     Each of the Lenders and the other Secured Parties hereby irrevocably further authorizes and directs each of the Administrative Agent and the Collateral Agent, acting at the direction of the Required Lenders, to execute and deliver, in each case on behalf of such Secured Party and without any further consent, authorization or other action by such Secured Party (other than the Required Lender direction referred to above), any amendments, supplements or other modifications of any Intercreditor Agreement that the Borrower may from time to time request (i) to give effect to any establishment, incurrence, amendment, extension, renewal, refinancing or replacement of any Indebtedness under the ABL North America Credit Documents, the Senior Secured Documents and any Indebtedness permitted by Section 6.01(a)(xii), to the extent the foregoing is otherwise permitted under this Agreement, (ii) to confirm for any party that such Intercreditor Agreement is effective and binding upon the Administrative Agent or the Collateral Agent, as applicable, on behalf of the Secured Parties or (iii) to effect any other amendment, supplement or modification so long as the resulting agreement would constitute an Intercreditor Agreement if executed at such time as a new agreement.

(d)     Each of the Lenders and the other Secured Parties hereby irrevocably further authorizes and directs each of the Administrative Agent and the Collateral Agent to execute and deliver, in each case on behalf of such Secured Party and without any further consent, authorization or other action by such Secured Party, any amendments, supplements or other modifications of any Security Document to add or remove any legend that may be required pursuant to any Intercreditor Agreement.

(e)     Each of the Administrative Agent and the Collateral Agent shall have the benefit of the provisions of Article VIII with respect to all actions taken by it pursuant to this Section or in accordance with the terms of any Intercreditor Agreement to the full extent thereof.

(f)     The parties hereto acknowledge and agree that notwithstanding anything to the contrary in this Agreement or any other Loan Document, the Administrative Agent and the Collateral Agent may rely conclusively as to any of the matters described in Section 9.15 and this Section 9.17 (including as to its authority hereunder), on a certificate or similar instrument provided to it by any Loan Party without further inquiry or investigation, which certificate shall be delivered to the Administrative Agent and the Collateral Agent by the Loan Parties upon request.

Section 9.18     Acknowledgement and Consent to Bail-In of EEA Financial Institutions.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

164

(a)     the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)     the effects of any Bail-in Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such liability  in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

Section 9.19     [Reserved].

Section 9.20     Amendments for Guarantee Limitations. Notwithstanding anything to the contrary herein, this Agreement and other Loan Documents may be amended or supplemented by an agreement or agreements in writing entered into by the Administrative Agent, acting at the direction of the Required Lenders, and the Borrower or any Loan Party as to which such agreement or agreements is to apply, without the need to obtain the consent of any Lender, to include guarantee limitations required by applicable local law and other provisions, in each case where the Required Lenders have determined that such provisions are necessary or advisable under local law for such purpose (with the Borrower hereby agreeing to, and to cause its subsidiaries to, enter into any such agreement or agreements upon reasonable request of the Administrative Agent (acting at the direction of Required Lenders) promptly upon such request).

Section 9.21     Parallel Debt; Parallel Debt owed to the Collateral Agent. Each of the Loan Parties hereby irrevocably and unconditionally undertakes to pay to the Collateral Agent as creditor in its own right and not as a representative of the other Secured Parties amounts equal to any amounts owing from time to time by that Loan Party to any Secured Party under any Loan Document as and when those amounts are due for payment under the relevant Loan Document.

(a)     Each of the Loan Parties and the Collateral Agent acknowledge that the obligations of each Loan Party under paragraph (a) are several and are separate and independent from, and shall not in any way limit or affect, the corresponding obligations of that Loan Party to any Secured Party under any Loan Document (its "Corresponding Debt") nor shall the amounts for which each Loan Party is liable under paragraph (a) (its "Parallel Debt") be limited or affected in any way by its Corresponding Debt provided that:

(i)     the Collateral Agent shall not demand payment with regard to the Parallel Debt of each Loan Party to the extent that such Lender's Corresponding

Debt has been irrevocably paid or (in the case of guarantee obligations) discharged; and

(ii)     a Finance Party shall not demand payment with regard to the Corresponding Debt of each Lender to the extent that such Lender's Parallel Debt has been irrevocably paid or (in the case of guarantee obligations) discharged.

(b)     The Collateral Agent acts in its own name and not as a trustee, and its claims in respect of the Parallel Debt shall not be held on trust. The collateral under the Collateral Documents granted under the Loan Documents to the Collateral Agent to secure the Parallel Debt is granted to the Collateral Agent in its capacity as creditor of the Parallel Debt and shall not be held on trust.

(c)     All monies received or recovered by the Collateral Agent pursuant to this Section 9.21, and all amounts received or recovered by the Collateral Agent from or by the enforcement of any collateral under the Collateral Documents granted to secure the Parallel Debt, shall be applied in accordance with this Agreement.

(d)     Without limiting or affecting the Collateral Agent's rights against the Loan Parties (whether under this Section 9.21 or under any other provision of the Loan Documents), each Lender acknowledges that:

(e)     nothing in this Section 9.21 shall impose any obligation on the Collateral Agent to advance any sum to any Lender or otherwise under any Loan Document, except in its capacity as lender; and

(f)     for the purpose of any vote taken under any Loan Document, the Collateral Agent shall not be regarded as having any participation or commitment other than those which it has in its capacity as a lender.

(g)     Special Appointment of Collateral Agent (German Collateral)

(i)     For the purposes of any security provided under the German Collateral Documents (where "German Collateral" means any security interest created under the German Collateral Documents) in addition to the provision set out above, the specific provisions set out in paragraphs (b) to (f) of this Section 9.21 shall be applicable. In the case of any inconsistency, the provisions set out in paragraphs (b) to (f) of this Section 9.21 shall prevail. The provisions set out in paragraph (b) to (f) of this Section 9.21 shall not constitute a trust but a fiduciary relationship (*Treuhand*) within the meaning of German law.

(ii)     With respect to any German Collateral constituted by non–accessory (*nicht akzessorische*) security interests, the Collateral Agent shall hold, administer and, as the case may be, enforce or release that German Collateral in its own name, but as trustee (*Treuhänder*) for the account of the Secured Parties.

(iii)     With respect to any German Collateral constituted by accessory (*akzessorische*) security interests, the Collateral Agent shall administer and, as the

case may be, enforce or release that German Collateral in the name of and for and on behalf of the Secured Parties and shall hold, administer and, as the case may be, enforce or release that German Collateral in its own name on the basis of its own rights under Section 9.21.

(iv)    Each Secured Party (other than the Collateral Agent) hereby instructs and authorizes the Collateral Agent (with the right of sub-delegation) to act as its agent (*Stellvertreter*) and in particular (without limitation) to enter into and amend any documents evidencing German Collateral and to make and accept all declarations and take all actions it considers necessary or useful in connection with any German Collateral on behalf of that Secured Party. The Collateral Agent shall further be entitled to enforce or release any German Collateral, to perform any rights and obligations under any documents evidencing German Collateral and to execute new and different documents evidencing or relating to the German Collateral.

(v)    At the request of the Collateral Agent, each Secured Party shall provide the Collateral Agent with a separate written power of attorney (*Spezialvollmacht*) for the purposes of executing any agreements and documents or otherwise acting on their behalf. Each Secured Party hereby ratifies and approves all acts previously done by the Collateral Agent on such secured party's behalf.

(vi)    Each Secured Party which becomes a party to this Agreement ratifies and approves all acts and declarations previously done by the Collateral Agent on such Secured Party's behalf (including, for the avoidance of doubt the declarations made by the Collateral Agent as representative without power of attorney (*Vertreter ohne Vertretungsmacht*) in relation to the creation of any pledge (*Pfandrecht*) on behalf and for the benefit of each Secured Party as future pledgee or otherwise).

(vii)    Each Secured Party hereby releases the Collateral Agent from the restrictions imposed by Section 181 German Civil Code (*Bürgerliches Gesetzbuch*) and similar restrictions applicable to it pursuant to any other law, in each case to the extent legally possible to that Secured Party. A Secured Party which is barred by its constitutional documents or by-laws from granting such exemption shall notify the Collateral Agent accordingly.

(viii)    The Collateral Agent accepts its appointment as agent and administrator of the German Collateral on the terms and subject to the conditions set out in this Agreement and the Secured Parties, the Collateral Agent and all other parties to this Agreement agree that, in relation to any German Collateral, no Secured Party (other than the Collateral Agent in that capacity) shall exercise any independent power to enforce any German Collateral or take any other action in relation to the enforcement of the German Collateral, or make or receive any declarations in relation thereto.

(h)    Special Appointment of Collateral Agent (Norwegian Collateral)

(i)      For the purposes of any security provided under the Norwegian Collateral Documents (where "<u>Norwegian Collateral</u>" means any security interest created under the Norwegian Collateral Documents), each Secured Party hereby appoints the Collateral Agent to act as its agent under and in connection with the Norwegian Collateral on behalf of that Secured Party and the Collateral Agent declares that it holds the Norwegian Collateral on behalf of that Secured Party on the terms contained in the Norwegian Collateral Documents and this Agreement.

(ii)      Each Secured Party authorizes the Collateral Agent to perform the duties, obligations and responsibilities and to exercise the rights, powers, authorities and discretions specifically given to the Collateral Agent under or in connection with the Norwegian Collateral Documents together with any other incidental rights, powers, authorities and discretions.

(i)      Special Appointment of Collateral Agent (French Collateral Documents)

(i)      Each Secured Party:

(A)      irrevocably and unconditionally appoints GLAS Trust Corporation Limited (who accepts such appointment) to act as security agent (*agent des sûretés*) pursuant to articles 2488-6 to 2488-12 of the French Civil Code in respect of any French Collateral Document; and

(B)      irrevocably authorizes, empowers and directs the Collateral Agent acting in such capacity, without limitation and notwithstanding any other rights conferred upon the Collateral Agent under this Agreement to take, register, manage and enforce any Lien governed by the laws of France in its own name and for the benefit of (*au profit de*) each such Secured Party (the Collateral Agent in such capacity, the "<u>French Collateral Agent</u>").

(ii)      As a result of the appointment referred to in paragraph (i) above, the French Collateral Agent shall:

(A)      be the *titulaire* of the Lien created or purported to be created by the French Collateral Documents and the rights and assets held by the French Collateral Agent in the exercise of its functions as *agent des sûretés* shall form part of a dedicated estate being distinct from the French Collateral Agent's own assets; and

(B)      in respect of any Lien created or purported to be created by a French Collateral Document, it shall act in its own name for the benefit of the Secured Parties.

(iii)      Any change of French Collateral Agent appointed pursuant to this <u>Section 9.21</u> shall be made in accordance with article 2488-11 of the French Civil Code.

(iv)      Each Secured Party:

(A)      approves the French Collateral Documents creating or expressed to create Liens in its favour and irrevocably authorises, empowers and directs the French Collateral Agent to negotiate, execute and deliver for and on its behalf each such French Collateral Document (and any ancillary document in connection therewith), to perform the duties and to exercise the rights, powers, prerogatives and discretions that are specifically delegated to the French Collateral Agent or any Secured Party under or in connection with such French Collateral Documents, together with any other rights, powers and discretions which are incidental thereto and to give a good discharge for any moneys payable under such French Collateral Documents;

(B)      acknowledges that the French Collateral Agent has been appointed by it to constitute, register, manage and enforce all Liens created in its favour by any French Collateral Document, and agrees that the French Collateral Agent may exercise the rights and perform the obligations arising from its nomination in accordance with applicable law from time to time;

(C)      authorises the French Collateral Agent to take any steps necessary and collect all information necessary or, at the French Collateral Agent's discretion, desirable for the preparation of any such French Collateral Document, the perfection, the preservation and/or the enforcement of any Lien created in its favour by any such French Collateral Document;

(D)      to the extent it may have any interest therein, every other party, to the extent permitted by law, authorises the French Collateral Agent to execute on its own behalf and on behalf of each Secured Party and other party (where relevant) any release of Liens granted under the French Collateral Documents following the applicable Discharge of [Secured Obligations] (as such term is defined in the Pari Passu Intercreditor Agreement)[12] in accordance with the applicable Security Documents;

(E)      acknowledges and confirms that the French Collateral Agent is entitled to take any step to protect the rights and interests of each of the Secured Parties,

> *provided that* notwithstanding the provisions of article 2488-9 of the French Civil Code, the French Collateral Agent shall not be bound to make the filing of any proof of claim for the benefit of any Secured Party, unless otherwise agreed between the French Collateral Agent and that Secured Party;
>
> and more generally to take any action to protect the rights of each of the Secured Parties under or in connection with any

---

[12] NTD: definitions of "*Secured Obligations*" and "*Grantor*" to be confirmed.

Collateral created under any French Collateral Documents, in each case together with any other right, power, prerogative and discretion which are incidental thereto; and

(F)　　acknowledges that (i) the French Collateral Agent (acting in such capacity) shall not be liable on its own estate (*patrimoine propre*) for the payment of any *Soulte* that would be payable to an obligor as a result of the enforcement of Collateral created pursuant to a French Collateral Document and (ii) the payment of any sums in respect of a *Soulte* (if any) shall be borne by each other Secured Party in accordance with this Agreement, the Pari Passu Intercreditor Agreement or any French Collateral Document.

(v)　　Notwithstanding any contrary provision in this Agreement or any other Loan Document:

(A)　　the French Collateral Agent shall not hold the benefit of the Liens created pursuant to the French Collateral Documents on trust but as security agent (*agent des sûretés*);

(B)　　[no [Grantor] (as such term is defined in the Pari Passu Intercreditor Agreement) incorporated under the laws of France shall undertake to pay any claim pursuant to this Section 9.21 and the French Collateral Documents shall not secure any claim pursuant to this Section 9.21;

(C)　　any change of the French Collateral Agent appointed pursuant to this Article shall be made in accordance with the provisions of this Agreement (*remplacement conventionnel*) or article 2488-11 of the French Civil Code (*remplacement judiciaire*); and

(D)　　no appointment of any additional security agent or delegation of powers by the French Collateral Agent shall be made in respect of the French Collateral Documents for those rights and duties which benefit to or are imposed on the French Collateral Agent by operation of articles 2488-6 to 2488-12 of the French Civil Code.

(vi)　　Nothing in this paragraph (j) (*Special Appointment of Collateral Agent (French Collateral Documents)*) shall limit any other rights or obligations that the French Collateral Agent may have under this Agreement.

(vii)　　With respect to any French Collateral Document, any reference in this Agreement to the French Collateral Agent acting as agent shall be deemed to include a reference to the French Collateral Agent acting as *agent des sûretés* as referred to in this paragraph (j) (*Special Appointment of Collateral Agent (French Collateral Documents)*).

(viii)   In this paragraph (j) (*Special Appointment of Collateral Agent (French Collateral Documents)*), "Soulte" means, in relation to any enforcement of Lien governed by French law occurring by way of contractual or judicial foreclosure or appropriation (including pursuant to a *pacte commissoire* or any similar enforcement mechanism), the amount by which the value of the Collateral appropriated or foreclosed pursuant to that enforcement (as determined in accordance with the relevant Security Documents or any applicable law) exceeds the amount of the [Secured Obligations] secured by that Security Document (immediately prior to such enforcement) discharged as a result of such enforcement.

Section 9.22   Erroneous Payments.

(a)   Each Lender hereby agrees that (i) if any Agent notifies such Lender that such Agent has determined in its sole discretion that any funds received by such Lender from such Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Lender (whether or not known to such Lender) (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, a "Erroneous Payment") and demands the return of such Erroneous Payment (or a portion thereof), such Lender shall promptly, but in no event later than one Business Day thereafter, return to such Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender to the date such amount is repaid to such Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by such Agent in accordance with banking industry rules on interbank compensation from time to time in effect and (ii) to the extent permitted by applicable law, such Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives, any claim, counterclaim, defense or right of setoff or recoupment with respect to any demand, claim or counterclaim by such Agent for the return of any Erroneous Payments received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine. A notice of any Agent to any Lender under this clause (a) shall be conclusive, absent manifest error.

(b)   Without limiting immediately preceding clause (a), each Lender hereby further agrees that if it receives an Erroneous Payment from any Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by such Agent (or any of its Affiliates) with respect to such Erroneous Payment (an "Erroneous Payment Notice"), (y) that was not preceded or accompanied by an Erroneous Payment Notice, or (z) that such Lender otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), in each case, an error has been made (and that it is deemed to have knowledge of such error at the time of receipt of such Erroneous Payment) with respect to such Erroneous Payment, and to the extent permitted by applicable law, such Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by such Agent for the return of any Erroneous Payments received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine. Each Lender agrees that, in each such case, it shall promptly (and, in all events, within one Business Day of its knowledge (or

deemed knowledge) of such error) notify such Agent of such occurrence and, upon demand from such Agent, it shall promptly, but in all events no later than one Business Day thereafter, return to such Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender to the date such amount is repaid to such Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by such Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(c)     The Borrower and each other Loan Party hereby agrees that (x) in the event an Erroneous Payment (or portion thereof) is not recovered from any Lender that has received such Erroneous Payment (or portion thereof) for any reason, the Agents shall be subrogated to all the rights of such Lender with respect to such amount and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party; except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by such Agent from the Borrower or any other Loan Party for the purpose of making such Erroneous Payment.

(d)     Each party's obligations under this <u>Section 9.22</u> shall survive the resignation or replacement of the Agents, the termination of the Commitments or the repayment, satisfaction or discharge of all Loan Document Obligations (or any portion thereof).

Section 9.23   <u>Original Issue Discount</u>. THE TERM LOANS HAVE BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR U.S. FEDERAL INCOME TAX PURPOSES. THE ISSUE PRICE, AMOUNT OF ORIGINAL ISSUE DISCOUNT, ISSUE DATE AND YIELD TO MATURITY OF THE TERM LOANS MAY BE OBTAINED BY WRITING TO THE BORROWER AT ITS ADDRESS SPECIFIED HEREIN.

Section 9.24   <u>Amendment and Restatement; No Novation</u>. In order to facilitate this amendment and restatement and otherwise to effectuate the desires of the Borrower, the Agents and the Lenders:

(a)     The Borrower, the Administrative Agent, the Collateral Agent and the Lenders hereby agree that, on the Effective Date, the terms and provisions of the Prepetition Term Loan Agreement shall be and hereby are amended and restated in their entirety by the terms, conditions and provisions of this Agreement, and the terms and provisions of the Prepetition Term Loan Agreement, except as otherwise expressly provided herein, shall be superseded by this Agreement.

(b)     Notwithstanding this amendment and restatement of the Prepetition Term Loan Agreement, including anything in this Section 9.24, and of any related "Loan Documents" (as such term is defined in the Prepetition Term Loan Agreement and referred to herein, individually or collectively, as the "<u>Prior Loan Documents</u>"), (a) all Obligations (as defined in the Prepetition Term Loan Agreement) outstanding under the Prepetition Term Loan Agreement and other Prior Loan Documents (the "<u>Existing Obligations</u>") shall continue as Obligations hereunder to the extent not repaid on or before the Effective Date, (b) each of this Agreement and any other Loan Document (as defined herein) that is amended and restated in connection with this

Agreement is given as a substitution for, and not as a payment of, the indebtedness, liabilities and Existing Obligations of the Borrower and each Loan Party under the Prepetition Term Loan Agreement or any other Prior Loan Document and (c) neither the execution and delivery of such documents nor the consummation of any other transaction contemplated hereunder shall constitute a novation of the Prepetition Term Loan Agreement or of any of the other Prior Loan Documents or any obligations thereunder.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**[INVACARE HOLDING CORPORATION],**
as Holdings

By: _____
Name:
Title:

**INVACARE CORPORATION,**
as Borrower

By: _____
Name:
Title:

**CANTOR FITZGERALD SECURITIES,**
as Administrative Agent

By: _____
Name: _____
Title:

**GLAS TRUST CORPORATION LIMITED,** as Collateral Agent

By: _____
Name: _____
Title:   Authorized Signatory

**[_],** as a Lender

By:  _____
Name:  _____
Title:   Authorized Signatory

**Exhibit F**

**Form of Exit ABL Agreement**

Certain documents, or portions thereof, contained in this **Exhibit F** and the Plan Supplement remain subject to continued negotiations, review and revisions by the Debtors and the Consenting Stakeholders.  The respective rights of the Debtors and the Consenting Stakeholders are expressly reserved, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained therein at any time in accordance with the terms of the Plan, or by order of the Bankruptcy Court; *provided* that if any document in this Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the Confirmation Hearing, the Debtors will file a redline of such document with the Bankruptcy Court.  Each of the documents contained in the Plan Supplement or its amendments are subject to certain consent and approval rights to the extent provided in the Plan or Restructuring Support Agreement.





Kathleen P. Leneghan
Senior Vice President & Chief Financial Officer, Invacare Corporation
1 Invacare Way
Elyria, OH 44035-4190

Dear Ms. Leneghan:

Pursuant to recent conversations between WHITE OAK COMMERCIAL FINANCE, LLC ("*White Oak*") and INVACARE CORPORATION ("*Invacare*" or "*Borrower*"), we understand that Invacare is **seeking a senior secured credit facility** (the "*Facility*") for its North American and certain European subsidiaries. Based upon those preliminary conversations, this letter sets forth a general overview of the preliminary terms and conditions concerning the potential Facility.

This overview is not intended to be, and should not be construed as, a commitment to lend, nor should it be construed as an attempt to establish all of the terms and conditions relating to the Facility. It is intended only to serve as a guideline for certain terms and conditions and how the Facility might be structured, and it is not intended to preclude negotiations within the general scope of these terms and conditions. The provision of the Facility will be further subject to additional business and legal due diligence, approval of terms by Borrower and White Oak, and the negotiation, execution and delivery of all documentation evidencing or securing the Facility (collectively, the "*Loan Documents*").

| | |
|---|---|
| **Borrower:** | Invacare Corporation |
| **Guarantor(s):** | All existing and future material North American subsidiaries shall be Corporate Guarantors |
| **The Facility:** | Up to $40,000,000 senior secured revolving credit facility, including letters of credit, with a $10,000,000 minimum draw |
| **Agent and Lender:** | White Oak Global Advisors, LLC or one of its affiliated entities (the "Lender" and "Agent") |
| **Borrowing Base:** | The lesser of $40,000,000 or the following formula: <br><br> • Up to 90% of eligible North American A/R (subject to dilution of less than 3%) which are billed and collected in US Dollars or Canadian Dollars; *plus* <br> • WEPPA and Letter of Credit reserves <br><br> Eligible A/R includes all accounts receivable of the Borrower other than: (a) accounts not paid within 60 days past due date or 90 days past invoice date; (b) accounts containing credit terms greater than 100 days (up to 150 days for certain accounts subject to underwriting approval); (c) accounts subject to a 25% cross-age; (d) accounts of a customer with a concentration greater than 25% with exceptions up to 50% as mutually agreed; (e) contra accounts; (f) accounts subject to a prior security interest, with the exception for customary permitted encumbrances; (g) accounts consisting of finance charges; (h) progress and milestone billings; (i) bill and hold accounts; (j) customer deposits, vendor rebates, deferred revenue, advance billings; (k) foreign accounts not supported by credit insurance, guaranty or letters of credit; (l) intercompany accounts or accounts due from affiliated entities; (m) poor credit quality accounts; (n) accounts arising from COD or credit card sales; (o) accounts arising from consignment, sale or return, sale on approval or other conditional transactions; and (p) other accounts which in the reasonable discretion of the White Oak do not constitute acceptable collateral |

CONFIDENTIAL – NOT A COMMITMENT

|  | Note that eligible collateral will be subject to a satisfactory review of a borrowing base on a [weekly] basis. White Oak will have the right to determine additional eligibility criteria, establish and modify reserves and advance rates

For estimated pro forma 1/31/23 borrowing base, refer to Exhibit A |
|---|---|
| **Timeline:** | • 3/23 - High level review of intercreditor and term loan agreements<br>• 3/23 - Agreement of SOW and timelines for Field Examiner and QOE providers<br>• 3/31 - Agreement on IOI terms<br>• 4/3 - Screen with IC<br>• 4/4 – QOE and Field Exam Kickoff<br>• 4/7 – Legal Kick Off<br>• 4/21 – Lender approvals<br>• 4/28 (or best efforts) – Funding |
| **Term:** | 36 months |
| **Collateral:** | First priority security interest on all working capital assets of the Borrower and the Corporate Guarantors, now owned or acquired in the future and subject to inter-creditor agreement |
| **Invoice Discount Facility:** | In addition to the Facility, White Oak Commercial Europe Limited ("WOCFE") is interested in providing up to a £5MM Selective Invoice Discounting Facility on eligible receivables in the United Kingdom and the Netherlands, with an advance rate up to 90% of eligible receivables. The Invoice Discount Facility will be pursued post-closing of the North American ABL. |
| **Other Debt:** | Terms and conditions of the Borrower's other indebtedness, including the Term Loan, Convertible Notes and intercompany claims, shall be satisfactory to the Lender in all material respects (including acceptable conditions for any amortization and excess cash flow sweeps), and subject to a debt and lien subordination agreement acceptable to White Oak |
| **Interest:** | 30-day SOFR rate plus 5.0%, with a SOFR floor of 2.0%, calculated on the greater of (i) actual borrowings or (ii) $10,000,000 |
| **Transaction Fees:** |  |
| **Prepayment of the Facilities:** | In connection with any permanent reduction of commitments under the Facility, the Borrowers would be required to pay: (i) 18 month Yield Maintenance, only if the permanent reduction occurs within 18 months of closing and (ii) early termination fees equal to:

Call Premium in Year One = 3.0%<br>Call Premium in Year Two = 2.0%<br>Call Premium in Year Three = 1.0%

Yield Maintenance Fee equal to the total amount of Interest and Transactions Fees due to Lender for up to 18 months from Closing.  Interest and Transaction Fees will |

CONFIDENTIAL – NOT A COMMITMENT

| | |
|---|---|
| | be based on the higher (i) $10,000,000 or (ii) actual borrowings on the date of repayment. |
| **Default Interest:** | 2.0% per annum over the rate of interest otherwise applicable |
| **Use of Proceeds:** | Refinance existing debt and transaction expenses. For estimated sources and uses, refer to Exhibit A |
| **Collateral and Financial Reporting:** | <ul><li>[Weekly] borrowing base certificate with collateral reports (or with each borrowing if more frequent)</li><li>Month-end A/R aging, A/P aging, and inventory reports within 20 days of each month-end</li><li>Monthly internally-prepared financial statements within 20 days of each month-end</li><li>Annual audited consolidated financial statements within 120 days from fiscal year end</li><li>Initial draft projections, by region, for the following year provided within 30 days prior to fiscal year-end with final board approved annual operating plan submitted by month-end February.</li><li>Same monthly reporting as above for EMEA and APAC except for monthly borrowing base and agings.</li></ul> |
| **Financial and Other Covenants, Representations and Warranties:** | For Borrower: customary for facilities of this type including, but not limited to: (i) Minimum unrestricted cash of $4,000,000 for North America, (ii) springing quarterly fixed charge coverage ratio greater than 1.25x including repatriation of cash from EMEA and ASPAC to North America (incl. Corporate) triggered if excess availability does not exceed 15% of the lesser of (i) gross availability or (ii) the Commitment amount with a floor of ▮▮▮▮▮<br><br>For the avoidance of doubt, the Highbridge Excess Cash Flow sweep ("ECF") would be included in the aforementioned springing FCCR calculations. |
| **Borrower Cash Management:** | White Oak would have dominion of A/R collections through a lockbox and collection account. Credit will be given for collections two business days after receipt of cleared funds. Deposit Account Control Agreements for collection and lockbox accounts only |
| **Collateral Exams/Appraisals:** | The Lender will require a satisfactory field exam of the Borrower prior to loan approval, performed by 3rd parties acceptable to the Lender (Durkin Group is an approved 3rd party). Subsequent to closing, the Lender will conduct at least 2 collateral field exams per year at Borrower's cost and performed by a 3rd party provider acceptable to the Lender. No limit on reimbursement in the event of default. |
| **Conditions Precedent:** | Customary for transactions of this type as determined by the Lender, together with such others as may be required by the Lender following completion of its due diligence including:<br><br><ul><li>A&M Consultant or other agreed to third-party to confirm that free cash flows and projected repatriations of cash from EMEA outlined in Post-Emergence Liquidity Analysis dated February 3rd, 2023 ("PELA") are reasonable.</li><li>Legal review and confirmation that there are no restrictions for EMEA to make forecasted Repatriations to North America under the PELA</li></ul> |

CONFIDENTIAL – NOT A COMMITMENT

| | |
|---|---|
| | • Minimum $30MM of Global (EMEA, NA and APAC) cash upon emergence from Chapter 11.<br>• Confirm 2023 FY EMEA EBITDA of $39.9MM within variance of 15%. EBITDA calculation to be agreed during diligence. For the avoidance of doubt there is no minimum EMEA EBITDA covenant proposed.<br>• Satisfactory background and OFAC checks on key members of management, owners > 25% and borrowers/guarantors<br>• Completion of credit and underwriting due diligence satisfactory to White Oak, including a field examination, site visit, receivable verification, insurance review, customers and vendor calls, auditors, and financial projections, etc. Underwrite to include diligence on financial projections of European business.<br>• Completion of legal documentation satisfactory to White Oak and its counsel, including, but not limited to, subordination and intercreditor agreements; collateral access agreements for all off-site collateral; opinion(s) of counsel<br>• No material adverse change shall have occurred to either the Borrower, any Guarantor or the Collateral<br>• Evidence of acceptable insurance coverage on the Collateral<br>• Evidence that White Oak has a perfected, first-priority security interest in the Collateral<br>• Approval by White Oak's investment committee<br>• Entry of a final, non-appealable order in form and substance acceptable to White Oak approving a plan of reorganization and related exit financing documentation, in each case, acceptable to White Oak, and the occurrence of the plan effective date under such plan of reorganization<br>• Receipt of the Borrower of not less than $70 million of cash or in-kind proceeds in respect of the rights offering contemplated by the Borrower's plan of reorganization |
| **Other Fees and Expenses:** | All legal and due diligence expenses incurred by White Oak would be paid by the Borrower capped at an amount mutually acceptable to White Oak and the Company. |
| **Due Diligence Deposit:** | Initial Deposit of $250k to cover EMEA financial forecast review, Field Exam and Legal. Deposit required to be topped up based on expenses incurred prior to Closing. |
| **Exclusivity** | 30 days from the execution of this Letter (or until White Oak declines to proceed with financing described in this Letter) |

Prior to taking any additional steps with respect to the proposed Facility, White Oak requires a refundable expense deposit of $250,000 (the "Due Diligence Deposit"), which White Oak will apply to due diligence costs, fees and out-of-pocket expenses (including legal costs) incurred by White Oak. White Oak may request additional due diligence deposits as the transaction progresses and as due diligence costs, fees and out-of-pocket expenses are incurred. If the proposed Facility is not consummated for any reason other than breach of this agreement by Borrower, the balance of the Due Diligence Deposit, net of any expenses incurred to the date of termination, will be returned to the Borrower (or at its direction). If the proposed Facility closes and a balance remains, those funds will be applied to the revolver after reconciliation. Please wire the Deposit using the instructions provided below.

4

CONFIDENTIAL – NOT A COMMITMENT

Notwithstanding anything to the contrary contained in any prior agreement (written or oral) between White Oak and the Borrower or any representative of the Borrower, the Borrower acknowledges that if White Oak determines that it will be conducting its field examination remotely, White Oak will be relying upon the accuracy and completeness of the information provided by the Borrower or its representatives. Such information may be provided orally, by hard copy or by the Borrower submitting computer generated files to White Oak or a third party service company acting on behalf of White Oak. The Borrower will use reasonable efforts to ensure the accuracy and completeness of the information provided to White Oak for the purpose of conducting its credit analysis of the Borrower, which analysis may include a remote field examination. For the avoidance of doubt, the only representations and warranties made by Borrower and its affiliates shall be those as set forth in the definitive agreements related to the senior secured credit facility.

This letter expires at noon ET on April 6, 2023 unless accepted by Borrower prior to such time, and shall be governed by and construed in accordance with the internal laws of the State of New York.

Borrower agrees for a period of 30 days from the date of the execution of this letter, to work exclusively with White Oak with respect to any senior secured credit facility for the Borrower's North American business, unless White Oak informs Borrower in writing that it no longer wishes to continue to engage in negotiations concerning the Facility.

The contents hereof are strictly confidential and are only to be shared internally with management of Borrower and its legal counsel and financial advisors, but not with any other third parties (including, but not limited to, any other potential debt or equity investors in Borrower) and may not be relied upon by any third party.  Borrower may not assign this letter. Any disclosure or use of the contents hereof in negotiations with other debt or equity investors is strictly prohibited.  **This document does not reflect a commitment to lend or borrow by any party.**

Please do not hesitate to contact us if questions arise.

CONFIDENTIAL – **NOT A COMMITMENT**

Very truly yours,

**WHITE OAK ABL, LLC**

By: _Thomas K. Otte_

Name: ~~Thomas~~ Thomas Otte

Title: Manager

**WHITE OAK COMMERCIAL FINANCE, LLC**

By: _____

Name: Robert Grbic

Title: President & CEO

ACKNOWLEDGED AND AGREED:

**INVACARE CORPORATION**

By: _____

Name: _____

Title: SVP + CFO

Wiring Instructions

JPM Morgan Chase
New York, NY 10017
Account #623002786
Routing # 021000021
SWIFT Code: CHASUS33
For Credit To: White Oak ABL, LLC
Invacare Corporation Due Diligence Deposit

6

CONFIDENTIAL – NOT A COMMITMENT

## Exhibit A – Estimated Pro Forma Borrowing Base and Sources & Uses

### Estimated Sources & Uses: As of 4/10/23E ($ in USD MMs)

|  | $ | % |
|---|---|---|
| **Availability** | $24.3 | 26% |
| Preferred Equity Rights Offering Amount | 70.0 | 74% |
| Cash on B/S - North America | 0.4 | 0% |
| **Total Sources** | **$94.7** | **100%** |
| PNC Debt | $14.0 | 15% |
| DIP Term Loan | 40.5 | 43% |
| Emergence Fees / Costs | 21.0 | 22% |
| Cash to B/S - North America | 4.9 | 5% |
| Excess Availability | 14.3 | 15% |
| **Total Uses** | **$94.7** | **100%** |

### ESTIMATED PRO FORMA BORROWING BASE: 4/30/23 ($ in USD MMs)

|  | PNC | +/- | White Oak |
|---|---|---|---|
| **Gross A/R - North America** | $47.0 | - | $47.0 |
| 90 Days Past Invoice Date | $1.8 | - | $1.8 |
| Cross Aged | 1.1 | - | 1.1 |
| **Aged Credits** | 0.6 | - | 0.6 |
| Contra Analysis | 0.0 | - | 0.0 |
| Concentration Limits | 0.0 | - | 0.0 |
| **Affiliates** | 0.6 | - | 0.6 |
| Government | 1.6 | (1.6) | - |
| International | 0.2 | - | 0.2 |
| Discounts | 7.2 | - | 7.2 |
| Cash / COD / CIA | 0.0 | - | 0.0 |
| Finance Charges | 0.1 | - | 0.1 |
| Rebates Due | 2.2 | - | 2.2 |
| **Returns and Allowances** | 0.7 | - | 0.7 |
| Additional Past due for terms> 90 | 0.0 | - | 0.0 |
| Additional Past due for terms> 120 | 0.0 | - | 0.0 |
| Unissued Credits | 0.0 | - | 0.0 |
| **Debit Memos** | 0.0 | - | 0.0 |
| **Tooling Bills** | 0.0 | - | 0.0 |
| Unapplied Cash | 0.0 | - | 0.0 |
| Deferred Revenue | 0.0 | - | 0.0 |
| Warranties Contra | 1.5 | - | 1.5 |
| Other | 0.0 | - | 0.0 |
| Other | 0.0 | - | 0.0 |
| **Total Ineligibles** | $17.5 | ($1.6) | $15.9 |
| **Eligible A/R** | $29.5 | ($1.6) | $31.1 |
| **Advance Rate** | 85.0% | 5.0% | 90.0% |
| **A/R Availability - North America** | $25.1 | $2.9 | $28.0 |
| Gross Raw Material Inventory - North America | $21.2 | - | $21.2 |
| Ineligibles | (0.7) | - | (0.7) |
| **Eligible Inventory** | 20.5 | - | 20.5 |
| NOLVS | 3.7% | - | 3.7% |
| NOLVS | 0.8 | - | 0.8 |
| **Advance Rate** | 0.0% | - | 0.0% |
| **Raw Material Inventory Availability - North America** | $0.0 | - | $0.0 |
| Gross Finished Goods Inventory - North America | $22.8 | - | $22.8 |
| Ineligibles | (16.4) | - | (16.4) |
| **Eligible Inventory** | 6.4 | - | 6.4 |
| NOLVS | 26.2% | - | 26.2% |
| NOLVS | 1.7 | - | 1.7 |
| **Advance Rate** | 0.0% | - | 0.0% |
| **Finished Goods Inventory Availability - North America** | $0.0 | - | $0.0 |
| **Total Availability, Before Reserves** | $25.1 | $2.9 | $28.0 |
| Letter of Credit Reserve | | (3.4) | ($3.4) |
| Availability Block | (4.0) | 4.0 | - |
| WEPPA Reserve | (0.3) | - | (0.3) |
| **Total Availability, After Reserves** | $20.8 | $3.5 | $24.3 |
| Suppressed Availability from Line Cap | (3.4) | 3.4 | - |
| **Total Availability, After Line Cap** | $17.4 | $6.9 | $24.3 |
| Line Cap | $17.4 | | $40.0 |
| **Total Debt** | $14.0 | ($4.0) | $10.0 |
| **Excess Availability** | $3.4 | $10.9 | $14.3 |

7

**Exhibit G**

**Form of Exit Secured Convertible Notes Indenture**

Certain documents, or portions thereof, contained in this **Exhibit G** and the Plan Supplement remain subject to continued negotiations, review and revisions by the Debtors and the Consenting Stakeholders.  The respective rights of the Debtors and the Consenting Stakeholders are expressly reserved, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained therein at any time in accordance with the terms of the Plan, or by order of the Bankruptcy Court; *provided* that if any document in this Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the Confirmation Hearing, the Debtors will file a redline of such document with the Bankruptcy Court.  Each of the documents contained in the Plan Supplement or its amendments are subject to certain consent and approval rights to the extent provided in the Plan or Restructuring Support Agreement.

*Draft 04.17.2023*

INVACARE HOLDINGS CORPORATION

AND

THE NOTES GUARANTORS LISTED ON THE SIGNATURE PAGES HERETO

AND

GLAS TRUST COMPANY LLC,

as Trustee and Notes Collateral Agent

INDENTURE[1]

Dated as of [_____], 2023

7.50% Convertible Senior Secured Notes due [2028], Tranche [I][II]

---

[1]Form of Indenture to be broken-out into two versions corresponding to each tranche of the existing notes.

# TABLE OF CONTENTS

PAGE

## ARTICLE 1
### DEFINITIONS

| | | |
|---|---|---|
| Section 1.01. | Definitions | 7 |
| Section 1.02. | References to Interest | 35 |
| Section 1.03. | Terms Generally | 35 |
| Section 1.04. | Accounting Terms; GAAP | 35 |
| Section 1.05. | Currency Translation; Rates | 35 |
| Section 1.06. | Certain Calculations and Tests | 36 |
| Section 1.07. | Divisions | 36 |
| Section 1.08. | Luxembourg Terms | 36 |
| Section 1.09. | Quebec Matters | 37 |
| Section 1.10. | French Terms | 37 |
| Section 1.11. | Australian Matters | 38 |

## ARTICLE 2
### ISSUE, DESCRIPTION, EXECUTION, REGISTRATION AND EXCHANGE OF NOTES

| | | |
|---|---|---|
| Section 2.01. | Designation and Amount | 38 |
| Section 2.02. | Form of Notes | 38 |
| Section 2.03. | Date and Denomination of Notes; Payments of Interest and Defaulted Amounts | 39 |
| Section 2.04. | Execution, Authentication and Delivery of Notes | 40 |
| Section 2.05. | Exchange and Registration of Transfer of Notes; Restrictions on Transfer; Depositary | 40 |
| Section 2.06. | Mutilated, Destroyed, Lost or Stolen Notes | 45 |
| Section 2.07. | Temporary Notes | 46 |
| Section 2.08. | Cancellation of Notes Paid, Converted, Etc. | 47 |
| Section 2.09. | CUSIP Numbers | 47 |
| Section 2.10. | Repurchases | 47 |

## ARTICLE 3
### SATISFACTION AND DISCHARGE

| | | |
|---|---|---|
| Section 3.01. | Satisfaction and Discharge | 47 |

## ARTICLE 4
### PARTICULAR COVENANTS OF THE COMPANY

| | | |
|---|---|---|
| Section 4.01. | Payment of Principal and Interest | 48 |
| Section 4.02. | Maintenance of Office or Agency | 48 |
| Section 4.03. | Appointments to Fill Vacancies in Trustee's Office | 49 |
| Section 4.04. | Provisions as to Paying Agent | 49 |
| Section 4.05. | Existence | 50 |
| Section 4.06. | Rule 144A Information Requirement; Reports; and Additional Interest | 50 |
| Section 4.07. | Stay, Extension and Usury Laws | 51 |
| Section 4.08. | Compliance Certificate; Statements as to Defaults | 52 |
| Section 4.09. | Qualifying Disposition | 52 |
| Section 4.10. | Indebtedness; Certain Equity Securities | 52 |
| Section 4.11. | Liens | 55 |

Section 4.12.    Fundamental Changes ..................................................................................58
Section 4.13.    Investments, Loans, Advances, Guarantees and Acquisitions ....................59
Section 4.14.    Asset Sales ..................................................................................................62
Section 4.15.    Intermediate Holdco Covenant ....................................................................64
Section 4.16.    Negative Pledge ..........................................................................................65
Section 4.17.    Restricted Payments; Certain Payments of Indebtedness ...........................66
Section 4.18.    Transactions with Affiliates ........................................................................69
Section 4.19.    Liquidity .....................................................................................................70
Section 4.20.    Change in Nature of Business .....................................................................70
Section 4.21.    Accounting Changes ...................................................................................71
Section 4.22.    Amendments or Waivers of Organizational Documents ..............................71
Section 4.23.    Intellectual Property ...................................................................................71
Section 4.24.    Additional Note Guarantees ........................................................................71
Section 4.25.    After-Acquired Property ..............................................................................71
Section 4.26.    No Impairment of the Security Interests .....................................................72
Section 4.27.    No-flowback into Switzerland .....................................................................72
Section 4.28.    Additional Limitations on Certain Investments ..........................................72
Section 4.29.    Limitations on Amendments ........................................................................72
Section 4.30.    Cash Management and Collections ..............................................................73
Section 4.31.    [Reserved] ...................................................................................................73
Section 4.32.    Limitations on the German Group ...............................................................73
Section 4.33.    Danish Collateral ........................................................................................73
Section 4.34.    Company Covenant ......................................................................................73
Section 4.35.    New Intermediate Holdings Covenant .........................................................74


ARTICLE 5
LISTS OF HOLDERS AND REPORTS BY THE COMPANY AND THE TRUSTEE


Section 5.01.    Lists of Holders ..........................................................................................75
Section 5.02.    Preservation and Disclosure of Lists ...........................................................75


ARTICLE 6
DEFAULTS AND REMEDIES


Section 6.01.    Events of Default ........................................................................................75
Section 6.02.    Acceleration; Rescission and Annulment .....................................................77
Section 6.03.    Additional Interest ......................................................................................77
Section 6.04.    Payments of Notes on Default; Suit Therefor ..............................................78
Section 6.05.    Application of Monies Collected by Trustee ................................................79
Section 6.06.    Proceedings by Holders ...............................................................................80
Section 6.07.    Proceedings by Trustee ...............................................................................81
Section 6.08.    Remedies Cumulative and Continuing ........................................................81
Section 6.09.    Direction of Proceedings and Waiver of Defaults by Majority of Holders ....81
Section 6.10.    Notice of Defaults .......................................................................................81
Section 6.11.    Undertaking to Pay Costs............................................................................81


ARTICLE 7
CONCERNING THE TRUSTEE


Section 7.01.    Duties and Responsibilities of Trustee ........................................................82
Section 7.02.    Reliance on Documents, Opinions, Etc .......................................................83
Section 7.03.    No Responsibility for Recitals, Etc. ............................................................85
Section 7.04.    Trustee, Paying Agents, Conversion Agents or Note Registrar May Own Notes ....85
Section 7.05.    Monies and Common Shares to Be Held in Trust ........................................85

Section 7.06.   Compensation and Expenses of Trustee ...................................................85
Section 7.07.   Officer's Certificate as Evidence .......................................................86
Section 7.08.   Eligibility of Trustee ..................................................................86
Section 7.09.   Resignation or Removal of Trustee .......................................................86
Section 7.10.   Acceptance by Successor Trustee .........................................................87
Section 7.11.   Succession by Merger, Etc ...............................................................87
Section 7.12.   Trustee's Application for Instructions from the Company ..................................88
Section 7.13.   Collateral Documents; Intercreditor Agreements ..........................................88

ARTICLE 8

CONCERNING THE HOLDERS

Section 8.01.   Action by Holders .......................................................................88
Section 8.02.   Proof of Execution by Holders ...........................................................89
Section 8.03.   Who Are Deemed Absolute Owners ..........................................................89
Section 8.04.   Company-Owned Notes Disregarded .........................................................89
Section 8.05.   Revocation of Consents; Future Holders Bound ............................................89

ARTICLE 9

HOLDERS' MEETINGS

Section 9.01.   Purpose of Meetings .....................................................................90
Section 9.02.   Call of Meetings by Trustee .............................................................90
Section 9.03.   Call of Meetings by Company or Holders ..................................................90
Section 9.04.   Qualifications for Voting ...............................................................90
Section 9.05.   Regulations .............................................................................91
Section 9.06.   Voting ..................................................................................91
Section 9.07.   No Delay of Rights by Meeting ...........................................................91

ARTICLE 10

SUPPLEMENTAL INDENTURES

Section 10.01.   Supplemental Indentures Without Consent of Holders .....................................92
Section 10.02.   Supplemental Indentures with Consent of Holders ........................................93
Section 10.03.   Effect of Supplemental Indentures ......................................................94
Section 10.04.   Notation on Notes ......................................................................94
Section 10.05.   Evidence of Compliance of Supplemental Indenture to Be Furnished Trustee ...............94

ARTICLE 11

CONSOLIDATION, MERGER, SALE, CONVEYANCE AND LEASE

Section 11.01.   Company May Consolidate, Etc. on Certain Terms .........................................94
Section 11.02.   [Reserved] .............................................................................95
Section 11.03.   Note Guarantors May Consolidate, Etc. on Certain Terms .................................95
Section 11.04.   Opinion of Counsel to Be Given to Trustee ..............................................95

ARTICLE 12

IMMUNITY OF INCORPORATORS, SHAREHOLDERS, OFFICERS AND DIRECTORS

Section 12.01.   Indenture and Notes Solely Corporate Obligations .......................................95

## ARTICLE 13
### NOTE GUARANTEES

Section 13.01.    Note Guarantees................................................................................96
Section 13.02.    Execution and Delivery of Note Guarantees ......................................97
Section 13.03.    Limitation on Note Guarantor Liability ..............................................97
Section 13.04.    Merger and Consolidation of Note Guarantors....................................99
Section 13.05.    Release ..............................................................................................99

## ARTICLE 14
### CONVERSION OF NOTES

Section 14.01.    Conversion Privilege..........................................................................99
Section 14.02.    Conversion Procedure; Settlement Upon Conversion ......................100
Section 14.03.    [Reserved].......................................................................................101
Section 14.04.    Increased Conversion Rate Applicable to Certain Notes Surrendered in Connection with Make-Whole Fundamental Changes..............................................101
Section 14.05.    Participating Distributions; Certain Adjustments ............................103
Section 14.06.    [Reserved].......................................................................................106
Section 14.07.    Shares to Be Fully Paid....................................................................106
Section 14.08.    Effect of Recapitalizations, Reclassifications and Changes of the Common Shares ......106
Section 14.09.    Certain Covenants ...........................................................................107
Section 14.10.    Responsibility of Trustee .................................................................107
Section 14.11.    Notice to Holders Prior to Certain Actions.......................................108
Section 14.12.    Shareholder Rights Plans .................................................................108
Section 14.13.    Limits upon Issuance of Common Shares upon Conversion .............108

## ARTICLE 15
### REPURCHASE OF NOTES AT OPTION OF HOLDERS

Section 15.01.    [Intentionally Omitted] ...................................................................109
Section 15.02.    Repurchase at Option of Holders Upon a Fundamental Change ......110
Section 15.03.    Withdrawal of Fundamental Change Repurchase Notice ...................112
Section 15.04.    Deposit of Fundamental Change Repurchase Price...........................112
Section 15.05.    Covenant to Comply with Applicable Laws Upon Repurchase of Notes......................113

## ARTICLE 16
### NO OPTIONAL REDEMPTION

Section 16.01.    No Optional Redemption ..................................................................113

## ARTICLE 17
### MISCELLANEOUS PROVISIONS

Section 17.01.    Provisions Binding on Company's Successors....................................113
Section 17.02.    Official Acts by Successor Corporation .............................................113
Section 17.03.    Addresses for Notices, Etc ...............................................................113
Section 17.04.    Governing Law; Jurisdiction.............................................................114
Section 17.05.    Evidence of Compliance with Conditions Precedent; Certificates and Opinions of Counsel to Trustee ......................................................................114
Section 17.06.    Legal Holidays .................................................................................115
Section 17.07.    Agent for Service of Process.............................................................115
Section 17.08.    Benefits of Indenture........................................................................115

#96781386v10

Section 17.09.    Table of Contents, Headings, Etc ........................................................115
Section 17.10.    Authenticating Agent ......................................................................115
Section 17.11.    Execution in Counterparts................................................................116
Section 17.12.    Severability ..................................................................................117
Section 17.13.    Waiver of Jury Trial ......................................................................117
Section 17.14.    Force Majeure ..............................................................................117
Section 17.15.    Calculations..................................................................................117
Section 17.16.    U.S.A. PATRIOT Act ....................................................................117
Section 17.17.    Withholding Taxes..........................................................................117
Section 17.18.    Intercreditor Agreements ................................................................118
Section 17.19.    Parallel Debt. Parallel Debt owed to the Notes Collateral Agent ...................118

ARTICLE 18

COLLATERAL

Section 18.01.    Collateral Documents........................................................................120
Section 18.02.    Release of Collateral ......................................................................121
Section 18.03.    Suits to Protect the Collateral ..........................................................122
Section 18.04.    Authorization of Receipt of Funds by the Trustee Under the Collateral Documents ......123
Section 18.05.    Purchaser Protected..........................................................................123
Section 18.06.    Powers Exercisable by Receiver or Trustee............................................123
Section 18.07.    Notes Collateral Agent......................................................................123

**ANNEX**

Annex A        Limitation on Note Guarantor Liability – Germany
Annex B        Limitation on Note Guarantor Liability – Switzerland
Annex C        Limitation on Note Guarantor Liability – France
Annex D        Limitation on Note Guarantor Liability – Luxembourg
Annex E        Limitation on Note Guarantor Liability – England and Wales
Annex F        Agreed Security Principles
Annex G        Collateral Documents

**EXHIBITS**

Exhibit A        Form of Note                                                           A-1
Exhibit B        Form of Free Transferability Certificate                               B-1
Exhibit C        Form of Guarantee                                                      C-1
Exhibit D        Form of Supplemental Indenture to be Delivered by Subsequent Note Guarantors   D-1

#96781386v10

INDENTURE dated as of [_____], 2023 between INVACARE HOLDINGS CORPORATION, a Delaware corporation, as issuer (the "**Company**," as more fully set forth in Section 1.01), the Note Guarantors listed on the signature pages hereto, and GLAS TRUST COMPANY LLC, a limited liability company organized and existing under the laws of the State of New Hampshire, not in its individual capacity but solely as Trustee (the "**Trustee**," as more fully set forth in Section 1.01) and Notes Collateral Agent (the "**Notes Collateral Agent**").

In order to declare the terms and conditions upon which the Company's 7.50% Convertible Senior Secured Notes due [2028], Tranche [I][II] (the "**Notes**") are, and are to be, authenticated, issued and delivered, and to declare the terms and conditions upon which the related Note Guarantees (as defined below) are to be issued and delivered (and in consideration of the premises and of the purchase and acceptance of the Notes and the Note Guarantees by the Holders thereof), in each case pursuant to, and in accordance with, the Joint Chapter 11 Plan of Invacare Corporation and its Debtor Affiliates dated as of February 14, 2023, as confirmed by the United States Bankruptcy Court on [_____], 2023 (the "**Plan**"), the Company and each Note Guarantor covenants and agrees with the Trustee and Notes Collateral Agent for the equal and proportionate benefit of the respective Holders from time to time of the Notes (except as otherwise provided below), as follows:

ARTICLE 1
DEFINITIONS

Section 1.01. *Definitions*. The terms defined in this **Section 1.01** (except as herein otherwise expressly provided or unless the context otherwise requires) for all purposes of this Indenture and of any indenture supplemental hereto shall have the respective meanings specified in this **Section 1.01**. The words "herein," "hereof," "hereunder" and words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision. The terms defined in this Article include the plural as well as the singular.

["**ABL North America Agent**" means the Agent, under and as defined in, the ABL North America Credit Agreement, or any successor agent under the ABL North America Credit Documents.

"**ABL North America Credit Agreement**" means the [Revolving Credit and Security Agreement], dated as of [_], 2023, by and among Invacare Corporation, as a borrower, [_], as lender and agent thereunder, the other Borrowers (as defined therein) from time to time thereunder, the other Guarantors (as defined therein) from time to time thereunder, and the other agents and lenders from time to time party thereto, as the same may be amended, restated, modified, supplemented, extended, renewed, refunded, replaced or refinanced from time to time; *provided* that it is agreed that a Permitted ABL EMEA Credit Facility may be documented via an amendment to the ABL North America Credit Agreement to also include a Permitted ABL EMEA Credit Facility.

"**ABL North America Credit Documents**" means the ABL North America Credit Agreement and the ["Other Documents"] as defined in the ABL North America Credit Agreement.

"**ABL North America Intercreditor Agreement**" means the Intercreditor Agreement, dated as of [ ], 2023, by and among the [Collateral Agent] (as defined therein), the [ABL Agent], and each additional representative party thereto from time to time and as acknowledged by certain of the Loan Parties, as amended, restated or otherwise modified from time to time in accordance with the terms thereof.

"**ABL North America Obligations**" means ["Revolving Obligations"] as defined in the ABL North America Intercreditor Agreement.

"**ABL Priority Collateral**" means ["Revolving Credit Priority Collateral"] as defined in the ABL North America Intercreditor Agreement.]

"**Additional Interest**" means all amounts, if any, payable pursuant to Section 4.06(d), Section 4.06(e) and Section 6.03, as applicable.

"**Additional Shares**" shall have the meaning specified in Section 14.04(b).

"**Affiliate**" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For the purposes of this definition, "control," when used with respect to any specified Person means the power to direct or cause the direction of the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.  Notwithstanding anything to the contrary herein, the determination of whether one Person is an "Affiliate" of another Person for purposes of this Indenture shall be made based on the facts at the time such determination is made or required to be made, as the case may be, hereunder.

"**After-Acquired Property**" means property (other than Excluded Assets) that is intended to be Collateral acquired by the Company or a Note Guarantor (including property of a Person that becomes a new Note Guarantor after the Issue Date) that is not automatically subject to a perfected security interest under the Collateral Documents.

"**Agreed Security Principles**" has the meaning set forth on Annex F.

"**Alber**" means Alber GmbH, a limited liability company (*Gesellschaft mit beschränkter Haftung*), incorporated and existing under the laws of the Federal Republic of Germany, registered in the commercial register (*Handelsregister*) of the local court (*Amtsgericht*) of Stuttgart under HRB 401393, with registered seat in Albstadt, Germany.

"**Auditor's Determination**" shall have the meaning specified in Annex A.

"**Australia**" shall mean the Commonwealth of Australia (and includes, where the context requires, any State or Territory of Australia).

"**Australian Collateral Agreements**" means the collateral agreements listed in Annex G as the Australian Collateral Agreements.

"**Australian Collateral Documents**" means each of the Australian Collateral Agreements, and each other security agreement, pledge, debenture, hypothec, mortgage, consent or other instrument or document, as applicable, executed and delivered by any Australian Note Party in connection with this Indenture and the Agreed Security Principles to secure the applicable Notes Obligations.

"**Australian Corporations Act**" means the *Corporations Act 2001* (Cth) (Australia).

"**Australian Controller**" has the meaning given to the term "controller", "administrator" or "deed administrator" in the Australian Corporations Act.

"**Australian Note Party**" means a Note Party incorporated or otherwise organized under the laws of Australia and its respective successors and assigns.

"**Australian PPSA**" means the *Personal Property Securities Act 2009* (Cth) of Australia and includes any regulations made thereunder.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"**Bankruptcy Law**" means any of Title 11 of the United States Code, the *Bankruptcy and Insolvency Act* (Canada), the *Companies' Creditors Arrangement Act* (Canada), the *Winding-Up and Restructuring Act* (Canada), and any other applicable insolvency, corporate arrangement or restructuring or other similar law of any jurisdiction including any law of any jurisdiction permitting a debtor to obtain a stay or a compromise of the claims of its creditors against it.

"**Beneficial Owner**" shall have the meaning specified in Section 14.13.

"**Beneficial Ownership Limit**" shall have the meaning specified in Section 14.13.

"**Board of Directors**" means, with respect to any Person, (a) in the case of any corporation, the board of directors of such Person or any committee thereof duly authorized to act on behalf of such board, (b) in the case of any limited liability company, the board of managers, board of directors, manager or managing member of such Person or the functional equivalent of the foregoing, (c) in the case of any partnership, the board of directors, board of managers, manager or managing member of a general partner of such Person or the functional equivalent of the foregoing and (d) in any other case, the functional equivalent of the foregoing.

"**Board Resolution**" means a copy of a resolution certified by the Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors, and to be in full force and effect on the date of such certification, and delivered to the Trustee.

"**Business Day**" means, with respect to any Note, any day other than a Saturday, a Sunday or a day on which the Federal Reserve Bank of New York is authorized or required by law or executive order to close or be closed.

"**Canadian Collateral Agreement**" means the collateral agreement listed in Annex G as the Canadian Collateral Agreement.

"**Canadian Collateral Documents**" means the Canadian Collateral Agreement, and each other security agreement, pledge, debenture, hypothec, mortgage, consent or other instrument or document, as applicable, governed by Canadian law in connection with this Indenture to secure the applicable Notes Obligations.

"**Canadian Note Guarantor**" means any Note Guarantor that is incorporated or otherwise organized under the laws of Canada or any province or territory thereof.

"**Capital Impairment**" shall have the meaning specified in Annex A.

"**Capital Lease Obligation**" means an obligation that is a Capitalized Lease; and the amount of Indebtedness represented thereby at any time shall be the amount of the liability in respect thereof that would at that time be required to be capitalized on a balance sheet in accordance with GAAP as in effect on the Issue Date.

"**Capital Stock**" means, for any entity, any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) stock issued by that entity.

"**Capitalized Leases**" means all leases that have been or should be, in accordance with GAAP as in effect on the Issue Date, recorded as capitalized leases.

"**Cases**" mean the voluntary petitions filed on January 31, 2023 with the bankruptcy court by Invacare Corporation and certain of its Subsidiaries initiating their respective cases under Chapter 11 of the Bankruptcy Code.

#96781386v10

"**Cash Management Obligations**" means (a) obligations in respect of any treasury management services, overdraft and related liabilities arising from treasury, depository, cash pooling arrangements and cash management services or any automated clearing house transfers of funds and (b) other obligations in respect of netting services, employee credit, commercial credit card, debit card, stored value card or purchase card programs and similar arrangements.

"**Casualty Event**" means any event that gives rise to the receipt by the Company or any Restricted Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"**close of business**" means 5:00 p.m. (New York City time).

"**Collateral**" has the meaning provided for such term or a similar term in each of the Collateral Documents and all other property of whatever kind and nature subject (or purported to be subject) from time to time to a Lien under any Collateral Document.

"**Collateral Documents**" means, collectively, the U.S. Collateral Agreement among the Company, each other Note Party and the Notes Collateral Agent (the "**U.S. Collateral Agreement**"), the Canadian Collateral Agreement, the Dutch Collateral Agreements, the English Collateral Agreement, the Luxembourg Collateral Agreements, the German Collateral Agreements, the French Collateral Agreements, the Swiss Collateral Agreements, the Australian Collateral Agreements, the Norwegian Collateral Agreements, the NZ Collateral Agreements, the Danish Collateral Agreement and each other security agreement, pledge, debenture, hypothec, mortgage, consent or other instrument or document, as applicable, executed and delivered by the Company and/or the other Note Guarantors in connection with this Indenture and the Agreed Security Principles to secure the applicable Notes Obligations.

"**Commission**" means the U.S. Securities and Exchange Commission.

"**Common Equity**" of any Person means Capital Stock of such Person that is generally entitled (a) to vote in the election of directors of such Person or (b) if such Person is not a corporation, to vote or otherwise participate in the selection of the governing body, partners, managers or others that will control the management or policies of such Person.

"**Common Shares**" means the common shares of the Company, par value $[0.001] per share, at the date of this Indenture, subject to Section 14.08.

"**Company**" shall have the meaning specified in the first paragraph of this Indenture, and subject to the provisions of Article 11, shall include its successors and assigns.

"**Company Order**" means a written order of the Company, signed by the Company's Chief Executive Officer, President, Chief Financial Officer, Executive or Senior Vice President, any Vice President (whether or not designated by a number or numbers or word or words added before or after the title "Vice President"), the Company's Treasurer or Assistant Treasurer or the Company's Secretary or any Assistant Secretary, and delivered to the Trustee.

"**Controlling Collateral Agent**" shall mean the "Applicable Authorized Representative" as defined in the Pari Passu Intercreditor Agreement.

"**Conversion Agent**" shall have the meaning specified in Section 4.02.

"**Conversion Date**" shall have the meaning specified in Section 14.02(c).

"**Conversion Obligation**" shall have the meaning specified in Section 14.01.

"**Conversion Rate**" shall have the meaning specified in <u>Section 14.01</u>.

"**Convertible Preferred Stock**" means the Company's 9.00% Series A Convertible Participating Preferred Stock as governed by that certain Certificate of Designations, dated as of [●], 2023 (as amended or otherwise modified from time to time).

"**Corporate Trust Office**" means the designated office of the Trustee at which at any time its corporate trust business shall be administered, which office at the date hereof is located at 3 Second Street, Suite 206, Jersey City, New Jersey 07311, United States of America, or such other address as the Trustee may designate from time to time by notice to the Holders and the Company, or the principal corporate trust office of any successor Trustee (or such other address as such successor Trustee may designate from time to time by notice to the Holders and the Company).

"**Credit Agreement**" means the Amended and Restated Credit Agreement, dated as of [  ], 2023, by and among the Company, Invacare Corporation, the lenders party thereto, Cantor Fitzgerald Securities, as administrative agent, and GLAS Trust Company LLC, as collateral agent, together with the related documents thereto (including any guarantees and security documents), and in each case as amended, extended, renewed, restated, supplemented or otherwise modified (in whole or in part, and without limitation as to amount, terms, conditions, covenants and other provisions) from time to time, and any agreement or instrument (and related documents) governing Indebtedness, including indentures, incurred to refinance, substitute, supplement, replace or add to (including increasing the amount available for borrowing or adding or removing any Person as a borrower, issuer or guarantor thereunder, in whole or in part), the borrowings and commitments then outstanding or permitted to be outstanding under such facilities or a successor facility, whether by the same or any other bank, institutional lender, purchaser, investor, trustee or agent or group thereof.

"**Credit Agreement Collateral Agent**" means the "Collateral Agent" as defined in the Credit Agreement.

"**Credit Facility Obligations**" means "Loan Document Obligations" as defined in the Credit Agreement.

"**Custodian**" means the Trustee, as custodian for The Depository Trust Company, with respect to the Global Notes, or any successor entity thereto.

"**Danish Collateral Agreement**" means the collateral agreement listed in <u>Annex G</u> as the Danish Collateral Agreement.

"**Danish Collateral Documents**" means the Danish Collateral Agreement, and each other security agreement, pledge, assignment, mortgage, consent or other instrument or document, as applicable, governed by Danish law in connection with this Indenture and the Agreed Security Principles to secure the applicable Notes Obligations.

"**Danish Note Party**" means any Note Party incorporated or otherwise organized under the laws of the Denmark.

"**Danish Share Pledge**" means the Danish law governed share pledge agreement between Invacare Holdings Two Netherlands as pledgor and the Collateral Agent as security agent relating to the shares in Invacare A/S, a public limited liability company incorporated under the laws of Denmark, having its registered address at Søndre Ringvej 37, 2605 Brøndby, Denmark, with CVR no. 18058936.

"**Default**" means any event that is, or after notice or passage of time, or both, would be, an Event of Default.

"**Defaulted Amounts**" means any amounts on any Note or Note Guarantee (including, without limitation, the Fundamental Change Repurchase Price, principal and interest) that are payable but are not punctually paid or duly provided for.

"**De Lage Program**" has the meaning assigned to such term in the definition of Vendor Financing Program.

"**Depositary**" means, with respect to each Global Note, the Person specified in **Error! Reference source not found.** as the Depositary with respect to such Notes, until a successor shall have been appointed and become such pursuant to the applicable provisions of this Indenture, and thereafter, "**Depositary**" shall mean or include such successor.

"**Disposition**" has the meaning assigned to such term in Section 4.14.

"**Disqualified Equity Interest**" means, with respect to any Person, any Equity Interest in such Person that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable, either mandatorily or at the option of the holder thereof), or upon the happening of any event or condition:

      (a)     matures or is mandatorily redeemable (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests), whether pursuant to a sinking fund obligation or otherwise;

      (b)     is convertible or exchangeable, either mandatorily or at the option of the holder thereof, for Indebtedness or Equity Interests (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests); or

      (c)     is redeemable (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests) or is required to be repurchased by such Person or any of its Affiliates, in whole or in part, at the option of the holder thereof;

in each case, on or prior to the date 91 days after the Maturity Date (determined as of the date of issuance thereof or, in the case of any such Equity Interests outstanding on the date hereof, the date hereof); *provided*, *however*, that (i) an Equity Interest in any Person that would not constitute a Disqualified Equity Interest but for terms thereof giving holders thereof the right to require such Person to redeem or purchase such Equity Interest upon the occurrence of an "asset sale," a "change of control" or similar event shall not constitute a Disqualified Equity Interest if any such requirement becomes operative only after repayment in full of all the Notes and all other Notes Obligations that are accrued and payable, (ii) if an Equity Interest in any Person is issued pursuant to any plan for the benefit of directors, officers, employees, members of management, managers or consultants, of the Company or any Subsidiary or by any such plan to such employees, such Equity Interest shall not constitute a Disqualified Equity Interest solely because it may be required to be repurchased by the Company or any Subsidiary in order to satisfy applicable statutory or regulatory obligations of such Person and (iii) no Equity Interest held by any future, present or former employee, director, officer, manager, member of management, consultant or independent contractor (or their respective affiliates or immediate family members) of the Company (or any subsidiary) shall be considered a Disqualified Equity Interest solely because such stock is redeemable or subject to repurchase pursuant to any customary stock option, employee stock award or similar agreement that may be in effect from time to time.

"**Dollars**" or "**$**" refers to lawful money of the United States of America.

"**Dollar Equivalent**" means, at any time, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount denominated in Sterling or Euros, the equivalent amount

thereof in Dollars as determined by the Company in good faith at such time in accordance with <u>Section 1.05</u> hereof.

"**Domestic Note Guarantor**" means any Note Guarantor that was formed under the laws of the United States or any state thereof or the District of Columbia.

"**Domestic Subsidiary**" means any Subsidiary that is not a Foreign Subsidiary.

"**Dutch Collateral Agreements**" means the collateral agreements listed in <u>Annex G</u> as the Dutch Collateral Agreements.

"**Dutch Collateral Documents**" means each of the Dutch Collateral Agreements, and each other security agreement, pledge, debenture, hypothec, mortgage, consent or other instrument or document, as applicable, governed by Dutch law in connection with this Indenture and the Agreed Security Principles to secure the applicable Notes Obligations.

"**Dutch Note Party**" means any Note Party incorporated or otherwise organized under the laws of the Netherlands or any province or territory thereof.

"**Effective Date**" shall have the meaning specified in <u>Section 14.04(d)</u>, except that, as used in <u>Section 14.05</u>, "**Effective Date**" means the first date on which the Common Shares trade on the applicable exchange or in the applicable market, regular way, reflecting the relevant share split or share combination, as applicable.

"**EMEA Note Parties**" means the Foreign Note Parties organized in any jurisdiction other than the United States and Canada.

"**EMU Legislation**" means the legislative measures of the European Council for the introduction of, changeover to or operation of a single or unified European currency.

"**English Collateral Agreement**" means the collateral agreement listed in <u>Annex G</u> as the English Collateral Agreement.

"**English Collateral Documents**" means (a) the English Collateral Agreement and (b) each other security agreement, pledge, debenture, hypothec, mortgage, consent or other instrument or document, as applicable, governed by English law in connection with this Indenture and the Agreed Security Principles to secure the applicable Notes Obligations.

"**English Note Party**" means any Note Party incorporated or otherwise organized under the laws of England and Wales.

"**Equity Interests**" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in, or interests in a Person, including capital stock of any class or classes (however designated) which is preferred as to the payment of dividends or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such Person, over shares of capital stock of any other class of such Person ("**Preferred Equity Interests**") (including, without limitation and for the avoidance of doubt, with respect to the Company, the Convertible Preferred Stock).

"**Euros**" and "**€**" mean the single currency of the European Union as constituted by the Treaty on European Union and as referred to in the EMU Legislation.

"**Event of Default**" shall have the meaning specified in Section <u>6.01</u>.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"**Exchange Rate**" means on any day, for purposes of determining the Dollar Equivalent of any currency other than Dollars, the rate at which such other currency may be exchanged into Dollars at the time of determination on such day as set forth on the Reuters WRLD Page for such currency. In the event that such rate does not appear on any Reuters WRLD Page, the Exchange Rate shall be determined by reference to such other publicly available service for displaying exchange rates as selected in good faith by the Company.

"**Excluded Assets**" means (a) any fee-owned real property with a Fair Market Value of less than $1,000,000 as determined on the Issue Date for existing real property and on the date of acquisition for after-acquired real property, (b) all leasehold interests in real property, (c) any governmental licenses or state or local franchises, charters or authorizations, to the extent a security interest in any such license, franchise, charter or authorization would be prohibited or restricted thereby (including any legally effective prohibition or restriction, but excluding any prohibition or restriction that is ineffective under the PPSA or Uniform Commercial Code of any applicable jurisdiction), (d) any asset if, to the extent that and for so long as the grant of a Lien thereon to secure the Notes Obligations is prohibited by any Requirements of Law (other than to the extent that any such prohibition would be rendered ineffective pursuant to any other applicable Requirements of Law, including PPSA or the Uniform Commercial Code of any applicable jurisdiction), or would require consent or approval of any Governmental Authority, (e) the Equity Interests of any (i) captive insurance company, (ii) not-for-profit subsidiary, (f) margin stock and, to the extent (i) prohibited by the terms of, creating an enforceable right of termination in favor of any other party thereto (other than the Company or any Note Guarantor) or requiring the consent of one or more third parties (other than the Company or any of its subsidiaries) under and/or (ii) any pledge could give rise to a "right of first refusal", a "right of first offer" or a similar right that may be exercised by any third party (other than the Company or any of its subsidiaries) pursuant to, any applicable Organizational Documents, joint venture agreement or shareholders' agreement, Equity Interests in any Person other than the Company and Restricted Subsidiaries that are wholly-owned subsidiaries, (g) assets of any (i) direct or indirect Foreign Subsidiary of the Company organized outside of a Specified Jurisdiction ("**Excluded Foreign Subsidiary**") and (ii) direct or indirect Domestic Subsidiary of an Excluded Foreign Subsidiary to the extent a security interest or grant of perfection in such assets would result in material adverse Tax consequences to the Company or one of the Restricted Subsidiaries as reasonably determined by the Company in consultation with the Notes Collateral Agent, (h) Foreign Intellectual Property (except with respect to any Intellectual Property governed by or arising or existing under, pursuant to or by virtue of the laws of any Specified Jurisdiction) and any intent-to-use trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, (i) any lease, license or other agreement or any property subject thereto (including pursuant to a purchase money security interest, capital lease or similar arrangement) to the extent that a grant of a security interest therein would violate or invalidate such lease, license or agreement or purchase money arrangement or capital lease or create a breach, default or right of termination in favor of any other party thereto (other than the Company or any Note Guarantor) after giving effect to the applicable anti-assignment provisions of the PPSA or Uniform Commercial Code of any applicable jurisdiction or other similar applicable law, other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the PPSA or Uniform Commercial Code of any applicable jurisdiction or other similar applicable law notwithstanding such prohibition, (j) [reserved], (k) cash or cash equivalents maintained in any deposit account that are comprised of (i) funds used or to be used for payroll and payroll taxes and other employee benefit payments to or for the benefit of the employees of the Company and/or any Restricted Subsidiary, in each case, during the applicable period, (ii) funds used or to be used to pay any taxes required to be collected, remitted or withheld during the current period and (iii) other funds which the Company or any Note Guarantor holds as an escrow or fiduciary for the benefit of any third person, but in each case subject to the terms of the Agreed Security Principles (including, without limitation, the Overriding Principle (as defined in the Agreed Security Principles)) (other than to the extent no additional action needs to be taken with respect to any such assets to create or perfect a security interest in any such assets), [(l) the Equity Interests of Invacare Corporation held by the Company and (m) the Equity Interests of [New Intermediate Holdings] held by the Company]. Notwithstanding the foregoing provisions of this definition or anything in this Indenture or any other Notes

Document to the contrary, (i) any asset that constitutes an "Excluded Asset" under and as defined in the Credit Agreement shall constitute an "Excluded Asset" for purposes of this Indenture and the other Notes Documents and (ii) any asset that does not constitute an "Excluded Asset" under and as defined in the Credit Agreement shall not constitute an "Excluded Asset" for purposes of this Indenture and the other Notes Documents.  Notwithstanding the foregoing provisions of this definition or anything in this Indenture or any other Notes Document to the contrary any asset that does not constitute "Excluded Property" under and as defined in the ABL North America Credit Agreement shall not constitute an "Excluded Asset" for purposes of this Indenture and the other Notes Documents.

"**Excluded Subsidiary**" means any of the following: (a) any Subsidiary that is not a wholly-owned subsidiary of the Company; provided, that no Note Guarantor shall become an Excluded Subsidiary and cease being a Note Guarantor solely as a result of no longer constituting a wholly-owned subsidiary of the Company unless such Note Guarantor no longer constitutes a Subsidiary, (b) each Subsidiary listed on Schedule 1.01(a) to the Credit Agreement, (c) [reserved], (d) each Immaterial Subsidiary, (e) any Subsidiary that is prohibited by (i) applicable Requirements of Law or (ii) any contractual obligation existing on the Issue Date or on the date any such Subsidiary is acquired (so long as, in respect of any such contractual prohibition, such prohibition is not incurred in contemplation of such acquisition), in each case from guaranteeing the Notes Obligations or which would require governmental (including regulatory) consent, approval, license or authorization to provide a Guarantee, (f) any Excluded Foreign Subsidiary, (g) any direct or indirect Domestic Subsidiary of an Excluded Foreign Subsidiary to the extent a security interest or grant of perfection in such assets would result in material adverse Tax consequences to the Company or any of its subsidiaries as reasonably determined by the Company in consultation with the Trustee, (h) [reserved], (i) any other Subsidiary excused from becoming a Note Guarantor pursuant to the terms of the Agreed Guarantee Principles, (j) [reserved], (k) [reserved] and (l) any not-for-profit Subsidiaries or captive insurance companies. Notwithstanding the foregoing provisions of this definition or anything in this Indenture or any other Notes Document to the contrary, (i) any subsidiary that constitutes an "Excluded Subsidiary" under and as defined in the Credit Agreement shall constitute an "Excluded Subsidiary" for purposes of this Indenture and the other Notes Documents and (ii) any subsidiary that does not constitute an "Excluded Subsidiary" under and as defined in the Credit Agreement shall not constitute an "Excluded Subsidiary" for purposes of this Indenture and the other Notes Documents. Notwithstanding the foregoing provisions of this definition or anything in this Indenture or any other Notes Document to the contrary, (i) neither Invacare Corporation nor New Intermediate Holdings shall not constitute an "Excluded Subsidiary" for purposes of this Indenture and the other Notes Documents, (ii) any subsidiary that does not constitute an "Excluded Subsidiary" under and as defined in the ABL North America Credit Agreement or (iii) an "Excluded Subsidiary" (or equivalent term) under and as defined in any Permitted EMEA Credit Facility, in each case, shall not constitute an "Excluded Subsidiary" for purposes of this Indenture and the other Notes Documents.

"**Fair Market Value**" means with respect to any asset or group of assets on any date of determination, the value of the consideration obtainable in a sale of such asset at such date of determination assuming a sale by a willing seller to a willing purchaser dealing at arm's length and arranged in an orderly manner over a reasonable period of time having regard to the nature and characteristics of such asset. Except as otherwise expressly set forth herein, such value shall be determined in good faith by the Company.

"**Financial Officer**" means the chief financial officer, principal accounting officer, treasurer or controller of the Company.

"**Foreign Guarantee Agreement**" has the meaning set forth in the Credit Agreement.

"**Foreign Intellectual Property**" means any right, title or interest in or to any Intellectual Property governed by or arising or existing under, pursuant to or by virtue of the laws of any jurisdiction other than the United States of America or any state thereof.

"**Foreign Note Party**" means a Note Party that is a Foreign Subsidiary organized in a Specified Jurisdiction.

"**Foreign Subsidiary**" means any Subsidiary that is organized under the laws of a jurisdiction other than the United States of America, any State thereof or the District of Columbia.

"**Form of Assignment and Transfer**" means the "Form of Assignment and Transfer" attached as Attachment 3 to the Form of Note attached hereto as Exhibit A.

"**Form of Fundamental Change Repurchase Notice**" means the "Form of Fundamental Change Repurchase Notice" attached as Attachment 2 to the Form of Note attached hereto as Exhibit A.

"**Form of Note**" means the "Form of Note" attached hereto as Exhibit A.

"**Form of Notice of Conversion**" means the "Form of Notice of Conversion" attached as Attachment 1 to the Form of Note attached hereto as Exhibit A.

"**French Collateral Agreements**" means the collateral agreements listed in Annex G as the French Collateral Agreements.

"**French Note Guarantor**" shall have the meaning specified in Annex C.

"**Fundamental Change**" shall be deemed to have occurred at the time after the Notes are originally issued if any of the following occurs:

(a) the Company becomes aware (by way of a report or any other filing pursuant to Section 13(d) of the Exchange Act, proxy, vote, written notice or otherwise) of a "person" or "group" within the meaning of Section 13(d) of the Exchange Act, other than the Company, its Subsidiaries and the employee benefit plans of the Company and its Subsidiaries, being or becoming the direct or indirect "beneficial owner," as defined in Rule 13d-3 under the Exchange Act, of the Company's Common Equity representing more than 50% of the voting power of all classes of the Company's Common Equity;

(b) the consummation of (A) any recapitalization, reclassification or change of the Common Shares (other than changes resulting from a subdivision or combination) as a result of which the Common Shares would be converted into, or exchanged for, stock, other securities, other property or assets; (B) any share exchange, consolidation, amalgamation, or merger of the Company pursuant to which the Common Shares will be converted into cash, securities or other property or assets; or (C) any sale, lease or other transfer in one transaction or a series of transactions of all or substantially all of the consolidated assets of the Company and its Subsidiaries, taken as a whole, to any Person other than one of the Company's Wholly Owned Subsidiaries; *provided, however*, that a transaction described in clause (B) in which the holders of all classes of the Company's Common Equity immediately prior to such transaction own, directly or indirectly, more than 50% of all classes of Common Equity of the continuing or surviving corporation or transferee or the parent thereof immediately after such transaction in substantially the same proportions as such ownership immediately prior to such transaction shall not be a Fundamental Change pursuant to this clause (b);

(c) the shareholders of the Company approve any plan or proposal for the liquidation or dissolution of the Company; or

(d) the Company fails to directly own all of the Equity Interests of Invacare Corporation and New Intermediate Holdings;

*provided*, *however*, that a transaction or transactions described in clause (a) and/or clause (b) above (whether or not the *proviso* to clause (b) above applies to such transaction) shall not constitute a Fundamental Change, if at least 90% of the consideration received or to be received by the common shareholders of the Company, excluding cash payments for fractional shares and cash payments made

pursuant to dissenters' appraisal rights, in connection with such transaction or transactions consists of shares of common stock that are listed or quoted on any of The New York Stock Exchange, The Nasdaq Global Select Market or The Nasdaq Global Market (or any of their respective successors) or will be so listed or quoted when issued or exchanged in connection with such transaction or transactions and as a result of such transaction or transactions the Notes become convertible into such consideration, excluding cash payments for fractional shares and cash payments made pursuant to dissenters' appraisal rights (subject to the provisions of Section 14.02(a)).  If any transaction in which the Common Shares are replaced by the securities of another entity occurs, following completion of any related Make-Whole Fundamental Change Period (or, in the case of a transaction that would have been a Fundamental Change or a Make-Whole Fundamental Change but for the *proviso* immediately following clause (d) of this definition, following the effective date of such transaction) references to the Company in this definition shall instead be references to such other entity.

For the avoidance of doubt, the conversion of (x) any preferred stock issued in accordance with the Reorganization Plan or (y) the Notes or any Other Senior Secured Convertible Notes shall not constitute a "Fundamental Change."

"**Fundamental Change Company Notice**" shall have the meaning specified in Section 15.02(d).

"**Fundamental Change Repurchase Date**" shall have the meaning specified in Section 15.02(b).

"**Fundamental Change Repurchase Notice**" shall have the meaning specified in Section 15.02(c)(i).

"**Fundamental Change Repurchase Price**" shall have the meaning specified in  Section 15.02(b).

"**GAAP**" means generally accepted accounting principles in the United States of America, as in effect from time to time.

"**German Collateral Agreements**" means the collateral agreements listed in Annex G as the German Collateral Agreements.

"**German Collateral Documents**" means each of the German Collateral Agreements, and each other security agreement, pledge, debenture, hypothec, mortgage, consent or other instrument or document, as applicable, governed by German law in connection with this Indenture and the Agreed Security Principles to secure the applicable Notes Obligations.

"**German Group**" means Invacare Germany Holding and each subsidiary of Invacare Germany Holding.

"**German Note Guarantor**" shall have the meaning specified in Annex A.

"**Global Note**" shall have the meaning specified in **Error! Reference source not found.**.

"**GmbH Net Assets**" shall have the meaning specified in Annex A.

"**Governmental Authority**" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, provincial or territorial, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including the National Association of Insurance Commissioners ("**NAIC**") and any supra-national bodies such as the European Union or the European Central Bank).

"**Guarantee**" of or by any Person (the "**guarantor**") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness of

any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness; *provided* that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business or consistent with past practice or customary and reasonable indemnity obligations in effect on the Issue Date or entered into after the Issue Date in connection with any acquisition or disposition of assets permitted under this Indenture (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be the lower of (i) an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made and (ii) the maximum amount for which such guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Guarantee or, if such Guarantee is not an unconditional guarantee of the entire amount of the primary obligation and such maximum amount is not stated or determinable, the amount of such guaranteeing Person's maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith.  The term "**Guarantee**" as a verb has a corresponding meaning.

"**Highbridge**" means, collectively, Highbridge Tactical Credit Master Fund, L.P. and Highbridge Convertible Dislocation Fund, L.P.

"**Holder**," as applied to any Note, or other similar terms (but excluding the term "beneficial holder"), means any Person in whose name at the time a particular Note is registered on the Note Register.

"**IFRS**" means international accounting standards as promulgated by the International Accounting Standards Board.

"**Immaterial Subsidiary**" means any Subsidiary that is not a Material Subsidiary.

"**Indebtedness**" of any Person means, without duplication,

(a)        all obligations of such Person for borrowed money,

(b)        all obligations of such Person evidenced by bonds, debentures, notes or similar instruments to the extent the same would appear as a liability on a balance sheet of such Person prepared in accordance with GAAP,

(c)        all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person,

(d)        all obligations of such Person in respect of the deferred purchase price of property or services (excluding (i) trade accounts payable in the ordinary course of business, (ii) any earn-out obligation, purchase price adjustment or similar obligation until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP and if not paid after being due and payable and (iii) liabilities associated with customer prepayments and deposits),

(e)        all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed,

(f)        all Guarantees by such Person of Indebtedness of others,

(g)    all Capital Lease Obligations of such Person,

(h)    all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty and

(i)    all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances;

*provided* that the term "**Indebtedness**" shall not include (i) deferred or prepaid revenue and (ii) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the seller.

The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner), to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. The amount of Indebtedness of any Person for purposes of clause (e) above shall (unless such Indebtedness has been assumed by such Person) be deemed to be equal to the lesser of (A) the aggregate unpaid amount of such Indebtedness and (B) the Fair Market Value of the property encumbered thereby as determined by such Person in good faith. For all purposes hereof, the Indebtedness of the Company and the Restricted Subsidiaries shall exclude intercompany liabilities arising from their cash management, tax, and accounting operations and intercompany loans, advances or Indebtedness having a term not exceeding 364 days (inclusive of any rollover or extensions of terms) and made in the ordinary course of business.

"**Indenture**" means this instrument as originally executed or, if amended or supplemented as herein provided, as so amended or supplemented.

"**Intellectual Property**" has the meaning assigned to such term in the U.S. Collateral Agreement, the Canadian Collateral Agreement, the English Collateral Agreement or the Dutch Collateral Agreements, as applicable.

"**Intercreditor Agreements**" means the ABL North America Intercreditor Agreement, the Pari Passu Intercreditor Agreement, any Permitted ABL EMEA Intercreditor Agreement, any Permitted First Lien Second Lien Intercreditor Agreement and any Subordination Agreement.

"**Interest Payment Date**" means each [_____] and [_____] of each year, beginning on [_____].[2]

["**Intermediate Holdcos**" means, collectively, Invacare Holdings Netherlands, Invacare Holdings Lux, Invacare Holdings Two Lux, Invacare Holdings Two Netherlands and Invacare Germany Holding.]

"**Intermediate Holdco Subsidiaries**" means, as to each Intermediate Holdco, such Intermediate Holdco's subsidiaries.

"**Invacare Corporation**" means Invacare Corporation, an Ohio corporation or any successor thereof.

"**Invacare Germany Holding**" means Invacare Germany Holding GmbH, a limited liability company (*Gesellschaft mit beschränkter Haftung*), incorporated and existing under the laws of the Federal Republic of Germany, registered in the commercial register (*Handelsregister*) of the local court (*Amtsgericht*) of Ulm under HRB 621121, with registered seat in Isny, Germany.

---

[2] To be discussed whether Maturity Date should be slightly longer or shorter than 5 years such that it falls on the first or fifteenth of the month (or if not, how Interest Payment Date and Regular Record Date provisions should be tweaked to address irregularity if such dates compared to market practice).

"**Invacare Holdings Lux**" means Invacare Holdings S.à r.l., a Luxembourg private limited liability company (*société à responsabilité limitée*) having its registered office located at 6, rue Eugène Ruppert, L-2453 Luxembourg, Grand Duchy of Luxembourg, and registered with the Luxembourg Trade and Companies Register (*Registre de Commerce et des Sociétés*) under number B169.438.

"**Invacare Holdings Netherlands**" means Invacare Holdings C.V., a limited partnership (*commanditaire vennootschap*) formed under the laws of the Netherlands, having its registered office at Benkenstrasse 260, 4108 Witterswil, Switzerland, and registered with the commercial register of the Chamber of Commerce (*Kamer van Koophandel*) for indefinite period under number 09123986.

"**Invacare Holdings Two Lux**" means Invacare Holdings Two S.à r.l., a Luxembourg private limited liability company (*société à responsabilité limitée*) having its registered office located at 6, rue Eugène Ruppert, L-2453 Luxembourg, Grand Duchy of Luxembourg, and registered with the Luxembourg Trade and Companies Register (*Registre de Commerce et des Sociétés*) under number B169.458.

"**Invacare Holdings Two Netherlands**" means Invacare Holdings Two B.V., a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*) incorporated under the laws of the Netherlands, having its corporate seat (*statutaire zetel*) at Amsterdam, the Netherlands, its registered office at Galvanistraat 14 3, 6716 AE Ede, the Netherlands, and registered with the trade register of the Chamber of Commerce (*Kamer van Koophandel*) under number 34058960.

"**Investment**" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or Indebtedness or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other Indebtedness or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person (excluding, in the case of the Company and the Restricted Subsidiaries, (i) intercompany advances arising from their cash management, cash pooling, tax, and accounting operations, (ii) intercompany loans, advances or Indebtedness having a term not exceeding 364 days (inclusive of any rollover or extensions of terms) and made in the ordinary course of business) and (iii) intercompany advances, transfer pricing and cost-sharing arrangements that are in the ordinary course of business or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person. The amount, as of any date of determination, of (i) any Investment in the form of a loan or an advance shall be the principal amount thereof outstanding on such date, minus, to the extent any such loan or advance is made to any third party unaffiliated with the Company and its Subsidiaries, any cash payments actually received by such investor representing interest in respect of such Investment (to the extent any such payment to be deducted does not exceed the remaining principal amount of such Investment), but without any adjustment for writedowns or write-offs (including as a result of forgiveness of any portion thereof) with respect to such loan or advance after the date thereof, (ii) any Investment in the form of a Guarantee shall be equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof, as determined in good faith by a Financial Officer, (iii) any Investment in the form of a transfer of Equity Interests or other non-cash property by the investor to the investee, including any such transfer in the form of a capital contribution, shall be the Fair Market Value of such Equity Interests or other property as of the time of the transfer, without any other adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment after the date of such Investment, and (iv) any Investment (other than any Investment referred to in <u>clause (i)</u>, <u>(ii)</u> or <u>(iii)</u> above) by the specified Person in the form of a purchase or other acquisition for value of any Equity Interests (including through any capital contribution), evidences of Indebtedness or other securities of any other Person shall be the original cost of such Investment (including any Indebtedness assumed in connection therewith), plus (A) the cost of all additions thereto, and minus (B) to the extent such original Investment was made in cash, the amount of any portion of such Investments that has been repaid to the investor in cash as a repayment of principal or a return of capital, and of any cash payments actually received by such investor representing interest, dividends or other distributions in respect of such Investment (in all of the foregoing cases in this <u>clause (B)</u>, to the extent such payments do

not exceed, in the aggregate, the original cash amount of such Investment), but without any other adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment after the date of such Investment. For purposes of Section 4.13, if an Investment involves the acquisition of more than one Person, the amount of such Investment shall be allocated among the acquired Persons in accordance with GAAP; *provided* that pending the final determination of the amounts to be so allocated in accordance with GAAP, such allocation shall be as reasonably determined by a Financial Officer.

"**Ipso Facto Event**" means an Australian Note Party that is the subject of an announcement, application, compromise, arrangement, managing controller, or administration as described in section 415D(1), 434J(1) or 451E(1) of the Australian Corporations Act.

"**Issue Date**" means [_____], 2023, the date of the issuance of the Notes under this Indenture.

"**Junior Financing**" means any Indebtedness (other than any permitted intercompany Indebtedness owing to the Company or any Restricted Subsidiary and, for the avoidance of doubt, other than (w) Indebtedness incurred under Section 4.10(a)(xxii)(A), (x) Indebtedness incurred under Section 4.10(a)(xxii)(B) solely to the extent such Indebtedness has the same lien priorities as the Indebtedness under the ABL North America Credit Agreement, (y) Indebtedness incurred under Section 4.10(a)(xxv)(A) solely to the extent secured by Liens permitted under Section 4.11(xix)(B) and (z) Indebtedness incurred under Section 4.10(a)(xxv)(B) solely to the extent such Indebtedness has the same lien priorities as the Indebtedness refinanced by such Indebtedness) that is (a) subordinated in right of payment to the Notes Obligations, (b) Indebtedness that is secured on a junior basis to the Liens securing the Notes Obligations or (c) Indebtedness that is unsecured; *provided* that (i) no such Junior Financing incurred or assumed on or after the Issue Date shall provide for any payments of principal, interest, fees or other amounts (other than customary third party agent or trustee fees) in cash on or prior to the date that is 91 days after the Maturity Date (determined as of the date of incurrence or assumption of such Junior Financing) and (ii) for purposes of Section 4.17(b), Indebtedness of the type described in clauses (a) through (c) shall constitute Junior Financing only to the extent the aggregate principal amount of such Indebtedness, when taken together with the aggregate principal amount of all other Indebtedness of the type described in clause (a) through (c), respectively, outstanding at such time, is greater than $1,000,000.

"**Latest Maturity Date**" has the meaning set forth in the Credit Agreement.

"**Lien**" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset, and (c) in the case of any Collateral under an Australian Collateral Document, any "security interest" as defined in sections 12(1) and 12(2) of the Australian PPSA.

["**Liquidity**" means, as of any date of determination, the sum of (x) the aggregate amount of unrestricted cash (other than to the extent restricted in favor of the Credit Facility Obligations or any Indebtedness permitted under Section 4.10(a)(i), Section 4.10(a)(xxi), Section 4.10(a)(xxii) and Section 4.10(a)(xxv)) and Permitted Investments owned by the Note Parties, as reflected on a balance sheet prepared as of such date on a consolidated basis in accordance with GAAP, to the extent such cash and Permitted Investments are free and clear of any Liens (other than (x) non-consensual Liens permitted by Section 4.11 and (y) consensual Liens permitted by Section 4.11(i), 4.11(xvi), 4.11(xix) or 4.11(xxiii)) and the use thereof for the application to the payment of Indebtedness is not prohibited by law or any contract to which the Company or any Restricted Subsidiary is a party, (y) cash and Permitted Investments of the Note Parties restricted or subject to a Lien in favor of the Credit Facility Obligations (which may also include cash and Permitted Investments securing other Indebtedness permitted hereunder that is secured by a Lien on the Collateral and subject to the Pari Passu Intercreditor Agreement) and (z) the aggregate amount that is then available to be borrowed under the ABL North America Credit Agreement (for the avoidance of doubt, after giving effect to the "borrowing base" provided for thereunder).]

"**Loan Documents**" has the meaning set forth in the Credit Agreement.

"**Luxembourg**" means the Grand Duchy of Luxembourg.

"**Luxembourg Civil Code**" means the Luxembourg Civil Code (Code civil).

"**Luxembourg Collateral Agreements**" means the collateral agreements listed in <u>Annex G</u> as the Luxembourg Collateral Agreements.

"**Luxembourg Collateral Documents**" means each of the Luxembourg Collateral Agreements, and each other security agreement, pledge, mortgage, or other instrument or document, as applicable, governed by Luxembourg law in connection with this Indenture and the Agreed Security Principles to secure the applicable Notes Obligations.

"**Luxembourg Note Guarantor**" shall have the meaning specified in <u>Annex D</u>.

"**Management Determination**" shall have the meaning specified in <u>Annex A</u>.

"**Make-Whole Fundamental Change**" means any transaction or event that constitutes a Fundamental Change (as defined above and determined after giving effect to any exceptions to or exclusions from such definition, but without regard to the *proviso* in <u>clause (b)</u> of the definition thereof).

"**Make-Whole Fundamental Change Period**" shall have the meaning specified in <u>Section 14.04(b)</u>.

"**Material Adverse Effect**" means after the Issue Date, a material adverse effect on (a) the business, assets, financial condition or results of operations, in each case, of the Company and its Restricted Subsidiaries, taken as a whole, (b) the rights and remedies (taken as a whole) of the Holders of the Notes under the applicable Notes Documents or (c) the ability of the Company and Note Guarantors (taken as a whole) to perform their payment obligations under the applicable Notes Documents.

"**Material Subsidiary**" means (a) each Restricted Subsidiary that, as of the last day of the fiscal quarter of the Company most recently ended for which financial statements are available, had revenues or total assets (determined on a consolidated basis for such Restricted Subsidiary and its Restricted Subsidiaries) for such quarter in excess of 2.5% of the consolidated revenues or total assets, as applicable, of the Company and the Restricted Subsidiaries for such quarter or that is designated by the Company as a Material Subsidiary and (b) any Restricted Subsidiary that is part of a group comprising Restricted Subsidiaries that each would not have been a Material Subsidiary under <u>clause (a)</u> but that, taken together, as of the last day of the fiscal quarter of the Company most recently ended for which financial statements are available, had revenues or total assets (determined on a consolidated basis for all such Restricted Subsidiaries and their respective Restricted Subsidiaries) for such quarter in excess of 5.0% of the consolidated revenues or total assets, as applicable, of the Company and the Restricted Subsidiaries for such quarter. Notwithstanding the foregoing provisions of this definition or anything in this Indenture or any other Notes Document to the contrary, (i) any subsidiary that constitutes a "Material Subsidiary" under and as defined in the Credit Agreement shall constitute a "Material Subsidiary" for purposes of this Indenture and the other Notes Documents and (ii) any subsidiary that does not constitute a "Material Subsidiary" under and as defined in the Credit Agreement shall not constitute a "Material Subsidiary" for purposes of this Indenture and the other Notes Documents. Notwithstanding the foregoing provisions of this definition or anything in this Indenture or any other Notes Document to the contrary, any subsidiary that constitutes a "Material Subsidiary" under and as defined in the ABL North America Credit Agreement shall constitute a "Material Subsidiary" for purposes of this Indenture and the other Notes Documents.

"**Maturity Date**" means [____, 2028].

"**Merger Event**" shall have the meaning specified in <u>Section 14.08(a)</u>.

#96781386v10

"**Net Proceeds**" means, with respect to any event, (a) the proceeds received in respect of such event in cash or Permitted Investments, including (i) any cash or Permitted Investments received in respect of any non-cash proceeds, including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment or earn-out (but excluding any interest payments), but only as and when received, (ii) in the case of a casualty, insurance proceeds that are actually received, (iii) [reserved], and (iv) in the case of a condemnation or similar event, condemnation awards and similar payments that are actually received, minus (b) the sum of (i) all fees and out-of-pocket expenses paid by the Company and the Restricted Subsidiaries in connection with such event (including attorney's fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, underwriting discounts and commissions, other customary expenses and brokerage, consultant, accountant and other customary fees), (ii) in the case of a Disposition of an asset (including pursuant to a Casualty Event or similar proceeding), (x) the amount of all payments that are permitted hereunder and are made by the Company and the Restricted Subsidiaries as a result of such event to repay Indebtedness permitted to be incurred hereunder (other than (x) the Loans or (y) other pari passu or junior financing secured by a Lien on the Collateral and incurred pursuant to Section 4.10(a)) and secured by such asset or otherwise subject to mandatory prepayment as a result of such event, (y) the pro rata portion of net cash proceeds thereof (calculated without regard to this clause (y)) attributable to minority interests and not available for distribution to or for the account of the Company and the Restricted Subsidiaries as a result thereof and (z) the amount of any liabilities directly associated with such asset and retained by Invacare Corporation or the Restricted Subsidiaries and (iii) the amount of all Taxes paid (or reasonably estimated to be payable), and the amount of any reserves established by the Company and the Restricted Subsidiaries to fund contingent liabilities reasonably estimated to be payable, that are directly attributable to such event, *provided* that any reduction at any time in the amount of any such reserves (other than as a result of payments made in respect thereof) shall be deemed to constitute the receipt by the Company at such time of Net Proceeds in the amount of such reduction.

"**New Intermediate Holdings**" means [Invacare Intermediate Holdco, Inc.], a Delaware corporation.

"**Norwegian Collateral Agreements**" means the collateral agreements listed in Annex G as the Norwegian Collateral Agreements.

"**Norwegian Collateral Documents**" means each of the Norwegian Collateral Agreements, and each other security agreement, pledge, debenture, hypothec, mortgage, consent or other instrument or document, as applicable, executed and delivered by any Norwegian Note Party in connection with this Indenture and the Agreed Security Principles to secure the applicable Notes Obligations.

"**Norwegian Note Party**" means any Note Party incorporated or otherwise organized under the laws of Norway.

"**Note**" or "**Notes**" shall have the meaning specified in the first paragraph of the recitals of this Indenture.

"**Note Guarantee**" means each Guarantee of the obligations with respect to the Notes issued by a Subsidiary of the Company pursuant to the terms of this Indenture.

"**Note Guarantor**" means Invacare Corporation and each other Subsidiary of the Company that is or becomes a guarantor of the Notes pursuant to the terms of this Indenture.

"**Note Register**" shall have the meaning specified in Section 2.05(b).

"**Note Registrar**" shall have the meaning specified in Section 2.05(b).

"**Note Parties**" means the Company and the Note Guarantors.

"**Notes Documents**" means this Indenture, the Notes, the Note Guarantees and the Collateral Documents.

"**Notes Obligations**" means all obligations of the Company and the Note Guarantors under or in respect of the Notes, this Indenture and the Collateral Documents.

"**Notice of Conversion**" shall have the meaning specified in Section 14.02(b).

"**NZ Collateral Agreements**" means the collateral agreements listed in Annex G as the NZ Collateral Agreements.

"**NZ Collateral Documents**" means each of the NZ Collateral Agreements, and each other security agreement, pledge, debenture, hypothec, mortgage, consent or other instrument or document, as applicable, executed and delivered by any NZ Note Party in connection with this Indenture and the Agreed Security Principles to secure the applicable Notes Obligations.

"**NZ Note Party**" means any Note Party incorporated or otherwise organized under the laws of New Zealand.

"**Officer**" means, with respect to the Company or a Note Guarantor, the President, the Chief Executive Officer, the Chief Financial Officer, the Treasurer, the Secretary, any Executive or Senior Vice President or any Vice President (whether or not designated by a number or numbers or word or words added before or after the title "Vice President") of the Company or the Note Guarantor, as applicable.

"**Officer's Certificate**," when used with respect to the Company, means a certificate that is delivered to the Trustee and that is signed by an Officer of the Company.  Each such certificate shall include the statements provided for in Section 17.05 if and to the extent required by the provisions of such Section.  The Officer giving an Officer's Certificate pursuant to Section 4.08 shall be the principal executive, financial or accounting officer of the Company.

"**open of business**" means 9:00 a.m. (New York City time).

"**Opinion of Counsel**" means an opinion in writing (in form and substance reasonably acceptable to the Trustee) signed by legal counsel, who may be an employee of or counsel to the Company, or other counsel, that is delivered to the Trustee, which opinion may contain customary exceptions and qualifications as to the matters set forth therein.  Each such opinion shall include the statements provided for in Section 17.05 if and to the extent required by the provisions of such Section 17.05.

"**Organizational Documents**" means (a) with respect to any corporation, the certificate or articles of incorporation, amendment or amalgamation, the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction) and/or any shareholder(s) agreements; (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction) and, with respect to any German Note Guarantor, the shareholder list (*Gesellschafterliste*); and (c) with respect to any partnership, limited partnership, joint venture, trust or other form of business entity, the partnership, limited partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Senior Secured Convertible Notes Agent**" means GLAS Trust Company LLC, as notes collateral agent in respect of the Other Senior Secured Convertible Notes.

"**Other Senior Secured Convertible Notes**" means the Company's 7.50% senior secured notes issued pursuant to the Other Senior Secured Convertible Notes Indenture.

"**Other Senior Secured Convertible Notes Documents**" means the Other Senior Secured Convertible Notes Indenture and the other transaction documents referred to therein (including the related guarantee, the notes and notes purchase agreement).

"**Other Senior Secured Convertible Notes Indenture**" means the indenture, dated as of the Issue Date, among the Company, as issuer, the guarantors listed therein, the Other Senior Secured Convertible Notes Agent and the trustee referred to therein pursuant to which the Other Senior Secured Convertible Notes are issued, as such indenture may be amended or supplemented from time to time.

"**outstanding**," when used with reference to Notes, shall, subject to the provisions of Section 8.04, mean, as of any particular time, all Notes authenticated and delivered by the Trustee under this Indenture, except:

(a)    Notes theretofore canceled by the Trustee or accepted by the Trustee for cancellation;

(b)    Notes, or portions thereof, that have become due and payable and in respect of which monies in the necessary amount shall have been deposited in trust with the Trustee or with any Paying Agent (other than the Company) or shall have been set aside and segregated in trust by the Company (if the Company shall act as its own Paying Agent);

(c)    Notes that have been paid pursuant to Section 2.06 or Notes in lieu of which, or in substitution for which, other Notes shall have been authenticated and delivered pursuant to the terms of Section 2.06 unless proof satisfactory to the Trustee is presented that any such Notes are held by protected purchasers in due course;

(d)    Notes converted pursuant to Article 14 and required to be cancelled pursuant to Section 2.08; and

(e)    Notes repurchased by the Company pursuant to the penultimate sentence of Section 2.10.

"**Pari Passu Intercreditor Agreement**" means the Pari Passu Intercreditor Agreement, dated as of the Issue Date, by and among the Notes Collateral Agent, the Collateral Agent under the Credit Agreement, Other Senior Secured Convertible Notes Agent, and each additional representative party thereto from time to time, as amended, restated or otherwise modified from time to time in accordance with the terms thereof.

"**Paying Agent**" shall have the meaning specified in Section 4.02.

"**Permitted ABL EMEA Credit Facility**" means a revolving credit facility availability in respect of which is determined by reference to a borrowing base based on accounts receivable and/or inventory that may be entered into by one or more of the EMEA Note Parties providing for credit loans, letters of credit or other indebtedness or advances; provided that it is agreed that a Permitted ABL EMEA Credit Facility may be documented via an amendment to the ABL North America Credit Agreement to also include a Permitted ABL EMEA Credit Facility.

"**Permitted ABL EMEA Intercreditor Agreement**" means an intercreditor agreement that the Required Holders and, so long as Highbridge is (x) a Holder of the Notes or (y) a holder of the Other Senior Secured Convertible Notes, Highbridge shall negotiate in good faith with the Company.

"**Permitted Encumbrances**" means:

(a)    Liens for Taxes that are not overdue for a period of more than 30 days or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate

reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, in each case, the nonpayment of which could not reasonably be expected to result in a Material Adverse Effect;

(b)      Liens imposed by law, such as carriers', warehousemen's, mechanics', materialmen's, repairmen's or construction contractors' Liens and other similar Liens, arising in the ordinary course of business that secure amounts not overdue for a period of more than 30 days or, if more than 30 days overdue, are unfiled and no other action has been taken to enforce such Liens or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, in each case so long as such Liens could not reasonably be expected to individually or in the aggregate have a Material Adverse Effect;

(c)      Liens incurred or deposits made in the ordinary course of business (i) in connection with workers' compensation, unemployment insurance and other social security legislation or (ii) securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees or similar instruments for the benefit of) insurance carriers providing property, casualty or liability insurance to the Company or any Restricted Subsidiary or otherwise supporting the payment of items of the type set forth in the foregoing clause (i);

(d)      Liens incurred or deposits made to secure the performance of tenders, bids, trade contracts (other than for the payment of Indebtedness), governmental contracts and leases (other than Capital Lease Obligations), statutory obligations, surety, stay, customs and appeal bonds, performance bonds, bankers acceptance facilities and other obligations of a like nature (including those to secure health, safety and environmental obligations) and obligations in respect of letters of credit, bank guarantees or similar instruments that have been posted to support the same, in each case incurred in the ordinary course of business or consistent with past practices;

(e)      easements, rights-of-way, restrictions, encroachments, protrusions, zoning restrictions and other similar encumbrances and minor title defects affecting real property that, in the aggregate, do not in any case materially interfere with the ordinary conduct of the business of the Company and the Restricted Subsidiaries, taken as a whole;

(f)      (i) Liens securing, or otherwise arising from, judgments, awards attachments and/or decrees and notices of *lis pendens* and associated rights relating to litigation being contested in good faith not constituting an Event of Default under Section 6.01(i) and (ii) any pledge and/or deposit securing any settlement of litigation;

(g)      Liens on goods the purchase price of which is financed by a documentary letter of credit issued for the account of the Company or any of the Restricted Subsidiaries or Liens on bills of lading, drafts or other documents of title arising by operation of law or pursuant to the standard terms of agreements relating to letters of credit, bank guarantees and other similar instruments; *provided* that such Lien secures only the obligations of the Company or such Restricted Subsidiaries in respect of such letter of credit, bank guarantee or other similar instrument to the extent such obligations are permitted by Section 4.10;

(h)      rights of setoff, banker's lien, netting agreements and other Liens arising by operation of law or by of the terms of documents of banks or other financial institutions in relation to the maintenance of administration of deposit accounts, securities accounts or cash management arrangements or in connection with the issuance of letters of credit, bank guarantees or other similar instruments;

(i)      Liens arising from precautionary Uniform Commercial Code financing statements or any similar filings made in respect of operating leases or consignment or bailee arrangements entered into by the Company or any of the Restricted Subsidiaries;

(j)        Liens or right of set-off arising under the general banking conditions (*algemene bankvoorwaarden*) or any non-Dutch equivalent thereof;

(k)        any Lien deemed to be granted under section 12(3) of the Australian PPSA which does not secure payment or performance of an obligation; and

(l)        [cash collateral in an amount not to exceed $[_] securing Cash Management Obligations.]

"**Permitted First Lien Indebtedness**" has the meaning set forth in Section 4.10(a)(xxvi).

"**Permitted First Lien Second Lien Intercreditor Agreement**" means an intercreditor agreement that the Required Holders and, so long as Highbridge is (x) a Holder of the Notes or (y) a holder of the Other Senior Secured Convertible Notes, Highbridge shall negotiate in good faith with the Company.

"**Permitted Investments**" means any of the following, to the extent owned by the Company or any Restricted Subsidiary:

(a)        Dollars, Euros, Sterling, Australian Dollars, Canadian dollars and such other currencies held by it from time to time in the ordinary course of business;

(b)        readily marketable obligations issued or directly and fully guaranteed or insured by the government or any agency or instrumentality of (i) the United States or (ii) any member nation of the European Union rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, having average maturities of not more than 24 months from the date of acquisition thereof; *provided* that the full faith and credit of the United States or such member nation of the European Union is pledged in support thereof;

(c)        time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) is a Lender or (ii) has combined capital and surplus of at least (x) $250,000,000 in the case of U.S. banks and (y) $100,000,000 (or the Dollar Equivalent as of the date of determination) in the case of non-U.S. banks (any such bank meeting the requirements of clause (i) or (ii) above being an "**Approved Bank**"), in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(d)        commercial paper and variable or fixed rate notes issued by an Approved Bank (or by the parent company thereof) or any variable or fixed rate note issued by, or guaranteed by, a corporation rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, in each case with average maturities of not more than 24 months from the date of acquisition thereof;

(e)        repurchase agreements entered into by any Person with an Approved Bank, a bank or trust company (including any of the Holders of the Notes) or recognized securities dealer, in each case, having capital and surplus in excess of (x) $250,000,000 in the case of U.S. banks and (y) $100,000,000 (or the Dollar Equivalent as of the date of determination) in the case of non-U.S. banks, in each case, for direct obligations issued by or fully guaranteed or insured by the government or any agency or instrumentality of (i) the United States or (ii) any member nation of the European Union rated A (or the equivalent thereof) or better by S&P and A2 (or the equivalent thereof) or better by Moody's, in which such Person shall have a perfected first priority security interest (subject to no other Liens) and having, on the date of purchase thereof, a Fair Market Value of at least 100% of the amount of the repurchase obligations;

(f)        marketable short-term money market and similar highly liquid funds either (i) having assets in excess of (x) $250,000,000 in the case of U.S. banks or other U.S. financial institutions and (y) $100,000,000 (or the Dollar Equivalent as of the date of determination) in the

case of non-U.S. banks or other non-U.S. financial institutions or (ii) having a rating of at least A-2 or P-2 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized rating service);

(g)        securities with average maturities of 24 months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, or by any political subdivision or taxing authority of any such state, commonwealth or territory or by a foreign government having an investment grade rating from either S&P or Moody's (or the equivalent thereof);

(h)        investments with average maturities of 12 months or less from the date of acquisition in mutual funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's;

(i)        instruments equivalent to those referred to in <u>clauses (a)</u> through <u>(h)</u> above denominated in Euros or any other foreign currency comparable in credit quality and tenor to those referred to above and customarily used by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by any Subsidiary organized in such jurisdiction;

(j)        investments, classified in accordance with GAAP as current assets, in money market investment programs that are registered under the Investment Company Act of 1940 or that are administered by financial institutions having capital of at least $250,000,000, and, in either case, the portfolios of which are limited such that substantially all of such investments are of the character, quality and maturity described in <u>clauses (a)</u> through <u>(i)</u> of this definition;

(k)        with respect to any Foreign Subsidiary: (i) obligations of the national government of the country or jurisdiction in which such Foreign Subsidiary maintains its chief executive office and principal place of business; *provided* such country or jurisdiction is a member of the Organization for Economic Cooperation and Development, in each case maturing within one year after the date of investment therein, (ii) certificates of deposit of, bankers acceptances of, or time deposits with, any commercial bank which is organized and existing under the laws of the country in which such Foreign Subsidiary maintains its chief executive office and principal place of business; *provided* such country or jurisdiction is a member of the Organization for Economic Cooperation and Development, and whose short-term commercial paper rating from S&P is at least "A-2" or the equivalent thereof or from Moody's is at least "P-2" or the equivalent thereof (any such bank being an "**Approved Foreign Bank**"), and in each case with maturities of not more than 24 months from the date of acquisition and (iii) the equivalent of demand deposit accounts which are maintained with an Approved Foreign Bank;

(l)        interest bearing instruments with a maximum maturity of 180 days in respect of which the obligor is a G8 government or other G8 governmental agency or a G8 financial institution with credit ratings from S&P of at least "A-2" or the equivalent thereof or from Moody's of at least "P-2" or the equivalent thereof; and

(m)        investment funds investing at least 90% of their assets in securities of the types described in <u>clauses (a)</u> through <u>(l)</u> above.

"**Permitted Lien**" means Liens permitted by <u>Section 4.11.</u>

["**Permitted Refinancing**" means, with respect to any Person, any modification, refinancing, refunding, renewal or extension of any Indebtedness of such Person; *provided* that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed or extended except (i) by an amount equal to unpaid accrued interest and premium (including tender premiums) thereon plus

underwriting discounts, other amounts paid, and fees, commissions and expenses (including upfront fees, original issue discount or initial yield payments) incurred, in connection with such modification, refinancing, refunding, renewal or extension and (ii) by an amount equal to any existing revolving commitments unutilized thereunder to the extent that the portion of any existing and unutilized revolving commitment being refinanced was permitted to be drawn under Section 4.10 immediately prior to such refinancing (other than by reference to a Permitted Refinancing) and such drawing shall be deemed to have been made, (b) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 4.10(a)(v) and Section 4.10(a)(xiv), Indebtedness resulting from such modification, refinancing, refunding, renewal or extension (i) has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed or extended and (ii) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 4.10(a)(xxii) or Section 4.10(a)(xxv), has a final maturity date later than 180 days after the later of (x) the Latest Maturity Date and (y) the Maturity Date, (c) if the Indebtedness being modified, refinanced, refunded, renewed or extended is subordinated in right of payment to the Notes Obligations, Indebtedness resulting from such modification, refinancing, refunding, renewal or extension is subordinated in right of payment to the Notes Obligations on terms at least as favorable to the Holders of the Notes as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed or extended, (d) [reserved], (e) immediately after giving effect thereto, no Event of Default shall have occurred and be continuing, and (f) if the Indebtedness being modified, refinanced, refunded, renewed or extended is permitted pursuant to Section 4.10(a)(ii), (a)(xii), (a)**Section** 4.10(a)(xxi) or (a)(xxiii), (i) the terms and conditions (including Lien priority, but excluding as to subordination, interest rate (including whether such interest is payable in cash or in kind), rate floors, fees, discounts and premiums) of Indebtedness resulting from such modification, refinancing, refunding, renewal or extension are, taken as a whole, not materially more favorable to the investors providing such Indebtedness than the terms and conditions of the Indebtedness being modified, refinanced, refunded, renewed or extended (except for covenants or other provisions applicable to periods after the Maturity Date at the time such Indebtedness is incurred) (it being understood that, to the extent that any financial maintenance covenant is added for the benefit of any such Permitted Refinancing, the terms shall not be considered materially more favorable if such financial maintenance covenant is either (A) also added for the benefit of any Loans remaining outstanding after the issuance or incurrence of such Permitted Refinancing or (B) only applicable after the later of (x) the Latest Maturity Date and (y) the Maturity Date, in each case, at the time of such refinancing); *provided* that the primary obligor in respect of, and/or the Persons (if any) that Guarantee, the Indebtedness resulting from such modification, refinancing, refunding, renewal or extension is the primary obligor in respect of, and/or Persons (if any) that Guaranteed the Indebtedness being modified, refinanced, refunded, renewed or extended; *provided further* that such Indebtedness resulting from such modification, refinancing, refunding, renewal or extension shall not be secured by any assets other than Collateral and the lien securing such Indebtedness shall not have greater priority than the lien securing the Indebtedness that is being modified, refinanced, refunded, renewed or extended (and if the Indebtedness being refinanced is unsecured, such Indebtedness resulting from such modification, refinancing, refunding, renewal or extension shall be unsecured). For the avoidance of doubt, it is understood that a Permitted Refinancing may constitute a portion of an issuance of Indebtedness in excess of the amount of such Permitted Refinancing; *provided* that such excess amount is otherwise permitted to be incurred under Section 4.10. For the avoidance of doubt, it is understood and agreed that a Permitted Refinancing includes successive Permitted Refinancings of the same Indebtedness.]

"**Permitted Transferees**" means, with respect to any Person that is a natural person (and any Permitted Transferee of such Person), (a) such Person's immediate family, including his or her spouse, ex-spouse, children, step-children and their respective lineal descendants, (b) any trust or other legal entity the beneficiary of which is such Person's immediate family, including his or her spouse, ex-spouse, children, stepchildren or their respective lineal descendants and (c) without duplication with any of the foregoing, such Person's heirs, executors and/or administrators upon the death of such Person and any other Person who was an Affiliate of such Person upon the death of such Person and who, upon such death, directly or indirectly owned Equity Interests in the Company.

"**Person**" means an individual, a corporation, a limited liability company, an association, a partnership, a joint venture, a joint stock company, a trust, an unincorporated organization or a government or an agency or a political subdivision thereof.

"**Physical Notes**" means permanent certificated Notes in registered form issued in denominations of $1,000 principal amount and integral multiples thereof.

"**Plan**" shall have the meaning specified in the recitals of this Indenture.

"**PPSA**" means the Personal Property Security Act (Ontario), including the regulations thereto, provided that if perfection or the effect of perfection or non-perfection or the priority of any Lien created hereunder or under any other Notes Document on the Collateral is governed by the personal property security legislation or other applicable legislation with respect to personal property security in effect in a jurisdiction in Canada other than the Province of Ontario, "PPSA" means the Personal Property Security Act or such other applicable legislation (including the Civil Code of Quebec) in effect from time to time in such other jurisdiction in Canada for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"**Predecessor Note**" of any particular Note means every previous Note evidencing all or a portion of the same debt as that evidenced by such particular Note; and, for the purposes of this definition, any Note authenticated and delivered under Section 2.06 in lieu of or in exchange for a mutilated, lost, destroyed or stolen Note shall be deemed to evidence the same debt as the mutilated, lost, destroyed or stolen Note that it replaces.

["**Priority Agent**" has the meaning set forth in the ABL North America Intercreditor Agreement.]

"**Qualified Equity Interests**" means Equity Interests other than Disqualified Equity Interests.

"**Qualifying Disposition**" means a sale, transfer or other disposition of Common Shares delivered upon conversion of the Notes (i) to any Person who acquires them in a broadly distributed public offering of such Common Shares (including the underwriter or placement agent of such offering, which may be the relevant converting Holder or an Affiliate of such converting Holder); (ii) effected on any securities exchange so long as neither the relevant converting Holder nor any Affiliate of such converting Holder solicited or arranged for the solicitation of orders to buy such Common Shares in anticipation of or in connection with such sale; (iii) made in compliance with the manner-of-sale requirements set forth in Rule 144(g) under the Securities Act; (iv) that constitutes the return of Common Shares in satisfaction of an existing share loan transaction; (v) to a Person or entity that is not, and after giving effect to such sale, transfer or other disposition, will not be, an "affiliate" (as such term is used in Rule 144) of the Company (based on representations made by such Person or entity) after taking into account all other sales of such Common Shares to such Person entity (other than pursuant to clause (i), (ii), (iii) or (iv) above); (vi) to a Person or entity that is an "affiliate" (as such term is used in Rule 144) of the Company prior to such sale, transfer or other disposition so long as the number of Common Shares sold, transferred or otherwise disposed of to such Person or entity (in any manner at any time, in one transaction or a series of transactions) does not in the aggregate exceed 9.0% of the outstanding Common Shares after taking into account all other sales of Common Shares to such Person or entity (other than pursuant to clause (i), (ii), (iii) or (iv) above); or (vii) to the Company or any Subsidiary of the Company.

"**Record Date**" means, with respect to any dividend, distribution or other transaction or event in which the holders of Common Shares (or other applicable security) have the right to receive any cash, securities or other property or in which the Common Shares (or such other security) is exchanged for or converted into any combination of cash, securities or other property, the date fixed for determination of holders of the Common Shares (or such other security) entitled to receive such cash, securities or other property (whether such date is fixed by the Board of Directors, by statute, by contract or otherwise).

"**Reference Property**" shall have the meaning specified in Section 14.08(a).

"**Registration Rights Agreement**" means the Registration Rights Agreement, dated as of [_____], 2023, among the Company, the Initial Holders (as defined therein) and the other parties thereto, as amended from time to time in accordance with its terms.

"**Regular Record Date**," with respect to any Interest Payment Date, means the [_____] or [_____] (whether or not such day is a Business Day) immediately preceding the applicable [_____] or [_____] Interest Payment Date, respectively.

"**Reorganization Plan**" has the meaning set forth in the Credit Agreement.

"**Resale Restriction Termination Date**" shall have the meaning specified in Section 2.05(c).

"**Restricted Debt Payment**" has the meaning assigned to such term in Section 4.17(b).

"**Restricted Debt Payment Amount**" means, at any time on or after the Issue Date, $2,500,000 minus the amount of Restricted Debt Payments made by the Company or any Restricted Subsidiary in reliance on Section 4.17(b)(iv).

"**Restricted Obligations**" shall have the meaning specified in Annex B.

"**Restricted Payment**" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Company or any Restricted Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interests in the Company or any Restricted Subsidiary or any option, warrant or other right to acquire any such Equity Interests.

"**Restricted Securities**" shall have the meaning specified in Section 2.05(c).

"**Restricted Subsidiary**" means any Subsidiary of the Company.

"**Required Additional Debt Terms**" means, with respect to any Indebtedness, (a) such Indebtedness does not mature earlier than 180 days after the later of (x) the Latest Maturity Date and (y) the Maturity Date or have a Weighted Average Life to Maturity less than the greatest Weighted Average Life to Maturity of the Notes outstanding at the time of incurrence of such Indebtedness, (b) such Indebtedness does not have mandatory prepayment or redemption provisions (other than customary asset sale proceeds events, insurance and condemnation proceeds events, change of control offers or events of default) that could result in the prepayment or redemption of such Indebtedness prior to the Maturity Date, (c) such Indebtedness is not guaranteed by any entity that is not the Company or a Note Guarantor, (d) such Indebtedness that is secured (i) is not secured by any assets not securing the Notes Obligations, (ii) is secured on a junior basis to the Liens securing the Notes Obligations and is subject to the relevant Intercreditor Agreement(s) and (iii) is subject to security agreements relating to such Indebtedness that are substantially the same as the Collateral Documents (with such differences as are reasonably satisfactory to the Required Holders), (e) [reserved] and (f) the terms and conditions of such Indebtedness (excluding pricing, interest rate margins, rate floors, discounts, fees, premiums and, subject to clauses (a) and (b) above, prepayment or redemption provisions, are not materially more favorable (when taken as a whole) to the lenders or investors providing such Indebtedness than the terms and conditions of this Indenture (when taken as a whole) are to the Holders of the Notes (except for covenants or other provisions applicable only to periods after the Maturity Date at such time) (it being understood that, to the extent that any financial maintenance covenant is added for the benefit of any such Indebtedness, no consent shall be required by the Trustee, the Notes Collateral Agent or any of the Holders of the Notes if such financial maintenance covenant is either (i) also added for the benefit of any Notes remaining outstanding after the issuance or incurrence of any such Indebtedness in connection therewith or (ii) only applicable after the Maturity Date at such time); *provided* that an Officer's Certificate delivered to the Trustee at least five Business Days prior to the incurrence of such Indebtedness, together with a reasonably detailed description of the material

terms and conditions of such Indebtedness or drafts of the documentation relating thereto, stating that the Company has determined in good faith that such terms and conditions satisfy the foregoing requirement, shall be conclusive evidence that such terms and conditions satisfy the foregoing requirement unless the Trustee, acting at the direction of the Required Holders, notifies the Company within such five Business Day period that it disagrees with such determination (including a reasonable description of the basis upon which it disagrees).

[ "**Required Additional First Lien Debt Terms**" means, with respect to any Indebtedness, (a) such Indebtedness is not guaranteed by any entity that is not the Company or a Note Guarantor, (d) such Indebtedness that is secured (i) is not secured by any assets not securing the Notes Obligations, (ii) may be secured on a senior basis to the Liens securing the Notes Obligations subject to a Permitted First Lien Second Lien Intercreditor Agreement and (iii) is subject to security agreements relating to such Indebtedness that are substantially the same as the Collateral Documents (with such differences as are reasonably satisfactory to the Required Holders), (b) such Indebtedness is provided by a third-party lender in the form of a customary credit facility and (c) the weighted average cost of capital in respect of such Indebtedness (inclusive of fees, discounts and premiums) shall be lower than the weighted average cost of capital of the Indebtedness permitted to be incurred pursuant to Section 4.10(a)(xxiii) immediately prior to the incurrence of such Indebtedness; *provided* that an Officer's Certificate delivered to the Trustee at least five Business Days prior to the incurrence of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of the documentation relating thereto, stating that the Company has determined in good faith that such terms and conditions satisfy the foregoing requirement, shall be conclusive evidence that such terms and conditions satisfy the foregoing requirement unless the Trustee, acting at the direction of the Required Holders, notifies the Company within such five Business Day period that it disagrees with such determination (including a reasonable description of the basis upon which it disagrees).]

"**Required Holders**" means, at any time, Holders holding Notes and/or the Other Senior Secured Convertible Notes representing more than 50.0% of the aggregate outstanding Notes and the Other Senior Secured Convertible Notes, voting together as a single class, at such time.

"**Requirements of Law**" means, with respect to any Person, any statutes, laws, treaties, rules, regulations, orders, decrees, writs, injunctions or determinations of any arbitrator or court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Responsible Officer**" means, when used with respect to the Trustee, any officer within the corporate trust department of the Trustee, including any vice president, assistant vice president, assistant secretary, assistant treasurer, trust officer or any other officer of the Trustee who customarily performs functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of this Indenture.

"**RSA**" means the Restructuring Support Agreement, dated as of January 31, 2023 (as amended and supplemented from time to time).

"**Rule 144**" means Rule 144 as promulgated under the Securities Act.

"**Rule 144A**" means Rule 144A as promulgated under the Securities Act.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Secured Parties**" means the Trustee, the Notes Collateral Agent and the Holders.

"**Signature Law**" shall have the meaning specified in Section 17.11.

"**Significant Subsidiary**" means a Subsidiary of the Company that meets the definition of "significant subsidiary" in Article 1, Rule 1-02(w)(1) of Regulation S-X under the Exchange Act; *provided* that, in the case of a Subsidiary of the Company that meets the criteria of clause (iii) of the definition thereof but not clause (i) or (ii) thereof, such Subsidiary shall not be deemed to be a Significant Subsidiary of the Company unless such Subsidiary's income from continuing operations before income taxes, extraordinary items and cumulative effect of a change in accounting principle exclusive of amounts attributable to any non-controlling interests for the last completed fiscal year prior to the date of such determination exceeds $5,000,000.

"**Specified Jurisdictions**" means England and Wales, Canada (including any province and territory thereof), Luxembourg, the Netherlands, Germany, Switzerland, France, Norway, Denmark, Australia and New Zealand.

"**Sterling**" means the lawful currency of the United Kingdom from time to time.

"**Stock Price**" shall have the meaning specified in Section 14.04(d).

"**Subsidiary**" means, with respect to any Person, any corporation, association, partnership or other business entity of which more than 50% of the total voting power of shares of Capital Stock or other interests (including partnership interests) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, general partners or trustees thereof is at the time owned or controlled, directly or indirectly, by (i) such Person; (ii) such Person and one or more Subsidiaries of such Person; or (iii) one or more Subsidiaries of such Person.

"**Swap**" means any agreement, contract, or transaction that constitutes a "**swap**" within the meaning of section 1a(47) of the Commodity Exchange Act.

"**Swap Agreement**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Swiss Collateral Agreements**" means the collateral agreements listed in Annex G as the Swiss Collateral Agreements.

"**Swiss Collateral Documents**" means each of the Swiss Collateral Agreements, and each other security agreement, pledge, debenture, mortgage or other instrument or document, as applicable, governed by Swiss law in connection with this Indenture and the Agreed Security Principles to secure the applicable Notes Obligations.

"**Swiss Note Limitation**" shall have the meaning specified in Annex B.

"**Swiss Note Guarantor**" shall have the meaning specified in Annex B.

"**Swiss Withholding Tax**" means taxes levied pursuant to the Swiss Federal Act on Withholding Tax (*Bundesgesetz über die Verrechnungssteuer vom 13. Oktober 1965, SR 642.21*).

#96781386v10

"**Taxes**" means any and all present or future taxes, levies, imposts, duties, deductions, charges, fees, assessments or withholdings (including backup withholdings) imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Transaction Costs**" means any fees, expenses and other transaction costs incurred or paid by, the Company or any of its Subsidiaries in connection with the Transactions, the Credit Agreement, this Indenture, the Other Senior Secured Convertible Notes Indenture and the other Notes Documents, and the transactions contemplated hereby and thereby.

"**Transactions**" means, collectively, (a) the transactions that occurred pursuant to the Credit Agreement and the ABL North America Credit Agreement, (b) the issuance of the Notes and the Note Guarantees, (c) the issuance of the Other Senior Secured Convertible Notes and related guarantees, (d) the entry into the Registration Rights Agreement, (e) the consummation of any other transactions in connection with the foregoing, the Plan and the RSA and (f) the payment of the fees and expenses incurred in connection with any of the foregoing (including the Transaction Costs).

"**transfer**" shall have the meaning specified in Section 2.05(c).

"**Trust Indenture Act**" means the Trust Indenture Act of 1939, as amended, as it was in force at the date of execution of this Indenture; *provided*, *however*, that in the event the Trust Indenture Act of 1939 is amended after the date hereof, the term "Trust Indenture Act" shall mean, to the extent required by such amendment, the Trust Indenture Act of 1939, as so amended.

"**Trustee**" means the Person named as the "**Trustee**" in the first paragraph of this Indenture until a successor trustee shall have become such pursuant to the applicable provisions of this Indenture, and thereafter "**Trustee**" shall mean or include each Person who is then a Trustee hereunder.

"**unit of Reference Property**" shall have the meaning specified in Section 14.08(a).

"**Vendor Financing Program**" means the sale of customer accounts receivables in the ordinary course of business by (i) Subsidiaries of Invacare Corporation or New Intermediate Holdings, as applicable, incorporated in Denmark, Sweden and/or Norway to Nordea Finans Danmark A/S pursuant to the agreements on purchase of receivables each dated May 12, 2021 and any amendments, extensions, renewals or replacements thereof and (ii) any Subsidiaries of Holdings to De Lage Landen Financial Services, Inc under the program in existence on the Issue Date and any amendments, extensions, renewals or replacements thereof (the "**De Lage Program**").

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

"**Wholly Owned Subsidiary**" means, with respect to any Person, any Subsidiary of such Person, except that, solely for purposes of this definition, the reference to "more than 50%" in the definition of "Subsidiary" shall be deemed replaced by a reference to "100%".

Section 1.02. *References to Interest*.  Unless the context otherwise requires, any reference to interest on, or in respect of, any Note in this Indenture shall be deemed to include Additional Interest if, in such context, Additional Interest is, was or would be payable pursuant to any of **Section** 4.06(d), **Section** 4.06(e) and **Section 6.03**. Unless the context otherwise requires, any express mention of Additional Interest in any provision hereof shall not be construed as excluding Additional Interest in those provisions hereof where such express mention is not made.

Section 1.03.  *Terms Generally*.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (a) any definition of or reference to any agreement (including this Indenture and the other Notes Documents), instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Indenture in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Indenture and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. Any references to "as of the date hereof" or similar terms or references shall be deemed to refer to the Issue Date.

Section 1.04.  *Accounting Terms; GAAP*.

(a)  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Indenture shall be prepared in conformity with, GAAP, applied in a manner consistent with that used in preparing the Company's or Invacare Corporation's, as applicable, audited financial statements, except as otherwise specifically prescribed herein.

(b)  Notwithstanding any other provision contained herein, for purposes of determining compliance with any provision of this Indenture and any related definitions, the determination of whether a lease is to be treated as an operating lease or capital lease shall be made without giving effect to any change in GAAP that becomes effective on or after November 30, 2016 that would require operating leases to be treated similarly to capital leases.

Section 1.05.  *Currency Translation; Rates*.  For purposes of any determination under **Article** 4 and **Article** 6 or any determination under any other provision of this Indenture expressly requiring the use of a current exchange rate, all amounts incurred, outstanding or proposed to be incurred or outstanding in currencies other than Dollars shall be translated into Dollars at the Exchange Rate (rounded to the nearest currency unit, with 0.5 or more of a currency unit being rounded upward); *provided*, *however*, that for purposes of determining compliance with **Article** 4 with respect to the amount of any Indebtedness, Investment, Disposition or Restricted Payment in a currency other than Dollars, no Default or Event of Default shall be deemed to have occurred solely as a result of changes in rates of exchange occurring after the time such Indebtedness or Investment is incurred or Disposition or Restricted Payment made; *provided further* that, for the avoidance of doubt, the foregoing provisions of this **Section** 1.05 shall otherwise apply to such Sections, including with respect to determining whether any Indebtedness or Investment may be incurred or Disposition or Restricted Payment made at any time under such Sections.

Section 1.06.  *Certain Calculations and Tests*.  Notwithstanding anything to the contrary herein, to the extent that the terms of this Indenture require the absence of a Default or Event of Default (or any type of Default or Event of Default) as a condition to the consummation of any transaction in connection with any acquisition or similar Investment (including the assumption or incurrence of Indebtedness), the determination of whether the relevant condition is satisfied may be made, at the election of the Company, in the case of any acquisition or similar Investment, at the time of either (x) the execution of the definitive agreement with respect to such acquisition or Investment or (y) the consummation of such acquisition or Investment; *provided* that if the Company elects to have such determination occur at the time of entry into the definitive agreement with respect to such acquisition or Investment, any testing of

compliance with any test shall be tested on a pro forma basis assuming such acquisition or Investment and other transactions in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) had been consummated.

Section 1.07.  *Divisions*.  For all purposes under the Notes Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

Section 1.08.  *Luxembourg Terms*.  In this Indenture, where it relates to a Luxembourg Note Guarantor and unless a contrary intention appears, a reference to:

(a)  "winding up", "administration", "moratorium of indebtedness", "insolvency", "reorganization", "composition", "arrangement with creditors" or "dissolution" includes, without limitation, any procedure or proceeding in relation to an entity becoming bankrupt (*faillite*), insolvency, voluntary or judicial liquidation (*liquidation volontaire ou judiciaire*), composition with creditors (*concordat préventif de faillite*), moratorium or reprieve from payment (*sursis de paiement*), controlled management (*gestion contrôlée*), general settlement with creditors, reorganisation or any other similar proceedings affecting the rights of creditors generally under Luxembourg law, and shall be construed so as to include any equivalent or analogous liquidation or reorganisation proceedings;

(b)  an "agent" includes, without limitation, a "*mandataire*";

(c)  a "receiver", "liquidator", "administrative receiver", "administrator", "trustee", "custodian" or the like includes, without limitation, a *juge délégué*, *commissaire*, *juge-commissaire*, *liquidateur*, *mandataire ad hoc*, *administrateur provisoire* or *curateur* or any other person performing the same function of each of the foregoing;

(d)  a "matured obligation" includes, without limitation, any *exigible*, *certaine* and *liquide obligation*;

(e)  security" or a "security interest" includes, without limitation, any hypothèque, nantissement, privilège, accord de transfert de propriété à titre de garantie, gage sur fonds de commerce, droit de retention or sûreté réelle whatsoever and any type of real security or agreement or arrangement having a similar effect, whether granted or arising by operation of law;

(f)  a "guarantee" includes any guarantee which is independent from the debt to which it relates and excludes any suretyship (*cautionnement*) within the meaning of article 2011 an seq. of the Luxembourg Civil Code; and

(g)  a person being or deemed to "be unable to pay its debts" includes, without limitation, that person being in a state of cessation of payments (*cessation de paiements*) and having lost its creditworthiness (*ébranlement de crédit*);

(h)  an "attachment" includes a *saisie*;

(i)  "by-laws" or constitutional documents includes its up-to-date (restated) articles of association (*statuts*); and

(j)  a "director", "officer" or "manager" includes a *gérant* or an *administrateur*.

36

Section 1.09. *Quebec Matters*. For purposes of any assets, liabilities or entities located in the Province of Québec and for all other purposes pursuant to which the interpretation or construction of this Indenture may be subject to the laws of the Province of Québec or a court or tribunal exercising jurisdiction in the Province of Québec, (a) "personal property" shall include "movable property", (b) "real property" or "real estate" shall include "immovable property", (c) "tangible property" shall include "corporeal property", (d) "intangible property" shall include "incorporeal property", (e) "security interest", "mortgage" and "lien" shall include a "hypothec", "right of retention", "prior claim" , "reservation of ownership" and a resolutory clause, (f) all references to filing, perfection, priority, remedies, registering or recording under the UCC or a PPSA shall include publication under the *Civil Code of Québec*, (g) all references to "perfection" of or "perfected" liens or security interest shall include a reference to an "opposable" or "set up" hypothec as against third parties, (h) any "right of offset", "right of setoff" or similar expression shall include a "right of compensation", (i) "goods" shall include "corporeal movable property" other than chattel paper, documents of title, instruments, money and securities, (j) an "agent" shall include a "mandatary", (k) "construction liens" or "mechanics, materialmen, repairmen, construction contractors or other like Liens" shall include "legal hypothecs" and "legal hypothecs in favour of persons having taken part in the construction or renovation of an immovable", (l) "joint and several" shall include "solidary", (m) "gross negligence or wilful misconduct" shall be deemed to be "intentional or gross fault", (n) "beneficial ownership" shall include "ownership on behalf of another as mandatary", (o) "easement" shall include "servitude", (p) "priority" shall include "rank" or "prior claim", as applicable (q) "survey" shall include "certificate of location and plan", (r) "state" shall include "province", (s) "fee simple title" shall include "absolute ownership" and "ownership" (including ownership under a right of superficies), (t) "accounts" shall include "claims", (u) "legal title" shall be including "holding title on behalf of an owner as mandatory or prete-nom", (v) "ground lease" shall include "emphyteusis" or a "lease with a right of superficies, as applicable, (w) "leasehold interest" shall include a "valid lease", (x) "lease" shall include a "leasing contract" and (y) "guarantee" and "guarantor" shall include "suretyship" and "surety", respectively.

Section 1.10. *French Terms*. In this Indenture, where it relates to a French entity and unless the contrary intention appears, a reference to: (a) a "similar officer" includes an *administrateur judiciaire*, a *mandataire ad hoc*, a *conciliateur*, a *mandataire liquidateur* or any other person appointed as a result of any proceedings under articles L. 611-3 to L. 611-16 of the French Commercial Code; (b) a "winding-up", "dissolution", "administration", or "amalgamation" includes (without limitation) a *redressement judiciaire*, *cession totale ou partielle de l'entreprise*, *liquidation judiciaire* or *a procédure de sauvegarde* under Livre Sixième of the French Commercial Code; (c) "other proceeding seeking liquidation, reorganization or other relief" shall include, without limitation: (i) proceedings for the appointment of a *mandataire ad hoc* for a *conciliation* in accordance with Articles L.611-3 to L.611-16 of the French Commercial Code, and (ii) the entry of a judgment for *sauvegarde, redressement judiciaire, cession totale de l'entrepris, liquidation judiciaire* or *cession totale de l'entreprise* under Articles L.620-1 to L.670-8 of the French Commercial Code; (d) a person failing generally to pay its debts as they become due is that person being in a state of *cessation des paiements* within the meaning of the French Commercial Code; (e) "control" has the meaning given in article L.233-3 I and II of the French Commercial Code; (f) "gross negligence" means "*faute lourde*"; (g) "merger" includes any fusion implemented in accordance with articles L.236-1 to L.236-24 of the French Commercial Code; (h) a "guarantee" includes, as regards French law, any "*cautionnement*", "*aval*", any "*garantie*" which is independent from the debt to which it relates and any type of "*sûreté personnelle*"; (i) a "security interest" or "lien" includes any type of security (*sûreté réelle*) and transfer by way of security and fiducie sûreté; (j) "wilful misconduct" means "dol"; (k) the "French Civil Code" means the Code Civil; (l) the "French Commercial Code" means the *Code de commerce*.

Section 1.11. *Australian Matters*.

(a)       Without prejudice to the generality of any provision of this Indenture, in this Indenture where it relates to an Australian Collateral Document, an Australian Note Party or any of their Subsidiaries incorporated under the laws of Australia or any state or territory thereof, a reference in this Indenture to: (i) with respect to any reference to an Affiliate, "Control" has the meaning given to it in section 50AA of the Australian Corporations Act; (ii) "Controller", "receiver" or "receiver and manager" has the meaning given to it in section 9 of the Australian Corporations Act; (iii) "Inventory" has the meaning provided in section

10 of the Australian PPSA; and (iv) "Subsidiary" means a subsidiary within the meaning given in Part 1.2 Division 6 of the Australian Corporations Act.

(b)  The parties agree that the Australian Banking Association Banking Code of Practice published by the Australian Bankers' Association (as amended, revised or amended and restated from time to time) does not apply to the Notes Documents or the transactions under them.

ARTICLE 2

ISSUE, DESCRIPTION, EXECUTION, REGISTRATION AND EXCHANGE OF NOTES

Section 2.01.  *Designation and Amount*.  The Notes shall be designated as the "7.50% Convertible Senior Secured Notes due [2028], Tranche [I][II]." The Notes are being issued pursuant to, and in accordance with, the Plan. The aggregate principal amount of Notes that may be authenticated and delivered under this Indenture is limited to $[_____][3] [_____][4], except for Notes authenticated and delivered upon registration or transfer of, or in exchange for, or in lieu of other Notes to the extent expressly permitted hereunder.

Section 2.02.  *Form of Notes*.  The Notes and the Trustee's certificate of authentication to be borne by such Notes shall be substantially in the respective forms set forth in Exhibit A, the terms and provisions of which shall constitute, and are hereby expressly incorporated in and made a part of this Indenture.  To the extent applicable, the Company and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby.

Any Global Note may be endorsed with or have incorporated in the text thereof such legends or recitals or changes not inconsistent with the provisions of this Indenture as may be required by the Custodian or the Depositary, or as may be required to comply with any applicable law or any regulation thereunder or with the rules and regulations of any securities exchange or automated quotation system upon which the Notes may be listed or traded or designated for issuance or to conform with any usage with respect thereto, or to indicate any special limitations or restrictions to which any particular Notes are subject.

Any of the Notes may have such letters, numbers or other marks of identification and such notations, legends or endorsements as the Officer executing the same may approve (execution thereof to be conclusive evidence of such approval) and as are not inconsistent with the provisions of this Indenture, or as may be required to comply with any law or with any rule or regulation made pursuant thereto or with any rule or regulation of any securities exchange or automated quotation system on which the Notes may be listed or designated for issuance, or to conform to usage or to indicate any special limitations or restrictions to which any particular Notes are subject.

Each Global Note shall represent such principal amount of the outstanding Notes as shall be specified therein and shall provide that it shall represent the aggregate principal amount of outstanding Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be increased or reduced to reflect repurchases, cancellations, conversions, transfers or exchanges permitted hereby.  Any endorsement of a Global Note to reflect the amount of any increase or decrease in the amount of outstanding Notes represented thereby shall be made by the Trustee or the Custodian, at the direction of the Trustee, in such manner and upon instructions given by the Holder of such Notes in accordance with this Indenture.  Payment of principal (including the Fundamental Change Repurchase Price, if applicable) of, and accrued and unpaid interest on, a Global Note shall be made to the Holder of such Note on the date of payment, unless a record date or other means of determining Holders eligible to receive payment is provided for herein.

---

[3]Insert for Tranche I notes. HB to confirm.

[4]Insert for Tranche II notes. HB to confirm.

Section 2.03.  *Date and Denomination of Notes; Payments of Interest and Defaulted Amounts*.

(a)      The Notes shall be issuable in registered form without coupons in denominations of $1,000 principal amount and integral multiples thereof.  Each Note shall be dated the date of its authentication and shall bear interest from the date specified on the face of such Note.  Accrued interest on the Notes shall be computed on the basis of a 360-day year composed of twelve 30-day months and, for partial months, on the basis of the number of days actually elapsed in a 30-day month.

(b)      The Person in whose name any Note (or its Predecessor Note) is registered on the Note Register at the close of business on any Regular Record Date with respect to any Interest Payment Date shall be entitled to receive the interest payable on such Interest Payment Date.  The principal amount of any Note (x) in the case of any Physical Note, shall be payable at the office or agency of the Company maintained by the Company for such purposes in the contiguous United States, which shall initially be the Corporate Trust Office and (y) in the case of any Global Note, shall be payable by wire transfer of immediately available funds to the account of the Depositary or its nominee, in accordance with the applicable procedures of the Depositary.  The Company shall pay interest (i) on any Physical Notes (A) to Holders holding Physical Notes having an aggregate principal amount of $5,000,000 or less, by check mailed to the Holders of these Notes at their address as it appears in the Note Register and (B) to Holders holding Physical Notes having an aggregate principal amount of more than $5,000,000, either by check mailed to each Holder or, upon application by such a Holder to the Note Registrar not later than the relevant Regular Record Date, by wire transfer in immediately available funds to that Holder's account within the United States, which application shall remain in effect until the Holder notifies, in writing, the Note Registrar to the contrary or (ii) on any Global Note by wire transfer of immediately available funds to the account of the Depositary or its nominee.

(c)      Any Defaulted Amounts shall forthwith cease to be payable to the Holder on the relevant payment date but shall accrue interest per annum at the rate borne by the Notes, subject to the enforceability thereof under applicable law, from, and including, such relevant payment date, and such Defaulted Amounts together with such interest thereon shall be paid by the Company, at its election in each case, as provided in clause (i) or (ii) below:

(i)      The Company may elect to make payment of or cause the Paying Agent to make payment of any Defaulted Amounts to the Persons in whose names the Notes (or their respective Predecessor Notes) are registered at the close of business on a special record date for the payment of such Defaulted Amounts, which shall be fixed in the following manner.  The Company shall notify the Trustee in writing of the amount of the Defaulted Amounts proposed to be paid on each Note and the date of the proposed payment (which shall be not less than 25 days after the receipt by the Trustee of such notice, unless the Trustee shall agree to an earlier date), and at the same time the Company shall deposit with the Trustee an amount of money equal to the aggregate amount to be paid in respect of such Defaulted Amounts or shall make arrangements satisfactory to the Trustee for such deposit on or prior to the date of the proposed payment, such money when deposited to be held in trust for the benefit of the Persons entitled to such Defaulted Amounts as in this clause provided.  Thereupon the Company shall fix a special record date for the payment of such Defaulted Amounts, which special record date shall be not more than 15 days and not less than 10 days prior to the date of the proposed payment, and not less than 10 days after the receipt by the Trustee of the notice of the proposed payment.  The Company shall promptly notify the Trustee in writing of such special record date, and the Trustee, in the name and at the expense of the Company, shall cause notice of the proposed payment of such Defaulted Amounts and the special record date therefor to be delivered to each Holder not less than 10 days prior to such special record date.  Notice of the proposed payment of such Defaulted Amounts and the special record date therefor having been so delivered, such Defaulted Amounts shall be paid to the Persons in whose names the Notes (or their respective Predecessor Notes) are registered at the close of business on such special record date and shall no longer be payable pursuant to the following clause (ii) of this Section 2.03(c)).

(ii)      The Company may make payment of or cause the Paying Agent to make payment of any Defaulted Amounts in any other lawful manner not inconsistent with the requirements of any securities exchange or automated quotation system on which the Notes may be listed or designated for issuance, and upon such notice as may be required by such exchange or automated quotation system, if, after notice given by the Company to the Trustee of the proposed payment pursuant to this clause, such manner of payment shall be deemed practicable by the Trustee.

Section 2.04.  *Execution, Authentication and Delivery of Notes*.   The Notes shall be signed in the name and on behalf of the Company by the manual, facsimile or other electronic signature of its Chief Executive Officer, President, Chief Financial Officer, Treasurer, Secretary or any of its Executive or Senior Vice Presidents.

At any time and from time to time after the execution and delivery of this Indenture, the Company may deliver Notes executed by the Company to the Trustee for authentication, together with a Company Order for the authentication and delivery of such Notes, and the Trustee in accordance with such Company Order shall authenticate and deliver such Notes, without any further action by the Company hereunder.

Only such Notes as shall bear thereon a certificate of authentication substantially in the form set forth on the form of Note attached as Exhibit A hereto, executed manually by an authorized signatory of the Trustee (or an authenticating agent appointed by the Trustee as provided by Section 17.10), shall be entitled to the benefits of this Indenture or be valid or obligatory for any purpose.  Such certificate by the Trustee (or such an authenticating agent) upon any Note executed by the Company shall be conclusive evidence that the Note so authenticated has been duly authenticated and delivered hereunder and that the Holder is entitled to the benefits of this Indenture.

In case any Officer of the Company who shall have signed any of the Notes shall cease to be such Officer before the Notes so signed shall have been authenticated and delivered by the Trustee, or disposed of by the Company, such Notes nevertheless may be authenticated and delivered or disposed of as though the person who signed such Notes had not ceased to be such Officer of the Company; and any Note may be signed on behalf of the Company by such persons as, at the actual date of the execution of such Note, shall be the Officers of the Company, although at the date of the execution of this Indenture any such person was not such an Officer.

Section 2.05.  *Exchange and Registration of Transfer of Notes; Restrictions on Transfer; Depositary*.  (a) The Company shall cause to be kept at the Corporate Trust Office a register (the register maintained in such office or in any other office or agency of the Company designated pursuant to **Section** 4.02, the "**Note Register**") in which, subject to such reasonable regulations as it may prescribe, the Company shall provide for the registration of Notes and of transfers of Notes.  Such register shall be in written form or in any form capable of being converted into written form within a reasonable period of time.  The Trustee is hereby initially appointed the "**Note Registrar**" for the purpose of registering Notes and transfers of Notes as herein provided.  The Company may appoint one or more co-Note Registrars in accordance with **Section** 4.02.

Upon surrender for registration of transfer of any Note to the Note Registrar or any co-Note Registrar, and satisfaction of the requirements for such transfer set forth in this Section 2.05, the Company shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Notes of any authorized denominations and of a like aggregate principal amount and bearing such restrictive legends as may be required by this Indenture.

Notes may be exchanged for other Notes of any authorized denominations and of a like aggregate principal amount, upon surrender of the Notes to be exchanged at any such office or agency maintained by the Company pursuant to Section 4.02.  Whenever any Notes are so surrendered for exchange, the Company shall execute, and the Trustee shall authenticate and deliver, in each case in accordance with the requirements of Section 2.04, the Notes that the Holder making the exchange is entitled to receive, bearing registration numbers not contemporaneously outstanding.

#96781386v10

All Notes presented or surrendered for registration of transfer or for exchange, repurchase or conversion shall (if so required by the Company, the Trustee, the Note Registrar or any co-Note Registrar) be duly endorsed, or be accompanied by a written instrument or instruments of transfer in form satisfactory to the Company and duly executed, by the Holder thereof or its attorney-in-fact duly authorized in writing.

No service charge shall be imposed by the Company, the Trustee, the Note Registrar, any co-Note Registrar or the Paying Agent for any exchange or registration of transfer of Notes, but the Company may require a Holder to pay a sum sufficient to cover any documentary, stamp or similar issue or transfer tax required in connection therewith as a result of the name of the Holder of new Notes issued upon such exchange or registration of transfer being different from the name of the Holder of the old Notes surrendered for exchange or registration of transfer.

None of the Company, the Trustee, the Note Registrar or any co-Note Registrar shall be required to exchange or register a transfer of (i) any Notes surrendered for conversion or, if a portion of any Note is surrendered for conversion, such portion thereof surrendered for conversion or (ii) any Notes, or a portion of any Note, surrendered for repurchase (and not withdrawn) in accordance with Article 15.

All Notes issued upon any registration of transfer or exchange of Notes in accordance with this Indenture shall be the valid obligations of the Company, evidencing the same debt, and entitled to the same benefits under this Indenture as the Notes surrendered upon such registration of transfer or exchange.

(b)        So long as the Notes are eligible for book-entry settlement with the Depositary, unless otherwise required by law, subject to the fourth paragraph from the end of (c), all Notes shall be represented by one or more Notes in global form (each, a "**Global Note**") registered in the name of the Depositary or the nominee of the Depositary.  The transfer and exchange of beneficial interests in a Global Note that does not involve the issuance of a Physical Note shall be effected through the Depositary (but not the Trustee or the Custodian) in accordance with this Indenture (including the restrictions on transfer set forth herein) and the applicable procedures of the Depositary therefor.

(c)        Every Note that bears or is required under this (c) to bear the legend set forth in this (c) (together with the Common Shares issued upon conversion of the Notes that is required to bear the legend set forth in 0, collectively, the "**Restricted Securities**") shall be subject to the restrictions on transfer set forth in this (c) (including the legend set forth below), unless such restrictions on transfer shall be eliminated or otherwise waived by written consent of the Company, and the Holder of each such Restricted Security, by such Holder's acceptance thereof, agrees to be bound by all such restrictions on transfer.  As used in this (c) and 0, the term "**transfer**" encompasses any sale, pledge, transfer or other disposition whatsoever of any Restricted Security.

Until the date (the "**Resale Restriction Termination Date**") that is the later of (1) the date that is one year after the date of original issuance of the Notes, or such shorter period of time as permitted by Rule 144 or any successor provision thereto, and (2) such later date, if any, as may be required by applicable law, any certificate evidencing such Note (and all securities issued in exchange therefor or substitution thereof, other than Common Shares issued upon conversion thereof, which shall bear the legend set forth in 0, if applicable) shall bear a legend in substantially the following form (unless such Notes have been transferred pursuant to a registration statement that has become or been declared effective under the Securities Act and that continues to be effective at the time of such transfer, or sold pursuant to the exemption from registration provided by Rule 144 or any similar provision then in force under the Securities Act, or unless otherwise agreed by the Company in writing, with written notice thereof to the Trustee in the form set forth in Exhibit B attached hereto):

THIS SECURITY AND THE COMMON SHARES ISSUABLE UPON CONVERSION OF THIS SECURITY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE ACQUIRER:

(1)     REPRESENTS THAT IT AND ANY ACCOUNT FOR WHICH IT IS ACTING IS A "QUALIFIED INSTITUTIONAL BUYER" (WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT) AND THAT IT EXERCISES SOLE INVESTMENT DISCRETION WITH RESPECT TO EACH SUCH ACCOUNT, AND

(2)     AGREES FOR THE BENEFIT OF INVACARE HOLDINGS CORPORATION (THE "**COMPANY**") THAT IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS SECURITY OR ANY BENEFICIAL INTEREST HEREIN PRIOR TO THE DATE THAT IS THE LATER OF (X) ONE YEAR AFTER THE ORIGINAL ISSUE DATE HEREOF OR SUCH SHORTER PERIOD OF TIME AS PERMITTED BY RULE 144 UNDER THE SECURITIES ACT OR ANY SUCCESSOR PROVISION THERETO AND (Y) SUCH LATER DATE, IF ANY, AS MAY BE REQUIRED BY APPLICABLE LAW, EXCEPT:

(A)     TO THE COMPANY OR ANY SUBSIDIARY THEREOF, OR

(B)     PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BECOME EFFECTIVE UNDER THE SECURITIES ACT, OR

(C)     TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, OR

(D)     PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT OR ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH CLAUSE (2)(D) ABOVE, THE COMPANY AND THE TRUSTEE RESERVE THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

No transfer of any Note prior to the applicable Resale Restriction Termination Date will be registered by the Note Registrar unless the applicable box on the Form of Assignment and Transfer has been checked.

Any Note (or security issued in exchange or substitution therefor) (i) as to which such restrictions on transfer shall have expired in accordance with their terms, (ii) that has been transferred pursuant to a registration statement that has become effective or been declared effective under the Securities Act and that continues to be effective at the time of such transfer or (iii) that has been sold pursuant to the exemption from registration provided by Rule 144 or any similar provision then in force under the Securities Act, may, upon surrender of such Note for exchange to the Note Registrar in accordance with the provisions of this Section 2.05, be exchanged for a new Note or Notes, of like tenor and aggregate principal amount, which shall not bear the restrictive legend required by this (c) and shall not be assigned a restricted CUSIP number. The Company shall be entitled to instruct the Custodian in writing to so surrender any Global Note as to which any of the conditions set forth in clause (i) through (iii) of the immediately preceding sentence have been satisfied, and, upon such instruction, the Custodian shall so surrender such Global Note for exchange; and any new Global Note so exchanged therefor shall not bear the restrictive legend specified in this (c) and shall not be assigned a restricted CUSIP number.  The Company shall promptly notify the Trustee in writing (in the form set forth in Exhibit B) upon the occurrence of the Resale Restriction Termination Date with respect to the Notes and promptly after a registration statement, if any, with respect to the Notes or the Common Shares issued upon conversion of the Notes has been declared effective under the Securities Act.  Upon notice of the Resale Restriction Termination Date with respect to the Notes, the legend set forth above shall be deemed removed from the Note, with no further action required by the Company, the Trustee, or, if applicable, the Depositary; *provided*, however, that, if the mandatory exchange

process of the Depositary is available therefor, the Company will use reasonable efforts to effect an exchange of every beneficial interest in each Restricted Security for beneficial interests in Global Notes that are not subject to the restrictions set forth in the restrictive legend or this (c) pursuant to such process on or prior to the 380th day after the date of original issuance for the Notes.

Notwithstanding any other provisions of this Indenture (other than the provisions set forth in this (c)), a Global Note may not be transferred as a whole or in part except (i) by the Depositary to a nominee of the Depositary or by a nominee of the Depositary to the Depositary or another nominee of the Depositary or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary and (ii) for exchange of a Global Note or a portion thereof for one or more Physical Notes in accordance with the second immediately succeeding paragraph.

The Depositary shall be a clearing agency registered under the Exchange Act.  The Company initially appoints The Depository Trust Company to act as Depositary with respect to each Global Note.  Initially, each Global Note shall be issued to the Depositary, registered in the name of Cede & Co., as the nominee of the Depositary, and deposited with the Trustee as custodian for Cede & Co.

If (i) the Depositary notifies the Company at any time that the Depositary is unwilling or unable to continue as depositary for the Global Notes and a successor depositary is not appointed within 90 days, (ii) the Depositary ceases to be registered as a clearing agency under the Exchange Act and a successor depositary is not appointed within 90 days or (iii) an Event of Default with respect to the Notes has occurred and is continuing and a beneficial owner of any Note requests that its beneficial interest therein be issued as a Physical Note, the Company shall execute, and the Trustee, upon receipt of an Officer's Certificate and a Company Order for the authentication and delivery of Notes, shall authenticate and deliver (x) in the case of clause (iii), a Physical Note to such beneficial owner in a principal amount equal to the principal amount of such Note corresponding to such beneficial owner's beneficial interest and (y) in the case of clause (i) or (ii), Physical Notes to each beneficial owner of the related Global Notes (or a portion thereof) in an aggregate principal amount equal to the aggregate principal amount of such Global Notes in exchange for such Global Notes, and upon delivery of the Global Notes to the Trustee such Global Notes shall be canceled.

Physical Notes issued in exchange for all or a part of the Global Note pursuant to this Section 2.05(c) shall be registered in such names and in such authorized denominations as the Depositary, pursuant to instructions from its direct or indirect participants or otherwise, or, in the case of clause (iii) of the immediately preceding paragraph, the relevant beneficial owner, shall instruct the Trustee in writing.  Upon execution and authentication, the Trustee shall deliver such Physical Notes to the Persons in whose names such Physical Notes are so registered.

At such time as all interests in a Global Note have been converted, canceled, repurchased or transferred, such Global Note shall be, upon receipt thereof, canceled by the Trustee in accordance with its then-customary procedures.  At any time prior to such cancellation, if any interest in a Global Note is exchanged for Physical Notes, converted, canceled, repurchased or transferred to a transferee who receives Physical Notes therefor or any Physical Note is exchanged or transferred for part of such Global Note, the principal amount of such Global Note shall, in accordance with the standing procedures and instructions existing between the Depositary and the Custodian, be appropriately reduced or increased, as the case may be, and an endorsement shall be made on such Global Note, by the Trustee or the Custodian, at the direction of the Trustee, to reflect such reduction or increase.

None of the Company, the Trustee or any agent of the Company or the Trustee shall have any responsibility or incur any liability for any aspect of the records relating to or payments made on account of beneficial ownership interests of a Global Note or maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

The Trustee in each of its various capacities as designated from time to time hereunder shall have no responsibility or obligation to any beneficial owner of a Global Note, a member of, or a participant in, the Depositary or other Person with respect to the accuracy of the records of the Depositary or its nominee or of any participant or member thereof, with respect to any ownership interest in the Notes

or with respect to the delivery to any participant, member, beneficial owner or other Person (other than the Depositary) of any notice (including any notice of purchase) or the payment of any amount or delivery of any Notes (or other security or property) under or with respect to such Notes. All notices and communications to be given to the Holders and all payments to be made to Holders in respect of the Notes shall be given or made only to or upon the order of the registered Holders (which shall be the Depositary or its nominee in the case of a Global Note). The rights of beneficial owners in any Global Note shall be exercised only through the Depositary subject to the applicable rules and procedures of the Depositary. The Trustee in each of its various capacities as designated from time to time hereunder may rely and shall be fully protected in relying upon information furnished by the Depositary with respect to its members, participants and any beneficial owners.

None of the Note Registrar, the Trustee in each of its various capacities as designated from time to time hereunder or the Conversion Agent shall have any obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Note (including any transfers between or among the Depositary participants, members or beneficial owners in any Global Note) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by, the terms of this Indenture. None of the Note Registrar, the Trustee in each of its various capacities as designated from time to time hereunder, the Conversion Agent or any of their agents shall have any responsibility for any actions taken or not taken by the Depositary.

(d)       Until the applicable Resale Restriction Termination Date, any stock certificate representing Common Shares issued upon conversion of a Note shall bear a legend in substantially the following form (unless such Common Shares have been transferred pursuant to a registration statement that has become or been declared effective under the Securities Act and that continues to be effective at the time of such transfer, or pursuant to the exemption from registration provided by Rule 144 or any similar provision then in force under the Securities Act, or such Common Shares have been issued upon conversion of a Note that has transferred pursuant to a registration statement that has become or been declared effective under the Securities Act and that continues to be effective at the time of such transfer, or pursuant to the exemption from registration provided by Rule 144 or any similar provision then in force under the Securities Act, or unless otherwise agreed by the Company with written notice thereof to the Trustee and any transfer agent for the Common Shares):

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE ACQUIRER:

(1)       REPRESENTS THAT IT AND ANY ACCOUNT FOR WHICH IT IS ACTING IS A "QUALIFIED INSTITUTIONAL BUYER" (WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT) AND THAT IT EXERCISES SOLE INVESTMENT DISCRETION WITH RESPECT TO EACH SUCH ACCOUNT, AND

(2)       AGREES FOR THE BENEFIT OF INVACARE HOLDINGS CORPORATION (THE "**COMPANY**") THAT IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS SECURITY OR ANY BENEFICIAL INTEREST HEREIN PRIOR TO THE DATE THAT IS THE LATER OF (X) ONE YEAR AFTER THE ORIGINAL ISSUE DATE OF THE SERIES OF NOTES UPON THE CONVERSION OF WHICH THIS SECURITY WAS ISSUED OR SUCH SHORTER PERIOD OF TIME AS PERMITTED BY RULE 144 UNDER THE SECURITIES ACT OR ANY SUCCESSOR PROVISION THERETO AND (Y) SUCH LATER DATE, IF ANY, AS MAY BE REQUIRED BY APPLICABLE LAW, EXCEPT:

(A)       TO THE COMPANY OR ANY SUBSIDIARY THEREOF, OR

(B)       PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BECOME EFFECTIVE UNDER THE SECURITIES ACT, OR

#96781386v10

(C)　　TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, OR

(D)　　PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT OR ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH CLAUSE (2)(D) ABOVE, THE COMPANY AND THE TRANSFER AGENT FOR THE COMPANY'S COMMON SHARES RESERVE THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

Any such Common Shares (i) as to which such restrictions on transfer shall have expired in accordance with their terms, (ii) that has been transferred pursuant to a registration statement that has become or been declared effective under the Securities Act and that continues to be effective at the time of such transfer or (iii) that has been sold pursuant to the exemption from registration provided by Rule 144 or any similar provision then in force under the Securities Act, may, upon surrender of the certificates representing such Common Shares for exchange in accordance with the procedures of the transfer agent for the Common Shares, be exchanged for a new certificate or certificates for a like aggregate number of Common Shares, which shall not bear the restrictive legend required by this (d).

(e)　　Any Note or Common Shares issued upon the conversion or exchange of a Note that is repurchased or owned by any Affiliate of the Company (or any Person who was an Affiliate of the Company at any time during the three months preceding) may not be resold by such Affiliate (or such Person, as the case may be) unless registered under the Securities Act or resold pursuant to an exemption from the registration requirements of the Securities Act in a transaction that results in such Note or Common Shares, as the case may be, no longer being a "restricted security" (as defined under Rule 144). The Company shall cause any Note that is repurchased or owned by it to be surrendered to the Trustee for cancellation in accordance with Section 2.08.

Section 2.06.　*Mutilated, Destroyed, Lost or Stolen Notes*. In case any Note shall become mutilated or be destroyed, lost or stolen, the Company in its discretion may execute, and upon its written request the Trustee or an authenticating agent appointed by the Trustee shall authenticate and deliver, in each case in accordance with the requirements of **Section** 2.04, a new Note, bearing a registration number not contemporaneously outstanding, in exchange and substitution for the mutilated Note, or in lieu of and in substitution for the Note so destroyed, lost or stolen. In every case the applicant for a substituted Note shall furnish to the Company, to the Trustee and, if applicable, to such authenticating agent such security or an indemnity bond as may be required by them to save each of them harmless from any loss, claim, liability, cost, damage or expense caused by or connected with such substitution, and, in every case of destruction, loss or theft, the applicant shall also furnish to the Company, to the Trustee and, if applicable, to such authenticating agent evidence to their satisfaction of the destruction, loss or theft of such Note and of the ownership thereof.

The Trustee or such authenticating agent may authenticate any such substituted Note and deliver the same upon the receipt of such security or indemnity as the Trustee, the Company and, if applicable, such authenticating agent may require. No service charge shall be imposed by the Company, the Trustee, the Note Registrar, any co-Note Registrar or the Paying Agent upon the issuance of any substitute Note, but the Company may require a Holder to pay a sum sufficient to cover any documentary, stamp or similar issue or transfer tax required in connection therewith as a result of the name of the Holder of the new substitute Note being different from the name of the Holder of the old Note that became mutilated or was destroyed, lost or stolen. In case any Note that has matured or is about to mature or has been surrendered

for required repurchase or is about to be converted in accordance with <u>Article 14</u> shall become mutilated or be destroyed, lost or stolen, the Company may, in its sole discretion, instead of issuing a substitute Note, pay or authorize the payment of or convert or authorize the conversion of the same (without surrender thereof except in the case of a mutilated Note), as the case may be, if the applicant for such payment or conversion shall furnish to the Company, to the Trustee and, if applicable, to such authenticating agent such security or indemnity as may be required by them to save each of them harmless for any loss, claim liability, cost, damage or expense caused by or connected with such substitution, and, in every case of destruction, loss or theft, evidence satisfactory to the Company, the Trustee and, if applicable, any Paying Agent or Conversion Agent evidence of their satisfaction of the destruction, loss or theft of such Note and of the ownership thereof.

Every substitute Note issued pursuant to the provisions of this <u>Section 2.06</u> by virtue of the fact that any Note is destroyed, lost or stolen shall constitute an additional contractual obligation of the Company, whether or not the destroyed, lost or stolen Note shall be found at any time, and shall be entitled to all the benefits of (but shall be subject to all the limitations set forth in) this Indenture equally and proportionately with any and all other Notes duly issued hereunder.  To the extent permitted by law, all Notes shall be held and owned upon the express condition that the foregoing provisions are exclusive with respect to the replacement, payment, conversion or repurchase of mutilated, destroyed, lost or stolen Notes and shall preclude any and all other rights or remedies notwithstanding any law or statute existing or hereafter enacted to the contrary with respect to the replacement, payment, conversion or repurchase of negotiable instruments or other securities without their surrender.

Section 2.07.  *Temporary Notes*.  Pending the preparation of Physical Notes, the Company may execute and the Trustee or an authenticating agent appointed by the Trustee shall, in each case in accordance with the requirements of **Section 2.04**, authenticate and deliver temporary Notes (printed or lithographed).  Temporary Notes shall be issuable in any authorized denomination, and substantially in the form of the Physical Notes but with such omissions, insertions and variations as may be appropriate for temporary Notes, all as may be determined by the Company.  Every such temporary Note shall be executed by the Company and authenticated by the Trustee or such authenticating agent upon the same conditions and in substantially the same manner, and with the same effect, as the Physical Notes. Without unreasonable delay, the Company shall execute and deliver to the Trustee or such authenticating agent Physical Notes (other than any Global Note) and thereupon any or all temporary Notes (other than any Global Note) may be surrendered in exchange therefor, at each office or agency maintained by the Company pursuant to **Section 4.02** and the Trustee or such authenticating agent shall authenticate and deliver, in each case in accordance with the requirements of **Section 2.04**, in exchange for such temporary Notes an equal aggregate principal amount of Physical Notes.  Such exchange shall be made by the Company at its own expense and without any charge therefor.  Until so exchanged, the temporary Notes shall in all respects be entitled to the same benefits and subject to the same limitations under this Indenture as Physical Notes authenticated and delivered hereunder.

Section 2.08.  *Cancellation of Notes Paid, Converted, Etc*.  The Company shall cause all Notes surrendered for the purpose of payment, repurchase, registration of transfer or exchange or conversion, if surrendered to any Person other than the Trustee (including any of the Company's agents, Subsidiaries or Affiliates), to be surrendered to the Trustee for cancellation.  All Notes delivered to the Trustee shall be canceled promptly by it in accordance with its then-customary procedures, and no Notes shall be authenticated in exchange thereof except as expressly permitted by any of the provisions of this Indenture.  The Trustee shall dispose of canceled Notes in accordance with its then-customary procedures.

Section 2.09.  *CUSIP Numbers*.  The Company in issuing the Notes may use "CUSIP" numbers (if then generally in use), and, if so, the Trustee shall use "CUSIP" numbers in all notices issued to Holders as a convenience to such Holders; *provided* that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or on such notice and that

#96781386v10

reliance may be placed only on the other identification numbers printed on the Notes.  The Company shall promptly notify the Trustee in writing of any change in the "CUSIP" numbers.[5]

Section 2.10.  *Repurchases*.  The Company may, to the extent permitted by law, and directly or indirectly (regardless of whether such Notes are surrendered to the Company), repurchase Notes in the open market or otherwise, whether by the Company or its Subsidiaries or through a private or public tender or exchange offer or through counterparties to private agreements, including by cash-settled swaps or other derivatives.  The Company shall cause any Notes so repurchased (other than Notes repurchased pursuant to cash-settled swaps or other derivatives) to be surrendered to the Trustee for cancellation in accordance with **Section** 2.08 and such Notes shall no longer be considered outstanding under this Indenture upon their repurchase.

## ARTICLE 3
### SATISFACTION AND DISCHARGE

Section 3.01.  *Satisfaction and Discharge*.  Upon written request of the Company contained in an Officer's Certificate delivered to the Trustee, this Indenture shall cease to be of further effect with respect to the Notes and all Note Guarantees and Liens on Collateral securing the Notes will be released, and the Trustee, at the expense of the Company, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture and release of such Guarantees and Liens, when (a) (i) all Notes theretofore authenticated and delivered (other than Notes which have been destroyed, lost or stolen and which have been replaced, paid or converted as provided in **Section** 2.06) have been delivered to the Trustee for cancellation; or (ii) the Company has irrevocably deposited with the Trustee or delivered to Holders, as applicable, after the Notes have become due and payable, whether on the Maturity Date, any Fundamental Change Repurchase Date, upon conversion or otherwise, cash or cash and Common Shares, if any (solely to satisfy the Company's Conversion Obligation, if applicable), sufficient to pay all of the outstanding Notes and all other sums due and payable under this Indenture by the Company; and (b) the Company has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture have been complied with.  Notwithstanding the satisfaction and discharge of this Indenture, the obligations of the Company to the Trustee under **Section** 7.06 shall survive.

## ARTICLE 4
### PARTICULAR COVENANTS OF THE COMPANY

Section 4.01.  *Payment of Principal and Interest*.  The Company covenants and agrees that it will cause to be paid the principal (including the Fundamental Change Repurchase Price, if applicable) of, and accrued and unpaid interest on, each of the Notes at the places, at the respective times and in the manner provided herein and in the Notes.

For the purposes of the Interest Act (Canada) and disclosure thereunder, whenever any interest or any fee to be paid hereunder is to be calculated on the basis of a 360-day or 365-day year, the yearly rate of interest to which the rate used in such calculation is equivalent is the rate so used multiplied by the actual number of days in the calendar year in which the same is to be ascertained and divided by 360 or 365, as applicable. The rates of interest under this Indenture are nominal rates, and not effective rates or yields. The principle of deemed reinvestment of interest does not apply to any interest calculation under this Indenture.

---

[5] Note to K&E: The language on fungibility of sub-tranches was included in the precedent because the financing was staggered over different stages there, and we issued sub-tranches of the notes on separate occasions.  We don't think including the sub-tranche language here makes sense because (i) all of the notes will be issued in a single issuance under the Plan, and the Company doesn't have capacity to issue additional notes, and (ii) the indenture doesn't refer to "sub-tranches" anywhere else.

If any provision of this Indenture would oblige the Company to make any payment of interest or other amount payable to any Holder in an amount or calculated at a rate which would be prohibited by applicable law or would result in a receipt by such Holder of "interest" at a "criminal rate," as such terms are construed under the Criminal Code (Canada), then, notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by applicable law or so result in a receipt by such Holder of "interest" at a "criminal rate."

Section 4.02. *Maintenance of Office or Agency*.   The Company will maintain in the contiguous United States, an office or agency where the Notes may be surrendered for registration of transfer or exchange or for presentation for payment or repurchase ("**Paying Agent**") or for conversion ("**Conversion Agent**") and where notices and demands to or upon the Company in respect of the Notes and this Indenture may be served.  The Company will give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency.  If at any time the Company shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office or the office or agency of the Trustee in the contiguous United States; *provided*, no service of legal process on the Company may be made at the Corporate Trust Office.

The Company may also from time to time designate as co-Note Registrars one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; *provided* that no such designation or rescission shall in any manner relieve the Company of its obligation to maintain an office or agency in the contiguous United States, for such purposes.  The Company will give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.  The terms "**Paying Agent**" and "**Conversion Agent**" include any such additional or other offices or agencies, as applicable.

The Company hereby initially designates the Trustee as the Paying Agent, Note Registrar, Custodian and Conversion Agent and the Corporate Trust Office as the office or agency in the contiguous United States, where Notes may be surrendered for registration of transfer or exchange or for presentation for payment or repurchase or for conversion and where notices and demands to or upon the Company in respect of the Notes and this Indenture may be served.

If the Company enters into an agency agreement with any registrar, paying agent, co-registrar or transfer agent that is not a party to the Indenture, it will notify the Trustee in writing of the name and address of each such agent. In addition, where the Trustee is entitled to appoint a paying agent or authentication agent, the Company shall, at all times, be responsible to pay each such party.

Section 4.03. *Appointments to Fill Vacancies in Trustee's Office*.   The Company, whenever necessary to avoid or fill a vacancy in the office of trustee, will appoint, in the manner provided in **Section** 7.09, a trustee, so that there shall at all times be a trustee hereunder.

Section 4.04. *Provisions as to Paying Agent*.  (a) If the Company shall appoint a Paying Agent other than the Trustee, the Company will cause such Paying Agent to execute and deliver to the Trustee an instrument in which such agent shall agree with the Trustee, subject to the provisions of this **Section** 4.04:

(i)      that it will hold all sums held by it as such agent for the payment of the principal (including the Fundamental Change Repurchase Price, if applicable) of, and accrued and unpaid interest on, the Notes in trust for the benefit of the Holders of the Notes;

(ii)     that it will give the Trustee prompt written notice of any failure by the Company to make any payment of the principal (including the Fundamental Change Repurchase Price, if

48

applicable) of, and accrued and unpaid interest on, the Notes when the same shall be due and payable; and

(iii)     that at any time during the continuance of an Event of Default, upon written request of the Trustee, it will forthwith pay to the Trustee all sums so held in trust.

The Company shall, on or before each due date of the principal (including the Fundamental Change Repurchase Price, if applicable) of, or accrued and unpaid interest on, the Notes, irrevocably deposit with the Paying Agent a sum sufficient to pay such principal (including the Fundamental Change Repurchase Price, if applicable) or accrued and unpaid interest, and (unless such Paying Agent is the Trustee) the Company will promptly notify the Trustee in writing of any failure to take such action; *provided* that if such deposit is made on the due date, such deposit must be received by the Paying Agent by 11:00 a.m., New York City time, on such date.

For the avoidance of doubt, the Paying Agent and the Trustee shall be held harmless and have no liability with respect to payments or disbursements to be made by the Paying Agent and/or Trustee (i) for which payment instructions are not made or that are not otherwise deposited by the respective times set forth in this Section 4.04 and (ii) until they have confirmed receipt of funds sufficient to make the relevant payment. Neither the Paying Agent nor the Trustee (as applicable) shall be bound to make payment of any amount pursuant to this Indenture until it is satisfied that it has received full payment of such amount from or on behalf of the Company.

(b)     If the Company shall act as its own Paying Agent, it will, on or before each due date of the principal (including the Fundamental Change Repurchase Price, if applicable) of, and accrued and unpaid interest on, the Notes, set aside, segregate and hold in trust for the benefit of the Holders of the Notes a sum sufficient to pay such principal (including the Fundamental Change Repurchase Price, if applicable) and accrued and unpaid interest so becoming due and will promptly notify the Trustee in writing of any failure to take such action and of any failure by the Company to make any payment of the principal (including the Fundamental Change Repurchase Price, if applicable) of, or accrued and unpaid interest on, the Notes when the same shall become due and payable.

(c)     Anything in this Section 4.04 to the contrary notwithstanding, the Company may, at any time, for the purpose of obtaining a satisfaction and discharge of this Indenture, or for any other reason, pay, cause to be paid or deliver to the Trustee all sums or amounts held in trust by the Company or any Paying Agent hereunder as required by this Section 4.04, such sums or amounts to be held by the Trustee upon the trusts herein contained and upon such payment or delivery by the Company or any Paying Agent to the Trustee, the Company or such Paying Agent shall be released from all further liability but only with respect to such sums or amounts.

(d)     Any money and Common Shares deposited with the Trustee or any Paying Agent, or then held by the Company, in trust for the payment of the principal (including the Fundamental Change Repurchase Price, if applicable) of, accrued and unpaid interest on and the consideration due upon conversion of any Note and remaining unclaimed for two years after such principal (including the Fundamental Change Repurchase Price, if applicable), interest or consideration due upon conversion has become due and payable shall be paid to the Company on written request of the Company contained in an Officer's Certificate delivered to the Trustee, or (if then held by the Company) shall be discharged from such trust; and the Holder of such Note shall thereafter look only to the Company for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money and Common Shares, and all liability of the Company as Trustee thereof, shall thereupon cease.

Section 4.05. *Existence*.  Subject to **Article** 11, the Company shall do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence.

Section 4.06. *Rule 144A Information Requirement; Reports; and Additional Interest*.

(a)     At any time the Company is not subject to Section 13 or 15(d) of the Exchange Act, the Company shall, so long as any of the Notes or the Common Shares issuable upon conversion thereof shall, at such time, constitute "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act, promptly provide to the Trustee and, upon written request, any Holder, beneficial owner or prospective purchaser of such Notes or the Common Shares issuable upon conversion of such Notes, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act to facilitate the resale of such Notes or Common Shares pursuant to Rule 144A.

(b)     For so long as the Company is subject to Section 13 or 15(d) of the Exchange Act, the Company shall deliver to the Trustee, within 15 days after the same are required to be filed with the Commission, copies of any documents or reports that the Company is required to file with the Commission pursuant to Section 13 or 15(d) of the Exchange Act (giving effect to any grace period provided by Rule 12b-25 under the Exchange Act or any similar or successor grace period); *provided*, that, notwithstanding the foregoing, for the financial statements to be delivered in connection with the fiscal quarter ended June 30, 2023, the Company shall use commercially reasonable efforts to deliver such financial statements when possible and shall be under no obligation to deliver such financial statements by any date.  Any such document or report that the Company files with the Commission via the Commission's EDGAR system shall be deemed to be delivered to the Trustee for purposes of this (b) at the time such documents are filed via the EDGAR system, it being understood that the Trustee shall have no responsibility to determine whether any documents have been filed on the EDGAR system. Notwithstanding anything to the contrary in this Indenture, the Company shall in no event be required to file with, or otherwise provide or disclose to, the Trustee or any Holder any information for which the Company is seeking, or has received, confidential treatment from the Commission.

(c)     Delivery of the reports and documents described in subsection (b) above to the Trustee is for informational purposes only, and the Trustee's receipt of such shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants hereunder (as to which the Trustee is entitled to conclusively rely on an Officer's Certificate).

(d)     If, at any time during the six-month period beginning on, and including, the date that is six months after the date of original issuance of the Notes, the Company fails to timely file any document or report that it is required to file with the Commission pursuant to Section 13 or 15(d) of the Exchange Act, as applicable (after giving effect to all applicable grace periods thereunder and other than reports on Form 8-K), or such Notes are not otherwise freely tradable under Rule 144 by Holders other than the Company's Affiliates or Holders that were the Company's Affiliates at any time during the three months preceding (as a result of restrictions pursuant to U.S. securities laws or the terms of this Indenture or the Notes (other than any restriction arising solely from the Company's or the Trustee's ability to require the delivery of legal opinions, certificates or other evidence in order to demonstrate that the proposed transfer is being made in compliance with applicable securities laws)), the Company shall pay Additional Interest on the Notes. Such Additional Interest shall accrue on the Notes at the rate of (i) 0.25% per annum of the principal amount of the Notes outstanding for each of the first 90 days and (ii) 0.50% per annum of the principal amount of the Notes outstanding for each day from, and including, the 91st day during such period for which the Company's failure to file has occurred and is continuing or the Notes are not otherwise freely tradable under Rule 144 by Holders other than the Company's Affiliates (or Holders that have been the Company's Affiliates at any time during the three months preceding) without restrictions pursuant to U.S. securities laws or the terms of this Indenture or the Notes (other than any restriction arising solely from the Company's or the Trustee's ability to require the delivery of legal opinions, certificates or other evidence in order to demonstrate that the proposed transfer is being made in compliance with applicable securities laws).  As used in this Section 4.06(c), documents or reports that the Company is required to "file" with the Commission pursuant to Section 13 or 15(d) of the Exchange Act does not include documents or reports that the Company furnishes to the Commission pursuant to Section 13 or 15(d) of the Exchange Act.

(e)     If, and for so long as, the restrictive legend on the Notes specified in Section 2.05(c) has not been removed, the Notes are assigned a restricted CUSIP or the Notes are not otherwise freely tradable under Rule 144 by Holders other than the Company's Affiliates or Holders that were the Company's

Affiliates at any time during the three months preceding (without restrictions pursuant to U.S. securities laws or the terms of this Indenture or the Notes) as of the 380th day after the date of original issuance of the Notes, the Company shall pay Additional Interest on the Notes at a rate equal to 0.50% per annum of the principal amount of the Notes outstanding until the restrictive legend on the Notes has been removed in accordance with Section 2.05(c), the Notes are assigned an unrestricted CUSIP and the Notes are freely tradable under Rule 144 by Holders other than the Company's Affiliates (or Holders that were the Company's Affiliates at any time during the three months preceding) (without restrictions pursuant to U.S. securities laws or the terms of this Indenture or the Notes).

(f)      [Reserved].

(g)      Additional Interest will be payable in arrears on each Interest Payment Date following accrual in the same manner as regular interest on the Notes.

(h)      The Additional Interest that is payable in accordance with (d) or (e) shall, subject to the immediately succeeding sentence, be in addition to, and not in lieu of, any Additional Interest that may be payable as a result of the Company's election pursuant to Section 6.03.  However, in no event shall any Additional Interest that may accrue as a result of the Company's failure to timely file any document or report that it is required to file with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Exchange Act, as applicable (after giving effect to all applicable grace periods thereunder and other than reports filed on Form 8-K), as described in (d), together with any interest that may accrue in the event the Company elects to pay Additional Interest in respect of an Event of Default relating to the Company's failure to comply with its obligations as set forth in (b) pursuant to Section 6.03, accrue at a rate in excess of 0.50% per annum pursuant to this Indenture, regardless of the number of events or circumstances giving rise to the requirement to pay such Additional Interest.

(i)      If Additional Interest is payable by the Company pursuant to this Section 4.06, the Company shall deliver to the Trustee an Officer's Certificate to that effect stating (i) the amount of such Additional Interest that is payable and (ii) the date on which such Additional Interest is payable.  Unless and until a Responsible Officer of the Trustee receives at the Corporate Trust Office such an Officer's Certificate, the Trustee may conclusively assume without inquiry that no such Additional Interest is payable.  If the Company has paid Additional Interest directly to the Persons entitled to it, the Company shall deliver to the Trustee an Officer's Certificate setting forth the particulars of such payment.

Section 4.07.  *Stay, Extension and Usury Laws*.  The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law that would prohibit or forgive the Company from paying all or any portion of the principal of or interest on the Notes as contemplated herein, wherever enacted, now or at any time hereafter in force, or that may affect the covenants or the performance of this Indenture; and the Company (to the extent it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

Section 4.08.  *Compliance Certificate; Statements as to Defaults*.  The Company shall deliver to the Trustee within 120 days after the end of each fiscal year of the Company (beginning with the fiscal year ending on [    ]) an Officer's Certificate stating whether the signers thereof have knowledge of any failure by the Company to comply with all conditions and covenants then required to be performed under this Indenture during such fiscal year and, if so, specifying each such failure and the nature thereof.

In addition, the Company shall deliver to the Trustee, as soon as possible, and in any event within 30 days after the occurrence of any Event of Default or Default, an Officer's Certificate setting forth the details of such Event of Default or Default, its status and the action that the Company is taking or proposing to take in respect thereof.

Section 4.09.  *Qualifying Disposition.*   Notwithstanding any other provision of this Indenture to the contrary, each converting Holder covenants and agrees that any sale, transfer or other disposition of Common Shares delivered upon conversion of the Notes must be a Qualifying Disposition.

Section 4.10.  *Indebtedness; Certain Equity Securities.*

(a)      the Company will not, and will not permit any Restricted Subsidiary to, create, incur, assume or permit to exist any Indebtedness, except:

(i)      the incurrence by the Company and any Note Guarantors of Indebtedness represented by the Notes (including any Guarantee) and any Permitted Refinancing thereof;

(ii)      Indebtedness outstanding on the Issue Date (other than Indebtedness described in Sections ***4.10***(a)(i), 4.10(a)(v), ***4.10***(a)(xvii), ***4.10***(a)(xviii), ***4.10***(a)(xxi), ***4.10***(a)(xxii), ***4.10***(a)(xxiii) and ***4.10***(a)(xxv)) and any Permitted Refinancing thereof;

(iii)      Guarantees by Invacare Corporation and the Restricted Subsidiaries in respect of Indebtedness of Invacare Corporation or any Restricted Subsidiary otherwise permitted hereunder (other than (x) Guarantees by Restricted Subsidiaries that are not Domestic Note Guarantors or Canadian Note Guarantors of Indebtedness incurred pursuant to Section 4.10(a)(xxii) and (y) Guarantees by Restricted Subsidiaries that are not EMEA Note Parties of Indebtedness incurred pursuant to Section 4.10(a)(xxv)); *provided* that (a) such Guarantee is otherwise permitted by ***Section*** 4.13, (b) no Guarantee by any Restricted Subsidiary of any Junior Financing shall be permitted unless such Restricted Subsidiary shall have also provided a Guarantee of the Notes Obligations pursuant to a Note Guarantee and (c) if the Indebtedness being Guaranteed is subordinated to the Notes Obligations, such Guarantee shall be subordinated to the Note Guarantee on terms at least as favorable (as reasonably determined by the Required Holders) taken as a whole, to the Holders of the Notes as those contained in the subordination of such Indebtedness;

(iv)      Indebtedness of Invacare Corporation or any Restricted Subsidiary owing to the Company or any Restricted Subsidiary to the extent permitted by ***Section*** 4.13; *provided* that all such Indebtedness of the Note Parties owing to any Restricted Subsidiary that is not a Note Party shall be subordinated in right of payment to the Notes (but only to the extent permitted by applicable law and not giving rise to material adverse Tax consequences) on terms reasonably satisfactory to the Required Holders;

(v)      (A) Indebtedness (including Capital Lease Obligations) of Invacare Corporation or any Restricted Subsidiary financing the acquisition, construction, repair, replacement, installation or improvement of any property (real or personal, and whether through the direct purchase of property or the Equity Interest of any person owning such property); *provided* that such Indebtedness is incurred concurrently with or within 270 days after the applicable acquisition, construction, repair, replacement, installation or improvement, and (B) any Permitted Refinancing of any Indebtedness set forth in the immediately preceding subclause (A); *provided further* that, at the time of any such incurrence of Indebtedness and after giving pro forma effect thereto and to the use of the proceeds thereof, the aggregate principal amount of Indebtedness that is outstanding in reliance on this subclause *(*v*)* shall not exceed $20,000,000 as of such time;

(vi)      Indebtedness in respect of Swap Agreements entered into to hedge or mitigate risks to which the Company or any Restricted Subsidiary has actual exposure (other than those in respect of shares of capital stock or other Equity Interests of the Company or any Restricted Subsidiary), including Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of the Company or any Restricted Subsidiary;

#96781386v10

(vii)    Indebtedness incurred pursuant to Section 8a of the German Old Age Employees Retirement Act (*Altersteilzeitgesetz*) or Section 7e of the Fourth Book of the German Social Security Code IV (*Sozialgesetzbuch IV*);

(viii)    Indebtedness consisting of unsecured promissory notes issued by any Note Party to current or former officers, managers, consultants, independent contractors, directors and employees or their respective estates, successors, spouses, former spouses, domestic partners, heirs, legatees or distributees to finance the purchase or redemption of Equity Interests of the Company permitted by **_Section_** 4.17(a);

(ix)    (A) Indebtedness arising from an agreement providing for indemnification obligations or obligations in respect of purchase price (including earnouts) or other similar adjustments incurred in any Investment or any Disposition, in each case permitted under this Indenture and (B) Indebtedness arising from guaranties, letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments securing the performance pursuant to any such agreement described in clause (A);

(x)    Indebtedness consisting of obligations under deferred compensation or other similar arrangements incurred (A) in the ordinary course of business to current or former directors, officers, employees, members of management, managers and consultants of the Company and/or any Restricted Subsidiary and (B) in connection with any Investment permitted hereunder;

(xi)    Cash Management Obligations and other Indebtedness in respect of netting services, cash pooling, overdraft protections and similar arrangements and Indebtedness arising from the honoring of a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds, in each case in the ordinary course of business;

(xii)    Indebtedness of Invacare Corporation, the other Domestic Note Guarantors and the Canadian Note Guarantors; *provided* that at the time of the incurrence thereof and after giving pro forma effect thereto, the aggregate principal amount of Indebtedness outstanding in reliance on this clause (xii) shall not exceed $10,000,000 and shall be subject to the Required Additional Debt Terms;

(xiii)    Indebtedness consisting of (A) the financing of insurance premiums or (B) take-or-pay obligations contained in supply arrangements, in each case in the ordinary course of business;

(xiv)    Indebtedness incurred by Invacare Corporation or any Restricted Subsidiary in respect of letters of credit, bank guarantees, bankers' acceptances, or similar instruments issued or created, or related to obligations or liabilities (other than Indebtedness) incurred in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other reimbursement-type obligations regarding workers compensation claims;

(xv)    obligations in respect of performance, bid, appeal and surety bonds and performance, bankers acceptance facilities and completion guarantees, leases, government or trade contracts and similar obligations provided by Invacare Corporation or any Restricted Subsidiary or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(xvi)    [reserved];

(xvii)    Indebtedness under the De Lage Program in the ordinary course of business and consistent with past practice and any Permitted Refinancing thereof in an aggregate amount at any time outstanding not to exceed $10,000,000;

#96781386v10

(xviii)   Indebtedness supported by a Letter of Credit (as defined in the ABL North America Credit Agreement or equivalent term under any document governing any other revolving credit facility), in a principal amount not to exceed the face amount of such Letter of Credit (as defined in the ABL North America Credit Agreement or equivalent term under any document governing any other revolving credit facility);

(xix)   any liability in respect of any Loan Party arising under a declaration of joint and several liability (*hoofdelijke aansprakelijkheid*) as referred to in Section 2:403 of the Dutch Civil Code (and any residual liability under such declaration arising pursuant to Section 2:404(2) of the Dutch Civil Code;

(xx)   any liability arising as a result of a fiscal unity (*fiscale eenheid*) between Note Parties;

(xxi)   Indebtedness in respect of the Other Senior Secured Convertible Notes (including any related Guarantee) and any Permitted Refinancing thereof;

(xxii)   Indebtedness of Invacare Corporation, any Note Guarantor that is a Canadian Subsidiary and/or any Note Guarantor that is a Domestic Subsidiary (other than Invacare Corporatoin) under (A) the ABL North America Credit Agreement and (B) any Permitted Refinancing of Indebtedness incurred pursuant to the foregoing subclause (A); *provided* that the aggregate principal amount of Indebtedness outstanding in reliance on this <u>clause (xxii))</u> shall not exceed $40,000,000; *provided further*, that any such Indebtedness, if secured, shall be secured only by Liens permitted under Section 4.11(xix)(B);

(xxiii)   Indebtedness in respect of (A) the Credit Agreement and (B) any Permitted Refinancing thereof; *provided* that the aggregate principal amount of Indebtedness outstanding in reliance on this <u>clause (</u>xxiii)<u>(A)</u> shall not exceed $[85,000,000];

(xxiv)   Guarantees by the Company of Indebtedness incurred pursuant to and ***Section*** 4.10(a)(xxii) and Section 4.10(a)(xxiii);

(xxv)   Indebtedness of any EMEA Note Party under (A) a Permitted ABL EMEA Credit Facility and (B) any Permitted Refinancing of Indebtedness incurred pursuant to the foregoing subclause (A); provided, that the aggregate principal amount of Indebtedness outstanding in reliance on this clause (xxv) shall not exceed $[30,000,000]; provided, that any such Indebtedness incurred in reliance on this clause (xxv) if secured, shall be secured only by Liens permitted under ***Section*** 4.11(xix)(B);

(xxvi)   following the payment in full of all Indebtedness and other obligations and the release of all Liens securing such Indebtedness, in each case, in accordance with the terms thereof, incurred pursuant to **Section 4.10(a)(xxiii)**, additional Indebtedness of the Company and any Permitted Refinancing thereof in an aggregate amount not to exceed $85,000,000 (any such Indebtedness, "**Permitted First Lien Indebtedness**"); provided, that any Indebtedness incurred pursuant to this <u>clause (</u>xxvi) (1) shall be subject to the Required Additional First Lien Debt Terms and (2) if secured, will be secured solely by Liens permitted under **Section 4.11(xxvii))**; and

(xxvii)   all premiums (if any), interest (including interest paid in kind and post-petition interest), accretion or amortization of original issue discount, fees, expenses, charges and additional or contingent interest on obligations described in <u>clauses (i)</u> through (xxvi) above.

(b)   The Company will not, nor will it permit any Restricted Subsidiary to, issue any Preferred Equity Interests or any Disqualified Equity Interests, except the Convertible Preferred Stock issued by the Company on the Issue Date.

Section 4.11.  *Liens*.  The Company will not, nor will it permit any Restricted Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, except:

(i)        Liens created under the Notes Documents;

(ii)       Permitted Encumbrances;

(iii)      Liens existing on the Issue Date (other than Liens created under the ABL North America Credit Documents, the Loan Documents or the Other Senior Secured Convertible Notes Documents) and any modifications, replacements, renewals or extensions thereof; *provided* that (A) such modified, replacement, renewal or extension Lien does not extend to any additional property other than (1) after-acquired property that is affixed or incorporated into the property covered by such Lien and (2) proceeds and products thereof, and (B) the obligations secured or benefited by such modified, replacement, renewal or extension Lien are permitted by **_Section_** 4.10;

(iv)       Liens securing Indebtedness permitted under **_Section_** 4.10(a)(v); *provided* that (A) such Liens attach concurrently with or within 270 days after the acquisition, repair, replacement, construction or improvement (as applicable) of the property subject to such Liens, (B) such Liens do not at any time encumber any property other than the property financed by such Indebtedness, except for accessions to such property and the proceeds and the products thereof, and any lease of such property (including accessions thereto) and the proceeds and products thereof and (C) with respect to Capital Lease Obligations, such Liens do not at any time extend to or cover any assets (except for accessions to or proceeds of such assets) other than the assets subject to such Capital Lease Obligations; *provided further* that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

(v)        leases, licenses, subleases or sublicenses granted to others (whether on an exclusive or non-exclusive basis) that are entered into in the ordinary course of business or that do not interfere in any material respect with the business of Invacare Corporation and the Restricted Subsidiaries, taken as a whole;

(vi)       Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(vii)      Liens (A) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection and (B) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of setoff) and that are within the general parameters customary in the banking industry;

(viii)     Liens (A) on cash advances or escrow deposits in favor of the seller of any property to be acquired in an Investment permitted pursuant to **_Section_** 4.13 to be applied against the purchase price for such Investment or otherwise in connection with any escrow arrangements with respect to any such Investment or any Disposition permitted under **_Section_** 4.14 (including any letter of intent or purchase agreement with respect to such Investment or Disposition) or (B) consisting of an agreement to dispose of any property in a Disposition permitted under **_Section_** 4.14 in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(ix)       Liens on property and Equity Interests, in each case, that are not Collateral, which Liens secure Indebtedness of a Restricted Subsidiary that is not a Note Guarantor that is permitted under **_Section_** 4.10(a);

(x)        Liens granted by a Restricted Subsidiary that is not a Note Guarantor in favor of any Note Party (other than the Company, New Intermediate Holdings or any Intermediate Holdco), Liens granted by a Restricted Subsidiary that is not a Note Guarantor in favor of Restricted Subsidiary that is not a Note Guarantor and Liens granted by a Note Party (other than the Company, New Intermediate Holdings or any Intermediate Holdco) in favor of any other Note Party;

(xi)        Liens existing on property at the time of its acquisition or existing on the property of any Person at the time such Person becomes a Restricted Subsidiary, in each case after the Issue Date (other than Liens on the Equity Interests of any Person that becomes a Restricted Subsidiary); *provided* that (A) such Lien was not created in contemplation of such acquisition or such Person becoming a Restricted Subsidiary, (B) such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof and other than after-acquired property subject to a Lien securing Indebtedness and other obligations incurred prior to such time and which Indebtedness and other obligations are permitted hereunder that require or include, pursuant to their terms at such time, a pledge of after-acquired property, it being understood that such requirement shall not be permitted to apply to any property to which such requirement would not have applied but for such acquisition), and (C) the Indebtedness secured thereby is permitted under ***Section*** 4.10(a)(v);

(xii)        any interest or title (and all encumbrances and other matters affecting such interest or title) of a lessor, sublessor, licensor or sublicensor or secured by a lessor's sublessor's, licensor's or sublicensor's interest under leases (other than leases constituting Capital Lease Obligations), subleases, licenses, cross-licenses or sublicense entered into by Invacare Corporation or any Restricted Subsidiary in the ordinary course of business;

(xiii)        Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale or purchase of goods by Invacare Corporation or any Restricted Subsidiary in the ordinary course of business;

(xiv)        Liens deemed to exist in connection with Investments in repurchase agreements permitted under clause (e) of the definition of the term "Permitted Investments";

(xv)        [reserved];

(xvi)        Liens that are contractual rights of setoff (A) relating to the establishment of depository relations with banks not given in connection with the incurrence of Indebtedness, including liens or rights of set-off arising under the general terms and conditions of banks with whom any group member maintains a banking relationship in the ordinary course of business; including liens of group members under the German general terms and condition of banks and saving banks (*Allgemeine Geschäftsbedingungen der Banken und Sparkassen*) (B) relating to pooled deposit or sweep accounts to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of Invacare Corporation and the Restricted Subsidiaries or (C) relating to purchase orders and other agreements entered into with customers of Invacare Corporation or any Restricted Subsidiary in the ordinary course of business;

(xvii)        ground leases in respect of real property on which facilities owned or leased by Invacare Corporation or any Restricted Subsidiary are located and, in respect of real property located in Germany, any landlord lien (*Vermieter- oder Verpächterpfandrecht*);

(xviii)        Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(xix)        Liens (A) on the Collateral of the Note Guarantors that are Domestic Subsidiaries and/or the Note Guarantors that are Canadian Subsidiaries in each case securing the

ABL North America Obligations; *provided* that such Liens shall be subject to the ABL North America Intercreditor Agreement and (B) on the Collateral of the EMEA Note Parties securing indebtedness permitted to be incurred in reliance on Section 4.10(a)(xxv); *provided* that such Liens shall be subject to a Permitted ABL EMEA Intercreditor Agreement which may provide for such Liens on accounts receivable and inventory (and the proceeds thereof) to be senior to the Liens on such assets securing the Note Obligations;

(xx)      other Liens; *provided* that at the time of incurrence of such Liens and the obligations secured thereby (after giving pro forma effect to any such obligations) the aggregate outstanding face amount of obligations secured by Liens existing in reliance on this clause (xx) shall not exceed $5,000,000;

(xxi)     any security or quasi-security granted under mandatory law (sections 22, 204 of the German Transformation Act (*Umwandlungsgesetz*)) in favor of creditors as a consequence of a merger or conversion permitted under this Indenture;

(xxii)    Liens on the Collateral (or a portion thereof) securing Indebtedness permitted under **Section** 4.10(a)(xxi) and/or **Section** 4.10(a)(xxiii); *provided* that, in each case, such Liens shall be pari passu with the Liens securing the Notes Obligations and shall be subject to the Pari Passu Intercreditor Agreement;

(xxiii)   receipt of progress payments and advances from customers in the ordinary course of business to the extent the same creates a Lien on the related inventory and proceeds thereof;

(xxiv)    (A) Liens on Equity Interests of joint ventures securing capital contributions to, or obligations of, such Persons and (B) customary rights of first refusal and tag, drag and similar rights in joint venture agreements;

(xxv)     Liens on amounts under pension standard legislation of Canada or any province thereto applicable to any Foreign Pension Plan that relate to contributions withheld from pay but not yet due to be remitted;

(xxvi)    Liens on cash and Permitted Investments arising in connection with the defeasance, discharge or redemption of Indebtedness for no longer than 60 days prior to such defeasance, discharge or redemption; and

(xxvii)   Liens on the Collateral securing Indebtedness permitted to be incurred pursuant to **Section** 4.10(a)(xxvi); *provided* that such Liens shall be subject to a Permitted First Lien Second Lien Intercreditor Agreement.

In addition, if the Required Holders shall have consented (which consent shall not be unreasonably withheld, delayed, conditioned or denied), Invacare Corporation and its Restricted Subsidiaries may post cash collateral up to the amount so agreed by the Required Holders to secure Indebtedness permitted pursuant to Section 4.10(a)(vi), but only to the extent such Indebtedness is not secured by any Liens on the Collateral that are otherwise permitted under this Section 4.11.

Notwithstanding the foregoing, the Company will not, nor will it permit any Restricted Subsidiary to, create, incur, assume or permit to exist any consensual Lien on any Equity Interests (i) of any Intermediate Holdco, except (x) Liens created under the Notes Documents and (y) Liens securing Indebtedness permitted under Section 4.10(a)(xxi), Section 4.10(a)(xxiii) and Section 4.10(a)(xxvi) or (ii) of Invacare Corporation or New Intermediate Holdings.

Section 4.12. *Fundamental Changes*.   The Company will not, nor will it permit any Restricted Subsidiary to, merge into, amalgamate or consolidate or amalgamate with any other Person, or

permit any Person to merge into or consolidate with it, or liquidate or dissolve, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of the assets (whether now owned or hereafter acquired) of the Company and the Restricted Subsidiaries, taken as a whole, to or in favor of any Person (other than as part of the Transactions), except that:

(a)        any Restricted Subsidiary of the Company (other than New Intermediate Holdings, Invacare Corporation or any Intermediate Holdco) may merge, amalgamate, consolidate or amalgamate with (i) Invacare Corporation; *provided* that Invacare Corporation shall be the continuing or surviving Person or (ii) one or more other Restricted Subsidiaries of Invacare Corporation; *provided* that, except with the consent of the Required Holders (such consent not to be unreasonably withheld, conditioned or delayed; provided, that it is acknowledged and agreed that it shall not be unreasonable to withhold consent to any such transaction that will have a material adverse impact on the Note Guarantees or the Collateral), when any Domestic Note Guarantor or Canadian Note Guarantor is merging, consolidating or amalgamating with any other Restricted Subsidiary, such merger, consolidation or amalgamation complies with <u>Article 11</u> and <u>Article 13</u> of this Indenture and either (A) the continuing or surviving Person shall be a Domestic Note Guarantor or Canadian Note Guarantor or (B) if the continuing or surviving Person is not a Domestic Note Guarantor or Canadian Note Guarantor, the acquisition of such Note Guarantor by such surviving Restricted Subsidiary is permitted under <u>Section 4.13</u>; *provided, further* that, except with the consent of the Required Holders (such consent not to be unreasonably withheld, conditioned or delayed; provided, that it is acknowledged and agreed that it shall not be unreasonable to withhold consent to any such transaction that will have a material adverse impact on the Note Guarantees or the Collateral), when any Note Guarantor that is not a Domestic Note Guarantor or Canadian Note Guarantor is merging, consolidating or amalgamating with any other Restricted Subsidiary the continuing or surviving Person shall be a Domestic Note Guarantor, a Canadian Note Guarantor or a Note Guarantor organized in the same Specified Jurisdiction as such Note Guarantor;

(b)        any Restricted Subsidiary (other than New Intermediate Holdings or any Intermediate Holdco) may liquidate or dissolve if the Company determines in good faith that such action is in the best interests of the Company and the Restricted Subsidiaries, taken as a whole, and is not materially disadvantageous to the Holders of the Notes;

(c)        any Restricted Subsidiary (other than New Intermediate Holdings or any Intermediate Holdco) may make a Disposition of all or substantially all of its assets (upon voluntary liquidation or otherwise) to any other Restricted Subsidiary; *provided* that if the transferor in such a transaction is a Note Guarantor, then such Disposition must comply with <u>Article 11</u> and <u>Article 13</u> of this Indenture and either (A) the transferee must be a Note Party (other than the Company, New Intermediate Holdings or an Intermediate Holdco), (B) to the extent constituting an Investment, such Investment must be an Investment in a Restricted Subsidiary that is not a Note Guarantor permitted by <u>Section 4.13</u> and <u>Section 4.28</u> or (C) to the extent constituting a Disposition to a Restricted Subsidiary that is not a Note Guarantor, such Disposition is for Fair Market Value and any promissory note or other non-cash consideration received in respect thereof is an Investment in a Restricted Subsidiary that is not a Note Guarantor permitted by <u>Section 4.13</u> and <u>Section 4.28</u>; *provided* that the aggregate amount of Dispositions made in reliance on <u>subclauses (B)</u> and <u>(C)</u> of this <u>clause (c)</u>, together with (x) all other Investments made in and Dispositions made to Restricted Subsidiaries that are not Note Guarantors by any Note Party after the Issue Date and (y) all Investments and Dispositions made in reliance on <u>*Section* 4.28(ii)</u>, shall not exceed, at the time of the making thereof, and after giving pro forma effect thereto, $7,500,000;

(d)        Invacare Corporation may merge, amalgamate or consolidate with any other Person (other than the Company, New Intermediate Holdings or any Intermediate Holdco); *provided* that Invacare Corporation shall be the continuing or surviving Person and such merger, amalgamation or consolidation complies with **Article 11**;

(e)        [reserved];

(f)        any Restricted Subsidiary may merge, consolidate or amalgamate with any other Person (other than the Company, New Intermediate Holdings or any Intermediate Holdco) in order to effect an

Investment permitted pursuant to Section 4.13; *provided* that the continuing or surviving Person shall be a Restricted Subsidiary and such merger, amalgamation or consolidation complies with Article 11 and Article 13; *provided*, *further*, that no such merger, consolidation or amalgamation involving any Note Guarantor that is not a Domestic Note Guarantor or Canadian Note Guarantor shall be permitted pursuant to this clause (f) unless the same has been consented to by the Required Holders (such consent not to be unreasonably withheld, conditioned or delayed; provided, that it is acknowledged and agreed that it shall not be unreasonable to withhold consent to any such transaction that will have a material adverse impact on the Note Guarantees or the Collateral);

(g)       [reserved];

(h)       [reserved]; and

(i)       any Restricted Subsidiary (other than New Intermediate Holdings or any Intermediate Holdco) may effect a merger, dissolution, liquidation consolidation or amalgamation to effect a Disposition permitted pursuant to Section 4.14; *provided* that no such merger, consolidation or amalgamation involving any Note Guarantor that is not a Domestic Note Guarantor or Canadian Note Guarantor shall be permitted pursuant to this clause (i) unless the same has been consented to by the Required Holders (such consent not to be unreasonably withheld, conditioned or delayed; provided, that it is acknowledged and agreed that it shall not be unreasonable to withhold consent to any such transaction that will have a material adverse impact on the Note Guarantees or the Collateral).

Section 4.13.  *Investments, Loans, Advances, Guarantees and Acquisitions*.    The Company will not, nor will it permit any Restricted Subsidiary to, make or hold any Investment, except:

(a)       Permitted Investments at the time such Permitted Investment is made;

(b)       loans or advances to present or former officers, directors, managers, members of management, consultants, independent contractors and employees of the Company and the Restricted Subsidiaries (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes, (ii) in connection with such Person's purchase of Equity Interests in the Company (*provided* that the amount of such loans and advances made in cash to such Person shall be contributed to the Company in cash as common equity or Qualified Equity Interests) and  (iii) for purposes not described in the foregoing clauses (i) and (ii); *provided* that at the time of incurrence thereof and after giving pro forma effect thereto, the aggregate principal amount outstanding in reliance on this clause (iii) shall not exceed $5,000,000;

(c)       Investments (i) by Invacare Corporation or any Restricted Subsidiary in any Note Party (other than the Company), *provided* that to the extent the aggregate amount of Investments by a Restricted Subsidiary that is not a Note Party in a Note Party exceeds $1,000,000, such non-Note Party Restricted Subsidiary shall have acceded to the Pari Passu Intercreditor Agreement pursuant to the terms thereof, (ii) by any Restricted Subsidiary that is not a Note Guarantor in any other Restricted Subsidiary that is also not a Note Guarantor, (iii) by Invacare Corporation or any Restricted Subsidiary (A) in any Restricted Subsidiary; *provided* that (x) the aggregate amount of such Investments made by Note Parties after the Issue Date in Restricted Subsidiaries that are not Note Guarantor in reliance on this clause (iii)(A), together with the aggregate amount of (I) all other Investments made in and Dispositions made to Restricted Subsidiaries that are not Note Guarantors by any Note Parties after the Issue Date and (II) all Investments and Dispositions made in reliance on *Section* 4.28(ii), shall not exceed, at the time of the making thereof and after giving pro forma effect thereto, $7,500,000, (y) no Event of Default has occurred and is continuing and (z) all Investments made by Note Parties in Restricted Subsidiaries that are not Note Parties in reliance on this clause (iii)(A) shall be made only for the purpose of financing working capital needs of such non-Note Parties or another purpose agreed to by the Required Holders (such consent not to be unreasonably withheld, conditioned or delayed; *provided*, that it is acknowledged and agreed that it shall not be unreasonable to withhold consent to any such transaction that will have a material adverse impact on the Note Guarantees or the Collateral) and shall be evidenced by an intercompany note that has been pledged as Collateral, (B) [reserved] or  (C) constituting Guarantees of Indebtedness or other monetary

#96781386v10

obligations of Restricted Subsidiaries that are not Note Guarantors owing to any Note Party, (iv) by Invacare Corporation or any Restricted Subsidiary in Restricted Subsidiaries that are not Note Guarantors so long as such transaction is part of a series of simultaneous transactions that results in the proceeds of the initial Investment being invested in one or more Note Parties (other than the Company) and (v)  subject to the consent of the Required Holders (such consent not to be unreasonably withheld, conditioned or delayed; provided, that it is acknowledged and agreed that it shall not be unreasonable to withhold consent to any such transaction that will have a material adverse impact on the Note Guarantees or the Collateral) by Invacare Corporation or any Restricted Subsidiary in any Restricted Subsidiary that is not a Note Guarantor, consisting of the contribution of Equity Interests of any other Restricted Subsidiary that is not a Note Guarantor so long as the Equity Interests of the transferee Restricted Subsidiary is pledged to secure the Notes Obligations;

(d)        Investments consisting of deposits, prepayments and/or other credits to suppliers in the ordinary course of business;

(e)        Investments consisting of extensions of trade credit in the ordinary course of business;

(f)        Investments (i) existing or contemplated on the Issue Date and any modification, replacement, renewal, reinvestment or extension thereof and (ii) existing on the Issue Date by Invacare Corporation or any Restricted Subsidiary and any modification, renewal or extension thereof; *provided* that the amount of the original Investment is not increased except by the terms of such Investment or as otherwise permitted by this Section 4.13;

(g)        Investments in Swap Agreements permitted under Section 4.10;

(h)        promissory notes and other non-cash consideration received in connection with Dispositions permitted by Section 4.14;

(i)        Investments made in connection with the Transactions (other than borrowings under the ABL North America Credit Agreement);

(j)        subject to the consent of the Required Holders (such consent not to be unreasonably withheld, conditioned or delayed; provided, that it is acknowledged and agreed that it shall not be unreasonable to withhold consent to any such transaction that will have a material adverse impact on the Note Guarantees or the Collateral), Investments made by any Note Party (other than the Company) in any non-Note Party (other than the Company) consisting of contributions or other Dispositions of Equity Interests of Persons that are non-Note Parties; provided that, prior to such contribution or Disposition, such Equity Interests were not owned directly by a Note Party or such Equity Interests are contributed or disposed of to a Non-Note Party that is a wholly owned Restricted Subsidiary of a Note Party;

(k)        Investments in the ordinary course of business consisting of endorsements for collection or deposit and customary trade arrangements with customers consistent with past practices;

(l)        Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers, from financially troubled account debtors or in settlement of delinquent obligations of, or other disputes with, customers and suppliers or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(m)        subject to the consent of the Required Holders (such consent not to be unreasonably withheld, conditioned or delayed; provided, that it is acknowledged and agreed that it shall not be unreasonable to withhold consent to any such transaction that will have a material adverse impact on the Note Guarantees or the Collateral), cash or property distributed from any Restricted Subsidiary that is not a Note Party (i) may be contributed to other Restricted Subsidiaries that are not Note Parties, and (ii) may pass through the Company, Invacare Corporation and/or any intermediate Restricted Subsidiaries in order

to effect the contribution described in clause (i), so long as part of a series of related transactions and such transaction steps are not unreasonably delayed and are otherwise permitted hereunder;

(n)  additional Investments and other acquisitions made and held by the Note Parties (other than the Company); *provided* that at the time any such Investment or other acquisition is made, the aggregate outstanding amount of such Investment or acquisition made in reliance on this clause (n), (including the aggregate amount of all consideration paid in connection with all other Investments and acquisitions made in reliance on this clause (n)), whether in the form of Indebtedness assumed or otherwise), shall not exceed at the time of incurrence thereof and after giving pro forma effect thereto, $2,500,000; *provided* that (x) the aggregate amount of such Investments made by Note Parties after the Issue Date in Restricted Subsidiaries that are not Note Guarantors in reliance on this clause (n), together with the aggregate amount of all (i) other Investments made in and Dispositions made to Restricted Subsidiaries that are not Note Guarantors by the Note Parties after the Issue Date and (ii) all Investments and Dispositions made in reliance on *Section* 4.28(ii), shall not exceed, at the time of the making thereof and after giving pro forma effect thereto, $7,500,000 at any time outstanding; and (y) all Investments made by Note Parties in Restricted Subsidiaries that are not Note Parties in reliance on this clause (n), shall be made only for the purpose of financing working capital needs of such non-Note Parties or another purpose agreed to by the Required Holder (such consent not to be unreasonably withheld, conditioned or delayed; provided, that it is acknowledged and agreed that it shall not be unreasonable to withhold consent to any such transaction that will have a material adverse impact on the Note Guarantees or the Collateral) and shall be evidenced by an intercompany note that has been pledged as Collateral;

(o)  [reserved];

(p)  advances of payroll payments to employees in the ordinary course of business;

(q)  Investments and other acquisitions to the extent that payment for such Investments is made with Qualified Equity Interests of the Company; *provided* that any other amounts used for such an Investment or other acquisition that are not Qualified Equity Interests of the Company shall otherwise be permitted pursuant to this Section 4.13;

(r)  [reserved];

(s)  [reserved];

(t)  Investments consisting of Indebtedness, Liens, fundamental changes, Dispositions and Restricted Payments permitted (other than by reference to this Section 4.13(t)) under Sections *4.10*, 4.11, 4.12, 4.14, 4.17, respectively;

(u)  [reserved];

(v)  contributions to a "rabbi" trust for the benefit of employees, directors, consultants, independent contractors or other service providers of the Company or any Restricted Subsidiary or other grantor trust subject to claims of creditors in the case of a bankruptcy of the Company;

(w)  to the extent that they constitute Investments, purchases and acquisitions of inventory, supplies, materials or equipment or purchases, acquisitions, licenses or leases of other assets, Intellectual Property, or other rights, in each case in the ordinary course of business;

(x)  [reserved];

(y)  [reserved];

(z)  [reserved];

(aa)  [reserved]; and

(bb)  unfunded pension fund and other employee benefit plan obligations and liabilities to the extent that the same are permitted to remain unfunded under applicable Requirements of Law.

Section 4.14.  *Asset Sales*.  (i) The Company will not, nor will it permit any Restricted Subsidiary to, sell, transfer, lease, license or otherwise dispose of any asset, including any Equity Interest and any Intellectual Property owned by it and (ii) the Company will not permit any Restricted Subsidiary to issue any additional Equity Interest following the Issue Date (other than (A) issuing directors' qualifying shares, nominal shares issued to foreign nationals to the extent required by applicable Requirements of Law, (B) issuing Equity Interests to Invacare Corporation, [New Intermediate Holdings] or any Restricted Subsidiary in compliance with **Section** 4.13(c), (C) any non-wholly-owned Restricted Subsidiary issuing Equity Interests of such Subsidiary to each owner of Equity Interests of such Subsidiary ratably based on their relative ownership interests and (D) issuing securities pursuant to a management equity plan, stock option plan, phantom equity plan or any other management, employee benefit or other compensatory plan or agreement (and any successor plans or arrangements thereto), in each case, having a fair market value (x) in excess of $500,000, in a single transaction or a series of related transactions or (y) in excess of $2,500,000 in any fiscal year (each, a "**Disposition**"), except:

(a)  Dispositions of obsolete or worn out property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used or useful, or economically practicable to maintain, in the conduct of the business of Invacare Corporation and the Restricted Subsidiaries (including (i) allowing any registration or application for registration of any Intellectual Property that is no longer used or useful, or economically practicable to maintain, to lapse, go abandoned, or be invalidated or (ii) disposing of, discontinuing the use or maintenance of, abandoning, failing to pursue or otherwise allowing to lapse, expire, terminate or put into the public domain any of its Intellectual Property if the Company determines in its reasonable business judgment that such discontinuance is desirable in the conduct of its business);

(b)  Dispositions of inventory in the ordinary course of business (including on an intercompany basis);

(c)  Dispositions of property to the extent that (i)  such property is exchanged for credit against the purchase price of similar replacement property, or other assets of comparable or greater value or usefulness to the business or  (ii) an amount equal to the Net Proceeds of such Disposition are promptly applied to the purchase price of such replacement property;

(d)  Dispositions of property to Invacare Corporation or any Restricted Subsidiary; *provided* that if the transferor in such a transaction is a Note Party, then either (i)  the transferee must be a Note Party (other than the Company), (ii)  to the extent constituting an Investment, such Investment must be an Investment in a Restricted Subsidiary that is not a Note Guarantor permitted by Section 4.13 and Section 4.28 or (iii) to the extent constituting a Disposition to a Restricted Subsidiary that is not a Note Guarantor, such Disposition is for Fair Market Value and any promissory note or other non-cash consideration received in respect thereof is an Investment in a Restricted Subsidiary that is not a Note Guarantor permitted by  Section 4.13 and Section 4.28; *provided* that the aggregate amount of such Dispositions made by Note Parties after the Issue Date in Restricted Subsidiaries that are not Note Parties in reliance on this clause (d), together with the aggregate amount of (x) all other Investments made in and Dispositions made to Restricted Subsidiaries that are not Note Guarantors by Note Parties after the Issue Date and (y) all Investments and Dispositions made in reliance on Section 4.28(ii), shall not exceed $7,500,000;

(e)  Dispositions permitted by Section 4.12, Investments permitted by Section 4.13, Restricted Payments permitted by Section 4.17 and Liens permitted by Section 4.11, in each case, other than by reference to this Section 4.14(e);

(f)        Dispositions of cash and/or Permitted Investments and/or other assets that were Permitted Investments when the relevant original Investment was made;

(g)        the sale or discount, in each case without recourse of past due accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof and not for financing purposes;

(h)        leases, subleases, licenses or sublicenses, in each case in the ordinary course of business and that do not materially interfere with the business of Invacare Corporation and the Restricted Subsidiaries, taken as a whole;

(i)        transfers of property subject to Casualty Events upon receipt of the Net Proceeds of such Casualty Event;

(j)        Dispositions of property to Persons other than the Company or any Restricted Subsidiary (including the sale or issuance of Equity Interests (other than Disqualified Equity Interests) in a Restricted Subsidiary) not otherwise permitted under this Section 4.14 in an aggregate amount during the term of this Indenture not to exceed $40,000,000; *provided*, that (i) such Disposition is made for Fair Market Value and (ii) Invacare Corporation or any Restricted Subsidiary shall receive not less than 75.0% of such consideration in the form of cash or Permitted Investments (*provided*, that for purposes of this clause (ii), the following shall be deemed to be cash or Permitted Investments: (A) any liabilities (as shown on the Company's or such Restricted Subsidiary's most recent balance sheet or in the notes thereto for which internal financial statements are available immediately preceding such date or, if incurred or accrued subsequent to the date of such balance sheet, such liabilities that would have been reflected on the the Company's or such Restricted Subsidiary's balance sheet or in the footnotes thereto if such incurrence or accrual had taken place on or prior to the date of such balance sheet in the good faith determination of the Company) of the Company or any of its Restricted Subsidiaries (other than liabilities that are by their terms subordinated to the Notes Obligations) that are extinguished in connection with the transactions relating to such Disposition, or that are assumed by the transferee, in each case, pursuant to an agreement that releases or indemnifies the Company and/or its applicable Restricted Subsidiaries, as the case may be, from further liability and (B) any notes or other obligations or other securities or assets received by the Company or any of its Restricted Subsidiaries from such transferee that are converted by the Company or such Restricted Subsidiary into cash or cash equivalents, or by their terms are required to be satisfied for cash or Permitted Investments (to the extent of the cash or Permitted Investments received), in each case, within 60 days of the receipt thereof); *provided*, further, that the Net Proceeds thereof shall be applied in accordance with Section 2.11(b) of the Credit Agreement;

(k)        Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between the joint venture parties set forth in, joint venture agreements and similar binding arrangements;

(l)        [reserved];

(m)        transfers of condemned property as a result of the exercise of "eminent domain" or other similar powers to the respective Governmental Authority or agency that has condemned the same (whether by deed in lieu of condemnation or otherwise), and transfers of property arising from foreclosure or similar action or that have been subject to a casualty to the respective insurer of such real property as part of an insurance settlement;

(n)        [reserved];

(o)        [reserved];

(p)        [reserved];

#96781386v10

(q)        any merger, amalgamation, consolidation, Disposition or conveyance the sole purpose of which is to reincorporate or reorganize (i) any Domestic Subsidiary in another jurisdiction in the U.S. and/or (ii) any Foreign Subsidiary in the U.S. or, subject to the consent of the Required Holders (such consent not to be unreasonably withheld, conditioned or delayed; *provided*, that it is acknowledged and agreed that it shall not be unreasonable to withhold consent to any such transaction that will have a material adverse impact on the Note Guarantees or the Collateral), any other jurisdiction; and

(r)        Dispositions of customer accounts receivable in connection with a Vendor Financing Program.

Subject to Section 4.33, to the extent that any Collateral is Disposed of as expressly permitted by this **Section 4.14** to any Person other than a Note Party, subject to the proviso set forth in clause (a) of the definition of Excluded Subsidiary with respect to any Disposition of less than 100% of the Equity Interests of a wholly-owned subsidiary, such Collateral shall be sold free and clear of the Liens created by the Notes Documents, which Liens shall be automatically released upon the consummation of such Disposition; it being understood and agreed that the Trustee and the Notes Collateral Agent, acting at the direction of the Required Holders, shall be authorized to take, and shall take, any actions deemed appropriate in order to effect the foregoing, and shall be entitled to rely, without independent investigation on an Officer's Certificate of the Company in connection with the foregoing (which shall be delivered to the Trustee and the Notes Collateral Agent upon request therefor).

Section 4.15.  *Intermediate Holdco Covenant*.

(a)        No Intermediate Holdco will incur any Indebtedness or Liens or engage in any activities or consummate any transactions (including, without limitation, any Investments or Dispositions) and will not conduct, transact or otherwise engage in any business or operations, in each case, other than:

(i)        the ownership and/or acquisition of the Equity Interests of direct subsidiaries of such Intermediate Holdco that are in existence on the Issue Date;

(ii)        the performance of obligations under and compliance with its Organizational Documents, or other Requirement of Law (including the maintenance of its legal existence, including the ability to incur fees, costs and expenses relating to such maintenance), ordinance, regulation, rule, order, judgment, decree or permit, including without limitation as a result of or in connection with the activities of the Restricted Subsidiaries;

(iii)        participating in tax, accounting, cash management, cash pooling, transfer pricing, cost-sharing arrangements and other administrative matters related to the Company or any of its Subsidiaries;

(iv)        the entry into, and exercise rights and performance of its obligations under and in connection with the Transactions (other than any such obligations under the ABL North America Credit Agreement), including the Notes Documents and the Indebtedness permitted to be incurred pursuant to Section 4.10(a)(xxi) and Section 4.10(a)(xxiii);

(v)        holding of any cash, Permitted Investments and other assets received from Invacare Corporation or any Restricted Subsidiary, in each case, pending prompt application thereof in a manner permitted by the terms of this Indenture (including by way of Restricted Payments pursuant to Section 4.17(a)(i));

(vi)        incurring fees, costs and expenses relating to overhead and general operating including professional fees for legal, tax and accounting issues and paying taxes, providing indemnification for its current and former officers, directors, members of management, managers, employees and advisors or consultants; and

(vii)      activities incidental to the businesses or activities described in the foregoing clauses.

(b)      No Intermediate Holdco shall, without the prior written consent of the Required Holders, cause or allow its Centre of Main Interest (as that term is used in Article 3(1) of Regulation (EU) No. 2015/848 of the European Parliament and of the Council of 20 May 2015 on Insolvency Proceedings (recast) (the "**Regulation**")) to change.

(c)      No direct or indirect wholly-owned subsidiary of an Intermediate Holdco shall cease to be a direct or indirect wholly-owned subsidiary of an Intermediate Holdco except (x) in connection with any transaction solely among one or more subsidiaries of such Intermediate Holdco that is permitted by Section 4.12 or (y) in any transaction consented to by the Required Holders (such consent not to be unreasonably withheld, conditioned or delayed; provided, that it is acknowledged and agreed that it shall not be unreasonable to withhold consent to any such transaction that will have a material adverse impact on the Note Guarantees or the Collateral).

(d)      No Intermediate Holdco shall merge, amalgamate or consolidate with any other Person without the consent of the Required Holders (such consent not to be unreasonably conditioned, withheld or delayed).

Section 4.16. *Negative Pledge*.  The Company will not, and will not permit any Restricted Subsidiary to, enter into any agreement, instrument, deed or lease that prohibits or limits the ability of any Note Party to create, incur, assume or suffer to exist any Lien upon any of their respective properties or revenues, whether now owned or hereafter acquired, for the benefit of the Holders of the Notes with respect to the Notes Obligations or under the Notes Documents; *provided* that the foregoing shall not apply to:

(a)      restrictions and conditions imposed by  (i) Requirements of Law, (ii) any Notes Documents, (iii) the ABL North America Credit Documents, (iv) the Loan Documents, (v) the Other Senior Secured Convertible Notes Documents, (vi)  any Permitted ABL EMEA Credit Facility, (vii) [reserved], (vii) any documentation governing any Permitted Refinancing incurred to refinance any such Indebtedness referenced in clauses (i) through (vii) above;

(b)      customary restrictions and conditions existing on the Issue Date and any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

(c)      restrictions and conditions contained in agreements relating to the Disposition of a Subsidiary or any assets pending such Disposition; *provided* that such restrictions and conditions apply only to the Subsidiary or assets that is or are subject of such Disposition and such Disposition is permitted hereunder;

(d)      customary provisions in leases, subleases, licenses, cross-licenses or sublicenses and other contracts restricting the assignment thereof;

(e)      restrictions imposed by any agreement relating to secured Indebtedness permitted by this Indenture to the extent such restriction applies only to the property securing by such Indebtedness;

(f)      any restrictions or conditions set forth in any agreement in effect at any time any Person becomes a Restricted Subsidiary (but not any modification or amendment expanding the scope of any such restriction or condition); *provided* that such agreement was not entered into in contemplation of such Person becoming a Restricted Subsidiary and the restriction or condition set forth in such agreement does not apply to the Company or any Restricted Subsidiary;

(g)       restrictions or conditions in any Indebtedness permitted pursuant to **_Section_** 4.10 that is incurred or assumed by Restricted Subsidiaries that are not Note Guarantors to the extent such restrictions or conditions are no more restrictive in any material respect than the restrictions and conditions in the Notes Documents or, in the case of Junior Financing, are market terms at the time of issuance and are imposed solely on such Restricted Subsidiary and its Subsidiaries;

(h)       restrictions on cash (or Permitted Investments) or other deposits imposed by agreements entered into in the ordinary course of business (or other restrictions on cash or deposits constituting Permitted Encumbrances);

(i)       restrictions existing under agreements as in effect on the date of this Indenture and any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

(j)       customary provisions in partnership agreements, limited liability company organizational governance documents, sale leaseback agreements, joint venture agreements and other similar agreements, in each case, entered into in the ordinary course of business;

(k)       customary net worth provisions contained in real property leases entered into by Subsidiaries, so long as the Company has determined in good faith that such net worth provisions could not reasonably be expected to impair the ability of the Company and its Subsidiaries to meet their ongoing obligations; and

(l)       restrictions arising in any Swap Agreement and/or any agreement relating to any Cash Management Obligation.

Section 4.17.  *Restricted Payments; Certain Payments of Indebtedness*.

(a)       The Company will not, nor will it permit any Restricted Subsidiary to, pay or make, directly or indirectly, any Restricted Payment, except:

(i)       each Restricted Subsidiary of the Company may make Restricted Payments to Invacare Corporation or any Restricted Subsidiary of Invacare Corporation (and, in the case of any such Subsidiary that is not a wholly-owned Subsidiary, to each other owner of Equity Interests of such Subsidiary ratably based on their relative ownership interests of the relevant class of Equity Interests);

(ii)       to the extent constituting a Restricted Payment, Invacare Corporation, [New Intermediate Holdings] and any Restricted Subsidiary may consummate any transaction permitted by **_Section_** 4.12 and **_Section_** 4.13 (other than **_Section_** 4.13(j), *(*m) *(*n), *(*q), and *(*t));

(iii)       to the extent constituting a Restricted Payment, the conversion of the Notes and the Other Senior Secured Convertible Notes into Equity Interests pursuant to the terms thereof;

(iv)       Restricted Payments by Invacare Corporation or New Intermediate Holdings to the Company, the proceeds of which are used by the Company to make repurchases, redemptions or reductions in number of shares issued (including, by utilization of the "net share" concept) by the Company of any Equity Interests in the Company, as applicable, made in connection with (I) the surrender of shares by employees to (x) facilitate the payment by such employees of the taxes associated with compensation received by such employees under the Company's stock-based compensation plans and, (y) to satisfy the purchase price of nonqualified stock options and (II) the deduction by the Company, of a portion of restricted stock or performance shares previously (i.e. prior to the date of the deduction) granted to employees under the Company's stock-based compensation plans to facilitate the payment by such employees of the taxes associated with the vesting of such restricted stock and performance shares; in an amount not to exceed (for both

clauses (I) and (II)), together with all Restricted Payments made pursuant to **_Section_** 4.17(a)(xiv), $4,000,000 in the aggregate in any fiscal year; *provided*, in each case, that prior to and after giving effect to such repurchases, redemptions or reductions no Default or Event of Default exists or is continuing;

(v)        Invacare Corporation and [New Intermediate Holdings] may make Restricted Payments in cash to the Company:

(A)        the proceeds of which shall be used by the Company to pay its Taxes or Taxes of any Subsidiary of the Company or any group that includes the Company or any Subsidiary of the Company and that files Taxes on a consolidated, combined, affiliated, unitary or similar basis, in each case attributable to the taxable income of the Company and its Subsidiaries, and computed at the highest applicable combined federal, state, and local marginal tax rate; provided that Restricted Payments pursuant to this subclause (A) shall not exceed the amount of Taxes that the Company would have paid if the Company and its Subsidiaries were a stand-alone taxpayer or stand-alone tax group; and

(B)        the proceeds of which shall be used by the Company to pay (1) its operating expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting, tax reporting and similar expenses payable to third parties), that are reasonable and customary and incurred in the ordinary course of business, (2) any reasonable and customary indemnification claims made by directors, officers, members of management, managers, employees or consultants of the Company attributable to the ownership or operations of Invacare Corporation and the Restricted Subsidiaries and (3) franchise and similar Taxes, and other fees and expenses required to maintain its organizational existence; and

(C)        the proceeds of which shall be used by the Company to satisfy its obligations under the Notes Documents and the Other Senior Secured Convertible Notes Documents.

(vi)        [reserved];

(vii)        [reserved];

(viii)        to the extent constituting a Restricted Payment, payments of the Notes and the Other Senior Secured Convertible Notes made pursuant to an exchange for or out of the proceeds of Indebtedness constituting a Permitted Refinancing of the Notes and Other Senior Secured Convertible Notes permitted under Section 4.10(a)(i) and (xxi), as applicable;

(ix)        redemptions in whole or in part of any of its Equity Interests for another class of its Equity Interests or with proceeds from substantially concurrent equity contributions or issuances of new Equity Interests; *provided* that such new Equity Interests contain terms and provisions at least as advantageous to the Holders of the Notes in all respects material to their interests as those contained in the Equity Interests redeemed thereby;

(x)        payments made or expected to made in respect of withholding or similar Taxes payable by any future, present or former employee, director, manager or consultant and any repurchases of Equity Interests in consideration of such payments including deemed repurchases in connection with the exercise of stock options and the vesting of restricted stock and restricted stock units;

(xi)        Invacare Corporation and [New Intermediate Holdings] may make Restricted Payments to the Company to enable the Company to (A) pay cash in lieu of fractional Equity Interests in connection with any dividend, split or combination thereof and (B) honor any

conversion request by a holder of convertible Indebtedness and make cash payments in lieu of fractional shares in connection with any such conversion and may make payments on convertible Indebtedness in accordance with its terms, in both cases of clause (A) and clause (B), in an amount not to exceed $500,000 in the aggregate;

(xii)    [reserved];

(xiii)    any Restricted Payment made on the Issue Date required to consummate the Reorganization Plan; and

(xiv)    payments made by Invacare Corporation, [New Intermediate Holdings] or any Restricted Subsidiary (including payments to the Company to enable the Company to make such payments) in respect of withholding or similar taxes payable upon exercise of Equity Interests by any future, present or former employee, director, officer, manager or consultant (or their respective controlled Affiliates or Permitted Transferees) and any repurchases of Equity Interests deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants or required withholding or similar taxes (including payments to the Company in respect of the foregoing), in an amount not to exceed, together with all Restricted Payments made pursuant to ***Section*** 4.17(a)(iv), $4,000,000 in the aggregate in any fiscal year.

(b)    The Company will not, nor will it permit any Restricted Subsidiary to, make or pay, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Junior Financing, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Indebtedness prior to the scheduled maturity date thereof (collectively, "**Restricted Debt Payments**"), except:

(i)    payment of regularly scheduled interest and principal payments, payments of fees, expenses and indemnification obligations when due in respect of any Indebtedness, other than payments in respect of any Junior Financing prohibited by the subordination provisions thereof;

(ii)    refinancings of Indebtedness with proceeds of Permitted Refinancing Indebtedness permitted to be incurred under ***Section*** 4.10;

(iii)    the conversion of any Junior Financing to or payments with Equity Interests (other than Disqualified Equity Interests) of the Company;

(iv)    prepayments, redemptions, purchases, defeasances and other payments or distributions in respect of Junior Financings prior to their scheduled maturity in an aggregate amount not to exceed an amount at the time of making any such prepayment, redemption, purchase, defeasance or other payment or distributions, together with any other such prepayment, redemption, purchase, defeasance or other payment or distributions made utilizing this clause (iv), not to exceed the portion, if any, of the Restricted Debt Payment Amount that Invacare Corporation elects to apply pursuant to this clause (iv);

(v)    any Restricted Debt Payments made on the Issue Date required to consummate the Reorganization Plan;

(vi)    [reserved];

(vii)    [reserved]; and

(viii)     payments as part of an applicable high yield discount obligation or AHYDO catch-up payment.

(c)     The Company will not, nor will it permit any Restricted Subsidiary to, amend or modify any documentation governing any Junior Financing, in each case if the effect of such amendment or modification (when taken as a whole) is in violation of any Intercreditor Agreement or other applicable intercreditor agreement or subordination agreement.

Notwithstanding anything herein to the contrary, the foregoing provisions of this Section 4.19 will not prohibit the payment of any Restricted Payment or the consummation of any irrevocable redemption, purchase, defeasance or other payment within 60 days after the date of declaration of such Restricted Payment or the giving of irrevocable notice of such redemption, purchase, defeasance or other payment, as applicable, if at the date of declaration or the giving of such notice such payment would have complied with the provisions of this Indenture.

Section 4.18.   *Transactions with Affiliates*.   The Company will not, nor will it permit any Restricted Subsidiary to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except:

(i)     (A) transactions among Note Parties (other than the Company (other than intercompany transactions otherwise permitted hereunder the proceeds of which are promptly invested by the Company in a Restricted Subsidiary pursuant to a transaction permitted hereunder) and, to the extent not otherwise prohibited hereunder, their Restricted Subsidiaries and (B) transactions involving aggregate payments or consideration of less than $1,000,000 (in one transaction or a series of transactions);

(ii)     on terms substantially as favorable to Invacare Corporation or such Restricted Subsidiary as would be obtainable by such Person at the time in a comparable arm's-length transaction with a Person other than an Affiliate;

(iii)    guaranty fees among Note Parties (other than the Company);

(iv)    issuances of Equity Interests of Invacare Corporation to the extent otherwise permitted by this Indenture;

(v)     employment, consulting, severance and other service or benefit related arrangements between the Company and the Restricted Subsidiaries and their respective officers and employees in the ordinary course of business (including loans and advances pursuant to ***Section*** 4.13(b), salary or guaranteed payments and bonuses) and transactions pursuant to stock option and other equity award plans and employee benefit plans and arrangements in the ordinary course of business;

(vi)    payments by Invacare Corporation and the Restricted Subsidiaries pursuant to tax sharing agreements among the Company, Invacare Corporation and the Restricted Subsidiaries on customary terms to the extent attributable to the ownership or operation of Invacare Corporation and the Restricted Subsidiaries, to the extent payments are permitted by ***Section*** 4.13;

(vii)   the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, directors, officers, consultants and employees of Invacare Corporation and the Restricted Subsidiaries in the ordinary course of business to the extent attributable to the ownership or operation of Invacare Corporation and the Restricted Subsidiaries;

(viii)  transactions pursuant to permitted agreements in existence or contemplated on the Issue Date or any amendment thereto to the extent such an amendment is not adverse to the Holders of the Notes in any material respect;

69

(ix)      Restricted Payments permitted under **_Section_** 4.17;

(x)      the Transactions and the payment of all fees, costs and expenses (including all legal, accounting and other professional fees, costs and expenses) related to the Transactions, including Transaction Expenses;

(xi)      [reserved];

(xii)      [reserved];

(xiii)      [reserved];

(xiv)      [reserved];

(xv)      (A) Guarantees permitted by **_Section_** 4.10 or **_Section_** 4.13 and (B) Investments permitted by **_Section_** 4.13(bb); and

(xvi)      transactions with customers, clients, joint venture partners, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Indenture that are fair to Invacare Corporation and the Restricted Subsidiaries, in the reasonable determination of the Board of Directors or the senior management of the Company, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party.

Section 4.19.  *Liquidity*.  Invacare Corporation shall not permit Liquidity at any time to be less than $20,000,000.

Section 4.20.  *Change in Nature of Business*.  The Company and the Restricted Subsidiaries, taken as a whole, will not enter into any new line of business that is fundamentally and substantively different from their existing lines of business conducted by them on the Issue Date, taken as a whole, other than activities reasonably related, complementary or ancillary to such existing lines of business or reasonable extensions thereof.

Section 4.21.  *Accounting Changes*.  The Company shall not make any change in its fiscal year; *provided*, however, that the Company may, upon written notice by the Company to the Trustee, change its fiscal year to any other fiscal year reasonably acceptable to the Required Holders, in which case, the Company and the Trustee, acting at the direction of the Required Holders, will, and are hereby authorized by the Holders of the Notes to, make any adjustments to this Indenture that are necessary to reflect such change in fiscal year.

Section 4.22.  *Amendments or Waivers of Organizational Documents*.  The Company shall not, nor shall it permit any Note Party to, amend or modify their respective Organizational Documents in a manner that is materially adverse to the Holders of the Notes (in their capacities as such); *provided that*, for purposes of clarity, it is understood and agreed that Invacare Corporation and/or any Note Guarantor may effect a change to its respective organizational form and/or consummate any other transaction that is permitted under **Section** 4.12 or that is done in accordance with the Plan on the Issue Date.

Section 4.23.  *Intellectual Property*.  Notwithstanding anything in this Indenture to the contrary, no Disposition or transfer (via an Investment, Disposition or otherwise) of Intellectual Property material to the business or operations of the Company and its Restricted Subsidiaries owned by a Note Party may be made to a Restricted Subsidiary that is not a Note Party.

Section 4.24.  *Additional Note Guarantees*.

#96781386v10

(a)     To the extent any one of the Company's Subsidiaries that is not a Note Guarantor as of the Issue Date Guarantees any Indebtedness of the Company or any Guarantor under the Credit Agreement as of the Issue Date, the Company shall use commercially reasonable efforts to cause such Subsidiary to execute and deliver to the Trustee a notation of Note Guarantee substantially in the form of Exhibit C (subject to the Agreed Guarantee Principles), pursuant to which such Subsidiary shall unconditionally Guarantee, on a senior secured basis, all of the Company's obligations under the Notes and this Indenture on the terms set forth in this Indenture within 60 days after the Issue Date. Thereafter, such Subsidiary shall be a Note Guarantor for all purposes hereof until such Note Guarantee is released in accordance herewith.

(b)     If any one of the Company's Subsidiaries that is not a Note Guarantor Guarantees any Indebtedness of the Company, Invacare Corporation or any Guarantor under the Credit Agreement after the Issue Date, that Subsidiary shall execute and deliver to the Trustee a supplemental indenture in the form of Exhibit D and a notation of Note Guarantee substantially in the form of Exhibit C, pursuant to which such Subsidiary shall unconditionally Guarantee, on a senior secured basis, all of the Company's obligations under the Notes and this Indenture on the terms set forth in this Indenture, in each case within 60 days of the date on which such Subsidiary provided such guarantee. Thereafter, such Subsidiary shall be a Note Guarantor for all purposes hereof until such Note Guarantee is released in accordance herewith.

(c)     Notwithstanding the foregoing, the supplemental indenture and notation of Note Guarantee may be modified in respect of any Note Guarantor organized outside of the United States of America as necessary or appropriate to (1) comply with applicable law, (2) avoid any general legal limitations such as general statutory limitations, financial assistance, corporate benefit, "thin capitalization" rules, retention of title claims or similar matters or (3) avoid a conflict with the fiduciary duties of such company's directors, contravention of any legal prohibition or regulatory condition, or the material risk of personal or criminal liability for any officers or directors (collectively referred to as "**Agreed Guarantee Principles**"), in each case as determined by the Company in its sole discretion.

Section 4.25.  *After-Acquired Property*.  From and after the Issue Date, and subject to the applicable limitations and exceptions set forth in the Collateral Documents, the Agreed Security Principles and this Indenture (including with respect to Excluded Assets), if the Company or any Note Guarantor acquires any After-Acquired Property or if any new Subsidiary becomes a Note Guarantor, the Company or such Note Guarantor shall promptly (but so long as the Credit Agreement is outstanding in no circumstance sooner than required with respect to the Credit Agreement) (i) grant a first-priority perfected security interest (subject to Permitted Liens and the terms of the Pari Passu Intercreditor Agreement) upon any such property, as security for the Notes Obligations and (ii) execute and deliver such mortgages, deeds of trust, security instruments, financing statements and certificates as shall be necessary to vest in the Notes Collateral Agent a perfected security interest, subject only to Permitted Liens, in such After-Acquired Property or in the Collateral of such Note Guarantor and to have such After-Acquired Property or such Collateral (but subject to the limitations set forth in the Collateral Documents) added to the Collateral, and thereupon all provisions of this Indenture relating to the Collateral shall be deemed to relate to such After-Acquired Property or Collateral to the same extent and with the same force and effect, and deliver certificates and Opinions of Counsel consistent with the ones delivered in the applicable jurisdiction in connection with other Collateral Documents or in the case of any jurisdiction where no Liens were previously granted, such certificates and Opinions of Counsel as are customary in such jurisdiction; *provided*, *however*, that if granting such security interest in such After-Acquired Property or Collateral requires the consent of a third party, to the extent such actions are also taken with respect to the Credit Agreement, the Company will use commercially reasonable efforts to obtain such consent with respect to the security interest for the benefit of the Trustee and the Notes Collateral Agent on behalf of the Holders of the Notes; *provided further*, *however*, that if such third party does not consent to the granting of such security interest after the use of such commercially reasonable efforts, the Company or such Note Guarantor, as the case may be, will not be required to provide such security interest.

Section 4.26.  *No Impairment of the Security Interests*.  Except as otherwise permitted under this Indenture and the Collateral Documents, none of the Company nor any of the Note Guarantors shall be permitted to take any action, or knowingly omit to take any action, which action or omission would

#96781386v10

have the result of materially impairing the security interest with respect to the Collateral for the benefit of the Trustee, the Notes Collateral Agent and the Holders of the Notes.

Section 4.27. *No-flowback into Switzerland*. The Company shall ensure that no proceeds received under the Notes Documents will be used in a manner which constitutes a "use of proceeds in Switzerland" as interpreted by Swiss tax authorities when assessing whether or not interest payable with respect to such borrowing is subject to Swiss Withholding Tax, except and to the extent that a written confirmation or tax ruling countersigned by the Swiss Federal Tax Administration (Eidgenössische Steuerverwaltung) has been obtained (in a form satisfactory to the Trustee (at the direction of the Required Holders)) confirming that the intended "use of proceeds in Switzerland" does not result in any amounts outstanding under the Notes qualifying as a Swiss financing for Swiss Withholding Tax purposes and that, accordingly, no Swiss Withholding Tax is or becomes payable on the interest payments made under any of the Notes Documents.

Section 4.28. *Additional Limitations on Certain Investments*. Notwithstanding anything to the contrary herein (including in **Section** 4.13), and without limiting any other provision of this Indenture, the Company will not, and will not permit any other Domestic Note Guarantor or Canadian Note Guarantor to, directly or indirectly make any Investment in any Note Guarantor that is not a Domestic Note Guarantor or Canadian Note Guarantor, other than (i) Investments in the form of cash and Permitted Investments made for bona fide business purposes; *provided* that any such Investments shall be made in the form of intercompany loans evidenced by an intercompany note that has been pledged as Collateral and (ii) other Investments in an amount not to exceed, at the time of the making thereof and after giving pro forma effect thereto, together with (x) all other Investments and Dispositions made by the Domestic Note Guarantors and Canadian Note Guarantors to Note Guarantors that are not Domestic Note Guarantors or Canadian Note Guarantors after the Issue Date and (y) all Investments and Dispositions made pursuant to **Section** 4.12(c)(B) and (C), **Section** 4.13(c)(iii)(A), **Section** 4.13(n)) and **Section** 4.14(c), $7,500,000.

Section 4.29. *Limitations on Amendments*. [The Company will not, nor will it permit any Restricted Subsidiary to, amend or modify any provision of any ABL North America Credit Document if the effect of such amendment or modification is material and adverse with respect to the interests of any of the Note Parties or Holders (it being understood and agreed that, without limitation, (x) any changes to the interest rate, redemption requirements, amortization schedule, negative covenants or events of default set forth in the ABL North America Credit Documents and any changes to Section [  ] of the ABL North America Credit Agreement shall, in each case, be deemed to be material for purposes hereof, (y) any changes to Section [  ] of the ABL North America Credit Agreement that impose new or increased limitations on the making of the payments described in such Section [  ] of the ABL North America Credit Agreement shall be deemed to be material and adverse for purposes hereof and (z) any changes to the [US-Canada Formula Amount] (as defined in the ABL North America Credit Agreement) or the component definitions thereof shall not be deemed to be material and adverse for purposes hereof) unless (x) Invacare Corporation shall have provided at least fifteen (15) calendar days' prior written notice to the Trustee of any such amendment or modification and (y) the Required Holders shall have consented in writing prior to the date of any such amendment or modification.]

Section 4.30. *Cash Management and Collections*. Without the consent of the Required Holders (not to be unreasonably withheld, conditioned or delayed; *provided*, that it is acknowledged and agreed that it shall not be unreasonable to withhold consent to any such transaction that will have a material adverse impact on the Note Guarantees or the Collateral), the Company shall ensure that the primary European cash collections and cash pooling arrangements of the Note Guarantors that are not Domestic Note Guarantors or Canadian Note Guarantors and their subsidiaries as in effect on the Issue Date shall not be modified in any material manner if the result of such modification would be (x) to cause material amounts of cash to be concentrated or pooled into bank accounts located in any jurisdiction other than the Netherlands, the United Kingdom, Sweden, Norway or Denmark or (y) materially adverse to the scope of collateral and lien perfection (with respect to cash and deposit accounts) contemplated by the parties hereto on the Issue Date.

#96781386v10

Section 4.31.  *[Reserved.]*

Section 4.32.  *Limitations on the German Group*.  Without consent of the Required Holders (such consent not to be unreasonably withheld), no member of the German Group (other than Alber) will (A) conduct its business (including, without limitation, financing activities and the entry into leasing arrangements) in any manner that is outside the ordinary course of its business or inconsistent with past practice in any material respect or (B) incur any funded debt for borrowed money or any Capital Lease Obligations (excluding, for the avoidance of doubt and to the extent the same are otherwise permitted hereunder (including under this **Section** 4.32), intercompany loans, Capital Lease Obligations in existence on the date hereof and any renewals or replacements thereof that do not result in a material liability increase and purchase money and similar obligations).

Section 4.33.  *Danish Collateral*.  Notwithstanding any other provision of this Indenture, Invacare Holdings Two Netherlands shall not dispose of the Equity Interests of Invacare A/S pledged pursuant to the Danish Share Pledge or any other Danish Collateral Document entered into from time to time.

Section 4.34.  *Company Covenant*.  Notwithstanding anything to the contrary herein, the Company will not incur any Indebtedness or Liens or engage in any activities or consummate any transactions (including, without limitation, any Restricted Payments, Investments or Dispositions) and will not conduct, transact or otherwise engage in any business or operations, in each case, other than:

(a)       the ownership and/or acquisition of the Equity Interests of Invacare Corporation and [New Intermediate Holdings];

(b)       the performance of obligations under and compliance with the Convertible Preferred Stock, its Organizational Documents, or other Requirement of Law (including the maintenance of its legal existence, including the ability to incur fees, costs and expenses relating to such maintenance), ordinance, regulation, rule, order, judgment, decree or permit, including without limitation as a result of or in connection with the activities of the Restricted Subsidiaries;

(c)       participating in tax, accounting, cash management, cash pooling, transfer pricing, cost-sharing arrangements and other administrative matters related to the Company or any of its Subsidiaries;

(d)       the entry into, and exercise of rights and performance of its obligations under and in connection with the Indebtedness permitted to be incurred pursuant to Sections 4.10(a)(xii), 4.10(a)(xxiii) and 4.10(a)(xxvi);

(e)       the entry into, and exercise of rights and performance of its obligations under and in connection with the Notes Document, the Other Senior Secured Convertible Notes Documents, the Indebtedness permitted to be incurred pursuant to **Section** 4.10(a)(xxi) (including the conversion of the Notes and the Other Senior Secured Convertible Notes into Equity Interests pursuant to the terms thereof);

(f)       the issuance of the Convertible Preferred Stock and the common Equity Interests of the Company;

(g)       holding of any cash, Permitted Investments and other assets received from any Restricted Subsidiary, in each case, pending prompt investment thereof in a manner permitted by the terms of this Indenture;

(h)       incurring fees, costs and expenses relating to overhead and general operating including professional fees for legal, tax and accounting issues and paying taxes, providing indemnification for its current and former officers, directors, members of management, managers, employees and advisors or consultants;

(i)　　the consummation of the Transactions on the Effective Date; and

(j)　　activities incidental to the businesses or activities described in the foregoing clauses.

Section 4.35.　　*New Intermediate Holdings Covenant*.

(a)　　Notwithstanding anything to the contrary herein, New Intermediate Holdings will not incur any Indebtedness or Liens or engage in any activities or consummate any transactions (including, without limitation, any Investments or Dispositions) and will not conduct, transact or otherwise engage in any business or operations, in each case, other than:

(i)　　the ownership and/or acquisition of the Equity Interests of direct subsidiaries of New Intermediate Holdings that are in existence on the Issue Date;

(ii)　　the performance of obligations under and compliance with its Organizational Documents, or other Requirement of Law (including the maintenance of its legal existence, including the ability to incur fees, costs and expenses relating to such maintenance), ordinance, regulation, rule, order, judgment, decree or permit, including without limitation as a result of or in connection with the activities of the Restricted Subsidiaries;

(iii)　　participating in tax, accounting, cash management, cash pooling, transfer pricing, cost-sharing arrangements and other administrative matters related to the Company or any of its Subsidiaries;

(iv)　　the entry into, and exercise rights and performance of its obligations under and in connection with the Transactions (other than any such obligations under the ABL North America Credit Agreement), including the Note Documents and the Indebtedness permitted to be incurred pursuant to Section 4.10(a)(xxiii);

(v)　　holding of any cash, Permitted Investments and other assets received from the Company or any Restricted Subsidiary, in each case, pending prompt application thereof in a manner permitted by the terms of this Indenture (including by way of Restricted Payments pursuant to Section 4.17(a)(i));

(vi)　　incurring fees, costs and expenses relating to overhead and general operating including professional fees for legal, tax and accounting issues and paying taxes, providing indemnification for its current and former officers, directors, members of management, managers, employees and advisors or consultants; and

(vii)　　activities incidental to the businesses or activities described in the foregoing clauses.

(b)　　No direct or indirect wholly-owned subsidiary of New Intermediate Holdings shall cease to be a direct or indirect wholly-owned subsidiary of New Intermediate Holdings except (x) in connection with any transaction solely among one or more subsidiaries of New Intermediate Holdings that is permitted by Section 4.12 or (y) in any transaction consented to by the Required Holders (such consent not to be unreasonably withheld, conditioned or delayed; provided, that it is acknowledged and agreed that it shall not be unreasonable to withhold consent to any such transaction that will have a material adverse impact on the Guarantees or the Collateral).

(c)　　New Intermediate Holdings shall not merge, amalgamate or consolidate with any other Person without the consent of the Required Holders (such consent not to be unreasonably conditioned, withheld or delayed).

ARTICLE 5

LISTS OF HOLDERS AND REPORTS BY THE COMPANY AND THE TRUSTEE

Section 5.01.  *Lists of Holders*.  The Company covenants and agrees that it will furnish or cause to be furnished to the Trustee, semi-annually, not more than 15 days after each [_____] and [_____] in each year beginning with [_____], [2023], and at such other times as the Trustee may request in writing, within 30 days after receipt by the Company of any such request (or such lesser time as the Trustee may reasonably request in order to enable it to timely provide any notice to be provided by it hereunder), a list in such form as the Trustee may reasonably require of the names and addresses of the Holders as of a date not more than 15 days (or such other date as the Trustee may reasonably request in order to so provide any such notices) prior to the time such information is furnished, except that no such list need be furnished so long as the Trustee is acting as Note Registrar.

Section 5.02.  *Preservation and Disclosure of Lists*.  The Trustee shall preserve, in as current a form as is reasonably practicable, all information as to the names and addresses of the Holders contained in the most recent list furnished to it as provided in **Section** 5.01 or maintained by the Trustee in its capacity as Note Registrar, if so acting.  The Trustee may dispose of any list furnished to it as provided in **Section** 5.01 upon receipt of a new list so furnished.

ARTICLE 6

DEFAULTS AND REMEDIES

Section 6.01.  *Events of Default*.  Each of the following events shall be an "**Event of Default**" with respect to the Notes:

(a)      default in any payment of interest on any Note when due and payable, and the default continues for a period of 30 days;

(b)      default in the payment of principal of any Note when due and payable on the Maturity Date, upon any required repurchase, upon declaration of acceleration or otherwise;

(c)      failure by the Company to comply with its obligation to convert the Notes in accordance with this Indenture upon exercise of a Holder's conversion right and such failure continues for five Business Days;

(d)      failure by the Company to issue a Fundamental Change Company Notice in accordance with Section 15.02(d) or notice of a Make-Whole Fundamental Change in accordance with Section 14.04(c), in each case, when due;

(e)      failure by the Company to comply with its obligations under Article 11;

(f)      failure by the Company for 60 days after written notice from the Trustee or the Holders of at least 25% in principal amount of the Notes then outstanding has been received by the Company to comply with any of its other agreements contained in the Notes or this Indenture;

(g)      any Note Guarantee by a Significant Subsidiary ceases to be in full force and effect in all material respects or any Note Guarantor that is a Significant Subsidiary denies or disaffirms such Note Guarantor's obligations under this Indenture or any Note Guarantee;

(h)      any Lien purported to be created under any Collateral Document shall cease to be, or shall be asserted by any Note Party in writing not to be, a valid and perfected Lien on any material portion of the Collateral, except (i) as a result of the sale or other disposition of the applicable Collateral to a Person that is not a Note Party in a transaction permitted under the Collateral Documents, (ii) as a result of the Collateral Agent's failure to maintain possession of any stock certificates, promissory notes or other instruments delivered to it under the Collateral Documents, (iii) as a result of the Collateral Agent's failure

#96781386v10

to file Uniform Commercial Code continuation statements or (iv) as to Collateral consisting of real property, to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage;

(i)        default by the Company or any Significant Subsidiary of the Company with respect to any mortgage, agreement or other instrument under which there may be outstanding, or by which there may be secured or evidenced, any indebtedness for money borrowed in excess of $5,000,000 (or its foreign currency equivalent) in the aggregate of the Company and/or any such Subsidiary, whether such indebtedness now exists or shall hereafter be created (i) resulting in such indebtedness becoming or being declared due and payable or (ii) constituting a failure to pay the principal or interest of any such debt when due and payable at its stated maturity, upon required repurchase, upon declaration of acceleration or otherwise, in each case, if such default is not cured or waived, or such acceleration is not rescinded, within 30 days after written notice is delivered to the Company by the Trustee or is delivered to the Company and the Trustee by Holders of at least 25% in aggregate principal amount of Notes then outstanding, in accordance with this Indenture;

(j)        a final judgment or judgments for the payment of $5,000,000 (or its foreign currency equivalent) or more (excluding any amounts covered by insurance) in the aggregate rendered against the Company or any Subsidiary of the Company, which judgment is not discharged, paid, bonded, waived or stayed within 60 days after (i) the date on which the right to appeal thereof has expired if no such appeal has commenced, or (ii) the date on which all rights to appeal have been extinguished;

(k)        the Company or any Significant Subsidiary shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to the Company or any such Significant Subsidiary or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, Australian Controller, interim receiver, manager, monitor, liquidator, custodian, voluntary administrator or other similar official of the Company or any such Significant Subsidiary or any substantial part of its property, or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors, or shall fail generally to pay its debts as they become due; or

(l)        an involuntary case or other proceeding shall be commenced against the Company or any Significant Subsidiary seeking liquidation, reorganization or other relief with respect to the Company or such Significant Subsidiary or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, Australian Controller, interim receiver, manager, monitor, liquidator, custodian, voluntary administrator or other similar official of the Company or such Significant Subsidiary or any substantial part of its property, and such involuntary case or other proceeding shall remain undismissed and unstayed for a period of 30 consecutive days.

Section 6.02.   *Acceleration; Rescission and Annulment*.   If one or more Events of Default shall have occurred and be continuing (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body), then, and in each and every such case (other than an Event of Default specified in **Section** 6.01(k) or **Section** 6.01(l) with respect to the Company or any of its Significant Subsidiaries), unless the principal of all of the Notes shall have already become due and payable, either the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then outstanding determined in accordance with **Section** 8.04, by notice in writing to the Company (and to the Trustee if given by Holders), may declare 100% of the principal of, and accrued and unpaid interest on, all the Notes to be due and payable immediately, and upon any such declaration the same shall become and shall automatically be immediately due and payable, anything contained in this Indenture or in the Notes to the contrary notwithstanding.   If an Event of Default specified in **Section** 6.01(k) or **Section** 6.01(l) with respect to the Company or any of its Significant Subsidiaries occurs and is continuing, 100% of the principal of, and accrued and unpaid interest, if any, on, all Notes shall become and shall automatically be immediately due and payable.

The immediately preceding paragraph, however, is subject to the conditions that if, at any time after the principal of the Notes shall have been so declared due and payable, and before any judgment or decree for the payment of the monies due shall have been obtained or entered as hereinafter provided, the Company shall pay or shall irrevocably deposit with the Trustee a sum sufficient to pay installments of accrued and unpaid interest upon all Notes and the principal of any and all Notes that shall have become due otherwise than by acceleration (with interest on overdue installments of accrued and unpaid interest to the extent that payment of such interest is enforceable under applicable law, and on such principal at the rate borne by the Notes) and amounts due to the Trustee pursuant to Section 7.06, and if (1) rescission would not conflict with any judgment or decree of a court of competent jurisdiction and (2) any and all existing Events of Default under this Indenture, other than the nonpayment of the principal of and accrued and unpaid interest, if any, on Notes that shall have become due solely by such acceleration, shall have been cured or waived pursuant to Section 6.09, then and in every such case (except as provided in the immediately succeeding sentence) the Holders of a majority in aggregate principal amount of the Notes then outstanding, by written notice to the Company and to the Trustee, may waive all existing and past Defaults or Events of Default with respect to the Notes and rescind and annul such declaration and its consequences and such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture; but no such waiver or rescission and annulment shall extend to or shall affect any subsequent Default or Event of Default, or shall impair any right consequent thereon.  Notwithstanding anything to the contrary herein, no such waiver or rescission and annulment shall extend to or shall affect any Default or Event of Default resulting from (i) the nonpayment of the principal (including the Fundamental Change Repurchase Price, if applicable) of, or accrued and unpaid interest on, any Notes or (ii) a failure to pay or deliver, as the case may be, the consideration due upon conversion of the Notes.

Section 6.03.  *Additional Interest*.  Notwithstanding anything in this Indenture or in the Notes to the contrary, to the extent the Company elects, the sole remedy for an Event of Default relating to the Company's failure to comply with its obligations as set forth in Section 4.06(b) shall (i) for the first 90 days after the occurrence of such an Event of Default (beginning on, and including the date on which such an Event of Default first occurs), consist exclusively of the right to receive Additional Interest on the Notes at a rate equal to 0.25% per annum of the principal amount of the Notes outstanding for each day during such 90-day period on which such Event of Default is continuing and (ii) for the period from, and including, the 91st day after the occurrence of such an Event of Default to, and including, the 180th day after the occurrence of such an Event of Default, consist exclusively of the right to receive Additional Interest on the Notes at a rate equal to 0.50% per annum of the principal amount of Notes outstanding for each day during such additional 90-day period on which such an Event of Default is continuing, subject to the second immediately succeeding paragraph.  Additional Interest payable pursuant to this Section 6.03 shall be in addition to, not in lieu of, any Additional Interest payable pursuant to Section 4.06(d) or Section 4.06(e).  If the Company so elects, such Additional Interest shall be payable in the same manner and on the same dates as the stated interest payable on the Notes.  On the 181st day after such Event of Default (if the Event of Default relating to the Company's failure to file is not cured or waived prior to such 181st day), the Notes shall be immediately subject to acceleration as provided in Section 6.02.  The provisions of this paragraph will not affect the rights of Holders of Notes in the event of the occurrence of any Event of Default other than the Company's failure to comply with its obligations as set forth in Section 4.06(b).  In the event the Company does not elect to pay Additional Interest following an Event of Default in accordance with this Section 6.03 or the Company elected to make such payment but does not pay the Additional Interest when due, the Notes shall be immediately subject to acceleration as provided in Section 6.02.

In order to elect to pay Additional Interest as the sole remedy during the first 180 days after the occurrence of any Event of Default described in the immediately preceding paragraph, the Company must notify all Holders of the Notes, the Trustee and the Paying Agent in writing of such election prior to the beginning of such 180-day period.  Upon the failure to timely give such notice, the Notes shall be immediately subject to acceleration as provided in Section 6.02.

In no event will the rate of any such Additional Interest payable pursuant to this Section 6.03, when taken together with any Additional Interest that may accrue as a result of the Company's failure to timely file any document or report that the Company is required to file with the Securities and Exchange

Commission pursuant to Section 13 or 15(d) of the Exchange Act, as applicable (after giving effect to all applicable grace periods thereunder and other than reports on Form 8-K), as described under Section 4.06(d), accrue at a rate in excess of 0.50% per annum, regardless of the number of events or circumstances giving rise to the requirement to pay such Additional Interest.

Section 6.04. *Payments of Notes on Default; Suit Therefor*.  If an Event of Default described in clause (a) or (b) of **Section** 6.01 shall have occurred and be continuing, the Company shall, upon demand of the Trustee, pay to the Trustee, for the benefit of the Holders of the Notes, the whole amount then due and payable on the Notes for principal and interest, if any, with interest on any overdue principal and interest, if any, at the rate borne by the Notes at such time, and, in addition thereto, such further amount as shall be sufficient to cover any amounts due to the Trustee under **Section** 7.06.  If the Company shall fail to pay such amounts forthwith upon such demand, the Trustee, in its own name and as Trustee of an express trust, may institute a judicial proceeding for the collection of the sums so due and unpaid, may prosecute such proceeding to judgment or final decree and may enforce the same against the Company or any other obligor upon the Notes and collect the moneys adjudged or decreed to be payable in the manner provided by law out of the property of the Company or any other obligor upon the Notes, wherever situated.

In the event there shall be pending proceedings for the bankruptcy or for the reorganization of the Company or any other Significant Subsidiary on the Notes under Title 11 of the United States Code, or any other applicable law, or in case a receiver, interim receiver, manager, monitor, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Company or such other Significant Subsidiary, the property of the Company or such other Significant Subsidiary, or in the event of any other judicial proceedings relative to the Company or such other Significant Subsidiary upon the Notes, or to the creditors or property of the Company or such other Significant Subsidiary, the Trustee, irrespective of whether the principal of the Notes shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether the Trustee shall have made any demand pursuant to the provisions of this Section 6.04, shall be entitled and empowered, by intervention in such proceedings or otherwise, to file and prove a claim or claims for the whole amount of principal and accrued and unpaid interest, if any, in respect of the Notes, and, in case of any judicial proceedings, to file such proofs of claim and other papers or documents and to take such other actions as it may deem necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel) and of the Holders allowed in such judicial proceedings relative to the Company or any other obligor on the Notes, its or their creditors, or its or their property, and to collect and receive any monies or other property payable or deliverable on any such claims, and to distribute the same after the deduction of any amounts due to the Trustee under Section 7.06; and any receiver, interim receiver, manager, monitor, assignee or trustee in bankruptcy or reorganization, liquidator, custodian or similar official is hereby authorized by each of the Holders to make such payments to the Trustee, as administrative expenses, and, in the event that such payments shall be made directly to the Holders, to pay to the Trustee any amount due it for reasonable compensation, expenses, advances and disbursements, including agents and counsel fees, and including any other amounts due to the Trustee under Section 7.06, incurred by it up to the date of such distribution.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting such Holder or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

All rights of action and of asserting claims under this Indenture, or under any of the Notes, may be enforced by the Trustee without the possession of any of the Notes, or the production thereof at any trial or other proceeding relative thereto, and any such suit or proceeding instituted by the Trustee shall be brought in its own name as Trustee of an express trust, and any recovery of judgment shall, after provision for the payment of the reasonable compensation, costs, expenses, disbursements and advances of the Trustee, its agents and counsel, be for the ratable benefit of the Holders of the Notes.

#96781386v10

In any proceedings brought by the Trustee (and in any proceedings involving the interpretation of any provision of this Indenture to which the Trustee shall be a party) the Trustee shall be held to represent all the Holders of the Notes, and it shall not be necessary to make any Holders of the Notes parties to any such proceedings.

In case the Trustee shall have proceeded to enforce any right under this Indenture and such proceedings shall have been discontinued or abandoned because of any waiver pursuant to Section 6.09 or any rescission and annulment pursuant to Section 6.02 or for any other reason or shall have been determined adversely to the Trustee, then and in every such case the Company, the Holders and the Trustee shall, subject to any determination in such proceeding, be restored respectively to their several positions and rights hereunder, and all rights, remedies and powers of the Company, the Holders and the Trustee shall continue as though no such proceeding had been instituted.

Section 6.05.  *Application of Monies Collected by Trustee*.  Subject to the provisions of the Intercreditor Agreements, any monies collected by the Trustee pursuant to this **Article** 6 with respect to the Notes and any money or other property distributable in respect of any grantor's Notes Obligations under this Indenture after an Event of Default shall be applied in the following order, at the date or dates fixed by the Trustee for the distribution of such monies or other property, upon presentation of the several Notes, and stamping thereon the payment, if only partially paid, and upon surrender thereof, if fully paid:

**First**, to the payment of all amounts due to the Notes Collateral Agent and the Trustee, in all of its capacities, under this Indenture;

**Second**, in case the principal of the outstanding Notes shall not have become due and be unpaid, to the payment of interest on, and any cash due upon conversion of, the Notes in default in the order of the date due of the payments of such interest and cash due upon conversion, as the case may be, with interest (to the extent that such interest has been collected by the Trustee) upon such overdue payments at the rate borne by the Notes at such time, such payments to be made ratably to the Persons entitled thereto;

**Third**, in case the principal of the outstanding Notes shall have become due, by declaration or otherwise, and be unpaid to the payment of the whole amount (including, if applicable, the payment of the Fundamental Change Repurchase Price and any cash due upon conversion) then owing and unpaid upon the Notes for principal and interest, if any, with interest on the overdue principal and, to the extent that such interest has been collected by the Trustee, upon overdue installments of interest at the rate borne by the Notes at such time, and in case such monies shall be insufficient to pay in full the whole amounts so due and unpaid upon the Notes, then to the payment of such principal (including, if applicable, the Fundamental Change Repurchase Price and any cash due upon conversion) and interest without preference or priority of principal over interest, or of interest over principal or of any installment of interest over any other installment of interest, or of any Note over any other Note, ratably to the aggregate of such principal (including, if applicable, the Fundamental Change Repurchase Price and any cash due upon conversion) and accrued and unpaid interest; and

**Fourth**, to the payment of the remainder, if any, to the Company.

Section 6.06.  *Proceedings by Holders*.  Except to enforce the right to receive payment of principal (including, if applicable, the Fundamental Change Repurchase Price) or interest when due, or the right to receive payment or delivery of the consideration due upon conversion, no Holder of any Note shall have any right by virtue of or by availing of any provision of this Indenture to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Indenture, or for the appointment of a receiver, interim receiver, manager, monitor, trustee, liquidator, custodian or other similar official, or for any other remedy hereunder, unless:

(a)       such Holder previously shall have given to the Trustee written notice of an Event of Default and of the continuance thereof, as herein provided;

#96781386v10

(b)        Holders of at least 25% in aggregate principal amount of the Notes then outstanding shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee hereunder;

(c)        such Holders shall have offered to the Trustee such security, prefunding and/or indemnity reasonably satisfactory to it against any loss, liability, claim, cost, damage or expense to be incurred therein or thereby;

(d)        the Trustee for 60 days after its receipt of such notice, request and offer of such security, prefunding and/or indemnity, shall have neglected or refused to institute any such action, suit or proceeding; and

(e)        no direction that, in the opinion of the Trustee, is inconsistent with such written request shall have been given to the Trustee by the Holders of a majority of the aggregate principal amount of the Notes then outstanding within such 60-day period pursuant to **Section 6.09**, it being understood and intended, and being expressly covenanted by the taker and Holder of every Note with every other taker and Holder and the Trustee that no one or more Holders shall have any right in any manner whatever by virtue of or by availing of any provision of this Indenture to affect, disturb or prejudice the rights of any other Holder (it being understood that the Trustee shall have no liability or responsibility to determine whether any such action is prejudicial to the Holders), or to obtain or seek to obtain priority over or preference to any other such Holder, or to enforce any right under this Indenture, except in the manner herein provided and for the equal, ratable and common benefit of all Holders (except as otherwise provided herein).  For the protection and enforcement of this **Section 6.06**, each and every Holder and the Trustee shall be entitled to such relief as can be given either at law or in equity.

Notwithstanding any other provision of this Indenture and any provision of any Note, the right of any Holder to receive payment or delivery, as the case may be, of (x) the principal (including the Fundamental Change Repurchase Price, if applicable) of, (y) accrued and unpaid interest, if any, on, and (z) the consideration due upon conversion of, such Note, on or after the respective due dates expressed or provided for in such Note or in this Indenture, or to institute suit for the enforcement of any such payment or delivery, as the case may be, on or after such respective dates against the Company shall not be impaired or affected without the consent of such Holder.

Section 6.07.  *Proceedings by Trustee*.  In case of an Event of Default, the Trustee may proceed to protect and enforce the rights vested in it by this Indenture by such appropriate judicial proceedings as are necessary to protect and enforce any of such rights, either by suit in equity or by action at law or by proceeding in bankruptcy or otherwise, whether for the specific enforcement of any covenant or agreement contained in this Indenture or in aid of the exercise of any power granted in this Indenture, or to enforce any other legal or equitable right vested in the Trustee by this Indenture or by law.

Section 6.08.  *Remedies Cumulative and Continuing*.  Except as provided in the last paragraph of **Section 2.06**, all powers and remedies given by this **Article 6** to the Trustee or to the Holders shall, to the extent permitted by law, be deemed cumulative and not exclusive of any thereof or of any other powers and remedies available to the Trustee or the Holders of the Notes, by judicial proceedings or otherwise, to enforce the performance or observance of the covenants and agreements contained in this Indenture, and no delay or omission of the Trustee or of any Holder of any of the Notes to exercise any right or power accruing during the continuance of any Default or Event of Default shall impair any such right or power, or shall be construed to be a waiver of any such Default or Event of Default or any acquiescence therein; and, subject to the provisions of **Section 6.06**, every power and remedy given by this **Article 6** or by law to the Trustee or to the Holders may be exercised from time to time, and as often as shall be deemed expedient, by the Trustee or by the Holders.

Section 6.09.  *Direction of Proceedings and Waiver of Defaults by Majority of Holders*.  The Holders of a majority of the aggregate principal amount of the Notes at the time outstanding determined in accordance with **Section 8.04** shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power

conferred on the Trustee with respect to the Notes; *provided*, *however*, that (a) such direction shall not be in conflict with any rule of law or with this Indenture, and (b) the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction.  The Trustee may refuse to follow any direction that it determines is unduly prejudicial to the rights of any other Holder or that would involve the Trustee in personal liability, it being expressly understood that the Trustee shall not have an affirmative duty to ascertain whether such action is prejudicial.  The Holders of a majority in aggregate principal amount of the Notes at the time outstanding determined in accordance with **Section** 8.04 may on behalf of the Holders of all of the Notes waive any existing or past Default or Event of Default hereunder and its consequences except (i) a default in the payment of accrued and unpaid interest, if any, on, or the principal (including any Fundamental Change Repurchase Price) of, the Notes when due that has not been cured pursuant to the provisions of **Section** 6.01, (ii) a failure by the Company to pay or deliver, as the case may be, the consideration due upon conversion of the Notes or (iii) a default in respect of a covenant or provision hereof which under **Article** 10 cannot be modified or amended without the consent of each Holder of an outstanding Note affected.  Upon any such waiver the Company, the Trustee and the Holders of the Notes shall be restored to their former positions and rights hereunder; but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon.  Whenever any Default or Event of Default hereunder shall have been waived as permitted by this **Section** 6.09, said Default or Event of Default shall for all purposes of the Notes and this Indenture be deemed to have been cured and to be not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon.

Section 6.10.  *Notice of Defaults*.  The Trustee shall, within 90 days after the occurrence and continuance of a Default of which a Responsible Officer has actual knowledge, deliver to all Holders notice of all Defaults actually known to a Responsible Officer, unless such Defaults shall have been cured or waived before the giving of such notice; *provided* that, except in the case of a Default in the payment of the principal of (including the Fundamental Change Repurchase Price, if applicable), or accrued and unpaid interest on, any of the Notes or a Default in the payment or delivery of the consideration due upon conversion, the Trustee shall be protected in withholding such notice if and so long as the Trustee in good faith determines that the withholding of such notice is in the interests of the Holders.

Section 6.11.  *Undertaking to Pay Costs*.  All parties to this Indenture agree, and each Holder of any Note by its acceptance thereof shall be deemed to have agreed, that any court may, in its discretion, require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; *provided* that the provisions of this **Section** 6.11 (to the extent permitted by law) shall not apply to any suit instituted by the Trustee, to any suit instituted by any Holder, or group of Holders, holding in the aggregate more than 10% in principal amount of the Notes at the time outstanding determined in accordance with **Section** 8.04, or to any suit instituted by any Holder for the enforcement of the payment of the principal of or accrued and unpaid interest, if any, on any Note (including, but not limited to, the Fundamental Change Repurchase Price, if applicable) on or after the due date expressed or provided for in such Note or to any suit for the enforcement of the right to convert any Note, or receive the consideration due upon conversion, in accordance with the provisions of **Article** 14.

ARTICLE 7

CONCERNING THE TRUSTEE

Section 7.01.  *Duties and Responsibilities of Trustee*.  The Trustee, prior to the occurrence of an Event of Default and after the curing or waiver of all Events of Default that may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Indenture.  In the event an Event of Default has occurred and is continuing, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's

#96781386v10

own affairs; *provided* that if an Event of Default occurs and is continuing, the Trustee will be under no obligation to exercise any of the rights or powers under this Indenture at the written request or direction of any of the Holders unless such Holders have offered to the Trustee indemnity and/or security (including by way of prefunding) reasonably satisfactory to it against any loss, claim, liability cost, damage or expense that might be incurred by it in compliance with such request or direction.

No provision of this Indenture shall be construed to relieve the Trustee from liability for its own grossly negligent action, its own grossly negligent failure to act or its own willful misconduct, except that:

(a)     prior to the occurrence of an Event of Default and after the curing or waiving of all Events of Default that may have occurred:

(i)     the duties and obligations of the Trustee shall be determined solely by the express provisions of this Indenture, and the Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii)     in the absence of gross negligence and willful misconduct on the part of the Trustee, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; but, in the case of any such certificates or opinions that by any provisions hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of any mathematical calculations or other facts stated therein);

(b)     the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer or Officers of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts;

(c)     the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Holders of not less than a majority of the aggregate principal amount of the Notes at the time outstanding determined as provided in Section 8.04 relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture;

(d)     whether or not therein provided, every provision of this Indenture relating to the conduct or affecting the liability of, or affording protection to, the Trustee shall be subject to the provisions of this Section;

(e)     the Trustee shall not be liable in respect of any payment (as to the correctness of amount, entitlement to receive or any other matters relating to payment) or notice effected by the Company or any Paying Agent or any records maintained by any co-Note Registrar with respect to the Notes;

(f)     if any party fails to deliver a notice relating to an event the fact of which, pursuant to this Indenture, requires notice to be sent to the Trustee, the Trustee may conclusively rely on its failure to receive such notice as reason to act as if no such event occurred, unless a Responsible Officer of the Trustee had actual knowledge of such event;

(g)     in the absence of written investment direction from the Company, all cash received by the Trustee shall be placed in a non-interest bearing trust account, and in no event shall the Trustee be liable for the selection of investments or for investment losses, fees, taxes or other charges incurred thereon or for losses incurred as a result of the liquidation of any such investment prior to its maturity date or the failure of the party directing such investments prior to its maturity date or the failure of the party directing such investment to provide timely written investment direction, and the Trustee shall have no obligation to

invest or reinvest any amounts held hereunder in the absence of such written investment direction from the Company;

(h)        the Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Company; and

(i)        in the event that the Trustee is also acting as Custodian, Note Registrar, Paying Agent, Conversion Agent or transfer agent hereunder, the rights and protections afforded to the Trustee pursuant to this Article 7 shall also be afforded to such Custodian, Note Registrar, Paying Agent, Conversion Agent or transfer agent.

None of the provisions contained in this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur personal financial liability in the performance of any of its duties or in the exercise of any of its rights or powers if there are reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it. Under no circumstances will the Trustee be liable in its individual capacity for the obligations evidenced by the Notes.

Section 7.02.  *Reliance on Documents, Opinions, Etc.*  Except as otherwise provided in **Section** 7.01:

(a)        the Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, note, coupon or other paper or document believed by it in good faith to be genuine and to have been signed or presented by the proper party or parties and the Trustee need not investigate any fact or matter stated in any such document;

(b)        any request, direction, order or demand of the Company mentioned herein shall be in writing and sufficiently evidenced by an Officer's Certificate (unless other evidence in respect thereof be herein specifically prescribed); and, if requested by the Trustee, an Opinion of Counsel; and any Board Resolution may be evidenced to the Trustee by a copy thereof certified by the Secretary or an Assistant Secretary of the Company;

(c)        the Trustee may consult with counsel of its selection and require an Opinion of Counsel and any advice of such counsel or Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted by it hereunder in good faith and in accordance with such advice or Opinion of Counsel;

(d)        the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture or other paper or document, but the Trustee may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Company, personally or by agent or attorney at the expense of the Company and shall incur no liability of any kind by reason of such inquiry or investigation;

(e)        the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, custodians, nominees or attorneys and the Trustee shall not be responsible for any act, omissions, misconduct or negligence on the part of any agent, custodian, nominee or attorney appointed by it with due care hereunder;

(f)        the permissive rights of the Trustee enumerated herein shall not be construed as duties;

(g)        the Trustee shall not be deemed to have notice of any Default or Event of Default unless a Responsible Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such a default is received by the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Notes and this Indenture;

(h)        the rights, privileges, protections, indemnities, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified and/or secured (including by way of prefunding) to its satisfaction, are extended to, and shall be enforceable by, the Notes Collateral Agent and the Trustee in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder;

(i)        the Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder;

(j)        unless this Indenture specifically provides otherwise, any demand, request, direction or notice from the Company will be sufficient if signed by an Officer of the Company;

(k)        the Trustee may request that the Company deliver a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture;

(l)        the Trustee may refrain from taking any action in any jurisdiction if the taking of such action in that jurisdiction would, in its reasonable opinion, based upon legal advice in the relevant jurisdiction, be contrary to any law, regulation or directive of that jurisdiction or, to the extent applicable, the State of New York or any directive, sanction or regulation of any agency of any such state or jurisdiction and may without liability do anything which is, in its reasonable opinion based upon legal advice, necessary to comply with any such law, directive or regulation; and

(m)        the Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request, order or direction of any of the Holders pursuant to the provisions of this Indenture, unless such Holders shall have offered and, if requested, provided to the Trustee, indemnity and/or other security (including by way of prefunding) reasonably satisfactory to the Trustee against the costs, expenses and liabilities which may be incurred by it in compliance with such request, order or direction.  In the event the Trustee receives inconsistent or conflicting requests and indemnity from two or more groups of Holders, each representing less than the majority in aggregate principal amount of the Notes then outstanding, pursuant to the provisions of this Indenture (as qualified, limited or otherwise affected by the provisions of any Intercreditor Agreement), the Trustee, in its sole discretion, may determine what action, if any, shall be taken and shall be held harmless and shall not incur any liability for its failure to act until such inconsistency or conflict is, in its reasonable opinion, resolved.

In no event shall the Trustee be liable for any special, punitive, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.  The Trustee shall not be charged with knowledge of any Default or Event of Default with respect to the Notes, unless either (1) a Responsible Officer shall have actual knowledge of such Default or Event of Default or (2) written notice of such Default or Event of Default shall have been given to the Trustee by the Company or by any Holder of the Notes.

Section 7.03.  *No Responsibility for Recitals, Etc.*  The recitals contained herein and in the Notes (except in the Trustee's certificate of authentication) shall be taken as the statements of the Company, and the Trustee assumes no responsibility for the correctness of the same.  The Trustee makes no representations as to the validity or sufficiency of this Indenture or of the Notes.  The Trustee shall not be accountable for the use or application by the Company of any Notes or the proceeds of any Notes authenticated and delivered by the Trustee in conformity with the provisions of this Indenture.

Section 7.04.  *Trustee, Paying Agents, Conversion Agents or Note Registrar May Own Notes*.  The Trustee, any Paying Agent, any Conversion Agent or Note Registrar, in its individual or any other capacity, may become the owner or pledgee of Notes with the same rights it would have if it were not the Trustee, Paying Agent, Conversion Agent or Note Registrar.

Section 7.05. *Monies and Common Shares to Be Held in Trust.* All monies and Common Shares received by the Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received. Money and Common Shares held by the Trustee in trust hereunder need not be segregated from other funds except to the extent required by law. The Trustee shall be under no liability for interest on any money or Common Shares received by it hereunder except as may be agreed from time to time by the Company and the Trustee.

Section 7.06. *Compensation and Expenses of Trustee.* The Company and the Note Guarantors, jointly and severally, covenant and agree to pay to the Trustee from time to time, and the Trustee shall receive, such compensation for all services rendered by it hereunder in any capacity (which shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) as mutually agreed to in writing between the Trustee and the Company, and the Company will pay or reimburse the Trustee upon its request for all reasonable expenses, costs, disbursements and advances reasonably incurred or made by the Trustee in accordance with any of the provisions of this Indenture in any capacity thereunder (including the reasonable compensation and the costs, expenses and disbursements of its agents and counsel and of all Persons not regularly in its employ) except any such expense, disbursement or advance as shall have been caused by its gross negligence or willful misconduct (as determined by a final order of a court of competent jurisdiction). In the event of the occurrence of an Event of Default or the Trustee considering it expedient or necessary or being requested by the Company to undertake duties which the Trustee reasonably determines to be of an exceptional nature or otherwise outside the scope of the normal duties of the Trustee, the Company, shall pay to the Trustee promptly upon request for all such additional remuneration for such duties. Such expenses include the properly incurred compensation, disbursements, expenses and advances of the Trustee's agents, counsel, accountants and experts. The Company and the Note Guarantors, jointly and severally, also covenant to indemnify the Trustee in any capacity under this Indenture and any other document or transaction entered into in connection herewith and its agents and any authenticating agent for, and to hold them harmless against, any loss, claim (whether asserted by the Company, a Holder or any other Person), damage, liability or expense incurred without gross negligence or willful misconduct on the part of the Trustee, its officers, directors, agents or employees, or such agent or authenticating agent, as the case may be, and arising out of or in connection with the acceptance or administration of this Indenture or in any other capacity hereunder, including the costs and expenses of defending themselves against any claim of liability in the premises, and the enforcement of this Indenture, including this Section. The obligations of the Company under this **Section** 7.06 to compensate or indemnify the Trustee and to pay or reimburse the Trustee for expenses, disbursements and advances shall be secured by a senior claim (or lien) to which the Notes are hereby made subordinate on all money or property held or collected by the Trustee, except, subject to the effect of **Section** 6.05, funds held in trust herewith for the benefit of the Holders of particular Notes. The Trustee's right to receive payment of any amounts due under this **Section** 7.06 shall not be subordinate to any other liability or indebtedness of the Company. The obligation of the Company under this **Section** 7.06 shall survive the satisfaction and discharge of this Indenture and the earlier resignation or removal or the Trustee. The Company need not pay for any settlement made without its consent, which consent shall not be unreasonably withheld. The indemnification provided in this **Section** 7.06 shall extend to the officers, directors, agents and employees of the Trustee.

Without prejudice to any other rights available to the Trustee under applicable law, when the Trustee and its agents and any authenticating agent incur expenses or render services after an Event of Default specified in Section 6.01(k) or Section 6.01(l) occurs, the expenses and the compensation for the services are intended to constitute expenses of administration under any bankruptcy, insolvency or similar laws.

Section 7.07. *Officer's Certificate as Evidence.* Except as otherwise provided in **Section** 7.01, whenever in the administration of the provisions of this Indenture the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or omitting any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may, in the absence of gross negligence or willful misconduct on the part of the Trustee, be deemed to be conclusively proved and established by an Officer's Certificate delivered to the Trustee, and such Officer's Certificate, in the absence of gross negligence or willful misconduct on the part of the Trustee, shall be full

warrant to the Trustee for any action taken or omitted by it under the provisions of this Indenture upon the faith thereof.

Section 7.08. *Eligibility of Trustee.* There shall at all times be a Trustee hereunder that is a corporation or other legal entity organized and doing business under the laws of the United States of America or any state thereof, that is authorized under such laws to exercise corporate trustee power that is subject to supervision or examination by the U.S. federal and state authorities and that has a combined capital and surplus of at least the minimum amount required by the Trust Indenture Act. If such Person publishes reports of condition at least annually, pursuant to law or to the requirements of any supervising or examining authority, then for the purposes of this Section, the combined capital and surplus of such Person shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section, it shall resign promptly in the manner and with the effect hereinafter specified in this Article.

Section 7.09. *Resignation or Removal of Trustee.* (a) The Trustee may at any time resign by giving written notice of such resignation to the Company and by delivering notice thereof to the Holders. Upon receiving such notice of resignation, the Company shall promptly appoint a successor Trustee by written instrument, in duplicate, executed by order of the Board of Directors, one copy of which instrument shall be delivered to the resigning Trustee and one copy to the successor Trustee. If no successor Trustee shall have been so appointed and have accepted appointment within 45 days after the giving of such notice of resignation to the Holders, the resigning Trustee may, upon ten Business Days' notice to the Company and the Holders, petition any court of competent jurisdiction for the appointment of a successor Trustee (at the Company's expense), or any Holder who has been a bona fide holder of a Note or Notes for at least six months (or since the date of this Indenture) may, subject to the provisions of **Section** 6.11, on behalf of himself or herself and all others similarly situated, petition any such court for the appointment of a successor Trustee. Such court may thereupon, after such notice, if any, as it may deem proper and prescribe, appoint a successor Trustee.

(b) In case at any time any of the following shall occur:

(i) the Trustee shall cease to be eligible in accordance with the provisions of Section 7.08 and shall fail to resign after written request therefor by the Company or by any such Holder, or

(ii) the Trustee shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or a receiver, interim receiver, manager or monitor of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation,

then, in either case, the Company may by a Board Resolution remove the Trustee and appoint a successor Trustee by written instrument, in duplicate, executed by order of the Board of Directors, one copy of which instrument shall be delivered to the Trustee so removed and one copy to the successor Trustee, or, subject to the provisions of Section 6.11, any Holder who has been a bona fide holder of a Note or Notes for at least six months (or since the date of this Indenture) may, on behalf of himself or herself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee. Such court may thereupon, after such notice, if any, as it may deem proper and prescribe, remove the Trustee and appoint a successor Trustee.

(c) The Holders of a majority in aggregate principal amount of the Notes at the time outstanding, as determined in accordance with Section 8.04, may at any time remove the Trustee and nominate a successor Trustee that shall be deemed appointed as successor Trustee by giving written notice of such removal and appointment to the Company and by delivering notice thereof to the remaining Holders (if any).

#96781386v10

(d)      Any resignation or removal of the Trustee and appointment of a successor Trustee pursuant to any of the provisions of this Section 7.09 shall become effective upon acceptance of appointment by the successor Trustee as provided in Section 7.10.

Section 7.10.  *Acceptance by Successor Trustee*.  Any successor Trustee appointed as provided in **Section** 7.09 shall execute, acknowledge and deliver to the Company and to its predecessor Trustee an instrument accepting such appointment hereunder, and thereupon the resignation or removal of the predecessor Trustee shall become effective and such successor Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, duties and obligations of its predecessor hereunder, with like effect as if originally named as Trustee herein; but, nevertheless, on the written request of the Company or of the successor Trustee, the Trustee ceasing to act shall, upon payment of any amounts then due it pursuant to the provisions of Section 7.06, execute and deliver an instrument transferring to such successor Trustee all the rights and powers of the Trustee so ceasing to act.  Upon request of any such successor Trustee, the Company shall execute any and all instruments in writing for more fully and certainly vesting in and confirming to such successor Trustee all such rights and powers.  Any Trustee ceasing to act shall, nevertheless, retain a senior claim to which the Notes are hereby made subordinate on all money or property held or collected by such Trustee as such, except for funds held in trust for the benefit of Holders of particular Notes, to secure any amounts then due it pursuant to the provisions of **Section** 7.06.

*No successor Trustee shall accept appointment as provided in this* Section 7.10 *unless at the time of such acceptance such successor Trustee shall be eligible under the provisions of* Section 7.08.

Upon acceptance of appointment by a successor Trustee as provided in this Section 7.10, each of the Company and the successor Trustee, at the written direction and at the expense of the Company shall send or cause to be sent a notice of the succession of such Trustee hereunder to the Holders at their addresses as they shall appear on the Note Register.  If the Company fails to send such notice within ten days after acceptance of appointment by the successor Trustee, the successor Trustee shall cause such notice to be sent at the expense of the Company.

Section 7.11.  *Succession by Merger, Etc*.  Any corporation or other entity into which the Trustee may be merged, amalgamated, or converted or with which it may be consolidated, or any corporation or other entity resulting from any merger, amalgamation, conversion or consolidation to which the Trustee shall be a party, or any corporation or other entity succeeding to all or substantially all of the corporate trust business of the Trustee (including the administration of this Indenture), shall be the successor to the Trustee hereunder without the execution or filing of any paper or any further act on the part of any of the parties hereto; *provided* that in the case of any corporation or other entity succeeding to all or substantially all of the corporate trust business of the Trustee such corporation or other entity shall be eligible under the provisions of **Section** 7.08.

In case at the time such successor to the Trustee shall succeed to the trusts created by this Indenture, any of the Notes shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor Trustee or authenticating agent appointed by such predecessor Trustee, and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Trustee or an authenticating agent appointed by such successor Trustee may authenticate such Notes either in the name of any predecessor Trustee hereunder or in the name of the successor Trustee; and in all such cases such certificates shall have the full force which is provided anywhere in the Notes or in this Indenture that the certificates of the Trustee shall have; *provided*, *however*, that the right to adopt the certificate of authentication of any predecessor Trustee or to authenticate Notes in the name of any predecessor Trustee shall apply only to its successor or successors by merger, amalgamation, conversion or consolidation.

Section 7.12.  *Trustee's Application for Instructions from the Company*.  Any application by the Trustee for written instructions from the Company (other than with regard to any action proposed to

be taken or omitted to be taken by the Trustee that affects the rights of the Holders of the Notes under this Indenture) may, at the option of the Trustee, set forth in writing any action proposed to be taken or omitted by the Trustee under this Indenture and the date on and/or after which such action shall be taken or such omission shall be effective.  The Trustee shall not be liable to the Company for any action taken by, or omission of, the Trustee in accordance with a proposal included in such application on or after the date specified in such application (which date shall not be less than three Business Days after the date any officer that the Company has indicated to the Trustee should receive such application actually receives such application, unless any such officer shall have consented in writing to any earlier date), unless, prior to taking any such action (or the effective date in the case of any omission), the Trustee shall have received written instructions in accordance with this Indenture in response to such application specifying the action to be taken or omitted.

Section 7.13.  *Collateral Documents; Intercreditor Agreements*.  By their acceptance of the Notes, the Holders hereby authorize and direct the Trustee and Notes Collateral Agent, as the case may be, to execute and deliver each of the Collateral Documents, the Pari Passu Intercreditor Agreement and the ABL North America Intercreditor Agreement or any Permitted ABL EMEA Intercreditor Agreement or Permitted First Lien Second Lien Intercreditor Agreement to which the Trustee or the Notes Collateral Agent, as applicable, is to be a party, including any Intercreditor Agreement or Collateral Documents executed on or after the Issue Date and any amendments, joinders or supplements to any Intercreditor Agreement or Collateral Document permitted by this Indenture.  It is hereby expressly acknowledged and agreed that, in doing so, the Trustee and the Notes Collateral Agent are not responsible for the terms or contents of such agreements, or for the validity or enforceability thereof, or the sufficiency thereof for any purpose.  Whether or not so expressly stated therein, in entering into, or taking (or forbearing from) any action under, any Intercreditor Agreement or any other Collateral Document, the Trustee and the Notes Collateral Agent each shall have all of the rights, privileges, benefits, immunities, indemnities and other protections granted to them under this Indenture (in addition to those that may be granted to it under the terms of such other agreement or agreements).

ARTICLE 8

CONCERNING THE HOLDERS

Section 8.01.  *Action by Holders*.  Whenever in this Indenture it is *provided* that the Holders of a specified percentage of the aggregate principal amount of the Notes may take any action (including the making of any demand or request, the giving of any notice, consent or waiver or the taking of any other action), (a) the fact that at the time of taking any such action, the Holders of such specified percentage have joined therein may be evidenced (i) by any instrument or any number of instruments of similar tenor executed by Holders in person or by agent or proxy appointed in writing, or (ii) by the record of the Holders voting in favor thereof at any meeting of Holders duly called and held in accordance with the provisions of **Article** 9, or (iii) by a combination of such instrument or instruments and any such record of such a meeting of Holders and (b) the Notes and the Other Senior Secured Convertible Notes shall be treated as if they together constituted a single class of Notes hereunder.  Whenever the Company or the Trustee solicits the taking of any action by the Holders of the Notes, the Company or the Trustee may, but shall not be required to, fix in advance of such solicitation, a date as the record date for determining Holders entitled to take such action.  The record date if one is selected shall be not more than fifteen days prior to the date of commencement of solicitation of such action.

Section 8.02.  *Proof of Execution by Holders*.  Subject to the provisions of **Section** 7.01, **Section** 7.02 and **Section** 9.05, proof of the execution of any instrument by a Holder or its agent or proxy shall be sufficient if made in accordance with such reasonable rules and regulations of the Trustee as shall then be customary and standard.  The holding of Notes shall be proved by the Note Register or by a certificate of the Note Registrar.  The record of any Holders' meeting shall be proved in the manner provided in **Section** 9.06.

Section 8.03.  *Who Are Deemed Absolute Owners*.  The Company, the Trustee, any authenticating agent, any Paying Agent, any Conversion Agent and any Note Registrar may deem the

Person in whose name a Note shall be registered upon the Note Register to be, and may treat it as, the absolute owner of such Note (whether or not such Note shall be overdue and notwithstanding any notation of ownership or other writing thereon made by any Person other than the Company or any Note Registrar) for the purpose of receiving payment of or on account of the principal (including any Fundamental Change Repurchase Price) of and (subject to **Section** 2.03) accrued and unpaid interest on such Note, for conversion of such Note and for all other purposes; and neither the Company nor the Trustee nor any Paying Agent nor any Conversion Agent nor any Note Registrar shall be affected or incur any liability by any notice to the contrary.  All such payments or deliveries so made to any Holder for the time being, or upon its order, shall be valid, and, to the extent of the sums or Common Shares so paid or delivered, effectual to satisfy and discharge the liability for monies payable or shares deliverable upon any such Note. Notwithstanding anything to the contrary in this Indenture or the Notes following an Event of Default, any holder of a beneficial interest in a Global Note may directly enforce against the Company, without the consent, solicitation, proxy, authorization or any other action of the Depositary or any other Person, such holder's right to exchange such beneficial interest for a Note in certificated form in accordance with the provisions of this Indenture.

Section 8.04.  *Company-Owned Notes Disregarded*.  In determining whether the Holders of the requisite aggregate principal amount of Notes have concurred in any direction, consent, waiver or other action under this Indenture, Notes that are owned by the Company, by any Subsidiary thereof or by any Affiliate of the Company or any Subsidiary thereof shall be disregarded and deemed not to be outstanding for the purpose of any such determination; *provided* that for the purposes of determining whether the Trustee shall be protected in relying on any such direction, consent, waiver or other action only Notes that a Responsible Officer actually knows are so owned shall be so disregarded.  Notes so owned that have been pledged in good faith may be regarded as outstanding for the purposes of this **Section** 8.04 if the pledgee shall establish to the satisfaction of the Trustee the pledgee's right to so act with respect to such Notes and that the pledgee is not the Company, a Subsidiary thereof or an Affiliate of the Company or a Subsidiary thereof.  In the case of a dispute as to such right, any decision by the Trustee taken upon the advice of counsel shall be full protection to the Trustee.  Upon request of the Trustee, the Company shall furnish to the Trustee promptly an Officer's Certificate listing and identifying all Notes, if any, known by the Company to be owned or held by or for the account of any of the above described Persons; and, subject to **Section** 7.01, the Trustee shall be entitled to accept such Officer's Certificate as conclusive evidence of the facts therein set forth and of the fact that all Notes not listed therein are outstanding for the purpose of any such determination.

Section 8.05.  *Revocation of Consents; Future Holders Bound*.  At any time prior to (but not after) the evidencing to the Trustee, as provided in **Section** 8.01, of the taking of any action by the Holders of the percentage of the aggregate principal amount of the Notes specified in this Indenture in connection with such action, any Holder of a Note that is shown by the evidence to be included in the Notes the Holders of which have consented to such action may, by filing written notice with the Trustee at the Corporate Trust Office and upon proof of holding as provided in **Section** 8.02 revoke such action so far as concerns such Note.  Except as aforesaid, any such action taken by the Holder of any Note shall be conclusive and binding upon such Holder and upon all future Holders and owners of such Note and of any Notes issued in exchange or substitution therefor or upon registration of transfer thereof, irrespective of whether any notation in regard thereto is made upon such Note or any Note issued in exchange or substitution therefor or upon registration of transfer thereof.

<div align="center">

ARTICLE 9

HOLDERS' MEETINGS

</div>

Section 9.01.  *Purpose of Meetings*.  A meeting of Holders may be called at any time and from time to time pursuant to the provisions of this **Article** 9 for any of the following purposes:

(a)        to give any notice to the Company or to the Trustee or to give any directions to the Trustee permitted under this Indenture, or to consent to the waiving of any Default or Event of Default

hereunder (in each case, as permitted under this Indenture) and its consequences, or to take any other action authorized to be taken by Holders pursuant to any of the provisions of Article 6;

(b)      to remove the Trustee and nominate a successor Trustee pursuant to the provisions of Article 7;

(c)      to consent to the execution of an indenture or indentures supplemental hereto pursuant to the provisions of Section 10.02; or

(d)      to take any other action authorized to be taken by or on behalf of the Holders of any specified aggregate principal amount of the Notes under any other provision of this Indenture or under applicable law.

Section 9.02.  *Call of Meetings by Trustee*.  The Trustee may at any time call a meeting of Holders to take any action specified in **Section** 9.01, to be held at such time and at such place as the Trustee shall determine.  Notice of every meeting of the Holders, setting forth the time and the place of such meeting and in general terms the action proposed to be taken at such meeting and the establishment of any record date pursuant to **Section** 8.01, shall be delivered to Holders of such Notes.  Such notice shall also be delivered to the Company.  Such notices shall be delivered not less than 20 nor more than 90 days prior to the date fixed for the meeting.

Any meeting of Holders shall be valid without notice if the Holders of all Notes then outstanding are present in person or by proxy or if notice is waived before or after the meeting by the Holders of all Notes then outstanding, and if the Company and the Trustee are either present by duly authorized representatives or have, before or after the meeting, waived notice.

Section 9.03.  *Call of Meetings by Company or Holders*.  In case at any time the Company, pursuant to a Board Resolution, or the Holders of at least 10% of the aggregate principal amount of the Notes then outstanding, shall have requested the Trustee to call a meeting of Holders, by written request setting forth in reasonable detail the action proposed to be taken at the meeting, and the Trustee shall not have delivered the notice of such meeting within 20 days after receipt of such request, then the Company or such Holders may determine the time and the place for such meeting and may call such meeting to take any action authorized in **Section** 9.01, by delivering notice thereof as provided in **Section** 9.02.

Section 9.04.  *Qualifications for Voting*.  To be entitled to vote at any meeting of Holders a Person shall (a) be a Holder of one or more Notes on the record date pertaining to such meeting or (b) be a Person appointed by an instrument in writing as proxy by a Holder of one or more Notes on the record date pertaining to such meeting.  The only Persons who shall be entitled to be present or to speak at any meeting of Holders shall be the Persons entitled to vote at such meeting and their counsel and any representatives of the Trustee and its counsel and any representatives of the Company and its counsel.

Section 9.05.  *Regulations*.  Notwithstanding any other provisions of this Indenture, the Trustee may make such reasonable regulations as it may deem advisable for any meeting of Holders, in regard to proof of the holding of Notes and of the appointment of proxies, and in regard to the appointment and duties of inspectors of votes, the submission and examination of proxies, certificates and other evidence of the right to vote, and such other matters concerning the conduct of the meeting as it shall think fit.

The Trustee shall, by an instrument in writing, appoint a temporary chairman of the meeting, unless the meeting shall have been called by the Company or by Holders as provided in Section 9.03 in which case the Company or the Holders calling the meeting, as the case may be, shall in like manner appoint a temporary chairman.  A permanent chairman and a permanent secretary of the meeting shall be elected by vote of the Holders of a majority in aggregate principal amount of the Notes represented at the meeting and entitled to vote at the meeting.

Subject to the provisions of Section 8.04, at any meeting of Holders each Holder or proxyholder shall be entitled to one vote for each $1,000 principal amount of Notes held or represented by him or her; *provided*, *however*, that no vote shall be cast or counted at any meeting in respect of any Note challenged as not outstanding and ruled by the chairman of the meeting to be not outstanding. The chairman of the meeting shall have no right to vote other than by virtue of Notes held by it or instruments in writing as aforesaid duly designating it as the proxy to vote on behalf of other Holders. Any meeting of Holders duly called pursuant to the provisions of Section 9.02 or Section 9.03 may be adjourned from time to time by the Holders of a majority of the aggregate principal amount of Notes represented at the meeting, whether or not constituting a quorum, and the meeting may be held as so adjourned without further notice.

Section 9.06. *Voting*. The vote upon any resolution submitted to any meeting of Holders shall be by written ballot on which shall be subscribed the signatures of the Holders or of their representatives by proxy and the outstanding aggregate principal amount of the Notes held or represented by them. The permanent chairman of the meeting shall appoint two inspectors of votes who shall count all votes cast at the meeting for or against any resolution and who shall make and file with the secretary of the meeting their verified written reports in duplicate of all votes cast at the meeting. A record in duplicate of the proceedings of each meeting of Holders shall be prepared by the secretary of the meeting and there shall be attached to said record the original reports of the inspectors of votes on any vote by ballot taken threat and affidavits by one or more Persons having knowledge of the facts setting forth a copy of the notice of the meeting and showing that said notice was delivered as provided in **Section** 9.02. The record shall show the aggregate principal amount of the Notes voting in favor of or against any resolution. The record shall be signed and verified by the affidavits of the permanent chairman and secretary of the meeting and one of the duplicates shall be delivered to the Company and the other to the Trustee to be preserved by the Trustee, the latter to have attached thereto the ballots voted at the meeting.

Any record so signed and verified shall be conclusive evidence of the matters therein stated. Notwithstanding anything to the contrary herein, Holders of the Notes shall vote together with the holders of the Other Senior Secured Convertible Notes as if the Notes and the Other Senior Secured Convertible Notes were a single class of securities for purposes of this Section 9.06.

Section 9.07. *No Delay of Rights by Meeting*. Nothing contained in this **Article** 9 shall be deemed or construed to authorize or permit, by reason of any call of a meeting of Holders or any rights expressly or impliedly conferred hereunder to make such call, any hindrance or delay in the exercise of any right or rights conferred upon or reserved to the Trustee or to the Holders under any of the provisions of this Indenture or of the Notes.

## ARTICLE 10
### SUPPLEMENTAL INDENTURES

Section 10.01. *Supplemental Indentures Without Consent of Holders*. The Company, when authorized by the resolutions of the Board of Directors and the Trustee, at the Company's expense, may from time to time and at any time enter into an indenture or indentures supplemental hereto for one or more of the following purposes:

(a) to cure any ambiguity, omission, mistake, defect error or inconsistency;

(b) to provide for the assumption of the Company's or any Note Guarantor's obligations to Holders of the Notes in the case of a consolidation, amalgamation, or merger or sale of all or substantially all of the Company's or a Note Guarantor's assets pursuant to the terms of this Indenture;

(c) to add additional Note Guarantees with respect to the Notes or to confirm and evidence the release, termination or discharge of any Note Guarantee with respect to such Notes when such release, termination or discharge is permitted under this Indenture;

(d) to secure the Notes or the related Note Guarantees or to add additional assets as Collateral;

(e)      to add to the covenants or Events of Default of the Company for the benefit of the Holders or surrender any right or power conferred upon the Company;

(f)      to make any change that does not adversely affect the rights of any Holder;

(g)      in connection with any Merger Event, provide that the notes are convertible into Reference Property, subject to the provisions of Section 14.02, and make such related changes to the terms of the Notes and conversion rights of the Holders to the extent expressly required by Section 14.08;

(h)      provide for the acceptance of appointment by a successor Trustee or facilitate the administration of the trusts under this Indenture by more than one Trustee;

(i)      comply with the rules of the Depositary; or

(j)      comply with any requirement of the Securities and Exchange Commission in connection with the qualification of this Indenture under the Trust Indenture Act.

Upon the written request of the Company, the Trustee and the Notes Collateral Agent, if applicable, are hereby authorized to join with the Company and the Note Guarantors, if applicable, in the execution of any amended or supplemental indenture or amendment or supplement to the other Notes Documents authorized or permitted by the terms of this Indenture and to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee or the Notes Collateral Agent, if applicable, shall not be obligated to enter into such amended or supplemental indenture or amendment or supplement to the other Notes Documents that affects its own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee or the Notes Collateral Agent, as the case may be, may in its discretion, but shall not be obligated to, enter into such supplemental indenture. Notwithstanding the foregoing, no Opinion of Counsel shall be required in connection with the addition of a Note Guarantor under this Indenture upon (i) execution and delivery by such Note Guarantor and the Trustee and the Notes Collateral Agent of a supplemental indenture to this Indenture, the form of which is attached as Exhibit C hereto, and (ii) delivery of an Officer's Certificate complying with the provisions of Section 17.05 hereof.

Any supplemental indenture authorized by the provisions of this Section 10.01 may be executed by the Company, the Note Guarantors, if applicable, the Trustee and the Notes Collateral Agent, if applicable, without the consent of the Holders of any of the Notes at the time outstanding, notwithstanding any of the provisions of Section 10.02.

Section 10.02.*Supplemental Indentures with Consent of Holders*.  With the consent (evidenced as provided in **Article** 8) of the Holders of at least a majority of the aggregate principal amount of the Notes and the Other Senior Secured Convertible Notes, voting together as a single class, then outstanding (determined in accordance with **Article** 8 and including, without limitation, consents obtained in connection with a repurchase of, or tender or exchange offer for, Notes and/or Other Senior Secured Convertible Notes), the Company, when authorized by the resolutions of the Board of Directors and the Trustee, at the Company's expense, may from time to time and at any time enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or any supplemental indenture or of modifying in any manner the rights of the Holders; *provided*, *however*, *that*, without the consent of each Holder of an outstanding Note affected, no such supplemental indenture shall:

(a)      reduce the amount of Notes whose Holders must consent to an amendment;

(b)      reduce the rate of or extend the stated time for payment of interest on any Note;

(c)      reduce the principal amount of or extend the Maturity Date of any Note;

(d)      make any change that adversely affects the conversion rights of any Notes;

#96781386v10

(e)     reduce the Fundamental Change Repurchase Price of any Note or amend or modify in any manner adverse to the Holders the Company's obligation to make such payments, whether through an amendment or waiver of provisions in the covenants, definitions or otherwise;

(f)     make any Note payable in a currency other than that stated in the Note;

(g)     change the ranking of the Notes;

(h)     release, or have the effect of releasing, all or substantially all of the value of the Note Guarantees; or

(i)     make any change in this **Article** 10 that requires each Holder's consent or in the waiver provisions in **Section** 6.02 or **Section** 6.09.

In addition, notwithstanding the foregoing in this <u>Section 10.02</u>, without the consent of the Holders of at least 75% in aggregate principal amount of the Notes and the Other Senior Secured Convertible Notes, voting together as a single class, then outstanding, no amendment or waiver may (A) make any change in any Collateral Document, the Pari Passu Intercreditor Agreement, the ABL North America Intercreditor Agreement, any Permitted ABL EMEA Intercreditor Agreement, any Permitted First Lien Second Lien Intercreditor Agreement or the provisions in this Indenture dealing with Collateral or application of trust proceeds of the Collateral with the effect of releasing the Liens on all or substantially all of the Collateral which secure the Notes Obligations or (B) change or alter the priority of Liens securing the Notes Obligations in any material portion of the Collateral in any way materially adverse, taken as a whole, to the Holders of such Notes and holders of the Other Senior Secured Convertible Notes, other than, in each case, as provided under the terms of this Indenture, the Collateral Documents, the Pari Passu Intercreditor Agreement or the ABL North America Intercreditor Agreement.

Upon the written request of the Company, and upon the filing with the Trustee of evidence of the consent of Holders as aforesaid and subject to Section <u>10.05</u>, the Trustee and the Notes Collateral Agent, if applicable, shall join with the Company and the Note Guarantors, if applicable, in the execution of such supplemental indenture or amendment or supplement to the other Notes Documents unless such supplemental indenture or amendment or supplement to the other Notes Documents affects the its own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee or the Notes Collateral Agent, as applicable, may, but shall not be obligated to, enter into such supplemental indenture.

Holders do not need under this <u>Section 10.02</u> to approve the particular form of any proposed supplemental indenture.  It shall be sufficient if such Holders approve the substance thereof.  After any such supplemental indenture becomes effective, the Company shall deliver to the Holders a notice briefly describing such supplemental indenture. However, the failure to give such notice to all the Holders, or any defect in the notice, will not impair or affect the validity of the supplemental indenture.

Section 10.03. *Effect of Supplemental Indentures*.   Upon the execution of any supplemental indenture pursuant to the provisions of this **Article** 10, this Indenture shall be and be deemed to be modified and amended in accordance therewith and the respective rights, limitation of rights, obligations, duties and immunities under this Indenture of the Trustee, the Company, the Note Guarantors and the Holders shall thereafter be determined, exercised and enforced hereunder subject in all respects to such modifications and amendments and all the terms and conditions of any such supplemental indenture shall be and be deemed to be part of the terms and conditions of this Indenture for any and all purposes.

Section 10.04. *Notation on Notes*.  Notes authenticated and delivered after the execution of any supplemental indenture pursuant to the provisions of this **Article** 10 may, at the Company's expense, bear a notation in form approved by the Trustee as to any matter provided for in such supplemental indenture.  If the Company or the Trustee shall so determine, new Notes so modified as to conform, in the opinion of the Trustee and the Board of Directors, to any modification of this Indenture contained in any such supplemental indenture may, at the Company's expense, be prepared and executed by the Company, authenticated by the Trustee (or an authenticating agent duly appointed by the Trustee pursuant to **Section**

17.10) and delivered in exchange for the Notes then outstanding, upon surrender of such Notes then outstanding, and in each case, in accordance with the requirements of **Section** 2.04.

Section 10.05. *Evidence of Compliance of Supplemental Indenture to Be Furnished Trustee*. In addition to the documents required by **Section** 17.05, the Trustee shall receive an Officer's Certificate and an Opinion of Counsel as conclusive evidence that any supplemental indenture executed pursuant hereto complies with the requirements of this **Article** 10 and is permitted or authorized by this Indenture and is the legal, valid and binding obligation of the Company, enforceable against it in accordance with its terms. The Trustee shall be fully protected in conclusively relying on such Officer's Certificate and Opinion of Counsel.

ARTICLE 11

CONSOLIDATION, MERGER, SALE, CONVEYANCE AND LEASE

Section 11.01. *Company May Consolidate, Etc*. on Certain Terms. The Company shall not consolidate with, amalgamate, merge with or into, or sell, convey, transfer or lease all or substantially all of its properties and assets to another Person, except in compliance with **Article** 4 and unless:

(a)     immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing under this Indenture;

(b)     the Company shall have delivered or caused to be delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such merger, consolidation, amalgamation, sale, assignment, transfer, lease, conveyance or disposition and supplemental indentures, if any, comply with this Indenture; and

(c)     to the extent any assets of the Person who is merged, consolidated or amalgamated with or into the Company are assets of the type that would constitute Collateral under the Collateral Documents, the Company will take such action as may be reasonably necessary to cause such property and assets to be made subject to the Lien of the applicable Collateral Documents in the manner and to the extent required in the Indenture or the applicable Collateral Documents and shall take all reasonably necessary action so that such Lien is perfected to the extent required by the applicable Collateral Documents.

For purposes of this Section 11.01, the sale, conveyance, transfer or lease of all or substantially all of the properties and assets of one or more Subsidiaries of the Company to another Person, which properties and assets, if held by the Company instead of such Subsidiaries, would constitute all or substantially all of the properties and assets of the Company on a consolidated basis, shall be deemed to be the sale, conveyance, transfer or lease of all or substantially all of the properties and assets of the Company to another Person.

Section 11.02. *[Reserved]*.

Section 11.03. *Note Guarantors May Consolidate, Etc*. on Certain Terms. The Company will not permit any Note Guarantor to, directly or indirectly, consolidate with, merge with or into, or sell, convey, transfer or lease all or substantially all of its properties and assets to another Person, except in compliance with **Article** 4 and unless:

(a)     except in the case of a Note Guarantor (x) that has disposed of all or substantially all of its assets, whether through a merger, amalgamation, consolidation or sale of Capital Stock or assets or (y) that, as a result of the disposition of all or a portion of its Capital Stock, ceases to be a Subsidiary of the Company, in both cases in compliance with Section 4.14 the resulting, surviving or transferee Person (if not such Note Guarantor) shall expressly assume, by a guarantee agreement and applicable Collateral Documents, all the obligations of such Note Guarantor under its Note Guarantee;

(b)        to the extent any assets of the Person who is merged, consolidated or amalgamated with or into the successor Note Guarantor are assets of the type that would constitute Collateral under the Collateral Documents, the successor Note Guarantor will take such action as may be reasonably necessary to cause such property and assets to be made subject to the Lien of the applicable Collateral Documents in the manner and to the extent required in this Indenture or the applicable Collateral Documents and shall take all reasonably necessary action so that such Lien is perfected to the extent required by the applicable Collateral Documents; and

(c)        immediately after giving effect to such transaction, no Default or Event of Default exists.

Section 11.04. *Opinion of Counsel to Be Given to Trustee.*  No such consolidation, merger, amalgamation, sale, conveyance, transfer or lease shall be effective unless the Trustee shall receive an Officer's Certificate and an Opinion of Counsel as conclusive evidence that any such consolidation, merger, amalgamation, sale, conveyance, transfer or lease and any such assumption and, if a supplemental indenture is required in connection with such transaction, such supplemental indenture, complies with the provisions of this **Article** 11.

## ARTICLE 12
### IMMUNITY OF INCORPORATORS, SHAREHOLDERS, OFFICERS AND DIRECTORS

Section 12.01. *Indenture and Notes Solely Corporate Obligations.*  No recourse for the payment of the principal of or accrued and unpaid interest on any Note, nor for any claim based thereon or otherwise in respect thereof, and no recourse under or upon any obligation, covenant or agreement of the Company in this Indenture or in any supplemental indenture or in any Note, nor because of the creation of any indebtedness represented thereby, shall be had against any incorporator, shareholder, employee, agent, Officer or director or Subsidiary, as such, past, present or future, of the Company or of any successor corporation, either directly or through the Company or any successor corporation, whether by virtue of any constitution, statute or rule of law, or by the enforcement of any assessment or penalty or otherwise; it being expressly understood that all such liability is hereby expressly waived and released as a condition of, and as a consideration for, the execution of this Indenture and the issue of the Notes.

## ARTICLE 13
### NOTE GUARANTEES

Section 13.01. *Note Guarantees.*

(a)        Each of the Note Guarantors, jointly and severally, hereby unconditionally Guarantees (and subject in each case to the Agreed Guarantee Principles set forth in any notation of Note Guarantee, supplemental indenture, or as contemplated by Section 4.24(b)) to each Holder of a Note authenticated and delivered by the Trustee and to the Trustee and its successors and assigns, irrespective of the validity and enforceability of this Indenture, the Notes or the obligations of the Company hereunder or thereunder that: (i) the due and punctual payment of the principal of, premium, if any, and interest on the Notes shall be promptly paid in full when due, whether at maturity, by acceleration, repurchase, redemption or otherwise, (ii) the due and punctual payment of interest, if any, on the overdue principal of and interest on the Notes, to the extent lawful, and the due and punctual performance of all other obligations of the Company to the Holders or the Trustee under this Indenture or any Note shall be promptly paid in full or performed, all in accordance with the terms hereof and thereof, and (iii) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that same shall be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration pursuant to Section 6.02 or otherwise. In addition, if an Ipso Facto Event is continuing, each Note Guarantor, absolutely, unconditionally and irrevocably, promises to pay the Notes Obligations to the Trustee for the benefit of the Secured Parties, on demand. Failing payment when due of any amount so guaranteed or any performance so guaranteed for whatever reason, the Note Guarantors shall be jointly and severally obligated to pay the same immediately.  Each Note Guarantor shall agree that this is a Guarantee of payment and not a Guarantee of collection. If acceleration of the time for payment of any Notes

Obligation by the Company is stayed by reason of the insolvency or receivership of the Company or otherwise, all Notes Obligations otherwise subject to acceleration under the terms of any Notes Document shall nonetheless be payable by the Note Guarantors hereunder forthwith on demand by the Trustee.

(b)        Each of the Note Guarantors hereby agrees that its obligations with regard to its Guarantee shall be joint and several, unconditional, irrespective of the validity or enforceability of the Notes or the obligations of the Company under this Indenture, the absence of any action to enforce the same, the recovery of any judgment against the Company or any other obligor with respect to this Indenture, the Notes or the obligations of the Company under this Indenture or the Notes, any action to enforce the same or any other circumstances (other than complete performance) which might otherwise constitute a legal or equitable discharge or defense of a Note Guarantor. Each Note Guarantor further, to the extent permitted by law, hereby waives and relinquishes all claims, rights and remedies accorded by applicable law to guarantors and agrees not to assert or take advantage of any such claims, rights or remedies, including but not limited to: (i) any right to require any of the Trustee, the Holders or the Company (each a "**Benefited Party**"), as a condition of payment or performance by such Note Guarantor, to (A) proceed against the Company, any other guarantor (including any other Note Guarantor) of the obligations under the Note Guarantees or any other person, (B) proceed against or exhaust any security held from the Company, any such other guarantor or any other person, (C) proceed against or have resort to any balance of any deposit account or credit on the books of any Benefited Party in favor of the Company or any other person, or (D) pursue any other remedy in the power of any Benefited Party whatsoever; (ii) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Company including any defense based on or arising out of the lack of validity or the unenforceability of the obligations under the Note Guarantees or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Company from any cause other than payment in full of the obligations under the Note Guarantees; (iii) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (iv) any defense based upon any Benefited Party's errors or omissions in the administration of the obligations under the Note Guarantees, except behavior which amounts to bad faith; (v) (A) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms of the Note Guarantees and any legal or equitable discharge of such Note Guarantor's obligations hereunder and under its Note Guarantee, (B) the benefit of any statute of limitations affecting such Note Guarantor's liability hereunder and under its Note Guarantee or the enforcement hereof and thereof, (C) any rights to set-offs, recoupments and counterclaims and (D) promptness, diligence and any requirement that any Benefited Party protect, secure, perfect or insure any security interest or lien or any property subject thereto; (vi) notices, demands, presentations, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance of the Note Guarantees, notices of default under the Notes or any agreement or instrument related thereto, notices of any renewal, extension or modification of the obligations under the Note Guarantees or any agreement related thereto, and notices of any extension of credit to the Company and any right to consent to any thereof; (vii) to the extent permitted under applicable law, the benefits of any "One Action" rule; and (viii) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms of the Note Guarantees. Except as set forth in Section 13.05, each Note Guarantor covenants that its Note Guarantee shall not be discharged except by complete performance of the obligations contained in its Note Guarantee and this Indenture.

(c)        If any Holder or the Trustee is required by any court or otherwise to return to the Company, the Note Guarantors or any custodian, trustee, liquidator or other similar official acting in relation to either the Company or the Note Guarantors, any amount paid to either the Trustee or such Holder, any Guarantee, to the extent theretofore discharged, shall be reinstated in full force and effect.

(d)        Each Note Guarantor agrees that it shall not be entitled to any right of subrogation in relation to the Holders in respect of any obligations guaranteed hereby until payment in full of all obligations guaranteed hereby.  Each Note Guarantor shall further agree that, as between the Note Guarantors, on the one hand, and the Holders and the Trustee, on the other hand, (i) the maturity of the obligations guaranteed hereby may be accelerated as provided in Section 6.02 for the purposes of any Guarantee, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect

#96781386v10

of the obligations guaranteed hereby and (ii) in the event of any declaration of acceleration of such obligations as provided in <u>Section 6.02</u>, such obligations (whether or not due and payable) shall forthwith become due and payable by the Note Guarantors for the purpose of any such Guarantee.  The Note Guarantors shall have the right to seek contribution from any non-paying Note Guarantor so long as the exercise of such right does not impair the rights of the Holders under the applicable Guarantee.

Section 13.02. *Execution and Delivery of Note Guarantees*.  To evidence its Guarantee set forth in **Section 13.01**, each Note Guarantor hereby agrees that a notation of such Note Guarantee substantially in the form of <u>Exhibit C</u> (as modified to reflect Agreed Guarantee Principles to the extent contemplated by **Section 4.24(b)**) shall be endorsed by an officer of such Note Guarantor, which notation shall be applicable to each Note authenticated and delivered by the Trustee, and that this Indenture shall be executed on behalf of such Note Guarantor by any of its Officers. Each of the Note Guarantors, jointly and severally, hereby agrees that its Guarantee set forth in **Section 13.01** shall remain in full force and effect notwithstanding any failure to endorse a notation of such Note Guarantee.  If an officer or Officer whose signature is on this Indenture or on the Note Guarantee of a Note Guarantor no longer holds that office at the time the Trustee authenticates a Note, the Note Guarantee of such Note Guarantor shall be valid nevertheless.  The delivery of any Note by the Trustee, after the authentication thereof hereunder, shall constitute due delivery of the Note Guarantees set forth in this Indenture on behalf of the Note Guarantors.

Section 13.03. *Limitation on Note Guarantor Liability*.

(a)    *General*.  Each Note Guarantor confirms, and by its acceptance of Notes, each Holder hereby confirms, that it is the intention of all such parties that any Guarantee of such Note Guarantor not constitute a fraudulent transfer or conveyance for purposes of Bankruptcy Law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar applicable law to the extent applicable to any Note Guarantee.  To effectuate the foregoing intention, the Trustee and the Holders irrevocably agree, and the Note Guarantors irrevocably agree, that the obligations of such Note Guarantor under this Article 13 shall be limited to the maximum amount as will, after giving effect to such maximum amount and all other contingent and fixed liabilities of such Note Guarantor that are relevant under such laws, and after giving effect to any collections from, rights to receive contribution from or payments made by or on behalf of any other Note Guarantor in respect of the obligations of such other Note Guarantor under this Article 13, result in the obligations of such Note Guarantor under its Note Guarantee not constituting a fraudulent transfer or conveyance.

(b)    [reserved].

(c)    *Germany*.  In respect of the Guarantee given by a German Note Guarantor (as defined in <u>Annex A</u>), the provisions set forth in <u>Annex A</u> shall apply and be incorporated by reference herein as if set forth in this <u>clause (c)</u>.

(d)    *Switzerland*.  In respect of the Guarantee given by a Swiss Note Guarantor (as defined in <u>Annex B</u>), the provisions set forth in <u>Annex B</u> shall apply and be incorporated by reference herein as if set forth in this <u>clause (d)</u>.

(e)    *France*.  In respect of the Guarantee given by a French Note Guarantor (as defined in <u>Annex C</u>), the provisions set forth in Annex C shall apply and be incorporated by reference herein as if set forth in this <u>clause (e)</u>.

(f)    *Luxembourg.* In respect of the Guarantee given by a Luxembourg Note Guarantor (as defined in <u>Annex D</u>), the provisions set forth in <u>Annex D</u> shall apply and be incorporated by reference herein as if set forth in this <u>clause (f)</u>.

(g)    *England and Wales.* In respect of the Guarantee given by an English Note Guarantor (as defined in <u>Annex E</u>), the provisions set forth in <u>Annex E</u> shall apply and be incorporated by reference herein as if set forth in this <u>clause (g)</u>.

(h)        *Norway.* Notwithstanding the other provisions of this Indenture, the obligations and liabilities of the Norwegian Note Parties shall not include any obligations or liabilities to the extent it would violate sections 8-7 to 8-10 (both inclusive) cf. sections 1-3 and 1-4 of the Norwegian Limited Liability Company's Act (Norw. Aksjeloven) or any other provision of law limiting the legal capacity or ability of a Norwegian Note Party to provide financial assistance. The liability of the Norwegian Note Parties hereunder shall be limited to a maximum total amount of USD 145,975,000 (with the addition of any and all interest, default interest, costs and expenses).

(i)        Denmark.

(i)        The guarantee and indemnity obligations or any third party Collateral of any Danish Note Party under any Notes Document shall be deemed not to be assumed (and any Collateral created in relation thereto shall be limited) to the extent that the same would otherwise constitute unlawful financial assistance within the meaning of §§ 206-212 of the Danish Companies Act (in Danish: selskabsloven).

(ii)        Any Danish Note Party's  guarantee and indemnity obligations in relation to obligations not incurred as a result of direct or indirect borrowings under any Notes Document by such Danish Note Party or by a direct or indirect Subsidiary of such Danish Note Party shall further be limited to an amount equal to the higher of (A) the equity (in Danish: egenkapital) of such Danish Note Party at the date hereof or, if such Danish Note Party is not party to this Indenture at the date hereof, the date of accession by such Danish Note Party to this Indenture, and (B) the date when a claim is made against such Danish Note Party calculated in accordance with IFRS, however, adjusted upwards to the extent market values are higher than book values.

(iii)        The limitations in Section 13.03(i)(i) and Section 13.03(i)(ii) shall apply to any security by guarantee, indemnity, joint and several liability, collateral or otherwise and to subordination of rights and claims, subordination or turn over of rights of recourse, application of proceeds and any other means of direct and indirect financial assistance.

Section 13.04. *Merger and Consolidation of Note Guarantors.*

(a)        In case of any sale or other disposition, consolidation, amalgamation, merger, sale or conveyance and upon the assumption by the successor person, by supplemental indenture, executed and delivered to the Trustee and satisfactory in form to the Trustee, of the Note Guarantee endorsed upon the Notes and the due and punctual performance of all of the covenants and conditions of this Indenture to be performed by the Note Guarantor, such successor person shall succeed to and be substituted for the Note Guarantor with the same effect as if it had been named herein as a Note Guarantor. Such successor person thereupon may cause to be signed any or all of the Note Guarantees to be endorsed upon all of the Notes available hereunder which theretofore shall not have been signed by the Company and delivered to the Trustee. All the Note Guarantees so issued shall in all respects have the same legal rank and benefit under this Indenture as the Note Guarantees theretofore and thereafter issued in accordance with the terms of this Indenture as though all of such Note Guarantees had been issued at the date of the execution hereof.

(b)        Except as set forth in Article 4 and Article 11, and notwithstanding clause (a) of this Section 13.04, nothing contained in this Indenture or in any of the Notes shall prevent any consolidation, amalgamation or merger of a Note Guarantor with or into another Person, or shall prevent any sale or conveyance of the property of a Note Guarantor as an entirety or substantially as an entirety.

Section 13.05. *Release.*

(a)        In the event (i) of a sale, exchange, transfer or other disposition of all or substantially all of the assets of any Note Guarantor, by way of merger, amalgamation, consolidation or otherwise, or a sale, exchange, transfer or other disposition of all the Equity Interests of any Note Guarantor, then held by the Company and its Restricted Subsidiaries to a Person that is not (either before or after giving effect to such

transactions) a Subsidiary of the Company, in each case so long as such sale or other disposition is permitted by this Indenture, (ii) in the case of any Note Guarantee issued on the Issue Date (or required but issued thereafter pursuant to Section 4.24(b)), upon the release or discharge of the Note Guarantee by such Note Guarantor in respect of the Credit Agreement (other than any release or discharge by, or as a result of, payment of the Credit Facility Obligations), and in any other case upon the release or discharge of any Note Guarantee in respect of any Indebtedness that resulted in the issuance after the Issue Date of the Note Guarantee by such Note Guarantor, (iii) the Company discharges the Notes and its Obligations under this Indenture under Article 3 with respect to the Notes, (iv) upon the merger, amalgamation or consolidation of any Note Guarantor with and into the Company or another Note Guarantor or upon the liquidation of such Note Guarantor, in each case, in compliance with the applicable provisions of this Indenture or (v) as described under Article 10, such Note Guarantor shall be released and relieved of any obligations under its Note Guarantee without any further action being required by the Trustee or any Holder.

(b)     Upon delivery by the Company to the Trustee of an Officer's Certificate and an Opinion of Counsel to the effect that such sale or other disposition was made by the Company in accordance with the provisions of this Indenture, the Trustee shall execute any documents reasonably required in order to evidence the release of any Note Guarantor from its obligations under its Guarantee.

(c)     Any Note Guarantor not released from its obligations under its Note Guarantee shall remain liable for the full amount of principal of and interest on the Notes and for the other obligations of any Note Guarantor under this Indenture as provided in this Article 13.

## ARTICLE 14
### CONVERSION OF NOTES

Section 14.01. *Conversion Privilege.*  Subject to and upon compliance with the provisions of this **Article 14**, each Holder of a Note shall have the right, at such Holder's option, to convert all or any portion (if the portion to be converted is $1,000 principal amount or an integral multiple thereof) of such Note at any time prior to the close of business on the second Business Day immediately preceding the Maturity Date at an initial conversion rate of [_____][6] Common Shares (subject to adjustment as provided in this **Article 14**, the "**Conversion Rate**") per $1,000 principal amount of Notes (subject to, and in accordance with, the settlement provisions of **Section 14.02**, the "**Conversion Obligation**").

Section 14.02. *Conversion Procedure; Settlement Upon Conversion.*

(a)     Upon conversion of any Note, the Company shall deliver to the converting Holder on the second Business Day immediately following the relevant Conversion Date, in respect of each $1,000 principal amount of Notes being converted, a number of Common Shares equal to the Conversion Rate, unless such Conversion Date occurs following the Regular Record Date immediately preceding the Maturity Date, in which case the Company shall make such delivery on the Maturity Date.

(b)     Subject to Section 14.02(e), before any Holder of a Note shall be entitled to convert a Note as set forth above, such Holder shall (i) in the case of a Global Note, comply with the applicable procedures of the Depositary in effect at that time and, if required, pay funds equal to interest payable on the next Interest Payment Date to which such Holder is not entitled as set forth in Section 14.02(h) and (ii) in the case of a Physical Note (1) complete, manually sign and deliver an irrevocable notice to the Conversion Agent as set forth in the Form of Notice of Conversion (or a facsimile thereof) (a "**Notice of Conversion**") at the designated corporate trust office of the Conversion Agent and state in writing therein the principal amount of Notes to be converted and the name or names (with addresses) in which such Holder wishes the certificate or certificates for the Common Shares to be delivered upon settlement of the Conversion Obligation to be registered, (2) surrender such Notes, duly endorsed to the Company or in blank (and accompanied by appropriate endorsement and transfer documents), at the designated corporate

---

[6]To reflect a strike price of $[_____] per share. HB to confirm.

trust office of the Conversion Agent, (3) if required, pay all applicable transfer or similar taxes, if any, pursuant to  Section 14.02(e), (4) if required, furnish appropriate endorsements and transfer documents and (5) if required, pay funds equal to interest payable on the next Interest Payment Date to which such Holder is not entitled as set forth in Section 14.02(h).  The Trustee (and if different, the Conversion Agent) shall notify the Company of any conversion pursuant to this Article 14 on the Conversion Date for such conversion.  No Notice of Conversion with respect to any Notes may be surrendered by a Holder thereof if such Holder has also delivered a Fundamental Change Repurchase Notice to the Company in respect of such Notes and has not validly withdrawn such Fundamental Change Repurchase Notice in accordance with Section 15.03.

If more than one Note shall be surrendered for conversion at one time by the same Holder, the Conversion Obligation with respect to such Notes shall be computed on the basis of the aggregate principal amount of the Notes (or specified portions thereof to the extent permitted thereby) so surrendered.

(c)     A Note shall be deemed to have been converted immediately prior to the close of business on the date (the "**Conversion Date**") that the Holder has complied with the requirements set forth in subsection (b) above.  The Company shall issue or cause to be issued, and deliver (if applicable) to the Conversion Agent or to such Holder, or such Holder's nominee or nominees, the full number of Common Shares to which such Holder shall be entitled in book-entry format in satisfaction of the Company's Conversion Obligation.

(d)     In case any Note shall be surrendered for partial conversion, the Company shall execute and the Trustee shall authenticate and deliver to or upon the written order of the Holder of the Note so surrendered a new Note or Notes in authorized denominations in an aggregate principal amount equal to the unconverted portion of the surrendered Note, without payment of any service charge by the converting Holder but, if required by the Company or Trustee, with payment of a sum sufficient to cover any documentary, stamp or similar issue or transfer tax or similar governmental charge required by law or that is imposed in connection therewith as a result of the name of the Holder of the new Notes issued upon such conversion being different from the name of the Holder of the old Notes surrendered for such conversion.

(e)     If a Holder submits a Note for conversion, the Company shall pay any documentary, stamp or similar issue or transfer tax due on the issue of the Common Shares upon conversion, unless (i) the tax is due because the Holder requests such shares to be issued in a name other than the Holder's name, in which case the Holder shall pay that tax or (ii) the tax consists of Luxembourg registration duties (*droits d'enregistrement*) payable in the case of voluntary registration of the conversion by a Holder with the *Administration de l'Enregistrement, des Domaines et de la TVA* in Luxembourg, or registration of the conversion in Luxembourg when such registration is not reasonably required to enforce the rights of that Holder under the Notes.  The Conversion Agent may refuse to deliver the certificates representing the Common Shares being issued in a name other than the Holder's name until the Holder pays any tax that is due by such Holder in accordance with the immediately preceding sentence.

(f)     Except as provided in Section 14.05, no adjustment shall be made for dividends on any Common Shares issued upon the conversion of any Note as provided in this Article 14.

(g)     Upon the conversion of an interest in a Global Note, the Trustee, or the Custodian at the direction of the Trustee, shall make a notation on such Global Note as to the reduction in the principal amount represented thereby.  The Company shall notify the Trustee in writing of any conversion of Notes effected through any Conversion Agent other than the Trustee.

(h)     Upon conversion, a Holder shall not receive any separate cash payment for accrued and unpaid interest, if any, except as set forth below.  The Company's settlement of the full Conversion Obligation shall be deemed to satisfy in full its obligation to pay the principal amount of the Note and accrued and unpaid interest, if any, to, but not including, the relevant Conversion Date. As a result, accrued and unpaid interest, if any, to, but not including, the relevant Conversion Date shall be deemed to be paid in full rather than cancelled, extinguished or forfeited.  Notwithstanding the foregoing, if Notes are converted after the close of business on a Regular Record Date, Holders of such Notes as of the close of business on

such Regular Record Date will receive the full amount of interest payable on such Notes on the corresponding Interest Payment Date notwithstanding the conversion.  Notes surrendered for conversion during the period from the close of business on any Regular Record Date to the open of business on the immediately following Interest Payment Date must be accompanied by funds equal to the amount of interest payable on the Notes so converted; *provided* that no such payment shall be required (1) for conversions after the close of business on the Regular Record Date immediately preceding the Maturity Date; (2) if the Company has specified a Fundamental Change Repurchase Date that is after a Regular Record Date and on or prior to the Business Day immediately following the corresponding Interest Payment Date; or (3) to the extent of any Defaulted Amounts, if any Defaulted Amounts exists at the time of conversion with respect to such Note.  Therefore, for the avoidance of doubt, all applicable Holders of record at the close of business on the Regular Record Date immediately preceding the Maturity Date shall receive the full interest payment due on the Maturity Date regardless of whether their Notes have been converted following such Regular Record Date.

(i)      The Person in whose name the Common Shares shall be issuable upon conversion shall be treated as a shareholder of record as of the close of business on the relevant Conversion Date.  Upon a conversion of Notes, such Person shall no longer be a Holder of such Notes surrendered for conversion.

(j)      The Company shall not issue any fractional Common Share upon conversion of the Notes.  Instead, in lieu of any fractional Common Share being delivered to any converting Holder, the number of fractional Common Shares otherwise deliverable upon conversion to any such converting Holder shall be aggregated and then rounded up to the nearest whole Common Share.

Section 14.03. *[Reserved]*.

Section 14.04. *Increased Conversion Rate Applicable to Certain Notes Surrendered in Connection with Make-Whole Fundamental Changes*.  (a)  If a Make-Whole Fundamental Change occurs or becomes effective prior to the Maturity Date and a Holder elects to convert its Notes in connection with such Make-Whole Fundamental Change, the Company shall, under the circumstances described below, increase the Conversion Rate for the Notes so surrendered for conversion by a number of additional Common Shares (the "**Additional Shares**"), as described below.  A conversion of Notes shall be deemed for these purposes to be "in connection with" such Make-Whole Fundamental Change if the relevant Notice of Conversion is received by the Conversion Agent from, and including, the Effective Date of the Make-Whole Fundamental Change up to, and including, the Business Day immediately prior to the related Fundamental Change Repurchase Date (or, in the case of a Make-Whole Fundamental Change that would have been a Fundamental Change but for the proviso in clause (b) of the definition thereof, the 35th Business Day immediately following the Effective Date of such Make-Whole Fundamental Change) (such period, the "**Make-Whole Fundamental Change Period**").

(b)      Upon surrender of Notes for conversion in connection with a Make-Whole Fundamental Change, the Company shall deliver Common Shares, including the Additional Shares, in accordance with Section 14.02; *provided*, *however*, that if, at the effective time of a Make-Whole Fundamental Change described in clause (b) of the definition of Fundamental Change, the Reference Property following such Make-Whole Fundamental Change is composed entirely of cash, for any conversion of Notes following the Effective Date of such Make-Whole Fundamental Change, the Conversion Obligation shall be calculated based solely on the Stock Price for the transaction and shall be deemed to be an amount of cash per $1,000 principal amount of converted Notes equal to the Conversion Rate (including any adjustment for Additional Shares), *multiplied by* such Stock Price.  The Company shall notify the Holders of Notes of the Effective Date of any Make-Whole Fundamental Change no later than five Business Days after such Effective Date.

(c)      The number of Additional Shares, if any, by which the Conversion Rate shall be increased shall be determined by reference to the table below, based on the date on which the Make-Whole Fundamental Change occurs or becomes effective (the "**Effective Date**") and the price (the "**Stock Price**") paid (or deemed to be paid) per Common Share in the Make-Whole Fundamental Change.  If the holders of the Common Shares receive in exchange for their Common Shares only cash in a Make-Whole

Fundamental Change described in clause (b) of the definition of Fundamental Change, the Stock Price shall be the cash amount paid per share.  Otherwise, the Stock Price shall be [*to insert valuation mechanic*][7].

(d)  The Stock Prices set forth in the column headings of the table below shall be adjusted as of any date on which the Conversion Rate of the Notes is otherwise adjusted.  The adjusted Stock Prices shall equal the Stock Prices applicable immediately prior to such adjustment, *multiplied by* a fraction, the numerator of which is the Conversion Rate immediately prior to such adjustment giving rise to the Stock Price adjustment and the denominator of which is the Conversion Rate as so adjusted.  The number of Additional Shares set forth in the table below shall be adjusted in the same manner and at the same time as the Conversion Rate as set forth in Section 14.05.

(e)  The following table sets forth the number of Additional Shares by which the Conversion Rate shall be increased per $1,000 principal amount of Notes pursuant to this Section 14.04 for each Stock Price and Effective Date set forth below:

| Effective Date | Stock Price | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| [_____], 2023 | | | | | | | | | | | | |
| [_____], 2024 | | | | | | | | | | | | |
| [_____], 2025 | | | | | | | | | | | | |
| [_____], 2026 | | | | | | | | | | | | |
| [_____], 2027 | | | | | | | | | | | | |
| [_____], 2028 | | | | | | | | | | | | |

The exact Stock Prices and Effective Dates may not be set forth in the table above, in which case:

(i)  if the Stock Price is between two Stock Prices in the table above or the Effective Date is between two Effective Dates in the table, the number of Additional Shares shall be determined by a straight-line interpolation between the number of Additional Shares set forth for the higher and lower Stock Prices and the earlier and later Effective Dates, as applicable, based on a 365 or 366-day year, as applicable;

(ii)  if the Stock Price is greater than $[•] per share (subject to adjustment in the same manner as the Stock Prices set forth in the column headings of the table above pursuant to subsection (d) above), no Additional Shares shall be added to the Conversion Rate; and

(iii)  if the Stock Price is less than $[•] per share (subject to adjustment in the same manner as the Stock Prices set forth in the column headings of the table above pursuant to subsection (d) above), no Additional Shares shall be added to the Conversion Rate.

Notwithstanding the foregoing, in no event shall the Conversion Rate per $1,000 principal amount of Notes exceed [_____][8] Common Shares, subject to adjustment in the same manner as the Conversion Rate pursuant to Section 14.05.

(f)  Nothing in this Section 14.04 shall prevent an adjustment to the Conversion Rate pursuant to Section 14.05 in respect of a Make-Whole Fundamental Change.

Section 14.05. *Participating Distributions; Certain Adjustments*.

---

[7]Valuation mechanic for determination of Stock Price to be confirmed.

[8]HB to confirm.

(a)        If the Company declares, or pays or delivers, a dividend, distribution or any other issuance on the Common Shares (whether in cash, or other securities or property), or if the Company or any of its Subsidiaries purchases Common Shares (whether in cash, or other securities or property) for more than the per Common Share fair value thereof, but excluding any dividend or distribution on Common Shares to all holders of Common Shares pursuant to which the Conversion Rate is being adjusted pursuant to <u>Section 14.05(b)</u>, then in any such case, the Company shall simultaneously declare and pay or deliver a dividend, distribution or such other issuance on the Notes on a pro rata basis with the Common Shares determined on an as-converted basis assuming all of the Notes and the Other Senior Secured Convertible Notes then outstanding had been converted pursuant to this Indenture and the Other Senior Secured Convertible Notes Indenture, as applicable, as of immediately prior to the record date of the applicable dividend, distribution or such other issuance (or if no record date is fixed, the date as of which the record holders of Common Shares entitled to such dividend, distribution or other issuance are to be determined) or the date of such purchase, as the case may be (regardless of whether such Notes or Other Senior Secured Convertible Notes were actually converted and without regard to any limitations on convertibility or as to whether sufficient Common Shares are available out of the Company's authorized but unissued shares for the purposes of effecting such conversion).  In the case of any purchase by the Company or any of its Subsidiaries of Common Shares for more than the per Common Share fair value thereof, for purposes of determining the amount of the corresponding dividend payable on the Notes, such purchase shall be deemed to be a dividend on the Common Shares in an amount per one Common Share equal to the aggregate consideration deliverable to purchase such Common Shares in excess of their fair value divided by the aggregate number of Common Shares outstanding immediately prior to such purchase.

In the event the Company shall take a record of the holders of the Common Shares (or other capital stock or securities at the time issuable upon conversion of the Notes) for the purpose of entitling or enabling such holders to receive any dividend or other distribution, or to receive any right to subscribe for or purchase any shares of capital stock of any class or any other securities, or to receive any other security, then the Company will send or cause to be sent to the Holders of the Notes a written notice specifying the record date for such dividend, distribution or right, and the amount and character of such dividend, distribution or right.  Such notice shall be sent in accordance with <u>Section 17.03</u> at least seven (7) days prior to the record date specified in such notice.

(b)        If the Company exclusively issues Common Shares as a dividend or distribution on Common Shares, if the Company pays a dividend in kind on the Convertible Preferred Stock or if the Company effects a share split or share combination, the Conversion Rate shall be adjusted based on the following formula:

$$CR_1 = CR_0 \times \frac{OS_1}{OS_0}$$

where,

$CR_0$        =        the Conversion Rate in effect immediately prior to the close of business on the Record Date of such dividend or distribution, or immediately prior to the open of business on the Effective Date of such share split or share combination, as applicable;

$CR_1$        =        the Conversion Rate in effect immediately after the close of business on such Record Date or immediately after the open of business on such Effective Date, as applicable;

$OS_0$        =        the number of Common Shares outstanding immediately prior to the close of business on such Record Date or immediately prior to the open of business such Effective Date, as applicable (before giving effect to any such dividend, distribution, split or combination); and

$OS_1$        =        (x) in the case of an issuance by the Company of Common Shares as a dividend or distribution on Common Shares or a share split or share combination effected by the

Company, the number of Common Shares outstanding immediately after giving effect to such dividend, distribution, share split or share combination and (y) in the case of the payment by the Company of a dividend in kind on the Convertible Preferred Stock, the sum of (A) the number of Common Shares outstanding immediately prior to the close of business on such Record Date (before giving effect to any such dividend or distribution) and (B) the number of Common Shares into which the Convertible Preferred Stock issued as a payment of such dividend would be convertible.

Any adjustment made under this <u>Section 14.05(b)</u> shall become effective immediately after the close of business on the Record Date for such dividend or distribution, or immediately after the open of business on the Effective Date for such share split or share combination, as applicable.  If any dividend or distribution of the type described in this Section <u>14.05(b)</u> is declared but not so paid or made, the Conversion Rate shall be immediately readjusted, effective as of the date the Board of Directors determines not to pay such dividend or distribution, to the Conversion Rate that would then be in effect if such dividend or distribution had not been declared.

(c)        Except as stated herein, the Company shall not adjust the Conversion Rate for the issuance of Common Shares or any securities convertible into or exchangeable for Common Shares or the right to purchase Common Shares or such convertible or exchangeable securities.

(d)        In addition to those adjustments required by <u>clause (b)</u> of this <u>Section 14.05</u>, and to the extent permitted by applicable law and subject to the applicable rules of any exchange on which any of the Company's securities are then listed, the Company from time to time may (but is not required to) increase the Conversion Rate by any amount for a period of at least 20 Business Days (i) if the Company determines that such increase would be in the Company's best interest or (ii) to avoid or diminish any income tax to holders of Common Shares or rights to purchase Common Shares in connection with a dividend or distribution of Common Shares (or rights to acquire Common Shares) or similar event.  Whenever the Conversion Rate is increased pursuant to the preceding sentence, the Company shall deliver to the Holder of each Note a notice of the increase at least 15 days prior to the date the increased Conversion Rate takes effect, and such notice shall state the increased Conversion Rate and the period during which it will be in effect.

(e)        Except as described in this <u>Section 14.05</u> and <u>Section 14.04</u>, the Conversion Rate shall not be required to be adjusted for any transaction or event.  Without limiting the foregoing, the Conversion Rate shall not be required to be adjusted:

(i)        upon the issuance of Common Shares at a price that is less than $1,000 *divided by* the Conversion Rate as of such time;

(ii)        upon the issuance of any Common Shares pursuant to any present or future plan providing for the reinvestment of dividends or interest payable on the Company's securities and the investment of additional optional amounts in Common Shares under any plan;

(iii)        upon the issuance of any Common Shares or options or rights to purchase those shares pursuant to any present or future employee, director or consultant benefit plan or program of or assumed by the Company or any of the Company's Subsidiaries;

(iv)        upon the issuance of any Common Shares pursuant to any option, warrant, right or exercisable, exchangeable or convertible security not described in <u>clause (iii)</u> of this subsection and outstanding as of the date the Notes were first issued;

(v)        for a third-party tender offer;

(vi)        solely for a change in the par value of the Common Shares; or

(vii)        for accrued and unpaid interest, if any.

For the avoidance of doubt, the Conversion Rate shall not be required to be adjusted for the issuance of the Notes, the conversion of such Notes in accordance with their terms and/or the issuance of securities or payments upon conversion of such Notes.

(f)        All calculations and other determinations under this Article 14 shall be made by the Company and shall be made to the nearest one-ten thousandth (1/10,000th) of a share. The Company shall not be required to make an adjustment to the Conversion Rate unless the adjustment would require a change of at least 1% in the Conversion Rate. However, the Company shall carry forward any adjustments that are less than 1% of the Conversion Rate and make such carried forward adjustments (1) on the Conversion Date for any Notes, (2) on each anniversary of the original issue date of the Notes and (3) on the Effective Date of any Make-Whole Fundamental Change or the effective date of any Fundamental Change, in each case, without duplication and regardless of whether the aggregate adjustment is less than 1%.

(g)        Whenever the Conversion Rate is adjusted as herein provided, the Company shall promptly file with the Trustee (and the Conversion Agent if not the Trustee) an Officer's Certificate setting forth the Conversion Rate after such adjustment and setting forth a brief statement of the facts requiring such adjustment.  Unless and until a Responsible Officer of the Trustee shall have received such Officer's Certificate, the Trustee shall not be deemed to have knowledge of any adjustment of the Conversion Rate and may conclusively assume without inquiry that the last Conversion Rate of which it has knowledge is still in effect.  Promptly after delivery of such certificate, the Company shall prepare a notice of such adjustment of the Conversion Rate setting forth the adjusted Conversion Rate and the date on which each adjustment becomes effective and shall deliver such notice of such adjustment of the Conversion Rate to each Holder.  Failure to deliver such notice shall not affect the legality or validity of any such adjustment.

(h)        For purposes of this Section 14.05, the number of Common Shares at any time outstanding shall not include Common Shares held in the treasury of the Company so long as the Company does not pay any dividend or make any distribution on Common Shares held in the treasury of the Company, but shall include Common Shares issuable in respect of scrip certificates issued in lieu of fractions of Common Shares.

Section 14.06. *[Reserved]*.

Section 14.07. *Shares to Be Fully Paid*.   The Company shall provide, free from preemptive rights, out of its authorized but unissued shares or shares held in treasury, sufficient Common Shares to provide for conversion of the Notes from time to time as such Notes are presented for conversion (assuming delivery of the maximum number of Additional Shares pursuant to **Section** 14.04 and that at the time of computation of such number of shares, all such Notes would be converted by a single Holder).

Section 14.08. *Effect of Recapitalizations, Reclassifications and Changes of the Common Shares*.

(a)        In the case of:

(i)        any recapitalization, reclassification or change of the Common Shares (other than changes in par value or from no par value or resulting from a subdivision or combination),

(ii)        any consolidation, merger, amalgamation, combination or similar transaction involving the Company,

(iii)        any sale, lease or other transfer to a third party of the consolidated assets of the Company and the Company's Subsidiaries substantially as an entirety or

(iv)        any statutory share exchange,

#96781386v10

in each case, as a result of which the Common Shares would be converted into, or exchanged for, stock, other securities, other property or assets (including cash or any combination thereof) (any such event, a "**Merger Event**"), then, at and after the effective time of such Merger Event, the right to convert each $1,000 principal amount of Notes shall be changed into a right to convert such principal amount of Notes into the kind and amount of shares of stock, other securities or other property or assets (including cash or any combination thereof) that a holder of a number of Common Shares equal to the Conversion Rate immediately prior to such Merger Event would have owned or been entitled to receive (the "**Reference Property**," with each "**unit of Reference Property**" meaning the kind and amount of Reference Property that a holder of one Common Share is entitled to receive) upon such Merger Event and, prior to or at the effective time of such Merger Event, the Company or the successor or purchasing Person, as the case may be, shall execute with the Trustee a supplemental indenture permitted under Section 10.01(g) providing for such change in the right to convert each $1,000 principal amount of Notes; *provided*, *however*, that at and after the effective time of the Merger Event the number of Common Shares otherwise deliverable upon conversion of the Notes in accordance with Section 14.02 shall instead be deliverable in the amount and type of Reference Property that a holder of that number of Common Shares would have received in such Merger Event.

If the Merger Event causes the Common Shares to be converted into, or exchanged for, the right to receive more than a single type of consideration (determined based in part upon any form of shareholder election), then (A) the Reference Property into which the Notes will be convertible shall be deemed to be the types and amounts of consideration actually received by the holders of Common Shares, and (B) the unit of Reference Property for purposes of the immediately preceding paragraph shall refer to the consideration referred to in clause **(A)** attributable to one Common Share.  The Company shall notify Holders, the Trustee and the Conversion Agent (if other than the Trustee) in writing of such weighted average as soon as practicable after such determination is made.

Such supplemental indenture described in the second immediately preceding paragraph shall provide for anti-dilution and other adjustments that shall be as nearly equivalent as is possible to the adjustments provided for in this Article 14.  If, in the case of any Merger Event, the Reference Property includes shares of stock, securities or other property or assets (including cash or any combination thereof) of a Person other than the successor or purchasing corporation, as the case may be, in such Merger Event, then such supplemental indenture shall also be executed by such other Person and shall contain such additional provisions to protect the interests of the Holders of the Notes as the Company shall reasonably consider necessary by reason of the foregoing, including the provisions providing for the purchase rights set forth in Article 15.

(b)     When the Company executes a supplemental indenture pursuant to subsection (a) of this Section 14.08, the Company shall promptly file with the Trustee an Officer's Certificate briefly stating the reasons therefor, the kind or amount of cash, securities or property or asset that will comprise a unit of Reference Property after any such Merger Event, any adjustment to be made with respect thereto and that all conditions precedent have been complied with, and shall promptly deliver notice thereof to all Holders.  The Company shall cause notice of the execution of such supplemental indenture to be delivered to each Holder within 20 days after execution thereof.  Failure to deliver such notice shall not affect the legality or validity of such supplemental indenture.

(c)     The Company shall not become a party to any Merger Event unless its terms are consistent with this Section 14.08.  None of the foregoing provisions shall affect the right of a holder of Notes to convert its Notes into Common Shares as set forth in Section 14.01 and Section 14.02 prior to the effective date of such Merger Event.

(d)     The above provisions of this Section shall similarly apply to successive Merger Events.

Section 14.09. *Certain Covenants*.  (a) The Company covenants that all Common Shares issued upon conversion of Notes will be fully paid and non-assessable by the Company and free from all taxes, liens and charges with respect to the issue thereof.

(b)        The Company covenants that, if any Common Shares to be provided for the purpose of conversion of Notes hereunder require registration with or approval of any governmental authority under any federal or state law before such Common Shares may be validly issued upon conversion, the Company will, to the extent then permitted by the rules and interpretations of the Commission, secure such registration or approval, as the case may be.

(c)        The Company further covenants that if at any time after the Issue Date the Common Shares shall be listed on any national securities exchange or automated quotation system, the Company will use reasonable best efforts to list and keep listed, so long as the Common Shares shall be so listed on such exchange or automated quotation system, the Common Shares issuable upon conversion of the Notes.

Section 14.10. *Responsibility of Trustee*.  The Trustee in any of its capacities hereunder and any other Conversion Agent shall not at any time be under any duty or responsibility to any Holder to determine the Conversion Rate (or any adjustment thereto) or whether any facts exist that may require any adjustment (including any increase) of the Conversion Rate, or with respect to the nature or extent or calculation of any such adjustment when made, or with respect to the method employed, or herein or in any supplemental indenture provided to be employed, in making the same.  The Trustee in any of its capacities hereunder and any other Conversion Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any Common Shares, or of any securities, property or cash that may at any time be issued or delivered upon the conversion of any Note; and the Trustee in any of its capacities hereunder and any other Conversion Agent make no representations with respect thereto.  Neither the Trustee in any of its capacities hereunder nor any Conversion Agent shall be responsible for any failure of the Company to issue, transfer or deliver any Common Shares or stock certificates or other securities or property or cash upon the surrender of any Note for the purpose of conversion or to comply with any of the duties, responsibilities or covenants of the Company contained in this Article.  Without limiting the generality of the foregoing, neither the Trustee in any of its capacities hereunder nor any Conversion Agent shall be under any responsibility to determine the correctness of any provisions contained in any supplemental indenture entered into pursuant to **Section** 14.08 relating either to the kind or amount of shares of stock or securities or property (including cash) receivable by Holders upon the conversion of their Notes after any event referred to in such **Section** 14.08 or to any adjustment to be made with respect thereto, but, subject to the provisions of **Section** 7.01, may accept (without any independent investigation) as conclusive evidence of the correctness of any such provisions, and shall be protected in relying upon, the Officer's Certificate (which the Company shall be obligated to file with the Trustee prior to the execution of any such supplemental indenture) with respect thereto.

Section 14.11. *Notice to Holders Prior to Certain Actions*.  In case of any:

(a)        action by the Company or one of its Subsidiaries that would require an adjustment in the Conversion Rate pursuant to Section 14.05;

(b)        Merger Event; or

(c)        voluntary or involuntary dissolution, liquidation or winding-up of the Company or any of its Subsidiaries;

then, in each case (unless notice of such event is otherwise required pursuant to another provision of this Indenture), the Company shall cause to be filed with the Trustee and the Conversion Agent (if other than the Trustee) and to be sent to each Holder at its address appearing on the Note Register, as promptly as possible but in any event at least 20 days prior to the applicable date hereinafter specified, a notice stating (i) the date on which a record is to be taken for the purpose of such action by the Company or one of its Subsidiaries or, if a record is not to be taken, the date as of which the holders of Common Shares of record are to be determined for the purposes of such action by the Company or one of its Subsidiaries, or (ii) the date on which such Merger Event, dissolution, liquidation or winding-up is expected to become effective or occur, and the date as of which it is expected that holders of Common Shares of record shall be entitled to exchange their Common Shares for securities or other property deliverable upon such Merger Event, dissolution, liquidation or winding-up.  Failure to give such notice, or any defect therein, shall not affect the

#96781386v10

legality or validity of such action by the Company or one of its Subsidiaries, Merger Event, dissolution, liquidation or winding-up.

Section 14.12. *Shareholder Rights Plans*. If the Company has a shareholder rights plan in effect upon conversion of the Notes, each Common Share issued upon such conversion shall be entitled to receive the appropriate number of rights, if any, and the certificates representing the Common Shares issued upon such conversion shall bear such legends, if any, in each case as may be provided by the terms of any such shareholder rights plan, as the same may be amended from time to time. However, if, prior to any conversion of Notes, the rights have separated from the Common Shares in accordance with the provisions of the applicable shareholder rights plan, the provisions of **Section** 14.05(a) shall apply to such separated rights.

Section 14.13. *Limits upon Issuance of Common Shares upon Conversion*.

(a)     Notwithstanding anything to the contrary herein, no Person will be entitled to receive any Common Shares otherwise deliverable upon conversion of the Notes to the extent, but only to the extent, that such receipt would cause such Person to become, directly or indirectly, a Beneficial Owner of more than 9.9% of the Common Shares outstanding at such time on an aggregate basis (such restriction, the "**Beneficial Ownership Limit**").

For purposes of this Section 14.13 only, a Person shall be deemed the "**Beneficial Owner**" of and shall be deemed to beneficially own any Common Shares that such Person or any of such person's Affiliates (as defined in Rule 12b-2 under the Exchange Act) or associates (as defined in Rule 12b-2 under the Exchange Act) is deemed to beneficially own, together with any Common Shares beneficially owned by any other persons whose beneficial ownership would be aggregated with such Person for purposes of Section 13(d) of the Exchange Act. Subject to the following proviso, for purposes of this Section 14.13 only, beneficial ownership shall be determined in accordance with Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder as in effect on the date hereof; *provided* that the number of Common Shares beneficially owned by such Person and its Affiliates and associates and any other persons whose beneficial ownership would be aggregated with such Person for purposes of Section 13(d) of the Exchange Act shall include the number of Common Shares issuable upon exercise or conversion of any of the Company's securities or rights to acquire the Common Shares, whether or not such securities or rights are currently exercisable or convertible or are exercisable or convertible only after the passage of time (including the number of Common Shares issuable upon conversion of the Notes in respect of which the beneficial ownership determination is being made), but shall exclude the number of Common Shares that would be issuable upon (A) conversion of the remaining, unconverted portion of any Notes beneficially owned by such Person or any of its Affiliates or associates and any other persons whose beneficial ownership would be aggregated with such Person for purposes of Section 13(d) of the Exchange Act and (B) exercise or conversion of the unexercised or unconverted portion of any of the Company's other securities subject to a limitation on conversion or exercise analogous to the limitation contained herein beneficially owned by such Person or any of its Affiliates or associates and any other persons whose beneficial ownership would be aggregated with such Person for purposes of Section 13(d) of the Exchange Act. For the avoidance of doubt, the term "Beneficial Owner" as used in this Section 14.13 shall not include (i) with respect to any Global Note, the nominee of the Depositary or any Person having an account with the Depositary or its nominee or (ii) with respect to any Physical Note, the Holder of such Physical Note unless, in each case, such nominee, account holder or Holder shall also be a Beneficial Owner of such Note.

(b)     Any purported delivery of Common Shares upon conversion of the Notes shall be void and have no effect to the extent, but only to the extent, that such delivery would result in any Person becoming the Beneficial Owner of Common Shares outstanding at such time in excess of the Beneficial Ownership Limit.

(c)     When such Holder surrenders Notes for conversion, that Holder must provide a certification to the Company as to whether the Person (or Persons) receiving Common Shares upon conversion is, or would, as a result of such conversion, become the beneficial owner of Common Shares

outstanding at such time in excess of any Beneficial Ownership Limit then applicable to such Person (or Persons).

(d) If any delivery of Common Shares otherwise owed to any Person (or persons) upon conversion of the Notes is not made, in whole or in part, as a result of the Beneficial Ownership Limit, the Company's obligation to make such delivery shall not be extinguished and, such Holder may either:

(i) request the return of the Notes surrendered by such Holder for conversion, after which the Company shall deliver such Notes to such Holder within two Business Days after receipt of such request; or

(ii) certify to the Company that the Person (or Persons) receiving Common Shares upon conversion is not, and would not, as a result of such delivery, become the Beneficial Owner of Common Shares outstanding at such time in excess of the Beneficial Ownership Limit, after which the Company shall deliver any such Common Shares withheld on account of such Beneficial Ownership Limit by the later of (i) the date such shares were otherwise due to such Person (or Persons) and (ii) two Business Days after receipt of such certification; *provided, however*, until such time as the affected Holder gives such notice, no Person shall be deemed to be the shareholder of record with respect to the Common Shares otherwise deliverable upon conversion in excess of the Beneficial Ownership Limit. Upon delivery of such notice, the provisions under Section 14.02 shall apply to the Common Shares to be delivered pursuant to such notice.

ARTICLE 15
REPURCHASE OF NOTES AT OPTION OF HOLDERS

Section 15.01.*[Intentionally Omitted]*.

Section 15.02.*Repurchase at Option of Holders Upon a Fundamental Change*. (a) If a Fundamental Change occurs at any time, each Holder shall have the right, at such Holder's option, to require the Company to repurchase for cash all of such Holder's Notes, or any portion thereof that is equal to $1,000 or an integral multiple of $1,000, on the date (the "**Fundamental Change Repurchase Date**") specified by the Company that is not less than 20 calendar days or more than 35 calendar days following the date of the Fundamental Change Company Notice at a repurchase price equal to 100% of the principal amount thereof, plus accrued and unpaid interest thereon to, but excluding, the Fundamental Change Repurchase Date (the "**Fundamental Change Repurchase Price**"), unless the Fundamental Change Repurchase Date falls after a Regular Record Date but on or prior to the Interest Payment Date to which such Regular Record Date relates, in which case the Company shall instead pay the full amount of accrued and unpaid interest to Holders of record as of such Regular Record Date, and the Fundamental Change Repurchase Price shall be equal to 100% of the principal amount of Notes to be repurchased pursuant to this **Article** 15. The Fundamental Change Repurchase Date shall be subject to postponement in order to allow the Company to comply with applicable law as a result of changes to such applicable law occurring after the date of this Indenture.

(b) Repurchases of Notes under this Section 15.02 shall be made, at the option of the Holder thereof, upon:

(i) delivery to the Paying Agent by a Holder of a duly completed notice (the "**Fundamental Change Repurchase Notice**") in the form set forth in Attachment 2 to the Form of Note attached hereto as Exhibit A, if the Notes are Physical Notes, or in compliance with the Depositary's procedures for surrendering interests in Global Notes, if the Notes are Global Notes, in each case on or before the close of business on the Business Day immediately preceding the Fundamental Change Repurchase Date; and

#96781386v10

(ii)      delivery of the Notes, if the Notes are Physical Notes, to the Paying Agent at any time after delivery of the Fundamental Change Repurchase Notice (together with all necessary endorsements for transfer) at the designated corporate trust office of the Paying Agent, or book-entry transfer of the Notes, if the Notes are Global Notes, in compliance with the applicable procedures of the Depositary, in each case such delivery being a condition to receipt by the Holder of the Fundamental Change Repurchase Price therefor.

The Fundamental Change Repurchase Notice in respect of any Notes to be repurchased shall state:

(iii)      in the case of Physical Notes, the certificate numbers of the Notes to be delivered for repurchase;

(iv)      the portion of the principal amount of Notes to be repurchased, which must be $1,000 or an integral multiple thereof; and

(v)      that the Notes are to be repurchased by the Company pursuant to the applicable provisions of the Notes and this Indenture;

*provided*, *however*, that if the Notes are Global Notes, the Fundamental Change Repurchase Notice must comply with the applicable procedures of the Depositary.

Notwithstanding anything herein to the contrary, any Holder delivering to the Paying Agent the Fundamental Change Repurchase Notice contemplated by this Section 15.02 shall have the right to withdraw, in whole or in part, such Fundamental Change Repurchase Notice at any time prior to the close of business on the Business Day immediately preceding the Fundamental Change Repurchase Date by delivery of a written notice of withdrawal to the Paying Agent in accordance with Section 15.03.

The Paying Agent shall promptly notify the Company of the receipt by it of any Fundamental Change Repurchase Notice or written notice of withdrawal thereof.

(c)      On or before the 20th calendar day after the occurrence of the effective date of a Fundamental Change, the Company shall provide to all Holders of Notes and the Trustee and the Paying Agent (in the case of a Paying Agent other than the Trustee) a notice (the "**Fundamental Change Company Notice**") of the occurrence of the effective date of the Fundamental Change and of the repurchase right at the option of the Holders arising as a result thereof.  In the case of Physical Notes, such notice shall be by first class mail or, in the case of Global Notes, such notice shall be delivered in accordance with the applicable procedures of the Depositary.  Each Fundamental Change Company Notice shall specify:

(i)      the events causing the Fundamental Change;

(ii)      the date of the Fundamental Change;

(iii)      the last date on which a Holder may exercise the repurchase right pursuant to this Article 15;

(iv)      the Fundamental Change Repurchase Price;

(v)      the Fundamental Change Repurchase Date;

(vi)      the name and address of the Paying Agent and the Conversion Agent, if applicable;

(vii)      if applicable, the Conversion Rate and any adjustments to the Conversion Rate;

(viii)     that the Notes with respect to which a Fundamental Change Repurchase Notice has been delivered by a Holder may be converted only if the Holder withdraws the Fundamental Change Repurchase Notice in accordance with the terms of this Indenture; and

(ix)     the procedures that Holders must follow to require the Company to repurchase their Notes;

*provided, however*, that, if the Notes are Global Notes, the Holders (and holders of a beneficial interest in such Global Notes) must comply with the applicable procedures of the Depositary.

No failure of the Company to give the foregoing notices and no defect therein shall limit the Holders' repurchase rights or affect the validity of the proceedings for the repurchase of the Notes pursuant to this Section 15.02.

At the Company's written request, the Trustee shall give such notice in the Company's name and at the Company's expense; *provided*, *however*, that, in all cases, the text of such Fundamental Change Company Notice shall be prepared by the Company.

(d)     Notwithstanding the foregoing, the Company shall not be required to purchase, or to make an offer to purchase, the Notes upon a Fundamental Change if a third party makes such an offer in the same manner, at the same time and otherwise in compliance with the requirements for an offer made by the Company as set forth above, and such third party purchases all Notes properly surrendered and not validly withdrawn under its offer in the same manner, at the same time and otherwise in compliance with the requirements for an offer made by the Company as set forth above.

(e)     Notwithstanding the foregoing, the Company shall not be required to give such notice or repurchase the Notes as described above upon a Fundamental Change pursuant to clause (b) of the definition thereof if (i) such Fundamental Change results in the Notes becoming convertible (pursuant to Section 14.08) into an amount of cash per Note greater than the Fundamental Change Repurchase Price (assuming the maximum amount of accrued interest would be payable based on the latest possible Fundamental Change Repurchase Date) and (ii) the Company provides written notice of the Holders' right to convert their Notes based on such Fundamental Change to Holders, the Trustee and the Conversion Agent (if other than the Trustee) within five (5) Business Days of such transaction or event.

(f)     Notwithstanding the foregoing, no Notes may be repurchased by the Company on any date at the option of the Holders upon a Fundamental Change if the principal amount of the Notes has been accelerated, and such acceleration has not been rescinded, on or prior to such date (except in the case of an acceleration resulting from a Default by the Company in the payment of the Fundamental Change Repurchase Price with respect to such Notes). The Paying Agent will promptly return to the respective Holders thereof any Physical Notes held by it during the acceleration of the Notes (except in the case of an acceleration resulting from a Default by the Company in the payment of the Fundamental Change Repurchase Price with respect to such Notes), or any instructions for book-entry transfer of the Notes in compliance with the applicable procedures of the Depositary shall be deemed to have been cancelled, and, upon such return or cancellation, as the case may be, the Fundamental Change Repurchase Notice with respect thereto shall be deemed to have been withdrawn.

Section 15.03. *Withdrawal of Fundamental Change Repurchase Notice*.  A Fundamental Change Repurchase Notice may be withdrawn (in whole or in part) by means of a written notice of withdrawal delivered to the designated corporate trust office of the Paying Agent in accordance with this **Section** 15.03 at any time prior to the close of business on the Business Day immediately preceding the Fundamental Change Repurchase Date, specifying:

(i)     the principal amount of the Notes with respect to which such notice of withdrawal is being submitted (which must be $1,000 or an integral multiple thereof),

(ii)      if Physical Notes have been issued, the certificate number of the Note in respect of which such notice of withdrawal is being submitted, and

(iii)      the principal amount, if any (which must be $1,000 or an integral multiple thereof), of such Note that remains subject to the original Fundamental Change Repurchase Notice, which portion must be in principal amounts of $1,000 or an integral multiple of $1,000;

*provided*, *however*, that if the Notes are Global Notes, the notice must comply with appropriate procedures of the Depositary.

Section 15.04. *Deposit of Fundamental Change Repurchase Price*.  (a)  The Company will deposit with the Trustee (or other Paying Agent appointed by the Company, or if the Company is acting as its own Paying Agent, set aside, segregate and hold in trust as provided in **Section** 4.04) on or prior to 11:00 a.m., New York City time, on the Fundamental Change Repurchase Date an amount of money sufficient to repurchase all of the Notes to be repurchased at the appropriate Fundamental Change Repurchase Price.  Subject to receipt of funds and/or Notes by the Trustee (or other Paying Agent appointed by the Company), payment for Notes surrendered for repurchase (and not withdrawn prior to the close of business on the Business Day immediately preceding the Fundamental Change Repurchase Date) will be made on the later of (i) the Fundamental Change Repurchase Date (*provided* the Holder has satisfied the conditions in **Section** 15.02) and (ii) the time of book-entry transfer or the delivery of such Note to the Trustee (or other Paying Agent appointed by the Company) by the Holder thereof in the manner required by **Section** 15.02 by mailing checks for the amount payable to the Holders of such Notes entitled thereto as they shall appear in the Note Register; *provided*, *however*, that payments to the Depositary shall be made by wire transfer of immediately available funds to the account of the Depositary or its nominee. The Trustee shall, promptly after such payment and upon written demand by the Company, return to the Company any funds in excess of the Fundamental Change Repurchase Price.

(b)      If by 11:00 a.m. New York City time, on the Fundamental Change Repurchase Date, there has been irrevocably deposited with the Trustee (or other Paying Agent appointed by the Company) money sufficient to make payment on all the Notes or portions thereof that are to be repurchased on such Fundamental Change Repurchase Date, then, with respect to the Notes that have been properly surrendered for repurchase and have not been validly withdrawn, (i) such Notes will cease to be outstanding, (ii) interest will cease to accrue on such Notes (whether or not book-entry transfer of the Notes has been made or the Notes have been delivered to the Trustee or Paying Agent) and (iii) all other rights of the Holders of such Notes will terminate (other than the right to receive the Fundamental Change Repurchase Price and, if applicable, accrued and unpaid interest).

(c)      Upon surrender of a Physical Note that is to be repurchased in part pursuant to Section 15.02, the Company shall execute and the Trustee shall authenticate and deliver, in accordance with the requirements of Section 2.04, to the Holder a new Note in an authorized denomination equal in principal amount to the unrepurchased portion of the Note surrendered.

Section 15.05. *Covenant to Comply with Applicable Laws Upon Repurchase of Notes*.  In connection with any repurchase offer, the Company will, if required:

(a)      comply with the provisions of Rule 13e-4, Rule 14e-1 and any other tender offer rules under the Exchange Act;

(b)      file a Schedule TO or any other required schedule under the Exchange Act; and

(c)      otherwise comply with all federal and state securities laws in connection with any offer by the Company to repurchase the Notes;

in each case, so as to permit the rights and obligations under this Article 15 to be exercised in the time and in the manner specified in this Article 15.

ARTICLE 16

NO OPTIONAL REDEMPTION

Section 16.01. *No Optional Redemption*.   The Notes shall not be redeemable by the Company prior to the Maturity Date, and no sinking fund is provided for the Notes.

ARTICLE 17

MISCELLANEOUS PROVISIONS

Section 17.01. *Provisions Binding on Company's Successors*.   All the covenants, stipulations, promises and agreements of the Company contained in this Indenture shall bind its successors and assigns whether so expressed or not.

Section 17.02. *Official Acts by Successor Corporation*.   Any act or proceeding by any provision of this Indenture authorized or required to be done or performed by any board, committee or Officer of the Company shall and may be done and performed with like force and effect by the like board, committee or officer of any corporation or other entity that shall at the time be the lawful sole successor of the Company.

Section 17.03. *Addresses for Notices, Etc.*   Any notice or demand that by any provision of this Indenture is required or permitted to be given or served by the Trustee or by the Holders on the Company shall be deemed to have been sufficiently given or made, for all purposes if given or served by being deposited postage prepaid by registered or certified mail in a post office letter box addressed (until another address is filed by the Company with the Trustee) to Invacare Holdings Corporation, One Invacare Way, Elyria, Ohio 44035, Attention: General Counsel.  Any notice, direction, request or demand hereunder to or upon the Trustee shall be deemed to have been sufficiently given or made, for all purposes, if given or served by being deposited postage prepaid by registered or certified mail in a post office letter box addressed to the Corporate Trust Office. Any notice, direction, request or demand hereunder to or upon the Notes Collateral Agent shall be deemed to have been sufficiently given or made, for all purposes, if given or served by being deposited postage prepaid by registered or certified mail in a post office letter box addressed to GLAS Trust Company LLC Limited, 3 Second Street, Suite 206, Jersey City, New Jersey 07311, United States of America Attention: Transaction Manager for Project Impact Invacare.

The Trustee, by notice to the Company, may designate additional or different addresses for subsequent notices or communications. The Notes Collateral Agent, by notice to the Company, may designate additional or different addresses for subsequent notices or communications.

Any notice or communication delivered or to be delivered to a Holder of Physical Notes shall be mailed to it by first class mail, postage prepaid, at its address as it appears on the Note Register and shall be sufficiently given to it if so mailed within the time prescribed. Any notice or communication delivered or to be delivered to a Holder of Global Notes shall be delivered in accordance with the applicable procedures of the Depositary and shall be sufficiently given to it if so delivered within the time prescribed.

Failure to mail or deliver a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.  If a notice or communication is mailed or delivered, as the case may be, in the manner provided above, it is duly given, whether or not the addressee receives it.

In case by reason of the suspension of regular mail service or by reason of any other cause it shall be impracticable to give such notice to Holders by mail, then such notification as shall be made with the approval of the Trustee shall constitute a sufficient notification for every purpose hereunder.

Section 17.04. *Governing Law; Jurisdiction*.   THIS INDENTURE, EACH NOTE, EACH NOTE GUARANTEE AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS INDENTURE OR ANY NOTE OR NOTE GUARANTEE, SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO THE CONFLICTS OF LAWS PROVISIONS THEREOF).

#96781386v10

The Company and each Note Guarantor irrevocably consents and agrees, for the benefit of the Holders from time to time of the Notes and the Trustee, that any legal action, suit or proceeding against it with respect to obligations, liabilities or any other matter arising out of or in connection with this Indenture, the Notes or the Note Guarantees may be brought in the courts of the State of New York or the courts of the United States located in the Borough of Manhattan, New York City, New York and, until amounts due and to become due in respect of the Notes have been paid, hereby irrevocably consents and submits to the non-exclusive jurisdiction of each such court *in personam*, generally and unconditionally with respect to any action, suit or proceeding for itself in respect of its properties, assets and revenues.

The Company and each Note Guarantor irrevocably and unconditionally waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions, suits or proceedings arising out of or in connection with this Indenture brought in the courts of the State of New York or the courts of the United States located in the Borough of Manhattan, New York City, New York and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

Section 17.05. *Evidence of Compliance with Conditions Precedent; Certificates and Opinions of Counsel to Trustee*.  Upon any application or demand by the Company to the Trustee or the Notes Collateral Agent to take any action under any of the provisions of this Indenture, the Company shall furnish to the Trustee and the Notes Collateral Agent an Officer's Certificate and an Opinion of Counsel stating that such action is permitted by the terms of this Indenture.

Each Officer's Certificate provided for, by or on behalf of the Company in this Indenture and delivered to the Trustee or the Notes Collateral Agent with respect to compliance with this Indenture (other than the Officer's Certificates provided for in Section 4.08) shall include (a) a statement that the person signing such certificate is familiar with the requested action and this Indenture; (b) a brief statement as to the nature and scope of the examination or investigation upon which the statement contained in such certificate is based; (c) a statement that, in the judgment of such person, he or she has made such examination or investigation as is necessary to enable him or her to express an informed judgment as to whether or not such action is permitted by this Indenture; (d) a statement as to whether or not, in the judgment of such person, such action is permitted by this Indenture; and (e) a statement as to whether or not, in the judgment of such person, all conditions precedent and covenants, if any, provided for in this Indenture related to the proposed action have been complied with.

Notwithstanding anything to the contrary in this Section 17.05, if any provision in this Indenture specifically provides that the Trustee or Notes Collateral Agent shall or may receive an Opinion of Counsel in connection with any action to be taken by the Trustee or Notes Collateral Agent or the Company hereunder, the Trustee or Notes Collateral Agent shall receive such Opinion of Counsel.

Section 17.06. *Legal Holidays*.   In any case where any Interest Payment Date, any Fundamental Change Repurchase Date or Maturity Date is not a Business Day, then any action to be taken on such date need not be taken on such date, but may be taken on the next succeeding Business Day with the same force and effect as if taken on such date, and no interest shall accrue in respect of the delay.

Section 17.07. *Agent for Service of Process*.   By the execution and delivery of this Indenture, each Note Guarantor that is not a Domestic Subsidiary does, and with respect to any entity that becomes a Note Guarantor after the date hereof and is not a Domestic Subsidiary, within 10 days of becoming a Note Guarantor, as applicable, will, (a) acknowledge that they will designate and appoint Invacare Holdings Corporation, One Invacare Way, Elyria, Ohio 44035, or another Person satisfactory to the Trustee (the "**Authorized Agent**"), as their authorized agent upon whom process may be served in any suit or proceeding arising out of or relating to this Indenture or the Note Guarantees that may be instituted in any federal or state court in the State of New York or brought under federal or state securities laws, and acknowledge that the Authorized Agent has accepted such designation, (b) submit to the jurisdiction of any such court in any such suit or proceeding, and (c) agree that service of process upon the Authorized Agent and written notice of said service to the Note Guarantor that is not a Domestic Subsidiary in accordance

with this **Section** 17.07 shall be deemed effective service of process in any such suit or proceeding. Each Note Guarantor that is not a Domestic Subsidiary further agrees to take any reasonable action, including the execution and filing of any and all such documents and instruments, as may be necessary to continue such designation and appointment of the Authorized Agent in full force and effect so long as any of the Notes shall be outstanding; *provided*, *however*, that each Note Guarantor that is not a Domestic Subsidiary may, by written notice to the Trustee, designate such additional or alternative agent for service of process under this **Section** 17.07 that (i) maintains an office located in the Borough of Manhattan, The City of New York, in the State of New York, (ii) is either (x) counsel for the Note Guarantor or (y) a corporate service company which acts as agent for service of process for other persons in the ordinary course of its business and (iii) agrees to act as agent for service of process in accordance with this **Section** 17.07. Such written notice shall identify the name of such agent for process and the address of the office of such agent for process in the Borough of Manhattan, The City of New York, State of New York. Upon the written request of any Holder, the Trustee shall deliver a copy of such notice to such Holder.

Section 17.08. *Benefits of Indenture*. Nothing in this Indenture or in the Notes, expressed or implied, shall give to any Person, other than the Holders, the parties hereto, any Paying Agent, any Conversion Agent, any authenticating agent, any Note Registrar and their successors hereunder, any benefit or any legal or equitable right, remedy or claim under this Indenture.

Section 17.09. *Table of Contents, Headings, Etc*. The table of contents and the titles and headings of the articles and sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part hereof, and shall in no way modify or restrict any of the terms or provisions hereof.

Section 17.10. *Authenticating Agent*. The Trustee may appoint an authenticating agent that shall be authorized to act on its behalf and subject to its reasonable judgment in the authentication and delivery of Notes in connection with the original issuance thereof and transfers and exchanges of Notes hereunder, including under **Section** 2.04, **Section** 2.05, **Section** 2.06, **Section** 2.07, **Section** 10.04 and **Section** 15.04 as fully to all intents and purposes as though the authenticating agent had been expressly authorized by this Indenture and those Sections to authenticate and deliver Notes. For all purposes of this Indenture, the authentication and delivery of Notes by the authenticating agent shall be deemed to be authentication and delivery of such Notes "by the Trustee" and a certificate of authentication executed on behalf of the Trustee by an authenticating agent shall be deemed to satisfy any requirement hereunder or in the Notes for the Trustee's certificate of authentication. Such authenticating agent shall at all times be a Person eligible to serve as Trustee hereunder pursuant to **Section** 7.08.

Any corporation or other entity into which any authenticating agent may be merged, amalgamated or converted or with which it may be consolidated, or any corporation or other entity resulting from any merger, amalgamation, consolidation or conversion to which any authenticating agent shall be a party, or any corporation or other entity succeeding to all or substantially all of the corporate trust business of any authenticating agent, shall be the successor of the authenticating agent hereunder, if such successor corporation or other entity is otherwise eligible under this Section 17.10, without the execution or filing of any paper or any further act on the part of the parties hereto or the authenticating agent or such successor corporation or other entity.

Any authenticating agent may at any time resign by giving written notice of resignation to the Trustee and to the Company. The Trustee may at any time terminate the agency of any authenticating agent by giving written notice of termination to such authenticating agent and to the Company. Upon receiving such a notice of resignation or upon such a termination, or in case at any time any authenticating agent shall cease to be eligible under this Section, the Trustee may appoint a successor authenticating agent (which may be the Trustee), shall give written notice of such appointment to the Company and shall deliver notice of such appointment to all Holders.

The Company agrees to pay to the authenticating agent from time to time reasonable compensation for its services although the Company may terminate the authenticating agent, if it determines such agent's fees to be unreasonable.

The provisions of <u>Section 7.02</u>, <u>Section 7.03</u>, <u>Section 7.04</u>, Section <u>8.03</u> and this Section <u>17.10</u> shall be applicable to any authenticating agent.

If an authenticating agent is appointed pursuant to this  Section <u>17.10</u>, the Notes  may have endorsed thereon, in addition to the Trustee's certificate of authentication, an alternative certificate of authentication in the following form:

_____,
as Authenticating Agent, certifies that this is one of the Notes described
in the within-named Indenture.

By: _____
Authorized Officer

Section 17.11. *Execution in Counterparts*.   This Indenture may be executed in any number of counterparts, each of which shall be an original, but such counterparts shall together constitute but one and the same instrument.  The exchange of copies of this Indenture and signature pages by facsimile or PDF transmission shall constitute effective execution and delivery of this Indenture as to the parties hereto and may be used in lieu of the original Indenture for all purposes.  Signatures of the parties hereto transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes. This Indenture shall be valid, binding, and enforceable against a party when executed and delivered by an authorized individual on behalf of the party by means of (a) an original manual signature, (b) a faxed, scanned, or photocopied manual signature, or (c) any other electronic signature permitted by the federal Electronic Signatures in Global and National Commerce Act, state enactments of the Uniform Electronic Transactions Act, Electronic Commerce Act 2000 (Ontario) and/or any other relevant electronic signatures law, including any relevant provisions of the PPSA or Uniform Commercial Code (collectively, "**Signature Law**"), in each case to the extent applicable. Each faxed, scanned, or photocopied manual signature, or other electronic signature, shall for all purposes have the same validity, legal effect, and admissibility in evidence as an original manual signature. Each party hereto shall be entitled to conclusively rely upon, and shall have no liability with respect to, any faxed, scanned, or photocopied manual signature, or other electronic signature, of any other party and shall have no duty to investigate, confirm or otherwise verify the validity or authenticity thereof. For the avoidance of doubt, original manual signatures shall be used for execution or indorsement of writings when required under the Uniform Commercial Code or other Signature Law due to the character or intended character of the writings.

Section 17.12. *Severability*.  In the event any provision of this Indenture, in the Notes or in any Note Guarantee shall be invalid, illegal or unenforceable, then (to the extent permitted by law) the validity, legality or enforceability of the remaining provisions shall not in any way be affected or impaired.

Section 17.13. *Waiver of Jury Trial*.   EACH OF THE COMPANY, EACH OF THE NOTE GUARANTORS AND THE TRUSTEE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 17.14. *Force Majeure*.  In no event shall the Trustee be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, pandemics, epidemics, recognized public emergencies, quarantine restrictions, loss or malfunctions of utilities, communications or computer (software and hardware) services, hacking, cyber-attacks, or other use or infiltration of the Trustee's technological infrastructure exceeding authorized access; it being understood that the Trustee shall use reasonable efforts that are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

#96781386v10

Section 17.15. *Calculations*.  Except as otherwise provided herein, the Company shall be responsible for making all calculations called for under the Notes.  These calculations include, but are not limited to, determinations of accrued interest payable on the Notes, Additional Interest and the Conversion Rate of the Notes. The Company shall make all these calculations in good faith and, absent manifest error, the Company's calculations shall be final and binding on Holders of Notes. The Company shall provide a schedule of its calculations to each of the Trustee and the Conversion Agent, and each of the Trustee and Conversion Agent is entitled to rely conclusively upon the accuracy of the Company's calculations without independent verification. The Trustee will forward the Company's calculations to any Holder of Notes upon the request of that Holder at the sole cost and expense of the Company.

Section 17.16. *U.S.A. PATRIOT Act*.  The parties hereto acknowledge that in accordance with Section 326 of the U.S.A. PATRIOT Act, the Trustee, like all financial institutions and in order to help fight the funding of terrorism and money laundering, is required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustee.  The parties to this Indenture agree that they will provide the Trustee with such information as it may request in order for the Trustee to satisfy the requirements of the U.S.A. PATRIOT Act.

Section 17.17. *Withholding Taxes*.  If the Company or another applicable withholding agent pays withholding taxes or backup withholding on behalf of the Holder or beneficial owner of a Note as a result of an adjustment or the non-occurrence of an adjustment to the Conversion Rate, the Company may, at its option (or another withholding agent might) withhold from or set off such payments against payments of cash or the delivery of Common Shares or other conversion consideration on the Note, any payments on the Common Shares or sales proceeds received by, or other funds or assets of, such Holder (or, in the case of another withholding agent, the beneficial owner) of the Note.

All parties to this Indenture shall provide an executed IRS Form W-9 or appropriate IRS Form W-8 (or, in each case, any successor form) to the Trustee prior to the Issuer Date, and shall promptly update any such form to the extent such form expires or becomes inaccurate in any respect because of a change in circumstances. The Trustee shall have the right to request from any party to this Indenture, or any other Person entitled to payment hereunder, any additional forms, documentation or other information as may be reasonably necessary for the Trustee to satisfy its reporting and withholding obligations under the Code. To the extent any such forms to be delivered under this paragraph are not provided prior to the time the related payment is required to be made or are reasonably determined by the Trustee to be incomplete and/or inaccurate in any material respect, the Trustee shall be entitled to withhold on any such payments hereunder to the extent withholding is required under Chapters 3, 4, or 61 of the Code, and shall have no obligation to gross up any such payments. In addition, the Company and the Note Guarantors, jointly and severally, agree to indemnify the Trustee in relation to all Taxes paid by the Trustee, or required to be withheld or deducted from a payment to any Person entitled to payment hereunder, and any reasonable expenses arising therefrom or with respect thereto.

Section 17.18. *Intercreditor Agreements*.  Each Holder, by its acceptance of a Note, (a) agrees that it will be bound by the provisions of any Intercreditor Agreement as if it were a signatory thereto and will take no actions contrary to the provisions of any Intercreditor Agreement and (b) authorizes and instructs the Trustee and the Notes Collateral Agent to enter into (x) the Pari Passu Intercreditor Agreement on the Issue Date, (y) the ABL North America Intercreditor Agreement on the Issue Date and (y) any Permitted ABL EMEA Intercreditor Agreement, if applicable, after the Effective Date in accordance with this Indenture and the other Notes Documents, in each case as Trustee and as Notes Collateral Agent, as the case may be, and on behalf of such Holder, including without limitation, making the representations of the Holders contained therein.  The foregoing provisions as they relate to the Pari Passu Intercreditor Agreement and the ABL North America Intercreditor Agreement are intended as an inducement to the lenders under the Credit Agreement and the ABL North America Credit Agreement to extend credit and such lenders are intended third party beneficiaries of such provisions and the provisions of the Pari Passu Intercreditor Agreement and the ABL North America Intercreditor Agreement, as applicable.

#96781386v10

Section 17.19. *Parallel Debt. Parallel Debt owed to the Notes Collateral Agent.*

(a)      Each of the Note Parties hereby irrevocably and unconditionally undertakes to pay to the Notes Collateral Agent as creditor in its own right and not as a representative of the other Secured Parties amounts equal to any amounts owing from time to time by that Note Party to any Secured Party under any Notes Document as and when those amounts are due for payment under the relevant Notes Document.

(b)      Each of the Note Parties and the Notes Collateral Agent acknowledge that the obligations of each Note Party under paragraph (a) are several and are separate and independent from, and shall not in any way limit or affect, the corresponding obligations of that Note Party to any Secured Party under any Notes Document (its "**Corresponding Debt**") nor shall the amounts for which each Note Party is liable under paragraph (a) (its "**Parallel Debt**") be limited or affected in any way by its Corresponding Debt provided that:

(i)      the Notes Collateral Agent shall not demand payment with regard to the Parallel Debt of any Note Party to the extent that such Note Party's Corresponding Debt has been irrevocably paid or (in the case of guarantee obligations) discharged; and

(ii)      no Holder shall demand payment with regard to the Corresponding Debt of any Note Party to the extent that such Note Party's Parallel Debt has been irrevocably paid or (in the case of guarantee obligations) discharged.

(c)      The Notes Collateral Agent acts in its own name and not as a Trustee, and its claims in respect of the Parallel Debt shall not be held on trust. The collateral under the Collateral Documents granted under the Notes Documents to the Notes Collateral Agent to secure the Parallel Debt is granted to the Notes Collateral Agent in its capacity as creditor of the Parallel Debt and shall not be held on trust.

(d)      All monies received or recovered by the Notes Collateral Agent pursuant to this Section 17.19, and all amounts received or recovered by the Notes Collateral Agent from or by the enforcement of any collateral under the Collateral Documents granted to secure the Parallel Debt, shall be applied in accordance with this Indenture.

(e)      Without limiting or affecting the Notes Collateral Agent's rights against the Note Parties (whether under this Section 17.19 or under any other provision of the Notes Documents), each Holder acknowledges that:

(i)      nothing in this Section 17.19 shall impose any obligation on the Notes Collateral Agent to advance any sum to any Holder or otherwise under any Notes Document, except in its capacity as a note holder; and

(ii)      for the purpose of any vote taken under any Notes Document, the Notes Collateral Agent shall not be regarded as having any participation or commitment other than those which it has in its capacity as a note holder.

(f)      Special Appointment of Notes Collateral Agent (German Collateral):

(i)      For the purposes of any security provided under the German Collateral Documents (where "**German Collateral**" means any security interest created under the Collateral Documents governed by German law) in addition to the provision set out above, the specific provisions set out in paragraphs (b) to (e) of this Section 17.19 shall be applicable. In the case of any inconsistency, the provisions set out in paragraphs (b) to (e) of this Section 17.19 shall prevail. The provisions set out in paragraphs (b) to (e) of this Section 17.19 shall not constitute a trust but a fiduciary relationship (Treuhand) within the meaning of German law.

#96781386v10

(ii)     With respect to any German Collateral constituted by non–accessory (*nicht akzessorische*) security interests, the Notes Collateral Agent shall hold, administer and, as the case may be, enforce or release that German Collateral in its own name, but as trustee (*Treuhänder*) for the account of the Secured Parties.

(iii)     With respect to any German Collateral constituted by accessory (akzessorische) security interests, the Notes Collateral Agent shall administer and, as the case may be, enforce or release that German Collateral in the name of and for and on behalf of the Secured Parties and shall hold, administer and, as the case may be, enforce or release that German Collateral in its own name on the basis of its own rights under Section 17.19.

(iv)     Each Secured Party (other than the Notes Collateral Agent) hereby instructs and authorizes the Notes Collateral Agent (with the right of sub-delegation) to act as its agent (*Stellvertreter*) and in particular (without limitation) to enter into and amend any documents evidencing German Collateral and to make and accept all declarations and take all actions it considers necessary or useful in connection with any German Collateral on behalf of that Secured Party. The Notes Collateral Agent shall further be entitled to enforce or release any German Collateral, to perform any rights and obligations under any documents evidencing German Collateral and to execute new and different documents evidencing or relating to the German Collateral.

(v)     At the request of the Notes Collateral Agent, each Secured Party shall provide the Notes Collateral Agent with a separate written power of attorney (*Spezialvollmacht*) for the purposes of executing any agreements and documents or otherwise acting on their behalf. Each Secured Party hereby ratifies and approves all acts previously done by the Notes Collateral Agent on such secured party's behalf.

(vi)     Each Secured Party which becomes a party to this Indenture ratifies and approves all acts and declarations previously done by the Notes Collateral Agent on such Secured Party's behalf (including, for the avoidance of doubt the declarations made by the Notes Collateral Agent as representative without power of attorney (*Vertreter ohne Vertretungsmacht*) in relation to the creation of any pledge (*Pfandrecht*) on behalf and for the benefit of each Secured Party as future pledgee or otherwise).

(vii)     Each Secured Party hereby releases the Notes Collateral Agent from the restrictions imposed by Section 181 German Civil Code (*Bürgerliches Gesetzbuch*) and similar restrictions applicable to it pursuant to any other law, in each case to the extent legally possible to that Secured Party. A Secured Party which is barred by its constitutional documents or by laws from granting such exemption shall notify the Notes Collateral Agent accordingly.

(viii)     The Notes Collateral Agent accepts its appointment as agent and administrator of the German Collateral on the terms and subject to the conditions set out in this Indenture and the Secured Parties, the Notes Collateral Agent and all other parties to this Indenture agree that, in relation to any German Collateral, no Secured Party (other than the Notes Collateral Agent in that capacity) shall exercise any independent power to enforce any German Collateral or take any other action in relation to the enforcement of the German Collateral, or make or receive any declarations in relation thereto.

(g)     Special Appointment of Collateral Agent (Norwegian Collateral):

(i)     For the purposes of any security provided under the Norwegian Collateral Documents (where "Norwegian Collateral" means any security interest created under the Collateral Documents governed by Norwegian law), each Secured Party hereby appoints the Notes Collateral Agent to act as its agent under and in connection with the Norwegian Collateral on behalf of that Secured Party and the Notes Collateral Agent declares that it holds the Norwegian

Collateral on behalf of that Secured Party on the terms contained in the Norwegian Collateral Documents and this Indenture.

(ii)     Each Secured Party authorizes the Notes Collateral Agent to perform the duties, obligations and responsibilities and to exercise the rights, powers, authorities and discretions specifically given to the Notes Collateral Agent under or in connection with the Norwegian Collateral Documents together with any other incidental rights, powers, authorities and discretions.

ARTICLE 18

COLLATERAL

Section 18.01. *Collateral Documents*.

(a)     The due and punctual payment of the principal of, premium and interest on the Notes when and as the same shall be due and payable, whether on an Interest Payment Date, at maturity, by acceleration, repurchase, redemption or otherwise, and interest on the overdue principal of, premium and interest on the Notes and performance of all other obligations of the Company and the Note Guarantors to the Holders, the Trustee or the Notes Collateral Agent under this Indenture, the Notes, the Guarantees, the Intercreditor Agreements and the Collateral Documents, according to the terms hereunder or thereunder, shall be secured as provided in the Collateral Documents, which define the terms of the Liens that secure Notes Obligations, subject to the terms of the Intercreditor Agreements. The Trustee, the Company and the Note Guarantors hereby acknowledge and agree that the Notes Collateral Agent holds the Collateral in trust (or, as the case may be, as direct representative) for the benefit of the Holders, the Trustee and the Notes Collateral Agent and pursuant to the terms of the Collateral Documents and the Intercreditor Agreements. Each Holder, by accepting a Note, consents and agrees to the terms of the Collateral Documents (including the provisions providing for the possession, use, release and foreclosure of Collateral) and the Intercreditor Agreements, each as may be in effect or may be amended from time to time in accordance with its terms and this Indenture, and authorizes and directs the Notes Collateral Agent to enter into the Collateral Documents, the Pari Passu Intercreditor Agreement and the ABL North America Intercreditor Agreement on the Issue Date, and the Collateral Documents and any Permitted ABL EMEA Intercreditor Agreement and any Permitted First Lien Second Lien Intercreditor Agreement, if any, at any time after the Issue Date, if applicable, and to perform its obligations and exercise its rights thereunder in accordance therewith. In the event of conflict between an Intercreditor Agreement, any of the other Collateral Documents and this Indenture, the applicable Intercreditor Agreement shall control. The Company shall deliver to the Notes Collateral Agent copies of all documents required to be filed pursuant to the Collateral Documents, and will do or cause to be done all such acts and things as may be reasonably required by the next sentence of this Section 18.01, to assure and confirm to the Notes Collateral Agent the security interest in the Collateral contemplated hereby, by the Collateral Documents or any part thereof, as from time to time constituted, so as to render the same available for the security and benefit of this Indenture and of the Notes secured hereby, according to the intent and purposes herein expressed. On or following the Issue Date and subject to the Pari Passu Intercreditor Agreement, the Company and the Note Guarantors shall, at their sole expense, execute any and all further documents, financing statements (including continuation statements and amendments to financing statements), agreements and instruments, and take all further action that may be required under applicable law, or that the Trustee or the Notes Collateral Agent may reasonably request (it being understood that neither the Trustee nor the Notes Collateral Agent is under any obligation or duty to make such request), in order to grant, preserve, maintain, protect and perfect (or continue the perfection of) the validity and priority of the Liens and security interests created or intended to be created by the Collateral Documents in the Collateral; *provided* that for so long as there are outstanding any Credit Facility Obligations, no actions shall be required to be taken with respect to the perfection of the security interests in the Collateral to the extent such actions are not required to be taken with respect to the Credit Agreement. Such security interest and Liens will be created under the Collateral Documents and other security agreements and other instruments and documents.

(b)     It is understood and agreed that prior to the discharge of the Credit Facility Obligations, to the extent that the Credit Agreement Collateral Agent is satisfied with or agrees to any deliveries or

documents required to be provided in respect of any matters relating to the Collateral or makes any determination in respect of any matters relating to the Collateral (including, without limitation, extensions of time or waivers for the creation and perfection of security interests in, or the obtaining of title insurance, legal opinions or other deliverables with respect to, particular assets (including in connection with assets acquired, or Subsidiaries formed or acquired, after the Issue Date), the Notes Collateral Agent shall be deemed to be satisfied with such deliveries and/or documents and the judgment of the Credit Agreement Collateral Agent in respect of any such matters under the Credit Agreement shall be deemed to be the judgment of the Notes Collateral Agent in respect of such matters under this Indenture and the Collateral Documents.

It is understood and agreed that prior to the discharge of the ABL Obligations, to the extent that the ABL Agent is satisfied with or agrees to any deliveries or documents required to be provided in respect of any matters relating to the ABL Priority Collateral or makes any determination in respect of any matters relating to the ABL Priority Collateral (including, without limitation, extensions of time or waivers for the creation and perfection of security interests in, or the obtaining of title insurance, legal opinions or other deliverables with respect to, particular assets (including in connection with assets acquired, or Subsidiaries formed or acquired, after the Issue Date), the Notes Collateral Agent shall be deemed to be satisfied with such deliveries and/or documents and the judgment of the ABL Agent in respect of any such matters under the ABL North America Credit Agreement shall be deemed to be the judgment of the Notes Collateral Agent in respect of such matters under this Indenture and the Collateral Documents.

Section 18.02. *Release of Collateral*.

(a)        Collateral may be released from the Lien and security interest created by the Collateral Documents at any time and from time to time in accordance with the provisions of the Collateral Documents, the Intercreditor Agreements and this Indenture. Notwithstanding anything to the contrary in the Collateral Documents, the Intercreditor Agreements and this Indenture, but subject to <u>Section 4.33</u>, the Company and the Note Guarantors will be entitled to the release of property and other assets constituting Collateral from the Liens securing the Notes and the Notes Obligations under any one or more of the following circumstances:

(i)        to enable the Company and/or one or more Note Guarantors to consummate the sale, transfer or other disposition (including by the termination of capital leases or the repossession of the leased property in a capital lease by the lessor) of such property or assets (to a Person that is not the Company or a Subsidiary of the Company) to the extent permitted by Section <u>4.14</u>;

(ii)        in the case of a Note Guarantor that is released from its Guarantee with respect to the Notes pursuant to the terms of this Indenture, the release of the property and assets of such Guarantor;

(iii)        with respect to any Collateral that is or becomes an "Excluded Asset," upon it becoming an Excluded Asset;

(iv)        to the extent the Liens on the Collateral securing the Credit Facility Obligations are released by the Credit Agreement Collateral Agent (other than any release by, or as a result of, payment of the Credit Facility Obligations), upon the release of such Liens;

(v)        in connection with any enforcement action taken by the Controlling Collateral Agent or the Priority Debt Agent, as applicable, in accordance with the terms of the Pari Passu Intercreditor Agreement, the ABL North America Intercreditor Agreement or the Collateral Documents; or

(vi)        as described under <u>Article 10</u> hereof.

(b)        The Liens on the Collateral securing the Notes and the Note Guarantees also will be released:

(i)        upon payment in full of the principal of, together with accrued and unpaid interest on, the Notes and all other Notes Obligations under this Indenture, the Note Guarantees and the Collateral Documents that are due and payable at or prior to the time such principal, together with accrued and unpaid interest, are paid,

(ii)       upon a discharge of this Indenture as described under Article 3 hereof, or

(iii)      pursuant to the Collateral Documents, the Pari Passu Intercreditor Agreement or the ABL North America Intercreditor Agreement.

(c)        With respect to any release of Collateral, upon receipt of an Officer's Certificate stating that all conditions precedent under this Indenture, the Collateral Documents and the Intercreditor Agreements, as applicable, to such release have been met and that it is permitted for the Trustee and/or Notes Collateral Agent to execute and deliver the documents requested by the Company in connection with such release and any necessary or proper instruments of termination, satisfaction or release prepared by the Company, the Trustee and the Notes Collateral Agent shall, execute, deliver or acknowledge (at the Company's expense) such instruments or releases to evidence the release of any Collateral permitted to be released pursuant to this Indenture or the Collateral Documents or the Lien Intercreditor Agreements and shall do or cause to be done (at the Company's expense) all acts reasonably requested of them to release such Lien as soon as is reasonably practicable. Neither the Trustee nor the Notes Collateral Agent shall be liable for any such release undertaken in reliance upon any such Officer's Certificate, and notwithstanding any term hereof or in any Collateral Document or in the Intercreditor Agreements to the contrary, the Trustee and the Notes Collateral Agent shall not be under any obligation to release any such Lien and security interest, or execute and deliver any such instrument of release, satisfaction or termination, unless and until it receives such Officer's Certificate, upon which it shall be entitled to conclusively rely.

Section 18.03.    *Suits to Protect the Collateral*.

Subject to the provisions of Article 7 and the Collateral Documents and the Intercreditor Agreements, the Trustee may or may direct the Notes Collateral Agent to take all actions it determines in order to:

(a)        enforce any of the terms of the Collateral Documents; and

(b)        collect and receive any and all amounts payable in respect of the Notes Obligations hereunder.

Subject to the provisions of the Collateral Documents and the Intercreditor Agreements, the Trustee and the Notes Collateral Agent shall have the power to institute and to maintain such suits and proceedings as the Trustee or the Notes Collateral Agent may determine to prevent any impairment of the Collateral by any acts which may be unlawful or in violation of any of the Collateral Documents or this Indenture, and such suits and proceedings as the Trustee or the Notes Collateral Agent may determine to preserve or protect its interests and the interests of the Holders in the Collateral. Nothing in this Section 18.03 shall be considered to impose any such duty or obligation to act on the part of the Trustee or the Notes Collateral Agent.

Section 18.04.    *Authorization of Receipt of Funds by the Trustee Under the Collateral Documents*.

Subject to the provisions of the Intercreditor Agreements, the Trustee is authorized to receive any funds for the benefit of the Holders distributed under the Collateral Documents, and to make further distributions of such funds to the Holders according to the provisions of this Indenture.

Section 18.05. *Purchaser Protected*.

In no event shall any purchaser in good faith of any property purported to be released hereunder be bound to ascertain the authority of the Notes Collateral Agent or the Trustee to execute the applicable release or to inquire as to the satisfaction of any conditions required by the provisions hereof for the exercise of such authority or to see to the application of any consideration given by such purchaser or other transferee; nor shall any purchaser or other transferee of any property or rights permitted by this Article 18 to be sold be under any obligation to ascertain or inquire into the authority of the Company or the applicable Note Guarantor to make any such sale or other transfer.

Section 18.06. *Powers Exercisable by Receiver or Trustee*.

In case the Collateral shall be in the possession of a receiver, interim receiver, manager, monitor or trustee, lawfully appointed, the powers conferred in this Article 18 upon the Company or a Note Guarantor with respect to the release, sale or other disposition of such property may be exercised by such receiver, interim receiver, manager, monitor or trustee, and an instrument signed by such receiver, interim receiver, manager, monitor or trustee shall be deemed the equivalent of any similar instrument of the Company or a Guarantor or of any Officer or Officers thereof required by the provisions of this Article 18; and if the Trustee or the Notes Collateral Agent shall be in the possession of the Collateral under any provision of this Indenture, then such powers may be exercised by the Trustee or the Notes Collateral Agent.

Section 18.07. *Notes Collateral Agent*.

(a)     The Company and each of the Holders by acceptance of the Notes hereby designates and appoints the Notes Collateral Agent as its agent under this Indenture, the Collateral Documents and the Intercreditor Agreements, and the Company and each of the Holders by acceptance of the Notes hereby irrevocably authorizes the Notes Collateral Agent to take such action on its behalf under the provisions of this Indenture, the Collateral Documents and the Intercreditor Agreements and to exercise such powers and perform such duties as are expressly delegated to the Notes Collateral Agent by the terms of this Indenture, the Collateral Documents and the Intercreditor Agreements, and consents and agrees to the terms of the Intercreditor Agreements and each Collateral Document, as the same may be in effect or may be amended, restated, supplemented or otherwise modified from time to time in accordance with their respective terms. The Notes Collateral Agent agrees to act as such on the express conditions contained in this **Section 18.07**. Each Holder agrees that any action taken by the Notes Collateral Agent in accordance with the provision of this Indenture, the Intercreditor Agreements and the Collateral Documents, and the exercise by the Notes Collateral Agent of any rights or remedies set forth herein and therein shall be authorized and binding upon all Holders.  Notwithstanding any provision to the contrary contained elsewhere in this Indenture, the Collateral Documents and the Intercreditor Agreements, the duties of the Notes Collateral Agent shall be ministerial and administrative in nature, and the Notes Collateral Agent shall not have any duties or responsibilities, except those expressly set forth herein and in the Collateral Documents and the Intercreditor Agreements to which the Notes Collateral Agent is a party, nor shall the Notes Collateral Agent have or be deemed to have any trust or other fiduciary relationship with the Trustee, any Holder, the Company or any Note Guarantor, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Indenture, the Collateral Documents and the Intercreditor Agreements or otherwise exist against the Notes Collateral Agent.  Without limiting the generality of the foregoing sentence, the use of the term "agent" in this Indenture with reference to the Notes Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

(b)     The Notes Collateral Agent may perform any of its duties under this Indenture, the Collateral Documents or the Intercreditor Agreements by or through receivers, interim receivers, managers, monitors, agents, employees, attorneys-in-fact or with respect to any specified Person, such Person's Affiliates, and the respective officers, directors, employees, agents, advisors and attorneys-in-fact of such Person and its Affiliates (a "**Related Person**"), and shall be entitled to advice of counsel concerning all

matters pertaining to such duties, and shall be entitled to act upon, and shall be fully protected in taking action in reliance upon any advice or opinion given by legal counsel.  The Notes Collateral Agent shall not be responsible for the negligence or misconduct of any receiver, interim receiver, manager, monitor, agent, employee, attorney-in-fact or Related Person that it selects as long as such selection was made in good faith and with due care.

(c)      None of the Notes Collateral Agent or any of its respective Related Persons shall (i) be liable for any action taken or omitted to be taken by any of them under or in connection with this Indenture or the transactions contemplated hereby (except for its own gross negligence or willful misconduct) or under or in connection with any Collateral Document or the Intercreditor Agreements or the transactions contemplated thereby (except for its own gross negligence or willful misconduct), or (ii) be responsible in any manner to any of the Trustee or any Holder for any recital, statement, representation, warranty, covenant or agreement made by the Company or any other Note Party or Affiliate of any Note Party, or any Officer or Related Person thereof, contained in this Indenture, the Collateral Documents or the Intercreditor Agreements, or in any certificate, report, statement or other document referred to or provided for in, or received by the Notes Collateral Agent under or in connection with, this Indenture, the Collateral Documents or the Intercreditor Agreements, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Indenture, the Collateral Documents or the Intercreditor Agreements, or for any failure of any Note Party or any other party to this Indenture, the Collateral Documents or the Intercreditor Agreements to perform its obligations hereunder or thereunder.  None of the Notes Collateral Agent or any of its respective Related Persons shall be under any obligation to the Trustee or any Holder to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Indenture, the Collateral Documents or the Intercreditor Agreements or to inspect the properties, books, or records of any Note Party or any Note Party's Affiliates.

(d)      The Notes Collateral Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, facsimile, certification, telephone message, statement, or other communication, document or conversation (including those by telephone or e-mail) believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person or Persons, and upon advice and statements of legal counsel (including, without limitation, counsel to the Company or any other Note Party), independent accountants and other experts and advisors selected by the Notes Collateral Agent.  The Notes Collateral Agent shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, or other paper or document.  The Notes Collateral Agent shall be fully justified in failing or refusing to take any action under this Indenture, the Collateral Documents or the Intercreditor Agreements unless it shall first receive such advice or concurrence of the Trustee or the Holders of a majority in aggregate principal amount of the Notes as it determines and, if it so requests, it shall first be indemnified to its reasonable satisfaction by the Holders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  The Notes Collateral Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Indenture, the Collateral Documents or the Intercreditor Agreements in accordance with a request, direction, instruction or consent of the Trustee or the Holders of a majority in aggregate principal amount of the then outstanding Notes and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Holders.

(e)      The Notes Collateral Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, unless a Responsible Officer of the Notes Collateral Agent shall have received written notice from the Trustee or the Company referring to this Indenture, describing such Default or Event of Default and stating that such notice is a "notice of default."  The Notes Collateral Agent shall take such action with respect to such Default or Event of Default as may be requested by the Trustee in accordance with Article 6 or the Holders of a majority in aggregate principal amount of the Notes (subject to this Section 18.07).

(f)      The Notes Collateral Agent may resign at any time by notice to the Trustee and the Company, such resignation to be effective upon the acceptance of a successor agent to its appointment as Notes Collateral Agent.  If the Notes Collateral Agent resigns under this Indenture, the Company shall

appoint a successor collateral agent.  If no successor collateral agent is appointed prior to the intended effective date of the resignation of the Notes Collateral Agent (as stated in the notice of resignation), the Trustee, at the direction of the Holders of a majority of the aggregate principal amount of the Notes then outstanding, may appoint a successor collateral agent, subject to the consent of the Company (which consent shall not be unreasonably withheld and which shall not be required during a continuing Event of Default).  If no successor collateral agent is appointed and consented to by the Company pursuant to the preceding sentence within thirty (30) days after the intended effective date of resignation (as stated in the notice of resignation) the Notes Collateral Agent shall be entitled to petition a court of competent jurisdiction to appoint a successor.  The Holders of a majority in aggregate principal amount of the Notes at the time outstanding may at any time remove the Notes Collateral Agent and nominate a successor collateral agent that shall be deemed appointed as successor collateral agent by giving written notice of such removal and appointment to the Company and by delivering notice thereof to the remaining Holders (if any). Upon the acceptance of its appointment as successor collateral agent hereunder, such successor collateral agent shall succeed to all the rights, powers and duties of the retiring or removed Notes Collateral Agent, and the term "Notes Collateral Agent" shall mean such successor collateral agent, and the retiring or removed Notes Collateral Agent's appointment, powers and duties as the Notes Collateral Agent shall be terminated.  After the retiring Notes Collateral Agent's resignation or removal hereunder, the provisions of this Section 18.07 shall continue to inure to its benefit and the retiring or removed Notes Collateral Agent shall not by reason of such resignation or removal be deemed to be released from liability as to any actions taken or omitted to be taken by it while it was the Notes Collateral Agent under this Indenture.

(g)        GLAS Trust Company LLC shall initially act as Notes Collateral Agent and shall be authorized to appoint co-Notes Collateral Agents as necessary in its sole discretion.  Except as otherwise explicitly provided herein or in the Collateral Documents or the Intercreditor Agreements, neither the Notes Collateral Agent nor any of its respective officers, directors, employees or agents or other Related Persons shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof.  The Notes Collateral Agent shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither the Notes Collateral Agent nor any of its officers, directors, employees or agents shall be responsible for any act or failure to act hereunder, except for its own gross negligence or willful misconduct.

(h)        The Notes Collateral Agent is authorized and directed to (i) enter into the Collateral Documents to which it is party, whether executed on or after the Issue Date, (ii) enter into the Intercreditor Agreements, whether executed on or after the Issue Date, (iii) make the representations of the Holders set forth in the Collateral Documents and Intercreditor Agreements, (iv) bind the Holders on the terms as set forth in the Collateral Documents and the Intercreditor Agreements and (v) perform and observe its obligations under the Collateral Documents and the Intercreditor Agreements.

(i)        If at any time or times the Trustee shall receive (i) by payment, foreclosure, set-off or otherwise, any proceeds of Collateral or any payments with respect to the Notes Obligations arising under, or relating to, this Indenture, except for any such proceeds or payments received by the Trustee from the Notes Collateral Agent pursuant to the terms of this Indenture, or (ii) payments from the Notes Collateral Agent in excess of the amount required to be paid to the Trustee pursuant to Article 6, the Trustee shall promptly turn the same over to the Notes Collateral Agent, in kind, and with such endorsements as may be required to negotiate the same to the Notes Collateral Agent such proceeds to be applied by the Notes Collateral Agent pursuant to the terms of this Indenture, the Collateral Documents and the Intercreditor Agreements.

(j)        The Notes Collateral Agent is each Holder's agent for the purpose of perfecting the Holders' security interest in assets which, in accordance with Article 9 of the Uniform Commercial Code can be perfected only by possession.  Should the Trustee obtain possession of any such Collateral, upon request from the Company, the Trustee shall notify the Notes Collateral Agent thereof and promptly shall deliver such Collateral to the Notes Collateral Agent or otherwise deal with such Collateral in accordance with the Notes Collateral Agent's instructions.

(k)        The Notes Collateral Agent shall have no obligation whatsoever to the Trustee or any of the Holders to assure that the Collateral exists or is owned by any Note Party or is cared for, protected, or insured or has been encumbered, or that the Notes Collateral Agent's Liens have been properly or sufficiently or lawfully created, perfected, protected, maintained or enforced or are entitled to any particular priority, or to determine whether all of the Note Party's property constituting Collateral intended to be subject to the Lien and security interest of the Collateral Documents has been properly and completely listed or delivered, as the case may be, or the genuineness, validity, marketability or sufficiency thereof or title thereto, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities, and powers granted or available to the Notes Collateral Agent pursuant to this Indenture, any Collateral Document or the Intercreditor Agreements other than pursuant to the instructions of the Trustee or the Holders of a majority in aggregate principal amount of the Notes or as otherwise provided in the Collateral Documents.

(l)        If the Company or any Note Guarantor (i) incurs any Indebtedness pursuant to <u>Section 4.10(a)(xxv)</u> at any time when no Permitted ABL EMEA Intercreditor Agreement is in effect and (ii) delivers to the Notes Collateral Agent an Officer's Certificate so stating and requesting the Notes Collateral Agent to enter into a Permitted ABL EMEA Intercreditor Agreement in favor of a designated agent or representative for the holders of the Indebtedness so incurred, the Notes Collateral Agent shall (and is hereby authorized and directed to) enter into such intercreditor agreement (at the sole expense and cost of the Company, including legal fees and expenses of the Notes Collateral Agent), bind the Holders on the terms set forth therein and perform and observe its obligations thereunder.

(m)        If the Company or any Note Guarantor (i) incurs any Permitted First Lien Indebtedness that is permitted to be incurred pursuant to the terms hereof and (ii) delivers to the Notes Collateral Agent an Officer's Certificate so stating and requesting the Notes Collateral Agent to enter into a Permitted First Lien Second Lien Intercreditor Agreement in favor of a designated agent or representative for the holders of the Indebtedness so incurred, the Notes Collateral Agent shall (and is hereby authorized and directed to) enter into such intercreditor agreement (at the sole expense and cost of the Company, including legal fees and expenses of the Notes Collateral Agent), bind the Holders on the terms set forth therein and perform and observe its obligations thereunder.

(n)        No provision of this Indenture, the Intercreditor Agreements or any Collateral Document shall require the Notes Collateral Agent (or the Trustee) to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder or thereunder or to take or omit to take any action hereunder or thereunder or take any action at the request or direction of Holders (or the Trustee in the case of the Notes Collateral Agent) unless it shall have received indemnity, prefunding and/or security satisfactory to the Notes Collateral Agent and the Trustee against potential costs and liabilities incurred by the Notes Collateral Agent relating thereto.  Notwithstanding anything to the contrary contained in this Indenture, the Intercreditor Agreements or the Collateral Documents, in the event the Notes Collateral Agent is entitled or required to commence an action to foreclose or otherwise exercise its remedies to acquire control or possession of the Collateral, the Notes Collateral Agent shall not be required to commence any such action or exercise  any remedy or to inspect or conduct any studies of any property under the mortgages or take any such other action if the Notes Collateral Agent has determined that the Notes Collateral Agent may incur personal liability as a result of the presence at, or release on or from, the Collateral or such property, of any hazardous substances.  The Notes Collateral Agent shall at any time be entitled to cease taking any action described in this clause if it no longer reasonably deems any indemnity, prefunding and/or security or undertaking from the Company or the Holders to be sufficient.

(o)        The Notes Collateral Agent (i) shall not be liable for any action taken or omitted to be taken by it in connection with this Indenture, the Intercreditor Agreements and the Collateral Documents or instrument referred to herein or therein, except to the extent that any of the foregoing are found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from its own gross negligence or willful misconduct, (ii) shall not be liable for interest on any money received by it except as the Notes Collateral Agent may agree in writing with the Company (and money held in trust by the Notes Collateral Agent need not be segregated from other funds except to the extent required by law) and (iii) may consult with counsel of its selection and the advice or opinion of such counsel as to matters of law

#96781386v10

shall be full and complete authorization and protection from liability in respect of any action taken, omitted or suffered by it in good faith and in accordance with the advice or opinion of such counsel.  The grant of permissive rights or powers to the Notes Collateral Agent shall not be construed to impose duties to act.

(p)  Neither the Notes Collateral Agent nor the Trustee shall be liable for delays or failures in performance resulting from acts beyond its control.  Such acts shall include but not be limited to acts of God, strikes, lockouts, riots, acts of war, epidemics, governmental regulations superimposed after the fact, fire, communication line failures, computer viruses, power failures, earthquakes or other disasters.  Neither the Notes Collateral Agent nor the Trustee shall be liable for any indirect, special, punitive, incidental or consequential damages (included but not limited to lost profits) whatsoever, even if it has been informed of the likelihood thereof and regardless of the form of action.

(q)  The Notes Collateral Agent does not assume any responsibility for any failure or delay in performance or any breach by the Company or any other Grantor under this Indenture, the Intercreditor Agreements and the Collateral Documents.  The Notes Collateral Agent shall not be responsible to the Holders or any other Person for any recitals, statements, information, representations or warranties contained in this Indenture, the Collateral Documents, the Intercreditor Agreements or in any certificate, report, statement, or other document referred to or provided for in, or received by the Notes Collateral Agent under or in connection with, this Indenture, the Intercreditor Agreements or any Collateral Document; the execution, validity, genuineness, effectiveness or enforceability of the Intercreditor Agreements and any Collateral Documents of any other party thereto; the genuineness, enforceability, collectability, value, sufficiency, location or existence of any Collateral, or the validity, effectiveness, enforceability, sufficiency, extent, perfection or priority of any Lien therein; the validity, enforceability or collectability of any Notes Obligations; the assets, liabilities, financial condition, results of operations, business, creditworthiness or legal status of any obligor; or for any failure of any obligor to perform its Notes Obligations under this Indenture, the Intercreditor Agreements and the Collateral Documents.  The Notes Collateral Agent shall have no obligation to any Holder or any other Person to ascertain or inquire into the existence of any Default or Event of Default, the observance or performance by any obligor of any terms of this Indenture, the Intercreditor Agreements and the Collateral Documents, or the satisfaction of any conditions precedent contained in this Indenture, the Intercreditor Agreements and any Collateral Documents.  The Notes Collateral Agent shall not be required to initiate or conduct any litigation or collection or other proceeding under this Indenture, the Intercreditor Agreements and the Collateral Documents unless expressly set forth hereunder or thereunder.  The Notes Collateral Agent shall have the right at any time to seek instructions from the Holders with respect to the administration of this Indenture, the Collateral Documents and the Intercreditor Agreements.

(r)  The parties hereto and the Holders hereby agree and acknowledge that neither the Notes Collateral Agent nor the Trustee shall assume, be responsible for or otherwise be obligated for any liabilities, claims, causes of action, suits, losses, allegations, requests, demands, penalties, fines, settlements, damages (including foreseeable and unforeseeable), judgments, expenses and costs (including but not limited to, any remediation, corrective action, response, removal or remedial action, or investigation, operations and maintenance or monitoring costs, for personal injury or property damages, real or personal) of any kind whatsoever, pursuant to any environmental law as a result of this Indenture, the Intercreditor Agreements, the Collateral Documents or any actions taken pursuant hereto or thereto.  Further, the parties hereto and the Holders hereby agree and acknowledge that in the exercise of its rights under this Indenture, the Intercreditor Agreements and the Collateral Documents, the Notes Collateral Agent may hold or obtain indicia of ownership primarily to protect the security interest of the Notes Collateral Agent in the Collateral and that any such actions taken by the Notes Collateral Agent shall not be construed as or otherwise constitute any participation in the management of such Collateral.  In the event that the Notes Collateral Agent or the Trustee is required to acquire title to an asset for any reason, or take any managerial action of any kind in regard thereto, in order to carry out any fiduciary or trust obligation for the benefit of another, which in either of the Notes Collateral Agent or the Trustee's sole discretion may cause the Notes Collateral Agent or the Trustee, as applicable, to be considered an "owner or operator" under the provisions of the Comprehensive Environmental Response, Compensation and Liability Act ("**CERCLA**"), 42 U.S.C. §9601, et seq., or otherwise cause the Notes Collateral Agent or the Trustee to incur liability under CERCLA or any other federal, state or local law, each of the Notes Collateral Agent and the Trustee

127

reserves the right, instead of taking such action, to either resign as the Notes Collateral Agent or the Trustee or arrange for the transfer of the title or control of the asset to a court-appointed receiver. Neither the Notes Collateral Agent nor the Trustee shall be liable to the Company, the Note Guarantors or any other Person for any environmental claims or contribution actions under any federal, state or local law, rule or regulation by reason of either of the Notes Collateral Agent's or the Trustee's actions and conduct as authorized, empowered and directed hereunder or relating to the discharge, release or threatened release of hazardous materials into the environment. If at any time it is necessary or advisable for property to be possessed, owned, operated or managed by any Person (including the Notes Collateral Agent or the Trustee) other than the Company or the Note Guarantors, a majority in interest of Holders shall direct the Notes Collateral Agent or the Trustee to appoint an appropriately qualified Person (excluding the Notes Collateral Agent or the Trustee) who they shall designate to possess, own, operate or manage, as the case may be, the property.

(s)        Upon the receipt by the Notes Collateral Agent of a written request of the Company signed by an Officer (a "**Collateral Document Order**"), the Notes Collateral Agent is hereby authorized to execute and enter into, and shall execute and enter into, without the further consent of any Holder or the Trustee, any Collateral Document to be executed after the Issue Date. Such Collateral Document Order shall (i) state that it is being delivered to the Notes Collateral Agent pursuant to, and is a Collateral Document Order referred to in, this Section 18.07(s), and (ii) instruct the Notes Collateral Agent to execute and enter into such Collateral Document. Any such execution of a Collateral Document shall be at the direction and expense of the Company, upon delivery to the Notes Collateral Agent of an Officer's Certificate stating that all conditions precedent to the execution and delivery of the Collateral Document have been satisfied. The Holders, by their acceptance of the Notes, hereby authorize and direct the Notes Collateral Agent to execute such Collateral Documents.

(t)        Subject to the provisions of the applicable Collateral Documents and the Intercreditor Agreements, each Holder, by acceptance of the Notes, agrees that the Notes Collateral Agent shall execute and deliver the Intercreditor Agreements and the Collateral Documents to which it is party and all agreements, documents and instruments incidental thereto, and act in accordance with the terms thereof. For the avoidance of doubt, the Notes Collateral Agent shall have no discretion under this Indenture, the Intercreditor Agreements or the Collateral Documents and shall not be required to make or give any determination, consent, approval, request or direction without the written direction of the Holders of a majority in aggregate principal amount of the then outstanding Notes or the Trustee, as applicable.

(u)        After the occurrence and continuance of an Event of Default, the Trustee, acting at the direction of the Holders of a majority of the aggregate principal amount of the Notes then outstanding, may direct the Notes Collateral Agent in connection with any action required or permitted by this Indenture, the Collateral Documents or the Intercreditor Agreements.

(v)        The Notes Collateral Agent is authorized to receive any funds for the benefit of itself, the Trustee and the Holders distributed under the Collateral Documents or the Intercreditor Agreements and to the extent not prohibited under the Intercreditor Agreements, for turnover to the Trustee to make further distributions of such funds to itself, the Trustee and the Holders in accordance with the provisions of Section 6.05 and the other provisions of this Indenture.

(w)        In each case that the Notes Collateral Agent may or is required hereunder or under any Collateral Document or any Intercreditor Agreement to take any action (an "**Action**"), including without limitation to make any determination, to give consents, to exercise rights, powers or remedies, to release or sell Collateral or otherwise to act hereunder or under any Collateral Document or any Intercreditor Agreement, the Notes Collateral Agent may seek direction from the Holders of a majority in aggregate principal amount of the then outstanding Notes. The Notes Collateral Agent shall not be liable with respect to any Action taken or omitted to be taken by it in accordance with the direction from the Holders of a majority in aggregate principal amount of the then outstanding Notes. If the Notes Collateral Agent shall request direction from the Holders of a majority in aggregate principal amount of the then outstanding Notes with respect to any Action, the Notes Collateral Agent shall be entitled to refrain from such Action unless and until the Notes Collateral Agent shall have received direction from the Holders of a majority in

aggregate principal amount of the then outstanding Notes, and the Notes Collateral Agent shall not incur liability to any Person by reason of so refraining.

(x)     Notwithstanding anything to the contrary in this Indenture or in any Collateral Document or any Intercreditor Agreement, in no event shall the Notes Collateral Agent or the Trustee be responsible for, or have any duty or obligation with respect to, the recording, filing, registering, perfection, protection or maintenance of the security interests or Liens intended to be created by this Indenture, the Collateral Documents or the Intercreditor Agreements (including without limitation the filing or continuation of any UCC financing or continuation statements or similar documents or instruments), nor shall the Notes Collateral Agent or the Trustee be responsible for, and neither the Notes Collateral Agent nor the Trustee makes any representation regarding, the validity, effectiveness or priority of any of the Collateral Documents or the security interests or Liens intended to be created thereby.

(y)     Before the Notes Collateral Agent acts or refrains from acting in each case at the request or direction of the Company or the Note Guarantors, it may require an Officer's Certificate and an Opinion of Counsel, which shall conform to the provisions of this <u>Section 18.07</u> and <u>Section 17.05</u>; *provided* that no Officer's Certificate or Opinion of Counsel shall be required in connection with the Collateral Documents, the Pari Passu Intercreditor Agreement and the ABL North America Intercreditor Agreement to be entered by the Notes Collateral Agent on the Issue Date.  The Notes Collateral Agent shall not be liable for any action it takes or omits to take in good faith in reliance on such certificate.

(z)     Notwithstanding anything to the contrary contained herein, the Notes Collateral Agent shall act pursuant to the instructions of the Holders and the Trustee with respect to the Collateral Documents and the Collateral.

(aa)     The rights, privileges, benefits, immunities, indemnities and other protections given to the Trustee are extended to, and shall be enforceable by, the Notes Collateral Agent as if the Notes Collateral Agent were named as the Trustee herein and the Collateral Documents were named as this Indenture herein.

(bb)     [Reserved.]

(cc)     Section 7.06 of this Indenture shall apply *mutatis mutandis* to the Notes Collateral Agent in its capacity as such.

[*Remainder of page intentionally left blank*]

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as of the date first written above.

**INVACARE HOLDINGS CORPORATION**

By:  _____
     Name:
     Title:


**GLAS TRUST COMPANY LLC**, as Trustee

By:  _____
     Name:
     Title:


**GLAS TRUST COMPANY LLC**, as Notes
     Collateral Agent

By:  _____
     Name:
     Title:

**INVACARE CORPORATION**
**FREEDOM DESIGNS, INC.**
**MEDBLOC, INC.**
**ADAPTIVE SWITCH LABORATORIES,**
**INC.**
**INVACARE CREDIT CORPORATION**
**INVACARE HOLDINGS, LLC**
**INVAMEX HOLDINGS LLC**


By: _____
Name:
Title:

131

**CARROLL HEALTHCARE GENERAL PARTNER, INC.**

By: _____
Name:
Title:

**INVACARE CANADA GENERAL PARTNER INC.**

By: _____
Name:
Title:

**CARROLL HEALTHCARE INC.**

By: _____
Name:
Title:

**INVACARE CANADA L.P.**

By:  Invacare Canada General Partner Inc.
Its:  General Partner

By: _____
Name:
Title:

**MOTION CONCEPTS L.P.**

By:  Carroll Healthcare Inc.
Its:  General Partner

By: _____
Name:
Title:

**PERPETUAL MOTION ENTERPRISES LIMITED**

By: _____
Name: Kathleen P. Leneghan
Title:   Vice President and Treasurer

#96781386v10

**INVACARE FRANCE OPERATIONS SAS**

By: _____
Name:
Title:

**INVACARE POIRIER SAS**

By: _____
Name:
Title:

**INVACARE HOLDINGS S.À R.L.**
*Société à responsabilité limitée*
Registered Office: 6, rue Eugène Ruppert,
L-2453 Luxembourg,
Grand Duchy of Luxembourg
RCS Number: B169438


By: _____
Name:
Title:


By: _____
Name:
Title:

**INVACARE HOLDINGS TWO S.À R.L.**
*Société à responsabilité limitée*
Registered Office: 6, rue Eugène Ruppert,
L-2453 Luxembourg,
Grand Duchy of Luxembourg
RCS Number: B169458


By: _____
Name:
Title:


By: _____
Name:
Title:

**INVACARE HOLDINGS C.V.**

By: Invacare Holdings, LLC
Its: General Partner

By: _____
Name:
Title:

**INVACARE HOLDINGS TWO B.V.**


By: _____
Name:
Title:

Invacare **B.V.**


By: _____
Name:
Title:


**INVACARE UK OPERATIONS LIMITED**


By: _____

Name:
Title:

**INVACARE LIMITED**

By: _____
Name:
Title:

**INVACARE VERWALTUNGS GMBH**

By: _____
Name:
Title:

**INVACARE A/S**

By: _____
Name:
Title:

**INVACARE HOLDING AS**

By: _____
Name:
Title:

**INVACARE AS**

By: _____
Name:
Title:

136

**INVACARE AUSTRALIA PTY LTD**


By: _____
Name:
Title:


**INVACARE NEW ZEALAND**


By: _____
Name:
Title:

**INVACARE AG**

By: _____
Name:
Title:


**ALBER GMBH**

By:
Name:
Title:


**INVACARE INTERNATIONAL GMBH**

By:
Name:
Title:

ANNEX A

Limitation on Note Guarantor Liability – Germany

*Section 13.03(c). Germany*. In respect of the Guarantee given by a German Note Guarantor (as defined below), the following provisions shall apply:

(a) Definitions

"AG" means (i) a stock corporation (*Aktiengesellschaft, AG*) incorporated under German law and/or (ii) a limited partnership (*Kommanditgesellschaft*) with a stock corporation (*Aktiengesellschaft, AG*) as general partner (*Komplementär*).

"AG Guarantor" means any Note Guarantor which is an AG, any SE Guarantor and any KGaA Guarantor.

"AktG" means the German Stock Corporation Act (*Aktiengesetz, AktG*).

"Auditor's Determination" means the determination pursuant to paragraph (c)(iv) below.

"BGB" means the German Civil Code (*Bürgerliches Gesetzbuch, BGB*).

"DPLA" means a domination and/or profit and loss pooling agreement (*Beherrschungs- und/oder Gewinnabführungsvertrag*) as defined in § 291 (1) AktG.

"EU Guarantor" means any limited liability company (or limited partnership with a limited liability company as its general partner) incorporated in a jurisdiction other than Germany whose centre of main interest (as that term is used in Article 3(1) of Regulation (EU) No. 2015/848 of 20 May 2015 on Insolvency Proceedings) is in Germany.

"German Note Guarantor" means any AG Guarantor, any GmbH Guarantor and any EU Guarantor.

"GmbH" means (i) a limited liability company (*Gesellschaft mit beschränkter Haftung, GmbH*) incorporated under German law and/or (ii) a limited partnership (*Kommanditgesellschaft*) with a limited liability company (*Gesellschaft mit beschränkter Haftung, GmbH*) as general partner (*Komplementär*).

"GmbH Capital Impairment" means the GmbH Net Assets of a GmbH Guarantor falling below the amount (*Entstehung einer Unterbilanz*) required to maintain that GmbH Guarantor's registered share capital (*Stammkapital*) or an increase of an existing shortage (*Vertiefung einer Unterbilanz*) of its registered share capital (*Stammkapital*) and thereby violating §§ 30, 31 GmbHG.

"GmbH Guarantor" means a Note Guarantor which is a GmbH.

"GmbH Net Assets" means the net assets (*Reinvermögen*) of a GmbH Guarantor calculated in accordance with § 42 GmbHG, §§ 242, 264 HGB and the generally accepted accounting principles applicable (*Grundsätze ordnungsgemäßer Buchführung*) from time to time in Germany as adjusted pursuant to paragraph (c)(vi) below.

"GmbHG" means the German Limited Company Act (*Gesetz betreffend die Gesellschaften mit beschränkter Haftung, GmbHG*).

"HGB" means the German Commercial Code (*Handelsgesetzbuch, HGB*).

"InsO" means the German Insolvency Code (*Insolvenzordnung, InsO*).

#96781386v10

"KGaA" means a Note Guarantor which is a partnership limited by shares (*Kommanditgesellschaft auf Aktien, KGaA*).

"KGaA Guarantor" means a Note Guarantor which is a KGaA.

"Limited Obligation" means any guarantee and any other liability, indemnity or other payment obligation under this Indenture or any other provision of the Notes Documents.

"Limited Upstream Obligation" means any Limited Obligation if and to the extent such Limited Obligation secures or relates to liabilities which are owed by direct or indirect shareholders of the relevant Note Guarantor (upstream) or Subsidiaries of such shareholders (such Subsidiaries not to include the relevant Note Guarantor and the Subsidiaries of that relevant Note Guarantor) (cross-stream).

"Liquidity Impairment" means a German Note Guarantor being deprived of the liquidity necessary to fulfil its liabilities towards its creditors and thereby violating § 15b (5) InsO.

"Management Notification" means the notification pursuant to paragraph (c)(iii) below.

"SE" means a European company (*Europäische Gesellschaft, SE*) incorporated under German law.

"SE Guarantor" means a Note Guarantor which is (i) an SE and/or (ii) a limited partnership (*Kommanditgesellschaft*) with a SE as general partner (*Komplementär*).

"SE Regulation" means Council Regulation (EC) No 2157/2001 of 8 October 2001 on the Statute for a European company (SE).

(b)   AG Guarantee Limitation Language

   (i)   Save as set out otherwise in this paragraph (b), the Holders, Trustee and/or the Notes Collateral Agent shall not enforce, and any AG Guarantor shall have a defence (*Einrede*) against any Limited Upstream Obligation of such AG Guarantor or of any Note Guarantor that is a subsidiary of such AG Guarantor.

   (ii)   Any Limited Upstream Obligation granted by such AG Guarantor or by any Subsidiary of that AG Guarantor shall be enforceable (*vollstreckbar*) if a DPLA is in force between the relevant AG Guarantor and a direct shareholder (with the direct shareholder as dominating party) provided that:

      (A)   the mere existence of a DPLA between the relevant AG Guarantor and a direct shareholder (with the direct shareholder as dominating party) leads to the inapplicability of § 57 (1) and § 71a AktG (in connection with § 278 (3) AktG and/or Art. 5 SE Regulation with respect to the relevant payments under the Limited Upstream Obligation; or

      (B)   the loss compensation claim (*Verlustausgleichsanspruch*) of the AG Guarantor under the DPLA would be, or can be expected to be, fully valuable and recoverable (*vollwertig*) in the balance sheet of the AG Guarantor.

   (iii)   Any Limited Upstream Obligation granted by such AG Guarantor or by any Subsidiary of that AG Guarantor shall be enforceable (*vollstreckbar*) if and to the extent such Limited Upstream Obligation is covered (*gedeckt*) by a fully valuable and recoverable consideration or recourse claim (*vollwertiger Gegenleistungs- oder Rückgewähranspruch*) of the AG Guarantor against the affiliate whose obligations are secured by the relevant Limited Upstream

Annex A-2

Obligation and would therefore not lead to a violation of § 57 (1) AktG (in connection with § 278 (3) AktG and/or Art. 5 SE Regulation, as applicable), in each case unless it would lead to a violation of § 71a AktG.

(iv) Any Limited Upstream Obligation granted by such AG Guarantor or by any Subsidiary of that AG Guarantor shall be enforceable (*vollstreckbar*) if and to the extent:

(A) an amount received under this Indenture is applied for the repayment, prepayment or other refinancing of any financial indebtedness of such AG Guarantor or Subsidiary of such AG Guarantor; and

(B) such exception does not lead to a violation of § 57 (1) or § 71a AktG (in connection with § 278 (3) AktG and/or Art. 5 SE Regulation, as applicable).

(c) GmbH Guarantee Limitation Language

(i) Save as set out in this paragraph (c), the Holders, Trustee and/or the Notes Collateral Agent shall not enforce, and any GmbH Guarantor (and/or the relevant subsidiary of a GmbH Guarantor) shall have a defense (*Einrede*) against, any Limited Upstream Obligation if and to the extent a discharge (*Erfüllung*) or enforcement (*Vollstreckung*) in respect of a Limited Upstream Obligation would cause a GmbH Capital Impairment to occur.

(ii) The restrictions in paragraph (i) shall not apply:

(A) if and to the extent the Limited Upstream Obligation of the GmbH Guarantor secures any indebtedness under any Notes Document in respect of:

(1) loans to the extent such loans are (directly or indirectly) on-lent or otherwise passed on to the relevant GmbH Guarantor or its Subsidiaries; or

(2) bank guarantees or letters of credit that are issued for the benefit of any of the creditors of the GmbH Guarantor or the GmbH Guarantor's Subsidiaries,

in each case, to the extent that any such on-lending or otherwise passing on or bank guarantees or letters of credit are still outstanding at the time of the enforcement of the relevant Limited Upstream Obligation; for the avoidance of doubt, nothing in this paragraph (ii) shall have the effect that such on-lent amounts may be enforced multiple times (no double dip);

(B) if, at the time of enforcement of the Limited Upstream Obligation, a DPLA (either directly or indirectly through an unbroken chain of domination and/or profit transfer agreements) exists between any of its direct or, where applicable, indirect shareholders as dominating company (*herrschendes Unternehmen*) and the relevant GmbH Guarantor as a dominated company (*beherrschtes Unternehmen*), provided that:

        (1)       the GmbH Guarantor is a Subsidiary of the relevant Note Party whose obligations are secured by the relevant Limited Upstream Obligation; or

        (2)       the GmbH Guarantor and the relevant Note Party whose obligations are secured by the relevant Limited Upstream Obligation are both Subsidiaries of a joint (direct or indirect) parent company and such parent company as dominating entity (*beherrschendes Unternehmen*),

in each case to the extent the relevant GmbH Guarantor has a fully valuable recourse claim (*vollwertiger Verlustausgleichsanspruch*) against the dominating company, unless and to the extent the existence of such DPLA alone (e.g., without a fully recoverable recourse claim) results in the inapplicability of § 30 (1) sentence 1 GmbHG) with respect to the relevant payments under the Limited Upstream Obligation;

    (C)      if and to the extent any payment under the Limited Upstream Obligation is covered (*gedeckt*) by a fully valuable and recoverable consideration or recourse claim (*vollwertiger Gegenleistungs- oder Rückgewähranspruch*) of the GmbH Guarantor against the relevant Note Party whose obligations are secured by the relevant Limited Upstream Obligation; or

    (D)      if the relevant GmbH Guarantor has not complied with its obligations pursuant to paragraphs (iii) and/or (iv) (as applicable) below; however, if and to the extent that the relevant Limited Upstream Obligation has been enforced without regard to the restrictions contained in this paragraph (c) because the Management Notification and/or the Auditor's Determination has not (or not in a timely manner) been delivered pursuant to paragraphs (iii) and/or (iv) (as applicable) below, but the Auditor's Determination has then been delivered within three months from its due date in accordance with paragraph (iv) below, the Holders, Trustee and/or the Notes Collateral Agent shall upon demand of the GmbH Guarantor to the Notes Collateral Agent repay any amount received from the GmbH Guarantor which pursuant to the Auditor's Determination would not have been available for enforcement, if the Auditor's Determination had been delivered in a timely manner.

(iii)    If the relevant GmbH Guarantor does not notify the Trustee within fifteen (15) Business Days after the making of a demand against that GmbH Guarantor under the relevant Limited Upstream Obligation:

    (A)      to what extent such Limited Upstream Obligation is an upstream or cross-stream guarantee or indemnity; and

    (B)      to what extent a GmbH Capital Impairment would occur as a result of an enforcement of the Limited Upstream Obligation (setting out in reasonable detail the amount of its GmbH Net Assets, providing an up-to-date pro forma balance sheet),

then the restrictions set out in paragraph (c)(i) above shall cease to apply until a Management Notification has been provided.

Annex A-4

(iv)    If the Trustee (acting at the direction of the Required Holders) disagrees with the Management Notification, it may within twenty (20) Business Days of its receipt, request the relevant GmbH Guarantor to provide to the Trustee within forty (40) Business Days of receipt of such request a determination by the any auditors of international standard and reputation appointed by the GmbH Guarantor (at the cost and expense of such GmbH Guarantor) setting out in reasonable detail the amount in which the payment under the Limited Upstream Obligation would cause a GmbH Capital Impairment subject to the terms set out under this paragraph (c). Save for manifest errors, the Auditor's Determination shall be binding on all parties.

(v)    If, after it has been provided with an Auditor's Determination which prevented it from demanding any or only partial payment under the Limited Upstream Obligation, the Trustee ascertains in good faith that the financial conditions of the GmbH Guarantor as set out in the Auditor's Determination has substantially improved, the Trustee (acting reasonably) may, at the GmbH Guarantor's cost and expense, arrange for the preparation of an updated balance sheet of the GmbH Guarantor by applying the same principles that were used for the preparation of the Auditor's Determination by the auditors who prepared the Auditor's Determination in order for such auditors to determine whether (and, if so, to what extent) the GmbH Capital Impairment has been cured as a result of the improvement of the financial condition of the GmbH Guarantor. The Trustee may not arrange for the preparation of an Auditor's Determination prior to the expiry of three months from the date of the issuance of the preceding Auditor's Determination. The Trustee may only demand payment under the Limited Upstream Obligation to the extent the auditors determine that the GmbH Capital Impairment have been cured.

(vi)    The GmbH Net Assets shall be adjusted as follows:

(A)    the amount of any increase in the registered share capital of the relevant GmbH Guarantor which was carried out after the relevant GmbH Guarantor became a party to this Indenture and made from retained earnings (*Kapitalerhöhung aus Gesellschaftsmitteln*) shall be deducted from the amount of the registered share capital (*Stammkapital*) of the relevant GmbH Guarantor if it is in breach of the terms of the Notes Documents and has been carried out without the prior written consent of the Trustee (acting on instructions from the relevant Secured Parties);

(B)    the amount of non-distributable assets according to § 253 (6) HGB shall not be included in the calculation of GmbH Net Assets;

(C)    the amount of non-distributable assets according to § 268 (8) HGB shall not be included in the calculation of GmbH Net Assets;

(D)    the amount of non-distributable assets according to § 272 (5) HGB shall not be included in the calculation of GmbH Net Assets; and

(E)    loans or other liabilities incurred by the relevant GmbH Guarantor in willful or grossly negligent violation of the Notes Documents shall not be taken into account as liabilities.

(vii)    Where a GmbH Guarantor claims in accordance with the provisions of this paragraph (c) that the Note Guarantee can only be enforced in a limited amount, it shall promptly realize, to the extent lawful and within reasonable opinion

Annex A-5

commercially justifiable, any and all of its assets that are shown in the balance sheet with a book value (*Buchwert*) that is significantly lower than the market value of the assets and are not necessary for the relevant GmbH Guarantor's business (*nicht betriebsnotwendig*).

(d)   Liquidity Impairment Limitation Language

(i)   Save as set out in this paragraph (d), the Holders, Trustee and/or Notes Collateral Agent shall not enforce, and any German Note Guarantor shall have a defence (*Einrede*) against, any Limited Upstream Obligation if and to the extent a payment and/or enforcement in respect of a Limited Upstream Obligation would cause a Liquidity Impairment for such German Note Guarantor.

(ii)   Paragraphs (c)(iii), (c)(iv) and (c)(vii) above (including the repayment contemplated in (c)(ii)(D) above) shall apply *mutatis mutandis* to the restriction in paragraph (i) above.

(e)   Where the provisions of this Section 13.03(c) apply to a limited partnership (*Kommanditgesellschaft*), all references to the assets of a German Note Guarantor shall *mutatis mutandis* include a reference to the assets of the general partner (*Komplementär*) of such limited partnership (*Kommanditgesellschaft*).

(f)   In addition to the restrictions set out in paragraphs (b) through (e) above, the right to enforce the Limited Upstream Obligation against a German Note Guarantor shall be limited if and to the extent that if a German Note Guarantor demonstrates that, according to the decisions of the German Federal Supreme Court (*Bundesgerichtshof*) or a higher regional court of appeals (*Oberlandesgericht*), the granting or the enforcement of the Limited Upstream Obligation would otherwise (A) trigger (1) a violation of such German Note Guarantor's obligations pursuant to §§ 30, 31 of the GmbHG or § 57 (1) and § 71a AktG (in connection with § 278 (3) AktG), and/or (2) a direct violation of § 826 BGB, and (B) result in any managing director (*Geschäftsführer*) or director(s) (*Vorstände*) of the German Note Guarantor becoming personal liable pursuant to the applicable provisions of the GmbHG or the AktG and the German Note Guarantor shall have a defense (*Einrede*) against any claim under the Limited Upstream Obligation to the extent required in order not to incur such liability.

(g)   For the avoidance of doubt, the validity and enforceability of any Limited Upstream Obligation granted by a German Note Guarantor or of any subsidiary of a German Note Guarantor in respect of any borrowing liabilities which are owed by a German Note Guarantor or any of its subsidiaries shall not be limited under this Section 13.03(c).

(h)   Nothing in this Section 13.03(c) shall prevent the Trustee or Notes Collateral Agent or a German Note Guarantor from claiming in court that payments under and/or an enforcement of the Limited Upstream Obligations do or do not fall within the scope of §§ 30, 31, 43 GmbHG, §§ 57, 71a, 93, 278 (3) AktG, § 15b (5) InsO, Art. 5 SE Regulation and/or § 826 BGB (as applicable).

(i)   Nothing in this Section 13.03(c) shall constitute a waiver (*Verzicht*) of any right granted under this Indenture or any other Notes Document to the Holders, Trustee or Notes Collateral Agent or *vice versa*.

(j)   Each reference in this Section 13.03(c) to a statutory provision shall be construed to be a reference to the relevant equivalent statutory provision (if any) as amended, re-enacted or replaced from time to time.

(k)   Notwithstanding anything to the contrary in this Indenture, this Section 13.03(c) and any rights and/or obligations arising out of it shall be governed by, and construed in accordance with, German law.

ANNEX B

Limitation on Note Guarantor Liability – Switzerland

*Section 13.03(d). Switzerland.* In respect of the Guarantee given by a Note Guarantor incorporated in Switzerland (each a "**Swiss Note Guarantor**"), the following provisions shall apply:

(a)     If and to the extent a Swiss Note Guarantor becomes liable under this Indenture or any other Notes Document for obligations of any other Note Party (other than the wholly owned direct or indirect subsidiaries of such Swiss Note Guarantor) (the "**Restricted Obligations**") and if complying with such obligations would constitute a repayment of capital (*Einlagerückgewähr*), a violation of the legally protected reserves (*gesetzlich geschützte Reserven*) or a (constructive) repayment of statutory capital reserves (*Rückzahlung der gesetzlichen Kapitalreserve*) or the payment of a (constructive) dividend (*Gewinnausschüttung*) by such Swiss Note Guarantor or would otherwise be restricted under Swiss law and practice then applicable, such Swiss Note Guarantor's aggregate liability for Restricted Obligations shall not exceed the amount of the Swiss Note Guarantor's freely disposable equity at the time it becomes liable (the "**Freely Disposable Amount**").

(b)     This limitation shall only apply to the extent it is a requirement under applicable law at the time the Swiss Note Guarantor is required to perform Restricted Obligations under the Notes Documents. Such limitation shall not free the Swiss Note Guarantor from its obligations in excess of the Freely Disposable Amount, but merely postpone the performance date thereof until such times when the Swiss Note Guarantor has again freely disposable equity and if and to the extent such freely disposable equity is available.

(c)     If the enforcement of the obligations of the Swiss Note Guarantor under this Indenture or any other Notes Document would be limited due to the effects referred to in this Annex B, the Swiss Note Guarantor shall further, to the extent permitted by applicable law and Swiss accounting standards and upon request by the Trustee (acting at the direction of the Required Holders), (i) write up or sell any of its assets that are shown in its balance sheet with a book value that is significantly lower than the market value of the assets, in case of sale, however, only if such assets are not necessary for the Swiss Note Guarantor's business (*nicht betriebsnotwendig*) and (ii) reduce its share capital to the minimum allowed under then applicable law, provided that such steps are permitted under the Notes Documents.

(d)     The Swiss Note Guarantor shall take and cause to be taken all and any action, to the extent reasonably practical and possible, including, without limitation, (i) the passing of any shareholders' resolutions to approve any payment or other performance under this Indenture or any other Notes Documents, (ii) the provision of an audited interim balance sheet, (iii) the provision of a confirmation from the auditors of the Swiss Note Guarantor that a payment of the Swiss Note Guarantor under the Notes Document in an amount corresponding to the Freely Disposable Amount is in compliance with the provisions of Swiss corporate law which are aimed at protecting the share capital and legal reserves, in order to allow a prompt payment of amounts owed by the Swiss Note Guarantor under the Notes Documents as well as the performance by the Swiss Note Guarantor of other obligations under the Notes Documents.

(e)     If so required under applicable law (including tax treaties) at the time it is required to make a payment under this Indenture or any other Notes Document, the Swiss Note Guarantor:

(i)     shall use its best efforts to ensure that such payments can be made without deduction of Swiss Withholding Tax, or with deduction of Swiss Withholding Tax at a reduced rate, by discharging the liability to such tax by notification pursuant to applicable law (including tax treaties) rather than payment of the tax;

(ii)     shall deduct the Swiss Withholding Tax at such rate (being 35% on the date hereof) as in force from time to time or as provided by any applicable double tax treaties, if the

notification procedure pursuant to sub-paragraph (a) above does not apply; or shall deduct the Swiss Withholding Tax at the reduced rate resulting after discharge of part of such tax by notification if the notification procedure pursuant to sub-paragraph (a) applies for a part of the Swiss Withholding Tax only; and shall pay within the time allowed any such taxes deducted to the Swiss Federal Tax Administration; and

(iii)     shall promptly notify the Trustee that such notification or, as the case may be, deduction has been made, and provide the Trustee with evidence that such a notification of the Swiss Federal Tax Administration has been made or, as the case may be, such taxes deducted have been paid to the Swiss Federal Tax Administration.

(f)     In the case of a deduction of Swiss Withholding Tax, the Swiss Note Guarantor shall use its best efforts to ensure that any person that is entitled to a full or partial refund of the Swiss Withholding Tax deducted from such payment under this Indenture or any other Notes Document, will, as soon as possible after such deduction:

(i)     request a refund of the Swiss Withholding Tax under applicable law (including tax treaties), and

(ii)     pay to the Trustee upon receipt any amount so refunded.

(g)     The Trustee shall reasonably co-operate with the Swiss Note Guarantor to secure such refund.

**ANNEX C**

Limitation on Note Guarantor Liability – France

*Section 13.03(e). France.* In respect of the Guarantee given by any guarantor incorporated in France (the "**French Note Guarantor**"), the following provisions shall apply:

(a)       the obligations and liabilities of any French Note Guarantor under the Notes Documents will not include any obligation or liability which, if incurred, would constitute financial assistance within the meaning of article L. 225-216 of the French Code de commerce and/or a misuse of assets and/or abuse of power, within the meaning of articles L. 241-3, L. 242-6, and L. 244-1 of the French *Code de commerce* or any other law or regulation having the same effect or any interpretation of such laws and/or regulations by the French courts (as the case may be);

(b)       notwithstanding any other provisions to the contrary in any Notes Document, in respect of  the Company, the aggregate liability and exposure of such French Note Guarantor under this Indenture shall be limited at any time to the amount (if any) equal to the aggregate of all amounts borrowed directly or indirectly by the Company under this Indenture to the extent any such amount(s) is(are) on-lent (directly or indirectly) or otherwise made available to the relevant French Guarantor or its direct or indirect Subsidiaries (including, but not limited to, by way of intercompany loan agreements or similar arrangements whether direct or indirect) and which is outstanding on the date a payment is to be made in respect of the Company by the relevant French Guarantor under this Indenture (it being specified that any payment made by the French Guarantor under this Indenture in respect of the Company's payment obligations under this Indenture shall automatically extinguish, *pro tanto*, the payment obligations under the relevant intercompany loan agreements or similar arrangements referred to above *pro tanto*).]

(c)       For the purposes of this Annex C, "**Subsidiary**" means, in relation to any company, another company which is controlled by it within the meaning of article L. 233-3 of the French *Code de commerce*.

(d)       It is acknowledged that such French Note Guarantor is not acting jointly and severally with the other Guarantors and shall not be considered as "*co-débiteur solidaire*" as to their obligations pursuant to the guarantees provided by such French Note Guarantor.

#96781386v10

**ANNEX D**

Limitation on Note Guarantor Liability – Luxembourg

*Section 13.03(f). Luxembourg.*

(a)     Notwithstanding anything to the contrary in this Indenture, the guarantee granted by any Note Guarantor existing under the laws of Luxembourg (a "**Luxembourg Note Guarantor**") under this Article 13 or any other Notes Documents, the Other Senior Secured Convertible Notes Documents the Foreign Guarantee Agreement and any other Loan Documents shall be limited at any time to an aggregate amount not exceeding the higher of:

(1)     95 per cent. of such Luxembourg Note Guarantor's *capitaux propres* (as referred to in article 34 of the Luxembourg law dated 19 December 2002 on the commercial register and annual accounts, as amended, and as implemented by the Grand-Ducal regulation dated 18 December 2015 setting out the form and the content of the presentation of the balance sheet and profit and loss account) (the "Own Funds") as determined as at the date on which a demand is made under the guarantee, increased by the amount of any Luxembourg Intra-Group Liabilities; or

(2)     95 per cent. of such Luxembourg Note Guarantor's Own Funds determined as at the date of this Indenture or as at the date it becomes a party to this Indenture, as applicable, increased by the amount of any Luxembourg Intra-Group Liabilities,

in each case, as determined on the basis of the then most recent annual accounts of the Luxembourg Guarantor.

(b)     For the purpose of this Clause 13.03(f), "Luxembourg Intra-Group Liabilities" shall mean any amounts owed by the Luxembourg Note Guarantor to any other member of its corporate group and that have not been financed (directly or indirectly) by any issuance under any Notes Document.

(c)     The limitation set out in paragraph (a) above shall not apply:

(1)     in respect of any amounts due under the Notes Documents by a Note Party which is a Subsidiary of that Luxembourg Note Guarantor; and

(2)     in respect of any amounts due under the Notes Documents by a Note Party which is not a Subsidiary of that Luxembourg Note Guarantor and which have been on-lent to or made available by whatever means, directly or indirectly, to that Luxembourg Note Guarantor or any of its Subsidiaries.

#96781386v10

**ANNEX E**

Limitation on Note Guarantor Liability – England and Wales

*Section 13.03(g). England and Wales.*

The obligations and liabilities of each guarantee granted by any Note Guarantor existing under the laws of England and Wales (each, an "**English Note Guarantor**") under this Indenture and in connection with any other Notes Document (including any secured swap obligation) (the "English Guarantee Obligations") do not apply to any liability, and no security interest granted by an English Note Guarantor will secure any English Guarantee Obligation, to the extent that it would result in this Indenture and/or the Guarantee being illegal, in breach of law or regulation, or constituting unlawful financial assistance in any relevant jurisdiction (including, for the avoidance of doubt, within the meaning of sections 678 or 679 of the Companies Act 2006 applicable to each English Note Guarantor incorporated in England and Wales) concerning the financial assistance by that English Note Guarantor for the acquisition of, or subscription for, shares or concerning the protection of shareholders' capital, and any guarantee, indemnity, obligations and liabilities of each English Note Guarantor shall be construed accordingly.

#96781386v10

**ANNEX F**

Agreed Security Principles

**1.      Agreed Security Principles**

(a)      Subject to paragraph (b) below, the guarantees and security required to be provided under the Notes Documents (i) by any Note Guarantor incorporated in a Foreign Guarantor Jurisdiction (such term as defined below) (a "***Foreign Guarantor***") or (ii) over the Equity Interests of a Foreign Guarantor owned by any Note Party, will in each case, be given in accordance with the security principles set out in this Annex F (these "***Agreed Security Principles***"). This Annex F identifies the Agreed Security Principles and determines the extent and terms of the guarantees and security proposed to be provided  (x) by the Foreign Guarantors and (y) in respect of the Equity Interests of Foreign Guarantors owned by any Note Party in relation to the Notes and certain of the other Notes Obligations.

(b)      To the extent that an interpretation of these Agreed Security Principles or a determination is required to be made hereunder in connection with the delivery of guarantees and security or the terms of the guarantees and security, such determination will be made by the Company and the Required Holders and, with respect to any provisions relating to protections or obligations of the Notes Collateral Agent or the Trustee, the Notes Collateral Agent and the Trustee, respectively.  For the avoidance of doubt, neither the Notes Collateral Agent nor the Trustee shall have any obligation to ensure that the security and guarantees provided are consistent with these Agreed Security Principles, and the Notes Collateral Agent and Trustee shall be entitled to their own counsel in each foreign jurisdiction and the Company agrees to pay all fees and expenses related thereto.

**2.      Guarantees**

Subject to the guarantee limitations set out in the Notes Documents, including Annex A to Annex E of this Indenture, and with respect to the Foreign Guarantors, customary limitations in the relevant jurisdiction reasonably agreed by the Company and the Holders, each guarantee by a Foreign Guarantor will be an upstream, cross-stream and downstream guarantee for the Notes Obligations in accordance with, and subject to, the terms of these Agreed Security Principles in each relevant jurisdiction (references to "*security*" to be read for this purpose as including guarantees).  Security documents will secure the obligations and all liabilities of the Note Parties under the Notes Documents, in each case in accordance with, and subject to, the requirements of these Agreed Security Principles in each relevant jurisdiction.

**3.      Secured Liabilities**

(a)      Security documents will secure:

(i)      in the case of a Note Party, the borrowing and guarantee obligations of that Note Party under the Notes Documents; or

(ii)      in the case of a third party security provider or independent obligor, all liabilities of the Note Parties under the Notes Documents,

in each case in accordance with, and subject to, the terms of the Agreed Security Principles in each relevant jurisdiction.

**4.      Overriding Principle**

#96781386v10

(a)      The guarantees and security to be provided in respect of the Notes by Foreign Subsidiaries in accordance with these Agreed Security Principles are only to be given by Foreign Subsidiaries which are incorporated in England & Wales, France, Switzerland, Luxembourg, Germany, Denmark, Australia, New Zealand, Norway and the Netherlands (each a "***Foreign Guarantor Jurisdiction***") and no security or guarantees shall be required to be given by foreign entities not incorporated in Foreign Guarantor Jurisdictions or by (or shares or investments in) any joint venture or similar arrangement, any minority interest or any Foreign Guarantor that is not directly or indirectly wholly owned by the Company.

(b)      The parties agree that the overriding intention, subject to paragraph (a) above, is for security only to be granted by and shall be limited to a Foreign Guarantor which is incorporated in a Foreign Guarantor Jurisdiction in respect only over:

　　　　(A)      its material bank accounts (without control over use);

　　　　(B)      its tangible moveable property;

　　　　(C)      structural intra-group receivables owed by such Foreign Guarantor to any company that is also a Note Party;

　　　　(D)      intellectual property owned by such Foreign Guarantor incorporated in (1) England and Wales (a "***UK Guarantor***"), (2) Australia (an "***Australian Guarantor***") or (3) New Zealand (a "***New Zealand Guarantor***");

　　　　(E)      in the case of a UK Guarantor, Australian Guarantor or New Zealand Guarantor, as applicable, its insurance policies;

　　　　(F)      account and trade receivables owed to such Foreign Guarantor;

　　　　(G)      the shares owned in such Foreign Guarantor by its direct holding company provided that such direct holding company is also a Note Party and shares owned by such Foreign Guarantor in its direct subsidiaries;

　　　　(H)      in the case of a UK Guarantor, Australian Guarantor or New Zealand Guarantor, as applicable, its goodwill and uncalled capital;

　　　　(I)      all or substantially all of its assets by way of a qualifying floating charge (or equivalent) from any UK Guarantor, Australian Guarantor or New Zealand Guarantor, as applicable, and any Foreign Guarantor incorporated in a Foreign Guarantor Jurisdiction with a practical equivalent of an English law floating charge; and

　　　　(J)      in respect of a Foreign Guarantor incorporated in Norway, additional security will be granted, in the form of registered floating charges, over trade receivables (No. *factoringpant*), inventory (No. *varelagerpant*) and operating machinery (No. *driftstilbehørspant*) - and in each case as such asset classes are defined in the Norwegian Lien Act (No. *panteloven*),

(the "***Overriding Principle***") and that no other security shall be required to be given by any other Foreign Guarantor or any other person or in relation to any other asset.

#96781386v10

(c)     Without prejudice to paragraph (b) above, no guarantees shall be required to be granted by and no security shall be required to be granted by (i) any joint venture or similar arrangement, any minority interest, (ii) any member of the Group (as defined below) that is not directly or indirectly wholly owned by the Company or (iii) Equity Interests qualifying as Excluded Assets.

**5.**     **Governing Law and Jurisdiction of Security**

(a)     All security (other than share security) will be governed by the law of, and secure only assets located in, the jurisdiction of incorporation of the applicable grantor of the security (or in relation to any structural intra-group receivables only, the governing law of such intra-group receivable loan document).

(b)     Share security over any subsidiary will be governed by the law of the place of incorporation of that subsidiary.

(c)     Except in respect of share security and security in respect of intellectual property, no action in relation to security (including any perfection step, further assurance step, filing or registration) will be required in jurisdictions where the grantor of the security is not incorporated.

**6.**     **Terms of security documents**

The following principles will be reflected in the terms of any security taken in connection with the Notes:

(a)     security will, to the extent possible under local law, not be enforceable or, in the case of any floating charge constituted pursuant to any English security document or any other security document with a practical equivalent of an English law floating charge, crystallise until the occurrence of an Event of Default (an "***Applicable Event***") which is continuing;

(b)     unless as otherwise required by law (e.g. with respect to a power of attorney provided under any Swiss law governed security interests or the power of attorney for the purposes of the notarization of the equity pledge security of any Note Party incorporated or otherwise organized under the laws of Germany), the beneficiaries of the security or any agent will only be able to exercise a power of attorney and to exercise any withdrawal rights in respect of a secured asset following (1) the occurrence of an Applicable Event which is continuing or (2) if the relevant Note Party has failed to comply with its obligations under the relevant security documents within five Business Days of request;

(c)     the security documents should only operate to create security rather than to impose new commercial obligations or repeat clauses in other Notes Documents; accordingly:

     (i)     they should not contain additional representations, undertakings or indemnities (including in respect of insurance, information, maintenance or protection of assets or the payment of fees, costs and expenses) unless these are the same as or consistent with those contained in the Indenture or are required for the creation or perfection of security or customary in the relevant jurisdiction;

     (ii)     notwithstanding anything to the contrary in any security document, the terms of a security document shall not operate or be construed so as to prohibit or restrict any transaction, matter or other step not prohibited by the Notes Documents or where the applicable level of creditor consent required by the relevant Notes Document ("***Required Creditor Consent***") has been obtained and the Notes

Collateral Agent shall (pursuant to its authority under Section 18.02 of the Indenture) promptly following receipt of an officer's certificate of the type described in Section 18.02 enter into such documentation and/or take such other action as is required by a Foreign Guarantor that grants Collateral (a "***Chargor***") (acting reasonably) in order to facilitate any such transaction, matter or other step, including by way of executing any confirmation, consent to dealing, release or other similar or equivalent document, provided that any costs and expenses incurred by the Notes Collateral Agent entering into such documentation and/or taking such other action at the request of such Chargor pursuant to this paragraph shall be for the account of such Chargor, in accordance with the costs and expenses provisions set out in the Indenture and such provision shall be included in each security document; and

(iii)     the security documents should not operate so as to require additional consents or authorisations from the Holders unless these are the same as or consistent with those contained in the Indenture or are required for the creation or perfection of security;

(d)     security will, where possible and practical, automatically create security over future assets of the same type as those already secured; where local law requires supplemental pledges or notices to be delivered in respect of future acquired assets in order for effective security to be created over that class of asset, such supplemental pledges or notices will be provided only upon request of the Notes Collateral Agent or the Trustee (acting at the direction of Required Holders) and at intervals no more frequent than annually (unless required more frequently under local law or local market practice);

(e)     other than in the case of a German law security transfer agreement, information, such as lists of assets, will be provided if, and only to the extent, required by local law in the relevant jurisdiction to be provided to perfect or register the security or following an Applicable Event which is continuing to assist enforcement and, unless required to be provided by local law or local market practice more frequently, be provided annually (or, following an Applicable Event which is continuing, on the Notes Collateral Agent's or the Trustee's reasonable request (acting at the direction of Required Holders));

(f)     the security documents will provide that upon the occurrence of the satisfaction and discharge of the Indenture the Notes Collateral Agent shall, at the reasonable request of and the cost and expense of the Company, release, reassign or retransfer the respective asset or class of assets to the relevant Note Party, and shall take all actions and execute any and all documents as may be necessary or convenient to evidence the cancellation, release and termination of all guarantees and security pursuant to Section 18.02 of the Indenture without having to make or being deemed to make any representation or warranty, whether express or implied, with respect to any asset or class of assets so released;

(g)     unless required by local law or customary in the relevant jurisdiction, the circumstances in which the Collateral shall be released should not be dealt with in individual security documents but, if so required, shall, except to the extent required by local law, be the same as those set out in the Notes Documents;

(h)     each security document must contain a clause which records that if there is a conflict between the security document, the Indenture or any applicable Intercreditor Agreement then (to the fullest extent permitted by law) the provisions of the Indenture and the applicable Intercreditor Agreement will take priority over the provisions of the security document unless and to the extent it would prejudice the legality, creation, priority, perfection, validity or enforceability of such security document or the security created under the security document;

(i)     each of the security documents will, to the extent possible under local law, include a provision that provides that (i) all rights, protections, limitations on liability, exculpations and indemnifications provided or otherwise afforded to the Trustee and the Notes Collateral Agent under the Indenture, including, without limitation Articles 7 and 18 of the Indenture shall apply in all respects to the Notes Collateral Agent as chargee, security trustee or pledgee under the applicable security document, (ii) the applicable security document shall be subject to the provisions of Section 18.07(z) of the Indenture, which provisions shall apply to the applicable security document *mutatis mutandis* as though fully set forth therein, with each reference to the Company being read to include the applicable chargor or pledgor, (iii) the Notes Collateral Agent may act and exercise rights under the applicable security document, but shall not be obligated to act or exercise rights under the applicable  security documents (and shall not incur liability for failure to act or exercise rights)  unless directed in writing by the Required Holders; provided that the Notes Collateral Agent shall not be required to take any action or exercise any right that, in its opinion or the opinion of its counsel, may expose the Notes Collateral Agent to liability or that is contrary to any Notes Document or applicable laws or for which it has not been indemnified to its satisfaction;

(j)     Subject to (or to the extent permitted by) the applicable law and in accordance with market practice, the terms of the security documents shall secure the Notes Obligations as such Notes Obligations (and/or the Indenture or other Notes Documents) may be amended, amended and restated, restated, supplemented, replaced, renewed, restructured, extended, refunded, refinanced or otherwise modified from time to time (including without limitation, where such transactions result in any increases or decreases of the principal amount of the Notes Obligations, any extensions of maturity, any changes in interest rates or other economic terms, or any changes in the Secured Parties, Holders or Holders' agents) so as to minimize the need for any additional security documents, confirmations, reaffirmations, supplements, amendments or other actions with respect to such security documents in connection with the foregoing; and

(k)     Each of the security documents will provide that all proceeds will be applied in accordance with Section 6.05 of the Indenture.

**7.     Shares**

(a)     Until an Applicable Event has occurred and is continuing, the legal title of the shares subject to any security will remain with the relevant grantor of the security (unless transfer of title on granting such security is customary in the applicable jurisdiction and does not result in any risk of liability to the Notes Collateral Agent (as advised by the advisors to the Notes Collateral Agent or Holders)).

(b)     Until an Applicable Event has occurred and is continuing, any grantor of share security will be permitted to retain and to exercise all voting rights and powers in relation to any shares and other related rights charged by it and receive, own and retain all assets and proceeds in relation thereto without restriction or condition, provided that such grantor must not exercise any such voting rights and powers in any manner which:

(i)     has the effect of changing the rights of such shares or of any related rights with respect to such shares, unless specifically permitted by the Indenture; or

(ii)    adversely affects the validity or enforceability of such share security or causes an Event of Default to occur, or is otherwise prejudicial to the interests of the Notes Collateral Agent and/or the Secured Parties.

(c)     Where customary and applicable as a matter of law and following a request by the Notes Collateral Agent or the Trustee (acting at the direction of Required Holders), as soon as

reasonably practicable (taking into account any stamping, endorsement in blank, assignment in blank or other transfer requirements) following the granting of any share security over certificated shares or quotas, the applicable share certificate (or other documents evidencing title to the relevant shares, including in particular the shareholder's register with respect to Luxembourg companies) and a stock transfer form executed in blank (or applicable law equivalent) will be provided to the Notes Collateral Agent.

(d)     No security shall be required to be granted over any shares or ownership interests in any person which are not directly owned by its immediate holding company.

(e)     If required under local law, security over shares will be registered subject to the general principles set out in these Agreed Security Principles.

(f)     Unless the restriction is required by law, the constitutional documents of the company whose shares have been charged will be amended to remove any restriction on the transfer, approval requirements or the registration of the transfer of the shares on enforcement of the security granted over them.

## 8.     Bank accounts

(a)     Until an Applicable Event has occurred and is continuing, unless the Indenture expressly provides for any specific account (by reference to its purpose) to be subject to specific restrictions on use, any Note Party will be free to deal, operate and transact business in relation to any bank accounts over which it grants security (including opening and closing accounts) until the occurrence of an Applicable Event which is continuing.

(b)     Until an Applicable Event has occurred and is continuing, unless the Indenture expressly provide for any specific account (by reference to its purpose) to be subject to specific restrictions on use, there will be no "*fixed*" security over bank accounts, cash or receivables or any obligation to hold, pay or sweep cash or receivables into a particular account.

(c)     If required by local law to perfect the security and if possible without disrupting operation of the account, notice of the security will be served on the account bank in relation to applicable accounts within five (5) Business Days of the creation of the security over such account and the applicable grantor of the security will use its reasonable endeavours to obtain a signed acknowledgement of that notice within twenty (20) Business Days of service.  If the grantor of the security has used its reasonable endeavors but has not been able to obtain acknowledgement or acceptance its obligation to obtain acknowledgement will cease on the expiry of that twenty (20) Business Day period.  Irrespective of whether notice of the security is required for perfection, if the service of notice would prevent any member of the Group from using a bank account in the course of its business no notice of security will be served until the occurrence of an Applicable Event which is continuing.

(d)     Any security over bank accounts will be subject to any security interests in favour of the account bank which are created either by law or in the standard terms and conditions of the account bank. No grantor of security will be required to change its banking arrangements or standard terms and conditions in connection with the granting of bank account security, but will, in relation to accounts in Germany and/or Luxembourg, be required to request the account bank to waive such liens pursuant to its general terms and conditions.

(e)     Unless the Indenture expressly provide for any specific account (by reference to its purpose) to be subject to specific restrictions on use, no control agreements (or perfection by control or similar arrangements) shall be required with respect to any account.

(f)     If any bank account is required to be opened as a matter of local law in order to perfect any share security required to be granted in accordance with these Agreed Security Principles (i) such bank account shall not be required to be opened prior to the date falling 180 days after such share security is granted and (ii) the Holders authorise the Notes Collateral Agent to enter into any documentation requested by the applicable account bank in connection with such security.

(g)     If required under applicable local law, security over bank accounts will be registered subject to the general principles set out in these Agreed Security Principles.

**9.      Moveable Property**

(a)     A Foreign Guarantor shall grant security over its moveable property, subject to the general principles in these Agreed Security Principles.

(b)     Until an Applicable Event has occurred and is continuing and to the extent permitted under the Notes Documents the Foreign Guarantor providing the security is permitted to dispose of and use its moveable assets.

(c)     If the granting of effective security over moveable assets gives rise to registration rights or similar taxes or costs, the secured amount under such security will be proportionate to the value of the underlying moveable asset, and 'mandates' to grant security will be granted where customary.

**10.      Insurance Policies**

(a)     A UK Guarantor, Australian Guarantor or New Zealand Guarantor, as applicable, shall grant security over its insurance policies, subject to the general principles in these Agreed Security Principles.

(b)     No security will be granted over any insurance policy which does not allow security to be granted or which excludes the assignability of the insurance receivables, other than where such grant of security or such assignment is subject only to the consent of the relevant insurer. The provisions of this paragraph shall not operate to jeopardise any floating charge nor any assignment or other security interest over any and all damages, compensation, proceeds or other income attributable to such insurance policies which such UK Guarantor, Australian Guarantor or New Zealand Guarantor, as applicable, may be entitled (or which such UK Guarantor, Australian Guarantor or New Zealand Guarantor, as applicable, may be awarded or otherwise derive therefrom).

(c)     If required by UK law, Australian law or New Zealand law, as applicable, to perfect the security or customary in England and Wales, notice of the security will be served on the insurer within five Business Days of the security being granted and such UK Guarantor, Australian Guarantor or New Zealand Guarantor, as applicable, shall use its reasonable endeavours (not involving the incurrence of material costs or incurrence of any external expenses) to obtain a signed acknowledgement of that within twenty (20) Business Days of service.

(d)     Any obligation on the applicable UK Guarantor, Australian Guarantor or New Zealand Guarantor to use such reasonable endeavors to obtain an acknowledgement from such

bank of the notification shall cease on the expiry of the above mentioned twenty (20) Business Day period.

**11.      Intellectual property**

(a)      A UK Guarantor, Australian Guarantor or New Zealand Guarantor, as applicable, shall grant security over its intellectual property, subject to the general principles in these Agreed Security Principles.

(b)      Until an Applicable Event has occurred and is continuing and to the extent permitted under the Notes Documents, such UK Guarantor, Australian Guarantor or New Zealand Guarantor, as applicable, shall be free to deal with, use, licence and otherwise commercialise those assets in the course of its business (including allowing its intellectual property to lapse if no longer material to its business) to the extent permitted under the Indenture.

(c)      No security will be granted over intellectual property which cannot be secured under the terms of any relevant licensing agreement.

(d)      If required under UK law, Australian law or New Zealand law, as applicable, to create or perfect the relevant security, security over intellectual property will be registered under the law of that security document or UK law, Australian law or New Zealand law, as applicable, subject to the general principles set out in these Agreed Security Principles.

(e)      Security over Intellectual Property rights will be taken on an "as is, where is" basis and such UK Guarantor, Australian Guarantor or New Zealand Guarantor, as applicable, will not be required to procure any changes to, or corrections of filings on any registers (unless, subject to this Annex F, such changes to, or corrections of, filings are required to validly create such Security).

(f)      in respect of a Foreign Guarantor incorporated in Norway, additional security will be granted, in the form of registered floating charges, over trade receivables (No. *factoringpant*), inventory (No. *varelagerpant*) and operating machinery (No. *driftstilbehørspant*) - and in each case as such asset classes are defined in the Norwegian Lien Act (No. *panteloven*),

**12.      Receivables**

(a)      A Foreign Guarantor shall grant security over its receivables, subject to the general principles in these Agreed Security Principles.

(b)      Notice of the security shall be served on the relevant debtor immediately after an Event of Default, which is continuing.

(c)      Each Foreign Guarantor will use commercially reasonable efforts to amend, after the Issue Date, the respective receivable invoices to mention the Notes Collateral Agent's security interest in such receivables to the extent required under the laws of the local jurisdiction of the Foreign Guarantor to perfect the security interest.

(d)      The Notes Collateral Agent will receive a floating charge with respect to receivables in Norway and New Zealand.

(e)      If required under local law, security over intercompany receivables will be registered subject to the general principles set out in this Annex F.

(f)     If a Foreign Guarantor grants security over its receivables it shall be free to deal with, amend, waive or terminate those receivables in the course of its business until the occurrence of an Applicable Event (other than any amendments or waivers that would adversely prejudice the rights of the Secured Parties).

(g)     No security will be granted over any trade receivables which cannot be secured under the terms of the relevant contract or if the terms of the relevant contract exclude the assignability of the trade receivables. The provisions of this paragraph shall not operate to jeopardise any floating charge nor any assignment or other security interest over any and all damages, compensation, proceeds, remuneration, profit, rent or other income attributable to such trade receivables which the Foreign Guarantor may be entitled (or which such Foreign Guarantor may be awarded or otherwise derive therefrom).

(h)     If required under local law security over trade receivables will be registered subject to the general principles set out in this Annex F.

(i)     Any list of receivables will not include details of the underlying contacts (but may include non-sensitive generic information to the extent that would allow for the creation of security) unless required under local law.

**13.     Additional Principles**

These Agreed Security Principles embody the recognition by all parties that there may be certain legal and practical difficulties in obtaining effective or commercially reasonable guarantees and/or security from Foreign Guarantors in each jurisdiction in which it has been agreed that guarantees and security will be granted by those Foreign Guarantors. In particular:

(a)     general legal and statutory limitations, regulatory restrictions (including foreign exchange controls), financial assistance, anti-trust and other competition authority restrictions, corporate benefit, fraudulent preference, equitable subordination, "*transfer pricing*", "*thin capitalisation*", "*earnings stripping*", "*exchange control restrictions*", "*capital maintenance*" rules and "*liquidity impairment*" rules, tax restrictions, retention of title claims, employee consultation or approval requirements and similar principles may limit the ability of a member of the Group to provide a guarantee or security or may require that the guarantee or security be limited as to amount or otherwise and, if so, the guarantee or security will be limited accordingly, provided that, to the extent requested by the Notes Collateral Agent or the Trustee (acting at the direction of Required Holders) before signing any applicable security or accession document, the relevant member of the group consisting of the Company and the Restricted Subsidiaries (the "***Group***") shall use reasonable endeavours (but without incurring material cost and without adverse impact on relationships with third parties) to overcome any such obstacle or otherwise such guarantee or security document shall be subject to such limit;

(b)     a key factor in determining whether or not a guarantee or security will be taken (and in respect of the security, the extent of its perfection and/or registration) is the applicable time and cost (including adverse effects on taxes, interest deductibility, stamp duty, registration taxes, notarial costs guarantee fees payable to any person that is not a member of the Group and all applicable legal fees) which will not be disproportionate to the benefit accruing to the Holders of obtaining such guarantee or security, as determined by the Company and the Required Holders);

(c)     members of the Group will not be required to give guarantees or enter into security documents if they are not directly or indirectly wholly owned by the Company or if it is not within the legal capacity of the relevant members of the Group or if it would conflict with the fiduciary or statutory duties of their directors or contravene any applicable legal, regulatory or contractual prohibition or restriction or have the potential to result in a

material risk of personal or criminal liability for any director or officer of or for any member of the Group, provided that, to the extent requested by the Notes Collateral Agent or the Trustee (acting at the direction of Required Holders) before signing any applicable security document or accession document, the relevant member of the Group shall, in relation to a contractual prohibition or restriction only, use reasonable endeavours (but without incurring material cost and without adverse impact on relationships with third parties) to overcome any such obstacle or otherwise such guarantee or security document shall be subject to such limit;

(d)     having regard to the principle in paragraph (b) above, the Company and the Required Holders shall discuss in good faith (having regard to customary practice in applicable jurisdictions) with a view to determining whether certain security can be provided by the relevant Foreign Guarantor granting a promise to pledge in favour of the Holders coupled with an irrevocable power of attorney to the Notes Collateral Agent as opposed to a definitive legal mortgage or pledge over the relevant asset;

(e)     guarantees and security will be limited so that the aggregate of notarial costs and all registration and like taxes and duties relating to the provision of security will not exceed an amount to be agreed between the Company and the Required Holders;

(f)     where a class of assets to be secured includes material and immaterial assets, if the cost of granting security over the immaterial assets is disproportionate to the benefit of such security to the Holders, as determined by the Company and the Required Holders security will be granted over the material assets only;

(g)     it is expressly acknowledged that it may be either impossible or impractical to create security over certain categories of assets, as determined by the Company and the Required Holders, in which event security will not be taken over such assets;

(h)     in each case to the extent the applicable restriction, condition or third party right did not arise in contemplation of the relevant guarantee or grant of security, any asset subject to a legal requirement, contract, lease, licence, instrument, regulatory constraint (including any agreement with any government or regulatory body) or other third party arrangement, which may prevent or condition the asset from being charged, secured or being subject to the applicable security document (including requiring a consent of any third party, supervisory board or works council (or equivalent)) and any asset which, if subject to the applicable security document, would give a third party the right to terminate or otherwise amend any rights, benefits and/or obligations with respect to any member of the Group in respect of the asset or require the relevant chargor to take any action materially adverse to the interests of the Group or any member thereof, in each case will be excluded from a guarantee or security document, provided that reasonable endeavours (exercised for a specified period of time) to obtain consent to charging any asset (where otherwise prohibited) shall be used by the Group if the Trustee (acting at the direction of Required Holders) specifies prior to the date of the security or accession document that the asset is material and the Company is satisfied that such endeavours will not involve placing relationships with third parties in jeopardy;

(i)     the giving of a guarantee, the granting of security and the registration and/or the perfection of the security granted will not be required if it would have a material adverse effect on the ability of the relevant member of the Group to conduct its operations and business in the ordinary course as otherwise permitted by the Notes Documents (including dealing with the secured assets and all contractual counterparties or amending, waiving or terminating (or allowing to lapse) any rights, benefits or obligations, in each case prior to an Applicable Event which is continuing), and any requirement under these Agreed Security Principles to seek consent of any person or take or not take any other action shall be subject to this paragraph (i);

(j)     any security document will only be required to be notarised if required by law in order for the relevant security to become effective or admissible in evidence;

(k)     to the extent possible and unless required by applicable law, there should be no action required to be taken in relation to the guarantees or security when any secured party assigns or transfers any of its participation to a new secured party (and, unless explicitly agreed to the contrary in the Notes Documents, no Foreign Guarantor shall bear or otherwise be liable for any taxes, any notarial, registration or perfection fees or any other costs, fees or expenses that result from any assignment or transfer by a Holder);

(l)     no title investigations or other diligence on assets will be required and no title insurance will be required;

(m)     security will not be required over any cash constituting regulatory capital or customer cash (and such assets or cash shall be excluded from any relevant security document);

(n)     to the extent legally effective, all security will be given in favour of the Notes Collateral Agent and not the Secured Parties individually (with the Notes Collateral Agent to hold one set of security documents for all the Secured Parties); "*parallel debt*" provisions will be used where necessary;

(o)     each security document shall be deemed not to restrict or condition any transaction not prohibited under the Notes Documents and the security granted under each security document entered into after the Issue Date shall be deemed to be subject to these Agreed Security Principles, before and after the execution of the relevant security document and creation of the relevant security;

(p)     each security document must be provided on terms which are not inconsistent with the turnover or sharing provisions in the Indenture.

(q)     no guarantee or security shall guarantee or secure any "*Excluded Swap Obligations*" defined in accordance with the LSTA Market Advisory Update dated February 15, 2013 entitled "*Swap Regulations' Implications for Loan Documentation*", and any update thereto by the LSTA;

(r)     no translation of any document relating to any security or any asset subject to any security will be required to be prepared or provided to the Secured Parties, unless (i) any document which is to be signed by the Notes Collateral Agent or any notice to be delivered to the Notes Collateral Agent or (ii) required for such documents to become effective or admissible in evidence and an Applicable Event is continuing;

(s)     local security documents may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement, and delivery of an executed counterpart to any security document by facsimile transmission or other electronic transmission (such as .pdf) shall be effective as delivery of a manually signed counterpart, in each case to the extent such execution is effective under local law; and

(t)     where the terms of a security document require a party thereto (other than a Secured Party) to use its reasonable efforts, reasonable endeavours or a similar or equivalent standard in taking an action thereunder, notwithstanding any meaning to the contrary as a matter of the governing law of such security document, such standard shall be interpreted and construed in accordance with the law of the State of New York and no Default or Event of Default (howsoever described) shall arise under any Notes Document in respect

of a breach of such obligation because a contrary construction of such provision was taken (or would be taken by any applicable court of competent jurisdiction).

14.   **Voluntary Credit Support**

   (a)   If, in accordance with this Annex F, a Note Party or a Subsidiary of the Company organized or incorporated in any Foreign Guarantor Jurisdiction, the United States or Canada, is not required to grant any guarantee or to grant security over an asset, the Company may, in its sole discretion, elect to (or to procure that such person will) grant such guarantee or security ("***Voluntary Credit Support***").

   (b)   Each Note Party or a Subsidiary of the Company shall be required to accept such Voluntary Credit Support and shall enter into any document requested by the Company to create, perfect, register or notify third parties of such Voluntary Credit Support on such terms as the Company shall, in its reasonable discretion, after consultation with the Notes Collateral Agent, elect, subject to satisfaction of any "know your customer" requirements of the Secured Parties (acting promptly, reasonably and in good faith) including that the Secured Parties are capable of accepting such Voluntary Credit Support as a matter of law or regulation or internal policy.

15.   **Amendment**

In any event of any conflict or inconsistency between any term of these Agreed Security Principles and any term of a Collateral Document or a guarantee, the Secured Parties authorize, instruct and direct the Notes Collateral Agent to, and the Notes Collateral Agent shall promptly (at the option and upon request of the Company) (i) enter into such amendments to such Collateral Document or guarantee or (ii) release and terminate such Collateral and enter into a replacement Collateral Document or guarantee on such amended terms, in each case as shall be necessary or desirable to cure such conflict or inconsistency.

16.   **Execution of applicable Intercreditor Agreements**

Any Foreign Guarantor, existing on the Closing Date or hereinafter incorporated, shall sign or acknowledge, as applicable, any Intercreditor Agreement.

**ANNEX G**

Collateral Documents

#96781386v10

**EXHIBIT A**

[FORM OF FACE OF NOTE]

[INCLUDE FOLLOWING LEGEND IF A GLOBAL NOTE]

[UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT HEREUNDER IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.]

[INCLUDE FOLLOWING LEGEND IF A RESTRICTED SECURITY]

[THIS SECURITY AND THE COMMON SHARES ISSUABLE UPON CONVERSION OF THIS SECURITY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE ACQUIRER:

(1) REPRESENTS THAT IT AND ANY ACCOUNT FOR WHICH IT IS ACTING IS A "QUALIFIED INSTITUTIONAL BUYER" (WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT) AND THAT IT EXERCISES SOLE INVESTMENT DISCRETION WITH RESPECT TO EACH SUCH ACCOUNT, AND

(2) AGREES FOR THE BENEFIT OF INVACARE HOLDINGS CORPORATION (THE "COMPANY") THAT IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS SECURITY OR ANY BENEFICIAL INTEREST HEREIN PRIOR TO THE DATE THAT IS THE LATER OF (X) ONE YEAR AFTER THE ORIGINAL ISSUE DATE HEREOF OR SUCH SHORTER PERIOD OF TIME AS PERMITTED BY RULE 144 UNDER THE SECURITIES ACT OR ANY SUCCESSOR PROVISION THERETO AND (Y) SUCH LATER DATE, IF ANY, AS MAY BE REQUIRED BY APPLICABLE LAW, EXCEPT:

(A) TO THE COMPANY OR ANY SUBSIDIARY THEREOF, OR

(B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BECOME EFFECTIVE UNDER THE SECURITIES ACT, OR

(C) TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, OR

(D) PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT OR ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH CLAUSE (2)(D) ABOVE, THE COMPANY AND THE TRUSTEE RESERVE THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE

SECURITIES LAWS. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.][9]

[INCLUDE THE FOLLOWING LEGEND IF THE NOTES ARE ISSUED WITH ORIGINAL ISSUE DISCOUNT]

[THIS SECURITY REPRESENTED BY THIS INSTRUMENT IS ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR PURPOSES OF SECTION 1271 ET SEQ. OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED.  A HOLDER MAY OBTAIN THE ISSUE PRICE, AMOUNT OF ORIGINAL ISSUE DISCOUNT, ISSUE DATE AND YIELD TO MATURITY FOR SUCH NOTE BY SUBMITTING A REQUEST FOR SUCH INFORMATION TO THE COMPANY AT THE FOLLOWING ADDRESS: INVACARE HOLDINGS CORPORATION, ONE INVACARE WAY, ELYRIA, OHIO 44035, ATTENTION: CHIEF FINANCIAL OFFICER.]

---

[9] This legend (other than the first paragraph hereof) shall be deemed removed from the face of this Security without further action of the Company, the Trustee, or the Holders at such time as the Company instructs the Trustee to remove such legend pursuant to Section 2.05(c) of the Indenture.

Invacare Holdings Corporation

7.50% Convertible Senior Secured Note due [2028], Tranche [I][II]

No. [_____]                                                    [Initially]10 $[_____]

CUSIP No. [_____]

Invacare Holdings Corporation, a corporation duly organized and validly existing under the laws of the State of Delaware (the "**Company**," which term includes any successor corporation or other entity under the Indenture referred to on the reverse hereof), for value received hereby promises to pay to [CEDE & CO.]11 [_____]12, or registered assigns, the principal sum [as set forth in the "Schedule of Exchanges of Notes" attached hereto]13 [of $[_____]]14, which amount, taken together with the principal amounts of all other outstanding Notes, shall not, unless permitted by the Indenture, exceed $[_____] in aggregate at any time, in accordance with the rules and procedures of the Depositary, on [_____, 2028]15, and interest thereon as set forth below.

This Note shall bear interest at the rate of 7.50% per year from [_____], 2023, or from the most recent date to which interest had been paid or provided for to, but excluding, the next scheduled Interest Payment Date until [_____, 2028]16. Interest is payable semi-annually in arrears on each [_____] and [_____], commencing on [_____], to Holders of record at the close of business on the preceding [_____] and [_____] (whether or not such day is a Business Day), respectively. Additional Interest will be payable as set forth in Section 4.06(d), Section 4.06(e) and Section 6.03 of the within-mentioned Indenture, and any reference to interest on, or in respect of, any Note therein shall be deemed to include Additional Interest if, in such context, Additional Interest is, was or would be payable pursuant to any of such Section 4.06(d), Section 4.06(e) or Section 6.03, and any express mention of the payment of Additional Interest in any provision therein shall not be construed as excluding Additional Interest in those provisions thereof where such express mention is not made.

Any Defaulted Amounts shall accrue interest per annum at the rate borne by the Notes, subject to the enforceability thereof under applicable law, from, and including, the relevant payment date to, but excluding, the date on which such Defaulted Amounts shall have been paid by the Company, at its election, in accordance with Section 2.03(c) of the Indenture.

The Company shall pay or cause the Paying Agent to pay the principal of and interest on this Note, if and so long as such Note is a Global Note, in immediately available funds to the Depositary or its nominee, as the case may be, as the registered Holder of such Note. As provided in and subject to the provisions of the Indenture, the Company shall pay or cause the Paying Agent to pay the principal of any Notes (other than Notes that are Global Notes) at the office or agency designated by the Company for that purpose. The Company has initially designated the Trustee as its Paying Agent and Note Registrar in respect of the Notes and the Corporate Trust Office as a place where Notes may be presented for payment or for registration of transfer and exchange.

---

10 Include if a global note.

11 Include if a global note.

12 Include if a physical note.

13 Include if a global note.

14 Include if a physical note.

15 To be the Maturity Date of the notes.

16 To be the Maturity Date of the notes.

A-3

Reference is made to the further provisions of this Note set forth on the reverse hereof, including, without limitation, provisions giving the Holder of this Note the right to convert this Note into Common Shares on the terms and subject to the limitations set forth in the Indenture.  Such further provisions shall for all purposes have the same effect as though fully set forth at this place.

**This Note, and any claim, controversy or dispute arising under or related to this Note, shall be construed in accordance with and governed by the laws of the State of New York (without regard to the conflicts of laws provisions thereof).**

In the case of any conflict between this Note and the Indenture, the provisions of the Indenture shall control and govern.

This Note shall not be valid or become obligatory for any purpose until the certificate of authentication hereon shall have been signed manually by the Trustee or a duly authorized authenticating agent under the Indenture.

[*Remainder of page intentionally left blank*]

#96781386v10

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed.

INVACARE HOLDINGS CORPORATION

By: _____
       Name:
       Title:

Dated:

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

GLAS TRUST COMPANY LLC
as Trustee, certifies that this is one of the Notes described
in the within-named Indenture.

By:_____
    Authorized Signatory

#96781386v10

[FORM OF REVERSE OF NOTE]

Invacare Holdings Corporation
7.50% Convertible Senior Secured Note due [2028]

This Note is one of a duly authorized issue of Notes of the Company, designated as its 7.50% Convertible Senior Secured Notes due [2028], Tranche [I][II] (the "**Notes**"), limited to the aggregate principal amount of $[_____], all issued or to be issued under and pursuant to an Indenture dated as of [_____], 2023 (the "**Indenture**"), by and among the Company, the Note Guarantors and GLAS Trust Company LLC, as trustee (the "**Trustee**") and notes collateral agent (the "**Notes Collateral Agent**") to which Indenture and all indentures supplemental thereto reference is hereby made for a description of the rights, limitations of rights, obligations, duties and immunities thereunder of the Trustee, the Company and the Holders of the Notes. Capitalized terms used in this Note and not defined in this Note shall have the respective meanings set forth in the Indenture.

In case certain Events of Default shall have occurred and be continuing, the principal of, and interest on, all Notes may be declared, by either the Trustee or Holders of at least 25% in aggregate principal amount of Notes then outstanding, and upon said declaration shall become, due and payable, in the manner, with the effect and subject to the conditions and certain exceptions set forth in the Indenture.

Subject to the terms and conditions of the Indenture, the Company will make all payments and deliveries in respect of the Fundamental Change Repurchase Price on the Fundamental Change Repurchase Date and the principal amount on the Maturity Date, as the case may be, to the Holder who surrenders a Note to a Paying Agent to collect such payments in respect of the Note. The Company will pay cash amounts in money of the United States that at the time of payment is legal tender for payment of public and private debts.

The Indenture contains provisions permitting the Company and the Trustee in certain circumstances, without the consent of the Holders of the Notes, and in certain other circumstances, with the consent of the Holders of not less than a majority in aggregate principal amount of the Notes at the time outstanding, evidenced as in the Indenture provided, to execute supplemental indentures modifying the terms of the Indenture and the Notes as described therein. It is also provided in the Indenture that, subject to certain exceptions, the Holders of a majority in aggregate principal amount of the Notes at the time outstanding may on behalf of the Holders of all of the Notes waive any past Default or Event of Default under the Indenture and its consequences.

No reference herein to the Indenture and no provision of this Note or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay or deliver, as the case may be, the principal (including the Fundamental Change Repurchase Price, if applicable) of, accrued and unpaid interest on, and the consideration due upon conversion of, this Note at the place, at the respective times, at the rate and in the lawful money herein prescribed.

The Notes are issuable in registered form without coupons in denominations of $1,000 principal amount and integral multiples thereof. At the office or agency of the Company referred to on the face hereof, and in the manner and subject to the limitations provided in the Indenture, Notes may be exchanged for a like aggregate principal amount of Notes of other authorized denominations, without payment of any service charge but, if required by the Company or Trustee, with payment of a sum sufficient to cover any transfer or similar tax that is imposed in connection therewith as a result of the name of the Holder of the new Notes issued upon such exchange of Notes being different from the name of the Holder of the old Notes surrendered for such exchange.

The Notes are not subject to redemption through the operation of any sinking fund or otherwise.

Upon the occurrence of a Fundamental Change, the Holder has the right, at such Holder's option and subject to the limitations set forth in the Indenture, to require the Company to repurchase for cash all of

#96781386v10

such Holder's Notes or any portion thereof (in principal amounts of $1,000 or integral multiples thereof) on the Fundamental Change Repurchase Date at a price equal to the Fundamental Change Repurchase Price.

Subject to the provisions of the Indenture, the Holder hereof has the right, at its option, prior to the close of business on the second Business Day immediately preceding the Maturity Date, to convert any Notes, or portion thereof that is $1,000 or an integral multiple thereof, into Common Shares, at the Conversion Rate specified in the Indenture, as adjusted from time to time as provided in the Indenture.

This Note is guaranteed, as set forth in the Indenture, and is secured by Liens on certain Collateral as specified in the Indenture and the Collateral Documents.

A-7

ABBREVIATIONS

The following abbreviations, when used in the inscription of the face of this Note, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM = as tenants in common

UNIF GIFT MIN ACT = Uniform Gifts to Minors Act

CUST = Custodian

TEN ENT = as tenants by the entireties

JT TEN  = joint tenants with right of survivorship and not as tenants in common

Additional abbreviations may also be used though not in the above list.

#96781386v10

**SCHEDULE A[17]**

SCHEDULE OF EXCHANGES OF NOTES

Invacare Holdings Corporation
7.50% Convertible Senior Secured Notes due [2028], Tranche [I][II]

The initial principal amount of this Global Note is _____ DOLLARS ($[_____]).  The following increases or decreases in this Global Note have been made:

| Date of exchange | Amount of decrease in principal amount of this Global Note | Amount of increase in principal amount of this Global Note | Principal amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee or Custodian |
|---|---|---|---|---|
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ | _____ |

---

[17]Include if a global note.

#96781386v10

**ATTACHMENT 1**

[FORM OF NOTICE OF CONVERSION]

To:  GLAS Trust Company LLC
3 Second Street, Suite 206
Jersey City, New Jersey 07311

       The undersigned registered owner of this Note hereby exercises the option to convert this Note, or the portion hereof (that is $1,000 principal amount or an integral multiple thereof) below designated, into Common Shares in accordance with the terms of the Indenture referred to in this Note, and directs that any cash payable and Common Shares issuable and deliverable upon such conversion and any Notes representing any unconverted principal amount hereof, be issued and delivered to the registered Holder hereof unless a different name has been indicated below.  If any Common Shares or any portion of this Note not converted are to be issued in the name of a Person other than the undersigned, the undersigned will pay all documentary, stamp or similar issue or transfer taxes, if any in accordance with Section 14.02(d) and Section 14.02(e) of the Indenture.  Any amount required to be paid to the undersigned on account of interest accompanies this Note.  Capitalized terms used herein but not defined shall have the meanings ascribed to such terms in the Indenture.

Dated:  _____  _____

                                        _____

                                          Signature(s)

_____

Signature Guarantee

Signature(s) must be guaranteed
by an eligible Guarantor Institution
(banks, stock brokers, savings and
loan associations and credit unions)
with membership in an approved
signature guarantee medallion program
pursuant to Securities and Exchange
Commission Rule 17Ad-15 if shares
of Common Shares are to be issued, or
Notes are to be delivered, other than
to and in the name of the registered holder.

Fill in for registration of shares if
to be issued, and Notes if to
be delivered, other than to and in the
name of the registered holder:

_____
(Name)

_____
(Street Address)

_____
(City, State and Zip Code)

A-10

Please print name and address

Principal amount to be converted (if less than all):
$_____,000

NOTICE:  The above signature(s) of the Holder(s) hereof
must correspond with the name as written upon the face of the
Note in every particular without alteration or enlargement or
any change whatever.

_____

Social Security or Other Taxpayer
Identification Number

ATTACHMENT 2

**[FORM OF FUNDAMENTAL CHANGE REPURCHASE NOTICE]**

To:  GLAS Trust Company LLC
3 Second Street, Suite 206
Jersey City, New Jersey 07311

       The undersigned registered owner of this Note hereby acknowledges receipt of a notice from Invacare Holdings Corporation (the "**Company**") as to the occurrence of a Fundamental Change with respect to the Company and specifying the Fundamental Change Repurchase Date and requests and instructs the Company to pay to the registered holder hereof in accordance with Section 15.02 of the Indenture referred to in this Note (1) the entire principal amount of this Note, or the portion thereof (that is $1,000 principal amount or an integral multiple thereof) below designated, and (2) if such Fundamental Change Repurchase Date does not fall during the period after a Regular Record Date and on or prior to the corresponding Interest Payment Date, accrued and unpaid interest, if any, thereon to, but excluding, such Fundamental Change Repurchase Date.  Capitalized terms used herein but not defined shall have the meanings ascribed to such terms in the Indenture.

       In the case of Physical Notes, the certificate numbers of the Notes to be repurchased are as set forth below:

Dated:  _____

                                     _____

                                     Signature(s)

                                     _____

                                     Social Security or Other Taxpayer
                                     Identification Number

                                     Principal amount to be repaid (if less than all):  $_____,000

                                     NOTICE:  The above signature(s) of the Holder(s) hereof must correspond with the name as written upon the face of the Note in every particular without alteration or enlargement or any change whatever.

A-12

**ATTACHMENT 3**

[FORM OF ASSIGNMENT AND TRANSFER]

For value received _____ hereby sell(s), assign(s) and transfer(s) unto _____ (Please insert social security or Taxpayer Identification Number of assignee) the within Note, and hereby irrevocably constitutes and appoints _____ attorney to transfer the said Note on the books of the Company, with full power of substitution in the premises.

In connection with any transfer of the within Note occurring prior to the Resale Restriction Termination Date, as defined in the Indenture governing such Note, the undersigned confirms that such Note is being transferred:

☐        To Invacare Holdings Corporation or a subsidiary thereof; or

☐        Pursuant to a registration statement that has become or been declared effective under the Securities Act of 1933, as amended; or

☐        Pursuant to and in compliance with Rule 144A under the Securities Act of 1933, as amended; or

☐        Pursuant to and in compliance with Rule 144 under the Securities Act of 1933, as amended, or any other available exemption from the registration requirements of the Securities Act of 1933, as amended.


Dated: _____

_____

_____
Signature(s)

_____
Signature Guarantee

Signature(s) must be guaranteed by an
eligible Guarantor Institution (banks, stock
brokers, savings and loan associations and
credit unions) with membership in an approved
signature guarantee medallion program pursuant
to Securities and Exchange Commission
Rule 17Ad-15 if Notes are to be delivered, other
than to and in the name of the registered holder.

NOTICE:  The signature on the assignment must correspond with the name as written upon the face of the Note in every particular without alteration or enlargement or any change whatever.

EXHIBIT B

**[COMPANY LETTERHEAD]**

**7.50% Convertible Senior Secured Notes due [2028], Tranche [I][II]**

**Free Transferability Certificate**

[__], 20[__]

To:  GLAS Trust Company LLC
3 Second Street, Suite 206
Jersey City, New Jersey 07311

Re:      Invacare Holdings Corporation, 7.50% Convertible Senior Secured Notes due [2028], Tranche [I][II]

Dear Sir/Madam:

Whereas the 7.50% Convertible Senior Secured Notes due [2028], Tranche [I][II] (the "Securities") have become freely tradable without restrictions by non-affiliates of Invacare Holdings Corporation (the "Company") pursuant to Rule 144(b)(1) under the Securities Act of 1933, as amended, in accordance with Section 2.05(c) of the indenture, dated as of [____], 2023 (the "Indenture") by and among the Company, the Note Guarantors and GLAS Trust Company LLC, as Trustee (the "Trustee") and Notes Collateral Agent, pursuant to which the Securities were issued, the Company hereby provides notice pursuant to Section 2.05(c) of the Indenture of the occurrence of the Resale Restriction Termination Date and instructs you that:

(i)    the restrictive legends described in Section 2.05(c) of the Indenture and set forth on the Securities and Common Shares issued upon conversion of the Securities shall be deemed removed from the Global Notes (as defined in the Indenture), in accordance with the terms and conditions of the Securities and as provided in the Indenture, without further action on the part of holders or the Trustee; and

(ii)   the restricted CUSIP number for the Securities ([_____]) shall be deemed removed from the Global Notes and replaced with the unrestricted CUSIP number set forth therein ([_____]), in accordance with the terms and conditions of the Securities and as provided in the Indenture, without further action on the part of holders or the Trustee.

Capitalized terms used but not defined herein shall have the meanings set forth in the Indenture.

Very truly yours,

INVACARE HOLDINGS CORPORATION

By: _____

Name:

Title:

EXHIBIT C

FORM OF GUARANTEE

The Note Guarantors listed on the signature pages hereto and their respective successors under the Indenture, dated [_____], 2023 (the "**Indenture**"), among Invacare Holdings Corporation (the "**Company**"), the note guarantors party thereto and GLAS Trust Company LLC, as Trustee and Notes Collateral Agent, relating to the Company's 7.50% Convertible Senior Secured Notes due [2028], Tranche [I][II], jointly and severally with any other Note Guarantors, hereby irrevocably and unconditionally (i) guarantee the due and punctual payment of the principal of, premium, if any, and interest on the Notes, whether at maturity, by acceleration, repurchase, redemption or otherwise, the due and punctual payment of interest on the overdue principal of and interest, if any, on the Notes, to the extent lawful, and the due and punctual performance of all other obligations of the Company to the Holders or the Trustee, all in accordance with the terms set forth in Article 13 of the Indenture and (ii) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, guarantee that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration pursuant to Section 6.02 of the Indenture or otherwise.  Capitalized terms used herein have the meanings assigned to them in the Indenture unless otherwise indicated.

No stockholder, officer, director or incorporator, as such, past, present or future, of the Note Guarantors shall have any personal liability under this Note Guarantee by reason of his, her or its status as such stockholder, officer, director or incorporator.  This Note Guarantee shall be binding upon each Note Guarantor and its successors and assigns and shall inure to the benefit of the successors and assigns of the Trustee and the Holders and, in the event of any transfer or assignment of rights by any Holder or the Trustee, the rights and privileges herein conferred upon that party shall automatically extend to and be vested in such transferee or assignee, all subject to the terms and conditions hereof.

This Note Guarantee shall not be valid or obligatory for any purpose until the certificate of authentication on the Note upon which this Note Guarantee is noted shall have been executed by the Trustee under the Indenture by the manual or electronic signature of one of its authorized officers.

THE TERMS OF ARTICLE 13 OF THE INDENTURE ARE INCORPORATED HEREIN BY REFERENCE.

This Note Guarantee shall be governed by and construed in accordance with the laws of the State of New York.

[NAME OF NOTE GUARANTOR]

By: _____
    Name:
    Title:

**EXHIBIT D**

[FORM OF SUPPLEMENTAL INDENTURE
TO BE DELIVERED BY SUBSEQUENT NOTE GUARANTORS]

[_____] Supplemental Indenture (this "Supplemental Indenture"), dated as of _____, [between][among] _____ (the "Guaranteeing Subsidiary"), a subsidiary of Invacare Holdings Corporation, a Delaware corporation (the "Company"), and GLAS Trust Company LLC, as trustee (the "Trustee") and notes collateral agent (the "Notes Collateral Agent").

W I T N E S S E T H

WHEREAS, each of the Company and the Note Guarantors has heretofore executed and delivered to the Trustee and Notes Collateral Agent an indenture, dated as of [_____], 2023 (the "Indenture"), providing for the issuance of $[_____] in aggregate principal amount of 7.50% Convertible Senior Secured Notes due [2028], Tranche [I][II] (the "Notes");

WHEREAS, the Indenture provides that under certain circumstances the Guaranteeing Subsidiary shall execute and deliver to the Trustee a supplemental indenture pursuant to which the Guaranteeing Subsidiary shall unconditionally and absolutely guarantee all of the Company's Obligations under the Notes and the Indenture on the terms and conditions set forth herein and under the Indenture (the "Guarantee"); and

WHEREAS, pursuant to Section 10.01 of the Indenture, the Trustee is authorized to execute and deliver this Supplemental Indenture without the consent of Holders.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

(1)    Capitalized Terms.  Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

(2)    Agreement to Guarantee.  The Guaranteeing Subsidiary hereby agrees to be a Note Guarantor under the Indenture and to be bound by the terms of the Indenture applicable to a Note Guarantor, including, but not limited to, Article 13 thereof.

(3)    Execution and Delivery.  The Guaranteeing Subsidiary agrees that the Guarantee shall remain in full force and effect notwithstanding the absence of the endorsement of any notation of such Guarantee on the Notes.

(4)    Governing Law.  THIS SUPPLEMENTAL INDENTURE WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

(5)    Counterparts.  The parties may sign any number of copies of this Supplemental Indenture. Each signed copy shall be an original, but all of them together represent one and the same agreement.  The exchange of copies of this Supplemental Indenture and of signature pages by facsimile, PDF or other electronic transmission shall constitute effective execution and delivery of this Supplemental Indenture as to the parties hereto and may be used in lieu of the original Supplemental Indenture and signature pages for all purposes.  Any signature (including, without limitation, (x) any electronic symbol or process attached to, or associated with, a contract or other record and adopted by a person with the intent to sign, authenticate or accept such contract or record and (y) any facsimile, E-pencil or .pdf signature) hereto or to any other certificate, agreement or document related to this Supplemental Indenture, and any contract formation or record-keeping, in each case, through electronic means, shall have the same legal validity and

enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law. For the avoidance of doubt, the foregoing also applies to any amendment, extension or renewal of this Supplemental Indenture. Each of the parties to this Supplemental Indenture represents and warrants to the other parties that it has the corporate capacity and authority to execute this Supplemental Indenture through electronic means and there are no restrictions for doing so in that party's constitutive documents.

(6)     <u>Effect of Headings</u>.  The Section headings herein are for convenience only and shall not affect the construction hereof.

(7)     <u>The Trustee and the Notes Collateral Agent</u>.  Neither the Trustee nor the Notes Collateral Agent shall be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this Supplemental Indenture or for or in respect of the recitals contained herein, all of which recitals are made solely by the Guaranteeing Subsidiary.

(8)     <u>Benefits Acknowledged</u>.  The Guaranteeing Subsidiary acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated by the Indenture and this Supplemental Indenture and that the guarantee and waivers made by it pursuant to this Guarantee are knowingly made in contemplation of such benefits.

#96781386v10

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed, all as of the date first above written.

[GUARANTEEING SUBSIDIARY]

By: _____
    Name:
    Title:

GLAS TRUST COMPANY LLC,
as Trustee

By: _____
    Name:
    Title:

GLAS TRUST COMPANY LLC,
as Notes Collateral Agent

By: _____
Name:
Title:

## Exhibit H

**Rejected Executory Contracts and Unexpired Leases Schedule**

Certain documents, or portions thereof, contained in this **Exhibit H** and the Plan Supplement remain subject to continued negotiations, review and revisions by the Debtors and the Consenting Stakeholders.  The respective rights of the Debtors and the Consenting Stakeholders are expressly reserved, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained therein at any time in accordance with the terms of the Plan, or by order of the Bankruptcy Court; *provided* that if any document in this Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the Confirmation Hearing, the Debtors will file a redline of such document with the Bankruptcy Court.  Each of the documents contained in the Plan Supplement or its amendments are subject to certain consent and approval rights to the extent provided in the Plan or Restructuring Support Agreement.

Article V.A of the Plan provides that on the Effective Date, except as otherwise provided in the Plan, the Plan Supplement, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, all Executory Contracts and Unexpired Leases of the Debtors shall be deemed assumed by the Debtors or Reorganized Debtors, as applicable, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract and Unexpired Lease:  (1) previously was assumed or rejected by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion to reject Filed on or before the Effective Date; or (4) is identified on the Rejected Executory Contract and Unexpired Lease Schedule.

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description |
|---|---|---|---|---|
| 1 | 23-90068 | Invacare Corporation | AEROTEK INC | SERVICES AGREEMENT DTD 8/30/2010 |
| 2 | 23-90068 | Invacare Corporation | AIR SAFETY LIMITED | MASTER SUPPLY AGREEMENT #8016 |
| 3 | 23-90068 | Invacare Corporation | ALEXANDER, SUSAN H. | INDEMNITY AGREEMENT DTD 12/1/2016 |
| 4 | 23-90068 | Invacare Corporation | ALLIANCE ADVISORS LLC | MASTER SERVICES AGREEMENT DTD 2/8/2022 |
| 5 | 23-90068 | Invacare Corporation | ALLIANCE INDUSTRIAL SOLUTIONS | GENERAL LABOR AGREEMENT |
| 6 | 23-90068 | Invacare Corporation | ALLIANCE SOLUTIONS GROUP LLC | STAFFING SERVICES AGREEMENT |
| 7 | 23-90068 | Invacare Corporation | ALLIED UNIVERSAL | SECURITY PROFESSIONAL SERVICE AGREEMENT |
| 8 | 23-90068 | Invacare Corporation | ALLIEDSIGNAL TRUCK BRAKE SYSTEMS CO | LEASE AGREEMENT |
| 9 | 23-90068 | Invacare Corporation | ALLIEDSIGNAL TRUCK BRAKE SYSTEMS CO | LEASE AGREEMENT |
| 10 | 23-90072 | Invacare Corporation | ALTENBURGER, ROSS | RESTRICTED SHARE AWARDS 3/12/2021 |
| 11 | 23-90072 | Invacare Corporation | ALTENBURGER, ROSS | RESTRICTED SHARE AWARDS 4/1/2022 |
| 12 | 23-90068 | Invacare Corporation | ALTIMATE MEDICAL INC | SHARE PURCHASE AGREEMENT DTD 9/29/2014 |
| 13 | 23-90068 | Invacare Corporation | ALUMAG ALUMINUM TECH (TAI CANG) CO LTD | MASTER SUPPLY AGREEMENT #1095 DTD 12/29/2004 |
| 14 | 23-90068 | Invacare Corporation | ASG SKILLED MANUFACTURING | STAFFING SERVICES AGREEMENT |
| 15 | 23-90068 | Invacare Corporation | ASSURAMED | SHARE PURCHASE AGREEMENT AMONG ASSURAMED, INC, INVACARE CORP., AND INVACARE SUPPLY GROUP, INC. DATED 12/21/12 |
| 16 | 23-90068 | Invacare Corporation | ASSURAMED | SHARE PURCHASE AGREEMENT AMONG ASSURAMED, INC, INVACARE CORP., AND INVACARE SUPPLY GROUP, INC. DATED 12/21/12 |
| 17 | 23-90068 | Invacare Corporation | ASSURAMED INC | SHARE PURCHASE AGREEMENT DTD 12/21/2012 |
| 18 | 23-90068 | Invacare Corporation | ASSURAMED INC | SHARE PURCHASE AGREEMENT DTD 12/21/2012 |
| 19 | 23-90072 | Invacare Corporation | AT&T WIRELESS | ACCOUNT NO. 287266341503 |
| 20 | 23-90068 | Invacare Corporation | AVALARA | UNIFIED SALES |
| 21 | 23-90068 | Invacare Corporation | AVALARA SERVICES | SALES ORDER TERM AND CONDITIONS DTD 5/20/2022 |
| 22 | 23-90083 | Invacare Corporation | BACHANHEIMER, CARA | DEATH BENEFIT ONLY AGREEMENT |
| 23 | 23-90072 | Invacare Corporation | BACHIE, STEPHEN | RESTRICTED SHARE AWARDS 3/12/2021 |
| 24 | 23-90072 | Invacare Corporation | BACHIE, STEPHEN | RESTRICTED SHARE AWARDS 3/27/2020 |
| 25 | 23-90072 | Invacare Corporation | BACHIE, STEPHEN | RESTRICTED SHARE AWARDS 4/1/2022 |
| 26 | 23-90068 | Invacare Corporation | BACKBONE TECH PARTNERS | CONSULTING SERVICES |
| 27 | 23-90068 | Invacare Corporation | BACKBONE TECHNOLOGY LLC | PROFESSIONAL SERVICES AGREEMENT |
| 28 | 23-90068 | Invacare Corporation | BACKBONE TECHNOLOGY LLC | STATEMENT OF WORK |
| 29 | 23-90072 | Invacare Corporation | BAXTER, LINDA | RESTRICTED SHARE AWARDS 3/12/2021 |
| 30 | 23-90072 | Invacare Corporation | BAXTER, LINDA | RESTRICTED SHARE AWARDS 3/27/2020 |
| 31 | 23-90072 | Invacare Corporation | BAXTER, LINDA | RESTRICTED SHARE AWARDS 4/1/2022 |
| 32 | 23-90068 | Invacare Corporation | BECK, JULIE A. | INDEMNITY AGREEMENT DTD 09-18-2019 |
| 33 | 23-90072 | Invacare Corporation | BECKERMAN, JAMES | RESTRICTED SHARE AWARDS 3/12/2021 |
| 34 | 23-90072 | Invacare Corporation | BECKERMAN, JAMES | RESTRICTED SHARE AWARDS 3/27/2020 |
| 35 | 23-90072 | Invacare Corporation | BECKERMAN, JAMES | RESTRICTED SHARE AWARDS 4/1/2022 |
| 36 | 23-90072 | Invacare Corporation | BELTMAN, JOOST | PERFORMANCE SHARE AWARDS 3/12/2021 |
| 37 | 23-90072 | Invacare Corporation | BELTMAN, JOOST | PERFORMANCE SHARE AWARDS 3/27/2020 |
| 38 | 23-90072 | Invacare Corporation | BELTMAN, JOOST | PERFORMANCE STOCK UNITS 4/1/2022 |
| 39 | 23-90068 | Invacare Corporation | BELTMAN, JOOST | PERFORMANCE UNIT AWARD  4/1/2022 |
| 40 | 23-90072 | Invacare Corporation | BELTMAN, JOOST | RESTRICTED SHARE AWARDS 3/12/2021 |
| 41 | 23-90072 | Invacare Corporation | BELTMAN, JOOST | RESTRICTED SHARE AWARDS 3/27/2020 |
| 42 | 23-90072 | Invacare Corporation | BELTMAN, JOOST | RESTRICTED STOCK UNITS 4/1/2022 |
| 43 | 23-90068 | Invacare Corporation | BERKS PLASTIC SURGERY INSTITUTE PC | LETTER REGARDING APPLICATION #77532699 DTD 7/29/2009 |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description |
|-----|-------------|-------------|-------------------|---------------------|
| 44 | 23-90072 | Invacare Corporation | BINDER, MARC | RESTRICTED STOCK UNITS 3/12/2021 |
| 45 | 23-90072 | Invacare Corporation | BINDER, MARC | RESTRICTED STOCK UNITS 3/27/2020 |
| 46 | 23-90072 | Invacare Corporation | BINDER, MARC | RESTRICTED STOCK UNITS 4/1/2022 |
| 47 | 23-90068 | Invacare Corporation | BLOOMBERG LP | TERM EXTENSION LETTER |
| 48 | 23-90085 | Invacare Corporation | BLOUCH, GERALD | DEATH BENEFIT ONLY AGREEMENT |
| 49 | 23-90068 | Invacare Corporation | BRANAM FASTENING SYSTEMS INC | PURCHASE AUTHORIZATION FORMS |
| 50 | 23-90068 | Invacare Corporation | BRANDLIVE INC | BRANDLIVE SERVICES AGREEMENT |
| 51 | 23-90068 | Invacare Corporation | BRANDLIVE INC | EVENT PRODUCTION SOFTWARE |
| 52 | 23-90068 | Invacare Corporation | BRANDLIVE INC | RENEWAL ORDER FORM 2022-2023 DTD 2/9/2022 |
| 53 | 23-90068 | Invacare Corporation | BROADRIDGE | PROXY SERVICES |
| 54 | 23-90068 | Invacare Corporation | BROADRIDGE INVESTOR COMMUNICATIONS SOLUTIONS INC | SERVICES SCHEDULE DTD 1/31/2022 |
| 55 | 23-90072 | Invacare Corporation | BUCKLEY, THOMAS | SUPPLEMENTAL EXECUTIVE RETIREMENT PLAN |
| 56 | 23-90068 | Invacare Corporation | BUSINESS WIRE | PRESS RELEASE SERVICE |
| 57 | 23-90068 | Invacare Corporation | BUSINESS WIRE | SPECIAL PRICING AGREEMENT (BULK) |
| 58 | 23-90068 | Invacare Corporation | BUSINESS WIRE | SPECIAL PRICING AGREEMENT (DISCOUNT) |
| 59 | 23-90068 | Invacare Corporation | CASSIDAY, RICK | CHANGE OF CONTROL AGREEMENT |
| 60 | 23-90068 | Invacare Corporation | CASSIDAY, RICK | EMPLOYMENT AGREEMENT LETTER DTD 4/22/2021 |
| 61 | 23-90068 | Invacare Corporation | CASSIDAY, RICK | INDEMNITY AGREEMENT DTD 6/7/2021 |
| 62 | 23-90068 | Invacare Corporation | CASSIDAY, RICK | PERFORMANCE UNIT AWARD   4/1/2022 |
| 63 | 23-90075 | Invacare Corporation | CASSIDY, RICK | SEPARATION AGREEMENT |
| 64 | 23-90068 | Invacare Corporation | CHAMPION EQUITY HOLDINGS LLC | SHARE PURCHASE AGREEMENT DTD 8/7/2013 |
| 65 | 23-90068 | Invacare Corporation | CHAMPION EQUITY HOLDINGS LLC | SHARE PURCHASE AGREEMENT DTD 8/7/2013 |
| 66 | 23-90068 | Invacare Corporation | CHAMPION EQUITY HOLDINGS, LLC | SHARE PURCHASE AGREEMENT AMONG CHAMPION EQUITY HOLDINGS, LLC, INVACARE CORPORATION, AND CHAMPION MANUFACTURING, INC. DATED 8/7/13 |
| 67 | 23-90068 | Invacare Corporation | CHAMPION EQUITY HOLDINGS, LLC | SHARE PURCHASE AGREEMENT AMONG CHAMPION EQUITY HOLDINGS, LLC, INVACARE CORPORATION, AND CHAMPION MANUFACTURING, INC. DATED 8/7/13 |
| 68 | 23-90068 | Invacare Corporation | CHAMPION MANUFACTURING INC | SHARE PURCHASE AGREEMENT DTD 8/7/2013 |
| 69 | 23-90068 | Invacare Corporation | CHANGHONG PLASTICSCO LTD | MASTER SUPPLY AGREEMENT #1045 DTD 7/15/2004 |
| 70 | 23-90068 | Invacare Corporation | CHANGZHOU PLASTIC MANUFACTURING FACTORY | MASTER SUPPLY AGREEMENT #2600 DTD 9/6/2007 |
| 71 | 23-90068 | Invacare Corporation | CHARM HOUNG INDUSTRY CO LTD | MASTER SUPPLY AGREEMENT #1059 DTD 7/2/2004 |
| 72 | 23-90072 | Invacare Corporation | CHETTY, SANKESH | RESTRICTED STOCK UNITS 3/12/2021 |
| 73 | 23-90072 | Invacare Corporation | CHETTY, SANKESH | RESTRICTED STOCK UNITS 3/27/2020 |
| 74 | 23-90072 | Invacare Corporation | CHETTY, SANKESH | RESTRICTED STOCK UNITS 4/1/2022 |
| 75 | 23-90066 | Adaptive Switch Laboratories, Inc. | CITRIX SHAREFILE | FILE SHARING |
| 76 | 23-90068 | Invacare Corporation | CITY WIDE FACILITY SOLUTIONS | CUSTODIAL SERVICES |
| 77 | 23-90068 | Invacare Corporation | CITYWIDE FACILITY SOLUTIONS | JANITORIAL SERVICE PACKAGE AND TERMS & CONDITIONS |
| 78 | 23-90068 | Invacare Corporation | COMCAST BUSINESS | CABLE, INTERNET AND VOICE SERVICE |
| 79 | 23-90068 | Invacare Corporation | COMPASS HEALTH BRAND CORP. | SHARE PURCHASE AGREEMENT AMONG COMPASS HEALTH BRANDS CORP. AND INVACARE CORPORATION, AND GARDEN CITY MEDICAL INC. DATED 9/30/16 |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description |
|---|---|---|---|---|
| 80 | 23-90068 | Invacare Corporation | COMPASS HEALTH BRANDS CORP | SHARE PURCHASE AGREEMENT DTD 9/30/2016 |
| 81 | 23-90068 | Invacare Corporation | COMPASS HEALTH BRANDS CORP | SHARE PURCHASE AGREEMENT DTD 9/30/2016 |
| 82 | 23-90068 | Invacare Corporation | COMPASS HEALTH BRANDS CORP | SHARE PURCHASE AGREEMENT DTD 9/30/2016 |
| 83 | 23-90068 | Invacare Corporation | CRAMER-DECKER INDUSTRIES | CONSENT AND COEXISTENCE AGREEMENT |
| 84 | 23-90068 | Invacare Corporation | CRAMER-DECKER MEDICAL INC | CONSENT AND COEXISTENCE AGREEMENT |
| 85 | 23-90068 | Invacare Corporation | CRISP, JAMES & BRENDA | AMENDMENT TO EXTEND LEASE DTD 3/23/2012 |
| 86 | 23-90068 | Invacare Corporation | CRISP, JAMES & BRENDA | AMENDMENT TO EXTEND LEASE DTD 4/26/2010 |
| 87 | 23-90068 | Invacare Corporation | CRISP, JAMES & BRENDA | AMENDMENT TO EXTEND LEASE DTD 6/10/2011 |
| 88 | 23-90068 | Invacare Corporation | CRISP, JAMES & BRENDA | ASSIGNMENT OF LEASE DTD 10/11/2012 |
| 89 | 23-90068 | Invacare Corporation | CRISP, JAMES & BRENDA | LEASE AGREEMENT |
| 90 | 23-90068 | Invacare Corporation | CRISP, JAMES & BRENDA | LEASE RENEWAL ADDENDUM DTD 7/28/2008 |
| 91 | 23-90068 | Invacare Corporation | CRISP, JAMES & BRENDA | NOTIFICATION OF ASSIGNMENT DTD 10/30/2007 |
| 92 | 23-90068 | Invacare Corporation | CROWELL & MORING LLP | RETENTION LETTER DTD 2/17/2021 |
| 93 | 23-90068 | Invacare Corporation | CTE CORPORATION | MASTER SUPPLY AND DISTRIBUTION AGREEMENT #296 DTD 2/11/2003 |
| 94 | 23-90068 | Invacare Corporation | DANAHER SERTA-ICG (TIANJIN) CO LTD | MASTER SUPPLY AGREEMENT #1093 DTD 3/7/2005 |
| 95 | 23-90068 | Invacare Corporation | DANIEL J EDELMAN INC | APPENDIX C - PROGRAM OBJECTIVES/SCOPE OF SERVICES |
| 96 | 23-90068 | Invacare Corporation | DANIEL J EDELMAN INC | APPENDIX C OF OBJECTIVES/ SCOPES OF SERVICES |
| 97 | 23-90072 | Invacare Corporation | DANIELSOHN-WEIL, PETRA | RESTRICTED STOCK UNITS 3/12/2021 |
| 98 | 23-90072 | Invacare Corporation | DANIELSOHN-WEIL, PETRA | RESTRICTED STOCK UNITS 3/27/2020 |
| 99 | 23-90072 | Invacare Corporation | DANIELSOHN-WEIL, PETRA | RESTRICTED STOCK UNITS 4/1/2022 |
| 100 | 23-90067 | Freedom Designs, Inc. | DELL FINANCIAL SERVICES LP | EQUIPMENT - COMPUTER |
| 101 | 23-90068 | Invacare Corporation | DELURY, KEVIN | CHANGE OF CONTROL AGREEMENT |
| 102 | 23-90068 | Invacare Corporation | DELURY, KEVIN | OFFER LETTER DTD 11/9/2022 |
| 103 | 23-90072 | Invacare Corporation | DELURY, KEVIN | RESTRICTED SHARE AWARDS 11/14/2022 |
| 104 | 23-90068 | Invacare Corporation | DOWNING ENTERPRISES | TRADESHOW/EXHIBIT MANAGEMENT-HOUSES INVACARE DISPLAYS & EQUIPMENT |
| 105 | 23-90068 | Invacare Corporation | DSS HOLDINGS LLC | STAFFING SERVICES AGREEMENT |
| 106 | 23-90068 | Invacare Corporation | DUN&BRADSTREET | COMMERCIAL CREDIT REPORTS |
| 107 | 23-90068 | Invacare Corporation | DYNAMIC CONTROLS | CUSTOMER NON CANCEL NON RETURN APPROVAL FORM |
| 108 | 23-90068 | Invacare Corporation | DYNAMIC CONTROLS | CUSTOMER NON CANCEL NON RETURN APPROVAL FORM GCB66720B DTD 12/17/2020 |
| 109 | 23-90068 | Invacare Corporation | DYNAMIC CONTROLS | CUSTOMER NON CANCEL NON RETURN APPROVAL FORM GIC0207 IN EMAIL DTD 6/17/2020 |
| 110 | 23-90068 | Invacare Corporation | DYNAMIC CONTROLS | CUSTOMER NON CANCEL NON RETURN APPROVAL FORM QIC6013 DTD 5/31/2021 |
| 111 | 23-90068 | Invacare Corporation | ECHO STORAGE OPTIONS LLC | RENTAL AGREEMENT |
| 112 | 23-90068 | Invacare Corporation | EDELMAN | IR CONSULTING |
| 113 | 23-90072 | Invacare Corporation | ENDRIES INTERNATIONAL INC. COMPANY | PURCAHSE AUTHORIZATION FORM FOR PART NUMBER 1100209 DTD 12/2/2021 |
| 114 | 23-90072 | Invacare Corporation | ENDRIES INTERNATIONAL INC. COMPANY | PURCAHSE AUTHORIZATION FORM FOR PART NUMBER 19155K95 DTD 1/25/2021 |
| 115 | 23-90072 | Invacare Corporation | ENDRIES INTERNATIONAL INC. COMPANY | PURCAHSE AUTHORIZATION FORM FOR PART NUMBER 60125271 DTD 1/16/2022 |
| 116 | 23-90072 | Invacare Corporation | ENDRIES INTERNATIONAL INC. COMPANY | PURCAHSE AUTHORIZATION FORM FOR PART NUMBER 60125272 DTD 1/4/2022 |
| 117 | 23-90072 | Invacare Corporation | ENDRIES INTERNATIONAL INC. COMPANY | PURCAHSE AUTHORIZATION FORM FOR PART NUMBER 60125272 DTD 9/16/21 |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description |
|---|---|---|---|---|
| 118 | 23-90072 | Invacare Corporation | ENDRIES INTERNATIONAL INC. COMPANY | PURCAHSE AUTHORIZATION FORM FOR PART NUMBER 60125320 DTD 10/21/2020 |
| 119 | 23-90072 | Invacare Corporation | ENDRIES INTERNATIONAL INC. COMPANY | PURCAHSE AUTHORIZATION FORM FOR PART NUMBER 60125324 DTD 12/23/2021 |
| 120 | 23-90072 | Invacare Corporation | ENDRIES INTERNATIONAL INC. COMPANY | PURCAHSE AUTHORIZATION FORM FOR PART NUMBER 60125325 DTD 12/23/2021 |
| 121 | 23-90072 | Invacare Corporation | ENDRIES INTERNATIONAL INC. COMPANY | PURCAHSE AUTHORIZATION FORM FOR PART NUMBER 60125332 DTD 1/22/2021 |
| 122 | 23-90072 | Invacare Corporation | ENDRIES INTERNATIONAL INC. COMPANY | PURCAHSE AUTHORIZATION FORM FOR PART NUMBER 60125334 DTD 12/28/2020 |
| 123 | 23-90072 | Invacare Corporation | ENDRIES INTERNATIONAL INC. COMPANY | PURCAHSE AUTHORIZATION FORM FOR PART NUMBER 60125334 DTD 9/16/2021 |
| 124 | 23-90072 | Invacare Corporation | ENDRIES INTERNATIONAL INC. COMPANY | PURCAHSE AUTHORIZATION FORM FOR PART NUMBER 60125341 DTD 1/29/2021 |
| 125 | 23-90072 | Invacare Corporation | ENDRIES INTERNATIONAL INC. COMPANY | PURCAHSE AUTHORIZATION FORM FOR PART NUMBER 60125425 DTD 12/23/2021 |
| 126 | 23-90072 | Invacare Corporation | ENDRIES INTERNATIONAL INC. COMPANY | PURCAHSE AUTHORIZATION FORM FOR PART NUMBER 60125464 DTD 5/29/2020 |
| 127 | 23-90072 | Invacare Corporation | ENDRIES INTERNATIONAL INC. COMPANY | PURCAHSE AUTHORIZATION FORM FOR PART NUMBER 60125500 DTD 11/17/2021 |
| 128 | 23-90072 | Invacare Corporation | ENDRIES INTERNATIONAL INC. COMPANY | PURCAHSE AUTHORIZATION FORM FOR PART NUMBER 60125545 DTD 4/6/2020 |
| 129 | 23-90072 | Invacare Corporation | ENDRIES INTERNATIONAL INC. COMPANY | PURCAHSE AUTHORIZATION FORM FOR PART NUMBER 60127454 DTD 12/28/2020 |
| 130 | 23-90072 | Invacare Corporation | ENDRIES INTERNATIONAL INC. COMPANY | PURCAHSE AUTHORIZATION FORM FOR PART NUMBER 60127455 DTD 1/27/21 |
| 131 | 23-90072 | Invacare Corporation | ENDRIES INTERNATIONAL INC. COMPANY | PURCAHSE AUTHORIZATION FORM FOR PART NUMBER 60127498 DTD 3/26/2021 |
| 132 | 23-90072 | Invacare Corporation | ENDRIES INTERNATIONAL INC. COMPANY | PURCAHSE AUTHORIZATION FORM FOR PART NUMBER 60127498 DTD 9/16/2021 |
| 133 | 23-90072 | Invacare Corporation | ESTRADA, JAVIER | RESTRICTED STOCK UNITS 3/12/2021 |
| 134 | 23-90072 | Invacare Corporation | ESTRADA, JAVIER | RESTRICTED STOCK UNITS 3/27/2020 |
| 135 | 23-90072 | Invacare Corporation | ESTRADA, JAVIER | RESTRICTED STOCK UNITS 4/1/2022 |
| 136 | 23-90068 | Invacare Corporation | FAAS, PHILLIP AND EVA CAROL | 4457 63RD CIRCLE, UNITS 1-2, PINELLAS PARK, FL 33781 |
| 137 | 23-90068 | Invacare Corporation | FAAS, PHILLIP AND EVA CAROL | AMENDMENT TO EXTEND LEASE DTD 6/4/2013 |
| 138 | 23-90068 | Invacare Corporation | FAAS, PHILLIP AND EVA CAROL | ASSIGNMENT OF LEASE DTD 10/11/2012 |
| 139 | 23-90068 | Invacare Corporation | FAAS, PHILLIP AND EVA CAROL | COMMERCIAL LEASE- FLORIDA |
| 140 | 23-90068 | Invacare Corporation | FAAS, PHILLIP AND EVA CAROL | CROSS ACCESS EASEMENT AGREEMENT DTD 10/5/2007 |
| 141 | 23-90068 | Invacare Corporation | FAAS, PHILLIP AND EVA CAROL | CROSS ACESS EASEMENT AGREEMENT |
| 142 | 23-90068 | Invacare Corporation | FAAS, PHILLIP AND EVA CAROL | NOTIFICATION OF ASSIGNMENT DTD 10/30/2007 |
| 143 | 23-90068 | Invacare Corporation | FAAS, PHILLIP AND EVA CAROL | RENTAL AGREEMENT LETTER DTD 10/14/2012 |
| 144 | 23-90068 | Invacare Corporation | FAGERDALA SHANGHAI FOAMS CO LTD | MASTER SUPPLY AGREEMENT #1082 DTD 11/5/2004 |
| 145 | 23-90068 | Invacare Corporation | FAGERDALA SHANGHAI FOAMS CO LTD | MASTER SUPPLY AGREEMENT #1086 DTD 12/2/2004 |
| 146 | 23-90068 | Invacare Corporation | FAGERDALA SUZHOU PACKAGING CO LTD | MASTER SUPPLY AGREEMENT #1086 DTD 12/2/2004 |
| 147 | 23-90072 | Invacare Corporation | FARRELL, MICHAEL | RESTRICTED STOCK UNITS 3/12/2021 |
| 148 | 23-90072 | Invacare Corporation | FARRELL, MICHAEL | RESTRICTED STOCK UNITS 3/27/2020 |
| 149 | 23-90072 | Invacare Corporation | FARRELL, MICHAEL | RESTRICTED STOCK UNITS 4/1/2022 |
| 150 | 23-90068 | Invacare Corporation | FEHR, STEPHANIE L. | INDEMNITY AGREEMENT DTD 3/25/2021 |
| 151 | 23-90068 | Invacare Corporation | FENCHURCH FILTERS SUZHOU LIMITED | MASTER SUPPLY AGREEMENT #8016 |
| 152 | 23-90068 | Invacare Corporation | FERGUSON, DIANA S. | INDEMNITY AGREEMENT DTD 7/19/2018 |
| 153 | 23-90072 | Invacare Corporation | FERREIRA, CINTIA | RESTRICTED STOCK UNITS 3/12/2021 |
| 154 | 23-90072 | Invacare Corporation | FERREIRA, CINTIA | RESTRICTED STOCK UNITS 4/1/2022 |
| 155 | 23-90072 | Invacare Corporation | FIEST, JASON | RESTRICTED SHARE AWARDS 3/12/2021 |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description |
|-----|-------------|-------------|-------------------|---------------------|
| 156 | 23-90072 | Invacare Corporation | FIEST, JASON | RESTRICTED SHARE AWARDS 3/27/2020 |
| 157 | 23-90072 | Invacare Corporation | FIEST, JASON | RESTRICTED SHARE AWARDS 4/1/2022 |
| 158 | 23-90068 | Invacare Corporation | FINDLAY FOAM RECYCLING | FOAM RECYCLING PRICING TERMS (ELYRIA, OH) |
| 159 | 23-90068 | Invacare Corporation | FOAMEX ASIA MANUFACTURING (WUXI) CO LTD | MASTER SUPPLY AGREEMENT #1063 DTD 8/17/2004 |
| 160 | 23-90086 | Invacare Corporation | FOX, JEROME E. | DEATH BENEFIT ONLY AGREEMENT |
| 161 | 23-90068 | Invacare Corporation | FROG LEGS INC | VOLUME PURCHASE AGREEMENT #289 DTD 1/1/2002 |
| 162 | 23-90068 | Invacare Corporation | FULL SPECTRUM MARKETING LLC | STATEMENT OF WORK |
| 163 | 23-90068 | Invacare Corporation | GARDEN CITY MEDICAL INC | SHARE PURCHASE AGREEMENT DTD 9/30/2016 |
| 164 | 23-90068 | Invacare Corporation | GENERAL BEARING COROPRATION | MASTER SUPPLY AGREEMENT #1078 DTD 2/21/2005 |
| 165 | 23-90072 | Invacare Corporation | GIBELEY, MARC M. | RESTRICTED STOCK UNITS 3/12/2021 |
| 166 | 23-90072 | Invacare Corporation | GIBELEY, MARC M. | RESTRICTED STOCK UNITS 3/27/2020 |
| 167 | 23-90072 | Invacare Corporation | GIBELEY, MARC M. | RESTRICTED STOCK UNITS 4/1/2022 |
| 168 | 23-90068 | Invacare Corporation | GLOBAL MOBILITY SOLUTIONS LLC | RELOCATION SERVICES AGREEMENT |
| 169 | 23-90072 | Invacare Corporation | GLOY, MADELEINE | RESTRICTED STOCK UNITS 4/1/2022 |
| 170 | 23-90068 | Invacare Corporation | GOLDMAN SACHS & CO LLC | LETTER AGREEMENT DTD 6/8/2017 |
| 171 | 23-90068 | Invacare Corporation | GOLDMAN SACHS & CO LLC | LETTER AGREEMENT DTD 6/9/2017 |
| 172 | 23-90068 | Invacare Corporation | GOLDMAN SACHS & CO LLC | LETTER AGREEMENT DTD 9/15/2021 |
| 173 | 23-90072 | Invacare Corporation | GONCLAVES, DANIEL | RESTRICTED STOCK UNITS 4/1/2022 |
| 174 | 23-90068 | Invacare Corporation | GOODWIN, ANGELA | CHANGE OF CONTROL AGREEMENT |
| 175 | 23-90068 | Invacare Corporation | GOODWIN, ANGELA | EMPLOYMENT OFFER LETTER DTD 2/8/2019 |
| 176 | 23-90068 | Invacare Corporation | GOODWIN, ANGELA | LETTER AGREEMENT DTD 2/8/2019 |
| 177 | 23-90068 | Invacare Corporation | GOODWIN, ANGELA | OFFER LETTER DTD 2/8/2019 |
| 178 | 23-90072 | Invacare Corporation | GOODWIN, ANGELA | PERFORMANCE SHARE AWARDS 3/12/2021 |
| 179 | 23-90072 | Invacare Corporation | GOODWIN, ANGELA | PERFORMANCE SHARE AWARDS 3/27/2020 |
| 180 | 23-90072 | Invacare Corporation | GOODWIN, ANGELA | PERFORMANCE SHARE AWARDS 4/1/2022 |
| 181 | 23-90068 | Invacare Corporation | GOODWIN, ANGELA | PERFORMANCE UNIT AWARD  4/1/2022 |
| 182 | 23-90072 | Invacare Corporation | GOODWIN, ANGELA | RESTRICTED SHARE AWARDS 3/12/2021 |
| 183 | 23-90072 | Invacare Corporation | GOODWIN, ANGELA | RESTRICTED SHARE AWARDS 3/27/2020 |
| 184 | 23-90072 | Invacare Corporation | GOODWIN, ANGELA | RESTRICTED SHARE AWARDS 4/1/2022 |
| 185 | 23-90072 | Invacare Corporation | GROSPITCH, MICHAEL | RESTRICTED SHARE AWARDS 3/12/2021 |
| 186 | 23-90072 | Invacare Corporation | GROSPITCH, MICHAEL | RESTRICTED SHARE AWARDS 3/27/2020 |
| 187 | 23-90072 | Invacare Corporation | GROSPITCH, MICHAEL | RESTRICTED SHARE AWARDS 4/1/2022 |
| 188 | 23-90071 | Invacare Corporation | GUDBRANSON, ROBERT | SUPPLEMENTAL EXECUTIVE RETIREMENT PLAN |
| 189 | 23-90077 | Invacare Corporation | GUDBRANSON, ROBERT K. | DEATH BENEFIT ONLY AGREEMENT |
| 190 | 23-90072 | Invacare Corporation | GUERRERO, GAVRIELA | RESTRICTED SHARE AWARDS 3/12/2021 |
| 191 | 23-90072 | Invacare Corporation | GUERRERO, GAVRIELA | RESTRICTED SHARE AWARDS 4/1/2022 |
| 192 | 23-90072 | Invacare Corporation | HAMILTON, MICHELLE | RESTRICTED STOCK UNITS 3/12/2021 |
| 193 | 23-90072 | Invacare Corporation | HAMILTON, MICHELLE | RESTRICTED STOCK UNITS 4/1/2022 |
| 194 | 23-90068 | Invacare Corporation | HARRIS, MARTIN C. | INDEMNITY AGREEMENT DTD 1/24/2003 |
| 195 | 23-90072 | Invacare Corporation | HARRIS, MARTIN C. | RESTRICTED STOCK UNITS 3/12/2021 |
| 196 | 23-90072 | Invacare Corporation | HARRIS, MARTIN C. | RESTRICTED STOCK UNITS 3/27/2020 |
| 197 | 23-90068 | Invacare Corporation | HAWK COMPOSITES (SUZHOU) CO LTD | MASTER SUPPLY AGREEMENT #1079 DTD 11/2/2004 |
| 198 | 23-90068 | Invacare Corporation | HICKS RENTAL PROPERTIES | AMENDMENT TO EXTEND LEASE DTD 3/23/2012 |
| 199 | 23-90068 | Invacare Corporation | HICKS RENTAL PROPERTIES | AMENDMENT TO EXTEND LEASE DTD 4/26/2010 |
| 200 | 23-90068 | Invacare Corporation | HICKS RENTAL PROPERTIES | AMENDMENT TO EXTEND LEASE DTD 6/10/2011 |
| 201 | 23-90068 | Invacare Corporation | HICKS RENTAL PROPERTIES | LEASE - 4501 63RD CIRCLE N, PINELLAS PARK, FL 33781 |
| 202 | 23-90068 | Invacare Corporation | HICKS RENTAL PROPERTIES | AMENDMENT TO EXTEND LEASE DTD 5/23/1996 |
| 203 | 23-90068 | Invacare Corporation | HICKS RENTAL PROPERTIES | AMENDMENT TO EXTEND LEASE DTD 5/23/1997 |
| 204 | 23-90068 | Invacare Corporation | HICKS RENTAL PROPERTIES | AMENDMENT TO EXTEND LEASE DTD 6/19/2000 |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description |
|---|---|---|---|---|
| 205 | 23-90068 | Invacare Corporation | HICKS RENTAL PROPERTIES | AMENDMENT TO EXTEND LEASE DTD 6/21/2002 |
| 206 | 23-90068 | Invacare Corporation | HICKS RENTAL PROPERTIES | AMENDMENT TO EXTEND LEASE DTD 6/23/1995 |
| 207 | 23-90068 | Invacare Corporation | HICKS RENTAL PROPERTIES | INCREASE OF RENT LETTER DTD 7/10/2007 |
| 208 | 23-90068 | Invacare Corporation | HICKS RENTAL PROPERTIES | INCREASE OF RENT LETTER DTD 7/15/2013 |
| 209 | 23-90068 | Invacare Corporation | HICKS RENTAL PROPERTIES | INCREASE OF RENT LETTER DTD 7/18/2005 |
| 210 | 23-90068 | Invacare Corporation | HICKS RENTAL PROPERTIES | INCREASE OF RENT LETTER DTD 7/23/2003 |
| 211 | 23-90068 | Invacare Corporation | HICKS RENTAL PROPERTIES | INCREASE OF RENT LETTER DTD 7/25/2006 |
| 212 | 23-90068 | Invacare Corporation | HICKS RENTAL PROPERTIES | INCREASE OF RENT LETTER DTD 7/7/2004 |
| 213 | 23-90068 | Invacare Corporation | HICKS RENTAL PROPERTIES | INCREASE OF RENT LETTER DTD 8/20/2008 |
| 214 | 23-90068 | Invacare Corporation | HICKS RENTAL PROPERTIES | LEASE AMENDMENT DTD 2/16/1994 |
| 215 | 23-90068 | Invacare Corporation | HICKS, LINDA L, TRUSTEE | AMENDMENT TO EXTEND LEASE DTD 6/24/1993 |
| 216 | 23-90068 | Invacare Corporation | HICKS, LINDA L, TRUSTEE | BUSINESS LEASE DTD 7/7/1992 |
| 217 | 23-90068 | Invacare Corporation | HICKS, LINDA L, TRUSTEE | OPTION TO PURCAHSE PREMISES DTD 9/3/1993 |
| 218 | 23-90072 | Invacare Corporation | HUBENY, STEPHEN | RESTRICTED SHARE AWARDS 3/12/2021 |
| 219 | 23-90072 | Invacare Corporation | HUBENY, STEPHEN | RESTRICTED SHARE AWARDS 3/27/2020 |
| 220 | 23-90072 | Invacare Corporation | HUBENY, STEPHEN | RESTRICTED SHARE AWARDS 4/1/2022 |
| 221 | 23-90072 | Invacare Corporation | HUGHES, DAVID SCOTT | RESTRICTED SHARE AWARDS 3/12/2021 |
| 222 | 23-90072 | Invacare Corporation | HUGHES, DAVID SCOTT | RESTRICTED SHARE AWARDS 3/27/2020 |
| 223 | 23-90072 | Invacare Corporation | HUGHES, DAVID SCOTT | RESTRICTED SHARE AWARDS 4/1/2022 |
| 224 | 23-90068 | Invacare Corporation | IFA FITTINGS MANUFACTURING CO LTD | MASTER SUPPLY AGREEMENT #1096 DTD 3/4/2005 |
| 225 | 23-90068 | Invacare Corporation | IFA FOUNDRY (SHANGHAI) CO LTD | MASTER SUPPLY AGREEMENT #1096 DTD 3/4/2005 |
| 226 | 23-90068 | Invacare Corporation | IGUS (SHANGHAI) CO LTD | MASTER SUPPLY AGREEMENT #3000 DTD 4/23/2007 |
| 227 | 23-90068 | Invacare Corporation | INSIGHT GLOBAL LLC | MASTER SERVICES AGREEMENT FOR STAFFING SERVICES |
| 228 | 23-90067 | Freedom Designs, Inc. | INTECH FUNDING CORP | CNC MACHINING CENTER |
| 229 | 23-90072 | Invacare Corporation | JAENKE, BRUCE | RESTRICTED SHARE AWARDS 3/12/2021 |
| 230 | 23-90072 | Invacare Corporation | JAENKE, BRUCE | RESTRICTED SHARE AWARDS 3/27/2020 |
| 231 | 23-90072 | Invacare Corporation | JAENKE, BRUCE | RESTRICTED SHARE AWARDS 4/1/2022 |
| 232 | 23-90068 | Invacare Corporation | JIEH-MING PLASTICS MFG CO LTD | MASTER SUPPLY AGREEMENT #1073 DTD 10/26/2004 |
| 233 | 23-90068 | Invacare Corporation | JOBSOHIO | AMENDMENT TO GRANT AGREEMENT |
| 234 | 23-90068 | Invacare Corporation | JOBSOHIO | GRANT AGREEMENT |
| 235 | 23-90068 | Invacare Corporation | JOERNS HEALTHCARE PARENT, LLC | MEMBERSHIP INTEREST PURCHASE AGREEMENT BETWEEN JOERNS HEALTHCARE PARENT, LLC, INVACARE CONTINUING CARE, INC. AND INVACARE CORPORATION DATED JULY 2, 2015 |
| 236 | 23-90068 | Invacare Corporation | JOERNS HEALTHCARE PARENT, LLC | MEMBERSHIP INTEREST PURCHASE AGREEMENT BETWEEN JOERNS HEALTHCARE PARENT, LLC, INVACARE CONTINUING CARE, INC. AND INVACARE CORPORATION DATED JULY 2, 2015 |
| 237 | 23-90068 | Invacare Corporation | JOHNS HOPKINS HOME CARE GRP INC, THE | PRODUCT PURCHASING AGREEMENT TERM SHEET |
| 238 | 23-90068 | Invacare Corporation | KAROL, DARCIE L. | INDEMNITY AGREEMENT DTD 6/4/2018 |
| 239 | 23-90072 | Invacare Corporation | KELLEHER, KEITH | RESTRICTED SHARE AWARDS 3/12/2021 |
| 240 | 23-90072 | Invacare Corporation | KELLEHER, KEITH | RESTRICTED SHARE AWARDS 3/27/2020 |
| 241 | 23-90072 | Invacare Corporation | KELLEHER, KEITH | RESTRICTED SHARE AWARDS 4/1/2022 |
| 242 | 23-90068 | Invacare Corporation | KENCO | 3RD PARTY LOGISTICS |
| 243 | 23-90068 | Invacare Corporation | KENCO TRANSPORTATION MANAGEMENT LLC | AMENDMENT #1 TO TRANSPORTATION MANAGEMENT AGREEMENT |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description |
|---|---|---|---|---|
| 244 | 23-90068 | Invacare Corporation | KENCO TRANSPORTATION MANAGEMENT LLC | AMENDMENT #2 TO TRANSPORTATION MANAGEMENT AGREEMENT DTD 11/13/2020 |
| 245 | 23-90068 | Invacare Corporation | KENCO TRANSPORTATION MANAGEMENT LLC | AMENDMENT 1 TO TRANSPORTATION MANAGEMENT AGREEMENT |
| 246 | 23-90068 | Invacare Corporation | KENCO TRANSPORTATION MANAGEMENT LLC | AMENDMENT 2 TO TRANSPORATION MANAGEMENT AGREEMENT |
| 247 | 23-90068 | Invacare Corporation | KENCO TRANSPORTATION MANAGEMENT LLC | AMENDMENT 2 TO TRANSPORTATION MANAGEMENT AGREEMENT |
| 248 | 23-90068 | Invacare Corporation | KENCO TRANSPORTATION MANAGEMENT LLC | AMENDMENT 2 TO TRANSPORTATION MANAGEMENT AGREEMENT DTD 11/13/2020 |
| 249 | 23-90068 | Invacare Corporation | KENCO TRANSPORTATION MANAGEMENT LLC | STATEMENT OF WORK #1 |
| 250 | 23-90068 | Invacare Corporation | KENCO TRANSPORTATION MANAGEMENT LLC | TRANSPORTATION MANAGEMENT AGREEMENT |
| 251 | 23-90068 | Invacare Corporation | KENCO TRANSPORTATION MANAGEMENT LLC | TRANSPORTATION MANAGEMENT AGREEMENT |
| 252 | 23-90068 | Invacare Corporation | KENSTONE METAL (KUNSHAN) CO LTD | MASTER SUPPLY AGREEMENT #1098 DTD 1/28/2005 |
| 253 | 23-90068 | Invacare Corporation | KINGSTATE ELECTRONICS (DONGGUAN) CO LTD | MASTER SUPPLY AGREEMENT #1047 DTD 7/13/2004 |
| 254 | 23-90068 | Invacare Corporation | KINGSTATE ELECTRONICS CORP | MASTER SUPPLY AGREEMENT #1047 DTD 7/13/2004 |
| 255 | 23-90068 | Invacare Corporation | KUNSHAN HUIYU PACKAGING PRODUCT CO LTD | MASTER SUPPLY AGREEMENT #1066 DTD 9/13/2004 |
| 256 | 23-90068 | Invacare Corporation | KUNSHAN HWAKUAN LABEL & PRINTING CO LTD | MASTER SUPPLY AGREEMENT #1046 DTD 6/18/2004 |
| 257 | 23-90072 | Invacare Corporation | LAPLACA, ANTHONY | PERFORMANCE SHARE AWARDS 3/12/2021 |
| 258 | 23-90072 | Invacare Corporation | LAPLACA, ANTHONY | PERFORMANCE SHARE AWARDS 4/1/2022 |
| 259 | 23-90068 | Invacare Corporation | LAPLACA, ANTHONY | PERFORMANCE UNIT AWARD  4/1/2022 |
| 260 | 23-90072 | Invacare Corporation | LAPLACA, ANTHONY | RESTRICTED SHARE AWARDS 3/12/2021 |
| 261 | 23-90072 | Invacare Corporation | LAPLACA, ANTHONY | RESTRICTED SHARE AWARDS 3/27/2020 |
| 262 | 23-90072 | Invacare Corporation | LAPLACA, ANTHONY | RESTRICTED SHARE AWARDS 4/1/2022 |
| 263 | 23-90080 | Invacare Corporation | LAPORTE, DALE C. | DEATH BENEFIT ONLY AGREEMENT |
| 264 | 23-90072 | Invacare Corporation | LAVIN, PAUL | RESTRICTED STOCK UNITS 3/12/2021 |
| 265 | 23-90072 | Invacare Corporation | LAVIN, PAUL | RESTRICTED STOCK UNITS 3/27/2020 |
| 266 | 23-90072 | Invacare Corporation | LAVIN, PAUL | RESTRICTED STOCK UNITS 4/1/2022 |
| 267 | 23-90068 | Invacare Corporation | LBP LEASING, INC. | COPIER SERVICE CONTRACT |
| 268 | 23-90068 | Invacare Corporation | LBP LEASING, INC. | EQUIPMENT - COPIER - C250I |
| 269 | 23-90068 | Invacare Corporation | LEDDA, RALF | CHANGE OF CONTROL AGREEMENT |
| 270 | 23-90068 | Invacare Corporation | LEDDA, RALF | INDEMNITY AGREEMENT DTD 11/1/2016 |
| 271 | 23-90072 | Invacare Corporation | LEDDA, RALF | PERFORMANCE STOCK UNITS 3/12/2021 |
| 272 | 23-90072 | Invacare Corporation | LEDDA, RALF | PERFORMANCE STOCK UNITS 3/27/2020 |
| 273 | 23-90072 | Invacare Corporation | LEDDA, RALF | RESTRICTED STOCK UNITS 3/12/2021 |
| 274 | 23-90072 | Invacare Corporation | LEDDA, RALF | RESTRICTED STOCK UNITS 3/27/2020 |
| 275 | 23-90072 | Invacare Corporation | LEE, LOIS | RESTRICTED SHARE AWARDS 3/12/2021 |
| 276 | 23-90072 | Invacare Corporation | LEE, LOIS | RESTRICTED SHARE AWARDS 3/27/2020 |
| 277 | 23-90072 | Invacare Corporation | LEE, LOIS | RESTRICTED SHARE AWARDS 4/1/2022 |
| 278 | 23-90068 | Invacare Corporation | LENEGHAN, KATHLEEN | PERFORMANCE UNIT AWARD  4/1/2022 |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description |
|---|---|---|---|---|
| 279 | 23-90072 | Invacare Corporation | LENEGHAN, KATHY | PERFORMANCE SHARE AWARDS 3/12/2021 |
| 280 | 23-90072 | Invacare Corporation | LENEGHAN, KATHY | PERFORMANCE SHARE AWARDS 3/27/2020 |
| 281 | 23-90072 | Invacare Corporation | LENEGHAN, KATHY | PERFORMANCE SHARE AWARDS 4/1/2022 |
| 282 | 23-90072 | Invacare Corporation | LENEGHAN, KATHY | RESTRICTED SHARE AWARDS 3/12/2021 |
| 283 | 23-90072 | Invacare Corporation | LENEGHAN, KATHY | RESTRICTED SHARE AWARDS 3/27/2020 |
| 284 | 23-90072 | Invacare Corporation | LENEGHAN, KATHY | RESTRICTED SHARE AWARDS 4/1/2022 |
| 285 | 23-90068 | Invacare Corporation | LETNER, RICH | CHANGE OF CONTROL AGREEMENT |
| 286 | 23-90068 | Invacare Corporation | LIGHT COUNTRY CO LTD | MASTER SUPPLY AGREEMENT #1062 DTD 8/9/2004 |
| 287 | 23-90068 | Invacare Corporation | LIGHT COUNTRY CO LTD | MASTER SUPPLY AGREEMENT #1062 DTD 8/9/2004 |
| 288 | 23-90068 | Invacare Corporation | LIGHT COUNTRY CO LTD | MASTER SUPPLY AGREEMENT #1062 DTD 8/9/2004 |
| 289 | 23-90068 | Invacare Corporation | LIGHT COUNTRY CO LTD (DONG GUAN) | MASTER SUPPLY AGREEMENT #1062 DTD 8/9/2004 |
| 290 | 23-90068 | Invacare Corporation | LINDA L HICKS TRUST | BUSINESS LEASE DTD 7/1/1999 |
| 291 | 23-90068 | Invacare Corporation | LINDA L HICKS TRUST | CROSS ACCESS EASEMENT AGREEMENT DTD 10/5/2007 |
| 292 | 23-90068 | Invacare Corporation | LINDA L HICKS TRUST | CROSS ACESS EASEMENT AGREEMENT |
| 293 | 23-90068 | Invacare Corporation | LINDE GAS/ DBA THE SERVICE CENTER | RESPIRATORY WARRANTY REPAIR SERVICE |
| 294 | 23-90072 | Invacare Corporation | LIS, TIMOTHY | RESTRICTED SHARE AWARDS 3/12/2021 |
| 295 | 23-90072 | Invacare Corporation | LIS, TIMOTHY | RESTRICTED SHARE AWARDS 3/27/2020 |
| 296 | 23-90072 | Invacare Corporation | LIS, TIMOTHY | RESTRICTED SHARE AWARDS 4/1/2022 |
| 297 | 23-90068 | Invacare Corporation | LLOYD LINDEN INC | MASTER SUPPLY AGREEMENT #1136 DTD 1/1/2007 |
| 298 | 23-90068 | Invacare Corporation | MAILFINANCE INC | EQUIPMENT - POSTAGE METER |
| 299 | 23-90068 | Invacare Corporation | MALLORY ALEXANDER INTERNATIONAL LOGISTICS | CUSTOMS BROKERAGE SERVICES |
| 300 | 23-90072 | Invacare Corporation | MARCHIONY, MICHELLE ZIMMERMAN | RESTRICTED SHARE AWARDS 4/1/2022 |
| 301 | 23-90068 | Invacare Corporation | MASTER DATA CENTER, INC. | IP MANAGEMENT SERVICES |
| 302 | 23-90068 | Invacare Corporation | MAXTEC INC | MASTER SUPPLY AGREEMENT #404 DTD 1/8/2010 |
| 303 | 23-90068 | Invacare Corporation | MAXTEC INC | MASTER SUPPLY AGREEMENT #424 DTD 4/23/2012 |
| 304 | 23-90068 | Invacare Corporation | MELTWATER | ONLINE MEDIA MONITORING |
| 305 | 23-90068 | Invacare Corporation | MERITS HEALTH PRODUCTS CO LTD | MASTER SUPPLY AGREEMENT #1019 DTD 1/21/2011 |
| 306 | 23-90072 | Invacare Corporation | MERRIMAN, MICHAEL | RESTRICTED STOCK UNITS 9/13/2022 |
| 307 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01017833-M001 |
| 308 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01020647-M001 |
| 309 | 23-90068 | Invacare Corporation | MIKE ALBERT LEASING INC | MAL-01026820 |
| 310 | 23-90073 | Invacare Corporation | MIKLICH, THOMAS | SUPPLEMENTAL EXECUTIVE RETIREMENT PLAN |
| 311 | 23-90068 | Invacare Corporation | MOBILE MINI SOLUTIONS | 20ZS 20' STANDARD TRI CAM CONTAINER |
| 312 | 23-90068 | Invacare Corporation | MOBILE MINI SOLUTIONS | 40ZS 40' STANDARD TRI DOOR |
| 313 | 23-90068 | Invacare Corporation | MOBILE MINI SOLUTIONS | 40ZX 40' STANDARD TRI DOOR AND CG1 CONTAINER GUARD LOCK |
| 314 | 23-90068 | Invacare Corporation | MOBILE MODULAR PORTABLE STORAGE | CONTAINER LEASE QUOTATION #425028 DTD 11/8/2021 |
| 315 | 23-90082 | Invacare Corporation | MONAGHAN, MATTEW | DEATH BENEFIT ONLY AGREEMENT |
| 316 | 23-90075 | Invacare Corporation | MONAGHAN, MATTEW | SEPARATION AGREEMENT |
| 317 | 23-90068 | Invacare Corporation | MONAGHAN, MATTHEW | CHANGE OF CONTROL AGREEMENT |
| 318 | 23-90068 | Invacare Corporation | MONAGHAN, MATTHEW | INDEMNITY AGREEMENT DTD 4/1/2015 |
| 319 | 23-90072 | Invacare Corporation | MONAGHAN, MATTHEW | PERFORMANCE SHARE AWARDS 3/12/2021 |
| 320 | 23-90072 | Invacare Corporation | MONAGHAN, MATTHEW | PERFORMANCE SHARE AWARDS 3/27/2020 |
| 321 | 23-90072 | Invacare Corporation | MONAGHAN, MATTHEW | PERFORMANCE SHARE AWARDS 4/1/2022 |
| 322 | 23-90068 | Invacare Corporation | MONAGHAN, MATTHEW | PERFORMANCE UNIT AWARD  4/1/2022 |
| 323 | 23-90072 | Invacare Corporation | MONAGHAN, MATTHEW | RESTRICTED SHARE AWARDS 3/12/2021 |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description |
|---|---|---|---|---|
| 324 | 23-90072 | Invacare Corporation | MONAGHAN, MATTHEW | RESTRICTED SHARE AWARDS 3/27/2020 |
| 325 | 23-90072 | Invacare Corporation | MONAGHAN, MATTHEW | RESTRICTED SHARE AWARDS 3/27/2020 |
| 326 | 23-90072 | Invacare Corporation | MONAGHAN, MATTHEW | RESTRICTED SHARE AWARDS 4/1/2022 |
| 327 | 23-90068 | Invacare Corporation | MONAGHAN, MATTHEW E | EMPLOYMENT AGREEMENT |
| 328 | 23-90068 | Invacare Corporation | MONAGHAN, MATTHEW E | IDEMNITY AGREEMENT DTD 4/1/2015 |
| 329 | 23-90072 | Invacare Corporation | MORGAN, JOHN | RESTRICTED SHARE AWARDS 3/12/2021 |
| 330 | 23-90072 | Invacare Corporation | MORGAN, JOHN | RESTRICTED SHARE AWARDS 3/27/2020 |
| 331 | 23-90072 | Invacare Corporation | MORGAN, JOHN | RESTRICTED SHARE AWARDS 4/1/2022 |
| 332 | 23-90068 | Invacare Corporation | MORTON PROPERTIES INC | 2ND LEASE AMENDMENT |
| 333 | 23-90068 | Invacare Corporation | MOSCARINO LANDSCAPING | SNOW REMOVAL |
| 334 | 23-90068 | Invacare Corporation | MOSCARINO LANDSCAPING | SNOW REMOVAL SERVICES |
| 335 | 23-90068 | Invacare Corporation | MOSCARINO OUTDOOR CREATIONS | SNOW REMOVAL CONTRACT DTD 8/13/2022 |
| 336 | 23-90068 | Invacare Corporation | MTMC INTERIOR DESIGN CORP | PLATINUM PROVIDER AGREEMENT |
| 337 | 23-90068 | Invacare Corporation | MTMC INTERIOR DESIGN CORPORATION | ASSET PURCHASE AGREEMENT (ONGOING COVENANTS, INCL NONCOMPETE) |
| 338 | 23-90068 | Invacare Corporation | MTMC INTERIOR DESIGN CORPORATION | ASSET PURCHASE AGREEMENT BETWEEN INVACARE CONTINUING CARE, INC., AND MTMC INTERIOR DESIGN CORPORATION, DATED 10/26/19 |
| 339 | 23-90068 | Invacare Corporation | MTMC INTERIOR DESIGN CORPORATION | ASSET PURCHASE AGREEMENT DTD 10/26/2019 |
| 340 | 23-90068 | Invacare Corporation | MTMC INTERIOR DESIGN CORPORATION | ASSIGNMENT & ASSUMPTION AGREEMENT DTD 11/1/2019 |
| 341 | 23-90068 | Invacare Corporation | MTMC INTERIOR DESIGN CORPORATION | ASSIGNMENT AND ASSUMPTION AGREEMENT DTD 11/1/2019 |
| 342 | 23-90068 | Invacare Corporation | MTMC INTERIOR DESIGN CORPORATION | BILL OF SALE DTD 11/1/2019 |
| 343 | 23-90067 | Freedom Designs, Inc. | MTMC INTERIOR DESIGN CORPORATION | PLATINUM PROVIDER AGREEMENT |
| 344 | 23-90072 | Invacare Corporation | MUELLER, THOMAS | RESTRICTED STOCK UNITS 3/12/2021 |
| 345 | 23-90072 | Invacare Corporation | MUELLER, THOMAS | RESTRICTED STOCK UNITS 3/27/2020 |
| 346 | 23-90072 | Invacare Corporation | MUELLER, THOMAS | RESTRICTED STOCK UNITS 4/1/2022 |
| 347 | 23-90068 | Invacare Corporation | NASDAQ IR INSIGHT | CRM FOR INVESTOR CALLS |
| 348 | 23-90072 | Invacare Corporation | NASTAS, CLIFFORD D. | RESTRICTED STOCK UNITS 3/12/2021 |
| 349 | 23-90072 | Invacare Corporation | NASTAS, CLIFFORD D. | RESTRICTED STOCK UNITS 3/27/2020 |
| 350 | 23-90072 | Invacare Corporation | NASTAS, CLIFFORD D. | RESTRICTED STOCK UNITS 4/1/2022 |
| 351 | 23-90068 | Invacare Corporation | NATIONAL EMPLOYERS COUNCIL INC | SERVICE AGREEMENT |
| 352 | 23-90068 | Invacare Corporation | NEW PROKIN INTERNATIONAL LTD | MASTER SUPPLY AGREEMENT #1087 DTD 1/27/2005 |
| 353 | 23-90068 | Invacare Corporation | NINGBO GENERAL BEARING CO LTD | MASTER SUPPLY AGREEMENT #1078 DTD 2/21/2005 |
| 354 | 23-90068 | Invacare Corporation | NINGBO GENERAL BEARING CO LTD | MASTER SUPPLY AGREEMENT #1078 DTD 4/17/2007 |
| 355 | 23-90068 | Invacare Corporation | NINGBO JIANGBEI DISTRICT CICHENG PNEUMATIC COMPONENTS FACTORY | MASTER SUPPLY AGREEMENT #1090 |
| 356 | 23-90068 | Invacare Corporation | NINGBO YUNFENG IMPORT & EXPORT CO LTD | MASTER SUPPLY AGREEMENT #1044 |
| 357 | 23-90068 | Invacare Corporation | NINGHAI JIANPAI AUTOMOTIVE ACCESSORY CO LTD | MASTER SUPPLY AGREEMENT #1044 |
| 358 | 23-90068 | Invacare Corporation | NINGHAI JIANPAI AUTOMOTIVE ACCESSORY CO LTD | MASTER SUPPLY AGREEMENT #1044 DTD 9/1/2015 |
| 359 | 23-90068 | Invacare Corporation | NINGHAI JIANPAI AUTOMOTIVE ACCESSORY CO LTD | MASTER SUPPLY AGREEMENT #1069 DTD 9/21/2004 |
| 360 | 23-90068 | Invacare Corporation | NMB TECHNOLOGIES CORPORATION | PRICING AGREEMENT |
| 361 | 23-90068 | Invacare Corporation | NYSE MARKET (DE) INC | INVOICE #054021428844NYL DTD 3/14/2022 |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description |
|-----|-------------|-------------|-------------------|---------------------|
| 362 | 23-90068 | Invacare Corporation | ON24 | WEBCAST MANAGEMENT SUBSCRIPTION |
| 363 | 23-90068 | Invacare Corporation | ON24 INC | WEBCAST ELITE 1000 SUBSCRIPTION AGREEMENT |
| 364 | 23-90068 | Invacare Corporation | ONE TRUST TECHNOLOGY LIMITED | PRIVACY COMPLIANCE TOOL |
| 365 | 23-90072 | Invacare Corporation | OPFERMANN, REGIS | RESTRICTED STOCK UNITS 3/12/2021 |
| 366 | 23-90072 | Invacare Corporation | OPFERMANN, REGIS | RESTRICTED STOCK UNITS 3/27/2020 |
| 367 | 23-90072 | Invacare Corporation | OPFERMANN, REGIS | RESTRICTED STOCK UNITS 4/1/2022 |
| 368 | 23-90068 | Invacare Corporation | PELOTON INCORPORATION CO | MASTER SUPPLY AGREEMENT #1088 DTD 12/7/2004 |
| 369 | 23-90072 | Invacare Corporation | PEREZ, GERARDO MONTEMAYOR | RESTRICTED STOCK UNITS 3/12/2021 |
| 370 | 23-90072 | Invacare Corporation | PEREZ, GERARDO MONTEMAYOR | RESTRICTED STOCK UNITS 3/27/2020 |
| 371 | 23-90072 | Invacare Corporation | PEREZ, GERARDO MONTEMAYOR | RESTRICTED STOCK UNITS 4/1/2022 |
| 372 | 23-90067 | Freedom Designs, Inc. | PITNEY BOWES GLOBAL FINANCIAL SERVICES LLC | EQUIPMENT - POSTAGE MACHINE |
| 373 | 23-90068 | Invacare Corporation | PITNEY BOWES GLOBAL FINANCIAL SERVICES LLC | POSTAGE METER |
| 374 | 23-90068 | Invacare Corporation | PREVENT | MAINTENANCE SERVICE |
| 375 | 23-90068 | Invacare Corporation | PREVENT INC | MASTER SERVICES AGREEMENT |
| 376 | 23-90068 | Invacare Corporation | PRICESPIDER | BUSINESS SUPPLIES |
| 377 | 23-90072 | Invacare Corporation | PURTILL, GEOFF | PERFORMANCE STOCK UNITS 3/12/2021 |
| 378 | 23-90072 | Invacare Corporation | PURTILL, GEOFF | PERFORMANCE STOCK UNITS 3/27/2020 |
| 379 | 23-90072 | Invacare Corporation | PURTILL, GEOFF | PERFORMANCE STOCK UNITS 4/1/2022 |
| 380 | 23-90072 | Invacare Corporation | PURTILL, GEOFF | RESTRICTED STOCK UNITS 3/12/2021 |
| 381 | 23-90072 | Invacare Corporation | PURTILL, GEOFF | RESTRICTED STOCK UNITS 3/27/2020 |
| 382 | 23-90072 | Invacare Corporation | PURTILL, GEOFF | RESTRICTED STOCK UNITS 4/1/2022 |
| 383 | 23-90072 | Invacare Corporation | PURTILL, GEOFF | RESTRICTED STOCK UNITS 9/13/2022 |
| 384 | 23-90068 | Invacare Corporation | PURTILL, GEOFFREY P | PERFORMANCE UNIT AWARD  4/1/2022 |
| 385 | 23-90068 | Invacare Corporation | Q4 | IR WEBSITE, QUARTERLY ER WEBCASTING |
| 386 | 23-90072 | Invacare Corporation | RAMBHATLA, RAMAKANT | RESTRICTED SHARE AWARDS 3/12/2021 |
| 387 | 23-90072 | Invacare Corporation | RAMBHATLA, RAMAKANT | RESTRICTED SHARE AWARDS 3/27/2020 |
| 388 | 23-90072 | Invacare Corporation | RAMBHATLA, RAMAKANT | RESTRICTED SHARE AWARDS 4/1/2022 |
| 389 | 23-90072 | Invacare Corporation | REGIS, ERIC | RESTRICTED STOCK UNITS 3/12/2021 |
| 390 | 23-90072 | Invacare Corporation | REGIS, ERIC | RESTRICTED STOCK UNITS 3/27/2020 |
| 391 | 23-90072 | Invacare Corporation | REGIS, ERIC | RESTRICTED STOCK UNITS 4/1/2022 |
| 392 | 23-90068 | Invacare Corporation | REINER, HANSJORG | CHANGE OF CONTROL AGREEMENT |
| 393 | 23-90072 | Invacare Corporation | REINER, HANSJORG | RESTRICTED STOCK UNITS 3/12/2021 |
| 394 | 23-90072 | Invacare Corporation | REINER, HANSJORG | RESTRICTED STOCK UNITS 3/27/2020 |
| 395 | 23-90072 | Invacare Corporation | REINER, HANSJORG | RESTRICTED STOCK UNITS 4/1/2022 |
| 396 | 23-90078 | Invacare Corporation | REMMERS, JOHN | DEATH BENEFIT ONLY AGREEMENT |
| 397 | 23-90068 | Invacare Corporation | RENESAS | CUSTOMER NON CANCEL NON RETURN APPROVAL |
| 398 | 23-90068 | Invacare Corporation | RENESAS | CUSTOMER NON CANCEL NON RETURN APPROVAL FORM |
| 399 | 23-90068 | Invacare Corporation | RENESAS | CUSTOMER NON CANCEL NON RETURN APPROVAL FORM DTD 6/12/2019 |
| 400 | 23-90068 | Invacare Corporation | RENESAS | CUSTOMER NON CANCEL NON RETURN APPROVAL FORM DTD 7/19/2019 |
| 401 | 23-90068 | Invacare Corporation | RENESAS | EMAIL REGARDING RENESAS MICROCONTROLLER |
| 402 | 23-90068 | Invacare Corporation | REP ACQUISITION CORPORATION | SHARE PURCHASE AGREEMENT AMONG REP ACQUISITION CORPORATION, INVACARE CORPORATION, AND ALTIMATE MEDICAL, INC. DATED 8/29/14 |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description |
|---|---|---|---|---|
| 403 | 23-90068 | Invacare Corporation | REP ACQUISITION CORPORATION | SHARE PURCHASE AGREEMENT AMONG REP ACQUISITION CORPORATION, INVACARE CORPORATION, AND ALTIMATE MEDICAL, INC. DATED 8/29/14 |
| 404 | 23-90068 | Invacare Corporation | REP ACQUISITON CORPORATION | SHARE PURCHASE AGREEMENT DTD 9/29/2014 |
| 405 | 23-90068 | Invacare Corporation | REP ACQUISITON CORPORATION | SHARE PURCHASE AGREEMENT DTD 9/29/2014 |
| 406 | 23-90072 | Invacare Corporation | REYNOLDS, EMIT | RESTRICTED SHARE AWARDS 3/12/2021 |
| 407 | 23-90072 | Invacare Corporation | REYNOLDS, EMIT | RESTRICTED SHARE AWARDS 4/1/2022 |
| 408 | 23-90072 | Invacare Corporation | RICHESON, RONALD | RESTRICTED SHARE AWARDS 3/12/2021 |
| 409 | 23-90072 | Invacare Corporation | RICHESON, RONALD | RESTRICTED SHARE AWARDS 3/27/2020 |
| 410 | 23-90072 | Invacare Corporation | RICHESON, RONALD | RESTRICTED SHARE AWARDS 4/1/2022 |
| 411 | 23-90068 | Invacare Corporation | ROODINSEAT CORPORATION | MASTER SUPPLY AGREEMENT #1138 DTD 10/1/2007 |
| 412 | 23-90072 | Invacare Corporation | ROSALES, ALEJANDRO | RESTRICTED STOCK UNITS 3/12/2021 |
| 413 | 23-90072 | Invacare Corporation | ROSALES, ALEJANDRO | RESTRICTED STOCK UNITS 3/27/2020 |
| 414 | 23-90072 | Invacare Corporation | ROSALES, ALEJANDRO | RESTRICTED STOCK UNITS 4/1/2022 |
| 415 | 23-90072 | Invacare Corporation | ROTELLI, LISA | RESTRICTED SHARE AWARDS 3/12/2021 |
| 416 | 23-90072 | Invacare Corporation | ROTELLI, LISA | RESTRICTED SHARE AWARDS 3/27/2020 |
| 417 | 23-90072 | Invacare Corporation | ROTELLI, LISA | RESTRICTED SHARE AWARDS 4/1/2022 |
| 418 | 23-90072 | Invacare Corporation | RUPPE, BRIAN | RESTRICTED SHARE AWARDS 3/12/2021 |
| 419 | 23-90072 | Invacare Corporation | RUPPE, BRIAN | RESTRICTED SHARE AWARDS 3/27/2020 |
| 420 | 23-90072 | Invacare Corporation | RUPPE, BRIAN | RESTRICTED SHARE AWARDS 4/1/2022 |
| 421 | 23-90068 | Invacare Corporation | SAJAN INC | MASTER SERVICES AGREEMENT DTD 2/1/2007 |
| 422 | 23-90072 | Invacare Corporation | SALIGA, ANDREW | RESTRICTED SHARE AWARDS 3/12/2021 |
| 423 | 23-90072 | Invacare Corporation | SALIGA, ANDREW | RESTRICTED SHARE AWARDS 3/27/2020 |
| 424 | 23-90072 | Invacare Corporation | SALIGA, ANDREW | RESTRICTED SHARE AWARDS 4/1/2022 |
| 425 | 23-90072 | Invacare Corporation | SANKOVICH, COURTNEY | RESTRICTED SHARE AWARDS 3/12/2021 |
| 426 | 23-90072 | Invacare Corporation | SANKOVICH, COURTNEY | RESTRICTED SHARE AWARDS 3/27/2020 |
| 427 | 23-90072 | Invacare Corporation | SANKOVICH, COURTNEY | RESTRICTED SHARE AWARDS 4/1/2022 |
| 428 | 23-90072 | Invacare Corporation | SCHULER, GRETCHEN | RESTRICTED SHARE AWARDS 3/12/2021 |
| 429 | 23-90072 | Invacare Corporation | SCHULER, GRETCHEN | RESTRICTED SHARE AWARDS 3/27/2020 |
| 430 | 23-90072 | Invacare Corporation | SCHULER, GRETCHEN | RESTRICTED SHARE AWARDS 4/1/2022 |
| 431 | 23-90072 | Invacare Corporation | SCHULTE, PAUL | RESTRICTED SHARE AWARDS 3/12/2021 |
| 432 | 23-90072 | Invacare Corporation | SCHULTE, PAUL | RESTRICTED SHARE AWARDS 3/27/2020 |
| 433 | 23-90072 | Invacare Corporation | SCHULTE, PAUL | RESTRICTED SHARE AWARDS 4/1/2022 |
| 434 | 23-90072 | Invacare Corporation | SCHWARTZ, ARON | RESTRICTED STOCK UNITS 4/1/2022 |
| 435 | 23-90072 | Invacare Corporation | SCRANTON, JEFFREY | RESTRICTED SHARE AWARDS 3/12/2021 |
| 436 | 23-90072 | Invacare Corporation | SCRANTON, JEFFREY | RESTRICTED SHARE AWARDS 3/27/2020 |
| 437 | 23-90072 | Invacare Corporation | SCRANTON, JEFFREY | RESTRICTED SHARE AWARDS 4/1/2022 |
| 438 | 23-90068 | Invacare Corporation | SHAH, BAIJU R. | INDEMNITY AGREEMENT DTD 5/19/2011 |
| 439 | 23-90068 | Invacare Corporation | SHANGHAI HUAFA ELECTRIC APPLIANCE INSTRUMENT CO LTD | MASTER SUPPLY AGREEMENT #8036 DTD 11/16/2009 |
| 440 | 23-90068 | Invacare Corporation | SHANGHAI SHUNLONG PHYSICAL THERAPY EQUIP CO LTD | MASTER SUPPLY AGREEMENT #1129 DTD 12/12/2005 |
| 441 | 23-90068 | Invacare Corporation | SHANGHAI SIMTECH COMPANY | MASTER SUPPLY AGREEMENT #1061 DTD 7/14/2004 |
| 442 | 23-90068 | Invacare Corporation | SHANGHAI XINPENG INDUSTRY CO LTD | MASTER SUPPLY AGREEMENT #1028 DTD 3/23/2004 |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description |
|---|---|---|---|---|
| 443 | 23-90068 | Invacare Corporation | SHANGHAI XINPENG INDUSTRY CO LTD | MASTER SUPPLY AGREEMENT #1085 DTD 12/2/2004 |
| 444 | 23-90068 | Invacare Corporation | SHANGHAI YONGHONG AUTO PARTS CO LTD | MASTER SUPPLY AGREEMENT #1106 DTD 6/17/2005 |
| 445 | 23-90068 | Invacare Corporation | SHENG YE ELECTRICAL CO LTD | MASTER SUPPLY AGREEMENT #1067 DTD 9/21/2004 |
| 446 | 23-90072 | Invacare Corporation | SHOWMAN, DANIEL | RESTRICTED SHARE AWARDS 3/12/2021 |
| 447 | 23-90072 | Invacare Corporation | SHOWMAN, DANIEL | RESTRICTED SHARE AWARDS 4/1/2022 |
| 448 | 23-90072 | Invacare Corporation | SILVA, EZEQUIEL FILIPE | RESTRICTED STOCK UNITS 3/12/2021 |
| 449 | 23-90072 | Invacare Corporation | SILVA, EZEQUIEL FILIPE | RESTRICTED STOCK UNITS 4/1/2022 |
| 450 | 23-90084 | Invacare Corporation | SLANGEN, LOUIS | DEATH BENEFIT ONLY AGREEMENT |
| 451 | 23-90068 | Invacare Corporation | SMC CORPORATION OF AMERICA | LETTER OF INTENT DTD 3/22/2019 |
| 452 | 23-90072 | Invacare Corporation | SPIDARE, PATRICIA | RESTRICTED SHARE AWARDS 3/12/2021 |
| 453 | 23-90072 | Invacare Corporation | SPIDARE, PATRICIA | RESTRICTED SHARE AWARDS 3/27/2020 |
| 454 | 23-90072 | Invacare Corporation | SPIDARE, PATRICIA | RESTRICTED SHARE AWARDS 4/1/2022 |
| 455 | 23-90072 | Invacare Corporation | STEIRA, ERIC | RESTRICTED STOCK UNITS 3/12/2021 |
| 456 | 23-90072 | Invacare Corporation | STEIRA, ERIC | RESTRICTED STOCK UNITS 3/27/2020 |
| 457 | 23-90072 | Invacare Corporation | STEIRA, ERIC | RESTRICTED STOCK UNITS 4/1/2022 |
| 458 | 23-90072 | Invacare Corporation | STEPNIEWICZ, MAGDA | RESTRICTED STOCK UNITS 4/1/2022 |
| 459 | 23-90072 | Invacare Corporation | STRIKER, FRANCIS | RESTRICTED SHARE AWARDS 4/1/2022 |
| 460 | 23-90079 | Invacare Corporation | STUMPP, PATRICIA | DEATH BENEFIT ONLY AGREEMENT |
| 461 | 23-90070 | Invacare Corporation | STUMPP, PATRICIA | SUPPLEMENTAL EXECUTIVE RETIREMENT PLAN |
| 462 | 23-90068 | Invacare Corporation | SUPERIOER FASTENING (SHANGHAI) LTD | MASTER SUPPLY AGREEMENT #1074 DTD 10/29/2004 |
| 463 | 23-90068 | Invacare Corporation | SUZHOU NEW DISTRICT PRINTING FACTORY | MASTER SUPPLY AGREEMENT #8000 DTD 9/10/2007 |
| 464 | 23-90068 | Invacare Corporation | SUZHOU SHENY IMP&EXP TRADING CO LTD | MASTER SUPPLY AGREEMENT #2600 DTD 9/6/2007 |
| 465 | 23-90074 | Invacare Corporation | TABICKMAN, LOUIS | SUPPLEMENTAL EXECUTIVE RETIREMENT PLAN |
| 466 | 23-90068 | Invacare Corporation | TAICANG LIANGHONG ELECTRICAL PLASTIC CO LTD | MASTER SUPPLY AGREEMENT #1106 DTD 6/17/2005 |
| 467 | 23-90068 | Invacare Corporation | TEMPLAFY LLC | CONTENT ENABLEMENT PLATFORM |
| 468 | 23-90068 | Invacare Corporation | TEMPLAFY LLC | SERVICE CONTRACT DTD 5/17/2021 |
| 469 | 23-90068 | Invacare Corporation | TENEX CAPITAL MANAGEMENT | SHARE PURCHASE AGREEMENT AMONG COMPASS HEALTH BRANDS CORP. AND INVACARE CORPORATION, AND GARDEN CITY MEDICAL INC. DATED 9/30/16 |
| 470 | 23-90068 | Invacare Corporation | THOMSON ELECTRONIC SUPPLIES INC | CONSIGNMENT INVENTORY AGREEMENT |
| 471 | 23-90068 | Invacare Corporation | TKE (TK ELEVATOR) | TAYLOR WOODS ELEVATOR MAINTENANCE |
| 472 | 23-90068 | Invacare Corporation | TOP END WHEEL CHAIR SPORTS INC | BUSINESS LEASE DTD 7/7/1992 |
| 473 | 23-90068 | Invacare Corporation | TRALIANT HOLDINGS LLC | EXHIBIT B STATMENT OF WORK DTD 12/1/2022 |
| 474 | 23-90068 | Invacare Corporation | TRANKEY MICRO-TECH CORP | MASTER SUPPLY AGREEMENT #1070 DTD 10/7/2004 |
| 475 | 23-90068 | Invacare Corporation | TRANSFER NA INT'L FREIGHT SERVICES LLC | CUSTOMS POWER OF ATTORNEY AND ACKNOWLEDGMENT OF TERMS & CONDITIONS OF SERVICE |
| 476 | 23-90068 | Invacare Corporation | TRANSUNION | ORDINARY COURSE PROFESSIONAL |
| 477 | 23-90072 | Invacare Corporation | TROKIC, ADI | RESTRICTED STOCK UNITS 4/1/2022 |
| 478 | 23-90072 | Invacare Corporation | TUCKER, RONALD | RESTRICTED SHARE AWARDS 3/12/2021 |
| 479 | 23-90072 | Invacare Corporation | TUCKER, RONALD | RESTRICTED SHARE AWARDS 3/27/2020 |
| 480 | 23-90072 | Invacare Corporation | TUCKER, RONALD | RESTRICTED SHARE AWARDS 4/1/2022 |
| 481 | 23-90068 | Invacare Corporation | TUV RHEINLAND OF NORTH AMERICA INC | 2023 ANNUAL FEE QUOTATION DTD 11/28/2022 |
| 482 | 23-90068 | Invacare Corporation | TUV RHEINLAND OF NORTH AMERICA, INC. | LICENSE FOR T-MARK ON 9L COMPRESSOR (1145469) AND IRC5PO2AW COMPRESSOR (1153689) |
| 483 | 23-90072 | Invacare Corporation | UHL, EDWARD | RESTRICTED SHARE AWARDS 3/12/2021 |
| 484 | 23-90072 | Invacare Corporation | UHL, EDWARD | RESTRICTED SHARE AWARDS 3/27/2020 |

| No. | Case Number | Debtor Name | Counterparty Name | Contract Description |
|-----|-------------|-------------|-------------------|---------------------|
| 485 | 23-90072 | Invacare Corporation | UHL, EDWARD | RESTRICTED SHARE AWARDS 4/1/2022 |
| 486 | 23-90068 | Invacare Corporation | UNIVERSAL PROTECTION SERVICE LP | SECURITY PROFESSIONAL SERVICE AGREEMENT |
| 487 | 23-90072 | Invacare Corporation | VAN DER BREGGEN, MICHAEL | RESTRICTED SHARE AWARDS 3/12/2021 |
| 488 | 23-90072 | Invacare Corporation | VAN DER BREGGEN, MICHAEL | RESTRICTED SHARE AWARDS 4/1/2022 |
| 489 | 23-90072 | Invacare Corporation | VERCAEMER, SOFIE | RESTRICTED STOCK UNITS 3/12/2021 |
| 490 | 23-90072 | Invacare Corporation | VERCAEMER, SOFIE | RESTRICTED STOCK UNITS 3/27/2020 |
| 491 | 23-90072 | Invacare Corporation | VERCAEMER, SOFIE | RESTRICTED STOCK UNITS 4/1/2022 |
| 492 | 23-90072 | Invacare Corporation | WILHELM, KIMBERLY | RESTRICTED SHARE AWARDS 3/12/2021 |
| 493 | 23-90072 | Invacare Corporation | WILHELM, KIMBERLY | RESTRICTED SHARE AWARDS 3/27/2020 |
| 494 | 23-90072 | Invacare Corporation | WILHELM, KIMBERLY | RESTRICTED SHARE AWARDS 4/1/2022 |
| 495 | 23-90072 | Invacare Corporation | WILLEMS, ALAN | RESTRICTED STOCK UNITS 4/21/2022 |
| 496 | 23-90068 | Invacare Corporation | WUXI FIRSTSTAR TRADING CORP | MASTER SUPPLY AGREEMENT #8003 DTD 11/4/2010 |
| 497 | 23-90068 | Invacare Corporation | WUXI STAR POWER EQUIPMENT CO LTD | MASTER SUPPLY AGREEMENT #8003 DTD 11/4/2010 |
| 498 | 23-90068 | Invacare Corporation | WUXI ZHENGFENG SPECIAL TYPE PRINTING CO LTD | MASTER SUPPLY AGREEMENT #8017 DTD 4/29/2008 |
| 499 | 23-90068 | Invacare Corporation | XIAMEN LENCO CO LTD | MASTER SUPPLY AGREEMENT #1088 DTD 8/27/2007 |
| 500 | 23-90068 | Invacare Corporation | YOUTH YNX INDUSTRIAL CO LTD | MASTER SUPPLY AGREEMENT #1060 DTD 7/2/2004 |
| 501 | 23-90068 | Invacare Corporation | ZHONGSHAN EVERFLOW ELECTRONIC & ELECTRICAL MFG CO LTD | MASTER SUPPLY AGREEMENT #1142 DTD 2/1/2007 |
| 502 | 23-90072 | Invacare Corporation | ZHU, KAI | RESTRICTED STOCK UNITS 4/1/2022 |
| 503 | 23-90072 | Invacare Corporation | ZHU, KAI | RESTRICTED STOCK UNITS 4/18/2022 |

**<u>Exhibit I</u>**

**Schedule of Retained Causes of Action**

**Exhibit I**

Schedule of Retained Causes of Action

The provisions contained in this Exhibit I and the Plan Supplement remain subject to continued negotiations, review, and revision by the Debtors and the Consenting Stakeholders. The respective rights of the Debtors and the Consenting Stakeholders are expressly reserved, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained therein at any time in accordance with the terms of the Plan, or by order of the Bankruptcy Court; *provided* that if any document in this Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the Confirmation Hearing, the Debtors will file a redline of such document with the Bankruptcy Court. Each of the documents contained in the Plan Supplement or its amendments are subject to certain consent and approval rights provided in the Plan or Restructuring Support Agreement.

Article IV.J of the Plan provides as follows:

**In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, as enumerated on the Schedule of Retained Causes of Action, and such Reorganized Debtor's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the DIP Orders or any other order of the Bankruptcy Court, the Avoidance Actions (but excluding Avoidance Actions in relation to Birlasoft Solutions Inc. and any of its Related Parties, Affiliates and insiders other than pursuant to section 547 of the Bankruptcy Code) or Claims subject to the release and exculpation provisions contained in this Plan, including in Article VIII hereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.**

**The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action**

**against any Entity, except as otherwise expressly provided in the Plan, including Article VIII hereof. Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.**

**The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII hereof. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.**

Notwithstanding and without limiting the generality of Article IV.J of the Plan, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all Causes of Action, including the following types of claims:

## I.     Causes of Action Related to Taxing Authorities

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all tax obligations to which any Debtor or Reorganized Debtor is a party or pursuant to which any Debtor or Reorganized Debtor has any rights whatsoever, including, without limitation, against or related to all Entities that owe or that may in the future owe money related to tax refunds to the Debtors or the Reorganized Debtors, regardless of whether such Entity is specifically identified herein. Without limiting the generality of the foregoing, the Debtors expressly reserve all Causes of Action against the Entities identified in <u>Schedule I(i)</u>, which will be supplemented.

## II.      Causes of Action Related to Insurance Policies

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all insurance contracts and insurance policies to which any Debtor or Reorganized Debtor is a party or pursuant to which any Debtor or Reorganized Debtor has any rights whatsoever, regardless of whether such contract or policy is specifically identified in the Plan, this Plan Supplement, or any amendments thereto, including, without limitation, Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matters. Without limiting the generality of the foregoing, the Debtors' expressly reserve all Causes of Action against the Entities identified in Schedule I(ii), which will be supplemented.

## III.     Claims, Defenses, Cross-Claims, and Counter-Claims Related to Litigation and Possible Litigation

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to all Entities that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal or judicial or non-judicial, regardless of whether such Entity is specifically identified in the Plan, this Plan Supplement, or any amendments thereto. Without limiting the generality of the foregoing, the Debtors' expressly reserve all Causes of Action against the Entities identified in Schedule I(iii), which will be supplemented.

## IV.     Causes of Action Related to Contracts and Leases

Unless otherwise released by the Plan, the Debtors and Reorganized Debtors, as applicable, expressly reserve Causes of Action based in whole or in part upon any and all contracts and leases and similar instruments, to which any of the Debtors or Reorganized Debtors is a party or pursuant to which any of the Debtors or Reorganized Debtors has any rights whatsoever (regardless of whether such contract or lease is specifically identified in the Plan, this Plan Supplement, or any amendments thereto), including without limitation all contracts and leases that are assumed pursuant to the Plan or were previously assumed by the Debtors. The claims and Causes of Action reserved include, but are not limited to, Causes of Action against vendors, suppliers of goods and services, lessors, lessees, and licensees, or any other parties: (a) for overpayments, back charges, duplicate payments, improper holdbacks, deductions owing or improper deductions taken, deposits, warranties, guarantees, indemnities, recoupment, reimbursement, or setoff; (b) for wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) for failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption or rejection, if applicable, of such contracts; (d) for payments, deposits, holdbacks, reserves or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor or other party; (e) for any liens, including mechanics',

artisans', materialmens', possessory or statutory liens held by any one or more of the Debtors; (f) arising out of environmental or contaminant exposure matters against landlords, lessors, environmental consultants, environmental agencies or suppliers of environmental services or goods; (g) for counter-claims and defenses related to any contractual obligations; (h) for any turnover actions arising under section 542 or 543 of the Bankruptcy Code; and (i) for unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property or any business tort claims.

## V.    Causes of Action Related to Accounts Receivable and Accounts Payable

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to all Entities that owe or that may in the future owe money to the Debtors or Reorganized Debtors, regardless of whether such Entity is expressly identified in the Plan, this Plan Supplement, or any amendments thereto. Furthermore, the Debtors expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the Debtors or Reorganized Debtors, as applicable, owe money to them. Without limiting the generality of the foregoing, the Debtors' expressly reserve all Causes of Action against the Entities identified in Schedule I(iv), which will be supplemented.

## VI.   Causes of Action Related to Deposits / Prepayments, Adequate Assurance, and Other Collateral Postings

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all postings of a security deposits, adequate assurance payment, or any other type of deposit, prepayment, or collateral, regardless of whether such posting of security deposit, adequate assurance payment, or any other type of deposit, prepayment or collateral is specifically identified herein; provided that notwithstanding anything herein to the contrary, the Debtors and the Reorganized Debtors hereby acknowledge and agree that no such Causes of Action exist with respect to (a) any cash collateral posted before, on, or after the Petition Date with respect to the DIP Facilities or other letters of credit or guarantees issued by the DIP Lenders or (b) other security deposits, adequate assurance payment, or any other type of deposit, prepayment, or collateral with respect to the DIP Claims.

## VII.  Causes of Action Related to Liens

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all liens regardless of whether such lien is specifically identified herein; provided that notwithstanding anything herein to the contrary, the Debtors and the Reorganized Debtors hereby acknowledge and agree that no such Causes of Action exist with respect to the liens securing the DIP Facilities.

## VIII.  Causes of Action Related to Customer Obligations

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to all former and current customers that owe or may in the future owe money to the Debtors or the Reorganized Debtors whether for unpaid invoices or any other matter whatsoever, including contracts.

## IX.     Causes of Action Related to Audits

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to any auditor of the Debtors or any auditor's affiliate, subsidiary, or other Person or Entity acting on its behalf related to any audit involving any of the Debtors.

## I.     Causes of Action Related to Governmental Units

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against any local, state, federal, or foreign "governmental unit" (as defined in section 101(27) of the Bankruptcy Code). Without limiting the generality of the foregoing, the Debtors expressly reserve all Causes of Action against the Entities identified in <u>Schedule I(v)</u>, which will be supplemented.

**Exhibit J**

**Restructuring Transactions Memorandum**

Certain documents, or portions thereof, contained in this **Exhibit J** and the Plan Supplement remain subject to continued negotiations, review and revisions by the Debtors and the Consenting Stakeholders.  The respective rights of the Debtors and the Consenting Stakeholders are expressly reserved, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained therein at any time in accordance with the terms of the Plan, or by order of the Bankruptcy Court; *provided* that if any document in this Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the Confirmation Hearing, the Debtors will file a redline of such document with the Bankruptcy Court.  Each of the documents contained in the Plan Supplement or its amendments are subject to certain consent and approval rights to the extent provided in the Plan or Restructuring Support Agreement.

In accordance with Article IV.B of the Plan, the Debtors intend to implement and effectuate the following Restructuring Transactions:

On or before the Effective Date, the Debtors, Reorganized Debtors, or the Non-Debtor Affiliates, as applicable, shall take all applicable actions set forth in the Restructuring Transactions Memorandum and may take any additional action as may be necessary or appropriate to effectuate the Restructuring Transactions, and any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions that are consistent with and pursuant to the terms and conditions of the Plan and the Restructuring Support Agreement, which transactions may include, as applicable: (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, reorganization, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and the Restructuring Transactions Memorandum and that satisfy the applicable requirements of applicable law and any other terms to which the applicable parties may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and the Restructuring Transactions Memorandum and having other terms to which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, dissolution, or other certificates or documentation pursuant to applicable law; (d) the consummation of the Rights Offering pursuant to the Rights Offering Procedures, including the distribution of the Equity Rights to the Eligible Holders and the issuance of New Convertible Preferred Equity in connection therewith; (e) the issuance of New Common Equity; (f) the execution and delivery of the Exit Term Loan Agreement, any Exit ABL Agreement (if any); the Exit Secured Convertible Notes Indenture, and the other Exit Facilities Documents (if applicable), and any filings related thereto; (g) the execution and delivery of the New Organizational Documents, and any certificates or articles of incorporation, bylaws, or such other applicable formation documents (if any) of each Reorganized Debtor (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable); (h) issuance of the New Intermediate Preferred Equity; (i) the creation of the Litigation

Trust; and (j) all other actions that the applicable Reorganized Debtors determine to be necessary or advisable, including making filings or recordings that may be required by applicable law in connection with the Plan.  All Holders of Claims and Interests receiving distributions pursuant to the Plan and all other necessary parties in interest, including any and all agents thereof, shall prepare, execute, and deliver any agreements or documents, including any subscription agreements, and take any other actions as the Debtors determine are necessary or advisable to effectuate the provisions and intent of the Plan.

This Restructuring Transactions Memorandum is intended only as a draft summary of the Restructuring Transactions and represents a simplified and illustrative set of steps.  For the avoidance of doubt, this **Exhibit J** reflects the Debtors' current intentions with respect to the Restructuring Transactions and the post-Effective Date organizational structure of the Reorganized Debtors.  Nothing in this **Exhibit J** shall be viewed as the final version of the Restructuring Transactions, nor shall it limit or modify, in any way, any section of the Plan Supplement or any related provisions in the Confirmation Order, or any authority or discretion granted to the Debtors and/or Reorganized Debtors thereby.  The Debtors and their advisors will continue to review the Restructuring Transactions from a legal, operational, and tax perspective.

31915590.6

**Exhibit J**

**Restructuring Transactions Memorandum**

In accordance with Article IV of the Plan,[1] the Debtors intend to implement and effectuate the following Restructuring Transactions.

This Restructuring Transactions Memorandum is intended only as a draft summary of the Restructuring Transactions and represents a simplified and illustrative set of steps.  For the avoidance of doubt, this **Exhibit J** reflects the Debtors' current intentions with respect to the Restructuring Transactions and the post-Effective Date organizational structure of the Reorganized Debtors.  Nothing in this **Exhibit J** shall be viewed as the final version of the Restructuring Transactions, nor shall it limit or modify, in any way, any section of the Plan, the Plan Supplement or any related provisions in the Confirmation Order, or any authority or discretion granted to the Debtors and/or Reorganized Debtors thereby (subject to any limitations or applicable consent rights under the Plan and the Restructuring Support Agreement).  The Debtors and their advisors will continue to review the Restructuring Transactions from a legal, operational, regulatory, and tax perspective.

The parties reserve all rights to amend, revise, or supplement the Plan Supplement, including the Restructuring Transactions in this **Exhibit J**, subject to any limitations or applicable consent rights under the Plan and the Restructuring Support Agreement (including the consent rights of the DIP Lenders and Term Loan Lenders), at any time prior to the Effective Date or any other such date as may be provided for by the Plan or by order of the Bankruptcy Court.

In furtherance of the Plan and the Restructuring Transactions, the following transaction steps shall occur at the time and in the sequence as described in this **Exhibit** J.

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Plan.

Prior to the Effective Date, the following transactions occur in the order set forth below (except as otherwise specified):

1. Invacare forms New Intermediate Holding Company, a [Delaware] corporation.

2. Invacare forms New Parent, a [Delaware] corporation

3. New Parent forms [Invacare Merger Sub, Inc.], a [Delaware] corporation ("**Merger Sub**").

Pursuant to Article IV of the Plan, on the Effective Date, the following transactions occur in the order set forth below (except as otherwise specified):

4. Invacare contributes all of its interests in (i) Invacare Holdings C.V., (ii) Invacare Holdings, LLC, (iii) Invacare Asia Ltd., (iv) Invacare SA, (v) Invacare Portugal Lda, (vi) Invacare Thailand, (vii) Invacare Credit Corporation, (viii) and Invacare Verwaltungs GmbH to New Intermediate Holding Company in exchange for all of the equity of New Intermediate Holding Company.

5. Invacare contributes all of the equity of New Intermediate Holding Company to New Parent.

6. Merger Sub merges with and into Invacare, with Invacare surviving. All outstanding stock of Invacare is cancelled, and all stock of Merger Sub is exchanged for new stock of Invacare.

7. New Parent issues the New Common Equity, the New Convertible Preferred Equity and the Exit Secured Convertible Notes to Invacare. Invacare's nominal old stock of New Parent remains outstanding.

8. Invacare transfers the Litigation Trust Assets to the Litigation Trust for the benefit of the Litigation Trust Beneficiaries; and Invacare distributes the Unsecured Noteholder Rights, the New Common Equity and the Litigation Trust Interests to the Holders of Unsecured Notes Claims and Holders of the General Unsecured Claims that elect to receive the Class 6 Equity Option, as applicable, in complete satisfaction of the Unsecured Notes Claims and such General Unsecured Claims.

9. The participating Holders of Unsecured Notes Claims elect to exercise their Unsecured Noteholders Rights and thereby (i) purchase the New Money Preferred Equity for $75M in cash and (ii) exchange $93.75M of their Unsecured Notes Claims for the Exchanged Preferred Equity. Together, the New Money Preferred Equity and the Exchanged Preferred Equity constitute the New Convertible Preferred Equity.

10. Invacare issues the Exit Term Loan Facility and distributes cash, as applicable, to Holders of Term Loan Claims in complete satisfaction of the Term Loan Claims

11. Invacare distributes the Exit Secured Convertible Notes and the Excess New Money, if applicable, to Holders of Secured Notes Claims in complete satisfaction of the Secured Notes Claims.

12. Invacare distributes the GUC Cash Settlement and the Litigation Trust Interests to the Holders of General Unsecured Claims that do not elect to receive the Class 6 Equity Option in complete satisfaction of such General Unsecured Claims.

**Exhibit K**

**Form of Management Incentive Plan**

[To be filed]

Certain documents, or portions thereof, contained in this **Exhibit K** and the Plan Supplement remain subject to continued negotiations, review and revisions by the Debtors and the Consenting Stakeholders.  The respective rights of the Debtors and the Consenting Stakeholders are expressly reserved, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained therein at any time in accordance with the terms of the Plan, or by order of the Bankruptcy Court; *provided* that if any document in this Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the Confirmation Hearing, the Debtors will file a redline of such document with the Bankruptcy Court.  Each of the documents contained in the Plan Supplement or its amendments are subject to certain consent and approval rights to the extent provided in the Plan or Restructuring Support Agreement.

Article IV.D of the Plan provides as follows:

On the Effective Date, the Reorganized Debtors will reserve exclusively for participants in the Management Incentive Plan a pool of equity interests of Reorganized Invacare or another Entity designated pursuant to the Plan to issue equity interests on the Effective Date (the "Management Incentive Plan Pool"), which may take the form of equity or equity-based awards, including, options, restricted stock units, or other equity instruments, determined on a fully diluted and fully distributed basis.  The terms and conditions of the Management Incentive Plan (including the participants, forms of awards, amount of allocations and the timing of the grant of the options and other equity-based compensation), and the terms and conditions of such options and other equity-based compensation (including vesting, exercise prices, base values, hurdles, forfeiture, repurchase rights and transferability), shall be determined prior to the Effective Date and disclosed in the Plan Supplement.

All grants under the Management Incentive Plan, including the Management Incentive Plan Pool, shall ratably dilute all equity issued pursuant to the Plan, including any New Convertible Preferred Equity issued pursuant to the Rights Offering and the Backstop Commitment Agreement.

## **Exhibit L**

### **Form of Employment Agreement**

[To be filed]

Certain documents, or portions thereof, contained in this **Exhibit L** and the Plan Supplement remain subject to continued negotiations, review and revisions by the Debtors and the Consenting Stakeholders. The respective rights of the Debtors and the Consenting Stakeholders are expressly reserved, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained therein at any time in accordance with the terms of the Plan, or by order of the Bankruptcy Court; *provided* that if any document in this Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the Confirmation Hearing, the Debtors will file a redline of such document with the Bankruptcy Court. Each of the documents contained in the Plan Supplement or its amendments are subject to certain consent and approval rights to the extent provided in the Plan or Restructuring Support Agreement.

## Exhibit M

### Form of Litigation Trust Agreement

Certain documents, or portions thereof, contained in this **Exhibit M** and the Plan Supplement remain subject to continued negotiations, review and revisions by the Debtors and the Consenting Stakeholders.  The respective rights of the Debtors and the Consenting Stakeholders are expressly reserved, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement, to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained therein at any time in accordance with the terms of the Plan, or by order of the Bankruptcy Court; *provided* that if any document in this Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the Confirmation Hearing, the Debtors will file a redline of such document with the Bankruptcy Court.  Each of the documents contained in the Plan Supplement or its amendments are subject to certain consent and approval rights to the extent provided in the Plan or Restructuring Support Agreement.

**OLD IVC LITIGATION TRUST**

**OLD IVC LITIGATION TRUST AGREEMENT**

**Dated as of [ ], 2023**

*Pursuant to the First Amended and Restated Joint Plan of*
*Reorganization of Invacare Corporation*
*and its Debtor Affiliates under Chapter 11*
*of the Bankruptcy Code Dated March 29, 2023*

BR DRAFT 4/12/2023

# TABLE OF CONTENTS

**Page**

ARTICLE I AGREEMENT OF TRUST ...................................................2

    1.1        Creation and Name .................................................2

    1.2        Purposes...............................................................2

    1.3        Transfer of Assets ................................................3

    1.4        Acceptance of Assets and Assumption of Liabilities. ..................3

    1.5        Jurisdiction .........................................................4

ARTICLE II POWERS; TRUST ADMINISTRATION; REPORTING.......................4

    2.1        Powers. ..............................................................4

    2.2        General Administration. .........................................7

    2.3        Reporting. ..........................................................7

ARTICLE III ACCOUNTS, INVESTMENTS, AND PAYMENTS .......................8

    3.1        Accounts. ...........................................................8

    3.2        Investment Guidelines. ..........................................9

    3.3        Payment of Operating Expenses. ..............................9

    3.4        Distributions to Litigation Trust Beneficiaries. ................10

ARTICLE IV TRUSTEE; DELAWARE TRUSTEE ...............................13

    4.1        Number ............................................................13

    4.2        Term of Service. .................................................13

    4.3        Compensation and Expenses of the Trustee. ................14

    4.4        Standard of Care; Exculpation. ...............................15

    4.5        Protective Provisions. ...........................................16

    4.6        Indemnification. .................................................17

    4.7        Trustee Independence .........................................19

    4.8        No Bond ...........................................................19

    4.9        Delaware Trustee. ..............................................19

ARTICLE V TAX MATTERS .............................................24

i

31923185.4

5.1       Treatment of Litigation Trust Assets Transfer ...........................................24

5.2       Income Tax Status. ..................................................................................24

5.3       Tax Returns. ...........................................................................................25

5.4       Withholding of Taxes and Reporting Related to Litigation Trust
          Operations ..............................................................................................26

5.5       Valuation ................................................................................................27

5.6       Expedited Determination of Taxes .........................................................28

ARTICLE VI GENERAL PROVISIONS ......................................................................28

6.1       Irrevocability ..........................................................................................28

6.2       Term; Termination. .................................................................................28

6.3       Amendments............................................................................................29

6.4       Severability.............................................................................................30

6.5       Notices. ...................................................................................................30

6.6       Successors and Assigns ...........................................................................31

6.7       Limitation on Litigation Trust Interests for Securities Laws Purposes.......31

6.8       Exemption from Registration ..................................................................31

6.9       Entire Agreement; No Waiver..................................................................32

6.10      Headings. ................................................................................................32

6.11      Governing Law........................................................................................32

6.12      Dispute Resolution ..................................................................................33

6.13      Effectiveness ...........................................................................................35

6.14      Counterpart Signatures ...........................................................................35

31923185.4

## OLD IVC LITIGATION TRUST AGREEMENT

This Old IVC Litigation Trust Agreement (this "**Trust Agreement**"), dated the date set forth on the signature pages hereof and effective as of the Effective Date, is entered into pursuant to the First Amended Joint Plan of Reorganization of Invacare Corporation and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code [Docket No. 366] (as may be further amended or modified, the "**Plan**"),[1] in Case No. 23-90068 (CML) in the United States Bankruptcy Court for the Southern District of Texas Houston Division ("**Bankruptcy Court**") by [   ] (the "**Delaware Trustee**") and the Litigation Trustee identified on the signature pages hereof (the "**Trustee**" and, together with the Delaware Trustee, the "**Parties**").

## <u>RECITALS</u>

**WHEREAS,** the Plan contemplates the creation of the Old IVC Litigation Trust (the "**Litigation Trust**");

**WHEREAS**, the Confirmation Order has been entered by the Bankruptcy Court;

**WHEREAS,** pursuant to the Plan, the Litigation Trust is established to liquidate and distribute the Litigation Trust Assets in accordance with the Plan and make distributions to the eligible holders of Classes 5 and 6 Claims (the "**Litigation Trust Beneficiaries**") in accordance with the Plan, Confirmation Order, and this Trust Agreement;

**WHEREAS**, the Trustee shall administer the Litigation Trust in accordance with the terms of the Plan and this Trust Agreement;

**WHEREAS**, pursuant to the Plan, the Litigation Trust is intended to qualify as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations, and

---

[1]     All capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Plan, and such definitions are incorporated herein by reference. All capitalized terms not defined herein or in the Plan, but defined in the Bankruptcy Code or Bankruptcy Rules, shall have the meanings ascribed to them by the Bankruptcy Code and Bankruptcy Rules, and such definitions are incorporated herein by reference.

a "grantor trust" for United States federal income tax purposes, pursuant to Sections 671-677 of the Internal Revenue Code (the "**IRC**"), with the Litigation Trust Beneficiaries treated as the grantors of the Litigation Trust.

**NOW, THEREFORE,** it is hereby agreed as follows:

<div align="center">

**ARTICLE I**

**<u>AGREEMENT OF TRUST</u>**

</div>

1.1 **<u>Creation and Name</u>.** There is hereby created a trust known as the "Old IVC Litigation Trust." The Trustee of the Litigation Trust may transact the affairs of the Litigation Trust in the name of the Litigation Trust, and references herein to the Litigation Trust shall include the Trustee acting on behalf of the Litigation Trust. It is the intention of the Parties that the Litigation Trust qualify as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations and that this document constitute the governing instrument of the Litigation Trust. The Trustee and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as **<u>Exhibit 1</u>**.

1.2 **<u>Purposes</u>.** The purposes of the Litigation Trust are to:

(a) receive the Litigation Trust Assets pursuant to the terms of the Plan and the Confirmation Order;

(b) pursue, and if applicable, resolve (by way of settlement, judgment, or otherwise) the Non-Released LT Claims, in accordance with the Plan;

(c) hold, manage, protect and invest the Litigation Trust Assets, together with any income or gain earned thereon and proceeds derived therefrom (collectively, the "**Trust Assets**") in accordance with the terms of the Plan, the Confirmation Order and this Trust

2

Agreement (the "**Governing Documents**") for the benefit of the Litigation Trust Beneficiaries, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purposes of the Litigation Trust;

(d) qualify at all times as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations;

(e) engage in any lawful activity that is consistent with, necessary or incidental to the Governing Documents; and

(f) make distributions of Trust Assets to Litigation Trust Beneficiaries in accordance with the terms of this Trust Agreement.

1.3     **Transfer of Assets.**  Pursuant to, and in accordance with Article IV.K of the Plan, the Litigation Trust has received the Litigation Trust Assets to fund the Litigation Trust.  The Litigation Trust Assets and any other assets to be transferred to the Litigation Trust under the Plan will be transferred to the Litigation Trust free and clear of any liens or other claims by the Debtors or the Reorganized Debtors, any creditor, or other entity.

1.4     **Acceptance of Assets and Assumption of Liabilities.**

(a) In furtherance of the purposes of the Litigation Trust, the Litigation Trust hereby expressly accepts the transfer to the Litigation Trust of the Litigation Trust Assets and any other transfers contemplated by the Plan in the time and manner as, and subject to the terms, contemplated in the Plan.

(b) In furtherance of the purposes of the Litigation Trust, except as otherwise provided in this Trust Agreement, the Litigation Trust shall have all defenses, cross-claims, offsets, and recoupments, as well as rights of indemnification, contribution, subrogation, and similar rights,

3

regarding such claims that the Debtors or the Reorganized Debtors have or would have had under applicable law.

(c)     Notwithstanding anything to the contrary herein, no provision herein shall be construed or implemented in a manner that would cause the Litigation Trust to fail to qualify as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations.

(d)     In this Trust Agreement, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

1.5     **Jurisdiction**.  The Bankruptcy Court shall have continuing jurisdiction over the Litigation Trust, provided, however, that the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over the Litigation Trust.

<div align="center">

**ARTICLE II**

**POWERS; TRUST ADMINISTRATION; REPORTING**

</div>

2.1     **Powers.**

(a)     The Trustee is and shall act as a fiduciary to the Litigation Trust in accordance with the provisions of the Governing Documents. The Trustee shall, at all times, administer the Litigation Trust in accordance with the purposes set forth in Section 1.2 above. Subject to the limitations set forth in this Trust Agreement, the Trustee shall have the power to take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the Litigation Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and not inconsistent with the requirements of Section 2.2 below, and any trust power now or hereafter permitted under the laws of the State of Delaware.

4

(b)      Except as required by applicable law or otherwise specified herein, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)      Without limiting the generality of Section 2.1(a) above, and except as limited below or by the Plan, the Trustee shall:

(i)      hold, administer and prosecute the Trust Assets;

(ii)      make distributions as provided in this Trust Agreement;

(iii)      provide periodic reports and updates regarding the status of the administration of the Litigation Trust in accordance with Section 2.3(b) below;

(iv)      invest the monies held from time to time by the Litigation Trust in accordance with the Investment Guidelines pursuant to Section 3.2 below;

(v)      enter into leasing and financing agreements with third parties to the extent such agreements are reasonably necessary to permit the Litigation Trust to operate;

(vi)      incur expenses and other obligations of the Litigation Trust and pay or satisfy such obligations from the Trust Assets; as set forth in the Plan;

(vii)      establish such funds, reserves, and accounts within the Litigation Trust, as the Trustee deems useful in carrying out the purposes of the Litigation Trust;

(viii)      sue and be sued and participate, as a party or otherwise, in any judicial, administrative, arbitrative, or other proceeding;

(ix)      establish, supervise, and administer the Litigation Trust and make distributions to Litigation Trust Beneficiaries pursuant to the terms of this Trust Agreement;

(x)      appoint such officers and retain such consultants, advisors, independent contractors, experts and agents and engage in such legal, financial, administrative,

5

accounting, investment, auditing, forecasting, and alternative dispute resolution services and activities as the Litigation Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in his or her discretion, deems advisable or necessary in order to carry out the terms of this Trust Agreement;

(xi)     pay reasonable compensation from the Trust Assets for any of the Litigation Trust's consultants, advisors, independent contractors, experts, and agents for legal, financial, administrative, accounting, investment, auditing, forecasting, and alternative dispute resolution services and activities as the Litigation Trust requires;

(xii)     pay reasonable compensation from the Trust Assets for the Trustee, the Delaware Trustee, and their employees, consultants, advisors, independent contractors, experts and agents, and reimburse the Trustee and the Delaware Trustee for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xiii)     execute and deliver such instruments as the Trustee deems proper in administering the Litigation Trust;

(xiv)     enter into such other arrangements with third parties as the Trustee deems useful in carrying out the purposes of the Litigation Trust, provided such arrangements do not conflict with any other provision of this Trust Agreement;

(xv)     in accordance with Section 4.4 below, defend, indemnify, and hold harmless (and purchase insurance indemnifying) the Trust Indemnified Parties (as defined in Section 4.4 below), to the fullest extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to defend, indemnify, hold harmless, and/or insure its directors, trustees, officers, employees, consultants, advisors, agents, and representatives. No party

6

31923185.4

shall be indemnified in any way for any liability, expense, claim, damage, or loss for which he or she is liable under Section 4.4 below; and

        (xvi)     exercise any and all other rights, and take any and all other actions as are permitted, of the Trustee in accordance with the terms of this Trust Agreement.

        (d)     The Trustee shall not have the power to guarantee any debt of other persons.

2.2     **General Administration.**

        (a)     The Trustee shall act in accordance with the Governing Documents. In the event of a conflict between the terms of this Trust Agreement and the Plan, the terms of the Plan shall control.

        (b)     The Trustee shall (i) timely file such income tax and other returns and statements required to be filed and shall cause to be paid timely from the Trust Assets all taxes required to be paid by the Litigation Trust, if any, (ii) comply with all applicable reporting and withholding obligations, (iii) satisfy all requirements necessary to qualify and maintain qualification of the Litigation Trust as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations, and (iv) take no action that could cause the Litigation Trust to fail to qualify as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations.

2.3     **Reporting.**

        (a)     The Trustee shall timely prepare, file and distribute such statements, reports and submissions to the extent required by applicable law.

        (b)     The Trustee shall cause to be prepared and filed with the Bankruptcy Court, as soon as available, and in any event no later than one hundred and twenty (120) days following the end of each fiscal year, an annual report (the "**Annual Report**") containing special-purpose

7

financial statements of the Litigation Trust (including, without limitation, a special-purpose statement of assets, liabilities and net claimants' equity, a special purpose statement of changes in net claimants' equity and a special-purpose statement of cash flows). The Trustee shall not be required to obtain an audit of the Annual Report by a firm of independent certified public accountants. The Annual Report shall be made available to Litigation Trust Beneficiaries by means of actual notice, provided, however, the Trustee may post the Annual Report on a website maintained by the Litigation Trust in lieu of actual notice to each Litigation Trust Beneficiary (unless otherwise required by law).

### ARTICLE III

### ACCOUNTS, INVESTMENTS, AND PAYMENTS

3.1     **Accounts.**

(a)     The Trustee shall maintain one or more accounts ("**Trust Accounts**") on behalf of the Litigation Trust with one or more financial depository institutions (each a "**Financial Institution**"). Candidates for the positions of Financial Institution shall fully disclose to the Trustee any interest in or relationship with the Reorganized Debtors or their affiliated persons. Any such interest or relationship shall not be an automatic disqualification for the position, but the Trustee shall take any such interest or relationship into account in selecting a Financial Institution.

(b)     The Trustee may replace any retained Financial Institution with a successor Financial Institution at any time, and such successor shall be subject to the considerations set forth in Section 3.1(a) above.

(c)     The Trustee may, from time to time, create such accounts and reasonable reserves within the Trust Accounts as authorized in this Section 3.1 and as he or she may deem necessary, prudent or useful in order to provide for distributions to the Litigation Trust

8

Beneficiaries and may, with respect to any such account or reserve, restrict the use of money therein for a specified purpose (the "**Trust Subaccounts**"). Any such Trust Subaccounts established by the Trustee shall be held as Trust Assets and, except as specifically designated as such in accordance with the provisions of Section 5.3(c) below, are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" or a "disputed ownership fund" within the meaning of the IRC or Treasury Regulations.

3.2     **Investment Guidelines.**

(a)     The Trustee may invest the Trust Assets in accordance with the Investment Guidelines, attached hereto as **Exhibit 2** (the "**Investment Guidelines**").

(b)     In the event the Litigation Trust holds any non-liquid assets, the Trustee shall own, protect, oversee, and monetize such non-liquid assets in accordance with the Governing Documents. This Section 3.2(b) is intended to modify the application to the Litigation Trust of the "prudent person" rule, "prudent investor" rule and any other rule of law that would require the Trustee to diversify the Trust Assets.

(c)     Cash proceeds received by the Litigation Trust in connection with its monetization of the non-liquid Trust Assets shall be invested in accordance with the Investment Guidelines until needed for the purposes of the Litigation Trust as set forth in Section 1.2 above.

3.3     **Payment of Operating Expenses.** All operating expenses of the Litigation Trust shall be paid from the Trust Assets, as set forth in the Plan. None of the Trustee, Delaware Trustee, the Litigation Trust Beneficiaries, nor any of their officers, agents, advisors, professionals or

9

employees shall be personally liable for the payment of any operating expense or other liability of the Litigation Trust.

     3.4     **Distributions to Litigation Trust Beneficiaries.**

     (a)     The Trustee will make distributions of Trust Assets to Litigation Trust Beneficiaries pursuant to and in accordance with the Governing Documents; *provided* that after setting aside any reserves pursuant to Section 2.1(c)(vii) above or any other provision of this Litigation Trust Agreement, Trust Assets will be distributed in the following order:

     (i)     first, to the Holders of Allowed Unsecured Notes Claims who participate in the Rights Offering until such beneficiaries have received an aggregate amount equal to $600,000 plus a preferred return on such amount, accruing at a rate equal to 15% compounded annually;

     (ii)     second, to Holders of Allowed Unsecured Notes Claims (including the Holders of Allowed Unsecured Notes Claims who participate in the Rights Offering) and Holders of Allowed General Unsecured Claims on a *Pro Rata* basis and, in each instance, without reduction for conversion into New Common Equity or New Convertible Preferred Equity (in the case of Class 5 Unsecured Note Claims) or distributions of the GUC Cash Settlement or New Common Equity (in the case of Class 6 General Unsecured Claims).

     (b)     The Trustee shall maintain reserves for any distributable amounts required to be set aside on account of Disputed Claims and shall distribute such amounts in accordance herewith, as such Disputed Claims are resolved, and such amounts shall be distributable in respect of such Disputed Claims as such amounts would have been distributable had the Disputed Claims been Allowed Claims as of the Effective Date.  Any funds held in a reserve for Disputed Claims

10

that re no longer needed for such Disputed Claim shall be removed from the reserve and revert to the Trust Assets.

(c)     Distributions shall be made to Litigation Trust Beneficiaries as determined by the Trustee in his or her discretion, provided, however, the Litigation Trust must distribute at least annually to the Litigation Trust Beneficiaries its net income plus all net proceeds from the sale of assets, except that the Litigation Trust may retain an amount of net proceeds or net income reasonably necessary to maintain the value of its assets or to meet claims and contingent liabilities (including Disputed Claims).

(d)     The Litigation Trust may withhold from amounts distributable to any Person any and all amounts, determined in the Trustee's reasonable sole discretion, required by any law, regulation, rule, ruling, directive, or other governmental requirement (including, without limitation, tax withholding in accordance with Section 5.4 below). Any Trust Assets which are undistributable in accordance with this Section 3.4 as of the termination of the Litigation Trust shall be distributed in accordance with provisions of the Plan and this Trust Agreement.

(e)     The Trustee shall be deemed the Distribution Agent under the Plan when making distributions to holders of Litigation Trust Interests.

(f)     Subject to Bankruptcy Rule 9010, any Litigation Trust distribution or delivery to a Litigation Trust Beneficiary shall be made: (1) at the addresses set forth on the respective proofs of Claim filed by such holders; (2) at the address set forth in any written notices of address changes delivered to the Trustee after the date of any related proof of Claim; or (3) at the address reflected in the schedules if no proof of Claim was filed and the Trustee has not received a written notice of a change of address.  Except as set forth in the Plan, if any Litigation

11

Trust distribution or other communication from the Litigation Trust is returned as undeliverable, no further Litigation Trust distribution shall be made to such holder unless the Trustee is notified in writing of such holder's then current address. Undeliverable Litigation Trust distributions shall remain in the possession of the Trustee until the earlier of (i) such time as a Litigation Trust distribution becomes deliverable or (ii) such undeliverable Litigation Trust distribution becomes unclaimed property pursuant to the provisions of the Plan and this Trust Agreement, in which case the unclaimed property will revert to and become part of the Trust Assets. Except as required by law, the Trustee (or its duly authorized agent) shall have no obligation to locate any Litigation Trust Beneficiary, but may, in its sole discretion, make such efforts to determine the current address of such Litigation Trust Beneficiary.

(g)    After final Litigation Trust distributions have been made in accordance with the Plan, Confirmation Order and this Trust Agreement, and adequate provision has been made for all final obligations of the Litigation Trust, the Trustee shall have the authority to direct the remaining Trust Assets to a tax-exempt organization as selected by the Trustee in his or her discretion.

(h)    Checks issued to Litigation Trust Beneficiaries shall be null and void if not negotiated within one hundred eighty (180) calendar days after the date of issuance thereof. Requests for reissuance of any voided check shall be made directly to the Trustee by the Litigation Trust Beneficiary to whom such check was originally issued. Any Claim in respect of such voided check shall be made within one hundred eighty (180) calendar days after the date of issuance of such check. If no request is made as provided in the preceding sentence, the check shall revert to the Trustee, such Litigation Trust distribution shall be deemed to be reduced to zero, and the funds represented by such check shall revert to the Trust Assets.

12

(i)     Cash payments to foreign holders of Litigation Trust Interests may be made, at the option of the Trustee, in such funds and by such means as are necessary or customary in the foreign jurisdiction of such foreign holder.

(j)     The Trustee shall have the discretion to determine the timing of Litigation Trust distributions in the most efficient and cost-effective manner possible; provided, however, that the Trustee's discretion may not be exercised in a manner inconsistent with any express requirements of the Plan.

(k)     The Trustee shall not be required to make any distribution of less than $50.

## ARTICLE IV

## TRUSTEE; DELAWARE TRUSTEE

4.1     **Number**.  In addition to the Delaware Trustee appointed pursuant to Section 4.9 below, there shall be one (1) Trustee who shall be the person named on the signature pages hereof.

4.2     **Term of Service.**

(a)     The Trustee shall serve from the Effective Date until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 4.2(b) below, (iii) his or her removal pursuant to Section 4.2(c) below, or (iv) the termination of the Litigation Trust pursuant to Section 6.2 below.

(b)     The Trustee may resign at any time upon written notice filed with the Bankruptcy Court. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)     The Trustee may be removed by the Bankruptcy Court in the event the Trustee becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence or for other good cause, provided the Trustee has received

13

31923185.4

reasonable notice and an opportunity to be heard. Other good cause shall mean fraud, self-dealing, intentional misrepresentation, willful misconduct, indictment for or conviction of a felony in each case whether or not connected to the Litigation Trust, or a consistent pattern of neglect and failure to perform or participate in performing the duties of Trustee hereunder.

(d)     In the event of any vacancy in the office of the Trustee, including the death, resignation or removal of any Trustee, such vacancy shall be filled by the Bankruptcy Court.

(e)     Immediately upon the appointment of any successor Trustee pursuant to Section 4.2(d) above, all rights, titles, duties, powers and authority of the predecessor Trustee hereunder shall be vested in and undertaken by the successor Trustee without any further act. No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee. No predecessor Trustee shall be liable personally for any act or omission of his or her successor Trustee. No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(f)     Each successor Trustee shall serve until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 4.2(b) above, (iii) his or her removal pursuant to Section 4.2(c) above, and (iv) the termination of the Litigation Trust pursuant to Section 6.2 below.

4.3     **Compensation and Expenses of the Trustee.**

(a)     The Trustee shall be compensated for his or her service as a Trustee in the amount of [$_____] [per hour, paid monthly].

(b)     The Litigation Trust will promptly reimburse the Trustee for all reasonable out-of-pocket costs and expenses incurred by the Trustee in connection with the performance of his or her duties hereunder.

14

31923185.4

(c)     The Litigation Trust shall include in the Annual Report a description of the amounts paid under this Section 4.3.

4.4     **Standard of Care; Exculpation.**

(a)     As used herein, the term "**Trust Indemnified Party**" shall mean each of (i) the Trustee, (ii) the Delaware Trustee, and (iii) the officers, employees, consultants, advisors, and agents of each of the Litigation Trust and the Trustee.

(b)     To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall not have or incur any liability for actions taken or omitted in their capacities as Trust Indemnified Parties, or on behalf of the Litigation Trust, except those acts found by a final order of a court of competent jurisdiction ("**Final Order**") to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of the Litigation Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or this Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from the Trust Assets.

(c)     To the extent that, at law or in equity, the Trust Indemnified Parties have duties (including fiduciary duties) or liability related thereto, to the Litigation Trust or the Litigation Trust Beneficiaries, it is hereby understood and agreed by the Parties that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, and replaced by the

15

duties and liabilities expressly set forth in this Trust Agreement with respect to the Trust Indemnified Parties; provided, however, that with respect to the Trust Indemnified Parties other than the Delaware Trustee the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to this Section 4.4 and its subparts.

(d)     The Litigation Trust will maintain appropriate insurance coverage for the protection of the Trust Indemnified Parties, as determined by the Trustee in his or her discretion.

4.5     **Protective Provisions.**

(a)     Every provision of this Trust Agreement relating to the conduct or affecting the liability of or affording protection to Trust Indemnified Parties shall be subject to the provisions of this Section 4.5.

(b)     In the event the Trustee retains counsel (including at the expense of the Litigation Trust), the Trustee shall be afforded the benefit of the attorney-client privilege with respect to all communications with such counsel, and in no event shall the Trustee be deemed to have waived any right or privilege including, without limitation, the attorney-client privilege even if the communications with counsel had the effect of guiding the Trustee in the performance of duties hereunder. A successor Trustee shall succeed to and hold the same respective rights and benefits of the predecessor for purposes of privilege, including the attorney-client privilege. No Party or other person may raise any exception to the attorney-client privilege described herein as any such exceptions are hereby waived by all Parties.

(c)     No Trust Indemnified Party shall be personally liable under any circumstances, except for his or her own willful misconduct, bad faith, gross negligence or fraud as determined by a Final Order.

16

(d)       No provision of this Trust Agreement shall require the Trust Indemnified Parties to expend or risk their own personal funds or otherwise incur financial liability in the performance of their rights, duties and powers hereunder.

(e)       In the exercise or administration of the Trust hereunder, the Trust Indemnified Parties (i) may act directly or through their respective agents or attorneys pursuant to agreements entered into with any of them, and the Trust Indemnified Parties shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys have been selected by the Trust Indemnified Parties in good faith and with due care, and (ii) may consult with counsel, accountants and other professionals to be selected by them in good faith and with due care and employed by them, and shall not be liable for anything done, suffered or omitted in good faith by them in accordance with the advice or opinion of any such counsel, accountants or other professionals.

4.6       **Indemnification.**

(a)       To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall be entitled to indemnification and reimbursement for reasonable fees and expenses (including attorneys' fees and costs but excluding taxes in the nature of income taxes imposed on compensation paid to the Trust Indemnified Parties) in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of the Litigation Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith,

17

gross negligence or fraud. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from the Trust Assets.

(b)        Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trust Indemnified Parties in connection with any action, suit or proceeding, whether civil, administrative or arbitrative, from which they are indemnified by the Litigation Trust shall be paid by the Litigation Trust from the Trust Assets in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trust Indemnified Parties, to repay such amount in the event that it shall be determined ultimately by Final Order that the Trust Indemnified Parties or any other potential indemnitee are not entitled to be indemnified by the Litigation Trust.

(c)        The Trustee shall purchase and maintain appropriate amounts and types of insurance on behalf of the Trust Indemnified Parties, as determined by the Trustee, which may include insurance with respect to liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trust Indemnified Party, and/or as an employee, agent, lawyer, advisor or consultant of any such person.

(d)        The indemnification provisions of this Trust Agreement with respect to any Trust Indemnified Party shall survive the termination of such Trust Indemnified Party from the capacity for which such Trust Indemnified Party is indemnified. Termination or modification of this Trust Agreement shall not affect any indemnification rights or obligations in existence at such time. In making a determination with respect to entitlement to indemnification of any Trust Indemnified Party hereunder, the person, persons or entity making such determination shall presume that such Trust Indemnified Party is entitled to indemnification under this Trust

18

31923185.4

Agreement, and any person seeking to overcome such presumption shall have the burden of proof to overcome the presumption.

(e)     The rights to indemnification hereunder are not exclusive of other rights which any Trust Indemnified Party may otherwise have at law or in equity, including common law rights to indemnification or contribution.

4.7     **Trustee Independence.**  The Trustee shall not, during the term of his or her service, hold a financial interest in, act as attorney or agent for, or serve as an officer or as any other professional for the Reorganized Debtors. The Trustee shall not act as an attorney, agent, or other professional for any Litigation Trust Beneficiary in connection with the Debtors or Reorganized Debtors. For the avoidance of doubt, this Section 4.7 shall not be applicable to the Delaware Trustee.

4.8     **No Bond.**  Neither the Trustee nor the Delaware Trustee shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

4.9     **Delaware Trustee.**

(a)     There shall at all times be a Delaware Trustee. The Delaware Trustee shall either be (i) a natural person who is at least twenty-one (21) years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law to be eligible to serve as the Delaware Trustee, and shall act through one or more persons authorized to bind such entity. The initial Delaware Trustee shall be [Wilmington Trust, National Association]. If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section 4.9, it shall resign immediately in the manner and with the effect hereinafter specified in Section 4.9(c) below. For the avoidance of doubt, the Delaware Trustee will only have such rights, duties and

19

obligations as expressly provided by reference to the Delaware Trustee hereunder. The Trustee shall have no liability for the acts or omissions of any Delaware Trustee.

(b)      The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities of the Trustee set forth herein. The Delaware Trustee shall be a trustee of the Litigation Trust for the sole and limited purpose of fulfilling the requirements of Section 3807(a) of Chapter 38 of title 12 of the Delaware Code, 12 Del. C. Section 3801 *et seq.* (the "**Act**") and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to accepting legal process served on the Litigation Trust in the State of Delaware and the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Act. There shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating to the Litigation Trust or the Litigation Trust Beneficiaries, such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement. The Delaware Trustee shall have no liability for the acts or omissions of any Trustee. Any permissive rights of the Delaware Trustee to do things enumerated in this Trust Agreement shall not be construed as a duty and, with respect to any such permissive rights, the Delaware Trustee shall not be answerable for other than its willful misconduct, bad faith, gross negligence or fraud. The Delaware Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Trust Agreement at the request or direction of the Trustee or any other person pursuant to the provisions of this Trust Agreement unless the Trustee or such other person shall have offered

20

to the Delaware Trustee security or indemnity (satisfactory to the Delaware Trustee in its discretion) against the costs, expenses and liabilities that may be incurred by it in compliance with such request or direction. The Delaware Trustee shall be entitled to request and receive written instructions from the Trustee and shall have no responsibility or liability for any losses or damages of any nature that may arise from any action taken or not taken by the Delaware Trustee in accordance with the written direction of the Trustee. The Delaware Trustee may, at the expense of the Litigation Trust, request, rely on and act in accordance with officer's certificates and/or opinions of counsel, and shall incur no liability and shall be fully protected in acting or refraining from acting in accordance with such officer's certificates and opinions of counsel.

(c)      The Delaware Trustee shall serve until such time as the Trustee removes the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Trustee in accordance with the terms of Section 4.9(d) below. The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustee; provided that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustee in accordance with Section 4.9(d) below; provided further that if any amounts due and owing to the Delaware Trustee hereunder remain unpaid for more than ninety (90) days, the Delaware Trustee shall be entitled to resign immediately by giving written notice to the Trustee. If the Trustee does not act within such sixty (60) day period, the Delaware Trustee, at the expense of the Litigation Trust, may apply to the Court of Chancery of the State of Delaware or any other court of competent jurisdiction for the appointment of a successor Delaware Trustee.

(d)      Upon the resignation or removal of the Delaware Trustee, the Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware

21

31923185.4

Trustee. Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustee, and any fees and expenses due to the outgoing Delaware Trustee are paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of his or her duties and obligations under this Trust Agreement. The successor Delaware Trustee shall make any related filings required under the Act, including filing a Certificate of Amendment to the Certificate of Trust of the Litigation Trust in accordance with Section 3810 of the Act.

(e)     Notwithstanding anything herein to the contrary, any business entity into which the Delaware Trustee may be merged or converted or with which it may be consolidated or any entity resulting from any merger, conversion or consolidation to which the Delaware Trustee shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Delaware Trustee, shall be the successor of the Delaware Trustee hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto.

(f)     The Delaware Trustee shall be entitled to compensation for its services as agreed pursuant to a separate fee agreement between the Litigation Trust and the Delaware Trustee, which compensation shall be paid by the Litigation Trust. Such compensation is intended for the Delaware Trustee's services as contemplated by this Trust Agreement. The terms of this paragraph

22

shall survive termination of this Trust Agreement and/or the earlier resignation or removal of the Delaware Trustee.

(g)     The Delaware Trustee shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document, other than this Trust Agreement, whether or not an original or a copy of such agreement has been provided to the Delaware Trustee. The Delaware Trustee shall have no duty to know or inquire as to the performance or nonperformance of any provision of any other agreement, instrument or document, other than this Trust Agreement. Neither the Delaware Trustee nor any of its directors, officers, employees, agents or affiliates shall be responsible for nor have any duty to monitor the performance or any action of the Litigation Trust, the Trustee or any other person, or any of their directors, members, officers, agents, affiliates or employee, nor shall it have any liability in connection with the malfeasance or nonfeasance by such party. The Delaware Trustee may assume performance by all such persons of their respective obligations. The Delaware Trustee shall have no enforcement or notification obligations relating to breaches of representations or warranties of any other person. The Delaware Trustee shall have no responsibilities (except as expressly set forth herein) as to the validity, sufficiency, value, genuineness, ownership or transferability of any Litigation Trust Asset, written instructions, or any other documents in connection therewith, and will not be regarded as making, nor be required to make, any representations thereto.

(h)     The Delaware Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Trust Agreement arising out of, or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics;

23

31923185.4

riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

<div align="center">

**ARTICLE V**

**TAX MATTERS**

</div>

5.1     **Treatment of Litigation Trust Assets Transfer.**  For all United States federal income tax purposes, all Parties shall treat the transfer of the Litigation Trust Assets to the Litigation Trust as if the Litigation Trust Assets (other than such assets attributable to Disputed Claims) had been first transferred to the Litigation Trust Beneficiaries and then transferred by the Litigation Trust Beneficiaries to the Litigation Trust in exchange for Litigation Trust Interests. The Litigation Trust Beneficiaries shall be treated for all purposes of the IRC as the grantors and deemed owners of their respective shares of the Litigation Trust Assets (other than the Trust Assets allocable to Disputed Claims and held as a "disputed ownership fund"). The foregoing treatment shall also apply, to the extent permitted by applicable law, for United States state and local income tax purposes.

5.2     **Income Tax Status.**

(a)     For United States federal income tax purposes (and for purposes of all state, local and other jurisdictions to the extent applicable), this Litigation Trust shall be treated as a liquidating trust pursuant to Section 301.7701-4(d) of the Treasury Regulations and as a grantor trust pursuant to Sections 671-677 of the IRC. To the extent consistent with Revenue Procedure 94-45 and not otherwise inconsistent with this Trust Agreement, this Trust Agreement shall be construed so as to satisfy the requirements for liquidating trust status.

24

31923185.4

(b)     The Litigation Trust shall at all times to be administered so as to constitute a domestic trust for United States federal income tax purposes.

5.3     **Tax Returns.**

(a)     The "taxable year" of the Litigation Trust shall be the "calendar year" as such terms are defined in section 441 of the IRC.  In accordance with Section 6012 of the IRC and Section 1.671-4(a) of the Treasury Regulations, the Litigation Trust shall file with the IRS annual tax returns on Form 1041 as a grantor trust. In addition, the Litigation Trust shall file in a timely manner such other tax returns, including any state and local tax returns, as are required by applicable law and pay any taxes shown as due thereon. The Litigation Trust's taxable income (other than taxable income allocable to any assets attributable to a "disputed ownership fund") shall be allocated by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Litigation Trust had distributed all of the Trust Assets (valued at their book value), other than assets allocable to Disputed Claims, to the Litigation Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior distributions from the Litigation Trust. Similarly, taxable loss of the Litigation Trust shall be allocated by reference to the manner in which economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Trust Assets. Within a reasonable time following the end of the taxable year, the Litigation Trust shall send to each Litigation Trust Beneficiary a separate statement setting forth such Litigation Trust Beneficiary's items of income, gain, loss, deduction or credit and will instruct each such Litigation Trust Beneficiary to report such items on his/her applicable income tax return.

25

(b)      The Litigation Trust shall be responsible for payment, from the Litigation Trust Assets, of any taxes imposed on the Litigation Trust (including any "disputed ownership fund" within the meaning of Section 1.468B-9 of the Treasury Regulations) or the Trust Assets. In accordance therewith, any taxes imposed on any disputed ownership fund or its assets will be paid from the Trust Assets.

(c)      The Trustee may timely elect to treat any Trust Assets allocable to Disputed Claims as a "disputed ownership fund" governed by Section 1.468B-9 of the Treasury Regulations, and (2) to the extent permitted by applicable law, shall report consistently for state and local income tax purposes.  If a "disputed ownership fund" election is made, all parties (including the Trustee and the holders of Litigation Trust Interests) shall report for U.S. federal, state and local income tax purposes consistently with the foregoing.  The Trustee shall file all income tax returns with respect to any income attributable to a "disputed ownership fund" and shall pay from the Litigation Trust Assets all U.S. federal, state and local income taxes attributable to such disputed ownership fund based on the items of income, deduction, credit, or loss allocable thereto.

5.4      **Withholding of Taxes and Reporting Related to Litigation Trust Operations.** The Litigation Trust shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions made by the Litigation Trust shall be subject to any such withholding and reporting requirements. The Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with any such withholding, payment, and reporting requirements. All amounts properly withheld from distributions to a Litigation Trust Beneficiary as required by applicable law and paid over to the applicable taxing authority for the account of such Litigation Trust Beneficiary shall be treated as part of the Litigation Trust distribution to such Litigation Trust Beneficiary. To the extent that the

26

operation of the Litigation Trust or the liquidation of the Trust Assets creates a tax liability imposed on the Litigation Trust, the Litigation Trust shall timely pay such tax liability and any such payment shall be considered a cost and expense of the operation of the Litigation Trust payable without Bankruptcy Court order. Any federal, state or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from distributions hereunder. All Litigation Trust Beneficiaries shall be required to provide any information necessary to effect the withholding of such taxes. The Trustee may require each Litigation Trust Beneficiary to furnish to the Litigation Trust (or its designee) its social security number or employer or taxpayer identification number as assigned by the IRS and complete any related documentation (including but not limited to a Form W-8BEN, Form W-8BENE-E, or Form W-9) (the "**Tax Documents**"). The Trustee may condition any and all distributions to any Litigation Trust Beneficiary upon the timely receipt of properly executed Tax Documents and receipt of such other documents as the Trustee reasonably requests, and in accordance with the Plan.

5.5     **Valuation.** As soon as reasonably practical after the Effective Date, the Trustee shall make a good faith valuation of the Litigation Trust Assets.  Such valuation shall be made available from time to time, to the extent relevant, and used consistently by all parties for all United States federal income tax purposes. In connection with the preparation of the valuation contemplated hereby and by the Plan, the Litigation Trust shall be entitled to retain such advisors or professionals as the Litigation Trust shall determine to be appropriate or necessary, and the Trustee shall take such other actions in connection therewith as it determines to be appropriate or necessary.  The Litigation Trust shall bear all of the reasonable costs and expenses incurred in connection with determining such value, including the fees and expenses of any advisors or professionals retained in connection therewith.  The Litigation Trust also shall file (or cause to be

27

filed) any other statements, returns or disclosures relating to the Litigation Trust that are required by any governmental unit.

5.6    **Expedited Determination of Taxes**.    The Trustee may request an expedited determination of taxes of the Litigation Trust, under Section 505 of the Bankruptcy Code for all returns filed for, or on behalf of, the Litigation Trust for all taxable periods through the termination of the Litigation Trust.

## ARTICLE VI

## GENERAL PROVISIONS

6.1    **Irrevocability**.    To the fullest extent permitted by applicable law, the Litigation Trust is irrevocable.

6.2    **Term; Termination.**

(a)    The term for which the Litigation Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of this Section 6.2.

(b)    The Trustee and the Litigation Trust shall be discharged or dissolved, as the case may be, at such time as (a) the Trustee determines that the pursuit of additional Non-Released LT Claims is not likely to yield sufficient additional Cash to justify further pursuit of such claims and (b) all distributions of Trust Assets required to be made by the Trustee under the Plan and this Trust Agreement have been made in accordance with provisions of the Plan and this Trust Agreement, which shall not be unreasonably delayed, but in no event shall the Litigation Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion made by a party in interest within the six (6) month period prior to such fifth (5th) anniversary (or within the six (6) month period prior to the end of an extension period), determines

28

that a fixed period extension (not to exceed five (5) years without a private letter ruling from the IRS or an opinion of counsel satisfactory to the Trustee that any further extension would not adversely affect the status of the Litigation Trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery of the Litigation Trust Assets (the "**Dissolution Date**").

(c)     On the Dissolution Date or as soon as reasonably practicable thereafter, after the wind-up of the affairs of the Litigation Trust by the Trustee and payment of all of the liabilities have been provided for as required by applicable law including Section 3808 of the Act, all monies remaining in the Litigation Trust shall be distributed or disbursed in accordance with Section 3.4 above.

(d)     Following the dissolution and distribution of the assets of the Litigation Trust, the Litigation Trust shall terminate, and the Trustee shall execute and cause a Certificate of Cancellation of the Certificate of Trust of the Litigation Trust to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the Litigation Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation. A certified copy of the Certificate of Cancellation shall be given to the Delaware Trustee for its records promptly following such filing.

6.3     **Amendments**.  Any amendment to or modification of this Trust Agreement may be made only pursuant to an order of the Bankruptcy Court; provided, however, the Trustee may amend this Trust Agreement from time to time without the consent, approval or other authorization of, but with notice to, the Bankruptcy Court, to make: (i) minor modifications or clarifying amendments necessary to enable the Trustee to effectuate the provisions of this Trust Agreement; or (ii) modifications to satisfy any requirements, conditions or guidelines contained in any opinion,

29

directive, order, statute, ruling or regulation of any federal, state or foreign governmental entity. Notwithstanding the foregoing proviso, no amendment or modification of this Trust Agreement shall modify this Trust Agreement in a manner that is inconsistent with the Plan or the Confirmation Order other than to make minor modifications or clarifying amendments as necessary to enable the Trustee to effectuate the provisions of this Trust Agreement. Notwithstanding the foregoing, neither this Trust Agreement, nor any Exhibit to this Trust Agreement, shall be modified or amended in any way that could jeopardize, impair, or modify the Litigation Trust's "liquidating trust" status. Any amendment affecting the rights, duties, immunities or liabilities of the Delaware Trustee shall require the Delaware Trustee's written consent.

6.4     **Severability**. Should any provision in this Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Trust Agreement.

6.5     **Notices.**

(a)     Notices to Litigation Trust Beneficiaries shall be given in accordance with such person's address as determined in accordance with Section 3.4(f) above.

(b)     Any notices or other communications required or permitted hereunder to the following Parties shall be in writing and delivered to the addresses or e-mail addresses designated below, or to such other addresses or e-mail addresses as may hereafter be furnished in writing to each of the other Parties listed below in compliance with the terms hereof.

To the Litigation Trust

[_____]

With a copy to:

30

[_____]

To the Delaware Trustee;

[_____]

With a copy to:

[_____]

(c)     All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses.

6.6     **Successors and Assigns**. The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the Litigation Trust, the Trustee, and their respective successors and assigns, except that neither the Litigation Trust, nor the Trustee, may assign or otherwise transfer any of their rights or obligations, if any, under this Trust Agreement except in the case of the Trustee in accordance with Section 4.2(d) above.

6.7     **Limitation on Litigation Trust Interests for Securities Laws Purposes**. Litigation Trust Interests (a) shall not be assigned, conveyed, hypothecated, pledged, or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will, under the laws of descent and distribution or otherwise by operation of law; (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest.

6.8     **Exemption from Registration**. The Parties hereto intend that the interests of the Litigation Trust Beneficiaries under this Trust Agreement shall not be "securities" under applicable laws, but none of the Parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If it

31

should be determined that any such interests constitute "securities," the Parties hereto intend that the exemption provisions of Section 1145 of the Bankruptcy Code will be satisfied and the offer and sale under the Plan of the Litigation Trust Interests will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.

6.9 **Entire Agreement; No Waiver**. The entire agreement of the Parties relating to the subject matter of this Trust Agreement is contained herein, and in the documents referred to herein (including the Plan), and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any further exercise thereof or of any other right, power, or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

6.10 **Headings.** The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

6.11 **Governing Law**. The validity and construction of this Trust Agreement and all amendments hereto and thereto shall be governed by the laws of the State of Delaware, and the rights of all Parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions thereof that would purport to apply the law of any other jurisdiction; provided, however, that the Parties hereto intend that the provisions hereof shall control and there shall not be applicable to the Litigation Trust, the Trustee, the Delaware Trustee, or this Trust Agreement, any provision of

32

the laws (statutory or common) of the State of Delaware pertaining to trusts that relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court or governmental body or agency of Trustee accounts or schedules of Trustee fees and charges; (b) affirmative requirements to post bonds for the Trustee, officers, agents, or employees of a trust; (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding, or disposition of real or personal property; (d) fees or other sums payable to the Trustee, officers, agents, or employees of a trust; (e) the allocation of receipts and expenditures to income or principal; (f) restrictions or limitations on the permissible nature, amount, or concentration of trust investments or requirements relating to the titling, storage, or other manner of holding of trust assets; (g) the existence of rights or interests (beneficial or otherwise) in trust assets; (h) the ability of beneficial owners or other persons to terminate or dissolve a trust; or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of the Trustee or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustee or the Delaware Trustee set forth or referenced in this Trust Agreement. Section 3540 of the Act shall not apply to the Litigation Trust.

6.12    **Dispute Resolution**.

(a)    Unless otherwise expressly provided for herein, the dispute resolution procedures of this Section 6.12 shall be the exclusive mechanism to resolve any dispute arising under or with respect to this Trust Agreement.

(b)    **Informal Dispute Resolution**. Any dispute under this Trust Agreement shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when a disputing party sends to the counterparty or counterparties a written notice of dispute ("**Notice of Dispute**"). Such Notice of Dispute shall state clearly the matter in dispute. The period

33

of informal negotiations shall not exceed thirty (30) days from the date the Notice of Dispute is received by the counterparty or counterparties, unless that period is modified by written agreement of the disputing party and counterparty or counterparties. If the disputing party and the counterparty or counterparties cannot resolve the dispute by informal negotiations, then the disputing party may invoke the formal dispute resolution procedures as set forth below.

(c)     **Formal Dispute Resolution**. The disputing party shall invoke formal dispute resolution procedures, within the time period provided in the preceding subparagraph, by serving on the counterparty or counterparties a written statement of position regarding the matter in dispute ("**Statement of Position**"). The Statement of Position shall include, but need not be limited to, any factual data, analysis or opinion supporting the disputing party's position and any supporting documentation and legal authorities relied upon by the disputing party. Each counterparty shall serve its Statement of Position within thirty (30) days of receipt of the disputing party's Statement of Position, which shall also include, but need not be limited to, any factual data, analysis or opinion supporting the counterparty's position and any supporting documentation and legal authorities relied upon by the counterparty. If the disputing party and the counterparty or counterparties are unable to consensually resolve the dispute within thirty (30) days after the last of all counterparties have served its Statement of Position on the disputing party, the disputing party may file with the Bankruptcy Court a motion for judicial review of the dispute in accordance with Section 6.12(d) below.

(d)     **Judicial Review**. The disputing party may seek judicial review of the dispute by filing with the Bankruptcy Court (or, if the Bankruptcy Court shall not have jurisdiction over such dispute, such court as has jurisdiction pursuant to Section 1.5 above) and serving on the counterparty or counterparties and the Trustee, a motion requesting judicial resolution of the

34

dispute. The motion must be filed within forty-five (45) days of receipt of the last counterparty's Statement of Position pursuant to the preceding subparagraph. The motion shall contain a written statement of the disputing party's position on the matter in dispute, including any supporting factual data, analysis, opinion, documentation and legal authorities, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly administration of the Litigation Trust. Each counterparty shall respond to the motion within the time period allowed by the rules of the court, and the disputing party may file a reply memorandum, to the extent permitted by the rules of the court.

6.13    **Effectiveness**. This Trust Agreement shall become effective on the Effective Date.

6.14    **Counterpart Signatures**. This Trust Agreement may be executed in any number of counterparts and by different Parties on separate counterparts (including by PDF transmitted by e-mail), and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

35

IN WITNESS WHEREOF, the Parties have executed this Trust Agreement this _____ day
of _____, 2023.


**TRUSTEE**                                    **DELAWARE TRUSTEE**
                                               **[_____]**

_____        By:_____
Name:                                           Name:
                                                Title:

36

31923185.4

**EXHIBIT 1**

**CERTIFICATE OF TRUST OF THE OLD IVC LITIGATION TRUST**

**EXHIBIT 2**

**INVESTMENT GUIDELINES**