IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: <br><br> INVACARE CORPORATION, *et al.*, <br><br> Debtor. | Chapter 11 <br><br> Case No. 23-90068 (CML) <br><br> Jointly Administered |

**OBJECTION OF BENDIX COMMERCIAL VEHICLES SYSTEMS LLC TO THE DEBTOR'S FIRST AMENDED JOINT CHAPTER 11 PLAN OF INVACARE CORPORATION AND ITS DEBTOR AFFILIATES**
[Relates to Dkt. No.536]

MAY IT PLEASE THE COURT:

Bendix Commercial Vehicle Systems LLC ("**Bendix**"), by and through its undersigned counsel, hereby submits this objection (the "**Objection**") to the Debtor's *First Amended Joint Chapter 11 Plan of Invacare Corporation and Its Debtor Affiliates* [Docket No. 356] (the "**First Amended Plan**"). This Court should not confirm the First Amended Plan because it improperly classifies claims and unfairly discriminates among claims of equal rank. As the Supreme Court stated in *Czyzewski v. Jevic Holding Corp.*, if a Debtor wishes to avail themselves of the chapter 11 plan process, they have to follow the requirements of the Bankruptcy Code. The Debtors have failed to do so. In support of its Objection, Bendix respectfully states as follows:

**BACKGROUND**

1.  Bendix and the Debtors have been identified as potentially responsible parties ("**PRP**") under the federal Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C.A. Section 9601 *et. seq.* ("**CERCLA**") and the State of Ohio equivalent for the costs

1

of response to releases of hazardous substances at or from the property located at 899 Cleveland Street in the City of Elyria, County of Lorain, State of Ohio (the "**Site**").

2. On or about April 11, 1994, Bendix as lessor and Invacare Corporation ("**Invacare**") as tenant, entered into that certain *Lease Agreement* (the "**Prior Lease**") regarding the Site. The Prior Lease expired on September 30, 2004.

3. Bendix and Invacare extended their landlord-tenant relationship on a month-to-month basis by letter agreement dated September 30, 2004.

4. On or about December 1, 2004, Bendix entered into a new Lease Agreement dated December 1, 2004 (the "**Lease**") with Invacare Corporation ("**Invacare**") for the lease of the Site.

5. Section 6.2(a) of the Lease required Invacare to keep in good order, condition and repair the Site. Section 6.2(b) of the Lease required Invacare to surrender the Site in the same condition as received, with several exceptions that do not apply here. Section 6.2(c) of the Lease states that Invacare will assume use of the Site.

6. Section 9 of the Lease requires Invacare to be responsible for and to protect, defend, indemnify, and hold harmless, Bendix for and against any and all losses, costs, liabilities, damages, claims, demands, expenses and legal actions arising or allegedly arising out of any accident or occurrence causing or allegedly causing damage to the Site or in any way connected with the condition of the Site or the use of the Site by Invacare.

7. Section 30 of the Lease states in its entirety:

Tenant, during the occupancy of the Premises, shall not cause:

(i) A spill, leak, introduction, discharge, release or disposal of any Hazardous Substance as defined in the Comprehensive Environmental Response, Compensation or Liability Act of 1980, 42 U.S.C. 9601 et seq., petroleum products or any pollutant or contaminant of any kind (Hazardous Substances) in, on under or from the Premises or any portion thereof when such could constitute a violation of applicable state, federal or local laws and regulations;

(ii) A discharge of Hazardous Substances into the sanitary or storm sewer or water systems serving the Premises, or into any municipal or other governmental water system or storm and/or sanitary sewer system without complying with all applicable federal, state and local laws and regulations, and without first obtaining any necessary license, permit or other approval of all governmental agencies having jurisdiction thereover;

(iii) The storage, treatment or disposal of any Hazardous Substances in, on or under the Premises without complying with all federal, state, and local laws and ordinances, and without first obtaining all necessary licenses and permits; or

(iv) There to be conducted any site investigations, studies or remedial activities without first providing Landlord written notice thereof. Any site investigation, studies or remediation activities performed on the Premises by Tenant shall conform with all applicable environmental laws and the directives and orders of all governmental agencies having jurisdiction. The Tenant shall promptly provide to Landlord and Landlord shall promptly provide to Tenant copies of any correspondence and notices sent to or received from such agencies as the same relate to site investigations, studies or remedial activities of or relating to the Premises.

Tenant shall be solely responsible, at its expense, for the control and proper handling, in compliance with all, and as required by all, applicable federal, state and local laws and regulations, of any Hazardous Substances used or stored on the Premises by Tenant. Tenant shall undertake, at its sole expense to investigate, remediate and/or remove in accordance with and as required by all applicable environmental laws any Hazardous Substances released, discharged, or disposed in, on, under or from the Premises at any time caused by Tenant or its contractors, employees, or other agents; and without limiting Tenant's other indemnity or insurance obligations under this Lease, Tenant shall indemnify and hold harmless Landlord from and against all liabilities, claims, damages, causes of action, fines, penalties and expenses, whether direct, indirect, consequential or otherwise, arising from any incident or occurrence on or about the Premises attributable to the presence, use, release, discharge or disposal of Hazardous Substances at any time by Tenant or its contractors, employees or other agents. The obligation of Tenant under this Section 30, including, but without limitation, the foregoing indemnity, shall survive the expiration or earlier termination of this Lease, anything to the contrary contained herein notwithstanding.

Landlord shall indemnify Tenant for, and shall hold Tenant harmless from and against, all liabilities, claims, damages, causes of action, fines, penalties and expenses of every kind and nature whatsoever, whether direct, indirect, consequential or otherwise, arising from the presence, use, release, discharge or disposal of Hazardous Substances on or about the Premises arising from any negligent or willful act of Landlord or its contractors, predecessors, employees or other agents, except that Landlord shall not be required to indemnify or reimburse Tenant for any expenses already incurred or paid for by Tenant on or before the date of execution hereof. The obligation of Landlord under this Section 30, including, but without limitation, the foregoing indemnity, shall survive the expiration or earlier termination of this Lease, anything to the contrary contained herein notwithstanding.

Prior to the termination of this Lease for any reason, Tenant shall provide to the Landlord a certified ASTM designated E: 1527-00, Phase I Environmental Site Assessment of the Premises (the "**Environmental Site Assessment**").

The Environmental Site Assessment shall be performed by an environmental consultant approved by the Landlord and the certification and date of such Environmental Site Assessment shall be within thirty (30) days of the termination of this Lease or Tenant's occupancy of the Premises hereunder, whichever is later.

If the result of the Environmental Site Assessment discloses recognized environmental conditions related to the Premises, the Landlord and the Tenant shall negotiate in good faith, the additional phase II environmental site assessment and investigation necessary based upon the recognized environmental conditions set forth in the Environmental Site Assessment, the sharing of costs related thereto, and the remediation of the recognized environmental conditions set forth in the Environmental Site Assessment, based upon the results of the additional phase II environmental site assessment and investigation performed hereunder."

8. On or about December 21, 2017, Invacare sent written notice to Bendix that it was exercising its right to terminate the Lease effective as of February 28, 2018.

9. In February 2018, Invacare advised Bendix that Invacare had identified a former degreaser as a Recognized Environmental Condition ("**REC**") meaning that the former degreaser contains "the presence or likely presence of hazardous substances or petroleum products" and it may have caused the spillage of solvents that caused environmental contamination to the Site.

10. As set forth above, the Lease requires Bendix to provide Invacare with a certified ASTM designated E: 1527-090, Phase I Environmental Site Assessment of the Premises (the "**ESA**"). Bendix has developed and is continuing to develop certain environmental information regarding the Site.

11. Bendix intends to enter the Site into the Ohio Environmental Protection Agency's Voluntary Action Program ("**VAP**") to investigate possible environmental contamination at the Site prior to offering the Site for sale. The Ohio EPA VAP will allow the PRPs to investigate possible environmental contamination, clean it up and receive a covenant not to sue from the State

4

of Ohio assuming certain cleanup requirements have been satisfied. This covenant protects PRPs from being legally responsible to the State of Ohio for further investigation and clean up.

12. On January 31, 2023 (the "**Petition Date**"), the Debtors commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors continue to operate their businesses and manage their assets as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

13. On March 29, 2023, Debtors filed their First Amended Plan, which intends to (i) deliver substantially all the Reorganized Debtors' value (in the form of debt and equity) to Highbridge Capital Management ("**Highbridge**") and the Backstop Parties and (ii) release Highbridge, the Backstop Parties, all insiders (including former offices and directors), Azurite Management LLC (a significant shareholder), and other non-debtor parties from any and all claims that may be asserted against them by the Debtors, as well unsecured creditors, such as Bendix.

14. The First Amended Plan also proposes to pay all Intercompany Claims in full and likewise reinstate.

15. Most egregiously, the First Amended Plan provides for broad, improper opt-out non-Debtor third party releases (the "**Third Party Releases**") that Holders of Claims will provide to, for example, management, ownership, lenders, unsecured noteholders, and others.

16. Bendix timely filed a general unsecured claim [Claim No. 10328] (the "**Bendix Claim**") in the amount of $365,500.00 for costs incurred relating to the potential environmental liability cause by Invacare's degreaser machine. Bendix anticipates that this claim may increase once further investigations and remediation has occurred.

**OBJECTION AND ARGUMENT**

17. Debtors' Plan should not be confirmed because it violates Section 1123(a)(4) of the Bankruptcy Code ("Section 1123(a)(4)"). In short, the First Amended Plan attempts to provide favorable treatment to certain unsecured creditors while not extending the same treatment to similarly situated creditors, such as Bendix. Section 1123(a)(4) states that a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interests." 11 U.S.C. § 1123(a)(4). This section requires equality of treatment of claims or interests placed in the same class. A plan that does not satisfy Section 1123(a)(4) cannot be confirmed. *See* 11 U.S.C. § 1129(a)(1) ("[t]he court shall confirm a plan only if… (1) [t]he plan complies with applicable provisions of this title").

18. As proponents, Debtors bear the burden of establishing by a preponderance of the evidence that the First Amended Plan complies with each of the confirmation requirements of section 1129 in both the 1129(a) and 1129(b) cramdown contexts. *In re Exide Techs.*, 303 B.R. 48, 58 (Bankr. D. Del. 2003).

19. Moreover, the Bankruptcy Court has an independent duty to determine whether a plan proponent has met its evidentiary burden under section 1129(a) prior to entering an order confirming a chapter 11 plan. *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 656 (Bankr. D. Del. 2003).

**The Plan is Not Confirmable Because it Unfairly Discriminates Against Holders of Class 6 Claims**

20. Under the First Amended Plan, general unsecured creditors are classified in either Class 5 (Unsecured Notes Claims) or Class 6 General Unsecured Claims. Both Class 5 and Class 6 are impaired and entitled to vote under the First Amended Plan. Class 7 contains Intercompany

Claims, which also are general unsecured claims. The First Amended Plan improperly provides for reinstatement of the Class 7 Intercompany Claims, but only a de minimis recovery for Class 6 creditors.

21. Section 1129(b)(1) of the Bankruptcy Code provides that to confirm a plan that has not been accepted by all impaired classes, the plan proponent must show that the plan "does not discriminate unfairly: and is "fair and equitable" with respect to the non-accepting impaired class. 11 U.S.C. § 1129(b)(1). "Generally speaking, this standard ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes. Thus, a plan proponent may not segregate two similar claims or groups of claims into separate classes and provide disparate treatment for those classes." *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988). The burden is upon the Debtors to prove that the plan does not discriminate unfairly. *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 122 (D. Del. 2006); *Sentry Operating Co. of Tex., Inc.*, 264 B.R. 850, 853 (Bankr. S.D. Tex. 2001).

22. Under Section 1129(b)(1) of the Bankruptcy Code, a plan discriminates unfairly when it treats similarly situated classes differently without a reasonable basis for the disparate treatment. *See Sentry Operating Co. of Tex., Inc.*, 264 B.R. 863-64; *Armstrong*, 348 B.R. at 121. In determining whether a plan discriminates unfairly, Professor and former Bankruptcy Judge Bruce A. Markell, developed the "Markell test" to establish a rebuttable presumption of unfair discrimination when:

> (1) A dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

*Sentry Operating Co. of Texas, Inc.,* 264 B.R. 863-64 (quoting Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 Am. Bankr. L.J. 227 (1998)).

23. If there is an allegation of a materially lower percentage recovery, the presumption can be rebutted only "by a showing that, outside of bankruptcy, the dissenting class would similarly receive less than the class receiving a greater recovery, or that the alleged preferred class had infused new value into the reorganization which offset its gain." *Armstrong,* 348 B.R. at 121 (internal quotation marks and citations omitted).

24. Under the Markell Test, the Debtors' First Amended Plan is patently unconfirmable. First, Classes 5, 6 and 7 all have the same priority. Second, but for certain gerrymandering relating to the Birlasoft Claim, Class 6 likely will vote to reject the First Amended Plan. As to the third element, the First Amended Plan proposes to reinstate the Intercompany Claims, while paying Class 6 claims a mere pittance of what they are owed. Without question, Class 6 Claims are receiving a materially lower percentage than Class 7. This analysis does not even take into consideration the priority being provided to the Class 5 Noteholders over that of the Class 6 Claimants who opt into the proposed Rights Offering.

25. Further, Bendix is unaware of any compelling justification for the grossly disparate treatment. *See Sentry Operating Co.*, 264 B.R. at 850. In *Sentry*, the debtor proposed a plan with a grossly disparate treatment of two classes of unsecured claims. Once class, consisting of the debtor's trade creditors, would receiver full payment on their claims while the other class, with whom the debtor did not anticipate doing future business, was to recovery only 1% on its claims. *Id.* at 862. Not surprisingly, the court denied confirmation on that proposed plan. Similarly, the Ninth Circuit reversed both the bankruptcy and district courts, which had confirmed a chapter 11 plan that proposed to pay trade creditors 80% of their claims on the plan's effective date while a

secured creditor's deficiency claim's recovery was contingent upon the generation of sufficient cash flow. *Liberty Nat'l Enters. V. Ambank La Mesa L.P. (In re Ambanc La Mesa L.P.)*, 115 F.3d 650, 652-656 (9th Cir. 1997). The Ninth Circuit reasoned that the "continued services of ordinary tradespeople may not always be a commercially necessity for an apartment operating in a large metropolitan area with many other providers of those services." *Id.* at 657.

26. Here, Debtors' proposed disparate treatment of Class 6 Claims to Class 7 Claims is inconsistent with one of the fundamental purposes of the Bankruptcy Code: equality in treatment of similarly situated creditors. Debtors cannot justify why they reinstate Intercompany Claims and propose to pay Class 6 Claims a de minimis return. If that is not unfair discrimination, it is hard to imagine what is.

**Internal Discrimination in Class 6 Violates any Notion of a Good Faith Filing**

27. Even worse, there is discrimination internally in Class 6 due to the Debtors' last minute gamesmanship regarding its "settlement" of the Birlasoft Claim.

28. Section 1129(b)(3) of the Bankruptcy Code expressly provides that every plan of reorganization be "proposed in good faith and not by any means forbidden by law." This provision has been construed to require that a plan be proposed with "honesty and good intentions" and with "a basis for expecting that a reorganization can be effected." In keeping with that mantra, bankruptcy courts are required to determine whether a chapter 11 plan, viewed in light of the "totality of the circumstances," fairly achieves a result consistent with the purposes of the Bankruptcy Code.

29. The Bendix Claim is classified as a Class 6 Claim; however, as it is largely based on future amounts due and owing by the Debtors, the Debtors, or the Litigation Trustee will likely object to it, possibly resulting in the disallowance of the Bendix Claim. On the other hand, some

unliquidated claims, like the Birlasoft claim, are being allowed in agreed amounts for purposes of voting on the Debtors' First Amended Plan and on a substantive basis and as a result and will receive payment under the First Amended Plan. *See, e.g., Debtors' Emergency Motion for Entry of an Order (I) Approving a Settlement with Birlasoft Solutions, Inc., (II) Authorizing the Debtors to Enter into and Perform Under a Settlement with Birlasoft Solutions, Inc., and (III) Granting Related Relief* [Docket 447] (the "**Emergency Birlasoft 9019 Motion**").

30. Through the Emergency Birlasoft 9019 Motion, Debtors were able to resolve a disgruntled former vendor's prepetition claim in the amount of $49,279,000 in exchange for a $2 million payment, releases, and support of Debtors' Plan. To creditors like Bendix that remain blowing in the wind, this action feels like a violation of plan solicitation requirements by entering into agreements with certain creditors that obligated these creditors to vote in favor of a plan in exchange for allowance of their claims. *See, generally* 11 U.S.C. § 1125(b).

31. However, the Debtors have not "settled" other unliquidated Class 6 Claims by agreeing to a fixed claim amount; any such unliquidated claim is subject to objection and disallowance. Thus, while most unliquidated Class 6 Claims not electing to participate in the Rights Offering likely will receive a de minimis cash distribution in the form of a minority interest in unregistered stock, because the Debtors have agreed to allow unliquidated portions of unsecured creditors' respective claims, certain unsecured creditors are receiving better treatment than other unliquidated claimants in Class 6. Such disparate treatment among the same class members should not be permitted because it is not made in good faith, but rather to gerrymander the voting results of Class 6. *See In re AOV Indus., Inc.*, 792 F.2d 1140, 1152 (D.C. 1986) (Section 1123(a)(4) prohibits payment of different percentage settlements to co-class members).

32. Moreover, while the First Amended Plan states that it constitutes a settlement between the Debtors and, among other groups, Holders of all Claims (see Plan at Article IV(A), it is void of any discussion of the factors necessary for the approval of settlements. *In re WebSci Technologies, Inc.*, 234 Fed. Appx. 26, 29 (3d Cir. 2007) (citations omitted) (setting forth the following four criteria that a court must consider for approval of a settlement: )1) the probability of success in litigation; 2) the likely difficulties of collection; 3) the complexity and expense of litigation; and 4) the interest of creditors.)  The Debtors should be required to establish the required factors for a settlement within the First Amended Plan, the same way they would if a separate motion was filed under Bankruptcy Rules 9019.

**Debtors' Environmental Liability Should Be Non-Dischargeable**

33. Bendix further believes Debtors have a non-dischargeable obligation to the State of Ohio Environmental Protection Agency.  Simply stated, Invacare contaminated real property and as a result, Invacare should be liable for any onsite contamination. Invacare's contamination caused an identifiable harm and it should be required to protect the human health and safety of those in the surrounding geographical area.

34. While Bendix is in the process of submitting this property to the Ohio EPA's VAP, there is a clean-up cost associated with the environmental liability caused by Invacare.  Yet, Debtors' Plan does not appear to contain any mechanism to address their environmental liability. At a minimum, Debtors should be obligated to establish an escrow account for the benefit of the Ohio Environmental Protection Agency for funds to be used in association with the remediation of the Site.  The escrow account can be funded by Reorganized Invacare's post-effective date profits.

11

35. This Court cannot allow Invacare to escape the financial responsibility to clean up and remediate the real property it contaminated, creating toxic exposure, public health, environmental health and safety risks. This Court should limit the proposed releases as to not affect Invacare's legal and financial responsibility to the Ohio Environmental Protection Agency.

*[Remainder of page intentionally left blank.]*

## **RESERVATION OF RIGHTS**

36. Bendix reserves it right to raise additional grounds for relief requested in this Objection and to supplement and/or amend this Objection.

37. The filing of this Objection is not to be construed as a waiver of any of Bendix's rights and/or defenses in connection with any claim asserted by or against Bendix in connection with these Chapter 11 Cases.

WHEREFORE, Bendix respectfully requests that this Court deny approval of the First Amended Plan and grant Bendix such other relief as the Court deems appropriate.

Dated: April 24, 2023

_____
Michael D. Rubenstein (Bar #22860)
Liskow & Lewis
1001 Fannin Street, Suite 1800
Houston, Texas 77002
Telephone: (713) 651-2953
mdrubenstein@liskow.com

-and-

Christopher B. Wick (*pro hac vice*)
Hahn Loeser & Parks LLP
200 Public Square, Suite 2800
Cleveland, Ohio 44114
Phone: (216) 621-0150
Facsimile: (216) 241-2824
E-mail: cwick@hahnlaw.com
Attorneys for Bendix Commercial Vehicle Systems LLC

**CERTIFICATE OF SERVICE**

    I hereby certify that on the 24th day of April, 2023, the foregoing pleading was served upon all counsel of record by electronic mail by the Clerk of the Court via the CM/ECF system and/or by electronic mail.

_____
Michael D. Rubenstein