**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| IN RE: | ) | Chapter 11 |
| | ) | |
| INVACARE CORPORATION, *et al.*,[1] | ) | Case No. 23-90068 (CML) |
| | ) | |
| Reorganized Debtors. | ) | (Jointly Administered) |
| | ) | |

**KENCO TRANSPORTATION MANAGEMENT, LLC'S SUPPLEMENTAL RESPONSE
TO THE REORGANIZED DEBTORS' SUPPLEMENTAL BRIEF IN SUPPORT OF
THEIR CLAIM OBJECTION**

---

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, are: Invacare Corporation (0965); Freedom Designs, Inc. (4857); and Adaptive Switch Laboratories, Inc. (6470). The corporate headquarters and the mailing address for the Debtors is 1 Invacare Way, Elyria, Ohio 44035.

24261720

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT AND THE APRIL 12 ARGUMENTS ...................................... 1

SUPPLEMENTAL RESPONSE .......................................................................................... 3

I.      The Affiliates are Parties to the Agreement and are Jointly and Severally Liable. ....................................................................................... 3

     A.      Relevant Principles of Contract Interpretation Under Ohio Law. ..................................................................................................... 4

     B.      The Agreement Unambiguously Demonstrates that the Affiliates are Parties. ..................................................................... 6

     C.      The Reorganized Debtors Fail to Demonstrate Ambiguity. ........................ 7

     D.      Joint and Several Liability is Unambiguous. ............................................... 12

     E.      Extrinsic Evidence Cannot be Used to Create Ambiguity. ....................... 13

     F.      The Reorganized Debtors' Extrinsic Evidence is Not Dispositive. ............................................................................................ 16

II.      Kenco is Owed Management Fees for the Termination Notice Period. .................................................................................................. 17

III.      Kenco Will Provide Proof Payment of Carrier Charges. ..................................... 23

IV.      Kenco's Amended Claims are Timely. ................................................................ 24

CONCLUSION ................................................................................................................. 26

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*216 Jamaica Avenue, LLC v. S & R Playhouse Realty Co.*,
  540 F.3d 433 (6th Cir. 2008) ................................................. 15

*Aerel, S.R.L. v. PCC Airfoils, L.L.C.*,
  448 F.3d 899 (6th Cir. 2006) ................................................... 8

*In re All Kelley & Ferraro Asbestos Cases*,
  821 N.E.2d 159 (Ohio 2004) ............................................... 4, 12

*Am. Select Ins. Co. v. Stopar*,
  1992 WL 369254 (Ohio Ct. App. Dec. 10, 1992) ................................ 20

*Belk v. Le Chaperon Rouge Co.*,
  2020 WL 3642880 (N.D. Ohio July 6, 2020) .................................... 12

*State ex rel. Burgess & Niple v. Linzell*,
  93 N.E.2d 9 (Ohio 1950) ....................................................... 14

*Consolidated Management v. Handee Marts*,
  671 N.E.2d 1304 (Ohio Ct. App. 1996) ..................................... 13, 14

*Dannemiller Grocery Co. v. Bessler Disappearing Stairway Co.*,
  1931 WL 2161 (Ohio Ct. App. 1931) ........................................... 14

*In re DePugh*,
  409 B.R. 84 (Bankr. S.D. Tex. 2009) .......................................... 25

*Eastham v. Chesapeake Appalachia, L.L.C.*,
  754 F.3d 356 (6th Cir. 2014) ................................................. 4, 5

*Gates v. Ohio Sav. Assn.*,
  2009 WL 4160508 (Ohio Ct. App. 2009) ......................................... 5

*Hope Acad. Broadway Campus v. White Hat Mgt., L.L.C.*,
  46 N.E.3d 665 (Ohio 2015) ..................................................... 9

*In re iHeartMedia, Inc.*,
  2019 WL 1590546 (Bankr. S.D. Tex. Apr. 12, 2019) ............................ 25

*Infocision Mgmt. Corp. v. Found. for Moral L. Inc.*,
  2011 WL 3022002, at *7 (N.D. Ohio July 22, 2011) ............................ 18

*Jindal Builders & Restoration Corp. v. Brown & Cris, Inc.*,
　　1997 WL 674621 (Ohio Ct. App. Oct. 31, 1997) .................................................17

*Masco Corp. v. Wojcik*,
　　795 F. App'x 424 (6th Cir. 2019) .......................................................................9

*Mission Product Holdings, Inc. v. Tempnology, LLC*,
　　139 S. Ct. 1652 (2019) ......................................................................................21

*Monsler v. Cincinnati Cas. Co.*,
　　598 N.E.2d 1203 (Ohio Ct. App. 1991) .............................................................6

*Neuro-Commc'n Servs., Inc. v. Cincinnati Ins. Co.*,
　　219 N.E.3d 907 (Ohio 2022) ............................................................................13

*Portage Cmty. Bank v. Fazio*,
　　2017 WL 2951841 (Ohio Ct. App. July 10, 2017) .............................................18

*Ragen v. Hancor, Inc.*,
　　920 F. Supp. 2d 810 (N.D. Ohio 2013) .............................................................14

*Reliant Energy Servs., Inc. v. Enron Canada Corp.*,
　　349 F.3d 816, 822 (5th Cir. 2003) ...............................................................12, 13

*S.E. Land Dev. Ltd. v. Primrose Mgmt. L.L.C.*,
　　952 N.E.2d 563 (Ohio Ct. App. 2011) .............................................................19

*Savedoff v. Access Grp., Inc.*,
　　524 F.3d 754 (6th Cir. 2008) .........................................................................5, 7

*Shifrin v. Forest City Ents., Inc.*,
　　597 N.E.2d 499 (Ohio 1992) ...........................................................................13

*St. Marys v. Auglaize Cty. Bd. of Commrs.*,
　　875 N.E.2d 561 (Ohio 2007) ...........................................................................14

*State ex rel. Stacy v. Batavia Loc. Sch. Dist. Bd. of Edn.*,
　　829 N.E.2d 298 (Ohio 2005) ...........................................................................22

*State v. Porterfield*,
　　829 N.E.2d 690 (Ohio 2005) .............................................................................5

*Sunesis Trucking Co. v. Thistledown Racetrack, L.L.C.*,
　　22 N.E.3d 190 (Ohio Ct. App. 2014) ...............................................................19

*Transportation Ins. Co. v. Busy Beaver Bldg. Centers, Inc.*,
　　969 F. Supp. 2d 875 (S.D. Ohio 2013) ........................................................15, 16

*Wall v. Kroger Co.*,
  2015 WL 968937 (Ohio Ct. App Mar. 4, 2015) ........................................................7

*Westfield Ins. Co. v. Galatis*,
  797 N.E.2d 1256 (Ohio Ct. App. 2003) .................................................................5

**Statutes**

11 U.S.C.A. § 365 ...........................................................................................19, 22

**Other Authorities**

13 Williston on Contracts § 39:24 (4th ed.) ...............................................................21

Kenco Transportation Management, LLC ("Kenco") hereby submits this response (the "Supplemental Response") to the *Reorganized Debtors' Reply and Supplemental Brief in Support of Omnibus Objection to Proofs of Claims Filed by Kenco* [ECF No. 788] (the "Supplemental Brief" or "Supp. Br.") filed by the above-captioned reorganized debtors (each a "Reorganized Debtor," and collectively, the "Reorganized Debtors")[2] and, in further support of *Kenco's Response to the Reorganized Debtors' Claims Objections* [ECF No. 679] (the "Response")[3] and, in support hereof, respectfully states as follows:

## PRELIMINARY STATEMENT AND THE APRIL 12 ARGUMENTS

1.      The Reorganized Debtors' Supplemental Brief adds very little to the *Reorganized Debtors' Omnibus Objection to Proofs of Claims Filed by Kenco* [ECF No. 666] (the "Objection") apart from hyperbole and additional inapposite case law.  At its core, the Supplemental Brief is a transparent attempt to steer this matter into unnecessary, time consuming, and expensive discovery in order to delay Kenco's recovery even further.

2.      As discussed herein, however, much of the Objection can be resolved through argument at the April 12, 2024 hearing.  ***First***, the issue of whether the Affiliates[4] identified on Exhibit A to the Agreement are parties to the Agreement and, thus, jointly and severally liable thereunder can be resolved as a matter of law based on the plain language of the Agreement.  At best, the Reorganized Debtors point to one recital (which incorporates Exhibit A) and one provision that could have, in theory, been written tighter.  However, neither reflects any intent to exclude the Affiliates as contract counterparties to the Agreement such that there is any ambiguity

---

[2]      The term "Debtor" shall refer to the above-captioned Reorganized Debtors during the time period prior to the effectiveness of the chapter 11 plan confirmed in the above-captioned chapter 11 cases (the "Chapter 11 Cases").

[3]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Response.

[4]      "Affiliates" includes Reorganized Debtors Freedom Designs, Inc. and Adaptive Switch Laboratories, Inc.

on the issue.[5]  To the contrary, the participation of the Affiliates was clearly a critical aspect of the Agreement.  Otherwise, there would have been no reason to include the defined term "Affiliates" in the Agreement.

3.      **Second**, the issue of whether Kenco is entitled to a claim for management fees for the six-month notice period preceding the triggered termination of the Agreement can also be resolved through argument based on the plain language of the Agreement, the undisputed correspondence between the parties around the time of the Petition Date, and the Debtors' motion to reject the Agreement.  As discussed further herein, the provision establishing the six-month period could not be unilaterally waived by the Debtors and, therefore, the Objection should be overruled as to this issue.

4.      **Third**, discovery on the amounts Kenco has paid to freight carriers is not necessary because Kenco will agree to a prospective procedure where it provides the Reorganized Debtors with proof of payment of any such carrier amounts and, upon receipt of such proof, the Reorganized Debtors shall pay Kenco the distribution to which Kenco is entitled under the chapter 11 plan for such claim amounts.[6]  Kenco admits that it has paid certain carriers less than the full invoiced amount.[7]  More important, however, is the fact that there are certain carriers who remain unpaid.  While these unpaid carriers have not yet pursued litigation against Kenco for their unpaid invoices, that risk to Kenco will remain until the expiration of applicable statutes of limitations.  In the context of this claims allowance process, Kenco should not be put in a position where it needs to reach-out to all unpaid carriers immediately and arrange to pay them 100 cents on the

---

[5]      Since there is no ambiguity, there is no need to consider extrinsic evidence.

[6]      If the Affiliates are found to be parties to the Agreement, Kenco is entitled to a 15% distribution on its claims (*i.e.*, a 5% distribution from each of the three non-substantively consolidated bankruptcy estates).

[7]      It should be noted that such discounted payments were not given by carriers without a fight requiring Kenco to incur legal fees.

dollar (or close thereto) in order to have an allowed claim that is only entitled to 15 cents on the dollar.  Rather, Kenco should only have to pay in order to resolve a meritorious carrier demand. Therefore, a going-forward process where Kenco submits proof of payment to receive incremental distributions is appropriate.[8]

5.     The only issues that will not be addressed at the hearing will be the timeliness of Kenco's Amended Claims[9] and a prove-up of the total amount of the claim.[10]  At the conclusion of the April 12, 2024 hearing, Kenco believes that the Court should schedule a status hearing two weeks later (or such other agreeable time) to allow the parties to meet and confer as to the how the remaining issues will be resolved through this contested matter.

## SUPPLEMENTAL RESPONSE

### I.     The Affiliates are Parties to the Agreement and are Jointly and Severally Liable.

6.     The preamble of the Agreement reflects that the Agreement is made by and between Kenco and "Invacare Corporation and its Affiliates ('SHIPPER')."[11]  (*See* **Ex. 1 – Agreement pg. 2 of 21**).[12]  Identical or similar language appears in preambles to Statement of Work No. 1 (***Id.* at**

---

[8]     For the sake of transparency and the avoidance of doubt, in its pending state court litigation against the non-debtor Affiliates, Kenco will seek to recover the full amount of the unpaid carrier claims from the non-debtor Affiliates (irrespective of whether Kenco has paid such amounts) because, upon collection from the non-debtor Affiliates, Kenco will pay such amounts to the relevant carriers (*i.e.*, Kenco does not seek a windfall under any circumstances).

[9]     This issue will likely require discovery on the issue of the Debtors' use of RateLinx to pay certain carriers directly (*i.e.*, Kenco did not know which of these carriers had been paid or not at the time of filing its Original Claims).

[10]    The allowed amount of Kenco's claim will depend on result of the April 12, 2024 hearing as well as the resolution of the question of the timeliness of Kenco's Amended Claims.

[11]    "Affiliates" are defined as Invacare's affiliated companies as identified on Exhibit A to the Agreement.  (*See* **Ex. 1 – Agreement Recital B at pg. 2 of 21 and Ex. A at pg. 11 of 21 (each page number corresponds to the ECF page number in the top right hand corner)**).

[12]    Exhibits 1-7 were filed as part of Kenco's Response [ECF No. 679].

3

**pg. 12 of 21**),[13] Amendment 1 to the Agreement (**_Id._ at pg. 18 of 21**), and Amendment 2 to the Agreement (**_Id._ at pg. 19 of 21**).

7.     Notwithstanding these clear identifications of the Affiliates as parties to the Agreement, the Reorganized Debtors point to a handful of provisions which they assert demonstrate that the Affiliates do not fall within the definition of SHIPPER and, thus, the Affiliates are not parties to the Agreement.  While these provisions could have been more artfully worded, they in no way demonstrate that the Affiliates are not parties to the Agreement or that any ambiguity exists.

8.     When examining the entire Agreement and attempting to construe it as a whole, as required under Ohio law, these provisions do not give rise to an ambiguity as to whether the Affiliates are parties to the Agreement.  Moreover, whether Invacare Corporation and the Affiliates are jointly and severally liable under the Agreement is not ambiguous because the Agreement is silent on the issue of liability allocation and, therefore, the Ohio default rule of joint and several liability amongst multiple counterparties who default on a collective promise to pay is the controlling rule.

### A.     Relevant Principles of Contract Interpretation Under Ohio Law.

9.     Under Ohio law, "[w]hen confronted with an issue of contract interpretation, [a court's] role is to give effect to the intent of the parties."  _Eastham v. Chesapeake Appalachia, L.L.C._, 754 F.3d 356, 361 (6th Cir. 2014) (quotation and citation omitted).[14]  To do that, courts should:

---

[13]     In Statement of Work No. 1, the definitional language reads "Invacare Corporation and its Affiliates ('SHIPPER' or 'Invacare')".

[14]     _See also In re All Kelley & Ferraro Asbestos Cases_, 821 N.E.2d 159, 167 (Ohio 2004) ("In construing the terms of a written contract, the primary objective is to give effect to the intent of the parties, which we presume rests in the language that they have chosen to employ.").  The Reorganized Debtors omit the second

> examine the contract as a whole and presume that the intent of the parties is reflected in the language of the contract.  In addition, [courts should] look to the plain and ordinary meaning of the language used in the contract unless another meaning is clearly apparent from the contents of the agreement.  When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties.

*Id.*; *see also Westfield Ins. Co. v. Galatis,* 797 N.E.2d 1256, 1261 (Ohio Ct. App. 2003).

10.     Contractual language is ambiguous "only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (analyzing Ohio law).  "[C]ourts may not use extrinsic evidence to create an ambiguity; rather, the ambiguity must be patent, i.e., apparent on the face of the contract." *Id.*  In determining whether contractual language is ambiguous, the contract must be construed as a whole, so as to give reasonable effect to every provision in the agreement. *Id.*

11.     While no clear standard has evolved to determine the "level of lucidity" necessary for a writing to be unambiguous, when confronted with allegations of ambiguity, a court must objectively and thoroughly examine the writing to ascertain its meaning. *Gates v. Ohio Sav. Assn.*, 2009 WL 4160508, at *3 (Ohio Ct. App. 2009).  "Only when a definitive meaning proves elusive should rules for construing ambiguous language be employed.  **Otherwise, allegations of ambiguity become self-fulfilling**." *State v. Porterfield*, 829 N.E.2d 690, 693 (Ohio 2005) (emphasis added).

---

part of this quote when citing this case in Paragraph 5 of their Supplemental Brief, as if to suggest that the intent of the Parties should be determined from something other than the language in the Agreement.

**B.** **The Agreement Unambiguously Demonstrates that the Affiliates are Parties**.

12.     As mentioned above, the Agreement, Statement of Work No. 1, and two amendments to the Agreement define SHIPPER as Invacare Corporation and its Affiliates. That alone should foreclose the Reorganized Debtors' assertion that the Affiliates are not parties liable under the Agreement. *See Monsler v. Cincinnati Cas. Co.*, 598 N.E.2d 1203, 1209 (Ohio Ct. App. 1991) ("A fundamental principle of contract construction requires that the document be read as a whole in order to identify the intent of the parties. *A specific provision controls over a general one*.") (emphasis added).

13.     The critical importance of the Affiliates' participation in the contractual relationship with Kenco is evident from the Agreement. Otherwise, there would be no reason to include the defined term "Affiliates." For example, the first section of Statement of Work No. 1 states that Kenco will provide the following services:

> Provide Invacare access to KTM's integrated technology platform (e.g., TMS, Web Portal, BI/BA tools, etc.) for Invacare's use on a 24/7/365 basis for the purpose of entering, viewing and extracting shipment data and as otherwise mutually agreed by the parties to support Invacare's on-going transportation and logistics of its daily operations. The integrated technology platform will utilize a single access point to Invacare's current and future ERP systems. **For Invacare's third party suppliers and its Affiliates that do not utilize Oracle or SAP, such suppliers and Affiliates will access the TMS (as defined below) through KTM's web based portal ("Web Portal").**

**(Ex. 1 – Agreement pg. 12 of 21 § 1)** (emphasis added). This provision demonstrates that certain Affiliates do not use the same systems as Invacare and, therefore, it was necessary to delineate that these Affiliates would still be able to access Kenco's platform through other means. More telling is the language in this provision that identified "Invacare's third party suppliers" who also would need to access the Kenco platform. The fact that the suppliers are explicitly identified as "third

parties" demonstrates that the parties to the Agreement knew how to identify relevant players who were involved in the underlying supply chain but were not parties liable under the Agreement.  In other words, if the Affiliates were not intended to be parties to the Agreement, they would have been identified as "third party Affiliates" and not included in the definition of SHIPPER.

14.     Statement of Work No. 1 also speaks directly to the question of whether the term SHIPPER includes the Affiliates.  Specifically, the third bullet-point set forth on page 4 of the Statement of Work No. 1 provides:

> The monthly management fee covers the non-start-up services described in the Agreement and this SOW, and all modes of transportation initiated by **SHIPPER, _which includes the Affiliates referenced in Exhibit A_ to the Agreement**, and supplier shipments initiated via the inbound portal.

(**Ex. 1 – Agreement pg. 15 of 21 - 3rd bullet point**) (emphasis added).

15.     In light of the foregoing, when examining the Agreement to construe it as a whole, the only reasonable interpretation is that SHIPPER includes the Affiliates such that the Affiliates are parties liable under the Agreement.

### C.     The Reorganized Debtors Fail to Demonstrate Ambiguity.

16.     The Reorganized Debtors assert that Kenco's reading of the Agreement is internally inconsistent, which renders the Agreement ambiguous.  Supp. Br. ¶¶ 10-11.  Under Ohio law, however, to conclude that an inconsistency is inconsistent enough to render a contract ambiguous, the Court must find that looking at the agreement as a whole does not resolve the inconsistency or that the language is susceptible to two or more *reasonable* interpretations.  *See Savedoff*, 524 F.3d at 763 (citing *Covington v. Lucia*, 784 N.E.2d, 186, 190 (Ohio Ct. App. 2003)) (emphasis added).  "The Ohio Supreme Court has reminded us that we should not hastily find ambiguities in a contract."  *Wall v. Kroger Co.*, 2015 WL 968937, at *3 (Ohio Ct. App Mar. 4, 2015).

17.     The existence of competing readings of contractual language is not sufficient in and of itself to render the provision ambiguous.  *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 904 (6th Cir. 2006) (finding this argument has been "consistently rejected" by Ohio courts with cases in support).  The Reorganized Debtors fail to identify any provision that would suggest the Affiliates are not contractual parties liable under the Agreement.

18.     While the Reorganized Debtors argue that "several" provisions clearly refer to SHIPPER as only Invacare Corporation, they only point to a handful of provisions[15] in their attempt to manufacture ambiguity as to whether the Affiliates were intended to be parties to the Agreement.

19.     First, they point to Recital B, which provides:

> WHEREAS SHIPPER to satisfy its transportation needs, desires to utilize the services of KTM to arrange for transportation of SHIPPER's freight in addition to freight applying to SHIPPER's locations and affiliated companies as identified in Exhibit A ("Affiliates").

**(Ex. 1 – Agreement Recital B at pg. 2 of 21)**.

20.     Kenco acknowledges that Recital B could have been drafted more artfully. Specifically, since the term SHIPPER had been defined above to include the Affiliates, the inclusion of "…and affiliated companies identified in Exhibit A ('Affiliates')" is redundant. However, it is apparent that one of the purposes of Recital B is to establish that the "Affiliates" is defined as the "affiliated companies as identified in Exhibit A" since the defined term Affiliates

---

[15]     The Reorganized Debtors also argue that the fact the notice provision at Section 16 of the Agreement directs notices to be sent to Invacare Corporation supports their contention that the Affiliate are not parties under the Agreement.  That argument is borderline frivolous.  This Court is undoubtedly familiar with commercial agreements involving multiple affiliated co-obligors where notices are directed to a single point of contact, typically the parent company of affiliated co-obligors.  Similarly, the Reorganized Debtors cite no authority in support of their proposition that each affiliate needed a signature line in the Agreement.  *See* Supp. Br. ¶ 9.  Tellingly, they do not challenge Kenco's contention that Kathaleen Leneghan had actual and apparent authority to bind the Affiliates to the Agreement.  *See* Response ¶¶ 42-45.

(with a capital "A") is used in the preamble before "Affiliates" having been defined. The introduction of the definition of "Affiliates" could have been drafted better. But nothing about Recital B suggests that an intention contrary to the provisions discussed above unequivocally demonstrating that the Affiliates are parties to the Agreement. "Unambiguous language does not become ambiguous simply because it could have been written even more unambiguously." *Masco Corp. v. Wojcik*, 795 F. App'x 424, 429 (6th Cir. 2019).

21.     The Reorganized Debtors also assert that Recital B defines "Affiliates" as the "*locations and* affiliated companies as identified in Exhibit A[.]" Supp. Br. ¶ 31; (**Ex. 1 – Agreement Recital B at pg. 2 of 21)** (emphasis added). The contention that the defined term "Affiliates" was intended to capture "*locations*" and not just "*affiliated companies*" is utterly frivolous. Indeed, shoehorning the term "locations" into the term Affiliates does not comport with the principle of interpretation that words should be given their common, ordinary, and usual meaning. *Hope Acad. Broadway Campus v. White Hat Mgt., L.L.C.*, 46 N.E.3d 665, 674–75 (Ohio 2015) ("Common words in a contract are given their plain and ordinary meaning, unless another meaning is clearly evident from the face or overall content of the contract, or unless the result is manifestly absurd.").

22.     It is apparent from Exhibit A which line items are Invacare Corporation locations and which line items are the affiliated companies:

#### Exhibit A - Invacare locations and Affiliates

1.  Invacare Taylor Street - 1200 Taylor Street, Elyria OH 44035 USA (Plant)
2.  Invacare Taylor Woods - 39400 Taylor Parkway, North Ridgeville OH 44039   USA (DC)
3.  Invacare California - 5650 East Santa Ana St, Ontario CA 91761 USA (DC – Geodis operated facility)
4.  Invacare Top End - 4501 63rd Cir N, Pinellas Park FL 33781 USA (Top End division, plant)
5.  Invacare Sanford -2101 E Lake Mary Blvd, Sanford FL 32773 USA (Plant)
6.  Invamex Mexico - 7801 S Jackson Rd, Pharr TX 78577 USA (Plant)
7.  Invacare Canada - 570 Matheson Blvd. E. Unit 8, Mississauga ON L4Z4G4 Canada (DC)
8.  Alber USA- 1005 International Dr, Oakdale, PA 15071
9.  Adaptive Switch Laboratories (ASL)- 125 Spur 191, Suite C, Spicewood, TX 78669

10. Freedom Designs -2241 Madera Road, Simi Valley CA 93065
11. Medbloc - 700 Ensminger Road, Suite 112, Tonawanda NY 14150
12. Motion Concepts - 84 Citation Drive Units 1-7, Concord ON L4K3Cl Canada
13. Perpetual Motion Enterprises (PME) - 3520 Pharmacy Avenue, Unit 9, Toronto ON MlW 2T8 Canada
14. All Pro - 2625 Jewett Lane, Sanford, FL32771 (DC - ***third party***)

(**Ex. 1 – Agreement pg. 11 of 21**) (emphasis added).

23.     Item Nos. 1 through 5 are obviously all Invacare Corporation locations.  Items Nos. 6 through 13 are all affiliates of Invacare Corporation,[16] each of which are set forth on the organizational chart attached to the first-day declaration submitted in connection with these chapter 11 cases.[17]  The absurdity of the Reorganized Debtors' reading of "locations" into the definition of "Affiliate" is evident when considering Item No. 14, All Pro, a third party distribution center operator located in Sanford, Florida that serves the Invacare Corporation plant in Sanford (*see* **Ex. 1 – Agreement pg. 11 of 21, Item No. 5 on Ex. A**).

24.     Presupposing their reading of the definition of Affiliate is reasonable (*i.e.*, "Affiliates" includes locations), the Reorganized Debtors assert that it is not "reasonable to conclude that the parties intended for 'All Pro,' a third-party supplier whose name also appears in Exhibit A, to have been a party."  Supp. Br. ¶ 16.  The Reorganized Debtors ignore the fact that Exhibit A explicitly identifies All Pro as a "third party" in Item No. 14, so there is no confusion about their status as a non-party.  Again, as with Statement of Work No. 1, the parties knew how

---

[16]     According to the Ohio Secretary of State's website, Alber USA, LLC was "merged out of existence" on September 30, 2021, which is why Kenco is not pursuing Alber USA in its state court litigation against other non-debtor Affiliates.  *See* https://bizimage.ohiosos.gov/api/image/pdf/202127203252.  Similarly, Kenco made a strategic decision not to pursue Invamex, S. de R.L. de C.V. in its litigation against the non-debtor Affiliates.

[17]     *See Declaration of Kathleen P. Leneghan, Senior Vice President and Chief Financial Officer of Invacare Corporation, in Support of Chapter 11 Petitions and First Day Motions* [ECF No. 24] at Exhibit A (PDF page 57 of 301).  While this organizational chart is outside of the four corners of the Agreement, the Reorganized Debtors (two of which are identified on Exhibit A) should not be allowed to deny that Exhibit A sets forth affiliates of Invacare Corporation.  The fact that listings do not include "LLC" or "Inc." after the names of the Affiliates is a distinction without meaning in this context.

10

to identify relevant players who were involved in the underlying supply chain but were not parties liable under the Agreement. The fact that only All Pro is identified as a "third party" on Exhibit A demonstrates that every other entity set forth thereon *is* a party to the Agreement. Lastly, the Reorganized Debtors' glib conclusion that "the obvious purpose of Exhibit A, which avoids the problems raised by Kenco's construction, is that it simply identifies locations that required shipping services" is disingenuous. If that was the purpose, no need existed to create the defined term "Affiliate," and it is the Reorganized Debtors' strained construction that runs roughshod over the Agreement which, when construing the contract as a whole, reflects that the Affiliates are actual parties to the Agreement.

25. Finally, the Reorganized Debtors rely on Section 3.A of the Agreement:

> SHIPPER agrees to tender its and its Affiliates shipments with origin and/or destination residing in Canada and/or the United States to [Kenco], and [Kenco] agrees to manage the transportation of said shipments.

**(Ex. 1 – Agreement pg. 3 of 21 § 3(A))**.[18, 19]

26. Similar to Recital B, Kenco acknowledges that there was no need for Section 3.A to reference "Affiliates" since SHIPPER is defined as Invacare Corporation and its Affiliates. While this could have been drafted better, nothing about Section 3.A suggests an intention contrary to the provisions discussed above unequivocally demonstrating that the Affiliates are parties to the Agreement. Again, redundant language does not inject ambiguity into the Agreement.

27. When viewed in light of Ohio courts' admonishment against hastily finding ambiguities, these few instances of inartful drafting do not reflect an intention diametrically

---

[18]  Language referring to "shipments tendered on behalf of SHIPPER and its Affiliates" also appeared on page 4 of Statement of Work No. 1 but was deleted by Amendment 1.

[19]  It should be noted that this provision cuts against the Reorganized Debtors' position that "Affiliates" really just means "locations" since this provision would then read as "Invacare Corporation agrees to tender its and its locations' shipments," which is nonsensical since the locations would be *Invacare's* locations.

opposed (or even lightly opposed) to inclusion of the Affiliates as parties to the Agreement. Again, if the Affiliates were not intended to be parties, there was no need to include the term Affiliates in the first place.

### D. Joint and Several Liability is Unambiguous.

28.    The Reorganized Debtors attempt to argue that, even if the Affiliates are parties, the Agreement is ambiguous as to whether liability amongst Invacare Corporation and the Affiliates is joint and several. Supp. Br. ¶¶ 29-34. The Agreement is silent on the issue of whether liability is joint and several or only several and, therefore, the default Ohio rule of joint and several liability applies. Tellingly, the Reorganized Debtors cite no Ohio authority that refutes this uncontroversial proposition.

29.    It is "well-settled Ohio law that an obligation entered into by more than one person is presumed to be joint absent language to the contrary….". *Belk v. Le Chaperon Rouge Co.*, 2020 WL 3642880, at *8 (N.D. Ohio July 6, 2020) (emphasis added); *see also In re All Kelley & Ferraro Asbestos Cases*, 821 N.E.2d at 165 ("The law in Ohio as it has existed for over 160 years— [is] that joint and several liability generally attaches when multiple parties default on their collective promise to pay a single sum of money, unless the contract sets forth their individual obligations."). The Reorganized Debtors cite *In re Kelley* to say that joint and several liability turns on the intent of the parties, but their analysis stops short because they fail to acknowledge that *Kelley* states that the intent of the parties is determined by the language they employ. *Id.* at 167. Indeed, the Agreement contains no language that negates the presumption of joint and several liability among Invacare Corporation and the Affiliates. As such, the Agreement is unambiguous with respect to joint and several liability.[20]

---

[20]    The *Enron Canada* case cited by the Reorganized Debtors does not address Ohio law, and is more nuanced than presented. Supp. Br. ¶ 33. In *Enron Canada*, the court held the contract was ambiguous as to whether

12

### E.      Extrinsic Evidence Cannot be Used to Create Ambiguity.

30.      The Ohio Supreme Court has held that "[i]f no ambiguity appears on the face of the instrument, parol evidence cannot be considered in an effort to demonstrate such an ambiguity." *Shifrin v. Forest City Ents., Inc.*, 597 N.E.2d 499 (Ohio 1992); *see also Neuro-Commc'n Servs., Inc. v. Cincinnati Ins. Co.*, 219 N.E.3d 907, 913 (Ohio 2022) (rejecting plaintiff's attempted introduction of parol evidence to *create* ambiguity in the contract) (emphasis original).   As discussed above, the Agreement is clear on its face, and thus parol evidence should not be considered.

31.      Nevertheless, the Reorganized Debtors cite a lower appellate court decision, *Consolidated Management, Inc. v. Handee Marts*, to try an end-run around the parol evidence rule based on the "rule of practical construction."  Supp. Br. ¶ 19.  A closer examination of that case, however, reveals that the rule of practical construction is used by a court *only after* a court finds that the contractual provision at issue is ambiguous.  Indeed, in *Consolidated Management*, the trial court had concluded the terms at issue were ambiguous before relying on the practical

---

it imposed joint liability on the various Enron parties. *Reliant Energy Servs., Inc. v. Enron Canada Corp.*, 349 F.3d 816, 822 (5th Cir. 2003).  Specifically, the court held that the netting agreement was ambiguous as to whether certain amounts were a joint obligation of the members of the "group from whom such payment is due" because that phrase was subject to multiple reasonable interpretations. *Id.* at 825.  Matters were also complicated by a netting agreement and an underlying master agreement. *Id.*

The Reorganized Debtors also attempt to argue that, even if Agreement imposes joint liability, the parties' conduct (*i.e.*, Kenco's sending invoices to Invacare Corporation) "manifest[ed] a modification of the original agreement[.]"  Supp. Br. ¶ 34.  This is a blatant end-run around the parol evidence rule.  First, Section 16 of the Agreement (**Ex. 1 – Agreement pg. 8 of 21 § 16**) specifically provides that notices are to be sent to Invacare Corporation and, as mentioned above, this is a typical practice.  There is nothing unusual about a contract where a single point of contact is identified for a group of affiliated co-obligors.  Sending invoices to the designated point of contact cannot be construed as a release of co-obligors from liabilities.  Indeed, Section 15 of the Agreement is a "Nonwaiver" provision that provides "[f]ailure of either party to insist upon performance of any of the terms and conditions or provisions of this Agreement, or to exercise any right or privilege herein, *shall not* be construed as thereafter waiving any such terms, conditions, provisions, rights or privileges….".  (**Ex. 1 – Agreement pg. 8 of 21 § 15**) (emphasis added).  Finally, even if it was appropriate to consider parol evidence, the ordinary course dealings between Kenco and the SHIPPER cannot be claimed to manifest contrary intention on the issue of joint liability because that issue only arises in a situation where Kenco is *exercising remedies*.  The course of dealings prior to that time is irrelevant.

construction rule. *Consolidated Management v. Handee Marts,* 671 N.E.2d 1304, 1308 (Ohio Ct. App. 1996) ("Hardee Marts contends that the trial court erred in applying the rule of practical construction to the lease *based on its finding that the terms of the lease were ambiguous…*") (emphasis added).[21]

32.     There is no Ohio case law where a court relied upon the rule of practical construction to relieve itself from the obligations to examine the contract and to strive to construe it as a whole before declaring a term to be ambiguous.[22]  The Ohio Supreme Court has stated a court must first find that the contract is ambiguous *before* evaluating course of performance to reconcile those ambiguities. *St. Marys v. Auglaize Cty. Bd. of Commrs.*, 875 N.E.2d 561, 568 (Ohio 2007) (affirming appellate court's decision which found contract ambiguous regarding certain obligations of the parties and, to resolve those ambiguities, examined the course of the parties' performance to give meaning to the ambiguous terms); *State ex rel. Burgess & Niple v. Linzell*, 93 N.E.2d 9, (Ohio 1950) (holding that when the provisions of a contract are ambiguous, a court may look to the performance of the parties).  The Northern District of Ohio further explained, "[The Court] may use the parties' course of performance to create a practical construction of a contract's ambiguous terms.  That is, where a term could be read two ways, the Court can take the parties' own reading of it—their practical construction of it—as authoritative." *Ragen v. Hancor, Inc.*, 920 F. Supp. 2d 810, 830 (N.D. Ohio 2013) (citations omitted); *see also Dannemiller Grocery Co. v. Bessler Disappearing Stairway Co.*, 1931 WL 2161, at *2 (Ohio Ct.

---

[21]     The language quoted by the Reorganized Debtors at ¶ 19 of their Supplemental Brief originates from an Ohio legal encyclopedia, Ohio Jurisprudence 3d, not from a decision of any court.  At most, the Court of Appeals in *Consolidated Management* was inappropriately pointing to the dispute between the parties (evident in the record before it) for purposes of bolstering its affirmance of the trial court's finding of an ambiguity, but it most certainly did not say that the rule of practical construction can be used by a trial court for purposes of finding ambiguity.

[22]     If such a case existed, Kenco presumes the Reorganized Debtors would give it more focus than a two sentence paragraph.

App. Oct. 17, 1931) ("Where the meaning of a contract is clear, there is no need for practical construction. The ambiguity must arise from the language of the contract itself and courts will not admit parole testimony to construe an ambiguity forced into the contract to strain the apparent meaning of the language."). These cases demonstrate that a court must find the agreement ambiguous before looking at course of performance.[23] Thus, because the Agreement is clear on its face, and the issue of Affiliate liability does not turn on course of performance, parol evidence should not be considered.[24]

33. The Reorganized Debtors further argue that this dispute mirrors *Transportation Ins. Co. v. Busy Beaver Bldg. Centers, Inc.*, 969 F. Supp. 2d 875, 889 (S.D. Ohio 2013). In citing *Transportation Ins. Co.*, the Reorganized Debtors again skip over the principle that a court may only consider extrinsic evidence when the contract language is ambiguous. The Southern District of Ohio stated, "A court may look to the parties' course of conduct as evidence of their construction of a contract when the contract language is unclear. . . [if the] language is clear and unambiguous, however, courts may not create a new contract by finding an intent not expressed by the contractual language." *Transportation Ins. Co.*, 969 F. Supp. 2d at 888. The court found the insurance policies

---

[23]   Ohio law does not allow for self-serving *post hoc* assertions of ambiguity when a contract is clear on its face. As the Sixth Circuit Court of Appeals has stated:

> Ohio law does not require contracting parties to share a subjective meeting of the minds to establish a valid contract; otherwise, no matter how clearly the parties wrote their contract, one party could escape its requirements simply by contending that it did not understand them at the time. What it does require is that the terms of the agreement establish an objective meeting of the minds, which is to say that the contract was clear and unambiguous.

*216 Jamaica Avenue, LLC v. S & R Playhouse Realty Co.*, 540 F.3d 433, 440 (6th Cir. 2008).

[24]   The Reorganized Debtors argue that the "preponderance of provisions" that identify "SHIPPER" as Invacare Corp., combined with the parties' course of performance, "overwhelmingly" shows that "SHIPPER" means only Invacare Corporation. *See* Supp. Br. ¶ 28. This hyperbolic statement should be disregarded because several phrases in a twenty page contract are not a preponderance, and the parties' course of conduct is irrelevant on the issue of determining liability. It is also of no moment that the Reorganized Debtors seek to introduce extrinsic evidence by way of invoices from 2021 (Ex. J) and a recent declaration from Mr. Hughes (Ex. H).

ambiguous, which made consideration of the parties' course of performance appropriate.  *Id.* at fn. 24.  Here, the Agreement is unambiguous, so consideration of extrinsic evidence is unnecessary.

34.     The Reorganized Debtors' effort, throughout their pleadings, to introduce information outside the four corners of the Agreement is an improper attempt to interject ambiguity where none exists.  The Agreement is clear and unambiguous, and thus extrinsic evidence should be excluded.

### F.     The Reorganized Debtors' Extrinsic Evidence is Not Dispositive.

35.     Even if, at the conclusion of the April 12 hearing, the Court were to conclude somehow that the Agreement is ambiguous as to whether the term SHIPPER includes the Affiliates such that the Affiliates are parties to the Agreement, the parties will have to engage in discovery in connection with developing evidence in support of their competing positions.[25]

36.     While consideration of extrinsic evidence will not take place on April 12, Kenco would be remiss not to point out the abject frailty of the extrinsic evidence proffered by the Reorganized Debtors.

37.     The Reorganized Debtors spend much time bemoaning the parties' course of conduct.  Supp. Br. ¶¶ 20-26.  For example, the letter of authorization introduced improperly by the Reorganized Debtors has no bearing on the liability of the Affiliates.  Supp. Br. ¶ 20 (Ex. M).  That letter is nothing more than what it is: a draft letter of authorization in email format stating that Kenco is allowed to act on Invacare's behalf, which is something Kenco could provide to

---

[25]     The parties agreed to defer engaging in discovery on any matter until resolution of this issue.

motor carriers as proof of authority.  *See* (Ex. M).  To say that it is contemporaneous evidence that shows Kenco understood Invacare was the only party to the Agreement strains credulity.[26]

38.     Similarly, the Reorganized Debtors suggest the Affiliates are not liable because Kenco directed its invoices to Invacare, and Kenco identifies only "Invacare Corporation" as the sole "Customer Name" in the invoices attached to its Amended Claims.  Supp. Br. ¶¶ 21-22.  Both contentions fall flat in light of the plain language of the Agreement.  Pursuant to Section 16 of the Agreement, "all notices required or permitted to be given under this Agreement shall be in writing…and shall be addressed as follows: (SHIPPER) Invacare Corporation, VP NA Operations, 1 Invacare Way, Elyria, OH 44035."  (**Ex. 1 – Agreement pg. 8 of 21 § 16**).  Kenco therefore was sending its invoices as directed by the notice provision of the Agreement, and the records attached to the Amended Claims reflect that.

39.     Finally, the fact Kenco filed suit only against Invacare Corporation prior to the Petition Date does not mean Kenco waived its rights against any other party.  Section 15 of the Agreement is a nonwaiver provision which ensures that the terms and conditions of the Agreement cannot be modified by the actions of the parties.  (**Ex. 1 – Agreement pg. 8 of 21 § 15**).  Thus, Kenco's right to pursue the Affiliates was not waived when it sued Invacare prepetition.

## II.     Kenco is Owed Management Fees for the Termination Notice Period.

40.     The Reorganized Debtors next claim that Kenco cannot seek management fees post termination for a few reasons, each of them is incorrect.[27]

---

[26]     Curiously, the email attached to the Reorganized Debtors' Supplemental Brief as Exhibit M only identifies locations of Invacare Corporation and Affiliates with *Invacare* in their names.  The email does *not* include the locations of the Affiliates that do not include the word "Invacare" in their name.

[27]     The Reorganized Debtors dispute liability for management fees for the 180-day notice period.  However, they have never argued, assuming they were liable for such fees, that Kenco could have mitigated such damages.  Mitigation of damages is an affirmative defense under Ohio law where the burden lies with the defendant.  *Jindal Builders & Restoration Corp. v. Brown & Cris, Inc.*, 1997 WL 674621, at *1 (Ohio Ct. App. Oct. 31, 1997) ("Mitigation is an affirmative defense in Ohio.  The burden of proving that the nonbreaching party failed to mitigate its damages is on the breaching party." (citation omitted)).  Moreover,

41.    *First*, the Reorganized Debtors assert that post-termination fees are unavailable because on January 31, 2023, the day after Kenco submitted its 180-day termination notice, the Reorganized Debtors issued their own notice, directing Kenco to cease providing further transportation services to "Invacare or any of its affiliates" (*i.e.* Shipper).  (**Ex. 2 – January 31 Letter**).  The Reorganized Debtors argue that because Kenco provided no further services, Kenco cannot recover those fees.  The Reorganized Debtors are confusing liability with damages.

42.    Section 10 of the Agreement is a termination provision, which outlines that *either party* may terminate, without cause, upon 180 days' (roughly six months) notice.  (**Ex. 1 – Agreement pg. 7 of 21 § 10(A)**).  Further, Section 10 also provides for circumstances in which either party may terminate *immediately*.  *Id.*  Indeed, Section 10(C) provides that in the event of one party's insolvency or bankruptcy, *the non-defaulting party may terminate* upon written notice to the other party.  *Id.* at § 10(C).  Here, Kenco opted to terminate under Section 10(A), without cause and upon 180-days' notice.  (*See* **Ex. C – Kenco Termination Letter**).  When Kenco sent this letter, Kenco made clear that under Section 10, the Agreement would terminate effective July 29, 2023.  Thus, following Kenco's notice of termination, the Agreement was still effective for the remaining, unexpired notice period.

---

to the extent that the Court finds the Reorganized Debtors did not waive this affirmative defense, mitigation of damages is not a defense to liability, and whether Kenco mitigated is an issue of fact that bears only on the amount of damages.  *Infocision Mgmt. Corp. v. Found. for Moral L. Inc.*, 2011 WL 3022002, at *7 (N.D. Ohio July 22, 2011) ("While a failure to mitigate is an affirmative defense which limits the amount of damages a plaintiff can recover, it is not a defense to liability." (citation omitted)).

Considering that Kenco's Response has been on file for over 7 months and the chapter 11 plan deadline to object to claims has expired, the Reorganized Debtors should not be allowed to inject a new theory into this contested matter at this point.  *See, e.g.*, *Portage Cmty. Bank v. Fazio*, 2017 WL 2951841, at *4 (Ohio Ct. App. July 10, 2017) ("Failure to mitigate damages is an affirmative defense that is waived if it is not raised in a party's pleading."); *see also* [ECF No. 715 – *Order Extending the Claims Objection Deadline to February 2, 2024*].

43.     When Invacare directed Kenco to cease all services on January 31, 2023 (presumably because it was not going to pay)—and when the Reorganized Debtors formally rejected the Agreement in these bankruptcy cases—this was an anticipatory breach of the Agreement because neither Section 10, nor any other provision of the Agreement allowed for Invacare to effectively terminate immediately under the circumstances.  *See, e.g., Sunesis Trucking Co. v. Thistledown Racetrack, L.L.C.*, 22 N.E.3d 190, 195 (Ohio Ct. App. 2014) ("An anticipatory breach of contract by a promisor is a repudiation of the promisor's contractual duty before the time fixed for performance has arrived."  (citations and quotations omitted).  As such, Kenco was not obligated to perform any further services to be entitled to damages caused by this breach, which includes management fees for the unexpired term of the Agreement.  *Id* at ¶ 196 ("If an anticipatory breach of contract is found to occur, the injured party has the option of (1) terminating the contract and suing the breaching party immediately, or (2) continuing the contract and suing the breaching party for damages after the time for performance has passed." (citing 18 Ohio Jurisprudence 3d Contracts, Section 238 (2011); *S.E. Land Dev. Ltd. v. Primrose Mgmt. L.L.C.*, 952 N.E.2d 563 (Ohio Ct. App. 2011); 11 U.S.C.A. § 365 ("[T]he rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease…").[28]

44.     ***Second***, the Reorganized Debtors assert that Invacare had a right to demand that Kenco cease performing all services, essentially terminating the Agreement effective immediately, because this notice period was for Invacare's sole benefit and, therefore, Invacare had the right to unilaterally waive it.  However, this is both factually and legally incorrect.

---

[28]     The policy underlying generally imposing a 180-day notice period before termination is to provide both parties with predictability.  On the one hand, immediate termination by Kenco would be highly disruptive to the SHIPPER's supply chain.  On the other hand, immediate termination by the SHIPPER would be highly prejudicial to Kenco in light of Kenco's capital expenditures and human resources allocated to serving the SHIPPER's account and the associated implications that immediate termination would have for the same including, not limited to, severance payment obligations to members of Kenco's workforce.

45.     The termination provisions in Section 10 of the Agreement are mutual—both sides had the ability to terminate without cause on notice.  (**Ex. 1 – Agreement pg. 7 of 21 § 10(A)**).  The Reorganized Debtors baldly state that that the notice period was for Invacare's sole benefit because it had "the right to continue using Kenco's services for six more months" and that "Kenco cannot claim that it needed time to get its affairs in order."  Supp. Br. ¶ 38.  But this does not explain why the notice period was *also* not to Kenco's benefit.  Indeed, Kenco certainly had the right to continue earning its management fees for six more months.  Further, the Reorganized Debtors offer no support for their conclusory assertion that Kenco did not need "time to get its affairs in order."  To the contrary, by notifying Invacare when it did, Kenco was giving itself 180-days to wind down business and move on.  Thus, the six-month notice provision does not solely benefit Invacare, and therefore Invacare did not have the right to unilaterally waive it.

46.     Moreover, the only law cited in support of the Reorganized Debtors' position is a treatise and a single case, both of which are inapt.  *Am. Select Ins. Co. v. Stopar*, 1992 WL 369254 (Ohio Ct. App. Dec. 10, 1992) is non-analogous because it dealt with waiver of a contractual provision in the context of an insurer, rather than termination of a service contract.  There, the court explained that provisions in insurance policies "in respect of notice and proofs of loss…are inserted for the benefit of the insurer" and explained that such provisions "may be waived by the insurer in a case in which it has knowledge of the facts."  *Id.*  Thus, *Stopar* is distinguishable because that notice period had to do with informing an insurance carrier of a loss (of which it was already aware), not a notice of termination of a service contract with monthly fees—these are entirely different kinds of notice provisions, which service different purposes.  Further, a continued reading of the selected text from Williston on Contracts entirely undermines the Reorganized Debtors' position.  Williston continues that "a waiver of contract requirements and conditions *may*

20

*not be made unilaterally when it would deprive the nonwaiving party of a benefit* under the provision in question." 13 Williston on Contracts § 39:24 (4th ed.) (emphasis added).

47.     Here, Invacare's unilateral waiver of the six-month notice period certainly deprived Kenco of a benefit under the provision in question—its right to collect six months of management fees under the Agreement while it wraps up its business with Invacare.  Further, Williston also explains that if "the express language of the contract unambiguously indicates that a term protects both parties, extrinsic evidence is inadmissible to show that the provision was inserted to protect only the party alleged to have waived its protection."  *Id.*  As explained above, the termination provisions and requisite notice periods are mutual and therefore expressly protect both Kenco and Invacare.  As a result, extrinsic evidence is inadmissible to prove that Invacare had the right to unilaterally terminate.  Thus, the Reorganized Debtors' assertion that Invacare had the right to waive the six-month notice provision, and terminate immediately, is both legally and factually incorrect.

48.     Further, the Debtors' own conduct constitutes an admission of liability for the six months of management fees.  A day after Debtors informed Kenco that it would not accept further services, Debtors notified Kenco that they would be seeking to reject the Agreement in the bankruptcy proceeding.  (**Ex. 4 – February 1 Letter**).  Shortly thereafter, the Reorganized Debtors moved this Court for an order authorizing the rejection of the Agreement, which this Court granted. [ECF Nos. 176, 303].  Certainly, had the Debtors believed that the prior written direction to Kenco to cease further services was permissible termination sufficient to cut off liability for further management fees under the Agreement, a Court order formally rejecting the Agreement would be unnecessary.  And, of course, by rejecting the Agreement in this action, the Reorganized Debtors have now admitted that they have breached the Agreement.  *See Mission Product Holdings, Inc.*

*v. Tempnology, LLC*, 139 S. Ct. 1652, 1657 (2019) ("A rejection breaches a contract but does not rescind it.  And that means all the rights that would ordinarily survive a contract breach ... remain in place."); 11 U.S.C.A. § 365 ("[T]he rejection of an executory contract…of the debtor constitutes a breach of such contract…").

49.     Finally, a review of the four-corners of the Agreement indicates that Kenco is permitted to recover management fees for the six-month notice period.  The Agreement and SOW provide for Kenco's monthly management fees, which are fixed fees.  (**Ex. 1 – Agreement pg. 7 of 21 § 10, pg. 15 of 21**).  The Agreement also provides for early termination by either party under specified circumstances.  (**Ex. 1 – Agreement pg. 7 of 21 § 10**).  Kenco permissibly opted to terminate under Section 10(A)—termination without cause on 180-days' notice.  *Id*.  When Kenco sent its termination notice, the Agreement was still effective for the remaining, unexpired 180-day notice period and only terminated as of July 29, 2023.  The Agreement contains no provision stating that cancellation of the notice period—which Invacare and its affiliates had no legal right to do—excuses payment of Kenco's management fees.  "Money damages awarded in a breach of contract action are designed to place the aggrieved party in the same position it would have been in had the contract not been violated."  *State ex rel. Stacy v. Batavia Loc. Sch. Dist. Bd. of Edn.*, 829 N.E.2d 298, 305 (Ohio 2005) (citations and quotations omitted).  Indeed, awarding Kenco its fixed management fees for the six-month notice period would restore Kenco to the position it would have been in but for Invacare's breach.  In short, awarding these management fees is the only way to fulfill Kenco's expectation interest under the Agreement.

50.     Thus, Kenco may recover its management fees for the six-month notice period as contract damages.

**III.     Kenco Will Provide Proof Payment of Carrier Charges**.

51.     The Reorganized Debtors argue that the Court should order discovery into whether and to what extent Kenco has settled freight charges with carriers.  Supp. Br. ¶ 48.  As a preliminary matter, it should be noted the Reorganized Debtors' argument that Kenco is attempt to achieve a windfall recovery is too cute by half.  The Reorganized Debtors do not dispute that the SHIPPER is responsible for carrier charges under the Agreement.  However, in light of the bankruptcy, Kenco has been pursued by certain of these carriers for unpaid amounts.  Hence, Kenco has found itself attempting to negotiate modest settlements off *full* invoice amounts for which it will only recover 15% through the bankruptcy process.[29]  Hence, Kenco is seeking to limit further out of pocket loss rather than obtain a windfall recovery.[30]

52.     As discussed above, Kenco admits that it has paid certain carriers at modest agreed-upon discounts off the applicable invoices.  Kenco also admits that various carrier invoices have not yet been paid.  However, Kenco will remain at risk of being sued by carries for outstanding invoices until the applicable statutes of limitations pass.[31]  Kenco should not be put in a position where it needs to reach-out immediately to all unpaid carriers and arrange to pay them 100 cents on the dollar (or close thereto) in order to have an allowed claim that is only entitled to 15 cents on the dollar.  Rather, it should only have pay in order to resolve a meritorious carrier demand.[32]

---

[29]     If the Affiliates are not parties to the Agreement, Kenco's bankruptcy recovery will be limited to 5%.

[30]     The Reorganized Debtors' attempt to characterize these agreed-upon discounts as "rebates" that should be passed through to the SHIPPER is laughable considering the time and expense (*i.e.*, legal fees) that Kenco has expended in connection with fending off irate carriers.

[31]     Depending on the applicable state law, statutes of limitations for breach of contract claims can range from 3 to 10 years.

[32]     Kenco is not hereby admitting liability to any carrier for invoices for which Kenco did not receive payment from the SHIPPER, and reserves all rights in that regard.

53.     Therefore, a going-forward process where Kenco submits proof of payment in order to receive incremental distributions under the chapter 11 plan is appropriate.[33]  Kenco will agree to provide copies of cancelled checks, ACH/wire confirmations, or other suitable proof of payment along with a certification as which carrier invoice(s) the payment(s) applied.  Upon receipt of such proof and certification, the Reorganized Debtors shall promptly pay the concomitant incremental distribution to Kenco.  Nothing in the Bankruptcy Code precludes the Court from fashioning such an equitable mechanism for the allowance of Kenco's claims as to the carrier charges.

**IV.     Kenco's Amended Claims are Timely**.

54.     The issue of timeliness of Kenco's Amended Claims requires discovery and (most likely) an evidentiary hearing because the Reorganized Debtors do not acknowledge that Kenco had no visibility as to whether or not Invacare Corporation and its Affiliates paid certain carriers that historically had been paid directly through Invacare's RateLinx platform.

55.     As such, the issue of timeliness shall not be addressed at the April 12 hearing which the parties have agreed shall not be a contested evidentiary hearing or deal with matters where discovery is necessary.  Nonetheless, Kenco is compelled to respond to the Reorganized Debtors' contention that the Amended Claims are untimely.

56.     The Reorganized Debtors contend that Kenco failed to offer a reason why it filed the Amended Claims.  Supp. Br. ¶ 41.  This statement ignores the language of the Amended Claims.  In the Original Claims, Kenco sought amounts owed for prepetition management fees, post-termination management fees, and carrier charges, which were due and owing prior to the

---

[33]     For the avoidance of doubt, and as noted above, this mechanism only applies to Kenco's recoveries from the Reorganized Debtors for carrier charges.  With respect to the non-debtor Affiliates, Kenco will seek to recover the full amount of the carrier charges (less any partial recoveries received from the Reorganized Debtors) from the non-debtor Affiliates irrespective of whether Kenco has paid such amounts because, upon collection from the non-debtor Affiliates, Kenco will pay such amounts to the relevant carriers (*i.e.*, there will be no windfall or double recovery to Kenco).

Petition Date as of January 21, 2023.  In the Amended Claims, Kenco seeks slightly increased amounts owed for the prepetition and post-termination management fees, increased U.S. carrier charges, plus a relatively small amount of Canadian carrier charges.  The prepetition management fees were increased by $163,112.12 to account for additional parcel and claim fees – pursuant to Section 2 - Bullet Points 10-11 of Statement of Work No. 1 – because these fees did not become known to Kenco until after the claims bar date.  (*See* **Ex. 1 – Agreement pg. 15 of 21**).  Similarly, the increased carrier charges became known to Kenco only when, after the claims bar date, it was contacted by numerous carriers who had not been paid by Invacare and its affiliates.

57.     The Amended Claims are not new claims, as the theories of recoveries are identical in both the Original and Amended Claims.  Accordingly, a close nexus exists between the Original and Amended Claims sufficient to support amendment.  *See, e.g.*, *In re iHeartMedia, Inc.*, 2019 WL 1590546, at *2 (Bankr. S.D. Tex. Apr. 12, 2019).

58.     Finally, Kenco did not unduly delay filing the Amended Claims.  Indeed, Kenco has met its burden to show that its delay in filing the Amended Claims was due to excusable neglect.  *See* Response fn. 11; *see also In re DePugh*, 409 B.R. 84, 100-01 (Bankr. S.D. Tex. 2009).  Kenco moved expeditiously to file the Amended Claims less than 45 days after the claims bar date and two days prior to the Confirmation Hearing to update the outstanding balance of fees and charges due and owing to Kenco under the Agreement.  As such, Kenco's Amended Claims were submitted timely.

## <u>CONCLUSION</u>

WHEREFORE, Kenco respectfully requests that, at the conclusion of the April 12, 2024 hearing, the Court enter one or more orders:

a.      Declaring the Affiliates[34] to be liable parties under the Agreement;

b.      Declaring Kenco to be entitled to the management fees provided under the Agreement for the 180-day period following January 30, 2023;

c.      Approving the proposed "proof of payment" process for allowance of, and distributions on, Kenco's claims for carrier charges;

d.      Scheduling a status conference approximately two weeks after the April 12 hearing (or such other time that is convenient for the Court) to discuss the remaining issues (including the timeliness of the Amended Claims and any prove-up of amounts) and case scheduling; and

e.      Providing such further relief as is appropriate.

---

[34]      As discussed above, the Affiliates are: (i) Invamex, S. de R.L. de C.V. Mexico; (ii) Invacare Canada L.P.; (iii) Adaptive Switch Laboratories, Inc.; (iv) Freedom Designs, Inc.; (v) Medbloc, Inc.; (vi) Motion Concepts L.P.; and (vii) Perpetual Motion Enterprises Limited.

Dated: April 8, 2024

Respectfully submitted,

**BENESCH, FRIEDLANDER,**
      **COPLAN & ARONOFF LLP**

*/s/ Sven T. Nylen*

Sven T. Nylen (admitted *pro hac vice*)
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606-4637
Telephone: (312) 212-4949
Email: snylen@beneschlaw.com

*-and-*

John C. Gentile (admitted *pro hac vice*)
1313 North Market Street, Suite 1201
Wilmington, Delaware 19801
Telephone: (302) 442-7010
Email: jgentile@beneschlaw.com

*-and-*

Deana S. Stein
127 Public Square, Suite 4900
Cleveland, Ohio 44114
Telephone: (216) 363-4500
Email: dstein@beneschlaw.com

*Counsel to Kenco Transportation Management, LLC*

**<u>CERTIFICATE OF SERVICE</u>**

I, Sven T. Nylen, hereby certify that on the 8th day of April, 2024, a copy of the foregoing Supplemental Brief was served via the Court's CM/ECF system upon all parties registered to receive such service.

*/s/ Sven T. Nylen*_____

Sven T. Nylen (admitted *pro hac vice*)
